Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Roland Tellis (186269)
Mark Pifko (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2320
Facsimile:   (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

*Plaintiffs' Interim Co-Lead Counsel*

[Additional Counsel listed on
Signature Page]

Adam J. Levitt (*pro hac vice*)
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone:    (312) 214-0000
Facsimile:    (312) 214-0001
alevitt@gelaw.com

Joseph G. Sauder (*pro hac vice*)
Matthew D. Schelkopf (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone:   (610) 642-8500
Facsimile:    (610) 649-3633
JGS@chimicles.com
MDS@chimicles.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. 13-cv-3072-EMC<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hearing Date:     April 3, 2014<br>Time:               1:30 p.m.<br>Judge:             Hon. Edward M. Chen<br>Courtroom:       5<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 2

  A. The defective SYNC system in the Class Vehicles ........................................ 2

  B. The TSBs and warranty extension .................................................................. 4

  C. Consumers' similar experiences and complaints ........................................... 6

III. LEGAL STANDARD ................................................................................................ 6

IV. ARGUMENT ............................................................................................................. 7

  A. Plaintiffs plead affirmative misrepresentations ............................................. 7

    1. The FAC puts Ford on notice of the misrepresentations at issue in this action. ................................................................................................. 8

    2. Ford's marketing misrepresentations are not puffery ........................... 9

    3. The Court may impute misrepresentations of authorized Ford dealerships to Ford .................................................................................................. 10

    4. Ford's warranty statements are misrepresentations ............................ 11

    5. The FAC pleads fraudulent omissions. ............................................... 12

    6. Ford failed to disclose the existence of MyFord Touch defects known to Ford that impact the safety of the Class Vehicles. .......................... 12

      a. The defects ................................................................................. 12

      b. The defects' safety-related consequences ................................. 13

      c. Ford's knowledge of the defects ............................................... 16

        (1) Technical Service Bulletins ........................................... 17

        (2) Consumer complaints ..................................................... 18

        (3) Technicians' statements .................................................. 19

    7. Ford actively concealed the existence of MyFord Touch defects. .................. 21

    8. Ford's partial representations about MyFord Touch triggered a duty to disclose the defects. ............................................................................ 22

  B. Plaintiffs' Iowa, Texas, and Virginia consumer-fraud claims are not time barred. .... 24

  C. Ford's argument that the economic-loss rule bars Plaintiffs' claims is meritless. ...... 26

- i -

1     1. Plaintiff Sheerin's Colorado claims are not barred. ........................................27

2     2. Plaintiff Oremland's tort claims under Florida law are not barred. ...............29

3     3. Plaintiff Fink's tort claims under North Carolina law are not barred.............30

4     4. Plaintiff Zuchowski's negligence claim under Ohio law is not barred. ..........31

5   D. The FAC pleads a plausible claim for breach of express warranty............................32

6     1. The FAC alleges sufficient detail establishing that Plaintiffs had malfunctioning, defective MyFord Touch systems in their vehicles that Ford
7       was unable to fix..............................................................................................32

8     2. Ford's New Vehicle Limited Warranty was part of every bargain because Ford promised the warranty to each purchaser as part of each transaction.....34
9
     3. To the extent applicable, Plaintiffs have satisified the U.C.C. notice
10       requirements. ...................................................................................................37

11     4. Lack of direct privity does not require dismissal of Plaintiffs' common-law breach-of-warranty claim under Arizona law.................................................38
12
   E. Plaintiffs properly state breach-of-implied-warranty claims.......................................39
13
     1. Class vehicles equipped with the MyFord Touch system do not conform to
14       their ordinary, intended use. ...........................................................................39

15     2. The Alabama, California, and North Carolina implied-warranty-of-merchantability claims are not barred by the absence of privity.....................41
16
       a. Plaintiff Battle can cure her implied-warranty claim under Alabama
17        law by amendment..............................................................................41

18       b. The California Plaintiffs may bring implied-warranty-of-merchantability claims despite a lack of privity with Ford. ................42
19
       c. Privity is not required for implied-warranty-of-merchantability
20        claims under North Carolina law........................................................43

21     3. Notice is either not required or has been given because Ford knew of the defects in the MyFord Touch System and concealed them from Plaintiffs ....44
22
   F. Ford's scattershot arguments challenging the FAC's Magnuson-Moss Warranty Act
23     claim fail..........................................................................................................................45

24   G. Plaintiff Makowski's waiver .........................................................................................47

25   H. The FAC alleges that Ford, without proper public notification, extended its Limited Warranty to cover the continuing malfunctioning of the MyFord Touch system,
26     thereby alleging a California secret-warranty claim .....................................................47

27 V. CONCLUSION ...........................................................................................................................50

28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.C. Excavating v. Yacht Club II Homeowners Ass'n,*
114 P.3d 862 (Colo. 2005) ...................................................................................28

*Aguilar v. General Motors, LLC,*
2013 U.S. Dist. LEXIS 149108 (E.D. Cal. Oct. 16, 2013)...................................18

*Am. Honda Motor Co. v. Cerasani,*
955 So. 2d 543 (Fla. 2007) .............................................................................45, 46

*Anunziato v. eMachines, Inc.,*
402 F. Supp. 2d 1133 (C.D. Cal. 2005) ..............................................................42

*Apodaca v. Whirlpool Corp.,*
2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013) ...............................7, 22

*Arnold v. Dow Chem. Co.,*
91 Cal. App. 4th 698 (2001) .................................................................................42

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .........................................................................................7, 16

*Baier v. Ford Motor Co.,*
2005 U.S. Dist. LEXIS 17338 (N.D. Iowa Apr. 21, 2005) ..................................24

*Banks v. Nissan N. Am., Inc.,*
2012 U.S. Dist. LEXIS 37754 (N.D. Cal. Mar. 20, 2012) ...................................20

*Barr v. Prudential-Bache Secur., Inc.,*
1991 U.S. App. LEXIS 30014 (9th Cir. Dec. 12, 1991) ......................................25

*Berenblat v. Apple, Inc.,*
2009 U.S. Dist. LEXIS 80734 (N.D. Cal. Aug. 21, 2009) ...................................39

*Bernick v. Jurden,*
293 S.E.2d 405 (N.C. 1982) ............................................................................35, 43

*Board of Dirs. of Bay Point Condominium Ass'n, Inc. v. RML Corp.,*
2002 Va. Cir. LEXIS 10 (Va. Cir. Ct. Jan. 28, 2002) ..........................................37

*Bradbury v. DaimlerChrysler Corp.,*
2007 WL 6930486 (Mass. Super. Ct. Sept. 18, 2007)..........................................33

*Brody v. Bock,*
897 P.2d 769 (Colo. 1995) ...................................................................................28

- iii -

*Burns v. Winnebago Indus., Inc.*,
  2013 U.S. Dist. LEXIS 116377 (M.D. Fla. Aug. 16, 2013) ............................................. 29, 30

*Bussian v. DaimlerChrysler Corp.*,
  411 F. Supp. 2d 614 (M.D.N.C. 2005) ..................................................................... 35

*Calloway v. City of Reno*,
  993 P.2d 1259 (Nev. 2000) ................................................................................. 26

*Carter v. Brighton Ford, Inc.*,
  251 P.3d 1179 (Colo. App. 2010) ........................................................................ 27

*Cartwright v. Viking Indus., Inc.*,
  249 F.R.D. 351 (E.D. Cal. 2008) ......................................................................... 42

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*,
  537 N.E.2d 624 (Ohio 1989) ......................................................................... 32, 37

*Cholakyan v. Mercedes-Benz USA, LLC*,
  796 F. Supp. 2d 1220 (C.D. Cal. 2011) ................................................................... 49

*Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*,
  656 F. Supp. 49 (S.D. Ohio 1986) .................................................................... 31, 32

*Cirulli v. Hyundai Motor Co.*,
  2009 U.S. Dist. LEXIS 125139 (C.D. Cal. June 12, 2009) ................................................. 49

*Clark v. LG Elecs. USA, Inc.*,
  2013 U.S. Dist. LEXIS 155179 (S.D. Cal. Oct. 29, 2013) ......................................... 18, 19, 23

*Clemens v. DaimlerChrysler Corp.*,
  534 F.3d 1017 (9th Cir. 2008) ....................................................................... 42, 43

*Club Car, Inc. v. Dow Chem. Co.*,
  2007 NCBC LEXIS 10, at *9 (N.C. Super. Ct. May 3, 2007) ................................................. 31

*Coastal Leasing Corp. v. O'Neal*,
  405 S.E.2d 208 (N.C. Ct. App. 1991) ..................................................................... 44

*Cohen v. Am Gen. Corp.*,
  264 F. Supp. 2d 616 (N.D. Ill. 2003) ............................................................. 45, 46, 47

*Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.*,
  753 So. 2d 1219 (Fla. 1999) ............................................................................. 30

*Computer Network, Inc. v. AM Gen. Corp.*,
  696 N.W.2d 49 (Mich. Ct. App. 2005) ..................................................................... 33

*Cook, Perkiss and Liehe, Inc. v. Northern Cal. Coll. Serv. Inc.*,
  911 F. 2d 242 (9th Cir. 1990) ............................................................................ 9

- iv -

*Cooley v. Big Horn Harvestore Sys., Inc.*,
    813 P.2d 736 (Colo. 1991) ............................................................................ 37

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
    2013 U.S. Dist. LEXIS 63260 (C.D. Cal. Apr. 24, 2013) ...................................... 49

*Cuviello v. City & Cnty. of San Francisco*,
    940 F. Supp. 2d 1071 (N.D. Cal. 2013) .................................................................. 7

*Daniel v. Ford Motor Co.*,
    2013 U.S. Dist. LEXIS 80638 (E.D. Cal. June 6, 2013) ...................................... 22

*Date v. Sony Elecs., Inc.*,
    2010 U.S. Dist. LEXIS 96870 (E.D. Mich. Sept. 16, 2010) ........................... 40, 41

*Decker v. Mazda Motor of Am., Inc.*,
    2011 U.S. Dist. LEXIS 124182 (C.D. Cal. Oct. 24, 2011) ...................................... 20

*Dekelaita v. Nissan Motor Corp. in United States*,
    799 N.E.2d 367 (Ill. App. Ct. 2003) .................................................................... 47

*Delawder v. Am. Woodmark Corp.*,
    178 Fed. Appx. 197 (4th Cir. 2006) ...................................................................... 33

*Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*,
    693 So. 2d 602 (Fl. Ct. App. 1997) ...................................................................... 30

*Department of Fair Empl. & Hous. v. Law Sch. Admission Council Inc.*,
    896 F. Supp. 2d 849 (N.D. Cal. 2012) .................................................................... 7

*DiCintio v. DaimlerChrysler Corp.*,
    768 N.E.2d 1121 (N.Y. 2002) ......................................................................... 46, 47

*Ehrlich v. BMW of North Am., LLC*,
    801 F. Supp. 2d 908 (C.D. Cal. 2010) ............................................. 18, 22, 43, 49

*Ellis v. Louisiana-Pac. Corp.*,
    2011 U.S. Dist. LEXIS 129378 (W.D.N.C. Nov. 8, 2011),
    *aff'd*, 699 F.3d 778 (4th Cir. 2012) ............................................................... 30, 31

*Ellis v. Louisiana-Pac. Corp.*,
    699 F.3d 778 (4th Cir. 2012) ............................................................................... 31

*Falco v. Nissan North America, Inc.*,
    2013 U.S. Dist. LEXIS 147060 (C.D. Cal. Oct. 10, 2013) ............................... 17, 18

*Falk v. Gen. Motors Corp.*,
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) .................................................................. 7

- v -

*Federal Ins. Co. v. Lazzara Yachts of N. Am., Inc.*,
   2010 U.S. Dist. LEXIS 28865 (M.D. Fla. Mar. 25, 2010) ................................................ 37, 47

*Fleisher v. Fiber Composites, LLC*,
   2012 U.S. Dist. LEXIS 157343 (E.D. Pa. Nov. 2, 2012) ........................................................ 41

*Galitski v. Samsung Telecomms. Am., LLC*,
   2013 U.S. Dist. LEXIS 171908 (N.D. Tex. Dec. 5, 2013) ....................................................... 40

*Gilbert Fin. Corp. v. Steelform Contracting Co.*,
   82 Cal. App. 3d 65 (1978) ...................................................................................................... 42

*Giles v. GMAC*,
   494 F.3d 865 (9th Cir. 2007) .................................................................................................. 26

*Gonzalez v. Drew Indus. Inc.*,
   750 F. Supp. 2d 1061 (C.D. Cal. 2007) .................................................................................. 43

*Gray v. Toyota Motor Sales, U.S.A.*,
   2012 U.S. Dist. LEXIS 15992 (C.D. Cal. Jan. 23, 2012),
   *aff'd*, 2014 U.S. App. LEXIS 2197 (9th Cir. Feb. 5, 2014) .............................................. 23, 24

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
   2013 U.S. Dist. LEXIS 82746 (C.D. Cal. June 12, 2013) ....................................................... 18

*Guerrero v. Gen. Motors Corp.*,
   2008 U.S. Dist. LEXIS 119839 (E.D. Cal. Apr. 14, 2008) ..................................................... 11

*Hadar v. Concordia Yacht Builder, Inc.*,
   886 F. Supp. 1082 (S.D.N.Y. 1995) ....................................................................................... 34

*HDM Flugservice GmbH v. Parker Hannifin Corp.*,
   332 F.3d 1025 (6th Cir. 2003) ................................................................................................ 31

*Hearn v. R.J. Reynolds Tobacco Co.*,
   279 F. Supp. 2d 1096 (D. Ariz. 2003) .................................................................................... 37

*Hiigel v. Gen. Motors Corp.*,
   544 P.2d 983 (Colo. 1975) ...................................................................................................... 27

*Hobbs v. General Motors Corp.*,
   134 F. Supp. 2d 1277 (M.D. Ala. 2001) ........................................................................... 36, 37

*Horowitz v. Stryker Corp.*,
   613 F. Supp. 2d 271 (E.D.N.Y. 2009) ..................................................................................... 36

*HTP, Ltd. v. Lineas Aeras Costarricenses S.A.*,
   685 So. 2d 1238 (Fla. 1996) ................................................................................................... 30

- vi -

*Hydroxycut Mktg. Lit. & Sales Prac. Lit. v. Iovate Health Sciences Grp.*,
  801 F. Supp. 2d 993 (S.D. Cal. 2011) ................................................................ 36

*I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co.V, LLC*,
  2005 U.S. Dist. LEXIS 47041 (N.D. Cal. July 15, 2005) ................................. 26

*In re Bldg. Materials Corp. of Am.*,
  2013 U.S. Dist. LEXIS 61228 (D.S.C. Apr. 29, 2013) ..................................... 24

*In re Bridgestone/Firestone Inc. v. Wilderness Tires Prods. Liab. Litig.*,
  155 F. Supp. 2d 1069 (S.D. Ind. 2001),
  *rev'd on other grounds*, 288 F.3d 1012 (7th Cir. 2002) ................................ 44

*In re Ford Motor Co. Vehicle Paint Litig.*,
  1996 U.S. Dist. LEXIS 11063 (E.D. La. July 30, 1996) ................................... 31

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*,
  2013 U.S. Dist. LEXIS 105830 (S.D. Fla. 2013) .............................................. 38

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) ......................................................................................... 8

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices and Prods. Liab. Litig.*,
  890 F. Supp. 2d 1210 (C.D. Cal. 2011) ............................................................. 18

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
  2012 U.S. Dist. LEXIS 189744 (C.D. Cal. May 4, 2012) ........................... 46, 47

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,
  and Prods. Liab. Litig.*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010) ....................................................*passim*

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,
  and Prods. Liab. Litig.*,
  754 F. Supp. 2d 1208 (C.D. Cal. 2010) ............................................................. 19

*Isip v. Mercedes-Benz USA, LLC*,
  155 Cal. App. 4th 19 (2007) ............................................................................... 40

*Jekowsky v. BMW of N. Am., LLC*,
  2013 U.S. Dist. LEXIS 175374 (N.D. Cal. Dec. 13, 2013) ............................... 20

*Jensen v. BMW of North Am., Inc.*,
  41 Cal. Rptr. 2d 295 (Cal. Ct. App. 1995) ....................................................... 36

*Johnson v. Wal-Mart Stores, Inc.*,
  2013 U.S. App. LEXIS 22119 (9th Cir. Oct. 30, 2013) ...................................... 9

- vii -

*Keegan v. Am. Honda Motor Co.*,
 838 F. Supp. 2d 929 (C.D. Cal. 2012) ...................................................................39

*Keller v. A.O. Smith Harvestore Prods., Inc.*,
 819 P.2d 69 (Colo. 1991) ...........................................................................28, 29

*Kent v. Celozzi-Ettleson Chevrolet, Inc.*,
 1999 U.S. Dist. LEXIS 17282 (N.D. Ill. Nov. 3, 1999) ........................................11

*Kinlaw v. Long Mfg. N. C., Inc.*,
 259 S.E.2d 552 (N.C. 1979) ...................................................................................35

*LaBonte v. Ford Motor Co.*,
 1999 Ohio App. LEXIS 4795 (Ohio Ct. App., Oct. 7, 1999)................................33

*LaPuma v. Collinwood Concrete*,
 661 N.E.2d 714 (Ohio 1996) ...................................................................................32

*Lau v. Mercedes-Benz USA, LLC*,
 2012 U.S. Dist. LEXIS 11358 (N.D. Cal. Jan. 31, 2012).......................................11

*Long v. Graco Children's Prods.*,
 2013 U.S. Dist. LEXIS 121227 (N.D. Cal. Aug. 26, 2013) ...................................20

*Lucy v. Kia Motors Am., Inc.*,
 48 Va. Cir. 460 (1999).............................................................................................46

*LWT, Inc. v. Childers*,
 19 F.3d 539 (10th Cir. 1994) ............................................................................34, 35

*Mago v. Mercedes-Benz, U.S.A., Inc.*,
 142 P.3d 712 (Ariz. Ct. App. 2006) .......................................................................47

*Maietta v. Ford Motor Co.*,
 1997 U.S. Dist. LEXIS 3788 (N.D. Ill. Mar. 24, 1997) ...................................10, 11

*Mangold v. Nissan N. Am., Inc.*,
 809 N.E.2d 251 (Ill. App. Ct. 2004) .......................................................................47

*Marsikian v. Mercedes Benz USA, LLC*,
 2009 U.S. Dist. LEXIS 117012 (C.D. Cal. May 4, 2009).......................................48

*McAdams v. CitiFinancial Mortg. Co.*,
 2008 U.S. Dist. LEXIS 16094 (M.D. La. Mar. 3, 2008) ........................................25

*Mesa v. BMW of N. Am., LLC*,
 904 So. 2d 450 (Fla. Dist. Ct. App. 2005)..............................................................46

*Mickens v. Ford Motor Co.*,
 900 F. Supp. 2d 427 (D.N.J. 2012)..........................................................................12

- viii -

*Midwest Ford, Inc. v. C.T. Taylor Co.*,
    694 N.E.2d 114 (Ohio Ct. App. 1997) ........................................................... 32

*Mills v. Bristol-Myers Squibb Co.*,
    2011 U.S. Dist. LEXIS 90357 (D. Ariz. Aug. 11, 2011) ....................................... 36

*Morgan v. Harmonix Music Sys., Inc.*,
    2009 WL 2031765 (N.D. Cal. July 30, 2009) ................................................... 10

*Morris v. BMW*,
    2007 U.S. Dist. Lexis 85513 (N.D. Cal. Nov. 7, 2009)................................... 48, 49

*Mui Ho v. Toyota Motor Corp.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013)............................................... 17, 18, 21, 24

*Oestreicher v. Alienware Corp.*,
    544 F. Supp. 2d 964 (N.D. Cal. 2008), *aff'd,* 322 Fed. Appx. 489 (9th Cir. 2009) ............... 10

*Official Comm. of Admin. v. Bricker*,
    2010 U.S. Dist. LEXIS 99140 (N.D. Ohio Sept. 21, 2010) ................................. 25

*Pacific Indem. Co. v. Therm-O-Disc, Inc.*,
    476 F. Supp. 2d 1216 (D.N.M. 2006).......................................................... 13

*Parrot v. Daimlerchrysler Corp.*,
    130 P.3d 530 (Ariz. 2006) .................................................................. 46, 47

*Pearson v. DaimlerChrysler Corp.*,
    813 N.E.2d 230 (Ill. App. Ct. 2004).......................................................... 46

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2005) .................................................................. 7

*Peterson v. Volkswagen of Am., Inc.*,
    697 N.W.2d 61 (Wis. 2005) ................................................................ 46, 47

*Precision Towers, Inc. v. Nat-Com, Inc.*,
    2002 Phila. Ct. Com. Pl. LEXIS 16 (Sept. 23, 2002)........................................ 37

*Prichard Enters v. Adkins.*,
    858 F. Supp. 2d 576 (E.D.N.C. 2012) ....................................................... 35

*Rees v. Unleaded Software, Inc.*,
    2013 Colo. App. LEXIS 1870 (Colo. App. 2013)........................................ 28, 29

*Robertson v. Ford Motor Co.*,
    40 Va. Cir. 231 (Va. Cir. Ct. 1996) ......................................................... 24

*Rosales v. FitFlop USA, LLC*,
    882 F. Supp. 2d 1168 (S.D. Cal. 2012) ...................................................... 37

- ix -

*Rothe v. Maloney Cadillac, Inc.*,
  518 N.E.2d 1028 (Ill. 1988) ...................................................................... 38

*Ryan v. Am. Honda Motor Co., Inc.*,
  896 A.2d 454 (N.J. 2006) ......................................................................... 46

*Samuels v. King Motor Co.*,
  782 So. 2d 489 (Fla. Ct. App. 2001) ........................................................ 30

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) ...................................................... 20

*Seekings v. Jimmy GMC, Inc.*,
  638 P.2d 210 (Ariz. 1981) ......................................................................... 38

*Seifi v. Mercedes-Benz USA, LLC*,
  2013 U.S. Dist. LEXIS 73415 (N.D. Cal. May 23, 2013) ......................... 13

*Skelton v. General Motors Corp.*,
  500 F. Supp. 1181 (N.D. Ill. 1980) ........................................................... 39

*Skibinski v. Lunger*,
  70 Va. Cir. 423 (Va. Cir. Ct. 2006) .................................................... 24, 25

*Smith v. Ford Motor Co.*,
  749 F. Supp. 2d 980 (N.D. Cal. 2010), *aff'd*, 462 Fed. Appx. 660 (9th Cir. 2011) .......... 23, 24

*Sonnier v. State Farm Mut. Auto. Ins. Co.*,
  509 F.3d 673 (5th Cir. 2007) ..................................................................... 33

*St Johns United Methodist Church v. Delta Elecs.*,
  2012 U.S. Dist. LEXIS 109037 (S.D. Tex. Aug. 3, 2012) ........................ 25

*Stearns v. Select Comfort Retail Corp.*,
  2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009) ........................... 40

*Szubski v. Mercedes-Benz, U.S.A., L.L.C.*,
  796 N.E.2d 81 (Ct. Com. Pl. Ohio 2003) ...................................... 45, 46, 47

*Tiara Condominium Assoc., Inc. v. Marsh & McLennan Cos.*,
  110 So. 3d 399, 401 (Fla. 2013) ..................................................... 26, 29, 30

*Tietsworth v. Sears, Roebuck & Co.*,
  720 F. Supp. 2d 1123 (N.D. Cal. 2010) .................................................... 22

*Time Warner Entm't-Advance/Newhouse P'ship v.
  Carteret-Craven Elec. Membership Corp.*,
  506 F.3d 304 (4th Cir. 2007) ..................................................................... 31

- x -

*Town of Alma v. AZCO Constr., Inc.*,
  10 P.3d 1256 (Colo. 2000) ......................................................................... 27

*Trgo v. Chrysler Corp.*,
  34 F. Supp. 2d 581 (N.D. Ohio 1998) ....................................................... 32

*TRW Vehicle Safety Sys., Inc. v. Moore*,
  936 N.E.2d 201 (Ind. 2010)........................................................................ 15

*Uniflex, Inc. v. Olivetti Corp. of Am.*,
  445 N.Y.S.2d 993 (N.Y. App. Div. 1982).................................................. 46

*Vintage Homes, Inc. v. Coldiron*,
  585 S.W. 2d 886 (Tex. Civ. App. 1979)..................................................... 37

*Voelker v. Porsche Cars N. Am., Inc.*,
  353 F.3d 516 (7th Cir. 2003) ......................................................... 45, 46, 47

*Walters v. Carson*,
  2012 U.S. Dist. LEXIS 178473 (D.N.J. Dec. 17, 2012).............................. 36

*White Consol. Indus., Inc. v. Wilkerson*,
  737 So. 2d 447 (Ala. 1999) ......................................................................... 41

*Wilson v. Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) .............................................................. 19, 20

*Wright v. Brooke Grp. Ltd.*,
  114 F. Supp. 2d 797 (N.D. Iowa 2000) ...................................................... 37

*Yancey v. Remington Arms Co., LLC*,
  2013 U.S. Dist. LEXIS 140397 (M.D.N.C. Sept. 30, 2013) ...................... 35

*Yurcic v. Purdue Pharma, L.P.*,
  343 F. Supp. 2d 386 (M.D. Pa. 2004).......................................................... 36

## STATUTES

13 Pa.C.S. § 2719 ............................................................................................. 34

15 U.S.C. § 2301 .............................................................................................. 46

15 U.S.C. § 2310 .............................................................................................. 45

ALA. Code § 7-2-719 ....................................................................................... 34

ARIZ. REV. STAT. § 47-2719 ............................................................................ 34

CAL. CIV. CODE § 1791.2................................................................................. 36

CAL. CIV. CODE § 1795.90 ................................................................................................47, 48

CAL. CIV. CODE § 1795.92 ........................................................................................................48

CAL. COM. CODE § 2719 ...........................................................................................................34

CAL. COM. CODE § 2314 ...........................................................................................................42

COLO. REV. STAT. § 4-2-719 ....................................................................................................34

COLO. REV. STAT. § 6-1-105 .....................................................................................................28

CONN. GEN. STAT. § 42a-2-719 ................................................................................................34

FLA. STAT. § 672.719 ................................................................................................................34

IOWA CODE § 554.2719 .............................................................................................................34

IOWA CODE § 714H.5 ................................................................................................................25

MASS. GEN. LAWS ch. 106, § 2-719 .........................................................................................34

N.C. GEN. STAT. § 25-2-719 ......................................................................................................34

N.J. STAT. § 12A:2-719 .............................................................................................................34

OHIO REV. CODE ANN. 1302.93 ...............................................................................................34

TEX. BUS. & COM. CODE § 2.719..............................................................................................34

TEX. BUS. & COM. CODE § 17.565............................................................................................24

U.C.C. § 2-313 ..........................................................................................................................34

U.C.C. § 2-607..................................................................................................................37, 38, 44

U.C.C. § 2-719 ..........................................................................................................................34

VA. CODE ANN. § 59.1-508.3 ....................................................................................................34

# I.     INTRODUCTION

Plaintiffs' First Amended Class Action Complaint ("FAC") details the circumstances by which Ford misled millions of customers into purchasing or leasing vehicles equipped with MyFord Touch, a poorly researched, hastily designed, and inherently defective in-car entertainment and communication system. By misrepresenting the system's safety benefits, such as freedom from distracted driving, and functionality benefits, such as voice and touch controls, and by omitting material facts relating to the safety of the system, Ford has injured its customers. Ford's dismissal arguments are entirely meritless and should be rejected.

In its dismissal memorandum ("Def. Mem."), Ford ignores large tracts of the FAC. Ford criticizes Plaintiffs for not identifying any "affirmative misrepresentation," for example,[1] yet it overlooks its concrete, nationally distributed marketing representations touting the specific safety and functionality benefits of MyFord Touch.[2] It attempts to support its legal argument that the Class Vehicles were merchantable by claiming that "[n]one of Plaintiffs has alleged that their vehicle was unfit for driving at any point,"[3] which, of course, is untrue.[4] Ford also claims that Plaintiffs have failed to show that their vehicles "experienced specific concerns that could not be remedied despite multiple repair attempts,"[5] but it fails to account for the FAC's allegations about Plaintiffs who repeatedly returned their vehicles to the dealer, to no avail.[6] Indeed, Ford appears to misunderstand the premise of Plaintiffs' case: contrary to Ford's promise in its Limited Warranty to "repair,"

---

[1] *See*, *e.g.*, Def. Mem. at 1.

[2] *See*, *e.g.*, ¶¶ 250-60. As used herein, "¶ __" refers to paragraphs of Plaintiffs' First Amended Complaint.

[3] *See* Def. Mem. at 2.

[4] Several Plaintiffs also could not use their vehicles at various points because they had been brought in for futile attempts to have their My Ford Touch System repaired. *See* ¶¶ 77 ("[d]uring the many service visits made by Plaintiff Thomas-Maskrey, she was unable to use her vehicle"), 93 ("Plaintiff D'Aguanno has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations associated with the MyFord Touch system, including … lost use of the vehicle while being serviced"), 104 ("[t]he Ford dealership asked her to bring her Ford Escape in for service again, and kept her vehicle in its shop for weeks at a time, depriving her of use of the vehicle"), 155 ("[d]uring the many service visits made by Plaintiff Rizzo, he was unable to use his vehicle").

[5] Def. Mem.at 2.

[6] *See*, *e.g.*, ¶¶ 23-30, 51, 57-60, 69-71, 76-77.

- 1 -

1   "replace" or "adjust" any parts on the Class Vehicles that malfunction, and to Ford's many other

2   representations, as detailed herein, the MyFord Touch system is defective, and there is no fix.[7]

3        Moreover, Ford misstates the law. It asserts the FAC fails to demonstrate that Ford

4   knowingly concealed material information at the time of sale, but it overlooks several recent cases

5   holding, based on similar allegations, that a manufacturer does have a disclosure obligation. Ford

6   disingenuously claims that the failure of the MyFord Touch system – which Ford widely marketed

7   as a safety feature – does not render the Class Vehicles unsafe. But recent consumer automobile

8   cases make clear that the type of defect plaguing the MyFord Touch system is indeed a safety

9   problem that Ford must disclose. Finally, and as explained below, the other legal technicalities

10  advanced by Ford with respect to some of Plaintiffs' claims – based on the economic-loss rule,

11  statutes of limitations, privity, and certain pre-suit notice requirements – are equally unpersuasive.

12  As a result, the Court should deny Ford's motion in its entirety.

13                          **II.        FACTUAL BACKGROUND**

14  **A.      The defective SYNC system in the Class Vehicles**

15       Ford's SYNC® is a factory-installed, integrated in-vehicle communications and

16  entertainment system that allows users to make hands-free telephone calls, control music, and

17  perform other functions using voice commands. The SYNC system consists of applications and user

18  interfaces developed by Ford and other third-party developers using a Microsoft-designed Windows

19  embedded automotive-operating system. Ford released the original SYNC into the retail market in

20  2007 when Ford installed the system in twelve groups of model year 2008 vehicles in North

21  America. ¶¶ 232-33, 247.

22       Ford initially promoted the SYNC system as a product providing drivers with the ability to

23  operate Bluetooth-enabled mobile phones and digital media players in Ford vehicles using voice

24  commands, steering wheel controls, and radio controls. Ford later expanded the SYNC software so

25  text messages received by the vehicle operator could be "vocalized" by a digitized female voice

26  named "Samantha" and read aloud through the vehicle's speaker system. ¶ 233.

27

28       _____
         [7] ¶ 8.

                              - 2 -

1    The SYNC system's brain is the Accessory Protocol Interface Module ("APIM"), which

2    interfaces with all vehicle audio sources as well as high-speed and medium-speed vehicle Controller

3    Area Network buses ("CAN"). The SYNC system's Microsoft Windows auto-based operating

4    system can also receive software updates through the use of the vehicle's USB port. ¶¶ 248-49.

5    In 2007, as a standalone option, the SYNC system's suggested retail price was $395. Around

6    January 2010, Ford announced the release of the MyFord Touch system (branded as MyLincoln

7    Touch in Ford's Lincoln brand products) (collectively referred to as "MyFord Touch") as the next-

8    generation of the Ford SYNC system. ¶ 235. Ford' suggested retail price for the MyFord Touch as a

9    stand-alone option was approximately $1000. ¶ 241.

10    The MyFord Touch system is generally available only on medium to high-end trim

11    packages. With MyFord Touch, Ford aimed to create a technological infotainment system that

12    would be available not only on its higher-end vehicles, but would become the signature feature of

13    all Ford vehicles – a feature that would increase sales of vehicles across the entire range of Ford,

14    Mercury, and Lincoln products. ¶ 237. As with the SYNC system, the MyFord Touch system was

15    designed to enable drivers to integrate nearly all mobile phones, PDAs and digital media players

16    into their vehicles. Once integrated, the operation of these devices is performed by voice commands,

17    touch-screen inputs, steering-wheel controls, radio controls, Bluetooth and Wi-Fi connectivity.

18    ¶¶ 232-33, 250, 259. The MyFord Touch system controls include two color LCD displays in the

19    gauge cluster and one 8-inch LCD touch screen in the center stack, a media hub with two USB

20    ports, input jacks, and five-way controls located on the steering wheel and SYNC voice-activated

21    communications and entertainment system. ¶¶ 242-46.

22    Ford actively touts the SYNC system. It has a website dedicated solely to it:

23    http://www.ford.com/technology/sync/. Among other claims, this website states that "SYNC helps

24    you keep your eyes on the road and stay connected to your world." The SYNC website contains

25    several videos, one of which is titled "SYNC SAVED MY LIFE." This video purports to depict

26    someone reading a letter they wrote after being in a serious car accident. Among other things, the

27    video narrator says "SYNC saved my life," "if SYNC had not dialed 911, I certainly would have

28    perished at the bottom of that river," "SYNC is there when nobody else is," and "it gave me my life

- 3 -

… that's the ultimate technology." The video displays the words "SYNC. Can call for help, even if you can't." ¶ 251.

This automated emergency function operates through a SYNC feature called "911Assist," which, according to Ford's website, operates as follows: "In the event of an accident in which an airbag deploys or, in certain vehicles, the fuel pump shutoff is activated, 911 Assist with GPS uses a properly paired and connected mobile phone inside the vehicle to make a call directly to a 911 operator and gives emergency responders your exact location." Ford's promotion of the SYNC system also capitalizes on the recent enactment of distracted driver laws. Over a dozen states have enacted laws that prohibit the use of hand-held cell phones while driving. The Sync system website promotes its hands-free calling feature as follows: "You never have to miss a call just because you're behind the wheel. If your phone rings, you can answer with the push of a button, and you can make a call with the sound of your voice." This website further states that "[c]alling anyone is as easy as saying his or her name." ¶¶ 252-53.

**B.      The TSBs and warranty extension**

Well aware of the many SYNC/MyFord Touch system problems experienced by consumers, Ford issued several Technical Service Bulletins ("TSB") and updates in an unsuccessful effort to resolve them. On or around April 27, 2011, Ford issued TSB 11-4-18 pertaining to Ford vehicles equipped with the SYNC system and the MyFord Touch or MyLincoln Touch options. Specifically, Ford's TSB noted that these systems may experience blank screens, missing presets, lack of voice recognition, incorrect dialing of phone numbers and display problems with the backup camera. The TSB recommended reprogramming the software system. ¶¶ 274-75.

On or around July 22, 2011, Ford issued TSB 11-7-24, which superseded Ford's TSB from 11-4-18, again pertaining to the functionality of Ford vehicles equipped with the SYNC system and the MyFord Touch or MyLincoln Touch options. Specifically, this TSB explained that Class Vehicles "may experience" various symptoms caused by the defective APIM, including "blank/black display screen, radio switches from off to on or changes state after ending a phone call or voice command, phone pairing, incorrect Sirius channel selection using voice command, unable to download photo resolution 800x378, phonebook downloads, AM/FM missing preset display

- 4 -

information, voice recognition, voice recognition when using SYNC services, USB device detection, travel-link download time, Sirius channel art-logo mismatch, clock intermittently displays incorrect time, traffic direction and information …, calling wrong phone number, travel link subscription, address book downloads, navigation set in kilometers but voice communicates in miles, and backup camera scrolling display." As a result, Ford's TSB recommended performing a software update by fully reprogramming the APIM, and, where reprogramming was unsuccessful, replacing the APIM. ¶ 276.

On or around March 6, 2012, Ford issued Customer Satisfaction Program Campaign 12M01 pertaining to Ford vehicles equipped with the SYNC system and the MyFord Touch or MyLincoln Touch options. This campaign explained that certain MY 2011-2012 Explorer, Edge, MKX and MY 2012 Focus vehicles equipped with the SYNC system and the MyFord Touch or MyLincoln Touch options may require replacement of the APIM, the brain of the SYNC system. Ford's 12M01 Campaign extended warranty coverage of the APIM to four years of service from the warranty start date on Ford vehicles and five years on Lincoln vehicles, regardless of mileage. ¶ 278.

On or about November 5, 2012, Ford issued TSB 12-11-1 due to concerns with "navigation, voice recognition, call sound quality, phone pairing and/or system performance" in Class Vehicles. This TSB provided steps for a full software update of the APIM to the latest software version now available, version V3.5.1. Those Class Vehicles equipped with navigation required a new SD-card for proper navigation function. On or about November 8, 2012, Ford issued Campaign "DEMONSTRATION/DELIVERY HOLD – Application Performance Upgrade 11 AOI" because software was released to "improve overall system functionality, voice recognition, screen refresh rates, response to touch, and to simplify screens for ease of use" due, again, to concerns with "navigation, voice recognition, call sound quality, phone pairing and/or system performance." ¶¶ 280-82.

On or about November 15, 2012, Ford issued TSB 12-11-2 because certain vehicles equipped with the SYNC system and the MyFord Touch or MyLincoln Touch options, built on or before May 14, 2012, "exhibit a screen message indicating navigation stopped functioning contact your dealer, GPS has a red strike through X, Navigation unavailable is displayed in the upper right

- 5 -

hand corner of the screen …." Ford instructed that technicians perform a reprogram of the Global Position Satellite Module (GPSM). ¶ 283.

On or about January 14, 2013, Ford issued Campaign "DEMONSTRATlON/DELIVERY HOLD Application Performance Upgrade 12A04" because software was released to "improve overall system functionality and performance including navigation, voice recognition, call sound quality, and phone pairing." As a result, and due to new software, Ford instructed dealers "to inspect the APIM software level and if necessary, reprogram the Accessory Protocol Interface Module …." If the system was unresponsive, inoperative, or if the vehicle software update was unsuccessful, dealers were instructed to replace the SYNC module. ¶ 284.

On June 17, 2013, Ford issued a press release titled "SYNC and MyFord Touch Sold on 79 Percent of New Ford Vehicles, New Technology Drives Quality Satisfaction."  Ford announced that, combined, SYNC and MyFord Touch systems are sold on 79 percent of new 2013 Ford vehicles. According to Ford, customers cite to these features as a reason consumers prefer Ford vehicles over competitors. Despite touting the successes of SYNC and MyFord Touch systems, Ford contradicted that position by stating it would redesign the MyFord Touch system across all product lines and return to knobs for some functions due to the profound problems with the system. ¶¶ 15, 239.

## C.       Consumers' similar experiences and complaints

Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the Internet is replete with examples of blogs and other websites where consumers have complained of the exact same SYNC/MyFord Touch system defects within the Class Vehicles. Likewise, the database maintained by the National Highway Traffic Safety Administration contains dozens of similar consumer complaints. ¶¶ 288-91.

## III.     LEGAL STANDARD

Ford seeks dismissal of the FAC under Fed. R. Civ. P. 12(b)(6) and, with respect to Plaintiffs' fraud-based claims, under Fed. R. Civ. P. 9(b). *See* Def. Mem. at 1-3, 6-8. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face."[8] A motion to dismiss challenges the legal sufficiency of the claims alleged.[9] A complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'"[10] A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] In addressing a motion to dismiss, "a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party."[12]

"'A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.'"[13] Under Rule 9(b), the fraudulent omission claims asserted by Plaintiffs "can succeed without the same level of specificity required by a normal fraud claim."[14] Contrary to Ford's claim that "all of Plaintiffs' claims under state consumer protection statutes must satisfy Rule 9(b)," Def. Mem. at 6, some consumer-protection statutes do not require pleading such claims with the particularity required under 9(b).[15]

## IV.   ARGUMENT

### A.   Plaintiffs plead affirmative misrepresentations

Ford erroneously contends that the FAC fails to set forth even one affirmative misrepresentation. Def. Mem. at 1, 8-11. But in fact, Plaintiffs allege that Ford aggressively

---

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[9] *See Cuviello v. City & Cnty. of San Francisco*, 940 F. Supp. 2d 1071, 1079 (N.D. Cal. 2013).

[10] *Id.* (citing *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009)).

[11] *Id.* (citing *Iqbal*, 556 U.S. at 556).

[12] *Department of Fair Empl. & Hous. v. Law Sch. Admission Council Inc.*, 896 F. Supp. 2d 849, 854 (N.D. Cal. 2012).

[13] *Apodaca v. Whirlpool Corp.*, 2013 U.S. Dist. LEXIS 176363, at *11 (C.D. Cal. Nov. 8, 2013) (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)).

[14] *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (citations omitted); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) (*In re Toyota UA I*) (Rule 9(b) strictures relaxed for fraudulent omission claims "because '[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission'") (quoting *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009)).

[15] *See, e.g., Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("an action under [New York General Business Law] § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), but need only meet the bare-bones notice-pleading requirements of Rule 8(a)").

promoted the MyFord Touch system with a nationwide multi-media campaign, luring consumers with the promise of very specific benefits and functions that, as Ford knew at the time, would fail to materialize because of the hopelessly defective nature of the ill-designed, hastily researched MyFord Touch platform.[16] Twenty Plaintiffs allege they saw advertisements for and representations made by Ford about MyFord Touch, including on television, in print, and on the Internet, and have recounted to the best of their abilities the content of those representations – all of which tout MyFord Touch's safety benefits and accessibility through voice and touch controls.[17] Because Ford's statements mischaracterize specific product features, they are not mere puffery. Additionally, several Plaintiffs allege that Ford's authorized dealerships made specific, affirmative misrepresentations about MyFord Touch, which may be imputed to Ford.[18] Finally, all Plaintiffs have alleged that they relied upon Ford's false warranty statements.[19] These allegations are sufficient to state fraud-based claims based on Ford's affirmative misrepresentations.

        **1.**        **The FAC puts Ford on notice of the misrepresentations at issue in this action.**

Ford does not dispute that it made the specific representations set forth in the FAC. Rather, Ford seeks dismissal of Plaintiffs' claims to the extent they are predicated on Ford's affirmative misrepresentations because the FAC does not pair each Plaintiff with a particular advertisement. Def. Mem. at 8-9. Through this formalistic argument, which misconstrues the pleading requirements, Ford attempts to impose an unrealistic burden on Plaintiffs.[20] As discussed above, Rule 9(b) requires Plaintiffs to put Ford on notice of the claims against it to allow it to prepare its defense, but it does not require particularity for particularity's sake. If the FAC does not describe or

---

[16] *See*, *e.g.*, ¶¶ 250-60.

[17] *See* ¶¶ 22 (Whalen), 43 (CDD), 56 (Raney-Aarons), 66 (Watson), 78 (Thomas-Maskrey), 85 (Battle), 98 (Sheerin), 106 (Makowski), 126 (Creed), 148 (Matlin), 157 (Rizzo), 164 (Miller), 172 (Purcell), 180 (Fink), 187 (Zuchowski), 195 (Avedisian), 202 (Rodriguez), 210 (Ervin), 217 (Connell), 225 (Miller-Jones). The FAC reproduces a number of Ford's advertisements in which Ford makes affirmative misrepresentations about MyFord Touch's safety benefits and voice and touch functions. *See* ¶¶ 250-56, 259-60.

[18] *See* ¶¶ 22 (Whalen), 37 (CDD), 49 (Rosser), 84 (Battle), 126 (Creed), 164 (Miller), 180 (Fink), 187 (Zuchowski).

[19] *See* ¶ 298.

[20] *See*, *e.g.*, *In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) ("where … a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements").

- 8 -

reproduce a specific representation contained in Ford's written materials (¶¶ 250-60) or uttered by Ford sales representatives (¶¶ 22, 37, 49, 84, 126, 164, 180, 187), then Plaintiffs will not be seeking to hold Ford accountable for that representation in this action. Ford requires no greater notice of the statements at issue in order to prepare its defense.

Significantly, each of these alleged misrepresentations is based on a uniform message designed to tout the MyFord Touch system's purported safety benefits and accessibility through voice and touch controls. All of these representations are false because, as *every* Plaintiff has alleged, MyFord Touch systematically fails to respond to voice and touch commands – including by regularly failing entirely and otherwise regularly losing voice and touch functionality.[21] In each instance, Ford made the misrepresentations.[22] The FAC thus adequately alleges the "who, what, where, when, and how" of the misrepresentations and provides "an explanation as to why the statement[s] … complained of w[ere] false or misleading."[23]

### 2.   Ford's marketing misrepresentations are not puffery.

Nor can Ford succeed by arguing that its affirmative misrepresentations constitute mere puffery. Def. Mem. at 10-11, 34. According to the Ninth Circuit, "'misdescriptions of specific or absolute characteristics of a product are actionable.'"[24] Cherry-picking from Plaintiffs' allegations regarding the advertisements each Plaintiff reviewed before purchasing their Class Vehicles, Ford focuses only on its representations that MyFord Touch would "enhance" the driving experience and

---

[21] These allegations also undermine Ford's argument that Plaintiffs "fail[] to identify what information was allegedly material to each Plaintiff's purchase decision and leaves uncertain whether the Plaintiff experienced any problems with that feature." Def. Mem. at 11. Each Plaintiff has plainly alleged that the MyFord Touch voice and touch controls in their Class Vehicles – the subject of Ford's nationwide advertising campaign – failed to operate. ¶¶ 23, 36, 50, 57, 68, 76, 83, 90, 97, 103, 112, 119, 128, 147, 154, 163, 170, 178, 186, 193, 201, 208, 216, 223.

[22] Where a specific dealership or individual touted the safety and/or voice and touch functionality of MyFord Touch, the FAC identifies the dealership or individual. ¶¶ 22, 37, 49, 84, 126, 164, 180, 187.

[23] *Johnson v. Wal-Mart Stores, Inc.*, 2013 U.S. App. LEXIS 22119, at *4 (9th Cir. Oct. 30, 2013) (citations omitted).

[24] *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Coll. Serv. Inc.*, 911 F. 2d 242, 246 (9th Cir. 1990) (quoting *Stiffel Co. v. Westwood Lighting Grp.*, 658 F. Supp. 1103, 1115 (D.N.J. 1987)).

- 9 -

1    "increase the safety" of its vehicles. Def. Mem. at 10. But the FAC sets forth far more specific

2    misrepresentations that Ford overlooks in forging its half-hearted straw-man argument.[25]

3            Ford does not explain how such statements, which mischaracterize specific product features,

4    constitute puffery. Plaintiffs allege in detail that MyFord Touch's purported voice and touch

5    controls are frequently inaccessible as a result of systemic failure and lock-up.[26] Plaintiffs (and other

6    drivers) cannot "answer [calls] with the push of a button [or] make a call with the sound of [their]

7    voice[s]," cannot "easily control phone, entertainment, climate, and … navigation with … touch

8    controls and voice commands," and cannot "easily access[] through voice … or with a simple tap on

9    the touchscreen" Class Vehicles' "functions, settings and information."[27] Rather, when MyFord

10   Touch crashes or its voice and touch functionality fails, as frequently occurs, Plaintiffs (and other

11   drivers) must attend to MyFord Touch's malfunctions, leading to distracted driving and other unsafe

12   conditions. Plaintiffs therefore adequately allege that Ford's statements about MyFord Touch's

13   purported safety benefits and voice and touch controls are demonstrably false.[28]

14           **3.    The Court may impute misrepresentations of authorized Ford dealerships to
                     Ford.**

15           Ford relies on *Maietta v. Ford Motor Co.*[29] to argue that statements of authorized Ford

16   dealerships cannot be imputed to Ford. Def. Mem. at 9. The *Maietta* court, however, mistakenly

17

18       [25] *See, e.g.*, ¶¶ 253 (MyFord Touch allows drivers to "answer [calls] with the push of a button,
     and you can make a call with the sound of your voice"), 254 ("[w]ith [MyFord Touch], you can
19   easily control phone, entertainment, climate, and available navigation with intuitive touch controls
     and voice commands"), 259 (MyFord Touch "makes the vehicle functions, settings and information
20   easily accessible to the driver through voice, steering wheel controls or with a simple tap on the
     touchscreen").

21       [26] *See* ¶¶ 23, 36, 50, 57, 68, 76, 83, 90, 97, 103, 112, 119, 128, 147, 154, 163, 170, 178, 186,
     193, 201, 208, 216, 223.

22       [27] ¶¶ 253-54, 259.

23       [28] Ford's reliance on *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008),
     *aff'd*, 322 Fed. Appx. 489 (9th Cir. 2009), is misplaced. The vague statements at issue in that case –
24   that "each unit is packed full of fans and exhaust units to ensure optimum performance" and that the
     products exhibit "superb, uncompromising quality" – are a far cry from Ford's specific promises
25   about the MyFord Touch voice and touch controls. Where the *Oestreicher* statements are subjective
     and cannot be proven inaccurate, Ford claims that MyFord Touch has specific features – voice and
26   touch controls – that it effectively lacks, leading to concrete safety risks. This key point also
     distinguishes Ford's misrepresentations from the "vague statement" at issue in *Morgan v. Harmonix
27   Music Sys., Inc.*, 2009 WL 2031765, at *3 (N.D. Cal. July 30, 2009) (finding visual depictions of
     drum pedal non-actionable), on which Ford ineffectively relies.

28       [29] *Maietta v. Ford Motor Co.*, 1997 U.S. Dist. LEXIS 3788 (N.D. Ill. Mar. 24, 1997).

- 10 -

relied on Illinois state-court decisions, failing to recognize the difference between the federal notice-pleading requirements and Illinois' more onerous fact-pleading requirements, leading another federal court from the same district to reject *Maietta* as unpersuasive. *See Kent v. Celozzi-Ettleson Chevrolet, Inc.*[30]

As in *Kent*, Ford is not entitled to dismissal of the FAC's fraud-based claims premised on affirmative misrepresentations by Ford's authorized dealerships because "an automobile dealership may under certain circumstances be an agent of the manufacturer," including circumstances giving rise to apparent or ostensible agency.[31] Further, agency is a fact question, so dismissal at the pleading stage is inappropriate.[32]

Nevertheless, the FAC includes ample factual allegations from which the Court can infer the existence of agency relationships between Ford and its authorized dealers with respect to the MyFord Touch. *See*, *e.g.*, ¶¶ 274-87 (detailing numerous TSBs, software updates, and correspondence issued by Ford to authorized Ford dealers, instructing them to perform specific tasks on customers' MyFord Touch units).[33] Plaintiffs have sufficiently demonstrated an agency relationship between Ford and its authorized dealers.[34]

### 4. Ford's warranty statements are misrepresentations.

Finally, Ford's own Limited Warranty contains an affirmative misrepresentation by virtue of its promise to "repair, replace or adjust" Plaintiffs' MyFord Touch systems in a manner that corrects the defects. *See* Def. Mem. at 4. While Ford is correct that the Limited Warranty contains a generic admission of potential defect, using that to insulate Ford from liability for misrepresenting specific

---

[30] *Kent v. Celozzi-Ettleson Chevrolet, Inc.*, 1999 U.S. Dist. LEXIS 17282, at *10 (N.D. Ill. Nov. 3, 1999) (*Maietta* "rel[ies] on decisions from the Illinois state courts, which are not truly pertinent because Illinois, unlike the federal courts, is a fact pleading jurisdiction").

[31] *Id.* at *11.

[32] *Id.* at *10. *See also Guerrero v. Gen. Motors Corp.*, 2008 U.S. Dist. LEXIS 119839, at *11 (E.D. Cal. Apr. 14, 2008) (question of agency relation between GM and employee of authorized GM dealership a "question of fact for the jury to decide").

[33] *See Lau v. Mercedes-Benz USA, LLC*, 2012 U.S. Dist. LEXIS 11358, at *12 (N.D. Cal. Jan. 31, 2012) (determining that authorized dealers were agents of automaker defendant because warranty repairs were performed by dealers).

[34] *See id.*

- 11 -

product features (or knowingly omitting specific defects) would undermine the remedial purpose of state consumer-protection laws, as other courts have found in rejecting this very argument.[35]

### 5.   The FAC pleads fraudulent omissions.

The FAC adequately alleges Ford withheld material facts that it had a duty to disclose regarding the safety and functionality of MyFord Touch. As Ford concedes, manufacturers are obligated to disclose product defects impacting safety, as well as defects of which they possess exclusive knowledge. *See* Def. Mem. at 15-16. The FAC alleges that Ford was obligated to disclose the defects for these reasons, and because Ford actively concealed them, because it knew or should have known of them at the time of sale, and because it made partial disclosures triggering such a duty. The FAC thus adequately pleads fraud-based claims based on Ford's fraudulent omissions.

### 6.   Ford failed to disclose the existence of MyFord Touch defects known to Ford that impact the safety of the Class Vehicles.

Ford contends that Plaintiffs fail to allege one or more unitary defects rather than a multiplicity of individual flaws or symptoms. Def. Mem. at 12 (describing a "laundry list of problems"). This formulaic argument fails because the FAC adequately sets forth (i) the specific defects Ford failed to disclose, (ii) the safety-related consequences of those defects, and (iii) facts supporting not merely Ford's knowledge but Ford's *exclusive* knowledge of those defects.

#### a.   The defects

The FAC alleges MyFord Touch is plagued by specific software and hardware defects that caused the "flaws" or symptoms experienced by Plaintiffs and described throughout the FAC.[36] Specifically, the FAC alleges that the software defects are partly responsible for the total system failures and black-outs, peripheral device connectivity problems (wired and Bluetooth), and other

---

[35] *See, e.g.*, *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (rejecting identical argument by Ford under New Jersey consumer-fraud statute).

[36] The software defects Plaintiffs identify include: deadlocks and task starvations; buffer and/or stack overflows; race conditions; missed real-time deadlines; logical errors within algorithms, subroutines, and device drivers; dead ends in state machines; and invalid pointer dereferences and related errors in pointer arithmetic. The hardware defects include: memory corruptions, including database corruptions; spurious electrical signals, including interrupts; invalid or improper messages on the Controller Area Network buses; stuck memory bits; miscalibrated or malfunctioning sensors (like the camera charge-couple device) and actuators (for window defrosters and climate controls); and insufficient electrical grounds. *See* ¶¶ 268-69.

1    dysfunctions experienced by all MyFord Touch users, including Plaintiffs. *See*, *e.g.*, ¶¶ 262-73. The

2    FAC also explains how the hardware defects contribute to the flaws or symptoms experienced by

3    Plaintiffs. Plaintiffs have traced the defects outlined above to failures of Ford's software process and

4    architecture choices – failures that Ford should have corrected before releasing MyFord Touch to

5    the public. *See* ¶ 271. These allegations demonstrate the MyFord Touch system defects are common

6    defects that came about as a result of Ford's inadequate development and testing of the product.

7            The FAC also alleges that MyFord Touch is defective because it was not designed with a

8    quick, easy, and reliable way to reboot a malfunctioning unit without first pulling the vehicle to the

9    side of the road, and without causing loss of the user's personal data and configuration settings.

10   ¶ 272. This design failure introduces safety risks of its own, including distracted driving.[37] Ford's

11   dismissal argument ignores this allegation.

12           The FAC clearly demonstrates that the MyFord Touch system's tendencies to crash, freeze,

13   lose voice and touch responsiveness, and lose wireless and peripheral device connectivity are all

14   rooted in a small number of software and hardware defects that came about as a result of Ford's

15   inadequate testing and development of the MyFord Touch system before its public release. This is

16   more than sufficient to put Ford on notice of the defects.

17                   **b.      The defects' safety-related consequences**

18           The FAC alleges that these specific product defects introduce safety risks associated with all

19   MyFord Touch units. Because all Class Vehicles are still under warranty, Plaintiffs' claims do not

20   require them to demonstrate a safety risk. *See* Def. Mem. at 17. Instead, the existence of an

21   unreasonable safety risk in this case is relevant because courts routinely hold that it is a material fact

22   that must be disclosed.[38] The FAC nonetheless alleges that the MyFord Touch defects result in

23

24   _____

25   [37] *See Pacific Indem. Co. v. Therm-O-Disc, Inc.*, 476 F. Supp. 2d 1216, 1226 (D.N.M. 2006)
     ("failure to incorporate into a product an optional safety feature or device may constitute a defective
     condition of the product"); *In re Toyota UA I*, 754 F. Supp. 2d at 1193 (finding lack of "fail-safe
26   mechanism" capable of mitigating unintended acceleration in vehicles a "material fact").

     [38] *See Seifi v. Mercedes-Benz USA, LLC*, 2013 U.S. Dist. LEXIS 73415, at *20-22 (N.D. Cal.
27   May 23, 2013) (car manufacturer had duty to disclose a defect that "plausibly constitutes an
     unreasonable safety risk") (citing *Ehrlich v. BMW of North Am., LLC*, 801 F. Supp. 2d 908, 918
28   (C.D. Cal. 2010)).

                                              - 13 -

substantial dangerous conditions that put drivers, passengers, pedestrians, and other motorists at risk of personal injury and property damage.

Far from dreaming up merely "speculative" dangers, Plaintiffs allege that MyFord Touch creates concrete risks that have, in fact, materialized for many drivers, including Plaintiffs. For example, Plaintiffs Whalen (¶ 25), Raney-Aarons (¶ 58), D'Aguanno (¶ 90), Sheerin (¶ 97), Matlin (¶ 147), Rizzo (¶ 154), Fink (¶ 178), Zuchowski (¶ 186), Avedisian (¶ 193), and Ervin (¶ 208) have all alleged that the rearview (or back-up) camera feature of MyFord Touch has failed to operate when driving their Class Vehicles in reverse. Despite Ford's unreasoned, unsupported assertion to the contrary, when a rearview camera locks up or provides inaccurate readings, this obviously produces a concrete danger of harm to persons and property. Anyone and anything passing behind the vehicle while the driver backs up is likely to be hit by the vehicle. Drivers cannot keep a lookout while driving in reverse if the rearview camera they rely upon is displaying a frozen or time-lagged image, unbeknownst to them, or even no image at all. Indeed, Ford promotes the rearview camera feature as a safety feature (*see*, *e.g.*, ¶ 180) and NHTSA describes rearview cameras as safety features (*see*, *e.g.*, ¶ 256). As Plaintiffs allege, many drivers have reported encountering the same problems with their MyFord Touch rearview cameras. *See*, *e.g.*, ¶¶ 289 (consumer reports on syncsucks.com), 291 (consumer reports to NHTSA).[39]

The MyFord Touch defects also introduce a high risk of distracted driving. Although Ford promotes MyFord Touch as enabling drivers "to keep your hands on the wheel and eyes on the

---

[39] Selected reports reproduced in the FAC include the following statements relating to the MyFord Touch rearview camera feature: "Yesterday I started the vehicle and the entire screen was out including the backup sensors and camera. I have contacted Ford and the dealership but they do not seem to be very responsive.… I find this to be a safety issue as my wife relies on the camera and sensors when parking a vehicle"; "Backup camera works or not. Depends on the day"; MyFord Touch automatically launched an "upgrade and disabled all related features for about 30 minutes.… It … appears to always happen immediately after starting the car, which is when the rear view camera is very likely to be needed"; "backup camera system goes down or screen freezes while backing up"; MyFord Touch "has been freezing, back up camera blacking out… Dealer said it has to do with the new system and there being bugs"; "Not having the backup camera is risky for there may be small children behind the vehicle"; "The [MyFord Touch] system has a multitude of defects, but the safety related defect is that the system can spontaneously reboot at any time with no warning to the driver. This can happen at random, and multiple times within a short period of time. When backing up this shuts down the backup camera which could result in injuries to children who get behind the vehicle." ¶ 291.

- 14 -

road" (¶ 250), when the voice and touch functionality fails, when peripheral device connectivity or Bluetooth fail, and when the whole system unexpectedly crashes, MyFord Touch causes drivers to attend to its malfunctions rather than the road. Ford represents unequivocally to the public that "[d]riving while distracted can result in loss of vehicle control" (¶ 254), but its brief trivializes that risk.

The much-touted 9-1-1 Assist feature is also disabled when MyFord Touch crashes or becomes inoperable. ¶ 264. Thus, if the vehicle is in a collision, nothing triggers the system to dial 9-1-1 and alert emergency medical professionals to the vehicle's location, as promised by Ford. The safety risk that the faulty MyFord Touch system creates in these circumstances is palpable.

Nor is Ford's secondary argument – that the defects alleged create no safety risks because MyFord Touch is an "optional" device – persuasive. *See* Def. Mem. at 16-17. Ford builds yet another straw man, arguing "[a] vehicle with a MyFord Touch system that, due to an alleged defect, at times does not allow for hands-free calling, does not display what is behind the car when it is in reverse, or does not automatically call 9-1-1 in certain circumstances is no less safe than the same vehicle not equipped with a MyFord Touch system." Def. Mem. at 16. This erroneously relies on a comparison of vehicles equipped with MyFord Touch against vehicles equipped with no in-car communication/entertainment system, rather than the appropriate comparison, *viz.*, of vehicles equipped with the dysfunctional MyFord Touch system against vehicles equipped with functional systems of a similar nature. This is not a case faulting a manufacturer for offering state-of-the-art safety equipment only as a premium option to an elite few (indeed, MyFord Touch has been installed in more than five million Class Vehicles); rather, it is a case involving a manufacturer's premature introduction of a defectively designed communication/entertainment unit, which induces drivers to depend on it, and therefore, when the system crashes, it creates its own safety hazards.[40] Ford's argument fails as a result.

---

[40] Under Ford's reasoning, no manufacturer could be held liable for injuries sustained as a result of defective "optional" equipment, such as sunroofs; after all, according to Ford, a vehicle with a faulty sunroof is "no less safe" than a vehicle with no sunroof at all. But this is patently untrue because the optional sunroof creates its own safety hazards if improperly designed. Indeed, Ford itself has been found liable for injuries sustained by occupants of its vehicles equipped with faulty sunroofs. *See*, *e.g.*, *TRW Vehicle Safety Sys.*, *Inc. v. Moore*, 936 N.E.2d 201, 210 (Ind. 2010)

- 15 -

Finally, Ford's argument that "[a]s a matter of judicially-noticeable facts," it is untrue that climate-control functions are routed exclusively through MyFord Touch, fails because is simply incorrect. *See* Def. Mem. at 16. In at least some of the Class Vehicles, Ford eliminated the physical knobs for climate-control functions, including defrosters. ¶ 263. After outcry from consumers, Ford backtracked on this design choice and reintroduced knobs. ¶ 15. To the extent Ford is referring not to knobs but to steering-wheel controls, Ford's argument still fails because the steering-wheel controls are also routed through MyFord Touch, and at least one Plaintiff has specifically alleged that her vehicle's steering-wheel controls failed when her MyFord Touch unit failed. ¶ 170 (Purcell). Finally, even if functional analog climate controls were present in all Class Vehicles, this is irrelevant to Ford's motion because the FAC alleges additional safety risks unrelated to the presence or absence of analog climate controls, as described above.

### c.      Ford's knowledge of the defects

The FAC alleges facts sufficient to demonstrate that Ford knew of the alleged defects. Even under Rule 9(b), Plaintiffs may plead Ford's knowledge generally.[41] Plaintiffs allege that Ford knew about the MyFord Touch defects on at least the following three grounds: (i) Ford issued several secret TSBs to its authorized dealers acknowledging the MyFord Touch problems and instructing them to perform specific corrective tasks (although these failed); (ii) Ford directly or indirectly received early complaints from customers putting it on notice of the defects; and (iii) at least one Plaintiff alleged that Ford dealership personnel informed him that the MyFord Touch problems he experienced were common. Plaintiffs, by contrast, could not have identified the defects until after purchasing or leasing their Class Vehicles and experiencing the MyFord Touch for themselves. As set forth below, Plaintiffs sufficiently allege Ford's exclusive knowledge of the defects.

---

(affirming finding of Ford's liability under claim for negligent sunroof design where decedent was killed in part because of "the failure of [the sunroof's] mounting brackets").

[41] *Iqbal*, 556 U.S. at 686-87 (state of mind need not be pled under "elevated pleading standard" but the "less rigid … strictures of Rule 8").

**(1)    Technical Service Bulletins**

Allegations that an automobile manufacturer issued TSBs to its dealers relating to the relevant feature or equipment suffice to plead the manufacturer's knowledge of the defect, even where issuance of the TSBs occurs after a plaintiff purchased or leased the vehicle.[42] Plaintiffs allege that Ford issued MyFord Touch-related TSBs to its dealers on April 27, 2011 (¶ 275); July 22, 2011 (¶ 276); March 13, 2012 (¶ 277); September 1, 2012 (¶ 279); November 5, 2012 (¶ 280); November 15, 2012 (¶ 283); August 5, 2013 (¶ 285); and October 3, 2013 (¶ 286). As the FAC's descriptions of each TSB show, Ford attempted to address problems affecting virtually every feature of MyFord Touch (*e.g.*, blank screens, failure of voice recognition, failure of touch commands, rearview-camera display problems, failure to pair with mobile phones and peripheral devices, radio malfunctions, USB device failure, incorrect traffic and GPS information, and general system performance).

Plaintiffs also allege that Ford launched a "Customer Service Satisfaction Campaign" on March 6, 2012 (¶ 278) and "performance upgrade" campaigns on November 8, 2012 (¶ 281), and January 14, 2013 (¶ 284), in connection with which Ford sent letters to Ford dealers instructing them to perform specific tasks to optimize consumers' MyFord Touch systems. The March 6, 2012 campaign went as far as requiring dealers to replace the APIM module (the "brain" of MyFord Touch) in certain Class Vehicles, but because the APIM design itself is defective, this "fix" did not cure the defect. Indeed, all of the "fixes" and upgrades Ford launched failed to correct the defects in the MyFord Touch system. ¶ 287. These allegations demonstrate that Ford was well aware of the defects complained of, and indeed had exclusive knowledge of the specific hardware and software defects described by Plaintiffs.

---

[42] *See, e.g.*, *Falco v. Nissan North America, Inc.*, 2013 U.S. Dist. LEXIS 147060, at *17-18 (C.D. Cal. Oct. 10, 2013) (finding allegations that defendant "issued the first of several [TSBs] to its dealerships instructing technicians to replace components of the Timing Chain Tensioning System in the vehicles covered by the complaint" in July 2007 sufficient to "permit plausible inferences that [defendant] was aware of the defect at the time they sold the vehicles in 2005 and 2006"); *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 998 (N.D. Cal. 2013) (finding allegations that TSBs regarding headlight defect were issued after plaintiffs purchased their vehicles sufficient to permit the inference that defendant was aware of the issue at the time of the sales).

1

### (2)     Consumer complaints

2          Similarly, allegations that consumers directly or indirectly notified an automobile

3   manufacturer of problems with the relevant feature or equipment suffice to plead the manufacturer's

4   knowledge of the defect.[43] Plaintiffs allege that consumer complaints regarding MyFord Touch,

5   specifying precisely the problems experienced by each Plaintiff, began to appear as early as October

6   28, 2010.[44] The FAC reproduces 19 detailed complaints made by consumers to NHTSA. ¶ 291.

7   Plaintiffs also allege that consumers posted similar complaints on various websites dedicated to

8   problems with MyFord Touch, including syncsucks.com, outofmytouch.com, and

9   fordsyncproblems.com, as well as general vehicle forums. ¶¶ 8, 288-90. Several Plaintiffs, finally,

10  directly notified Ford of the MyFord Touch problems they experienced,[45] and nearly all took their

11  Class Vehicles to authorized Ford dealers for MyFord Touch-related service.[46] Cumulatively, these

12

13  [43] *See*, *e.g.*, *Grodzitsky v. Am. Honda Motor Co.*, *Inc.*, 2013 U.S. Dist. LEXIS 82746, at *22

14  (C.D. Cal. June 12, 2013) (finding both "[c]omplaints made directly to [d]efendant" and
    "[c]omplaints posted about the [alleged defect] on 'public online vehicle owner forums'" supported

15  inference of manufacturer's knowledge of defect); *Aguilar v. General Motors, LLC*, 2013 U.S. Dist.
    LEXIS 149108, at *14 (E.D. Cal. Oct. 16, 2013) (finding that "early consumer complaints" about

16  the alleged defect supported inference of manufacturer's knowledge of defect); *Falco*, 2013 U.S.
    Dist. LEXIS 147060, at *16 (same); *Mui Ho*, 931 F. Supp. 2d at 998 (same); *In re Toyota Motor*

17  *Corp. Hybrid Brake Mktg.*, *Sales Practices and Prods. Liab. Litig.*, 890 F. Supp. 2d 1210, 1219
    (C.D. Cal. 2011) (same); *Ehrlich v. BMW of N. Am.*, *LLC*, 801 F. Supp. 2d 908, 918-19 (C.D. Cal.

18  2010) (same); *Clark v. LG Elecs. USA*, *Inc.*, 2013 U.S. Dist. LEXIS 155179, at *12, 14 (S.D. Cal.
    Oct. 29, 2013) (finding that consumer complaints posted on websites indicating consumers called

19  defendant's customer service lines to complain about alleged defect supported inference of
    manufacturer's knowledge of defect).

20  [44] Ford makes much of the timing element of a fraudulent-concealment claim (*e.g.*, Def. Mem. at
    12-15, 20), but Ford misdirects its rhetoric because no Plaintiff purchased or leased a Class Vehicle

21  before October 2010. Plaintiffs' allegations therefore show that Ford's knowledge of the defects
    precedes any Plaintiff's purchase or lease. Moreover, Ford cannot persuasively argue that the

22  availability of public information about MyFord Touch (such as news reports or federal databases)
    preceding Plaintiffs' dates of purchase or lease defeats any Plaintiff's claims. As numerous courts

23  have held, such availability does nothing to undercut a consumer's fraud-based claims, if only
    because consumers are not generally required to conduct research before shopping for a new

24  vehicle. *See*, *e.g.*, *In re Toyota UA I*, 754 F. Supp. 2d at 1192 ("[w]hile prospective customers could
    have been tipped off to the possibility of [sudden unintended acceleration] by researching past

25  complaints filed with NHTSA, many customers would not have performed such a search, nor would
    they be expected to").

26  [45] *See*, *e.g.*, ¶¶ 38-42 (CDD); 51 (Rosser); 70 (Watson); 194 (Avedisian).

27  [46] *See*, *e.g.*, ¶¶ 26-27 (Whalen); 39 (CDD); 51 (Rosser); 71 (Watson); 77 (Thomas-Maskrey); 92
    (D'Aguanno); 104 (Makowski); 112 (Oremland); 120 (Mitchell); 147 (Matlin); 155 (Rizzo); 171

28  (Purcell); 179 (Fink); 194 (Avedisian); 201 (Rodriguez); 209 (Ervin); 216 (Connell); 224 (Miller-
    Jones).

- 18 -

allegations show that Ford knew about the defects and indeed was the only entity capable of knowing their full extent.[47]

**(3)    Technicians' statements**

Finally, allegations that non-employee technicians described the problems with the relevant feature or equipment as "common" suffice to plead the manufacturer's knowledge of the defect.[48] At least one Plaintiff made such allegations. *See* ¶ 40 (CDD "spoke with Greg Murphy, a service manager at AutoNation (Power Ford)," who "explained … that he knew the MyFord Touch system was defective, that Ford had no intentions of correcting the defect, that his dealership had received complaints from customers about MyFord Touch, and that his dealership was not telling new car customers about the MyFord Touch problems"). Like that of the repair technician in *Clark*, Mr. Murphy's candor supports a finding that Ford knew about the defects.[49]

Because Ford had exclusive knowledge of the MyFord Touch defects, Ford had a duty to disclose those defects to Plaintiffs and the other Class members. The case law on which Ford relies does not compel a different result. Ford relies on *Wilson v. Hewlett-Packard Co.*[50] to contend that Plaintiffs have failed to sufficiently demonstrate that it had knowledge of the defects in the MyFord Touch system at the time of sale. *See* Def. Mem. at 14-15. But the 14 consumer complaints on which the *Wilson* plaintiffs relied to demonstrate defendant's pre-sale knowledge did not indicate how or where they were made and were either undated or dated years after plaintiffs had purchased their laptops.[51] *Wilson* is easily distinguishable in light of the mountain of evidence (including eight TSBs, numerous consumer complaints, and a dealer admission) cited in the FAC.

---

[47] *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, *Sales Practices*, *and Prods. Liab. Litig.*, 754 F. Supp. 2d 1208, 1227 (C.D. Cal. 2010) (*In re Toyota UA II*) (finding plaintiffs alleged facts sufficient to demonstrate manufacturer's exclusive knowledge "of the sheer magnitude and ongoing nature of the defect, as well as potential ways of identifying and correcting the defect").

[48] *See*, *e.g.*, *Clark*, 2013 U.S. Dist. LEXIS 155179, at *15-16 (finding statement of repair technician servicing appliance that alleged defect is a "common" problem supported inference of manufacturer's knowledge of defect).

[49] *See id.*

[50] *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012).

[51] *Id.* at 1148.

Indeed, several decisions issued subsequent to *Wilson* have found that plaintiffs adequately pled time of sale knowledge based on allegations similar to those in the FAC. The court in *Long v. Graco Children's Prods.*, for example, held that plaintiff sufficiently pled fraudulent omissions under California's Consumer Legal Remedies Act ("CLRA") by alleging defendant "knew or should have known" about the defect at the time of sale due to (i) NHTSA and Amazon.com complaints from before and after plaintiff's purchase, (ii) the existence of consumer complaints directly to defendant, and (iii) on information and belief, "pre-release testing data" that was performed.[52] The court in *Jekowsky v. BMW of N. Am., LLC* likewise found plaintiff's allegations that defendant knew or should have known of the defect during the warranty period, based on "consumer complaints, watchdog reports, and federal regulatory databases" as well as "authorized dealerships in California were receiving 'an inordinate number of complaints from dealers regarding cracked Alloy Wheels during the warranty period'" sufficient to show defendant was aware of the defect.[53]

For the same reasons, Ford's reliance on *Sanders v. Apple Inc.*[54] is misplaced. *See* Def. Mem. at 19. Plaintiff in that case made generic allegations that defendant must have known of a defect's existence by virtue of its "superior position of knowledge" and "exclusive knowledge as the manufacturer."[55] Plaintiffs here do much more.

---

[52] *Long v. Graco Children's Prods.*, 2013 U.S. Dist. LEXIS 121227, at *20-29 (N.D. Cal. Aug. 26, 2013).

[53] *Jekowsky v. BMW of N. Am., LLC*, 2013 U.S. Dist. LEXIS 175374, at *2, 15 (N.D. Cal. Dec. 13, 2013). *See also Decker v. Mazda Motor of Am., Inc.*, 2011 U.S. Dist. LEXIS 124182, at *12 (C.D. Cal. Oct. 24, 2011) (finding plaintiff's allegations sufficient to show defendant knew or should have known about the defect at the time of sale based on "superior and exclusive knowledge of the [defect], through its 'dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other internal sources of aggregate information about the problem."); *Banks v. Nissan N. Am., Inc.*, 2012 U.S. Dist. LEXIS 37754, at *2-3 (N.D. Cal. Mar. 20, 2012) (finding plaintiffs' allegations regarding "a) the [TSB] … issued by defendant on May 12, 2006, involving a braking defect in vehicles after a computerized diagnostic interrogation reveals error code C1179; and b) the existence of numerous NHTSA consumer complaints regarding brake failure since 2004 (some smaller portion of which reference the C1179 error code referenced in the TSB)" to plausibly allege defendant's knowledge of an unreasonable safety risk and defendant's intent to conceal this knowledge from consumers).

[54] *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 986 (N.D. Cal. 2009).

[55] *Id.* at 986.

**7.     Ford actively concealed the existence of MyFord Touch defects.**

Much more than Ford's "mere non-disclosure" evidences that Ford actively concealed (and conceals) the MyFord Touch defects. *Cf.*, Def. Mem. at 21. The FAC's allegations about Ford's practices in purportedly remedying MyFord Touch units, as well as Ford's adamant pre-litigation denials that the defects exist, adequately establish Ford's active concealment of the MyFord Touch defects.

Ford's failed "repairs" of Plaintiffs' MyFord Touch units, which amounts to replacing defective parts with equally defective parts, demonstrates Ford's active concealment of the defects.[56] Concealing TSBs also demonstrates active concealment.[57] Ford concealed its TSBs, which were only published to and implemented by authorized Ford dealers, and contacted consumers only when a user-controlled software update was available. ¶¶ 28 (user-controlled update), 274-87 (TSBs).

Ford offers two frail arguments against the sufficiency of Plaintiffs' active-concealment allegations: its remedial efforts may be for "legitimate business purposes" and the Federal Rules of Evidence ("FRE") render evidence of such efforts inadmissible. Def. Mem. at 21. That a party's conduct has multiple "purposes," some of which may be "legitimate," does not preclude a court from considering such conduct in the context of a complaint for fraud. With respect to the second argument, as Ford well knows, the FRE concern admissibility at trial, not sufficiency of factual allegations in a pleading. Both of these arguments should be rejected.

But Ford completely overlooks a further set of allegations that strongly support a finding of active concealment. Multiple Plaintiffs alleged that Ford, via its technical or customer-service representatives, adopted a blame-the-victim strategy and expressly denied that a defect existed when Plaintiffs contacted Ford. *See*, *e.g.*, ¶¶ 42 ("[a] Ford Consumer Affairs representative that identified himself as 'Mark' … denied that [MyFord Touch] was experiencing system-wide problems," faulting Plaintiff CDD's devices rather than Ford's system), 104 (Makowski), 164 (Miller). Such

---

[56] *See Mui Ho*, 931 F. Supp. 2d at 999 ("[d]efendants' decisions to repair Class Vehicles' headlamps only temporarily, or to replace them with other defective parts" demonstrates active concealment).

[57] *In re Toyota UA I*, 754 F. Supp. 2d at 1190.

- 21 -

allegations demonstrate active concealment. In *Apodaca v. Whirlpool Corp.*, for example, the court found that "allegations that [d]efendant denied the defect when [p]laintiffs called to request repairs or replacement dishwashers" supported a finding of active concealment.[58] The court in *Tietsworth v. Sears*, *Roebuck & Co.* likewise found that "[d]efendants' alleged denial of a defect when [p]laintiffs called to request free servicing or replacements" supported a finding of active concealment.[59]

### 8.  Ford's partial representations about MyFord Touch triggered a duty to disclose the defects.

Ford represented that the voice and touch controls in MyFord Touch enable drivers "to keep your hands on the wheel and eyes on the road" (¶ 250), and that its features "create an interactive, rich interface that makes the vehicle functions, settings and information easily accessible to the driver through voice, steering wheel controls or with a simple tap on the touch screen" (¶ 259). These "undistracted driving" and "easy accessibility" claims are misleading because they fail to disclose material facts, namely the MyFord Touch defects described above.[60] They thus trigger Ford's duty to disclose those defects.

As to reliance, "[a]ctual reliance is presumed (or at least inferred) when the omission is material."[61] A plaintiff adequately pleads reliance on fraudulent omissions where the complaint describes, generally, how plaintiff would have been exposed to the omitted material fact.[62] Twenty Plaintiffs alleged that they viewed websites or advertisements that could have contained disclosures of the alleged defects (¶¶ 22, 43, 56, 66, 78, 85, 98, 106, 126, 148, 157, 164, 172, 180, 187, 195, 202, 210, 217, 225), and the FAC reproduces a number of specific examples (*see*, *e.g.*, ¶¶ 250-56,

---

[58] *Apodaca v. Whirlpool Corp.*,2013 U.S. Dist. LEXIS 176363, at *21-22 (C.D. Cal. Nov. 8, 2013).

[59] *Tietsworth v. Sears*, *Roebuck & Co.*, 720 F. Supp. 2d 1123, 1134-35 (N.D. Cal. 2010).

[60] *Apodaca*, 2013 U.S. Dist. LEXIS 176363, at *22 (defendant's claim to using "commercial grade components" in product "failed to disclose material facts related to this partial representation, namely the potential problems with the control board and detergent dispenser").

[61] *Ehrlich*, 801 F. Supp. 2d at 919 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009)).

[62] *Daniel v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 80638, at *13 (E.D. Cal. June 6, 2013) (plaintiff pled reliance on omission where complaint identifies "website, advertisement, or other material that could plausibly contain the allegedly omitted fact").

- 22 -

259-60).[63] It is also well-settled that, where omitted facts relate to the very purpose or operability of a product, as here, reliance is adequately alleged even without such additional allegations. Ford's position "defies common sense and real-world business practice. No [automobile manufacturer] would ever advertise its product to, in essence, consistently fail …."[64] "Such disclosures do not exist in the real world because they represent product or service failure."[65] Plaintiffs thus adequately allege reliance on Ford's partial disclosures, triggering a duty to disclose the MyFord Touch defects.

Ford relies heavily on *Gray v. Toyota Motor Sales*, *U.S.A.*[66] and *Smith v. Ford Motor Co.*[67] to contend that it did not have a disclosure obligation to Plaintiffs. *See* Def. Mem. at 15-17. These cases are easily distinguishable. Plaintiffs in *Gray* alleged that Toyota knowingly marketed inaccurate fuel-economy figures.[68] The case had nothing to do with safety, other than to reaffirm the principle that a defendant has a disclosure duty when safety issues are implicated.[69] *Smith* involved an ignition-lock defect that prevented drivers from starting and shutting off their vehicle's engines.[70] In finding the safety issues associated with this defect to be "speculative," Judge Chesney noted that the cases relied on by plaintiffs "concerned a 'severe risk of injury while the vehicle was in motion,'" whereas the dangers envisioned in *Smith* "deriv[ed] in each instance from the particular location at which the driver initially has parked the vehicle" and were not supported by any evidence that the defect caused the vehicles to stop unexpectedly or under dangerous conditions.[71] Notably, Judge Conti recently refused to apply this holding from *Smith* in a case involving

---

[63] The FAC further alleges that had the material information been disclosed, Plaintiffs would not have bought or leased the Class Vehicles, or would have paid less for them. *See*, *e.g.*, ¶¶ 502, 820.

[64] *Clark*, 2013 U.S. Dist. LEXIS 155179, at *18-19.

[65] *Id.*

[66] *Gray v. Toyota Motor Sales*, *U.S.A.*, 2012 U.S. Dist. LEXIS 15992 (C.D. Cal. Jan. 23, 2012), *aff'd*, 2014 U.S. App. LEXIS 2197 (9th Cir. Feb. 5, 2014).

[67] *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980 (N.D. Cal. 2010), *aff'd*, 462 Fed. Appx. 660 (9th Cir. 2011).

[68] 2012 U.S. Dist. LEXIS 15992, at *3.

[69] *See id.* at *11-15 ("[i]t is undisputed that the case before us [does not involve] a safety-related defect.").

[70] 749 F. Supp. 2d at 989.

[71] *Id.* at 991.

- 23 -

1    headlamps in cars that flicker or go out.[72] Clearly, the description of the defect in the FAC – which

2    include instances where the MyFord Touch defect manifested while a Class Vehicle was in motion[73]

3    – make this case closer to *Mui Ho* than to *Gray* or *Smith*.

4        As demonstrated above, the FAC pleads the requisite factual content to allow this Court to

5    draw the reasonable inference that Ford is liable for its fraudulent conduct in relation to its defective

6    MyFord Touch system.

7    **B.    Plaintiffs' Iowa, Texas, and Virginia consumer-fraud claims are not time barred.**

8        Without citing a single case from Iowa, Texas or Virginia, Ford argues that Plaintiffs'

9    consumer-fraud claims are time barred under each of those states' laws. *See* Def. Mem. at 22-23.

10   For the reasons set forth below, this position is without merit.

11       ***First,*** each state permits a defendant's fraudulent or active concealment to toll the statute of

12   limitations.[74] The FAC's allegations of Fords' active concealment (*e.g.*, ¶¶ 230-31, 665, 1017, 1072)

13   are sufficient to toll these statutes of limitation here.

14

15       _____

16       [72] *See Mui Ho*, 931 F. Supp. 2d at 997 (N.D. Cal. 2013).

         [73] *See* ¶¶ 137, 155, 193, 201, 216.

17       [74] **Iowa**: *Baier v. Ford Motor Co*., 2005 U.S. Dist. LEXIS 17338, at *10-11 (N.D. Iowa Apr. 21,
         2005) ("[t]he Iowa Supreme Court has determined that fraudulent concealment can toll a statute of
18       limitations where one party has a cause of action against a second party but that second party, by
         fraud or fraudulent concealment, prevented the first party from obtaining knowledge of the cause of
19       action") (citing *McClendon v. Beck*, 569 N.W.2d 382, 385 (Iowa 1997)).

20       **Virginia**: *In re Bldg. Materials Corp. of Am.*, 2013 U.S. Dist. LEXIS 61228, at *11-12 (D.S.C.
         Apr. 29, 2013) ("Virginia law allows for the tolling of a statute of limitations period where the
21       plaintiff can demonstrate fraudulent concealment") (citing *Flick v. Wyeth LLC*, 2012 U.S. Dist.
         LEXIS 78900, at *3 (W.D. Va. June 6, 2012)). *But see Robertson v. Ford Motor Co.*, 40 Va. Cir.
22       231, 233 (Va. Cir. Ct. 1996) ("[t]here are no statutorily mandated ways in which the statute of
         limitations may be tolled under the [Virginia Consumer Protection Act]"). Even if this outlier case
23       could be read as prohibiting the tolling of the statute, Ford's argument should still be rejected
         because Virginia follows the discovery rule for this claim. *See Skibinski v. Lunger*, 70 Va. Cir. 423,
         423 (Va. Cir. Ct. 2006).

24       **Texas**: TEX. BUS. & COM. CODE § 17.565 ("[t]he period of limitation provided in this section
         may be extended for a period of 180 days if the plaintiff proves that failure timely to commence the
25       action was caused by the defendant's knowingly engaging in conduct solely calculated to induce the
         plaintiff to refrain from or postpone the commencement of the action"). Jose Randy Rodriguez – the
26       Texas plaintiff against whom Ford asserts a statute--of limitations defense – bought his vehicle on
         May 17, 2011, and filed his action on July 26, 2013. *See Rosser v. Ford Motor Co.*, No. 13-3471-
27       EMC. Thus, if the Texas Deceptive Trade Practices Act's two-year statute of limitations is extended
         by 180 days under Tex. Bus. & Com. Code § 17.565, the deadline for filing this claim would have
28       been November 13, 2013, at the earliest (*i.e.*, 180 days after May 17, 2013).

                                                    - 24 -

**Second,** each state also follows the discovery rule, which provides that the statute of limitations only begins to accrue when the plaintiff discovers (or should have discovered) the violation.[75]

Ford's contention that certain Plaintiffs immediately became aware that their MyFord Touch system was defective (*See* Def. Mem. at 22-23) is misplaced. Courts routinely decline to resolve such factual questions – such as when the plaintiff actually became aware of the existence of a cause of action – in connection with a motion to dismiss.[76] Significantly, these Plaintiffs attempted to fix the problems with their MyFord Touch systems by returning their vehicles to a Ford dealer, and/or by installing software updates on their own. ¶¶ 120, 201, 216. None of these recent efforts resolved their MyFord Touch systems' ongoing problems. *See id.*

Equally unpersuasive is Ford's argument that Plaintiffs' tolling allegations are "directly contradicted" by the fact that different plaintiffs filed a separate class-action lawsuit in a Louisiana state court in January of 2012.[77] *See* Def. Mem. at 23. While Ford claims that case also involved "alleged defects in MyFord Touch systems," it does not describe the nature of those allegations or explain how anything in that lawsuit would be sufficient to put Plaintiffs on notice of their claims. *Id.* To the contrary, Ford had previously joined Plaintiffs in representing to this Court that "[t]o the best of the parties' knowledge, other than the three above-captioned cases [in this Court], there are

---

[75] **Texas**: *St Johns United Methodist Church v. Delta Elecs.*, 2012 U.S. Dist. LEXIS 109037, at *6 (S.D. Tex. Aug. 3, 2012) ("[t]he [Texas Deceptive Trade Practices Act's] two-year statute of limitations period is tolled under the discovery rule until the plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, his injury"); *Skibinski*, 70 Va. Cir. at 423 ("[t]he statute of limitations in an action for violation of the Virginia Consumer Protection Act…based upon allegations of misrepresentation, deception, or fraud begins to accrue when the violation is discovered or, by the exercise of due diligence, should have been discovered"). **Iowa**: IOWA CODE § 714H.5(5) (statute of limitations for Iowa's Consumer Fraud Act is two years from "the occurrence of the last event giving rise to the cause of action…or within two years of the discovery of the violation of this chapter by the person bringing the action, whichever is later.").

[76] *See Barr v. Prudential-Bache Secur., Inc.*, 1991 U.S. App. LEXIS 30014, at *3 (9th Cir. Dec. 12, 1991) ("[w]hether a plaintiff knew or should have known of a cause of action presents a question of fact for the trier of fact") (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1501 (9th Cir. 1989). *See also Official Comm. of Admin. v. Bricker*, 2010 U.S. Dist. LEXIS 99140, at *28 (N.D. Ohio Sept. 21, 2010); *McAdams v. CitiFinancial Mortg. Co.*, 2008 U.S. Dist. LEXIS 16094, at *18 (M.D. La. Mar. 3, 2008).

[77] To the extent that Ford is suggesting that this January 2012 filing would have triggered the running of these two-year-long statute of limitations, it would result in the deadline for filing the case January 2014. This action was filed well before then.

- 25 -

1   no other pending related cases." *See* Dkt. No. 33, at 9. Ford accordingly fails to meet its burden of

2   invoking the statute of limitations as an affirmative defense here.[78]

3   **C.      Ford's argument that the economic-loss rule bars Plaintiffs' claims is meritless.**

4          Ford asserts that Plaintiffs' "tort-based" claims are barred under the economic-loss doctrine.

5   Def. Mem. at 24. The economic-loss doctrine is a "judicially created doctrine that sets forth the

6   circumstances under which a tort action is prohibited if the only damages suffered are economic

7   losses."[79] But, this doctrine is not a hard-and-fast "rule," as Ford suggests.[80] Indeed, as the Ninth

8   Circuit explained, "[m]any courts have explicitly refused to extend the economic loss doctrine

9   beyond the product liability context or beyond claims for negligence and strict liability…. [And

10  where,] some courts have applied the economic loss doctrine to bar recovery … [those claims] have

11  usually amounted to nothing more than a failure to perform a promise contained in a contract."[81]

12         Nevertheless, seeking to stretch the economic-loss doctrine beyond its limits, Ford attempts

13  to apply it to the Colorado, Florida, and North Carolina Plaintiffs' statutory and common-law fraud

14  claims. In doing so, Ford argues that Plaintiffs' claims are nothing more than products-liability or

15  breach-of-warranty claims retitled as fraud. But in making this argument, Ford turns a blind eye to

16  the fact that the "essence" of Plaintiffs' "tort-based" claims is *not* merely that the MyFord Touch

17  system "did not perform as advertised," as Ford incorrectly asserts, but, rather, that Ford

18  *fraudulently induced* Plaintiffs to purchase or lease the Class Vehicles, or to pay substantially more

19  for the Class Vehicles. ¶¶ 17, 514, 558, 560-61, 619, 655, 657-58, 870, 907, 909-10. Ford's

20  arguments ultimately run counter to case law in the relevant states, and therefore fail.

---

21      [78] *See I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co.V, LLC*, 2005 U.S. Dist.
22  LEXIS 47041, at *37 (N.D. Cal. July 15, 2005) ("the statute of limitations is an affirmative defense
    to be raised by the defendants … not a pleading requirement that must be satisfied by the plaintiff
23  …. 'A defendant raising the statute of limitations as an affirmative defense has the burden of
    proving the action is time barred.'") (quoting *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402
24  (9th Cir. 1995)).
        [79] *Tiara Condominium Assoc.*, *Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401 (Fla.
25  2013).
        [80] *See, e.g.*, *Calloway v. City of Reno*, 993 P.2d 1259, 1265-66, 1266 n.3 (Nev. 2000) (refusing
26  to delineate the universe of claims that would, or would not, be subject to the economic-loss
    doctrine, and holding that "the more reasoned method" is to examine in each case "the relevant
27  policies in order to ascertain the proper boundary between the distinct civil law duties that exist
    separately in contract and tort").
28      [81] *Giles v. GMAC*, 494 F.3d 865, 875-76 (9th Cir. 2007).

1

### 1.       Plaintiff Sheerin's Colorado claims are not barred.

2

Ford asserts that the economic-loss doctrine bars Plaintiff Sheerin's tort-based claims (*i.e.*,

3

his statutory claims under the Colorado's Consumer Protection Act ("CCPA"), and his common-law

4

claims for strict liability and fraud). Def. Mem. at 24. These arguments fail because Ford overlooks

5

key case law holding that the economic-loss doctrine does not apply to Plaintiff Sheerin's tort-based

6

claims.

7

First, under Colorado law, the economic-loss doctrine does not, and cannot, bar Plaintiff

8

Sheerin's strict-liability claim. On the contrary, the Colorado Supreme Court expressly permits strict

9

liability claims for purely economic losses.[82] Notwithstanding this clear authority from Colorado's

10

highest court, which is directly on point, Ford's moving papers do not address the decision. Indeed,

11

Ford fails to cite even a *single* case where strict-liability claims were disallowed for economic losses

12

under Colorado law.

13

Instead, Ford selectively quotes from *Carter v. Brighton Ford, Inc*.[83] But Ford's reliance is

14

misplaced because the *Carter* decision only addressed contract-based claims. Specifically, *Carter*

15

examined whether the "innocent seller" defense under the Colorado Products Liability Act shielded

16

defendant from plaintiff's claims for breach of implied warranty of merchantability and revocation

17

of acceptance.[84] Ford's argument concerning Plaintiff's strict-liability claims therefore must fail.

18

Ford also contends that the economic-loss doctrine bars Plaintiff Sheerin's statutory CCPA

19

and common-law fraud claims. But Ford again overlooks key case law. Critically, Colorado courts

20

do not apply the economic-loss doctrine in circumstances where the tort claims at issue establish a

21

duty independent of the contract.[85]

22

23

[82] *Hiigel v. Gen. Motors Corp.*, 544 P.2d 983, 989 (Colo. 1975) ("Although there is a split among the jurisdictions as to whether the damage to the product sold is covered under the doctrine of strict liability, we think the wiser view is that it is. Since … the burden of having cast a defective product into the stream of commerce falls upon the manufacturer, it appears inconsistent to limit his responsibility to property other than the product sold.").

24

25

[83] *Carter v. Brighton Ford, Inc*., 251 P.3d 1179 (Colo. App. 2010).

26

[84] *See* 251 P.3d at 1181.

27

[85] *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000) (where there is "a duty independent of any contractual obligations, the economic loss rule has no application and does not bar a plaintiff's tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule").

28

1   Here, under the CCPA, Ford owes an independent statutory duty to Plaintiff Sheerin –

2   outside of any contract – (i) not to, among other things, make "a false representation as to the

3   characteristics, ingredients, uses, benefits, alterations, or quantities of goods," (ii) not to "represent[]

4   that goods … are of a particular standard, quality, or grade … if he knows or should know that they

5   are of another," and (iii) not to "advertise[] goods … with intent not to sell them as advertised."[86]

6   Plaintiff Sheerin's CCPA claim is based on Ford's violations of those duties. The economic-loss

7   doctrine therefore does not bar Plaintiff's CCPA claim.[87]

8   Similarly, Colorado courts instruct that the economic-loss doctrine would not bar Plaintiff

9   Sheerin's common-law fraud claim because, like Plaintiff Sheerin's CCPA claim, it is based on the

10  breach of a duty specific to the claim – not to engage in fraud – which is independent of any

11  contract.[88] With respect to Plaintiff Sheerin's CCPA and common-law fraud claims, because Ford

12  owes a duty independent of the contract, the economic-loss rule accordingly does not apply.

13  Nevertheless, ignoring this precedent, Ford exclusively relies on *Rees v. Unleaded Software*,

14  *Inc*.[89] Ford asserts that *Rees* bars all of Plaintiff Sheerin's fraud-based claims, including those

15  asserted under the CCPA. *Rees*, however, similarly fails to support Ford's assertions. As discussed

16  above, the economic-loss doctrine does not apply when the duty that has been allegedly breached is

17  not derived from the contract. In *Rees*, the conduct at issue concerned defendant's breach of its

18  duties under the contract, not any duties arising independently of the contract.[90]

19  Plaintiff Sheerin's claims are premised on misrepresentations intended to induce reliance,

20  *not* on Ford's promise to perform.[91] Here, the essence of Plaintiffs' fraud-based claims is *not* merely

21

22  ───────────────
    [86] COLO. REV. STAT. § 6-1-105(1)(b), (g), and (i).

23  [87] *See, e.g.*, *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 865-70 (Colo.
    2005) (recognizing that homeowners association's negligence claims under the Construct Defect

24  Action Reform Act were based on a duty independent of contract and, thus, not barred by the
    economic-loss rule).

25  [88] *See, e.g.*, *Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995) (common-law fraud claim not barred
    by economic-loss rule because it is based on violation of a duty independent of contract).

26  [89] *Rees v. Unleaded Software, Inc*., 2013 Colo. App. LEXIS 1870 (Colo. App. 2013).

27  [90] 2013 Colo. App. LEXIS 1870, at *8 (economic-loss rule applied because the alleged false and
    misleading statements at issue were about defendant's *ability to perform contractual duties*).

28  [91] *See Brody*, 897 P.2d at 776 (distinguishing between a promise to perform and a promise
    intending to induce reasonable reliance and action on the part of the promisee); *Keller v. A.O. Smith*

- 28 -

1    that the MyFord Touch system did not perform as promised, but, also that Ford fraudulently induced

2    Plaintiffs to purchase or lease the Class Vehicles, or to pay substantially more for the Class Vehicles

3    than they otherwise would have absent the fraud. *See* ¶¶ 17, 514, 558, 560-61, 619, 655, 657-58,

4    870, 907, 909-10. Accordingly, *Rees* is inapposite.

5            **2.    Plaintiff Oremland's tort claims under Florida law are not barred.**

6            With respect to Florida law, Ford similarly argues that Plaintiff is asserting fraud-based

7    claims that are purportedly predicated on the same conduct giving rise to his claims for breach of

8    warranty under a product-liability theory. Def. Mem. at 24. Ford therefore asserts that the claims are

9    barred by the economic-loss doctrine. But Ford is mistaken. As discussed above, like Plaintiff

10   Sheerin, Plaintiff Oremland's "tort-based" claims are alleged statutory violations and allege that

11   Ford fraudulently induced him to purchase his Class Vehicle, or to pay substantially more for it than

12   he otherwise would have absent the fraud. Like the result under Colorado law, Plaintiff Oremland's

13   claims accordingly are not barred, because Florida recognizes that the economic-loss doctrine does

14   not apply to statutory causes of action and claims of fraudulent inducement to a contract.

15           Nevertheless, relying on *Burns v. Winnebago Indus., Inc.*,[92] Ford argues that the economic-

16   loss rule bars Plaintiff Oremland's "tort-based" claims under Florida law. In *Burns*, the district court

17   refused to apply the negligent-misrepresentation and fraudulent-inducement exceptions to Florida's

18   economic-loss doctrine.[93] Specifically, the *Burns* court believed that it was "unclear" whether the

19   Florida Supreme Court's decision in another case[94] "affect[ed] the viability of [those] exceptions."[95]

20   And the analysis in *Burns* is based on a misreading of the *Tiara* court's holding. In *Tiara*, the

21   Florida Supreme Court traced the history of the economic-loss doctrine in Florida. The Florida

22   Supreme Court then held as follows:

23

---

24   *Harvestore Prods., Inc.*, 819 P.2d 69 (Colo. 1991) (holding that plaintiff's negligent misrepresenta-
     tion claim was "independent of any principle of contract law," because the alleged misrepresenta-

25   tions related to claims *intended to induce action* – to purchase farm equipment – not a promise to
     perform duties in a contract).

26       [92]  *Burns v. Winnebago Indus., Inc.*, 2013 U.S. Dist. LEXIS 116377 (M.D. Fla. Aug. 16, 2013).
         [93] *Id.* at *8.

27       [94] *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013).

28       [95] 2013 U.S. Dist. LEXIS 116377, at *8.

> Having reviewed the origin and original purpose of the economic loss
> rule, and what has been described as the unprincipled extension of that
> rule, *we now take this final step and hold that the economic loss rule
> applies only in the products liability context. We thus recede from our
> prior rulings to the extent that they have applied the economic loss
> rule to cases other than products liability*…. Our experience with the
> economic loss rule over time, which led to the creation of the excep-
> tions to the rule, now demonstrates that expansion of the rule beyond
> its origins was unwise and unworkable in practice. Thus, today we
> return the economic loss rule to its origin in products liability.[96]

Contrary to the *Burns* court's holding, there was no ambiguity – the *Tiara* court did *not* hold that the well-recognized exceptions to the economic-loss rule are no longer applicable in the products-liability context, it merely overruled prior case law applying the economic-loss rule to contractual-privity cases.

Setting aside Ford's misplaced reliance on *Burns*, the economic-loss doctrine does not apply under Florida law to claims like Plaintiff Oremland's concerning alleged breaches of independent duties arising from statute or fraud.[97] Ford's argument, accordingly, is meritless.

### 3. Plaintiff Fink's tort claims under North Carolina law are not barred.

Ford argues that Plaintiff Fink's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (Count I) is barred by the economic-loss doctrine. Ford's reliance on *Ellis v. Louisiana-Pac. Corp.*[98] is misplaced. *Ellis* is distinguishable. In *Ellis*, the district court ruled the economic-loss rule barred plaintiff's UDTPA claims because the damage sought under the UDTPA claim "[was] the same damage upon which the breach of warranty claim is based."[99] In contrast, here, Plaintiff Fink alleges under UDTPA that he was damaged because Ford's fraudulent

---

[96] *Tiara Condo. Ass'n*, 110 So. 3d 407 (emphasis added).

[97] *See, e.g.*, *Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.*, 753 So. 2d 1219, 1223 (Fla. 1999) (holding that "the economic loss rule does not bar statutory causes of action"); *HTP, Ltd. v. Lineas Aeras Costarricenses S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996) (recognizing that "fraudulent inducement claims may coexist with breach of contract claims," and holding that plaintiff's "cause of action for fraud in the inducement is an independent tort and is not barred by the economic loss rule"); *Samuels v. King Motor Co.*, 782 So. 2d 489, 498 (Fla. Ct. App. 2001) (determining that the trial court erred in dismissing plaintiff's claims for fraud in the inducement and deceptive and unfair trade practices, and stating that "the economic loss rule does not bar the Plaintiffs' fraud in the inducement claim because fraudulent inducement is a tort independent from any underlying contract."); *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So. 2d 602, 609 (Fl. Ct. App. 1997) (holding that economic-loss rule does not affect Florida's unfair trade practices act).

[98] *Ellis v. Louisiana-Pac. Corp.*, 2011 U.S. Dist. LEXIS 129378 (W.D.N.C. Nov. 8, 2011), *aff'd*, 699 F.3d 778 (4th Cir. 2012).

[99] 2011 U.S. Dist. LEXIS 129378, at *4-5.

misrepresentations induced him and other North Carolina consumers to lease or purchase Class

Vehicles, or to pay more for the vehicles than they otherwise would have. ¶¶ 17, 870. This damage

is separate and distinct from the damage caused by the fact that the MyFord Touch system is

defective and does not work as advertised. Accordingly, *Ellis* is inapposite.

Additionally, because the North Carolina appellate courts have not yet decided whether to

extend the economic-loss rule to UDTPA claims, the district court in *Ellis* improperly created North

Carolina law. On appeal, the Fourth Circuit recognized this, and refused to affirm the district court's

ruling on grounds that the economic-loss rule bars UDTPA claims.[100] Accordingly, at a minimum,

Plaintiffs request that this Court follow the Fourth Circuit's lead in refusing to create new law by

applying the economic-loss rule to the UDTPA.

Ford also contends that the economic-loss rule bars Plaintiff Fink's fraudulent concealment

claim (Count V). But Ford fails to cite a single case holding that the economic-loss rule bars fraud

claims under North Carolina law. Def. Mem. 24-25. Indeed, North Carolina does not apply the

economic-loss rule to fraud claims.[101] Accordingly, Ford's argument that the economic-loss rule

bars Count V under North Carolina law also fails.

### 4. Plaintiff Zuchowski's negligence claim under Ohio law is not barred.

In Ohio, the economic-loss doctrine's applicability depends on the complexity of the parties

and the type of tort claim at issue.[102] Where, as here, the parties are *not* in contract privity, courts

---

[100] *See Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 n.5 (4th Cir. 2012) ("the North Carolina courts have never addressed whether UDTPA claims are subject to the [economic loss rule], and in the absence of such direction, we are well-advised to rely on other grounds."). *See also Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 315 (4th Cir. 2007) ("as a court siting in diversity, we should not create or extend the North Carolina common law").

[101] *See In re Ford Motor Co. Vehicle Paint Litig.*, 1996 U.S. Dist. LEXIS 11063, at *37 (E.D. La. July 30, 1996) ("North Carolina has allowed plaintiffs to recover purely economic losses in an action for fraud," and holding that economic-loss doctrine did not bar plaintiff's fraudulent-misrepresentation claim under North Carolina law); *see also Club Car, Inc. v. Dow Chem. Co.*, 2007 NCBC LEXIS 10, at *9 (N.C. Super. Ct. May 3, 2007) (noting that the "North Carolina appellate courts have yet to extend the application of the economic loss doctrine to bar claims based on fraud").

[102] *See, e.g.*, *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1029 (6th Cir. 2003) (stating that "parties lacking privity might be subject to the economic loss rule under some circumstances and that commercial parties lacking privity, as opposed to non-commercial parties, would be foreclosed from recovering economic losses"); *Cincinnati Gas & Elec. Co. v. Gen. Elec.*

1   apply a more relaxed rule allowing individual consumers to bring negligence claims for solely

2   economic injuries.[103] Under this relaxed rule, there can be no argument that Plaintiff Zuchowski's

3   negligence claim is barred by the economic-loss doctrine.[104]

4        Setting aside its flawed economic-loss rule argument, Ford also argues that Plaintiff

5   Zuchowski's negligence claim fails "because Ford has complied with all of its obligations to him

6   under its written warranty." Def. Mem. at 26. This argument is based on Sections VI – VIII of

7   Ford's motion, which, as explained herein, are meritless. Accordingly, this argument also fails.

8   **D.      The FAC pleads a plausible claim for breach of express warranty.**

9        **1.      The FAC alleges sufficient detail establishing that Plaintiffs had malfunctioning, defective MyFord Touch systems in their vehicles that Ford was unable to fix.**

10        Ford insists it did all that its New Vehicle Limited Warranty required of it. Its agents at Ford

11   dealerships, according to Ford "repair[ed], replace[d], or adjust[ed]" all malfunctioning parts

12   "without charge" during the warranty period. Def. Mem. at 27. But, according to Ford, the warranty

13   does not promise that Ford will actually make the malfunctioning part work. *Id*. For this reason,

14   Ford urges, the FAC fails to allege that Ford breached its Limited Warranty.

15        But any notion of "repair" in this context requires fixing something that is broken. Con-

16   sumers would understand Ford's warranty to "repair" a malfunctioning part as a promise to make

17

18   *Co.*, 656 F. Supp. 49, 56-61 (S.D. Ohio 1986) ("since there is a written contract between

19   sophisticated parties and plaintiffs seek recovery for economic loss alone, plaintiffs are limited to such remedies that are available under contract law").

20   [103] *See LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) (consumer's failure to allege other than economic damages does not destroy tort claim but only removes it from purview

21   of products-liability statutes); *Midwest Ford, Inc. v. C.T. Taylor Co.*, 694 N.E.2d 114, 116-17 (Ohio Ct. App. 1997) (noting that, in the absence of privity, Ohio law distinguishes between consumers,

22   who may maintain negligence claim for solely economic damages, and commercial buyers, who may not); *Trgo v. Chrysler Corp.*, 34 F. Supp. 2d 581, 591 n.9 (N.D. Ohio 1998) (acknowledging

23   that the Supreme Court of Ohio had "recently allowed certain tort claims to proceed even though the plaintiff sought only economic damages" where the plaintiff was a consumer, but holding that

24   "Plaintiffs Trgo would not be able to pursue economic loss damages in tort because of their status as commercial buyers").

25   [104] Ford concedes that the Ohio Supreme Court expressly limited its holding in *Chemtrol Adhesives* barring negligence claims under the economic-loss rule to parties in *contractual privity*.

26   Def. Mem. at 25. Accordingly, *Chemtrol Adhesives* is not dispositive here, because there is no contract between the parties. *See Midwest Ford, Inc.*, 694 N.E.2d at 116 ("The [*Chemtrol*] Court

27   expressly disclaimed reconsideration of whether, *absent privity*, a plaintiff can recover economic losses under tort theories.... Since Midwest is not in privity with O'Brien, *Chemtrol* is not

28   dispositive.") (emphasis in original).

- 32 -

the part work as represented – not to replace one malfunctioning part with another. Dictionaries define "repair" as to "fix" or "restore by replacing a part or putting together what is torn or broken," or to "restore to a sound or healthy state."[105] Courts similarly define the term as "to fix anything that is broken."[106] Servicing a malfunctioning part but failing to make it work does not qualify as a "repair." The warranty's promise to replace or adjust a malfunctioning part similarly requires the adjusted or replacement part to function properly after completion of the warranty work. Contrary to Ford's suggestion, the FAC alleges in great detail that Ford failed to cure the malfunctioning MyFord Touch system in each Plaintiff's vehicle.[107]

Ford cites three authorities as support that its failure to repair the defective SYNC systems does not constitute a breach of warranty. Br. at 30. But the decisions are distinguishable because plaintiffs did not allege or establish that the repairs failed.[108]

Ford next argues that those Plaintiffs who did not seek a repair from Ford cannot assert a warranty claim. Def. Mem. at 28. This argument is unpersuasive. As the FAC makes clear, it would have been futile for Plaintiffs to seek such a repair because the Limited Warranty failed its essential purpose. The same UCC provision on which Ford relies recognizes that a warrantor's inability to

---

[105] *See*, *e.g.*, http://www.merriam-webster.com/dictionary/repair?show=0&t=1391989166 (defining transitive-verb form of "repair").

[106] *See*, *e.g.*, *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 676 (5th Cir. 2007); *Delawder v. Am. Woodmark Corp.*, 178 Fed. Appx. 197, 202 (4th Cir. 2006).

[107] *See*, *e.g.*, ¶¶ 23-30, 51, 57-60, 69-71, 76-77. The FAC alleges the specific problems that each Plaintiff experienced, the Plaintiff's attempts to obtain repair from a Ford dealership, and that the repair(s) failed because the Plaintiff continues to experience same problems afterwards. *See*, *e.g.*, ¶¶ ¶¶ 21-33 (Whalen); ¶¶ 36, 38-40, 42 (Center for Defensive Driving); ¶¶ 50-51 (Grif Rosser); ¶¶ 57-60 (Megan Raney-Aarons); ¶¶ 68-71 (Watson); 76-77 (Thomas-Maskrey); 90, 92 (D'Aguanno); 103-04 (Makowski); 112 (Oremland); 119-20 (Mitchell)[107]; 128-41 (Creed); ; 147 (Matlin); 154-55 (Rizzo); 170-71 (Purcell); 178-79 (Fink); 193-94 (Avedisian); 201 (Rodriguez); 208-09 (Ervin); 216 (Connell); 223-24 (Miller-Jones). These allegations, together with allegations that Ford's agents told Plaintiffs that Ford could not fix the problems (*e.g.*, ¶ 40), plead that Ford breached its Limited Warranty to repair, replace or adjust malfunctioning parts.

[108] *See Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 55 (Mich. Ct. App. 2005) ("all repairs were actually made"); *LaBonte v. Ford Motor Co.*, 1999 Ohio App. LEXIS 4795, at *16-17 (Ohio Ct. App., Oct. 7, 1999) ("Ford complied with the terms of its limited warranty by making repairs and/or adjustments to affect the warning light on two occasions (at 17,784 miles and 21,185 miles) and that the problem did not reoccur until approximately 36,608 miles"); *Bradbury v. DaimlerChrysler Corp.*, 2007 WL 6930486 (Mass. Super. Ct. Sept. 18, 2007) (trial court distinguished *Santosuosso v. Gibbs Ford. Inc.*, 1992 Mass.App.Div. 167 (1992), for holding that "defendant's 'best efforts' to fix the vehicle, *when ultimately unsuccessful* are insufficient to satisfy the warranty requirements") (emphasis added).

cure the defect nullifies the limitation: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this [code]." U.C.C. § 2-719(2).[109] Courts agree that a purchaser is released from the remedies provided in a limited warranty when they are ineffective, such as when the warrantor cannot repair a defect.[110]

### 2. Ford's New Vehicle Limited Warranty was part of every bargain because Ford promised the warranty to each purchaser as part of each transaction.

Ford moves to dismiss the FAC's express-warranty claims on the ground that the FAC does not plead that any warranty – including Ford's written New Vehicle Limited Warranty provided to every vehicle purchaser – was part of the bargain or that any Plaintiffs relied on it. Def. Mem. at 35-37. But U.C.C. § 2-313(1)(a) does not require a showing of reliance by the buyer; rather, it provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." The FAC alleges that each Plaintiff purchased (or leased) a Ford or Lincoln vehicle *and* Ford's promise to repair or replace defective parts. Ford's New Vehicle Limited Warranty was a central part of each and every purchase or lease. *See* ¶¶ 297, 298, 473, 527, 579, 624, 677, 723, 771, 827, 876, 928, 979, 1032, 1077.

This is more than enough to establish that Ford's Limited Warranty was part of each Plaintiff's bargain. Courts are reluctant – for evident reasons – to let manufacturers evade their obligations under a warranty, where the warranty was used to entice customers to buy the manufacturer's product. Courts therefore readily find that a manufacturer's written warranty is part of a transaction. In *LWT, Inc. v. Childers*, for example, the Tenth Circuit ruled that the mere fact a manufacturer's written warranty was printed in the manufacturer's product catalog, which had been

---

[109] This U.C.C. provision has been adopted in all 15 states in which Plaintiffs reside. *See, e.g.*, ALA. CODE § 7-2-719(2); ARIZ. REV. STAT. § 47-2719(B); CAL. COM. CODE § 2719(2); COLO. REV. STAT. § 4-2-719(2); CONN. GEN. STAT. § 42a-2-719(2); FLA. STAT. § 672.719(2); IOWA CODE § 554.2719(2); MASS. GEN. LAWS ch. 106, § 2-719; N.J. STAT. § 12A:2-719(2); N.Y. U.C.C. Law § 2-719(2); N.C. GEN. STAT. § 25-2-719(2); OHIO REV. CODE ANN. 1302.93(B); 13 Pa.C.S. § 2719(b); TEX. BUS. & COM. CODE § 2.719(b); VA. CODE ANN. § 59.1-508.3(b).

Ford also claims that the FAC does not allege defects that Ford failed to fix. Def. Mem. at 28-29. But the FAC plainly alleges such defects, *see supra* at 12-13, and the Ford did not fix them, .

[110] *Hadar v. Concordia Yacht Builder, Inc.*, 886 F. Supp. 1082, 1099-1100 (S.D.N.Y. 1995).

- 34 -

provided to the purchaser/plaintiff before the transaction, was enough to create a factual question

whether it was part of the purchase transaction:

> A limited warranty contained in a manufacturer's catalog may be considered part of the basis of the parties' bargain, so long as the purchaser received the catalog and had an opportunity to read the warranty … prior to or at the time of the sale …. The question of whether the catalog containing the limited warranty became part of the parties' bargain is ordinarily one of fact for the jury.[111]

Ford's reliance on *Yancey v. Remington Arms Co., LLC*, where a district court applying the

law of North Carolina dismissed written-warranty claims against a rifle manufacturer for failing to

prove reliance is misplaced.[112] That court overlooked the fact that, decades before, the North

Carolina Supreme Court ("NCSC") recognized that while reliance remains a requirement of an

express-warranty claim, it can be readily inferred. In *Kinlaw v. Long Mfg. N. C., Inc.*, the North

Carolina supreme court reversed the trial court's dismissal (affirmed by a lower appellate court) of

an express-warranty claim arising from the alleged breach of a tractor manufacturer's written

warranty.[113] The court ruled that the lack of privity does not bar an express-warranty claim where

the manufacturer makes representations about the product to induce a purchase.[114] *Kinlaw* and its

ease-of-inferring-reliance rule remains controlling law in North Carolina, notwithstanding *Yancey*'s

failure to recognize it.[115]

Ford also contends it need not honor its written warranty to California purchasers absent

express allegations of reliance.[116] California law, however, is to the contrary. As the district court

held in *In re Toyota Motor Corp.*, reliance, while perhaps once required in some states' common

---

[111] *LWT, Inc. v. Childers*, 19 F.3d 539, 541 (10th Cir. 1994).

[112]  *Yancey v. Remington Arms Co., LLC*,  2013 U.S. Dist. LEXIS 140397, at *7, *26 (M.D.N.C. Sept. 30, 2013).

[113] *Kinlaw v. Long Mfg. N. C., Inc.*, 259 S.E.2d 552, 553-54 (N.C. 1979).

[114] *Id.* at 555-57 (explaining with approval movement away from privity requirement in other jurisdictions).

[115] *See, e.g., Prichard Enters v. Adkins.*, 858 F. Supp. 2d 576, 585 (E.D.N.C. 2012); *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 621 (M.D.N.C. 2005); *Bernick v. Jurden*, 293 S.E.2d 405, 414 (N.C. 1982).

[116] Def. Mem. at 36 n.17 (citing *Keegan v. Am Honda Motor Co.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012)).

- 35 -

law, is not required under the U.C.C.[117] As to Ford's violation of California's Beverly-Song Act, the claim does not require privity or reliance. Indeed, "the Act applies to new motor vehicle manufacturers who make express warranties."[118] It does not state or imply that reliance is necessary to create an express warranty.[119] Moreover, the FAC explicitly alleges that Ford's written warranty "formed the basis of the bargain" for each Plaintiff. ¶¶ 297-98, 423, 473.

Ford's remaining authorities do not address manufacturers' written warranties extended to purchasers as part of the purchase transaction. Instead, most concern advertising and other representations aside from those in the contract. In *Hydroxycut Mktg. Litig. & Sales Prac. Litig. v. Iovate Health Sciences Grp.*, for example, the complaint did not allege breach of a written warranty – indeed, it provided no indication as to "which affirmations or promises formed the 'basis of their bargain.'"[120] The complaints in *Walters v. Carson*[121] and *Mills v. Bristol-Myers Squibb Co.*[122] also did not allege a written warranty. In *Horowitz v. Stryker Corp.*, the court complained that "Plaintiff does not even describe how this representation [about a medical device] was made."[123] In *Hobbs v. General Motors Corp.*, the alleged representation about a "full size spare" tire did not appear in the written warranty.[124] In *Yurcic v. Purdue Pharma, L.P.*, there was no written warranty or no public representations to support an express-warranty claim.[125] These cases are easily distinguished, because the FAC specifically identifies the actual terms of Ford's Limited Warranty breached by

---

[117] *In re Toyota UA I*, 754 F. Ct. Supp. 2d at 1183 n.22 (quoting *Weinstat v. Dentsply Int'l, Inc.*, 103 Cal. Rptr. 3d 614, 626 (Cal. App. 2010)).

[118] *Jensen v. BMW of North Am., Inc.*, 41 Cal. Rptr. 2d 295, 304 (Cal. Ct. App. 1995).

[119] *See* CAL. CIV. CODE § 1791.2(a)(1) ("A written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer … undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance." (b) provides: "if such words ['warrant' or 'guarantee'] are used then an express warranty is created.").

[120] *Hydroxycut Mktg. Lit. & Sales Prac. Lit. v. Iovate Health Sciences Grp.*, 801 F. Supp. 2d 993, 1008 (S.D. Cal. 2011).

[121] *Walters v. Carson*, 2012 U.S. Dist. LEXIS 178473, at *8-9 (D.N.J. Dec. 17, 2012).

[122] *Mills v. Bristol-Myers Squibb Co.*, 2011 U.S. Dist. LEXIS 90357, at *7-8 n.3 (D. Ariz. Aug. 11, 2011).

[123] *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 286 (E.D.N.Y. 2009).

[124] *Hobbs v. General Motors Corp.*, 134 F. Supp. 2d 1277, 1280-81 (M.D. Ala. 2001).

[125] *Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 394-95 (M.D. Pa. 2004).

1    Ford's inability to repair Plaintiffs' defective MyFord Touch systems. ¶¶ 299, 301, 386, 422, 472,

2    526, 578, 623,676, 722, 770, 826, 875, 927, 978, 1031, 1076.

3           In short, the FAC alleges that Ford provided its Limited Warranty to every Plaintiff as part

4    of each Plaintiff's transaction and identified the warranty as included with each purchase. Privity is

5    not required to enforce the warranty and, to the extent any state requires reliance, it is easily inferred

6    from these circumstances.

7           **3.      To the extent applicable, Plaintiffs have satisfied the U.C.C. notice**
                       **requirements.**

8

9           Ford next contends that Plaintiffs from nine states failed to provide Ford with the notice set

10   forth in U.C.C. § 2-607. *See* Def. Mem. at 37, n.19. Preliminarily, this  U.C.C. section only requires

11   notice to a "seller." *See* U.C.C. § 2-607(3). Courts distinguish between an immediate seller (which

12   Ford is not) and a remote manufacturer (which Ford is), and hold that § 2-607(3)'s notice

13   requirement applies only to the former but not to the latter.[126] There is also case law from the

14   majority of those states recognizing that the filing of a complaint itself can satisfy this notice

15   requirement.[127] Regardless, Ford's contention that it lacked the requisite knowledge under U.C.C.

16   § 2-607 is disingenuous in light of the overwhelming allegations in the FAC concerning consumer

17   complaints, the NHTSA database, news articles and direct notice *of this particular problem* Ford

18

19

20          [126] *See Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012) ("when
     claims are against a defendant in its capacity as a manufacturer, not as a seller, plaintiff is not
21   required to give notice") (citations omitted).

22          [127] (**Arizona**): *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1116 (D. Ariz.
     2003); (**Colorado**): *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 741 (Colo. 1991);
23   (**Iowa**): *Wright v. Brooke Grp. Ltd.*, 114 F. Supp. 2d 797, 830 (N.D. Iowa 2000); (**Ohio**): *Chemtrol
     Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 636 (Ohio 1989); (**Pennsylvania**):
24   *Precision Towers, Inc. v. Nat-Com, Inc.*, 2002 Phila. Ct. Com. Pl. LEXIS 16, at *13 (Sept. 23,
     2002); (**Virginia**): *Board of Dirs. of Bay Point Condominium Ass'n, Inc. v. RML Corp.*, 2002 Va.
25   Cir. LEXIS 10, at *55-57 (Va. Cir. Ct. Jan. 28, 2002).

26          In the remaining states (**Florida** and **Texas**), there is authority that U.C.C. § 2-607 does not
     require notice to a remote manufacturer like Ford. *See Federal Ins. Co. v. Lazzara Yachts of N. Am.,
27   Inc.*, 2010 U.S. Dist. LEXIS 28865, at *14 (M.D. Fla. Mar. 25, 2010); *Vintage Homes, Inc. v.
     Coldiron*, 585 S.W. 2d 886, 888 (Tex. Civ. App. 1979). **Alabama** also recognizes that the notice
28   requirement is "not to be automatically applied." *Hobbs v. GMC*, 134 F. Supp. 2d 1277, 1284 (M.D.
     Ala. 2001).

- 37 -

1    received from Plaintiffs and similarly situated consumers. *See, e.g.,* ¶¶ 4, 63, 144, 194.[128] The court

2    can reject Ford's argument to dismiss the warranty claims on this basis.

3         **4.      Lack of direct privity does not require dismissal of Plaintiffs' common-law breach-of-warranty claim under Arizona law.**

4    

5         Plaintiffs do not contest Ford's argument that Arizona law requires privity for breach of

6    express and implied warranty claims under the U.C.C. *See* Def. Mem. at 39, 43. But that limitation

7    only applies to Counts II and III of the FAC – not to Count IV's common-law breach-of-contract

8    claim. The Arizona Supreme Court held in *Seekings v. Jimmy GMC, Inc.* that Arizona law does not

9    require privity for such claims that arise *outside* of the U.C.C.[129] Based on *Seekings*, the court in *In*

10   *re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.* recently rejected a

11   virtually identical attempt by a remote manufacturer to dismiss an Arizona breach-of-express-

12   warranty claim that arose outside of the U.C.C., even where there was no privity.[130] This Court

13   should do the same here, and deny Ford's request to dismiss Count IV.[131]

14   ───────────────

      [128] Ford's argument that Plaintiffs waited an unreasonable amount of time to commence
15   litigation is similarly unavailing. *See* Def. Mem. at 39. Plaintiffs are consumers, many of whom
     brought their vehicles into Ford dealers in an attempt to remedy the problems with their MyFord
16   Touch systems. The comments to the rule indicate that the rule should be given a liberal
     construction under the circumstances. U.C.C. § 2-607 (2012), *Official Comment 4* ("[a] reasonable
17   time for notification from a retail consumer is to be judged by different standards so that in his case
     it will be extended, for the rule requiring notification is designed to defeat commercial bad faith, not
18   to deprive a good faith consumer of his remedy").

      [129] *Seekings v. Jimmy GMC, Inc.,* 638 P.2d 210, 215 (Ariz. 1981) ("lack of privity between a
19   manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express
     warranty").
20
      [130] *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 2013 U.S.
21   Dist. LEXIS 105830, at *66-70 (S.D. Fla. 2013).

22    [131] Ford contends the Court should dismiss the FAC's breach-of-contract claims also because the
     FAC does not allege a contract between Ford and each Plaintiff. Def. Mem. at 40 n.20. But the FAC
23   does alleges such contracts. *E.g.*, ¶ 297 ("In connection with the sale (by purchase or lease) of each
     one of its new vehicles, Ford provides an express limited warranty on each vehicle. In those war-
24   ranties, Ford promises to repair any defect or malfunction that arises in the vehicle during a defined
     period of time. This warranty is provided by Ford to the vehicle owner in writing."). The Ford New
25   Vehicle Limited Warranty Guide explicitly states that Ford itself made the warranty promises to the
     Plaintiffs. *E.g.*, Declaration of Randall W. Edwards, Ex.A (Dkt. No. 57-2) at 8 ("[t]his chart gives a
26   general summary of your warranty coverage provided by Ford Motor Company under the New
     Vehicle Limited Warranty"); *id. at* 9 ("Ford provides the New Vehicle Limited Warranty in order to
27   remedy any such defects that result in vehicle part malfunction or failure during the warranty
     period"). Ford's promises to buyers create contract privity. *See, e.g., Rothe v. Maloney Cadillac,*
28   *Inc.*, 518 N.E.2d 1028, 1030-31 (Ill. 1988) (""we recognized in *Szajna* the privity of contract which
     exists between a manufacturer and consumer when the manufacturer makes a contractual promise
     (express warranty) directly to the consumer").

1

**E.      Plaintiffs properly state breach-of-implied-warranty claims**

2

From its launch in 2010, Ford hailed the MyFord Touch as an "intuitive driver experience"

3

intended to significantly enhance the safety and convenience of Ford vehicles. *See* ¶¶ 5-6, 235, 251-

4

256, 258-59. In reality, however, the MyFord Touch system is, and always has been, plagued with

5

numerous defects. These are not minor inconveniences that merely interfere with entertaining

6

passengers in the Class Vehicles. Rather, as described in the FAC, these system failures directly

7

jeopardize the safety of the driver and passengers, and other motorists and pedestrians. ¶¶ 7-14, 257,

8

261-70, 288-91. Because the Class Vehicles equipped with the MyFord Touch system do not

9

conform to their ordinary and intended use, Ford has breached the implied warranty of

10

merchantability.[132]

11

**1.      Class vehicles equipped with the MyFord Touch system do not conform to their ordinary, intended use.**

12

Ford argues that, because Plaintiffs have not specifically alleged that they were unable to

13

drive the Class Vehicles and "[t]he ordinary purpose of a vehicle is to drive," Plaintiffs' breach of

14

implied warranty of merchantability claims fail. Def. Mem. at 42. Under Ford's unreasonably

15

narrow view, if it delivers a car that will start and can be driven, that is enough. But that is not the

16

law. Indeed, Ford's own authorities undermine its argument.[133] In short, "California courts reject the

17

notion that merely because a vehicle provides transportation from point A to point B, it necessarily

18

does not violate the implied warranty of merchantability."[134]

19

20

21

22

---

[132] *See Berenblat v. Apple, Inc.*, 2009 U.S. Dist. LEXIS 80734, at *2 (N.D. Cal. Aug. 21, 2009) ("'[m]erchantability' requires that a product conform to its ordinary and intended use").

23

24

25

26

[133] For example, Ford relies on *Skelton v. General Motors Corp.*, 500 F. Supp. 1181 (N.D. Ill. 1980), for the proposition that breach-of-implied-warranty claims against a car manufacturer fail where the subject vehicles are still capable of providing transportation. In *Skelton*, however, the plaintiffs alleged that the defendant replaced the original transmission with an inferior model, but they did not allege that the replacement transmission adversely impacted the vehicle's operation. *Id.* at 1191-92. Here, Plaintiffs have alleged that the defects in the MyFord Touch system affect primary driving functions of the Class Vehicles. *See* ¶¶ 7, 262-66, 291. *Skelton* accordingly is inapposite.

27

28

[134] *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 946 (C.D. Cal. 2012) (internal citations omitted).

- 39 -

1          Numerous other courts across the country agree. Ford cannot escape liability under

2  Plaintiffs' implied-warranty-of-merchantability claims merely because the Class Vehicles provide

3  basic transportation.[135]

4          Moreover, Ford's argument improperly ignores the fact that it *specifically intended* and, in

5  fact, marketed and advertised that the MyFord Touch would improve the Class Vehicles' safety and

6  functionality. As Plaintiffs allege, "infotainment systems" like the MyFord Touch system are

7  "designed to attract buyers who want to manage available technology while on the road, while

8  minimizing distractions, and maximizing safety." ¶ 2.[136] Understanding this, "Ford aggressively

9  promoted its MyFord Touch system as a revolutionary technology that enhances the safety and

10  convenience of Ford vehicles." ¶¶ 5, 251-56, 258-59.

11         Additionally, Ford charges a hefty premium of approximately $1,000 to add the "state-of-

12  the-art technology" to new vehicle purchases, which clearly indicates that Ford perceives the

13  MyFord Touch as a considerable enhancement to the safety and functionality of the Class Vehicles.

14  ¶ 241. Accordingly, it is reasonable to infer that the Class Vehicles' intended purpose is not merely

15

16

---

17        [135] *Galitski v. Samsung Telecomms. Am.*, *LLC*, 2013 U.S. Dist. LEXIS 171908, at *39-40 (N.D.

18  Tex. Dec. 5, 2013) (holding that, despite still being able to use his Samsung Galaxy phone, plaintiff nonetheless plead a plausible claim for breach of implied warranty, because he alleged there was a

19  "[a] defect that causes [his] phone to randomly freeze, shut down, and power-off while in standby mode, thereby making it impossible to receive or deliver calls, messages or data and requiring him

20  to remove the battery, reinsert it, and re-power the phone just for it to work again"); *Date v. Sony Elecs.*, *Inc.*, 2010 U.S. Dist. LEXIS 96870, at *37-38 (E.D. Mich. Sept. 16, 2010) (holding that

21  plaintiffs properly stated a claim for breach of implied warranty against Sony on grounds that Sony's TVs could not "accept and display 1080p signal natively" as advertised, despite plaintiffs'

22  admission that they were still able to watch regular programming on the Sony TVs); *Stearns v. Select Comfort Retail Corp.*, 2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009) ("[T]here must

23  be a fundamental defect that renders the product unfit for its ordinary purpose. At the same time, this does not mean the alleged defect must preclude any use of the product at all."); *see also Isip v.*

24  *Mercedes-Benz USA*, *LLC*, 155 Cal. App. 4th 19, 27 (2007) (rejecting notion that a car is fit for its ordinary purpose merely because it can still be driven, and explaining that "[a] vehicle that smells,

25  lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose").

26        [136] *See also* ¶ 240 ("As Ford's President stated at the time MyFord Touch was rolled out, '[a]s

27  we began developing [MyFord Touch's] capability, we saw this groundswell of new technology, new functionality and incredible capability opening up to consumers …. It was readily apparent that

28  unless we devised an intuitive interface to help drivers manage these capabilities, they could detract – and possibly distract – from the driving experience.").

                            

1   basic transportation, but, rather, transportation with enhanced technological and safety features.[137]

2   Finally, Ford overlooks the fact that several Plaintiffs were unable to use their vehicles at all while

3   they were the subject of fruitless attempts to repair the MyFord Touch systems. *See* ¶¶ 77, 93, 104,

4   155. In sum, because the Class Vehicles do not, and cannot, meet their intended use, there can be no

5   real dispute that Ford has breached the implied warranty of merchantability. ¶¶ 7-14, 257, 261-70,

6   288-91.

7          **2.      The Alabama, California, and North Carolina implied-warranty-of-merchantability claims are not barred by the absence of privity.[138]**

8

9                 **a.      Plaintiff Battle can cure her implied-warranty claim under Alabama law by amendment.**

10          Alabama Plaintiff Battle acknowledges that her common-law implied-warranty claim

11   requires privity with Ford. She can cure this defect, however. Alabama offers an alternative to

12   common-law implied warranty that does not require privity where, like here, the unmerchantability

13   claim is based on allegations of an "unreasonably dangerous" product.[139] Accordingly, Plaintiff

14   Battle should be given the opportunity to replead this claim.

15

16

17

18

─────────────

19   [137] *See Fleisher v. Fiber Composites*, *LLC*, 2012 U.S. Dist. LEXIS 157343, at *21-23 (E.D. Pa. Nov. 2, 2012) ("The FAC alleges that Fiber 'marketed, promoted, and sold Portico [decking material] products to increase the aesthetic appeal, as well as to enhance the outdoor enjoyment of a consumer's properties.' We agree with Plaintiffs that, based on these allegations in the FAC, it is reasonable to infer that the ordinary use of outdoor decking material, and the use for which Fiber intended Portico, is in part to 'increase the aesthetic appeal' and 'enhance the outdoor enjoyment' of Plaintiffs' residential properties. Thus, the FAC adequately alleges that under the warranty of merchantability, the minimum quality required of Portico is one which the consumer expects to satisfy a certain aesthetic expectation."); *Date*, 2010 U.S. Dist. LEXIS 96870, at *38 (denying defendants' motion to dismiss plaintiffs' implied warranty claims and stating that the "Court cannot conclude, as a matter of law, that these 1080p televisions were fit for their intended use when they were allegedly unable to perform to the essential promises made in their advertisements and marketing materials").

26   [138] Plaintiffs withdraw the implied-warranty-of-merchantability claims of Plaintiff Aguanno (Arizona – Count I), Plaintiff Makowski (Connecticut – Count III), Plaintiff Oremland (Florida – Count III), Plaintiff Mitchell (Iowa – Count III), and Plaintiffs Miller and Purcell (New York – Count IV). Plaintiffs also dismiss the breach of express warranty claim under the Arizona U.C.C. for lack of privity.

28   [139] *See*, *e.g.*, *White Consol. Indus.*, *Inc. v. Wilkerson*, 737 So. 2d 447, 449, 451 (Ala. 1999).

- 41 -

**b.** **The California Plaintiffs may bring implied-warranty-of-merchantability claims despite a lack of privity with Ford.**

The California Plaintiffs bring breach-of-implied-warranty claims under California Commercial Code § 2314 (Count IV) and the Song-Beverly Act (Count VIII). Ford contends that both of these claims should be dismissed for lack of privity. This argument is meritless.

Under California Commercial Code § 2314, a plaintiff asserting breach-of-warranty claims must stand in vertical contractual privity with the defendant.[140] But California courts recognize a well-established exception to the privity requirement where, as here, the consumer is a third-party beneficiary of the contract between the manufacturer and a third party.[141]

In California, courts specifically "permit a third party to bring an action even though he is not specifically named as a beneficiary, if he is *more than incidentally benefited by the contract*."[142] Here, there can be no real dispute that the California Plaintiffs "more than incidentally benefitted" from the contract between Ford and its authorized dealerships, and, thus, may assert breach-of-implied-warranty claims under California Commercial Code § 2314 as third-party beneficiaries.[143]

Ford's reliance on *Clemens v. DaimlerChrysler Corp.*[144] in support of its privity argument is misplaced. In *Clemens*, the Ninth Circuit considered an implied-warranty claim that a vehicle purchaser asserted against the manufacturer from which he did not directly purchase the vehicle,

---

[140] *See Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1141 (C.D. Cal. 2005).

[141] *See In re Toyota UA I*, 754 F. Supp. 2d at 1185 ("where a plaintiff pleads that he or she is a third-party beneficiary to a contract that gives rise to the implied warranty of merchantability, he/she does not say what the holding says may assert a claim for the implied warranty's breach"); *Cartwright v. Viking Indus., Inc.*, 249 F.R.D. 351, 356 (E.D. Cal. 2008) (plaintiffs were, as third-party beneficiaries, entitled to maintain a breach-of-implied-warranty claim against the manufacturer where plaintiffs, not the distributors, were the intended consumers); *Arnold v. Dow Chem. Co.*, 91 Cal. App. 4th 698, 720 (2001) (finding, based on the fact that distributors and retailers were not intended to be the ultimate consumers, that plaintiff could maintain breach-of-implied-warranty claim notwithstanding lack of privity with pesticide manufacturer).

[142] *Gilbert Fin. Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65, 69-70 (1978) (emphasis added).

[143] *See In re Toyota UA I*, 754 F. Supp. 2d at 1185 (holding that consumers were intended third-party beneficiaries where they "pled that they purchased vehicles from a network of dealers who are agents of [Toyota]," that the "dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles," and "the warranty agreements were designed for and intended to benefit the ultimate consumers only").

[144] *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008).

- 42 -

ultimately affirming the district court's dismissal based on the lack of vertical privity.[145] The *Clemens* court, however, did not consider the third-party beneficiary exception to the vertical privity requirement.[146] Instead, after noting various *other* exceptions to the privity requirement, the court went on to note that the plaintiff did not seek applications of any of the established exceptions.[147] Rather, the plaintiff in *Clemens* invited the creation of a "similar exception" for his case, an invitation that the court declined, noting that "a federal court sitting in diversity is not free to create new exceptions to it."[148] The Ninth Circuit thus had no occasion in *Clemens* to consider the California appellate cases recognizing the third-party beneficiary exception to the vertical privity requirement of implied warranty claims.

Additionally, Ford's argument that the Song-Beverly Act requires "vertical privity" between the California Plaintiffs and Ford has been soundly rejected by other courts.[149] The Court should similarly reject that argument here.

> **c.      Privity is not required for implied-warranty-of-merchantability claims under North Carolina law.**

Under North Carolina law, "the absence of an allegation of privity between plaintiff and warrantor in the sale of the warrantied item is not fatal to the claim."[150] North Carolina courts have also observed that "the UCC is neutral on the requirement of privity, or a contractual relationship, when the defendant is not the plaintiff's immediate seller" and that North Carolina's "allegiance to the principle of privity has, at best, wavered."[151]

---

[145] *Id.* at 1021, 1023-24.

[146] *Id.* at 1023.

[147] *Id.*

[148] *Id.* at 1024.

[149] *See, e.g., Ehrlich*, 801 F. Supp. 2d at 921 (distinguishing conflicting case law and citing, among other sources, *Witkin*, for proposition that Song-Beverly eliminates vertical privity requirement and distinguishing split of authority on basis that courts finding vertical privity requirement ignored the plain language of statute); *Gonzalez v. Drew Indus. Inc.*, 750 F. Supp. 2d 1061, 1072 (C.D. Cal. 2007) ("although defendants argue that the implied warranty claims should be dismissed because they have no vertical privity with Gonzalez, this argument ignores the plain language of the Song-Beverly Act, which has been interpreted by a sister-district court in this district as explicitly imposing an implied warranty on manufacturers as well as retail sellers") (citing *Gusse v. Damon Corp.*, 470 F. Supp. 2d 1110, 1116 n.9 (C.D. Cal. Jan. 17, 2007)).

[150] *Bernick v. Jurden*, 293 S.E.2d 405, 414 (N.C. 1982).

[151] *Id.* (citations omitted).

- 43 -

In an analogous case, the North Carolina Court of Appeals reversed a trial court's dismissal of a lessee's cross claim against a seller-supplier for breach of express warranty due to alleged lack of privity.[152] The lessee had originally been sued by the lessor, but then named the seller-supplier as a third-party defendant. The seller-supplier moved to dismiss the lessee's cross claims on grounds that the seller-supplier was only in privity with the lessor, who had purchased the equipment. In reversing the trial court's dismissal of the lessee's cross claim, the *Coastal Leasing* court stated:

> In the present case, [lessee] alleged express and implied warranties flowing to him as third-party beneficiary of the equipment sales contract, breach of those warranties and damages .... Further, [lessee] has the right to try to prove that the seller's direct representations to him, in addition to any express or implied warranties to the lessor, formed part of the "basis of the bargain" for purposes of triggering remedies for breach of express warranty.[153]

Similar to *Coastal Leasing*, Plaintiff Fink is a third-party beneficiary of the transaction between Ford and the authorized Ford dealership from which he purchased the Class Vehicle. *See* ¶ 176. Accordingly, Plaintiff Fink's implied-warranty claims under North Carolina law should not be dismissed.

### 3. Notice is either not required or has been given because Ford knew of the defects in the MyFord Touch System and concealed them from Plaintiffs

Plaintiffs have either met or are excused from their obligation to provide Ford with notice under Section 2-607(3)(a) of the Uniform Commercial Code. The FAC contains detailed allegations that Ford knew of the defect well before the lawsuit was filed through Ford's own internal investigations and testing and consumer complaints. ¶¶ 8, 10-12, 262-91. Under these circumstances, any notice before the filing of this lawsuit is unnecessary – the lawsuit itself is sufficient to satisfy any statutory notice requirements.[154]

---

[152] *See Coastal Leasing Corp. v. O'Neal*, 405 S.E.2d 208 (N.C. Ct. App. 1991).

[153] *Id.* at 212.

[154] *See In re Bridgestone/Firestone Inc. v. Wilderness Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110-11 (S.D. Ind. 2001), *rev'd on other grounds*, 288 F.3d 1012 (7th Cir. 2002) (holding that plaintiffs satisfied U.C.C. § 2-607's notice requirement, and the policies behind it, by filing the complaint, and explaining that "no purpose would be served by requiring pre-litigation notice" because the defendant had "ample notice" of the defects and chose not to remedy them).

- 44 -

**F.      Ford's scattershot arguments challenging the FAC's Magnuson-Moss Warranty Act claim fail.**

In three short paragraphs, Ford asserts three cursory arguments to dismiss the FAC's Magnuson-Moss Warranty Act ("MMWA") claims. It first argues that a MMWA claim requires a viable state-law breach-of-warranty claim. Def. Mem. at 45. As shown above, the FAC alleges viable express and implied-warranty claims.

Ford next asserts that the MMWA does not protect the seven Plaintiffs who leased, rather than purchased, their vehicles, who, according to Ford, are not "consumers" under the MMWA. First, Ford's argument is belied by the terms of its warranty, which provides:

> The New Vehicle Limited Warranty and the Emissions Warranties described in this booklet apply to your vehicle if: …
>
> • it was originally sold *or leased* by Ford Motor Company or one of its dealers in the United States or U.S Federalized Territories; and it was originally registered/licensed and operated in the United States, U.S. Federalized Territories, or Canada.[155]

If Ford intended to exclude lessees like the seven Plaintiffs from its written warranties, it would not have drafted the warranties to include leased vehicles.

Further, Congress enacted the MMWA to enhance the enforceability of warranties on consumer products and protect the "ultimate user of the product."[156] The MMWA allows a "consumer" to bring a suit where the consumer claims to be "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this [Act] or under a written warranty, implied warranty, or service contract."[157] Pertinent here, the MMWA defines "consumer" to encompass lessees like the Plaintiffs. The lessee Plaintiffs are "consumers" under the MMWA. To qualify as a consumer who may file suit under the MMWA, a person must come within one of three alternative categories of consumers, the third of which is a "catch-all" category: "any other person

---

[155] *See*, *e.g.*, Edwards Decl., Ex. A (Dkt. No. 57-2), at 4 (emphasis added).

[156] *See*, *e.g.*, *Am. Honda Motor Co. v. Cerasani*, 955 So. 2d 543, 545 (Fla. 2007); *Szubski v. Mercedes-Benz, U.S.A., L.L.C.*, 796 N.E.2d 81, 88 (Ct. Com. Pl. Ohio 2003); *Cohen v. Am Gen. Corp.*, 264 F. Supp. 2d 616, 621 (N.D. Ill. 2003).

[157] 15 U.S.C. § 2310(d); *see also Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003).

- 45 -

who is entitled … under applicable State law to enforce against the warrantor … the obligations of the warranty ….”[158]

This definition squarely encompasses the lessee Plaintiffs. Their lease agreements explicitly extend Ford's warranty to their leased car and commenced on the first date of their lease. State laws plainly permit them as lessees to enforce the warranty against Ford, the warrantor.[159] Nowhere does Ford assert that state law somehow bars Ford's Limited Warranty from encompassing these Plaintiffs' leases. Ford instead asserts its challenge to the lessee Plaintiffs *only* under the MMWA, while not disputing that their warranty rights are no different from purchaser plaintiffs. *See* Def. Mem. at 45. The lessee Plaintiffs thus are "consumers" entitled to sue Ford under the MMWA for their injuries from Ford's inability to repair their defective MyFord Touch systems.[160]

Courts have also rejected Ford's argument, holding that any interpretation of the MMWA as inapplicable to leases "is inconsistent with the purposes of the [MMWA] – to protect the ultimate user of the product."[161] Most courts addressing the issue conclude that the MMWA applies to warranties extended with a lease.[162] Ford's outlier authorities, *DiCintio v. DaimlerChrysler Corp.*[163] and *Parrot v. Daimlerchrysler Corp.*[164] do not compel a different result here.[165]

---

[158] 15 U.S.C. § 2301(3). *See also In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 2012 U.S. Dist. LEXIS 189744, at *326-28 (C.D. Cal. May 4, 2012) (*In re Toyota UA III*).

[159] *See, e.g.*, *Am. Honda Motor Co. v. Cerasani*, 955 So. 2d 543, 547 (Fla. 2007) (Florida Lemon Law entitles lessees to enforce automobile warranties); *Uniflex, Inc. v. Olivetti Corp. of Am.*, 445 N.Y.S.2d 993, 995 (N.Y. App. Div. 1982) (lessee can pursue breach-of-warranty claim where purchase order between the lessor and the manufacturer expressly extended to the lessee the right to enforce against the manufacturer all warranties running from the manufacturer to the lessor); *Pearson v. DaimlerChrysler Corp.*, 813 N.E.2d 230, 240-41 (Ill. App. Ct. 2004) (lessee has standing to enforce manufacturer's limited warranty); *Ryan v. Am. Honda Motor Co., Inc.*, 896 A.2d 454, 457 (N.J. 2006) (lessee "is entitled to enforce the warranty under New Jersey law"). *Lucy v. Kia Motors Am., Inc.*, 48 Va. Ct. 460, 461-62 (1999) (lessees entitled to enforce express warranties before and after passage of Virginia Motor Vehicle Warranty Enforcement Act).

[160] *See Voelker*, 353 F.3d at 524; *Am. Honda*, 955 So. 2d at 546; *Cohen*, 264 F. Supp. 2d at 621 ("where the sale of a vehicle is merely to facilitate a lease, the issuance of the warranty accompanies this sale, and the lessor explicitly transfers its rights in the warranty to the lessee – the lessee is protected by the Magnuson-Moss Act"). Here, of course, there was no need for the Ford dealership to assign the leased vehicle's warranty to the lessee Plaintiff because the warranty and the lease agreement *directly* extended the warranty to them.

[161] *Szubski*, 796 N.E.2d at 88; *see also Cohen*, 264 F. Supp. 2d at 621 ("[t]his reading … best serves Congress' goal of 'better protecting consumers'") (citation omitted); *Mesa v. BMW of N. Am., LLC*, 904 So. 2d 450, 458 (Fla. Dist. Ct. App. 2005) (same).

[162] *See In re Toyota UA III*, 2012 U.S. Dist. LEXIS 189744, at *329; *Am. Honda*, 955 So. 2d at 547-49; *Ryan*, 896 A.2d at 456-58; *Peterson v. Volkswagen of Am., Inc.*, 697 N.W.2d 61, 68, 70-71

- 46 -

1    Finally, Ford contends that Plaintiffs must exhaust dispute-resolution procedures before

2  asserting their MMWA claims. Def. Mem. at 45-46. But the MMWA recognizes a futility exception

3  to dispute-resolution requirements.[166] The FAC plainly alleges that Ford's dispute-resolution

4  procedure would be futile due to its demonstrated inability to cure the defects in its MyFord Touch

5  systems. FAC ¶¶ 8, 12, 14, 16, 321.

6  **G.      Plaintiff Makowski's waiver**

7    Ford acknowledges that Plaintiff Makowski's fraud-based claims (Counts I, IV, and V) were

8  not released as a result of her acceptance of the outcome of the dispute-resolution procedure offered

9  by Ford. Def. Mem. at 46. Her release therefore does not affect those claims. Plaintiff Makowski

10  acknowledges that her express and implied-warranty claims against Ford (Counts II and III) have

11  been released and thus withdraws them.

12  **H.      The FAC alleges that Ford, without proper public notification, extended its Limited
           Warranty to cover the continuing malfunctioning of the MyFord Touch system,**
13  **       thereby alleging a California secret-warranty claim**

14    Ford's secret-warranty-adjustment program qualifies as an unlawful "adjustment program"

15  as that phrase is defined by the clear and straightforward language of California's Motor Vehicle

16  Warranty Adjustment Programs Act ("MVWAPA," also known as the "Secret Warranty Law").[167]

17  MVWAPA defines an "adjustment program" as a "program" or "policy" that (i) "expands or

18  extends the consumer's warranty beyond its stated limit," or (ii) "under which a manufacturer offers

---

19  (Wis. 2005); *Mangold v. Nissan N. Am., Inc.*, 809 N.E.2d 251, 254-55 (Ill. App. Ct. 2004);
20  *Dekelaita v. Nissan Motor Corp. in United States*, 799 N.E.2d 367, 372 n.3, 374-75 (Ill. App. Ct.
    2003); *Szubski*, 796 N.E.2d at 88; *Cohen*, 264 F. Supp. 2d at 621 n.1.

21  [163] *DiCintio v. DaimlerChrysler Corp.*, 768 N.E.2d 1121 (N.Y. 2002).

    [164] *Parrot v. Daimlerchrysler Corp.*, 130 P.3d 530 (Ariz. 2006).
22
    [165] The state court decisions in *DiCintio* and *Parrot* do not control here. Ford cites them for their
23  interpretation of the MMWA, a *federal* law. State-court interpretations of a federal statute do not
    govern here. This Court thus can apply the majority authorities finding that the MMWA reaches to
24  warranties arising from vehicle leases and reject *DiCintio* and *Parrot*'s imprudent rulings as well
    deserving their outlier status. Ford's written warranty commenced on the first day of Plaintiffs'
25  leases under the warranty's express terms. Under *Voelker* and its many progeny, the lessee Plaintiffs
    can assert a MMWA claim. Even an Arizona appellate court applied *Parrot* narrowly (and rejected
26  *DiCintio*) to conclude that a lessee can assert a MMWA claim. *Mago v. Mercedes-Benz, U.S.A.,
    Inc.*, 142 P.3d 712, 718-19 (Ariz. Ct. App. 2006).

27  [166] *See In re Toyota UA I*, 754 F. Supp. 2d at 1188-89; *In re Toyota UA III*, 2012 U.S. Dist.
    LEXIS 189744, at *322-23.

28  [167] CAL. CIV. CODE § 1795.90, *et seq.*

- 47 -

to pay all or any part of the cost of repairing, or to reimburse consumers for all or part of any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance."[168] If the alleged Ford program satisfies either of the criteria set forth in § 1795.90(d), it is an "adjustment program" within the meaning of the MVWAPA.

The Secret Warranty Law imposes duties on vehicle manufacturers for any adjustment programs. Among these are to notify consumers about the covered "condition" and the program's "terms and conditions."[169] The FAC alleges that Ford, faced with widespread customer complaints about its failing MyFord Touch systems, extended its written warranty on the APIM module, the MyFord Touch system's "brain," resulting in a four-year warranty for Ford vehicles and five years for Lincoln vehicles. ¶¶ 248, 274-78, 413. In particular, the FAC alleges that in early March 2012, Ford launched a Customer Satisfaction Program Campaign 12M01 ("Campaign 12M01") targeting Ford vehicles equipped with the MyFord Touch system. Ford would replace the APIM module under this 12M01 campaign, which also extended the warranty period: "Ford's Campaign 12M01 extended warranty coverage of the APIM to four years of service from the warranty start date on Ford vehicles and five years on Lincoln vehicles, regardless of mileage." ¶ 278.

Ford also issued multiple TSBs (¶ 274) that repeatedly updated SYNC software in vain efforts to resolve the system failures. ¶¶ 276-86, 413.

Key to the claim, the FAC alleges that Ford never gave the statute-mandated notice to California Plaintiffs and class members or to the California Department of Motor Vehicles of its warranty extension and series of secret TSB programs. ¶¶ 414-16. Ford does not directly dispute the allegation. This alone states a secret-warranty claim under § 1792.92. As the court held in *Morris v. BMW*, "Defendants do not deny that they failed to inform the public of the adjustment program stemming from the TSB. Plaintiffs thus have successfully alleged violations of the Secret Warranty Act."[170]

---

[168] CAL. CIV. CODE § 1795.90(d).

[169] CAL. CIV. CODE § 1795.92.

[170] *Morris v. BMW*, 2007 U.S. Dist. Lexis 85513, at *18 (N.D. Cal. Nov. 7, 2009). *See also Marsikian v. Mercedes Benz USA, LLC*, 2009 U.S. Dist. LEXIS 117012, at *18 (C.D. Cal. May 4,

- 48 -

1    Ford instead focuses on the secret TSB program, and tries to sweep Ford's warranty

2    extension into the TSB allegations. Def. Mem. at 47 ("Plaintiffs generically allege (wrongly) that

3    the TSBs 'expanded and/or extended the original warranty'"). The FAC plainly alleges, however,

4    that Ford extended its written warranty coverage to four (Ford) or five (Lincoln) years without

5    referencing the TSB program. ¶ 278.

6         Ford's authorities are thus inapposite. None address an explicit, albeit secret, extension of

7    the warranty period. For example, in *Corson v. Toyota Motor Sales*, *U.S.A.*, *Inc.*, plaintiffs alleged

8    an adjustment program based on Defendants' issuance of a TSB.[171] Defendants disputed that this

9    TSB constituted such a program, and the court agreed because plaintiffs did not allege that the TSB

10   directed dealers to provide free repair for a defective vehicle outside the warranty period.[172] The

11   court distinguished *Ehrlich v. BMW*[173] on the ground that the *Ehrlich* complaint did allege a secret

12   program of free repairs beyond the warranty period[174] – just like the FAC here.

13        Similarly, in *Cholakyan v. Mercedes-Benz USA*, *LLC*, the court found that plaintiff "failed to

14   allege facts that would support a finding that the TSB extended warranty coverage beyond the

15   original period or constituted an adjustment program."[175] And there likewise was no allegation of a

16   warranty extension in *Cirulli v. Hyundai Motor Co.*[176] Rather, the complaint only alleged that

17   defendant "repaired vehicles on a case-by-case basis" and quietly declined to charge "the most vocal

18   [c]lass members …."[177] This was insufficient.

19        In short, California's Secret Warranty Law required Ford to notify all California Class

20   Members of its warranty-coverage extension that provides free MyFord Touch system software

21   updates and reinstallations. Ford failed to do so. The FAC sufficiently states a claim.

22   _____

23   2009) (complaint stated a Secret-Warranty Law claim by alleging defendant secretly extended its
     written warranty to cover a previously excluded defect).

24   [171] *Corson v. Toyota Motor Sales*, *U.S.A.*, *Inc.*, 2013 U.S. Dist. LEXIS 63260, at *15 (C.D. Cal.
     Apr. 24, 2013).

25   [172] *Id*. at *17.

26   [173] *Ehrlich*, 801 F. Supp. 2d at 920.

     [174] *See id*.

27   [175] *Cholakyan v. Mercedes-Benz USA*, *LLC*, 796 F. Supp. 2d 1220, 1241 (C.D. Cal. 2011).

     [176] *Cirulli v. Hyundai Motor Co.*, 2009 U.S. Dist. LEXIS 125139 (C.D. Cal. June 12, 2009).

28   [177] *Id*. at *16.

- 49 -

1

## V.    CONCLUSION

2          Ford's motion should be denied for the reasons set forth above.

3

4    DATED: February 21, 2014          HAGENS BERMAN SOBOL SHAPIRO LLP

5                                      By _____/s/ Steve W. Berman_____
                                              STEVE W. BERMAN
6                                      Steve W. Berman (*pro hac vice*)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
7                                      1918 8th Avenue, Suite 3300
                                       Seattle, Washington 98101
8                                      Tel: (206) 623-7292
                                       Fax: (206) 623-0594
9                                      steve@hbsslaw.com

10
                                       Adam J. Levitt (*pro hac vice*)
11                                     GRANT & EISENHOFER P.A.
                                       30 North LaSalle Street, Suite 1200
12                                     Chicago, Illinois 60602
                                       Tel: (312) 214-0000
13                                     Fax: (312) 214-0001
                                       alevitt@gelaw.com
14

15                                     Roland Tellis (186269)
                                       Mark Pifko (228412)
16                                     BARON & BUDD, P.C.
                                       15910 Ventura Boulevard, Suite 1600
17                                     Encino, California 91436
                                       Tel: (818) 839-2320
18                                     Fax: (818) 986-9698
                                       rtellis@baronbudd.com
19                                     mpifko@baronbudd.com

20

21                                     Joseph G. Sauder (*pro hac vice*)
                                       Matthew D. Schelkopf (*pro hac vice*)
22                                     CHIMICLES & TIKELLIS LLP
                                       One Haverford Centre
23                                     361 West Lancaster Avenue
                                       Haverford, Pennsylvania 19041
24                                     Tel: (610) 642-8500
                                       Fax: (610) 649-3633
25                                     JGS@chimicles.com

26

27

28

- 50 -

1

Jeff D. Friedman (CSB No. 173886)
Shana E. Scarlett (CSB No. 217895)

2

715 Hearst Avenue, Suite 202
Berkeley, California 94710

3

Tel: (510) 725-3000

4

Fax: (510) 725-3001
jefff@hbsslaw.com

5

shanas@hbsslaw.com

6

Jason A. Zweig (*pro hac vice*)

7

HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700

8

New York, New York 10017
Tel.: (212) 752-5455

9

Fax: (917) 210-3980
jasonz@hbsslaw.com

10

11

Kyle J. McGee (*pro hac vice*)
GRANT & EISENHOFER P.A.

12

123 Justison Street
Wilmington, Delaware 19801

13

Tel.: (302) 622-7000
Fax: (302) 622-7100

14

kmcgee@gelaw.com

15

*Attorneys for Plaintiffs and the Proposed Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

- 51 -

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically via the Court's ECF system, on February 21, 2014. Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: February 21, 2014

*/s/ Steve W. Berman*_____
Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com

- 52 -