1
2
3
4
5                  UNITED STATES DISTRICT COURT
6                 NORTHERN DISTRICT OF CALIFORNIA
7

8   IN RE                                    No. C-13-3072 EMC

9   MYFORD TOUCH CONSUMER
    LITIGATION.
10  _____/        **ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANT'S
11                                           MOTION TO DISMISS**

12                                           **(Docket No. 56)**

13

14

15          Plaintiffs are twenty-three persons and one organization residing in fifteen different states.

16  They have filed a class action against Defendant Ford Motor Company, asserting, in essence, that an

17  "infotainment system" – known as MyFord Touch ("MFT") – used in certain of its vehicles (Ford,

18  Lincoln, and Mercury) is defective and that Ford knew the system was defective at the time it sold

19  the vehicles to Plaintiffs and other putative class members.  Plaintiffs have asserted various claims

20  under federal and state law, but the claims can loosely be categorized into (1) fraud claims and (2)

21  breach-of-warranty claims.  Ford has challenged the bulk of the claims in the currently pending

22  motion to dismiss.

23          Having considered the parties' briefs and accompanying submissions, as well as the oral

24  argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Ford's motion.

25  ///

26  ///

27  ///

28  ///

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

# I.  FACTUAL & PROCEDURAL BACKGROUND

As a preliminary matter, the Court provides below a chart which lists the name of each named Plaintiff, the state of Plaintiff's residence, whether Plaintiff purchased or leased the car, the car that was purchased or leased, and the date of purchase or lease.[1]

| Name | State | Purchase or Lease | Car | Date of Purchase or Lease |
|---|---|---|---|---|
| Jennifer Whalen | California | Purchase | 2013 Ford Explorer XLT | 4/2012 |
| Center for Defensive Driving (CDD) | California | Lease | 2013 Ford F-150 Lariat | 2/22/2013 |
| Grif Rosser | California | Purchase | 2013 Ford Focus ST | 9/29/2012 |
| Megan Raney-Aarons | California | Lease | 2012 Ford Edge | 2/2012 |
| Richard Decker Watson | California | Purchase | 2011 Lincoln MKX | 10/2012 |
| Darcy Thomas-Maskrey | California | Purchase | 2013 Ford Flex | 7/2012 |
| Angela Battle | Alabama | Purchase | 2011 Ford Fusion | 5/2011 |
| Joe D'Aguanno | Arizona | Purchase | 2013 Ford Explorer Sport | 11/2012 |
| James Laurence Sheerin | Colorado | Purchase | 2013 Ford Explorer Limited | 6/18/2012 |
| Deb Makowski | Connecticut | Purchase | 2011 Ford Escape | 9/1/2011 |

---

[1] All Plaintiffs purchased or leased a Ford of Lincoln vehicle – *i.e.*, no Plaintiff purchased or leased a Mercury vehicle.  Plaintiffs concede that the Mercury brand was discontinued in 2011.  *See* FAC at 1 n.1.  According to Ford, the MFT system was never used in a Mercury car.  *See* Mot. at 1 n.2 (arguing that "Plaintiffs' references to 'MyMercury Touch' are mistaken" as "[n]o Mercury vehicle has been equipped with [the MFT] system").

United States District Court

For the Northern District of California

| Name | State | Purchase or Lease | Car | Date of Purchase or Lease |
|------|-------|-------------------|-----|---------------------------|
| George Oremland | Florida | Purchase | 2012 Lincoln MKZ | 12/2011 |
| Thomas Mitchell | Iowa | Purchase | 2011 Lincoln MKX | 11/8/2010 |
| William Creed | Massachusetts | Purchase | 2011 Ford Explorer | 3/14/2011 |
| Joshua Matlin | New Jersey | Lease | 2011 Ford Edge SE | 10/28/2010 |
| Russ Rizzo | New Jersey | Lease | 2012 Ford Explorer XLT 4 Wheel Drive | 2/2012 |
| Jeffrey Miller | New York | Lease | 2013 Ford Fusion Titanium | 2/17/2013 |
| Nuala Purcell | New York | Lease | 2011 Ford Edge | 11/2010 |
| Daniel Fink | North Carolina | Purchase | 2013 Ford Explorer | 12/2012 |
| Jason Zuchowski | Ohio | Lease | 2012 Ford Edge | 3/2012 |
| Art Avedisian | Pennsylvania | Purchase | 2011 Ford Expedition EL | 1/31/2011 |
| Jose Randy Rodriguez | Texas | Purchase | 2012 Ford Focus Titanium | 5/17/2011 |
| Michael Ervin | Texas | Purchase | 2013 Ford C-Max SEL | 10/14/2012 |
| Jason Connell | Virginia | Purchase | 2011 Lincoln MKX | 10/2010 |
| Henry Miller-Jones | Virginia | Purchase | 2013 Ford Fusion Titanium AWD | 4/20/2013 |

///

///

///

///

///

**United States District Court**
For the Northern District of California

In their operative complaint, Plaintiffs allege as follows.

The MFT system is

> a factory-installed, integrated in-vehicle communication, navigation, and entertainment system that allows users to use a rearview camera, control vehicle climate, operate adaptive cruise control, receive navigational direction, make hands-free telephone calls, control music, and perform other functions with voice and touch commands. [MFT] also includes 9-1-1 Assist, which automatically contacts emergency personnel with the vehicle's coordinates in case of an accident. In addition to touchscreen and voice-based commands, [MFT] also features a steering wheel control panel.

FAC ¶ 232. Pictures of what the MFT system looks like can be found in paragraphs 242-43 and 245 of the complaint. Ford has promoted the MFT system, including in particular its safety, communication, and entertainment features, in various ways – *e.g.*, on its website, through advertisements (including print and television), and through dealerships. *See, e.g.*, FAC ¶¶ 22, 49, 66, 251-61.

MFT is powered by an operating system known as Ford SYNC. *See* FAC ¶ 3. Ford SYNC is also the name of the earlier, first generation of the MFT system. *See* FAC ¶ 233. "Ford designed and developed SYNC with Microsoft and installed the original Sync system in Ford vehicles in 2007." FAC ¶ 233. "The initial versions of Ford SYNC, however, did not include a touchscreen, like [MFT]." FAC ¶ 233.

"In January 2010, hoping to capitalize on the success of SYNC, Ford announced that it would be launching a second generation of SYNC called [MFT]. [MFT] was a much more comprehensive technology which utilized Ford SYNC as the operating system, but included many more features than had been available with the initial versions of Ford SYNC." FAC ¶ 235. Ford aimed to employ MFT in all of its vehicles, not just its higher-end vehicles. *See* FAC ¶ 237. The rollout of the MFT system began in 2010 (*i.e.*, for 2011 model vehicles). *See* FAC ¶¶ 16, 238. "Currently, more than 5 million Ford vehicles contain [MFT]." FAC ¶ 238. In a June 2013 press release, Ford stated that, "combined, Sync and [MFT] systems are sold on 79 percent of new 2013 Ford vehicles." FAC ¶ 239.

Ford charges a premium for the MFT system. "As a stand-alone option, Ford's suggested retail price for the [MFT] system is approximately $1,000. Customers can add further options to

their [MFT] system – such as GPS navigation capability – by paying additional fees of several hundred dollars." FAC ¶ 241.

However, according to Plaintiffs, there are serious problems with the MFT system. Plaintiffs underscore that "[t]he scope of the problem is wide. In late 2012, Ford reported 400 problems with the [MFT] system for every 1000 vehicles. That was an improvement over the problems earlier in 2012 when Ford reported a 'things-gone-wrong' rate for its [MFT] system of 500 for every 1000 vehicles." FAC ¶ 10.

Plaintiffs have identified various problems with the MFT system, ranging from the entire system freezing up or crashing (in which case no features connected to MFT are operational, including the navigation technology, the radio, the rearview camera, and the defroster) to isolated problems such as random but frequent screen black outs, nonresponsiveness to touch or voice commands, locking up of the rearview camera, and inaccurate directions on the navigation system. *See* FAC ¶ 7; *see also* FAC ¶¶ 262-63. Plaintiffs maintain that the problems with the MFT system actually create safety risks as malfunctions in the system lead to the driver becoming distracted. *See* FAC ¶ 263. Also, there are more obvious safety risks involved when, *e.g.*, the rearview camera or defroster breaks down. Plaintiffs maintain that, although there are varying problems with the MFT system, there is an underlying defect in the system attributable to software and/or hardware. *See* FAC ¶¶ 268-69.

Plaintiffs assert that Ford failed to conduct adequate testing of the MFT system prior to its release. *See, e.g.*, FAC ¶ 271. Furthermore, soon after the release of the system, customer complaints began to mount. In response, Ford began to issue Technical Service Bulletins ("TSBs") and software updates. "TSBs are recommended repairs issued by the manufacturer and sent to dealers." FAC ¶ 274. The first TSB was issued on April 27, 2011. *See* FAC ¶ 275. TSBs continued to be issued through at least October 3, 2013. *See* FAC ¶ 286. Plaintiffs have identified at least eight TSBs, as well as multiple software updates. *See generally* FAC ¶¶ 274-87.

According to Plaintiffs, in spite of the TSBs and software updates, Ford still has not fixed the problem with MFT – this in spite of the fact that, at the very least, there is an express limited warranty on each vehicle. *See* FAC ¶¶ 297-300. A copy of the relevant limited warranty can be

found at Exhibit A of Ford's request for judicial notice. *See* Docket No. 57-2 (RJN, Ex. A) (limited

warranty). The limited warranty provides, in relevant part, as follows:

> Under your New Vehicle Warranty if:
>
> – your Ford vehicle is properly operated and maintained, and
> – was taken to a Ford dealership for a warranted repair during the
> warranty period,
>
> then authorized Ford Motor Company dealers will, without charge,
> *repair, replace, or adjust* all parts on our vehicle that malfunction or
> fail during normal use during the applicable coverage period due to a
> manufacturing defect in factory-supplied materials or factory
> workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free.
> Defects may be unintentionally introduced into vehicles during the
> design and manufacturing processes and such defects could result in
> the need for repairs. For this reason, Ford provides the New Vehicle
> Limited Warranty in order to remedy any such defects that result in
> vehicle part malfunction or failure during the warranty period.
>
> The remedy under this written warranty, and any implied warranty, is
> limited to repair, replacement, or adjustment of defective parts. *This
> exclusive remedy shall not be deemed to have failed its essential
> purpose so long as Ford, through its authorized dealers, is willing and
> able to repair, replace, or adjust defective parts in the prescribed
> manner.* Ford's liability, if any, shall in no event exceed the cost of
> correcting manufacturing defects as herein provided and upon
> expiration of this warranty, any such liability shall terminate.
>
> . . . .
>
> Nothing in this warranty should be construed as requiring defective
> parts to be replaced with parts of a different type of design than the
> original part, so long as the vehicle functions properly with the
> replacement part. Moreover, Ford and its authorized dealers are
> entitled to a reasonable time and a reasonable number of attempts
> within which to diagnose and repair any defect covered by this
> warranty.

Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 8-9) (emphasis added).

## II.   LEGAL STANDARD

Ford has moved for a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Rule

12(b)(6) allows for dismissal based on a failure to state a claim for relief. A motion to dismiss based

on the rule essentially challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus.*

*v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering a 12(b)(6) motion, a court must

take all allegations of material fact as true and construe them in the light most favorable to the

United States District Court

For the Northern District of California

nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

Ford's 12(b)(6) motion presents arguments with respect to the following categories of claims: (1) fraud claims; (2) certain tort claims; (3) express warranty claims; (4) implied warranty claims; (5) claims under the federal Magnuson-Moss Warranty Act ("MMWA"); and (6) claims under California's secret warranty law. Because the instant case involves fraud claims, Rule 9(b) is also implicated. "Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party 'state with particularity the circumstances constituting fraud or mistake.'" *Reese v. Malone*, No. 12-35260, 2014 U.S. App. LEXIS 2747, at *17 (9th Cir. Feb. 13, 2014).

The Court's opinion addresses first the fraud and tort claims. The opinion then turns to the warranty-related claims.

### III.     FRAUD AND TORT CLAIMS

A.     Fraud Claims

Plaintiffs' fraud claims are based on state law. The fraud claims are either claims for fraudulent concealment (common law) or claims for fraud based on a consumer protection statute.

///

///

///

///

///

United States District Court
For the Northern District of California

| California | Count I | California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 |
| | Count II | California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 |
| | Count III | California False Advertising Law, Cal. Bus. & Prof. Code § 17500 |
| | Count VI | Fraud by concealment |
| **Alabama** | Count IV | Fraudulent concealment |
| **Arizona** | Count I | Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 |
| | Count V | Fraudulent concealment |
| **Colorado** | Count I | Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 |
| | Count VI | Fraudulent concealment |
| **Connecticut** | Count I | Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110A |
| | Count V | Fraudulent concealment |
| **Florida** | Count I | Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201 |
| | Count V | Fraudulent concealment |
| **Iowa** | Count I | Consumer Frauds Act, Iowa Code § 714H.1 |
| | Count V | Fraudulent concealment |
| **Massachusetts** | Count I | Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A |
| | Count V | Fraudulent concealment |
| **New Jersey** | Count I | New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 |
| | Count V | Fraudulent concealment |

| New York | Count I | New York General Business Law § 349 |
| | Count II | New York General Business Law § 350 |
| | Count VI | Fraudulent concealment |
| North Carolina | Count I | North Carolina Unfair & Deceptive Trade Practices Acct, N.C. Gen. Stat. § 75-1.1 |
| | Count V | Fraudulent concealment |
| Ohio | Count I | Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 |
| | Count VI | Fraudulent concealment |
| Pennsylvania | Count I | Unfair Trade Practices & Consumer Protection Law, Pa. Stat. Ann. § 201-1 |
| | Count V | Fraudulent concealment |
| Texas | Count I | Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 |
| | Count V | Fraud by concealment |
| Virginia | Count I | Virginia Consumer Protection Act, Va. Conn. Ann. § 59.1-196 |
| | Count V | Fraudulent concealment |

With respect to the fraud claims, Ford makes the following arguments: (1) that Plaintiffs have failed to plead with sufficient particularity any affirmative misrepresentation by Ford; (2) that, to the extent Plaintiffs claim a failure to disclose by Ford, they fail to plead sufficient facts that (a) Ford knew, at the time of sale, of a material fact of which Plaintiffs were not aware and that (b) Ford had a duty to disclose in the first place; and (3) that, for the Iowa, Texas, and Virginia Plaintiffs, their fraud claims based on the consumer protection statutes are time barred.

///

///

///

9

**United States District Court**
For the Northern District of California

1      1.      Affirmative Misrepresentation

2          The Court agrees with Ford that Plaintiffs have failed to state a fraud claim based on an

3   affirmative misrepresentation.  Below are typical allegations from the operative complaint regarding

4   the fraud on Plaintiffs:

> Plaintiff Whalen selected and ultimately purchased her vehicle, in part,
> because of the features of the [MFT] system, as represented through
> advertisements and representations made by Ford.  Specifically, prior
> to her purchase of the vehicle, Plaintiff Whalen viewed television
> advertisements regarding the [MFT] and a representative of Henry
> Curtis Ford made verbal representations about [MFT] to Plaintiff
> Whalen.  A salesperson from Henry Curtis Ford even demonstrated
> the [MFT] and Bluetooth system working through his phone and stated
> Plaintiff Whalen could connect her phone or IPOD to the system and
> listen to music.  She recalls that the advertisements and representations
> touted the voice command features of the [MFT] system, including,
> the ability to adjust the temperature of the vehicle; the ability to
> control the audio portion of the vehicle without having to take her eyes
> off the road; and the purported ability to dial 9-1-1 in the event of an
> accident.  *None of the advertisements reviewed or representations
> received by Plaintiff Whalen contained any disclosure relating to any
> defects in the [MFT] system.*  Had Ford disclosed that the [MFT] in
> her vehicle suffered from numerous defects which would prevent her
> full use of her vehicle and pose safety risks, she would not have
> purchased her vehicle with [MFT], or would have paid less for the
> vehicle.

16   FAC ¶ 22 (emphasis added).

> Plaintiff Zuchowski saw advertisements for and representations made
> by Defendant Ford about MyFord Touch, including television, print
> media, and on the internet.  The Marshall Ford salesperson represented
> that the MyFord Touch system worked well and had full functionality.
> Although Plaintiff Zuchowski cannot recall the exact language from
> the various publications, he recalls the materials touting the innovative
> nature of MyFord Touch, how it would enhance the driving
> experience, and increase the safety of the vehicle.  *None of these
> publications contained any disclosure relating to any defects in the
> MyFord Touch system.*  Had these materials that Plaintiff Zuchowski
> viewed disclosed that the MyFord Touch in his vehicle suffered from
> numerous defects which would prevent his full use of his vehicle and
> pose safety risks, he would not have leased his vehicle with MyFord
> Touch, or certainly would not have paid as much as he did for his
> vehicle.

25   FAC ¶ 187 (emphasis added).

26          As indicated by the above, Plaintiffs' fraud theory is really a failure to disclose rather than an

27   affirmative misrepresentation.  As Ford contends, Plaintiffs are not really arguing that the MFT

28   system does not have the features described in, *e.g.*, Ford's advertisements.  *See* Mot. at 9.  Rather,

United States District Court

For the Northern District of California

their beef is that the features of the MFT system do not work (and that Ford knew that fact at the time of the sales/leases to Plaintiffs but failed to disclose such). This is not a case where, *e.g.*, Ford made an affirmative representation that the MFT system was defect free. In fact, the opposite is true given the limited warranty, which expressly states that the warranty does not mean that each Ford vehicle is defect free.

The case law cited by Ford is on point. Those cases show that, unless a product manufacturer makes claims about, *e.g.*, a product's quality or reliability, no claim based on an affirmative misrepresentation is viable. For example, in *In re iPhone 4S Consumer Litigation*, No. C 12-1127 CW, 2014 U.S. Dist. LEXIS 19363 (N.D. Cal. Feb. 14, 2014), the plaintiffs filed suit against Apple regarding the Siri feature on its iPhone. Judge Wilken rejected the plaintiffs' fraud claim in part because they failed to point to "any specific statement by Apple that expressly indicates that Siri would be able to answer every question, or do so consistently." *Id.* at *20-21; *see also Morgan v. Harmonix Music Sys., Inc.*, No. C08-5211 BZ, 2009 WL 2031765, at *3 (N.D. Cal. July 30, 2009) (stating that "plaintiffs have alleged no specific representations about the durability of the foot pedal" on the drum set); *Long v. Hewlett-Packard Co.*, No. C 06-02816 JW, 2007 U.S. Dist. LEXIS 79262, at *21 (N.D. Cal. July 27, 2007) (stating that "[t]he word 'notebook' describes the type of product being sold; it does not constitute a representation regarding the quality of the computer's parts, nor a representation regarding the consistency or longevity of the computer's operation").

The case law cited by Plaintiffs is not to the contrary. For example, in *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351 (2003), a fraud claim was asserted against the defendant because it had represented in its advertisements that, *e.g.*, a customer would receive 50 channels from its satellite TV services. According to the defendant, the fraud claim was not viable because this statement "was not a statement that all 50 channels would be available at all times." *Id.* at 1362. The court held that whether the statement was untrue or misleading was a triable issue of fact to be resolved later. More importantly (at least for purposes of this opinion), the court indicated that the theory here would be one of a failure to disclose. *See id.* ("Under the False Advertising Act and the UCL, '[a] perfectly true statement couched in such a manner that it is likely to mislead or

1  deceive the consumer, *such as by a failure to disclose other relevant information*, is actionable.")

2  (emphasis added).

3      In their opposition, Plaintiffs suggest that, at the very least, there were affirmative

4  misrepresentations made in Ford's limited warranty.  Plaintiffs admit that "the Limited Warranty

5  contains a generic admission of potential defect" but maintain that "using that to insulate Ford from

6  liability for misrepresenting specific product features (or knowingly omitting specific defects) would

7  undermine the remedial purpose of state consumer-protection laws."  Opp'n at 11-2.  But Plaintiffs

8  miss the point here.  The fact that Ford's limited warranty stated "[t]his warranty does not mean that

9  each Ford vehicle is defect free," Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 8-9), does not

10  provide a basis for a claim that Ford made an *affirmative misrepresentation* that the MFT system

11  was defect free.

12      Plaintiffs' reliance on *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427 (D.N.J. 2012), *see*

13  Opp'n at 12 n.35, is unavailing.  In *Mickens*, the court simply stated that "[w]arranty coverage of a

14  particular problem does not, as a matter of law, negate a CFA [Consumer Fraud Act] claim that the

15  manufacturer knowingly *omitted* information about a design defect."  *Mickens*, 900 F. Supp. 2d at

16  442 (emphasis omitted).  But here Plaintiffs are trying to argue not just an omission (failure to

17  disclose) but also an affirmative misrepresentation.

18      Accordingly, to the extent Plaintiffs have asserted any fraud claims based on an affirmative

19  representation (as opposed to a failure to disclose), the Court grants Ford's motion, with one

20  exception.

21      The exception is with respect to one Plaintiff, Mr. Miller (New York).  For Mr. Miller, there

22  is the allegation that, he "was aware of some mixed reviews of [MFT], [but] *he was informed by the*

23  *sales representatives at Mahopac Ford that Ford had corrected any defects in [MFT]*."  FAC ¶ 164

24  (emphasis added).  This is an affirmative representation – *i.e.*, that all defects with the MFT system

25  had been corrected.

26      Ford contends that the Court should still dismiss Mr. Miller's claim because "[a] statement

27  by a salesperson at a dealership cannot be imputed to Ford absent an agency relationship, which

28  Plaintiffs have not even attempted to plead."  Mot. at 9 (citing *Maietta v. Ford Motor Co.*, No. 96 C

**United States District Court**

For the Northern District of California

8347, 1997 U.S. Dist. LEXIS 3788 (N.D. Ill. Mar. 24, 1997) (citing an Illinois Supreme Court opinion for the proposition that "'[a] complaint relying on agency must plead facts which, if proved, establish the existence of an agency relationship[;] [i]t is insufficient to merely plead the legal conclusion of agency'")).[2] Plaintiffs argue in return that whether there is an agency relationship is a question of fact and, here, they have made sufficient "factual allegations from which the Court can infer the existence of agency relationships between Ford and its authorized dealers with respect to [MFT]." Opp'n at 11. Plaintiffs cite in particular ¶¶ 274-87 of the complaint, which discuss the TSBs and software updates sent by Ford to dealers.

Based on these paragraphs, Plaintiffs have made sufficient allegations of agency to withstand the motion to dismiss. "Under New York law an agent may bind his principal in matters within the scope of his agency," *Agristor Leasing v. Hollister*, No. 83-CV-1357, 1985 U.S. Dist. LEXIS 12872, at *9 (N.D.N.Y. Dec. 12, 1985), and "'[a] principal is liable for an agent's misrepresentations [or other frauds] that cause pecuniary loss to a third party, when the agent acts within the scope of his . . . authority.'" *Seifts v. Consumer Health Solns. LLC*, No. 05 Civ. 09355 (RJH), 2011 U.S. Dist. LEXIS 113617, at *19 (S.D.N.Y. Sept. 30, 2011); *cf. Sachs v. Cantwell*, No. 10 Civ. 1663 (JPO), 2012 U.S. Dist. LEXIS 125335, at *55 (S.D.N.Y. Sept. 4, 2012) (stating that, "[u]nder New York law, 'an employer may be vicariously liable for an intentional tort committed by an employee if the employee was acting within the scope of employment at the time the tort was committed'"). It is reasonable to infer that an agency relationship may be found where a salesperson of an authorized dealership of Ford makes a representation about the Ford product in the course of the sale of that product.

---

[2] Plaintiffs criticize *Maietta* because the court there "relied on Illinois state-court decisions, failing to recognize the difference between federal notice-pleading requirements and Illinois'[s] more onerous fact-pleading requirements, leading another federal court from the same district to reject *Maietta* as unpersuasive." Opp'n at 11. But the federal court case cited by Plaintiffs – *Kent v. Celozzi-Ettleson Chevrolet, Inc.*, No. 99 C 2868, 1999 U.S. Dist. LEXIS 17282 (N.D. Ill. Nov. 3, 1999) – was decided before *Twombly* and *Iqbal*. Post-*Iqbal* and/or *Twombly*, courts have held that a conclusory allegations of an agency relationship is not enough. *See, e.g., Castaneda v. Saxon Mortg. Servs.*, No. CIV. 2:09-01124 WBS DAD, 2010 U.S. Dist. LEXIS 17235, at *18 (E.D. Cal. Feb. 26, 2010) (stating that "plaintiffs have not alleged sufficient facts to suggest an agency relationship between Novastar and plaintiffs' mortgage brokers outside of the conclusory allegation that Novastar had an agency relationship with the brokers and provided direction for them to breach their fiduciary duties").

United States District Court

For the Northern District of California

In its reply brief, Ford argues that "instructions to dealers about how to perform repairs do not create an agency relationship regarding sales representations."  Reply at 4.  While this argument is not necessarily without merit, ultimately, the scope of the agency is a factual one for the jury to resolve, especially as information about Ford's precise relationship with its dealers – in particular, with regard to MFT – is largely within Ford's possession, custody, or control.

2.    Failure to Disclose

For Plaintiffs' claims that Ford engaged in fraud by failing to disclose, Ford makes two primary arguments: (1) that Plaintiffs have failed to adequately allege Ford knew, at the time of sale, of a material fact of which Plaintiffs were not aware and (2) that Plaintiffs have failed to adequately allege Ford had a duty to disclose in the first place.

a.    Knowledge of Material Fact of Which Plaintiffs Were Unaware

As preliminary matter, the Court rejects Ford's argument that the fraud claims based on a failure to disclose should be dismissed because its limited warranty *informed* customers that the vehicles were not defect free.  As noted above, in *Mickens*, the court stated that "[w]arranty coverage of a particular problem does not, as a matter of law, negate a CFA [Consumer Fraud Act] claim that the manufacturer knowingly omitted information about a design defect."  *Mickens*, 900 F. Supp. 2d at 442.  Moreover, it would be odd to say that a generic disclosure of possible defects should insulate Ford from liability if it actually knew of a specific defect.

Aside from the above argument, Ford makes two main arguments as to why Plaintiffs have not adequately alleged that Ford knew, at the time of sale, of a material fact of which Plaintiffs were not aware: (1) "Plaintiffs' allegations do not set forth which facts were allegedly material to each Plaintiff" and (2) "Plaintiffs' . . . allegations . . . fail to establish Ford's knowledge" of these facts.  Opp'n at 13.

i.    Materiality

The materiality is argument weak.  Plaintiffs should not be obligated to spell out which exact features of the MFT system they were most interested in.  The FAC adequately conveys that the MFT system was an attractive component because of safety features and features that make the driving experience easier or more enjoyable.  Furthermore, "materiality is generally a question of

14

United States District Court
For the Northern District of California

1   fact," *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 333 (2011), and a reasonable jury could

2   well conclude that the problems with the MFT system were material facts because the system

3   arguably was the subject of Ford's marketing efforts – the system enhanced the functionality and

4   experience of the vehicle, including its safety.

5          Although Ford contends that there is no safety risk if the MFT system is rendered inoperable

6   because a car without the MFT system can still be safe (*e.g.*, cars that are not Fords or Lincolns do

7   not have the MFT system), a reasonable jury could still conclude otherwise.  For instance, a

8   reasonable jury could find that a MFT system that suddenly breaks down while a person is driving

9   the car could cause a safety risk because of the driver becoming distracted.  More obviously, a

10  reasonable jury could find a safety risk if a person was relying on the rearview camera feature of

11  MFT while driving in reverse and that feature broke down.  *See, e.g.*, FAC ¶ 25 (Plaintiff Whalen

12  alleging that "the backup camera would freeze *while driving*").  The Court also notes that it is odd

13  for Ford to quibble with materiality here when it promoted the MFT system as a desirable

14  component of a vehicle in the first place.  In other words, if the MFT system was so desirable, then it

15  would not be surprising for Plaintiffs to consider a problem with the system – particularly a systemic

16  one – a material fact.

17                         ii.     Knowledge

18         As for Ford's argument that Plaintiffs have failed to sufficiently allege Ford knew, at the

19  time of sale, of the material facts (*i.e.*, the problems with the MFT system), that argument is also

20  problematic.  In evaluating the argument, the Court bears in mind that Plaintiffs purchased or leased

21  their vehicles containing the MFT system between October 2010 and April 2013, with most

22  purchases or leases taking place in 2011 and 2012.  According to Plaintiffs, Ford knew at the time of

23  the purchases or leases that there were problems with MFT based on, *e.g.*, (1) the TSBs and updates

24  that it issued to dealers; (2) the customer complaints that were made (*e.g.*, websites set up

25  specifically to complain about MFT and nineteen complaints ranging from October 2010 to July

26  2013 made to NHTSA, *see* FAC ¶¶ 288-91); and (3) a statement by a salesperson at a dealership

27  (apparently some time in 2013) that the MFT problems he experienced were common.  *See* Opp'n at

28  16.

1       For Plaintiffs who purchased or leased their vehicles from 2011 to 2013, there is a plausible

2   allegation of knowledge on the part of Ford.  For example, three Plaintiffs (CDD, Mr. Miller, and

3   Mr. Miller-Jones) purchased or leased their vehicles in 2013.  Prior to 2013, Ford had issued six

4   TSBs to dealers as well as two updates.  *See* FAC ¶¶ 275-83.  Thus, it is more than fair to say that,

5   by 2013, Ford was aware of significant problems with the MFT system.  Of course, most Plaintiffs

6   purchased or leased their vehicles before 2013 (four in 2010, six in 2011, and eleven in 2012).  Prior

7   to 2012, Ford had issued only two TSBs and no updates.  *See* FAC ¶¶ 275-76.  Nevertheless, it is

8   still reasonable to infer that, if Ford had issued four TSBs and two updates in 2012 alone, Ford

9   should have known of problems with MFT by around 2011, *i.e.*, before it could recommend what

10  repairs or updates needed to be done.  Presumably, the TSBs and updates were proceeded by an

11  accretion of knowledge by Ford.  *See Falco v. Nissan N. Am., Inc.*, No. CV 13-00686 DDP (MANx),

12  2013 U.S. Dist. LEXIS 147060, at *17-18 (C.D. Cal. Oct. 10, 2013) (stating that, where defendant

13  issued the first of several TSBs in July 2007 and further did a redesign in 2006 or 2007, that

14  "permit[s] plausible inferences that [defendant] was aware of the defect at the time they sold the

15  vehicles in 2005 and 2006").

16      The closer question is whether there is enough to charge Ford with knowledge with respect

17  to those Plaintiffs who purchased or leased their vehicles in 2010.  2010 was the year of the rollout

18  of MFT.  That being the case, Plaintiffs would basically have to be alleging that, at or about the time

19  of rollout, Ford knew that the MFT system had problems.  While the Court has some doubts whether

20  Plaintiffs will actually be able to prove such, that does not mean that Plaintiffs' case is implausible.

21  The first TSB issued in April 2011, *i.e.*, only a few months after the rollout of the MFT system.  One

22  could reasonably infer that the TSB was issued in response to consumer complaints that surfaced

23  immediately after rollout.  That there were such complaints is substantiated by the NHTSA

24  complaints identified by Plaintiffs, as well as the fact that some of the 2010 Plaintiffs began taking

25  in their cars for servicing almost immediately.  *See, e.g.*, FAC ¶¶ 120 (Mr. Mitchell), 216 (Mr.

26  Connell).

27      Accordingly, for 12(b)(6) purposes, given all reasonable inferences must be drawn in

28  Plaintiffs' favor, the Court finds that Plaintiffs have adequately pled knowledge on the part of Ford.

b.    Duty to Disclose

The parties agree that, where a fraud claim is based on nondisclosure or concealment, there

must first be a duty to disclose and that a duty can arise from the following circumstances:

(1)    when there is a known defect in a consumer product and there are safety concerns associated

with the product's use[3];

(2)    when the defendant had exclusive knowledge of material facts not known to the plaintiff;

(3)    when the defendant actively conceals a material fact from the plaintiff; and

(4)    when the defendant makes partial representations but also suppresses some material facts.

*See, e.g.*, *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 987-88 (N.D. Cal. 2010) (Chesney, J.); *see*

*also Wilson v. Hewlett-Packard*, 668 F.3d 1136, 1141 (9th Cir. 2012).

In the instant case, Plaintiffs have relied on each of the above circumstances in arguing that

Ford had a duty to disclose.  For purposes of this opinion, the Court need only address the first two

categories.

i.    Safety Concerns

As indicated above, Plaintiffs have alleged enough to implicate a duty to disclose based on

safety concerns alone.  Ford argues that a vehicle with an inoperable MFT system "is no less safe

than the same vehicle not equipped with a [MFT] system," Mot. at 16, but, as discussed above, a

reasonable jury could find that a suddenly malfunctioning MFT system could create a safety risk,

particularly if the system were to suddenly crash while a person was driving.  It is one thing for a

product never to have a feature; it is another for a consumer to have purchased the product with that

feature and to depend on that feature, only to have it suddenly malfunction.  Ford contends that,

"[b]y this rationale, any feature on a car can become a safety risk," as virtually any defect could

become distracting to the driver."  Mot. at 17.  But this argument is not particularly convincing

given the prominence of the MFT system and its far-reaching capabilities with respect to the driving

experience.

---

[3] Both at the hearing and in their papers, Plaintiffs argued that they did not have to show a
safety risk because "all Class Vehicles are still under warranty."  Opp'n at 13.  However, Plaintiffs
also admitted in their brief that there is a "duty to disclose a defect that 'plausibly constitutes an
unreasonable safety risk.'"  Opp'n at 13 n.38.

In any event, there are certain obvious safety risks if there is a breakdown in the MFT system – *e.g.*, if the rearview mirror camera or the defroster were to stop functioning. *See, e.g.*, FAC ¶ 266 ("Additionally, because certain crucial vehicle functions, including the defroster and the rearview camera, are routed through and controlled by MyFord Touch, these features become inoperable when the MyFord Touch system crashes. Thus, driving in winter becomes dangerous because the driver cannot defrost his or her windshield and other windows, and drivers are more likely to collide with other cars or pedestrians when moving in reverse because the rearview camera fails."). These safety concerns are not speculative as the concerns were in *Smith*, 749 F. Supp. 2d at 991 (stating that "Plaintiffs offer no evidence that the ignition-lock defect causes engines to shut off unexpectedly or causes individuals to stop their vehicles under dangerous conditions," and thus "agree[ing] with Ford that the dangers envisioned by plaintiffs are speculative in nature, deriving in each instance from the particular location at which the driver initially has parked the vehicle and/or the driver's individual circumstances").

To the extent Ford disputes a safety risk because the defroster can be operated outside of the MFT system, *see* Reply at 12, it is not clear from the evidence provided by Ford that that purported fact is indeed true. For example, ¶ 243 of the FAC show buttons for "My Temp" but it is not clear that that function controls the defroster. Also, page 27 of the MFT Handbook, *see* Def.'s RJN, Ex. B (MFT Handbook), does not clearly show a button for a defroster. Furthermore, Plaintiffs allege in their complaint that, "[i]n at least some of the Class Vehicles, Ford eliminated the physical knobs for climate-control functions, including defrosters. ¶ 263. *After outcry from consumers*, Ford backtracked on this design choice and *reintroduced knobs*. ¶ 15." Opp'n at 16 (emphasis added). Thus, even if Ford's evidence did show that a defroster can be operated outside of the MFT system, Plaintiffs have alleged that this was not always the case.

As for Ford's contention that a safety risk from a broken rearview camera is not that significant because there are many cars today and during the relevant period that do not have such camera, that argument is also unpersuasive. Ford's position fails to take into account that a safety risk can arise by virtue of the fact that there is a safety feature in a product that a consumer comes to depend upon (or at least a reasonable jury could so find).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  Accordingly, for 12(b)(6) purposes, the Court concludes that a reasonable jury could find a

2  safety concern here with respect to MFT that gives rise to a duty to disclose.

3                              ii.   Exclusive Knowledge

4  Even if there were insufficient safety concerns to give rise to a duty to disclose, Ford could

5  still have a duty to disclose based on an independent ground.  According to Plaintiffs, one such

6  ground is exclusive knowledge.  Exclusive knowledge can be established where, *e.g.*, the defendant

7  knew of a defect while the plaintiffs did not and, "given the nature of the defect, it was difficult to

8  discover."  *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011).

9  But exclusivity is not limited to this specific circumstance.  Indeed, courts have noted that

10  "[e]xclusivity is not applied with rigidity."  *Czuchaj v. Conair Corp.*, No. 13-CV-1901-BEN (RBB),

11  2014 U.S. Dist. LEXIS 54410, at *10 (S.D. Cal. Apr. 17, 2014).  Thus, for example, even the

12  presence of information online does not automatically defeat exclusive knowledge.  *See id.* at *11.

13  Also, exclusivity is analyzed in part by determining whether the defendant has superior knowledge.

14  *See id.*; *see also Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 583 (E.D. Cal.

15  2012).  But where a plaintiff simply makes conclusory allegations that a defendant has superior

16  knowledge, that is not enough to overcome a 12(b)(6) challenge.  *See, e.g.*, *Taragan v. Nissan N.*

17  *Am., Inc.*, No. 09-3660 SBA, 2013 U.S. Dist. LEXIS 87148, at *21-22 (N.D. Cal. June 20, 2013)

18  (indicating that "'a plaintiff cannot establish a duty by pleading, *in a purely conclusory fashion*, that

19  a defendant was in a superior position to know the truth about a product and actively concealed the

20  defect'"; adding that, "Plaintiffs must allege specific facts that they claim should have alerted Nissan

21  that the Intelligent Key system design was, in fact, defective") (emphasis added).

22  Here, Ford primarily argues against exclusive knowledge on the ground that there was public

23  knowledge about problems with the MFT system.  *See* Mot. at 20.  While the complaint does contain

24  allegations regarding publicly available knowledge, that is far from being dispositive.  Even if the

25  public – and therefore Plaintiffs – were aware of some problems with MFT, that does not establish

26  that either the public or Plaintiffs knew or should have known of the severity of the problems,

27  including the fact that the problems could not be fixed (as alleged by Plaintiffs).  Indeed, as Ford

28  conceded at the hearing, Plaintiffs would not have had full awareness of the TSBs because the full

United States District Court

For the Northern District of California

1  content of the TSBs was not publicly available on the NHTSA website. Even if Plaintiffs were

2  aware of the TSBs, that would suggest that the problems, even if significant, were still capable of

3  being repaired. Plaintiffs would not know that the MFT system was in fact not capable of repair, as

4  alleged in the FAC.

5      3.   Time Bar

6      Ford's final argument regarding the fraud claims is that, for the Iowa, Texas, and Virginia

7  Plaintiffs,[4] their fraud claims based on the consumer protection statutes are time barred.

8      Ford contends – and Plaintiffs do not dispute – that the consumer protection statutes for these

9  states is two years. Plaintiffs also do not dispute that they filed suit more than two years after the

10 Iowa, Texas, and Virginia Plaintiffs first experienced problems with the MFT system. Where the

11 parties disagree is whether there is a basis for tolling of the statute of limitations.

12     Statute of limitations is, of course, an affirmative defense that a plaintiff has no obligation to

13 plead around in his or her complaint. *See Belluomini v. CitiGroup, Inc.*, No. CV 13-01743 CRB,

14 2013 U.S. Dist. LEXIS 103882, at *9 n.3 (N.D. Cal. July 24, 2013) (stating that "[f]ederal courts

15 have repeatedly held that a plaintiff is not required to plead facts in his complaint in order to avoid

16 potential affirmative defenses"). But where there is a statute-of-limitations problem apparent from

17 the face of the complaint, *see id.* at *10 n.3 (noting that a Rule 12(b)(6) motion may still be made

18 where "it is apparent from the face of the complaint that an action will be time barred"), it is not

19 uncommon for a plaintiff to make allegations of tolling, as Plaintiffs did in their FAC.

20     Here, Plaintiffs pled tolling based on Ford's active concealment – *i.e.*, Ford's active

21 concealment of the problems with MFT prevented Plaintiffs from finding out about Ford's fraud

22 (failure to disclose the problems with MFT). *See* FAC ¶ 230 ("Any applicable statute(s) of

23 limitation has been tolled by Defendant's knowing and active concealment and denial of the facts

24 alleged herein.").

25     For purposes of 12(b)(6), Plaintiffs have adequately alleged active concealment. If, as

26 Plaintiffs allege, Ford pretended to fix the problems with MFT instead of actually admitting that the

27  _____

28     [4] Mr. Mitchell is the only Iowa Plaintiff. The Texas Plaintiffs are Mr. Rodriguez and Mr. Ervin. The Virginia Plaintiffs are Mr. Connell and Mr. Miller-Jones.

United States District Court

For the Northern District of California

problems could not be fixed, that would be active concealment.[5]  *Cf. Ho v. Toyota Motor Corp*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013) (Conti, J.) (finding that plaintiffs had adequately pled active concealment by alleging, *inter alia*, that defendants repaired the class vehicles' headlamps only temporarily or replaced them with other defective parts).  Also, active concealment is supported by Plaintiffs' allegation that Ford kept the existence of the TSBs "secret" – *i.e.*, Ford never shared the existence of the TSBs with Plaintiffs when they took their cars in for service.

Moreover, aside from active concealment, there are enough allegations in the complaint to support Plaintiffs' position (as argued at the hearing) that the fraud claims did not accrue until well after they first began to experience problems with their cars.[6]  First, a single problem with MFT did not establish that there was a systemic problem with the system.  Second, and even more important, even after successive problems with the MFT system, that does not in and of itself establish that Plaintiffs should therefore have known of Ford's alleged *fraud* in concealing the extent of the problems with the MFT system.

///

///

///

///

///

---

[5] In its papers, Ford suggests that Federal Rule of Evidence 408 would bar any evidence of repairs.  However, at this stage of the proceedings (*i.e.*, 12(b)(6)), the Court is not concerned about the admissibility of evidence.  *See* Opp'n at 21.

[6] *See, e.g.*, Iowa Code § 714H.5(5) ("An action pursuant to this chapter must be brought within two years of the occurrence of the last event giving rise to the cause of action under this chapter or within two years of the discovery of the violation of this chapter by the person bringing the action, whichever is later."); Tex. Bus. & Com. Code § 17.565 ("All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."); Va. Code Ann. § 8.01-249 ("The cause of action in the actions herein listed shall be deemed to accrue as follows: [¶] 1. In actions for fraud or mistake, in actions for violations of the Consumer Protection Act (§ 59.1-196 *et seq.*) based upon any misrepresentation, deception, or fraud, and in actions for rescissions of contract for undue influence, when such fraud, mistake, misrepresentations, deception, or undue influence is discovered or by the exercise of due diligence reasonably should have been discovered.").

B.      Certain Tort Claims

For certain tort claims, Ford has also argued for dismissal largely on the basis of the economic loss rule.  The claims at issue here are as follows:

| Colorado | Count I | Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 |
| | Count II | Strict Product Liability |
| | Count VI | Fraudulent Concealment |
| Florida | Count I | Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201 |
| | Count V | Fraudulent Concealment |
| North Carolina | Count I | North Carolina Unfair & Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 |
| | Count V | Fraudulent Concealment |
| Ohio | Count IV | Negligence |

        1.      Colorado

                a.      Strict Liability Claim

For the Colorado Plaintiff (Mr. Sheerin), Ford asserts that, where a plaintiff brings a strict liability claim, and the only damages sought are damages to the product itself (*i.e.*, economic loss and not, *e.g.*, damages to the plaintiff or other property belonging to the plaintiff), Colorado does not recognize such a claim.

The critical case is *Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975).  There, the Colorado Supreme Court adopted the doctrine of strict liability in tort which was stated in § 402A of

///

///

///

///

///

///

United States District Court
For the Northern District of California

the Restatement.[7]  It also determined that "a failure to warn adequately can render a product,

otherwise free of defect, defective for purposes of § 402A."  *Id.* at 987.

> For purposes of this case, however, the *Hiigel* court's significant ruling was with respect to the issue of damages for strict liability.  More specifically, the *Hiigel* court criticized the trial court's interpretation of § 402A as being

> > too narrow.  Although there is a split among the jurisdictions as to whether the damage *to the product sold* is covered under the doctrine of strict liability, *we think the wiser view is that it is*.  Since under § 402A the burden of having cast a defective product into the stream of commerce falls upon the manufacturer, it appears inconsistent to limit his responsibility to property other than the product sold.

*Id.* at 989 (emphasis added).

> A subsequent decision of the Colorado Supreme Court, *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256 (Colo. 2000), did not overrule *Hiigel* in this regard.  *Town of Alma* addressed the issue of whether the rule barred the plaintiff's claim for negligence, not strict liability.[8]

> b.    Fraud Claims

> According to Ford, the two fraud claims under Colorado law (*i.e.*, fraudulent concealment and the consumer protection statute) are directly barred by the economic loss rule.

---

[7] Under that section,

> (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> > (a)    the seller is engaged in the business of selling such a product, and

> > (b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Hiigel*, 544 P.2d at 986 (internal quotation marks omitted).

[8] And even with regard to negligence, the Colorado Supreme Court stated that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care under tort law*."  *Town of Alma*, 10 P.3d at 1264 (emphasis added).

23

**United States District Court**
For the Northern District of California

1    In *Town of Alma*, the Colorado Supreme Court opined on the economic loss rule, stating that

2    "[t]he key to determining the availability of a contract or tort action lies in determining the source of

3    the duty that forms the basis of the action." *Town of Alma*, 10 P.3d at 1262. *See id.* (stating that

4    "'[a] breach of duty which arises under the provisions of a contract must be redressed under

5    contract, and a tort action will not lie'"). Here, Plaintiffs make three arguments as to a duty of care

6    owed by Ford independent of the contract: (1) a duty under the consumer protection statute (in short,

7    a statutory duty), (2) a duty not to fraudulently induce another to enter a contract, and (3) a duty to

8    disclose that exists independent of the contract.

9        Plaintiffs' position has merit on all three grounds.  For example, in *A.C. Excavating v. Yacht*

10   *Club II Homeowners Association*, 114 P.3d 862 (Colo. 2005), the Colorado Supreme Court

11   essentially recognized that a statutory duty was a duty independent of a contract.  *See id.* at 865, 868

12   (noting that case law established that subcontractors owe homeowners a duty of care, independent of

13   any contractual obligations, to act without negligence in the construction of homes and that "the

14   General Assembly has [also] explicitly recognized that subcontracts are under an independent duty

15   of care"); *see also Stan Clauson Assocs. v. Coleman Bros. Constr., LLC*, 297 P.3d 1042, 1047 (Colo.

16   Ct. App. 2013) ("concluding] that SCA does not owe Coleman a duty independent of the

17   agreement[;] [l]and planning is not a profession that is held to an independent duty and standard of

18   care *under any Colorado statute*, nor have land planners otherwise been held to such a duty or

19   standard at common law in our state") (emphasis added).  Here, one of Plaintiffs' fraud claims has a

20   statutory basis.  *See* Colo. Rev. Stat. § 6-1-101 (Colorado Consumer Protection Act).

21       Also, although "fraud claims cannot proceed where they arise from duties implicated by the

22   parties' contract," pre-contractual allegations of fraudulent inducement are not barred by the

23   economic loss rule.  *XeDAR Corp. v. Rakestraw*, No. 12-cv-01907-CMA-BNB, 2013 U.S. Dist.

24   LEXIS 3416, at *17-18 (D. Colo. Jan. 8, 2013).  Notably, *Town of Alma* intimated such in a

25   footnote.  *See Town of Alma*, 10 P.3d at 1263 n.10 (citing Texas state court opinion noting that

26   fraudulent inducement is based on an independent duty, thus precluding application of the economic

27

28

24

United States District Court
For the Northern District of California

loss rule).  Colorado courts of appeal have also so indicated.[9]  *See, e.g.*, *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 628 (Colo. Ct. App. 2009) (noting that another court "suggested that pre-contractual claims of fraudulent inducement might be considered independent of the contract – and hence not be barred by the economic loss rule [–] [b]ut, as this case comes before us, the parties agree that the jury's $ 50,000 theft award was predicated on the final post-contractual installment payment made in 2004[,] long after the contract was entered").  In this case, Plaintiffs allege pre-contractual fraudulent inducement led them to purchase or lease the vehicles.  *See, e.g.*, FAC ¶ 22 (Plaintiff Whalen alleging that she saw television advertisements regarding MFT and that a dealership salesperson made verbal representations about MFT; also alleging that she selected and purchased her vehicle in part because of the feature of MFT as represented through the advertisements and representations made by Ford).

The case cited by Ford – *i.e.*, *Van Rees v. Unleaded Software, Inc.*, 2013 Colo. App. LEXIS 1870 (Colo. Ct. App. Dec. 5, 2013) – is not to the contrary.  Indeed, in *Van Rees*, the court acknowledged that a precontract false representation intended to induce action would not get the benefit of the economic loss rule.  *See id.* at *7-9.  The economic loss rule was a bar to the fraud claims in *Van Rees* because the plaintiff did not really assert fraudulent inducement (even though he claimed precontract representations had been made).  Rather, the gist of the plaintiff's fraud claim was simply that the defendant had falsely promised to perform certain contract terms.  *See id.* at *7, 9.  The court underscored that the promise to perform was memorialized in the parties' contracts and that the risk of nonperformance was something that the plaintiff could have protected against through contract bargaining.  *See id.* at *8, 10 (stating that, "[b]y bargaining for contract prices and duties, the parties had the ability to account for the risk of nonperformance"); *cf. Makoto*, 250 P.3d

---

[9] Note that there are some courts in other states that have found an exception to the fraudulent inducement exception to the economic loss rule.  These courts have largely relied on an opinion from a Michigan state court, *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995), which held that "the economic-loss doctrine does apply to claims for fraudulent inducement if the allegedly fraudulent misrepresentations relate solely to the 'quality or character of the goods sold.'"  *Irwin Seating Co. v. IBM*, 306 Fed. Appx. 239, 243 (6th Cir. 2009).  *Huron*, however, has been criticized.  *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 677-78 (3d Cir. 2002) (noting that *Huron* "is not without its critics," but also pointing to cases defending *Huron*).

United States District Court

For the Northern District of California

1   at 628 (noting that "another division of this court recently rejected a similar contention that 'a claim

2   for fraud in the performance of a contract necessarily is based on a duty independent of the

3   contract'").

4          Finally, as discussed in Part IV.A.2.b, Ford had a duty to disclose that was entirely

5   independent of any contract between itself and Plaintiffs.  That duty to disclose had nothing to do

6   with the terms of the limited warranty that Ford extended to Plaintiffs.

7          2.      Florida

8          As above, Ford challenges the two fraud claims of the Florida Plaintiff (Mr. Oremland) – *i.e.*,

9   fraud under the consumer protection statute and fraudulent concealment – on the basis of the

10  economic loss rule.  And as above, Plaintiffs contend that the economic loss rule is not applicable

11  because the fraud claims are based on a duty independent of any contract – *i.e.*, a statutory duty, a

12  duty not to fraudulently induce another to enter a contract, and a duty to disclose.

13         Plaintiffs' position is supported by the Florida Supreme Court's decision in *Tiara Condo*

14  *Association v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399 (Fla. 2013).  There, the

15  Supreme Court acknowledged prior case law holding that there are exceptions to the economic loss

16  doctrine, including where there is fraudulent inducement and where there are free-standing statutory

17  causes of action.  *See id.* at 406 (noting that "we . . . reaffirmed in cases involving either privity of

18  contract or products liability, the other exceptions to the economic loss rule that we have developed,

19  such as for . . . fraudulent inducement . . . or free-standing statutory causes of action still apply").

20  As noted above, both exceptions apply here.

21         The case that Ford cites, *Burns v. Winnebago Industries, Inc.*, No. 8:13-cv-1427-T-24 MAP,

22  2013 U.S. Dist. LEXIS 116377 (M.D. Fla. Aug. 16, 2013), is not to the contrary.  While the *Burns*

23  court did find that the plaintiff's fraudulent concealment claim was barred by the economic loss rule,

24  it made no ruling that *all* claims for fraud are necessarily barred by the rule.  Furthermore, the court

25  recognized the fraudulent inducement exception to the rule but simply held that, "under the facts

26  alleged, the exception . . . do[es] not apply."  *Id.* at *9.  Unfortunately, the specific facts of the case

27  are not clear from the order, and therefore why the fraudulent inducement exception was not

28  applicable cannot be determined.

United States District Court

For the Northern District of California

As for *HTC Leleu Family Trust v. Piper Aircraft, Inc.*, No. 1:12-cv-21118-KMM, 2012 U.S. Dist. LEXIS 149498 (S.D. Fla. Oct. 17, 2012), another case cited by Ford, it too is of little support. There, the court explained that, "[i]f the fraud is in a term of the bargain, it is not barred by the economic loss rule," but, "if the alleged fraud relates to an act of performance, then it is barred." *Id.* at *10-11.[10]   Ultimately, the court found the plaintiff's fraudulent inducement claim (as well as fraudulent concealment and negligent misrepresentation claims) not viable because it was related to whether the defendant adequately performed under the contract – "that is, whether Defendant breached the agreement by providing a defective Aircraft." *Id.* at *12.  Here, Plaintiffs' fraudulent inducement claim is not based on Ford's performance under the contract (which presumably would be to repair or replace a defect within the limited warranty period).  *Cf. Marvin Lumber & Cedar Co. v. Ppg Indus.*, 223 F.3d 873, 896 (8th Cir. 2000) (noting that "'[t]he defendant must have fraudulently induced the plaintiff to enter into the agreement, and that inducement must be a promise other than merely pledging to perform the terms of the contract'").

### 3.   North Carolina

The North Carolina Plaintiff (Mr. Fink) also brings two fraud claims, one under a consumer protection statute and another for fraudulent concealment – both of which have been challenged on the basis of the economic loss rule.

The fraudulent concealment claim is clearly viable based on Plaintiffs' theory that they were fraudulently induced to purchase or lease the vehicles with the MFT system.  *See Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.*, No. 1:09cv00018, 2010 U.S. Dist. LEXIS 107526, at *5 (M.D.N.C. Oct. 7, 2010) (stating that, "[u]nder North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the

---

[10] In support of this statement, the *HTC* court cited *Allen v. Stephan Co.*, 784 So. 2d 456, 458 (Fla. Ct. App. 2000) ("To determine whether the economic loss rule bars recovery under fraud, the question is simply this: is the fraud alleged in an act of performance or in a term of the bargain? Where, as here, the representation is simply made and relied upon in inducing the completion of the transaction, then clearly it is a term of the bargain. Nothing further was required of the Allens [the sellers] in connection with this contract term after they made the representation that all SRP's taxes had been paid.  If, however, the misrepresentation had been in connection with the seller's performance – such as the ability to provide increased reservations and better hotel management services in Hotels of Key Largo, which required continuing action on the part of the seller, then the fraud is in the performance and the economic loss rule bars recovery sounding in tort.").

United States District Court
For the Northern District of California

1  execution of the contract"); *see also Wireless Communs., Inc. v. Epicor Software Corp.*, No.

2  3:10CV556-DSC, 2011 U.S. Dist. LEXIS 2633, at *14 (W.D.N.C. Jan. 11, 2011) (distinguishing,

3  *inter alia*, *Schumacher* because, there, the validity of the contract was challenged and the plaintiff

4  "specifically pled facts that the defendant[] never intended to perform the contract[] or specifically

5  intended to deceive the plaintiff[]"). Furthermore, the fraudulent concealment claim is viable based

6  on the duty to disclose which exists independent of any contract (*e.g.*, the limited warranty).

7      As for the claim under the consumer protection statute, here, there is authority to support

8  Ford's position – namely, *Ellis v. Louisiana-Pacific Corp.*, No. 3:11CV191, 2011 WL 5402878

9  (W.D.N.C. Nov. 8, 2011). In *Ellis*, the court found that the plaintiffs' claim under the consumer

10 protection statute was barred by the economic loss rule because they already had a contractual

11 remedy available, *i.e.*, a warranty remedy. *See id.* at *1. The court also noted that "the damage

12 incurred by the plaintiff is not separate and apart from the damage arising out of a breach of

13 warranty claim." *Id.* at *2; *see also Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625,

14 627 (M.D.N.C. 2005) (report and recommendation, subsequently adopted by district court)

15 (concluding that "Plaintiff's unfair or deceptive trade practices claim should be dismissed pursuant

16 to the 'economic loss rule'"; but "limit[ing] its decision to cases such as the instant case involving

17 allegations of a defective product where the only damage alleged is damage to the product itself and

18 the allegations of unfair trade practices are intertwined with the breach of contract or warranty

19 claims"). But Plaintiffs legitimately point out that, on the *Ellis* appeal, the Fourth Circuit declined to

20 make a ruling on whether the economic loss rule barred the plaintiffs' claim. It explained as

21 follows: "[T]he North Carolina courts have never addressed whether [Unfair and Deceptive Trade

22 Practices Act] claims are subject to the [economic loss rule], and in the absence of such direction,

23 we are well-advised to rely on other grounds" for dismissal. *Ellis v. La.-Pac. Corp.*, 699 F.3d 778,

24 787 n.5 (4th Cir. 2012).

25     As the Fourth Circuit indicated, no state court has expressly ruled on whether claims under

26 the consumer protection statute may be barred by the economic loss rule. Only a few federal district

27 courts in North Carolina have so ruled. *See, e.g.*, Reply at 19 (citing, *e.g.*, *Malone v. Tamko Roofing

28 Prods.*, No. 3:13-cv-00089-MOC-DCK, 2013 U.S. Dist. LEXIS 145530, at *6-7 (W.D.N.C. Oct. 8,

United States District Court
For the Northern District of California

1   2013)).  In light of this fact, the Court is not precluded from holding, and does so hold, that the

2   consumer protection statute here gives rise to a duty independent of the contract and therefore

3   should not be barred by the economic loss rule.  *See Coker v. DaimlerChrysler Corp.*, 617 S.E.2d

4   306, 319 (N.C. Ct. App. 2005) (Hudson, J., dissenting) (supporting the view that claims under

5   consumer protection statute "are exempt from the economic loss rule because the rule is judicial, not

6   legislative, and must give way to specific legislative policy pronouncement allowing damages for

7   economic loss[;] [i]n other words, by enacting a remedy for economic losses suffered by reason of

8   an act deemed wrongful by the statute, the legislature has effectively preempted the economic loss

9   rule for those cases covered by the act'").[11]  In any event, the economic loss rule does not apply to

10  Plaintiffs' claim of fraudulent concealment.

11          4.      Ohio

12          Finally, Ford contends that the Ohio Plaintiff's (Mr. Zuchowski) claim for negligence is

13  barred by the economic loss doctrine.  In support of this position, Ford cites *Chemtrol Adhesives,*

14  *Inc. v. American Manufacturers Mutual Insurance Co.*, 537 N.E.2d 624 (Ohio 1989).  There, the

15  Ohio Supreme Court took note of the "general rule . . . that a plaintiff who has suffered only

16  economic loss due to another's negligence has not been injured in a manner which is legally

17  cognizable or compensable."  *Id.* at 630.

18          The reason for denying recovery in negligence for purely economic
             loss lies not in a failure to find "negligent" conduct by the
19           manufacturer, nor in a lack of proximate relationship between that
             conduct and the consumer's injury.  Rather, the key factor is the
20           extent, and more important, the source, of the duty owed by the
             manufacturer to the consumer.  In negligence, the law imposes upon
21           the manufacturer of a product the duty of reasonable care.  That duty
             protects the consumer from physical injury, whether to person or
22           property.  However, the law of negligence does  not extend the
             manufacturer's duty so far as to protect the consumer's economic
23           expectations, for such protection would arise not under the law but
             rather solely by agreement between the parties.  "[W]hen the
24           promisee's injury consists merely of the loss of his bargain, no tort
             claim arises because the duty of the promisor to fulfill the term of
25           the bargain arises only from the contract."

26  _____

27          [11] The majority in *Coker* declined to address the economic loss rule "in light of our holding
     that plaintiffs lack standing to assert either fraud or unfair and deceptive trade practices claims."
28   *Coker*, 617 S.E.2d at 314.

**United States District Court**
For the Northern District of California

> In the instant case, Midland-Ross provided Chemtrol with an arch dryer pursuant to the contract between them. If the defect in the arch dryer had caused personal injury or damage to other property of Chemtrol, Midland-Ross might be found to have breached its duty of care imposed by law, and recovery in negligence would accordingly lie. However, Chemtrol's losses here were economic, i.e., additional expenses incurred because the Midland-Ross arch dryer did not perform as expected. Midland-Ross' duty to provide a working arch dryer arose not under the law of negligence but rather under its contract with Chemtrol.

*Id.* at 630-31.

In response, Plaintiffs argue that *Chemtrol* is not dispositive because, there, the parties were two business entities (*i.e.*, the plaintiff was not a consumer); moreover, the parties were in contractual privity. According to Plaintiffs, there is a more relaxed rule where a consumer brings suit and is not in contractual privity with the defendant. *See* Opp'n at 31-32.

Plaintiffs' view has support. For example, in *In re Porsche Cars N.A., Inc. Plastic Coolant Tubes Products Liability Litigation*, 880 F. Supp. 2d 801 (S.D. Ohio 2012), the court took note that, under *Chemtrol*, a commercial plaintiff in contractual privity with the defendant could not recover damages in tort for purely economic loss. *See id.* at 871. But in *Chemtrol*, the court "distinguished parties in privity from those not in privity, stating, '[f]or an ordinary consumer, i.e., one not in privity of contract with the seller or manufacturer against whom recovery is sought, an action in negligence may be an appropriate remedy to protect the consumer's property interests.'" *Id.* The *Porsche* court went on to cite several Ohio district court opinions which "permitted individual consumers to bring negligence claims for purely economic loss against a manufacturer with whom they are not in privity of contract." *Id.* at 872.

As Ford points out in its reply brief, Judge Seeborg recently held to the contrary in *Ford Tailgate*. In *Ford Tailgate*, Judge Seeborg cited a 1965 Ohio Supreme Court decision, *see Inglis v. Am. Motors Corp.*, 209 N.E.2d 583 (Ohio 1965), for the proposition that, under Ohio law, "a plaintiff cannot recover in negligence for purely economic losses allegedly caused by a defective product when the only damage is to the product itself." *Ford Tailgate*, 2014 U.S. Dist. LEXIS 32287, at *23; *see also Inglis*, 209 N.E.2d at 140 (agreeing with Dean Prosser's comments that "'the usual rule . . . for negligence [is] there is no liability for mere pecuniary loss of a bargain'"). He

**United States District Court**

For the Northern District of California

acknowledged that "[a] more recent Ohio decision [*i.e.*, *Chemtrol*] suggested in dicta that this rule applies only where the consumer was in privity with the manufacturer at the time of sale." *Ford Tailgate*, 2014 U.S. Dist. LEXIS 32287, at *23-24. But, he explained, "[t]he Ohio state courts . . . continue to apply *Inglis* not *Chemtrol* in cases involving individual consumers." *See id.* at *24-25 (citing three cases). While some federal district courts in Ohio followed *Chemtrol*, none "cite *Inglis* or discuss the continuing viability of that case. Because *Inglis* continues to be the rule in Ohio, defendant's motion to dismiss plaintiffs' Ohio negligence claim . . . must be granted without leave to amend." *Id.* at *25-26.

However, the three Ohio state court cases cited by Judge Seeborg did not rely on *Inglis* in any way in reaching their conclusions. In fact, all cited *Chemtrol*, though none seems to have considered the *Chemtrol* dicta which suggested that a plaintiff-individual consumer not in privity with the defendant would not be subject to the economic loss rule. The Court therefore respectfully declines to follow Judge Seeborg's approach – particularly because, here, the duty to disclose on the part of Ford has nothing to do with any contract (*e.g.*, the limited warranty) between Ford and Plaintiffs.

C.   <u>Summary on Fraud and Tort Claims</u>

For the foregoing reasons, the Court rules as follows on the fraud and tort claims:

(1)   On the fraud claims based on an affirmative misrepresentation, the motion to dismiss is granted except as to Mr. Miller (a New York resident). The dismissal is without prejudice.

(2)   On the fraud claims based on a failure to disclose, the motion to dismiss is denied.

(3)   On the Colorado strict liability and fraud claims, the motion to dismiss is denied.

(4)   On the Florida fraud claims, the motion to dismiss is denied.

(5)   On the North Carolina fraud claims, the motion to dismiss is denied.

(6)   On the Ohio negligence claim, the motion to dismiss is denied.

## IV.   <u>WARRANTY CLAIMS</u>

Plaintiffs have asserted multiple warranty-based claims, some based on statutes and some based on a breach of contract or the common law. Ford has primarily challenged the statutory warranty claims.

**United States District Court**
For the Northern District of California

A.    <u>Express Warranty Claims</u>

Plaintiffs' claims for breach of express warranty are largely predicated on state statutes that have adopted UCC § 2-313.[12]  UCC § 2-313 provides in relevant part as follows: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  UCC § 2-313(1)(a).  Here, the only express warranty at issue is that contained in Ford's limited warranty, which provides that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on our vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."  Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 9).

According to Plaintiffs, Ford breached the terms of the limited warranty because Ford and/or its dealers were ultimately unable to fix the problems with MFT, and thus the warranty failed of its essential purpose.  *See, e.g.*, *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984) (stating that "a repair or replace remedy fails of its essential purpose only if repeated repair attempts are unsuccessful within a reasonable time") (emphasis omitted); *Asp v. Toshiba Am. Consumer Prods., LLC*, 616 F. Supp. 2d 721, 729 (S.D. Ohio 2008) (stating that a remedy fails of its essential purpose where "buyers of products governed by exclusive repair and replace warranties . . . are able to show that repairing or replacing the product will not remedy the defect"); *Malkamaki v. Sea Ray Boats, Inc.*, 411 F. Supp. 2d 737, 745 (N.D. Ohio 2005) (stating that "[f]ailure to cure defects under warranty within a reasonable time supports a finding that a remedy failed of its essential purpose"); *see also* Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 9) (stating that "[t]his exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner").

---

[12] The one exception is California.  In the FAC, there is no *direct* claim for breach of express warranty pursuant to California Commercial Code § 2313; rather, the California claim for breach of express warranty is based on California Civil Code §§ 1791.2 and 1793.2(D) (the Song-Beverly Act).  However, Plaintiffs have indirectly implicated § 2313 in their claim for violation of California Business & Professions Code § 17200.  *See* FAC ¶ 328(vi) (alleging that Ford has violated § 17200 by violating various California laws, including § 2313).

United States District Court

For the Northern District of California

1.      <u>Failure to Present Vehicle for Repair</u>

In its motion, Ford argues first that four of the twenty-four Plaintiffs (namely, Ms. Battle, Mr. Sheerin, Mr. Miller, and Mr. Zuchowski) do not have viable express warranty claims because they never brought their cars in for repairs in the first instance. Without doing so, Ford contends, these Plaintiffs cannot assert a failure of essential purpose because Ford was never given the opportunity to repair, replace, or adjust the MFT system in their cars.

Ford's position is supported by the case law. For example, in *Asp*, a district court held that, "before the exclusive repair and replace remedy is considered to have failed of its essential purpose, 'the seller *must be given an opportunity* to repair or replace the product.'" *Asp*, 616 F. Supp. 2d at 729 (emphasis added); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 8:10ML 02151 JVS (FMOx), 754 F. Supp. 2d 1145, 1179 (C.D. Cal. 2010) (stating that "Plaintiffs who neither sought repairs pursuant to the recalls nor sought repairs for SUA-related issues may not pursue a claim for breach of express warranty based on the written warranty"); *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 744 n.7 (Colo. 1991) (stating that, "[t]o establish their claim of failure of essential purpose . . . , the plaintiffs were required to establish [*inter alia*] that the defendants had an opportunity to repair or replace the defects [but] were unable to do so"); *cf. Taliaferro v. Samsung Telecomms. Am., LLC*, No. 3:11-CV-1119-D, 2012 WL 169704, at *2 (N.D. Tex. Jan. 19, 2012) (stating that "a plaintiff cannot state a claim for breach of express warranty unless he meets the conditions precedent prescribed by the express warranty").

Furthermore, the case on which Plaintiffs relied at the hearing, *McCollough Enterprises, LLC v. Marvin Windows & Doors*, No. Civil Action 09-0573-WS-B, 2010 WL 5014670 (S.D. Ala. Dec. 2, 2010), is not to the contrary. In *McCollough*, the district court simply stated that, "[i]f the remedy promised by the seller is so hollow or ineffectual as to be meaningless, then the warranty fails of its essential purpose and the customer is not bound by limitations of remedy contained therein." *Id.* at *8. But the fact that a customer is not bound by a warranty's limitations of remedy once that warranty has failed of its essential purpose is a different issue from whether a defendant should be

1  given an opportunity to repair or replace before the warranty can be said to have failed of its

2  essential purpose.

3        To the extent Plaintiffs make the alternative argument that they are excused from bringing in

4  their cars for repairs because to do so would have been futile, the Court is not persuaded.  The Court

5  acknowledges that futility may, in theory, be a basis for an excuse.  Even in *Asp*, the district court

6  implicitly acknowledged such; it rejected the plaintiff's futility argument only because "[a] handful

7  of customer complaints about the DVR, and their experience with Toshiba's ability to repair or

8  replace the alleged defect, does not reasonably give rise to an argument that it would have been

9  futile for Plaintiff to give Toshiba the opportunity to fix his DVR."  *Asp*, 616 F. Supp. 2d at 731.

10  Still Plaintiffs have cited no cases establishing a futility exception to the presentation required by the

11  express terms of the express warranty.

12        Even assuming a futility argument is theoretically possible, here, there are insufficient

13  allegations in the complaint to make futility plausible.  Based on the complaint, the Court does not

14  have a sense of whether Ford's alleged inability to fix the problems with MFT was commonplace,

15  unique to Plaintiffs, or somewhere in between.  Plaintiffs do not contend that none of MFT's

16  problems could not be repaired.  We do not know whether the named Plaintiffs' vehicles could have

17  been repaired.  Indeed, even if half of Ford's cars had problems with MFT, as alleged by Plaintiffs in

18  their complaint, *see* FAC ¶ 10, that does not necessarily mean that Plaintiffs' problems could not be

19  fixed.

20        Although Plaintiffs contend that the inability to fix was commonplace, that is not adequately

21  supported by the complaint, which simply points to (1) Plaintiffs' own experiences, (2) 19 NHTSA

22  complaints, and (3) two Internet websites called "syncsucks.com" and "outofmytouch.com."  *See*

23  FAC ¶¶ 8, 288 *et seq.*  The website complaints can be discounted because there are no allegations in

24  the FAC that there were complaints on the websites about MFT not being fixable.  *See* FAC ¶¶ 288-

25  90.  For the NHTSA complaints, most of the complaints did suggest or state that the MFT problems

26  were not fixable.  But even if the Court were to credit all 19 NHTSA complaints as making claims of

27  irreparable problems with MFT, and further credit the 20 Plaintiffs who did bring in their cars for

28  repairs, that would still leave the Court with only 39 complaints.  While this is more than just a

United States District Court

For the Northern District of California

1  handful of complaints and certainly raises the possibility of futility, it still does not meet the

2  requisite plausibility standard of *Iqbal* and *Twombly*.

3      Accordingly, the Court dismisses the claims of the following four Plaintiffs: Ms. Battle, Mr.

4  Sheerin, Mr. Miller, and Mr. Zuchowski.  The dismissal on this basis is without prejudice.

5  However, as discussed below, there are independent reasons to dismiss with prejudice the express

6  warranty claims for two Plaintiffs (Ms. Battle and Mr. Sheerin) – *i.e.*, for failure to provide notice of

7  the breach of warranty.

8      2.    <u>"Lumping" Problems/Repairs</u>

9      For the remaining twenty Plaintiffs, Ford concedes that they did bring their cars in for

10  repairs.  Ford contends, however, that their claims for breach – predicated on a failure of essential

11  purpose – should still be dismissed on an independent ground.  More specifically, Ford argues that,

12  even if these Plaintiffs did bring their cars in for multiple repairs, the repairs were for different

13  problems, and Plaintiffs cannot "lump" the problems/repairs together to establish a failure of

14  essential purpose.  Ford asserts:

15          Just as a warranty for a new smart phone does not fail its
    essential purpose when the phone receives a warranty repair for a

16      malfunctioning camera and, later, receives another warranty repair for
    a problem with its Bluetooth capability, Ford's Limited Warranty does

17      not fail of its essential purpose when a vehicle equipped with a [MFT]
    system receives a warranty repair for a malfunctioning back-up

18      camera and later receives a warranty repair for an issue with its
    Bluetooth capability.  This is because the system experienced two

19      different problems, each of which was successfully repaired.

20  Mot. at 29.

21      Ford's argument is not without any support.  *See, e.g.*, *Schultz v. Gen. R.V. Ctr.*, No. 04-

22  72562, 2006 WL 2583140, at *11 (E.D. Mich. Sept. 6, 2006) (stating that "Plaintiffs cannot

23  establish a claim that the limited warranty's exclusive remedy of repair or replacement . . . failed of

24  its essential purpose by lumping together all the repairs and the aggregate amount of time his RV

25  was out of service"); *Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 55 (Mich. Ct. App.

26  2005) (noting that "[t]here were numerous different repairs to the vehicle over a lengthy period,

27  most of which were not repeat repairs").  Nevertheless, the Court rejects the argument because this

28  case is only at the 12(b)(6) stage.  In contrast to *Computer Network*, all of the problems here relate to

**United States District Court**

For the Northern District of California

the MFT system specifically.  *Compare id.* at 53 (discussing different problems with plaintiff's vehicle which were facially unrelated – *e.g.*, engine problems, malfunctioning turn signals, defective steering, defective air conditioning, etc.).  Moreover, Plaintiffs have alleged there is an underlying defect within the MFT system (software and/or hardware).  Even if that underlying defect manifests itself in different ways within the MFT system, that does not necessarily detract from the allegation that there is still an underlying systemic defect.  That assertion is supported by factual allegations in the complaint, in particular, the allegations related to Ford's issuance of the TSBs and software updates.  In other words, if Ford was trying to fix the problems with MFT by issuing TSBs and software updates that implemented systemic types of fixes, that lends support to Plaintiffs' theory that the varying problems were manifestations of an underlying systemic problem and hence "grouping" is permissible, at least for pleading purposes.

     3.    <u>Basis of the Bargain</u>

Ford argues that, even if the twenty Plaintiffs' express warranty claims cannot be dismissed on the ground of "lumping," there is another basis for dismissal.  As noted above, UCC § 2-313 provides in relevant part as follows: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain* creates an express warranty that the goods shall conform to the affirmation or promise."  UCC § 2-313(1)(a) (emphasis added).  According to Ford, "basis of the bargain" means that Plaintiffs must have been aware of and relied on the limited warranty prior to purchasing their vehicles – *i.e.*, without reliance, no express warranty claim is viable.

The Court does not agree.  Comment 3 to UCC § 2-313 provides as follows:

> The present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain.  In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; *hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement*.  Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof.  The issue normally is one of fact.

1   UCC § 2-313, cmt. 3 (emphasis added).  *See, e.g.*, *Weinstat v. Dentsply*, 180 Cal. App. 4th 1213,

2   1227 (2010) (noting that "[p]re-[UCC] law governing express warranties required the purchaser to

3   prove reliance on specific promises made by the seller" but that the UCC does not; under comment

4   3, there is a "presumption that the seller's affirmations go to the basis of the bargain").  Ford has

5   failed to show that any of the states at issue rejected comment 3 when they adopted their versions of

6   UCC § 2-313.  In fact, the statutes indicate that comment 3 was actually incorporated.

7       The Court acknowledges that there are a few lower court cases indicating that reliance is

8   required, even where a claim is based on UCC § 2-313.  *See, e.g.*, *Corson v. Toyota Motor Sales,*

9   *U.S.A., Inc.*, No. CV 12-08499 JGB (VBKx), 2013 WL 18027009, at *9 (C.D. Cal. Apr. 24, 2013)

10  (interpreting Pennsylvania law).  However, these cases are not dispositive, particularly as they do

11  not address and account for comment 3 to UCC § 2-313.  Moreover, none are decisions of the

12  highest state court.  Also, many of the cases cited by Ford are distinguishable because they did not

13  involve *written* warranties delivered in connection with a sale (as here).  Where there is an express

14  written warranty, an assertion that the warranty not part of the deal between the issuing party and

15  receiving party is far less persuasive.  *See Cipollone v. Liggett Group,* Inc., 893 F.2d 541, 568 n.29

16  (3d Cir. 1999) (although requiring plaintiff to prove that she knew of the advertisement containing

17  the "affirmation of fact or promise" to meet the basis-of-the-bargain requirement, noting that this

18  burden would not be imposed where a written warranty was delivered to the purchaser in connection

19  with a sale because, in such a situation, "there is no question that the plaintiff has knowledge that the

20  alleged warranty exists"); *Norcold v. Gateway Supply Co.*, 798 N.E.2d 618, 623 (Ohio Ct. App.

21  2003) (stating that "comment 3 indicates that UCC section 2-313 is relevant to the question of

22  whether an express warranty has been *created*, and the 'basis of the bargain' rule is not applicable to

23  situations were written warranties are clear and express").  *See generally Pegasus Mgmt. Co., Inc. v.*

24  *Lyssa, Inc.*, 995 F. Supp. 29, 38 (D. Mass. 1998) (stating that "'[t]he problems of a reliance, and a

25  right to rely, on the representations do not appear when the action is grounded in warranty'" because

26  "'[t]he warranty is as much a part of the contract as any other part'").

27       At the hearing, Ford argued still that, under California law, reliance is a requirement where

28  the parties are not in privity with one another.  In support of this argument, Ford cites *Keegan v.*

1    *American Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012).  In *Keegan*, the parties disputed

2    whether reliance was required for an express warranty claim.  The district court acknowledged that,

3    previously, a state appellate court had stated: "'[B]reach of express warranty arises in the context of

4    contract formation *in which reliance plays no role*.'" *Id.* at 546 (quoting *Weinstat*; emphasis added).

5    The *Keegan* court, however, distinguished *Weinstat* because, "[t]here, plaintiff alleged an express

6    warranty claim against the product seller" and so the claim was "based on privity of contract.  Here,

7    none of the plaintiffs purchased his or her vehicles directly from the manufacturer.  Therefore, none

8    was in privity with defendants." *Id.*

9          While *Keegan* supports Ford's position, other courts interpreting California law have not

10   found such a limitation – *i.e.*, they have not required reliance where the parties are not in privity.

11   *See, e.g.*, *Toyota*, 754 F. Supp. 2d at 1183 & n.22 (in case where plaintiffs sued car manufacturer,

12   stating that plaintiffs had to have been exposed to the advertising but adding that there is no reliance

13   requirement under *Weinstat*); *McVicar v. Goodman Global, Inc.*, No. SACV 13-1223-DOC (RNBx),

14   2014 WL 794585, at *11 (C.D. Cal. Feb. 25, 2014) (in case where plaintiffs sued air conditioner

15   manufacturer, relying on *Weinstat*); *Horvath v. LG Elecs. Mobilecomm USA, Inc.*, No. 11-CV-

16   01576-H-RBB, 2012 WL 2861160, at *6 (S.D. Cal. Feb. 13, 2012) (in case where plaintiffs sued

17   mobile phone manufacturer, relying on *Weinstat*).

18         Finally, although Plaintiffs did not buy or lease their vehicles directly from Ford (and thus no

19   privity), there is no dispute that Ford did extend a limited warranty to Plaintiffs upon their purchase

20   or lease of the cars.  A privity requirement would seem to have little meaning under such

21   circumstances of this case.  The Court also notes that, even if reliance were required for an express

22   warranty claim under California Commercial Code § 2313, there is no comparable reliance

23   requirement for an express warranty claim under the Song-Beverly Act – a claim which Plaintiffs

24   have advanced here.

25         The Court therefore concludes that dismissal under Rule 12(b)(6) on the ground of reliance is

26   not warranted.

27

28

United States District Court
For the Northern District of California

4.     Notice

Ford also contends there is a notice requirement for a claim of express warranty based on UCC § 2-607(3)(a).  UCC § 2-607(3)(a) provides that, "[w]here a tender has been accepted, . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  UCC § 2-607(3)(a).  Ford asserts that, here, eleven Plaintiffs (namely, Ms. Battle, Mr. D'Aguanno, Mr. Sheerin, Dr. Oremland, Mr. Mitchell, Mr. Zuchowski, Mr. Avedisian, Mr. Rodriguez, Mr. Ervin, Mr. Connell, and Mr. Miller-Jones) failed to allege that they satisfied this notice requirement.  There is no dispute among the parties that there is a notice requirement for each of the states at issue under the relevant statute.

As the parties agreed at the hearing, the notice issue must be evaluated on a state-by-state basis.  The Court first addresses the express warranty claims of Ms. Battle, Mr. Sheerin, and Mr. Zuchowski.  Although the Court has already dismissed these Plaintiffs' express warranty claims on the ground of failure to present the car for repair, the dismissal was without prejudice.  Here, a failure to comply with the notice requirement is a basis for dismissal with prejudice.

a.     Ms. Battle (Alabama)

The Court agrees with Ford that Ms. Battle's express warranty claim should be dismissed for failure to comply with the notice requirement.

First, contrary to what Plaintiffs argue, the notice required here was notice to Ford, the manufacturer of Ms. Battle's car, and not just notice to the direct seller of Ms. Battle's car. Admittedly, UCC § 2-607(a)(3) on its face refers to notice to the seller.  Nevertheless, some states, including Alabama, require notice to the manufacturer where the manufacturer (and not the seller) is the one being sued.  *See Hobbs v. Gen. Motors Corp.*, 134 F. Supp. 2d 1277, 1285(M.D. Ala. 2001) (stating that "remote manufacturers should be afforded the same protections as sellers, either by way of notice provided directly to them, or through notice to them by the direct seller from the buyer").

Second, although Plaintiffs contend that Ms. Battle provided the requisite notice to Ford when Plaintiffs filed the instant lawsuit, that argument lacks merit.  Under Alabama law, the filing of a complaint does not constitute notice.  *See id.* (stating that notice must "precede the filing of the complaint," at least in a case involving economic harm rather than personal injury); *see also Jewell*

United States District Court

For the Northern District of California

1    *v. Seaboard Indus.*, 667 So. 2d 653, 661 (Ala. 1995) (concluding that plaintiff did not give sufficient

2    notice of breach because, before he filed his complaint, he made no attempt to notify defendant that

3    he had experienced problems).

4          Third, Plaintiffs suggest that the purpose underlying the notice requirement has been satisfied

5    because Ford already knew that many of its customers were having problems with MFT.  *See* Opp'n

6    at 37-38 (arguing that "Ford's contention that it lacked the requisite knowledge under U.C.C. § 2-

7    607 is disingenuous in light of the overwhelming allegations in the FAC concerning consumer

8    complaints, the NHTSA database, news articles and direct notice *of this particular problem* Ford

9    received from Plaintiffs and similarly situated consumers").  But similar arguments have been

10   rejected by courts applying Alabama law.  For example, in *Smith v. Apple*, No. 08-AR-1498-S, 2009

11   WL 3958096 (N.D. Ala. Nov. 4, 2009), a district court stated: "[A] general awareness on Apple's

12   part of alleged defects in its iPhone does not extinguish the purpose of the notice requirement, nor

13   does it substitute for that requirement under Alabama law."  *Id.* at *1; *see also In re Ford Motor Co.

14   E-350 Van Prods. Liab. Litig.*, No. 03-4558 (HAA), 2008 WL 4126264, at *6, 9 (D.N.J. Sept. 2,

15   2008) (dismissing Alabama warranty claim for failure to comply with notice requirement even

16   though there were allegations that Ford was "'fully aware of the alleged defect from the earliest

17   stages of the E350's development, [and] was further warned by the NTSB and NHTSA'").

18         Accordingly, the Court dismisses Ms. Battle's express warranty claim.  The dismissal is with

19   prejudice as Plaintiffs have failed to show that they could make an amendment that would overcome

20   dismissal on this basis.

21                  b.    Mr. Sheerin (Colorado)

22         The Court also concludes that dismissal of Mr. Sheerin's express warranty claim is proper.

23         Unlike Alabama law, Colorado law does not require notice to the manufacturer.  *See Cooley*,

24   813 P.2d at 741-42 (stating that notice to the immediate seller is required, not to anyone beyond the

25   immediate seller, including the manufacturer).  Nevertheless, that does not obviate the requirement

26   that notice still must be given to the seller, and here no notice was given to the seller because, as

27   noted above, Mr. Sheerin did not even bring his car in for a repair.

28

1    As above, the Court dismisses the express warranty claim with prejudice – *i.e.*, because

2  Plaintiffs have failed to show that they could make an amendment that would overcome dismissal on

3  this basis.

4          c.    Mr. Zuchowski (Ohio)

5    For Mr. Zuchowski, the express warranty claim is not subject to dismissal based on the

6  notice requirement.

7    Ohio law appears to require notice to a manufacturer. *See, e.g.*, *Radford v. Daimler Chrysler

8  Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001) (in case where plaintiff sued car manufacturer for

9  damages to her car when it spontaneously caught fire, dismissing Ohio warranty claim based on

10 failure to provide notice).

11   But, under Ohio law, the filing of a complaint can serve as notice of breach. *See Chemtrol*,

12 537 N.E.2d at 638 (stating that "we believe in a proper case the filing of a civil complaint could

13 serve as notice of breach" although concluding that "this is not such a case, as Lexington's suit was

14 filed a full two years after the damages were sustained"); *cf. Lincoln Elec. Co. v. Technitrol, Inc.*,

15 718 F. Supp. 2d 876, 883 (N.D. Ohio 2010) (stating that "[t]he circumstances in this case are similar

16 to the circumstances described in *Chemtrol* that would preclude the complaint from constituting

17 sufficient notice: defendant had no prior knowledge of the defects, and the complaint was filed a

18 long period of time after plaintiff's damages were sustained"). Ford argues to the contrary, citing *St.*

19 *Clair v. Kroger Co.*, 581 F. Supp. 2d 896 (N.D. Ohio 2008), where the court stated: "The policy

20 reasons for pre-litigation notice are not satisfied by the filing of a complaint." *Id.* at 903. However,

21 *St. Clair* failed to take into account the Ohio Supreme Court's clear statement in *Chemtrol* that, "in a

22 proper case[,] the filing of a civil complaint could serve as notice of breach." *Chemtrol*, 537 N.E. 2d

23 at 638. The district court's decision in *St. Clair* is therefore not persuasive.

24   Furthermore, *Chemtrol* is not inconsistent with the function of notice. While some courts

25 have observed that the purpose of the notice requirement is to give *pre-litigation* notice of a breach,

26 *see Schmidt v. Ford Motor Co.*, No. 12-7222, 2013 WL 5303947, at *5 (E.D. Pa. Sept. 20, 2013)

27 (stating that the purpose "'is to allow the seller an opportunity to resolve the dispute regarding an

28 alleged breach before the buyer initiates a lawsuit'"), other courts have framed the purpose

underlying the notice requirement more broadly, stating, *e.g.*, that the notice requirement is "designed to allow the defendant seller an opportunity for repairing the defective item, reducing damages, avoiding defective products in the future, negotiating settlements, and protecting against stale claims." *Kerr v. Hunter Div.*, 32 Va. Cir. 497, 507 (1981).  While often pre-suit notice best serves those purposes, notice by complaint may serve that function as well.  *See Kerr*, 32 Va. at 507 (noting, *e.g.*, that "[n]egotiating settlement does not of course contemplate only pre-suit negotiations").

Finally, to the extent Ford argues that Mr. Zuchowski did not provide timely notice of the alleged breach, that is a factual question for the jury to decide.  Here, Mr. Zuchowski filed suit against Ford on July 26, 2013.  *See Rosser v. Ford Motor Co.*, No. C-13-3471 EMC (Docket No. 1) (complaint).  He leased his vehicle in March 2012, *i.e.*, more than a year earlier.  *See* FAC ¶ 184.  Although he began to experience problems with his MFT system "[a]lmost immediately following the lease date of his vehicle," FAC ¶ 186, that does not establish that Mr. Zuchowski knew, or even should have known, at that time that Ford's limited warranty had *failed of its essential purpose*.  The question is when Mr. Zuchowski knew or should have known that the MFT system was not repairable.  Simply because Mr. Zuchowski's car had a problem at the outset does not establish that the problem was not repairable at that time; nor is it even enough to put Mr. Zuchowski on inquiry notice of such.

### d.   Mr. D'Aguanno (Arizona)

The Court rejects Ford's contention that, as a matter of law, Mr. D'Aguanno failed to satisfy the notice requirement.

Admittedly, there is case law indicating that, under Arizona law, notice of a breach must be conveyed to the manufacturer of a product.  *See, e.g.*, *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1115-16 (D. Ariz. 2003) (in case where plaintiffs sued tobacco manufacturers, dismissing Arizona warranty claims for failure to provide notice within a reasonable time).  However, case law also indicates that, under Arizona law, notice can be given through the filing of a complaint.  *See id.* (stating that "filing a complaint upon an opposing party (as is the case here) may constitute reasonably timely notice" because "'notice of the claim of breach need take no special

form' and 'where no particular mode of notice is required by the statute[,] what constitutes giving of notice is liberally construed'"); *see also Tasion Comm. Inc. v. Ubiquiti Networks, Inc.*, No. C-13-1803 EMC, 2014 WL 1048710, at *9 (N.D. Cal. Mar. 14, 2014) (stating that "Arizona courts have expressly held that the Complaint itself may constitute notice"); *Yee*, 2010 WL 2572976, at *3 (stating that "[t]he notice 'need take no special form,' and the complaint itself may provide adequate notice").

To the extent Ford argues that no timely notice was given, that is question of fact for the jury to decide.

### e.    Dr. Oremland (Florida)

The Court rejects Ford's contention that, as a matter of law, Dr. Oremland failed to satisfy the notice requirement.

Ford's argument is predicated on the assumption that Florida law requires notice to the manufacturer.  However, at least one district court has held that notice to a manufacturer is not required because the relevant Florida statute refers to notice to a seller, not a manufacturer.  *See Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.*, No. 8:09-CV-607-T-27MAP, 2010 U.S. Dist. LEXIS 28865, at *14 (M.D. Fla. Mar. 25, 2010) (stating that "[t]he plain language of the statute . . . does not require notice to a manufacturer," as opposed to a seller; adding that "[t]he parties have not cited to any Florida case extending [the] notice requirements to a manufacturer").

In its reply brief, Ford cites *Jovine v. Abbott Laboratories, Inc.*, 795 F. Supp. 2d 1331 (S.D. Fla. 2011), to support its position.  In *Jovine*, the district court did dismiss the plaintiff's express warranty claim because he failed to allege that he gave the defendants notice of the alleged breach of warranty.  *See id.* at 1339-40.  But even if the Court assumes – in Ford's favor – that the defendants were manufacturers (or at least not direct sellers of the product to the plaintiff), *Jovine* is of limited support because no rationale was given in the opinion as to why notice to a manufacturer (or a remote seller) is required, particularly given the plain language of the statute.

### f.    Mr. Mitchell (Iowa)

As to Mr. Mitchell, the Court rejects Ford's notice argument.

43

1    Under Iowa law, notice to the manufacturer is not required.  *See, e.g.*, *Wright v. Brooke Grp.*

2  *Ltd.*, 114 F. Supp. 2d 797, 830 (N.D. Iowa 2000) (stating that, "[b]ecause defendants never sold

3  cigarettes to Mr. Wright or contracted to sell cigarettes to Mr. Wright, the notice provision . . . was

4  never triggered" and thus Mr. Wright never had a duty to notify defendants of his warranty claims).

5    Ford's reliance on *Randa v. U.S. Homes, Inc.*, 325 N.W.2d 905 (Ia. Ct. App. 1982), is not

6  persuasive because, there, the third-party defendant may have been a direct seller to the third-party

7  plaintiff rather than a remote manufacturer.  *See id.* at 910 (stating that the evidence at trial "showed

8  that U.S. Plywood sold vertical cedar plywood to [U.S. Homes] to be used as exterior siding").

9                    g.    Mr. Avedisian (Pennsylvania)

10    For Mr. Avedisian, the Court also rejects Ford's notice argument.

11    Under Pennsylvania law, it does appear that notice to a manufacturer is required.  *See, e.g.*,

12  *Schmidt*, 2013 WL 5303947, at *5 (stating that, under Pennsylvania law, "a plaintiff, specifically a

13  buyer, must provide notification of the alleged product defect to the manufacturer prior to bringing

14  suit on a breach-of-warranty theory"); *In re Ford E-350 Van Prods. Liab. Litig.*, No. CV-03-4558

15  (GEB), 2010 WL 2813788, at *39-40 (D.N.J. July 9, 2010) (in case where plaintiffs sued car

16  manufacturer, denying summary judgment to manufacturer on alleged lack of notice because there

17  was a factual dispute as to the reasonableness of the time within which the plaintiffs gave notice).

18    However, under Pennsylvania law, the filing of a complaint may constitute sufficient notice.

19  *See id.* at *39-40.  Even a case cited by Ford concedes such.  *See Precision Towers, Inc. v. Nat-Com,*

20  *Inc.*, No. 2143, 2002 Phila. Ct. Com. Pl. LEXIS 16, at *13 (Sept. 23, 2002) (stating that "[t]he filing

21  of a complaint has been held to satisfy the notice requirement for a breach of warranty claim").

22    As to whether Mr. Avedisian gave timely notice, that is a question of fact for the jury to

23  decide.

24                    h.    Mr. Rodriguez and Mr. Ervin (Texas)

25    For Mr. Rodriguez and Mr. Ervin, the express warranty claims fail because of failure to

26  satisfy the notice requirement.

27    First, although Plaintiffs cite a case to support their position that notice to a manufacturer is

28  not required, *see Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888 (Tex. Civ. App. 1979)

1   (stating that the notice requirement "applies only as between a buyer and his immediate seller" – not

2   a manufacturer), the weight of Texas authority supports Ford's position that such notice is required.

3   *See, e.g.*, *McKay v. Novartis Pharms. Corp.*, 934 F. Supp. 2d 898, 912-13 (W.D. Tex. 2013) (noting

4   that "[t]he Texas Supreme Court has acknowledged a split among its courts of appeals with regard to

5   whether a buyer is required to give notice . . . to a remote seller/manufacturer"; adding that "[t]hree

6   out of the four Texas courts of appeal which have addressed the issue have held that the buyer is

7   required"); *United States Tire-Tech, Inc. v. Boeran, R.V.*, 110 S.W.3d 194, 199 (Tex. Ct. App. 2003)

8   (stating that "a buyer is required to give notice of an alleged breach of warranty to a remote

9   manufacturer").

10       Second, under Texas law, the filing of a complaint does not constitute notice. *See id.* at 110

11   S.W.3d at 202 (stating that "commencement of litigation [did not] satisfy this notice requirement").

12       Finally, generalized knowledge of concerns are also insufficient to meet the notice

13   requirement: "The manufacturer must be made aware of a problem with a particular product

14   purchased by a particular buyer." *Id.* This would seem particularly true where it is not a foregone

15   conclusion that Plaintiffs' cars were in fact not repairable.

16       The Court therefore dismisses the express warranty claims of Mr. Rodriguez and Mr. Ervin.

17   The dismissal is with prejudice as Plaintiffs have failed to show that they could amend their pleading

18   to avoid dismissal on this basis.

19           i.   Mr. Connell and Mr. Miller-Jones (Virginia)

20       Finally, the Court rejects Ford's contention that the notice requirement is a bar to the express

21   warranty claims of Mr. Connell and Mr. Miller Jones.

22       Even if notice to the manufacturer were required, *compare Hebron v. Am. Isuzu Motors, Inc.*,

23   60 F.3d 1095, 1098 (4th Cir. 1995) (in case where plaintiff sued car manufacturer, dismissing

24   Virginia warranty claim for failure to provide notice in a reasonable time frame), *with Bay Point

25   Condo. Ass'n v. RML Corp.*, 57 Va. Cir. 295, 317 (2002) (stating that buyer was not required to give

26   notice of warranty claim to manufacturer because manufacturer was not the seller in the transaction);

27   *Kerr*, 32 Va. Cir. at 503, 508 (1981) (stating that "[t]he buyer need only given notice to his seller,

28   not to the remote manufacturers"), the filing of a complaint may constitute notice. *See Aqualon Co.*

1    *v. Mac Equip., Inc.*, 149 F.3d 262, 270 (4th Cir. 1998) (examining whether the notice – *i.e.*, filing of

2    the complaint – was done within a reasonable time); *Bay Point Condo.*, 57 Va. Cir. at 319 (noting

3    that the UCC does not bar using a claim for damages as notification; adding that, in case under

4    consideration, "none of the policy concerns surrounding the giving of notice were even remotely

5    applicable"). *But see Kerr*, 32 Va. Cir. at 508 (indicating that, at least most of the time, notice

6    cannot be given by filing suit; stating that the statute is designed "to deny [a law]suit to serve as

7    notice in those cases where pre-suit notice serves a beneficial purpose"); *cf. Cole v. Keller Indus.*,

8    132 F.3d 1044, 1048 (4th Cir. 1998) (stating that "a non-purchaser is not required to give notice,

9    under Va. Code § 8.2-607 to the manufacturer, as a condition precedent to suing on a warranty under

10   the Virginia law for personal injuries," which suggests that pre-suit notice is required if statute

11   otherwise applicable).

12        As to whether either Mr. Connell or Mr. Miller-Jones gave timely notice, that is a question of

13   fact for the jury to decide.

14        5.    Privity Requirement Under Arizona Law

15        As to Mr. D'Aguanno (Arizona), Ford raises one final argument in favor of dismissal of the

16   express warranty claim. More specifically, Ford contends that his claim should be dismissed

17   because "Arizona requires a plaintiff to be in privity with a defendant to state a claim for breach of a

18   U.C.C. warranty," Mot. at 39, and, here, Mr. D'Aguanno did not buy his car from Ford but rather a

19   dealer.

20        In their opposition, Plaintiffs concede that the UCC-based express warranty claim should be

21   dismissed. *See* Opp'n at 38. Plaintiffs argue, however, that Mr. D'Aguanno's express warranty

22   claim based on the common law and/or breach of contract is still viable. *See* FAC ¶ 498 ("To the

23   extent Ford's limited warranties are deemed not to be warranties under the Uniform Commercial

24   Code as adopted in Arizona, Plaintiff pleads in the alternative under common law warranty and

25   contract law."). In turn, Ford contends that even these claims are subject to dismissal.

26        The Court agrees in part. To the extent Plaintiffs assert a claim for common law warranty,

27   courts have held that such a claim, under Arizona law, sounds in tort, and, therefore, Mr.

28

United States District Court

For the Northern District of California

D'Aguanno's common law warranty claim "falls squarely within the parameters of the 'economic loss' rule." *Apollo Grp. v. Avnet, Inc.*, 58 F.3d 477, 481 (9th Cir. 1995).

But Plaintiffs have also alleged a warranty claim based on breach of contract. Here, Ford argues that the contract-based claim "fails because '[a]llege[d] breach of contract should not be construed as including breach of warranty theories.'" Mot. at 40 (quoting *Mandeville v. Onoda Cement Co.*, 67 Fed. App'x 417, 418 (9th Cir. 2003)). But *Mandeville* is not citable authority under Ninth Circuit Rule 36-3. *See* 9th Cir. R. 36-3(b) (allowing for citation of unpublished authority issued on or after January 1, 2007). Moreover, *Mandeville* did not address *Flory v. Silvercrest Industries*, 633 P.2d 383 (Ariz. 1981), where the Arizona Supreme Court suggested that a "contract of warranty" can exist outside of the UCC. *Id.* at 390; *see also In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1340 (S.D. Fla. 2013) (noting that, "in *Flory*, the Arizona Supreme Court found that a written warranty made by the manufacturer of a mobile home to the buyers did not qualify as an express warranty under the U.C.C. because it was not made by the seller of the mobile home, but that the manufacturer's warranty may have formed a separate, enforceable contract between the manufacturer and [buyer]").

Accordingly, for Mr. D'Aguanno, the UCC-based express warranty claim is dismissed as is his common law express warranty claim. However, his breach-of-contract express warranty claim survives. The dismissal of the former claims is with prejudice.

B.    Implied Warranty Claims

1.    Fit for Ordinary and Intended Purpose

For each of the states at issue, Plaintiffs have brought a claim (or claims) of breach of the implied warranty of merchantability. Most claims, although not all,[13] are based on state statutes that have adopted UCC § 2-314. UCC § 2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind" and that "[g]oods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used." UCC § 2-314. For all of the claims, whether or not based

---

[13] *See, e.g.*, FAC ¶ 396 *et seq.* (breach of implied warranty under the California Song-Beverly Act); FAC ¶ 940 *et seq.* (breach of implied warranty under Ohio tort law).

United States District Court

For the Northern District of California

1   on the UCC, Plaintiffs generally offer the same basic theory – *i.e.*, that the class vehicles were not fit

2   for their ordinary purpose.  *See, e.g.*, FAC ¶ 359 (alleging that "[t]hese Class Vehicles . . . were not

3   in merchantable condition and are not fit for the ordinary purpose for which cars are used"); FAC ¶

4   404 (alleging that, "[b]ecause of the defects in the Class Vehicles' [MFT] systems that cause certain

5   crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to

6   become inoperative, they are not safe to drive and thus not fit for ordinary purposes").  In its papers,

7   Ford argues that the implied warranty claims must be dismissed because the ordinary purpose of a

8   car is to provide transportation and, here, Plaintiffs have never alleged that they were not able to

9   drive their cars as a result of any problems with MFT.

10       While Ford's position is not without any merit, the Court is not persuaded that dismissal

11   under Rule 12(b)(6) is warranted.  As even Ford implicitly concedes, the ordinary purpose of a car is

12   not just to provide transportation but rather safe, reliable transportation.  *See, e.g.*, *Carlson v. Gen.*

13   *Motors Corp.*, 883 F.2d 287, 297 (4th Cir.1989) ("Since cars are designed to provide transportation,

14   the implied warranty of merchantability is simply a guarantee that they will operate in a safe

15   condition and substantially free of defects.  Thus, where a car can provide safe, reliable

16   transportation, it is generally considered merchantable.") (internal quotation marks omitted).  Here,

17   it is a question of fact for the jury as to whether the problems with MFT posed enough of a safety

18   risk that the cars at issue could not be said to provide safe, reliable transportation.[14]

19       To be sure, the safety risk in the instant case may not be of the same magnitude as those in

20   some of the cases cited by Ford.  *See, e.g.*, *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d

21   1220, 1243-44 (C.D. Cal. 2011) (taking note of plaintiff's allegation that water leak defect could

22   cause engine and/or electrical failure: "[v]ehicles subject to engine failure cannot be said to be

23   merchantable"); *cf. Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 13-7431-JFW (VBx),

24   ────────────────

25       [14] Plaintiffs' contrary argument is that the purpose of the car equipped with MFT system is to
     provide not just "basic transportation, but, rather, transpotation with enhanced technological and
26   safety features."  Opp'n at 41.  Plaintiffs cite no case that, in analyzing the warranty of
     merchantability, countenances the disassembly of a product into its component parts as Plaintiffs
27   suggest.  Identifying a particular component of a car (such as electric windows, stereo radio,
     Bluetooth, etc.) and using that to define the ordinary purpose of the car as one which so equipped
     would merely be an exercise in question begging.  To have any meaning, the purpose of the car for
28   purposes of the warranty of merchantability must be more general.

United States District Court

For the Northern District of California

2014 WL 211462 (C.D. Cal. Jan. 9, 2014) (stating that plaintiffs could not "allege that their pre-collision braking feature failed to automatically slow their vehicles in an unavoidable frontal collision.").  But the level of risk to safety need not be gross or certain.  *See, e.g.*, *Aguilar v. Gen. Motors, LLC*, No. 13-cv-00437-LJO-GS, 2013 WL 5670888, at *7 (E.D. Cal. Oct. 16, 2013) (taking note of plaintiff's allegation that a steering defect could "result in potential failure of power steering, pulling to the left and right, and loss of steering control during the normal course of driving[;] [s]uch a defect would render a vehicle unfit for driving"); *cf. Ho*, 931 F. Supp. 2d at 997-98 (in the context of assessing a fraud claim, "find[ing] that Plaintiffs successfully showed that the alleged defect posed a genuine safety risk because a headlamp flickering or going out at night or in inclement weather could put the car's driver in danger").  *Id.* at *13.  At this juncture, the Court finds the degree of safety risk posed by the alleged defective MFT system cannot be decided on a Rule 12(b)(6) motion.

> 2. Privity

Ford asserts that, even if the Court finds a sufficiently alleged safety risk to create a question of fact regarding fitness for pleading purposes, the implied warranty claims of certain Plaintiffs should still be dismissed because they require privity and, here, Plaintiffs did not buy or lease their vehicles from Ford.  Plaintiffs concede that Ford is right as to some of the individuals and therefore has withdrawn the implied warranty claims of Mr. D'Aguanno, Ms. Makowski, Dr. Oremland, Mr. Mitchell, Mr. Miller, and Mr. Purcell.  *See* Opp'n at 41 n.138.  However, Plaintiffs argue that there are still viable implied warranty claims for those individuals from Alabama (Ms. Battle), California (Ms. Whalen, CDD, Mr. Rosser, Ms. Raney-Aarons, Mr. Watson, and Ms. Thomas-Maskrey), and North Carolina (Mr. Fink).

> a. Alabama

For Alabama, Plaintiffs actually concede that the implied warranty claim (pursuant to Alabama Code § 7-2-314) should be dismissed.  Plaintiffs argue, however, that they have a comparable tort claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").  *See* Opp'n at 41 & n.139 (citing *White Consolid. Indus., Inc. v. Wilkerson*, 737 So. 2d 447, 449 (Ala. 1999) (stating that "[a] claim under the AEMLD is grounded in tort and is premised on the notion

1    that 'a [manufacturer's marketing] a product not reasonably safe, when applied to its intended use in

2    the usual and customary manner, constitutes negligence as a matter for law'"; adding that, "'[u]nder

3    the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably

4    safe for its intended purpose and use'"); *see also Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 871

5    F. Supp. 2d 1241, 1247 (N.D. Ala. 2012) (sating that the AEMLD is "Alabama's hybridized variant

6    of the theory of strict liability in tort"); *Cain v. Sheraton Perimeter Park S. Hotel*, 592 So. 2d 218,

7    220 (Ala. 1991) (stating that "[t]he AEMLD is not based on a theory of strict liability in tort, but it

8    retains a fault concept").  Plaintiffs ask for leave to amend so that they can asserted such a claim.

9         Based on Plaintiffs' concession, the Court dismisses the implied warranty claim based on §

10   7-2-314.  Plaintiffs' request for leave to amend to assert a AEMLD claim is denied.  As Ford argues,

11   a claim brought pursuant to the AEMLD would be futile here because it would be barred by the

12   economic loss rule.  *See Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 107 (Ala.

13   2004) ("[The economic loss] doctrine states that a plaintiff's AEMLD claim that a product is

14   defective is limited to a contractual recovery when the evidence shows that the defect caused injury

15   to only the product and to no other property."); *Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala.

16   1998) ("Under [the economic loss] rule, a cause of action does not arise under tort theories of

17   negligence, wantonness, strict liability, or the AEMLD where a product malfunctions or is defective

18   and thereby causes damages only to the product itself."); *Wellcraft Mar., Div. of Genmark Indus.,*

19   *Inc. v. Zarzour*, 577 So. 2d 414, 418 (Ala. 1990) ("[T]here is no cause of action in tort under the

20   AEMLD for a product defect that results in damage only to the product itself. . . . A defective

21   product is a loss of the benefit of a bargain which is a contract rather than a tort action.") (internal

22   quotation marks omitted).

23              b.    California

24         As a preliminary matter, the Court notes that Plaintiffs have asserted two implied warranty

25   claims under California law – one pursuant to California Commercial Code § 2314 (modeled on the

26   UCC) and one pursuant to the Song-Beverly Act.  For the implied warranty claim under the Song-

27   Beverly Act, there is no privity requirement.  *See Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d

28   908, 921 (C.D. Cal. 2010) (noting that the "weight of authority" states "the plain language of section

**United States District Court**
For the Northern District of California

1   1792 of the Song-Beverly Act does not impose a . . . vertical privity requirement"; citing several

2   cases as well as Witkin in support); *see also* Cal. Civ. Code § 1729 (providing that "every sale of

3   consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and

4   the retail seller's implied warranty that the goods are merchantable").

5           For the UCC-based implied warranty claim, Plaintiffs concede that there is a privity

6   requirement but argue that "California courts recognize a well-established exception to the privity

7   requirement where, as here, the consumer is a third-party beneficiary of the contract between the

8   manufacturer and a third party."[15]  Opp'n at 42.

9           Plaintiffs are correct that some courts have recognized a third-party beneficiary exception to

10  the privity requirement.  *See, e.g.*, *Roberts v. Electrolux Home Prods.*, No. CV 12-1644 CAS

11  (VBKxx), 2013 U.S. Dist. LEXIS 185488, at *27, 30 (C.D. Cal. Mar. 4, 2013) (noting that courts

12  have disagreed as to whether a consumer can assert an implied warranty claim "as third-party

13  beneficiaries of agreements between the manufacturer and retailer," but concluding that a consumer

14  can – *i.e.*, that there is "an exception to the privity requirement that applies when a plaintiff is the

15  intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer").

16  These courts have typically cited *Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App.

17  3d 65 (1978), in support.  *See Roberts*, 2013 U.S. Dist. LEXIS 185488, at *27-28.  In *Gilbert*, the

18  _____

19          [15] In their complaint, Plaintiffs invoked this third-party beneficiary exception but made other
    arguments as well:

20          *Plaintiffs and the other Class members have had sufficient direct*
21          *dealings with either the Ford or their agents (dealerships) to establish*
            *privity of contract between Plaintiffs and the other Class members.*
22          Notwithstanding this, privity is not required in this case because
            Plaintiffs and the other Class members are intended third-party
23          beneficiaries of contracts between Ford and its dealers; specifically,
            they are the intended beneficiaries of Ford's implied warranties.  The
24          dealers were not intended to be the ultimate consumers of the Class
            Vehicles and have no rights under the warranty agreements provided
25          with the Class Vehicles; the warranty agreements were designed for
            and intended to benefit the ultimate consumers only.  *Finally, privity is*
26          *also not required because Plaintiffs' and the other Class members'*
            *Class Vehicles are dangerous instrumentalities due to the*
27          *aforementioned defects and nonconformities.*

28  FAC ¶ 361 (emphasis added).  The Court, however, does not address Plaintiffs' other arguments as
    they were not specifically raised in their opposition brief.

51

plaintiff-homeowner asserted an implied warranty claim against a subcontractor. The trial court dismissed the claim on the basis of lack of privity. On appeal, the appellate court stated: "[U]nder the facts of this case we do not need to decide the issue of privity per se" because, "[u]nder Civil Code section 1559 and the cases interpreting it, we conclude [the plaintiff-homeowner] is a third party beneficiary of the contract between [the contractor] and [the defendant-subcontractor] and therefore can sue for breach of the implied warranty of fitness." *Gilbert*, 82 Cal. App. 3d at 69.

Not all courts, however, have recognized the third-party beneficiary exception. For example, in *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075 (N.D. Cal. 2011) (Alsup, J.), the court declined to rely on *Gilbert* because it

> dealt with a plaintiff who contracted with a general contractor to build a building and later sued a subcontractor whom the contractor had hired to work on the project. That decision explicitly did 'not need to decide the issue of privity' because it found that the plaintiff was a third-party beneficiary of the contract between the general contractor and the contractor. No reported California decision has held that the purchaser of a consumer product may dodge the privity rule by asserting that he or she is a third-party beneficiary of the distribution agreements linking the manufacturer to the retailer who ultimately made the sale.

*Id.* at 1083. In *Long v. Graco Children's Prods., Inc.*, No. 13-cv-01257-WHO, 2013 U.S. Dist. LEXIS 121227 (N.D. Cal. Aug. 26, 2013) (Orrick, J.), the court did not make any mention of *Gilbert* at all. Rather, it decided not to recognize the third-party beneficiary exception because of the Ninth Circuit's decision in *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), which it concluded was binding authority. *See Long*, 2013 U.S. Dist. LEXIS 121227, at *47-48.

In *Clemens*, the Ninth Circuit began by taking note that an implied warranty claim under California Commercial Code § 2314 requires vertical privity. *See Clemens*, 534 F.3d at 1023. The court acknowledged, however, that "[s]ome particularized exceptions to the [privity] rule exist. The first arises when the plaintiff relies on written labels or advertisements of a manufacturer. The other exceptions arise in special cases involving foodstuffs, pesticides, and pharmaceuticals, and where the end user is an employee of the purchaser." *Id.* at 1023. Notably, the plaintiff did not assert any of these exceptions; "[i]nstead, he urges that they are exemplary rather than exhaustive, and that similar equities support an exception for his case." *Id.* The Ninth Circuit

United States District Court

For the Northern District of California

decline[d] this invitation to create a new exception that would permit [the plaintiff's] action to proceed. [In] [s]o doing, we acknowledge that state courts have split on this privity question, *see Rothe v. Maloney Cadillac, Inc.*, 492 N.E.2d 497, 502, 97 Ill. Dec. 61 (Ill. App. Ct. 1986), *aff'd in part and rev'd in part, Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028 (Ill. 1988) (collecting cases on both sides), and that the requirement may be an archaism in the modern consumer marketplace. *See Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 952-59 (Ind. 2005) (discussing the history of the privity requirement at length and rejecting its application to consumer-manufacturer warranty claims). Nonetheless, California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975). A lack of vertical privity requires the dismissal of Clemens's implied warranty claims.

*Id.* at 1023-24.

While Ninth Circuit authority is binding on this Court, this Court does not read *Clemens* (as the court did in *Long*) as foreclosing the third-party beneficiary exception. Although *Clemens*, like this case, involved a plaintiff who bought a car from a dealership and then sued the manufacturer for a defect with the car, it is not clear whether the plaintiff argued for application of the third-party beneficiary exception specifically. As indicated above, the Ninth Circuit's opinion simply reflects that the plaintiff argued for "similar equities." *Clemens*, 534 F.3d at 1023. Furthermore, that the plaintiff did not invoke the third-party beneficiary exception specifically is suggested by the fact that nowhere in the *Clemens* decision did the Ninth Circuit address *Gilbert*.

In light of *Gilbert* and the lack of a clear holding to the contrary in *Clemens*, the Court concludes that the third-party beneficiary exception remains viable under California law. In *Xavier*, of course, the court chose not to follow *Gilbert* because *Gilbert* involved a homeowner suing a subcontractor, and not a consumer suing a product manufacturer. While that same factual distinction can be made between *Gilbert* and the instant case, the Court does not find that factual distinction material. Neither the *Xavier* court nor Ford here has explained why this difference should command a result different from that in *Gilbert*.

Accordingly, the Court rejects Ford's contention that the third-party beneficiary exception is not cognizable under California law.

c.     North Carolina

Similar to above, Plaintiffs contend that the North Carolina implied warranty claim is viable because, even though there is a privity requirement, there is, in effect, a third-party beneficiary exception to the privity rule.  In support, Plaintiffs rely on *Coastal Leasing Corp. v. O'Neal*, 405 S.E.2d 208 (N.C. Ct. App. 1991).

In *Coastal Leasing*, an individual negotiated for the purchase of an ice maker and a condensing unit from the defendant-company.  The company "suggested and was instrumental in arranging for a lease transaction in lieu of a sale." *Id.* at 233.  Accordingly, the individual leased the equipment from a leasing company instead, with the defendant-company selling and supplying the equipment to the leasing company.  Subsequently, the leasing company sued the individual because he failed to pay the balance due under the equipment lease.  The individual in turn filed a crossclaim against the defendant-company, asserting that the equipment had malfunctioned.  On appeal, the defendant-company argued that the individual could not assert any breach-of-warranty claims against it because he lacked privity with the company.  The court rejected the argument, explaining that "[the individual] alleged express and implied warranties flowing to him as third-party beneficiary of the equipment sales contract [between the leasing company and the defendant-company], breach of those warranties and damages.  'If the third party is an intended beneficiary, the law implies privity of contract.'" *Id.* at 236.

Based on *Coastal Leasing*, the Court rejects Ford's lack-of-privity argument as untenable. The third-party beneficiary theory is valid under North Carolina law.  Nothing in *Coastal Leasing* suggests that the third-party beneficiary exception should be limited to the leasing context or to situations in which the direct seller is a mere agent of the consumer.

3.     Notice

In addition to the privity requirement, Ford argues that there is a notice requirement which must be satisfied in order for Plaintiffs to move forward with their implied warranty claims.  Here, Ford's notice argument is the same as that raised in Part V.A.4, *supra*, with respect to the express warranty claims.  Plaintiffs agree that the same notice analysis should apply.  Accordingly, the

1    Court's rulings on notice with respect to the express warranty claims are also applicable to the

2    implied warranty claims (based on the UCC) as well.

3    C.    Claims Under the Magnuson-Moss Warranty Act ("MMWA")

4          Plaintiffs have submitted not only state statutory warranty claims but also a federal statutory

5    warranty claim, namely, a claim for violation of the MMWA.

6          1.    Derivative Claim

7          Ford argues first that Plaintiffs' MMWA claim is, essence, derivative of the state express and

8    implied warranty claims.  The MMWA provides in relevant part that "a consumer who is damaged

9    by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this

10   title, or under a written warranty, implied warranty, or service contract, may bring suit for damages

11   and other legal and equitable relief."  15 U.S.C. § 2310(d); *see also* FAC ¶¶ 317-18 (indicating that

12   MMWA claim is based on express and implied warranties).  Ford contends that the MMWA claim

13   should therefore be dismissed for the same reasons that the express and implied warranty claims

14   should be dismissed.  *See, e.g.*, *Clemens*, 534 F.3d at 1022 (noting that plaintiff "alleges a violation

15   of the [MMWA] only insofar as [defendant] may have breached its warranties under state law; there

16   is no allegation that [defendant] otherwise failed to comply with the [MMWA and] [t]herefore, the

17   federal claims hinge on the state law warranty claims").  In opposition, Plaintiffs do not dispute that

18   the MMWA claim rises or falls with the state express and implied warranty claims.  *See, e.g.*, Opp'n

19   at 45 (simply arguing that "the FAC alleges viable express and implied-warranty claims").

20   Accordingly, the Court concludes that the MMWA claim is dismissed in part – more specifically, to

21   the extent the Court has dismissed any of the state express and implied warranty claims.

22         2.    Leases

23         Ford asserts next that, to the extent there is any MMWA claim that is not dismissed pursuant

24   to the above, there is an independent basis for dismissal as to seven Plaintiffs (namely, CDD, Ms.

25   Raney-Arons, Mr. Matlin, Mr. Rizzo, Mr. Miller, Ms. Purcell, and Zuchowkski).  These Plaintiffs

26   did not purchase their vehicles but rather only leased them and, according to Ford, the MMWA does

27   not provide a remedy for persons who are simply lessees.

28

Courts are divided on the issue of whether a lessee can bring a claim under the MMWA.  In assessing this issue, this Court begins with the plain language of the MMWA.  Under the statute, "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief."  15 U.S.C. §§ 2310(d)(1).  The term "consumer" is defined as follows:

> [1] a buyer (other than for purposes of resale) of any consumer product, [2] any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and [3] any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

*Id.* § 2301(3).  The third category is made up of two subclauses – (a) a person who is entitled by the terms of "such warranty" to enforce the obligations of "the warranty" and (b) a person who is entitled under the applicable state law to enforce the obligations of "the warranty."  *See Am. Honda Motor Co. v. Cerasani*, 955 So. 2d 543, 548 (Fla. 2007).  The question is whether a lessee can be a consumer under any of the above definitions.  In their papers, the parties primarily focus on category three only – in particular, the second subclause.  However, the Court finds it prudent to address all three categories.  *See, e.g.*, Opp'n at 47 n.165 (putting at issue second category through reliance on *Mago v. Mercedes-Benz, U.S.A., Inc.*, 142 P.3d 712, 717-18 (Ariz. Ct. App. 2006)).

Clearly, a lessee is not a consumer under category one.  A lessee does not actually "buy" a consumer product but rather only leases a consumer product.

Category two, however, presents a closer call.  For example, if a car dealership purchases from a car manufacturer a vehicle that has a warranty and then the dealership leases the car to a person while the warranty is still valid, the lessee is arguably a person to whom the vehicle is transferred during the duration of the warranty.  Ford implicitly argues that this construction must be rejected because of the way that "written warranty" and "implied warranty" is defined in the MMWA.

- "Written warranty" means, *e.g.*, "any written affirmation of fact or written promise made *in connection with the sale* of a consumer product by a supplier to a buyer . . . which written

United States District Court

For the Northern District of California

affirmation [or] promise . . . becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such a product."  15 U.S.C. § 2301(6)(A) (emphasis added).

- "Implied warranty" means "an implied warranty arising under State law . . . *in connection with the sale* by a supplier of a consumer product."  *Id.* § 2301(7) (emphasis added).

But just because written warranty and implied warranty require a connection with a sale does not mean that the sale must be one between the direct supplier and the consumer.  In other words, nothing in the statute prevents the necessary "sale" as that term is used in §§ 2301(6)(A) and (7) as being a sale between a direct supplier and a lessor.  *See Dekelaita v. Nissan Motor Corp.*, 799 N.E.2d 367, 373-74 (Ill. Ct. App. 2003) (stating that, "[w]here, as here, there was a sale – between the dealer and the lessor – it suffices to say that there was a written warranty issued in connection with the sale"); *see also Mago*, 142 P.3d at 717 ("decid[ing] that a qualifying sale must occur something within the sequence of events that ultimately places the consumer product with the consumer[;] [plaintiff] produced evidence that the sale from Dealer to Lessor led to his lease [and,] [c]onsequently, [plaintiff] is not precluded from seeking relief under the [MMWA] merely because he was not the buyer in the qualifying sale").  In other words, in a typical car lease, the warranty claimed by Plaintiffs herein can be said to have been "issued in connection with" the "sale" between dealer and the lessor (*e.g.*, the finance company).

Of course, one might argue that a written warranty (at least) requires more – *i.e.*, that the requisite sale between the supplier and buyer must be for "purposes other than resale of [the consumer] product."  15 U.S.C. § 2301(6)(A).  However, courts have recognized that a lessor purchases the vehicle not for resale, but to lease it to the lessee.  *See Mago*, 142 P.3d at 718 ("decid[ing] that a vehicle lessor can qualify as a buyer 'for purposes other than resale'" because "the plain language of § 2301(6) does not require that a buyer purchase the consumer product without a future intent to resell the product [–] [r]ather, § 2301(6) requires only that the buyer have purposes for purchasing the product other than resale" and "[a] buyer who purchases a vehicle for the purpose of leasing it possesses such a purpose"; adding that to interpret otherwise "would lead to an absurd result" as "most consumers who purchase a vehicle intend to resell it after a period of

United States District Court

For the Northern District of California

1  use"); *Peterson v. Volkswagen of Am., Inc.*, 697 N.W.2d 61, 71 (Wisc. 2005) (stating that, "'[w]hile

2  it is true that [the leasing company] [i]s likely to sell the vehicle after the expiration of the lease

3  (potentially even to plaintiff[]), the *purpose* of the transaction between [the leasing company] and

4  defendant was not for resale, but for the lease of the vehicle to plaintiff[]'").

5         To be sure, not all courts are in agreement on this issue.  *See Voelker v. Porsche Cars N.*

6  *Am., Inc.*, 353 F.3d 516, 523, 525 (7th Cir. 2003) (noting that, under category one, the sale to the

7  buyer must be "'other than for purposes of a resale,'" and that, "whenever a lessor takes title to a

8  car, at least one of its purposes is, presumably, the actual resale of the vehicle"; applying the same

9  analysis to category three).  However, the interpretation advanced by Plaintiffs comports with the

10  plain language of the statute, and the parties have not pointed to, *e.g.*, any legislative history

11  suggesting that "resale" as used in the MMWA was meant to cover "lease."

12         Finally, category three also allows for a lessee to be a consumer.  Under category three, a

13  consumer is "any other person who is entitled by the terms of such warranty (or service contract) or

14  under applicable State law to enforce against the warrantor (or service contractor) the obligations of

15  the warranty (or service contract)."  15 U.S.C. § 2301(3).  As noted above, the third category is

16  made up of two subclauses: (a) a person who is entitled by the terms of "such warranty" to enforce

17  the obligations of "the warranty" and (b) a person who is entitled under the applicable state law to

18  enforce the obligations of "the warranty."  A lessee can be a consumer under the first subclause

19  because "such warranty" refers back to a written or implied warranty as defined under the MMWA,

20  and, as discussed above, a written or implied warranty under the MMWA simply requires a

21  connection with a sale, and a sale can be one between the supplier and a lessor.  For a written

22  warranty, there is also the requirement that the sale be for purposes other than resale, but as noted

23  above a lease is for a purpose other than resale.

24         As for the second subclause, here, it is not clear whether the warranty referred to is a written

25  or implied warranty as defined by the MMWA.  *See Voelker*, 353 F.3d at 525 (stating that, "[f]or

26  Voelker [the plaintiff-lessee] to state a valid claim, . . . the New Car Limited Warranty need not meet

27

28

United States District Court

For the Northern District of California

the definition of written warranty contained in § 2301(6)").[16]  But even assuming both subsections refer to the same warranty, that is not an obstacle to Plaintiffs for the reasons stated in the above paragraph.

In any event, Plaintiffs who are lessees are entitled under state law to enforce the limited warranty issued by Ford if only because the limited warranty on its face states that it applies both to sales and leases.  *See* Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 4) (stating that the limited warranty applies if the vehicle "was originally sold or leased by Ford Motor Company or one of its dealesr in the United States or U.S. Federalized Territories, and it was originally registered/licensed and operated in the United States, U.S. Federalized Territories, or Canada"); *cf. Voelker*, 353 F.3d at 524 (finding that plaintiff-lessee was entitled under state law to enforce a new car limited warranty because "Copans [the dealership] . . . assigned to [plaintiff] 'all its rights under the Porsche Limited Warranty'" and, "[u]nder the state of Illinois, as an assignee of that warranty, a lessee like [plaintiff] was entitled to enforce the rights arising from the warranty").

---

[16] *See also American Honda Motor Co., Inc. v. Cerasani*, 955 So. 2d 543, 548 (Fla. 2007).  In *American Honda*, the Florida Supreme Court maintained that "the warranty" as used in the second subclause does not have to mean a written or implied warranty as defined in the MMWA because the first subclause of category three uses the term "such warranty" whereas the second subclause only uses the term "the warranty":

> The demonstrative adjective "such," meaning "of the same type, class, or sort," refers to the antecedent noun "written warranty."  Thus, the first alternative in Category Three requires that the warranty be a "written warranty" as defined in section 2301(6). However, Congress did not use the term "written warranty" or "such warranty" in setting forth the criteria for the second alternative, instead using the generic term "the warranty."  Therefore, we conclude that the type of warranty enforceable under state law that will enable a person to qualify as a Category Three consumer is not limited to the narrow definition of "written warranty" provided in the MMWA.

*Id.* at 548.  Arguably, however, the phrase "the warranty" is arguably used not only for purposes of the second subclause but for purposes of the first subclause (*i.e.*, a person entitled by the terms of "such warranty' *to enforce the obligations of* "*the warranty*").  Nothing on the face of the statute suggests that phrase "the warranty" should have different meanings for the two subclauses.  *See, e.g.*, *DiCintio v. DaimlerChrysler Corp.*, 768 N.E.2d 1121, 1126-27 (N.Y. 2002) (stating that the "warranty" referred to in *either* the first or second subclause of category three "must be a written or implied warranty as defined [under the MMWA], and, as such, must arise in connection with a sale").

3.      Exhaustion

Finally, Ford challenges the MMWA claim on the ground that all Plaintiffs except one (Ms. Makowski) failed to exhaust dispute resolution procedures before asserting the MMWA claim.

Title 15 U.S.C. § 2310(a)(3) provides as follows:

> One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2).  If –
>
> (A)      a warrantor establishes such a procedure,
>
> (B)      such procedure, and its implementation, meets the requirements of such rules, and
>
> (C)      he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,
>
> then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) except to the extent the court determines [sic] necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure.

15 U.S.C. § 2310(a)(3).

Here, Ford's limited warranty does require the use of an informal dispute settlement procedure before a claim under the MMWA may be brought in a lawsuit.  *See* Docket No. 57-2 (RJN, Ex. A) (Limited Warranty at 7) ("You are required to submit your warranty dispute to the BBB AUTO LINE before exercising rights or seeking remedies under the [MMWA].").  Notably, Plaintiffs do not dispute this in their papers.  Plaintiffs' only contention in their papers is that the "dispute-resolution procedure would be futile due to [Ford's] demonstrated inability to cure the defects in its [MFT] systems."  Opp'n at 47; *see, e.g.*, FAC ¶ 14 (alleging that "[o]wner and lessee requests that Ford fix the problems have been futile[;] [d]espite the issuance of the TSBs and the upgrades, Ford does not have a fix for the defect").

Similar to above, the Court recognizes the possibility of a futility exception.  *See Toyota*, 754 F. Supp. 2d at 1188-89 (taking note of cases that futility could be an excuse for failure to comply

United States District Court

For the Northern District of California

1  with the dispute resolution mechanism; ultimately concluding that plaintiffs' allegations allowed for

2  an inference of futility).  However, as above, based on the allegations in the complaint, the Court

3  cannot say that resort to the informal dispute settlement procedure provided for by Ford would have

4  been futile for each Plaintiff.  Accordingly, dismissal of the MMWA claim (without prejudice) is

5  appropriate based on the failure to comply with the informal dispute settlement procedure.

6  D.    Ms. Makowski's Waiver (Connecticut)

7        Finally, as to one Plaintiff, Ms. Makowski, Ford contends that all warranty-based claims

8  should be dismissed because she actually participated in an informal dispute resolution procedure

9  and, in accepting the arbitrator's decision, she "[gave] up any right to sue [Ford] in court on any

10  claim that has been resolved at the arbitration hearing, unless the business fails to perform according

11  to the Arbitrator's decision or unless otherwise provided by state or federal law."  Docket No. 57-4

12  (RJN, Ex. C) (acceptance of arbitration decision).

13        In the FAC, Ms. Makowski has three warranty claims: (1) breach of express warranty, *see*

14  Conn. Gen. stat. Ann. § 42A-2-313; (2) breach of implied warranty, *see id.* § 42A-2-314; and (3)

15  breach of contract/common law warranty.  In their opposition, Plaintiffs concede that the first two

16  claims were released, *see* Opp'n at 47, but is silent as to the third claim.  Ford has made out at least a

17  prima facie showing that the third claim should be dismissed because it must have been resolved at

18  the arbitration hearing.  *See, e.g.*, Docket No. 57-4 (RJN, Ex. C) (stating that, "[i]n the original

19  customer claim form that was filed with BBB Auto Line on May 31, 2012 the customer stated that

20  the desired outcome to resolve the concern would be one of the following[:] replace the system,

21  extend the manufacturer warranty or assist the customer in obtaining a new vehicle").  Plaintiffs

22  failed to substantively explain why the third claim should not be dismissed.  Thus, the Court agrees

23  with Ford that the third claim should also be dismissed.

24  E.    Claim Under California Secret Warranty Law

25        Ford challenges Plaintiffs' claim for relief brought pursuant to California's Secret Warranty

26  Law.  Under the California Secret Warranty Law, "[a] manufacturer shall, within 90 days of the

27  adoption of an adjustment program, . . . notify by first-class mail all owners or lessees of motor

28

United States District Court

For the Northern District of California

1   vehicles eligible under the program of the condition giving rise to and the principal terms and

2   conditions of the program." Cal. Civ. Code § 1795.92(a). An adjustment program is defined as

> any program or policy [1] that expands or extends the consumer's
> warranty beyond its stated limit or [2] under which a manufacturer
> offers to pay for all or any part of the cost of repairing, or to reimburse
> consumers for all or any part of the cost of repairing, any condition
> that may substantially affect vehicle durability, reliability, or
> performance, other than service provided under a safety or emission-
> related recall campaign. "Adjustment program" does not include ad
> hoc adjustments made by a manufacturer on a case-by-case basis.

8   *Id.* § 1795.90(d).

9       Plaintiffs' secret warranty claim is based on three different theories: (1) that Ford's TSBs

10   constituted an adjustment program; (2) that Ford's decision to pay or give reimbursements for MFT

11   repairs "in some situations" constituted an adjustment program, FAC ¶ 414; and (3) that Ford's

12   Campaign 12M01 constituted an adjustment program. Ford contends that none of these theories

13   supports a viable secret warranty claim.

14       To the extent Plaintiffs asserts that the TSBs constituted an adjustment program, the Court

15   agrees with Ford. While repairs were made to vehicles pursuant to the TSBs, nothing indicates that

16   the TSBs either expanded or extended the existing warranty on the cars beyond its stated limit.

17   Plaintiffs have simply offered a conclusory allegation that the TSBs expanded or extended the

18   original warranty without any specific factual allegations in support. *See* FAC ¶ 413 (alleging that

19   the TSBs "were part of a program set forth by Ford where Ford's dealers would repair the defective

20   vehicles free of charge only when certain undisclosed conditions were met and that "this program

21   expanded and/or extended the original warranty, and therefore constitutes an 'adjustment

22   program'"). *See also Corson v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 12-08499 JGB (VBKx),

23   2013 U.S. Dist. LEXIS 63260, at *18 (C.D. Cal. Apr. 24, 2013) (stating that, "even though Plaintiffs

24   allege that the TSB 'constituted a program or policy that expands or extends, in a blanket fashion,

25   consumers' standard warranty beyond the stated limit,' Plaintiffs do not provide any factual support

26   for such allegation"). Notably, Plaintiffs admitted at the hearing that Ford's limited warranty was

27   still in effect at the time cars were brought in for repairs. The FAC fails to satisfy the pleading

28   requirement of *Twombly* and *Iqbal*.

As for Plaintiffs' theory that Ford's decision to pay or reimburse for MFT repairs "in some situations," FAC ¶ 414, that clearly is insufficient to support a valid secret warranty claim. As noted above, an "'[a]djustment program' does not include ad hoc adjustments made by a manufacturer on a case-by-case basis." Cal. Civ. Code § 1795.90(d).

However, Plaintiffs' secret warranty claim is viable to the extent Plaintiffs assert that Ford's Campaign 12M01 constituted an adjustment program. Campaign 12M01 meets the definition of an adjustment program because Plaintiffs have alleged that it extended the warranty available on cars. *See* FAC ¶ 278 ("Ford's Campaign 12M01 extended warranty coverage of the APIM to four years of service from the warranty start date on Ford vehicles and five years on Lincoln vehicles, regardless of mileage."). In addition, Plaintiffs have adequately alleged that Ford failed to timely give notice of this adjustment program. *See* FAC ¶¶ 410, 415.

Accordingly, Plaintiffs' secret warranty claim is valid to the extent it is based on the alleged adjustment program Campaign 12M01.

F.      Summary

For the foregoing reasons, the Court dismisses the following warranty-based claims.

| Jennifer Whalen | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives)<br><br>All other warranty claims survive |
|---|---|---|

United States District Court

For the Northern District of California

| Center for Defensive Driving (CDD) | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives)<br><br>All other warranty claims survive |
|---|---|---|
| Grif Rosser | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives)<br><br>All other warranty claims survive |
| Megan Raney-Aarons | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives) |
| Richard Decker Watson | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives)<br><br>All other warranty claims survive |

**United States District Court**
For the Northern District of California

| Darcy Thomas-Maskrey | California | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>California secret warranty claim: dismissed in part (claim based on Campaign 12M01 survives)<br><br>All other warranty claims survive |
|---|---|---|
| Angela Battle | Alabama | Express warranty: dismissed with prejudice for failure to provide notice; also dismissed for failure to present car for repair<br><br>Implied warranty: dismissed with prejudice for failure to provide notice and lack of privity; no leave to file AEMLD claim because such a claim would be futile<br><br>MMWA claim: dismissed with prejudice to the extent derivative of the express and implied warranty claims above; also dismissed without prejudice for failure to follow informal dispute resolution process<br><br>This leaves as the only warranty claim the claim for breach of contract/common law warranty |

United States District Court
For the Northern District of California

| Joe D'Aguanno | Arizona | Express warranty claim: dismissed with prejudice for lack of privity

Implied warranty claim: dismissed with prejudice for lack of privity

Claim for breach of contract/common law warranty: claim for common law warranty dismissed with prejudice based on economic loss doctrine (but no dismissal of claim for breach of contract)

MMWA claim: dismissed with prejudice to the extent derivative of the express and implied warranty claims above; dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claim the claim for breach of contract |
|---|---|---|
| James Laurence Sheerin | Colorado | Express warranty claim: dismissed with prejudice for failure to provide notice; also dismissed for failure to present car for repair

Implied warranty claim: dismissed with prejudice for failure to provide notice

MMWA claim: dismissed with prejudice to the extent derivative of the express and implied warranty claims above; also dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claim the claim for breach of contract/common law warranty |

| | | |
|---|---|---|
| Deb Makowski | Connecticut | Express warranty claim: dismissed with prejudice based on arbitration release<br><br>Implied warranty claim: dismissed with prejudice based on arbitration release; also dismissed with prejudice for lack of privity<br><br>Claim for breach of contract/common law warranty: dismissed with prejudice based on arbitration release<br><br>MMWA claim: dismissed with prejudice as derivative of the express warranty, implied warranty, and breach of contract/common law warranty claims above<br><br>No warranty claims left |
| George Oremland | Florida | Implied warranty claim: dismissed with prejudice for lack of privity<br><br>MMWA claim: dismissed with prejudice to the extent derivative of implied warranty claim above; also dismissed without prejudice for failure to follow informal dispute resolution process<br><br>This leaves as the only warranty claims the express warranty claim and claim for breach of contract/common law warranty |

| | | |
|---|---|---|
| Thomas Mitchell | Iowa | Implied warranty claim: dismissed with prejudice for lack of privity<br><br>MMWA claim: dismissed with prejudice to the extent derivative of implied warranty claim above; also dismissed without prejudice for failure to follow informal dispute resolution process<br><br>This leaves as the only warranty claims the express warranty claim and claim for breach of contract/common law warranty |
| William Creed | Massachusetts | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>All other warranty claims survive |
| Joshua Matlin | New Jersey | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>All other warranty claims survive |
| Russ Rizzo | New Jersey | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>All other warranty claims survive |

| Jeffrey Miller | New York | Express warranty claim: dismissed without prejudice for failure to present car for repair

Implied warranty claim: dismissed with prejudice for lack of privity

MMWA claim: dismissed with/without prejudice to the extent derivative of express and implied warranty claims above; also dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claim the claim for breach of contract/ common law warranty |
| --- | --- | --- |
| Nuala Purcell | New York | Implied warranty claim: dismissed with prejudice for lack of privity

MMWA claim: dismissed with prejudice to the extent derivative of implied warranty claim above; also dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claims the express warranty claim and claim for breach of contract/common law warranty |
| Daniel Fink | North Carolina | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process

All other warranty claims survive |

69

United States District Court

For the Northern District of California

| Jason Zuchowski | Ohio | Express warranty claim: dismissed without prejudice for failure to present car for repair

MMWA claim: dismissed without prejudice to the extent derivative of express warranty claim above; also dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claims the implied warranty claim and claim for breach of contract |
| --- | --- | --- |
| Art Avedisian | Pennsylvania | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process

All other warranty claims survive |
| Jose Randy Rodriguez | Texas | Express warranty claim: dismissed with prejudice for failure to provide notice

Implied warranty claim: dismissed with prejudice for failure to provide notice

MMWA claim: dismissed with prejudice to the extent derivative of the express and implied warranty claims above; also dismissed without prejudice for failure to follow informal dispute resolution process

This leaves as the only warranty claim the claim for breach of contract/common law warranty |

United States District Court
For the Northern District of California

| Michael Ervin | Texas | Express warranty claim: dismissed with prejudice for failure to provide notice<br><br>Implied warranty claim: dismissed with prejudice for failure to provide notice<br><br>MMWA claim: dismissed with prejudice to the extent derivative of the express and implied warranty claims above; also dismissed without prejudice for failure to follow informal dispute resolution process<br><br>This leaves as the only warranty claim the claim for breach of contract/common law warranty |
| --- | --- | --- |
| Jason Connell | Virginia | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>All other warranty claims survive |
| Henry Miller-Jones | Virginia | MMWA claim: dismissed without prejudice for failure to follow informal dispute resolution process<br><br>All other warranty claims survive |

///

///

///

///

///

///

///

///

**V.    CONCLUSION**

For the foregoing reasons, Ford's motion to dismiss is granted in part and denied in part.  The Court's specific rulings on the fraud/tort and warranty claims can be found in Part IV.C and V.F.

This order disposes of Docket No. 56.


IT IS SO ORDERED.


Dated:  May 30, 2014

_____
EDWARD M. CHEN
United States District Judge

United States District Court

For the Northern District of California

72