STEVE W. BERMAN
CATHERINE Y.N. GANNON
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

ROLAND TELLIS (186269)
MARK PIFKO (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

*Plaintiffs' Interim Co-Lead Counsel*

*[Additional Counsel listed on Signature Page]*

ADAM J. LEVITT
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone: (312) 214-0000
Facsimile: (312) 214-0001
alevitt@gelaw.com

MATTHEW D. SCHELKOPF
JOSEPH G. SAUDER
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
MDS@chimicles.com
JGS@chimicles.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION. | Case No. 13-cv-3072-EMC<br><br>Judge Chen<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION .............................................................................................. 8

III.    VENUE ............................................................................................................ 8

IV.     PARTIES ......................................................................................................... 8

        A.     Plaintiffs ............................................................................................. 8

               1.     California .................................................................................. 8

                      a.     Jennifer Whalen ............................................................. 8

                      b.     The Center for Defensive Driving ................................ 11

                      c.     Richard Decker Watson ................................................ 14

                      d.     Darcy Thomas-Maskrey ................................................ 16

               2.     Arizona ..................................................................................... 17

                      a.     Joe D'Aguanno .............................................................. 17

               3.     Colorado ................................................................................... 19

                      a.     James Laurence Sheerin ................................................ 19

               6.     Iowa .......................................................................................... 20

                      a.     Thomas Mitchell ............................................................ 20

               7.     Massachusetts .......................................................................... 21

                      a.     William Creed ................................................................ 21

               8.     New Jersey ................................................................................ 25

                      a.     Joshua Matlin ................................................................ 25

                      b.     Russ Rizzo ...................................................................... 27

               9.     New York .................................................................................. 29

                      a.     Jeffrey Miller ................................................................. 29

                      b.     Nuala Purcell ................................................................. 30

               10.    North Carolina ......................................................................... 32

                      a.     Daniel Fink ..................................................................... 32

11.  Ohio ....................................................................................34

    a.  Jerome Miskell ....................................................34

12.  Texas ..................................................................................36

    a.  Jose Randy Rodriguez ........................................36

    b.  Michael Ervin .....................................................38

13.  Virginia ..............................................................................40

    a.  Jason Connell.......................................................40

    b.  Henry Miller-Jones .............................................41

14.  Washington .........................................................................43

    a.  Leif Kirchoff .......................................................43

B.  Defendant ..........................................................................................45

V.  TOLLING OF THE STATUTE OF LIMITATIONS ..............................45

VI.  FACTUAL ALLEGATIONS ..................................................................46

A.  Ford Introduces and Begins Selling MyFord Touch ........................46

B.  The MyFord Touch System ..............................................................49

1.  MyFord Touch Hardware. .....................................................49

2.  The Operating System Utilized by MyFord Touch. ..............51

C.  Ford Promotes MyFord Touch Safety Features ...............................52

D.  Ford Promotes MyFord Touch Communications And
Entertainment Features ....................................................................55

E.  Serious Defects Have Plagued MyFord Touch Since Its
Introduction ......................................................................................57

F.  Ford Issues Multiple Secret TSBs, "Updates," and Warranty
Extensions.........................................................................................62

G.  Consumer Complaints Document MyFord Touch Defects in Class
Vehicles ............................................................................................66

1.  Consumers Complain On-Line. .............................................66

2.  Consumers Complaints to NHTSA are Evidence of a
Widespread Problem. .............................................................67

- ii -

H.    Ford Technicians Have Chronicled With Precision How The
      Defects In The Myford Touch Impact The Safety Of Their
      Customers ................................................................................................. 76

I.    Ford Employees, Both Present And Former, Routinely Chastise
      The Company For The Defects In The MyFord Touch System ................. 79

J.    The MyFord Touch Problems Have Diminished the Value of the
      Class Vehicles ......................................................................................... 80

K.    Despite Express Warranties, Ford Has Not Fixed the Problems
      With MyFord Touch ................................................................................. 82

VII.    CLASS ALLEGATIONS ..................................................................................... 83

VIII.   VIOLATIONS ALLEGED ................................................................................... 87

A.    Claims Brought on Behalf of the Nationwide Class ................................. 87

COUNT I VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15
      U.S.C. §§ 2301, ET SEQ.) .................................................................................. 87

B.    Claims Brought on Behalf of the California Class .................................... 89

COUNT I VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
      (CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.) ........................................... 89

COUNT II VIOLATION OF CALIFORNIA CONSUMERS LEGAL
      REMEDIES ACT (CAL. CIV. CODE §§ 1750, ET SEQ.) .................................. 90

COUNT III VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
      (CAL. BUS. & PROF. CODE §§ 17500, ET SEQ.) ........................................... 91

COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
      (CAL. COM. CODE § 2314) ............................................................................... 93

COUNT V FRAUD BY CONCEALMENT (BASED ON CALIFORNIA LAW) ........................... 94

COUNT VI VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY
      ACT FOR BREACH OF EXPRESS WARRANTIES (CAL. CIV. CODE
      §§ 1791.2 & 1793.2(D)) ...................................................................................... 95

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY
      ACT FOR BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792) ........................... 97

COUNT VIII VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1795.92
      (ON BEHALF OF THE CALIFORNIA SUB-CLASS) ......................................... 99

C.    Claims Brought on Behalf of the Arizona Class ...................................... 100

COUNT I VIOLATIONS OF THE CONSUMER FRAUD ACT (ARIZ. REV.
      STAT. §§ 44-1521, ET SEQ.) ............................................................................ 100

COUNT II FRAUDULENT CONCEALMENT (BASED ON ARIZONA LAW) ......................... 102

- iii -

D.      Claims Brought on Behalf of the Colorado Class .................................. 103

COUNT I VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
        ACT (COLO. REV. STAT. §§ 6-1-101, *et seq.*)...................................... 103

COUNT II STRICT PRODUCT LIABILITY (BASED ON COLORADO LAW)......................... 104

COUNT III FRAUDULENT CONCEALMENT (BASED ON COLORADO
        LAW).................................................................................... 105

G.      Claims Brought on Behalf of the Iowa Class ......................................... 106

COUNT I BREACH OF EXPRESS WARRANTY (IOWA CODE § 554.2313) ........................... 106

H.      Claims Brought on Behalf of the Massachusetts Class ........................... 109

COUNT I VIOLATIONS OF THE MASSACHUSETTS CONSUMER
        PROTECTION ACT (MASS. GEN. LAWS CH. 93A)...................................... 109

COUNT II BREACH OF EXPRESS WARRANTY (MASS. GEN. LAWS CH.
        106, § 2-313) ............................................................................. 109

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (MASS. GEN. LAWS CH. 106, § 2-314) .................................................. 111

COUNT IV FRAUDULENT CONCEALMENT (BASED ON
        MASSACHUSETTS LAW)............................................................... 112

I.      Claims Brought on Behalf of the New Jersey Class................................. 114

COUNT I VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
        (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*) ............................................... 114

COUNT II BREACH OF EXPRESS WARRANTY (N.J. STAT. ANN. § 12A:2-
        313)....................................................................................... 114

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (N.J. STAT. ANN. § 12A:2-314) .......................................................... 116

COUNT IV FRAUDULENT CONCEALMENT (BASED ON NEW JERSEY
        LAW).................................................................................... 117

J.      Claims Brought on Behalf of the New York Class .................................. 119

COUNT I VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
        (N.Y. GEN. BUS. LAW § 349).......................................................... 119

COUNT II VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
        (N.Y. GEN. BUS. LAW § 350).......................................................... 120

COUNT III BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. § 2-313)................................ 121

COUNT IV FRAUDULENT CONCEALMENT (BASED ON NEW YORK
        LAW).................................................................................... 123

THIRD AMENDED CLASS ACTION COMPLAINT

K.      Claims Brought on Behalf of the North Carolina Class ........................................... 125

COUNT I VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND
        DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. §§ 75-1.1,
        *ET SEQ.)* .................................................................................................................. 125

COUNT II BREACH OF EXPRESS WARRANTY (N.C. GEN. STAT. § 25-2-
        313) ........................................................................................................................... 126

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (N.C. GEN. STAT. § 25-2-314) ................................................................................ 128

COUNT IV FRAUDULENT CONCEALMENT (BASED ON NORTH
        CAROLINA LAW) .................................................................................................... 128

L.      Claims Brought on Behalf of the Ohio Class ......................................................... 130

COUNT I VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
        (OHIO REV. CODE §§ 1345.01, *ET SEQ.*) .......................................................... 130

COUNT II BREACH OF EXPRESS WARRANTY (OHIO REV. CODE
        § 1302.26) ................................................................................................................ 132

COUNT III BREACH OF IMPLIED WARRANTY IN TORT (BASED ON
        OHIO LAW) .............................................................................................................. 134

COUNT IV NEGLIGENCE (BASED ON OHIO LAW) ......................................................... 135

COUNT V FRAUDULENT CONCEALMENT (BASED ON OHIO LAW) .............................. 135

M.      Claims Brought on Behalf of the Texas Class ....................................................... 137

COUNT I VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT
        (TEX. BUS. & COM. CODE §§ 17.41, *et seq.*) .................................................... 137

COUNT II FRAUD BY CONCEALMENT (BASED ON TEXAS LAW) .................................. 139

N.      Claims Brought on Behalf of the Virginia Class .................................................... 140

COUNT I VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION
        ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) ................................................... 140

COUNT II BREACH OF EXPRESS WARRANTY (VA. CODE ANN. § 8.2-
        313) ........................................................................................................................... 142

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (VA. CODE ANN. § 8.2-314) .................................................................................... 143

COUNT IV FRAUDULENT CONCEALMENT (BASED ON VIRGINIA LAW) ...................... 144

O.      Claims Brought on Behalf of the Washington Class ............................................... 146

COUNT I  VIOLATION OF THE WASHINGTON CONSUMER
        PROTECTION ACT  (WASH. REV. CODE ANN. §§ 19.86.010, *ET
        SEQ*.) ....................................................................................................................... 146

- v -

COUNT II  BREACH OF EXPRESS WARRANTY  (REV. CODE WASH.
    § 62A.2-313)............................................................................................................147

REQUEST FOR RELIEF..........................................................................................................149

DEMAND FOR JURY TRIAL..................................................................................................150

1    Plaintiffs Jennifer Whalen, the Center for Defensive Driving, Richard Decker Watson,

2    Darcy Thomas-Maskrey, Joe D'Aguanno, James Laurence Sheerin, Thomas Mitchell, William

3    Creed, Joshua Matlin, Russ Rizzo, Jeffrey Miller, Nuala Purcell, Daniel Fink, Jerome Miskell, Jose

4    Randy Rodriguez, Michael Ervin, Jason Connell, Henry Miller-Jones, and Leif Kirchoff

5    (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"),

6    allege as their Third Amended Class Action Complaint ("Complaint") and Demand for Jury Trial,

7    the following:

8                              **I.      INTRODUCTION**

9          1.      There are certain basic rules all automobile manufacturers must follow.  This case

10   arises from Defendant Ford Motor Company's ("Ford") breach of these rules.  When Ford sells a

11   vehicle to a customer, it has a duty to ensure the vehicle functions properly and safely, and is free

12   from defects.  When Ford discovers a defect it must disclose the defect when it sells Ford vehicles.

13   When Ford becomes aware of a defect in its vehicles, it has an obligation to correct the defect or

14   cease selling the vehicles.  When Ford introduces a new technology in its vehicles, and touts its

15   benefits, it must test the technology to ensure that it functions properly and as represented.  When

16   Ford provides a warranty to a customer, Ford is bound to stand by that warranty.  Ford failed

17   consumers in all of these areas when it sold or leased vehicles equipped with the defective Ford

18   "infotainment" system known as MyFord Touch, and MyLincoln Touch.[1]

19         2.      The MyFord Touch system is known in the automobile industry as an "infotainment

20   system."  Such systems are designed to attract buyers who want to manage available technology

21   while on the road, while minimizing distractions, and maximizing safety.  The MyFord Touch

22   system is no different.  Ford promises that the MyFord Touch system does all of this and more.

---

[1] Ford manufactures, or has manufactured, vehicles under the Ford and Lincoln names.  The Lincoln Motor Company (also known simply as "Lincoln") is a division of the Ford Motor Company that continues to sell luxury vehicles under the Lincoln brand, primarily in North America.  The MyFord Touch and MyLincoln Touch systems are identical and suffer from the same defects.  For purposes of this Third Amended Complaint, they will collectively be referred to as "MyFord Touch" or "MyTouch."  All vehicles with a MyFord Touch system are referred to collectively herein as the "Class Vehicles," each a "Class Vehicle."

- 1 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                    CASE NO. 13-CV-3072-EMC

3.      MyFord Touch consists of two or three LCD screens (the primary screen being a touchscreen) that are powered by an operating system known as Ford SYNC.[2]  The screens are the gateway between the user and the vehicle's safety, navigation, communications, entertainment and climate control features.  Among other operations, MyFord Touch allows the vehicle owner to operate the audio systems in the vehicle; use the GPS navigation technology; control the climate systems in the vehicle, including defrosters; operate the rearview, or back up, camera; operate the adaptive cruise control; and operate a Bluetooth-enabled mobile telephone or other device, with the touch of a fingertip.  In addition, MyFord Touch dials 9-1-1 when it detects that the vehicle has been involved in an accident and reports the vehicle's location so that emergency services providers can respond immediately, even when the occupants of the vehicle cannot call for help.

4.      Ford introduced the MyFord Touch system in certain of its vehicles beginning with model year 2011.  At the time of launch, MyFord Touch was hailed as state-of-the-art.  In fact, Ford was one of the first major automobile manufacturers to release an infotainment system to the car-shopping public.  THE WALL STREET JOURNAL called Ford a "first-mover" in this area.

5.      From the start, Ford aggressively promoted its MyFord Touch system as revolutionary technology that enhances the safety and convenience of Ford vehicles.  In connection with the launch of MyFord Touch, Ford's CEO at the time, Alan Mulally, in specifically referring to MyFord Touch, stated "this is a reason to buy Ford … It's just smart design.  We think it's a value proposition."

6.      And, of course, the promises Ford has made to the public about the MyFord Touch system helps sell Ford vehicles.  Up to 80% of Ford buyers choose vehicles with the MyFord Touch system.[3]  Ford acknowledges that the MyFord Touch system helps sell its vehicles.[4]  Ford represented when MyFord Touch was announced that:

---

[2] Some Ford and Lincoln vehicle models, such as the F-250, are equipped with one touchscreen and a second screen in the gauge cluster for a total of two screens.

[3] http://online.wsj.com/news/articles/SB10001424127887323566804578549351972660468?mg=reno64-wsj.

[4] *Id.*

"MyFord Touch combined with new SYNC functionality, creates an experience that will cause people to fall in love with their vehicles again," said Derrick Kuzak, Ford group vice president, Global Product Development.  "It's not just a technology; it's an experience – one we hope will have people across the globe looking forward to spending time behind the wheel of their vehicle."

7.     However, actual driver experiences with the MyFord Touch system differ dramatically from the Ford promise.  Owners and lessees have reported thousands of persistent and repeated failures with the system.  Descriptions of the failures include consistent and uniform symptoms which are experienced by virtually all MyFord Touch users, including, most dramatically, the system freezing up or crashing altogether.  When the system freezes or crashes, the driver cannot operate any of the features connected to MyFord Touch, including the navigation technology, the radio, and important safety features such as the rearview camera or defroster.  Typically, the screen will go dark, and will come back on saying it is "performing scheduled system maintenance."  In fact, it is simply malfunctioning.  Other complaints include:  the screen randomly but frequently "blacks out;" the system will not respond to touch or voice commands; the system will not connect to the owner's mobile phone or other peripheral device; the rearview camera will lock up; the navigation system will provide inaccurate directions and/or misread the location of the vehicle.  The problems cross all models and model years.  MyFord Touch system failures directly jeopardize the safety of the vehicle driver and occupants, and other motorists and pedestrians, by disabling safety features and preventing the driver from using features necessary to drive the vehicle in a safe and reasonable manner.

8.     The Internet and Ford dealership repair files are replete with complaints from consumers who have experienced ongoing problems with their MyFord Touch systems.  There are multiple Internet websites, with names like "*syncsucks.com*" or "*outofmytouch.com*" dedicated to frustrated MyFord Touch consumers documenting their problems.  In addition, MyFord Touch owners have filed numerous complaints with the National Highway Traffic Safety Administration ("NHTSA") concerning the defects in MyFord Touch.  These frustrated consumers are often seeking help or guidance from other users (or Ford), but they cannot alleviate their problems because there is no fix:  the system is simply defective.  Ford employees have also chronicled

hundreds of complaints.  In fact current CEO, Mark Fields, has himself characterized the problems associated with the MyFord Touch in his own car as "very frustrating to say the least" in an e-mail dated May 11, 2012. (WLN1-0467067).  About a year later in a subsequent email, dated April 24, 2013 and outlining yet another MyFord Touch defect in Mr. Field's vehicle, Mark Fields admits: "Is this for real … do our customers really have to wait until July???  I started experiencing this [defect] back in early January … I don't even use the system anymore."  (WLN2-00372326).

9.      Consumer media have tracked the widely-reported MyFord Touch problems.  In late 2012, the New York Times described the problems as "embarrassing" for Ford and suggested that the system could be called "*MyFord Ouch*," rather than *MyFord Touch*.[5]  Consumer Reports advised that it could not recommend that consumers buy any vehicle equipped with the MyFord Touch system.[6]  The problems plaguing the MyFord Touch system caused Ford to tumble in an annual survey of vehicle reliability.[7]  The link between the drop in Ford reliability and the MyFord Touch debacle was confirmed by Raj Nair, Ford product development chief at the Deutsche Bank Global Auto Industry Conference in January 2013.[8]

10.      The scope of the problem is wide.  In late 2012, Ford reported 400 problems with its MyFord Touch system for every 1000 vehicles.  That was an improvement over the problems earlier in 2012 when Ford reported a "things-gone-wrong" rate for its MyFord Touch system of 500 for every 1000 vehicles.[9]

11.      The MyFord Touch problems have been so extensive and pervasive that, early on, Ford was forced to admit them publicly.  In 2011, just a year after the first vehicle with MyFord Touch was made available to the public, Ford CEO Alan Mulally admitted on several occasions that

---

[5] "Ford Extends Warranties on MyFord Touch System," New York Times (Nov. 28, 2012).

[6] http://en.wikipedia.org/wiki/MyFord_Touch#cite_note-16 (as of Oct. 31, 2013).

[7] *See*, *e.g.*, http://wheels.blogs.nytimes.com/2011/06/23/aggravating-myford-touch-sends-ford-plummeting-in-j-d-power-quality-survey/?hpw.

[8] http://www.autonews.com/article/20130115/OEM11/130119861#axzz2iafFMKVW (Jan. 15, 2013).

[9] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                                    CASE NO. 13-CV-3072-EMC

the MyFord Touch system suffers from numerous problems.[10]  For example, on May 31, 2011, at a press conference, Mulally admitted, "We have just a few issues with some of the newer technologies associated with SYNC and MyFord Touch …."[11]

12.     Ford also acknowledges the MyFord Touch system's failures internally.  In fact some employees developed a specific reference to illustrate the MyFord Touch system and its litany of updates.  When Mark Fields instructs the MyFord Touch team on the latest Performance Upgrade in July 2011, Dominic Colella, an employee with Ford SYNC Integration, jokes:  "I thought we were going to go with 'Polished Turd' instead?"  Jeremiah Bragg, a Warranty Engineer with Ford, agrees and says, "That's what I was going to use, but I guess they don't want that to rub off either."  (WLN2-26702).  Ford has also issued multiple secret Technical Service Bulletins (TSBs) to attempt to address the problem.  Ford has also developed and issued several "updates" to all MyFord Touch owners.  None of the TSBs or updates has corrected the problems that the Plaintiffs and other Class members have experienced with MyFord Touch.

13.     The MyTouch failures are due to software bugs and failures of the software process and architecture that Ford was keenly aware of prior to the launch of the Class Vehicles.  In a 14D Form, which is a document Ford uses to chronicle technical problems and their root causes, the following assessment is made by Ford employees: ████████████████████

████████████████████████████

██████████████████████████████████

███████████████████████████████

██████████████████████████████

███████████████████████████████████

████████████████████████████████

███████████████████████████

---

[10] *See*, *e.g.*, http://www.autonews.com/article/20110726/BLOG06/110729892/#axzz2jJt8i01j (On analyst conference call, Mulally admits to problems with MyFord Touch).

[11] http://www.bloomberg.com/news/2011-06-02/ford-missing-targets-pressures-mulally-to-fix-mishaps-cars.html.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                          CASE NO. 13-CV-3072-EMC

████████████████████████████████████████████████████████████

███████████████████████   The effects of these software bugs and defects were exacerbated by Ford's failure to provide users a quick, easy and reliable way to reboot a malfunctioning MyTouch Ford system.

14.    In 2015, Ford's global product development chief announced that it would redesign the MyFord Touch system across all product lines and go back to knobs for some functions because of the profound problems with the system.[12]

15.    Owner and lessee requests that Ford fix the problems have been futile.  Despite the issuance of the TSBs and the upgrades, Ford does not have a fix for the defect.

16.    While Ford has said that it continues to work on the MyFord Touch system until a fix has been achieved, it is clear that internally the company has abandoned the MyFord Touch system, along with 10 million Ford customers. █████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████

17.    According to a press release issued by Ford on December 11, 2014, Ford will be replacing MyFord Touch with SYNC 3: "a new communications and entertainment system that is faster, more intuitive and easier to use with enhanced response to driver commands."[13]  This system will be powered by Blackberry's QNX software system and will be installed in about half of Ford's North American vehicles by the end of 2016.  When asked whether the Ford and Lincoln customers

---

[12] http://online.wsj.com/news/articles/SB10001424127887323566804578549351972660468?mg=reno64-wsj.

[13] https://media.ford.com/content/fordmedia/fna/us/en/news/2014/12/11/ford-sync-3-delivers-new--innovative-ways-for-people-to-connect.html.

who already have MyFord Touch installed in their vehicles could upgrade to SYNC 3, Don Butler, Executive Director of Connected Vehicles and Services stated: "[t]he upgrade path is a new vehicle."[14] This announcement, coupled with the statement that "SYNC Gen 3 is the next point when there will be significant improvement" is further evidence that Ford fully intends to leave the 10 million owners of a MyFord Touch system with no recourse or relief, they and their defective MyFord Touch systems have been abandoned by Ford.

18. Ford has charged a substantial premium for its MyFord Touch system since its roll-out in 2011 model vehicles. Including the MyFord Touch system in a Ford vehicle adds approximately $1000 to a new vehicle purchase. In addition, many owners and lessees of Class Vehicles – including certain Plaintiffs – have suffered deprivation of the use of their vehicles when Ford technicians retained the vehicles for extended periods of time in a futile attempt to correct the problems. Many more owners and lessees have simply given up seeking out repairs and software updates, as they have lost all confidence that Ford has the ability to resolve the MyFord Touch defects. In addition, many owners of Class Vehicles – again, including certain Plaintiffs – sold their vehicles at a loss of several thousand dollars, or were forced to terminate their lease early, due to the faulty and defective MyFord Touch system. The defective Class Vehicles are worth far less than are similar non-defective vehicles, and far less than the defect-free vehicles the Plaintiffs and the other Class members bargained for and thought they had received.

19. As a result of Ford's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose known defects in the MyFord Touch system, owners and/or lessees of the Class Vehicles have suffered losses in money and/or property. Had Plaintiffs and the other Class members known of the defects in the MyFord Touch system at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

20. Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of Ford and Lincoln vehicles equipped with the MyFord Touch system. Plaintiffs

---

[14] https://autos.yahoo.com/news/ford-axes-troubled-myford-touch-152449537.html.

1   seek damages, injunctive relief, and equitable relief for the conduct of Ford related to the MyFord

2   Touch, as alleged in this complaint.

3                              **II.      JURISDICTION**

4          21.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28

5   U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in

6   controversy exceed $5,000,000, exclusive of costs and interest; and minimal diversity exists.  This

7   Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8                                **III.     VENUE**

9          22.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of

10  the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Plaintiff Whalen

11  purchased her Class Vehicle in this District, and Ford has marketed, advertised, sold, and leased the

12  Class Vehicles within this District.

13                              **IV.      PARTIES**

14  **A.      Plaintiffs**

15          **1.      California**

16                  **a.      Jennifer Whalen**

17         23.     Plaintiff Jennifer Whalen ("Plaintiff Whalen") is an individual residing in Windsor,

18  California.  In April 2012, Plaintiff Whalen purchased a new 2013 Ford Explorer XLT from Henry

19  Curtis Ford, an authorized Ford dealer in Petaluma, California.  Plaintiff Whalen purchased, and

20  still owns, this vehicle.  Unknown to Plaintiff Whalen, at the time she purchased her vehicle, the

21  MyFord Touch installed in her vehicle suffered from defects which has caused her out-of-pocket

22  loss associated with the MyFord Touch system defect, future attempted repairs, and diminished

23  value of her vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff

24  Whalen, so Plaintiff Whalen purchased her vehicle on the reasonable, but mistaken, belief that her

25  vehicle would be safe and reliable.

26         24.     Plaintiff Whalen selected and ultimately purchased her vehicle, in part, because of

27  the features of the MyFord Touch system, as represented through advertisements and

28  representations made by Ford.  Specifically, prior to her purchase of the vehicle, Plaintiff Whalen

                                        - 8 -

1   viewed television advertisements regarding the MyFord Touch and a representative of Henry Curtis

2   Ford made verbal representations about MyFord Touch to Plaintiff Whalen.  A salesperson from

3   Henry Curtis Ford even demonstrated the MyFord Touch and Bluetooth system working through his

4   phone and stated Plaintiff Whalen could connect her phone or iPod to the system and listen to

5   music.  She recalls that the advertisements and representations touted the voice command features

6   of the MyFord Touch system, including, the ability to adjust the temperature of the vehicle; the

7   ability to control the audio portion of the vehicle without having to take her eyes off the road; and

8   the purported ability to dial 9-1-1 in the event of an accident.  None of the advertisements reviewed

9   or representations received by Plaintiff Whalen contained any disclosure relating to any defects in

10  the MyFord Touch system.  Had Ford disclosed that the MyFord Touch in her vehicle suffered from

11  numerous defects which would prevent her full use of her vehicle and pose safety risks, she would

12  not have purchased her vehicle with MyFord Touch, or would have paid less for the vehicle.

13         25.     The problems with Plaintiff Whalen's MyFord Touch system began almost

14  immediately following her purchase of the Vehicle.  The problems she has experienced include, but

15  are not limited to, problems with the speech/voice recognition features, problems with the

16  navigation system, and problems connecting her Samsung Stratosphere to the MyFord Touch

17  system.

18         26.     Plaintiff Whalen first took her vehicle back to Henry Curtis Ford on or about April 1,

19  2012, specifically to have the problems with the MyFord Touch in her vehicle addressed.  The

20  MyFord Touch system in her vehicle failed to stream music from her phone via Bluetooth, had

21  unexplained freezing of the rearview camera and an unreasonable time for navigation to calculate

22  destinations.  The technicians at Henry Curtis Ford tested the system and performed a master reset.

23  The master reset was not successful and the problems with the MyFord Touch continued to plague

24  Plaintiff Whalen's vehicle.

25         27.     On or about May 14, 2012, Plaintiff Whalen took her vehicle back to Henry Curtis

26  Ford because, *inter alia*, the backup camera would freeze while driving, the navigation system

27  loaded unreasonably slow, the audio system would switch from Sirius XM to iPod without warning

28  and, again, streaming of music from her phone via Bluetooth was not functioning.  The technician

- 9 -

found a bad connection in the iPod cable and performed a master reset.  The master reset was not successful and the problems with the MyFord Touch continued to plague Plaintiff Whalen's vehicle.

28.     Plaintiff Whalen again presented her vehicle to Henry Curtis Ford on or about January 8, 2013, to have the problems with the MyFord Touch in her vehicle addressed.  The system's screen was unexplainably freezing at times and the HVAC buttons became non-responsive at times.  Additionally, the system's voice activation was not responding to commands and the system would not disconnect from a phone call despite such commands.  The technicians at Henry Curtis Ford performed SYNC Upgrade recall #12A04 which included a reflash of the MyFord Touch system and replacement of the vehicle's SD map card.  The attempted repairs were not successful and the problems with the MyFord Touch continued to plague Plaintiff Whalen's vehicle.

29.     On or about May 14, 2013, Plaintiff Whalen took her vehicle back to Henry Curtis Ford due to the non-functioning of the MyFord Touch system when answering phone calls, a failure of the clock to keep accurate time by approximately 10-20 minutes, and an unexplained freezing of the navigation system.  The technicians at Henry Curtis Ford tested the system and performed a master reset.  The master reset was not successful and the problems with the MyFord Touch continued to plague Plaintiff Whalen's vehicle.

30.     In or about July 2013, Plaintiff Whalen received a notice from Ford, claiming that another software update, MyFord Touch software version 3.6, will be available for download from Ford's website in August 2013.

31.     In August 2013, Plaintiff Whalen downloaded her third update from Ford. Following the download, Plaintiff Whalen continues to experience problems with the MyFord Touch system.

32.     As of this date, Plaintiff Whalen continues to experience problems with the MyFord Touch system in her vehicle, including but not limited to, the Bluetooth system in her vehicle failing to operate as designed, unexplained freezing of the navigation, inability to answer phone calls using the MyFord Touch system, unrecognized voice commands when attempting to operate the system and sudden off and on of the audio system absent prompting.

33.     The State of California requires drivers to use hands-free equipment while talking or texting on their cellular telephones.  In Sonoma County, where Plaintiff Whalen resides, the penalty for a first cell phone-use offense is approximately $160.  Plaintiff Whalen has not been able to use the hands-free function of her MyFord Touch system.

34.     Plaintiff Whalen has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to, out-of-pocket loss associated with the MyFord Touch system defect alleged herein and future attempted repairs, and diminished value of her vehicle.

35.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Whalen of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**b.     The Center for Defensive Driving**

36.     Plaintiff The Center for Defensive Driving ("Plaintiff CDD") is a 501(c)(3) nonprofit corporation headquartered in Torrance, California.  On or about February 22, 2013, Plaintiff CDD acquired a new 2013 Ford F-150 Lariat from Power Ford, an authorized Ford dealer in Torrance, California.  Plaintiff CDD leased, and currently leases, this vehicle.  Unknown to Plaintiff CDD, at the time it leased its vehicle, the MyFord Touch installed in its vehicle suffered from defects which have caused it out-of-pocket loss associated with the MyFord Touch system defect and diminished the value of its vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff CDD, so Plaintiff CDD leased its vehicle on the reasonable, but mistaken, belief that its vehicle would be safe and reliable.

37.     At all pertinent times, although Plaintiff CDD has maintained its vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague its vehicle.

38.     The Ford F-150 Lariat leased by Plaintiff CDD came equipped with MyFord Touch. Almost immediately following the acquisition of its vehicle, Plaintiff CDD experienced problems with its MyFord Touch system.  Since the date of the lease of its vehicle, the problems Plaintiff CDD experienced with the MyFord Touch system are so frequent and pervasive, it is not able to determine the precise dates it has experienced such problems (although it has documented at least

- 11 -

1   thirty such experiences between February 26, 2013 and September 13, 2013).  Issues that Plaintiff

2   CDD experienced included, but were not limited to: system lockup and total system failure; periodic

3   non-responsiveness to peripheral devices (such as MP3 players and smartphones); inability to use

4   Bluetooth features to stream music or other audio; and periodic non-responsiveness to voice and

5   touch commands.

6       39.     At Power Ford, prior to agreeing to lease the F-150 Lariat, Plaintiff CDD inquired

7   about the functionality and quality of the MyFord Touch system installed in the vehicle.  A Ford

8   sales representative, Roland Belikow, represented to Plaintiff CDD that the MyFord Touch system

9   works well, can play audio from MP3 players, including Plaintiff CDD's Apple iPod, and connect

10  with smartphone devices, including Apple iPhones, for hands-free telephone usage as well as audio

11  and other entertainment functions.  Mr. Belikow demonstrated for Plaintiff CDD the GPS

12  navigation capabilities of the MyFord Touch system as well as the voice command functions.  At no

13  time did Mr. Belikow or any other Ford representative disclose that the MyFord Touch system is in

14  any way defective.

15      40.     Plaintiff CDD contacted Ford technical support (using the Ford SYNC hotline) on

16  numerous occasions shortly after leasing the F-150 Lariat to report and correct the problems it was

17  experiencing.  Ford technical support advised Plaintiff CDD to do a "master reset" on the MyFord

18  Touch system, which temporarily corrected the issues experienced.  However, the same issues

19  would recur, generally within one to five days, after performing a "master reset."

20      41.     At the suggestion of Ford technical support, Plaintiff CDD brought the F-150 Lariat

21  to the Power Ford dealership for service on February 28, 2013.  The technicians at the dealership

22  confirmed that the F-150 Lariat was equipped with the latest software updates and advised Plaintiff

23  CDD to disconnect any peripheral devices if the system fails in the future.  The system continued to

24  fail, with and without peripheral devices attached to it, and Plaintiff CDD spoke to several other

25  Ford technical support representatives.  Plaintiff CDD brought the F-150 Lariat in for service at

26  Power Ford again, for the same issues relating to MyFord Touch, on March 12, 2013.

27      42.     On March 26, 2013, Plaintiff CDD spoke with a Ford representative who identified

28  himself as "Brent."  Brent advised Plaintiff CDD to connect peripherals to the auxiliary jack rather

- 12 -

than the MyFord Touch system, which would lead to distracted driving if the driver had to manually manipulate a peripheral device while driving.  Brent admitted to Plaintiff CDD that there is no fix for the problems experienced by Plaintiff CDD.  After Plaintiff CDD began experiencing these and related MyFord Touch problems, Plaintiff CDD spoke with Greg Murphy, a service manager at AutoNation (Power Ford).  Mr. Murphy explained to Plaintiff CDD that he knew the MyFord Touch system was defective, that Ford had no intentions of correcting the defect, that his dealership had received complaints from customers about MyFord Touch, and that his dealership was not telling new car customers about the MyFord Touch problems.

43.     As the problems persisted, Plaintiff CDD initiated a "buyback request" with Ford (according to which Ford would reacquire the F-150 Lariat and issue Plaintiff CDD a refund) on April 10, 2013.  On May 2, 2013, Ford denied Plaintiff CDD's buyback request.

44.     After several more weeks of identical problems, Plaintiff CDD spoke with Ford Consumer Affairs on June 19, 2013.  A Ford Consumer Affairs representative that identified himself as "Mark" informed Plaintiff CDD that Plaintiff CDD should visit the Ford SYNC website to deal with peripheral device compatibility issues, and denied that SYNC was experiencing system-wide problems.  Mark advised Plaintiff CDD that its problems were related not to the MyFord Touch system but to Plaintiff CDD's peripheral devices, and that Plaintiff CDD's problems were isolated, not a result of a defect in the MyFord Touch system.

45.     In addition to speaking with Ford sales representatives about the MyFord Touch system, as alleged above, Plaintiff CDD saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff CDD cannot recall the exact language from the various publications, Plaintiff CDD recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff CDD viewed disclosed that the MyFord Touch in its vehicle suffered from numerous defects which would prevent its full use of the vehicle and pose safety risks, Plaintiff CDD would not have leased

- 13 -

1    the vehicle with MyFord Touch, or certainly would not have paid more for its vehicle than it should

2    have.

3          46.    At all pertinent times Plaintiff CDD has maintained its vehicle as recommended by

4    Ford.

5          47.    Plaintiff CDD has suffered an ascertainable loss as a result of Ford's omissions

6    associated with the MyFord Touch system, including but not limited to out-of-pocket loss

7    associated with the MyFord Touch system defect alleged herein and the diminished value of its

8    vehicle.

9          48.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

10   CDD of the existence of the MyFord Touch system's defect and/or defective design prior to its

11   agreement to lease its vehicle.

12              **c.    Richard Decker Watson**

13         49.    Plaintiff Richard Decker Watson ("Plaintiff Watson") is an individual residing in Los

14   Angeles, California.  In or around October 2012, Plaintiff Watson acquired a used 2011 Lincoln

15   MKX equipped with a MyFord Touch system, which he purchased from Sunrise Ford, an

16   authorized Ford dealership located in North Hollywood, California.

17         50.    At all pertinent times, although Plaintiff Watson has maintained his vehicle as

18   recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

19         51.    Plaintiff Watson learned about the MyFord Touch system while researching vehicles

20   online prior to October 2012.  Plaintiff Watson visited various Ford and Lincoln websites during

21   this research and reviewed Ford's MyFord Touch/SYNC websites that explained the technology

22   underpinning the MyFord Touch system.  Because he was impressed with the technology associated

23   with MyFord Touch, and believed the system offered a number of attractive features, such as hands-

24   free telephone communications and GPS navigation, Plaintiff Watson purchased his 2011 Lincoln

25   MKX in order to acquire a vehicle equipped with MyFord Touch.  Plaintiff Watson also reviewed

26   Ford's promotional materials and advertisements concerning MyFord Touch and the SYNC

27   technology, and these materials and advertisements influenced his decision to purchase his 2011

28   Lincoln MKX.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                      CASE NO. 13-CV-3072-EMC

52.     Plaintiff Watson also purchased a subscription to Ford's SYNC Services program, for which he pays an annual fee of $200.  Through this program, Plaintiff Watson is entitled to use the Operator Assist feature in his Lincoln MKX, but because of various problems with his MyFord Touch system, Plaintiff Watson has been unable to use this feature.  Ford has not refunded him the cost of his subscription.

53.     Unknown to Plaintiff Watson at the time he acquired his 2011 Lincoln MKX was that the MyFord Touch system in his Lincoln MKX was defective and suffered from numerous issues including:  system lockup and total system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-responsiveness to voice commands.  Ford knew about, but did not disclose, the defect to Plaintiff Watson and he purchased his Lincoln MKX under the reasonable, but mistaken, belief that the MyFord Touch system would perform in a reasonable manner.  It did not.

54.     On several occasions, beginning immediately after Plaintiff Watson purchased his Lincoln MKX, the MyFord Touch system in his vehicle has experienced problems, including failure to provide GPS navigation, failure to respond to touch commands, failure to properly play back audio and to respond to audio controls, and intermittently freezing up and resetting itself, among other malfunctions.

55.     Plaintiff Watson reviewed Ford's websites to find solutions to the MyFord Touch malfunctions he was encountering.  After following the directions provided on those websites, Plaintiff Watson's MyFord Touch system continued malfunctioning in the same ways, and he contacted Ford via telephone.  Ford directed him to take his vehicle to a Ford dealership for service.

56.     Plaintiff Watson took his Lincoln MKX to Sunrise Ford to have the MyFord Touch issues he was encountering resolved within one week of acquiring the vehicle.  He also took the vehicle for service on two further occasions to other dealerships specializing in Lincolns, including Star Ford Lincoln in Glendale, California and Galpin Lincoln in Van Nuys, California.  None of these service visits remedied the problems Plaintiff Watson was encountering with his MyFord Touch system.  Although Plaintiff Watson has maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

- 15 -

57.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Watson of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

58.     Plaintiff Watson has suffered an ascertainable loss as a result of Ford's omission, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of his vehicle.

#### d.      Darcy Thomas-Maskrey

59.     Plaintiff Darcy Thomas-Maskrey ("Plaintiff Thomas-Maskrey") is an individual residing in Riverside, California.  In July 2012, Plaintiff Thomas-Maskrey purchased a new 2013 Ford Flex from Riverside Ford, an authorized Ford dealer in Riverside, California.  Plaintiff Thomas-Maskrey purchased, and still owns, this vehicle.  Unknown to Plaintiff Thomas-Maskrey at the time she purchased her vehicle, the MyFord Touch installed in her vehicle suffered from defects which have caused her out-of-pocket loss associated with the MyFord Touch system defect and diminished the value of her vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff Thomas-Maskrey, so Plaintiff Thomas-Maskrey purchased her vehicle on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.

60.     At all pertinent times, although Plaintiff Thomas-Maskrey has maintained her vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague her vehicle.

61.     The Ford Flex purchased by Plaintiff Thomas-Maskrey came equipped with MyFord Touch.  Almost immediately following the purchase date of her vehicle, Plaintiff Thomas-Maskrey experienced problems with her MyFord Touch system.  Since the date of the purchase of her vehicle, the problems she has experienced with her MyFord Touch system are so frequent and pervasive, she is not able to determine the precise dates she has experienced such problems.  Issues that Plaintiff Thomas-Maskrey experienced include but are not limited to:  system lockup and total system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-responsiveness to voice commands.  From the first day she had the vehicle, her MyFord Touch system failed to properly connect with her cellular telephone, depriving her of use of the hands-free telephone feature.  Plaintiff Thomas-Maskrey's MyFord Touch system

- 16 -

also freezes or blacks out periodically, and frequently fails to connect with peripheral devices, like music players.

62.     Plaintiff Thomas-Maskrey took her Ford Flex into service at Riverside Ford on no less than three occasions specifically to have her vehicle serviced to address issues with MyFord Touch.  The technicians at Riverside Ford were never able to resolve the issues with MyFord Touch.  During the many service visits made by Plaintiff Thomas-Maskrey, she was unable to use her vehicle.

63.     Plaintiff Thomas-Maskrey saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff Thomas-Maskrey cannot recall the exact language from the various publications, she recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Thomas-Maskrey viewed disclosed that the MyFord Touch in her vehicle suffered from numerous defects which would prevent her full use of her vehicle and pose safety risks, she would not have purchased her vehicle with MyFord Touch, or certainly would not have paid as much as she did for her vehicle.

64.     Plaintiff Thomas-Maskrey has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of her vehicle.

65.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Thomas-Maskrey of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**2.     Arizona**

    **a.     Joe D'Aguanno**

66.     Plaintiff Joe D'Aguanno ("Plaintiff D'Aguanno") is an individual residing in Phoenix, Arizona.  In November 2012, Plaintiff D'Aguanno purchased a new 2013 Ford Explorer

- 17 -

Sport from Sanderson Ford, an authorized Ford dealer in Phoenix, Arizona.  Plaintiff D'Aguanno purchased, and currently owns, this vehicle.  Unknown to Plaintiff D'Aguanno, at the time he purchased his vehicle, the MyFord Touch installed in his vehicle suffered from defects which have caused his vehicle to diminish in value.  Ford knew about these defects, but did not disclose the defects to Plaintiff D'Aguanno, so Plaintiff D'Aguanno purchased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

67.     At all pertinent times, although Plaintiff D'Aguanno has maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

68.     The Ford Explorer Sport purchased by Plaintiff D'Aguanno came equipped with MyFord Touch.  Almost immediately following the purchase date of his vehicle, Plaintiff D'Aguanno experienced problems with his MyFord Touch system.  Since the date of the purchase, the problems Plaintiff D'Aguanno experienced with the MyFord Touch system are so frequent and pervasive, he is not able to determine the precise dates he has experienced such problems.  Issues that Plaintiff D'Aguanno experienced include, but are not limited to: system lockup and total system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and smartphones); inability to use Bluetooth features to stream music or other audio; periodic non-responsiveness to voice and touch commands; frequent rearview camera lock up; frequent steering wheel command lock up or failure; frequent USB drive failure; and frequent (and random, unprompted) radio input changes.

69.     Plaintiff D'Aguanno learned about the MyFord Touch system in 2012 while shopping for a new vehicle.  Because he was impressed with the technology associated with MyFord Touch, and believed the system offered a number of attractive features, such as hands-free telephone communications, Plaintiff D'Aguanno purchased his Ford Explorer Sport in order to acquire a vehicle equipped with MyFord Touch.

70.     Plaintiff D'Aguanno brought his Ford Explorer Sport in for service related to his MyFord Touch system on at least five separate occasions.  The Ford personnel at Sanderson Ford reset the MyFord Touch system, reinstalled a controller chip, and performed a "hard" (manual) reset on the system, but all of Plaintiff D'Aguanno's problems with MyFord Touch persist.

- 18 -

71.     Plaintiff D'Aguanno has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to diminished value of his vehicle and lost use of the vehicle while being serviced.

72.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff D'Aguanno of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**3.      Colorado**

  **a.      James Laurence Sheerin**

73.     Plaintiff James Laurence Sheerin ("Plaintiff Sheerin") is an individual residing in Colorado Springs, Colorado.  In or around June 18, 2012, Plaintiff Sheerin acquired a 2013 Ford Explorer Limited equipped with a MyFord Touch system, which he purchased from Phil Long Ford, an authorized Ford dealership located in Colorado Springs, Colorado.  Unknown to Plaintiff Sheerin at the time he purchased his vehicle, the MyFord Touch installed in his vehicle suffered from defects which has caused him out-of-pocket loss associated with the MyFord Touch system defect and diminished the value of his vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff Sheerin, so Plaintiff Sheerin purchased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

74.     At all pertinent times, although Plaintiff Sheerin has maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

75.     Almost immediately following the purchase date of his vehicle, Plaintiff Sheerin experienced problems with his MyFord Touch system.  Since the date of the purchase of his vehicle, the problems he has experienced with his MyFord Touch system are so frequent and pervasive, he is not able to determine the precise dates he has experienced such problems.  Issues that Plaintiff Sheerin experienced include, but are not limited to: the system is unresponsive to voice commands and often freezes rendering the hands-free calling features, among others, inoperable; the backup camera does not appear on the touchscreen when the vehicle is in reverse; the system does not recognize his iPod when it is plugged into his USB port; and occasionally the touchscreen will freeze and he will be unable to control the audio functions.

- 19 -

76.     Plaintiff Sheerin saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff Sheerin cannot recall the exact language from the various publications, he recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Sheerin viewed disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with MyFord Touch, or certainly would not have paid as much as he did for his vehicle.

77.     Plaintiff Sheerin has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including, but not limited to, out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of his vehicle.

78.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Sheerin of the existence of the MyFord Touch system's defect and/or defective design prior to the purchase of his vehicle.

**4.     Iowa**

**a.     Thomas Mitchell**

79.     Plaintiff Thomas Mitchell ("Plaintiff Mitchell") is an individual residing in Sioux City, Iowa.  On or about November 8, 2010, Plaintiff acquired a 2011 Lincoln MKX equipped with a MyFord Touch system which he purchased from Sioux City Ford/Lincoln/Mercury, an authorized Ford dealership located in Sioux City, Iowa.  Plaintiff Mitchell still owns the vehicle.

80.     At all pertinent times, although Plaintiff Mitchell maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

81.     Plaintiff Mitchell has been a devoted purchaser of Lincoln vehicles for many years and generally purchased a new Lincoln vehicle every five years.  He had purchased a Lincoln vehicle in 2009 and pursuant to this typical practice would have purchased a new Lincoln vehicle again in 2014.  Plaintiff Mitchell is a retired engineer, and learned about the MyFord Touch system

- 20 -

1   in 2010.  Because he was impressed with the technology associated with MyFord Touch, and

2   believed the system offered a number of attractive features, Plaintiff Mitchell deviated from his past

3   practice of purchasing a new Lincoln vehicle every five years and instead purchased a Lincoln

4   MKX in late 2010 in order to obtain a vehicle with MyFord Touch.

5           82.     Unknown to Plaintiff Mitchell at that time was that the MyFord Touch system in his

6   new Lincoln MKX is defective, suffering from numerous issues including: system lockup and total

7   system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and

8   smartphones); and periodic non-responsiveness to voice and touch commands.  It did not.

9           83.     Plaintiff Mitchell has had his MyFord Touch system serviced on at least the

10   following three occasions at Sioux City Ford and Lincoln, an authorized Ford and Lincoln

11   dealership located in Sioux City, Iowa: November 8, 2010, November 12, 2010, and December 21,

12   2010.  At some of these visits, the technicians at Sioux City Ford and Lincoln attempted to install

13   updates on Plaintiff Mitchell's vehicle.  In addition, Plaintiff Mitchell has installed updates on his

14   own.  These updates have failed to correct the problems associated with his MyFord Touch.

15           84.     At all pertinent times Plaintiff Mitchell has maintained his vehicle as recommended

16   by Ford.

17           85.     Plaintiff Mitchell has suffered an ascertainable loss as a result of Ford's omissions

18   associated with the MyFord Touch system, including but not limited to out-of-pocket loss

19   associated with the MyFord Touch system defect alleged herein and future attempted repairs, and

20   diminished value of his vehicle.

21           86.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

22   Mitchell of the existence of the MyFord Touch system's defect and/or defective design prior to

23   purchase.

24         **5.**     **Massachusetts**

25              **a.**     **William Creed**

26           87.     Plaintiff William Creed ("Plaintiff Creed") is an individual residing in Tyngsboro,

27   Massachusetts.  On or about March 14, 2011, Plaintiff Creed purchased a new 2011 Ford Explorer

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                    CASE NO. 13-CV-3072-EMC

from Ipswich Ford, an authorized Ford dealer in Ipswich, Massachusetts.  At the time of purchase, the vehicle came equipped with the MyFord Touch system.

88.     At all pertinent times, although Plaintiff Creed maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system plagued his vehicle.

89.     Plaintiff Creed selected and ultimately purchased his vehicle, in part, because of the features of the MyFord Touch system, as represented through advertisements and representations made by Ford.  Specifically, prior to his purchase of the vehicle, Plaintiff Creed viewed television advertisements regarding the MyFord Touch and a representative of Ipswich Ford made verbal representations about MyFord Touch to Plaintiff Creed.  He recalls that the advertisements and representations touted the voice command features of the MyFord Touch system, including, the ability to adjust the temperature of the vehicle; the ability to control the audio portion of the vehicle without having to take his eyes off the road; and the purported ability to dial 9-1-1 in the event of an accident.  None of the advertisements reviewed or representations received by Plaintiff Creed contained any disclosure relating to any defects in the MyFord Touch system.  Had Ford disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with MyFord Touch, or would have paid less for the vehicle.

90.     Unbeknownst to Plaintiff Creed, at the time he purchased the vehicle, the MyFord Touch system installed in his vehicle suffered from defects which diminished the value of his vehicle and caused him future attempted repairs.  Ford knew about these defects, but did not disclose the defects to Plaintiff Creed, so Plaintiff Creed purchased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

91.     The problems with Plaintiff Creed's MyFord Touch system began almost immediately following his purchase of the Vehicle.  The problems he experienced include, but are not limited to, problems with the speech/voice recognition features, problems with the navigation system, and problems connecting his iPhone 4S to the MyFord Touch system.

92.     Plaintiff Creed first took his vehicle to Drum Hill Ford on or about April 12, 2011, specifically to have the problems with the MyFord Touch in his vehicle addressed.  The system in

- 22 -

1    his vehicle showed an "SD Card Failure."  The technicians at Drum Hill Ford tested the system and

2    performed a master reset.  The master reset was not successful and the problems with the MyFord

3    Touch continued to plague Plaintiff Creed's vehicle.

4          93.     On or about April 4, 2012, Plaintiff Creed presented his vehicle to Bonnell Ford, an

5    authorized Ford dealership in Winchester, Massachusetts.  Bonnell performed recall 11A028 which

6    included reprogramming the APIM with navigation.  Plaintiff Creed continued to experience

7    problems with the MyFord Touch system in his vehicle.

8          94.     On or about April 26, 2012, Plaintiff Creed took his vehicle to Drum Hill Ford

9    because, *inter alia*, the radio would not shut off after making a call.  Furthermore, the vehicle's

10   radio would turn on by itself.  The technician reset the APIM module and, once again, performed a

11   master reset.  The master reset was not successful and the problems with the MyFord Touch

12   continued to plague Plaintiff Creed's vehicle.

13         95.     On or about May 16, 2012, Plaintiff Creed once again took his vehicle to Drum Hill

14   Ford because, *inter alia*, and as in April of 2012, the radio in his vehicle would not shut off after

15   making a call.  Furthermore, the vehicle's radio would turn on by itself.  The touch screen would

16   also freeze or read the radio was on but there was no audio.  The technician reset the APIM module

17   and, once again, performed a master reset.  Once again, the master reset was not successful and the

18   problems with the MyFord Touch continued to plague Plaintiff Creed's vehicle.

19         96.     On or about May 23, 2012, Plaintiff Creed took his vehicle to Drum Hill Ford stating

20   that, when using a USB in the system, there was no audio when switching back to radio.  The

21   technician reset the APIM module and performed a master reset.  Plaintiff Creed continued to

22   experience problems with the MyFord Touch system in his vehicle.

23         97.     On or about November 1, 2012, Plaintiff Creed returned to Drum Hill Ford because,

24   among other issues, the audio from the MyFord Touch system in his vehicle was distorted and the

25   system failed to understand commands.  The technician replaced the APIM module and loaded the

26   newest software.  Despite replacement of the APIM, Plaintiff Creed continued to experience

27   problems with the MyFord Touch system in his vehicle.

28

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                                                CASE NO. 13-CV-3072-EMC

98.     On or about November 27, 2012, Plaintiff Creed again experienced issues with the MyFord Touch system in his vehicle including, but not limited to, the radio coming on after canceling a phone call.  Also, the radio and/or MP3 player would begin to play after the vehicle was started without a command from the operator.  The Drum Hill Ford technician installed an updated A4 SD card and software.  This repair did not resolve the problems with the MyFord Touch system in Plaintiff Creed's vehicle.

99.     On or about January 22, 2013, Plaintiff Creed returned to Drum Hill Ford because, among other issues, the SYNC Travel Link would not load.  The technician performed an APIM VIP reconfiguration and follow-up testing.  Plaintiff Creed continued to experience problems with the MyFord Touch system in his vehicle.

100.    The MyFord Touch system has rendered Plaintiff Creed's vehicle unsafe to drive because Plaintiff Creed has found that he is distracted while driving, as he has to continually take his eyes off the road to see why the MyFord Touch system is not working on his vehicle.

101.    In or about July 2013, Plaintiff Creed received a notice from Ford, claiming that another software update, MyFord Touch software version 3.6, will be available for download from Ford's website in August 2013.

102.    In August 2013, Plaintiff Creed downloaded his third update from Ford.  Following the download, Plaintiff Creed continued to experience problems with the MyFord Touch system.

103.    On or about August 28, 2013, Plaintiff Creed returned to Drum Hill Ford because, among other issues, a low volume static/squeal occurred on some phone calls, the temperature control was very slow to respond (sometimes taking ½ hour to work properly), the fan motor would not function at the "high" speed setting, and the Travel Link was unreasonably slow to load.  The Ford technician again performed a master reset.  Plaintiff Creed continued to experience problems with the MyFord Touch system in his vehicle.

104.    In or about January 6, 2015, Plaintiff Creed traded in his vehicle at Herb Chamber's Honda in Burlington, Massachusetts.  As of the date of his trade in, Plaintiff Creed continued to experience a low volume static squeal type noise occurring on some phone calls.  The vehicle's Travel Link and navigation also continued to be unreasonably slow to load.

- 24 -

105.    Plaintiff Creed has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to the diminished value of his vehicle.

106.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Creed of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

107.    On or about January 4, 2013, Plaintiff Creed contacted the Better Business Bureau ("BBB") in order to initiate a lemon law proceeding against Ford.  At this time, Plaintiff Creed's vehicle had approximately 53,400 miles on the odometer.  Plaintiff Creed formally submitted his BBB claim on January 14, 2013.  On January 15, 2013, the BBB rejected Plaintiff Creed's claim and informed him that his vehicle exceeded the mileage limitation for filing a BBB claim.

108.    Plaintiff Creed sent Ford an S93A pre-suit letter thirty days prior to the filing of the First Amended Class Action Complaint.

**6.    New Jersey**

      **a.    Joshua Matlin**

109.    Plaintiff Joshua Matlin ("Plaintiff Matlin") is an individual residing in Wood-Ridge, New Jersey at the beginning of this lawsuit and it is still his permanent residence.  On October 28, 2010, Plaintiff Matlin leased a 2011 Ford Edge SE equipped with MyFord Touch from Freehold Ford, an authorized Ford dealer based in Freehold, New Jersey.  Unknown to Plaintiff Matlin, at the time he leased his vehicle, the MyFord Touch installed in his vehicle suffered from defects which have caused out-of-pocket loss associated with the MyFord Touch system defect.  Ford knew about these defects, but did not disclose the defects to Plaintiff Matlin, so Plaintiff Matlin leased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

110.    At all pertinent times, although Plaintiff Matlin maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

111.    The Ford Edge leased by Plaintiff Matlin came equipped with MyFord Touch.  Shortly after leasing his vehicle, Plaintiff Matlin experienced problems with his MyFord Touch system.  The problems Plaintiff Matlin has experienced with his MyFord Touch system were so

- 25 -

1   frequent and pervasive, Plaintiff Matlin has taken his vehicle in for service to Freehold Ford and

2   Jersey City Ford (an authorized Ford dealership in Jersey City, New Jersey) on at least four separate

3   occasions following the commencement of his lease.  Issues that Plaintiff Matlin experienced,

4   include, but are not limited to: constant freezing of the system, random system crashes, backup

5   camera freezes, loss of radio presets, loss of climate control, inconsistent Bluetooth pairing with

6   phone.  The technicians at Freehold Ford were never able to resolve the issues Plaintiff Matlin

7   experienced with MyFord Touch.  During the many service visits made by Plaintiff Matlin, he was

8   unable to use his vehicle.

9          112.    Plaintiff Matlin saw advertisements for and representations made by Ford about

10  MyFord Touch, including television, print media, and on the internet.  Such materials touted the

11  innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the

12  safety of the vehicle.  Plaintiff Matlin was persuaded by these materials and leased his Ford Edge

13  based on the benefits offered by MyFord Touch.  None of these publications contained any

14  disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff

15  Matlin viewed disclosed that the MyFord Touch in his vehicle suffered from numerous defects

16  which would prevent the full use of his vehicle and pose safety risks, he would not have leased his

17  vehicle with MyFord Touch, or would have paid less for his vehicle.

18         113.    At all pertinent times Plaintiff Matlin has maintained his vehicle as recommended by

19  Ford.

20         114.    Plaintiff Matlin has suffered an ascertainable loss as a result of Ford's omissions

21  associated with the MyFord Touch system, including but not limited to out-of-pocket loss

22  associated with the MyFord Touch system defect alleged herein and future attempted repairs, and

23  diminished value of his vehicle.  Ultimately, the problems experienced by Plaintiff Matlin with his

24  MyFord Touch were so pervasive, he terminated his lease early suffering a loss of over $3500.

25         115.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

26  Matlin of the existence of the MyFord Touch system's defect and/or defective design prior to

27  purchase.

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                          CASE NO. 13-CV-3072-EMC

1

          **b.    Russ Rizzo**

2        116.    Plaintiff Russ Rizzo ("Plaintiff Rizzo") is an individual residing in Holmdel, New

3    Jersey.  In February 2012, Plaintiff Rizzo leased a new 2012 Ford Explorer XLT 4 Wheel Drive

4    from Tom's Ford, an authorized Ford dealer in Keyport, New Jersey.  Unknown to Plaintiff Rizzo at

5    the time he leased his vehicle, the MyFord Touch installed in his vehicle suffered from defects

6    which have caused him out-of-pocket loss associated with the MyFord Touch system defect and

7    diminished the value of his vehicle.  Ford knew about these defects, but did not disclose the defects

8    to Plaintiff Rizzo, so Plaintiff Rizzo leased his vehicle on the reasonable, but mistaken, belief that

9    his vehicle would be safe and reliable.

10       117.    At all pertinent times, although Plaintiff Rizzo maintained his vehicle as

11   recommended by Ford, the defects with the MyFord Touch system continued to plague his vehicle

12   up to and including July 22, 2014, the date on which he terminated his lease.  Plaintiff Rizzo

13   terminated his lease early due substantially, if not exclusively, to the defective MyFord Touch

14   system installed in his Explorer, and was charged $718.39 by Ford as a result.

15       118.    The Ford Explorer XLT 4 Wheel Drive leased by Plaintiff Rizzo came equipped with

16   MyFord Touch.  Almost immediately following the lease date of his vehicle, Plaintiff Rizzo

17   experienced problems with his MyFord Touch system.  Since the date of the lease of his vehicle, the

18   problems he has experienced with his MyFord Touch system are so frequent and pervasive, he is not

19   able to determine the precise dates he has experienced such problems.  Issues that Plaintiff Rizzo

20   experienced include but are not limited to:  system lockup and total system failure; periodic non-

21   responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-

22   responsiveness to voice commands.  Plaintiff Rizzo's MyFord Touch system crashed frequently, at

23   times displaying an error reading, "desktop EXE critical error," and needed to shut down.  Further,

24   Plaintiff Rizzo's rearview camera, which is routed through the MyFord Touch system, periodically

25   failed to display what is behind Plaintiff Rizzo's vehicle when he shifted into reverse.

26       119.    Plaintiff Rizzo took his Ford Explorer XLT 4 Wheel Drive into service at Tom's

27   Ford on no less than twenty occasions specifically to have his vehicle serviced to address issues

28   with MyFord Touch.  The technicians at Tom's Ford were never able to resolve the issues with

                                          - 27 -

MyFord Touch.  Dealership personnel told Plaintiff Rizzo that, when the MyFord Touch system freezes up or crashes, Plaintiff Rizzo should pull his vehicle to the side of the road, shift into park, turn the engine off, open the door, close the door, wait a minute, and then turn the vehicle on again. When the MyFord Touch screen initiates, it displays a message saying, "performing system maintenance."  This procedure did not correct the errors Plaintiff Rizzo has experienced.  During the many service visits made by Plaintiff Rizzo, he was unable to use his vehicle.

120.     Plaintiff Rizzo initiated a lemon law claim with Ford's Consumer Affairs Division. On August 5, 2013, Plaintiff Rizzo was informed that his lemon law claim had been decided in Ford's favor.

121.     Prior to leasing his vehicle, Plaintiff Rizzo saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff Rizzo cannot recall the exact language from the various publications, he recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Rizzo viewed disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have leased his vehicle with MyFord Touch, or would have paid less for his vehicle.

122.     At all pertinent times Plaintiff Rizzo has maintained his vehicle as recommended by Ford.

123.     Plaintiff Rizzo has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of his vehicle, as well as the fee of $718.39 imposed by Ford due to Plaintiff Rizzo's early termination of his lease.

124.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Rizzo of the existence of the MyFord Touch system's defect and/or defective design prior to his agreement to lease his vehicle.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                          CASE NO. 13-CV-3072-EMC

**7.      New York**

        **a.      Jeffrey Miller**

125.     Plaintiff Jeffrey Miller ("Plaintiff Miller") is an individual residing in Cortlandt Manor, New York.  On February 17, 2013, Plaintiff Miller leased a 2013 Ford Fusion Titanium equipped with MyFord Touch from Park Ford, an authorized Ford and Lincoln dealer based in Mahopac, New York.  Plaintiff Miller still leases this vehicle.  Unknown to Plaintiff Miller, at the time he leased his vehicle, the MyFord Touch installed in his vehicle suffered from defects which have caused out-of-pocket loss associated with the MyFord Touch system defect, future attempted repairs, and diminished value of his vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff Miller, so Plaintiff Miller leased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

126.     At all pertinent times, although Plaintiff Miller maintained his vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

127.     The Ford Fusion leased by Plaintiff Miller came equipped with MyFord Touch. Shortly after leasing his vehicle, Plaintiff Miller experienced problems with his MyFord Touch system.  The problems Plaintiff Miller has experienced include, but are not limited to:  inability to pair the system to his mobile device and, when the phone does pair, the system will disconnect the phone without warning; unresponsive navigation system; and failure to play music through the USB drive.  Plaintiff Miller testified at his deposition that he notified the sales manager, the concierge and Mr. Nick D'Andrea at Park Ford of problems he was experiencing with the MyFord Touch system on multiple occasions but they failed to address his concerns.  *See* Miller Tr. 209:15-22.  He also testified that as a result of these issues, he is unable to utilize the many features that Ford claims the MyFord Touch system provides.  In or around August 2013, Plaintiff Miller installed an update to his MyFord Touch system, installing version 3.6.2; however, the updates have failed to correct the problems he experiences with MyFord Touch.

128.     Plaintiff Miller saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet and believed that MyFord Touch offered the most integrated and comprehensive system for various infotainment functions of

- 29 -

1    any vehicle manufacturer.  Such materials touted the innovative nature of MyFord Touch, how it

2    would enhance the driving experience, and increase the safety of the vehicle, and depicted real

3    people utilizing the system and acting "amazed" at the functionality of the system.  Although

4    Plaintiff Miller was aware of some mixed reviews of MyFord Touch, he was informed by the sales

5    representatives at Park Ford of Mahopac that Ford had corrected many of the defects in MyFord

6    Touch.  Had any materials Plaintiff Miller viewed disclosed that the MyFord Touch system in his

7    vehicle would suffer from numerous defects which would prevent the full use of his vehicle and

8    pose safety risks, he would not have leased his vehicle with MyFord Touch, or would have paid less

9    for his vehicle.

10            129.    At all pertinent times Plaintiff Miller has maintained his vehicle as recommended by

11    Ford.

12            130.    Plaintiff Miller has suffered an ascertainable loss as a result of Ford's omissions

13    and/or misrepresentations associated with the MyFord Touch system, including, but not limited to,

14    out-of-pocket loss associated with the MyFord Touch system defect alleged herein and future

15    attempted repairs, and diminished value of his vehicle.

16            131.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

17    Miller of the existence of the MyFord Touch system's defect and/or defective design prior to

18    purchase.

19            **b.      Nuala Purcell**

20            132.    Plaintiff Nuala Purcell ("Plaintiff Purcell") is an individual residing in Yonkers,

21    New York.  In November 2010, Plaintiff Purcell leased a new 2011 Ford Edge from Schultz Ford,

22    an authorized Ford dealer in Nanuet, New York.  Unknown to Plaintiff Purcell at the time she leased

23    her vehicle, the MyFord Touch installed in her vehicle suffered from defects which have caused her

24    out-of-pocket loss associated with the MyFord Touch system defect and diminished the value of her

25    vehicle.  Ford knew about these defects, but did not disclose the defects to Plaintiff Purcell, so

26    Plaintiff Purcell leased her vehicle on the reasonable, but mistaken, belief that her vehicle would be

27    safe and reliable.

28

- 30 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                            CASE NO. 13-CV-3072-EMC

133.    At all pertinent times, although Plaintiff Purcell maintained her vehicle as recommended by Ford, the defects with the MyFord Touch system continue to plague her vehicle.

134.    The Ford Edge leased by Plaintiff Purcell came equipped with MyFord Touch. Almost immediately following the lease date of her vehicle, Plaintiff Purcell experienced problems with her MyFord Touch system.  Since the date of the lease of her vehicle, the problems she has experienced with her MyFord Touch system are so frequent and pervasive, she is not able to determine the precise dates she has experienced such problems.  Issues that Plaintiff Purcell experienced include but are not limited to:  system lockup and total system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-responsiveness to voice commands.  Plaintiff Purcell experienced phone and peripheral device connectivity problems every day (the MyFord Touch system would not recognize the devices and had to be rebooted, for example).  The radio and audio functions routed through MyFord Touch failed to operate properly, failing to respond to touch, steering wheel, and voice commands, and remaining stuck on a certain radio station, or changing stations randomly.  The GPS navigation routed through Plaintiff Purcell's MyFord Touch system similarly failed to operate properly.

135.    Plaintiff Purcell took her Ford Edge into service at Scarsdale Ford, another authorized Ford dealer, on no less than five occasions specifically to have her vehicle serviced to address issues with MyFord Touch.  The technicians at Scarsdale Ford were never able to resolve the issues with MyFord Touch.  During the many service visits made by Plaintiff Purcell, she was unable to use her vehicle.

136.    Plaintiff Purcell saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff Purcell cannot recall the exact language from the various publications, she recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Purcell viewed disclosed that the MyFord Touch system in her vehicle suffered from numerous defects which would prevent her full

THIRD AMENDED CLASS ACTION COMPLAINT

1  use of her vehicle and pose safety risks, she would not have leased her vehicle with MyFord Touch,

2  or would have paid less for her vehicle.

3      137.    At all pertinent times Plaintiff Purcell has maintained her vehicle as recommended

4  by Ford.  Plaintiff Purcell returned her vehicle in April 2013, after the expiration of her lease.

5      138.    Plaintiff Purcell has suffered an ascertainable loss as a result of Ford's omissions

6  associated with the MyFord Touch system, including but not limited to out-of-pocket loss

7  associated with the MyFord Touch system defect alleged herein and the diminished value of her

8  vehicle.

9      139.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

10  Purcell of the existence of the MyFord Touch system's defect and/or defective design prior to her

11  agreement to lease the vehicle.

12      **8.    North Carolina**

13          **a.    Daniel Fink**

14      140.    Plaintiff Daniel Fink ("Plaintiff Fink") is an individual residing in Raleigh, North

15  Carolina.  In December 2012, Plaintiff Fink purchased a new 2013 Ford Explorer from Dunn Ford,

16  an authorized Ford dealer in Dunn, North Carolina.  Plaintiff Fink purchased, and still owns, this

17  vehicle.  Unknown to Plaintiff Fink at the time he purchased his vehicle, the MyFord Touch system

18  installed in his vehicle suffered from defects which have caused him out-of-pocket loss associated

19  with the MyFord Touch system defect and diminished the value of his vehicle.  Ford knew about

20  these defects, but did not disclose the defects to Plaintiff Fink, so Plaintiff Fink purchased his

21  vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

22      141.    At all pertinent times, although Plaintiff Fink maintained his vehicle as

23  recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

24      142.    The Ford Explorer purchased by Plaintiff Fink came equipped with MyFord Touch.

25  Almost immediately following the purchase date of his vehicle, Plaintiff Fink experienced problems

26  with his MyFord Touch system.  Since the date of the purchase of his vehicle, the problems he has

27  experienced with his MyFord Touch system are so frequent and pervasive, he is not able to

28  determine the precise dates he has experienced such problems.  Issues that Plaintiff Fink

- 32 -

experienced include but are not limited to:  system lockup and total system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-responsiveness to voice commands.  Plaintiff Fink's MyFord Touch system exhibits a number of malfunctions, including system lock-up, failure to provide GPS navigation, rearview camera lock-up (occasionally, the rearview camera will emit shrill beeps indicating that something is very close to the rear of the vehicle, when nothing is there), and failure to respond to touch commands.  When the system locks up, the MyFord Touch screen goes blank or displays an error code, and Plaintiff Fink cannot utilize the rearview camera, cannot use the GPS navigation, cannot sync his smartphone or music device with the system, and cannot use the Bluetooth functionality to link his phone with MyFord Touch.

143.    Plaintiff Fink took his Ford Explorer into service at Crossroads Ford, another authorized Ford dealer in Cary, North Carolina, for problems with MyFord Touch and has had the MyFord Touch system's software and hardware upgraded by Ford technicians.  The chip installation and other purported fixes performed by the Ford dealership failed to correct the problems Plaintiff Fink's MyFord Touch system exhibits, and those problems persist.  During the many service visits made by Plaintiff Fink, he was unable to use his vehicle.

144.    Plaintiff Fink saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  Plaintiff Fink took several Ford Explorers for test drives in advance of his purchase.  On one occasion, Plaintiff Fink test drove a Ford Explorer with MyFord Touch at Crossroads Ford in Cary, North Carolina.  The Crossroads Ford salesperson represented that the MyFord Touch system worked well and had full functionality, including a state-of-the-art navigation system, a rearview camera described to Plaintiff Fink as a great safety benefit, and the ability to sync with mobile telephones, including Plaintiff Fink's particular phone.  Although Plaintiff Fink cannot recall the exact language from the various publications he has seen, he recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Fink viewed disclosed that the MyFord Touch in his vehicle suffered

- 33 -

1    from numerous defects which would prevent his full use of his vehicle and pose safety risks, he

2    would not have purchased his vehicle with MyFord Touch, or certainly would not have paid as

3    much as he did for his vehicle.

4         145.    At all pertinent times Plaintiff Fink has maintained his vehicle as recommended by

5    Ford.

6         146.    Plaintiff Fink has suffered an ascertainable loss as a result of Ford's omissions

7    associated with the MyFord Touch system including, but not limited to, out-of-pocket loss

8    associated with the MyFord Touch system defect alleged herein and the diminished value of his

9    vehicle.

10        147.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

11   Fink of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

12        **9.    Ohio**

13             **a.    Jerome Miskell**

14        148.    Plaintiff Jerome Miskell ("Plaintiff Miskell") is an individual residing in Mentor,

15   Ohio.  On March 7, 2013, Plaintiff Miskell purchased a new 2013 Ford Escape equipped with

16   MyFord Touch from Klaben Ford, an authorized Ford dealer in Kent, Ohio.  Plaintiff Miskell still

17   owns this vehicle.  Plaintiff Miskell learned about the MyFord Touch system from Ford television

18   commercials featuring celebrity spokesperson Mike Rowe, internet websites (including Ford.com),

19   and print advertisements.  Unknown to Plaintiff Miskell at the time he purchased his vehicle, the

20   MyFord Touch installed in his vehicle suffered from defects which have caused him out-of-pocket

21   loss associated with the MyFord Touch system defect and diminished the value of his vehicle.  Ford

22   knew about these defects, but did not disclose the defects to Plaintiff Miskell, so Plaintiff Miskell

23   purchased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and

24   reliable.

25        149.    At all pertinent times, although Plaintiff Miskell maintained his vehicle as

26   recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

27        150.    The Ford Escape purchased by Plaintiff Miskell came equipped with MyFord Touch.

28   Almost immediately following the purchase date of his vehicle, and no later than April 20, 2013,

- 34 -

THIRD AMENDED CLASS ACTION COMPLAINT

1    Plaintiff Miskell experienced problems with his MyFord Touch system.  Since the date of the

2    purchase of his vehicle, the problems he has experienced with his MyFord Touch system are so

3    frequent and pervasive, he is not able to determine the precise dates he has experienced such

4    problems.  Issues that Plaintiff Miskell experienced include but are not limited to:  system lockup

5    and total system failure; periodic non-responsiveness to peripheral devices (such as Plaintiff

6    Miskell's Apple iPhone 4S and iPhone 5S devices); GPS system failure and excessive delay or lag

7    time (*e.g.*, 5-10 minute wait to calculate directions, often resulting in completely inoperable GPS);

8    and periodic non-responsiveness to voice commands.  Plaintiff Miskell's MyFord Touch system

9    exhibits a number of malfunctions, including system lock-up, failure to provide GPS navigation,

10   and failure to respond to touch commands.  When the system locks up, the MyFord Touch screen

11   goes blank or displays an error code (or a "system maintenance" splash screen), and Plaintiff

12   Miskell cannot use the GPS navigation, cannot sync his smartphone with the system, and cannot use

13   the Bluetooth functionality to link his phone with MyFord Touch.

14          151.    Plaintiff Miskell took his Ford Escape into service at Classic Ford, another

15   authorized Ford dealer in Mentor, Ohio, for problems with MyFord Touch and has had the MyFord

16   Touch system's software and hardware serviced and/or upgraded by Ford technicians.  The system

17   resets, APIM reboots, software upgrades, and other purported fixes performed by the Ford

18   dealership failed to correct the problems Plaintiff Miskell's MyFord Touch system exhibits, and

19   those problems persist.  During the service visits made by Plaintiff Miskell, he was unable to use his

20   vehicle.

21          152.    Plaintiff Miskell saw advertisements for and representations made by Ford about

22   MyFord Touch, including television, print media, and on the internet.  Although Plaintiff Miskell

23   cannot recall the exact language from the various publications he has seen, he recalls the materials

24   touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and

25   increase the safety of the vehicle.  None of these advertisements contained any disclosure relating to

26   any defects in the MyFord Touch system.  Had these materials that Plaintiff Miskell viewed

27   disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would

28

1    prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle

2    with MyFord Touch, or would have paid less for his vehicle.

3           153.    Plaintiff Miskell has suffered an ascertainable loss as a result of Ford's omissions

4    associated with the MyFord Touch system including, but not limited to, out-of-pocket loss

5    associated with the MyFord Touch system defect alleged herein and the diminished value of his

6    vehicle.

7           154.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

8    Miskell of the existence of the MyFord Touch system's defect and/or defective design prior to

9    purchase.

10          **10.    Texas**

11                  **a.    Jose Randy Rodriguez**

12          155.    Plaintiff Jose Randy Rodriguez ("Plaintiff Rodriguez") is an individual residing in

13   Harlingen, Texas.  On May 17, 2011, Plaintiff Rodriguez purchased a 2012 Ford Focus Titanium 5

14   door equipped with MyFord Touch from Tipton Ford, an authorized Ford dealer in Brownsville,

15   Texas.  Plaintiff Rodriguez still owns this vehicle.  Plaintiff Rodriguez learned about the MyFord

16   Touch system in Autumn 2010.  In part because he was impressed with the technology associated

17   with MyFord Touch, and believed the system offered a number of attractive features, Mr. Rodriguez

18   pre-ordered in February 2011 a new 2012 Ford Focus equipped with MyFord Touch, several months

19   before the vehicle model was available for purchase.  Unknown to Plaintiff Rodriguez at the time he

20   purchased his vehicle, the MyFord Touch system installed in his vehicle suffered from defects

21   which have caused him out-of-pocket loss associated with the MyFord Touch system defect and

22   diminished the value of his vehicle.  Ford knew about these defects, but did not disclose the defects

23   to Plaintiff Rodriguez, so Plaintiff Rodriguez purchased his vehicle on the reasonable, but mistaken,

24   belief that his vehicle would be safe and reliable.

25          156.    At all pertinent times, although Plaintiff Rodriguez maintained his vehicle as

26   recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

27          157.    The Ford Focus purchased by Plaintiff Rodriguez came equipped with MyFord

28   Touch.  Almost immediately following the purchase date of his vehicle, Plaintiff Rodriguez

- 36 -

1   experienced problems with his MyFord Touch system.  Since the date of the purchase of his vehicle,

2   Plaintiff Rodriguez has taken his Ford Focus in for service at least 6-8 times to Tipton Ford, and

3   also to Boggus Ford in Harlingen, Texas.  Issues that Plaintiff Rodriguez experienced include, but

4   are not limited to:  the Bluetooth audio does not function; system does not connect to mobile phone

5   rendering the hands-free calling feature inoperable; the SYNC system does not respond to

6   commands and freezes up; the system will freeze and reboot without warning; and the GPS is

7   unresponsive.  When the system freezes and/or reboots, it is often while the vehicle is in motion,

8   creating a significant safety hazard.  The problems experienced by Plaintiff Rodriguez with his

9   MyFord Touch system are so pervasive that Plaintiff Rodriguez does not even utilize many of the

10  features of the system since they create dangerous driving conditions.

11          158.    Prior to purchasing his vehicle, Plaintiff Rodriguez saw advertisements for and

12  representations made by Ford about MyFord Touch, including television, print media, and on the

13  internet.  Although Plaintiff Rodriguez cannot recall the exact language from the various

14  publications, he recalls the materials touting the innovative nature of MyFord Touch, how it would

15  enhance the driving experience, and increase the safety of the vehicle.  None of these publications

16  contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials

17  that Plaintiff Rodriguez viewed disclosed that the MyFord Touch system in his vehicle suffered

18  from numerous defects which would prevent the full use of his vehicle and pose safety risks, or had

19  the Ford salespersons informed him of the same, he would not have purchased his vehicle with

20  MyFord Touch, or would have paid less for his vehicle.

21          159.    At all pertinent times Plaintiff Rodriguez has maintained his vehicle as recommended

22  by Ford.

23          160.    Plaintiff Rodriguez has suffered an ascertainable loss as a result of Ford's omissions

24  associated with the MyFord Touch system, including but not limited to out-of-pocket loss

25  associated with the MyFord Touch system defect alleged herein and the diminished value of his

26  vehicle.

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

1     161.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

2    Rodriguez of the existence of the MyFord Touch system's defect and/or defective design prior to his

3    agreement to purchase his vehicle.

4     162.    Plaintiff Rodriguez also purchased a 2012 Ford Explorer on December 12, 2011.

5    Plaintiff Rodriguez purchased the Ford Explorer for the exclusive use of his sister and her family,

6    and therefore never took possession of the vehicle himself.  Plaintiff Rodriguez has driven the Ford

7    Explorer less than 5 times since purchasing the vehicle, the most recent time being sometime in

8    2013.  He also recalls attempting to connect one Samsung Galaxy S and one Samsung Galaxy S2,

9    sometime around the time of purchase.  He experienced intermittent connectivity and was unable to

10   sync his files on those two occasions.  Plaintiff Rodriguez's sister has told him that she experiences

11   problems with her Sirius satellite radio and her FM radio presets in the 2012 Ford Explorer.

12    163.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

13   Rodriguez of the existence of the MyFord Touch system's defect and/or defective design prior to his

14   agreement to purchase his vehicle.

15                               **b.     Michael Ervin**

16    164.    Plaintiff Michael Ervin ("Plaintiff Ervin") is an individual residing in Deer Park,

17   Texas.  On or about October 14, 2012, Plaintiff Ervin purchased a new 2013 Ford C-Max SEL from

18   AC Collins Ford, an authorized Ford dealer in Pasadena, Texas.  Plaintiff Ervin no longer owns this

19   vehicle.  Unknown to Plaintiff Ervin at the time he purchased his vehicle, the MyFord Touch system

20   installed in his vehicle suffered from defects which have caused him out-of-pocket loss associated

21   with the MyFord Touch system defect and diminished the value of his vehicle.  Ford knew about

22   these defects, but did not disclose the defects to Plaintiff Ervin, so Plaintiff Ervin purchased his

23   vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

24    165.    At all pertinent times, although Plaintiff Ervin maintained his vehicle as

25   recommended by Ford, the defects with the MyFord Touch system continued to plague his vehicle

26   throughout the duration of his ownership.

27    166.    The Ford C-Max SEL purchased by Plaintiff Ervin came equipped with MyFord

28   Touch.  Almost immediately following the purchase date of his vehicle, Plaintiff Ervin experienced

- 38 -

1    problems with his MyFord Touch system.  Since the date of the purchase of his vehicle, the

2    problems he has experienced with his MyFord Touch system are so frequent and pervasive, he is not

3    able to determine the precise dates he has experienced such problems.  Issues that Plaintiff Ervin

4    experienced included but were not limited to:  system lockup and total system failure; periodic non-

5    responsiveness to peripheral devices (such as MP3 players and smartphones); and periodic non-

6    responsiveness to voice commands.  His MyFord Touch system frequently crashed and frequently

7    provided messages about performing scheduled system maintenance while crashing.  The system

8    routinely failed to power on once the vehicle was started.  While operating the vehicle, the MyFord

9    Touch system occasionally activated the rearview camera when the vehicle was not in reverse.

10   Plaintiff Ervin's MyFord Touch system regularly failed to respond to voice and touch commands.

11   Further, Plaintiff Ervin's MyFord Touch system failed to sync with his Windows phone and its

12   connection to his phone would break several times per day.

13           167.    Plaintiff Ervin took his Ford C-Max SEL into service at AC Collins Ford on no less

14   than six occasions specifically to have his vehicle serviced to address issues with MyFord Touch.

15   The technicians at AC Collins Ford were never able to resolve the issues with MyFord Touch.

16   During the many service visits made by Plaintiff Ervin, he was unable to use his vehicle.  Plaintiff

17   Ervin sold his Ford C-Max SEL at a loss of approximately $8000 as a result of his inability to

18   correct the MyFord Touch problems, which rendered the vehicle unsafe.

19           168.    Prior to purchasing his Ford C-Max SEL, Plaintiff Ervin saw advertisements for and

20   representations made by Ford about MyFord Touch, including television, print media, and on the

21   internet.  Although Plaintiff Ervin cannot recall the exact language from the various publications, he

22   recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the

23   driving experience, and increase the safety of the vehicle.  None of these publications contained any

24   disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff

25   Ervin viewed disclosed that the MyFord Touch system in his vehicle suffered from numerous

26   defects which would prevent his full use of his vehicle and pose safety risks, he would not have

27   purchased his vehicle with MyFord Touch, or would have paid less for his vehicle.

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                        CASE NO. 13-CV-3072-EMC

1      169.    At all pertinent times Plaintiff Ervin has maintained his vehicle as recommended by

2  Ford.

3      170.    Plaintiff Ervin has suffered an ascertainable loss as a result of Ford's omissions

4  associated with the MyFord Touch system, including but not limited to out-of-pocket loss

5  associated with the MyFord Touch system defect alleged herein and the diminished value of his

6  vehicle.

7      171.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

8  Ervin of the existence of the MyFord Touch system's defect and/or defective design prior to

9  purchase.

10     **11.    Virginia**

11            **a.    Jason Connell**

12     172.    Plaintiff Jason Connell ("Plaintiff Connell") is an individual residing in Alexandria,

13  Virginia at the time of the start of this litigation but now resides in Silver Spring, Maryland.  In

14  October 2010, Plaintiff Connell purchased a 2011 Lincoln MKX equipped with MyFord Touch

15  from World of Ford, an authorized Ford and Lincoln dealer based in Alexandria, Virginia.  Plaintiff

16  Connell experienced a total loss collision with the vehicle in October 2014.  The vehicle was

17  therefore transferred to Plaintiff Connell's insurance company, USAA.  Unknown to Plaintiff

18  Connell, at the time he purchased his vehicle, the MyFord Touch installed in his vehicle suffered

19  from defects which have caused him out-of-pocket loss associated with the MyFord Touch system

20  defect, future attempted repairs, and diminished the value of his vehicle.  Ford knew about these

21  defects, but did not disclose the defects to Plaintiff Connell, so Plaintiff Connell purchased his

22  vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

23     173.    At all pertinent times, although Plaintiff Connell maintained his vehicle as

24  recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

25     174.    The Lincoln MKX purchased by Plaintiff Connell came equipped with MyFord

26  Touch.  Shortly following the purchase of his vehicle, Plaintiff Connell experienced problems with

27  his MyFord Touch system.  The problems Plaintiff Connell has experienced with his MyFord Touch

28  system are so frequent and pervasive, Plaintiff Connell has taken his vehicle in for service to World

- 40 -

of Ford on at least October 11, 2010, December 16, 2010, and September 19, 2013.  Issues that Plaintiff Connell experienced, include, but are not limited to:  the system shuts down and freezes up, and the trunk of the vehicle opens randomly.  The technicians at World of Ford were never able to resolve the issues Plaintiff Connell experienced with MyFord Touch.  During the many service visits made by Plaintiff Connell, he was unable to use his vehicle.

175.    Plaintiff Connell saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet, including statements made by Ford's CEO Alan Mulally concerning the benefits of MyFord Touch.  Such materials touted the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Had these materials that Plaintiff Connell viewed disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would prevent full use of his vehicle and pose safety risks, he would not have purchased his vehicle with MyFord Touch, or certainly would have paid less for his vehicle.

176.    At all pertinent times Plaintiff Connell has maintained his vehicle as recommended by Ford.

177.    Plaintiff Connell has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and future attempted repairs, and diminished value of his vehicle.

178.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Connell of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**b.    Henry Miller-Jones**

179.    Plaintiff Henry Miller-Jones ("Plaintiff Miller-Jones") is an individual residing in Reston, Virginia.  On or about April 20, 2013, Plaintiff Miller-Jones purchased a new 2013 Ford Fusion Titanium AWD from Ted Britt Ford, an authorized Ford dealer in Fairfax, Virginia.  Plaintiff Miller-Jones purchased, and still owns, this vehicle.  Unknown to Plaintiff Miller-Jones at

- 41 -

1    the time he purchased his vehicle, the MyFord Touch installed in his vehicle suffered from defects

2    which have caused him out-of-pocket loss associated with the MyFord Touch system defect and

3    diminished the value of his vehicle.  Ford knew about these defects, but did not disclose the defects

4    to Plaintiff Miller-Jones, so Plaintiff Miller-Jones purchased his vehicle on the reasonable, but

5    mistaken, belief that his vehicle would be safe and reliable.

6          180.    At all pertinent times, although Plaintiff Miller-Jones maintained his vehicle as

7    recommended by Ford, the defects with the MyFord Touch system continue to plague his vehicle.

8          181.    The Ford Fusion Titanium AWD purchased by Plaintiff Miller-Jones came equipped

9    with MyFord Touch.  Almost immediately following the purchase date of his vehicle, Plaintiff

10   Miller-Jones experienced problems with his MyFord Touch system.  Since the date of the purchase

11   of his vehicle, the problems he has experienced with his MyFord Touch system are so frequent and

12   pervasive, he is not able to determine the precise dates he has experienced such problems.  Issues

13   that Plaintiff Miller-Jones experienced include but are not limited to:  system lockup and total

14   system failure; periodic non-responsiveness to peripheral devices (such as MP3 players and

15   smartphones); inability to use Bluetooth features to stream music or other audio; and periodic non-

16   responsiveness to voice and touch commands.  Additionally, Plaintiff Miller-Jones' GPS navigation

17   feature frequently fails to provide accurate directions and misreads his location.

18         182.    Plaintiff Miller-Jones took his Ford Fusion Titanium AWD to Ted Britt Ford on no

19   less than four occasions specifically in relation to issues with MyFord Touch.  On one occasion,

20   Plaintiff Miller-Jones had his vehicle serviced by a Ford repair technician to address MyFord Touch

21   problems, leaving the vehicle overnight.  On other occasions, Plaintiff Miller-Jones was instructed

22   by personnel on the various functions of MyFord Touch, in an attempt by Ford to correct the

23   problems he was experiencing.  Neither the technicians nor the instructional personnel at Ted Britt

24   Ford were ever able to resolve Plaintiff Miller-Jones' issues with MyFord Touch.  During the

25   service visits made by Plaintiff Miller-Jones, he was unable to use his vehicle.

26         183.    Plaintiff Miller-Jones saw advertisements for and representations made by Ford

27   about MyFord Touch, including television, print media, and on the internet.  Although Plaintiff

28   Miller-Jones cannot recall the exact language from the various publications, he recalls the materials

- 42 -

touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle. None of these publications contained any disclosure relating to any defects in the MyFord Touch system. Had these materials that Plaintiff Miller-Jones viewed disclosed that the MyFord Touch in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with MyFord Touch, or would have paid less for his vehicle.

184.    At all pertinent times Plaintiff Miller-Jones has maintained his vehicle as recommended by Ford.

185.    Plaintiff Miller-Jones has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of his vehicle.

186.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Miller-Jones of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**12.    Washington**

      **a.    Leif Kirchoff**

187.    Plaintiff Leif Kirchoff ("Plaintiff Kirchoff") is an individual residing in Bainbridge Island, Washington. On or about February 14, 2013, Plaintiff Kirchoff purchased a new 2013 F-250 from Bickford Ford, an authorized Ford dealer in Snohomish, Washington. Plaintiff Kirchoff purchased, and still owns, this vehicle. Unknown to Plaintiff Kirchoff at the time he purchased his vehicle, the MyFord Touch system installed in his vehicle suffered from defects which have caused him out-of-pocket loss associated with the MyFord Touch system defect and diminished the value of his vehicle. Ford knew about these defects, but did not disclose the defects to Plaintiff Kirchoff, so Plaintiff Kirchoff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

188.    At all pertinent times Plaintiff Kirchoff maintained his vehicle as recommended by Ford, but the defects with the MyFord Touch system continue to plague his vehicle.

- 43 -

189.     The F-250 purchased by Plaintiff Kirchoff came equipped with MyFord Touch with navigation.  Plaintiff Kirchoff began to experience problems with his MyFord Touch system soon after receiving delivery of the vehicle in February 2013.  Since the date of the purchase of his vehicle, the problems he has experienced with his MyFord Touch system are so frequent and pervasive, he is not able to determine the precise dates he has experienced such problems.  Issues that Plaintiff Kirchoff experienced include but are not limited to:  periodic non-responsiveness to peripheral devices; Bluetooth connectivity issues; inability to properly stream music; rear camera connection problems; wrong or missing navigation data; system lockup, and total system failure. Additionally, Plaintiff Kirchoff's GPS navigation feature frequently fails to provide accurate directions and misreads his location.

190.     Plaintiff Kirchoff took his Ford F-250 to Bickford Ford on three occasions and Parr Ford Mazda on one occasion specifically in relation to issues with his MyFord Touch system. During these service visits made by Plaintiff Kirchoff, he was unable to use his vehicle.  Plaintiff Kirchoff also estimates spending approximately 20 hours on the phone with Ford customer service regarding the defects present in his MyFord Touch system.

191.     Plaintiff Kirchoff saw advertisements for and representations made by Ford about MyFord Touch, including television, print media, and on the internet.  He also saw advertisements stating that Ford had made significant upgrades and corrections to the system between the 2012 and 2013 model years. Although Plaintiff Kirchoff cannot recall the exact language from the various publications, he recalls the materials touting the innovative nature of MyFord Touch, how it would enhance the driving experience, and increase the safety of the vehicle.  None of these publications contained any disclosure relating to any defects in the MyFord Touch system.  Although Plaintiff Kirchoff was aware of some mixed reviews of MyFord Touch, he was informed by the sales representatives at Bickford Ford that Ford had made significant improvements to the MyFord Touch system.  Had these materials that Plaintiff Kirchoff viewed disclosed that the MyFord Touch system in his vehicle suffered from numerous defects which would prevent his full use of his vehicle and pose safety risks, he would not have purchased his vehicle with MyFord Touch, or would have paid less for his vehicle.

- 44 -

192.     Plaintiff Kirchoff has suffered an ascertainable loss as a result of Ford's omissions associated with the MyFord Touch system, including but not limited to out-of-pocket loss associated with the MyFord Touch system defect alleged herein and the diminished value of his vehicle. He has also spent approximately 20 hours on the phone with the Ford SYNC support team, diagnosing the problems, documenting several issues, and receiving commitments that those issues would be carefully reviewed by the software team for a future software release.

193.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Kirchoff of the existence of the MyFord Touch system's defect and/or defective design prior to purchase.

**B.     Defendant**

194.     Ford Motor Company is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.  At all times relevant to this action, Ford manufactured, sold, leased, and warranted the Class Vehicles at issue under the Ford and Lincoln brand names throughout the United States.  Ford and/or its agents designed, manufactured, and installed the defective MyFord Touch systems in the Class Vehicles.  Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

**V.     TOLLING OF THE STATUTE OF LIMITATIONS**

195.     Any applicable statute(s) of limitations has been tolled by Ford's knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and the other Class members could not have reasonably discovered the true, latent defective nature of the MyFord Touch system until shortly before this class action litigation was commenced.

196.     Ford was and remains under a continuing duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles, that this defect is a result of Ford's design choices, and that it will require costly repairs, and diminishes the resale value of the Class Vehicles.  As a result of the active concealment by Ford, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

- 45 -

# VI.    FACTUAL ALLEGATIONS

## A.    Ford Introduces and Begins Selling MyFord Touch

197.    MyFord Touch is a factory-installed, integrated in-vehicle communication, navigation, and entertainment system that allows users to use a rearview camera, control vehicle climate, operate adaptive cruise control, receive navigational direction, make hands-free telephone calls, control music, and perform other functions with voice and touch commands.  MyFord Touch also includes 9-1-1 Assist, which automatically contacts emergency personnel with the vehicle's coordinates in case of an accident.  In addition to touchscreen and voice-based commands, MyFord Touch also features a steering wheel control panel.

198.    MyFord Touch technology builds on the foundation laid in an earlier, first generation of the system: Ford SYNC.  Ford SYNC was described as a "factory-installed fully integrated in-vehicle communications system and entertainment system.  SYNC provides drivers with hands-free voice-activated control over mobile phones and digital music players, and automatically connects phones and music players with the in-vehicle microphone and sound system."  Ford designed and developed SYNC with Microsoft and installed the original SYNC system in Ford vehicles in 2007, limited to twelve groups of model year 2008 vehicles in North America.  By the end of 2009, SYNC was available on over 20 of Ford's vehicles, and was an option chosen by approximately 70% of Ford owners.  Ford initially promoted the SYNC system as a product providing drivers with the ability to operate Bluetooth-enabled mobile phones and digital media players in Ford vehicles using voice commands, steering wheel controls, and radio controls.  Later, SYNC software was expanded so text messages received by the driver could be "vocalized" by a digitized female voice named "Samantha" and read aloud through the vehicle's speaker system.  The initial versions of Ford SYNC, however, did not include a touchscreen, like MyFord Touch.

199.    Ford considered SYNC to be a highly successful feature.  According to Ford, the resale value of a Ford vehicle with SYNC was $200 higher than a comparable Ford vehicle without SYNC.  Further, Paul Mascarenas, Ford's Vice President of Engineering for Global Product Development, was quoted as saying, "SYNC is absolutely impacting our top line revenue in terms of improved vehicle sales, net transaction pricing, and incremental revenue from SYNC services …

- 46 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

1   Customers clearly want SYNC and are prepared to pay for it because we delivered great technology

2   at excellent value for the money.  The positive revenue generation is the hard line connection to

3   Ford's corporate business plan."  POPULAR MECHANICS ranked SYNC as the fourth in its 2007 "Top

4   10 Most Brilliant Gadgets" list.[15]

5        200.   In January 2010, hoping to capitalize on the success of SYNC, Ford announced that

6   it would be launching a second generation of SYNC called "MyFord Touch."  MyFord Touch was a

7   much more comprehensive technology which utilized Ford SYNC as the operating system, but

8   included many more features than had been available with the initial versions of Ford SYNC.[16]  It

9   hailed MyFord Touch as an "intuitive driver experience."[17]  MyFord Touch was intended to

10  "redesign the in-car interface, mirroring how consumers interact with most devices in their lives by

11  using touch-sensitive buttons, touch screens, and voice recognition."  The launch of MyFord Touch

12  was also promoted by Ford as a significant reason to purchase a Ford vehicle.

13       201.   At the time of the launch, Ford's CEO Alan Mulally said, referring to MyFord

14  Touch, "this is a reason to buy Ford … It's just smart design.  We think it's a value proposition."[18]

15  With great fanfare, Ford CEO Mulally delivered the keynote address at the Annual Consumer

16  Electronics show in 2010 in Las Vegas specifically to unveil MyFord Touch.

17       202.   With MyFord Touch, Ford aimed to create a technological infotainment system that

18  would be available not only on its higher-end vehicles, but would become the signature feature of

19  all Ford vehicles – a feature that would increase sales of vehicles across the entire range of Ford,

20  and Lincoln products.  At the time Ford unveiled the MyFord Touch, Ford's Vice President for

21  Group Product Development stated, "[d]emocratization of technology is a key aspect of our product

22  plan … With [MyFord Touch], we didn't want to create an upscale electronics package and just put

---

[15] http://en.wikipedia.org/wiki/Ford_SYNC.

[16] http://www.zdnet.com/blog/gadgetreviews/ford-announces-myford-touch-with-dual-4-2-lcds-wi-fi-and-improved-voice-recognition/10838.

[17] http://www.zdnet.com/blog/gadgetreviews/ford-announces-myford-touch-with-dual-4-2-lcds-wi-fi-and-improved-voice-recognition/10838.

[18] http://www.nydailynews.com/news/money/ford-unveils-cool-new-in-car-technology-consumer-electronics-show-article-1.170650.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

1   it on our highest-end vehicles.  This technology will be available across our full range of vehicles:

2   From our affordable small cars to the ultimate Lincoln, we're going to make a premium, appealing

3   and intuitive experience available to everyone," and further described the system's ability to

4   "deliver[] a premium interior experience that will help consumers fall in love with their vehicles

5   again ...."[19]

6   203.    Around the same time, however, Ford developers were grappling with how they

7   could market a product and set of upgrades they knew did not work.  An October 6, 2010 e-mail

8   written by Ford Product Manager, Erin Hortum to the Ford marketing team states: "I've been

9   thinking about your suggestion around how we approach this 'service pack' without making it

10  sound like the car is broken down." (WLN2-40011).  Later on in the e-mail chain the Product

11  Manager notes: "My concern with calling it enhancement is that it's not an enhancement at all. It

12  may also imply that all issues will be fixed when we're sure that they won't be." (WLN2-40010).

13  204.    At the 2010 rollout, only a limited number of Ford vehicles were equipped with

14  MyFord Touch.  But Ford announced its goal that by 2015, at least 80% of Ford vehicles would be

15  equipped with MyFord Touch.[20]  Currently, more than 10 million Ford vehicles contain MyFord

16  Touch.[21]

17  205.    On June 17, 2013, Ford issued a press release titled "SYNC and MyFord Touch Sold

18  on 79 Percent of New Ford Vehicles, New Technology Drives Quality Satisfaction."  Ford

19  announced that, combined, SYNC and MyFord Touch systems are sold on 79 percent of new 2013

20  Ford vehicles.  According to Ford, customers cite to these features as a reason why consumers

21  prefer Ford vehicles over competitors.

22  206.    Ford designed MyFord Touch to manage new technological capabilities in cars, in

23  order to simplify a user's experience with the vehicle and to make it safer.  As Ford's President

24  stated at the time MyFord Touch was rolled out, "[a]s we began developing [MyFord Touch's]

25

26  [19] http://www.gminsidenews.com/forums/f37/ford-announces-myford-touch-technology-87723/.

27  [20] http://www.zdnet.com/blog/gadgetreviews/ford-announces-myford-touch-with-dual-4-2-lcds-wi-fi-and-improved-voice-recognition/10838.

28  [21] http://www.cnet.com/news/ford-sync-3-announced/.

- 48 -

capability, we saw this groundswell of new technology, new functionality and incredible capability opening up to consumers … It was readily apparent that unless we devised an intuitive interface to help drivers manage these capabilities, they could detract – and possibly distract – from the driving experience."[22]

207.    For this state-of-the-art technology, Ford charges a hefty premium.  As a stand-alone option, Ford's suggested retail price for the MyFord Touch system is approximately $1,000. Customers can add further options to their MyFord Touch system – such as GPS navigation capability – by paying additional fees of several hundred dollars.

**B.    The MyFord Touch System**

**1.    MyFord Touch Hardware**.

208.    MyFord Touch consists of two or three LCD screens that provide the gateway between the user and the various technological features that comprise the MyFord Touch system. The following photograph depicts the MyFord Touch system in a Ford vehicle:



209.    The primary centerpiece of MyFord Touch is an eight-inch LCD touchscreen that is located in the center stack, depicted in the photograph below.

[22] http://www.gminsidenews.com/forums/f37/ford-announces-myford-touch-technology-87723/.

- 49 -

1
2
3
4
5
6
7
8
9
10
11
12



13       210.    As can be seen above, the LCD touchscreen interface is divided into four equal-sized

14   sections.  The upper left quarter of the screen is the interface which displays the connection to a

15   user's mobile device, and allows the user to operate a mobile device, including making hands-free

16   telephone calls, reviewing contact information on the mobile device, and other features related to

17   the mobile device.  The lower left quarter of the screen operates the audio system in the vehicle.  It

18   allows the user to access and select various radio stations, or other sources of audio that can be

19   played in the vehicle.  The upper right quarter of the screen permits the user to interface with the

20   vehicles' navigation and GPS technology.  The bottom right quarter of the screen is the interface

21   with the vehicles' climate control system and allows the user to control the climate in the car.  There

22   is also a menu screen, which allows the user to control various aspects of the MyFord Touch

23   system, as well as other features in the vehicle, including cabin lighting, audio settings, and other

24   aspects of the vehicle.

25
26
27
28

211.   The other two LCD interfaces are located to the left and right of the speedometer directly in front of the driver, as depicted in the photograph below.[23]



212.   These two additional interfaces are not touchscreens.  Rather, the user navigates these through a five-way control located on the steering wheel (images of the controls on the steering wheel are contained in the image in paragraph 227 above).  They allow the user to perform some of the same functions that can be performed on the center stack interface, however, on a more limited basis.

**2.      The Operating System Utilized by MyFord Touch**.

213.   MyFord Touch is powered by "Ford SYNC," an operating system that is based on Microsoft's Windows Embedded Automotive operating system.[24]  SYNC operates a number of features that form part of the MyFord Touch system.

---

[23] Some Ford and Lincoln vehicle models, such as the F-250, only have one screen in the gauge cluster.

[24] http://www.zdnet.com/blog/gadgetreviews/ford-announces-myford-touch-with-dual-4-2-lcds-wi-fi-and-improved-voice-recognition/10838.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11 817775 V1                                                                    CASE NO. 13-CV-3072-EMC

214.    The "brain" of the MyFord Touch system is the Accessory Protocol Interface Module ("APIM") also referred to as the "SYNC Module."  The system's APIM interfaces with all vehicle audio sources as well as high-speed and medium-speed vehicle Controller Area Network buses ("CAN").  The following depicts the SYNC module or APIM:



215.    The MyFord Touch system's Microsoft Windows auto-based operating system can also receive software updates through the use of the Class Vehicles' USB ports.

C.      **Ford Promotes MyFord Touch Safety Features**

216.    Ford actively touts the MyFord Touch system's safety features as a reason to buy Ford and to pay the premium charged for the MyFord Touch systems.  For example, on Ford's website for the MFT system (www.ford.com/technology/sync), Ford states that, "SYNC helps you keep your eyes on the road and stay connected to your world."  The website features a video entitled, "SYNC Saved My Life," in which the narrator, reading a letter purportedly sent to Ford by

a consumer, says the following: "SYNC saved my life"; "if SYNC had not dialed 911, I certainly would have perished at the bottom of that river"; "SYNC is there when nobody else is"; and "it gave me my life … that's the ultimate technology."  The video displays the words, "SYNC.  Can call for help, even if you can't."

217.    This automated emergency notification function operates through a MyFord Touch feature called "911 Assist."  According to Ford's website, this feature operates in the following way:  "In the event of an accident in which an airbag deploys or, in certain vehicles, the fuel pump shutoff is activated, 911 Assist with GPS uses a properly paired and connected mobile phone inside the vehicle to make a call directly to a 911 operator and gives emergency responders your exact location."

218.    Ford's promotion of the MyFord Touch system also capitalizes on the recent enactment of distracted driver laws.  Over a dozen states have enacted laws prohibiting the use of hand-held cellular telephones while driving.  The MyFord Touch website (www.ford.com/technology/sync/features/hands-free-calling) promotes its hands-free calling feature as follows: "You never have to miss a call just because you're behind the wheel.  If your phone rings, you can answer with the push of a button, and you can make a call with the sound of your voice."  The website emphasizes the calling ease:  "Calling anyone is as easy as saying his or her name."

219.    Numerous advertisements from MyFord Touch contained similar safety messages such as:

> MyLincoln Touch™
>
> With MyLincoln Touch,™ you can easily control phone, entertainment, climate, and available navigation with intuitive touch controls and voice commands.*
>
> *Driving while distracted can result in loss of vehicle control.  Only use mobile phones/MyLincoln Touch™/other devices, even with voice commands, when it is safe to do so.  Some features may be locked out while the vehicle is in gear.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

220.    Another example of promotion of the safety capabilities of MyFord Touch is in the following advertisement which represents that MyFord Touch is designed to make the "vehicle experience smarter, safer and simpler."






### MyFord Touch

The introduction of MyFord driver connect technology heralds a sweeping redesign in the way drivers interact with their vehicles, focused on making the in-vehicle experience smarter, safer and simpler.  Featuring rich graphic display screens, user-friendly controls and expanded voice commands, MyFord Touch™ offers drivers increased connectivity while fostering a "hands on the wheel, eyes on the road" approach to keeping in touch.

MyFord leverages the company's award-winning SYNC® communications system, making additional vehicle controls voice-accessible while refining the voice recognition technology to make it more intuitive than ever.  As part of MyFord, SYNC has expanded, allowing users to operate additional features like climate controls and audio and navigation systems without their eyes ever leaving the road.  New features like in-car WiFi, HD Radio™ technology and song tagging combined with extensive personalization options help create a rich, custom driving experience for Ford customers.

### Making the desirable affordable

MyFord represents premium technology, but it will not be exclusive to premium products – the system was engineered from the start to be delivered in affordable, high-volume cars and trucks for everyone around the globe.  As new and freshened Ford, Lincoln and Mercury models continue to arrive, all will be outfitted with MyFord driver connect technology.  Across different models, different trim levels, even different countries, drivers immediately will know they're behind the wheel of a Ford vehicle equipped with the technology, safety and convenience features they expect.

### Safety Leadership

Ford's Adaptive Cruise Control and Collision Warning with Brake Support allows drivers to set the vehicle's speed and maintain it without using the accelerator pedal, using radar sensors to detect moving vehicles ahead and warn drivers of collision risks.

Ford has more U.S. government 5-star crash test ratings than any other brand.  Ford's rapid advancement of crash-avoidance and crash-protection technologies continues to build on its leading safety heritage.

In 2009, Ford introduced Adaptive Cruise Control and Collision Warning with Brake Support, and Blind Spot Information System with Cross Traffic Alert.  These technologies help drivers avoid potential collisions by using radar to detect the position of other vehicles and warn the driver with a combination of visual and audio alerts.

Ford announced plans to introduce the world's first automotive inflatable seat belts, combining attributes of traditional safety belts and air bags to provide an added level of crash protection for rear seat passengers.  The device will be an option on the next-generation Ford Explorer that goes into production this year.



Ford Motor Company | 2009 Annual Report        9

- 54 -

221.    The MyFord Touch system also operates the vehicle's backup camera.  Backup cameras are safety features which allow drivers to see what is behind their vehicle as they back up. NHTSA has said that backup cameras could prevent half of the deaths caused by backover accidents.[25]  There is a proposed rule that would require backup cameras in all vehicles in the United States by 2015.[26]

222.    Nowhere in any of these materials does Ford disclose that these purported safety features provided by SYNC may not be operable because of the defects in MyFord Touch.  In fact, because of the defects in MyFord Touch, a dangerous driving condition is created as the vehicle's driver is forced to focus her attention on the malfunctioning MyFord Touch instead of the road.

**D.    Ford Promotes MyFord Touch Communications And Entertainment Features**

223.    In addition to extolling the safety features of MyFord Touch, Ford also promotes various communication and entertainment features of MyFord Touch proclaiming the benefits of the MyFord Touch system and how it purportedly enhances the driving experience in specific ways, including by facilitating hands-free telephone use, providing automatic emergency notification (911 Assist), voice-controlled audio functionality, and a safe and convenient rearview camera system.

224.    For example, regarding Ford's 2012 Edge and Explorer models, Ford distributed the following promotional material which contained the following statement concerning MyFord Touch: "together these [MyFord Touch] elements create an interactive, rich interface that makes the vehicle functions, settings and information easily accessible to the driver through voice, steering wheel controls or with a simple tap on the touchscreen."  The following is a depiction of the advertisement:

---

[25] http://www.autonews.com/article/20130620/OEM11/130629981#axzz2iafFMKVW.
[26] *Id.*

- 55 -



225.   A 2012 advertisement made similar promises with respect to safety:



226.   Nowhere in any of these materials does Ford disclose that MyFord Touch is subject to, among other things, freezing and rebooting while the vehicle is in motion, therefore rendering the features it promotes in this advertisement inoperable.  In fact, because of the defects in MyFord Touch, a dangerous driving condition is created as the vehicle's driver is forced to focus her attention on the malfunctioning MyFord Touch instead of the road.

- 56 -

**E.     Serious Defects Have Plagued MyFord Touch Since Its Introduction**

227.     Since its launch, however, the MyFord Touch system has failed to perform as advertised.  Many of the features advertised as part of the system often fail to perform entirely – especially when the system freezes up or crashes.

228.     In addition, while many of the features of the MyFord Touch system were apparently intended to make the driving experience safer for the vehicle owner, the persistent problems Class Vehicle owners and/or lessees have experienced with MyFord Touch have actually created significant safety risks.  For example, in the event of a malfunction, Class Vehicle owners/lessees are forced to focus on the malfunction while driving or are distracted by the malfunction putting the driver at risk of an accident.  Further, during a MyFord Touch malfunction, a number of crucial vehicle functions bearing directly on safety are rendered inoperable.  For example, the climate controls, including windshield defrosters, as well as rearview cameras (necessary to keep a lookout while driving in reverse), are operated only through the MyFord Touch touchscreen.  When the screen freezes, or the system randomly shuts down, those features are completely inoperable.  At times the audio system turns on at loud volumes startling drivers.  Some drivers have even reported key components of the instrument panel unexpectedly turning to black while driving 60 miles per hour on a freeway.  Such malfunctions put drivers, passengers, other motorists, and pedestrians at substantial risk of injury or death.

229.     Further, the MyFord Touch system's failure to contact 9-1-1 in emergencies as designed (and as advertised) puts drivers and passengers at risk.  Ford has acknowledged that in 9-1-1 testing the GPS provided the wrong coordinates of a vehicle in need of assistance, and first responders were sent tens of miles away from where the vehicle was actually located.

230.     The defective MyFord Touch system also produces substantial and potentially dangerous inconveniences.  As numerous Plaintiffs have alleged, while using certain features in MyFord Touch, such as the GPS navigation technology, the MyFord Touch screen will simply turn off, then turn back on and, when it does, it states that it is "performing scheduled system maintenance."  In the meantime, the user's route that was programmed into the GPS is no longer available and can leave the vehicle owner lost.  Correcting for the error requires the driver to attend

- 57 -

to the GPS rather than the road.  Notably, when this occurs, the system is not performing "scheduled" maintenance; it is simply malfunctioning.

231.   Additionally, because certain crucial vehicle functions, including the rearview camera, are routed through and controlled by MyFord Touch, these features become inoperable when the MyFord Touch system crashes.  Thus, drivers are more likely to collide with other cars or pedestrians when moving in reverse because the rearview camera fails.

232.   Ford has acknowledged these problems by issuing a series of corrective measures but, like the system itself, these measures have also been a failure.

233.   Instead of being fixed, the MyFord Touch system suffers from the following defects:

**Software bugs**, including the following, *inter alia*:

    a.    Deadlocks and task starvations (*i.e.*, MyFord Touch allocates insufficient resources to different tasks, leading to system failure or lock-up).  Deadlock occurs when two or more parts of the software become permanently stuck waiting for each other.  Deadlocks arise between two tasks (or programs), or between two state machines that ordinarily cooperate, if the software is not properly architected.  Relatedly, task starvation occurs when lower priority parts of the software never get a chance to do their jobs because they cannot access a necessary resource, such as a CPU, to run.  Unlike deadlock, task starvation can be temporary and can affect a single task (rather than several, although it may affect several tasks as well).  Task starvation results when a faster processor is needed to properly run the programs, or when tasks are misprioritized by design;

    b.    Buffer and/or stack overflows.  Buffer and stack overflows occur when a program attempts to use more space (or memory) than is available to it by virtue of the data structure;

    c.    Race conditions (including via unprotected singletons and within shared non-reentrant subroutines).  Race conditions occur when two or more tasks or programs both use the same object (*e.g.*, a global variable or a hardware register) without adequate protection against simultaneous use.  Each task or program attempts to draw on the same data, which can corrupt the data;

    d.    Missed real-time deadlines, *e.g.*, as a result of incorrect prioritization of tasks and interrupt service routines.  Software that must not only get the right mathematical answer but also get the right answer on time is "real-time." Missing such deadlines has consequences.  In the MyFord Touch system, an example of a real-time deadline would be in the communication with peripheral devices such as Bluetooth connections to cell phones.  The common reported problem of supported phones not being able to connect could be caused by underlying missed deadlines.  Like task starvation, this occurs when either a faster processor is needed or the tasks are misprioritzed;

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1

e.  Logical errors within individual algorithms, subroutines, and device drivers. Logical errors are software bugs within a single span of code. Programmers make mistakes and not all of those mistakes are detected reliably in testing. For example, a function to compare two numbers and return the larger value might have a bug that only occurs when one of the values is over 1,000,000. That logical error then may cause an observable system crash;

f.  Errors including dead ends in state machines. A dead end in a state machine occurs when the software is not properly designed to handle a particular sequence of events, such as key presses or menu selections, and the system becomes unresponsive, fails to power on, or fails to operate normally; and

g.  Invalid pointer dereferences and related errors in pointer arithmetic. This is a type of memory corruption that leads to random misbehaviors, some of which produce observable symptoms like system crashes or lock-ups.

234.  **Other software and hardware defects**, including inadequate defenses against the following, *inter alia*:

* deadlock, starvation, and/or death of tasks;

* stack overflow;

* memory corruptions, including database corruptions;

* spurious electrical signals, including interrupts;

* invalid or improper messages on the CAN bus;

* stuck memory bits;

* miscalibrated or malfunctioning sensors and actuators: (Sensors such as the camera CCD for the backup camera and for the temperature feedback in the climate control system. Actuators such as window defrosters and climate controls);

* insufficient electrical grounds, *e.g.*, at peripheral connection points and antennae; and

* other electrical/electronic, system, and/or software malfunctions.

235.  All of these software and hardware defects are a result of Ford's inadequate design of the MyFord Touch system and/or of Ford's faulty implementation of the MyFord Touch software in the manufacturing process. Ford also failed to perform adequate safety and performance testing on the MyFord Touch system, which would meaningfully reflect the average consumer's experience with the infotainment system.

236.  The software-related bugs and defects described above resulted from some or all of the following **failures of software process and architecture**:

* inadequate testing, including insufficient unit testing, insufficient integration testing, and insufficient regression testing;

- 59 -

* failure to adopt or enforce software development best practices, including failure to adequately enforce bug-reducing coding rules;

* insufficient use of static analysis tools and peer reviews to find problems before they get into vehicles;

* selection of inappropriate software architectures, such as excessive reliance upon global variables and other shared objects;

* failure to program defensively by, *e.g.*, bounds-checking parameters and handling subroutine return error codes at run-time; and

* use of an insufficient system for logging run-time events to provide necessary information to engineers tasked to resolve issues.

237. ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████

238. ██████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

239. Ford also documented that the company failed to conduct planned testing prior to the launch of the MyFord Touch. ███████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████

- 60 -

1
2
3
4
5
6
7
8
9
10
11
12

13    240.    Further, the effects of these software and hardware bugs and defects were

14  exacerbated by Ford's inexplicable failure to provide users a quick, easy, and reliable way to reboot

15  a malfunctioning MyFord Touch system without first pulling the vehicle off the road and without

16  causing loss of the user's personal data and configuration settings.

17    241.    Ford knew of these defects from as early as the fall of 2009, when the MFT

18  development team catalogued "Experienced periodic desktop.exe crashes in the build, all in

19  different areas, but all may be Nav related."  (WLN2-324811) and "RVC [rear view camera] screen

20  is slow to refresh realtime display and is dropping frames periodically" (WLN2-324812).  Ford also

21  became aware of these defects through the warnings of various Ford employees in charge of the

22  MyFord Touch system, the preliminary testing performed by Ford management lessees and analysis

23  from third-parties brought in specifically to investigate the MyFord Touch system defects.  Not only

24  was Ford aware of these defects throughout the software development and build process, but Ford

25  made the conscious decision to nevertheless install the defective MyFord Touch systems into the

26  Class Vehicles and charge a premium to consumers.

27
28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                              CASE NO. 13-CV-3072-EMC

1    **F.      Ford Issues Multiple Secret TSBs, "Updates," and Warranty Extensions**

2           242.    As Class Vehicle owners' complaints mounted, Ford began to issue Technical

3    Service Bulletins ("TSB") and "updates" in an effort to resolve them.  TSBs are recommended

4    repairs issued by the manufacturer and sent to dealers.  TSBs are issued when a manufacturer

5    receives widespread reports of a particular problem in its vehicles.

6           243.    As early as November 2010, the same time the first MyFord Touch cars were coming

7    off the assembly line, Ford employees were gathering information and deliberating upon whether to

8    issue a TSB or a SSM.  In an e-mail sent to several Ford engineers and dated November 10, 2010

9    has as its subject line "TSB Request for Input: 010-2010-1911: 2011 Edge/MKX With Various

10   Functionality Concern With The MyFord Touch And MyLincoln Touch System.  Some 2011 Ford

11   Edge and Lincoln MKX vehicles may experience various concerns with MyFord Touch and

12   MyLincoln Touch Systems in the following areas:  Travel Direction Information (TDI), Travel Link

13   Unsubscribed, Voice Recognition, Phone Pairing, Information Calling The Wrong Phone Number,

14   Address Book Downloads, Touch Screen Inop Conditions, SD Card Fault, Screen Reboots,

15   Performing System Maintenance, Navigation Set in Kilometers/Voice Communicates in Miles, and

16   Reverse Camera Scrolling Display. To correct this condition the APIM will need to be reflashed."

17   (WLN2-00002019).  It is unclear whether this TSB was ever released to the consumer.

18          244.    On or about April 27, 2011, Ford issued TSB 11-4-18 pertaining to Ford vehicles

19   equipped with MyFord Touch.  In TSB 11-4-18, Ford noted that the MyFord Touch systems

20   installed in Class Vehicles may experience blank screens, missing presets, lack of voice recognition,

21   incorrect dialing of phone numbers, and display problems with the rearview camera.  The TSB

22   directed dealerships to reprogram the software system.

23          245.    On or about July 22, 2011, Ford issued TSB 11-7-24, which superseded TSB 11-4-18.

24   TSB 11-7-24 also pertained to the operation of Ford vehicles equipped with MyFord Touch.

25   Specifically, this TSB explained that Class Vehicles "may experience" various concerns with

26   "blank/black display screen, radio switches from off to on or changes state after ending a phone call

27   or voice command, phone pairing, incorrect Sirius channel selection using voice command, unable

28   to download photo resolution 800x378, phonebook downloads, AM/FM missing preset display

- 62 -

1    information, voice recognition, voice recognition when using SYNC services, USB device detection,

2    travel link download time, Sirius channel art logo mismatch, clock intermittently displays incorrect

3    time, traffic direction and information (TOI) calling wrong phone number, travel link subscription,

4    address book downloads, navigation set in kilometers but voice communicates in miles, and backup

5    camera scrolling display."  TSB 11-7-24 directed the dealership to perform a software update by

6    fully reprogramming the APIM and, if that did not resolve the problem, to replace the APIM.  In

7    addition, the TSB acknowledged an ancillary issue to the various problems experienced by Class

8    members with their MyFord Touch systems.  When a Ford dealership attempts to "fix" the problems

9    with MyFord Touch systems, it usually requires that the system has to be completely reset to the

10   default factory settings.  Thus, all of the user's personal information and preferences will have been

11   deleted from the system and will require the user to again input such information into the system.

12         246.    On March 13, 2012, Ford issued TSB 12-3-11.  This TSB explained that vehicles

13   with MyFord Touch systems built between October 30, 2011 and December 31, 2011, "may exhibit

14   multifunction and infotainment display screens simultaneously going blank, scrambled images,

15   flickering displays.  These conditions will occur on both screens at the same time."

16         247.    In early March 2012, Ford issued what appears to be the first update to MyFord

17   Touch as well as a warranty extension on the SYNC module.  On or about March 6, 2012, Ford

18   initiated Customer Satisfaction Program Campaign 12M01 ("Campaign 12M01") pertaining to Ford

19   vehicles equipped with the MyFord Touch system.  This Campaign explained that certain MY 2011-

20   2012 Explorer, Edge, MKX and MY 2012 Focus vehicles equipped with MyFord Touch may

21   require replacement of the SYNC module, the brain of the MyFord Touch system.  Ford's

22   Campaign 12M01 extended warranty coverage of the APIM to four years of service from the

23   warranty start date on Ford vehicles and five years on Lincoln vehicles, regardless of mileage.  In

24   addition to Campaign 12M01, at or around the same time, Ford initiated a program titled Software

25   Application Upgrade Program 11A01, its first "update" to all Ford vehicle owners with MyFord

26   Touch.  Installation of the upgrade was a requirement to receiving the warranty extension in

27   Campaign 12M01.  According to Ford, "[w]ith this Performance Upgrade, you'll immediately

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                    CASE NO. 13-CV-3072-EMC

1    notice the benefits of a faster system, simpler graphics, easier controls, enhanced voice recognition

2    capability, tablet compatibility and support for Audible.com audiobooks."

3           248.    Internally, however, there was a different conversation.  Gary Jablonsky,

4    Infotainment and Connectivity Engineering Manager, writes an e-mail on August 8, 2011 noting

5    that: "The words Re-Launch are banished.  While the name Re-Launch accurately characterizes the

6    amount of work we are undertaking, it also conveys a negative connotation that we don't want

7    shared outside of the company – so to make sure that doesn't happen we need to change internal

8    speaking immediately. The Re-Launch is now called the 'Performance Upgrade.' 'Re-Launch' is

9    the new 'Voldemort' … his whose name we will not say." (WLN2-360857).  The Performance

10   Upgrade/Re-Launch marketing tactics, however, were essentially moot as this update did not cure

11   the problems experienced by Class members with MyFord Touch.

12          249.    On or about September 1, 2012, Ford issued TSB 12-9-1 relating to MyFord Touch.

13   TSB 12-9-1 explained that Ford vehicles equipped with MyFord Touch "may exhibit concerns with

14   Missing Radio Presets, Radio Stays On, Voice Recognition Inoperative, and Sirius Missing Fuel

15   Prices."

16          250.    On or about November 5, 2012, Ford issued TSB 12-11-1 to address concerns with

17   "navigation, voice recognition, call sound quality, phone pairing and/or system performance" with

18   regard to MyFord Touch.  This TSB superseded TSB 12-9-1.  TSB 12-11-1 provided steps for a full

19   software update of the SYNC module to the latest software version then available, V3.5.1.  Those

20   Class Vehicles equipped with navigation required a new A4 level SD-card for proper navigation

21   function.

22          251.    In connection with TSB 12-11-1, on or about November 8, 2012, Michael A.

23   Berardi, Ford's Director of Service Engineering Operations, sent a letter to all Ford and Lincoln

24   dealers titled "DEMONSTRATION/DELIVERY HOLD Application Performance Upgrade 11A01"

25   ("Campaign 11A01").  The letter described a process to be utilized by Ford dealers on MyFord

26   Touch to "improve overall system functionality, voice recognition, screen refresh rates, response to

27   touch, and to simplify screens for ease of use" due to concerns with "navigation, voice recognition,

28   call sound quality, phone pairing and/or system performance."

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                              CASE NO. 13-CV-3072-EMC

252.    Campaign 11A01 provided steps for a full software update of the SYNC module to the latest software version now available, V3.5.1.  Those Class Vehicles equipped with navigation required a new A4 level SD-card for proper navigation function.

253.    On or about November 15, 2012, Ford issued TSB 12-11-2 because, among other things, vehicles equipped with MyFord Touch, "may exhibit a screen message indicating navigation stopped functioning contact your dealer, GPS has a red strike through X, Navigation unavailable is displayed in the upper right hand corner of the screen …."  To address the problem, Ford instructed technicians to perform a reprogram of the Global Position Satellite Module (GPSM).

254.    On or about January 14, 2013, Michael E. Berardi, Ford's Director of Service Engineering Operations issued Campaign "DEMONSTRATION/DELIVERY HOLD Application Performance Upgrade 12A04" because software was released to "improve overall system functionality and performance including navigation, voice recognition, call sound quality, and phone pairing."  The upgrade contained the latest operating system software – version BB/12285/v 3.5.1.  Upgrade 12A04 instructed Dealers "to inspect the APIM software level and if necessary, reprogram the Accessory Protocol Interface Module…."  If the system was unresponsive, inoperative, or if the vehicle software update was unsuccessful, dealers were instructed to replace the SYNC module.

255.    On or about August 5, 2013, Ford issued TSB 13-8-2 to address "concerns with navigation, voice recognition, call sound quality, phone pairing, clock, media, WiFi pass code entry, and/or system performance."  The TSB instructed dealers to install an update to the "Consumer Interface Processor," updating it to software version 3.6.

256.    On or about October 3, 2013, Ford issued TSB 13-10-6, which superseded TSB 13-8-2.  TSB 13-10-6 was issued to address "concerns with navigation, voice recognition, call sound quality, phone pairing, clock, media, WiFi pass code entry, rear view camera guide lines and/or system performance."  The TSB instructed dealers to install an update to the "Consumer Interface Processor," updating it to software version 3.6.

257.    Despite this almost unprecedented number of TSBs, the MyFord Touch system is still defective.

**G.      Consumer Complaints Document MyFord Touch Defects in Class Vehicles**

        **1.      Consumers Complain On-Line.**

        258.    Plaintiffs' experiences are not isolated or outlying occurrences.  Indeed, the Internet is replete with examples of blogs and other websites where consumers have complained of the exact same defect within the Class Vehicles.

        259.    For example, a website titled "syncsucks.com" lists the following "most common SYNC/MyFord Touch issues," all of which are symptoms of the same defective APIM:

- screen goes black and won't come back on;
- backup camera goes black without warning while backing up;
- SYNC system restarts without warning while driving;
- SYNC system freezes up completely even after the vehicle is turned off;
- says phone connected, yet voice says no phone connected when asking to dial number;
- displays phone is connected, yet after repeated efforts it will not respond to ANY voice command;
- music randomly starts playing while using the phone;
- randomly jumps from audio source to audio source;
- keeps disconnecting USB iPod;
- will not recognize multiple brand-new USB jump drives; and
- never really got to enjoy my six months of satellite radio as SYNC said I had no subscription forcing me to call Sirius multiple times to try and sort that out.[27]

        260.    Another website called "fordsyncproblems.com" was created by a consumer in response to "Ford's inability to resolve issues with my newly purchased 2012 Ford Escape."  The website states that the Escape owner purchased the 2012 Escape "for the specific use and safety for my daily 70 mile commute," but that "[w]hen making a phone call through the SYNC system I can hear the phone conversation clearly through the car speakers BUT the person on the other end of the conversation cannot hear me clearly; it either sounds like I am in a tunnel or it is very choppy.  The

---

[27] http://www.syncsucks.com.

quality of the conversation gets worse as your speed increases."[28]  There are several other similar websites.[29]

### 2.    Consumers Complaints to NHTSA are Evidence of a Widespread Problem.

261.    Likewise, the database maintained by the National Highway Traffic Safety Administration contains dozens of similar consumer complaints, some of which are set forth below:

**Date Complaint Filed:**       11/30/2010
**Date of Incident:**       10/9/2010
**NHTSA ID Number:**       10368439
**Manufacturer:**  Ford Motor Company
**Vehicle Identification Number**: 2FMDK3JC9BB…

THIS CAME WITH THE MYFORD TOUCHSYSTEM WITH SYNC SERVICES. THIS SERVICE HAS YET TO WORK. AFTER HAVING THE DEALER HAVE IT FOR A DAY, THEY COME BACK AND SAY ITS A FORD PROBLEM THAT THEY ARE LOOKING INTO. I CALL SYNC SERVICE AND THEY SAY THE DEALER ONLY HAS TO FLASH THE MEMORY AND THIS WILL FIX IT. THE DEALER DOESN'T HAVE THE TOOLS TO DO THIS YET. I WAS EVEN TOLD TO TAKE IT TO ANOTHER DEALER AND THIS IS HOW I FOUND OUT THEY NEED TO ORDER CABLES. THEY STILL HAVE NOT GOT THESE AND I WAS TOLD EVEN AFTER THEY GET THEM NOW, NOT TO WORK ON ANY VEHICLES TILL FORD GETS A FIX FOR IT. WHY WAS THIS SYSTEM EVEN PUT INTO THE MARKET IF THEY HAVE THESE ISSUES!!

**Date Complaint Filed:** 3/27/2011
**Date of Incident:** 11/20/2010
**NHTSA ID Number:**10393012
**Manufacturer:**  Ford Motor Company
**Vehicle Identification Number**: Not Available

FORD'S SYNC SYSTEM IS A SAFETY HAZARD. IT DOES NOT WORK AS ADVERTISED, CONSTANTLY CRASHES AND IS A GRAVE DISTRACTION FOR DRIVERS.

**Date Complaint Filed**:       8/16/2012

**Date of Incident:** 1/27/2011
**NHTSA ID Number:**10470900
**Manufacturer:**  Ford Motor Company
**Vehicle Identification Number**: 2FMDK3KC5BB…

---

[28] http://fordsyncproblems.com/5001.html.

[29] *See* http://www.fordfusionclub.com/showthread.php?t=413068; http://www.focusfanatics.com/forum/showthread. php?t=260838; and http://jalopnik.com/gm-hasnt-really-found-that-new-thing-yet-for-ford-its-485829232.

I PURCHASED MY 2011 FORD EDGE IN DECEMBER OF 2010 AND HAVE NOT HAD A DAY WHEN THERE HASN'T BEEN A PROBLEM WITH WITH EITHER THE SYNC OR SIRIUS SYSTEM. I HAVE HAD MY AUTO SERVICED SIX SEPARATE TIMES AND STILL HAVE ISSUES. AMONG THESE SIX VISITS, FOUR INVOLVED EITHER RECALLS OR "FULL FLASH REPROGRAMS," IN ADDITION TO THE MAJOR SOFTWARE UPDATE WITH THE USB FORD SENT OUT. CURRENTLY MY RADIO SUDDENLY SWITCHES BANDS, OR PRESETS MALFUNCTION, AND MY RADIO WON'T TURN OFF WITHOUT A COMPLICATED SERIES OF SCREEN ADJUSTMENTS. ALSO WHEN THIS HAPPENS MY MEMORY SEAT FUNCTION IS DISABLED AND NO LONGER WORKS. I CONSIDER THESE PROBLEMS NOT MERELY COSMETIC, BUT FUNCTIONAL SAFETY ISSUES SINCE THE SERVICE DEPARTMENT CANNOT FIGURE OUT HOW THE RADIO/SYNC ISSUES AFFECT THE MEMORY SEAT FUNCTION AND THUS COULD ULTIMATELY AFFECT A MORE CRITICAL AUTO FUNCTION AND THESE OCCUR WHILE DRIVING WHICH HAS CAUSED ME MOMENTARY DISORIENTATION.

**Date Complaint Filed:** 6/12/2011
**Date of Incident:**      3/5/2011
**NHTSA ID Number:**       10406568
**Manufacturer:** Ford Motor Company
**Vehicle Identification Number**: 2FMDK3KC7BB…

THE SYNC SYSTEM IS CONSISTENTLY LOCKING UP, THE MUSIC PLAYS WHEN THE DASHBOARD STATES THE AUDIO IS OFF, WHEN THIS HAPPENS NONE OF THE BUTTONS WORK. I HAVE BEEN PULLING OVER TO THE SIDE OF THE ROAD TO TURN MY VEHICLE OFF, OPEN THE DOOR TO MAKE THE SCREEN CLEAR, THIS DOES NOT WORK. THEN ALL OF A SUDDEN THE SYNC SYSTEM WILL RE-BOOT ITSELF AND THEN IT WORKS AGAIN. THE BLUETOOTH SYSTEM IS ALWAYS DISCONNECTING MY PHONE OR I CALL SOMEONE AND I CAN'T HEAR THEM, TO THE POINT I DON'T EVEN USE THE BLUETOOTH ANYMORE. WHEN THE MOTOR IS SHUT OFF AND YOU OPEN THE VEHICLES DOOR THE SCREEN SHOULD COME UP WITH FORD EMBLEM. THE SYNC SYSTEM LOCKING UP INCIDENT HAS OCCURRED 3 TIMES AND I'M FIXING TO TAKE IT IN AGAIN. IT'S ALWAYS BEEN THE SAME ANSWER THERE WAS AN UPDATE THAT NEEDED TO BE DONE. IT IS FORDS RESPONSIBILITY TO MAKE WHEN A VEHICLE IS SOLD NEW FOR $40K, THAT IT WORKS. OF COURSE I STILL HAVE TO MAKE MY MONTHLY PAYMENT TO FORD, IF THIS CONTINUES I'M GOING TO LOOK INTO THE LEMON LAW BECAUSE THIS IS RIDICULOUS.

**Date Complaint filed:**      12/3/2012
**Date of Incident:**     12/3/2012
**NHTSA ID Number:**      10487021
**Manufacturer:** Ford Motor Company
**Vehicle Identification Number**: Not Available

2011 FORD EXPLORER. CONSUMER WRITES IN REGARDS TO SYNC MALFUNCTION IN VEHICLE. *SMD THE CONSUMER STATED WHEN THE SYSTEM FAILED, THE SCREEN WENT BLACK AND THE RADIO AND TEMPERATURE CONTROL STOPPED WORKING, AS WELL AS OTHER COMPONENTS. THE SYNC HAS BEEN WORKED ON BY THE DEALERSHIP 13 TIMES. ATTACHMENT

- 68 -

**Date Complaint filed:**        12/6/2012
**Date of Incident:**     12/3/2012
**NHTSA ID Number**: 10488263
**Manufacturer:**  Ford Motor Company
**Vehicle Identification Number**: Not Available

2011 FORD EXPLORER. CONSUMER WRITES IN REGARDS TO ISSUES WITH A "MY FORD TOUCH" VOICE ACTIVATED SYSTEM. *TGW THE CONSUMER STATED THE "MY FORD TOUCH" IS A VOICE OR TOUCH SCREEN ACTIVATED SYSTEM THAT CONTROLLED ENTERTAINMENT, CLIMATE, NAVIGATION AND HANDS FREE CELL PHONE FUNCTIONS. WHEN THE SYSTEM STOPPED WORKING, THERE WAS NO CONTROL OVER ANY OF THE AFOREMENTIONED DEVICES. THE CONSUMER HAD TO TAKE THE VEHICLE TO THE DEALER THREE TIMES, BECAUSE OF THE MALFUNCTIONING SYSTEM. A TYPICAL PROBLEM WAS THE SYSTEM LOCKING UP, THE SCREEN WOULD FREEZE AND THERE WAS NO CONTROL OVER THE HEATER/AIR CONDITIONER OR RADIO VOLUME. USUALLY AFTER 10-12 MINUTES THE SCREEN WOULD GO BLANK AND A MESSAGE APPEARED THAT READ PERFORMING SCHEDULE MAINTENANCE.

**Date Complaint Filed**: 7/8/2013
**Date of Incident**: 7/7/2013
**NHTSA ID Number**: 10523680
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: Not Available
**SUMMARY**:
DEAR NHTSA, I HAVE RECENTLY PURCHASED A FORD EXPLORER LIMITED 2013 MODEL ABOUT 3 MONTHS AGO. SINCE I HAVE PURCHASED THIS VEHICLE I HAVE NOTICED THAT THE MYTOUCH SYSTEM HAS CONSTANT GLITCHES AND CAUSING DISTRACTIONS WHILE DRIVING. YESTERDAY I STARTED THE VEHICLE AND THE ENTIRE SCREEN WAS OUT INCLUDING THE BACKUP SENSORS AND CAMERA. I HAVE CONTACTED FORD AND THE DEALERSHIP BUT THEY DO NOT SEEM TO BE VERY RESPONSIVE. I WILL BE TAKING THIS VEHICLE TO THE DEALERSHIP TOMORROW HOWEVER I FIND THIS TO BE A SAFETY ISSUE AS MY WIFE RELIES ON THE CAMERA AND SENSORS WHEN PARKING A VEHICLE.

**Date Complaint Filed**: 6/19/2013
**Date of Incident**: 6/15/2013
**NHTSA ID Number**: 10520751
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2LMDJ8JK9D8…
**SUMMARY**:
VEHICLE STOPPED RECEIVING TRAFFIC INFO ON NAVIGATION SCREEN.  ALL OTHER DATA RECEIVED VIA "SYNC" SYSTEM FROM SIRIUS OPERATING CORRECTLY. DEALER REPLACED COMPUTER MODULE THEY IDENTIFIED AS CONTROLLING THIS FUNCTION.  NO CHANGE IN CONDITION.  PROBLEM ESCALATED TO FORD TECH PEOPLE.  A MONTH AGO, THE RADIO FUNCTIONS FAILED.  IT REQUIRED A SYSTEM UPGRADE.

- 69 -

**Date Complaint Filed**: 4/10/2013
**Date of Incident**: 4/9/2013
**NHTSA ID Number**: 10505787
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2LMDJ6JK0DB…
**SUMMARY**:
WHILE DRIVING ON THE HIGHWAY AT ABOUT 65MPH, THE SYNC SYSTEM SCREEN
WENT BLACK, AFTER ABOUT 5 MINUTES, THE SYSTEM CAME BACK UP. I WAS
UTILIZING THE NAVIGATION SYSTEM AT THE TIME AND WAS FORCED TO STOP, RE-
ENTER THE DETAILS OF THE LOCATION I WAS INTENDED TO VISIT. THE SYNC
SYSTEM SHOULD NEVER JUST RESTART ITSELF WITHOUT WARNING A DRIVER. I AM
CONCERNED THERE IS A MORE SEVERE PROBLEM WITH THE MAIN CONTROL
SYSTEM WITH THIS PARTICULAR VEHICLE AS THREE OTHER ISSUES HAPPENED
WITHIN A WEEK OF EACH OTHER. 1. BLIB MODULE (BLIND SPOT AND CROSS
TRAFFIC SENSORS FAULTED AND NEEDED REPLACEMENT) 2. SYNC SYSTEM
REBOOTS ITSELF WHILE DRIVING AND UTILIZING NAVIGATION 3. LOW PRESSURE
ERROR POPS UP, STEERING BECOMES IMPOSSIBLE, ACCELERATION DIES, AND
BRAKING SLUGGISH. CAR REQUIRED SHUTDOWN AND RESTART TO RESOLVE.

**Date Complaint Filed**: 1/19/2013
**Date of Incident**: 7/11/2012
**NHTSA ID Number**: 10493496
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMCU9H99…
**SUMMARY**:
THE MYFORD TOUCH SYSTEM WITH NAVIGATION IS UNSAFE. DUE TO CONTINUOUS
SOFTWARE AND HARDWARE ERRORS, THE LARGE VIDEO SCREEN IS DISTRACTING
TO THE DRIVER. PHONE DOES NOT SYNC FROM TIME TO TIME, NAVIGATION DOES
NOT ACQUIRE GPS SIGNAL OR VEHICLE POSITION IS INCORRECT. MANY PROBLEMS
WITH BLUETOOTH AND USB INTEGRATION, TOO MANY TO LIST HERE. WHEN
GLITCHES OCCUR, THE SCREEN OFTEN GOES COMPLETELY BLANK, SHOWING
NOTHING AT ALL. I HAVE HAD MY ESCAPE IN FOR SERVICE THREE TIMES FOR
THESE PROBLEMS. MY SPOUSE COMPLAINS WHEN SHE RIDES IN THE CAR THAT I
AM DISTRACTED BY CONTINUOUS ERRORS OF THE MFT DISPLAY. PROBLEMS WITH
MFT SYSTEM HAVE ALSO BEEN NOTED BY CONSUMER REPORTS. I WILL TAKE
ADVANTAGE OF THE LEMON LAW TO CORRECT THIS UNSAFE SITUATION WITH MY
VEHICLE. *TR

**Date Complaint Filed**: 12/6/2012
**Date of Incident**: 12/3/2012
**NHTSA ID Number**: 10488263
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: Not Available
**SUMMARY**:
2011 FORD EXPLORER. CONSUMER WRITES IN REGARDS TO ISSUES WITH A "MY
FORD TOUCH" VOICE ACTIVATED SYSTEM. *TGW THE CONSUMER STATED THE "MY
FORD TOUCH" IS A VOICE OR TOUCH SCREEN ACTIVATED SYSTEM THAT

- 70 -

CONTROLLED ENTERTAINMENT, CLIMATE, NAVIGATION AND HANDS FREE CELL PHONE FUNCTIONS. WHEN THE SYSTEM STOPPED WORKING, THERE WAS NO CONTROL OVER ANY OF THE AFOREMENTIONED DEVICES. THE CONSUMER HAD TO TAKE THE VEHICLE TO THE DEALER THREE TIMES, BECAUSE OF THE MALFUNCTIONING SYSTEM. A TYPICAL PROBLEM WAS THE SYSTEM LOCKING UP, THE SCREEN WOULD FREEZE AND THERE WAS NO CONTROL OVER THE HEATER/AIR CONDITIONER OR RADIO VOLUME. USUALLY AFTER 10-12 MINUTES THE SCREEN WOULD GO BLANK AND A MESSAGE APPEARED THAT READ PERFORMING SCHEDULE MAINTENANCE. WHEN THE SYSTEM WAS FINALLY RESTORED, EVERYTHING WORKED AGAIN. SOMETIMES WHEN USING THE NAVIGATION TO FIND AN ADDRESS, THE CAR ICON WOULD WANDER OFF THE PRESCRIBED ROUTE EVEN THOUGH THE CONSUMER WAS DRIVING THE PRESCRIBED ROUTE. WHEN THAT HAPPENED, THE SCREEN WOULD OFTEN DISPLAY A LARGE YELLOW QUESTION MARK. THE FIRST TIME THE CONSUMER VISITED THE DEALER, THEY FLASHED THE MEMORY. IT HELPED, BUT IT STILL FAILED, AT TIMES. THE SECOND TIME, HE RETURNED TO THE DEALER, THEY INSTALLED AN UPDATED PROGRAM FROM FORD THAT WAS SUPPOSED TO CORRECT THE PROBLEMS. BUT, AS TIME WENT ON, THE NEW PROGRAM STARTED TO FAIL IN A SIMILAR WAY AS THE OLD PROGRAM. THE LAST TIME, THE CONSUMER VISITED THE DEALER, THEY DID A MASTER RESET BY DISCONNECTING THE BATTERY, THEREBY REMOVING ALL POWER FROM THE SYSTEM AND REBOOTING IT WHEN THE BATTERY WAS RECONNECTED. THE DEALER INFORMED THE CONSUMER, HE COULD ALSO PULL FUSE 29 AND PUT IT BACK IN AGAIN. HOWEVER, THE CONSUMER STATED HE WAS NOT ABLE TO REACH THE FUSE, AS IT WAS TUCKED WAY UP UNDER THE DASHBOARD, BUT EVEN IF HE COULD REACH IT, IT WOULDN'T FIX THE DEFECTIVE SOFTWARE PROVIDED BY FORD AND MICROSOFT. DISCONNECTING THE BATTERY DIDN'T FIX THE PROBLEM, IT ONLY REBOOTED THE COMPUTER AND EVENTUALLY, THE PROBLEM WOULD RETURN. *JB

**Date Complaint Filed**: 11/6/2012
**Date of Incident**: 9/4/2012
**NHTSA ID Number**: 10483516
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMCU0H9XDU…
**SUMMARY**:
TL* THE CONTACT OWNS A 2013 FORD ESCAPE. THE CONTACT STATED THAT THE MYTOUCH SYSTEM FAILED AND WOULD NOT ALLOW HER TO MAKE A CALL. IN ADDITION, THE MYTOUCH SYSTEM WOULD NOT PROPERLY RESPOND TO COMMANDS. THE VEHICLE WAS TAKEN TO THE DEALER FOR TESTING ON SEVERAL OCCASIONS WHERE THE DEALER ADVISED THAT THE MYTOUCH CHIP NEEDED TO BE REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND ADVISED THE CONTACT THAT SOMEONE WOULD CALL THE CONTACT AT A LATER DATE. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 22,083.
**Date Complaint Filed**: 10/31/2012
**Date of Incident**: 6/15/2011
**NHTSA ID Number**: 10482741
**Manufacturer**: Ford Motor Company

- 71 -

**Vehicle Identification Number**: 2FMDK4KC9BB…
**SUMMARY:**
TL* THE CONTACT OWNS A 2011 FORD EDGE. THE CONTACT STATED THAT WHILE PARKED THE CONTACT NOTICED THE SYNC TECHNOLOGY ON THE TOUCH SCREEN WAS NOT FUNCTIONING PROPERLY AFFECTING THE AIR CONDITIONER, RADIO, CELL PHONE SYNC, AND NAVIGATION SYSTEM. THE CONTACT STATED HE WAS CONSTANTLY DISTRACTED AND LOOKING AWAY FROM THE ROAD TO CANCEL OR SWITCH FUNCTIONS ON THE SCREEN. THE VEHICLE WAS TAKEN TO THE DEALER FOR DIAGNOSTIC TESTING FOURTEEN DIFFERENT TIMES. THE TECHNICIAN PERFORMED VARIOUS SOFTWARE UPDATES AND REPLACED THE COMPUTER THREE DIFFERENT TIMES BUT THE FAILURE CONTINUED. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 200.

**Date Complaint Filed**: 9/25/2012
**Date of Incident**: 7/25/2012
**NHTSA ID Number**: 10477022
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMCU0H93DU…
**SUMMARY**:
NUMEROUS FAULTS WITH RADIO AND NAVIGATION SYSTEM PART OF MYFORD TOUCH SYSTEM. THE RADIO WILL COME ON BY ITSELF AND WILL NOT SHUT OFF. THIS USUALLY OCCURS WHEN A CELL PHONE IS IN USE AND CONNECTS OR DISCONNECTS VIA BLUETOOTH WHEN THE CAR IS STARTED OR TURNED OFF. WHEN THIS FAULT OCCURS THE RADIO WILL NOT ALLOW DIFFERENT STATIONS TO BE SELECTED. THE RADIO WILL NOT TURN OFF EVEN AFTER THE ENGINE IS TURNED OFF AND THE DOORS ARE OPENED. THE POWER BUTTON FOR THE RADIO WILL NOT FUNCTION TO SHUT OFF THE RADIO AT THESE TIMES. THE RADIO WILL REMAIN ON FOR APPROXIMATELY 20 MINUTES AFTER THE VEHICLE IS SHUT OFF AND THE ALARM IS TURNED ON. THE DEALER HAS ACKNOWLEDGED THIS PROBLEM EXISTS WITH SIMILAR VEHICLES AND HAS STATED THAT A REPAIR DOES NOT EXIST. THE NAVIGATION SYSTEM IS SLOW TO RESPOND AND AT TIMES CANNOT PROPERLY LOCATE THE VEHICLE. THE NAVIGATION SYSTEM ALSO HAS FAULTED BY NOT ALLOWING MANUAL ENTRY OF ADDRESSES OR SELECTION OF SAVED DESTINATIONS. THE DEALER HAS ACKNOWLEDGED A REPAIR FOR THIS DOES NOT EXIST OTHER THAN TO DISCONNECT THE BATTERY TERMINALS FOR AT LEAST 10 MINUTES. *TR

**Date Complaint Filed**: 8/9/2012
**Date of Incident**: 8/26/2011
**NHTSA ID Number**: 10469990
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMHK7D81BG…
**SUMMARY**:
FORD "MYFORD TOUCH" SYSTEM HAS FAILED ON NUMEROUS OCCASIONS. IT HAS FROZEN, LOCKED UP, AND CONTINUOUSLY REBOOTED. WHEN THIS OCCURS, YOU LOSE ALL FUNCTIONALITY AND ABILITY TO CHANGE RADIO STATIONS, ADJUST CLIMATE CONTROL, USE NAVIGATION, HANDS FREE FUNCTIONS, ETC. WHILE THERE IS SOME MANUAL CONTROLS FOR BASIC OPERATIONS, IT DOES NOT ALLOW

- 72 -

FULL CONTROL OF TALL SYSTEMS. FOR INSTANCE, WHEN THE MFT SYSTEM FAILS, YOU HAVE NO ABILITY TO TURN ON OR ADJUST THE REAR CLIMATE CONTROLS FOR REAR PASSENGERS. DEALER HAS TRIED UPGRADING SOFTWARE, RESETTING SOFTWARE, REINSTALLING SOFTWARE, AND REPLACING HARDWARE. WHILE THE PROBLEM IS NOT AS BAD AS IT HAS BEEN, IT CONTINUES WITH NO RESOLVE. *TR

**Date Complaint Filed**: 2/25/2012
**Date of Incident**: 12/5/2011
**NHTSA ID Number**: 10449336
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2FMDK4KC5BB…
**SUMMARY**:
PURCHASED MY 2011 EDGE LIMITED DEC. 2010, HAD INTERMITTENT SYNC PROBLEMS STARTING APPROX JUNE 2011.  DID AN UPGRADE OFF THE SYNC MY RIDE WEBSITE IN NOV 2011 AND THAT STARTED ALL THE SYNC PROBLEMS.  THEY INCLUDE: NAVIGATION FAILURE WHILE ON A TRIP, THAT WAS FUN, BEING LOST WITH 2 CARS OF FAMILY FOLLOWING US.  BACKUP CAMERA WORKS OR NOT, DEPENDS ON THE DAY.  DASHBOARD LIGHTS BLINKING ON & OFF WHILE DRIVING, BLUETOOTH DISCONNECTING MY PHONE ALMOST EVERYDAY.  THE SYNC SYSTEM LIKES TO TURN OFF, BLACK SCREEN, RESETS ITSELF WITHOUT DOING ANYTHING EXCEPT TURNING THE CAR ON!  SOMETIMES WHEN I LEAVE THE CAR THE SYNC SYSTEM & RADIO WILL STAY ON EVEN AFTER I LOCK THE CAR.  2X IT HAS GONE TO THE DEALER, 2X I GET THE CAR BACK & AM TOLD I HAVE TO DEAL WITH IT AS THERE IS NO FIX TO THE GLITCH IN THE SYSTEM.  SO, 42K FOR A NEW CAR, ALSO PURCHASED AN EXTENDED WARRANTY, WHEN ALL WARRANTY'S ARE EXPIRED WHO WILL PAY FOR FORDS "GLITCH"?  I WILL NEVER RECOMMEND THIS CAR TO ANYONE.  *TR

**Date Complaint Filed**: 1/5/2012
**Date of Incident**: 11/23/2011
**NHTSA ID Number**: 10442557
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMHK8D8X…
**SUMMARY**:
THE FORD SYNC SYSTEM DECIDED TO DO AN UPGRADE AND DISABLED ALL RELATED FEATURES FOR ABOUT 30 MINUTES.  THIS INCLUDED AUDIO, CELL PHONE LINK, RADIO, HEATER AND THE REAR VIEW CAMERA!  IT HAS OCCURRED AGAIN AND APPEARS TO ALWAYS HAPPEN IMMEDIATELY AFTER STARTING THE CAR, WHICH IS WHEN THE REAR VIEW CAMERA IS VERY LIKELY TO BE NEEDED.  *TR

**Date Complaint Filed**: 12/9/2011
**Date of Incident**: 12/8/2011
**NHTSA ID Number**: 10439143
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2FMDK4KC9BB…
**SUMMARY**:
VEHICLE EQUIPPED WITH MYFORD TOUCH SYSTEM.  SYSTEM CONTROLS HEATING/DEFROSTING SYSTEM.  THIS SYSTEM HAS FAILED TO OPERATE PROPERLY

- 73 -

ON MULTIPLE OCCASIONS.  FORD MOTOR COMPANY IS AWARE OF ISSUE AND HAS
NOT CORRECTED IT.  FORD SHOULD NOT BE ALLOWED TO MARKET VEHICLES THAT
DO NOT HAVE PROPERLY FUNCTIONING HEATING/DEFROSTING CONTROLS.  THESE
VEHICLES ARE DANGEROUS AND THE ISSUE IS WELL KNOW BY INTERNET
SEARCHES.  PEOPLE RELY ON VEHICLES TO OPERATE PROPERLY IN WINTER
CONDITIONS.  THIS NEEDS TO BE ADDRESSED.  THANK YOU FOR YOUR HELP.  *TR

**Date Complaint Filed**: 11/30/2011
**Date of Incident**: 2/1/2011
**NHTSA ID Number**: 10437851
**Manufacturer:** Ford Motor Company
**Vehicle Identification Number**: 1FMHK8F8XBG…
**SUMMARY**:
MORE LIKE ADAPTIVE 'CURSE' CONTROL.  MY 2011 EXPLORER LIMITED 4X4 WITH
THE ADAPTIVE CRUISE ALWAYS CATCHES THE REAR OF SEMI TRUCKS IN OTHER
LANES, CAUSING IT TO APPLY FULL BRAKES AND PEOPLE BEHIND ME ALMOST
CRASH INTO ME.  MY 2011 LIMITED IS TOTALLY FACTORY ORIGINAL, NO TOW BARS.
HERE IN CALIFORNIA THE SEMI TRUCK SPEED IS 55 WHILE AUTOS CAN GO 65-70MPH
(AND IN MOST CASES EVERYONE GOES 80+).  SO WHEN I'M GOING ALONG AT 65-70
WITH NO VEHICLES HEAD OF ME IN MY LANE AND THE THING GOES 100% BRAKES I
ALMOST CRASH.  I ALSO GET THE CRUISE CONTROL TOTALLY DISABLED BECAUSE
OF AN ERROR IN THE SYNC MODULES.  THE SYNC COMPUTER MODULES CONTROL
THE ADAPTIVE CRUISE, STABILITY CONTROL, BACK UP DETECTION SYSTEM, AUTO
WIPERS, AUTO PARKING SYSTEM, TRACTION CONTROL, 4X4 SYSTEM, ETC., ETC.  I
FEAR THAT THE SRS IS ALSO TIED INTO THESE SAME SYNC COMPUTER MODULES.
FORD CLAIMS THE SYNC SYSTEM AUTOMATICALLY RESETS/REBOOTS ITSELF
EVERY 24 HOURS WHILE THE VEHICLE IS OFF TO AVOID SYSTEM OUTAGES.  WHAT
HAPPENS MOST OF THE TIME IS THE SYSTEM WILL RUN (EVEN THOUGH THE
SCREEN IS OFF) FOR ABOUT A WEEK UNTIL, WHILE DRIVING, THE SYNC COMPUTER
CRASHES JUST LIKE HOME COMPUTERS & CELL PHONES DO IF LEFT ON
CONTINUOUSLY.  WHILE THIS CRASH IS TAKING PLACE THE TOUCH SCREEN
FREEZES, MUSIC PLAYING WILL STOP, OR CHANGE VOLUME, OR CHANGE TRACK,
OR CHANGE SOURCE; WIPERS WILL STOP WORKING, CRUISE CONTROL WILL SHUT
OFF, BACKUP CAMERA SYSTEM GOES DOWN OR SCREEN FREEZES WHILE BACKING
UP, 4X4 IS DISABLED, CENTER DISPLAYS WILL GO BLANK.  MY 2011 EXPLORER HAS
BEEN IN THE FORD SERVICE DEPT FOR SYNC MODULE REPLACEMENT AND
REPROGRAMMING 4 TIMES NOW SINCE JAN 2011.  STILL NO FIX.  *KB

**Date Complaint Filed**: 11/20/2011
**Date of Incident**: 8/31/2011
**NHTSA ID Number**: 10437068
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 1FMHK8F8XCG…
**SUMMARY**:
THIS FORM DOES NOT ALLOW ENTRY OF MULTIPLE DATES.  THERE IS AN ISSUE
WITH MYFORD TOUCH WITH THIS VEHICLE THAT IS CONTINUAL.  PUTTING IN ONE
DATE IS POINTLESS.  THE CLIMATE (DEFROSTER, ETC) SYSTEM AND THE
NAVIGATION SYSTEM ARE PART OF THIS MODULE, ALONG WITH PHONE AND

- 74 -

AUDIO FEATURES.  THIS MODULE LOCKS CONTINUALLY AND IT IS DANGEROUS
BECAUSE YOU CAN'T CONTROL THE DEFROSTER OR NAVIGATION SYSTEM
MANUALLY WHEN THIS OCCURS.  REPEATED TRIPS TO THE DEALER HAVE BEEN
FRUITLESS AND MY WIFE WAS IN DANGEROUS SITUATIONS SEVERAL TIMES IN
HEAVY TRAFFIC CORRIDOR CONDITIONS IN NORTHERN NEW JERSEY.  IT IS
UNCONSCIONABLE THAT FORD IS SELLING THESE VEHICLES FOR NEARLY $50,000
THAT ARE DEFECTIVE AND THEY KNOW THEY ARE DEFECTIVE.

**Date Complaint Filed**: 8/8/2011
**Date of Incident**: 7/28/2011
**NHTSA ID Number**: 10418053
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2FMDK3JC3BB…
**SUMMARY:**
FORD SYNC SYSTEM HAS BEEN FREEZING, BACK UP CAMERA BLACKING OUT, GPS
STALLING.  CAR HAS BEEN RETURNED TO DEALER 3 TIMES FOR A REBOOT SYSTEM.
DEALER SAID IT HAS TO DO WITH THE NEW SYSTEM AND THERE BEING BUGS.  *TR

**Date Complaint Filed**: 6/1/2011
**Date of Incident**: 4/5/2011
**NHTSA ID Number**: 10404872
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2LMDJ6JK5BB…
**SUMMARY**:
WHEN DRIVING DOWN THE HIGHWAY, THE SYNC SCREEN GOES COMPLETELY
BLANK. AT THIS POINT I HAVE NO ACCESS TO HEAT, A/C, DEFROSTER, RADIO, OR
BACKUP CAMERA. ON OCCASION THE SCREEN HAS BEEN BLANK FOR UP TO ONE
HUNDRED MILES. I DON'T WORRY ABOUT THE DEFROSTER IN THE SUMMER BUT IN
THE WINTER THIS IS A DEFINITE SAFETY CONCERN. NOT HAVING THE BACKUP
CAMERA IS RISKY FOR THERE MAY BE SMALL CHILDREN BEHIND THE VEHICLE.
I'VE BEEN IN CONTACT WITH FORD MOTOR COMPANY. THEY TELL ME THERE
ENGINEERING DEPARTMENT IS WORKING ON A FIX BUT THERE IS NO ETA NOR DO
THEY HAVE ANY IDEA WHEN OR IF THEY CAN FIX IT. THE CONSUMER WANTED TO
INCLUDE THE FILE NUMBER ASSIGNED TO HER BY FORD MOTOR COMPANY.
COMPLAINT # 441951441

**Date Complaint Filed**: 12/15/2010
**Date of Incident**: 12/10/2010
**NHTSA ID Number**: 10370847
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2FMDK3JC0BB…
**SUMMARY:**
SYNC/MY TOUCH CONSOLE ON 2011 FORD EDGE LOCKS UP OR GOES DEAD. THERE
IS NO WAY TO ACTIVATE THE WINDSHIELD DEFROST WITHOUT THE TOUCH
SCREEN. DEALERSHIP SERVICE DEPARTMENT HAS BEEN UNABLE TO UNLOCK
SCREENS. THIS PROBLEM HAS BEEN WIDELY REPORTED ON OWNERS WEBSITE FOR
THE 2011 EDGES, BUT FORD DOES NOT SEEM TO HAVE A FIX FOR IT. IT IS WINTER
AND I NEED TO RUN DEFROST. *TR

**Date Complaint Filed**: 11/15/2010
**Date of Incident**: 10/20/2010
**NHTSA ID Number**: 10365783
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2FMDK4KC9BB…
**SUMMARY**:
THIS IS A PREEMPTIVE COMPLAINT, AS I THANKFULLY HAVE NOT HAD AN
ACCIDENT YET. THE MYFORD TOUCH SYSTEM IN ALL 2011 FORD MOTOR CO
VEHICLES ARE DEFECTIVE. THE SYSTEM HAS A MULTITUDE OF DEFECTS, BUT THE
SAFETY RELATED DEFECT IS THAT THE SYSTEM CAN SPONTANEOUSLY REBOOT AT
ANY TIME WITH NO WARNING TO THE DRIVER. THIS CAN HAPPEN AT RANDOM,
AND MULTIPLE TIMES WITHIN A SHORT PERIOD OF TIME. WHEN BACKING UP THIS
SHUTS DOWN THE BACKUP CAMERA WHICH COULD RESULT IN INJURIES TO
CHILDREN WHO GET BEHIND THE VEHICLE. AT NIGHT THIS CAUSES THE SCREEN TO
SUDDENLY GO FULL WHITE AT FULL BACKLIGHT, WHICH IS EXTREMELY
DISTRACTING TO A DRIVER AT NIGHT. ANOTHER SAFETY ISSUE WOULD BE WHEN
THE SYSTEM REBOOTS WHEN THE DRIVE IS BEING GUIDED TO AN EMERGENCY
FACILITY OR IS ON THE PHONE WITH 911. FORD ACKNOWLEDGED THE PROBLEMS
TO DEALERSHIPS ON OCT 20TH AND INFORMED THEM NOT TO DO ANYTHING AT
THIS TIME. MANY CUSTOMERS HAVE BEEN REPORTING THESE PROBLEMS ON THE
OWNER2OWNER WEBSITE FOR THE FORD SYNC SYSTEM. I AM SUBMITTING THIS
COMPLAINT IN HOPES IT CAN BE DEALT WITH BEFORE SOMEONE GETS HURT
RATHER THAN AFTER. THANK YOU *TR

**Date Complaint Filed**: 10/28/2010
**Date of Incident**: 9/27/2010
**NHTSA ID Number**: 10362842
**Manufacturer**: Ford Motor Company
**Vehicle Identification Number**: 2LMDJ8JK8BB…
**SUMMARY**:
THE SIRIUS TRAVEL LINK (THRU MYLINCOLN TOUCH) DOES NOT WORK AND HAS
NOT WORKED FROM DAY 1 OF PICKING UP THE SUV ON 9/27/10. AT FIRST LINCOLN
WOULD NOT ADMIT ANY ISSUES BUT NOW THEY FINALLY DO BUT DO NOT SAY
WHEN A FIX WILL BE AVAILABLE. I SHOULD HAVE BEEN TOLD THAT OPTION WAS
NOT WORKING BEFORE THEY HAD ME SIGN A LEASE FOR THE CAR. ALOT OF US
ARE PAYING FOR SOMETHING THAT DOES NOT WORK AND DO NOT KNOW IF IT
EVER WILL. *TR

**H.      Ford Technicians Have Chronicled With Precision How The Defects In The Myford
Touch Impact The Safety Of Their Customers**

262.     The following entries are from Ford's Global Common Quality Indicator System

("CQIS"). This system  is a database providing access to selected vehicle concern information

originating from dealerships and internal Ford sources; REPAIR 11/04/2010 10:25AM█████

██████████  (PCE) MSS - FCSD - VSP C/P SVC ENG WEB FORM DATA - *TECH'S

- 76 -

QUESTION:  *LOOKING FOR DIRECTION.  CUSTOMER IS VERY VERY UPSET WITH NEW VEHICLE AND WE HAVE NO LEADS ON DIAG.  *DESCRIPTION OF VEHICLE CONCERN:  *CUSTOMER STATES WHEN DRIVING THIS MORNING (EARLY WHILE DARK OUTSIDE) THE RADIO WENT ON LOUD (FULL VOLUME), A/C CAME ON FULL BLAST ALL OF THE LIGHTS WENT OUT INSIDE AND OUT (HEADLIGHTS, DASH LIGHTS, TOUCH SCREEN ECT.) SHE PULLED OFF ROAD AND SHUT OFF VEHICLE. STARTED VEHICLE A MOMENT LATER AND ALL ITEMS CAME BACK ON AND WORKED. ALSO AT TIMES AT RANDOM THE SYNC SYSTEM WILL SAY "CALL ENDED" EVEN WHEN SHE IS NOT USING THE PHONE.  *DIAGNOSTICS ALREADY COMPLETED:  *VEHICLE WAS AT SHOP 11-1-10 FOR TOUCH SCREEN GOING BLACK, BACK UP CAMERA AND SENSORS INOP. PER HOTLINE WE DID PERFORM TSB 10-21-2 EVEN THOUGH THIS VEHICLE IS OUT OF DATE RANGE, ALL ITEMS PASSED. WE DID VERIFY THIS CONCERN AND RELEASED VEHICLE BACK TO CUSTOMER WITH INFORMATION ABOUT KNOWN SOFTWARE ISSUE WITH MYTOUCH THAT COULD BE CAUSING CONCERN. ADVISED CUSTOMER WE WOULD NOTIFY WHEN THAT INFORMATION IS AVAILABLE TO US  *PARTS REPLACED:  *NOTHING *

WLN3_SPLIT069814, page 934
CQIS Report Number: AKAA4026

REPAIR   03/12/2014 01:19PM ███████████████               MSS - FCSD - TECH SVC HOTLINE WEB FORM DATA - *CONCERN: CUSTOMER SAID HE WAS DRIVING ON THE EXPRESSWAY WHEN HE SAW A MESSAGE 'NOT IN PARK' THEN ALL THE INSTRUMENTATION SHUT OFF, THE WIPERS CAME ON. HE PULLED OFF THE ROAD AND SHUT VEHICLE OFF (IN HIS WORDS TO TRY AND REBOOT SYSTEM) WHEN HE TRIED TO RESTART NOTHING NO CRANK, PASSENGER DOOR WINDOW WORKED, BUT, NOTHING ELSE * *DIAGNOSTICS: NOTHING AT THIS TIME, RAN OASIS FOR MESSAGES * *PARTS REPLACED: NONE * *TECH QUESTION: WE HAVE NOT HAD A CHANCE TO HOOK UP TO IDS YET, THOUGH I DID SEARCH TSB/SSM. WITH A BRAND NEW VEHICLE AND SUCH UNUSUAL COMBINATION OF SYMPTOMS, WONDERING IF

THERE IS SOMETHING WITH ENGINEERING THAT WOULD BE A PROBLEM. JUST TRYING TO SEE IF THERE IS SOMETHING WE SHOULD KNOW. THERE WAS ONE TSB DEALING WITH WIRING TSB 13-12-12 BUT, DID NOT HAVE SOME OF THESE FREAKY SYMPTOMS

WLN3_SPLIT397212, page 981
CQIS Report Number : ECLHL005

REPAIR   09/18/2012 04:11PM ▮▮▮▮▮▮▮▮▮▮               MSS - FCSD - TECH SVC HOTLINE
WEB FORM DATA - *CONCERN:VEHICLE INTERIOR WINDSHIELD FOGGED UP SO BAD HAD TO PULL OVER AND WAIT TO ALLOW WINDSHIELD  *TO DEFOG TO DRIVE. * *DIAGNOSTICS: CKD NO OVERHEAT CKD DRAIN FOR HTR BOX OK NO CODES * *PARTS REPLACED:NONE * *TECH QUESTION:WHAT COULD CAUSE THIS CODES * *PARTS REPLACED:NONE  * *TECH QUESTION:WHAT COULD CAUSE THIS AND HAVE YOU EXPERIENCED ANY OTHER CONCERNS OF THIS NATURE? SUGGESTIONS?

WLN3_SPLIT120895, page 1531
CQIS Report Number: CIJEH009

10-05-2011 08:32:25 pm ==== CUST SAYS= IN SERVICE FOR THE 5TH TIME= PUT IN PAPERS FOR THE LEMON LAW= THE LEASING COMPANY PROVIDED THE NUMBER TO CRC= NAVIGATION SYSTEM LOCKS UP, WILL NOT TAKE INFORMATION, SHUTS DOWN, BACK UP SYSTEM DOESN'T WORK, CIRCUIT BOARD SHUTS DOWN= JUST HAS OIL CHANGE, OIL ENGINE LIGHT CAME BACK ON= SOMETIMES THE VEH WILL FAIL TO START OR STALL WHILE DRIVING= EVERYTHING WOULD GO BLACK IN THE VEH= SYNC FAILED TO WORK= WOULD BE IN ROUTE SOMEWHERE AND IN THE MIDDLE OF GOING TO THE DESTINATION= AC GOES ON AND OFF= SO MANY ELECTRICAL ISSUES = DLRSHP IS WORKING WITH THE CUST, PROBLEM IS WITH FMC PRODUCT= SENT LEMON LAW PAPERWORK TO CRC FOR FMC AND ATTORNEY JOURNEY ON 10/3/2011 TRACKING #70111570000324795015= DLRSHP ADVISED CUST TO DISCONNECT A CABLE FROM THE NAVIGATION AND THAT ISN'T HER JOB= SELLING DLRSHP TOLD CUST THAT THERE'S NOTHING THEY CAN DO NOTHING

ABOUT IT. TOLD HER SHE NEEDED TO DO WHAT SHE NEEDED TO DO= DLRSHP IS MAKING FINAL ATTEMPT TO REPAIR BUT ISN'T EXPECTING THE CONCERN TO BE CORRECTED, ETA ON REPAIR TO BE COMPLETED UNKNOWN= DOESN'T WANT THE VEH ANYMORE, DOESN'T FEEL SAFE WITH IT==== DLRSHPAUTOWAY FORD-BRADENTON5325 14TH STREET WESTBRADENTON FL 34207(888) 208-8907= TOM, SM= DAVID, TECH==== CRC SAYSI HAVE DOCUMENTED YOUR CONCERNS AND AM SENDING YOUR INFORMATION TO OUR CUSTOMER CARE SOLUTIONS TEAM. YOU WILL BE CONTACTED BY A SPECIALIST TO DISCUSS YOUR ISSUE WITHIN 2 BUSINESS DAYS. THIS DOES NOT GUARANTEE THAT FORD WILL BUYBACK YOUR VEHICLE. FORD'S COMMITMENT IS TO HONOR THE NEW VEHICLE LIMITED WARRANTY.= ███████████████████████ = AVAIL ANY TIME= VEH AT DLRSHP 10-06-2011 10:43:42 pm CSM AUTUMN X7763-OBC TO DEALER AND SPOKE TO S/A DAVE AND HE ADVISED THAT THE CUSTOMER BROUGHT THE VEHICLE IN FOR THE SYNC ISSUE AND THE DEALER HAS UPDATED . CUSTOMER HAS A NEW PHONE . CUSTOMER HAS A BLACKBERRY KNOW AND DEALER IS UNAWARE OF THE MODULE . VEHICLE WAS IN SEPTEMBER 12TH AND ON 8-22-2011 .CSM LOOKED UP TSB 11-07-24 AND CSM WANT. REPLACED APIM BASE PARTS NUMBER 14D212. DEALER ADVISED THAT THEY WILL LOOK INTO TSB .- OBC TO CUSTOMER @ AND CSM ADVISED THAT WILL FOLLOW UP ON 10-10-2011 10-10-2011 11:10:55 pm CSM AUTUMN X7763- OBC TO CUSTOMER @ AND CSM ADVISED THAT SHE WILL BE WORKING WITH OUR LEGAL DEPARTMENT FROM NOW ON. CSM PROVIDED TANYAS INFO. CSM CLOSING DUPLICATE CASE

> WLN3_SPLIT249234, page 163
> CASE NUMBER: MRS-03786027811172 20910004

**I.      Ford Employees, Both Present And Former, Routinely Chastise The Company For The Defects In The MyFord Touch System**

263.  Ford's production literally contains hundreds of instances where Ford employees, past and present, explain ongoing defects relating to the MyFord Touch System they are experiencing in their

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                          CASE NO. 13-CV-3072-EMC

1    vehicles.  Most of these complaints also bemoan the inability of Ford to rectify the defects, thereby

2    placing these individuals and their families at risk.  For example, Steve Wilkie, Supervisor - Cam

3    Drive / VCT Design, notes the following in an e-mail dated January 3, 2011:  "My brother got the

4    'update' per the TSB and continues to have issues.  He did also have the dealer confirm that he has

5    no hardware issues per the diagnostics run.  His list is below.  He works for Apple and therefore is

6    critical possibly where others might not notice, however...  As well, my father who now has his

7    MKX which I had been driving is having similar issues, with the most often one being the black

8    screen and then 'routine maintenance' note.  His dealer now has his car overnight to try the system

9    update again tomorrow since they kept having issues today.  They would both be very happy to help

10   in any way if required.  The ongoing functional issues and then the dealers incapability to perform

11   the update in under a day is unacceptable.  Have we done anything to the Explorer launch to

12   improve things?  The amount of units with this out there is scary, and growing significantly daily...

13   Honestly, I think it's so bad we should stop shipping vehicles with the system as it stands currently.

14   Black eyes take a very long time to heal."  (WLN1-3071).

15   **J.      The MyFord Touch Problems Have Diminished the Value of the Class Vehicles**

16           264.    The problems plaguing MyFord Touch are well known and have directly impacted

17   Ford's reputation.  Prior to the release of the MyFord Touch system, Ford's reputation for quality

18   had enjoyed many years of steady improvement.  Ford's standing among consumers and consumer

19   reporting organizations plummeted following the launch of the system.  Consumer reporting

20   organizations attributed the drop to the MyFord Touch system problems.  For example, J.D. Power

21   & Associates' "Initial Quality Study" examines vehicles during the first 90 days of ownership.[30]  In

22   2010, the last year before rolling out the MyFord Touch system, Ford placed fifth on J.D. Power &

23   Associates' Initial Quality Study.[31]  In 2011, after the rollout, Ford fell to 23rd place in the same

24   survey.[32]  In 2010, Lincoln was ranked eighth in the same survey.[33]  In 2011, it tumbled to 17th

25   _____

26   [30] http://wheels.blogs.nytimes.com/2011/06/23/aggravating-myford-touch-sends-ford-plummeting-in-j-d-power-quality-survey/?hpw.

27   [31] *Id.*

     [32] *Id.*

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                          CASE NO. 13-CV-3072-EMC

place.[34] J.D. Power & Associates' Vice President stated that the primary factor in Ford's descent was the MyFord Touch system.[35]

265.    The MyFord Touch is so unreliable, according to Consumer Reports, that it recommends that no consumer purchase any Ford-made vehicles equipped with MyFord Touch.[36]

266.    Another automobile review website, cars.com, had the following to say about MyFord Touch: "A number of editors got behind the wheel, and the verdict among them was unanimous: MyFord Touch needs a lot of work, and it's worth sticking to an SE or lightly equipped SEL trim to avoid it."[37]

267.    Ford has publicly acknowledged its quality problem with the MyFord Touch system.[38]  In November 2012, Ford reported 400 problems with its MyFord Touch system for every 1,000 vehicles.  That was an improvement from March 2012, when Ford's "things-gone-wrong-rate" for the system was 500 for every 1000 vehicles.[39]

268.    On October 28, 2013, the Consumer Reports Annual Auto Reliability Ranking put Ford at the bottom of the industry, with the main reason being problems with the MyFord Touch. According to a spokesperson Ford admitted the defects were not fixed:

> "We continue to improve the infotainment systems and we've reduced complaints by nearly 50 percent since launch," said Ford spokesman Mark Schirmer.  More Ford and Lincoln vehicles, about 93 percent, are now being delivered with MyFord Touch or SYNC, he said.  "We still have improvements to make."[40]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] http://en.wikipedia.org/wiki/MyFord_Touch#cite_note-16.

[37] http://blogs.cars.com/kickingtires/2013/06/carscoms-issues-with-myford-touch.html.

[38] www.autonews.com (Jan. 16, 2013).

[39] *Id.*

[40] Jesse Snyder, *Automotive News*, Oct. 28, 2013 – 12:45 pm ET.

**K.      Despite Express Warranties, Ford Has Not Fixed the Problems With MyFord Touch**

269.    In connection with the sale (by purchase or lease) of each one of its new vehicles, Ford provides an express limited warranty on each vehicle.  In those warranties, Ford promises to repair any defect or malfunction that arises in the vehicle during a defined period of time.  This warranty is provided by Ford to the vehicle owner in writing and regardless of what state the customer purchased his or her vehicle in.  Ford issues one warranty for Ford vehicles, and a separate warranty for Lincoln vehicles.  Ford also issues a separate warranty for each model year, although all of the terms of the warranty are largely similar from year to year and regardless of whether the warranty was issued with regard to Ford vehicles, or Lincoln vehicles.  As further alleged below, the relevant terms of the warranties in this case are identical, regardless of the model year, or whether the warranty was issued on Ford vehicles, or Lincoln vehicles.

270.    Each Plaintiff was provided with a warranty and it was a basis of their purchase of their vehicles.

271.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  The following uniform language appears in all Ford and Lincoln Warranty Guides:

> Under your New Vehicle Limited Warranty if:
> -your Ford vehicle is properly operated and maintained, and
> -was taken to a Ford dealership for a warranted repair during the warranty period,
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

272.    With regard to Ford vehicles, the duration of the limited warranty is for three years or 36,000 miles, whichever event comes first.  Lincoln vehicles, on the other hand, are warranted for a period of four years or 50,000 miles, whichever event comes first.  According to the terms of the warranty, the warranty period begins, "the day you take delivery of your new vehicle, or the day it is

- 82 -

1    first put into service … whichever occurs first."  This language concerning the commencement of

2    the warranty period is identical in all warranties at issue in this litigation.

3         273.    All Plaintiffs and members of the Class experienced defects within the warranty

4    period.  However, despite the existence of the express warranties provided to Plaintiffs and

5    members of the Class, Ford has failed to honor the terms of the warranties by failing to "without

6    charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use

7    during the applicable coverage period due to a manufacturing defect in factory-supplied materials or

8    factory workmanship."

9                            **VII.    CLASS ALLEGATIONS**

10        274.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to

11   the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of

12   the following classes:

13            All persons or entities in the United States who are current or former owners and/or lessees

14                of a Ford, or Lincoln vehicle with MyFord Touch (the "Nationwide Class").

15            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

16                Touch in the State of California (the "California Class").

17            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

18                Touch in the State of Arizona (the "Arizona Class").

19            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

20                Touch in the State of Colorado (the "Colorado Class").

21            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

22                Touch in the State of Iowa (the "Iowa Class").

23            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

24                Touch in the State of Massachusetts (the "Massachusetts Class").

25            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

26                Touch in the State of New Jersey (the "New Jersey Class").

27            All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

28                Touch in the State of New York (the "New York Class").

- 83 -

1         All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

2         Touch in the State of North Carolina (the "North Carolina Class").

3         All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

4         Touch in the State of Ohio (the "Ohio Class").

5         All persons or entities who purchased or leased a Ford, or Lincoln vehicle with My Ford

6         Touch in the State of Texas (the "Texas Class").

7         All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

8         Touch in the State of Virginia (the "Virginia Class").

9         All persons or entities who purchased or leased a Ford, or Lincoln vehicle with MyFord

10        Touch in the State of Washington (the "Washington Class").

11   (Collectively, the "Class," unless otherwise noted).

12        275.    Excluded from the Class are individuals who have personal injury claims resulting

13   from the defect in the MyFord Touch system.  Also excluded from the Class are Ford and its

14   subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class;

15   governmental entities; and the judge to whom this case is assigned and his/her immediate family.

16   Plaintiffs reserve the right to revise the Class definition based upon information learned through

17   discovery.

18        276.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

19   Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

20   would be used to prove those elements in individual actions alleging the same claim.

21        277.    This action has been brought and may be properly maintained on behalf of each of

22   the Classes proposed herein under Federal Rule of Civil Procedure 23.

23        278.    <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class

24   are so numerous and geographically dispersed that individual joinder of all Class members is

25   impracticable.  While Plaintiffs are informed and believe that there are not less than tens of

26   thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs,

27   but may be ascertained from Ford's books and records.  Class members may be notified of the

28

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                                                      CASE NO. 13-CV-3072-EMC

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

279.    <u>Commonality and Predominance</u>:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)   Whether Ford engaged in the conduct alleged herein;

b)   Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c)   Whether the MyFord Touch system in the Class Vehicles contains a defect;

d)   Whether such defect causes the MyFord Touch system in the Class Vehicles to malfunction;

e)   Whether Ford knew about the defects and, if so, how long Ford has known of the defect;

f)   Whether Ford designed, manufactured, marketed, and distributed Class Vehicles with a defective MyFord Touch system;

g)   Whether Ford's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)   Whether Ford knew or should have known that the defects that existed with regard to the MyFord Touch system would lead to the malfunctions experienced with respect to the Class Vehicles;

i)   Whether Ford knew or reasonably should have known of the MyFord Touch defects in the Class Vehicles before it sold or leased them to Class members;

j)   Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of the defects alleged herein;

k)   Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                                          CASE NO. 13-CV-3072-EMC

1
2

        l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

3
4
5

280.    <u>Typicality</u>:  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

6
7
8
9
10
11

281.    <u>Adequacy</u>:  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

12
13
14
15

282.    <u>Declaratory and Injunctive Relief</u>:  Federal Rule of Civil Procedure 23(b)(2):  Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

16
17
18
19
20
21
22
23
24
25
26
27

283.    <u>Superiority</u>:  Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Nationwide and California Class members to individually seek redress for Ford's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

# VIII.   VIOLATIONS ALLEGED

**A.     Claims Brought on Behalf of the Nationwide Class**

## COUNT I
## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301, *et seq.*)

284.    While this claim was dismissed in part pursuant to Judge Chen's May 30, 2014 Order, Plaintiffs include it here to preserve the claim for appeal.

285.    Plaintiff Creed incorporates by reference all preceding allegations as though fully set forth herein.

286.    Plaintiff Creed brings this Count on behalf of the Nationwide Class.

287.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

288.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

289.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

290.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

291.    Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

292.    Ford breached these warranties as described in more detail above.  Without limitation, the Class Vehicles are equipped with the MyFord Touch system, a defective interactive electronic unit within the Class Vehicles.  The Class Vehicles share a common design defect in that the MyFord Touch system fails to operate as represented by Ford.

293.    Plaintiff and the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents (dealerships and technical support) to establish privity of contract between Ford, on one hand, and Plaintiff and each of the other Nationwide Class members on the other hand.  Nonetheless, privity is not required here because Plaintiff and each of the other

- 87 -

1    Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its

2    dealers, and specifically, of Ford's implied warranties.  The dealers were not intended to be the

3    ultimate consumers of the Class Vehicles and have no rights under the warranty agreements

4    provided with the Class Vehicles; the warranty agreements were designed for and intended to

5    benefit the consumers only.

6            294.    Affording Ford a reasonable opportunity to cure its breach of written warranties

7    would be unnecessary and futile here.  Indeed, Plaintiff has already done so, and Ford has failed,

8    after numerous attempts, to cure the defects.  At the time of sale or lease of each Class Vehicle,

9    Ford knew, should have known, or was reckless in not knowing of its omissions concerning the

10   Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation

11   and/or disclose the defective design.  Under the circumstances, the remedies available under any

12   informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an

13   informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach

14   of warranties is excused and thereby deemed satisfied.

15           295.    Plaintiff and the other Nationwide Class members would suffer economic hardship if

16   they returned their Class Vehicles but did not receive the return of all payments made by them.

17   Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any

18   payments made, Plaintiff and the other Nationwide Class members have not re-accepted their Class

19   Vehicles by retaining them.

20           296.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum

21   of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest

22   and costs, computed on the basis of all claims to be determined in this lawsuit.

23           297.    Plaintiff, individually and on behalf of the other Nationwide Class members, seeks

24   all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to

25   be proven at trial.

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                         CASE NO. 13-CV-3072-EMC

**B.      Claims Brought on Behalf of the California Class**

**COUNT I**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)**

298.    Plaintiffs Jennifer Whalen, the Center for Defensive Driving, Richard Decker Watson, and Darcy Thomas-Maskrey ("Plaintiffs," for purposes of all California Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

299.    Plaintiffs bring this Count on behalf of the California Class.

300.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

301.    Ford's conduct, as described herein, was and is in violation of the UCL.  Ford's conduct violates the UCL in at least the following ways:

        i.     By knowingly and intentionally concealing from Plaintiffs and the other California Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs;

        ii.    By marketing Class Vehicles as possessing functional and defect-free in-car communications and entertainment units;

        iii.   By refusing or otherwise failing to repair and/or replace defective MyFord Touch systems in Class Vehicles;

        iv.   By violating federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301;[41] and

        v.    By violating other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq.*, and Cal. Comm. Code § 2313.

302.    Ford's omissions alleged herein caused Plaintiffs and the other California Class members to make their purchases or leases of their Class Vehicles.  Absent those omissions,

---

[41] Plaintiffs acknowledge that this claim was dismissed without prejudice in the Court's May 30, 2014 opinion, and assert it herein only to preserve all applicable rights of appeal.

1    Plaintiffs and the other California Class members would not have purchased or leased these

2    Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or

3    would have purchased or leased less expensive alternative vehicles that did not contain an

4    infotainment system comparable to the MyFord Touch system and which were not marketed as

5    including such a system.

6        303.    Accordingly, Plaintiffs and the other California Class members have suffered injury

7    in fact including lost money or property as a result of Ford's omissions.

8        304.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices

9    by Ford under Cal. Bus. & Prof. Code § 17200.

10       305.    Plaintiffs request that this Court enter such orders or judgments as may be necessary

11   to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to

12   Plaintiffs and members of the Class any money it acquired by unfair competition, including

13   restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and

14   Cal. Civ. Code § 3345; and for such other relief set forth below.

15                              **COUNT II**
                **VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
16                    **(CAL. CIV. CODE §§ 1750, *et seq.*)**

17       306.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

18   herein.

19       307.    Plaintiffs bring this Count on behalf of the California Class.

20       308.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et*

21   *seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken

22   by any person in a transaction intended to result or which results in the sale or lease of goods or

23   services to any consumer."

24       309.    The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

25       310.    Plaintiffs and the other California class members are "consumers" as defined in Cal.

26   Civ. Code § 1761(d), and Plaintiffs, the other California class members, and Ford are "persons" as

27   defined in Cal. Civ. Code § 1761(c).

28

- 90 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                              CASE NO. 13-CV-3072-EMC

311.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other California Class members were deceived by Ford's failure to disclose that the Class Vehicles were equipped with defective MyFord Touch systems.

312.    Ford's conduct, as described hereinabove, was and is in violation of the CLRA. Ford's conduct violates at least Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

313.    Plaintiffs and the other California Class members have suffered injury in fact and actual damages resulting from Ford's material omissions because they paid an inflated purchase or lease price for the Class Vehicles.

314.    Ford knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the MyFord Touch systems, and that the MyFord Touch systems were not suitable for their intended use.

315.    The facts concealed and omitted by Ford to Plaintiffs and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.  Had Plaintiffs and the other California Class members known about the defective nature of the Class Vehicles and their MyFord Touch systems, they would not have purchased or leased the Class Vehicles or would not have paid the prices they paid in fact.

316.    Plaintiffs have provided Ford with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).  The notice was transmitted to Ford on July 25, 2013.

317.    Plaintiffs' and the other California Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

318.    Therefore, Plaintiffs and the other California Class members are entitled to equitable and monetary relief under the CLRA.

**COUNT III**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §§ 17500, *et seq.*)**

319.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

- 91 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

320.    Plaintiffs bring this Count on behalf of the California Class.

321.    California Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

322.    Ford has violated § 17500 because the omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

323.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the omissions of Ford with respect to the safety and reliability of the Class Vehicles.  Ford's representations turned out not to be true because the Class Vehicles are distributed with faulty and defective in-car communication and entertainment systems, rendering certain safety, communication, navigational, and entertainment functions inoperative.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

324.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

325.    Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

1    any money Ford acquired by unfair competition, including restitution and/or restitutionary

2    disgorgement, and for such other relief set forth below.

3                                    **COUNT IV**
                    **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
4                             **(CAL. COM. CODE § 2314)**

5           326.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

6    herein.

7           327.    Plaintiffs bring this Count on behalf of the California Class.

8           328.    Ford is and was at all relevant times a merchant with respect to motor vehicles under

9    Cal. Com. Code § 2104.

10          329.    A warranty that the Class Vehicles were in merchantable condition was implied by

11   law in the instant transaction, pursuant to Cal. Com. Code § 2314.

12          330.    These Class Vehicles, when sold and at all times thereafter, were not in merchantable

13   condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class

14   Vehicles are inherently defective in that there are defects in the MyFord Touch in-car

15   communication and entertainment system, rendering certain safety, communication, navigational,

16   and entertainment functions inoperative; and the MyFord Touch system was not adequately

17   designed, manufactured, and tested.

18          331.    Ford was provided notice of these issues by numerous complaints filed against it,

19   including this Complaint, and by numerous individual letters, telephone calls, and other

20   communications sent by Plaintiffs and other Class members before or within a reasonable amount of

21   time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

22          332.    Plaintiffs and the other Class members have had sufficient direct dealings with either

23   Ford or their agents (dealerships) to establish privity of contract between Plaintiffs and the other

24   Class members.  Notwithstanding this, privity is not required in this case because Plaintiffs and the

25   other Class members are intended third-party beneficiaries of contracts between Ford and its

26   dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers

27   were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the

28   warranty agreements provided with the Class Vehicles; the warranty agreements were designed for

                                              - 93 -

and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and the other Class members' Class Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

333.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**FRAUD BY CONCEALMENT**
**(BASED ON CALIFORNIA LAW)**

334.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

335.    Plaintiffs bring this Count on behalf of the California Class.

336.    As set forth above, Ford concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of their Class Vehicles.

337.    Ford had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as safe and proclaimed that safety is one of Ford's highest corporate priorities.  Once Ford made representations to the public about safety, quality, functionality, and reliability, Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

338.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford which has superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members.  These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

339.    Whether or not a vehicle's defroster and other climate systems work; whether the rearview camera monitor is reliably displaying what is actually behind the car, and is otherwise in working condition; whether the automatic emergency notification system will in fact dial 9-1-1 and

- 94 -

1    transmit GPS coordinates to emergency service providers upon collision; and the other functions

2    that fail as a result of the defect alleged herein, are material safety concerns.  Ford possessed

3    exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and

4    unreliable than similar vehicles.

5          340.    Ford actively concealed and/or suppressed these material facts, in whole or in part,

6    with the intent to induce Plaintiffs and the other Class members to purchase or lease Class Vehicles

7    at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

8          341.    Ford still has not made full and adequate disclosure and continues to defraud

9    Plaintiffs and the other Class members.

10         342.    Plaintiffs and the other Class members were unaware of these omitted material facts

11   and would not have acted as they did if they had known of the concealed and/or suppressed facts.

12   Plaintiffs' and the other Class members' actions were justified.  Ford was in exclusive control of the

13   material facts and such facts were not known to the public, Plaintiffs, or the Class.

14         343.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the other

15   Class members sustained damage.

16         344.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud,

17   and in reckless disregard of Plaintiffs' and the other Class members' rights and well-being to enrich

18   Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter

19   such conduct in the future, which amount is to be determined according to proof.

20                            **COUNT VI**
       **VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR**
21                  **BREACH OF EXPRESS WARRANTIES**
                  **(CAL. CIV. CODE §§ 1791.2 & 1793.2(D))**
22
23         345.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

     herein.
24
25         346.    Plaintiffs bring this Count on behalf of the California Class.

26         347.    Plaintiffs and the other Class members who purchased or leased the Class Vehicles in

27   California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

28

348.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

349.     Ford is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

350.     Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by Ford.

351.     Ford made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

352.     In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicles' Warranty Guides:

> Under your New Vehicle Limited Warranty if:
>
> -your Ford vehicle is properly operated and maintained, and
>
> -was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

353.     As set forth above in detail, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' MyFord Touch systems that render certain crucial safety, communication, navigational, and entertainment functions inoperative, defects that were and continue to be covered by Ford's express warranties, and these defects substantially impair the use, value, and safety of Ford's Class Vehicles to reasonable consumers like Plaintiffs and the other Class members.

354.     Plaintiffs Whalen, CDD, Watson, Thomas-Maskrey and other Class members delivered their Class Vehicles to Ford or its authorized repair facility for repair of the defects and/or notified Ford in writing of the need for repair of the defects because they reasonably could not

deliver the Class Vehicles to Ford or its authorized repair facility due to fear of the MyFord Touch system defect.

355.    Ford and its authorized repair facilities failed and continue to fail to repair the Class Vehicles to match Ford's written warranties after a reasonable number of opportunities to do so.

356.    Plaintiffs and the other Class members gave Ford or its authorized repair facilities at least two opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because Ford or its authorized repair facility refused to attempt the repair.

357.    Ford did not promptly replace or buy back the Class Vehicles of Plaintiffs and the other Class members.

358.    As a result of Ford's breach of its express warranties, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of Ford's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

359.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

360.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

### COUNT VII
### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. CIV. CODE §§ 1791.1 & 1792)

361.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

362.    Plaintiffs bring this Count on behalf of the California Class.

363.    Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

- 97 -

364. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

365. Ford is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

366. Ford impliedly warranted to Plaintiffs and the other Class members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

367. Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)     Pass without objection in the trade under the contract description.

(2)     Are fit for the ordinary purposes for which such goods are used.

(3)     Are adequately contained, packaged, and labeled.

(4)     Conform to the promises or affirmations of fact made on the container or label.

368. The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' MyFord Touch systems that cause certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative.

369. Because of the defects in the Class Vehicles' MyFord Touch systems that cause certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative, they are not safe to drive and thus not fit for ordinary purposes.

370. The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' MyFord Touch systems that cause certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative.

371. Ford breached the implied warranty of merchantability by manufacturing and selling Class Vehicles containing defects associated with the MyFord Touch system.  Furthermore, these

- 98 -

1   defects have caused Plaintiffs and the other Class members to not receive the benefit of their

2   bargain and have caused Class Vehicles to depreciate in value.

3        372.    As a direct and proximate result of Ford's breach of the implied warranty of

4   merchantability, Plaintiffs and the other Class members received goods whose dangerous and

5   dysfunctional condition substantially impairs their value to Plaintiffs and the other Class members.

6   Plaintiffs and the other Class members have been damaged as a result of the diminished value of

7   Ford's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

8        373.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class

9   members are entitled to damages and other legal and equitable relief including, at their election, the

10  purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class

11  Vehicles.

12       374.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are

13  entitled to costs and attorneys' fees.

**COUNT VIII**
**VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1795.92**
**(ON BEHALF OF THE CALIFORNIA SUB-CLASS)**

16       375.    While this claim was dismissed in part pursuant to Judge Chen's May 30, 2014

17  Order, plaintiffs include it here to preserve the claim for appeal.

18       376.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

19  herein.

20       377.    Cal. Civ. Code §§ 1795.90, *et seq*., sets forth what is commonly known as the Secret

21  Warranty Law.  Cal. Civ. Code § 1795.92 requires notification by manufacturers to purchasers and

22  lessees of their products of an "adjustment program."

23       378.    Cal. Civ. Code § 1795.90 defines an "adjustment program" as a program where the

24  original warranty is expanded or extended, or where a manufacturer offers to pay or reimburse for

25  repairs to a condition affecting durability or reliability of a vehicle.

26       379.    As set forth herein, Ford issued Technical Service Bulletins relating to the MyFord

27  Touch system.  Plaintiffs are informed and believe, and thereon allege, that these Technical Services

28  Bulletins were part of a program set forth by Ford where Ford's dealers would repair the defective

- 99 -

vehicles free of charge only when certain undisclosed conditions were met.  Plaintiffs are informed and believe, and thereon allege, that this program expanded and/or extended the original warranty, and therefore constitutes an "adjustment program" within the meaning of Cal. Civ. Code § 1795.90.

380.    As set forth herein, Plaintiffs are informed and believe, and thereon allege, that, in some situations, Ford agreed to pay or give reimbursements for repairs to MyFord Touch.  This practice constitutes an "adjustment program" within the meaning of Cal. Civ. Code § 1795.90.

381.    As the manufacturer of the Ford Vehicles, Ford had a duty to notify all owners or lessees of the Ford Vehicles eligible under the adjustment program described above of the terms and conditions of the program within 90 days of the program's implementation.  Plaintiffs are informed and believe, and thereon allege, that Ford failed to provide this required notification.

382.    As the manufacturer of the Ford Vehicles, Ford had a duty to notify the California Department of Motor Vehicles and its own dealers of the terms and conditions of the above-described adjustment program.  Plaintiffs are informed and believe, and thereon allege, that Ford failed to provide this required notification.

383.    As the manufacturer of the Ford Vehicles, Ford had a duty to ensure that Plaintiffs and other Class members who incurred an expense for repair of the defective MyFord Touch system prior to acquiring knowledge of the program would be reimbursed.  Plaintiffs are informed and believe, and thereon allege, that Ford failed to provide this reimbursement.

384.    As a result of the aforementioned conduct by Ford with regard to its secret warranty, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

**C.    Claims Brought on Behalf of the Arizona Class**

**COUNT I**
**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(ARIZ. REV. STAT. §§ 44-1521, *et seq.*)**

385.    Plaintiff Joe D'Aguanno ("Plaintiff," for purposes of all Arizona Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

386.    Plaintiff brings this Count on behalf of the Arizona Class.

387.    Plaintiff and Ford are each "persons" as defined by Ariz. Rev. Stat. § 44-1521(6). The Class Vehicles are "merchandise" as defined by Ariz. Rev. Stat. § 44-1521(5).

- 100 -

388.    The Arizona Consumer Fraud Act proscribes "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. § 44-1522(A).

389.    By failing to disclose and actively concealing the defects in the MyFord Touch systems in the Class Vehicles, Ford engaged in deceptive business practices prohibited by the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A), including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

390.    As alleged above, Ford concealed numerous material facts about the benefits and characteristics of the MyFord Touch system.  Each of these omissions contributed to the deceptive context of Ford's unlawful advertising and representations as a whole.

391.    Ford knew that the MyFord Touch systems in the Class Vehicles were defectively designed or manufactured, would fail without warning, and were not suitable for their intended use. Ford nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

392.    Ford owed Plaintiff a duty to disclose the defective nature of the MyFord Touch systems in the Class Vehicles, because Ford:

    i)    Possessed exclusive knowledge of the defects rendering the Class Vehicles more unreliable than similar vehicles;

    ii)    Intentionally concealed the defects associated with MyFord Touch through its deceptive marketing campaign and recall program that it designed to hide the defects in the MyFord Touch system; and/or

    iii)    Made incomplete representations about the characteristics and performance of the MyFord Touch system generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11 817775 V1                                          CASE NO. 13-CV-3072-EMC

393.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the MyFord Touch system.

394.    As a result of its violations of the Arizona Consumer Fraud Act detailed above, Ford caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff.  Plaintiff currently owns or leases, or within the class period has owned or leased, a Class Vehicle that is defective.  Defects associated with the MyFord Touch system have caused the value of Class Vehicles to decrease.

395.    Plaintiff and the Class sustained damages as a result of the Ford's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Arizona Consumer Fraud Act.

396.    Plaintiff also seeks court costs and attorneys' fees as a result of Ford's violation of the Arizona Consumer Fraud Act as provided in Ariz. Rev. Stat. § 12-341.01.

<div align="center">

**COUNT II**
**FRAUDULENT CONCEALMENT**
**(BASED ON ARIZONA LAW)**

</div>

397.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

398.    Plaintiff brings this Count on behalf of the Arizona Class.

399.    Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

400.    Ford further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

401.    Ford knew at the time it actively concealed this information that this information was material.

<div align="center">- 102 -</div>

402.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

403.    Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiff and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

404.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

405.    Plaintiff and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

406.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

407.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

**D.    Claims Brought on Behalf of the Colorado Class**

**COUNT I**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(COLO. REV. STAT. §§ 6-1-101, *et seq.*)**

408.    Plaintiff James Laurence Sheerin ("Plaintiff," for purposes of all Colorado Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

409.    Plaintiff brings this Count on behalf of the Colorado Class.

410.    Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation

- 103 -

1    as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the

2    characteristics, ingredients, uses, benefits, alterations, or quantities of goods."  Colo. Rev. Stat. § 6-

3    1-105(1)(b), (e).

4         411.    Ford is a "person" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

5         412.    In the course of Ford's business, it failed to disclose, and actively concealed, the

6    dangerous risk of MyFord Touch system failure in Class Vehicles as described above.  Accordingly,

7    Ford engaged in conduct likely to deceive.

8         413.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

9         414.    Ford's conduct proximately caused injuries to Plaintiff and the other Class members.

10        415.    Plaintiff and the other Class members were injured as a result of Ford's conduct in

11   that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the

12   benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries

13   are the direct and natural consequence of Ford's omissions.

**COUNT II**
**STRICT PRODUCT LIABILITY**
**(BASED ON COLORADO LAW)**

16        416.    Plaintiff incorporates by reference all preceding allegations as though fully set forth

17   herein.

18        417.    Plaintiff brings this Count on behalf of the Colorado Class.

19        418.    Colorado law recognizes an action for product defects that complements Colorado's

20   Product Liability Statute, Colo. Rev. Stat. Title 13, Article 21, Part 4.

21        419.    Ford is a "manufacturer" and "seller" of the Class Vehicles within the meaning of

22   Colo. Rev. Stat. § 13-21-401(1).

23        420.    Ford manufactured and sold the Class Vehicles in a defective condition and in a

24   condition that was unreasonably dangerous to drivers, other motorists, pedestrians, and others or to

25   their property, including persons who may reasonably be expected to use, consume, or be affected

26   by them, in at least the following respects:  (i) the Class Vehicles were defectively designed,

27   assembled, fabricated, produced, and constructed in that they were subject to complete MyFord

28   Touch system failure and dysfunction of crucial safety, communications, and entertainment

- 104 -

functions; and (ii) the Class Vehicles were not accompanied by adequate warnings about their defective nature.

421.    The Class Vehicles were defective and unreasonably dangerous at the time they were sold by Ford and were intended to and did reach Plaintiff and the other Class Members in substantially the same condition as they were in when they were manufactured, sold, and left the control of Ford.

422.    Plaintiff and the other Class members are persons who were reasonably expected to use, consume, or be affected by the Class Vehicles.

423.    As a direct and proximate result of the defective and unreasonably dangerous conditions of the Class Vehicles, Plaintiff and the other Class members have suffered damages.

**COUNT III**
**FRAUDULENT CONCEALMENT**
**(BASED ON COLORADO LAW)**

424.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

425.    Plaintiff brings this Count on behalf of the Colorado Class.

426.    Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

427.    Ford further omitted from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

428.    Ford knew at the time it actively concealed this information that this information was material.

429.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

- 105 -

430. Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiff and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

431. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

432. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others. Ford intentionally made the false statements in order to sell Class Vehicles.

433. Plaintiff and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

434. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

435. Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

E.     **Claims Brought on Behalf of the Iowa Class**

**COUNT I**
**BREACH OF EXPRESS WARRANTY**
**(IOWA CODE § 554.2313)**

436. Plaintiff Thomas Mitchell ("Plaintiff" for the Iowa class) incorporates by reference all preceding allegations as though fully set forth herein.

- 106 -

1    437.    Plaintiff brings this Count on behalf of himself as to his 2011 Lincoln MKX and on

2    behalf of the Iowa Class.

3    438.    Ford is and was at all relevant times a merchant with respect to motor vehicles under

4    Iowa Code § 554.2104.

5    439.    In its Limited Warranty, Ford expressly warranted that it would repair or replace

6    defects in material or workmanship free of charge if they became apparent during the warranty

7    period.  For example, the following language appears in all Class Vehicle Warranty Guides:

8    Under your New Vehicle Limited Warranty if:

9    -your Ford vehicle is properly operated and maintained, and

10    -was taken to a Ford dealership for a warranted repair during the warranty period,

11    then authorized Ford Motor Company dealers will, without charge, repair, replace, or

12    adjust all parts on your vehicle that malfunction or fail during normal use during the

13    applicable coverage period due to a manufacturing defect in factory-supplied

14    materials or factory workmanship.

15    440.    Ford's Limited Warranty formed the basis of the bargain that was reached when

16    Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a

17    MyFord Touch system from Ford.

18    441.    Ford breached the express warranty to repair and adjust to correct defects in

19    materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has

20    been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

21

22    442.    Furthermore, the limited warranty of repair and/or adjustments to defective parts,

23    fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the

24    other Class members whole and because Ford has failed and/or has refused to adequately provide

25    the promised remedies within a reasonable time.

26    443.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the

27    limited warranty of repair or adjustments to parts defective in materials or workmanship, and

28

- 107 -

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                                                   CASE NO. 13-CV-3072-EMC

1    Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by

2    law.

3              444.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the

4    Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and

5    were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding

6    its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or

7    lease the Class Vehicles under false and/or fraudulent pretenses.

8              445.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

9    through the limited remedy of "replacement or adjustments," as many incidental and consequential

10   damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to

11   its failure and/or continued failure to provide such limited remedy within a reasonable time, and any

12   limitation on Plaintiff's and the other Class members' remedies would be insufficient to make

13   Plaintiff and the other Class members whole.

14             446.    Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other

15   Class members assert as an additional and/or alternative remedy, as set forth in Iowa Code

16   § 554.2608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other

17   Class members of the purchase price of all Class Vehicles currently owned and for such other

18   incidental and consequential damages as allowed under Iowa Code §§ 554.2711 and 554.2608.

19             447.    Ford was provided notice of these issues by numerous complaints filed against it,

20   including the instant Complaint, and by numerous individual letters and communications sent by

21   Plaintiff and the other Class members before or within a reasonable amount of time after Ford

22   issued the TSBs and the allegations of Class Vehicle defects became public.

23             448.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and

24   the other Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**F.    Claims Brought on Behalf of the Massachusetts Class**

<center>COUNT I<br>
VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT<br>
(MASS. GEN. LAWS CH. 93A)</center>

449.    Plaintiff William Creed ("Plaintiff," for purposes of all Massachusetts Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

450.    Plaintiff brings this Count on behalf of the Massachusetts Class.

451.    The conduct of Ford as set forth herein constitutes unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, including but not limited to Ford's design, manufacture, and sale of Class Vehicles with the defective MyFord Touch system, which Ford failed to adequately investigate, disclose, and remedy, and its omissions regarding the safety, reliability, and functionality of its Class Vehicles, which omissions possessed the tendency to deceive.

452.    Ford engages in the conduct of trade or commerce and the misconduct alleged herein occurred in trade or commerce.

453.    Plaintiff, individually and on behalf of the other Class members, has made a demand on Ford pursuant to Mass. Gen. Laws Ch. 93A, § 9(3).  The letter was transmitted to Ford on July 22, 2013.  The letter asserted that rights of consumers as claimants had been violated, described the unfair and deceptive acts committed by Ford, and specified the injuries the Plaintiff and the other Class members have suffered and the relief they seek.

454.    Therefore, Plaintiff seeks monetary and equitable relief under the Massachusetts Consumer Protection Act as a result of Ford's unfair and deceptive acts and practices.

<center>COUNT II<br>
BREACH OF EXPRESS WARRANTY<br>
(MASS. GEN. LAWS CH. 106, § 2-313)</center>

455.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

456.    Plaintiff brings this Count on behalf of the Massachusetts Class.

457.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles.

<center>- 109 -</center>

458.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicle Warranty Guides:

> Under your New Vehicle Limited Warranty if:
>
> -your Ford vehicle is properly operated and maintained, and
>
> -was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

459.    Ford's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a MyFord Touch system from Ford.

460.    Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

461.    Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

462.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

463.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding

- 110 -

1    its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or

2    lease the Class Vehicles under false and/or fraudulent pretenses.

3         464.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

4    through the limited remedy of "replacement or adjustments," as many incidental and consequential

5    damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to

6    its failure and/or continued failure to provide such limited remedy within a reasonable time, and any

7    limitation on Plaintiff's and the other Class members' remedies would be insufficient to make

8    Plaintiff and the other Class members whole.

9         465.    Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other

10   Class members assert as an additional and/or alternative remedy, as set forth in Mass. Gen. Laws

11   Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the

12   other Class members of the purchase price of all Class Vehicles currently owned for such other

13   incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-

14   608.

15        466.    Ford was provided notice of these issues by numerous complaints filed against it,

16   including the instant Complaint, and by numerous individual letters and communications sent by

17   Plaintiff and the other Class members before or within a reasonable amount of time after Ford

18   issued the TSBs and the allegations of Class Vehicle defects became public.

19        467.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and

20   the other Class members have been damaged in an amount to be determined at trial.

21                              **COUNT III**
                **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
22                     **(MASS. GEN. LAWS CH. 106, § 2-314)**

23        468.    Plaintiff incorporates by reference all preceding allegations as though fully set forth

24   herein.

25        469.    Plaintiff brings this Count on behalf of the Massachusetts Class.

26        470.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

27        471.    A warranty that the Class Vehicles were in merchantable condition is implied by law

28   in the instant transactions.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                          CASE NO. 13-CV-3072-EMC

472. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' MyFord Touch systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

473. Ford was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

474. As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV
## FRAUDULENT CONCEALMENT
## (BASED ON MASSACHUSETTS LAW)

475. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

476. Plaintiff brings this Count on behalf of the Massachusetts Class.

477. Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

478. Ford further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had significant defects, and would not perform and operate properly when driven in normal usage.

479. Ford knew at the time it actively concealed this information that this information was material.

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

480.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

481.    Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiff and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

482.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

483.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others.  Ford intentionally made the false statements in order to sell Class Vehicles.

484.    Plaintiff and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

485.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

486.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

1   **G.      Claims Brought on Behalf of the New Jersey Class**

2                                    **COUNT I**
                     **VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
3                              **(N.J. STAT. ANN. §§ 56:8-1, *et seq.*)**

4          487.    Plaintiffs Joshua Matlin and Russ Rizzo ("Plaintiffs," for purposes of all New Jersey

5   Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

6          488.    Plaintiffs bring this Count on behalf of the New Jersey Class.

7          489.    The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJ CFA"),

8   prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

9          490.    In the course of Ford's business, it willfully failed to disclose and actively concealed

10  the dangerous risk of MyFord Touch system failure in Class Vehicles as described above.

11  Accordingly, Ford engaged in unfair and deceptive trade practices, including engaging in conduct

12  likely to deceive.  Further, Ford's acts and practices described herein offend established public

13  policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit

14  associated with such practices, and because Ford fraudulently concealed the defective nature of the

15  Class Vehicles from consumers.

16         491.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

17         492.    Ford's conduct proximately caused injuries to Plaintiffs and the other Class

18  members.

19         493.    Plaintiffs and the other Class members were injured as a result of Ford's conduct in

20  that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the

21  benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries

22  are the direct and natural consequence of Ford's omissions.

23         494.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney

24  General with a copy of this Complaint.

25                                   **COUNT II**
                          **BREACH OF EXPRESS WARRANTY**
26                            **(N.J. STAT. ANN. § 12A:2-313)**

27         495.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

28  herein.

THIRD AMENDED CLASS ACTION COMPLAINT

496.     Plaintiffs bring this Count on behalf of the New Jersey Class.

497.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

498.     In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicle Warranty Guides:

>   Under your New Vehicle Limited Warranty if:
>
>   -your Ford vehicle is properly operated and maintained, and
>
>   -was taken to a Ford dealership for a warranted repair during the warranty period,
>
>   then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

499.     Ford's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with a MyFord Touch system from Ford.

500.     Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

501.     Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

502.     Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

503.     Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and

- 115 -

1    were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding

2    its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or

3    lease the Class Vehicles under false and/or fraudulent pretenses.

4         504.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

5    through the limited remedy of "replacement or adjustments," as many incidental and consequential

6    damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to

7    its failure and/or continued failure to provide such limited remedy within a reasonable time, and any

8    limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make

9    Plaintiffs and the other Class members whole.

10        505.    Finally, due to Ford's breach of warranty as set forth herein, Plaintiffs and the other

11   Class members assert as an additional and/or alternative remedy, as set forth in N.J. Stat. Ann

12   § 12A:2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the

13   other Class members of the purchase price of all Class Vehicles currently owned for such other

14   incidental and consequential damages as allowed under N.J. Stat. Ann. §§ 12A:2-711 and 12A:2-

15   608.

16        506.    Ford was provided notice of these issues by numerous complaints filed against it,

17   including the instant Complaint, and by numerous individual letters and communications sent by

18   Plaintiffs and the other Class members before or within a reasonable amount of time after Ford

19   issued the TSBs and the allegations of Class Vehicle defects became public.

20        507.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and

21   the other Class members have been damaged in an amount to be determined at trial.

22                                          **COUNT III**
                       **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
23                               **(N.J. STAT. ANN. § 12A:2-314)**

24        508.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

25   herein.

26        509.    Plaintiffs bring this Count on behalf of the New Jersey Class.

27        510.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11 817775 V1                                                      CASE NO. 13-CV-3072-EMC

511.    A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

512.    These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' MyFord Touch systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

513.    Ford was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

514.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON NEW JERSEY LAW)**

</div>

515.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

516.    Plaintiffs bring this Count on behalf of the New Jersey Class.

517.    Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

518.    Ford further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had significant defects, and would not perform and operate properly when driven in normal usage.

519.    Ford knew at the time it actively concealed this information that this information was material.

<div align="center">- 117 -</div>

520.     The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

521.     Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiffs and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

522.     The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

523.     The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others.  Ford intentionally made the false statements in order to sell Class Vehicles.

524.     Plaintiffs and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

525.     As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

526.     Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

THIRD AMENDED CLASS ACTION COMPLAINT

**H.     Claims Brought on Behalf of the New York Class**

<div align="center">

**COUNT I**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW § 349)**

</div>

527.    Plaintiffs Jeffrey Miller and Nuala Purcell ("Plaintiffs," for purposes of all New York Class Counts) incorporate by reference all preceding allegations as though fully set forth herein.

528.    Plaintiffs bring this Count on behalf of the New York Class.  Plaintiffs Miller and Purcell are both pursuing omission claims pursuant to this Count.  Plaintiff Miller is also pursuing misrepresentation claims pursuant to this Count.

529.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

530.    In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk of MyFord Touch system failure in Class Vehicles as described above. Accordingly, Ford engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

531.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

532.    Because Ford's deception takes place in the context of automobile safety, its deception affects the public interest.  Further, Ford's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

533.    Ford's conduct proximately caused injuries to Plaintiffs and the other Class members.

534.    Plaintiffs and the other Class members were injured as a result of Ford's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

<div align="center">

- 119 -

</div>

**COUNT II**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. GEN. BUS. LAW § 350)**

535.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

536.    Plaintiffs bring this Count on behalf of the New York Class.

537.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…."  N.Y. Gen. Bus. Law § 350-a.

538.    Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

539.    Ford has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the dangerous risk of MyFord Touch system failure in Class Vehicles as described above, as well as the inherently defective nature of the MyFord Touch system as designed and sold by Ford, and the loss of communications and entertainment functionality as described above, were material and likely to deceive a reasonable consumer.

540.    Plaintiffs and the other Class members have suffered injury, including the loss of money or property, as a result of Ford's false advertising.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the representations and/or omissions of Ford with respect to the safety, quality, functionality, and reliability of the Class Vehicles.  Ford's representations turned out to be untrue because the MyFord Touch systems installed in Class Vehicles are prone to total system failures, diminished or completely inoperable functionality, and other failures as described hereinabove.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                                                  CASE NO. 13-CV-3072-EMC

541.     Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

542.     Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful and/or deceptive practices.  Plaintiffs and the other Class members are also entitled to recover their actual damages or $500, whichever is greater.  Because Ford acted willfully or knowingly, Plaintiffs and the other Class members are entitled to recover three times actual damages, up to $10,000.

<div align="center">

**COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. § 2-313)**

</div>

543.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

544.     Plaintiffs acknowledge that the Court dismissed this claim on behalf of Plaintiff Miller (but not Plaintiff Purcell) without prejudice for failure to present his car for repair, and re-assert it hereon on behalf of Miller only to preserve any appellate rights.  This claim is also asserted on behalf of Plaintiff Purcell.

545.     Plaintiffs bring this Count on behalf of the New York Class.

546.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

547.     In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicle Warranty Guides:

> Under your New Vehicle Limited Warranty if:
>
> -your Ford vehicle is properly operated and maintained, and
>
> -was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or
>
> adjust all parts on your vehicle that malfunction or fail during normal use during the

<div align="center">- 121 -</div>

applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

548.    Ford's Limited Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with a MyFord Touch system from Ford.

549.    Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

550.    Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

551.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

552.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

553.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

554.     Finally, due to Ford's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in N.Y. U.C.C. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under N.Y. U.C.C. §§ 2-711 and 2-608.

555.     Ford was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and the other Class members before or within a reasonable amount of time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

556.     As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT IV
## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK LAW)

557.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

558.     Plaintiffs bring this Count on behalf of the New York Class.

559.     Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

560.     Ford further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had significant defects, and would not perform and operate properly when driven in normal usage.

561.     Ford knew at the time it actively concealed this information that this information was material.

562.     The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

- 123 -

563.    Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiffs and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

564.    The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

565.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others.  Ford intentionally made the false statements in order to sell Class Vehicles.

566.    Plaintiffs and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

567.    As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

568.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

I.      **Claims Brought on Behalf of the North Carolina Class**

<div align="center">

**COUNT I**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. GEN. STAT. §§ 75-1.1, *et seq.*)**

</div>

569.    Plaintiff Daniel Fink ("Plaintiff," for purposes of all North Carolina Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

570.    Plaintiff brings this Count on behalf of the North Carolina Class.

571.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. Gen. Stat. § 75-16.

572.    Ford's acts and practices complained of herein were performed in the course of Ford's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

573.    In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk of MyFord Touch system failure in Class Vehicles as described above. Accordingly, Ford engaged in unlawful trade practices, including engaging in conduct likely to deceive.

574.    Ford's conduct proximately caused injuries to Plaintiff and the other Class members.

575.    Ford acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

576.    Plaintiff and the other Class members were injured as a result of Ford's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Ford's omissions.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                                CASE NO. 13-CV-3072-EMC

577.     Plaintiff, individually and on behalf of the other Class members, seeks treble damages pursuant to N.C. Gen. Stat. § 75-16, and an award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

### COUNT II
### BREACH OF EXPRESS WARRANTY
### (N.C. GEN. STAT. § 25-2-313)

578.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

579.     Plaintiff brings this Count on behalf of the North Carolina Class.

580.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

581.     In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicle Warranty Guides:

> Under your New Vehicle Limited Warranty if:
>
> -your Ford vehicle is properly operated and maintained, and
>
> -was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

582.     Ford's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a MyFord Touch system from Ford.

583.     Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

584.     Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the

- 126 -

1    other Class members whole and because Ford has failed and/or has refused to adequately provide

2    the promised remedies within a reasonable time.

3         585.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the

4    limited warranty of repair or adjustments to parts defective in materials or workmanship, and

5    Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by

6    law.

7         586.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the

8    Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and

9    were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding

10   its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or

11   lease the Class Vehicles under false and/or fraudulent pretenses.

12        587.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

13   through the limited remedy of "replacement or adjustments," as many incidental and consequential

14   damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to

15   its failure and/or continued failure to provide such limited remedy within a reasonable time, and any

16   limitation on Plaintiff's and the other Class members' remedies would be insufficient to make

17   Plaintiff and the other Class members whole.

18        588.    Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other

19   Class members assert as an additional and/or alternative remedy, as set forth in N.C. Gen. Stat.

20   § 25-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other

21   Class members of the purchase price of all Class Vehicles currently owned for such other incidental

22   and consequential damages as allowed under N.C. Gen. Stat. §§ 25-2-711 and 25-2-608.

23        589.    Ford was provided notice of these issues by numerous complaints filed against it,

24   including the instant Complaint, and by numerous individual letters and communications sent by

25   Plaintiff and the other Class members before or within a reasonable amount of time after Ford

26   issued the TSBs and the allegations of Class Vehicle defects became public.

27        590.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and

28   the other Class members have been damaged in an amount to be determined at trial.

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                              CASE NO. 13-CV-3072-EMC

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.C. GEN. STAT. § 25-2-314)**

591.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

592.     Plaintiff brings this Count on behalf of the North Carolina Class.

593.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

594.     A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

595.     These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' MyFord Touch systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

596.     Ford was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and other Class members before or within a reasonable amount of time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

597.     As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON NORTH CAROLINA LAW)**

598.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

599.     Plaintiff brings this Count on behalf of the North Carolina Class.

600.     Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

- 128 -

601.    Ford further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had significant defects, and would not perform and operate properly when driven in normal usage.

602.    Ford knew at the time it actively concealed this information that this information was material.

603.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

604.    Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiff and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

605.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

606.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others.  Ford intentionally made the false statements in order to sell Class Vehicles.

607.    Plaintiff and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

- 129 -

608.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

609.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

**J.      Claims Brought on Behalf of the Ohio Class**

<div align="center">

**COUNT I**
**VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT**
**(OHIO REV. CODE §§ 1345.01, *et seq.*)**

</div>

610.    Plaintiff Jerome Miskell ("Plaintiff," for purposes of all Ohio Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

611.    Plaintiff brings this Count on behalf of the Ohio Class.

612.    Plaintiff and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA"). Ford is a "supplier" as defined by the OCSPA. Plaintiff's and the other Ohio Class members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the OCSPA.

613.    By failing to disclose and actively concealing the defects in the MyFord Touch systems in the Class Vehicles, Ford engaged in deceptive business practices prohibited by the OCSPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

614.    Ford knew that the MyFord Touch systems in the Class Vehicles were defectively designed or manufactured, would fail without warning, and were not suitable for their intended use. Ford nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

615.    Ford owed Plaintiff a duty to disclose the defective nature of the MyFord Touch systems in the Class Vehicles, because Ford:

> i)      Possessed exclusive knowledge of the defects rendering the Class Vehicles more unreliable than similar vehicles;

<div align="center">

- 130 -

</div>

  ii)  Intentionally concealed the defects associated with MyFord Touch through its deceptive marketing campaign and recall program that it designed to hide the defects in the MyFord Touch system; and/or

  iii)  Made incomplete representations about the characteristics and performance of the MyFord Touch system generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

616. Ford's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the MyFord Touch system.

617. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

  a. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

  b. *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

  c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

  d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

  e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Oho App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

  f. *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

  g. *Mark J. Crawford, et al. v. Joseph Airport Toyota, Inc*. (OPIF #10001586);

  h. *State ex rel. William J. Brown v. Harold Lyons, et al*. (OPIF #10000304);

  i. *Brinkman v. Mazda Motor of America, Inc*. (OPIF #10001427);

  j. *Khouri v. Don Lewis* (OPIF #100001995);

  k. *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.     *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m.     *Brown v. Spears* (OPIF #10000403).

618.     As a result of its violations of the OCSPA detailed above, Ford caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff.  Plaintiff currently owns or leases, or within the class period has owned or leased, a Class Vehicle that is defective.  Defects associated with the MyFord Touch system have caused the value of Class Vehicles to decrease.

619.     Plaintiff and the Class sustained damages as a result of the Ford's unlawful acts and are, therefore, entitled to damages and other relief as provided under the OCSPA.

620.     Plaintiff also seeks court costs and attorneys' fees as a result of Ford's violation of the OCSPA as provided in Ohio Rev. Code § 1345.09.

### COUNT II
### BREACH OF EXPRESS WARRANTY
### (OHIO REV. CODE § 1302.26)

621.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.  Plaintiff acknowledges that this claim had been dismissed without prejudice in the Court's first opinion for failure to present car for repair, and re-assert it herein only to preserve applicable appellate rights.

622.     Plaintiff brings this Count on behalf of the Ohio Class.

623.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

624.     In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  For example, the following language appears in all Class Vehicle Warranty Guides:

Under your New Vehicle Limited Warranty if:

-your Ford vehicle is properly operated and maintained, and

-was taken to a Ford dealership for a warranted repair during the warranty period,

then authorized Ford Motor Company dealers will, without charge, repair, replace, or

adjust all parts on your vehicle that malfunction or fail during normal use during the

applicable coverage period due to a manufacturing defect in factory-supplied

materials or factory workmanship.

- 132 -

625.     Ford's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a MyFord Touch system from Ford.

626.     Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

627.     Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

628.     Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

629.     Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

630.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

631.     Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Ohio Rev. Code § 1302.66, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other

- 133 -

1    Class members of the purchase price of all Class Vehicles currently owned for such other incidental

2    and consequential damages as allowed under Ohio Rev. Code §§ 1302.66 and 1302.85.

3         632.    Ford was provided notice of these issues by numerous complaints filed against it,

4    including the instant Complaint, and by numerous individual letters and communications sent by

5    Plaintiff and the other Class members before or within a reasonable amount of time after Ford

6    issued the TSBs and the allegations of Class Vehicle defects became public.

7         633.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and

8    the other Class members have been damaged in an amount to be determined at trial.

9                              **COUNT III**
                   **BREACH OF IMPLIED WARRANTY IN TORT**
10                           **(BASED ON OHIO LAW)**

11        634.    Plaintiff incorporates by reference all preceding allegations as though fully set forth

12   herein.

13        635.    Plaintiff brings this Count on behalf of the Ohio Class.

14        636.    The Class Vehicles contained a design defect, namely, an in-car communication and

15   entertainment system that routinely fails, completely or partially, resulting in loss of crucial safety,

16   communications, and entertainment functions, as detailed herein more fully.

17        637.    The design, manufacturing, and/or assembly defect existed at the time these Class

18   Vehicles containing the MyFord Touch system left the hands of Ford.

19        638.    Based upon the dangerous product defect and its certainty to occur, Ford failed to

20   meet the expectations of a reasonable consumer.  The Class Vehicles failed their ordinary, intended

21   use because the MyFord Touch defect does not function (when it functions at all) as a reasonable

22   consumer would expect.  Moreover, it presents a serious danger to Plaintiff and the other Class

23   members that cannot be eliminated without significant cost.

24        639.    The design defect in the MyFord Touch systems in these Class Vehicles was the

25   direct and proximate cause of economic damages to Plaintiff, as well as damages incurred or to be

26   incurred by each of the other Class members.

27

28

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                          CASE NO. 13-CV-3072-EMC

**COUNT IV**
**NEGLIGENCE**
**(BASED ON OHIO LAW)**

640.    Ford owed Plaintiff and the other Class members the duty to design and manufacture the Class Vehicles in such a way as to ensure that the in-car communication and entertainment systems installed therein worked reasonably well and presented no significant risks to the safe operation of the vehicles.

641.    Ford breached this duty by negligently designing and/or manufacturing the Class Vehicles, including, but not limited to, the negligent design and/or manufacture of the Vehicles' MyFord Touch systems as more fully described in this Complaint.

642.    As a direct and proximate result of Ford's negligence, Plaintiff and the other Class members have sustained damages.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**(BASED ON OHIO LAW)**

643.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

644.    Plaintiff brings this Count on behalf of the Ohio Class.

645.    Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members' information that is highly relevant to their purchasing decision.

646.    Ford further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

647.    Ford knew at the time it actively concealed this information that this information was material.

648.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

- 135 -

649.    Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiff and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

650.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

651.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others.  Ford intentionally made the false statements in order to sell Class Vehicles.

652.    Plaintiff and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

653.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

654.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

1

**K.      Claims Brought on Behalf of the Texas Class**

2

<div align="center">

**COUNT I**
**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT**
**(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)**

</div>

3

4       655.    Plaintiffs Jose Randy Rodriguez and Michael Ervin ("Plaintiffs," for purposes of all

5    Texas Class Counts) incorporate by reference all preceding allegations as though fully set forth

6    herein.

7       656.    Plaintiffs bring this Count on behalf of the Texas Class.

8       657.    Plaintiffs and Ford are each "persons" as defined by Tex. Bus. & Com. Code

9    § 17.45(3).  The Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1).  Plaintiffs

10   and the other Texas Class members are "consumers" as defined in Tex. Bus. & Com. Code

11   § 17.45(4).  Ford has at all relevant times engaged in "trade" and "commerce" as defined in Tex.

12   Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing

13   the Class Vehicles in Texas, directly or indirectly affecting Texas citizens through that trade and

14   commerce.

15      658.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or

16   practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"),

17   Tex. Bus. & Com. Code §§ 17.41, *et seq.*

18      659.    By failing to disclose and actively concealing the defects in the MyFord Touch

19   systems in the Class Vehicles, Ford engaged in deceptive business practices prohibited by the

20   DTPA, including  engaging in acts or practices which are unfair, misleading, false, or deceptive to

21   the consumer.

22      660.    Ford knew that the MyFord Touch systems in the Class Vehicles were defectively

23   designed or manufactured, would fail without warning, and were not suitable for their intended use.

24   Ford nevertheless failed to warn Plaintiffs about these defects despite having a duty to do so.

25      661.    Ford owed Plaintiffs a duty to disclose the defective nature of the MyFord Touch

26   systems in the Class Vehicles, because Ford:

27              i)      Possessed exclusive knowledge of the defects rendering the Class Vehicles

28                      more unreliable than similar vehicles;

<div align="center">- 137 -</div>

ii)    Intentionally concealed the defects associated with MyFord Touch through its deceptive marketing campaign and recall program that it designed to hide the defects in the MyFord Touch system; and/or

iii)   Made incomplete representations about the characteristics and performance of the MyFord Touch system generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

662.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance and characteristics of the MyFord Touch system.

663.   Ford's intentional concealment of and failure to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class members constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs and the other Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs and the other Class members.

664.   Ford is also liable under Tex. Bus. & Com. Code § 17.50(a) because Ford's breach of the implied warranty of merchantability set forth herein was a producing cause of economic damages sustained by Plaintiffs and the other Class members.

665.   As a result of its violations of the DTPA detailed above, Ford caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or leased, a Class Vehicle that is defective.  Defects associated with the MyFord Touch system have caused the value of Class Vehicles to decrease.

666.   All procedural prerequisites, including notice, have been met.  The giving of notice to Ford is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b) and unnecessary because Ford has notice of the claims against it through the numerous complaints filed against it.  Pursuant to Tex. Bus. & Com. Code § 17.505(b), Plaintiffs, individually and on behalf of the other Class members, will send to the Texas Consumer Protection Division a copy of this Complaint.

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1                                                      CASE NO. 13-CV-3072-EMC

667.    Plaintiffs and the Class sustained damages as a result of the Ford's unlawful acts and are, therefore, entitled to damages and other relief as provided under the DTPA.

668.    Plaintiffs and the other Class members should be awarded three times the amount of their economic damages because Ford intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

## COUNT II
## FRAUD BY CONCEALMENT
## (BASED ON TEXAS LAW)

669.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

670.    Plaintiffs bring this Count on behalf of the Texas Class.

671.    As set forth above, Ford concealed and/or suppressed material facts concerning the safety and functionality of its Class Vehicles.

672.    Ford had a duty to disclose these safety and functionality issues because it consistently marketed its Class Vehicles as safe, reliable, and of a high quality, and proclaimed that safety is one of Ford's highest corporate priorities.  Once Ford made representations to the public about vehicle safety, Ford was under a duty to disclose these omitted facts, because where one speaks one must speak the whole truth and not conceal any facts which materially qualify or undermine those facts that are stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

673.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford, who has superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members until after the Class Vehicles were purchased or leased.  These omitted facts were material because they directly impact the safety and functionality of the Class Vehicles.  Whether or not a vehicle's defroster and other climate systems work; whether the rearview camera monitor is reliably displaying what is actually behind the car, and is otherwise in working condition; whether the automatic emergency notification system will in fact dial 9-1-1 and transmit GPS coordinates to emergency service providers upon collision; and the other functions that fail as a result of the defect

- 139 -

1   alleged herein, are material safety concerns.  Ford possessed exclusive knowledge of the defects

2   rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

3          674.    Ford was deliberately silent and actively concealed and/or suppressed these material

4   facts, in whole or in part, with the intent to induce Plaintiffs and the other Class members to

5   purchase or lease Class Vehicles at a higher price than they otherwise would pay, which did not

6   match the Class Vehicles' true value.

7          675.    Ford still has not made full and adequate disclosure and continues to defraud

8   Plaintiffs and the other Class members.

9          676.    Plaintiffs and the other Class members were unaware of these omitted material facts

10  and would not have acted as they did if they had known of the concealed and/or suppressed facts.

11  Plaintiffs' and the other Class members' actions were reasonable and justified.  Ford was in

12  exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the

13  other Class members.

14         677.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the other

15  Class members sustained damage.

16         678.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud,

17  and in reckless disregard of Plaintiffs' and the other Class members' rights and well-being to enrich

18  Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter

19  such conduct in the future, which amount is to be determined according to proof.

20  **L.     Claims Brought on Behalf of the Virginia Class**

21                          **COUNT I**
            **VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
22                **(VA. CODE ANN. §§ 59.1-196, *et seq.*)**

23         679.    Plaintiffs Jason Connell and Henry Miller-Jones ("Plaintiffs," for purposes of all

24  Virginia Class Counts) incorporate by reference all preceding allegations as though fully set forth

25  herein.

26         680.    Plaintiffs bring this Count on behalf of the Virginia Class.

27

28
                                            - 140 -

681.    The Virginia Consumer Protection prohibits "(14) using any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

682.    Ford is a "person" as defined by Va. Code Ann. § 59.1-198.  The transactions between Plaintiffs and the other Class members on one hand and Ford on the other, leading to the purchase or lease of the Class Vehicles by Plaintiffs and the other Class members, are "consumer transactions" as defined by Va. Code Ann. § 59.1-198, because the Class Vehicles were purchased or leased primarily for personal, family or household purposes.

683.    In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk of MyFord Touch system failure in Class Vehicles as described above. Accordingly, Ford engaged in acts and practices violating Va. Code Ann. § 59.1-200(A), including engaging in conduct likely to deceive.

684.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

685.    Ford's conduct proximately caused injuries to Plaintiffs and the other Class members.

686.    Plaintiffs and the other Class members were injured as a result of Ford's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Ford's omissions.

687.    Ford actively and willfully concealed and/or suppressed the material facts regarding the defective and unreasonably dangerous nature of the MyFord Touch system and the Class Vehicles, in whole or in part, with the intent to deceive and mislead Plaintiffs and the other Class members and to induce Plaintiffs and the other Class members to purchase or lease Class Vehicles at a higher price, which did not match the Class Vehicles' true value.  Plaintiffs and the other Class members therefore seek treble damages.

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

1

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(VA. CODE ANN. § 8.2-313)**

2

3    688.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

4    herein.

5    689.    Plaintiffs bring this Count on behalf of the Virginia Class.

6    690.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

7    691.    In its Limited Warranty, Ford expressly warranted that it would repair or replace

8    defects in material or workmanship free of charge if they became apparent during the warranty

9    period.  For example, the following language appears in all Class Vehicle Warranty Guides:

10                    Under your New Vehicle Limited Warranty if:

11                    -your Ford vehicle is properly operated and maintained, and

12                    -was taken to a Ford dealership for a warranted repair during the warranty period,

13                    then authorized Ford Motor Company dealers will, without charge, repair, replace, or

14                    adjust all parts on your vehicle that malfunction or fail during normal use during the

15                    applicable coverage period due to a manufacturing defect in factory-supplied

16                    materials or factory workmanship.

17    692.    Ford's Limited Warranty formed the basis of the bargain that was reached when

18    Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with a

19    MyFord Touch system from Ford.

20    693.    Ford breached the express warranty to repair and adjust to correct defects in

21    materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has

22    been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23    694.    Furthermore, the limited warranty of repair and/or adjustments to defective parts,

24    fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the

25    other Class members whole and because Ford has failed and/or has refused to adequately provide

26    the promised remedies within a reasonable time.

27    695.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the

28    limited warranty of repair or adjustments to parts defective in materials or workmanship, and

- 142 -

1    Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by

2    law.

3          696.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the

4    Class Vehicles it knew that the Class Vehicles did not conform to Ford's Limited Warranty and

5    were inherently defective, and Ford wrongfully and fraudulently concealed material facts regarding

6    its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or

7    lease the Class Vehicles under false and/or fraudulent pretenses.

8          697.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

9    through the limited remedy of "replacement or adjustments," as many incidental and consequential

10   damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to

11   its failure and/or continued failure to provide such limited remedy within a reasonable time, and any

12   limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make

13   Plaintiffs and the other Class members whole.

14         698.    Finally, due to Ford's breach of warranty as set forth herein, Plaintiffs and the other

15   Class members assert as an additional and/or alternative remedy, as set forth in Va. Code Ann.

16   § 8.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other

17   Class members of the purchase price of all Class Vehicles currently owned for such other incidental

18   and consequential damages as allowed under Va. Code Ann. §§ 8.2-711 and 8.2-608.

19         699.    Ford was provided notice of these issues by numerous complaints filed against it,

20   including the instant Complaint, and by numerous individual letters and communications sent by

21   Plaintiffs and the other Class members before or within a reasonable amount of time after Ford

22   issued the TSBs and the allegations of Class Vehicle defects became public.

23         700.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and

24   the other Class members have been damaged in an amount to be determined at trial.

25   <center>**COUNT III**</center>
<center>**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**</center>
26   <center>**(VA. CODE ANN. § 8.2-314)**</center>

27         701.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth

28   herein.

<center>- 143 -</center>

THIRD AMENDED CLASS ACTION COMPLAINT

702.   Plaintiffs bring this Count on behalf of the Virginia Class.

703.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

704.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

705.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' MyFord Touch systems rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

706.   Ford was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after Ford issued the TSBs and the allegations of Class Vehicle defects became public.

707.   As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(BASED ON VIRGINIA LAW)**

708.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

709.   Plaintiffs bring this Count on behalf of the Virginia Class.

710.   Ford intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

711.   Ford further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Class Vehicles it was selling had significant defects, and would not perform and operate properly when driven in normal usage.

- 144 -

712. Ford knew at the time it actively concealed this information that this information was material.

713. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective MyFord Touch systems, as alleged herein.

714. Ford had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles would be rendered inoperative due to faulty and defective MyFord Touch systems, because Plaintiffs and the other Class members relied on Ford's material representations that the Class Vehicles they were purchasing were safe and free from defects.

715. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

716. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Ford knew or recklessly disregarded that its representations were false because it knew that people had experienced inoperative climate control systems, audio systems, rearview camera systems, hands-free telephone systems, GPS navigation systems, and automatic emergency notification systems, among others. Ford intentionally made the false statements in order to sell Class Vehicles.

717. Plaintiffs and the other Class members relied on Ford's reputation – along with Ford's failure to disclose the faulty and defective nature of the MyFord Touch system – in purchasing or leasing Ford's Class Vehicles.

718. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

719. Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

- 145 -

**M.     Claims Brought on Behalf of the Washington Class**

<div align="center">

**COUNT I**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. §§ 19.86.010, *et seq*.)**

</div>

720.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

721.     Plaintiffs bring this Count on behalf of the Washington Class.

722.     The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Ford's manufacture and sale of vehicles with MyFord Touch defect(s), which Ford failed to adequately investigate, disclose and remedy. Further, Ford knew about these defects prior to the sale of the Class Vehicles but did not disclose the existence of these defects to Plaintiff and the Washington Class members.  Ford also omitted information regarding the safety and reliability of the Class Vehicles.

723.     Ford's actions as set forth above occurred in the conduct of trade or commerce.

724.     Ford's actions constituted a generalized course of deception that impacts the public interest because Plaintiffs and the Washington Class members were injured in exactly the same way as millions of others purchasing and/or leasing Ford vehicles and that the failure to follow the practices pertaining to motor vehicle warranties in Wash. Rev. Code § 19.18 is recognized by statute as matters vitally affecting the public interest.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business and has the potential for repetition.

725.     Ford's actions as set forth above induced Plaintiffs and the Washington Class members to purchase their Class Vehicles from Ford and/or pay a higher price for their Class Vehicles than they otherwise would have.

726.     Plaintiffs and the Washington Class members were injured as a result of Ford's conduct.  Due to Ford's deceptive or unfair conduct, Plaintiffs and the Washington Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Their vehicles have also suffered a diminution in value.

<div align="center">

- 146 -

</div>

727.     Ford's conduct proximately caused the injuries to Plaintiffs and the Washington Class members.

728.     Ford is liable to Plaintiffs and the Washington Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

729.     Pursuant to Wash. Rev. Code § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs and the Washington Class members seek injunctive relief.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(Rev. Code Wash. § 62A.2-313)**

</div>

730.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

731.     Plaintiffs bring this Count on behalf of the Washington Class.

732.     As an express warrantor and manufacturer and merchant, Ford had certain obligations under Wash. Rev. Code § 62A.2-313 to conform the Class Vehicles to the express warranties.

733.     When Plaintiffs and the Washington Class members purchased or leased their Class Vehicles, Ford expressly warranted in writing that the Class Vehicles were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. As set forth in Section VI., *supra.* Ford expressly warranted that it "will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

734.     The defects at issue in this litigation were present at the time of sale and lease to Plaintiffs and members of the Washington Class.

735.     Ford breached the Limited Warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford as Ford has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

736.     Furthermore, the Limited Warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and

- 147 -

1    the Washington Class members whole and because the Ford has failed and/or have refused to

2    adequately provide the promised remedies within a reasonable time.

3         737.    Pursuant to the express warranties, Ford was obligated to pay for or reimburse

4    Plaintiffs and the Washington Class members for costs incurred in purchasing new peripheral

5    devices that Ford represented were compliant with the MyFord Touch system and other costs

6    associated with bringing their Class Vehicles to the dealership for futile repair efforts. Ford was also

7    obligated to repair the defects.

8         738.    Accordingly, recovery by the Plaintiffs and the Washington Class members is not

9    limited to the Limited Warranty of repair or adjustments to parts defective in materials or

10   workmanship, and Plaintiffs and the Washington Class members seek all remedies as allowed by

11   law.

12        739.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the

13   Class Vehicles, and while knowing that the Class Vehicles did not conform to Ford's Limited

14   Warranty and were inherently defective, Ford wrongfully and fraudulently concealed material facts

15   regarding the Class Vehicles.  Plaintiff and the Washington Class members were therefore induced

16   to purchase the Class Vehicles under false and/or fraudulent pretenses.

17        740.    Ford and its agent dealers have failed and refused to conform the Class Vehicles to

18   the express warranties and Ford's conduct and has voided any attempt on its part to disclaim

19   liability for its actions.

20        741.    Moreover, many of the damages flowing from the Class Vehicles cannot be resolved

21   through the limited remedy of "replacement or adjustments," as those incidental and consequential

22   damages have already been suffered due to the Ford's fraudulent conduct as alleged herein, and due

23   to its failure and/or continued failure to provide such limited remedy within a reasonable time, and

24   any limitation on Plaintiffs' and the Washington Class members' remedies would be insufficient to

25   make Plaintiffs and the Washington Class whole.

26        742.    Ford received timely notice regarding the problems at issue in this litigation (indeed

27   Ford knew of the defects prior to offering the Class Vehicles for sale or lease). Ford was also

28   provided notice of these issues almost immediately after launching the first Class Vehicles through

- 148 -

1    the receipt of numerous complaints regarding the MyFord Touch. Ford has received, on information

2    and belief, tens of thousands of complaints and other notices from consumers, including Ford's own

3    employees, advising them of the defects at issue in this litigation.

4           743.    Washington Plaintiff has performed each and every duty required under the terms of

5    the warranties, except as may have been excused or prevented by the conduct of Ford or by

6    operation of law in light of Ford's unconscionable conduct.

7           744.    Washington Plaintiff has had sufficient dealings with either Ford or its agents

8    (dealerships) to establish privity of contract. Privity is not required in this case because Plaintiffs

9    and the Washington Class members are intended third-party beneficiaries of contracts between Ford

10   and its dealers; specifically, they are the intended beneficiaries of Ford's express warranties and

11   these warranties were advertised to Plaintiffs and the Washington Class members as the ultimate

12   consumers.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and

13   have no rights under the warranty agreements provided with the Class Vehicles; the warranty

14   agreements were designed for and intended to benefit the ultimate consumers only.

15          745.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and

16   the Washington Class members have been damaged in an amount to be determined at trial,

17   including but not limited to diminution of value.

18                              **REQUEST FOR RELIEF**

19          WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide and

20   State Classes, respectfully request that the Court enter judgment in their favor and against Ford

21   Motor Company, as follows:

22          A.      Certification of the proposed Nationwide Class and State Law Classes, including

23   appointment of Plaintiffs' counsel as Class Counsel;

24          B.      An order temporarily and permanently enjoining Ford Motor Company from

25   continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this

26   Complaint;

27          C.      Injunctive relief in the form of a recall or free replacement program;

28

THIRD AMENDED CLASS ACTION COMPLAINT

010388-11  817775 V1                                        CASE NO. 13-CV-3072-EMC

1     D.      Costs, restitution, damages, including punitive damages, and disgorgement in an

2  amount to be determined at trial;

3     E.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts

4  awarded;

5     F.      An award of costs and attorneys' fees; and

6     G.      Such other or further relief as may be appropriate.

7                    **DEMAND FOR JURY TRIAL**

8  Plaintiffs hereby demand a jury trial for all claims so triable.

- 150 -

DATED:  September 30, 2015          HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Steve W. Berman_____
           STEVE W. BERMAN
Steve W. Berman
Catherine Y.N. Gannon
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Tel:  (312) 214-0000
Fax:  (312) 214-0001
alevitt@gelaw.com

Roland Tellis (186269)
Mark Pifko (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Tel: (818) 839-2320
Fax: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

Joseph G. Sauder (*pro hac vice*)
Matthew D. Schelkopf (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Tel: (610) 642-8500
Fax: (610) 649-3633
JGS@chimicles.com
MDS@chimicles.com

*Plaintiffs' Interim Co-Lead Counsel*

- 151 -

THIRD AMENDED CLASS ACTION COMPLAINT
010388-11  817775 V1

CASE NO. 13-CV-3072-EMC

1
2
3
4
5

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
715 Hearst Avenue, Suite 202
Berkeley, California  94710
Tel: (510) 725-3000
Fax: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

6
7
8
9
10

Jason A. Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
Tel.: (212) 752-5455
Fax: (917) 210-3980
jasonz@hbsslaw.com

11
12
13
14

Kyle J. McGee
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware  19801
Tel.: (302) 622-7000
Fax: (302) 622-7100
kmcgee@gelaw.com

15
16
17
18
19

Gregory M. Travalio
Mark H. Troutman
ISAAC, WILES, BURKHOLDER & TEETOR LLC
Two Miranova Place, Suite 700
Columbus, Ohio  43215
Tel.: (614) 221-2121
Fax: (614) 365-9516
gtravalio@isaacwiles.com
mtroutman@isaacwiles.com

20
21
22
23

Michael A. Caddell (249469)
Cynthia B. Chapman (164471)
Cory S. Fein (250758)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, Texas  77010
Tel.: (713) 751-0400
Fax: (713) 751-0906

24
25

*Additional Counsel for Plaintiffs and the Proposed Class*

26
27
28

- 152 -

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed

3

electronically via the Court's ECF system, on September 30, 2015.  Notice of electronic filing will

4

be sent to all parties by operation of the Court's electronic filing system.

5

6

Dated: September 30, 2015

7

_/s/ Steve W. Berman_
Steve W. Berman

8

HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300

9

Seattle, Washington  98101
Tel: (206) 623-7292

10

Fax: (206) 623-0594
steve@hbsslaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 153 -