RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
E. CLAY MARQUEZ (S.B. #268424)
cmarquez@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone:     (415) 984-8700
Facsimile:      (415) 984-8701

BRIAN C. ANDERSON (S.B. #126539)
banderson@omm.com
SCOTT M. HAMMACK (*pro hac vice*)
shammack@omm.com
DAVID R. DOREY (S.B. #286843)
ddorey@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone:     (202) 383-5300
Facsimile:      (202) 383-5414

Attorneys for Defendant
FORD MOTOR COMPANY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. CV 13-3072-EMC<br><br>**FORD MOTOR COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND OBJECTIONS TO PLAINTIFFS' EVIDENCE**<br><br>Hearing Date: May 26, 2016<br>Time:          1:30 p.m.<br>Judge:         Hon. Edward M. Chen<br>Courtroom:  5 |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ......................................................................................... 1

II. FACTUAL BACKGROUND ......................................................................... 3

    A.    The MFT System Was a Revolutionary Advance in Automotive Technology ........................................................................................... 3

    B.    Ford's Changes to the MyFord Touch Steadily Eliminated Problems ................... 4

    C.    ████████████ REDACTED ████████████████
        ██████████████████████ .................... 5

    D.    Available Knowledge About the MFT Changed over Time ................................... 6

    E.    The MFT Is Not a Safety System .................................................................... 7

    F.    The Named Plaintiffs' and Others' Experiences with MFT Varied Greatly .......... 7

        1.    Customers Purchased Their Vehicles for Different Reasons ...................... 8

        2.    Customers Negotiated Vehicle Purchases in Different Ways, with Different Results ...................................................................................... 8

        3.    Named Plaintiffs Used Different Features of Their MFT Systems .............. 9

        4.    Customers Had Different Experiences with Their MFT Systems ............... 9

III. RIGOROUS ANALYSIS IS NEEDED OF CLASS ACTION REQUIREMENTS ........ 10

IV. COMMON ISSUES OF LAW AND FACT DO NOT PREDOMINATE ...................... 11

    A.    Plaintiffs' Fraud-Based Claims Require Individual Evidence on Many Issues ........................................................................................................ 12

        1.    The Facts Ford Allegedly Concealed Are Not Common .......................... 13

        2.    Whether the Allegedly Concealed Facts Were Material to Putative Class Members Requires an Individualized Analysis ............................... 15

        3.    Plaintiffs' Safety Allegations Cannot Cure the Lack of Common Evidence Demonstrating Materiality ...................................................... 17

        4.    A Presumption of Causation or Reliance Is Rebuttable, and It Is Rebutted by the Evidence in This Case .................................................. 19

        5.    Injury Is an Individualized Issue ........................................................... 21

        6.    Plaintiffs Lack a Reliable Common Methodology for Calculating Damages, and Their Economic Expert Reports Should Be Stricken ........ 23

        7.    Ford Did Not Have Exclusive Knowledge of the Allegedly Concealed Facts and Did Not Actively Conceal Them ............................ 28

        8.    Individual Issues of State Law Further Preclude Certification of Plaintiffs' Fraud Claims ...................................................................... 29

            a.    Class Actions Are Impermissible Under the Consumer Protection Statutes of Virginia and Colorado ...................... 29

b.   New Jersey Consumer Protection Laws Require Manifestation of the Alleged Defect Which Will Require Individual Inquiry ...................................................... 29

c.   Specific State Limits on Standing for Non-Consumers Also Require Individual Inquiry ................................................ 30

B.   Plaintiffs' Tort Claims Fail for Similar Reasons to Plaintiffs' Fraud Claims ........ 30

C.   Individualized Issues Predominate Plaintiffs' Express Warranty Claims.............. 31

1.   Common Proof Cannot Establish That Each Class Member Unsuccessfully Sought MFT Repairs ........................................................ 31

2.   Plaintiffs Cannot Use Common Proof to Establish That Each Class Member Provided the Requisite Notice of a Breach........................... 33

3.   Plaintiffs Make No Attempt to Offer Classwide Proof of Damages Caused by a Breach of Warranty ...................................... 34

D.   Individualized Issues Predominate Plaintiffs' Claims for Breach of Implied Warranty of Merchantability.................................................................. 35

E.   Plaintiffs' Magnuson-Moss Claims Cannot Be Certified ................................. 36

V.   A CLASS ACTION IS NOT A SUPERIOR METHOD TO RESOLVE CLAIMS BASED ON ALLEGED DEFECTS IN THE MFT SYSTEM ......................................... 37

A.   Ford Has Already Provided Significant Benefits to the Putative Class................. 37

B.   Class Members Have Alternative Means to Pursue Remedies ............................. 38

C.   The Putative Classes Are Not Manageable ............................................................ 39

1.   Legal Standards—and Evidence Relevant to Them—Vary by State........ 39

2.   Plaintiffs Confront Ford with a Fictional Composite Plaintiff to Create an Artificially Strong Case .......................................... 40

3.   Ascertainability Concerns Leave the Classes Unmanageable .................. 42

VI.   NAMED PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASSES .............. 42

A.   Plaintiffs Cannot Seek Certification of Claims This Court Has Dismissed........... 42

B.   Plaintiffs' Proposed Classwide Proof of Defect Is Not Applicable to Many of Named Plaintiffs' Individual Allegations ............................................. 43

C.   Plaintiff-Specific Defenses Based on Individualized Facts Preclude Class Certification on Typicality and Predominance Grounds........................................ 44

VII.   Several Named Plaintiffs are Not Adequate Representatives ....................................... 47

VIII.   THE COURT SHOULD EXCLUDE ON *DAUBERT* GROUNDS PLAINTIFFS' EXPERTS DR. ROSENBERG, DR. ARNOLD, AND MR. BOEDEKER...................... 48

Page

A.    Dr. Rosenberg Offers Irrelevant Opinions Not Linked to Plaintiffs' Legal
      Claims and a Subjective Safety Opinion That Is Not Reliable Under
      *Daubert* ................................................................................................... 48

B.    Dr. Arnold's and Mr. Boedeker's Opinions About Classwide Injury Should
      Be Excluded As Not Reliable Under Daubert .......................................... 50

IX.   MR. BERMAN'S DECLARATION LACKS FOUNDATION ........................................ 50

X.    CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*Abarca v. Franklin Cnty. Water Dist.*,
  761 F. Supp. 2d 1007 (E.D. Cal. 2011) ................................................................. 27

*Ahmadi v. Chertoff*,
  2008 WL 1886001 (N.D. Cal. Apr. 25, 2008) ...................................................... 42

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. 2014) .......................................................................... 24

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) .......................................................................... 23

*Am. Online, Inc. v. Superior Court*,
  90 Cal. App. 4th 1 (2001) ..................................................................................... 29

*Am. Software, Inc. v. Ali*,
  46 Cal. App. 4th 1386 (1996) ............................................................................... 33

*Am. Suzuki Motor Corp. v. Superior Court*,
  37 Cal. App. 4th 1291 (1995) ............................................................................... 36

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .............................................................................................. 11

*Arcand v. Brother Int'l Corp.*,
  673 F. Supp. 2d 282 (D.N.J. 2009) ....................................................................... 29

*Badella v. Deniro Mktg. LLC*,
  2011 U.S. Dist. LEXIS 128145 (N.D. Cal. Nov. 4, 2011) .................................... 16

*Barden v. Hurd Millwork Co.*,
  249 F.R.D. 316 (E.D. Wis. 2008) ......................................................................... 34

*Bartholic v. Scripto-Tokai Corp.*,
  140 F. Supp. 2d 1098 (D. Colo. 2000) .................................................................. 30

*Blough v. Shea Homes, Inc.*,
  2014 U.S. Dist. LEXIS 100600 (W.D. Wash. July 23, 2014) ............................... 20

*Bohnsack v. Varco, L.P.*,
  668 F.3d 262 (5th Cir. 2012) ................................................................................. 23

*Brazil v. Dole Packaged Foods, LLC*,
  2014 WL 2466559 (N.D. Cal. May 30, 2014) ...................................................... 25

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ................................................................................. 40

*Brown v. Hain Celestial Grp., Inc.*,
  2014 U.S. Dist. LEXIS 162038 (N.D. Cal. Nov. 18, 2014) .................................. 37

*Bruce v. Harley-Davidson Motor Co.*,
  2012 WL 769604 (C.D. Cal. Jan. 23, 2012) ......................................................... 15

*Bruton v. Gerber Prods. Co.*,
2014 U.S. Dist. LEXIS 86581 (N.D. Cal. June 23, 2014) ...................................... 42

*Butcher v. DaimlerChrysler Co.*,
2008 U.S. Dist. LEXIS 57679 (M.D.N.C. July 29, 2008) ..................................... 33

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .............................................................................................. 10

*Caro v. Procter & Gamble Co.*,
18 Cal. App. 4th 644 (1993) .................................................................................. 16

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ................................................................................... 20

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ................................................................................. 13

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) ............................................................................... 30

*Chisolm v. TranSouth Fin. Corp.*,
184 F.R.D. 556 (E.D. Va. 1999) ........................................................................... 29

*Chisolm v. TranSouth Fin. Corp.*,
194 F.R.D. 538 (E.D. Va. 2000) ........................................................................... 40

*Cholakyan v. Mercedes-Benz USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) .......................................................................... 15

*Claar v. Burlington N. R.R.*,
29 F.3d 499 (9th Cir. 1994) ............................................................................. 28, 49

*Cole v. Gen. Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) ................................................................................. 40

*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal. App. 4th 663 (2006) ............................................................................... 23

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ....................................................................... 11, 24, 35, 48

*Cooper v. GGGR Invs., LLC*,
2005 U.S. Dist. LEXIS 32333 (E.D. Va. 2005) .................................................... 20

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ................................................................................. 49

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .............................................................................................. 48

*David v. Suzuki Motor Corp.*,
629 F. Supp. 2d 1309 (S.D. Fla. 2009) ................................................................. 31

*Davis-Miller v. Auto. Club of S. Cal.*,
201 Cal. App. 4th 106, *as modified* (Nov. 22, 2011) ............................ 16

*Dellinger v. Pfizer Inc.*,
2006 WL 2057654 (W.D.N.C. July 19, 2006) ....................................... 20

*DePaepe v. GMC*,
141 F.3d 715 (7th Cir. 1998) ............................................................. 50

*Edwards v. Ford Motor Co.*,
603 F. App'x 538 (9th Cir. 2015) ................................................ 17, 20

*Ehert v. Uber Techs., Inc.*,
2015 WL 7759464 (N.D. Cal. Dec. 2, 2015) ...................................... 15

*Eisen v. Porsche Cars N. Am., Inc.*,
2012 U.S. Dist. LEXIS 116836 (C.D. Cal. Feb. 22, 2012) ................... 18

*Elias v. Hewlett-Packard Co.*,
950 F. Supp. 2d 1123 (N.D. Cal. 2013) ............................................. 17

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ..................................................... passim

*Fairbanks v. Farmers New World Life Ins.*,
197 Cal. App. 4th 544 (2011) ........................................................... 16

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
254 F.R.D. 68 (E.D.N.C. 2008) ......................................................... 39

*Fedor v. Nissan of N. Am., Inc.*,
432 N.J. Super. 303 (N.J. Super. Ct. App. Div. 2013) ......................... 45

*Fink v. Ricoh Corp.*,
365 N.J. Super. 520 (N.J. Super. Ct. Law Div. 2003) ......................... 20

*Garcia v. Chrysler Grp. LLC*,
2015 U.S. Dist. LEXIS 116733 (S.D.N.Y. Sept. 1, 2015) ................... 20

*Garcia v. Medved Chevrolet, Inc.*,
263 P.3d 92 (Colo. 2011) ................................................................. 20

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................ 24

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........................................................................ 42

*Green v. GMC*,
2003 N.J. Super. Unpub. LEXIS 13 (N.J. Super Ct. App. Div. July 10, 2003) ........ 29

*Green v. Green Mt. Coffee Roasters, Inc.*,
279 F.R.D. 275 (D.N.J. 2011) ..................................................... 29, 30

3

*Gregory v. Dillard's, Inc.*,
4    565 F.3d 464 (8th Cir. 2009)............................................................ 41

*Grigsby v. N. Miss. Med. Ctr., Inc.*,
5    586 F.2d 457 (5th Cir. 1978)............................................................ 46

6    *Guido v. Loreal USA, Inc.*,
7        2013 WL 3353857 (C.D. Cal. July 1, 2013) ................................. 15

*Guidroz-Brault v. Mo. Pac. R.R Co.*,
8    254 F.3d 825 (9th Cir. 2001)............................................................ 24

9    *Gutierrez v. Wells Fargo & Co.*,
        2010 WL 1233810 (N.D. Cal. Mar. 26, 2010) .............................. 22
10
*Hanlon v. Chrysler Corp.*,
11    150 F.3d 1011 (9th Cir. 1998).......................................................... 47

12    *Harris v. Sand Canyon Corp.*,
        274 F.R.D. 556 (D.S.C. 2010) ........................................................ 33
13
*Henry Schein, Inc. v. Stromboe*,
14    102 S.W.3d 675 (Tex. 2002)............................................................ 20

15    *Herremans v. BMW of N. Am., LLC*,
        2014 U.S. Dist. LEXIS 145957 (C.D. Cal. Oct. 3, 2014) .............. 17
16
*Herskowitz v. Apple, Inc.*,
17    301 F.R.D. 460 (N.D. Cal. 2014) ............................................... 25, 33

18    *Hubbard v. Gen. Motors Corp.*,
        1996 WL 274018 (S.D.N.Y. May 22, 1996)................................... 33
19
*In re 5-hour ENERGY Mktg. & Sales Practices Litig.*,
20    2014 WL 5311272 (C.D. Cal. Sept. 4, 2014)................................. 34

21    *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*,
        2015 WL 4591236 (D.N.J. July 29, 2015)..................................... 31
22
*In re Conagra Foods, Inc.*,
        90 F. Supp. 3d 919 (C.D. Cal. 2015).............................................. 20
23
*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
24    2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012)..................... 20

25    *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. v. Ford Motor Co.*,
        1997 U.S. Dist. LEXIS 23996 (D.N.J. Aug. 28, 1997)................... 21

26    *In re Ford Motor Co. Vehicle Paint Litig.*,
        182 F.R.D. 214 (E.D. La. 1998)................................................. 29, 39
27
*In re Graphics Processing Units Antitrust Litig.*,
28    253 F.R.D. 478 (N.D. Cal. 2008).................................................... 25

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re NJOY Consumer Class Action Litig.,*
    2016 WL 787415 (C.D. Cal. Feb. 2, 2016)........................................ 27

*In re NJOY, Inc. Consumer Class Action Litig.,*
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................................... 26, 34

*In re Novatel Wireless Sec. Litig.,*
    2012 WL 5463214 (S.D. Cal. Nov. 8, 2012) ................................ 27

*In re Optical Disk Drive Antitrust Litig.,*
    303 F.R.D. 311 (N.D. Cal. 2014) ............................................... 11

*In re Paxil Litig.,*
    212 F.R.D. 539 (C.D. Cal. 2003) ............................................... 39

*In re POM Wonderful LLC,*
    2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........................... 23

*In re Porsche Cars N. Am. Inc. Plastic Coolant Tubes Prods. Liab. Litig.,*
    880 F. Supp. 2d 801 (S.D. Ohio 2012) ...................................... 37

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) ......................................................... 19, 20

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.,*
    288 F.R.D. 445 (C.D. Cal. 2013) ........................................... 21, 22

*In re Vioxx Class Cases,*
    180 Cal. App. 4th 116 (2009) ............................................... 16, 20

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,*
    722 F.3d 838 (6th Cir. 2013)...................................................... 31

*Isip v. Mercedes-Benz USA, LLC,*
    155 Cal. App. 4th 19 (2007) ....................................................... 24

*Jones v. ConAgra Foods, Inc.,*
    2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) .......... 16

*Keegan v. Am. Honda Motor Co.,*
    284 F.R.D. 504 (C.D. Cal. 2012) ............................................... 16

*Keegan v. Am. Honda Motor Co.,*
    838 F. Supp. 2d 929 (C.D. Cal. 2012) ...................................... 36

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)................................................................... 48

*Kwikset Corp. v. Superior Court,*
    51 Cal. 4th 310 (2011) .............................................................. 16

*Laney v. Am. Standard Cos.*,
   2010 U.S. Dist. LEXIS 100129 (D.N.J. Sept. 23, 2010) ...................... 30

*Larson v. Trans Union LLC*,
   2015 WL 3945052 (N.D. Cal. June 26, 2015) ...................... 12

*Lee v. Gen. Motors Corp.*,
   950 F. Supp. 170 (S.D. Miss. 1996) ...................... 36

*Lilley v. Manning Motor Co.*,
   137 S.E.2d 847 (1964) ...................... 46

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*,
   646 F. Supp. 1442 (S.D.N.Y. 1986) ...................... 46

*Luppino v. Mercedes-Benz USA, LLC*,
   2011 U.S. Dist. LEXIS 65495 (D.N.J. June 20, 2011) ...................... 33

*Maertin v. Armstrong World Indus., Inc.*,
   241 F. Supp. 2d 434 (D.N.J. 2002) ...................... 45

*Maga v. Hennessy Indus., Inc.*,
   2014 WL 10051399 (D. Mass. Dec. 1, 2014) ...................... 33

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ...................... 34

*Marsh v. First Bank*,
   2014 U.S. Dist. LEXIS 69368 (N.D. Cal. May 19, 2014) ...................... 42

*Marshall v. H&R Block Tax Servs.*,
   270 F.R.D. 400 (S.D. Ill. 2010) ...................... 39

*Martin v. Ford Motor Co.*,
   292 F.R.D. 252 (E.D. Pa. 2013) ...................... 34, 36

*Martinez v. Nash Finch Co.*,
   886 F. Supp. 2d 1212 (D. Colo. 2012) ...................... 24

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...................... 39

*McCabe v. Daimler AG*,
   2013 WL 2452180 (N.D. Ga. June 7, 2013) ...................... 20

*Miles v. Kohli & Kaliher Assocs.*,
   917 F.2d 235 (6th Cir. 1990) ...................... 31

*Minkler v. Apple, Inc.*,
   65 F. Supp. 3d 810 (N.D. Cal. 2014) ...................... 36

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ...................... 24

*O'Connor v. Boeing N. Am., Inc.*,
   180 F.R.D. 359 (C.D. Cal. 1997) ........................................................................ 44

*O'Connor v. Boeing N. Am., Inc.*,
   197 F.R.D. 404 (C.D. Cal. 2000) .................................................................. 40, 41

*O'Connor v. Uber Techs.*,
   2015 U.S. Dist. LEXIS 116482 (N.D. Cal. Sept. 1, 2015) ................................ 47

*O'Shea v. Epson Am., Inc.*,
   2011 U.S. Dist. LEXIS 85273 (C.D. Cal. July 29, 2011) .................................. 49

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ........................................................................................... 46

*Oscar v. BMW of N. Am., LLC*,
   274 F.R.D. 498 (S.D.N.Y. 2012) ....................................................................... 22

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008) ....................................................................... 39

*Patterson v. BP Am. Prod. Co.*,
   240 P.3d 456 (Colo. App. 2010) ........................................................................ 19

*Payne v. FujiFilm U.S.A., Inc.*,
   2010 U.S. Dist. LEXIS 52808 (D.N.J. May 28, 2010) ...................................... 30

*Pecover v. Elec. Arts Inc.*,
   2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ................................................... 38

*Philippine Nat'l Oil Co. v. Garrett Corp.*,
   724 F.2d 803 (9th Cir. 1984) ............................................................................. 31

*Pidcock v. Ewing*,
   435 F. Supp. 2d 657 (E.D. Mich. 2006) ............................................................ 32

*Riverside Nat'l Bank v. Lewis*,
   572 S.W.2d 553 (Tex. Civ. App. 1978) ............................................................. 45

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ............................................................................. 47

*Rowden v. Pac. Parking Sys.*,
   282 F.R.D. 581 (C.D. Cal. 2012) ....................................................................... 40

*Sable v. Southmark/ Envicon Capital Corp.*,
   819 F. Supp. 324 (S.D.N.Y. 1993) .................................................................... 46

*Sanneman v. Chrysler Corp.*,
   191 F.R.D. 441 (E.D. Pa. 2000) ........................................................................ 47

*Smith v. Ford Motor Co.*,
   749 F. Supp. 2d 980 (N.D. Cal. 2010), *aff'd*, 462 F. App'x 660 (9th Cir. 2011) ................... 18

*Sosna v. Iowa*,
419 U.S. 393 (1975) ........................................................................................... 37

*State ex rel. Celebrezze v. Howard*,
77 Ohio App. 3d 387 (Ohio Ct. App. 1991) ...................................................... 40

*States v. R.D. Werner Co.*,
799 P.2d 427 (Colo. App. 1990) ........................................................................ 24

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ........................................................................... 19

*Suddreth v. Mercedes-Benz, LLC*,
2011 WL 5240965 (D.N.J. Oct. 31, 2011) ........................................................ 35

*T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*,
83 F. Supp. 3d 855 (N.D. Cal. 2015) ................................................................ 35

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
308 F.R.D. 630 (N.D. Cal. 2015) ...................................................................... 47

*Temple v. Fleetwood Enters.*,
133 F. App'x 254 (6th Cir. 2005) ...................................................................... 20

*Tidwell v. Thor Indus.*,
2007 U.S. Dist. LEXIS 21819 (S.D. Cal. Mar. 26, 2007) .................................. 41

*Tietsworth v. Sears, Roebuck & Co.*,
2012 WL 1595112 (N.D. Cal. May 4, 2012) .............................................. 22, 49

*Tietsworth v. Sears, Roebuck & Co.*,
720 F. Supp. 2d 1123 (N.D. Cal. 2010) ............................................................ 35

*Troup v. Toyota Motor Corp.*,
545 F. App'x 668 (9th Cir. 2013) ...................................................................... 35

*Tucker v. Pac. Bell Mobile Servs.*,
208 Cal. App. 4th 201 (2012) ............................................................................ 20

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ............................................................................. 41

*Waller v. Hewlett-Packard Co.*,
295 F.R.D. 472 (S.D. Cal. 2013) ....................................................................... 38

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ..................................................................... 11, 12, 17, 46

*Webb v. Carter's Inc.*,
272 F.R.D. 489 (C.D. Cal. 2011) ................................................................. 16, 20

*Werdebaugh v. Blue Diamond Growers*,
2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014) ................................... 49

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012)..........................................................................18

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010)..........................................................................15

*Zepeda v. PayPal, Inc.*,
777 F. Supp. 2d 1215 (N.D. Cal. 2011) ...........................................................40

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir.), *amended and superseded on other grounds*, 273 F.3d
1266 (9th Cir. 2001)...................................................................................38, 42

**STATUTES**

28 U.S.C. § 2072 ...................................................................................................10, 46

Ariz. Rev. Stat. § 12-341.01 ........................................................................................38

Cal. Civ. Code § 1761(d) ............................................................................................40

Cal. Civ. Code § 1761(e) ............................................................................................30

Cal. Civ. Code § 1780 .................................................................................................38

Cal. Civ. Code § 1793.22(b) .......................................................................................47

Cal. Civ. Code § 1794 .................................................................................................38

Colo. Rev. Stat. § 6-1-113(2) ......................................................................................29

Iowa Code § 554.2719 ................................................................................................34

Mass. Gen. Laws ch. 93A(9) .......................................................................................40

Mass. Gen. Laws ch. 93A(9), (11) ..............................................................................30

Mass. Gen. Laws ch. 93A, § 11 ..................................................................................38

N.C. Gen. Stat. § 25-2-314 ..........................................................................................35

N.C. Gen. Stat. § 75.16.1 ............................................................................................38

N.J. Stat. § 56:8–19 .....................................................................................................38

Ohio Rev. Code § 1345.09 ..........................................................................................38

Ohio Rev. Code Ann. § 1345.01(A) .......................................................................30, 40

Tex. Bus. & Com. Code §§ 17.45(4), 17.50 ...............................................................40

Tex. Code Ann. Bus. & Comm. Code § 17.50(b)(1) ...................................................38

Tex. Code Ann. Bus. & Comm. Code § 17.50(d) .......................................................38

Page

Va. Code Ann. § 59.1-198 ............................................................................................ 30, 40

**OTHER AUTHORITIES**

Dailymail.com, *Death of the headphone plug:  'USB audio' now available on the
latest Android Lollipop devices* (Jan. 28, 2015), *available at*
http://www.dailymail.co.uk/ sciencetech/article-2930145/Death-headphone-
plug-USB-audio-available-latest-Android-Lollipop-devices.html (last visited
Feb. 27, 2016) .............................................................................................................. 44

Restatement (Second) of Torts.................................................................................... 20

**RULES**

Fed. R. Civ. P. 23 .................................................................................................. 11, 29

Fed. R. Civ. P. 23 advisory committee's note............................................................ 21

Fed. R. Civ. P. 23(a).................................................................................................... 11

Fed. R. Civ. P. 23(b)(2)............................................................................................... 11

Fed. R. Civ. P. 23(c)(4)............................................................................................... 11

Fed. R. Evid. 401-402 ................................................................................................. 48

Fed. R. Evid. 701(a).................................................................................................... 50

Fed. R. Evid. 702 ........................................................................................................ 48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION

Plaintiffs' effort to certify twelve statewide classes of MyFord Touch/MyLincoln Touch ("MFT") vehicle owners and lessees glosses over or ignores very significant differences in the evidence that pertain to the claims of different putative class members.  Plaintiffs cherry-pick disparate documents applicable to limited software versions, vehicles, and customers to create a fictional composite of the MFT and of class members, wrongly suggesting that the underlying evidence is classwide.

The MFT was a revolutionary information and entertainment system that, like all new and complex software, continuously evolved and improved after its initial release.  Contrary to Plaintiffs' assertion that "the base software is 100% common across all vehicles with MFT," Ford released eleven, materially distinct, versions of the MFT software during the three-year class period.  Ford subsequently released several more versions (versions 3.6 and later), but Plaintiffs decided to exclude vehicles originally equipped with those versions from their class, presumably because they could not credibly attack the later versions as "inherently defective" given that they earned recognition as "best-in-class."  <span style="color:red">REDACTED</span>

<span style="color:red">REDACTED</span> The notion that the MFT is "common" across all vehicles at issue is a canard.

So too is the notion that all putative Class Members have experienced and continue to experience unsatisfactory performance.  <span style="color:red">REDACTED</span>

<span style="color:red">REDACTED</span> This evidence as to these groups is irreconcilable with ***classwide*** evidence on Plaintiffs' claims.

Hoping to add gravitas to this case and sidestep some claimant-specific elements of their

claims, Plaintiffs contend that the MFT problems can create an unreasonable safety hazard. This contention is a red herring—grounded on hypothetical scenarios lacking factual support. Despite being driven billions of miles, Plaintiffs present no evidence of an injury-causing accident due to a MFT malfunction, and government accident data reveals no elevated safety risk in MFT-equipped vehicles. The Named Plaintiffs do not seem to share their counsel's purported safety concerns, as they continue to use their vehicles with their families. Further, even the theoretical safety risks they conjure do not apply to all vehicles in the proposed classes.

This Court's two motion to dismiss rulings already identified several issues that turn on individualized facts. Discovery has confirmed that significant differences exist in the evidence on virtually every element of Plaintiffs' claims. The evidence about the MFT, let alone whether a "defect" exists, is not common to all eleven versions with their different operating characteristics and performance. Ford's knowledge of the MFT software evolved over time and differed with each version, as did the publicly available information. Significant differences regarding transactional circumstances and in purchase decisions defeat a unitary assessment of materiality and are sufficient to overcome any inference of reliance or causation. Differences also exist regarding notice, presentment and warranty repair attempts. Moreover, neither of Plaintiffs' economists tries to show actual injury, and their proposed damages models do not offer a reliable methodology to calculate classwide damages. Indeed, an evaluation of pricing data shows that MFT-equipped vehicles retain their value as well or better than comparable vehicles. In light of the highly different circumstances experienced by significant portions of the putative classes, their claims cannot be tried collectively using common evidence.

Plaintiffs also cannot show typicality because the Named Plaintiffs assert class claims that have already been dismissed as to them, or that turn on facts unique to them. Plaintiffs are not adequate class representatives because they propose to abandon potentially valuable individual claims in an effort to water down this case for class treatment, and they have inherent conflicts of interest with absent class members. And Plaintiffs scarcely attempt to address the superiority requirements, neither grappling with huge manageability concerns or the existence of viable alternative litigation and arbitration remedies for individuals to pursue claims.

Certifying any of the twelve proposed classes would be fundamentally at odds with Rule 23, the Rules Enabling Act, and due process.  Class certification should be denied.

## II.  FACTUAL BACKGROUND

### A.  The MFT System Was a Revolutionary Advance in Automotive Technology

Launched nearly six years ago in late summer 2010, the MFT system was unprecedented in the automotive industry.  Ken Williams Decl. ¶ 4.  The MFT featured a large touch screen that offered occupants of Ford and Lincoln vehicles multiple gateways to an array of vehicle functions: telephony and text messaging over a connected compatible phone, satellite radio, a Wi-Fi hotspot, climate control, audio playback of files from connected peripheral devices, navigation if equipped, and view images if the vehicle had a connected rearview camera.  *Id.* ¶ 5.[1]

REDACTED

REDACTED

---

[1] For a video demonstration of the features of the MFT, see "MyFord Touch – Full Tutorial," *available at* https://www.youtube.com/watch?v=Ovn61Nl03I4 (last visited Mar. 15, 2016).

[2] Citations to "Ex. __" reference documents attached to the concurrently filed Declaration of Randall W. Edwards in Support of Ford's Opposition to Plaintiff's Motion for Class Certification.

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

[REDACTED] Several publications like *Consumer Reports* noted problems, Ex. 9, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] As such, it is not surprising that a technology that fundamentally changes how a driver interacts with a vehicles' entertainment and communications features prompted more complaints than its simpler predecessors. [REDACTED]

[REDACTED]

## B.   Ford's Changes to the MyFord Touch Steadily Eliminated Problems

Following the standard approach in the software industry, *see* Ex. 7, Kelly Rpt. ¶ 89, [REDACTED]

[REDACTED]

[REDACTED] Ford has released thirteen updated versions of the MFT software through December 2015,[3] t[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] These updates were always provided to all customers at no cost.[4] In November 2012, Ford publicly agreed to extend the durational limits of its warranty to cover repairs to the MFT for unlimited mileage during the vehicle's first five years in service for Fords and first six years in service for Lincolns. [REDACTED]; Ex. 15.

Ford's updates were effective in significantly reducing repairs and customer complaints.

---

[3] [REDACTED]

[4] [REDACTED]

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

REDACTED

After condemning every MFT version as uniformly defective throughout this litigation, *e.g.*, TAC ¶ 15, Plaintiffs chose to exclude from their proposed classes those vehicles initially sold or leased after August 9, 2013—the date Ford rolled out version 3.6. This tacitly admits that Plaintiffs cannot credibly contend that all versions of the MFT software are inherently defective because it was a "defective software, built through a defective process." Mot. at 5. Notably, Ford provided version 3.6 ***for free*** for all vehicles, REDACTED

**C.** REDACTED

Plaintiffs' myopic focus in this litigation on MFT's problems should not obscure the larger picture, which is that the consumers Plaintiffs seek to bring into this litigation are generally happy with the MFT in their vehicles. REDACTED Indeed, five current and former Named Plaintiffs fall into this "no warranty attempts" category. Ex. 23 at 91; Dkt. No. 97 at 33-35. REDACTED

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

REDACTED

Thus, while the initial rollout of MFT was not flawless, Plaintiffs' contention that all owners experienced problems using their MFT, and that Ford was unable to solve the problems that some owners did experience, is a gross exaggeration not supported by the evidence.

### D. Available Knowledge About the MFT Changed over Time

Plaintiffs' motion implies that, throughout the three-year class period, no consumer had any ability to learn about MFT's operational limitations and problems when deciding whether to buy a Ford vehicle with MFT (and, if so, how much to pay for it). Again, the record belies this assertion. Almost immediately following the launch of the MFT, information (both positive and negative) became public about consumers' initial reactions to the MFT—including its perceived complexity and bugs experienced with the system. Ex. 9, *Consumer Reports* 2010. Throughout the proposed class period, additional information and complaints about the MFT performance continued to be made public in various sources, including *Consumer Reports News* in March 2011 and November 2011 and the *New York Times* in June 2011 and November 2012. Exs. 27-30. *See also* TAC ¶¶ 9–11, 259–60, 266, 268 (citing numerous articles and even statements attributed to Ford executives). In January 2012, another group of lawyers filed a putative class action based on the same alleged MFT defects at issue here. Ex. 31. Thus, those who purchased later in the proposed class period are less likely to fit Plaintiffs' contrived profile of an ignorant customer with no knowledge of MFT's problems when they bought their cars. Several Named Plaintiffs purchased their vehicles even though they were aware of the criticisms and bug concerns, Ex. 32 at 105:10-14, 107:8–11, 147:16–17, 148:20–21; Ex. 33 at 101:25–102:15; Ex.

34 at 103:11, or had already purchased another vehicle with MFT, meaning they were fully aware of how it performed.  *See* Section IV.A.4.

### E. The MFT Is Not a Safety System

Plaintiffs assert that malfunctions in the MFT can threaten safety due to driver distraction, among other things, but no evidence supports this assertion of a hypothetical safety risk.  The MFT is not a safety system; it does not control a vehicle's steering, braking, speed, gear selection, or crashworthiness.  No aspect or feature of MFT is regulated by Federal Motor Vehicle Safety Standards ("FMVSS").[5]  While climate control is regulated by a FMVSS, the MFT offers only redundant controls, so access to the key climate control features remains accessible even if the MFT does not respond.  <span style="background-color:black;color:red">REDACTED</span>; Williams Decl. ¶ 7.

Plaintiffs hypothesize that if the MFT malfunctions, the driver may become distracted and crash.  But there is no evidence that malfunctions in the MFT create an unreasonable safety hazard.  Despite the nearly 60 billion miles driven on MFT vehicles, *see* Ex. 22, Taylor Rpt. ¶ 21, Plaintiffs identify no evidence of a personal injury accident caused by a MFT malfunction (and Ford is aware of no evidence), and the NHTSA complaint database likewise contains no evidence of an MFT malfunction causing an accident.  *Id*.  Further, an analysis of government accident data shows no elevated accident or injury accident rate for MFT vehicles than comparable non-MFT vehicles.  *Id.* ¶¶ 28-29, Fig. 10.  Nor has a single Named Plaintiff identified any injury or accident they experienced following a malfunction of their MFT, despite driving themselves and their families for hundreds of thousands of miles, *e.g.*, Ex. 23 at 85:10–87:6; Ex. 37 at 148:23–149:7; Ex. 32 at 162:14–18, 164:4–9—belying the notion that they view their vehicles as unsafe.

### F. The Named Plaintiffs' and Others' Experiences with MFT Varied Greatly

Contrary to Plaintiffs' assertions that all putative class members were "subjected to Ford's common omissions and uniform defects," Mot. at 1–2, the evidence pertaining to just the 19 Named Plaintiffs illustrates that different members of the 564,000-member proposed class had a range of motivations for their purchases and different experiences with the MFT systems.

---

[5] The National Highway Safety Traffic Administration later released a FMVSS for the rearview camera, but it does not apply to the putative class vehicles.  It applied to future vehicles.

### 1. Customers Purchased Their Vehicles for Different Reasons

Plaintiffs' assertion that all class members "relied" in some sense on Ford's alleged "concealment" of MFT defects by buying MFT-equipped cars, or paying more for those cars than they would have if Ford had "disclosed" those problems, bears no relation to reality. While some customers specifically wanted to purchase a vehicle with a MFT, many others purchased Ford and Lincoln vehicles containing MFT for reasons unrelated to that system. When Plaintiff Rizzo bought his new Ford Explorer in 2012, he was replacing a 1995 Ford Explorer and simply "tried to emulate the exact same vehicle in the current year." Ex. 38 at 36:7–8. His main concern was that the Explorer have four-wheel drive and a trailer tow package. *Id.* at 42:19–20. He "decided to purchase the vehicle before [he] knew about the MyFord Touch," *id.* at 44:7–9, and would have purchased it even if it did not have the MFT. *Id.* at 39:2–5. Other Plaintiffs admitted that the MFT was not an important factor in their decision either. Ex. 39 at 65:5–11, 71:9–13, 195:9–14; Ex. 33 at 120:10. **REDACTED** Of course, other purchasers were attracted to the MFT, and it was part of the reason they bought their vehicles. *E.g.*, Ex. 41 at 25:18-22. But that just proves differences among class members.

### 2. Customers Negotiated Vehicle Purchases in Different Ways, with Different Results

Purchasing a vehicle is a highly individualized process, with the price paid by new vehicle customers varying due to individual negotiations and other factors that made information about the MFT vary in importance to different purchasers. Ex. 42, Singer Rpt. ¶¶ 28-29, 41, 52, 56-59, 74, 122; Ex. 43, Wood Rpt. at 9-11, 25. This variance in prices is even harder to unpack here because the availability of the MFT system varied by model and trim level: it came standard on some vehicles and was available as part of different option packages on other vehicles, and was unavailable on still others. Ex. 42, Singer Rpt. ¶¶ 50, 130, 132 & n.53, n.244; *see also* Ex. 44, Ford's Am. Interrog. Resps., Resp. No. 4 and Ex. A, Dec. 9, 2015. **REDACTED** Even among the Named Plaintiffs, many acquired

vehicles in which MFT was included as standard equipment, while others acquired vehicles in which the MFT system was selected as part of a larger options package. *Compare* Ex. 47 at 2 *with* Ex. 82. Some Named Plaintiffs paid above MSRP, some paid below, and some received substantial rebates. *Compare* Exs. 47-48 *with* Exs. 49 & 50 at 63; *see also* Ex. 51-54. Finally, five plaintiffs leased their vehicles instead, TAC ¶¶ 36, 109, 116, 125, 132, which is a different type of transaction decision altogether, with different purchase and pricing considerations. Ex. 42, Singer Rpt. at n.49. Given these variances, including the fact that the MFT often was standard equipment, Plaintiffs are wrong to contend that Ford charged a "price premium" for the MFT, Mot. at 3, let alone one on a classwide basis.

### 3. Named Plaintiffs Used Different Features of Their MFT Systems

Not all MFT-equipped vehicles had the same equipment, which dramatically affected the functionality of their MFT systems. For example, some MFT-equipped vehicles had rearview cameras, while others—including Plaintiff Miskell's—did not. Chris Eikey Decl. ¶¶ 4, 7. Some MFT-equipped vehicles had the optional navigation system, while others—such as Plaintiff Matlin's—did not. *Id.* ¶ 4. In addition, Plaintiffs' use of different features of their MFT systems varied based on their personal preferences, and some did not use it at all. *Compare* Ex. 38 at 23, 25, 28, 33–34 *with* Ex. 55 at 42:18–43:1 *with* Ex. 39 at 65:5–11. This variability in system usage among the Named Plaintiffs reflects the variability among the putative class members at large.

REDACTED

In short, the record shows that not all putative class members had the same level of interest in the same features of MFT (and hence they were not uniformly injured if those features did not always work perfectly).

### 4. Customers Had Different Experiences with Their MFT Systems

Plaintiffs' motion rests on the assumption that all 564,000 putative class members experienced the same types of problems and were dissatisfied with the performance of the MFT in their vehicles. Mot. at 14. REDACTED

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

REDACTED

Different Plaintiffs experienced different types of problems with MFT, each with its own root cause, each with its own effect, and each with its own solution. Taking problems with the rearview camera as but one example: some plaintiffs say that the rearview camera would "crash" the system and not display anything other than a blank screen. Ex. 56 at 95:2–10; Ex. 57 at 17:2–3; Ex. 58 at 207:20–25; Ex. 38 at 89. Other plaintiffs complain that the rearview camera video continues to play while driving forward.[6] *See, e.g.*, Ex. 59 at 70–71; Ex. 55 at 114–15; Ex. 32 at 61:18–19. Still other plaintiffs never mentioned any rearview camera problems. *See, e.g.*, Ex. 60 at 63:10–21; Ex. 33 at 163:12; Ex. 61 at 120:20–23. Moreover, multiple issues ostensibly pinned on the MFT were actually issues with phone connectivity or device compatibility, hardware, or model-specific issues REDACTED. *E.g.*, REDACTED; Eikey Decl. ¶¶ 2-3, 6; Ex. 33 at 30:5–7; Ex. 39 at 99:3–101:17. Certain problems identified by Plaintiffs were caused by specific peripheral devices. For example, Plaintiff Miller-Jones said his MFT system "had been working pretty smoothly" until he upgraded his iPhone to iOS 8.1. Ex. 33 at 30:5–7; *see also* Ex. 62 at 48:6–49:1 (Plaintiffs' expert admitting that "differences in performance based on the peripheral device").

This evidence shows that this lawsuit is not remotely the "everyone's in the same boat" case that Plaintiffs pretend it to be. To the contrary, most of the issues of fact and law the parties would debate at the trial of any given vehicle owner's claim would turn on evidence that pertains to, at most, a subset of the proposed class and, quite often, specifically to that single claimant.

## III.    RIGOROUS ANALYSIS IS NEEDED OF CLASS ACTION REQUIREMENTS

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). As a procedural mechanism, the class action device cannot be used to deprive Ford of its substantive right to assert individualized defenses where a given claim presents a factual and legal basis for a claimant-specific defense. *E.g.*, 28 U.S.C. § 2072; *Amchem Prods., Inc. v. Windsor*,

---

[6] This is not, in fact, a "problem" with the MFT system; it is a useful feature called "rear camera delay" that can be toggled on or off. *See* Ex. 36.

521 U.S. 591, 613 (1997) (Rule 23 "shall not abridge, enlarge or modify any substantive right").

Plaintiffs seek certification of claims only under Rule 23(b)(3). They do not seek certification of injunctive claims under Rule 23(b)(2) or of selected "classwide issues" under Rule 23(c)(4). Plaintiffs must show that the class is ascertainable, that the claims of the named plaintiffs are typical of the class, that the proposed class representatives and their proposed class counsel are adequate, and that common questions exist. Fed. R. Civ. P. 23(a). Plaintiffs also must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). It is not only Plaintiffs' evidence that must be considered, but also Ford's. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983-84 (9th Cir. 2011). The Court is obliged "to probe behind the pleadings" and engage in a "rigorous analysis" of the evidence supporting each Rule 23 requirement. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Where, as here, Plaintiffs cannot "affirmatively demonstrate" with "evidentiary proof" that the requirements of Rule 23 have been met, class certification must be denied. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

## IV. COMMON ISSUES OF LAW AND FACT DO NOT PREDOMINATE

Although "[a]ny competently crafted class complaint literally raises common 'questions,'" *Dukes*, 131 S. Ct. at 2551, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of common answers apt to drive the resolution of the litigation.'" *Id.* (citation omitted). To satisfy the "far more demanding" predominance requirement, common issues must be "both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *Amchem*, 521 U.S. at 623-24; *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 318 (N.D. Cal. 2014) (citation omitted). Plaintiffs cannot do so here.

Plaintiffs identify what they label as "common questions," saying that each is central to the claims they seek to certify. But many questions critical to these claims have no common answers that derive from common evidence. Instead, debate over Plaintiffs' claims turns predominantly on evidence relevant to various subsets of the proposed class and often evidence

relevant to just one or a few class members. This precludes certification under Rule 23(b)(3).

## A. **Plaintiffs' Fraud-Based Claims Require Individual Evidence on Many Issues**

For each of the twelve state classes that Plaintiffs seek to certify in connection with their statutory or common law fraud claims, Plaintiffs bear the burden of showing that common issues of fact or law predominate with respect to each claim.[7] *Larson v. Trans Union LLC*, 2015 WL 3945052, at *3 (N.D. Cal. June 26, 2015). As an initial matter, Plaintiffs ignore the state-law differences in those claims. *See* Section V.C.1. Instead, Plaintiffs just argue that common questions subject to common evidence predominate as to all of their statutory and common law concealment-based claims because "each such claim require[s] a showing that Ford intentionally concealed a material fact that it had a duty to disclose to Plaintiffs and the other Class members, resulting in damages." Mot. at 45 (summarizing elements of common law claims); *see also id.* at 26-27 (statutory claims). Plaintiffs assure the Court that the same body of "common proof" will provide answers to the "common questions" their claims raise: (1) whether Ford made an omission of fact, (2) whether a duty to disclose those facts existed, and (3) whether causation/ reliance can be presumed by showing that (4) the undisclosed facts would have been material to a reasonable person. But even Plaintiffs' simplistic approach fails to show that these questions necessarily have common answers based on classwide evidence. As explained below, the evidence varies among putative class members in potentially outcome-determinative ways on (1) whether the allegedly *concealed facts* about the MFT are common to all class members; (2) whether those "facts" are *material* to all class members despite the demonstrable variance in the facts applicable to the individual transactions; (3) whether the alleged concealment of those facts had the required *causal link* to class members' purchase decisions; (4) whether Ford had the same *exclusive knowledge* of those facts given changes to Ford's knowledge and public information; and (5) whether all class members suffered *injury* and, if so, (6) whether the amount of *damages* can be calculated using a classwide methodology. These evidentiary variances defeat class certification. *Dukes*, 131 S. Ct. at 2551. Plaintiffs cannot avoid these individualized issues by

---

[7] Plaintiffs are not seeking certification of a fraudulent concealment claim for the Washington Class or a statutory fraud claim for the Iowa Class.

relying on a pre-*Dukes* decision in *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005), as support for generic phrasing of "common questions" about defect, knowledge, duty, and materiality, where the answers based on the evidence in this case are not common to the class.

### 1. The Facts Ford Allegedly Concealed Are Not Common

Plaintiffs seek to gloss over precisely what "facts" Ford should have disclosed, saying only that Ford failed to disclose the existence of "the MFT system defect and its safety implications." Mot. at 27. But the notion that there can be a common set of facts regarding "the MFT system defect" is nonsensical given that the class covers at least eleven different versions of the MFT software installed in more than a dozen different vehicle models across a period of nearly three years. In discovery, Plaintiffs were slightly more specific, identifying seven supposedly material facts that they contend Ford unlawfully failed to disclose[8]:

(1) Ford's initial development of the MFT was contracted to inexperienced programmers;

(2) Ford's development of MFT did not follow industry standards, including MISRA standards;

(3) The initial release of the MFT software was made without following certain quality control measures;

(4) Ford's initial version 1.08 of the MFT was deeply flawed and materially defective;

(5) Ford knew prior to the release of version 1.08 that the software was deeply flawed and materially defective;

(6) Ford continued to expand the number of vehicles with MFT even though it knew its design was materially defective and that it could not repair the defects; and

(7) The MFT design defects caused driver distraction, resulting in a safety hazard.

These "facts," however, illustrate why the evidence in this case cannot constitute common proof of classwide fraud claims. Many of these purported omissions relate only to the initial version of the software, while others relate to varying qualities of performance provided by different MFT versions. REDACTED

_____

[8] Ex. 63 (Pl. Supplemental Resps. to Def.'s Interrogs. No. 19 dated Jan. 13, 2016.) REDACTED

1 ████████████████ REDACTED ████████████████ The changes from

2 version to version over time were substantial—adding functionality and fixing bugs. *See* Section

3 II.B. Plaintiffs cannot explain how the "material facts" related to version 1.08 would be relevant

4 to someone who purchased version 3.5 three years later after the software had undergone nearly a

5 dozen updates and ████████ REDACTED ████████. It is certainly possible—if not probable—that a

6 jury here would find facts regarding the development of version 1.08 to be less applicable to

7 purchasers of separate versions sold months or years later.

8     Plaintiffs cannot avoid the drastic changes to the different MFT software versions by

9 offering the expert report of Mr. Smith, who purports to identify common defects. Yet Plaintiffs

10 do not show that any Named Plaintiffs actually experienced all of the supposedly common defects

11 identified by Mr. Smith. Instead, in his quest to identify defects common across the vastly

12 different versions, Mr. Smith ignores many of the problems the Named Plaintiffs actually claim to

13 have experienced. ████████████ REDACTED ████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 _____

28 [9] ████████████████ REDACTED ████████████████ ; Eikey Decl. ¶ 4.

Plaintiffs rely heavily on *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010), to argue that variations in customer usage do not defeat certification. Mot. at 29. *Wolin* holds that certification of claims based on an alleged common design defect is not precluded solely by evidence that the defect only manifested itself in some class members' products. But that is not the flaw in Plaintiffs' approach here. There is no unitary MFT—no single classwide "product"—at issue in this lawsuit because the software changed substantially over time. If this case proceeds as a class action, the jury must learn about the benefits and limitations of each version and be able render separate judgments about whether each lies above or below whatever threshold standard is established for finding that Ford had a legal obligation to "disclose" that it was in some way "defective." *Wolin* supports denying certification on these facts, where "class members were exposed to different products such that the uncommon issue of causation predominated over the lesser shared issues." 617 F.3d at 1173-74.

At bottom, Plaintiffs' bold contention that the MFT software was "100% common across all class vehicles," Mot. at 14, is simply wrong. ████████████████████████ ██████████████████████████ This is fatal to class certification. *E.g.*, *Bruce v. Harley-Davidson Motor Co.*, 2012 WL 769604, at *6 (C.D. Cal. Jan. 23, 2012) (denying class certification because plaintiffs "failed to show they have the ability to use common evidence by which they can demonstrate the defective nature of the Class Vehicles"); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 554 (C.D. Cal. 2012) (denying class certification, as there was "substantial design variation among the class vehicles").

### 2. Whether the Allegedly Concealed Facts Were Material to Putative Class Members Requires an Individualized Analysis

Given the varying facts applicable to the transactions of different putative class members, Plaintiffs cannot use common evidence to prove that alleged omissions related to any particular version of MFT were material to all class members. Relying on the generally objective standard for materiality, and heavily on *Ehert v. Uber Technologies, Inc.*, 2015 WL 7759464 (N.D. Cal. Dec. 2, 2015), and *Guido v. Loreal USA, Inc.*, 2013 WL 3353857 (C.D. Cal. July 1, 2013), Plaintiffs argue that materiality necessarily is a common issue. Not so fast. For example, "a

misrepresentation or omission is material under California law 'if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action *in the transaction in question*.'" *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 529 (C.D. Cal. 2012) (emphasis added); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 332 (2011). Thus, two reasonable persons could attach different importance to a specific fact depending on the differing circumstances of their respective "transactions in question." Numerous authorities make clear that differences in materiality can preclude certification where the class members' situations and transaction circumstances vary.[10]

These varying circumstances of individual transactions are present here. For example, a jury could find that a class member like Ms. Mitchell—whose husband already owned a vehicle with the MFT system, but who disliked technology and had no intention of using the MFT—did not find the facts Ford allegedly omitted about the design aspects of MFT to be material; while that same jury might find a class member like Mr. Matlin—who is a tech enthusiast who had eagerly anticipated the initial launch of MFT and had reviewed extensive literature on the system—would have considered the same omissions to be material. Ex. 39 at 65:5-8, 71:9-13, 195:9-14; Ex. 55 at 42:14-43:22. Similarly, a jury could find that a class member like Plaintiff Miller, who read reviews of the MFT prior to purchase that "had complaints about how inconsistent its functioning was," or Plaintiff Miller-Jones, who had read critical articles about the MFT performance prior to purchase but decided to purchase the vehicle anyway, did not consider the allegedly omitted facts to be material while other class members who purchased a vehicle without being aware of those risks might think of them differently. Ex. 32 at 107:8-11; Ex. 33 at 101:25-102:15. And there is other evidence sufficient to allow a factfinder to conclude that

---

[10] *E.g.*, *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129, 132-33 (2009) (affirming denial of certification where materiality differed based on who the product was marketed to and their motivations for purchasing it); *Badella v. Deniro Mktg. LLC*, 2011 U.S. Dist. LEXIS 128145, at *25-26 (N.D. Cal. Nov. 4, 2011) (no common proof of materiality when dating service members joined for different reasons); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011) (denying certification because some customers would have purchased product even if concealed information had been disclosed); *Fairbanks v. Farmers New World Life Ins.*, 197 Cal. App. 4th 544, 565-66 (2011); *Davis-Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 122-23, *as modified* (Nov. 22, 2011); *Jones v. ConAgra Foods, Inc.*, 2014 U.S. Dist. LEXIS 81292, at *59-60 (N.D. Cal. June 13, 2014); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644 (1993).

different proposed class members purchased or leased vehicles for different reasons, as Dr. Singer explains. Ex. 42, Singer Rpt. ¶¶ 24-32.

Even under an objective standard of materiality, there is no unitary reasonable-person conclusion with respect to whether all class members in all their different circumstances would find omissions related to bugs in the MFT system to be material to their particular "transaction in question." REDACTED The minority held different views. The existence of this majority, but split, view cannot be reconciled with a conclusion that **all** owners would find the supposed defects with the MFT to be material, and common proof will not be able to establish otherwise.

### 3. Plaintiffs' Safety Allegations Cannot Cure the Lack of Common Evidence Demonstrating Materiality

Plaintiffs seek to avoid the obvious need for individualized evidence with respect to the materiality of technical disclosures about MFT's software design by alleging that defects in the MFT have "safety implications." Mot. at 27. Plaintiffs argue that the Ninth Circuit's reasoning in the non-precedential decision in *Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015), establishes that a duty to disclose arises from an alleged defect that creates an "unreasonable safety hazard." *Id.* at 541. But Plaintiffs' mere allegation of a wholly theoretical safety hazard cannot pass muster under the "rigorous analysis" of the evidentiary basis that is required at the class certification proceedings. *Dukes*, 131 S. Ct. at 2551.

Plaintiffs offer no meaningful evidence—let alone common evidence—that malfunctions of the MFT create an actual "unreasonable safety hazard." To establish an unreasonable safety hazard giving rise to a duty to disclose, plaintiffs must prove the existence of a concrete "risk of physical injury." *Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957, at *44 (C.D. Cal. Oct. 3, 2014). It must be based on more than "hypotheticals and conjectures," *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1137 (N.D. Cal. 2013), and cannot be "speculative"

or "deriving . . . from . . . the driver's individual circumstances." *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 991 (N.D. Cal. 2010), *aff'd*, 462 F. App'x 660 (9th Cir. 2011); *accord Eisen v. Porsche Cars N. Am., Inc.*, 2012 U.S. Dist. LEXIS 116836, at *13-14 (C.D. Cal. Feb. 22, 2012).

But Plaintiffs rely on speculation and inadmissible *ipse dixit* of their expert. Named Plaintiffs continue to drive their vehicles with their families without accident, and Plaintiffs' experts do not point to evidence of an actual injury to other vehicle owners or occupants from an accident caused by an MFT malfunction, and their experts admit they are aware of any. REDACT ███████████; Ex. 62 at 120:13-126:3. To the contrary, the available evidence reveals that the MFT presents no heightened safety risk. *See* Section II.E.

In addition, even Plaintiffs' hypothesized safety hazard is not based on common evidence of a common defect. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143 (9th Cir. 2012). Plaintiffs' motion identifies three ways in which the alleged MFT defects supposedly caused safety hazards: inaccurate GPS coordinates could cause a driver to become lost or cause the car to inaccurately report the vehicle's location to 911; the rearview camera could freeze or display inaccurate footage; and a malfunctioning system could distract the driver. Mot. at 16-17.[11] None of the three safety risk theories are susceptible to classwide adjudication.

███████████████ REDACTED ███████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

**Second**, Plaintiffs' allegations regarding an unreasonable safety hazard related to the

---

[11] Plaintiffs' expert, Mr. Rosenberg, also asserted that a safety hazard could occur if the climate control (defrost) functions became inoperable due to a MFT defect. Ex. 62 at 28:13-20. This ignores indisputable evidence that all MFT vehicles had redundant climate controls that operate entirely apart from the MFT system, so there is no evidence (common or otherwise) of defect causing a safety hazard on this ground. Williams Decl. ¶ 7. If the MFT system failed to turn on a window defroster, the driver could easily do so by pushing a button.

rearview camera is not subject to common evidence because not every MFT vehicle has a rearview camera. Eikey Decl. ¶ 4. Of those vehicles with a rearview camera, some also were equipped with sensors that provided audio warnings of objects behind the vehicle. Williams Decl. ¶ 42. [REDACTED]

[REDACTED] Finally, Plaintiffs' allegation that its failure causes an "unreasonable safety hazard" is too speculative given the lack of any evidence of injuries or accidents and the mirrors on the vehicles, independent of the MFT.

**Third**, the question of driver distraction cannot be adjudicated by classwide evidence. Plaintiffs' only expert who addressed distraction, Dr. Rosenberg, admitted that risks of distractions always exist, and not all distractions render driving unsafe. Ex. 62 at 90:13-91:10. He did not examine whether the MFT system caused a level of distraction different from vehicles without a MFT system. *Id.* at 53:3-8. As such, he cannot say whether the risk of distraction from problems in MFT-equipped vehicles is higher or lower than average, *id.* at 136:23-137:7, 53:3-8, and thus cannot say it is "unreasonable." Nor did he examine whether the risk of distraction was the same in all MFT vehicles and across all of the different versions of MFT. *Id.* at 44:14-45:12, 46:19-25, 135:22-25. Furthermore, both parties' experts recognize that whether and how much malfunctions in or design of the system cause distraction will vary from class member to class member. Ex. 69 at 18; Ex. 70 at 11-16, 25. [REDACTED]

### 4.     A Presumption of Causation or Reliance Is Rebuttable, and It Is Rebutted by the Evidence in This Case

Plaintiffs also cannot prove the element of proximate causation, or reliance, using classwide evidence. This element is required for monetary recovery under each of Plaintiffs' fraud-based claims.[12] Recognizing the inherently individualized nature of the question of actual

---

[12] *See* (**California**) *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (UCL); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (CLRA); (**Colorado**) *Patterson v. BP Am. Prod. Co.*, 240 P.3d 456, 465 (Colo. App. 2010); (**New Jersey**) *Fink v. Ricoh Corp.*, 365 N.J.

reliance,[13] Plaintiffs seek to avoid it by arguing they are entitled to an inference or presumption of reliance based on the material nature of the allegedly omitted facts. *E.g.*, Mot. at 27. Plaintiffs cannot satisfy their burden to support a classwide inference of reliance, however. *See In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 987 (C.D. Cal. 2015). As Plaintiffs' authorities acknowledge, a finding of classwide materiality only "gives rise to a ***rebuttable*** inference of reliance as to the class." *Edwards*, 603 F. App'x at 541 (emphasis added). This inference can be rebutted by showing that individual issues regarding reliance will predominate, and courts have declined to presume reliance when there is "persuasive evidence that materiality and reliance would vary from consumer to consumer." *Webb*, 272 F.R.D. at 502-03; *see also, e.g.*, *Vioxx*, 180 Cal. App. 4th at 129; *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 228 (2012) ("The rule permitting an inference of common reliance where material misstatements have been made to a class of plaintiffs will not arise where the record will not permit it.") (citation omitted); *Blough*, 2014 U.S. Dist. LEXIS 100600, at *41 (rebutting the presumption of reliance under Washington law because "discovery has revealed substantial variations in [plaintiffs'] knowledge of defects prior to purchase"); *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 99-101 (Colo. 2011) (remanding for individual consideration of reliance and recognizing inference is rebuttable).

The evidence rebuts any inference because individual issues of reliance on Ford's alleged nondisclosures about MFT predominate. Reliance entails the information being a "substantial factor" in the purchase decision. *E.g.*, *Tobacco II*, 46 Cal. 4th at 326; Restatement (Second) of Torts § 546. ███████████████ REDACTED ███████████████

Super. 520, 550 (N.J. Super. Ct. Law Div. 2003); **(North Carolina)** *Dellinger v. Pfizer Inc.*, 2006 WL 2057654, at *4 (W.D.N.C. July 19, 2006); **(New York)** *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 13887, at *51 (D.N.J. Feb. 6, 2012); **(Ohio)** *Temple v. Fleetwood Enters.*, 133 F. App'x 254, 265 (6th Cir. 2005); **(Texas)** (*Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002) ("[t]he burden on plaintiffs to prove reliance in order to recover . . . is in no way altered by the assertion of claims on behalf of a class."); **(Virginia)** *Cooper v. GGGR Invs., LLC*, 2005 U.S. Dist. LEXIS 32333 (E.D. Va. 2005); **(Washington)** *Blough v. Shea Homes, Inc.*, 2014 U.S. Dist. LEXIS 100600, at *38-39 (W.D. Wash. July 23, 2014). The common law on fraudulent omissions in all states implicated in this action have a causation requirement, as Plaintiffs' acknowledge. (Mot. at 45:19-20 & n.123 (citing cases)); *see also, e.g.*, *Garcia v. Chrysler Grp. LLC*, 2015 U.S. Dist. LEXIS 116733, at *50-51 (S.D.N.Y. Sept. 1, 2015) (New Jersey, New York, and Texas); *McCabe v. Daimler AG*, 2013 WL 2452180 (N.D. Ga. June 7, 2013) (Virginia, Texas, and California); Restatement (Second) of Torts § 551.

[13] *E.g.*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996) (holding that "a fraud class action cannot be certified when individual reliance will be an issue").

REDACTED

Ford's experts likewise explain that class members are exposed to different information and have different views on importance of information, with resulting differences in impact on purchase decisions. Ex. 43, Wood Rpt. at 5-11, 25; Ex. 42, Singer Rpt. ¶¶ 22, 33-42, 68-69, & n.57. Despite considerable methodology flaws, even the survey by Plaintiffs' expert, Mr. Boedeker, confirms that some people would purchase MFT vehicles even with full disclosure of a "defect." Ex. 42, Singer Rpt. ¶¶ 29, 120-21, & App. 3. The Named Plaintiffs' decisions further rebut a classwide inference of reliance. Plaintiff Rizzo testified that the MFT system played absolutely no role in his purchase decision, and that he would have still purchased it even if it did not have the MFT. *Id*. at 39:2–5; 44:7-9. Plaintiff Mitchell could not have relied upon the alleged fraudulent omissions or otherwise found those statements to be material given that he purchased a second MFT vehicle after learning of the alleged defects, as this Court recognized when it dismissed his claim. Dkt. No. 175 at 5-6. Plaintiff Rodriguez likewise purchased a second MFT vehicle; in denying Ford's motion to dismiss his claim based on factual issues about information material to Mr. Rodriguez, *id.* at 6, this Court illustrated the inherently individualized nature of inquiries about each person's purchase decisions.

All of this evidence rebuts any classwide inference of reliance and further establishes a predominance of individual issues defeating certification. *See also, e.g.*, *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. v. Ford Motor Co.*, 1997 U.S. Dist. LEXIS 23996, at *39-40 (D.N.J. Aug. 28, 1997) (finding a lack of predominance when "there are variations in the kinds or degree of reliance by the persons to whom the alleged misrepresentations were addressed") (citing the advisory committee comments to Rule 23).

**5.      Injury Is an Individualized Issue**

The existence of an actual injury resulting from Ford's allegedly unlawful conduct is a substantive element of each claim. *E.g.*, Section IV.A.4 at n.12; *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 288 F.R.D. 445, 449-50 (C.D. Cal. 2013) (addressing California laws). Plaintiffs make no attempt to establish common evidence of

injury—they and their experts simply assume injury if other liability elements are established on a classwide basis. Ex. 70 ¶ 36 ("Assuming liability, all members of the proposed Class were injured."; Ex. 71 ¶¶ 10-11; Mot. at 2. That is not the law. Courts hold that classwide injury is not automatically established by classwide evidence of concealment or other liability elements. In denying class certification under California's CLRA, UCL and related laws (which he collectively calls "product liability" claims), Judge Carney stated:

> Toyota presented substantial evidence that the updated software installed in the Class Vehicles as part of the national recall rectified any actual or perceived problem . . . . Plaintiffs [] argue that they suffered an actual injury because they would not have paid that same purchase price for each of their vehicles had they known of the problem with the ABS. Plaintiffs' benefit-of-the-bargain argument, however, is insufficient as a matter of law. Merely offering a creative damages theory does not establish the actual injury that is required to prevail . . . .

*Toyota*, 288 F.R.D. at 449-50 (emphasis added). *See also, e.g.*, *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2012) ("[P]laintiffs' argument, that they were injured because they did not make a free and informed decision, was legally equivalent ***to claiming deception itself as injury*** . . . being deceived is not a cognizable injury under [N.Y. Gen. Bus. Law] §§ 349 and 350.") (emphasis added); *Tietsworth v. Sears, Roebuck & Co.*, 2012 WL 1595112, at *14 (N.D. Cal. May 4, 2012). As Judge Alsup noted, the court "must give full consideration to whether plaintiffs' [] damages study is sufficient to establish classwide proof of actual injury and/or damages for each absent class member. Otherwise, Rule 23 would be used to truncate the required substantive elements of proof by each claimant in violation of the Rules Enabling Act." *Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *14 (N.D. Cal. Mar. 26, 2010).

Plaintiffs offer no evidence of classwide injury. For example, Plaintiffs offer no explanation, let alone an expert opinion that satisfies *Daubert*, that alleged concealment of "defects" and "material flaws" in version 1.08 released in 2010 would have any tendency to injure putative class members such as Plaintiff Miller-Jones, who purchased his vehicle in April 2013 with version 3.5 and upgraded to the (unchallenged) version 3.6 just four months later. (Ex. 33 at 43:5-8, 305:4-6.) Plaintiffs' position that ***all*** MFT owners and lessees were financially harmed because they "overpaid" for their vehicles as a result of the demand curve being pushed upward by alleged non-disclosures, *e.g.*, Mot. at 17 & TAC ¶ 279(j), is based on "flawed logic."

*In re POM Wonderful LLC*, 2014 WL 1225184, at *4 (C.D. Cal. Mar. 25, 2014). Plaintiffs must show "a change in price that has some empirically demonstrable relationship to a piece of information" that was concealed. *Id.* Plaintiffs offer no reliable empirical analysis. And when Ford's expert, Dr. Singer, analyzed the real-world resale value of MFT vehicles, he found that such vehicles retain their value as well or better than vehicles not equipped with MFT, showing that Ford's supposed omissions have had no bearing on the value of MFT vehicles, and that Plaintiffs' experts' contrary conclusions are entirely speculative. Ex. 42, Singer Rpt. ¶¶ 127-36.

Evidence concerning the price a given consumer paid for her vehicle and the role the MFT played in the negotiation of that price (including what that consumer knew about the MFT's performance before purchase) is surely relevant to determining the value that consumer placed on the system and thus whether any "overpayment" injury occurred at all. *E.g.*, *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 167 (C.D. Cal. 2007) ("The clear standard in the market involved here has long been to charge a range of prices to different customers even for identical products. . . . Thus, the relevant question is what ***each purchaser paid in the actual world***, relative to what that purchaser would have paid in the but-for world.") (emphasis added). *See also* Ex. 42, Singer Rpt. ¶¶ 21-23, 43-46, 52, 56-59. Yet absent individualized inquiry, Plaintiffs have no idea how much putative class members paid for their vehicles—let alone their MFTs (which were not sold as a standalone option). *Id.* Moreover, evidence concerning events following purchase also could be relevant, including her satisfaction with MFT's performance and how effectively any malfunctions she experienced were corrected. *Id.* Existence of injury necessarily turns on claimant-specific, not classwide, evidence.

> **6.    Plaintiffs Lack a Reliable Common Methodology for Calculating Damages, and Their Economic Expert Reports Should Be Stricken**

Plaintiffs' different claims, under the law of the different states, use different available measures of damages[14]—which Plaintiffs' economic experts ignore. Plaintiffs have the burden of

---

[14] *E.g.*, *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 675 (2006) ("the amount of actual damages for a CLRA award [is] the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction."); *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 276 (5th Cir. 2012) (holding that under Texas law, "benefit-of-the-bargain damages are

establishing that "damages are capable of measurement on a classwide basis," consistent with the substantive allegations they make. *Comcast*, 133 S. Ct. at 1433. While it is true that individual differences in the amount of damages putative class members might receive do not alone preclude class certification, Plaintiffs must present a viable common methodology under *Daubert*. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 459 (S.D. Cal. 2014) ("After *Comcast v. Behrend*, a party seeking certification must offer a classwide means for calculating damages.").

For their concealment claims only, Plaintiffs offer Dr. Arnold and Mr. Boedeker to calculate two alternative damages measures that they claim would be uniform across all of the proposed classes. Mot. at 47. Both their experts say their models are designed to measure economic loss by calculating the difference in value between the "non-defective" MFT system they assume all consumers expected to receive and the "defective" MFT system they assume all consumers actually received. Ex. 70 ¶ 29; Ex. 71 ¶¶ 88-92. But neither of the proffered methodologies are a reliable means to determine classwide damages under a "difference in value" theory as explained below. Ex. 42, Singer Rpt. ¶¶ 43-126, 137-40.

Dr. Arnold and Mr. Boedeker both improperly premise their analyses upon assumptions that lack evidentiary support. *Guidroz-Brault v. Mo. Pac. R.R Co.*, 254 F.3d 825, 830–32 (9th Cir. 2001); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). They both assume that every MFT vehicle sold during the three-year putative class period was uniformly "defective" when sold and remains so, ignoring evidence that the MFT's performance improved with each new version and ignoring the availability since August 2013 of a free update

normally not appropriate measures of damages for common law fraud claims," and noting that out-of-pocket and consequential damages are recognized); *States v. R.D. Werner Co.*, 799 P.2d 427, 430 (Colo. App. 1990) (in Colorado strict product liability action, the statute "provide[s] for a determination of 'comparative fault' within the process of measuring damages."); *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 23 (2007) (damages for breach of the implied warranty of merchantability are "the difference at the time of purchase between the value of the vehicle and the value it would have if it had been as warranted, unless special circumstances show damages in a different amount . . . . [which] may include ***any wear and tear or damage to the vehicle*** to the date of trial.") (emphasis added); *Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1218 (D. Colo. 2012) (actual damages not available under Colorado Consumer Fraud Act).

to the unchallenged version 3.6, ███████████████ REDACTED ███████████████

████████████████. *See also* Section II.B.  Both experts also wrongly assume that all

proposed class members lacked ***any*** information about MFT problems at the time of their

purchase.  *See* Section II.D.  In addition, as detailed below, both experts make assumptions about

customers' value received based on simplistic approaches that are unreliable under *Daubert*.

Dr. Arnold's economic loss model proposes to award to putative class members averages

of "the entire amount actually paid by Class members for the MyFord Touch system."  Mot. at

48.  But he assumes, contrary to record evidence and common sense, that every proposed class

member ascribed the same value to MFT and paid the same amount for it, Ex. 70 at 5, irrespective

of individual negotiations, rebates, whether the MFT was standard equipment on a vehicle or part

of an option package, or whether the vehicle was purchased or leased.  This alone undermines his

analysis because such averages can "lead to serious analytical problems" that "hide substantial

variation" that defeats common impact.  *In re Graphics Processing Units Antitrust Litig.*, 253

F.R.D. 478, 490-91, 494 (N.D. Cal. 2008).

In addition, Dr. Arnold assumes, again without an evidentiary basis or independent

evaluation, that no class member received any value from the system.  Even Named Plaintiffs do

not allege that the MFT did nothing; many still use the MFT regularly.  *E.g.*, Ex. 37 at 76:2-

77:25.  Dr. Arnold's complete failure to consider value received also is contrary to well-settled

law.  *E.g.*, *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 471 (N.D. Cal. 2014) ("[T]he Court finds

that these common questions do not predominate over the critical and fact-intensive question of

whether any individual class member received an 'unusable' product"); *Brazil v. Dole Packaged

Foods, LLC*, 2014 WL 2466559, at *15 (N.D. Cal. May 30, 2014) ("Dr. Capps's full refund

model is deficient because it is based on the assumption that consumers receive no benefit

whatsoever from purchasing the identified products.  This cannot be the case.").  ██ REDACTED ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████  Likewise, Mr. Boedeker's survey data indicates that

people with MFT experience view the system more highly than those without MFT experience.

*Id.* ¶¶ 116-19. Dr. Arnold's approach is irreconcilable with such evidence. *Id.* ¶¶ 60-61.

Mr. Boedeker's approach is no more reliable or able to determine damages on a classwide basis. He admits different consumers placed different values on MFT vehicles, Ex. 71 ¶ 20, that putative class members engaged in individualized vehicle purchase negotiations, and that he does not know they paid at the point of purchase. Ex. 76 at 74:2-3. Yet his economic loss estimates ignore individualized variation; the estimates are exactly the same for every class member. He purports to use a "conjoint analysis" technique relying on survey questions to show the (uniform) dollar amount by which the price would purportedly decline once consumers learned that their system was "defective." But Mr. Boedeker layers on additional calculations that are not grounded in standard economic practice. Ex. 42, Singer Rpt. ¶¶ 79-100. Mr. Boedeker's implementation of the "conjoint" method is also defective in its own right, failing to follow basic methodological guidelines for reliability. *Id.* ¶¶ 101-13. These are not mere merits disagreements, but instead render his methodology unreliable and inadmissible under *Daubert*. Plaintiffs' citation to several cases where proper conjoint analyses could be accepted, Mot. at 48-49, do not address the unreliability of Mr. Boedeker's flawed methods.

**First**, the data source for his analysis is not actual vehicle purchase prices, but the answers to an Internet survey he conducted in November 2015 of vehicle owners. All estimates of the "valuation" Boedeker derives from these survey responses are infected by the fact that 60% of respondents already had personal experience (whether good or bad) with MFT; hence, under well-recognized economic principles, respondents could not give reliable answers to hypothetical questions regarding value in a conjoint analysis. Ex. 42, Singer Rpt. ¶¶ 84-87, 117-19.

**Second**, Boedeker's survey method measures demand completely independent of supply, so it cannot even attempt to estimate a shift in the equilibrium price. *Id.* ¶¶ 72, 76-78, 101 & n. 182-83; *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) ("Harris's conjoint analysis does not satisfy *Comcast*. . . . [It] looks only to the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants.").

**Third**, understanding the need to consider supply, Boedeker employed "additional market

simulation" to inflate the alleged harm (to $1,390), but that approach is unreliable for many reasons. It is not based on generally accepted economic methods or recognized in any peer-reviewed sources; it even ignores guidelines specified in the lone non-published note he purported to follow. Ex. 42, Singer Rpt. ¶¶ 88-93. In addition, it ignores elementary economic principles. *Id.* And it assumes—with no supporting facts—there was a stable market over more than three years where the initial sale price of each MFT vehicle was set by a competitive equilibrium. To the contrary, the MFT "market" was not stable over the putative class period, in large part because Ford's competitors began to offer competitive alternatives to the MFT during the Class Period. Ex. 42, Singer Rpt. ¶¶ 91, 101 & p. 66 n.183; *In re NJOY Consumer Class Action Litig.*, 2016 WL 787415, at *8 (C.D. Cal. Feb. 2, 2016). The lack of an accepted basis for the "additional market simulation" methodology is further grounds to exclude Mr. Boedeker's. *In re Novatel Wireless Sec. Litig.*, 2012 WL 5463214, at *2 (S.D. Cal. Nov. 8, 2012).

**Fourth**, Boedeker's estimates of economic harm are not based on an attempt to elicit from his respondents the amount they would have been willing to pay at the point of purchase if Ford had disclosed the alleged defects. Instead, they are based purely on his attempts to elicit the value that different groups of respondents attributed to a defect-free system. Specifically, Boedeker subtracts his estimate of one group's willingness to pay for a defect-free system from his estimate of another group's willingness to pay for a defect-free system and illogically concludes he has somehow concocted a reliable estimate of the diminution in value attributable to concealment at the point of purchase. Ex. 42, Singer Rpt. ¶¶ 94-97. As common sense suggests, this approach does not generate any meaningful information about the "difference in value" between a defective and non-defective system, because it does not incorporate any information on any survey respondent's willingness to pay for a defective system. *Id*. ¶ 98. These calculations are contrary to well-accepted economic principles; Boedeker relies on no authority to support them. *Id*. ¶100.

Because expert testimony "must be grounded in the methods and procedures of science and signify something beyond 'subjective belief or unsupported speculation,'" *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011), the conclusions of Plaintiffs' economic experts are unreliable and must be disregarded for each of the independent reasons

stated above. *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (expert opinions that constitute "mere[ly] subjective beliefs or unsupported speculation" fail *Daubert*'s reliability standard). Thus, Plaintiffs have failed to identify any common methodology to determine class damages, meaning that individualized issues predominate on this issue as well.

### 7. Ford Did Not Have Exclusive Knowledge of the Allegedly Concealed Facts and Did Not Actively Conceal Them

Individualized evidence also would be required to show that Ford had exclusive knowledge or otherwise acted to affirmatively conceal the "material facts" that Plaintiffs contend it withheld, a requirement this Court has recognized. Dkt. No. 97 at 19-21 (discussing exclusive knowledge and active concealment). The record shows that both Ford's knowledge and others' knowledge about the alleged MFT problems varied over the class period.

First, Ford's actual knowledge about the design sufficiency and reliability of MFT changed over time—both because the system itself changed and because Ford's knowledge of the bugs contained therein evolved based on feedback from consumers as well as input from engineers working to solve those problems. REDACTED A jury could certainly reach different conclusions about Ford's actual knowledge at these different times.

Second, the evidence about whether Ford's knowledge was *exclusive* changed over time. As noted above, media publications at different periods provided ever-increasing amounts of information to the public. *See* Section II.D. Thus, the question of exclusive knowledge is very different for a consumer who purchased a vehicle with the MFT in September 2010 from one who purchased in August 2013. Moreover, the evidence shows that different Named Plaintiffs and absent class members had different information, resulting in different expectations about performance, none of which are sufficient to establish on a classwide basis what information was

exclusively within Ford's possession.  Ex. 43, Wood Rpt. at 5-8, 22-25.  Even Plaintiffs' expert, Dr. Rosenberg, acknowledges the varying degrees of user expectations regarding the MFT.  Ex. 62 at 93:4-9, 94:18-21, 100:21-24.

While certain purported class members had extensive knowledge about MFT issues before their purchase, others may not have had access to the same information.  Determining which facts were in Ford's "exclusive knowledge" at the time of purchase will necessarily require an individual inquiry.  *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998) (denying certification in part because Ford's knowledge varied over time).

### 8. Individual Issues of State Law Further Preclude Certification of Plaintiffs' Fraud Claims

#### a. Class Actions Are Impermissible Under the Consumer Protection Statutes of Virginia and Colorado

Virginia law bars class claims for violation of the VCPA, even when filed in other jurisdictions.  *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 294 (D.N.J. 2009); *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 16-17 (2001).  Plaintiffs' reliance on *Chisolm v. TranSouth Financial Corp.*, 184 F.R.D. 556 (E.D. Va. 1999), is misplaced because the case makes no mention of the VCPA.  Likewise, Colorado substantive law prohibits class actions for monetary damages under the CCPA, even when filed in other jurisdictions.  Colo. Rev. Stat. § 6-1-113(2); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 2015 U.S. Dist. LEXIS 166359, at *15 (D. Colo. Dec. 10, 2015) ("[T]he state statute controls rather than Fed. R. Civ. P. 23, and the class action restriction is enforceable.").

#### b. New Jersey Consumer Protection Laws Require Manifestation of the Alleged Defect Which Will Require Individual Inquiry

Manifestation of the alleged defect is required to recover under the NJCFA.  *Green v. Green Mt. Coffee Roasters, Inc.*, 279 F.R.D. 275, 284-85 (D.N.J. 2011); *Green v. GMC*, 2003 N.J. Super. Unpub. LEXIS 13, at *23 (N.J. Super Ct. App. Div. July 10, 2003).  Consequently, New Jersey courts repeatedly have held that "proving a defect is a highly individualized inquiry unsuitable for class treatment" and that common issues do not predominate if the class includes significant numbers of class members whose products have not manifested the alleged defect.

*Green Mt. Coffee*, 279 F.R.D. at 284; *Laney v. Am. Standard Cos.*, 2010 U.S. Dist. LEXIS 100129, at *52 (D.N.J. Sept. 23, 2010); *Payne v. FujiFilm U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 52808, at *17 (D.N.J. May 28, 2010); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998). Plaintiffs in this case do not attempt to show the frequency of manifestation of any issues, let alone the allegedly common ones. Thus, individualized questions preclude certification of the NJCFA claim because the Court would have to determine not only exactly which software "defects" (if any) are common to all class members, but also which purchasers experienced problems with the MFT and whether those problems were caused by defects in the MFT.

### c. Specific State Limits on Standing for Non-Consumers Also Require Individual Inquiry

Under many of the consumer fraud statutes under which Plaintiffs have brought their claims, a plaintiff lacks standing to sue if the vehicle was purchased for business use. *E.g.*, Cal. Civ. Code § 1761(e); Mass. Gen. Laws ch. 93A(9), (11); Ohio Rev. Code Ann. § 1345.01(A); Va. Code Ann. § 59.1-198. Named Plaintiffs CDD and Creed both acquired their vehicles for business use. Ex. 56 at 21:6-9; Ex. 60 at 48:2-9. As such, they lack standing to asset these claims. This issue requires individualized inquiries for absent class members as well.

### B. Plaintiffs' Tort Claims Fail for Similar Reasons to Plaintiffs' Fraud Claims

Plaintiffs also seek to certify two non-concealment tort claims: Colorado strict liability under Colorado law and negligence under Ohio law. Like the concealment claims discussed above, individualized issues relating to the purported safety risk and other sources of an alleged duty to disclose will predominate and prevent certification of a class for either claim. First, Colorado strict products liability claims require a plaintiff to show a product was "in a defective condition unreasonably dangerous to the user" and "the defect caused the plaintiff's injuries." *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1106 (D. Colo. 2000). As discussed above, Plaintiffs' contentions about safety risk are speculative and are not based on evidence with classwide application (even if relevant at all), and they are disconnected from the alleged economic injury. *See* Section IV.A.3. Second, under Ohio law, any negligence claim requires that the plaintiff show "the defendant owed him a duty, that the duty was breached, and that his

injury proximately resulted from the breach." *Miles v. Kohli & Kaliher Assocs.*, 917 F.2d 235, 243 (6th Cir. 1990); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013). Whether Ford owed consumers a duty to disclose information about the MFT turns on many of the same factors discussed above for the concealment claims, as do questions of proximate cause and injury. *See* Section IV.A.

## C.    **Individualized Issues Predominate Plaintiffs' Express Warranty Claims**

Individualized factual and legal issues predominate the claims for breach of express warranty in all nine states where Plaintiffs seek certification on that claim.

### 1.    **Common Proof Cannot Establish That Each Class Member Unsuccessfully Sought MFT Repairs**

The only express warranty at issue here is Ford's Limited Warranty. Mot. at 42; Ex. 73 at 15. It makes no promises that the MFT (or any other component) will be non-defective; instead it offers to repair or replace components that malfunction due to a defect. *See In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *24 (D.N.J. July 29, 2015) ("[A] repair or replacement warranty does not warrant how the goods will perform in the future. Rather, such a warranty simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period."). Plaintiffs do not allege that Ford refused to repair or replace a malfunctioning MFT in any vehicle. Rather, they assert a "failure of essential purpose" theory—that further presentment of the MFT to dealers seeking repairs for malfunctions would have been pointless because Ford could not correct such malfunctions. Mot. at 43; TAC ¶ 442. To certify classes under this theory, Plaintiffs must show that classwide evidence could establish both the elements of repeated presentment *and* inability to repair: a plaintiff must show that she brought her malfunctioning MFT system to an authorized Ford dealer at least twice seeking a repair for the *same* problem,[15] and the Ford dealer failed to fix that problem.[16] *E.g., Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984) ("[A] repair or

---

[15] *E.g., Caterpillar*, 2015 WL 4591236, at *23; *David v. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1319 n.11 (S.D. Fla. 2009).

[16] Contrary to Plaintiffs' argument, Mot. at 41-42, the Court's ruling on Ford's motion to dismiss was based on Plaintiffs' allegations only, and thus it did not hold that Plaintiffs had actually satisfied the presentment and notice requirements or could do so based on classwide evidence.

replace remedy fails of its essential purpose only if repeated repair attempts are unsuccessful within a reasonable time"); *see also* Dkt. No. 97 at 32–36. This inherently individualized inquiry is not susceptible to common proof.

In dismissing the express warranty claims of five Named Plaintiffs for failure to allege they sought a repair to their MFT, this Court's prior orders show that the presentment requirement is necessarily individualized. Dkt. No. 97 at 33–35; Dkt. No. 175 at 8.) Discovery has since revealed additional Named Plaintiffs who did not seek multiple MFT repairs. *E.g.*, Ex. 23 at 91:19–23; Ex. 74 at 128:10–134:3. These Named Plaintiffs were not a rarity. **REDACTED**

Nor can common evidence show that the 6% of class vehicles that did receive multiple repairs received repairs for the ***same*** problem and that a Ford dealer was unable to fix it. Plaintiffs cannot simply "lump" different problems or repairs together and obtain a merits determination of failure of essential purpose. *E.g.*, Dkt. No. 97 at 35–36; *Pidcock v. Ewing*, 435 F. Supp. 2d 657, 663 (E.D. Mich. 2006) (holding plaintiff cannot establish failure of essential purpose "by lumping together all repairs and by aggregating the amount of time the [vehicle] was out of service for any and all repairs"). Rather, an individual inquiry is needed to determine what specific problem was complained about at each repair visit, what steps were taken to resolve it, and whether a resolution was reached in a reasonable amount of time.

Plaintiffs instead try to revive the "futility" argument that this Court has twice rejected. Dkt. No. 97 at 34; Dkt. No. 175 at 7–8. Plaintiffs still cannot point to any case law to support this rehashed argument. And Plaintiffs are factually incorrect that "Ford had no repair available other than the software updates it issued." Mot. at 45. The evidence reveals numerous incident-specific issues as to which non-software repairs solved whatever problem was experienced. *E.g.*, Williams Decl. ¶ 44; **REDACTED**; Ex. 39 at 99:3–101:17 (phone connectivity issue resolved by replacement of a frayed USB cable). Plaintiffs' contention that the installation

---

17 **REDACTED**

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

of software updates was futile also cannot be reconciled with their tacit acknowledgment that

version 3.6 resolved any actionable defects by excluding it from their proposed classes. [REDACT]

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ [18]

Plaintiffs next argue that the Limited Warranty's provision giving Ford a "reasonable

time" to remedy a problem is unconscionable, and thus Ford is "not entitled to *any time at all* to

repair any MFT issues." Mot. at 43–44. While Plaintiffs cite cases where certain limitations in

an express warranty were found unconscionable, none of those cases held that a plaintiff can

allege breach of a repair-or-replace warranty without ever seeking repairs. *Id.* at 44 & n.122.

Such a theory is not viable, in part because unconscionability is determined at the time of contract

formation, "not whether it is unconscionable in light of subsequent events," as Plaintiffs here

allege. *Am. Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1391 (1996). In addition, the proof

needed to establish unconscionability is inherently individualized and thus ill-suited for class

treatment. *E.g.*, *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 475 (N.D. Cal. 2014) (the putative

class definition "lumps all [] customers together, and yet the unconscionability analysis, and

particularly the substantive unconscionability analysis, would differ considerably across these

various scenarios . . . ."); *Harris v. Sand Canyon Corp.*, 274 F.R.D. 556, 568 (D.S.C. 2010).

### 2. Plaintiffs Cannot Use Common Proof to Establish That Each Class Member Provided the Requisite Notice of a Breach

In Massachusetts, New Jersey, New York, and North Carolina,[19] absent class members

must timely provide notice of any alleged breach of warranty by notifying at least their selling

Ford dealer they believe that the Ford dealer has failed to honor the warranty obligation to repair.

As reflected in this Court's ruling that certain Named Plaintiffs could not pursue a warranty claim

---

[18] Plaintiffs have no support for their argument that they need not present their vehicles for repair because Ford provided software updates through the Internet. Mot. at 45. The Limited Warranty requires that problems are presented to a Ford dealer for resolution, Ex. 73 at 15, which gives Ford an opportunity to assess individual issues and provide a tailored response.

[19] (**Massachusetts**): *Maga v. Hennessy Indus., Inc.*, 2014 WL 10051399, at *16 (D. Mass. Dec. 1, 2014); (**New Jersey**): *Luppino v. Mercedes-Benz USA, LLC*, 2011 U.S. Dist. LEXIS 65495, at *7 (D.N.J. June 20, 2011); (**New York**): *Hubbard v. Gen. Motors Corp.*, 1996 WL 274018, at *4–5 (S.D.N.Y. May 22, 1996); (**North Carolina**): *Butcher v. DaimlerChrysler Co.*, 2008 U.S. Dist. LEXIS 57679, at *10–11 (M.D.N.C. July 29, 2008).

FORD'S CLASS CERT. OPP.
CASE NO. CV 13-3072-EMC

because they failed to provide adequate notice of any alleged breach, Dkt. 97 at 39–46, this is an inherently individualized analysis not suited for class treatment. *See In re 5-hour ENERGY Mktg. & Sales Practices Litig.*, 2014 WL 5311272, at *20 (C.D. Cal. Sept. 4, 2014); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 272 n.22 (E.D. Pa. 2013) ("Reliance and pre-litigation notice are two elements that often preclude certification of multi-state breach of express warranty classes."); *Barden v. Hurd Millwork Co.*, 249 F.R.D. 316, 321 (E.D. Wis. 2008) (pre-litigation notice "would appear to require a relatively intensive factual inquiry into each individual case").

### 3. Plaintiffs Make No Attempt to Offer Classwide Proof of Damages Caused by a Breach of Warranty

"In *Comcast*, the Supreme Court held that plaintiffs' method of proving damages must be tied to their theory of liability." *NJOY*, 120 F. Supp. 3d at 1117. Warranties may limit damages for breach (*e.g.*, Iowa Code § 554.2719), and Ford's Limited Warranty states that the damages for a breach by failure of essential purpose cannot "exceed the cost of correcting manufacturing defects," Ex. 73 at 15, and it expressly excludes incidental or consequential damages. *Id.* at 12.

Plaintiffs propose no damages model that measures the cost to any class member of correcting any alleged manufacturing defects in the MFT system. Nor have they provided any evidence that any class member experienced any cost to repair. Plaintiffs' experts' damages theories do not propose a classwide method for calculating what damages, if any, were proximately caused by any breach of warranty. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 604 (3d Cir. 2012) ("[I]t is of course necessary to show . . . that the breach of warranty was the proximate cause of the loss sustained . . . .") (citation omitted). Instead, as Plaintiffs' experts both admit, their proposed measures focus entirely on a fraud theory. Dr. Arnold admits his damages model was created without a breach of warranty theory "in mind." Ex. 75 at 98:25-99:5, 103:1-3; *see also id.* at 100:6–101:3. Similarly, Mr. Boedeker "did not look into any warranty-related issues," failed to do "any research investigation or calculations about anything related to warranties in this case," and noted that his "report doesn't cover any of that." Ex. 76 at 85:6-9, 87:2-5. These admissions preclude certification of any breach of warranty claims because Plaintiffs cannot "connect up" the alleged damages to the alleged breach by failure to repair. *See*

*Comcast*, 133 S. Ct. at 1433 ("It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

### D.    Individualized Issues Predominate Plaintiffs' Claims for Breach of Implied Warranty of Merchantability

Individualized issues predominate over Plaintiffs' claims for breach of the implied warranty of merchantability. Plaintiffs must show that all class ***vehicles*** are not "fit for the ordinary purposes for which such goods are used." *E.g.*, N.C. Gen. Stat. § 25-2-314; *see also, e.g.*, *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010). The ordinary purpose of Plaintiffs' vehicles is to provide "safe, reliable transportation," as this Court has stated. Dkt. No. 97 at 48. It is not enough to claim problems with the MFT system or its features; that argument was previously rejected by this Court. *Id.* at 48 n.14 ("Identifying a particular component of a car (such as electric windows, stereo radio, Bluetooth, etc.) and using that to define the ordinary purpose of the car as one which so equipped would merely be an exercise in question begging."). "Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable even if certain functions of the car—like a navigation or entertainment system—do not operate as promised." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 878 (N.D. Cal. 2015) (citing Dkt. No. 97).

Plaintiffs present no evidence (much less common evidence) proving that the different problems with MFT that occurred (or did not occur) in different class vehicles prevented all of those vehicles from providing safe, reliable transportation, as further explained above. *See* Section II.E. The reality is that whether a particular vehicle is unmerchantable does not turn on Plaintiffs' worst-case conjecture of what ***might*** happen if a particular component malfunctions; it turns on vehicle-specific facts about how that particular vehicle actually performed in the real world. *E.g.*, *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013); *Suddreth v. Mercedes-Benz, LLC*, 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011) ("It is simply not plausible that a motor vehicle could be classified as not merchantable when it has been used for its intended

purpose for 4 years and 50,000 miles").[20]  What each individual absent class member experienced with their vehicle would become the subject of countless mini-trials about whether each person's vehicle in fact provided safe, reliable transportation.  *See, e.g.*, *Martin*, 292 F.R.D. at 277 ("Proving breach—that the Ford Windstars were not 'fit for the ordinary purposes for which such goods are used'—is a question of fact.  Facts relevant to this inquiry include . . . **the experience of each individual Class member** with the Ford Windstar."); *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1299 (1995).  Named Plaintiffs' own experiences, often reflecting tens of thousands of miles driven with their families and friends, without accident, further confirm that the vehicles provided safe, reliable transportation, and show the individual nature of the inquiry.  *E.g.*, Ex. 74 at 80:10–11, 81:12–15) (87,000 miles); Ex. 77 at 70:4–6 (80,000 miles); Ex. 60 at 49:23–25 (102,500 miles).

Separately, Ford's Limited Warranty states that individuals who purchased their vehicle for business purposes do not have any implied warranties.  *See* Ex. 73 at 12.[21]  Whether a given class member purchased her vehicle for personal use, and hence even receives the benefit of an implied warranty, is an inherently individualized exercise.  *See* Section V.C.1.

Finally, the notice and damages predominance arguments for the breach of express warranty claims, Sections IV.C.2-3, apply equally to the breach of implied warranty claims.

### E.     Plaintiffs' Magnuson-Moss Claims Cannot Be Certified

Plaintiffs' state-specific Magnuson-Moss claims cannot be certified in any state other than Massachusetts because the Court dismissed that claim as to each Plaintiff except Mr. Creed.  Dkt. No. 97 at 61; TAC ¶¶ 284–97 (asserting Magnuson-Moss claim only on behalf of Plaintiff Creed, and including claim for other Named Plaintiffs only "to preserve the claim for appeal").  Because there is no proposed class representative who can assert a Magnuson-Moss claim in 11 of the 12 states for which class treatment is sought, no class claims can be asserted in those states.  *Sosna v.*

---

[20] *See also, e.g.*, *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 945–46 (C.D. Cal. 2012) ("The basic inquiry, therefore, is whether the vehicle was fit for driving."); *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 174 (S.D. Miss. 1996) (no claim where vehicles had been driven for five years and 90,000 miles without manifesting their alleged defects).

[21] Such exclusions are legally enforceable.  *E.g.*, *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 819 (N.D. Cal. 2014).

*Iowa*, 419 U.S. 393, 403 (1975) ("A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court.").

Nor can a Massachusetts Magnuson-Moss claim be certified. As this Court held, Plaintiff Creed's claim "rises or falls with the state express and implied warranty claims." Dkt. No. 97 at 55. It accordingly is not appropriate for class treatment because, as discussed above, Plaintiffs' breach of express warranty and breach of implied warranty of merchantability claims predominantly turn on inherently claimant-specific issues of fact and law. *See* Sections V.C & V.D. Moreover, a Massachusetts class is not viable because Plaintiff Creed is an inadequate class representative. He sold his vehicle, TAC ¶ 104, and therefore cannot give Ford an opportunity to cure after any certification. *In re Porsche Cars N. Am. Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 824 (S.D. Ohio 2012) ("before the class action can proceed, the defendant must be afforded an opportunity to cure the alleged breach of warranty . . . .").

## V.    A CLASS ACTION IS NOT A SUPERIOR METHOD TO RESOLVE CLAIMS BASED ON ALLEGED DEFECTS IN THE MFT SYSTEM

As discussed below, superiority of a class action should be rejected where (1) the putative class members have already obtained available benefits, (2) putative class members have adequate alternative means to pursue their claims, or (3) the claims are not manageable consistent with the due process rights of both absent class members and the defendant. Here, the proposed class fails on each of these grounds.

### A.    Ford Has Already Provided Significant Benefits to the Putative Class

Litigation is not a superior method to adjudicate these issues because a remedy has been available to all Class Members *for free* for over two-and-a-half years—a software update that Plaintiffs effectively concede resolves any actionable defects with the MFT by carving it and subsequent versions out of its proposed classes. *See Brown v. Hain Celestial Grp., Inc.*, 2014 U.S. Dist. LEXIS 162038, at *17–18 (N.D. Cal. Nov. 18, 2014) (finding that when plaintiffs narrowed their misrepresentation class to exclude products bought after a certain date because the "offending tagline was removed," this "reflect[ed] the developing realities of a given suit"); ████████████████████████████████████████████████████████████████████. In

1    *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 489 (S.D. Cal. 2013), the court declined to

2 certify a class for software misrepresentation claims where the defendant provided a free software

3 update that gave the product the functions the consumers initially expected. The court found that

4 individual issues predominate "when there's an available remedy for the grievance of the putative

5 class," and noted that "[w]ith the upgrade, they now have just what they paid for." *Id*. at 487–88.

6    **B.**     **Class Members Have Alternative Means to Pursue Remedies**

7    Plaintiffs are just wrong to say that "no other means exist here for class members to

8 adjudicate their claims against Ford." Mot. at 50. As of February 2016, there have been more

9 than 375 individual lawsuits filed in the twelve states at issue involving warranty or other

10 individual claims related to alleged specific problems those individuals encountered with the

11 MFT.[22] Ex. 78. While small in number compared to the 564,000 class vehicles sold in those

12 states, these cases show that—given the availability of attorney fees[23] and the substantial damages

13 claimed, *e.g.*, TAC ¶ 207—this is not a situation, like the cases on which Plaintiffs rely, in which

14 the costs of litigating a single-plaintiff case overwhelm the small value of the claims. *Cf. Pecover*

15 *v. Elec. Arts Inc.*, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) (alleging $20 overcharge in

16 antitrust case). Many other putative class members—including some current or former Named

17 Plaintiffs—have successfully utilized the Better Business Bureau Auto Line arbitration

18 mechanism provided for by Ford's Limited Warranty that allows for adjudication of warranty

19 claims at no cost to customers. For example, former Plaintiff Makowski used the Auto Line

20 arbitration process, which resulted in Ford buying back her vehicle for her original purchase price

21 less a mileage fee. Ex. 79. Because there are multiple alternatives available, this class action is

22 not superior. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-91 (9th Cir.),

23 *amended on other grounds*, 273 F.3d 1266 (9th Cir. 2001) (affirming a denial of class

24 certification in part because individual lawsuits were pending); *Parkinson v. Hyundai Motor Am.*,

25 ────────────────

[22] Even the individual who created a website that criticized MFT and invited other owners to do so as well—which Plaintiffs repeatedly cite, *see* TAC ¶¶ 8, 259—filed an independent lawsuit

26 and resolved it for a substantial monetary settlement. *See* http://syncsucks.com.

27 [23] *See, e.g.*, Cal. Civ. Code § 1794; Ariz. Rev. Stat. § 12-341.01; N.C. Gen. Stat. § 75.16.1; Ohio Rev. Code § 1345.09; Tex. Code Ann. Bus. & Comm. Code § 17.50(d)). In addition, several

28 laws also offer the possibilities of enhanced damages. *E.g.*, Cal. Civ. Code § 1780; Mass. Gen. Laws ch. 93A, § 11; N.J. Stat. § 56:8–19; Tex. Code Ann. Bus. & Comm. Code § 17.50(b)(1).

258 F.R.D. 580, 595 (C.D. Cal. 2008) (finding lack of superiority in part because " plaintiffs have an alternative, free forum for determination of warranty claims through the BBB Auto Line."). Plaintiffs claim that their litigation is expensive, Mot. at 2, but much of their expenditure (including their experts) was necessary only to pursue class, rather than individual, claims.

## C. The Putative Classes Are Not Manageable

A class action is not a superior way to handle this litigation because the putative class claims cannot manageably be litigated en masse in a manner that respects the due process rights of absent class members and Ford. There is no way to have a manageable trial that (1) maintains clear definition between the different state standards and (2) avoids the risk of blurring individual complaints into a hypothetical composite plaintiff that bears no relation to most of the class. Further, Plaintiffs propose no trial plan or describe how the Court could feasibly instruct the jury and use in limine motions to separate relevant evidence to different plaintiff groups.

### 1. Legal Standards—and Evidence Relevant to Them—Vary by State

No court could certify a single class under the laws of the twelve different states because the variations in the state law claims would swamp any common issues. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012). Even though Plaintiffs seek certification of twelve separate state classes instead of one nationwide class, their suit presents the same manageability problems. Jurors are likely to get confused because of similar but distinct requirements of those claims from state to state. *Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 410 (S.D. Ill. 2010) (declining to certify 11 state-specific classes when "differences in the required proofs of the states' statutes demonstrate that a multi-state certification would not be manageable because of the multiple and different variables that would have to be proved as to each class member"); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003) (finding a class action not superior and unmanageable due to the multiple state subclasses and the "risk of jury confusion"); *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 76–77 (E.D.N.C. 2008).

As one example, states apply different burdens of proof. *Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. at 223 (noting that the burden to prove fraudulent concealment varies across Colorado (preponderance), Iowa (clear and convincing preponderance), Virginia (clear and

convincing but not unequivocal), and California (clear and convincing and unequivocal). As another example, this Court has noted that some states require that absent class members provide proper notice of any alleged breach of warranty to the defendant, while others do not. *See* Dkt. No. 97 at 39 ("[T]he notice issue must be evaluated on a state-by-state basis"); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 727 (5th Cir. 2007) ("Given the variations among the states regarding the notice requirement, plaintiffs failed to adequately analyze the impact of these variations on predominance."). Further, some of the relevant state statutes require that proposed class members be "consumers" who were not business customers.[24] In such a situation, courts have found that "the necessary individual inquiries for each member of the proposed class impair the Court's ability to effectively and efficiently manage the litigation." *Rowden v. Pac. Parking Sys.*, 282 F.R.D. 581, 585 (C.D. Cal. 2012).

## 2. Plaintiffs Confront Ford with a Fictional Composite Plaintiff to Create an Artificially Strong Case

A jury should not be asked to render classwide all-or-nothing verdicts based on a body of evidence (whether given through the 19 Named Plaintiffs, or through Plaintiffs' counsel's expert witnesses) that is demonstrably inapplicable to the claims asserted by different subsets of different absent class members. The class action procedure is not superior if the interests of "efficiency" force Ford to defend against the hybrid claims of a "fictional composite" plaintiff that presents stronger claims than many or all putative class members would have. *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 415 (C.D. Cal. 2000); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) ("[C]ourts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be."). Plaintiffs' brief already shows this problem, broadly claiming that all class members "endured the unsafe, unreliable MFT system for as long as approximately three years" while cherry-picking evidence

---

[24] *See* Cal. Civ. Code § 1761(d); Mass. Gen. Laws ch. 93A(9), Ohio Rev. Code Ann. § 1345.01(A); Va. Code Ann. § 59.1-198; *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 552 (E.D. Va. 2000); *State ex rel. Celebrezze v. Howard*, 77 Ohio App. 3d 387, 393 (Ohio Ct. App. 1991); *Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215, 1222 (N.D. Cal. 2011); *see also* Tex. Bus. & Com. Code §§ 17.45(4), 17.50 (limiting suits from large businesses).

that has disparate and limited application to specific subgroups.  Mot. at 27, 44.  Similarly, in response to Ford's interrogatory asking each Named Plaintiff to identify each fact that supports their claim that Ford owed them a duty to disclose, each one pointed to the same universe of facts—REDACTED This means that Plaintiff Matlin, for example, is relying on facts that did not occur until 2013 to establish that Ford owed him a duty to disclose in October 2010 when he purchased his vehicle.

Plaintiffs' attempt to use composite evidence to gloss over key differences significantly infringes on Ford's ability to raise individualized defenses, including those that turn on the date the vehicle was purchased.  That a purchase that occurred in October 2010 cannot be treated the same as one in August 2013 is especially true here given the substantial changes to the MFT software, Ford's changing knowledge regarding problems with the MFT, and consumers' evolving knowledge of problems with the MFT.  *See* Section II; *see also Tidwell v. Thor Indus.*, 2007 U.S. Dist. LEXIS 21819, at *25 (S.D. Cal. Mar. 26, 2007) ("[I]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not "superior.'"); *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 n.6 (8th Cir. 2009) (rejecting proposal that would be "based on a hypothetical composite plaintiff").  *See also* Section IV.  In *O'Connor*, the court decertified a class because a finding of liability "without any reference to the [individualized] limitations defense runs 'the real risk . . . of a composite case being much stronger than any plaintiff's individual action would be . . . [and] permitting plaintiffs to strike [Defendants] with selective allegations, which may or may not have been available to individual named plaintiffs.'"  197 F.R.D. at 415.

Taking just evidence obtained from 19 Named Plaintiffs through the individual discovery process, one easily can see the disparate evidence.  *See* Sections II & IV.  Plaintiffs have not proposed a plan to manage these concerns, and they would likely have great difficulty coming up with one that both contemplates a reasonably succinct trial, and ensures appropriate consideration of all subclass-level factual and legal issues.  *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (vacating a class certification order in part because "[t]here has been

no showing by Plaintiffs of how the class trial could be conducted"); *Zinser*, 253 F.3d at 1189 (holding plaintiff "bears the burden of demonstrating 'a suitable and realistic plan for trial of the class claims"); *Marsh v. First Bank*, 2014 U.S. Dist. LEXIS 69368, at *26 (N.D. Cal. May 19, 2014) (declining to certify a nationwide class because the plaintiff did not meet her "responsibility to provide 'a suitable and realistic plan for the trial of the class claims.'").

### 3.      Ascertainability Concerns Leave the Classes Unmanageable

Nor are individuals who purchased ***used*** vehicles from Ford dealers an ascertainable part of the proposed classes.  Ford does not possess information about used-vehicle sales from independent Ford dealers, Eikey Decl. ¶ 9, and courts do not allow putative class members to self-identify through affidavits when the affidavits would be unreliable or "administratively infeasible."  *Bruton v. Gerber Prods. Co.*, 2014 U.S. Dist. LEXIS 86581, at *20 (N.D. Cal. June 23, 2014).  Indeed, four of the original Named Plaintiffs were subsequently dismissed from the case because, contrary to their allegations (and their counsel's vetting process), their vehicles turned out not to be equipped with a MFT system at all.  *See* Dkt. Nos. 134, 167.

## VI.      NAMED PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASSES

The Named Plaintiffs are not typical because (1) they seek to assert several claims on behalf of a class even though the Court has already dismissed those claims as to them individually; (2) they advance classwide theories that do not match their individual allegations of harm; and (3) the record reveals unique deficiencies in their claims based on facts specific to certain of them.  *Ellis*, 657 F.3d at 984 ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.").

### A.      Plaintiffs Cannot Seek Certification of Claims This Court Has Dismissed

Named Plaintiffs cannot represent a class with respect to claims that this Court has dismissed with respect to Named Plaintiffs themselves.  *E.g.*, *Ahmadi v. Chertoff*, 2008 WL 1886001, at *4 (N.D. Cal. Apr. 25, 2008); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (typicality requirement "limit[s] the class claims to those fairly encompassed by the named plaintiff's claim.").  Plaintiffs improperly seek certification of the following dismissed claims:

- fraudulent concealment claim under Iowa law (*see* Dkt. No. 175 at 5–6);

- Magnuson-Moss Warranty Act claims for California, Iowa, New Jersey, New York, North Carolina, Ohio, Virginia, or Washington putative classes (*see* Dkt. No. 97 at 60–61); and

- Plaintiff Miller's (although not Plaintiff Purcell's) breach of express warranty claim under New York law (*see* Dkt. No. 97 at 69).

In addition, Plaintiffs cannot seek certification of an Ohio class on a breach of warranty claim because Plaintiff Miskell elected not to assert such a claim. *See* TAC ¶ 621.

## B.    Plaintiffs' Proposed Classwide Proof of Defect Is Not Applicable to Many of Named Plaintiffs' Individual Allegations

Seeking to establish the existence of a common defect, Plaintiffs rely on the report of Mr. Smith, who identified five supposed common defects from his review of some (but not all) versions of the MFT code. *See* Section IV.A.1. But these defects differ from the ones allegedly encountered by the Named Plaintiffs. Plaintiffs contend that the common symptoms the Named Plaintiffs experienced were "issues with system stability, phone connectivity, voice recognition, and navigation." Mot. at 16. Mr. Smith's report does not address two of these four issues. Of the issues Mr. Smith's report does address, the Named Plaintiffs do not allege they experienced two of these supposedly "common" defects Mr. Smith identified—(1) the miscalculation of GPS locations for the Where Am I, Turn-by-Turn, or 911 Assist features, and (2) the allegedly inconsistent operation of the convenience touchscreen buttons providing redundant climate control. Ex. 65 ¶¶ 19, 87. Likewise, Plaintiffs' human-factors expert, Dr. Rosenberg, did not consider the Named Plaintiffs' experiences or whether the problems he identified were encountered by all, or any, of them. Ex. 62 at 11:2-10, 148:13-149:2, 181:25-182:4.

Instead, many of the problems the Named Plaintiffs claim to have experienced are unrelated to the issues identified by Plaintiffs' software expert. For example, Plaintiffs Miller and Connell say that their MFT system failed to play music from their phones when they were connected via USB, while Plaintiff Purcell said her MFT system was defective because she could not see text messages from her cell phone. Ex. 32 at 42:2–45:21, 47:12–17; Ex. 80 at 53:25–57:8; Ex. 61 at 120:5–10, 127:15–18. Plaintiffs offer no evidence that this problem was caused by one of the defects identified by Mr. Smith. Instead, Connell's and Miller's problems stem from the

fact that their Android phones did not have the ability to play audio via USB,[25] and Purcell's phone was not compatible with the text message feature of the MFT system—a fact disclosed on Ford's website. Eikey Decl. ¶ 2. Other Named Plaintiffs' allegations are entirely unrelated to any allegedly common defect as well. For example, Plaintiff Connell's fraud claims are based on his incorrect belief that his MFT system would be equipped with AppLink, Pandora, iHeartRadio, Twitter, 3-D maps, and a prototype web browser. *See* Ex. 80 at 76:10–84:3. These idiosyncratic grievances have nothing to do with the more generally stated problems that Plaintiffs seek to certify, thus rendering these Named Plaintiffs' claims atypical. *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 373 n.13 (C.D. Cal. 1997).

## C. Plaintiff-Specific Defenses Based on Individualized Facts Preclude Class Certification on Typicality and Predominance Grounds

That Plaintiffs' claims are ill-suited for class treatment is evidenced by the nature of the individualized defenses that Ford is entitled under constitutional due process principles to present to the Named Plaintiffs themselves. The Ninth Circuit has held that "a named plaintiffs' motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Ellis*, 657 F.3d at 984. Yet that is precisely what would happen if Plaintiffs' proposed classes are certified. Below are just a few of the individualized defenses to which Ford is entitled in response to idiosyncrasies in the Named Plaintiffs' individual claims. These examples are in addition to the numerous claims that have already been dismissed based on individualized facts. *See* Dkt. No. 97 at 31, 63-71 (dismissing warranty claims for failure to seek a repair and to provide notice; dismissing misrepresentation claims for failure to allege an actionable representation).

*Plaintiff Rizzo*. As noted above, Section II.F.1, Plaintiff Rizzo admitted he was completely unaware of the MFT when he decided to purchase his vehicle. This admission is fatal to his individual fraud claims because it demonstrates the MFT could not have been material to

---

[25] *See, e.g.*, Dailymail.com, *Death of the headphone plug: 'USB audio' now available on the latest Android Lollipop devices* (Jan. 28, 2015), *available at* http://www.dailymail.co.uk/sciencetech/article-2930145/Death-headphone-plug-USB-audio-available-latest-Android-Lollipop-devices.html (last visited Feb. 27, 2016); *see also* Ex. 32 at 24:1-3 (used Android HTC DNA and HTC-1 M8); Ex. 80 at 54:25-55:10 (used Android S4 and S3).

his purchase decision, nor could he have relied on any alleged omission about MFT performance in making his vehicle purchase decision. *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 461 (D.N.J. 2002) ("The concealed facts must be material facts which if known, would have prevented plaintiff from obligating himself.") (citation omitted). Separately, Mr. Rizzo's claims are barred by res judicata because Ford prevailed against Mr. Rizzo in a previous lemon-law suit he brought regarding MFT. Ex. 38 at 182:2–10; Ex. 81[26]; *see also Fedor v. Nissan of N. Am., Inc.*, 432 N.J. Super. 303, 318 (N.J. Super. Ct. App. Div. 2013) (lemon-law proceedings are "binding, subject only to the right of appeal.").

*Plaintiff Rodriguez*. Plaintiff Rodriguez started experiencing the problems that are the subject of this lawsuit *immediately* after he purchased his first vehicle with a MFT. Ex. 58 at 115:14–18, 286:13–299:15. Nevertheless, more than six months later, he purchased a second MFT vehicle for his sister to use. *Id.* at 145:11–13. That subsequent purchase—after he learned of the supposed problems with the MFT—precludes him from credibly asserting any alleged omissions were material to him—or at least raises a significant individualized defense against his claims that is not typical of all putative Texas class members. *See Riverside Nat'l Bank v. Lewis*, 572 S.W.2d 553, 558 (Tex. Civ. App. 1978) ("[M]ateriality in an action for fraud depends upon whether the contract would have been made notwithstanding the representations."); Dkt. No. 175 at 5–6 (this Court dismissed the fraud claims of Plaintiff Mitchell in light of Ford's argument that the pleadings "demonstrate that any fraudulent omissions regarding the quality of the MFT could not have been material to these Plaintiffs, because the Plaintiffs would not have purchased another MFT-equipped vehicle knowing it to be defective had these defects truly been material to their original purchasing decisions").

*Plaintiff Miller*. Plaintiff Miller admits he was aware of "widespread complaints" about the MFT before he leased his MFT vehicle. Ex. 32 at 240:11–13. This defeats his claims of fraud; it is well-settled that the "naked assertion of concealment of material facts which is

_____

[26] In denying Rizzo's lemon-law claim, the judge stated: "The issue with the My Touch screen was never able to be replicated by the respondent. Petitioner and his wife continued to drive the vehicle . . . . [and] to transport petitioner's children and grandchildren. Although petitioner testified that he didn't 'feel safe enough,' he did not present any evidence that the vehicle is unsafe . . . . It was only his subjective feelings."). *See* Ex. 81.

contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud," *Sable v. Southmark/ Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1452 (S.D.N.Y. 1986) (finding that plaintiff who was aware of the problems "was no longer justified in relying on the defendant's alleged concealment of the diesel defects or misrepresentation as to their adequacy. Without the element of justifiable reliance, the plaintiff fails to state a cause of action for fraud.").

     ***Plaintiff Fink***.  Plaintiff Fink never sought a repair for the MFT in his vehicle.  *E.g.*, Ex. 23 at 91:19–23.  Thus, he cannot prevail on his breach of express warranty claim consistent with prior orders on other Named Plaintiffs.  Dkt. No. 97 at 33–35 & Dkt. No. 175 at 8 (dismissing claims of Named Plaintiffs who did not obtain a MFT repair); *Lilley v. Manning Motor Co.*, 137 S.E.2d 847, 850 (1964).

     ***Plaintiff Kirchoff***.  Plaintiff Kirchoff faces severe credibility questions.  He told a customer service representative that he was not upset about the MFT, but rather about the leather seats, and he said he "sues companies for sport and enjoys it."  April Carmen Decl. ¶¶ 8-12.

     Were this action to proceed as a class action, Ford's due process rights to assert similar individualized defenses—that no doubt exist with respect to numerous absent class members— would be abridged in direct contravention of the Rules Enabling Act.  28 U.S.C. § 2072.  Under the Act, "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."  *Dukes*, 131 S. Ct. at 2561.  Moreover, were Ford to prevail on these Named-Plaintiff-specific defenses, the adverse ruling would necessarily be res judicata against all of the absent class members' claims, even if they did not suffer from the same individualized weaknesses.  *Grigsby v. N. Miss. Med. Ctr., Inc.*, 586 F.2d 457, 461 (5th Cir. 1978) ("Generally, all class members are bound by the judgment rendered in an action in which a class is properly certified.").  The existence of individualized defenses further renders the claims unmanageable in a class action.  *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) ("[N]o reading of the Rule can ignore the Act's mandate that rules of procedure shall not abridge, enlarge or modify any substantive right.").

# VII. SEVERAL NAMED PLAINTIFFS ARE NOT ADEQUATE REPRESENTATIVES

Class certification is further unwarranted because Named Plaintiffs have several conflicts of interest with putative class members. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process . . . ."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (named plaintiffs must not "have any conflicts of interest with other class members."); *Ellis*, 657 F.3d at 985.

*First*, Plaintiffs have strategically shaved off certain claims, potentially forfeiting class members' rights to pursue their potentially strongest individual claims to bolster their odds of controlling a big class action. In *Tasion Communications, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 641 (N.D. Cal. 2015), this Court found that this kind of tactical claim-shaving creates adequacy problems when the named plaintiffs' class-control ambitions cause them to abandon inherently individualized claims that could generate better recoveries for class members having the facts to prove them. *Id.* at 641; *see also O'Connor v. Uber Techs.*, 2015 U.S. Dist. LEXIS 116482, at *52–53 (N.D. Cal. Sept. 1, 2015) (finding plaintiffs did not establish adequacy when they "did not make any attempt to demonstrate that the monetary value of the [dropped claims] . . . [they] now would be waiving in order to obtain class certification"). For example, the proposed classes would abandon putative class members' potential remedies for warranty claims available through state Lemon Law programs, which potentially could result in a replacement vehicle or refund of the purchase price—more expansive remedies than that allowed under warranty law. *E.g.*, Cal. Civ. Code § 1793.22(b). In addition, Plaintiffs have abandoned warranty claims in Colorado, Arizona, Texas and Ohio where this Court has dismissed Named Plaintiffs' claims because of individualized issues. Dkt. No. 97 at 33–35 & 39-40.

*Second*, there is a conflict in this case between purchasers of new vehicles and purchasers of used vehicles. *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 448 (E.D. Pa. 2000). Plaintiffs' damages experts make no effort to distinguish damages for used vehicle purchasers and new vehicle purchasers. *See* Ex. 75 at 70:17-74:14 & Ex. 76 at 51:6-53:11. But new and used purchasers have different interests because either the alleged "damage" was passed through from

the new vehicle purchaser to the used vehicle purchaser, leaving the first purchaser uninjured, or

the new vehicle purchaser absorbed the cost of the defective system, leaving the used vehicle

purchaser uninjured.  Ex. 42, Singer Rpt. at n.33.

**VIII.   THE COURT SHOULD EXCLUDE ON *DAUBERT* GROUNDS PLAINTIFFS'
EXPERTS DR. ROSENBERG, DR. ARNOLD, AND MR. BOEDEKER**

Plaintiffs submitted opinions of multiple experts that fail to meet the requirements of

Federal Rule of Evidence 702 that scientific and technical expert testimony is only admissible if

both relevant and reliable.  As such, their testimony should be excluded.  *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141

(1999).  A *Daubert* analysis is necessary to determine admissibility of expert opinions at the class

certification stage.  *Ellis*, 657 F.3d at 982.

**A.      Dr. Rosenberg Offers Irrelevant Opinions Not Linked to Plaintiffs' Legal
Claims and a Subjective Safety Opinion That Is Not Reliable Under *Daubert***

Plaintiffs submit a 200+ page report from Craig Rosenberg that analyzed the MFT system

"to assess for its compliance with human factors and user interface best practices . . . [and]

identify attributes of MyFord Touch that placed excessive visual, manual and/or cognitive

demands on the driver, potentially leading to safety implications."  Ex. 69 at ii & 77.  Plaintiffs'

motion cites Dr. Rosenberg's opinions as ostensible support for two contentions: (1) that Ford

withheld information that was allegedly material to consumers and (2) that the MFT presented a

significant safety hazard.  Mot. at 27:17, 16:22.  But Dr. Rosenberg's testimony lacks the required

relevance to the first contention and lacks any reliable basis for the second contention.  As such,

the entirety of his report should be excluded under *Daubert*.

*First*, Dr. Rosenberg's reports recount a litany of features and functions (including alleged

bugs) he encountered in his personal review that he believes affect the usability, stability, and

safety of the system.  But his criticisms are irrelevant because they do not fit the legal claims in

the case.  Fed. R. Evid. 401-402, 702; *Comcast*, 133 S. Ct. at 1433–35 (rejecting a damages

model that failed to "translat[e] . . . the legal theory of the harmful event into an analysis of the

economic impact of that event"); *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS

71575, at *78–79 (N.D. Cal. May 23, 2014) (rejecting an expert's model because it "is inconsistent with Plaintiff's liability case").

Plaintiffs are pursuing concealment and warranty based claims. Yet none of the alleged defects Dr. Rosenberg identified were, or could have been, concealed.[27] In deposition, he admitted that all the issues he identified could have been identified on a test drive before a purchaser acquired the vehicle. Ex. 62 at 152:4-153:2, 155:23-156:4, 166:16-24; *see also* Ex. 43, Wood Rpt. at 8, 25. Thus, his testimony is irrelevant to Plaintiffs' concealment contentions. *See also O'Shea v. Epson Am., Inc.*, 2011 U.S. Dist. LEXIS 85273, at *23–24 (C.D. Cal. July 29, 2011) ("Plaintiffs fail to identify—and the Court is unable to find—any case in any jurisdiction in which a court imposed an affirmative, legal obligation upon a manufacturer to disclose . . . that its products performed less efficiently than similar products from competing manufacturers (or, less efficiently than 'reasonable consumer expectations'"). Moreover, Plaintiffs' assertion that Dr. Rosenberg supports their argument that Ford concealed facts that were "material" to consumers, Mot. at 27:17, finds no basis in his report, which does not mention materiality a single time in its 221 pages and does not purport to establish Dr. Rosenberg's foundation to render an opinion about materiality to a purchase decision. *Tietsworth*, 2012 WL 159112, at *8 (finding a proffered engineering expert "unqualified to opine on whether the [product's] failure rate was underreported" because the expert "is not an expert in consumer behavior").

*Second*, Dr. Rosenberg's safety opinion should be excluded because he lacks a reliable basis for this opinion that the MFT "increases the risk of a crash with the associated risk of injury or death due to excessive driver attention that needs to be spent on utilizing MyFord Touch, instead of attending to what is going on outside of the vehicle." Ex. 69 at 220. An expert's opinions must be based on more than merely the expert's *ipse dixit* or subjective beliefs and unsupported speculation. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) ("*Daubert II*"); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). "The whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their

---

[27] Nor, for that matter, do any of the issues Dr. Rosenberg identifies tend to establish Ford breached its repair-and-replace warranty.

opinions." *DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998).

Although he opines that the MFT increases the risk of a crash and consequent injury, Dr. Rosenberg admitted he had not analyzed any accident data or the likelihood of an accident. Ex. 62 at 120:13-121:8, 122:15-17, 123:12-20, 125:23-126:3.  He identified two NHTSA tests as the standards in human factors engineering for whether distraction is unsafe (the occlusion test and the eye-glance test), but he admits he did not conduct or review any testing of the MFT for either. *Id.* at 36:14-38:8, 90:13-91:10.  Likewise, he performed none of the situational awareness measurements he identified as common. *Id.* at 115:12-116:12.  He admitted his opinion about safety was subjective. *Id.* at 32:20, 134:4-16.  His personal opinion about increased risk of crash and injury, uninformed by any data about MFT vehicles' actual performance over 50+ billion miles of driving, and uninformed by any other established criteria to evaluate risk of crashes and injury, is nothing more than *ipse dixit* that flunks the *Daubert* test.

    **B.**    **<u>Dr. Arnold's and Mr. Boedeker's Opinions About Classwide Injury Should Be Excluded As Not Reliable Under Daubert</u>**

As discussed in Section IV.A.6, neither Dr. Arnold's nor Mr. Boedeker's economic opinions are relevant, reliable economic opinions that satisfy the admissibility standards of *Daubert*.  The opinions of both of Plaintiffs' economists should be excluded in their entirety.

**IX.**    **MR. BERMAN'S DECLARATION LACKS FOUNDATION**

Co-Lead Counsel Steve Berman's 66-page declaration provides a narrative asserting the truth of facts of which he has no personal knowledge.  They are simply his characterizations of documents and testimony.  It should be excluded for lack of foundation. Fed. R. Evid. 701(a).

**X.**    **<u>CONCLUSION</u>**

Plaintiffs' motion to certify twelve state classes should be denied in its entirety.

Dated:  March 15, 2016          **O'MELVENY & MYERS LLP**

                          By:  <u>/s/ Randall W. Edwards</u>
                                   Randall W. Edwards

                          Attorneys for Defendant Ford Motor Company