STEVE W. BERMAN (*pro hac vice*)
CATHERINE Y.N. GANNON (*pro hac vice*)
TYLER WEAVER (*pro hac vice*)
CRAIG SPIEGEL (122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com
tyler@hbsslaw.com
craigs@hbsslaw.com

ROLAND TELLIS (186269)
MARK PIFKO (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

ADAM J. LEVITT (*pro hac vice*)
JEFFREY A. ALMEIDA (*pro hac vice*)
KYLE MCGEE (*pro hac vice*)
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois 60602
Telephone: (312) 214-0000
Facsimile: (312) 214-0001
alevitt@gelaw.com
jalmeida@gelaw.com
kmcgee@gelaw.com

NICHOLAS E. CHIMICLES (*pro hac vice*)
BENJAMIN F. JOHNS (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
nick@chimicles.com
benjohns@chimicles.com

*Plaintiffs' Interim Co-Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. 3:13-cv-03072-EMC<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  May 26, 2016<br>Time:  9:00 a.m.<br>Judge:  Hon. Edward M. Chen<br>Courtroom:  5 |

**[REDACTED VERSION]**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................1

II.    FACTUAL REBUTTAL ........................................................................................3

    A.    Ford Ignores Plaintiffs' Common Evidence ..............................................3

    B.    Ford's Updates Did Not Meaningfully Improve the MFT System ............3

        1.    ███████████████ was unchanged during the Class Period. ..........4

        2.    Throughout the Class Period, consumers continually reported the *same* defects, regardless of the software version at issue................6

        3.    Ford's experts fail to describe any substantive differences in versions of the Base Software............................................................6

    C.    MFT's Defects Detrimentally Affect the Safe Operation of Class Vehicles ............7

    D.    What Some Consumers Believed They Knew About MFT Is Irrelevant Because Ford Never Disclosed the Extent of the Defects nor That Updates Would Not Fix Them........................................................................7

    E.    While Consumers May Have Experienced the Base Software's Defects in Different Ways, All of Their Vehicles Had Common Defects ...................9

    F.    Variations in Warranty Repairs Prove Nothing.........................................9

III.    THE CLASSES SHOULD BE CERTIFIED ......................................................10

    A.    Ford Fails to Undermine Predominance ...................................................10

        1.    Common issues predominate as to the statutory and consumer fraud claims....................................................................................10

            a.    MFT is a unitary system that suffers from a common defect in all versions during the Class Period. ..................................10

                i.    The same defective Base Software infected all MFT versions during the Class Period. ...........................11

                ii.    The software updates to MFT do not constitute new products. ..............................................................12

            b.    Neither materiality nor causation requires individualized inquiry...............................................................................14

                i.    The concealed facts pertain to safety hazards. ......................15

                ii.    Ford fails to rebut any presumption of reliance....................16

                iii.    Common evidence shows Ford had exclusive knowledge of the concealed facts...........................................18

c.    All Class members suffered injury. .................................................19

d.    All Class members' damages may be calculated using the same methods. ...................................................................................21

e.    No individualized State-law issues bar certification of any State Class. ...................................................................................23

      i.    The Class Action Bans under the Consumer Protection Statutes of Virginia and Colorado Do Not Preclude Class Certification .................................................................23

      ii.    The NJCFA claim warrants certification. ..............................23

      iii.    Distinguishing vehicles purchased or leased for business rather than personal use does not preclude class certification. ...............................................................24

2.    The Colorado strict liability and Ohio negligence claims should be certified. .........................................................................................24

3.    Plaintiffs' express warranty claims are suitable for class treatment. ............25

    a.    Ford raises only merits-based challenges to the express warranty claims. ...........................................................................25

    b.    Plaintiffs can prove classwide damages for breach of express warranty. .......................................................................................27

4.    Plaintiffs' implied warranty claims are suitable for class treatment. ............27

B.    A Class Action Is Superior ...........................................................................28

1.    Ford's eventual release of MFT version 3.6 after years of failures is irrelevant. ..........................................................................................28

2.    Ford's non-litigation alternatives are irrelevant and impractical. .................28

3.    The Classes are manageable. .........................................................................29

C.    Named Plaintiffs' Claims Are Typical of the Classes ...................................30

1.    Plaintiffs do not seek certification of dismissed claims. ...............................30

2.    Plaintiffs' proposed proof of defect is applicable to all Class members. ......31

3.    Ford's defenses do not render named Plaintiffs atypical. .............................31

D.    All Named Plaintiffs Are Adequate Class Representatives .........................31

E.    *Daubert* Issues ...............................................................................................32

1.    Dr. Rosenberg's report should not be excluded. ..........................................32

2.    The Boedeker and Arnold reports should not be excluded. ..........................33

3.   Dr. Wood's testimony and report should be excluded. .................................33

F.   The Berman Declaration Should Not Be Excluded.....................................................34

IV.   CONCLUSION ........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ................................................................................................... 19

*In re Aqua Dots Prods. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) ......................................................................................... 29

*Avedisian v. Mercedes-Benz USA, LLC*,
    43 F. Supp. 3d 1071 (C.D. Cal. 2014) ..................................................................... 15, 16

*Ballard v. Equifax Check Servs., Inc.*,
    186 F.R.D. 589 (E.D. Cal. 1999) ................................................................................... 24

*Blough v. Shea Homes, Inc.*,
    2014 U.S. Dist. LEXIS 100600 (W.D. Wash. July 23, 2014) ....................................... 18

*Brazil v. Dole Packaged Foods, LLC*,
    2014 U.S. Dist. LEXIS 157575 (N.D. Cal. Nov. 6, 2014) ............................................ 30

*Brown v. Hain Celestial Grp., Inc.*,
    2014 U.S. Dist. LEXIS 162038 (N.D. Cal. Nov. 18, 2014) .......................................... 28

*Bruce v. Harley-Davidson Motor Co.*,
    2012 U.S. Dist. LEXIS 36723 (C.D. Cal. Jan. 23, 2012) ............................................. 13

*Bruton v. Gerber Prods. Co.*,
    2014 U.S. Dist. LEXIS 86581 (N.D. Cal. June 23, 2014) ............................................ 30

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) .................................................................................... 10, 30

*CA, Inc. v. Ingres Corp.*,
    2009 Del. Ch. LEXIS 204 (Del. Ch. Dec. 7, 2009) ..................................................... 13

*Chavez v. Blue Sky Nat. Bev. Co.*,
    268 F.R.D. 365 (N.D. Cal. 2010) .................................................................................. 21

*Chisolm v. TranSouth Fin. Corp.*,
    194 F.R.D. 538 (E.D. Va. 2000) .................................................................................... 24

*Cholakyan v. Mercedes-Benz USA, LLC*,
    281 F.R.D. 534 (C.D. Cal. 2012) .................................................................................. 13

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ................................................................................................... 19

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015)................................................................22

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010) .....................................................................29

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006)......................................................................25, 27

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) .........................................................................18

*Delagarza v. Tesoro Ref. & Mktg. Co.*,
    2011 U.S. Dist. LEXIS 101127 (N.D. Cal. Sept. 8, 2011)....................... 1, 10

*Edwards v. Ford Motor Co.*,
    603 F. App'x 538 (9th Cir. 2015)................................................................13, 14

*Ehret v. Uber Techs., Inc.*,
    2015 U.S. Dist. LEXIS 161803 (N.D. Cal. Dec. 2, 2015)................................14

*Elias v. Hewlett-Packard Co.*,
    903 F. Supp. 2d 843 (N.D. Cal. 2012)..............................................................15

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)............................................................................35

*Ellsworth v. U.S. Bank, N.A.*,
    2014 U.S. Dist. LEXIS 81646 (N.D. Cal. June 13, 2014)................................29

*Falco v. Nissan N. Am., Inc.*,
    2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) .................... 13, 14, 27

*In re Ford Motor Co. Vehicle Paint Litig.*,
    182 F.R.D. 214 (E.D. La. 1998) ................................................................18, 19

*Frey v. First Nat'l Bank Sw.*,
    602 F. App'x 164 (5th Cir. 2015).....................................................................24

*Garcia v. Medved Chevrolet, Inc.*,
    263 P.3d 92 (Colo. 2011) ................................................................................17

*Guido v. L'Oreal, USA, Inc.*,
    2014 U.S. Dist. LEXIS 165777 (C.D. Cal. July 24, 2014)...............................22

*In re Hardieplank Fiber Cement Siding Litig.*,
    2013 U.S. Dist. LEXIS 98277 (D. Minn. July 15, 2013) ................................23

*Harris v. Vector Mktg. Corp.*,
    753 F. Supp. 2d 996 (N.D. Cal. 2010)..............................................................31

*Herskowitz v. Apple, Inc.*,
    301 F.R.D. 460 (N.D. Cal. 2014) ..................................................................26, 27

*Hiigel v. Gen. Motors Corp.*,
    544 P.2d 983 (Colo. 1975) ......................................................................................25

*Jarrett v. Insight Commc'ns Co., L.P.*,
    2014 U.S. Dist. LEXIS 103079 (W.D. Ky. July 29, 2014) ........................................21

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
    305 F.R.D. 164 (N.D. Cal. 2015) ...........................................................................21

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ..................................................................................20

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 U.S. Dist. LEXIS 141358 (N.D. Cal. Oct. 2, 2014) ........................................23

*Los Gatos Mercantile, Inc. v. E.I. Dupont De Nemours & Co.*,
    2015 U.S. Dist. LEXIS 106292 (N.D. Cal. Aug. 11, 2015) ......................................23

*Mass. Mut. Life Ins. Co. v. Superior Court*,
    97 Cal. App. 4th 1282 (2002) ................................................................................17

*In re MyFord Touch Consumer Litig.*,
    46 F. Supp. 3d 936 (N.D. Cal. 2014) ............................................................24, 25, 27

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015) .............................................................................20, 24

*O'Shea v. Epson Am., Inc.*,
    2011 U.S. Dist. LEXIS 85273 (C.D. Cal. July 29, 2011) .........................................32

*Oscar v. BMW of N. Am., LLC*,
    274 F.R.D. 498 (S.D.N.Y. 2011) ............................................................................20

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008) ...........................................................................13

*Petersen v. Costco Wholesale Co.*,
    312 F.R.D. 565 (C.D. Cal. 2016) ...........................................................................29

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    233 F.R.D. 229 (D. Mass. 2006) ............................................................................29

*In re Photochromic Lens Antitrust Litig.*,
    2013 U.S. Dist. LEXIS 186728 (M.D. Fla. Mar. 12, 2013) ......................................21

*In re POM Wonderful, LLC*,
    2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014) ........................................20

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ................................................................................ 29

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ............................................................... 1, 20, 28

*Samuel-Bassett v. Kia Motors Am., Inc.*,
   34 A.3d 1 (Pa. 2011) .......................................................................................... 12

*Sanchez-Knutson v. Ford Motor Co.*,
   2016 WL 1658801 (S.D. Fla. Apr. 6, 2016) .................................................. 22

*Sanchez-Knutson v. Ford Motor Co.*,
   310 F.R.D. 529 (S.D. Fla. 2015) .................................................................... 22

*Sancom, Inc. v. Qwest Commc'ns Corp.*,
   683 F. Supp. 2d 1043 (D.S.D. 2010) ............................................................ 19

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ................................................................... 29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) .......................................................................................... 23

*Smith v. Ingersoll-Rand Co.*,
   214 F.3d 1235 (10th Cir. 2000) ..................................................................... 33

*State Farm Fire & Cas. Co. v. Electrolux Home Prods.*,
   980 F. Supp. 2d 1031 (N.D. Ind. 2013) ....................................................... 34

*In re Sulfuric Acid Antitrust Litig.*,
   235 F.R.D. 646 (N.D. Ill. 2006) .................................................................... 19

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) .............................................................. 19, 28

*Tasion Commc'ns, Inc. v. Ubiquiti Networks*,
   2014 U.S. Dist. LEXIS 35455 (N.D. Cal. Mar. 14, 2014) ......................... 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) ......................... 24

*Tietsworth v. Sears, Roebuck & Co.*,
   2012 U.S. Dist. LEXIS 62956 (N.D. Cal. May 4, 2012) ............................ 20

*In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices & Prods. Liab. Litig.*,
   288 F.R.D. 445 (C.D. Cal. 2013) .................................................................. 20

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................................27

*Tucker v. Pacific Bell Mobile Servs.*,
   208 Cal. App. 4th 201 (2012) .........................................................................................18

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ...............................................................................................21, 22

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) ...........................................................................................1

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) .........................................................................................17

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. 2013) ...................................................................................28

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011).................................................................................17, 18

*In re Welding Fume Prods. Liab. Litig.*,
   245 F.R.D. 279 (N.D. Ohio 2007) ...................................................................................29

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   45 F. Supp. 3d 724 (N.D. Ohio 2014) .............................................................................30

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ....................................................................................10, 25

*Woods v. Vector Mktg. Corp.*,
   2015 U.S. Dist. LEXIS 118678 (N.D. Cal. Sept. 4, 2015) ...............................................29

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ........................................................................................10

1

## I.      INTRODUCTION

2        Plaintiffs' class certification motion should be granted.  Plaintiffs have presented substantial

3  classwide evidence that Ford:  (1) sold cars equipped with MFT software ████████████;

4  (2) hid the truth of the defects from Class members; and (3) charged a price premium for MFT.

5  Based on that common evidence, Plaintiffs' economic experts provide substantial proof that all

6  Class members suffered a quantifiable financial loss at the time of sale, because Ford could not have

7  charged a price premium for MFT if it had revealed the truth.  And the damages suffered by Class

8  members are measured at the time of sale, not later.  *See Pulaski & Middleman, LLC v. Google,*

9  *Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (damages are "based on what a purchaser would have paid at

10  the time of purchase had the purchaser received all the information" and "need not account for

11  benefits received after purchase").

12        Ford's opposition to class certification rests in large part on its desire to reject Plaintiffs'

13  factual and legal theory that damages are measured at the time of each Class member's purchase of

14  MFT.  But the plaintiffs' theory is the basis for the predominance inquiry, as the Ninth Circuit ex-

15  plained when it held that a district court erred by "concluding that merely because it was not

16  *assured* that plaintiffs would prevail on their primary legal theory, that theory was not the

17  appropriate basis for the predominance inquiry."  *United Steel, Paper & Forestry, Rubber, Mfg.*

18  *Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d

19  802, 809 (9th Cir. 2010).  As a result, Ford's focus on the post-sale experiences of Class members

20  and on software updates Ford provided after the Class Period is irrelevant, because it ignores

21  Plaintiffs' actual legal theory.[1]

22        In addition, Ford's attempts to undermine Plaintiffs' common evidence fail.  In their opening

23  brief, Plaintiffs demonstrated that Ford knew, during the entirety of the Class Period, that MyFord

24  Touch's ("MFT's") core Base Software was ████████████████

25

26        [1] *See Delagarza v. Tesoro Ref. & Mktg. Co.*, 2011 U.S. Dist. LEXIS 101127, at *34 (N.D. Cal.
Sept. 8, 2011) ("While there may be some variation within the [defendant's] refinery with respect to
27  the amount of downtime per shift or number of times per week that employees leave the premises,
such variation does not 'present sufficient evidence that individual questions predominate over
28  Plaintiffs' *actual theory*, which is based on [defendant's] purported general policies. . . .'") (internal
citations omitted; emphasis added).

███████████████████████████████████████████████████████████  Plaintiffs also

demonstrated that every Class member paid a premium price for this consistently defective

software, thus giving rise to a predominance of common issues.

Ford's opposition does not undermine that showing.  Ford ignores the damning factual evi-

dence and attempts instead to divert attention to points that fall apart on close scrutiny.  First, Ford

relies heavily on the fact that the Base Software was not identical from version to version.  But the

record is clear, and entirely undisputed, that the Base Software's ████████████████████████

███████████████████████████████████  Any variations in the code among versions was

███████████████████████████████"[2]  Ford knew that, yet kept that knowledge from

the public.

Ford also claims that variations in how particular consumer transactions occurred means that

Plaintiffs cannot establish a common damages methodology.  But the opinions of Ford's expert, Dr.

Hal Singer, are based on a fundamental misunderstanding of the methodologies put forth by

Plaintiffs' experts.  In particular, Dr. Singer fails to rebut the fact that all members of the proposed

classes purchased a Ford vehicle with the defective MFT system at an inflated equilibrium price,

which is not changed by post-sale events.  So all members of the Class were injured at the point of

sale, and Plaintiffs have demonstrated that the amount of harm can be established with a common

methodology.

To the extent Ford claims its consumer surveys show that ████████████████████████,

those surveys are unscientific and unreliable, and the opinions of Ford's expert who relied on them,

Dr. Christine T. Wood, should be disregarded and excluded.  In any event, what a consumer might

have said about MFT proves nothing about whether there was a common defect in the Base Soft-

ware and whether Ford charged all Class members a price premium for MFT.  The same is true of

Ford's attempts to undercut commonality by pointing to the fact that some consumers experienced

problems with MFT that were different than what others experienced.  This alleged difference

proves nothing other than consumers used MFT in different ways; the fact remains that all versions

were identical for all consumers who used a particular version, and that there was no substantial

---

[2]  Ex. 2 at WLN2-00026702.

1   improvement between versions during the Class Period.

2          Ford's other arguments consist of baseless arguments about typicality, superiority, or the

3   elements of certain claims, and wrongheaded *Daubert* motions.  Plaintiffs have established all the

4   elements of Rule 23(a) and predominance and superiority under Rule 23(b)(3).  The Court should

5   certify the Classes set forth in Plaintiffs' motion.

## II.   FACTUAL REBUTTAL

### A.   Ford Ignores Plaintiffs' Common Evidence

8          Ford does not dispute any of the following facts:

9   • Ford's initial development of the MFT software resulted in a fundamentally defective

10      product that ████████████████████████████████████.[3]

11   • While Ford issued software updates, it knew that ████████████████████

12      ████████████████████████████████████.[4]

13   • All relevant versions ("v.") of the MFT software were plagued by ████████████

14      ████████████████████████████████████████████████

15      ████████████████████████████████.[5]

16   • ████████████████████████████████████████.[6]

17   • Each version of MFT Base Software was identical for all vehicle models and trim

18      levels.[7]

19   These undisputed facts *alone* suffice to support class certification.  Nonetheless, Plaintiffs respond

20   below to each of Ford's various arguments concerning the factual basis for class certification.

### B.   Ford's Updates Did Not Meaningfully Improve the MFT System

22          While Ford repeatedly states that it issued several software updates, the undisputed evidence

---

[3] *See* Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities ("Mot.") at 4-7 and the exhibits cited therein.

[4] *See id.* at 10-14 and the exhibits cited therein.

[5] *See id.* at 7-9, 15, and the exhibits cited therein; Exs. 34, 35.  All references to "Ex." are to the exhibits attached to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification dated January 28, 2016 ("Berman Declaration").  ECF Nos. 203-206.

[6] *See* Mot. at 15 and the exhibits cited therein.

[7] *See id.* at 14 and the exhibits cited therein.

1     demonstrates that:  (1) over the Class Period, Ford made no efforts to █████████████

2     ████████████████████  (2) the performance of the software never substantially improved or

3     changed during the Class Period; and (3) the differences Ford points to are largely superficial

4     changes that did not remedy the defective software architecture.

5         **1.    ████████████████████ was unchanged during the Class Period.**

6         Plaintiffs' opening brief explained that problems with MFT are ███████████████

7     ████████████████████████████████████████████████  Ford's only

8     response is to suggest that by not including version 3.6 of the Base Software in the Class definition,

9     Plaintiffs have conceded that version 3.6 (and later versions) are defect-free.  *See* Ford Motor

10    Company's Opposition to Plaintiffs' Motion for Class Certification and Objections to Plaintiffs'

11    Evidence ("Opp'n") at 5.  Ford is incorrect.  To be clear, Plaintiffs' exclusion of version 3.6 and

12    later versions from the Class definitions is not such a concession, and Plaintiffs neither concede that

13    version 3.6 is "defect-free" nor agree that it represents a complete fix.  And this is irrelevant to the

14    issue here, which is that for all Class Vehicles (*i.e.*, those sold with versions 1.08 through 3.5), there

15    is substantial evidence of a common defect.[8]

16        The evidence of that common defect is overwhelming.  According to Ford's own engineers,

17    during the development of the Base Software, "█████████████████████████

18    ████████████████████████████████████████████

19    ████████████████████████████████████████████████████

20    ████████████████████████████████████████

21    ████████████████████████████████████████████

22    ████████████████████████████████

23        At the end of August 2012, weeks before the release of version 3.5, a key Ford engineer

24    indicated that ████████████████████████████████████████████

25

26

27       [8] In other words, even assuming that version 3.6 remedied all problems at issue in this case—
      and it did not—it would do nothing for the consumers who had to use their cars for the *years* it took

28    Ford to come up with anything approximating a "fix" to the significant problems with MFT, to say
      nothing of owners/lessees who no longer owned Class Vehicles when version 3.6 was released.

1   ████████████████. Reply Ex. 1 at WLN1-0720927.[9]  Through at least version 3.5, Ford's

2   software development team "████████████████████████████

3   ████████████████████████████████████████████" Ex. 33 at

4   WLN2-01135989.[10]

5          According to Ford's own software expert, ████████████████████

6   ████████████████████████ Def. Ex. 7 (Kelly Rpt.) at 29, ¶ 77 (emphasis add-

7   ed).[11] ████████████████████████████████████

8   ████████████████████████████████████████

9   ████████████████████████████████████████

10  ████████████████████████████████████████

11  ██ resulting in multiple versions that all contained the common defective design.

12         And this is not solely the opinion of Ford's engineers.  Plaintiffs' expert, Dan Smith, deter-

13  mined from his independent review of the code that ████████████████████

14  ████████████████████████████[13]  In contrast, Ford's software expert did not

15

16

17  ⁹ ████████████████████████████████████████

18  ████████. All references to "Reply Ex." are to the exhibits attached to the Declaration of Steve
    W. Berman in Support of Plaintiffs' Reply Brief in Support of Motion for Class Certification dated
19  May 2, 2016, and filed concurrently herewith ("Berman Reply Declaration").

20  ¹⁰ ████████████████████████████████████████
    ████████████████████████

21  ¹¹ All references to "Def. Ex." are to exhibits attached to the Declaration of Randall W. Edwards
    in Support of Ford's Opposition to Plaintiffs' Motion for Class Certification.  ECF Nos. 226-28.
22
    ¹²
23  ████████████████████████████████████████
    ████████████████████████████████████████
24  ████████████████████████████████████████
    ████████████████████████████████████████
25  ████████████████████████████████████████
    ████████████████████████████████████████
26  ████████████████████████████████████████

27  ¹³ ████████████████████████████████████
    ████████████████████████████████████████
28  ████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████

5 ████████████████████ *See* Reply Ex. 4 (Smith Rebuttal Rpt.), ¶¶ 16, 18, 33-53.

      **2.**    **Throughout the Class Period, consumers continually reported the *same* defects, regardless of the software version at issue.**

According to Ford's own documents, the primary problems reported by users during the Class Period ████████████████████████████████. *See* Mot. at 15; Exs. 48, 51, 52.  Ford does not dispute that evidence or its implications, nor does Ford dispute that even though Ford tweaked the Base Software, the problems were substantially unchanged during the Class Period.

      **3.**    **Ford's experts fail to describe any substantive differences in versions of the Base Software.**

While Ford, through Dr. John P.J. Kelly's expert report, attempts to establish that there are differences between the MFT software versions, those differences are immaterial and irrelevant to this motion.  Dr. Kelly did not undertake ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ *See* Reply Ex. 5 (Kelly Dep.) at 23:22-24:20, 104:15-105:24.  And as Mr. Smith explains in his rebuttal report, Dr. Kelly's analysis ████████████████████████████████████████████████████████ ████.  *See* Reply Ex. 4 (Smith Rebuttal Rpt.), ¶¶ 4-17.[15]  Ford tried to improve the software, but its revisions did not change the fundamental problems with the Base Software, nor remedy the MFT problems that Class members experienced.

---

[14] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

[15] ████████████████████████████████████████████████████████ ██████████████████████████████████

**C.      MFT's Defects Detrimentally Affect the Safe Operation of Class Vehicles**

Ford inaccurately contends that because Plaintiffs have not shown that they or other Class members had accidents due to their malfunctioning MFT, there is no evidence that MFT creates an unreasonable safety hazard.  Opp'n at 7.  Ford is wrong as a matter of law and fact.  As one of Ford's experts admits, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████.[16]

Ford apparently reached a similar conclusion when it initially promoted MFT as ███████ ████████████████████████████████████████████████████.  *See* Mot. at 16.  Instead, MFT created additional distractions by malfunctioning, thereby diverting driver atten-tion.  And to the extent Ford's argument regarding safety rests on the opinion of its expert, Dr. Paul Taylor, that reliance is misplaced.  As shown below, Dr. Taylor was unaware of several real-world accidents attributable to MFT malfunctions but testified that various MFT functions have safety implications.  His opinion that MFT-related safety risks are not "unreasonable" is based on speculation about the veracity of driver accident reports.  In any event, whether the safety hazards introduced by the MFT defects are unreasonable is a question common to the Class.

**D.      What Some Consumers Believed They Knew About MFT Is Irrelevant Because Ford Never Disclosed the Extent of the Defects nor That Updates Would Not Fix Them**

Ford erroneously argues that Class members are differently situated because some of them were aware, on some level, that MFT was imperfect.  Opp'n at 5-7.  But Ford agrees that Plaintiffs allege that Ford *never* disclosed the real truth (that Ford knew the Base Software was fundamentally flawed at the architectural level and was not fixed by Ford's updates).  *Id.* at 13.  For years, Ford led consumers to believe that a fix was just around the corner.  For example, in November 2011, Ford issued a press release promoting version 3.0 that quoted Platform Development head Gary Jablon-ski:  "Evolving the software with meaningful enhanced features was part of our plan from the very beginning.  It's no different than the experience with our smartphones and laptop computers –

---

[16] *See* Ex. 9 (Smith Rpt.), ¶¶ 40-64, 98-104; Reply Ex. 4 (Smith Rebuttal Rpt.), ¶¶ 194-203; Ex. 8 (Rosenberg Rpt.); Reply Ex. 6 (Rosenberg Rebuttal Rpt.).

1    except now, it's your car that gets better."[17]

2        Yet at the same exact time Ford made that public announcement, it knew ████████████

3    ████████████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████████████████████████

8    ██████████████████████████████   Ex. 149 at WLN1-4323496.

9        Ford knew before it ever released version 3.0 that it was nothing more than ██████████

10   ██████████████████████████████"[18]   But the public was completely unaware that Ford's software

11   updates were essentially meaningless, and would continue to be so.  Ford's failure to reveal the truth

12   was not limited to MFT version 3.0.  Ford consistently told Class members that a software fix was

13   on its way.[19]  That was false.  Ford also argues that some Class members knew more than others by

14   pointing out that some Class representatives knew that MFT was imperfect.  But the evidence

15   actually shows that those Plaintiffs believed that Ford would fix MFT,[20] and no evidence suggests

16

17   [17] Reply Ex. 7 at 2-3, http://www.prnewswire.com/news-releases/faster-simpler-better-myford-
     touch-upgrade-provides-new-and-existing-customers-enhancements-and-new-features-
18   133340618.html.

19   [18] Ex. 2 at WLN2-00026702; Ex. 160 at WLN1-4174224–25.  *See also*, *e.g.*, Exs. 152-159
     (demonstrating what Ford knew about v.3.0 before its release).

20   [19] ████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   [20] *See* Def. Ex. 32 (Miller Dep.) at 147:4-148:9 (dealer told Miller that updates were fixing
     problems); Def. Ex. 33 (Miller-Jones Dep.) at 102:16-24 (Miller-Jones believed that Ford could and
27   would fix any problems).  *See also* Reply Ex. 12 (Ervin Dep.) at 101:23-103:5, 139:24-140:5,
     202:23-203:7, 214:18-21 (pre-purchase reviews were not especially negative, and he always thought
28   the updates would fix the problems based on advance information about them).

Class members knew the safety hazards MFT's defects created.

**E.      While Consumers May Have Experienced the Base Software's Defects in Different Ways, All of Their Vehicles Had Common Defects**

Ford also focuses on the fact that consumers used different features of their MFT and had different experiences with MFT.  *See* Opp'n at 9-10.  But, yet again, Ford glosses over the undisputed fact that every Class member had the same fundamentally defective software architecture installed in their vehicles, regardless of what parts of the system they used or did not use. █████

████████████████████████████████████████████████████████████████

████████████████████████████████████   *See* Reply Ex. 4 (Smith Rebuttal Rpt.), ¶ 206. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████. *See* Reply Ex. 5 (Kelly Dep.) at 184:5-185:18; Reply Ex. 4 (Smith Rebuttal Rpt.), ¶ 207.  So it proves nothing that some consumers may have reported one issue and different consumers reported another.  What matters is that all versions had identical Base Software, and that between versions Ford did not change the fundamental architectural defects.

**F.      Variations in Warranty Repairs Prove Nothing**

Ford also erroneously claims that the warranty claims rate somehow indicates whether consumers were "happy" with MFT or experienced MFT problems.  *See* Opp'n at 5-6.  Ford relies on figures analyzed by Dr. Taylor, ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████   *Id.* at 284:19-286:9.  Thus, these purported warranty numbers are

unreliable and misleading.[21]

### III.    THE CLASSES SHOULD BE CERTIFIED

**A.    Ford Fails to Undermine Predominance**

   **1.    Common issues predominate as to the statutory and consumer fraud claims.**

Rule 23(b)(3) certification is appropriate when the most important issues may be resolved on a classwide basis, because predominance does not require uniformity in class claims.  *See Delagarza*, 2011 U.S. Dist. LEXIS 101127, at *38 (predominance does not "constitute a uniformity requirement, such that a single exception would defeat class certification").  It is only if "the main issues in a case require the separate adjudication of each class member's individual claim or defense [that] a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted).[22]

   **a.    MFT is a unitary system that suffers from a common defect in all versions during the Class Period.**

Contrary to Ford's argument, all Class members purchased or leased a vehicle containing the same defective MFT system.  Ford acknowledges that in *Wolin*, the Ninth Circuit held that a class can be certified in an automobile defect case where "the defect only manifested itself in some class members' products."  Opp'n at 15 (citing *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010)).  But in an attempt to distinguish *Wolin*, Ford argues that there is "no unitary MFT." *Id.* at 15.  According to Ford, because of "drastic" software changes, not all defects identified by Plaintiffs' experts and evidenced by Ford's own internal documents are common to all Class vehicles. *Id.* at 14.  Ford's argument fails, because all MFT versions during the Class Period contained



[21]

[22] And as to many of the potential individualized issues that Ford purports to identify, even those issues are best addressed with common proof ignored by Ford.  *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (finding a single, central issue of liability in a class action involving defective washing machines with two alleged defects, and stating that individualized issues could be addressed in various ways).

the same defective Base Software, and because new versions of MFT software do not constitute

new products.

        **i.**        **The same defective Base Software infected all MFT versions during the Class Period.**

The Base Software used in all versions of MFT during the Class Period was substantially

similar. *See* Section II(B), above. First, for each version of the Base Software, it is undisputed that

████████████████████████████████████████████████████████████

██████████████████. *See, e.g.*, Reply Ex. 15 (Westra Dep.) at 25:18-27:13, 108:8-112:13; Reply

Ex. 5 (Kelly Dep.) at 27:18-28:23.

There were some differences between various versions of the software. But those decisions

were not significant or substantial. As explained above, in Section II(B)(1), ████████████████

███████████████, the Base Software did not meaningfully change between versions 1.08 and 3.5,

despite the fact that MFT engineers ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*id.*, ¶¶ 163-

193), hence the software updates remained fundamentally flawed. As Plaintiffs demonstrated in

their opening brief, for every update in the Class Period, Ford knew—████████████████████

████████████████████████████████████████████████████████████. *See*

Mot. at 10-14 and exhibit cited therein. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ [23] And as a result, Class members

continued to experience the same primary problems, regardless of the version at issue. *See* Section

II(B)(2), *infra*.

To illustrate how little the software changed despite various attempts at superficial fixes,

---

[23] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

1   Plaintiffs' software expert, Dan Smith, identified ███████████████████████████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████.  *See id.*  Ford

5   countered with their own expert, Dr. Kelly, ███████████████████████████████████

6   ███████████████████████████████████  Def. Ex. 7, ¶¶ 171-317.  However, as Mr. Smith

7   has demonstrated with regard to every variation Dr. Kelly discusses, ████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ███████████████████████████████████████████  did not vary meaningfully from

15  version to version over the Class Period.

16          ii.          **The software updates to MFT do not constitute new products.**

17          Ford's software updates do not render MFT versions different products.  Kia Motors

18  unsuccessfully made the same argument in *Samuel-Bassett v. Kia Motors America, Inc.*, 34 A.3d 1

19  (Pa. 2011), where the state Supreme Court upheld certification of a class of consumers complaining

20  of a defective braking system in certain vehicles.[24]  Kia argued that predominance was not satisfied

21  because it introduced "thirteen separate design changes to the brakes" over the four model years at

22  issue.  *Id.* at 21.  Rejecting this argument, the court noted that while Kia "made several changes to

23  the design of the . . . brake system during [the class period], the modifications did not significantly

24  alter the basic defective design," because the redesigned brakes still exhibited the same problems.

25  *Id.* at 23.  Similarly, Ford's updates failed to remedy the underlying architectural defects in the MFT

26  software, and so they also fail to defeat predominance.

27  _____

28          [24] As here, the plaintiffs in *Kia* limited their proposed class to vehicles containing demonstrably defective components.  *See id.* at 12.

1    This is consistent with authority by and within the Ninth Circuit that class certification is

2    warranted where plaintiffs identify a part or system within a vehicle as the source of problems.[25]

3    Just last month, Judge Dean D. Pregerson rejected another car manufacturer's virtually identical

4    argument that the plaintiffs were "lumping together two separate issues with two different compo-

5    nents in two different timing chain systems" and therefore the proposed class vehicles did "not

6    possess a single common defect that unites the claims of all class members." *Falco v. Nissan*

7    *N. Am., Inc.*, 2016 U.S. Dist. LEXIS 46115, at *6-12 (C.D. Cal. Apr. 5, 2016).[26]

8    Two decisions Ford cites from the Central District of California—both of which pre-date the

9    Ninth Circuit's decision in *Edwards*—do not support its argument.  *See* Opp'n at 15.  The plaintiffs

10   in *Bruce v. Harley-Davidson Motor Co.*, 2012 U.S. Dist. LEXIS 36723 (C.D. Cal. Jan. 23, 2012),

11   alleged that a motorcycle chassis suffered from a defect, causing the vehicles to wobble, weave, or

12   lose stability.  The court excluded the testimony of plaintiffs' only defect expert because he did not

13   "sufficiently account[] for other potential causes of the Class Vehicles' alleged instability."  *Id.* at

14   *16.  As a result, the plaintiffs "failed to show that they have the ability to use common evidence by

15   which they can demonstrate the defective nature of the Class Vehicles."  *Id.* at *20.  In short, that

16   case was concerned with whether there actually was a common defect—not whether different itera-

17   tions of a commonly branded and marketed product could preclude class certification.

18   Likewise, the court in *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal.

19   2012), which involved an allegedly defective water management system that caused water to leak

20   into vehicles, found that the defective "system" identified by plaintiff was really "an amalgamation"

21   of as many as ten distinct parts.  *Id.* at 534.  And the plaintiff did not establish that those distinct

---

22

23   [25] *See Edwards v. Ford Motor Co.*, 603 F. App'x 538, 539-40 (9th Cir. 2015) (reversing district court's denial of class certification in a case involving a defect in Ford's electronic throttle control system that caused vehicles to accelerate unexpectedly, finding that "the district court erred in concluding that individualized proof was required on the question of the existence of a defect and on the question of materiality."); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 587 (C.D. Cal. 2008) (certifying class in case involving a defective automobile "flywheel system").

24

25

26   [26] *See CA, Inc. v. Ingres Corp.*, 2009 Del. Ch. LEXIS 204, at *91-92 (Del. Ch. Dec. 7, 2009) ("the conceptual line separating 'update' from 'new product' is not nearly as sharply defined as [defendant] suggests," and "is not arithmetical – there is no magical threshold past which adding bells and whistles to a pre-existing piece of software will suddenly transform those additions from a mere update to a full-blown new product").  Here, Ford's MFT updates were not marketed as new products carrying additional costs.

27

28

parts were integrated in any way.  Therefore, the court found that the plaintiff failed to satisfy

commonality.  In contrast, Plaintiffs' experts here have credibly opined that ███████████

███████████████████████████████.  So Plaintiffs have presented substantial classwide

evidence that there is a single system comprised of the same hardware and software, eligible for the

same software updates, covered by the same warranty, and (by definition) contained in all Class

Vehicles.

      In fact, during the Class Period, Ford ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████."  Reply Ex.

18 (Ex. 24 to Ken Williams Dep.) at WLN2-00026704.  So neither Ford nor any consumers

understood that the attempted "performance upgrades" constituted new MFT products during the

Class Period.

      **b.**     **Neither materiality nor causation requires individualized inquiry.**

      Ford admits that materiality is measured by an objective standard, but still maintains that

Plaintiffs cannot prove it using classwide evidence due to alleged differences in purchasing factors.

Opp'n at 16.  Courts routinely reject this argument.[27]  In any event, Plaintiffs have presented exten-

sive classwide evidence of materiality, including surveys and economic analysis showing that

consumers would spend less on a vehicle equipped with a defective MFT system than a fully-

functioning one.  *See* Ex. 185 (Baedeker Rpt.), ¶¶ 48-60 (survey results), ¶¶ 61-87 (economic

---

[27] *See Edwards*, 603 F. App'x at 541 ("[A] finding that the defendant has failed to disclose information that would have been material to a reasonable person who purchased the defendant's product gives rise to a rebuttable inference of reliance as to the class."); *Falco*, 2016 U.S. Dist. LEXIS 46115, at *24 ("whether consumers would find such omission material in their transaction" is common issue); *Ehret v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 161803, at *13-14 (N.D. Cal. Dec. 2, 2015) ("[W]hether Uber made the alleged misrepresentation, and if so, whether those misrepresentations are material and likely to deceive a reasonable consumer are apt to drive the resolution of Uber's liability. . . .").

analysis), and voluminous Ford documents supporting this point; Berman Decl., ¶¶ 4-48, 70-108.[28]

### i. The concealed facts pertain to safety hazards.

Ford denies that MFT poses safety hazards (Opp'n at 17) knowing that such a showing would establish materiality. Ford's denial lacks credibility, however, because numerous drivers of vehicles equipped with MFT, including Ford's own employees, have complained ███████████

███████████████████████████████████████████████

████████████   ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████[30]

Proof of a safety hazard does not require evidence of actual collisions,[31] although Plaintiffs can draw that extremely close nexus here. Rather, "[p]roving a safety issue requires showing a sufficient nexus between the alleged design defect and the alleged safety hazard." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 857 (N.D. Cal. 2012) (internal citation and quotation marks omitted). There is no bright-line rule on the required severity of the hazard, *Avedisian v. Mercedes-*

---

[28] Ford's authorities involving individualized materiality issues do not compel a different result. Opp'n at 16 n.10. In each case, the defendant came forward with evidence showing that the importance to class members of the omitted information varied widely, effectively rebutting the presumption of causation. These authorities are addressed in Section III(A)(1)(b)(ii), below ("Ford fails to rebut any presumption of reliance.").

[29] *See, e.g.*, Reply Exs. 19-26 (Exs. 5-12 to Taylor Dep.).

[30] Reply Ex. 13 (Taylor Dep.) at 31:16-34:14.

[31] Ford, like all manufacturers, issues safety recalls even in the absence of recorded accidents. *See, e.g.*, Reply Ex. 27 (Ford news release).

1   *Benz USA, LLC*, 43 F. Supp. 3d 1071, 1078 (C.D. Cal. 2014), but the *increased risk* of traffic acci-

2   dents surely qualifies.  *Id.* (noting that the National Highway Safety Act focuses on "reduc[ing] traf-

3   fic accidents and deaths and injuries resulting from traffic accidents") (citing 49 U.S.C. § 30101).

4   Plaintiffs have presented evidence showing that the MFT defects introduce risks that can lead, and

5   in some cases have led, to accidents.[32]  This provides a "sufficient nexus" between the defect and

6   safety hazards.  And this issue will be resolved by evidence common to all Class members.

7              **ii.        Ford fails to rebut any presumption of reliance.**

8              Ford's attempt to rebut the presumption that Class members would have acted differently

9   had Ford disclosed that MFT is dangerously defective misses the mark entirely.  Ford points to

10  internal customer surveys, the Wood, Singer, and Boedeker reports, and to cherry-picked examples

11  of Plaintiffs' testimony to argue that the presumption of reliance has been rebutted.  Opp'n at 20-21.

12  Whether considered individually or collectively, Ford's argument fails.

13             At best, Ford's evidence suggests that ███████████████████████████████

14  ███████████████████████████████████████████[33]  But none of Ford's evidence even

15  purports to show that consumers would pay the price that Ford charged for any MFT-equipped

16  vehicles had those consumers known the full truth about MFT's flaws.  Plaintiffs' own testimony

17  provides evidence to the contrary.  Plaintiff Rizzo testified that he "probably" would have bought

18  his vehicle even if it did not have MFT (Reply Ex. 39 (Rizzo Dep.) at 39:2-5), but he sued Ford

19  after experiencing "a multitude of problems," including frequent system crashes, black-outs while

20  using the rear-view camera, and a near-accident due to inability to control the defroster during a

21  storm (*id.* at 115:9-116:21).  He realized that:

22                    I am paying for something, and I am not getting the benefit of it.
                      Plus, God forbid there is an accident, it's not calling out.  It's not
23                    calling 911 to call anybody.  It's not saying, hey, we are in trouble.
                      . . .  The front windshield totally fogging up, not being able to see in

24

25  ────────────────────
    [32] Ex. 8 (Rosenberg Rpt.), *passim*; Reply Ex. 6 (Rosenberg Rebuttal Rpt.), *passim*; Reply Ex. 4
26  (Smith Rebuttal Rpt.), ¶¶ 194-203; Reply Exs. 19-26 (Exs. 5-12 to Taylor Dep.).  In addition to
    accidents, ██████████████████████████████████████████████████  *See,*
    *e.g.*, Reply Exs. 28-36, 37 at WLN1-0454979, 38 at WLN1-0207119.

27  [33] Ford's internal surveys show that ████████████████████████████████████████
28  ████████████████████████████████████████████████████████████

1

> front of you on a rainy day?  That's a problem.  And backing up and
> not having that camera is, you know, vital to safety.

*Id.* at 116:22-117:8.  Whether Plaintiff Rizzo or any Class member specifically requested MFT has

no bearing on materiality.[34]  The question is whether reasonable consumers would consider the

omitted information—*i.e.*, the existence and nature of the defects, including safety implications—

important in deciding whether and how much to pay for their MFT-equipped vehicles.  The unre-

butted evidence shows that such information is material.[35]  And the "fact a defendant may be able to

defeat the showing of causation as to a few individual class members does not transform the com-

mon question into a multitude of individual ones; plaintiffs satisfy their burden of showing causa-

tion as to each by showing materiality as to all."  *Mass. Mut. Life Ins. Co. v. Superior Court*, 97

Cal. App. 4th 1282, 1292 (2002) (quoting *Blackie v. Barrack*, 524 F.2d 891, 907 n.22 (9th Cir.

1975)).

Ford's citations do not change this.  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009),

concerned prescription medications.  Because the record showed that some doctors would continue

prescribing Vioxx and some consumers would continue taking it even if the omitted details were

disclosed, the court found materiality to be an individualized issue.  *Id.* at 134.  *Vioxx*, however,

turned on the existence of so-called "learned intermediaries"—doctors who were best equipped to

advise patients on the risk/benefit analysis to taking certain drugs—which is not the situation here.[36]

And again, Ford has presented no evidence that disclosure of the very information it omitted would

fail to impact whether and how much consumers would pay.

Ford's reliance on *Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011), is similarly

misplaced.  In *Webb*, the court was persuaded by evidence that consumers would not notice disclo-

sures on a clothing tag, and would not react uniformly to such disclosures if they were noticed.

---

[34] Ford's argument that certain Plaintiffs' purchases of second MFT-equipped vehicles undercut materiality is a red herring.  Plaintiff Rodriguez's December 2011 purchase of an MFT-equipped vehicle for his sister preceded the filing of his claim.  Plaintiff Mitchell's second vehicle is a 2014 model year with a post-Class Period version of MFT.

[35] *See, e.g.*, Ex. 185 (Boedeker Rpt.), ¶¶ 82-87 (willingness-to-pay decreases when defect is disclosed at point of purchase).

[36] *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92 (Colo. 2011), is inapposite, as it concerned allegedly deceptive paperwork and charges that customers often learned about in face-to-face interactions with sales representatives.

1    *Webb* is thus inapposite.  The Ninth Circuit recently ruled that exposure to omissions relating to

2    automobile defects can be proven by showing that, where the manufacturer communicates with

3    consumers via its dealerships, the manufacturer failed to cause its dealers to disclose the omitted

4    information.  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226-27 (9th Cir. 2015).  *Daniel* applies

5    here because Ford used its dealers to communicate with consumers and failed to cause them to

6    disclose the MFT system defects and their safety implications.  Mot. at 27-29.  And Plaintiffs have

7    offered survey evidence showing that consumers would pay less for an MFT-equipped vehicle if

8    Ford disclosed the MFT defects.[37]

9        *Tucker v. Pacific Bell Mobile Services*, 208 Cal. App. 4th 201 (2012), is also inapposite.

10   There, plaintiffs challenged a mobile provider's practice of rounding up partial minutes, but the

11   record showed that the provider partially disclosed the practice.  Thus, because a consumer aware of

12   the practice could not have been deceived, materiality became an individualized inquiry.  Ford

13   offers no evidence that it disclosed the architectural defects (and the safety implications thereof) to

14   anyone, and indeed, it denies such defects exist.  Similarly, in *Blough v. Shea Homes, Inc.*, 2014

15   U.S. Dist. LEXIS 100600 (W.D. Wash. July 23, 2014), many homeowners knew about the alleged

16   defects due to home inspections conducted before they bought their homes.  Moreover, both *Tucker*

17   and *Blough* are misrepresentation, not omission, cases.

            **iii.        Common evidence shows Ford had exclusive knowledge of the
                          concealed facts.**

18

19       Ford next argues that what it knew, and when, regarding MFT's defective quality somehow

20   requires individual inquiries.  Opp'n at 28-29.  Determining whether Ford had exclusive knowledge

21   of the facts concerning MFT will be established with common proof.  Plaintiffs have introduced

22   evidence showing that █████████████████████████████████████████████████

23   ██████  Even if Ford's knowledge evolved over the Class Period, this has no impact on whether

24   Ford had exclusive knowledge of material facts prior to the start of the Class Period.[38]  Ford next

25

26       [37] Ex. 185 (Boedeker Rpt.), ¶¶ 48-60 (survey results), 61-87 (economic analysis).

27       [38] For that reason, *In re Ford Motor Co. Vehicle Paint Litigation*, 182 F.R.D. 214 (E.D. La.
     1998), is distinguishable.  There, the court observed that Ford's knowledge about alleged paint
28   defects "was not uniform over the period in issue and that certain of its alleged 'concealing' activi-
     ties occurred in 1992, which could not have affected plaintiffs' purchasing 1990 model-year vehi-

1    claims that media reports created discrepancies in the level of information available to consumers.

2    Opp'n at 28.  But Ford cannot show that any consumer was ever apprised of the true facts obtained

3    only in this litigation—*i.e.*, that ████████████████████████████████████████████.

4    The availability of critical reviews in August 2013, as compared to the scarcity of reports in

5    September 2010, does not mean *ipso facto* that purchasers near the end of the Class Period knew

6    they were buying a dangerously defective product.  Ford's exclusive possession of material facts

7    regarding the MFT defects is a common question.

8                         **c.      All Class members suffered injury.**

9            Ford conflates liability with damages by arguing that Plaintiffs' experts "simply assume"

10   injury.  Opp'n at 22.  Here, Stefan Boedeker's and Dr. Jonathan Arnold's expert reports (Exhibits

11   185 and 186) show that "damages are capable of measurement on a classwide basis."  *Comcast*

12   *Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  That is all that is required.  Plaintiffs are not

13   required to prove damages or the merits of their case at class certification.  *See Amgen Inc. v. Conn.*

14   *Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).  At trial, Plaintiffs will show that "each

15   class member was injured at the point of sale upon paying a premium price" for the vehicles as

16   designed using common proof.  *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 479

17   (C.D. Cal. 2012) (citation omitted).

18           Ford misapprehends the standard for damages experts when it attacks the opinions of

19   Dr. Arnold and Mr. Boedeker as allegedly premised on "assumptions that lack evidentiary support."

20   Opp'n  at 24.  As stated in their reports, Dr. Arnold and Mr. Boedeker properly assume liability.[39]

21   Dr. Arnold and Mr. Boedeker are not engineers, and were not tasked to provide opinions on the

22   function of MFT or the merits of Plaintiffs' liability claims.

23

24   cles."  *Id.* at 220.  Here, Plaintiffs allege and will prove that Ford had exclusive knowledge of the
     MFT defects *before MFT was sold to any Class member*.  Moreover, the *Ford Motor Co. Vehicle*
25   *Paint* court did not reject class certification due to this deficiency, but merely noted that trying the
     case in light of the temporal issue Ford raised would be "problematic."  *Id.*

26        [39] *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) ("A damages model
     would, of course, be necessarily consistent with liability, or necessarily assume liability."); *see also*
27   *Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043, 1068 (D.S.D. 2010) ("[I]t is well-
     settled that a damages expert . . . can testify as to damages while assuming the underlying
28   liability.").

1   Ford notes that Plaintiff Miller-Jones purchased his vehicle four months before the end of

2   the Class Period.  But Plaintiff Miller-Jones, like all Class members, was injured at the time of

3   purchase.  *See Pulaski*, 802 F.3d at 988-89 (the focus for purposes of calculating damages is "the

4   time of purchase").  And it is settled that any variation in the amount of damages owed to each

5   Class member does not bar certification.  *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th

6   Cir. 2013); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) ("[I]t is a

7   'misreading of *Comcast*' to interpret it as 'preclud[ing] certification under Rule 23(b)(3) in any case

8   where the class members' damages are not susceptible to a formula for classwide measurement.'")

9   (quoting *In re Deepwater Horizon,* 739 F.3d 790, 815 n.104 (5th Cir. 2014)).  Indeed, rejecting the

10  same arguments Ford offers, the Ninth Circuit stated that the damages "calculation need not account

11  for benefits received after purchase."  *Pulaski*, 802 F.3d at 989.

12      Ford's cases are distinguishable.  The plaintiffs in *In re Toyota Motor Corp. Hybrid Brake*

13  *Marketing, Sales Practices & Products Liability Litigation*, 288 F.R.D. 445 (C.D. Cal. 2013), failed

14  to offer any common evidence of a defect plaguing the class vehicles.  Additionally, Ford cites

15  *Oscar v. BMW of North America, LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2011), for the unremarkable

16  proposition that deception alone, without injury, fails to state a claim.  But that court also recog-

17  nized that paying a price premium due to a seller's deception could support a claim under New York

18  law.  In *Tietsworth v. Sears, Roebuck & Co.*, 2012 U.S. Dist. LEXIS 62956 (N.D. Cal. May 4,

19  2012), the court denied certification of a class of purchasers of washing machines because the

20  allegedly defective component was not in all machines.  And in *In re POM Wonderful, LLC*, 2014

21  U.S. Dist. LEXIS 40415, at *21 (C.D. Cal. Mar. 25, 2014), a food labeling case, the court decerti-

22  fied the class because the damages expert failed to causally connect the misrepresentations to any

23  damage, basing an "inference" of causation on the fact that defendant's product was "more

24  expensive" than competitors' products.  Here in contrast, the Classes include only vehicles with the

25  defective MFT, and Plaintiffs provide substantial evidence of the value consumers placed on MFT

26  and the premium Ford got in each sale.

27

28

1

        **d.**     **All Class members' damages may be calculated using the same methods.**

2

      As Dr. Arnold and Mr. Boedeker discuss in their rebuttal reports,[40] the criticisms put forth

3

by Ford's expert reflect his own fundamental misunderstanding of Plaintiffs' expert opinions.  At

4

this stage, the Court is not required to make a determination of whose experts are correct.  "At class

5

certification, plaintiff must present 'a likely method for determining class damages,' though it is not

6

necessary to show that his method will work with certainty at this time." *Chavez v. Blue Sky Nat.*

7

*Bev. Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (quoting *In re Tableware Antitrust Litig.*, 241

8

F.R.D. 644, 652 (N.D. Cal. 2007).

9

      Ford's expert, Dr. Hal Singer, has been precluded in this district and elsewhere.[41]  During his

10

deposition, Dr. Singer ███████████████████████████████████████████████████████

11

█████████████████████████████████████████████████████████████████████████████

12

█████████████████████████████████████████████████████████████████████████████

13

█████████████████████████████████████████████████████████████████████████████

14

██████████████████████████████████ Reply Ex. 41 (Boedeker Rebuttal Rpt.), ¶¶ 62-65 and

15

Appendix 2 thereto.

16

      The Supreme Court's recent opinion in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036

17

(2016), also strongly supports certification.  Following *Tyson*, Ford cannot avoid certification by

18

pointing to the lack of clear pricing records for MFT, because Plaintiffs may submit "representative

19

evidence" of the prices Class members paid.  *Id.* at 1046.  Dr. Arnold and Mr. Boedeker offer two

20

methodologies that "fill [the] evidentiary gap" Ford created.  *Id.* at 1047.  And in rejecting the *Tyson*

21

defendant's argument that the plaintiff's expert analysis was "unrepresentative or inaccurate," the

22

Court explained that such a "defense is itself common to the claims made by all class members."

23

*Id.*  The same is true here.  Plaintiffs' experts have shown that the price premium paid by all Class

24

25

    [40] Reply Exs. 41 (Boedeker Rebuttal Rpt.), 44 (Arnold Rebuttal Rpt.).

26

    [41] *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015) (excluding Dr. Singer's unreliable, irrelevant testimony); *Jarrett v. Insight Commc'ns Co., L.P.*, 2014 U.S. Dist. LEXIS 103079, at *18 (W.D. Ky. July 29, 2014) ("Dr. Singer's opinion . . . is not supported

27

by the record."); *In re Photochromic Lens Antitrust Litig.*, 2013 U.S. Dist. LEXIS 186728 (M.D. Fla. Mar. 12, 2013) (criticizing Dr. Singer's method, use of flawed data, and lack of statistical significance), approved in part, 2014 U.S. Dist. LEXIS 46107 (M.D. Fla. Apr. 3, 2014).

28

members and additional sums received by Ford for MFT are readily calculable.  Certification will not deprive Ford of the "ability to litigate individual defenses" because "there [a]re no alternative means" for consumers to establish the overcharges.  *Id.*

Moreover, there is no merit to Ford's attack on Dr. Arnold's opinions on the ground that some Class members may be satisfied with MFT.  As Mr. Boedeker explains, "████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████"

And courts have regularly rejected Ford's challenges to the type of conjoint analysis used by Mr. Boedeker.[42]  As Mr. Boedeker explains, the methodology he uses is based on generally accepted economic methods.  Reply Ex. 41 (Boedeker Rebuttal Rpt.), ¶¶ 10-16.  In particular, there is no merit to Dr. Singer's criticism that the market simulations approach used by Mr. Boedeker is "not based on any method generally accepted by economists."  *See* Singer Report, ¶ 89.  To the contrary, the market-simulation approach "is supported by ample research literature in the fields of marketing, consumer choice research, and applied statistics discussing the use of market simulations in the context of conjoint analysis."  Reply Ex. 41 (Boedeker Rebuttal Rpt.), ¶ 14.

---

[42] *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1026 (C.D. Cal. 2015); *Guido v. L'Oreal, USA, Inc.*, 2014 U.S. Dist. LEXIS 165777 (C.D. Cal. July 24, 2014) (admitting conjoint analysis of price premium in mislabeled cosmetics case).  The court in *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015), certified a class of Ford Explorer owners and stated that it "accepts [p]laintiff's proffered expert's proposed conjoint analysis damages model for purposes of class certification, finding that it is sufficiently tied to [p]laintiff's legal theory and her proffered evidence that her Explorer shares the same defect as all others in its product line, and meets the predominance requirement under the Supreme Court's holding in *Comcast*."  Just weeks ago, the same court denied Ford's *Daubert* challenge to that same expert.  *Sanchez-Knutson v. Ford Motor Co.*, 2016 WL 1658801 (S.D. Fla. Apr. 6, 2016).

1

e.      **No individualized State-law issues bar certification of any State Class.**

2

i.      **The Class Action Bans under the Consumer Protection Statutes of Virginia and Colorado Do Not Preclude Class Certification**

3

4

Ford incorrectly asserts that Plaintiffs' claims under the Virginia Consumer Protection Act

5

("VCPA") and the Colorado Consumer Protection Act ("CCPA") cannot be certified because of

6

certain limitations in those state statutes.  But in *Shady Grove Orthopedic Associates, P.A. v. All-*

7

*state Insurance Co.*, 559 U.S. 393, 406-09 (2010), the Court held that a State cannot impose condi-

8

tions on a class action pending in federal court beyond Rule 23 requirements.  Consistent with this

9

directive, district courts in the Ninth Circuit routinely hold that class actions may be maintained

10

under Rule 23 despite a state statute barring them.  *See In re Lithium Ion Batteries Antitrust Litig.*,

11

2014 U.S. Dist. LEXIS 141358, at *115-20 (N.D. Cal. Oct. 2, 2014) (class action bans under Illinois

12

and South Carolina law were strictly "procedural, not substantive, and . . . application of Rule 23 to

13

them would not modify any substantive right").  Thus, Rule 23 trumps the class action procedural

prohibitions contained in the VCPA and CCPA.

14

Ford ignores authority that addressed the applicability of *Shady Grove* to the VCPA, instead

15

relying on two district court cases that predate that case.  *See In re Hardieplank Fiber Cement*

16

*Siding Litig.*, 2013 U.S. Dist. LEXIS 98277, at *46-47 (D. Minn. July 15, 2013) (the "absence of a

17

class action right under the VCPA" is a "procedural matter, rather than a substantive law defining

18

the types of rights and remedies available under the VCPA itself").  The Court should reach the

19

same conclusion for the CCPA.  *See Los Gatos Mercantile, Inc. v. E.I. Dupont De Nemours & Co.*,

20

2015 U.S. Dist. LEXIS 106292, at *72-74 (N.D. Cal. Aug. 11, 2015) (concluding that a class action

21

could be maintained because Rule 23 governed, notwithstanding the language of the South Carolina

22

consumer protection law that, like the CCPA, limited suit to individual actions).[43]

23

ii.      **The NJCFA claim warrants certification.**

24

Ford next contends that the New Jersey Consumer Fraud Act ("NJCFA") requires individu-

25

alized inquiries into the experiences of Class members to determine "which purchasers experienced

26

_____

27

[43] Plaintiffs acknowledge that the class action restriction under the CCPA was applied in *Tasion Commc'ns, Inc. v. Ubiquiti Networks*, 2014 U.S. Dist. LEXIS 35455, at *33-34 (N.D. Cal. Mar. 14, 2014).  But in that opinion, the court was not asked to consider this restriction in light of *Shady Grove* and the other authorities on which Plaintiffs rely.

28

problems with the MFT." *See* Opp'n at 30.  But the Third Circuit recently rejected that argument. *Neale*, 794 F.3d at 361.  Like Ford here, Volvo argued that a claim under the NJCFA could not be certified if it included class members who lacked Article III standing.  The Third Circuit held that "unnamed, putative class members need not establish Article III standing.  Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class." *Id.* at 362.  Ford does not dispute that the class representatives in this case have Article III standing, as this Court has already decided.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 952 (N.D. Cal. 2014).

> ### iii.    Distinguishing vehicles purchased or leased for business rather than personal use does not preclude class certification.

Ford argues that class certification should be denied for the handful of consumer protection laws that limit standing to consumers who make purchases for non-business purposes because it would require individual inquiries to determine whether a given transaction was for a business or consumer purpose.[44]  *See* Opp'n at 30.  Several courts have rejected this argument in the context of statutes with similar standing limitations.[45]  Any such concerns could be addressed by using the defendant's own records and/or through the claims administration process.  *See Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 170 (5th Cir. 2015) ("differentiating consumer accounts from business accounts may be done by inquiring of the banks or requiring class members to answer some threshold questions about the nature of the account").  Ford ignores those alternatives.

> ## 2.    The Colorado strict liability and Ohio negligence claims should be certified.

Ford argues that individualized issues will predominate as to Plaintiffs' tort claims under

---

[44] While Ford raises similar arguments related to Plaintiffs' breach of implied warranty claims (*see* Opp'n at 36), it does not make this argument with respect to the large majority of claims under consumer protection statutes or other claims for which Plaintiffs seek class certification.

[45] *See Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 598-99 (E.D. Cal. 1999) (holding that class certification was appropriate in a variety of circumstances involving individual "determinations of whether a given transaction was for a business or consumer purposes" because it "did not overwhelm the common questions of law and fact"); *see also Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 551-52 (E.D. Va. 2000) (finding that the "distinction between personal and business purchases" did not preclude class certification); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *96-97 (N.D. Cal. Mar. 29, 2013) (certifying classes, for settlement purposes, of all persons and entities who purchased television "primarily for business use (and not for personal, family, or household use)").

1   Colorado and Ohio law.  *See* Opp'n at 30.  With respect to Colorado strict liability, Ford asserts that

2   Plaintiffs cannot show that the Class Vehicles were sold in an "unreasonably dangerous" condition,

3   or that the defect caused Plaintiff's injuries.  *Id.* at 30.  But the Colorado Supreme Court permits

4   strict liability claims for purely economic losses of the type sought by Plaintiffs, as this Court

5   previously recognized.  *In re MyFord Touch*, 46 F. Supp. 3d at 962-63; *Hiigel v. Gen. Motors

6   Corp.*, 544 P.2d 983, 989 (Colo. 1975).  Ford presents no argument as to why this same analysis

7   cannot be applied across the entire Colorado Class.

8         Ford argues that individual determinations are required under Ohio law as to "[w]hether

9   Ford owed consumers a duty to disclose information about the MFT" and whether the alleged defect

10  proximately caused Plaintiffs' injuries.  *See* Opp'n at 31.  These are merits inquiries that need not be

11  proven at the certification stage.  And as with the Colorado strict liability claim, the Ohio negli-

12  gence claim is common to the class because the issues Ford identifies turn on its own conduct in

13  designing the defective MFT system—*i.e.*, whether Ford owed a duty to Class members, whether it

14  breached that duty, and whether its breach caused harm by inflating the price of Class Vehicles.

15        **3.    Plaintiffs' express warranty claims are suitable for class treatment.**

16              **a.    Ford raises only merits-based challenges to the express warranty claims.**

17        Ford erroneously argues that, to certify the express warranty claims, classwide evidence

18  must show that all Class members "repeated[ly] present[ed]" their MFT for repair and that on all

19  occasions, Ford was unable to repair it.  *See* Opp'n at 31.  The Sixth Circuit rejected that argument

20  in *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006).  There, Ford claimed that individual

21  issues predominated over the question whether a throttle body assembly was defective because "an

22  owner who . . . has not sought repair for the problem cannot 'prove' an express warranty claim

23  under the 'repair or replace' warranty."  *Id.* at 553.  The Sixth Circuit stated that the "court may

24  ultimately accept or reject this reading of the contract," but that "[w]hether the district court . . .

25  could find that Ford's warranty permits an owner to recover damages for loss resulting from the

26  alleged defect in the throttle body assembly is a merits issue."  *Id.*  Likewise here, any question

27  whether the same Limited Warranty permits owners to recover damages for loss resulting from the

28  defective MFT system is a merits issue.  *See also Wolin*, 617 F.3d at 1173-74 (relying on *Daffin* to

conclude that common issues predominate for express warranty claims arising out of a similar warranty).[46]

Ford also opposes certification of express warranty claims by disputing whether the MFT defect was reparable through means other than software updates.  Opp'n at 32.  This is a paradigmatic merits question.  Ford attempts to muddy the waters by pointing to an instance where a phone problem was resolved by replacing a USB cable, *id.*, but this has nothing to do with the common question whether the MFT system is defective.  Whether the MFT software versions were knowingly issued with undisclosed defects remains the common, predominant question here.

Finally, whether Ford's Limited Warranty failed of its essential purpose and contains an unconscionable "reasonable time" provision (and, if that provision is enforceable, what amount of time is "reasonable"), are questions common to the Classes, and whether any pre-suit notice requirement applies to the Massachusetts, New Jersey, New York, and North Carolina Classes is common to those Classes.[47]  A warranty fails of its essential purpose when the defect is such that no repair or replacement can remedy it.  All Class members' express warranty claims will stand or fall on the same evidence about the MFT defects.[48]  And the unconscionability of the "reasonable time" provision (or its meaning, if enforceable) will not vary for individual Class members.[49]  Lastly, any

---

[46] Even on the merits, Ford's supposed "evidence" to support its claim that numerous Class members sought no or few warranty repairs to MFT is flawed.  Ford's expert, Dr. Taylor, admitted at his deposition that his opinion that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[47] Ford does not argue that the express warranty claims asserted on behalf of the California, Iowa, Ohio, Virginia, or Washington Classes present a notice-based individualized issue.  *See* Opp'n at 33-34.

[48] Ford rehashes its presentment argument in contending that the failure of essential purpose and unconscionability analyses require individualized inquiries.  Opp'n at 31-33.

[49] Ford's reliance on *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014), for the claim that unconscionability requires an individualized inquiry, is misplaced.  The *Herskowitz* court found that individual issues predominated with respect to an allegedly unconscionable "all sales final" provision in downloadable media sales contracts, not because an unconscionability analysis is *always* individualized, but because the plaintiffs failed to present evidence that Apple had a systematic practice of denying refunds to customers that were double-charged and, moreover,

1    individual notice requirement would not predominate over the common questions affecting all Class

2    members in these States.[50]

3              **b.      Plaintiffs can prove classwide damages for breach of express warranty.**

4              Ford relies on the Limited Warranty's limitation-of-remedies to argue that Plaintiffs offer no

5    classwide approach to express-warranty damages, Opp'n at 34, but this is merely another attempt to

6    splinter a common contract interpretation question into individualized issues. *Daffin*, 458 F.3d at

7    553. First, the limitation Ford cites applies to manufacturing defects, not design defects, which are

8    "wholly different" categories. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales*

9    *Practices & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1181 (C.D. Cal. 2010). Thus, this limitation

10   does not apply to the MFT design defects, or at most, presents a common question. Second, Plain-

11   tiffs are entitled to pursue benefit-of-the-bargain damages for their express-warranty claims (*a for-*

12   *tiori* in light of the failure of essential purpose), *Falco*, 2016 U.S. Dist. LEXIS 46115, at *35-38,

13   and have offered a model measuring such damages. Ex. 185 (Boedeker Rpt.), ¶¶ 59-85. Ford

14   distorts Mr. Boedeker's testimony to suggest his model does not apply to warranty claims, but Mr.

15   Boedeker did not, and could not, opine as to the legal theories to which his calculations may apply.

16            **4.       Plaintiffs' implied warranty claims are suitable for class treatment.**

17            Ford incorrectly asserts that Plaintiffs cannot show that "all" Class vehicles fail to provide

18   safe, reliable transportation, thus purportedly requiring "countless mini-trials" as to each Class

19   member's experiences. Opp'n at 35-36. Plaintiffs offer common evidence that MFT was architec-

20   turally defective *as sold* during the Class Period, and this Court has held that "it is a question of fact

21   for the jury as to whether the problems with MFT posed enough of a safety risk that the cars at issue

22   could not be said to provide safe, reliable transportation." *In re MyFord Touch*, 46 F. Supp. 3d at

23   980. Ford's related argument that it has disclaimed warranties as to business purchasers is also

24   unavailing; whether this disclaimer is enforceable is a question common to the Classes.

---

25   because Apple presented evidence that some customers were denied refunds for reasons unrelated to

26   the challenged provision. *Id.* at 474-75. There are no such considerations here; the MFT system and the terms of the Limited Warranty are materially identical for all Class members.

27   [50] In the event the Court determines that any state requires individual pre-suit notice, it can be

28   ascertained with the searchable electronic records of customer inquiries and complaints maintained by Ford.

1

## B.     A Class Action Is Superior

### 1.     Ford's eventual release of MFT version 3.6 after years of failures is irrelevant.

Ford's argument that it has provided benefits to Class members because it finally managed to provide a version of the MFT system that it claims is functional after years of trying and failing is misguided and unresponsive to Plaintiffs' damages theory.  *See* Opp'n at 37-38.  That Ford eventually may have managed to stabilize the system after numerous attempts *over several years* is not a "benefit" to Class members who were injured at the time of sale when Ford knowingly sold a defective product.  *See Pulaski*, 802 F.3d at 988-89; *Tait,* 289 F.R.D. at 479.  Plaintiffs' removal of post-version 3.5 of MFT from the Classes does not insulate Ford from liability for sales of versions 1.08 through 3.5, which were defective when sold.

Ford relies on an inapposite case in which the court certified a class after the plaintiffs "narrowed the class definition by excluding products that are USDA-certified as organic."  *Brown v. Hain Celestial Grp., Inc.*, 2014 U.S. Dist. LEXIS 162038, at *16 (N.D. Cal. Nov. 18, 2014).  The court did not indicate that excluding such products somehow immunized the defendant from selling *other* products that they labeled as organic when they were not.  Similarly here, excluding versions 3.6 and after from the Class definitions does not change the fact that Plaintiffs have presented substantial classwide evidence that Ford knowingly sold all Class members a defective product.

In the other case cited by Ford, *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472 (S.D. Cal. 2013), the class included many post-fix purchasers who got exactly what they paid for.  And to the extent *Waller* may stand for the proposition that updates after the time of sale nullify a class claim for losses caused by products that were defective when sold, it is overruled by *Pulaski*, 802 F.3d at 989, in which the Ninth Circuit explained that the damages "calculation need not account for benefits received after purchase."

### 2.     Ford's non-litigation alternatives are irrelevant and impractical.

Ford's arguments that a class action is not superior when class members could either complain to the Better Business Bureau or file thousands of lawsuits are not viable alternatives.  The superiority requirement in "Rule 23(b)(3) was drafted with the legal understanding of 'adjudication' in mind: the subsection poses the question whether a single suit would handle the dispute better than

1   multiple suits.  A recall campaign is not a form of 'adjudication' under the committee note."  *In re*

2   *Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (citations omitted).

3       Ford's proposed alternatives do not "adjudicate" anything.  Even if the Court were to consi-

4   der Ford's proposed non-litigation alternatives, they are not superior to class action treatment as

5   they ignore the legislative intent behind the consumer fraud statutes under which Plaintiffs bring

6   claims.  In *In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015), the court rejected

7   the defendant's reliance on its internal refund program because it was insufficient to effectuate the

8   goals of consumer protection laws designed to act as a "strong deterrent against deceptive business

9   practices and supplement the activities of the Attorney General in the prosecution of consumer fraud

10  complaints" and "punish or deter offenders."  Ford's arguments likewise ignore the remedial and

11  punitive objectives of the state consumer protection statutes at issue here.  And finally, Ford's argu-

12  ment that the owners and lessees of the 564,000 Class Vehicles could pursue individual lawsuits and

13  arbitrations should be rejected.  Indeed, Plaintiffs' counsel have spent more than $3 million to date

14  in out-of-pocket expenses to litigate this action.[51]  *See Woods v. Vector Mktg. Corp*., 2015 U.S. Dist.

15  LEXIS 118678, at *52-53 (N.D. Cal. Sept. 4, 2015) ("It is far more efficient for the judiciary as a

16  whole, as well as both [parties], to litigate [p]laintiffs' . . . claims in one action, as opposed to in

17  several thousand individual actions filed across the country.").

18       **3.     The Classes are manageable.**

19       Contrary to Ford's suggestion that a jury could not comprehend a multi-jurisdiction class

20  action such as this, courts often certify multiple state classes.[52]  If necessary, they can be grouped

21  together based on similarities among state laws[53] or tried on an individual state-by-state basis.[54]

22

23       [51] Berman Reply Declaration ¶ 3.

24       [52] *See In re Pharm. Indus. Average Wholesale Price Litig*., 233 F.R.D. 229 (D. Mass. 2006)
    (certifying subclasses for forty-one states under consumer protection laws); *Petersen v. Costco

25  Wholesale Co.*, 312 F.R.D. 565, 582 (C.D. Cal. 2016) (certifying nine state subclasses); *In re
    Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 295 (N.D. Ohio 2007) (rejecting argument that

26  eight state subclasses were unmanageable).

27       [53] *See Ellsworth v. U.S. Bank, N.A.*, 2014 U.S. Dist. LEXIS 81646, at *69 (N.D. Cal. June 13,
    2014) (citing NEWBERG ON CLASS ACTIONS, § 4.61 (5th Ed. 2013)); *see also In re Conseco Life Ins.
    Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010); *In re Prudential Ins.

28  Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998).

1   Any "composite" evidentiary issues can be resolved through jury instructions, and if Ford believes

2   that MFT is not defective, it should welcome a merits determination on a classwide basis.[55]

3       Finally, there is no merit to Ford's argument that purchasers of used vehicles from Ford or

4   its dealers during the Class period are not ascertainable, so that the Classes are unmanageable.  *See*

5   Opp'n at 42.  Ford does not, and cannot, argue that Ford dealers do not keep records of such sales.

6   And self-identification through affidavits is a viable alternative, because the case cited by Ford is

7   inapposite.  In *Bruton v. Gerber Products Co.*, 2014 U.S. Dist. LEXIS 86581, at *26 (N.D. Cal.

8   June 23, 2014), consumers would have had "to recall: (1) whether they purchased a Gerber 2nd

9   Foods product; (2) whether they purchased a 2nd Foods product in a qualifying flavor; (3) whether

10  the product was in the appropriate packaging; and (4) whether the product was labeled with a

11  challenged label statement."  No such problems exist in asking purchasers of used vehicles to state

12  what Ford vehicle they bought, when they bought it, and whether it had MFT.[56]

13  **C.    Named Plaintiffs' Claims Are Typical of the Classes**

14      There is no merit to Ford's argument that named Plaintiffs' claims are not typical of the

15  Classes.  *See* Opp'n at 42-46.  All Plaintiffs purchased a vehicle with a defective MFT system

16  during the Class period and are pursuing the same claims based on the same theories involving the

17  same product.  Ford's attempts to defeat typicality are unpersuasive.

18      **1.    Plaintiffs do not seek certification of dismissed claims.**

19      Plaintiffs withdraw their request for certification of the Magnuson-Moss Warranty Act

20  claims and the Iowa claim for common-law fraudulent concealment.  Plaintiff Miller's breach of

21  express warranty claim was not dismissed; the Court granted dismissal without prejudice following

---

22  [54] *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724
23  (N.D. Ohio 2014) (a class action involving fourteen proposed state-wide classes that proceeded to
    trial initially on a behalf of the Ohio-only class).

24  [55] *See Butler*, 727 F.3d at 799 ("Sears argued that most members of the plaintiff class had not
    experienced any mold problem.  But if so, we pointed out, that was an argument not for refusing to
25  certify the class but for certifying it and then entering a judgment that would largely exonerate
    Sears—a course it should welcome, as all class members who did not opt out of the class action
26  would be bound by the judgment.").

27  [56] *See, e.g.*, *Brazil v. Dole Packaged Foods, LLC*, 2014 U.S. Dist. LEXIS 157575, at *48 (N.D.
    Cal. Nov. 6, 2014) ("Here, in contrast [to *Burton*], class members would only have to recall whether
    they purchased any challenged products, all of which bore the labeling claim, during the revised
28  class period.").

---

Ford's first motion to dismiss.  ECF No. 97 at 69.  Ford ignores the order on the second motion to dismiss: "Ford similarly waived its argument that Plaintiff Miller's express warranty claim must be dismissed – a position it did not even allude to, let alone squarely raise, in its motion."  *See* ECF No. 175 at 3 n.1.

       **2.**    **Plaintiffs' proposed proof of defect is applicable to all Class members.**

      The proof of defect proposed is common to all Class members, including named Plaintiffs. All Plaintiffs have alleged that MFT was defective as sold and Plaintiffs have provided extensive proof, including many documents from Ford itself detailing the company's multi-year failure to provide a safe, stable version of MFT.  Ford's arguments that each Plaintiff did not specifically allege each type of failure is irrelevant.  The MFT system did not work as intended or as advertised and each Plaintiff sustained damages resulting therefrom.

       **3.**    **Ford's defenses do not render named Plaintiffs atypical.**

      Ford's arguments regarding individual defenses do not defeat typicality or adequacy.  *See* Opp'n at 44-46.[57]  Ford first argues that because Mr. Rizzo was unaware of the MFT system when he purchased his vehicle, it could not have been material to his purchase decision.  But it certainly was material to Mr. Rizzo and to all Class members that the vehicles they purchased be safe.  As shown above, the MFT system's failures presented safety issues that Ford had exclusive knowledge of and failed to disclose.  Next, as to Plaintiff Rodriguez, Ford ignores this Court's order rejecting the argument that Plaintiff Rodriguez's claims fail for lack of materiality.  *See* ECF No. 175 at 6. Ford's next critique, regarding Plaintiff Fink, rehashes its warranty presentment argument, addressed in Section III(A)(3)(a), above.  And Ford's challenge to Plaintiff Kirchoff's credibility does not concern the merits of his claim, and so cannot serve to disqualify him.  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010).

**D.**    **All Named Plaintiffs Are Adequate Class Representatives**

      Ford's argument that "some" Plaintiffs are inadequate class representatives because they are not pursuing every single cause of action in the initial complaint is meritless.  The causes of action

---

[57] With respect to Plaintiff Miller, Plaintiffs withdraw their request to certify a common-law claim for fraudulent concealment under Iowa law.

1    not adjudicated on a classwide basis are still available to any Class member who wishes to pursue

2    them individually.  By protesting the absence of claims Ford describes as "inherently individual-

3    ized," Ford is essentially arguing that the Classes cannot be certified because Plaintiffs chose not to

4    pursue uncertifiable claims.  Ford's example of state Lemon Law programs is unpersuasive.  If there

5    were a hypothetical class member pursuing Lemon Law claims, certification of this class would do

6    nothing to prevent their recovery because certification of such a claim is not sought here.

7    **E.    *Daubert* Issues**

8         **1.    Dr. Rosenberg's report should not be excluded.**

9         Ford erroneously contends that Dr. Rosenberg's report should be excluded.  *See* Opp'n at

10   48-50.  Dr. Rosenberg concluded in his report that "MyFord Touch is a major source of driver

11   distraction and is therefore a serious safety issue."  Ex. 8 (Rosenberg Rpt.) at iii.  His opinions about

12   safety problems caused by MFT are based on his decades of experience, *id*. at § 1.1, established

13   industry standards and guidelines, *id*. at § 3, and a thorough testing for three-and-a-half weeks of

14   five Ford vehicles, *id*. at 8:17-18.  His report should thus not be excluded.

15        Ford first erroneously argues that Dr. Rosenberg's report must be excluded because "none of

16   the alleged defects Dr. Rosenberg identified were, or could have been, concealed."  Opp'n at 49

17   (footnote omitted).  Dr. Rosenberg does not opine that problems with MFT were concealed, and he

18   is not proffered as an expert on Ford's deceptive concealment of ████████████████████

19   ████████████████████.[58]  Ford then erroneously claims that his report must be excluded

20   because it does not support Plaintiffs' argument that "Ford concealed facts that were 'material' to

21   consumers."  Opp'n at 49.  To the contrary, his report supports Plaintiffs' contention that safety

22   problems with MFT are material to a reasonable consumer.  Whether Dr. Rosenberg specifically

23   refers to materiality is irrelevant; his conclusion that MFT is a major source of driver distraction that

24   causes safety problems supports a finding of materiality on a classwide basis.

25        And there is no merit to Ford's contention that "Dr. Rosenberg's safety opinion should be

26   excluded" as "unsupported speculation."  *See id.* at 49.  First, Ford offers no basis for its argument

27   _____

28   [58] Ford cites an irrelevant case, *O'Shea v. Epson America, Inc.*, 2011 U.S. Dist. LEXIS 85273 (C.D. Cal. July 29, 2011), in which the court held that Epson had no duty to disclose that its products performed less efficiently than competitors' products.  Plaintiffs here make no such claim.

1  that Dr. Rosenberg's opinion must be excluded because he did not perform NHTSA tests.  *See id.* at

2  50.  Ford does not cite any case that requires an expert to perform such tests in order to opine about

3  safety problems caused by a product.  And Ford distorts Dr. Rosenberg's testimony when it states

4  that he "admitted his opinion about safety was subjective."  *See id.*  Dr. Rosenberg explained that

5  █████████████████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ██████████████████████████████████  Reply Ex. 42 (Rosenberg Dep.) at 35:11-36:2.

11  Section 5.2 of his report comprises 24 pages that describe bugs in the MFT software and the serious

12  driver distractions caused during his lengthy testing of Ford vehicles.  So his opinions about MFT

13  safety are well-documented, fully supported, and far from speculative.[59]

14      **2.**      **The Boedeker and Arnold reports should not be excluded.**

15      For the reasons discussed in Section III(A)(1)(c), above, there is no merit to Ford's request

16  to have the Boedeker and Arnold reports excluded under *Daubert*.  *See* Opp'n at 50.

17      **3.**      **Dr. Wood's testimony and report should be excluded.**

18      Ford relies on a report authored by Dr. Christine T. Wood, who has testified in expert depo-

19  sitions ████████████████████████  Reply Ex. 43 ("Wood Dep.") at 58:22-59:1.  At her

20  deposition in this matter, Dr. Wood stated that ██████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████

23      Dr. Wood's report should be excluded for lack of sufficient foundation.  Other than ████████

24  ████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████

26

27       [59] *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243-44 (10th Cir. 2000) (affirming trial
court's admission of testimony by human factors engineer that machine was unsafe, even though the
28  expert did not test the machine).

█████████████████████████████████████████████████ ███████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Based on a similar lack of foundation, her

opinions were excluded as unreliable in another case.[61]

Moreover, Dr. Wood's testimony demonstrates that she has no basis to opine on how consu-

mers might █████████████████████████████████  Def. Ex. 43 (Wood Rpt.) at 25, or challenge

Dr. Rosenberg's opinions as to how these bugs could cause driver distraction under real world

conditions, *id.* at 23.  Dr. Rosenberg's rebuttal report includes a chart that █████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████  confirming that Dr. Rosenberg's report should be admitted and Dr. Wood's

stricken.  Reply Ex. 6 (Rosenberg Rebuttal Rpt.) at 28-31, Table 1.

**F.    The Berman Declaration Should Not Be Excluded**

Ford's request that the Court strike the Berman Declaration is meritless.  *See* Opp'n at 60.

Ford does not object to the admissibility of the exhibits attached to the declaration, nor does it argue

that the declaration misstates the contents of those exhibits.  So there is no basis to exclude that dec-

laration to the extent it sets forth the classwide evidence from those exhibits that Plaintiffs will use

---

[60] *Id.* at 75:20-25, 118:2-6, 137:12-25.  According to the Affidavit of Morpace's Karyn Row-
land, "Morpace has been contracted by Ford to conduct hundreds of consumer studies over the
course of its decades-long relationship with Ford."  ECF No. 233, ¶ 3.

[61] *State Farm Fire & Cas. Co. v. Electrolux Home Prods.*, 980 F. Supp. 2d 1031, 1039 (N.D.
Ind. 2013) (Dr. Wood's analysis was "unreliable" where she relied on reports from an interested
party without "independently verifying the facts" or doing anything to "research the sources of the
information, how the data was compiled, or verify the reliability of the data.").

to establish liability and damages on a classwide basis. *See Ellis v. Costco Wholesale Corp.*, 657
F.3d 970, 982 (9th Cir. 2011) (when "analyzing commonality," a district court must assess "the
persuasiveness of the evidence presented.").

## IV.    CONCLUSION

Plaintiffs respectfully request that this Court grant their motion for class certification, except
for the Magnuson-Moss Warranty Act claims and the claim for common-law fraudulent conceal-
ment under Iowa law.

DATED:  May 2, 2016                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                       By: */s/ Steve W. Berman*
                                       Steve W. Berman (*pro hac vice*)
                                       Catherine Y.N. Gannon (*pro hac vice*)
                                       Tyler Weaver (*pro hac vice*)
                                       Craig R. Spiegel (122000)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       1918 Eighth Avenue, Suite 3300
                                       Seattle, WA  98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       E-mail:  steve@hbsslaw.com
                                       E-mail:  catherineg@hbsslaw.com
                                       E-mail:  tyler@hbsslaw.com
                                       E-mail:  craigs@hbsslaw.com

                                       Adam J. Levitt (*pro hac vice*)
                                       Jeffrey A. Almeida (*pro hac vice*)
                                       Kyle McGee (*pro hac vice*)
                                       GRANT & EISENHOFER P.A.
                                       30 North LaSalle Street, Suite 1200
                                       Chicago, IL  60602
                                       Telephone:  (312) 214-0000
                                       Facsimile:  (312) 214-0001
                                       E-mail:  alevitt@gelaw.com
                                       E-mail:  jalmeida@gelaw.com
                                       E-mail:  kmcgee@gelaw.com

                                       Roland Tellis (186269)
                                       Mark Pifko (228412)
                                       BARON & BUDD, P.C.
                                       15910 Ventura Boulevard, Suite 1600
                                       Encino, CA  91436
                                       Telephone:  (818) 839-2320
                                       Facsimile:  (818) 986-9698
                                       E-mail:  rtellis@baronbudd.com
                                       E-mail:  mpifko@baronbudd.com

Nicholas E. Chimicles (*pro hac vice*)
Benjamin F. Johns (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone:  (610) 642-8500
Facsimile:  (610) 649-3633
E-mail:  nick@chimicles.com
E-mail:  benjohns@chimicles.com

*Plaintiffs' Interim Co-Lead Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically via the Court's ECF system, on May 2, 2016. Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system.

DATED:  May 2, 2016                           HAGENS BERMAN SOBOL SHAPIRO LLP


By: ____*/s/ Steve W. Berman*_____
                STEVE W. BERMAN