1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

| | |
|---|---|
| IN RE | Case No.  13-cv-03072-EMC |
| MYFORD TOUCH CONSUMER LITIGATION. | **FILED UNDER SEAL** |
| | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS** |
| | Docket No. 202 |

8

9

10

11

12

13       Plaintiffs filed this class action claiming that Defendants ("Ford") sold them, and other

14  putative class members, vehicles with defective MyFord Touch ("MFT") systems, despite

15  knowing at the time of sale that the MFT systems were defective.  Ford moved to dismiss

16  Plaintiffs' Second Amended Complaint, *see* Docket No. 157, and the Court denied this motion in

17  part, Docket No. 175.  Plaintiffs subsequently filed a Third Amended Complaint.  Docket No. 183

18  ("TAC").

19       Plaintiffs moved to certify twelve classes on January 28, 2016.  *See* Docket No. 196-5

20  ("Motion").[1]  Each class is defined as "[a]ll persons or entities who purchased or leased a Ford or

21  a Lincoln vehicle in [the applicable state] from Ford Motor Company or through a Ford Motor

22  Company dealership before August 9, 2013, which vehicle was equipped with a MyFord Touch or

23  MyLincoln Touch in-car communication and entertainment system."  *See* Notice of Mot. at 1-4.

24  Plaintiffs also sought to have all classes represented by Hagens Berman Sobol Shapiro LLP;

25  Baron & Budd, P.C.; Grant & Eisenhofer P.A.; and Chimicles & Tikellis LLP.  *Id*. at 4.  Ford

26

27  ───────────────

28  [1] The Motion seeks certification of classes of purchasers from Arizona, California, Colorado,
Iowa, Massachusetts, New Jersey, New York, North Carolina, Ohio, Texas, Virginia, and
Washington.

**United States District Court**
For the Northern District of California

1  opposed this motion, *see* Docket No. 219-3 ("Opposition"), and filed a Surreply to Plaintiffs'

2  Reply in support of the Motion.

### I.  BACKGROUND

4      Plaintiffs are nineteen individuals and one organization residing in twelve different states.

5  *See* TAC.

6      Plaintiffs each purchased at least one vehicle from Defendant Ford Motor Company that

7  was equipped by Ford with an "infotainment system" known as MyFord Touch.  The gravamen of

8  the numerous allegations pleaded over 153 pages in Plaintiffs' complaint is that Ford sold

9  Plaintiffs and other putative class members vehicles with defective MFT systems, despite Ford's

10  knowledge at the time of sale that the MFT system it had designed was seriously unsound.

11  Plaintiffs allege these defects would often render certain features of their vehicles completely

12  inoperable, because these features were controlled solely by the MFT system and could not be

13  manually operated.  *See* Docket No. 183 ("TAC") ¶ 228.

14      Plaintiffs explain that the MFT

> consists of two or three LCD screens (the primary screen being a
> touchscreen) that are powered by an operating system known as
> Ford SYNC.  The screens are the gateway between the user and the
> vehicle's safety, navigation, communications, entertainment and
> climate control features. Among other operations, MyFord Touch
> allows the vehicle owner to operate the audio systems in the vehicle;
> use the GPS navigation technology; control the climate systems in
> the vehicle, including defrosters; operate the rearview, or back up,
> camera; operate the adaptive cruise control; and operate a Bluetooth-
> enabled mobile telephone or other device, with the touch of a
> fingertip. In addition, MyFord Touch dials 9-1-1 when it detects that
> the vehicle has been involved in an accident and reports the
> vehicle's location so that emergency services providers can respond
> immediately, even when the occupants of the vehicle cannot call for
> help.

23  TAC ¶ 3.  Ford "aggressively promoted" the MFT system, including in particular its safety,

24  communication, and entertainment features, in various ways – *e.g.*, on its website, through

25  advertisements (including print and television), and through dealerships.  TAC ¶ 3.

26      MFT is powered by an operating system known as Ford SYNC.  *See* TAC ¶ 3.  Ford

27  SYNC is also the name of the earlier, first generation of the MFT system.  *See* TAC ¶ 198.  "Ford

28  designed and developed SYNC with Microsoft and installed the original Sync system in Ford

vehicles in 2007." *Id.*

"In January 2010, hoping to capitalize on the success of SYNC, Ford announced that it would be launching a second generation of SYNC called [MFT].  [MFT] was a much more comprehensive technology which utilized Ford SYNC as the operating system, but included many more features than had been available with the initial versions of Ford SYNC."  TAC ¶ 200.  Ford aimed to employ MFT in all of its vehicles, not just its higher-end vehicles.  *See* TAC ¶ 202.  The rollout of the MFT system began in 2010 (*i.e.*, for 2011 model vehicles).  *See* TAC ¶ 204.  "Currently, more than 10 million Ford vehicles contain [MFT]."  TAC ¶ 204.  In a June 2013 press release, Ford stated that, "combined, Sync and [MFT] systems are sold on 79 percent of new 2013 Ford vehicles."  TAC ¶ 205.

Ford charges a premium for the MFT system.  "Including the MyFord Touch system in a Ford vehicle adds approximately $1000 to a new vehicle purchase."  TAC ¶ 18.

However, according to Plaintiffs, there are serious problems with the MFT system. Plaintiffs underscore that "in November 2012, Ford reported 400 problems with the [MFT] for every 1000 vehicles.  That was an improvement over the problems earlier in 2012 when Ford reported a 'things-gone-wrong' rate for its [MFT] system of 500 for every 1000 vehicles."  TAC ¶ 267.

Plaintiffs have identified various problems with the MFT system:

> Descriptions of the failures include consistent and uniform symptoms which are experienced by virtually all MyFord Touch users, including, most dramatically, the system freezing up or crashing altogether. When the system freezes or crashes, the driver cannot operate any of the features connected to MyFord Touch, including the navigation technology, the radio, and important safety features such as the rearview camera or defroster. Typically, the screen will go dark, and will come back on saying it is "performing scheduled system maintenance." In fact, it is simply malfunctioning. Other complaints include: the screen randomly but frequently "blacks out;" the system will not respond to touch or voice commands; the system will not connect to the owner's mobile phone or other peripheral device; the rearview camera will lock up; the navigation system will provide inaccurate directions and/or misread the location of the vehicle. The problems cross all models and model years.

TAC ¶ 7.

**United States District Court**
For the Northern District of California

3

According to Plaintiffs, in spite of the TSBs and software updates, Ford still has not fixed the problem with MFT – this in spite of the fact that, at the very least, there is an express limited warranty on each vehicle.  A copy of the relevant limited warranty has been provided to the Court in previous briefings.  *See* Docket No. 57-2 (RJN, Ex. A) ("Limited Warranty").  The Limited Warranty provides, in relevant part, as follows:

> Under your New Vehicle Warranty if:
> – your Ford vehicle is properly operated and maintained, and
> – was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, *repair, replace, or adjust* all parts on our vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> This warranty does not mean that each Ford vehicle is defect free.  Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs.  For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.
>
> The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts.  *This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner.*  Ford's liability, if any, shall in no event exceed the cost of correcting manufacturing defects as herein provided and upon expiration of this warranty, any such liability shall terminate.
>
> . . . .
>
> Nothing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type of design than the original part, so long as the vehicle functions properly with the replacement part.  Moreover, Ford and its authorized dealers are entitled to a reasonable time and a reasonable number of attempts within which to diagnose and repair any defect covered by this warranty.

Limited Warranty at 8-9 (emphasis added).  In previous Orders, the Court dismissed claims where the named plaintiffs admitted they had not taken their vehicles in for repair, as required by the warranty.  *See, e.g.*, Docket No. 175 at 8.

Plaintiffs have withdrawn their motion for certification as to "the Magnuson-Moss

4

Warranty Act claims and the claim for common-law fraudulent inducement under Iowa law." Reply at 30, 35.  The Magnuson-Moss Warranty Act was the only claim brought on behalf of the nationwide class, TAC at 87, so Plaintiffs appear to no longer be seeking certification of a nationwide class.

## II.   DISCUSSION

A.   Defendants' Motion to Exclude Plaintiffs' Experts

Defendants argue that Plaintiffs' experts' testimony should be excluded for failure to meet the requirements of Federal Rule of Evidence 702.  *See* Opp. at 48 (citing Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).  The Court disagrees.

1.   Legal Standard

The Federal Rules of Evidence permit an expert to testify where he or she "is qualified as an expert by knowledge, skill, experience, training, or education" and his or her testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods; and" "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The expert's testimony must "be both relevant and reliable." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).

That expert evidence must be both reliable and relevant was made clear in *Daubert*.  509 U.S. at 590-91, 597.  "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  "The relevance prong under *Daubert* means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Henricksen v. ConocoPhillips Co.*, 605 F.Supp.2d 1142, 1154 (E.D. Wash. 2009).  Because Plaintiffs are the proponents of the expert testimony, it is their burden to prove admissibility. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

United States District Court
For the Northern District of California

2.  Plaintiffs' Economic Experts

Plaintiffs offer two economic experts, Drs. Arnold and Boedeker.

Dr. Arnold used data produced by Ford to calculate the revenue Ford received for sales of the MFT system with and without a navigation feature, and the economic loss suffered by consumers who purchased an MFT vehicle with and without the navigation feature.  *See* Ex. 186 at 5.  Dr. Arnold assumes that the economic loss suffered by each consumer equals the price he or she paid for the MFT system; that is, his calculations assume that the MFT is irretrievably defective and consumers receive no value whatsoever for it.  *See id*. at 15-16.  Accordingly, he calculated that consumers were harmed in the amount of $625 if they purchase the MFT without the navigation feature, and $1,364 if they purchased it with navigation.  *See id*.

Dr. Boedeker conducted a survey and employed a conjoint analysis to infer the value customers placed on the MFT at the time of purchase, how this value would have changed had customers known of the MFT's defects, and how this value would have changed if customers knew these defects may affect their ability to safely operate their vehicles.  *See* Ex. 185 at 33.  Conjoint analysis operates on the principle that "consumers' preferences for a particular product are driven by features or descriptions of features embodied in that product."  *Id*. at 15.  It measures how consumers value a product's various attributes.  Consumers are given a survey, and "shown product profiles with different levels of each attribute."  *Id*. at 16.  They "indicate their preferences" for the various profiles, "for different price points for each set of features."  *Id*.  This data is then interpreted to assign each attribute its share of the value given to the entire product.  *Id*.  Dr. Boedeker concluded that consumers value a properly functioning MFT at $1,390, that a defective MFT was worth $729 less than a functioning MFT, and that an MFT that was so defective as to affect safety was worth $839 less than a functioning MFT.  *Id*. at 33-34.

Dr. Arnold has advanced degrees in business, has taught economics, and works at Compass Lexecon applying economic models to damages.  Dr. Boedeker has advanced degrees in statistics and economics, and 25 years of experience applying economic, statistical, and financial models.  Both are qualified to testify as experts, and Ford does not argue that these experts lack specialized knowledge, or that they testify outside their expertise.  *See* Opp. at 23-28.  Instead, it

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    argues the experts' methodologies are unreliable.  *Id*. at 24.

2          Ford first argues that Plaintiffs' economic experts improperly assumed that "every MFT

3    vehicle . . . was uniformly 'defective' when sold and remains so."  *Id*.  But such an assumption

4    does not show that the experts' methodologies were unreliable.  As Ford noted repeatedly

5    throughout its Opposition, Plaintiffs' theory is that the vehicles were uniformly defective.  *See id*.

6    at 5, 7 (quoting Mot. at 1, 2).  Whether this is true or not is a fact in dispute.  As the comments to

7    Federal Rule of Evidence 702 explain, "[w]hen facts are in dispute, experts sometimes reach

8    different conclusions."  Federal Rule of Evidence 702 cmt. to 2000 amend.  But a trial court is not

9    "authorize[d] . . . to exclude an expert's testimony on the ground that the court believes one

10    version of the facts and not the other."  *Id*.  The Court could exclude opinions based on

11    assumptions that are "indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331

12    (5th Cir. 1996).  However, that the vehicles may have been uniformly defective in a material way

13    is not (at this juncture) indisputably wrong.

14          Dr. Boedeker's "willingness to pay" [2] calculation compared "the value of obtaining a

15    vehicle with the [MFT] at the point of purchase compared to obtaining an otherwise identical

16    vehicle that does not have the system."  Pls.' Ex. 185 at 27 (calculating the "willingness to pay" as

17    $1,390).  Dr. Boedeker's survey-based study examined what consumers would have been willing

18    to pay for a defect-free system at the time of purchase, to what they would have been willing to

19    pay for a defective system.  *Id*. at 34.  This measures damages according to the benefit of

20    Plaintiffs' bargain.  That a consumer would be willing to pay less for a defective system than a

21    perfectly operating system and the data upon which Dr. Boedeker based his calculations are not

22    "indisputably wrong."

23          Dr. Arnold's calculations assume that all the money paid by class members for their MFT

24    systems is a loss; in other words, the MFT system had no value whatsoever at the time of

25    purchase.  This assumption is contradicted by Ford's evidence that Plaintiffs still use the MFT's

---

[2] Dr. Boedeker went on to explain that the amount a consumer would have been willing to pay for the system is not necessarily the same amount the consumer actually paid.  For example, a consumer may have gotten a deal which enabled him or her to purchase the MFT for less than what he or she thought it was worth.  Pls.' Ex. 185 at 28.

navigation, Bluetooth, and backup camera features, *see* Ex. 37, suggesting that MFT, for all its alleged faults, had some utility and residual value.

Moreover, Dr. Arnold's assumption seems inconsistent with the evidence presented by Dr. Boedeker.  Dr. Boedeker established that the "implicit price" of a perfect MFT system was $1,390, and the "implicit price" of a defective system was $729 or $839 less than that, depending on what a consumer was told about safety ramifications of the defect.  *See* Pl.'s Ex. 185 at 33.  Thus, he found that consumers were still willing to pay at least $551 for a defective MFT system.  *Cf. Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and *what a reasonable consumer would have paid at the time of purchase* without the fraudulent or omitted information.") (emphasis added).

Nonetheless, the Court cannot find at this juncture that Dr. Arnold's assumptions are indisputably wrong.  For instance, although some consumers may use certain features of the MFT system, it is possible that as a whole, because it caused so many problems, consumers if given a chance would have preferred not to have it at all, thus making it worth $0.  Also, Dr. Arnold's calculation of the average price paid by each consumer for the MFT appears to be based on reliable methods and sufficient data, and will prove helpful to the trier of fact.  At this juncture, his testimony will not be excluded.

3.    Human Factors Expert

Ford next attacks Dr. Rosenberg, Plaintiffs' human factors expert.  Plaintiffs used Dr. Rosenberg's report to argue that the MFT was distracting to drivers, Mot. at 16, 27, that this distraction presented  "a significant safety hazard," *id*. at 16, 27, and that this safety hazard was material to consumers, *id*. at 27.

Dr. Rosenberg opines that the MFT's problems "lead to undue time and attention, excessive task demand, overly complicated mental models, and mistrust of the system, which result in driver distraction from the task of driving and cause a significant safety issue."  Pls.' Ex. 8 at 219.  Overall, the distractions posed by the MFT "increase[] the risk of a crash with the associated risk of injury or death."  *Id*. at 220.

Dr. Rosenberg has degrees in engineering and human factors, and extensive work experience in those fields. *Id.* at 3. He was a consultant to the Boeing Company "for over 16 years as a senior human factors engineer, user interface designer, and software architect." *Id.* Although he has not worked specifically with automobiles, he has designed software and user interfaces in the fields of "missile defense, homeland security, battle command management, networking and communications, air traffic control, location-based services, and Unmanned Aerial Vehicle ('UAV') command and control." *See id.* He has broad engineering and human factors expertise. His testimony about various technical problems with the MFT falls generally within his engineering expertise. Whether a system would distract a user from the user's primary task also fall within Dr. Rosenberg's expertise in human factors and user interface design.

As to whether the MFT renders a vehicle unsafe, Dr. Rosenberg does not - quite - state that the MFT renders a vehicle absolutely *un*safe. Instead, he opines that the MFT causes distractions, which combine to make the vehicle *less* safe that it would be were the MFT not to distract the driver. *See* Pls.' Ex. 8 at 30 (MFT "is likely to create safety issues"); 70 (MFT issues "reduc[e] any driver's ability to operate a [MFT]-equipped vehicle safety"); 95 (problems with the navigation system have "safety implications"); 99 (climate control defects "can result in safety issues"); 114 (the accumulation of problems "has safety implications"); 148 (problems with the back button "could lead [to] safety implications"); 176 (keypad issues "may lead to safety implications"); 214 (blurred button "well may lead to safety issues"); 218 (the "numerous issues" have "varying impact on safety"). The data he cites and the methodology used to derive this conclusion is sufficiently reliable under *Daubert*. Moreover, that the MFT poses significant distractions, and that those distractions make a vehicle with MFT less safe than one without, falls within Dr. Rosenberg's area of expertise. The Court will therefore not exclude Dr. Rosenberg's opinion that the MFT reduces safety by posing significant distractions and that these distractions can cause unsafe driving conditions.

### 4. Ford's Expert Wood

Ford relies on the expert opinion of Dr. Wood for the proposition that vehicle prices and customer satisfaction with the MFT varies per person, Opp. at 8, 9-10, that the MFT had varying

**United States District Court**
For the Northern District of California

1    importance in purchasing decisions, *id*. at 21, that different plaintiffs had different information

2    going into negotiations for an MFT-equipped vehicle, *id*. at 29, and that the errors Plaintiffs'

3    expert opines on could have been detected during a test drive, *id*. at 49.  Plaintiffs do not challenge

4    Dr. Wood's expertise,[3] but argue her opinion "should be excluded for lack of foundation."  Reply

5    at 33.

6            In reaching her opinion, Dr. Wood relied on customer satisfaction surveys conducted by a

7    third party.  Defs.' Ex. 43 at 5, 9, 10, 13.  She also relied on depositions of Named Plaintiffs.  *See*

8    *id*. at 4-11, 13, 14, 18, 24.  Plaintiffs argue that Dr. Wood's opinion is unreliable because she did

9    not interview class members, conduct her own survey, or review the accuracy and

10   representativeness of the survey data.  Reply at 34.  The Court will not exclude Dr. Wood for

11   having relied on surveys.  First, it is hard to see how anyone could determine the satisfaction of or

12   the features viewed as important by Ford's customers without asking them.  The surveys Dr.

13   Wood relies on appear to have done just that, and thus are proper foundation for her opinion.

14   Second, one of Plaintiffs' economic experts also relied on surveys conducted by others, and used

15   this survey to estimate the value Ford's customers placed on perfectly and poorly functioning

16   MFT systems.  *See* Pls.' Ex. 185 at 5, 20 (stating that Dr. Boedeker relied on a "survey conducted

17   by Amplitude Research," which appears to have been "design[ed] and host[ed]" by Amplitude

18   Research as well).  Plaintiffs cannot ask their expert to rely on surveys in order to reach

19   conclusions about Ford's customers' views, and then seek to exclude Ford's expert for doing the

20   same, absent a sound basis for distinguishing between them.

21           Plaintiffs also argue that Dr. Wood cannot opine about what MFT bugs were discoverable

22   during a test drive, because she had not spent as much time in the class vehicles as Dr. Rosenberg.

23   Reply at 34.  What Dr. Wood's report actually says is that Dr. Rosenberg discovered MFT bugs

24   "based on his own inspection," which suggests that the issues "could be apparent to prospective

25   owners or lessees test driving" a class vehicle, and notes that Dr. Rosenberg himself "testifie[d] in

26

27   ───────────────

28   [3] Dr. Wood has a B.A. and Ph.D. in psychology from Stanford, and has worked in human factors
     since 1988, studying safety-and health-related information's effects on human behavior since
     1991.  *See* Defs.' Ex. 43 at 1.

his deposition that all of the bugs he encountered would be discoverable . . . during a test drive." Defs.' Ex. 43 at 8.  Plaintiffs do not argue that Dr. Wood's paraphrasing is inaccurate, and the Court will not exclude Dr. Wood's opinion based on her paraphrasing Plaintiffs' expert.

Finally, Plaintiffs argue that Dr. Wood "has no basis to . . . challenge Dr. Rosenberg's opinions as to how these bugs could cause driver distraction." Reply at 34.  Dr. Wood cites surveys conducted by the NHTSA (a resource on which Dr. Rosenberg also relies), and testimony from Named Plaintiffs, for the rather unremarkable observation that people react differently when faced with distractions. Defs.' Ex. 43 at 23-24.  She cites Dr. Rosenberg's report for the same proposition. *Id.* at 24.  The Court presumes that Plaintiffs do not intend to argue that their testimony, or the opinion of their expert, is unreliable.  As both sides' experts believe information from the NHTSA is reliable, this appears to be a proper foundation for Dr. Wood's opinion.  Dr. Wood appears to have applied her human factors expertise to interpret this data to reach her conclusion.  The Court cannot conclude that it is so unreliable as to warrant exclusion under *Daubert*.

Accordingly, the Court will not exclude Dr. Wood's opinion.

5.     Ford's Objections to Plaintiffs' Reply

In addition to moving to exclude Plaintiffs' experts, Ford filed multiple objections to evidence included in Plaintiffs' Reply brief. *See* Docket No. 258.

Ford objects to new opinions included in the surrebuttal reports of Plaintiffs' experts Mr. Smith, Dr. Rosenberg, and Mr. Boedeker, contending these opinions were not present in the original report. *See id.* at 1, 3, 4.  In setting the briefing schedule for the class certification motion, the parties stipulated that Plaintiffs might file "rebuttal expert disclosures" along with their reply brief. *See* Docket No. 186 at 2.  Because these opinions are proper rebuttal of Ford's arguments and experts, Ford's objection is overruled.

Ford's objection that Mr. Smith makes statements about Ford's expert Dr. Kelly, which Ford contends are untrue and should be stricken is overruled.  The challenged statements are not material to the matters resolved herein.  The same goes for Ford's objection that Plaintiffs' characterization of Dr. Taylor's statements.

**United States District Court**
For the Northern District of California

B.      Analysis of Plaintiffs' Motion to Certify the Classes

      1.      Legal Standard

Before a class may be certified, courts require plaintiffs to show, "as a threshold matter," that an "identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009). If this requirement is met, a court will next ask whether

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class

Fed. R. Civ. P. 23(a). These requirements are frequently referred to as numerosity, commonality, typicality, and adequacy. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If Plaintiffs demonstrate they have identified an ascertainable class and meet the requirements of Rule 23(a), Plaintiffs must show they also satisfy at least one prong of Rule 23(b). *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Here, Plaintiffs seek certification under Rule 23(b)(3). Mot. at 2. Plaintiffs must thus show that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3). In evaluating the predominance and superiority factors, the Court must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.* It is Plaintiffs' burden to demonstrate they meet Rule 23's requirements. *See Howard v. CVS Caremark Corp.*, 628 F. App'x 537 (9th Cir. 2016).

2.    <u>Ascertainability</u>

Plaintiffs "must demonstrate that an identifiable and ascertainable class exists." *Mazur*, 257 F.R.D. at 567.  Plaintiffs' class definition must be such that the Court may determine membership by referencing objective criteria.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 614 (N.D. Cal. 2015).  The class description must also be sufficiently definite that the court may "ascertain whether an individual is a member." *Id.*

Plaintiffs argue that the classes here are "readily ascertainable" because they require only that a class member have "purchased or leased a particular vehicle containing MFT through Ford or a Ford dealership prior to August 9, 2013."  Mot. at 19.  Plaintiffs claim the identity of class members may be ascertained from Ford's records, because Ford's internal database permits Ford to identify customers with "SYNC, or SYNC with MyFord Touch, or now SYNC 3." *Id.*  Ford does not seriously contest Plaintiffs' argument, stating only that it does not maintain records for used cars.  Opp. at 42.

The classes sought to be certified are ascertainable.  Ford maintains records of persons who purchased Ford vehicles.  While ascertaining whether someone has purchased a used vehicle would be problematic if the vehicle were purchased directly from another consumer, or from a non-Ford dealer following a trade-in, these consumers are expressly excluded from the classes. *See* Mot. at 1-4 (limiting the classes to persons "who purchased or leased a Ford or a Lincoln vehicle . . . *from Ford Motor Company* or *through a Ford Motor Company dealership*.").  If Ford failed to maintain proper records, this should not be held against Plaintiffs. *See Melgar v. CSk Auto, Inc.*, No. 13-CV-03769-EMC, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015).

Moreover, even if Ford's records were inadequate, class members may self-identify by filing an affidavit. *See id.*  This means of identifying class members is not likely to be, as Ford argues, "unreliable or 'administratively infeasible.'"  Opp. at 42.  Vehicles are a large expense consumers are likely to remember making, and so consumers will likely be able reliably to self-identify. *See In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 2758598, at *15 (N.D. Cal. June 17, 2014) (court required proof of purchase, or affidavit).

3.      Rule 23(a) requirements

     a.      Numerosity

Ford does not argue that Plaintiffs' proposed classes are not numerous, *see generally* Opp., and Plaintiffs have stated that the smallest class has over 15,000 members, *see* Mot. at 20.  This element therefore has been met.

     b.      Commonality

For Plaintiffs to maintain this class action, there must be "questions of law or fact common to the class."  Fed. R. Civ. Proc. 23(a)(1).  In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court recognized that "[w]hat matters to class certification ... is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  564 U.S. 338, 350 (2011) (citation and internal quotation marks omitted).  However, the Court also recognized that "even a single common question will do."  *Id.* at 359.  Here, Plaintiffs identify ten common issues:

    (1)     the claims brought for each State Class . . . involve the same alleged defect;

    (2)     the existence of that defect will be proven with generalized, class-wide evidence;

    (3)     whether a reasonable consumer would want to know that Ford considered MFT to be a 'polished turd' and its software fixes were 'like lipstick on a pig';

    (4)     whether Ford knowingly sold vehicles equipped with a defectively designed MFT system;

    (5)     whether that systemic defect is responsible for critical safety hazards such as distracted driving;

    (6)     whether Ford had a duty to disclose the existence of the defect and/or its knowledge thereof;

    (7)     whether Ford adequately disclosed the existence of the defect and/or its knowledge thereof;

    (8)     whether the facts not disclosed by Ford were material;

    (9)     whether Plaintiffs and other members of the State Classes were injured as a result of Ford's failure to disclose the defect; and

(10)   whether the members of each State Class are entitled to damages and/or other relief as a result.

Mot. at 21. Ford does not argue that none of these questions have common answers, instead arguing that "*many* questions critical to these claims have no common answers." Opp. at 11 (emphasis added). That, however, is not the test. Rather, Plaintiffs need only identify "a single common question." *Wal-Mart Stores*, 564 U.S. at 359. If one or more such questions yield common answers which can drive the litigation, commonality is satisfied. *Id*. at 350.

At least two of the questions above – whether Ford knowingly sold defective systems and whether Ford had a duty to disclose – may be answered as to all class members and may "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 350. Both focus on Ford's behavior rather than on Plaintiffs'. If Ford knew about the alleged MFT defects and sold its cars anyway, then it had that knowledge as to sales to all Plaintiffs; if Ford did not know, then it lacked that knowledge as to all Plaintiffs. The question of whether or not Ford knew about the MFT defects goes to whether Plaintiffs can state a claim for fraud, as "knowledge of falsity" is a common element for fraud. *See, e.g., Hoey v. Sony Elecs. Inc.*, 515 F. Supp. 2d 1099, 1104 (N.D. Cal. 2007) (discussing elements of California fraud claim). As Plaintiffs plead fraud for every subclass, the answer to this question is common to all subclasses.

Because Plaintiffs have identified common questions susceptible to common answers, the Court finds that Plaintiffs have fulfilled this requirement.

### c.   Typicality

Ford argues that Named Plaintiffs are not typical because Plaintiffs seek to assert claims the Court has already dismissed as to Named Plaintiffs; because Plaintiffs assert classwide liability theories that do not match Named Plaintiffs' facts; and because Plaintiffs' claims are subject to unique defenses. Opp. at 42.

#### i.   Dismissed Claims

In their Reply, Plaintiffs withdrew their request for certification of the Magnuson-Moss Warranty Act claims and their claim for fraudulent inducement on behalf of the Iowa class. Reply at 30. With regard to Plaintiffs' New York breach of express warranty claim, Plaintiffs correctly note that the Court did not dismiss this claim. *See* Docket No. 175 at 3 n.1. Since Plaintiffs have

1    withdrawn their nationwide claims, as well as an Iowa claim that was not included in the TAC, the

2    only claims remaining are on behalf of the state classes.

3                            ii.        Unmatching Theories

4    Ford identifies two "common" defects Named Plaintiffs did not experience (miscalculation

5    of GPS location for certain features, and inconsistent operation of climate control buttons), as well

6    as several problems Named Plaintiffs experienced that may be unrelated to the alleged software

7    issues.  Opp. at 43.  Ford appears to argue that, because Named Plaintiffs did not experience

8    precisely the same problems as every other class member, Named Plaintiffs are not typical.  *Id.*

9    However, Rule 23(a)(3) does not require all representative claims perfectly match.  It only requires

10   Named Plaintiffs' claims to be "reasonably co-extensive with those of absent class members; they

11   need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

12   1998); *accord Staton v. Boeing Inc.*, 327 F.3d 938, 957 (9th Cir. 2003).  The typicality

13   requirement is "satisfied when each class member's claim arises from the same course of events,

14   and each class member makes similar legal arguments to prove the defendant's liability." *Stearns*

15   *v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (emphasis added).

16   In *Parsons v. Ryan*, the Ninth Circuit affirmed the district court's finding of typicality

17   where the named plaintiffs (prison inmates in Arizona), "like all other members of the putative

18   class," claimed they were "exposed . . . to a substantial risk of serious harm by" challenged

19   policies.  754 F.3d 657, 685-86 (9th Cir. 2014).  The court held "[i]t does not matter that the

20   named plaintiffs may have in the past suffered varying injuries or that they may currently have

21   different health care needs."  *Id.* at 686.  What mattered was that each class member was likely to

22   need health care at some point, and that they faced "a substantial risk of serious harm resulting

23   from exposure to the defendants' policies and practices governing health care."  *Id.*

24   As in *Parsons*, the differences that may exist between Named Plaintiffs' experience and

25   the class claims are not clearly material to their basic legal claims against Ford for purposes of

26   determining typicality.  At base, all Plaintiffs claim that they paid money expecting MFT to work,

27   and that it did not work.  All claim to have purchased a substantially defective product and, while

28   not identical, the range of features Plaintiffs claim were affected is allegedly materially the same.

**United States District Court**
For the Northern District of California

While Ford otherwise contends that the defects varied over the course of various software fixes and that there were material differences, as discussed in greater detail below, Plaintiffs have made a sufficient showing at this stage that the defects remained materially similar so as to permit class certification.  Named Plaintiffs thus "have the same or similar injury" as other members of the class: they paid money for a substantially defective product.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) ("The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation omitted).  And the nature of the alleged wrongful conduct by Ford is alleged to be materially the same:  all Plaintiffs allege that Ford misrepresented the abilities of the MFT system which was substantially defective, and then attempted to conceal that system's defects.  *Id.*  Class members have allegedly been injured by "the same course of conduct": though the injury might vary somewhat, all Plaintiffs were harmed by Ford's alleged misrepresentations about the MFT system in a sufficiently comparable way as to satisfy typicality.  *Id.*

### iii.   Unique Defenses

Ford asserts five Named Plaintiffs are subject to unique defenses, and thus are not typical of the class.  Opp. at 44-46 (arguing Ford has unique defenses against Plaintiffs Rizzo (one of two New Jersey class representatives), Rodriguez (one of two Texas representatives), Miller (one of two New York representatives), Fink (the only North Carolina representative), and Kirchoff (the only Washington representative)).

In *Hanon v. Dataproducts Corp.*, the Ninth Circuit explained that "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  976 F.2d 497, 508 (9th Cir. 1992).  Because the named plaintiff in such a case would need to "prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class," he was not typical and the class could not be certified.  *Id.*  Here, some of the putative named Plaintiffs are atypical in facing particular defenses, but this does not defeat certification because their unique defenses will not involve substantial resources.  *See Herkert v.*

17

*MRC Receivables Corp.*, 254 F.R.D. 344, 350 (N.D. Ill. 2008) ("To the extent there may be some unique defenses applicable to certain class members, there is no evidence that resolution of these individual issues will consume more time or resources than the resolution of the common issues in the case.").

Ford argues that Plaintiff Rizzo's claims are barred because he has admitted the MFT was not material to him, and because his claims are barred by res judicata. Opp. at 44-45. Plaintiffs do not respond to the latter argument, Reply at 31, and Ford presents evidence that Plaintiff Rizzo's claims are in fact barred. Because res judicata is likely to be a unique defense that will require preparation separate from Plaintiffs' other preparation, Plaintiff Rizzo is not a typical class representative under *Hanon*. He therefore cannot represent the New Jersey class. However, because Plaintiff Matlin can still represent that class, this does not preclude certification.

Plaintiff Rodriguez purchased a second MFT vehicle for his sister after experiencing problems with his first one. Opp. at 45. Ford contends this shows that MFT issues were not material to him. *Id.* However, this argument's logical extension is that the MFT problems were not material to any class member who continued to use his or her Ford vehicle after experiencing MFT issues. Because purchasing an MFT vehicle for someone else does not necessarily demonstrate immateriality any more than continuing to use an MFT vehicle (which many class members do, *see generally* TAC), Plaintiff Rodriguez is not so atypical as Ford contends.

Ford argues that Plaintiff Fink is not typical because he never sought repair on his vehicle's MFT, and so his breach of express warranty claim cannot be maintained. Opp. at 46. Ford is correct that the Court previously dismissed claims for breach of an express warranty where the plaintiff did not present his vehicle for repair (thus allowing Ford to cure). Docket No. 175 at 8. Because Plaintiff Fink never sought repair, he lacks standing to pursue a claim for breach of an express warranty. He thus cannot represent other class members with respect to this claim. However, Ford has not challenged Plaintiff Fink's ability to represent the North Carolina class on its three other claims (Unfair and Deceptive Trade Practices Act, Implied Warranty of Merchantability, Fraudulent Concealment), and so the class can likely still be certified as to those claims.

Ford challenges Plaintiff Kirchoff on credibility grounds.  Opp. at 46.  This Court has stated that credibility issues will defeat typicality only where those credibility problems are directly relevant to the issues in the case, and are "so sharp as to jeopardize the interests of absent class members."  *See Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010). Here, Ford asserts that Plaintiff Kirchoff has stated he "was not upset about the MFT," and that he "sues companies for sport," apparently seeking to imply that Plaintiff Kirchoff could not in good faith argue that the MFT was material to him.  Opp. at 46.  But any statement that Kirchoff "was not upset about the MFT" does not mean the defect was immaterial.  The fact that MFT issues did not "upset" Plaintiff Kirchoff does not mean that MFT did not factor into his decision-making. Nor is Plaintiff Kirchoff's statement that he "sues companies for sport and enjoys it" a reason to find him an inadequate representative.  *See* Mot. at 46 (quoting April Carmen Decl. ¶¶ 8-12).  This statement appears to have been made during a customer service call, which is only roughly summarized in Defendants' exhibit.  *See* Docket No. 232, Ex. A.  There is little context to suggest whether Plaintiff Kirchoff made this statement in earnest, in jest, or out of frustration with the customer service experience.  *See id.*  Moreover, Ford has not provided any evidence to suggest that Plaintiff Kirchoff is a vexatious litigant.  *See De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990) ("We recognize . . . 'the inherent power of federal courts to regulate the activities of abusive litigants . . . .'") (citation omitted).  The alleged comment is not inherently disqualifying, and in any event, this defense would not be time-consuming.

Plaintiff Miller was purportedly aware of MFT issues before leasing his MFT vehicle and so, according to Ford, could not have been defrauded.  Opp. at 45-46.  Plaintiffs state they are withdrawing their certification motion as to Plaintiff Miller's "claim for fraudulent concealment under Iowa law."  Reply at 31 n.57.  However, "Plaintiff Miller" appears to represent New York. TAC ¶ 125.  The Court will therefore construe Plaintiffs' statements as a withdrawal of the fraudulent concealment claim under New York law.

         d.     <u>Adequacy</u>

In evaluating adequacy, the Court must ask whether the named plaintiffs and counsel have "any conflicts of interest with other class members," and whether named plaintiffs and their

United States District Court
For the Northern District of California

1  counsel will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020.

2  Ford argues that Named Plaintiffs have conflicts of interest with the would-be class members that

3  will prevent adequate representation.  Opp. at 47.

4       First, Ford argues that Named Plaintiffs cannot adequately represent the interests of the

5  class because they "have strategically shaved off certain claims."  Opp. at 47.  Ford refers to state

6  Lemon Law programs, and warranty claims in Colorado, Arizona, Texas, and Ohio.  *Id*.  However,

7  it does not appear that Plaintiffs ever pled Lemon Law claims, so Ford cannot accuse them of

8  "shaving off" those claims solely for purpose of bringing a class action.  *See generally* Docket

9  Nos. 1-1 (Complaint), 47 (First Amended Complaint), 154 (Second Amended Complaint).  Nor

10  did Plaintiffs "shave off" the warranty claims.  The Court dismissed them, after Ford moved for

11  dismissal on those claims.  *See* Docket No. 97.

12                    i.   <u>Conflict</u>

13       Next, Ford argues that Named Plaintiffs are inadequate representatives because there is an

14  inherent conflict of interest between purchasers of new and used vehicles.  Opp. at 47.[4]  "[E]ither

15  the alleged "damage" was passed through from the new vehicle purchaser to the used vehicle

16  purchaser, leaving the first purchaser uninjured, or the new vehicle purchaser absorbed the cost of

17  the defective system, leaving the used vehicle purchaser uninjured."  *Id*. at 47-48.  To support this

18  pass-through argument, Ford cites *Sanneman v. Chrysler Corp.*, where the named plaintiff was a

19  used-car purchaser who admitted she was not representative of "original owners" of vehicles.  191

20  F.R.D. 441, 448 (E.D. Pa. 2000).  Because the class was defined as "original and current

21  owner[s]" and previous owners, and she was the current but not original owner of her vehicle, she

22  did not meet the class definition.  *Id*.  The court dismissed for failure to satisfy Rule 23(b).

23  Although the court observed that the conflict would have made certification of the proposed class

---

[4] Of the nineteen Named Plaintiffs, eleven purchased new vehicles.  *See* TAC ¶¶ 23, 36, 59 (three California class representatives purchased new vehicles), ¶ 66 (Arizona), ¶ 66 (Massachusetts), ¶ 140 (North Carolina), ¶ 148 (Ohio), ¶¶ 155 (two Texas representatives), ¶ 179 (Virginia), ¶ 187 (Washington).  One purchased a used vehicle.  *See* TAC ¶ 49 (Watson, for the California class). The remaining Named Plaintiffs either leased new vehicles, *see* TAC ¶¶ 109, 116, 125, 132, or it is not specified in the Complaint whether they purchased new or used vehicles, *see id*. ¶¶ 73, 79, 172.

1   impossible, that statement was in dicta.  *Id.*

2       The pass-through problem Ford raises more commonly appears in antitrust litigation.  In *In*

3   *re Methionine Antitrust Litigation*, plaintiffs proposed a class that included individuals who had

4   purchased a price-fixed product from direct purchasers, and those who had purchased the drug

5   from an indirect purchaser.  204 F.R.D. 161, 162 (N.D. Cal. 2001).  Judge Breyer refused to

6   certify the proposed class, noting that

7           Plaintiff does appear to have a conflict with the class members to
            whom it resold methionine. Plaintiff, as an intermediary, has an
8           interest in proving that it absorbed all the costs of the increased price
            in methionine that it purchased from its suppliers, while those who
9           purchased from plaintiff, or other similarly situated distributors,
            have an interest in proving that all of the costs were passed on.
10

11  *Id.* at 167; *see also In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d

12  339 n.7 (D. Del. 2015) (finding a conflict where "truck resellers within the class have an interest in

13  proving that they passed-through zero overcharge in order to recover 100% of the damages

14  attributed to each resale, while the downstream purchasers have an opposite interest").

15      There is no such problem here.  In this case, used-vehicle purchasers bought their vehicles

16  directly from Ford, and not from new-vehicle purchasers.  *See* Mot. at 19 (the class definition

17  requires that the consumer have "purchased or leased a particular vehicle containing MFT through

18  Ford or a Ford dealership").  Because no Plaintiff is in the position of an intermediary, there is no

19  pass-through problem and no conflict between new-vehicle purchasers and used-vehicle

20  purchasers.

21      4.   Rule 23(b) Requirements

22      In addition to satisfying Rule 23(a), Plaintiffs seek certification under Rule 23(b)(3).

23  Plaintiffs contend that the common questions of law and fact "predominate over any questions

24  affecting only individual members, and that a class action is superior to other available

25  methods . . . ."  *Id.* at 23(b)(3).

26      a.   Predominance:  Ford's General Arguments

27      Common issues predominate when they "present a significant aspect of the case and they

28  can be resolved for all members of the class in a single adjudication."  *Hanlon*, 150 F.3d at 1022.

United States District Court
For the Northern District of California

1    "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the

2    common and individual issues' in the case and 'tests whether proposed classes are *sufficiently*

3    cohesive to warrant adjudication by representation.'"  *Wang v. Chinese Daily News, Inc.*, 737 F.3d

4    538, 545 (9th Cir. 2013) (emphasis added).  The class members' claims do not need to be

5    identical.  *See Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands,*

6    *Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (allowing "some variation" between class members).

7    The inquiry before the Court is whether "th[at] variation is enough to defeat predominance under

8    Rule 23(b)(3)."  *Id.*  In other words, the Court must examine whether the variations "swamp" the

9    common issues.  *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 608 (3d Cir. 2012) (denying

10   class certification where "individual issues about what each class member expected when

11   purchasing or leasing his or her car would swamp the inquiry").

12        Here, Ford argues that there is no predominance because "evidentiary variances defeat

13   class certification."  *Id.* at 12.

            i.    Whether the Allegedly Concealed Facts About the MFT are
                  Common to All Class Members

16        The first evidentiary variance Ford identifies is whether the MFT defects were common

17   across all class members.  Opp. at 12.  Ford argues that because there were eleven versions of the

18   software in three years, *id.* at 13, with "drastic changes" to each version, *id.* at 14, there is no

19   unified set of MFT defects which it should have disclosed.  Plaintiffs argue that their expert, Mr.

20   Smith, found that Ford's base software was defective overall.  Reply at 11-12.  Because this base

21   software underlays all the versions of the MFT, all versions were defective in the same way.  *Id.* at

22   11.

23        Ford argues that Mr. Smith concluded the base software varied between versions of the

24   MFT.  Opp. at 15.  However, Mr. Smith stated in his expert report and in his deposition that he

25   had identified several bugs that were common to all versions of the software he had looked at.  Ex.

26   8 at 80-82.  And in his Rebuttal Report, Mr. Smith identified multiple common elements of the

27   base software, and noted that "Ford itself states that . . . 'Base Software is 100% common across

28   all vehicle programs.'"  Reply Ex. 4 at 21, 16-21.  He also opines that specific defects are

United States District Court
For the Northern District of California

"common" or "consistent" across multiple versions.  *See id.* at 26-53; see also Mot. Ex. 9 at 30, 33, 34, 35, 42, 46.  Even Ford's expert, Dr. Kelly, agrees that "base software is the same" from version to version of the MFT.  Ex. 5 at 27.

Plaintiffs convincingly argue that the primary defects of which they complain were caused by faults in the base software, and that this base software was the same throughout each version of the MFT.  First, Plaintiffs argue that the MFT problems came from the defects in the software architecture, which Ford still has not addressed.  *See* Mot. at 13 (quoting Pls.' Ex. 175, an internal Ford email); Reply at 3.  Plaintiffs' expert states that the flaws in the software architecture "are consistent across the versions at issue."  Pls.' Ex. 9.  Second, while Ford argues that "each new software version fixed bugs," such that any problems with the various software versions are not identical (Opp. at 33, 4), Plaintiffs have introduced statements from Ford suggesting that the attempted fixes were unsuccessful.  *See* Ex. 160 (referring to the fixes as "lipstick on [a] pig."); Ex.7 (fixes created new problems); Exs. 27-29 (software continued to be unstable through at least May 2013).  Ford's arguments notwithstanding, Plaintiffs' evidence suggests the software remained flawed even after Ford's attempts to fix it.

Plaintiffs argue that, because the base software is the same, the various defects can be proved through common evidence.  Plaintiffs quote Ford employees for the statement that most errors "were consistently problems with voice recognition, phone pairing and use, media, navigation, and stability."  Mot. at 15; *see also* Pls.' Exs. 10, 20.

Plaintiffs have introduced sufficient evidence to suggest that in the main they experienced common defects.  If, however, Ford demonstrates later in this litigation that the defects were in fact not sufficiently similar, this ruling does not necessarily preclude a motion to de-certify the class or to create subclasses.

        ii.     <u>Whether Material Facts are Common to All Class Members</u>

The second evidentiary variance Ford identifies is whether the defects were material to all class members.  Opp. at 12.  Specifically, Ford argues that materiality is not subject to common proof, because what matters to some vehicle purchasers will not matter to others.  Opp. at 16.  It points to the difference between some Named Plaintiffs that do not appear to have cared about the

23

1   MFT and others who "eagerly anticipated" it.  *Id.*

2   As this Court has recognized, in certain areas of the law materiality "is judged by an

3   objective reasonable person standard . . . and can be determined relative to the class as a whole."

4   *Ehret v. Uber*, 2015 WL 7759464, at *13 (discussing the CLRA); *see also Edwards v. Ford Motor*

5   *Co.*, 603 F. App'x 538, 541 (9th Cir. 2015) (reasonable person standard allows for class

6   certification of CLRA and UCL claims).  As discussed, *infra*, some of Plaintiffs' causes of action

7   permit a classwide inference of materiality.  To the extent some do not, the Court will deny

8   certification of those claims for the reasons given, *infra*.

9           iii.    Whether the Alleged Concealment of Those Facts Had the Required

10                  Causal Link to Class Members' Purchase Decisions

11  The third evidentiary variance is whether all class members purchased their MFT-equipped

12  vehicles because they were unaware of the MFT problems.  Opp. at 12.  Ford argues that

13  Plaintiffs' fraud-based claims require individualized proof of reliance, making class certification

14  improper.  Opp. at 19-20.  The Court will address this argument, *infra*.

15          iv.     Whether All Class Members Suffered Injury, and Whether the

16                  Amount of Damages Can Be Calculated Using a Classwide

17                  Methodology

18          (a)     Different measures of damages

19  Ford argues that "Plaintiffs' different claims, under the law of the different states, use

20  different available measures of damages - which Plaintiffs' economic experts ignore."  Opp. at 23.

21  It notes that, after the Supreme Court's decision in *Comcast v. Behrend*, "Plaintiffs must present a

22  viable common methodology."  *Id.* at 24 (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426

23  (2013)).

24          In *Comcast*, a class of consumer brought antitrust claims against Comcast Corp.  133 S. Ct.

25  at 1430.  The consumer pursued four theories of liability: that Comcast had clustered systems,

26  decreasing broadcast satellite providers' market penetration; that Comcast had reduced

27  competition from overbuilders; that Comcast had reduced benchmark competition; and that

28  clustering increased Comcast's bargaining power when negotiating with content providers.  *Id.* at

1430-31. The district court accepted only the overbuilder theory, rejecting the other three. *Id*. at

1431. It certified the class, and the Third Circuit affirmed. *Id*. In so doing, both courts rejected

Comcast's argument that the expert's damages model "did not isolate damages resulting from any

one theory of antitrust impact," and "failed to attribute damages resulting from overbuilder

deterrence." *Id*.

The Supreme Court reversed. *Id*. at 1432-33. Because consumers "would be entitled only

to damages resulting from reduced overbuilder competition," the damages model "must measure

only those damages attributable to that theory." *Id*. at 1433. "If the model does not even attempt

to do that, it cannot possibly establish that damages are susceptible of measurement across the

entire class for purposes of Rule 23(b)(3)." *Id*. Thus, "any model supporting a 'plaintiff's

damages case must be consistent with its liability case.'" *Id*. The Court held that the lower courts

should have inquired into whether the damages model was properly tied to the plaintiff's theory

"even [though] that requires inquiry into the merits of the claim." *Id*.

In applying *Comcast*, the Ninth Circuit has noted that individualized damages inquiries

will not defeat class certification. *See Pulaski*, 802 F.3d at 988. However, Ford's argument is not

merely that damages will require some individualized inquiry. Rather, the problem is that for at

least one of their theories of liability – incidental and consequential damages – Plaintiffs have

presented no methodology at all. *See Kleen Products LLC v. Int'l Paper Co.*, -- F.3d --, 2016 WL

4137371, at *7 (7th Cir. Aug. 4, 2016) ("We must see if there is a classwide method for proving

damages, and if not, whether individual damage determinations will overwhelm the common

questions on liability and impact."); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.)

("*Comcast* held that a district court errs by premising its Rule 23(b)(3) decision on a formula for

classwide measurement of damages whenever the damages measured by that formula are

incompatible with the class action's theory of liability"); *Roach v. T.L. Cannon Corp.*, 778 F.3d

401, 407 (2d Cir. 2015) ("*Comcast* held that a model for determining classwide damages relied

upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the

class's asserted theory of injury"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)

("the plaintiffs must be able to show that their damages stemmed from the defendant's actions that

created the legal liability").  In other words, the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs have not even told the Court what data it should look for.  For example, where Plaintiffs seek incidental and consequential damages, do they seek to recover for the loss of time in taking their vehicles to Ford for repair?  Without knowing the scope and methodology of the claim and nature of underlying data to be used, the Court cannot conduct the inquiry required by *Comcast*.

At various points in their TAC, Plaintiffs seek restitution,[5] benefit-of-the-bargain,[6] overpayment,[7] diminution in value of their vehicles,[8] economic damages, [9] incidental and consequential damages,[10] actual damages[11] and punitive damages. [12]  At their core, most of these

---

[5] *See* TAC ¶¶ 305 (California Unfair Competition Law claim), 325, (California False Advertising Law claim).

[6] *See* TAC ¶¶ 406 (Arizona fraudulent concealment claim), 415 (Colorado Consumer Protection Act claim), 434 (Colorado fraudulent concealment claim), 485 (Massachusetts fraudulent concealment claim), 493 (New Jersey Consume Fraud Act claim), 525 (New Jersey fraudulent concealment claim), 534 (New York General Business Law § 349 claim), 567 (New York fraudulent concealment claim), 576 (North Carolina Unfair and Deceptive Trade Practices claim), 608 (North Carolina fraudulent concealment claim), 653 (Ohio fraudulent concealment claim), 686 (Virginia Consumer Protection Act claim), 718 (Virginia fraudulent concealment claim), 726 (Washington Consumer Protection Act claim).

[7] *See* TAC ¶¶ 359 (California Song-Berly Consumer Warranty Act for breach of express warranties claim), 373 (California Song-Berly Consumer Warranty Act for breach of implied warranty of merchantability claim), 406 (Arizona fraudulent concealment claim), 434 (Colorado fraudulent concealment claim), 485 (Massachusetts fraudulent concealment claim), 525 (New Jersey fraudulent concealment claim), 567 (New York fraudulent concealment claim), 608 (North Carolina fraudulent concealment claim), 653 (Ohio fraudulent concealment claim), 718 (Virginia fraudulent concealment claim).

[8] *See* TAC ¶¶ 359 (California Song-Berly Consumer Warranty Act for breach of express warranties claim), 373 (California Song-Berly Consumer Warranty Act for breach of implied warranty of merchantability claim), 406 (Arizona fraudulent concealment claim), 415 (Colorado Consumer Protection Act claim), 434 (Colorado fraudulent concealment claim), 485 (Massachusetts fraudulent concealment claim), 493 (New Jersey Consumer Fraud Act claim), 525 (New Jersey fraudulent concealment claim), 534 (New York General Business Law § 349 claim), 541 (New York General Business Law § 350 claim), 567 (New York fraudulent concealment claim), 576 (North Carolina Unfair and Deceptive Trade Practices claim), 608 (North Carolina fraudulent concealment claim), 653 (Ohio fraudulent concealment claim), 686 (Virginia Consumer Protection Act claim), 718 (Virginia fraudulent concealment claim), 726 (Washington Consumer Protection Act claim) 745 (Washington breach of express warranty claim).

[9] *See* TAC ¶¶ 639 (Ohio breach of implied warranty claim), 668 (Texas Deceptive Trade Practices Act claim).

[10] *See* TAC ¶¶ 446 (Iowa breach of express warranty claim), 465 (Massachusetts breach of

26

**United States District Court**
For the Northern District of California

1    measures of damages seek to recover the decreased value of Plaintiffs' vehicles.  As noted, *supra*,

2    Dr. Arnold and Dr. Boedeker present methods to measure restitution and benefit-of-the-bargain

3    damages, respectively.  Claims seeking these forms of recovery can therefore be certified.

4    Likewise, these damages models will allow the fact finder to calculate the diminution in value of

5    Plaintiffs' vehicles.  The methodologies set forth in Plaintiffs' expert declarations are sufficiently

6    sound and capable of practicable application to the class without unreasonable difficulty.  Thus,

7    claims seeking these damages may be certified.  Where Plaintiffs seek actual or economic

8    damages, these claims will be certified to the extent Plaintiffs seek to recover lost value.

9         However, the Court will not certify these claims to the extent they seek incidental or

10   consequential damages.  In addition to the lack of a model to calculate incidental or consequential

11   damages in a manner amenable to class treatment, Plaintiffs do not even describe with any

12   specificity the harms for which they seek to recover.  Does this include the cost of rental cars

13   while their MFT-equipped vehicles were undergoing repair?  Does it include the time driving their

14   vehicles to and from Ford for repair?  Lost wages as a result?  Absent a clear model, the Court

15   might be tasked with conducting individualized inquiries into *how* each class member was

16   harmed, not just into the *extent* of the harm.  Plaintiffs have therefore failed to satisfy Rule

17   23(b)(3) with respect to their requests for incidental and consequential damages.

18        Finally, though Plaintiffs have not provided a damages model for statutory and punitive

19   damages, their claims seeking such recovery may be certified.  The statutes under which Plaintiffs

20

21   _____

22   contract claim), 505 (New Jersey breach of express warranty claim), 554 (New York breach of
     express warranty claim), 588 (North Carolina breach of express warranty claim), 631 (Ohio breach
     of express warranty claim), 698 (Virginia breach of express warranty claim), 741 (Washington
23   breach of express warranty claim).

24   [11] *See* TAC ¶¶ 313 (California Consumer Legal Remedies Act), 394 (Arizona Consumer Fraud
     Act), 542 (New York General Business Law § 350 claim), 618 (Ohio Consumer Sales Practices
25   Act claim), 665 (Texas Deceptive Trade Practices Act claim).

26   [12] *See* TAC ¶¶ 344 (California fraud by concealment claim), 407 (Arizona fraudulent concealment
     claim), 435 (Colorado fraudulent concealment claim), 486 (Massachusetts fraudulent concealment
     claim), 526 (New Jersey fraudulent concealment claim), 568 (New York fraudulent concealment
27   claim), 575 (North Carolina unfair and deceptive practices claim), 609 (North Carolina fraudulent
     concealment claim), 654 (Ohio fraudulent concealment claim), 678 (Texas fraud by concealment
28   claim), 719 (Virginia fraudulent concealment claim).

claim prescribe statutory damages, and punitive damages may be based on common facts such as Ford's culpability and wealth; it may also be keyed to compensatory damages which the Court certifies. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (limiting the ratio of punitive to other damages).

(b)    <u>Averages</u>

Defendant attacks Plaintiffs' damages theories advanced by Drs. Boedeker and Arnold on the ground that they improperly used averages. In particular, Ford contends that "absent individualized injury, Plaintiffs have no idea how much the putative class members paid for their vehicles." Opp. at 23. But the Supreme Court has confirmed that the use of averages is proper in some cases. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1041 (2016). There, a group of employees claimed that they should have received overtime pay for the time spent putting on and taking off protective gear. *See id.* at 1041. Following trial, the employer appealed, arguing the class should never have been certified. *Id.* Specifically, the employer challenged the damages calculation, which assumed that "each employee spent the same time donning and doffing protective gear." *Id.* The Court explained that calculations based on a representative sample were admissible in a class action if they would have been admissible in individual actions. *Id.* at 1046. Because the employer had failed to keep records as to how long it took employees to put on and take off their protective gear, employees could only have recovered individually be relying on representative samples. *Id.* at 1047. Because they would have had to rely on such averages in individual actions, the plaintiffs could use a representative sample in the class action as well. *Id.*

In *Vaquero v. Ashley Furniture Industries, Inc.*, also an employment case, the plaintiff "proposed to resolve the damages phase of the litigation through use of a survey, sampling evidence, or a special master." 824 F.3d 1150 (9th Cir. 2016). The Ninth Circuit read *Tyson* as allowing the use of "representative evidence" to calculate damages. *Id.* at *4. Other courts have read *Tyson* as applying where a party with the duty to maintain records has failed to do so. *See Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2242 n.19 (2016) (noting that the University of Texas is required to maintain application records, and citing *Tyson* for the proposition that "[t]o the extent that UT failed to preserve these records, the consequences of that decision should fall on

the University, not on petitioner.").

Even a narrow reading of *Tyson* confirms Plaintiffs may use averages and representative evidence here. While consumers may have some record of how much they paid for their Ford vehicles, they are unlikely to know how much of that price is attributable to the MFT. Indeed, not even Ford appears to know, as "Ford contends that it did not keep records . . . of how much Ford increased a vehicle's price if MFT was included." Mot. at 17. Ford did not contest this assertion in its Opposition.

As in *Tyson*, because individual records do not exist, representative evidence would have to be used if the Plaintiffs were pursuing individual actions. *See Tyson*, 136 S. Ct. at 1048 ("the study here could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action"). Moreover, there are unlikely to be material differences in how much each class member paid for the MFT. Thus, the use of averages is not improper.

(c)    <u>Events after the time of sale</u>

Ford next argues that Plaintiffs' "proposed damages models do not offer a reliable methodology to calculate classwide damages" in part because "MFT-equipped vehicles retain their value as well or better than comparable vehicles." Opp. at 2, 24-25. Plaintiffs argue that the Ninth Circuit allows them to calculate their injury from the time of purchase, and that they do not need to "'account for benefits received after purchase.'" Reply at 20 (quoting *Pulaski*, 802 F.3d at 989). This dispute breaks down into two sub-inquiries: whether Plaintiffs' interpretation of Ninth Circuit law is correct, and if not, whether Ford's efforts to mitigate harm must be taken into account.

Plaintiffs' interpretation of *Pulaski* is incorrect: the Ninth Circuit did <u>not</u> hold that "damages 'calculation need not account for benefits received after purchase.'" Reply at 28. In *Pulaski*, online advertisers claimed Google had misled them as to the websites on which their advertisements would appear. *Pulaski*, 802 F.3d at 981-82. Google's AdWords algorithm "determined the online placement and price of the ad" based on advertisers' answers to certain questions, and "advertisers did not know in advance exactly where their ads would appear." *Id.* at

982.  The advertisers alleged Google had included ads on "parked domains and error pages" without informing them of this in advance, and charged them for clicks from these "lower-quality" websites.  *Id.* at 982-83.  The Ninth Circuit noted that the plaintiffs were seeking restitution under California's Unfair Competition Law ("UCL").  *Id.* at 985.  Under California's "UCL and FAL [California's False Advertising Law] restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information."  *Id.* at 989.

Plaintiffs misrepresent *Pulaski*'s holding as applying to all "damages," when in fact it only discusses restitution.  *See* Reply at 1, 20, 28 (misrepresenting *Pulaski*).  The Ninth Circuit's statements about the measure of damages based at the time of purchase appear to be confined to situations in which a plaintiff seeks (1) restitution under (2) California's UCL or FAL.  *See id.* ("Because restitution under the UCL and FAL measures what the advertiser would have paid at the outset . . . .");  *see also Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 699 (2006) (where defendant wrongfully obtained plaintiff's property by fraud and plaintiff seeks restitution, the plaintiff may receive a value higher than that his property had at the time of the fraud if the value of the property increased following the fraud).  Other courts have read Pulaski as being so limited.  *See Le v. Kohls Dep't Stores, Inc.*, -- F. Supp. 3d --, 2016 WL 498083, at *7 (E.D. Wis. Feb. 8, 2016) (discussing Pulaski in the context of merchandise purchased from a department store); *Abbit v. ING USA Annuity*, No. 13CV2310-GPC-WVG, 2015 WL 7272220, at *7 (S.D. Cal. Nov. 16, 2015) ("Recently, the Ninth Circuit held that damages calculations in UCL and FAL actions need not account for benefits received after purchase of the service because the focus is on the value of the service at the time of purchase.").

Moreover, nothing in *Pulaski* suggested that there was anything that was (or could have been) done post-purchase.  The ads had already been run.  The court in *Pulaski* did not deal with a situation where a defendant took subsequent remedial action to repair, *e.g.*, a defective product, thus mitigating the consumer's loss.

The California Supreme Court has noted that the defendant's mitigation of an injury may leave the plaintiff "unable to prove a right to . . . restitution."  *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 789 (2010) (explaining that evidence of mitigation went to the amount recovered, not to

**United States District Court**
For the Northern District of California

1    standing).  Similarly, plaintiffs are generally recognized to have a duty to mitigate damages.  *See*

2    Restatement (Second) of Contracts § 350 ("damages are not recoverable for loss that the injured

3    party could have avoided without undue risk, burden or humiliation").  Thus, Plaintiffs are

4    incorrect in arguing their damages cannot be reduced by post-purchase mitigation.  There appears

5    to be no reason why such mitigation would not apply to all claims including UCL and FAL where

6    the facts permit it.

7        While Ford argues Plaintiffs' damages theories must be struck because they fail to account

8    for the fix, Plaintiffs' commonality arguments is predicated on the premise that Ford has been

9    unable to fix the MFT in any material way.  Plaintiffs have presented evidence that Ford did not

10   meaningfully fix the MFT, at least with regard to the problems of which Plaintiffs complain.  *See*

11   Pls.' Exs. 48, 51, 52; Mot. at 15; Reply at 6.  While Ford has presented evidence that some

12   software bugs were fixed, it is not clear whether these are the same bugs that caused Plaintiffs'

13   problems.  *See* Def. Ex. 7.  This thus appears to be a factual dispute, going to the merits of the

14   case, which the Court will not resolve at this time.  As noted above, Plaintiffs have made a

15   sufficient showing that in the main the defects were common for purposes of Rule 23.  At this

16   point, Plaintiffs' damages theory is "consistent with its liability case" and "measure[s] only those

17   damages attributable to that theory."  *Comcast*, 133 S. Ct. at 1433.  Again, this is without

18   prejudice to Ford's ability to present evidence of mitigation later in this litigation (to reduce its

19   liability) and to argue that the class should be decertified or subject to division into subclasses.

20        b.      <u>Predominance:  State Laws That Require Individualized Proof</u>

21        Plaintiffs attempt to state a claim on 43 state statutes.  They argue that "[e]ach State Class

22   is unified by [] common questions."  Mot. at 25.  Ford responds that there are a number of

23   differences between the "similar but distinct requirements" each state imposes on Plaintiffs'

24   claims, and that those differences preclude certification.  Opp. at 12, 39-40 (giving as examples

25   that various states "apply different burdens of proof," that some states require "notice of any

26   alleged breach of warranty to the defendant, while others do not," and that some states preclude

27   business customers from recovering under consumer protection laws).

28        For efficiency, the Court organizes this section according to the challenge raised by Ford.

**United States District Court**
For the Northern District of California

i.      Fraud-Based Claims – Exposure and Reliance

Ford argues that Plaintiffs must show reliance to recover on their fraud-based claims and that such showing is too individualized to permit class certification.  The Court agrees for the reasons set forth below, and will not certify these claims.

Plaintiffs' California claims illustrate why certification of claims requiring reliance is problematic even where reliance is treated liberally and subject to possible presumptions for purposes of class adjudication.  The California Supreme Court has held that "a plaintiff must plead and prove actual reliance . . . but, consistent with the principles set forth above, is not required to necessarily plead and prove individualized reliance . . . ."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009).  In that case, because the plaintiffs "allege[d] exposure to a long-term advertising campaign, the plaintiff is not required to plead . . . that the plaintiff relied on particular advertisements or statements."  *Id*.  All that was required was that the plaintiff "allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct."  *Id*.

The Ninth Circuit later relied on *Tobacco* in affirming a lower court's certification of a class.  *See Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 729 (9th Cir. 2012).  The Ninth Circuit observed that "Wells Fargo's misleading marketing materials" were "pervasive," and that this pervasiveness meant that class members "were exposed to the materials and likely relied on them."  *Id*.  The materials were "pervasive" because they were on Wells Fargo's website, brochures, and new account marketing jackets.  *Id*.  In addition, the marketing campaign spanned at least four years.  *See id*. at 728-29 (citing advertisements from 2001, 2004, and 2005).

The Ninth Circuit reached a different conclusion in *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).  There the plaintiff alleged that Honda's advertising for a braking system misrepresented the system's characteristics "and omitted material information on its limitations."  *Id*. at 585.  Honda's advertising campaign included a 2006 product brochure, television commercials describing the system's operation – including one that ran for a week in November 2005 and another that ran from February to September 2006 – and a print ad in some magazines from March to September 2006.  *Id.* at 586.  When Honda ceased mass advertising, it continued smaller-scale market efforts that included two intranet commercials that were viewable on kiosks

United States District Court
For the Northern District of California

at Acura dealerships, which dealers were encouraged to show to potential customers. *Id.* Honda also operated an "Owner Link" website that contained video clips describing the CMBS system, and was available to all customers. *Id.* at 587. Finally, the Acura Style magazine, a periodical sent to Acura dealerships, subscribing Acura owners, and interested customers, ran an article on the system in 2007. *Id.*

The Ninth Circuit concluded that this level of advertising did *not* "justify a presumption of reliance . . . because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited." *Id.* at 595. While the Ninth Circuit acknowledged that the *Tobacco II* decision had "reconfirmed that class members do not need to demonstrate individualized reliance," it explained that this "holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to Defendants' misleading statements, and defendants were not just denying the truth but representing the opposite." *Id.* at 595–96. In contrast, "Honda's product brochures and TV commercials fall short of the extensive and long-term fraudulent advertising campaign at issue in *Tobacco II*, and this difference is meaningful." *Id.* at 596 (citation omitted). The court concluded that "[f]or everyone in the class to have been exposed to the omissions . . . it is necessary for everyone in the class to have viewed the allegedly misleading advertising." *Id.* However, because of the limited scope of the advertising, it was "unreasonable to assume that all class members viewed it." *Id.* Thus, "[i]n the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." *Id.*

Like *Wells Fargo* and *Honda*, Ford is alleged to have promoted MFT on its website and in brochures. California Plaintiffs allege that they reviewed and relied on these advertising materials. *See* TAC ¶¶ 24, 45, 51, 63. For example, Plaintiffs describe statements Ford made on its website regarding the safety benefits of the MFT. *See* TAC ¶¶ 216-18. They also quoted marketing materials that advertise the MFT's safety features and communications integration. *See id.* ¶¶ 219-20, 224-25. However, like the plaintiffs in *Mazza*, Plaintiffs have not shown that this was an

"extensive and long-term fraudulent advertising campaign," sufficient to warrant an inference of reliance on the part of the entire class.

First, Plaintiffs do not allege for how long Ford's representations were present on its website. Plaintiffs allege that one California Plaintiff read about the MFT on Ford websites "while researching vehicles online prior to October 2012." *Id.* ¶ 51. In addition, a non-California Plaintiff read about the MFT on Ford websites in March 2013. *Id.* ¶ 148. The earliest pre-purchase exposure to marketing material on the internet identified by any Plaintiff occurred in October 2010, and the latest in April 2013. *See* TAC at ¶¶ 112, 183 (stating the Plaintiff saw "advertisements for and representations made by Ford about [MFT], including television print media, and on the internet," but not identifying Ford's website specifically). This two-and-one-half year period is far from a "decades-long" campaign. Indeed, it is shorter even than the three years of advertising found insufficient in *Mazza*. *See Mazza*, 666 F.3d at 586; *accord In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 374 (S.D.N.Y. 2015) ("*Tobacco* limited the presumption to cases 'where ... a plaintiff alleges exposure to a long-term advertising campaign,' . . . and courts have declined to apply it to UCL and FAL claims in the absence of such a substantial campaign.") (citation omitted). Nor did Plaintiffs present any evidence as to the proportion of the class that likely saw or were exposed to the website, thus failing to establish that the campaign was "pervasive."

Plaintiffs' print advertisements fare no better. Plaintiffs present vague, anecdotal evidence that they saw print advertisements. *See* TAC at ¶¶ 112, 183 (stating Plaintiffs cannot recall the wording, but recall the advertisements "touted the innovative nature of [MFT], how it would enhance the driving experience, and increase the safety of the vehicle"). First, the time span of these print advertisements is again two-and-one-half years, which is insufficient for the reasons identified above. Second, Plaintiffs provide no evidence about the size, reach, or scope of Ford's advertising campaign. Indeed, Plaintiffs cannot even recall what was contained in the advertisements they are meant to have relied upon.

In addition to anecdotal evidence, Plaintiffs present two advertisements from 2012. *See* TAC ¶¶ 224-25. But these fall into the same approximate time period as Ford's online statements,

United States District Court
For the Northern District of California

and so again fail to establish that Ford's advertising campaign was long and extensive. And again, there is no information about the pervasiveness of the advertisements. The third purported advertisement Plaintiffs offer is not an advertisement at all: careful reading of the fine print shows that this item was taken from Ford's "2009 Annual Report." *See id.* ¶ 220. Because this item is not even marketing material, it too fails to establish a long and pervasive advertising campaign sufficient to give rise to a classwide presumption of reliance.

Despite having ample time to conduct discovery, Plaintiffs did not introduce exhibits that would demonstrate a prolonged and extensive advertising campaign. Plaintiffs' Motion referred the Court to a deposition in which the deponent stated that Ford released a television ad in 2011 "publiciz[ing] the use or the availability of [MFT] in the Ford Edge." *See* Ex. 187 at 31 (cited by Mot. at 29 n. 115). While this is an external communication, it falls squarely within the two-and-one-half year time period that is insufficient for the reasons stated above. Moreover, Plaintiffs do not state how long this advertisement ran or how widely it was disseminated. That Ford ran one television advertisement about one car, during one year of the class period, does not show a prolonged and pervasive advertising campaign.

Plaintiffs' other evidence is similarly unpersuasive. Rather than introducing widely disseminated advertisements, Plaintiffs introduce four communications sent to customers who had already purchased an MFT-equipped vehicle. *See* Exs. 191, 193-95. Since these customers already owned a vehicle, this communication should not have induced them to purchase their vehicle. Plaintiffs' other exhibits - internal communications with dealers and an internal email of "media do's and don'ts" - do not appear to have been publicly disseminated. *See* Ex. 187 at 125, Exs. 190, 192. Again, they fail to establish a prolonged and pervasive advertising campaign that would permit the Court to presume reliance by the entire class.

Indeed, there is no sufficient basis to presume even classwide exposure to the alleged misrepresentation. Plaintiffs present no evidence that each purchaser of a vehicle equipped with MFT had to have seen the advertised representations (or misrepresentation) before purchasing the vehicle. This is therefore unlike cases which involve false statements on a package label. And only a handful of Named Plaintiffs assert that they relied on representations from a Ford

**United States District Court**
For the Northern District of California

1  salesperson.  *See* TAC ¶¶ 24, 39, 128, 144, 191.  There is no evidence that all or nearly all class

2  members would have been exposed to a consistent sales script containing alleged

3  misrepresentations about MFT.  Because Plaintiffs have failed to establish that Ford's marketing

4  of the MFT was "extensive and long-term," or that they would have inevitably (or nearly so) been

5  exposed to misrepresentations about MFT, they failed to demonstrate class members "were

6  exposed to the [allegedly misleading] materials and likely relied on them."  *Gutierrez*, 704 F.3d at

7  729.

8  Any presumption of reliance is made even more problematic by the fact that Plaintiffs cited

9  multiple statements by Ford and in news articles, identifying problems with the MFT.  These

10  statements were issued as early as May 2011.  *See* TAC ¶ 11.  They appear to have persisted

11  throughout the remainder of the class period.  *See id.* at ¶¶ 9, 11, 264 (negative statements from

12  June and July 2011); ¶ 9 (November 2012);  ¶¶ 9, 128, 267 (January and February 2013).  Indeed,

13  at least one Named Plaintiff admits that he was aware of "mixed reviews" of the MFT before

14  purchasing his vehicle.  *See id.* at ¶ 191.  It appears negative information about the MFT was

15  widely available before most Named Plaintiffs even purchased their vehicles.  *See id.* at ¶¶ 9, 11,

16  264.

17  Presuming classwide reliance would thus require the Court to infer that all class members

18  were exposed to positive statements regarding the MFT, that all class members relied on them, and

19  no class members saw the negative statements which would have warned them about the MFT

20  defects, thus potentially rendering any reliance unreasonable.  The Court cannot presume

21  classwide reliance under these circumstances.  *See Tucker v. Pac. Bell Mobile Servs.*, 208 Cal.

22  App. 4th 201, 228 (2012) ("The rule permitting an inference of common reliance where material

23  misstatements have been made to a class of plaintiffs will not arise where the record will not

24  permit it.").

25  Because they fail to demonstrate classwide exposure and reliance, the Court will not certify

26  Plaintiffs' claims for:

27  • violation of California Unfair Competition Law, to the extent those claims are

28  predicated upon fraud;

36

- violation of California False Advertising Law;[13]

- fraud by concealment based on California law;[14]

- violations of Arizona's Consumer Fraud Act;[15]

- fraudulent concealment based on Arizona Law;

- fraudulent concealment based on Colorado Law;[16]

- fraudulent concealment based on Massachusetts Law;[17]

- violation of the New Jersey Consumer Fraud Act;[18]

---

[13] For a California false advertising claim, as for an unfair competition law claim, consumers must show actual reliance.  *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-27 (2011).

[14] In addition, California courts require proof of actual reliance by individual class members. *Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 655 (2012) ("whether a particular class member has read that misrepresentation presents an individual question and not a common question."); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 928 (2010) ("to recover [on its fraudulent concealment claim], each unnamed class member would be required to prove individual reliance on Target's false country-of-origin designation."); *Occidental Land, Inc. v. Super. Ct.*, 18 Cal. 3d 355, 358 (1976) (each class member was required to state in writing that he or she had relied on the document at issue); *cf. Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1095 (1993) (allowing a presumption of reliance "when the same material misrepresentations have actually been communicated to each member of a class").

[15] In addition, Arizona requires proof of actual reliance to recover under its Consumer Fraud Act. *See Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 605 (Ct. App. 1980) ("Injury occurs when the consumer relies on the misrepresentation"); *Peery v. Hansen*, 120 Ariz. 266, 270 (Ct. App. 1978) ("a private claimant must show reliance"); *Kuehn v. Stanley*, 208 Ariz. 124, 129 (Ct. App. 2004) (for a claim of consumer fraud, "injury occurs when a consumer relies, even unreasonably, on false or misrepresented information").  Certification would thus be inappropriate even if the Court presumed classwide exposure.

[16] Where plaintiffs have been exposed to misrepresentations, Colorado permits a classwide inference of reliance.  *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 110 (Colo. 2011) ("the ignorance and reliance elements of fraudulent concealment may be established with circumstantial evidence common to a class."); *Kopeikin v. Merchants Mortgage & Trust Corp.*, 679 P.2d 599, 602 (Colo. 1984) ("Direct evidence of reliance, one of the elements of fraudulent concealment, is not required.").

[17] Massachusetts requires an individualized inquiry into reliance.  *See Olson v. Energy N., Inc.*, No. 9800228, 1999 WL 1332362, at *8 (Mass. Super. Jan. 14, 1999) ("the issue of liability cannot be decided on a classwide basis, because actual reliance by the plaintiffs on the defendants' alleged misrepresentations is a necessary element of a claim of fraud or deceit."); *Dalis v. Buyer Advert., Inc.*, 418 Mass. 220, 225, 636 N.E.2d 212, 216 (1994) ("*Unlike* a traditional common law action for fraud, consumers suing under c. 93A need not prove actual reliance on a false representation") (emphasis added).  Certification would thus be inappropriate even if the Court presumed classwide exposure.

[18] New Jersey requires individualized proof of damages for claims under this statute.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 605 (3d Cir. 2012) (requirement to prove ascertainable loss

- fraudulent concealment based on New Jersey Law;[19]

- violation of New York General Business Law § 349;[20]

- violation of New York General Business law § 350[21]

- fraudulent concealment based on New York Law;

- violation of the North Carolina Unfair and Deceptive Trade Practices Act;

- fraudulent concealment based on North Carolina Law;[22]

---

meant individualized proof was required); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 373 n.9 (3d Cir. 2015) (noting the finding in *Marcus*, and not reaching predominance). This is not a bar to certification, as in the Ninth Circuit "differences in damage calculations do not defeat class certification." *Pulaski*, 802 F.3d at 988. Certification would thus be inappropriate even if the Court presumed classwide exposure.

[19] New Jersey presumes neither reliance nor causation. *See Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 N.J. Super. 520, 549 (Ch. Div. 2003) (plaintiffs have "the burden of proving causation as to each class plaintiff")); *see also Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 43 (App. Div. 2000) (noting that "common law fraud requires proof of reliance"). Certification would thus be inappropriate even if the Court presumed classwide exposure.

[20] New York courts hold that "individual proof of [harm] remains at the core of proving 'injury' for a claim under General Business Law § 349." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 53 (1999); *see also Katz v. NVF Co.*, 473 N.Y.S.2d 786, 789 (1984) (in a shareholder action, "the individual issues respecting knowledge [of the misrepresentation] and reliance [on the misrepresentation] militate against class action treatment at this juncture."); *Wolfson v. Ubile*, No. 20926/76, 1977 WL 1546, at *2 (N.Y. Sup. Ct. Dec. 12, 1977) ("Whether or not the requisite reliance exists is subjective with each individual plaintiff."). Certification would thus be inappropriate even if the Court presumed classwide exposure.

[21] For false advertising claims, New York requires individualized inquiry "into whether each class member was unaware of [public] information with regard to their causes of action for false advertising under section 350 of the General Business Law and common-law fraud." *Lorillard Tobacco Co.*, 94 N.Y.2d at 594. The court also stated that "[r]eliance on defendants' misrepresentations will not be presumed," unless "defendants effectively controlled all the information about the transaction." *Id.* at 600. Where information contradicting defendants' statements has been reported in the press, this "forecloses any presumption of reliance and requires individualized inquiry into whether particular class members were unaware of such information." *Id.*; *accord Morrissey v. Nextel Partners, Inc.*, 895 N.Y.S.2d 580, 588 (2010) (requiring individualized inquiry where some plaintiffs were exposed to news articles undercutting defendant's representation). Here, it is likely that for much of the class, New York law precludes a presumption of reliance. Determining reliance would entail a high individualized inquiry. Certification would thus be inappropriate even if the Court presumed classwide exposure.

[22] North Carolina courts require the plaintiff's reliance on the defendant's representations to be "reasonable." The North Carolina Supreme Court has observed that "[j]ust where reliance ceases to be reasonable . . . is frequently very difficult to determine." *Johnson v. Owens*, 263 N.C. 754, 758 (1965). Relying on this principle, the Fourth Circuit has held class certification improper when plaintiffs state a fraud claim based on North Carolina law. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998). Because North Carolina courts hold that reliance is not reasonable when a plaintiff has conflicting information, "proof of reasonable

United States District Court
For the Northern District of California

1    • fraudulent concealment based on Ohio Law;

2    • fraud by concealment based on Texas Law;[23]

3    • fraudulent concealment based on Virginia Law;[24] and

4    • violation of the Washington Consumer Protection Act.

5                    ii.    <u>Other Tort Claims</u>

6    Plaintiffs' claims that are not based in fraud are subject to a different analysis.

7    As to Plaintiffs' claim for strict liability under Colorado law, Ford contends the claim

8    cannot be certified because "Plaintiffs' contentions about safety risk are speculative and are not

9    based on evidence with classwide application . . . ." Opp. at 30. The Court disagrees. As noted

10   above, Plaintiffs have introduced evidence suggesting that all class members' vehicles suffered

11   from common defects. Moreover, even if there are some differences between the defects,

12   Plaintiffs argue that the defects in each class member's vehicle cumulatively caused driver

13   distraction, which in turn raises safety concerns. This is sufficient to raise classwide issues which

14   predominate over individual issues.

15   As to Plaintiffs' negligence claim under Ohio law, Ford argues that the elements of

16   negligence (duty, breach, proximate causation, damages) are too individual to be certified. Opp. at

17   30-31. Causation appears to be a proper subject for classwide inquiry, and Ohio courts have

18   permitted negligence claims to proceed as class actions. *See Ass'n for Hosps. & Health Sys. v.*

19

20   reliance would depend upon a fact-intensive inquiry into what information each [plaintiff] actually
     had." *Id.* at 341 (citing *Johnson*). Even though the determination of whether reliance is
21   "reasonable" is an objective inquiry, it cannot readily be determined on a classwide basis, where,
     as here, reasonable reliance turns on *e.g.*, exposure (or not) to misleading advertising and to media
22   disclosing the problems/defects to the public – factors which vary amongst class members.
     Certification would thus be inappropriate even if the Court presumed classwide exposure.

23

24   [23] Texas requires individualized proof of reliance. *See Henry Schein, Inc. v. Stromboe*, 102
     S.W.3d 675, 693 (Tex. 2002) ("[C]lass members in the present case are held to the same standards
25   of proof of reliance – and for that matter all the other elements of their claims – that they would be
     required to meet if each sued individually."); *Fid. & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416,
26   423 (Tex. App. 2005) (holding certification was improper and noting that, under Schein,
     certification in a case "in which reliance was an issue" is "a near-impossibility."). Certification
27   would thus be inappropriate even if the Court presumed classwide exposure.

28   [24] Virginia requires justifiable or reasonable reliance for a plaintiff to prevail on a fraud claim.
     Certification would thus be inappropriate even if the Court presumed classwide exposure.

39

**United States District Court**
For the Northern District of California

1    *Dep't of Human Servs.*, 2004-Ohio-3810, ¶ 24.

2      Accordingly, the Court will certify Plaintiffs' claims for:

3        •   strict product liability under Colorado law and

4        •   negligence under Ohio law.

5          iii.    <u>Personal Use</u>

6      Ford argues that several of Plaintiffs' claims for violation of consumer protection statutes

7 cannot be certified because those statutes only apply to persons who purchased vehicles for

8 personal use and that determining personal versus business use requires intensive individual

9 inquiry. For the reasons stated below, the Court finds that this is not a bar to certification.

10      The first example of such a statute is the California Consumer Legal Remedies Act

11 ("CLRA"). The CLRA applies to "individual[s] who seek[] or acquire[], by purchase or lease, any

12 goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761. It does

13 not apply where the purchaser is an entity rather than an individual, *California Grocers Assn. v.*

14 *Bank of America*, 22 Cal. App. 4th 205, 217 (1994), or where an individual "purchase[s] items for

15 her business and not her own use," *Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009).

16      Plaintiffs argue that the Court may turn to Ford's records to determine whether a consumer

17 purchased a vehicle for personal or business use. Reply at 24. However, Plaintiffs identify no

18 reason why Ford would keep records on how customers intend to use their vehicle. Ford's records

19 do not seem a likely source for this information.

20      While Ford's records will not provide the necessary information, the fact finder may

21 determine whether a vehicle was purchased for business or personal reasons by other means. If a

22 vehicle was purchased for business purposes, then it is likely that the consumer will have taken

23 title in a corporate name, will have a commercial license plate, or will have taken a tax deduction

24 the business use of that vehicle. In order to recover for this claim, class members may be required

25 to submit a copy of the vehicle title showing it was taken in a personal name; a record showing

26 that the car is not registered as a commercial vehicle, and a declaration under oath or document

27 showing that they did not take a business tax deduction on their vehicle. This showing, while

28 individualized, is relatively simple and will not defeat predominance.

United States District Court
For the Northern District of California

Accordingly, the Court will certify the following claims:

- violation of California Consumers Legal Remedies Act;

- violation of the Massachusetts Consumer Protection Act;

- violation of the Ohio Consumer Sales Practices Act;

- violation of the Texas Deceptive Trade Practices Act;  and

- violation of the Virginia Consumer Protection Act.[25]

### iv.    Ordinary Purpose

Ford argues the implied warranty of merchantability ("IWM") claims cannot be certified because they require that the vehicles not be fit for ordinary purposes, which is an individualized inquiry.  Opp. at 35.  Ford and Plaintiffs agree that "[t]he ordinary purpose of Plaintiffs' vehicles is to provide 'safe, reliable transportation.'"  *Id.*; Reply at 27.  The parties disagree over whether the class vehicles were so defective, and defective in the same way, as to defeat this ordinary purpose.

As discussed above, Plaintiffs' claims depend upon each version of the MFT being defective in the same way.  Plaintiffs have produced enough evidence regarding Ford's base software for the Court to infer at this stage that each MFT version has materially similar defects.  If each MFT version is similarly flawed, it follows that each would breach (or not) the IWM in materially the same way.  Thus, Plaintiffs' IWM claims are proper for certification at this time.

For these reasons, the Court will certify Plaintiffs' claims for:

- breach of implied warranty of merchantability under California Law;

- violation of California's Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability;

- breach of implied warranty of merchantability under Massachusetts Law;

- breach of implied warranty of merchantability under New Jersey Law;

- breach of implied warranty of merchantability under North Carolina law;

- breach of implied warranty in tort under Ohio Law; and

---

[25] Ford also challenges Plaintiffs' ability to pursue a class action under Virginia's procedural rules. For the reasons discussed, *infra*, the Court rejects Ford's argument.

United States District Court

For the Northern District of California

1        • breach of implied warranty of merchantability under Virginia law.

2                    v.      Repairs

3        Ford argues that the only warranty at issue here is Ford's Limited Warranty.  Opp. at 31.

4   To recover for breach of express warranty ("EW" claims), a plaintiff must have brought his or her

5   vehicle in for repair twice, and Ford must have been unable to repair it.  *Id*.  Plaintiffs argue this is

6   a merits question, Reply at 25-26, and do not respond to Ford's point: the Court would have to

7   receive evidence from each individual class member that (1) he or she took the vehicle in for

8   repair on two separate occasions, and that (2) Ford was unable to repair it.

9        However, this information should be reflected in Ford's records.  If Ford has no record that

10  a particular consumer took his or vehicle in for repair twice, then the fact finder can presume that

11  the consumer did not do so.  A consumer may rebut that presumption by producing proof that he

12  or she took the vehicle in for two repairs, from his or her own records.  As the consumer has the

13  burden of proof, if he/she is not able to produce such proof, then he or she will not recover.  The

14  inquiry will turn on records and is relatively simple.  It does not defeat predominance.

15       Ford argues that its warranty limits damages to "cost of correcting manufacturing defects."

16  Def.'s Ex. 73 at 15.  Plaintiffs note that here, they complain of design defects, not manufacturing

17  defects.  Reply at 27.  Whether this warranty limitation bars Plaintiffs' claims is a matter that can

18  be determined on a classwide basis.[26]  *See In re Toyota Motor Corp. Unintended Acceleration*

19  *Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1181 (C.D. Cal. 2010)

20  ("defects in design are of a wholly different character than those occurring in the manufacturing

21  process"); *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1119 (2002) ("California

22  recognizes two distinct categories of product defects: manufacturing defects and design defects.").

23       Therefore, the Court will certify Plaintiffs' claims for:

24       • violation of California's Song-Beverly Consumer Warranty Act for Breach of

25          Express Warranties; and

26       • breach of express warranty under Washington Law.

27  —————————————————

28  [26] The parties did not brief whether the warranty applies to design defects.  The Court does not
    resolve this question, but notes that it may be answered on a classwide basis.

However, as to several of their EW claims, Plaintiffs seek "a return . . . of the purchase price of all Class Vehicles" and "incidental and consequential damages." *See, e.g*., TAC ¶ 446. They do not seek, *e.g.*, lost value.  The first claim for damages sought is overreaching, as Plaintiffs complain only of a problem with the MFT and not with the entire vehicle.  Moreover, they have presented no theory which explains why the alleged worthlessness of the MFT renders the entire vehicle worthless so as to warrant return of the purchase price of the vehicle.  The second damages claim is not encompassed by Plaintiffs' damages theory and Plaintiffs have not demonstrated they can be determined on a class-wide basis, the question of consequential damages being highly individualized.

Plaintiffs state these remedies are "additional and/or alternative."  *See id*.  They appear to be an alternative to the cost of "replacement[s] or adjustments."  *See id*. at ¶ 445.  But like incidental and consequential damages, Plaintiffs have not provided the Court with any idea as to what these costs would be for, let alone how to measure them and thus the Court cannot determine whether there is a viable model that can be applied to the class.

Thus, the Court will not certify Plaintiffs' claims for:

- breach of express warranty under Iowa Law;
- breach of express warranty under Massachusetts Law;
- breach of express warranty under New Jersey Law;
- breach of express warranty under New York Law;
- breach of express warranty under North Carolina Law;[27]
- breach of express warranty under Ohio Law;[28] and
- breach of express warranty under Virginia Law.

### vi.     State-Law Procedural Barriers

Ford argues that some of Plaintiffs' claims cannot be certified because Colorado and

---

[27] Moreover, as discussed *supra* section B.3.c.iii, Plaintiff Fink cannot represent the North Carolina class for a breach of express warranty claim.  This class therefore cannot be certified.

[28] In addition, Plaintiffs acknowledge that this claim has been previously dismissed, and include it for purposes of appeal.  TAC ¶ 621.

United States District Court
For the Northern District of California

1    Virginia bar class actions as to those claims.  Specifically, Colorado law prohibits class actions for

2    monetary damages based on the Consumer Protection Act, and Virginia bars class actions

3    altogether.  *See* Opp. at 29.  The question is whether these state statute survive Federal Rule of

4    Civil Procedure 23.

5           The Supreme Court is authorized "to prescribe general rules of practice and procedure and

6    rules of evidence for cases in the United States district courts," but not to "abridge, enlarge or

7    modify any substantive right."  28 U.S.C. § 2072(a), (b).  The United States Supreme court has

8    held that federal procedural rules trump state procedural rules in certain circumstances.  *See Shady*

9    *Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).  In evaluating

10   whether this is one of those circumstances, the Court must first ask "whether the federal and state

11   rules can be reconciled []because they answer different questions."  *Id*. at 410.  Here, Colorado's

12   and Virginia's statutes cannot be reconciled with Federal Rule of Civil Procedure 23.  The former

13   forbid class actions, and the latter permits them.

14          However, the *Shady Grove* majority was divided over the next step in the inquiry.  Because

15   the concurrence by Justice Stevens provides the narrowest ground for the holding, it is the

16   controlling opinion.  *See Garman v. Campbell Cty. Sch. Dist. No. 1*, 630 F.3d 977, 983 n.6 (10th

17   Cir. 2010) (finding Justice Stevens's opinion is controlling); *Marks v. United States*, 430 U.S. 188,

18   193 (1977) (explaining that when the Supreme Court is "fragmented . . . and no single rationale

19   explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as

20   that position taken by those Members who concurred in the judgments on the narrowest

21   grounds.'"); *see also Godin v. Schencks*, 629 F.3d 79, 87 (1st Cir. 2010) ("The critical question is

22   not 'whether the state law at issue takes the form of what is traditionally described as substantive

23   or procedural,' but rather 'whether the state law actually is part of a State's framework of

24   substantive rights or remedies.'") (relying on *Shady Grove*, 559 U.S. at 1440-42 (Stevens, J.

25   concurring)).  While the Ninth Circuit has not expressly recognized this, it has relied on Justice

26   Stevens's concurrence for the proposition that "there are some state procedural rules that federal

27   courts must apply in diversity cases because they function as part of the State's definition of the

28   substantive rights and remedies."  *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1187 (9th Cir.

**United States District Court**
For the Northern District of California

2013).  Under Justice Stevens's analysis, Rule 23 will not govern here if the Colorado and Virginia statutes are "procedural in the ordinary use of the term but [are] so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Shady Grove*, 559 U.S. 393, 423 (2010) (Stevens, J., concurring).

Here, Colorado's limitation on class actions is intertwined with the state right.  First, Colorado's limitation on class actions appears in the substantive section of the code, rather than in court rules.  *See In re Cty. of Orange*, 784 F.3d 520, 532 (9th Cir. 2015) (where rule regarding the right to a jury trial was contained in the California Constitution, it was substantive rather than procedural and not trumped by the Federal Rules); *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084 (N.D. Cal. 2014) (where limitation on class actions was part of state substantive law, FRCP did not trump).  Second, the limitation is part of the same paragraph which would otherwise make it possible for Plaintiffs to sue for damages.  *See* Colo. Rev. Stat. Ann. § 6-1-113(2) ("Except in a class action . . .  any person who, in a private civil action, is found to have engaged in or caused another to engage in any deceptive trade practice listed in this article shall be liable . . . .").  Where the limitation is "incorporated in the same statutory provision as the underlying right," courts find it substantive rather than procedural.  *Local 1776*, 74 F. Supp. 3d at 1084.  Finally, the limitation applies only to Colorado's Consumer Protection Act, suggesting it reflects a substantive policy judgment as to the area of the law by the legislature, not a rule of general procedure.  *See id*.

By contrast, Virginia's prohibition is in Virginia's procedural law, not the substantive VCPA.  *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013) ("The absence of a class action right under the VCPA is the 'default' position under Virginia law, rather than a provision of the VCPA itself.  Thus, Court concludes that the lack of a class action mechanism is a procedural matter, rather than a substantive law . . . .").  Because Virginia's class action ban is not part of the VCPA, and applies outside the context of the VCPA, it is procedural rather than substantive, and is precluded by Rule 23.  Virginia's ban on class actions therefore does not apply here.

For these reasons, the Court will not certify Plaintiffs' claim for:

- violation of the Colorado Consumer Protection Act.

The Court will certify Plaintiffs' claim for:

- violation of the Virginia Consumer Protection Act.

### vii.    Previously Dismissed Claims

Some of Plaintiffs' claims were previously dismissed.  *See* TAC ¶¶ 375, 621.  Though Ford did not separately challenge these claims, the Court notes in the interests of clarity that it will not certify Plaintiffs' claims for:

- violation of California Civil Code Section 1795.92 and

- breach of express warranty under Ohio Law.

### c.    Superiority

A class action is considered "superior to other methods of adjudication" if "classwide litigation of common issues will reduce litigation costs and promote greater efficiency."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  To determine superiority, the court must look at

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The first three factors are easily resolved.  Plaintiffs argue individual recovery here is likely to be so small as to make individual actions not worth bringing.[29]  Mot. at 50.  A class action is therefore a superior option.

---

[29] Even according to the most generous expert, average individual recovery would be less than $1,400.  *See* Pls.' Ex. 186 at 15-16 (recovery will be $625 or $1,364 per class member); Ex. 185 at 33-34 (recovery will be at most $839 per class member).

United States District Court

For the Northern District of California

1    As to the second factor, Ford has not presented any argument on other litigation "already

2    begun by . . . class members," and so this factor is neutral.  So too is the desirability of

3    concentrating the claims in this forum.  In evaluating this factor, courts look at "the location of the

4    parties, witnesses, and evidence." *Breeden v. Benchmark Lending Grp., Inc.*, 229 F.R.D. 623, 631

5    (N.D. Cal. 2005).  Here, class members are scattered across the country, so this forum is neither

6    better nor worse for Plaintiffs than any other.  While Ford is located in another state, it is a large

7    corporation which can litigate with relative ease in California.  This factor is also neutral.

8    Ford argues that this class action will be unmanageable.  Opp. at 39-42.  Several courts

9    have recognized that manageability is the most important factor in a Rule 23(b)(3) analysis.  *See*

10   *In re Activision Sec. Litig.*, 621 F. Supp. 415, 438 (N.D. Cal. 1985); *Daye v. Cmty. Fin. Serv.*

11   *Centers, LLC*, 313 F.R.D. 147, 173 (D.N.M. 2016); *In re OnStar Contract Litig.*, 278 F.R.D. 352,

12   386 (E.D. Mich. 2011); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 375

13   (E.D. La. 1997).  Plaintiffs seek recovery on behalf of twelve state classes and the Court will

14   certify seven of those twelve.  This is not obviously unmanageable.  *See In re Pharm. Indus.*

15   *Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006) (certifying forty-one subclasses).

16   If, however, the proof later shows that there is substantial variance between the versions of the

17   software, and that variance is material so as to require subclasses, Ford may move the Court to

18   revisit the question of manageability.

19   While Ford argues the various damages calculations would be unduly burdensome, as

20   discussed at the hearing this may be resolved with a damages matrix.  That is, if liability is proven

21   damages may be calculated according to which subclasses a particular class member falls into.

22   Moreover, "[i]n this circuit, . . . , damage calculations alone cannot defeat certification."

23   *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *accord Pulaski*, 802

24   F.3d at 986.

### III.   CONCLUSION

26   For the foregoing reason, the Court **GRANTS** Plaintiffs' motion to certify classes from the

27   following states, for the following claims:

28   • **California**: The Court will certify the class as to claims for violation of

**United States District Court**
For the Northern District of California

California's Consumers Legal Remedies Act, breach of the implied warranty of merchantability, violation of the Song-Beverly Act for Breach of Express Warranty, violation of the Song-Beverly Act for Breach of Implied Warranty of Merchantability, and violation of California's Unfair Competition Law to the extent they are predicated on bases other than fraud.  The Court will not certify the class as to Plaintiffs' claims for violation of California's Unfair Competition Law to the extent they are predicated upon fraud, violation of California's False Advertising Law, fraudulent concealment, or violation of California Civil Code Section 1795.92.

- **Colorado**: The Court will certify the class as to the claim for strict product liability. The Court will not certify the class as to Plaintiffs' claims for fraudulent concealment and violation of the Colorado Consumer Protection Act.

- **Massachusetts**: The Court will certify the class as to Plaintiffs' claim for violation of the Massachusetts Consumer Protection Act and breach of the implied warranty of merchantability.  The Court will not certify the class as to Plaintiffs' claims for breach of express warranty or fraudulent concealment.

- **New Jersey**: The Court will certify the class as to Plaintiffs' claim for breach of the implied warranty of merchantability.  The Court will not certify the class as to Plaintiffs' claims for violation of the New Jersey Consumer Fraud Act, breach of express warranty, and fraudulent concealment.

- **North Carolina**: The Court will certify the class as to Plaintiffs' claim for breach of the implied warranty of merchantability.  The Court will not certify the class as to Plaintiffs' claims for breach of express warranty, violation of the North Carolina Unfair and Deceptive Trade Practices Act, and fraudulent concealment.

- **Ohio**: The Court will certify the class as to Plaintiffs' claim for breach of implied warranty in tort, violation of the Consumer Sales Practices Act, and negligence. The Court will not certify the class as to Plaintiffs' claims for fraudulent concealment and breach of express warranty.

- **Texas**: The Court will certify the class as to Plaintiffs' claim for violation of the Deceptive Trade Practices Act.  The Court will not certify the class as to Plaintiffs' claim for fraud by concealment.

- **Virginia**: The Court will certify the class as to Plaintiffs' claim for breach of the implied warranty of merchantability and violation of the Virginia Consumer Protection Act.  The Court will not certify the class as to Plaintiffs' claims for breach of express warranty, and fraudulent concealment.

- **Washington**: The Court will certify the class as to Plaintiffs' claim for breach of express warranty.  The Court will not certify the class as to Plaintiffs' claim for violation of the Washington Consumer Protection Act.

The Court will not certify the classes for **Arizona**, **Iowa**, and **New York**.  The Court **DENIES** Plaintiffs' motion as to these states' classes.

This Order disposes of Docket No. 202.

The Court temporarily seals this Order.  By September 23, 2016, the parties shall submit to EMCpo@cand.uscourts.gov a joint document identifying the exact portions, if any, of the Order that need to be sealed, marking (without applying) their proposed redactions.  Any redactions shall meet the standards set forth in Local Civil Rule 79-5(b).  Should the parties fail to identify which portions of the Order need to be redacted, the Court shall remove the seal and the Order shall be publicly filed in its entirety.

**IT IS SO ORDERED**.


Dated: September 14, 2016

_____
EDWARD M. CHEN
United States District Judge