STEVE W. BERMAN (*pro hac vice*)
CRAIG SPIEGEL (122000)
TYLER WEAVER (*pro hac vice*)
CATHERINE Y.N. GANNON (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com
tyler@hbsslaw.com
craigs@hbsslaw.com

ROLAND TELLIS (186269)
MARK PIFKO (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

*Class Counsel*

ADAM J. LEVITT (*pro hac vice*)
JOHN E. TANGREN (*pro hac vice*)
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com

NICHOLAS E. CHIMICLES (*pro hac vice*)
BENJAMIN F. JOHNS (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
nick@chimicles.com
benjohns@chimicles.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. 3:13-cv-03072-EMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      February 1, 2018<br>Time:     1:30 p.m.<br>Courtroom: 5, 17th Floor<br>Judge:   Hon. Edward M. Chen |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT ........................................................................................................2

      A.      There are genuine issues of material fact regarding Plaintiffs'
            claims for breach of implied warranty of merchantability and
            violation of the Song-Beverly Act..........................................................2

            1.      Plaintiffs present substantial evidence that MFT vehicles
                     were not merchantable, because those vehicles did not
                     provide safe, reliable transportation and were not
                     substantially defect-free.....................................................................2

                     a.      Plaintiffs need only establish that the defective
                            MFT system caused a safety hazard, not that
                            accidents occurred. ................................................................2

                     b.      Plaintiffs present substantial evidence that the MFT
                            defects posed a substantial safety hazard and
                            therefore were not merchantable. .........................................3

                          (1)      MFT system failures distracted Plaintiffs,
                                  substantially increasing the likelihood of
                                crashes. ........................................................................3

                            (2)      Plaintiffs' expert, Dr. Rosenberg, provides
                                  substantial evidence that MFT defects
                                endanger drivers by distracting them. ...................................4

             2.      Summary judgment should be denied on Plaintiffs'
                       California Song-Beverly Act claim, because latent defects
                       in the MFT vehicles existed at the time of delivery and
                       manifested in the first year of ownership. ..........................................6

             3.      Used-car purchasers may assert Song-Beverly Act claims. ...........6

             4.      Ford's exclusion of business and commercial uses from the
                       implied warranty of merchantability is invalid. ...............................7

      B.      Summary judgment should be denied with respect to Plaintiffs' tort
             claims........................................................................................................9

             1.      The Colorado strict product liability claim should be
                       sustained. ..........................................................................................9

                         a.      The economic loss doctrine does not apply.........................9

                         b.      Plaintiffs have presented substantial evidence that
                            the MFT system is unreasonably dangerous. ......................9

2.    Substantial evidence supports the claim that Ford breached its duty under Ohio negligence law to design a safe product. ...................................................................................10

C.    Summary judgment should be denied with respect to Plaintiffs' express warranty claims for the alleged failure to seek multiple repairs. .............................................................................11

D.    Summary judgment should be denied with respect to Plaintiffs' UCL claim. ...............................................................................13

E.    Summary judgment should be denied with respect to Plaintiffs' MCPA § 9 claim. ....................................................................13

1.    Plaintiff Creed did not purchase his MFT vehicle in a business context. ..................................................................14

2.    Plaintiff Creed's MCPA demand letter suffices. ............................15

F.    Plaintiffs' damages experts provide substantial evidence of classwide damages. ....................................................................16

1.    The damage models measure express warranty damages. ............16

2.    Plaintiffs' damage models fit their implied warranty claims. .......18

a.    Dr. Arnold's damage model is proper. ..............................18

b.    Mr. Boedeker validly assesses warranty damages. ..........21

c.    Boedeker's model does not have flaws that justify summary judgment. .................................................22

G.    Summary judgment should be denied as to Plaintiffs' uncertified individual claims. .............................................................24

III.    CONCLUSION .....................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 19

*In re Asacol Antitrust Litig.*,
2016 WL 4083333 (D. Mass. July 20, 2016) ........................................................ 14

*Benkle, et al. v. Ford Motor Co.*,
No. 8:16-cv-01569 (C.D. Cal.) ................................................................................ 7

*Borkman v. BMW of N. Am., LLC*,
2017 WL 4082420 (C.D. Cal. Aug. 28, 2017) ........................................................ 3

*Brand v. Hyundai Motor Am.*,
226 Cal. App. 4th 1538 (2014) ......................................................................... 2, 3, 6

*Brandt v. Olympic Constr., Inc.*,
449 N.E.2d 1231 (Mass. App. Ct. 1983) ............................................................... 15

*Brown v. Gerstein*,
460 N.E.2d 1043 (Mass. App. Ct. 1984) ............................................................... 14

*Camacho v. Honda Motor Co.*,
741 P.2d 1240 (Colo. 1987) ................................................................................... 10

*Cont'l Ins. Co. v. Bahnan*,
216 F.3d 150 (1st Cir. 2000) .................................................................................. 14

*Copart, Inc. v. Sparta Consulting, Inc.*,
2017 WL 4269921 (E.D. Cal. Sept. 26, 2017) ...................................................... 25

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) .......................................................................... 11, 17

*Disher v. Tamko Bldg. Prods., Inc.*,
2015 WL 4609980 (S.D. Ill. July 31, 2015) ............................................................ 9

*Farmer v. Fannie Mae*,
31 Mass. L. Rep. 204 (Mass. Super. Ct. 2013) ..................................................... 16

*In re Ford Motor Co., Spark Plug & 3-Valve Engine Prods. Liab. Litig.*,
2014 WL 3778592 (N.D. Ohio July 30, 2014) ...................................................... 23

*Forest City Stapleton Inc. v. Rogers*,
393 P.3d 487 (Colo. 2017) ....................................................................................... 9

*Fredericks v. Rosenblatt*,
   667 N.E.2d 287 (Mass. App. Ct. 1996) ................................................................. 15

*Hammond Enters. Inc. v. ZPS Am. LLC*,
   2013 WL 5814505 (N.D. Cal. Oct. 29, 2013) ........................................................ 8

*Hiller v. DaimlerChrysler Corp.*,
   2007 WL 2367629 (Mass. Super. Ct. July 25, 2007) ............................................ 16

*Hoffman v. Daimler Trucks N. Am., LLC*,
   940 F. Supp. 2d 347 (W.D. Va. 2013) .................................................................. 8

*Holz v. Coates Motor Co.*,
   147 S.E.2d 152 (Va. 1966) .................................................................................... 19

*Isip v. Mercedes-Benz USA, LLC*,
   155 Cal. App. 4th 19 (2007) .................................................................................. 2

*Jackson v. Fischer*,
   2017 WL 1019830 (N.D. Cal. Mar. 16, 2017) ...................................................... 25

*Kay Constr. Co. v. Control Point Assocs.*,
   2002 WL 31187825 (Mass. Super. Ct. Aug. 16, 2002) ......................................... 14

*Linthicum v. Archambault*,
   398 N.E.2d 482 (Mass. 1979) ................................................................................ 14

*Loughridge v. Goodyear Tire and Rubber Co.*,
   192 F. Supp. 2d 1175 (D. Colo. 2002) .................................................................. 9

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) .................................................................................. 18

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
   761 F.2d 553 (9th Cir. 1985) ................................................................................. 17

*Miller v. Fuhu Inc.*,
   2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) ........................................................ 18

*Moynihan v. Life Care Ctrs. of Am., Inc.*,
   60 Mass. App. Ct. 1102 (2003) ............................................................................. 16

*Mui Ho v. Toyota Motor Corp.*,
   931 F. Supp. 2d 987 (N.D. Cal. 2013) .................................................................. 7

*In re MyFord Touch Consumer Litig.*,
   2015 WL 2451291 (N.D. Cal. May 30, 2014) ...................................................... 6

*In re MyFord Touch Consumer Litig.,*
   2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ........................................................ *passim*

*In re MyFord Touch Consumer Litig.,*
   46 F. Supp. 3d 936 (N.D. Cal. 2014) .............................................................................. 9

*Nat'l Fed'n of the Blind v. Target Corp.,*
   582 F. Supp. 2d 1185 (N.D. Cal. 2007) ....................................................................... 16

*In re NJOY Consumer Class Action Litig.,*
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ....................................................................... 23

*Philips v. Ford Motor Co.,*
   No. 14-cv-02989 (N.D. Cal.) ........................................................................................ 20

*Philips v. Ford Motor Co.,*
   No. 17-15323 (9th Cir.) ................................................................................................. 20

*Richards v. Arteva Specialties S.A.R.L.,*
   850 N.E.2d 1068 (Mass. App. Ct. 2006) ..................................................................... 15

*RRX Indus., Inc. v. Lab-Con, Inc.,*
   772 F.2d 543 (9th Cir. 1985) ........................................................................................ 17

*S.M. Wilson & Co. v. Smith Int'l, Inc.,*
   587 F.2d 1363 (9th Cir. 1978) ...................................................................................... 17

*Saavedra v. Eli Lilly & Co.,*
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ............................................................ 23

*Sanchez-Knutson v. Ford Motor Co.,*
   181 F. Supp. 3d 988 (S.D. Fla. 2016) ................................................................... 22, 23

*Sanchez-Knutson v. Ford Motor Co.,*
   2017 U.S. Dist. LEXIS 96560 (S.D. Fla. June 21, 2017) ........................................... 23

*Sater v. Chrysler Grp. LLC,*
   2015 WL 736273 (C.D. Cal. Feb. 20, 2015) ................................................................. 7

*Scott v. Honeywell Int'l Inc.,*
   2015 WL 1517527 (D. Colo. Mar. 30, 2015) ................................................................ 9

*Shroyer v. New Cingular Wireless Servs., Inc.,*
   622 F.3d 1035 (9th Cir. 2010) ...................................................................................... 13

*Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.,*
   890 F.2d 108 (9th Cir. 1989) .......................................................................................... 8

*Simas v. House of Cabinets,*
   757 N.E.2d 277 (Mass. App. Ct. 2001) ............................................................... 15

*South Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.,*
   183 F. Supp. 3d 197 (D. Mass. 2016) ................................................................ 14

*Spring v. Geriatric Auth. of Holyoke,*
   475 N.E.2d 727 (Mass. 1985) ............................................................................ 16

*Swenson v. Yellow Transp., Inc.,*
   317 F. Supp. 2d 51 (D. Mass. 2004) .................................................................. 14

*Tarpey v. Crescent Ridge Dairy, Inc.,*
   713 N.E.2d 975 (Mass. App. Ct. 1999) ............................................................. 15

*Twin Lakes Mfg. Co. v. Coffey,*
   281 S.E.2d 864 (Va. 1981) ................................................................................ 19

*U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.,*
   358 F. Supp. 2d 1021 (D. Colo. 2005) ................................................................ 9

*Wayne Mem'l Hospital v. Electronic Data Systems Corp.,*
   1990 WL 606686 (E.D.N.C. Apr. 10, 1990) ....................................................... 8

*Wendell v. GlaxoSmithKline LLC,*
   858 F.3d 1227 (9th Cir. 2017) ........................................................................... 24

*Wharton, Aldhizer & Weaver v. Savin Corp.,*
   350 S.E.2d 635 (Va. 1986) ................................................................................ 19

*Zierolf v. Wachovia Mortg.,*
   2012 WL 6161352 (N.D. Cal. Dec. 11, 2012) ..................................................... 9

## STATUTES

Cal. Civ. Code § 1794(c) ......................................................................................... 22

Cal. Civ. Code § 1795.5 ............................................................................................ 7

Cal. Com. Code § 1201(b)(10) ................................................................................. 8

Cal. Com. Code § 2316(2) ......................................................................................... 7

Cal. Com. Code § 2714(2) ................................................................................. 17, 18

Cal. Com. Code § 2719(2) ....................................................................................... 17

Mass. Gen. Laws ch. 93A, § 9 ................................................................................ 14

Mass. Gen. Laws ch. 93A, § 9(3) ........................................................................... 15

Mass. Gen. Laws ch. 106, § 2-714(2) ................................................................................... 18

N.C. Gen. Stat. § 25-2-714(2) .............................................................................................. 18

N.J. Stat. Ann. § 12A:2-714(2) ............................................................................................ 18

Ohio Rev. Code Ann. § 1302.88(B) ..................................................................................... 18

Va. Code Ann. § 8.2-714(2) ................................................................................................. 18

Wash. Rev. Code § 62A.2-714(2) ......................................................................................... 17

Wash. Rev. Code § 62A.2-719(2) ......................................................................................... 17

1

## I.   INTRODUCTION

2   Ford's Motion for Summary Judgment should be denied.[1] *First*, in order to prevail on their

3   claims for breach of the implied warranty of merchantability and violation of the Song-Berverly Act,

4   Plaintiffs need only show that MyFord Touch ("MFT") posed a safety hazard, not that it caused an

5   accident. Plaintiffs present substantial evidence that defects in the MFT system distract them, to the

6   point that they do not use the system at all or pull to the side of the road to temporarily fix distracting

7   problems. And as this Court recognized in ruling on class certification, Plaintiffs present substantial

8   classwide evidence by their expert, Dr. Craig Rosenberg, that distractions posed by the MFT system

9   increase the risk of a crash with the associated risk of injury or death.

10   *Second*, for the Song-Berverly Act claim, Plaintiffs present substantial evidence that latent

11   defects in the MFT vehicles existed at the time of delivery and manifested in the first year of owner-

12   ship. Plaintiffs also explain that used-car purchasers have valid implied warranty claims under the

13   Act when an express warranty is provided with the car, and because Ford's purported exclusion of

14   the implied warranty for business and commercial uses is unenforceable.

15   *Third*, summary judgment should be denied on the strict product liability claim under

16   Colorado law, because, as this Court has already ruled, the economic loss doctrine does not bar that

17   claim and because Plaintiffs have presented substantial evidence that the MFT system is unreason-

18   ably dangerous. Similarly, substantial evidence supports Plaintiffs' claim that Ford breached its duty

19   under Ohio negligence law to design a safe product. And summary judgment should not be entered

20   on Plaintiffs' claim under the Massachusetts Consumer Protection Act, because Plaintiff Creed did

21   not purchase his MFT vehicle for business purposes and provided a sufficient demand letter.

22   *Fourth*, summary judgment should be denied on Plaintiffs' express warranty claims for the

23   alleged failure to seek multiple repairs. Ford's Limited Warranty does not require buyers to seek any

24   repair for design defects. And even if the Limited Warranty required buyers to seek repairs, this

25   Court has already devised a solution to address Ford's complaint by using Ford's own records,

26

27   _____

[1] The sole exception is that Plaintiffs do not oppose Ford's Motion for Summary Judgment as it
relates to the CLRA claim of the Center for Defensive Driving ("CDD"). *See* Ford's Mem. of P. &

28   A. in Supp. of Mot. for Summ. J. ("Def. Mem.") at 24-25.

supplemented by consumer-provided proof, from which it can be determined which class members

have presented their vehicle for repairs on multiple occasions.

*Fifth*, Plaintiffs present substantial evidence of damages by their experts. Stefan Boedeker

presents a conjoint analysis that properly measures the lost benefit of the bargain suffered by all class

members, and Dr. Jonathan Arnold presents an alternative, valid model for establishing classwide

damages. This Court ruled that their damage models were admissible at the class certification stage,

and they remain valid damages models.

## II.   ARGUMENT

**A.   There are genuine issues of material fact regarding Plaintiffs' claims for breach of implied warranty of merchantability and violation of the Song-Beverly Act.**

    **1.   Plaintiffs present substantial evidence that MFT vehicles were not merchantable, because those vehicles did not provide safe, reliable transportation and were not substantially defect-free.**

Ford incorrectly argues that Plaintiffs cannot prove that MFT vehicles are not merchantable.

Def. Mem. 3-8. In granting class certification, in part, this Court stated that one of the common

issues is "whether that systemic defect is responsible for critical safety hazards such as distracted

driving." Order Granting in Part and Denying in Part Pls.' Mot. to Certify Class, ECF No. 279

("Class Cert. Order"), at 14. Plaintiffs now provide substantial evidence to prove that the MFT

system defects are, in fact, responsible for the critical safety hazard of distracted driving.

    **a.   Plaintiffs need only establish that the defective MFT system caused a safety hazard, not that accidents occurred.**

"The core test of merchantability is fitness for the ordinary purpose for which such goods are

used." *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26 (2007) (internal quotation marks

and citation omitted). In *Isip*, the Court affirmed a judgment for breach of the implied warranty of

merchantability even though the plaintiff did not introduce any evidence of an accident. So there

need only be a safety hazard, not proof that an accident occurred. Similarly, in *Brand v. Hyundai

Motor America*, 226 Cal. App. 4th 1538 (2014), the plaintiff sued for breach of the implied warranty

of merchantability, alleging that his car's sunroof spontaneously opened and closed while driving,

causing a safety hazard. The trial court granted the defendants' motion for nonsuit on the basis that

no reasonable jury could find the problem to be a safety hazard. The Court of Appeal reversed even though the plaintiff presented no evidence that an accident had occurred, because "a reasonable jury could conclude that a vehicle sunroof that opens and closes *on its own* creates a substantial safety hazard. [Plaintiff] described how on the freeway the papers in his car suddenly swirled about in the passenger compartment without notice, creating a dangerous distraction." *Id*. at 1547. And the court held that a jury "reasonably could infer a multitude of similar unsafe scenarios: a driver suddenly distracted, buffeted, or even incapacitated by unexpected incoming rain, sleet, snow, dust, or blinding sun, or endangered by objects shooting through or out of the cabin." *Id*.[2] So Ford's assertion that Plaintiffs must prove that the defects caused accidents is incorrect.

> **b.** **Plaintiffs present substantial evidence that the MFT defects posed a substantial safety hazard and therefore were not merchantable.**
>
> > **(1)** **MFT system failures distracted Plaintiffs, substantially increasing the likelihood of crashes.**

Plaintiffs' experiences reveal significant, repetitive failures of the MFT system overall and in a host of its features, including navigation, backup cameras, Bluetooth connectivity, voice activation problems, and problems playing music and/or the radio.[3] Plaintiffs testified that Ford salespeople touted MFT as a safety feature, and that they bought MFT, in part, to avoid distractions.[4] They also testified that unexpected and sudden failures in various aspects of the MFT system (including the backup camera) in fact distracted them while operating the vehicle.[5]

---

[2] *See also Borkman v. BMW of N. Am., LLC*, 2017 WL 4082420, at *9 (C.D. Cal. Aug. 28, 2017) ("[P]laintiff has adequately pleaded a breach of the implied warranty pursuant to the Song–Beverly Act. Plaintiff alleges that the Oil Filter Housing Defect creates hazardous conditions, including loss of power during operation, engine overheating, and ***potentially***, engine failure.") (emphasis added) (footnote omitted).

[3] Decl. of Steve W. Berman in Supp. of Pls.' Opp'n to Mot. for Summ. J., Ex. 1 (Watson Dep.) at 68:21-69:21; Ex. 2 (Thomas-Maskrey Dep.) at 15:12-16:17; Ex. 3 (Connell Dep.) at 18:17-19:13; Ex. 4 (Creed Dep.) at 11:15-25, 102:8-104:21; Ex. 5 (Fink Dep.) at 11:22-12:4, 12:11-15:6, 102:1-104:18; Ex. 6 (Matlin Dep.) at 21:1-11, 108:19-25, 112:19-114:13, 124:10-125:16; Ex. 7 (Sheerin Dep.) at 8:8-9:11; Ex. 8 (Whalen Dep.) at 38:18-40:13, 69:1-70:8, 89:5-20; Ex. 9 (Kirchoff Dep.) at 10:15-11:3; Ex. 10 (Miskell Dep.) at 9:13-10:7, 56:3-22. All "Ex." references are to the Berman Declaration unless otherwise indicated.

[4] *See, e.g.*, Ex. 1 (Watson Dep.) at 43:15-21; Ex. 11 (D'Aguanno Dep.) at 25:21-24, 26:22-24, 39:12-22, 84:4-7; Ex. 12 (Ervin Dep.) at 133:24-134:7.

[5] *See, e.g.*, Ex. 12 (Ervin Dep.) at 127:20-128:1, 128:11-16, 175:5-8; Ex. 9 (Kirchoff Dep.) at 72:19-73:4; Ex. 6 (Matlin Dep.) at 21:1-11; Ex. 13 (Miller-Jones Dep.) at 21:15-22; Ex. 14 (Mitchell Dep.) at 51:16-24, 55:12-17, 76:11-17; Ex. 15 (Purcell Dep.) at 126:1-11; Ex. 16 (Miller Dep.) at

1      Various MFT owners also testified that in order to avoid accidents, they stopped using the

2   MFT system or pulled off the road to fix problems.[6] For example, Watson testified that when the

3   MFT screens went blank, "Typically I would have to pull over and shut the car off and then restart

4   it."[7] Rizzo testified that when the screen went dark, "there were times where if the children were

5   around, I would walk in back of the vehicle and make sure, and then I hurry up back in because I

6   knew nobody was behind it."[8] He also testified that his "service guy" told him that when the screen

7   went blank while driving, "what you have to do: Pull over. Put the vehicle in park. Shut the engine

8   off. Open the door, the driver's door. Close the driver's door. Wait a few seconds and restart the

9   engine, and it should come back. Sometimes it did. Sometimes we had to do it two and three times;

10  and this problem was happening three to four times a week. And then when I finally like -- one

11  Saturday we were in the car and it happened three different times on the same day on a Saturday."[9]

12  He terminated his lease because "I could not deal any more with the problems associated with

13  MyFord Touch. It was very distracting, and it was very disturbing, and I just -- I had had enough

14  with that vehicle."[10] In light of such testimony, Ford's insistence that Plaintiffs must prove that the

15  defective MFT system actually caused accidents is demonstrably incorrect. Not only is there no law

16  to support that proposition, but the fact that users stopped relying on the defective MFT system

17  substantially decreased the chance of any such accident occurring.

18              **(2)    Plaintiffs' expert, Dr. Rosenberg, provides substantial evidence
                        that MFT defects endanger drivers by distracting them.**

19

20          Plaintiffs' expert Dr. Craig Rosenberg also provides substantial evidence that the defective

21  MFT system presents a safety hazard. In granting, in part, Plaintiffs' class certification motion, this

22  Court denied Ford's *Daubert* challenge to his report, stating:

23  _____

    11:20-12:2, 12:7-13:9, 24:25-25:17, 28:17-23, 35:10-16, 37:14-21, 39:19-40:1, 40:22-41:6, 179:12-

24  180:1; Ex. 17 (Rodriguez Dep.) at 209:17-210:6; Ex. 8 (Whalen Dep.) at 183:5-25, 199:12-14,
    206:5-9.

25      [6] Ex. 1 (Watson Dep.) at 72:14-73:23, 75:4-18; Ex. 2 (Thomas-Maskrey Dep.) at 17:8-19:16,
    46:13-47:25, 126:24-127:12; Ex. 3 (Connell Dep.) at 19:15-20:24, 254:16-24; Ex. 6 (Matlin Dep.) at

26  181:13-182:2; 182:25-183:14; Ex. 8 (Whalen Dep.) at 38:18-40:13, 205:21-206:9.

        [7] Ex. 1 (Watson Dep.) at 114:5-9.

27      [8] Ex. 18 (Rizzo Dep.) at 89:20-23.

        [9] *Id*. at 116:12-21.

28      [10] *Id*. at 58:17-22.

> Dr. Rosenberg opines that the MFT's problems "lead to undue time and attention, excessive task demand, overly complicated mental models, and mistrust of the system, which result in driver distraction from the task of driving and cause a significant safety issue." Pls.' Ex. 8 at 219. Overall, the distractions posed by the MFT "increase[] the risk of a crash with the associated risk of injury or death." *Id.* at 220.

Class Cert. Order at 8; *see also* Ex. 19 (Rosenberg Rpt.) at 199. This Court further stated:

> As to whether the MFT renders a vehicle unsafe, Dr. Rosenberg does not – quite – state that the MFT renders a vehicle absolutely unsafe. Instead, he opines that the MFT causes distractions, which combine to make the vehicle less safe that it would be were the MFT not to distract the driver. *See* Pls.' Ex. 8 at 30 (MFT "is likely to create safety issues"); 70 (MFT issues "reduc[e] any driver's ability to operate a [MFT]-equipped vehicle safety"); 95 (problems with the navigation system have "safety implications"); 99 (climate control defects "can result in safety issues"); 114 (the accumulation of problems "has safety implications"); 148 (problems with the back button "could lead [to] safety implications"); 176 (keypad issues "may lead to safety implica-tions"); 214 (blurred button "well may lead to safety issues"); 218 (the "numerous issues" have "varying impact on safety"). The data he cites and the methodology used to derive this conclusion is sufficiently reliable under *Daubert*. Moreover, that the MFT poses significant distractions, and that those distractions make a vehicle with MFT less safe than one without, falls within Dr. Rosenberg's area of expertise. ***The Court will therefore not exclude Dr. Rosenberg's opinion that the MFT reduces safety by posing significant distractions and that these distractions can cause unsafe driving conditions***.

*Id*. at 9 (emphasis added); *see also* Ex. 19 (Rosenberg Rpt.) at 28, 66, 88, 92, 106, 136, 160, 194, 198.

In addition, Dr. Rosenberg explains that "[d]istraction from in-vehicle information and enter-tainment systems and other sources, while likely under-reported, has been linked to 17% of all police-reported crashes (fatal, injury-only and property-damage-only). Distracted driving is a priority for the national Highway Traffic Safety Administration." Ex. 19 (Rosenberg Rpt.) at i, 25. And he explains that accidents that are in fact caused by distracted driving may not even be reported as such:

> There is reason to believe that distraction may be under-reported as a cause of accidents. Data collection after an accident often depends on self-reporting, and drivers may be unwilling to admit that they were distracted. In fatal accidents, there may be no remaining evidence of any distractions that occurred. Or a police report may indicate a cause, such as "crossed center line," without specifying why the driver crossed the center line. Also, police reports vary across jurisdictions and do not identify driver distractions consistently (National Highway Traffic Safety Administration, 2013a). A National Safety Council study found that many distraction-related accidents between 2009 and

2011 were not properly coded in the National Highway Traffic Safety Administration's crash information database (Tykla Law Firm, 2015).

*Id.* at 25. Dr. Rosenberg further explains that "numerous statistics still show the danger of distracted driving," *id.*, including:

- "In 2010, 17% of all police-reported crashes (fatal, injury-only and property-damage-only) involved driver distraction. These crashes have led to 'thousands of fatalities and over 400,000 injured people each year, on average' (National Highway Traffic Safety Administration, 2012)." *Id.*

- "In 2013, 3,154 people were killed in motor vehicle crashes involving distracted drivers. 424,000 people were injured (Department of Transportation, 2014). According to 2011 data, 10% of fatal crashes and 17% of injury crashes were 'distraction-affected' (National Highway Traffic Safety Administration, 2013a)." *Id.*

In light of the foregoing substantial evidence, this Court should deny Ford's summary judgment motion with respect to Plaintiffs' breach of the implied warranty of merchantability claims.

**2.    Summary judgment should be denied on Plaintiffs' California Song-Beverly Act claim, because latent defects in the MFT vehicles existed at the time of delivery and manifested in the first year of ownership.**

Ford erroneously argues that because "no California Plaintiff (or class member) has any evidence that MFT caused an accident or otherwise caused his or her vehicle to be inoperable during the one-year period," the claim under the Song-Beverly Consumer Warranty Act "fails." Def. Mem. 8. Ford cites no authority for that proposition because, as discussed above, no such authority exists. For example, in *Brand*, the court reversed nonsuit for the defendants on a Song-Beverly claim even though the plaintiff did not present any evidence that he actually suffered an accident or that his car was inoperable at any time. The court explained that a "reasonable jury could conclude the randomly opening and closing sunroof he discovered immediately after delivery was not a minor defect as Hyundai claims, but instead constituted a safety hazard breaching the implied warranty." *Brand*, 226 Cal. App. 4th at 1549. Plaintiffs here provide abundant evidence that MFT constitutes a safety hazard that existed at purchase and was evident at all times after purchase, as shown above.

**3.    Used-car purchasers may assert Song-Beverly Act claims.**

Ford erroneously claims that used-car buyers may not assert claims under the Song-Beverly Act. Def. Mem. 9. But contrary to Ford's argument, the Song-Beverly Act does not require vertical privity. *In re MyFord Touch Consumer Litig.*, 2015 WL 2451291, at *29-30 (N.D. Cal. May 30,

2014); *Sater v. Chrysler Grp. LLC*, 2015 WL 736273, at *8 (C.D. Cal. Feb. 20, 2015). In a case in

the Central District of California, Ford acknowledged that there is no vertical privity requirement

under the Act.[11] Moreover, the Act allows claims by used-car purchasers for breach of the implied

warranty of merchantability when an express warranty is provided. "Notwithstanding the provisions

of subdivision (a) of Section 1791 defining consumer goods to mean 'new' goods, the obligation of a

distributor or retail seller of used consumer goods in a sale in which an express warranty is given

shall be the same as that imposed on manufacturers under this chapter." Cal. Civ. Code § 1795.5. *See*

*Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 993 (N.D. Cal. 2013) (recognizing that a used-

car purchaser may assert a claim for breach of the implied warranty against a manufacturer if an

express warranty is given on the used car). While the duration of the implied warranty under section

1795.5 is shorter, it still exists and may be asserted against Ford, either as the manufacturer or the

distributor or retailer of used consumer goods, because Ford offered an express warranty on Plaintiff

Watson's car. *See* Ex. 1 (Watson Dep.) at 85:8-19, 87:18-23.

### 4. Ford's exclusion of business and commercial uses from the implied warranty of merchantability is invalid.

Ford incorrectly argues that it has lawfully excluded business and commercial uses from the

implied warranty of merchantability. Def. Mem. 9-10. Ford relies on one paragraph buried in a

35-page document that is identical to the paragraphs that surround it, but that does not satisfy the

standards for exclusion or modification of the implied warranty of merchantability.

Under the U.C.C., which all relevant states have adopted, "to exclude or modify the implied

warranty of merchantability or any part of it the language must mention merchantability and in case

of a writing must be conspicuous." *See, e.g.*, Cal. Com. Code § 2316(2). Ford's Limited Warranty

fails both requirements, because the heading in the Warranty Guide does not mention merchantabil-

ity, and the waiver's text is not conspicuous, because it is not displayed in any way that differs from

---

[11] Ford's Reply in Supp. of Mot. to Dismiss, *Benkle, et al. v. Ford Motor Co.*, No. 8:16-cv-01569 (C.D. Cal.), ECF No. 93, at 22 ("Ford concedes that, under the Song-Beverly Act, privity is not required, and withdraws its motion on this ground against Plaintiff Aviles.").

the surrounding text.[12] *See Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.*, 890 F.2d 108, 114 (9th Cir. 1989) (affirming finding that warranty disclaimer was not conspicuous and approvingly quoting statement that "the disclaimer [in capital letters] is of *minimal* compliance, and we do not venture to state what factors might alter this determination in future cases outside of the sophistication of the buyer") (quoting *Collins Radio Co. v. Bell*, 623 P.2d 1039, 1051 (Okla. Ct. App. 1980)).

Ford cites four inapposite cases in which exclusions or modifications to implied warranties were sustained. In *Hammond Enterprises Inc. v. ZPS America LLC*, 2013 WL 5814505, at *4 (N.D. Cal. Oct. 29, 2013), the magistrate judge held that implied warranty claims were properly excluded where "the disclaimer of implied warranties is all in capitalized letters and is introduced with a separate, bold heading, distinguishing the disclaimer from the surrounding paragraphs." In the three other cases cited by Ford, the disclaimers were similarly conspicuous.

In contrast, the court in *Wayne Memorial Hospital v. Electronic Data Systems Corp.*, 1990 WL 606686, at *6 (E.D.N.C. Apr. 10, 1990), held that an exclusion of the implied warranty of merchantability was not conspicuous where the heading did not reference merchantability and was "in the same type, color, and size as the rest of the Agreement." Similarly, in *Hoffman v. Daimler Trucks North America, LLC*, 940 F. Supp. 2d 347, 356 (W.D. Va. 2013), the court held that the purported exclusion of implied warranty of merchantability was not conspicuous because it was in the same font, type, and size as other paragraphs, was in capital letters like two other paragraphs on the same page, and appeared to be the same size. While Ford's disclaimer of the implied warranty is contained in a text box, it still is not conspicuous because the paragraph at issue is contained within the same box that covers *three pages* of the Warranty Guide.

---

[12] Conspicuous terms include a "heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size" and "language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." Cal. Com. Code § 1201(b)(10).

1

**B.      Summary judgment should be denied with respect to Plaintiffs' tort claims.**

2

**1.      The Colorado strict product liability claim should be sustained.**

3

**a.      The economic loss doctrine does not apply.**

4

Ford incorrectly argues that the economic loss doctrine bars a strict product liability claim

5

under Colorado law. *See* Def. Mem. 10-11. This Court has already rejected that argument. In denying

6

Ford's first motion to dismiss, this Court relied on *Hiigel v. General Motors Corp.*, which held,

7

"Although there is a split among the jurisdictions as to whether the damage to the product sold is

8

covered under the doctrine of strict liability, we think the wiser view is that it is." 544 P.2d 983, 989

9

(Colo. 1975) (citation omitted). This Court held that *Hiigel* remains the law in Colorado. *In re*

10

*MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 963 (N.D. Cal. 2014). This ruling constitutes

11

the law of the case, and Ford's new arguments do not justify overturning it. *See Zierolf v. Wachovia*

12

*Mortg.*, 2012 WL 6161352, at *4 (N.D. Cal. Dec. 11, 2012) (Chen, J.) ("[A] court is generally

13

precluded from reconsidering an issue that has already been decided by the same court ….") (quoting

14

*Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir. 1988)).

15

Ford relies on *Forest City Stapleton Inc. v. Rogers*, 393 P.3d 487 (Colo. 2017), and "other

16

Colorado cases," Def. Mem. 10-11, but none of them suggest that *Hiigel* has been overruled. *Forest*

17

*City* is an implied warranty case, not a strict product liability case, and does not cite *Hiigel*. And

18

neither *Scott v. Honeywell International Inc.*, 2015 WL 1517527 (D. Colo. Mar. 30, 2015), nor

19

*Disher v. Tamko Building Products, Inc.*, 2015 WL 4609980 (S.D. Ill. July 31, 2015), acknowledges

20

*Hiigel*. In contrast, two post-*Town of Alma* federal district court decisions that acknowledge *Hiigel*

21

have held that the economic loss doctrine did not bar strict liability claims. *See U.S. Aviation*

22

*Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 358 F. Supp. 2d 1021, 1025-1027 (D. Colo. 2005)

23

(applying *Hiigel* and sustaining strict liability claim); *Loughridge v. Goodyear Tire and Rubber Co.*,

24

192 F. Supp. 2d 1175, 1184 (D. Colo. 2002) (same).

25

**b.      Plaintiffs have presented substantial evidence that the MFT system is unreasonably dangerous.**

26

27

Ford incorrectly contends that Plaintiffs fail to show that MFT is unreasonably dangerous.

28

Def. Mem. 11-12. This Court explained that in opposing class certification of the Colorado strict

liability claim, Ford argued that "Plaintiffs' contentions about safety risk are speculative and are not based on evidence with classwide application." *In re MyFord Touch Consumer Litig.*, 2016 WL 7734558, at *24 (N.D. Cal. Sept. 14, 2016). But this Court held that "Plaintiffs have introduced evidence suggesting that all class members' vehicles suffered from common defects [that] cumula-tively caused driver distraction, which in turn raises safety concerns." *Id.* Colorado plaintiff Sheerin confirmed these safety concerns, testifying that he felt unsafe because MFT's hands-free and backup camera features did not work. Decl. of Randall W. Edwards in Supp. of Ford's Mot. for Summ. J. ("Edwards Decl."), Ex. 6 at 66. Ford's retort that "the vehicle still may be driven," Def. Mem. 11, does nothing to ameliorate these and other safety concerns, which are serious and unreasonable. *See* § II(A)(1)(b), *supra*. Nor is it a persuasive response to criticize consumers for continuing to operate their class vehicles, defective MFT and all. What other option does the reasonable consumer have?

These safety concerns create an issue of triable fact regarding whether they rendered the MFT system unreasonably dangerous, as determined by the factors in *Camacho v. Honda Motor Co.*, 741 P.2d 1240 (Colo. 1987). Ford's recitation of the *Camacho* factors, Def. Mem. 11, however, notably omits several of them that weigh in Plaintiffs' favor. For example, Ford fails to mention that the first factor to consider is "[t]he usefulness and desirability of the product—its utility to the user and to the public as a whole." *Camacho*, 741 P.2d at 1247. Given the widespread failures that the MFT system suffered while class vehicles were being driven, this factor weighs in favor of finding that the system was unreasonably dangerous. Ford also neglects to mention that "safety aspects of the product" should be considered, which, as noted earlier, also weigh in Plaintiffs' favor. *Id.* Finally, Ford omitted the factor of "[t]he manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility," *id.*, which, as illustrated by the systems of Ford's competitors that did not suffer from the same problems, was something Ford could have, but failed to do.

### 2. Substantial evidence supports the claim that Ford breached its duty under Ohio negligence law to design a safe product.

Ford's final challenge to Plaintiffs' tort claims has failed before. Ford erroneously asserts that Plaintiff Miskell and the other Ohio class members cannot show that they "suffered injury as a proxi-

1    mate cause of any breach of a duty to them." Def. Mem. 12. As this Court has noted, "[c]ausation

2    appears to be a proper subject for classwide inquiry." *In re MyFord Touch*, 2016 WL 7734558, at

3    *24. This is because the injury that Miskell and the other Ohio class members experienced is not due

4    to having been involved in a collision (as Ford suggests, *see* Def. Mem. 13) or some other individual-

5    ized occurrence, but, rather, is the common, classwide injury of decreased value of their vehicles. *See*

6    *In re MyFord Touch*, 2016 WL 7734558, at *24 (certifying class claims for economic damages but

7    not incidental or consequential damages). As this Court has already held, Plaintiffs have presented

8    sufficient evidence to create an issue of triable fact that these economic damages were caused by

9    Ford's failure to design a safe, non-defective product.

10   **C.    Summary judgment should be denied with respect to Plaintiffs' express warranty claims for the alleged failure to seek multiple repairs.**

11           Ford's "repair and replace" remedy does *not* apply to the design defects at issue in this litiga-

12   tion. Rather, that remedy applies *only* to manufacturing defects. The first paragraph of the Limited

13   Warranty states that if a Ford vehicle is brought in for repair, "then authorized Ford Motor Company

14   dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or

15   fail during normal use during the applicable coverage period ***due to a manufacturing defect*** in

16   factory-supplied materials or factory workmanship." Edwards Decl., Ex. 47 at 9 (emphasis added). In

17   construing the same Limited Warranty that's at issue in this matter, the Ninth Circuit held that "the

18   second paragraph expands the guarantee to design defects." *Daniel v. Ford Motor Co.*, 806 F.3d

19   1217, 1225 (9th Cir. 2015). But the second paragraph does not contain any requirement that the

20   vehicle be presented for repair in order for the design-defect warranty to apply.

21           Even if the "repair, replace, or adjust" language applied to design defects, which it does not,

22   Ford's argument that Plaintiffs and the other class members are unable to show multiple unsuccessful

23   repair attempts is the same argument that it unsuccessfully made in the class certification context.

24   This Court has already devised a solution to address Ford's complaint by using Ford's own records,

25   supplemented by consumer-provided proof, from which it can be determined which class members

26   have presented their vehicle for repairs, as well as the number of occasions on which they have done

27   so. *In re MyFord Touch*, 2016 WL 7734558, at *25. Ford does not dispute that it has records that

28

would show such repair attempts. *See* Def. Mem. 15 (discussing its own expert's analysis of its

warranty records showing repair attempts). Even if some class members are unable to show the

repair attempts that this Court has required, this is not a basis for granting summary judgment

classwide, because even Ford's own expert's analysis of Ford's records show that some class

members attempted multiple repairs. *Id.*

Ford's assertion that Plaintiffs are improperly "lumping" together all repairs to the MFT system, Def. Mem. 14, ignores this Court's findings that the MFT-related problems that Plaintiffs and the other class members have suffered are all interrelated. "Plaintiffs convincingly argue that the primary defects of which they complain were caused by faults in the base software, and that this base software was the same throughout each version of the MFT." *In re MyFord Touch*, 2016 WL 7734558, at *14. This case is thus distinguishable from the cases upon which Ford relies, in which the plaintiffs were making repairs to different components of their vehicles. For this reason, Plaintiff Mitchell has shown that he had multiple repair attempts because they were all related to the same MFT system, even if the symptoms of the defective base software were different.[13]

Ford's argument that some repair attempts should count as having been successful also fails in the face of this Court's previous finding. While some symptoms of the MFT problems may have been resolved for some class members after repair attempts, the evidence shows that the MFT system's base software "remained flawed even after Ford's attempts to fix it." *In re MyFord Touch*, 2016 WL 7734558, at *14. So there is no basis for Ford to assert that "at least ***three*** repair attempts" are necessary to establish multiple unsuccessful repair attempts, Def. Mem. 15, because Ford has not shown that it ever fixed the fundamental flaws in the MFT system for *any* class member. Two repair attempts per class member suffice, as the Court previously found. Class Cert. Order at 42. For this reason, Ford's assertion that Plaintiff Kirchoff's three attempts at repairing his vehicle's rearview

---

[13] Ford's assertion that Plaintiff Mitchell's first two service visits "were caused by [his] own defective cord," Def. Mem. 15, misrepresents the record. In fact, Mitchell testified that even after he had a new cable, "[t]here [were] still problems dealing with the MyLincoln Touch." Edwards Decl., Ex. 51 at 109:22-23. And there is no evidence that those problems were fixed during that or any other visit.

1    camera "solved" the problem, Def. Mem. 14, is incorrect; like the other class members, even after

2    these three repairs, Kirchoff's MFT system remains defective.

3    **D.    Summary judgment should be denied with respect to Plaintiffs' UCL claim.**

4         Ford incorrectly argues that Plaintiffs' UCL claims must be summarily dismissed because the

5    Court excluded UCL claims based on fraud from class certification. Def. Mem. 16. Ford's argument

6    fails for multiple reasons. First, the denial of class certification on UCL claims to the extent that they

7    are based on fraud does not entitle Ford to summary judgment on Plaintiffs' individual UCL claims

8    that sound in fraud. Second, Plaintiffs' class certification motion did not seek certification of UCL

9    claims limited to fraud. Rather, from the very first page of Plaintiffs' class certification motion, it

10   was clear that the "California Class seeks class certification of claims for: … (b) violation of the

11   Unfair Competition Law, Cal. Bus. & Prof. Code § 17200." Edwards Decl., Ex. 52 at Not. of Mot. &

12   Mot. 1; *see also id.* at Mem. of P. & A. 25. Here, the Court understood what Ford pretends not to

13   know—that Plaintiffs may also sue for violations of the UCL based on unlawful or unfair business

14   practices. And, Plaintiffs' claim for Ford's UCL violations incorporates the unlawful and unfair

15   prongs of the UCL as well. Edwards Decl., Ex. 2 (TAC) ¶¶ 300-304.

16        And to the extent Ford argues that the UCL claims for its unlawful business practices are sub-

17   ject to summary judgment, the allegations and evidence require denial of Ford's summary judgment

18   motion because Ford violated multiple laws, including Cal. Com. Code §§ 1791, 2313-2314, and the

19   commercial codes of multiple states. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035,

20   1043-44 (9th Cir. 2010) (recognizing that the unlawful prong of the UCL is appropriate for business

21   practices "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory,

22   or court-made"). As argued above, there is a triable issue of fact regarding Ford's liability under the

23   Song-Beverly Act and so there is also a triable issue under the UCL for unlawful business practices.

24   **E.    Summary judgment should be denied with respect to Plaintiffs' MCPA § 9 claim.**

25        Ford erroneously argues that Plaintiff Creed cannot maintain his claim under the Massachu-

26   setts Consumer Protection Act ("MCPA") because (a) he lacks standing as a consumer and (b) his

27

28

1    pre-suit demand letter "did not describe any concrete injury he allegedly suffered." *See* Def. Mem.

2    16-18. As set forth below, both arguments are without merit.

3        **1.      Plaintiff Creed did not purchase his MFT vehicle in a business context.**

4        Ford incorrectly asserts that *any* business use of a vehicle will defeat a claim under section 9

5    of the MCPA, Mass. Gen. Laws ch. 93A, § 9. *See* Def. Mem. 16-17. But there is no requirement

6    under Massachusetts law that the vehicle be used exclusively for personal reasons; instead, the

7    inquiry is whether the plaintiff was acting within a "business context" when entering into the initial

8    transaction.[14] *Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 57 (D. Mass. 2004) ("[O]ne does

9    not have to be a consumer … in order to recover under ch. 93A, § 9.") (citing *Maillet v. ATF-*

10   *Davidson Co.*, 552 N.E.2d 95, 99 (Mass. 1990)); *Linthicum v. Archambault*, 398 N.E.2d 482, 487

11   (Mass. 1979) (noting that the business-context analysis is determined at the time of the transaction).

12   In any event, "[t]he question whether the plaintiffs were engaged in trade or commerce … [is] one

13   for the … trier of fact." *Brown v. Gerstein*, 460 N.E.2d 1043, 1052 (Mass. App. Ct. 1984); *South*

14   *Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F. Supp. 3d 197, 217 (D. Mass.

15   2016) ("viewing the record in favor of the particular non-movant, a genuine issue of material fact

16   therefore exists as to whether section nine or section 11 applies").

17       Ford presents no evidence that Creed bought his vehicle in a business context. And the record

18   shows that he primarily used his vehicle for personal use, and purchased it on his own behalf (not on

19   behalf of a business). Ex. 20 at 18-19 (Creed's Resp. to Interrog. No. 11); Ex. 4 (Creed Dep.) at

20   54:11-13. While Creed owns two businesses, neither of them held title to the vehicle. Ex. 4 (Creed

21   Dep.) at 54:9-10. Creed's use of his vehicle for business purposes constituted only 30% or 40% of

22   his overall use of the vehicle. *Id.* at 51:19-20. Because he did not purchase his vehicle within a

23

24   ───────────────

25       [14] In the cases upon which Ford relies, the plaintiffs were business entities or engaged exclusively
     in business use. *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) (dismissing § 9 claim
26   because plaintiff "applied for and received a business owner's policy, and in the process completed a
     commercial insurance application in which he described his business as 'apartments'"); *Kay Constr.*
27   *Co. v. Control Point Assocs.*, 2002 WL 31187825, at *5 (Mass. Super. Ct. Aug. 16, 2002) (corporate
     plaintiff's claim under § 9 against an insurance company dismissed because "claim asserted is based
28   on conduct covered in § 11"); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July
     20, 2016) (dismissing § 9 claims of business entities but allowing § 9 claim of individual to proceed).

1   "business context"—and because it was subsequently used principally for his personal use—Creed

2   may bring a claim under § 9 of the MCPA.

3       **2.   Plaintiff Creed's MCPA demand letter suffices.**

4       Ford erroneously claims that Plaintiff Creed failed to provide an adequate demand letter. Def.

5   Mem. 17-18. In fact, Ford received a four-page letter from Creed, dated June 28, 2013, sent pursuant

6   to Mass. Gen. Laws ch. 93A, § 9(3). *See* Edwards Decl., Ex. 53. That letter states that Ford "failed,

7   despite its longstanding knowledge of the problem, to disclose to Mr. Creed and other consumers

8   that the Sync Systems contained in the [Class] Vehicles were prone to defective operation." *Id.* at

9   1-2. It then lists 15 problems in the system. *Id.* at 2. It further explains that Ford benefited from omit-

10  ting these problems by collecting funds from deceived customers and from "potentially unnecessary

11  vehicle service procedures." *Id.* The letter lists seven categories of remedies, including damages for

12  the loss of money and value. *Id.* at 3. This satisfies the MCPA, which requires only that the letter

13  identify the claimant and "reasonably describ[e]" the deceptive practice and injury suffered. Mass.

14  Gen. Laws ch. 93A, § 9(3).[15] Ford's answer to Creed's letter states, "Ford is prepared to make a

15  reasonable tender of settlement based on the limited information presented in your letter." Edwards

16  Decl., Ex. 54 at 2. So Creed's letter fulfilled the objectives of the statute, which is to allow the

17  recipient to evaluate the claim and determine whether to extend a reasonable settlement offer. *See,*

18  *e.g., Fredericks v. Rosenblatt*, 667 N.E.2d 287, 289 (Mass. App. Ct. 1996) (discussing objectives of

19

20

21

22      [15] *See Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1076 (Mass. App. Ct. 2006)
    (reversing conclusion that demand letter failed to "reasonably describe the injury suffered" where the

23  letter "expressly alleged that the plaintiff was injured 'in the form of [having to pay] higher out-of-
    pocket costs to purchase products containing polyester staple and other damages' as a result of the

24  defendants' price-fixing conspiracy"); *Tarpey v. Crescent Ridge Dairy, Inc.*, 713 N.E.2d 975, 983
    (Mass. App. Ct. 1999) (letter sufficient where it "carefully described the events giving rise to the

25  claim as well as the full reach of the claim under 93A" and "solicited a settlement offer within thirty
    days," even where it did not specify the dollar amount demanded); *Simas v. House of Cabinets*, 757

26  N.E.2d 277, 283 (Mass. App. Ct. 2001) (demand letter sufficient where it, *inter alia*, "set forth a
    detailed list of defects in workmanship that required repair" such that the recipient was able

27  "reasonably to ascertain its exposure"); *Brandt v. Olympic Constr., Inc.*, 449 N.E.2d 1231, 1234
    (Mass. App. Ct. 1983) ("It should have been apparent to the defendant [from the demand letter] that

28  the injury complained of was the diminution of the market value of the plaintiffs' land ....").

1  the § 9 demand letter). This situation is a far cry from the cases that Ford cites in which courts found

2  demand letters to be insufficient.[16]

3       And in January 2013, Creed filed: (1) a Lemon Law complaint with the Better Business Bur-

4  eau, *see* Ex. 4 (Creed Dep.) at 222:8-223:9, 224:2-4; and (2) a complaint with the Massachusetts

5  Attorney General requesting mediation with Ford, *see id.* at 225:2-23; Ex. 21 (AG compl.); *see*

6  *Farmer v. Fannie Mae*, 31 Mass. L. Rep. 204 (Mass. Super. Ct. 2013) ("That [plaintiff's] demand for

7  relief did not take the form of a letter has no bearing on the satisfaction of G.L.c. 93A, § 9(3).").

8  Creed requested that "Ford [] replace the car with a new one that works." Ex. 21 at 2. In response to

9  Creed's complaint to the Attorney General, an attempt to resolve the dispute with Ford was made but

10  was unsuccessful. Ex. 4 (Creed Dep.) at 233:19-234:7. It was only after an unavailing mediation

11  attempt and written correspondence to Ford that Creed was added to this case as a plaintiff in the

12  First Amended Complaint, ECF No. 47 (Nov. 12, 2013). In sum, Creed has satisfied the Massachu-

13  setts pre-suit notification requirements.[17]

14  **F.  Plaintiffs' damages experts provide substantial evidence of classwide damages.**

15       **1.  The damage models measure express warranty damages.**

16       Ford incorrectly claims that under its Limited Warranty, damages for breach of the express

17  warranty cannot exceed the cost of correcting manufacturing defects. Def. Mem. 19. Ford relies on

18  the following language in the Limited Warranty: "Ford's liability, if any, shall in no event exceed the

19  cost of correcting manufacturing defects as herein provided and upon expiration of this warranty, any

20  such liability shall terminate." *See* Edwards Decl., Ex. 47 at 9. But that phrase refers *only* to

21

22  ---

[16] *See Spring v. Geriatric Auth. of Holyoke*, 475 N.E.2d 727, 736 (Mass. 1985) (MCPA letter
23  "does not allege that the [plaintiff] was injured in any manner let alone 'reasonably' describe the
'injury suffered,'" and was "silent as to the relief requested"); *Moynihan v. Life Care Ctrs. of Am.,*
24  *Inc.*, 60 Mass. App. Ct. 1102, at *2-3 (2003) (letter "contained neither a reasonable description of the
plaintiff's injuries nor a damage figure of an amount which would enable the defendant to assess the
25  plaintiff's claim"); *Hiller v. DaimlerChrysler Corp.*, 2007 WL 2367629, at *2 (Mass. Super. Ct. July
25, 2007) ("Whereas the *Richards* demand letter specifies out-of-pocket costs as the injury,
26  Plaintiffs' demand letter is vague and devoid of any description of an injury.... [It] simply alludes to
a general claim of failure to warn of a latent defect.").

[17] If Creed's claim is dismissed for either reason above, Plaintiffs should be afforded an opportu-
27  nity to substitute another to represent the certified Massachusetts class. *See Nat'l Fed'n of the Blind
v. Target Corp.*, 582 F. Supp. 2d 1185, 1204 (N.D. Cal. 2007) (granting summary judgment on the
28  individual plaintiff's claim but allowing "substitution of another plaintiff or plaintiffs on this claim").

1    manufacturing defects. Under Ford's theory, it has no contractual duty to fix design defects (or to

2    compensate buyers for those design defects), even though the Ninth Circuit held in *Daniel* that the

3    Limited Warranty at issue covers design defects. Ford does not cite any authority that allows it to

4    evade its design-defect warranty obligations by stating that it will only fix manufacturing defects.

5         And in any event, that purported limitation is invalid. California and Washington law state,

6    "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy

7    may be had as provided in this code." Cal. Com. Code § 2719(2); Wash. Rev. Code § 62A.2-719(2).

8    In *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 547 (9th Cir. 1985), the Ninth Circuit

9    explained that section 2719(2) "provides an independent limit when circumstances render a damages

10   limitation clause oppressive and invalid." Ford's argument would make the Limited Warranty's

11   coverage of design defects wholly illusory and should be rejected, particularly when Plaintiffs have

12   shown that Ford has not fixed the MFT at all. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*,

13   761 F.2d 553, 556 (9th Cir. 1985) (reversing summary judgment for defendant under Wash. Rev.

14   Code § 62A.2-719(2), because "[u]nreasonable delays in repairing or inability to adequately repair a

15   product may cause a limited remedy to fail of its essential purpose") (internal quotation marks and

16   citation omitted); *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978)

17   ("repairs did not 'cure' the defects," so that "a purchaser, upon failure of the limited repair remedy to

18   serve its essential purpose, is entitled to recover the difference between the value of what he should

19   have received and the value of what he got").

20        Ford next incorrectly argues that Boedeker does "not even purport to calculate what damages,

21   if any, were the proximate result of a breach of an express warranty." Def. Mem. 19. In fact, his

22   analysis measures damages under Cal. Com. Code § 2714(2) and Wash. Rev. Code § 62A.2-714(2),

23   which provide that the "measure of damages for breach of warranty is the difference at the time and

24   place of acceptance between the value of the goods accepted and the value they would have had if

25   they had been as warranted …." This Court has already explained that Boedeker "conducted a survey

26   and employed a conjoint analysis to infer the value customers placed on the MFT at the time of

27   purchase, how this value would have changed had customers known of the MFT's defects, and how

28

1    this value would have changed if customers knew these defects may affect their ability to safely

2    operate their vehicles." Class Cert. Order at 6. This Court further explained that Boedeker "measures

3    damages according to the benefit of Plaintiffs' bargain. That a consumer would be willing to pay less

4    for a defective system than a perfectly operating system and the data upon which Dr. Boedeker based

5    his calculations are not 'indisputably wrong.'" *Id.* at 7.[18] This Court then explained that in measuring

6    the benefit of the bargain, Mr. Boedeker's methodology "will allow the fact finder to calculate the

7    diminution in value of Plaintiffs' vehicles" and is "sufficiently sound and capable of practicable

8    application to the class without unreasonable difficulty." *Id.* at 27.[19]

9            **2.      Plaintiffs' damage models fit their implied warranty claims.**

10           Ford next makes the irrelevant argument that "[c]ommon sense and case law refute the notion

11    that a vehicle is valueless where (as here) it is regularly used by the Plaintiffs and hundreds of thou-

12    sands of class members." Def. Mem. 20. Plaintiffs do not contend that MFT vehicles were valueless

13    as a whole but instead that they overpaid for the MFT vehicles because of defects in the MFT

14    system. And Ford's further objections to the damage models lack merit, as shown below.[20]

15           **a.      Dr. Arnold's damage model is proper.**

16           Ford again moves to exclude Dr. Arnold's opinion, arguing that his opinion that the value

17    received for a defective MFT is zero, so that "all class members are entitled to a full refund of what

18    he says is the price they implicitly paid for MFT as a freestanding component," is "devoid of any

19    economically reasoned analysis and fails to meet the standards required under implied warranty

20    law." Def. Mem. 20. Ford contends that his opinion ignores "value" that class members receive

21    _____

      [18] *See Miller v. Fuhu Inc.*, 2015 WL 7776794, at *20 (C.D. Cal. Dec. 1, 2015) (under Cal. Com.
22    Code § 2714(2), "the damages a plaintiff can recover for a breach of warranty are 'the monetary
      equivalent of the benefit of his bargain.'") (citing *S.M. Wilson & Co.*, 587 F.2d at 1375).

23           [19] Ford relies on *Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012), in which
      the plaintiffs claimed that a defect made tires go flat. The Third Circuit explained that in considering
24    class certification, "the District Court should have addressed an undisputed, fundamental point: *any*
      tire can 'go flat' for myriad reasons." *Id.* at 604. Here, in contrast, Plaintiffs present substantial evi-
25    dence that design defects in the MFT system caused myriad problems.

      [20] Every state at issue has adopted U.C.C. § 2-714(2), which states that the "measure of damages
26    for breach of warranty is the difference at the time and place of acceptance between the value of the
      goods accepted and the value they would have had if they had been as warranted, unless special
27    circumstances show proximate damages of a different amount." *See* Cal. Com. Code § 2714(2);
      Mass. Gen. Laws ch. 106, § 2-714(2); N.J. Stat. Ann. § 12A:2-714(2); N.C. Gen. Stat. § 25-2-714(2);
28    Ohio Rev. Code Ann. § 1302.88(B); Va. Code Ann. § 8.2-714(2).

1    "from their MFT-equipped vehicles, despite evidence of heavy use of MFT by Plaintiffs, the thou-

2    sands of miles driven, and the free software updates Ford made available to all class members." *Id.*

3        Ford's argument fails, because "the judge's function is not himself to weigh the evidence and

4    determine the truth of the matter but to determine whether there is a genuine issue for trial." *Ander-*

5    *son v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of

6    the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

7    a judge." *Id.* at 255. This Court has stated that it "cannot find at this juncture that Dr. Arnold's

8    assumptions are indisputably wrong. For instance, although some consumers may use certain

9    features of the MFT system, it is possible that as a whole, because it caused so many problems,

10   consumers if given a chance would have preferred not to have it at all, thus making it worth $0." *In*

11   *re MyFord Touch*, 2016 WL 7734558, at *5. And this Court explained that Dr. Arnold's "calculation

12   of the average price paid by each consumer for the MFT appears to be based on reliable methods and

13   sufficient data, and will prove helpful to the trier of fact." *Id.* Nothing has changed in the interim.

14       In any event, Ford's argument should be rejected because, as shown above, there are triable

15   issues of fact regarding the safety of the MFT vehicles and whether they were substantially free of

16   defects. And Ford's own cases do not support its argument. First, Ford relies on *Holz v. Coates*

17   *Motor Co.*, 147 S.E.2d 152 (Va. 1966), for the proposition that a defective MFT system cannot be

18   considered worthless when MFT vehicles are used by class members. *Holz* was rejected by the

19   Virginia Supreme Court in *Twin Lakes Mfg. Co. v. Coffey*, 281 S.E.2d 864 (Va. 1981). In *Twin*

20   *Lakes*, the court rejected the argument that "a buyer of defective goods who has used them may not

21   rest his claim for damages on evidence that they are worthless," and clarified that the "buyer was

22   denied recovery in *Holz*, not because he had derived some benefit from the use of the automobile,

23   but because 'there was no evidence to establish the value of the allegedly defective automo-

24   bile[.]'" *Id.* at 868. (citation omitted). The court explained that "there are cases where a buyer's use

25   of defective goods does not necessarily endow them with value for purposes of § 8.2-714(2)." *Id.*[21]

26

27   _____

28       [21] *See also Wharton, Aldhizer & Weaver v. Savin Corp.*, 350 S.E.2d 635, 637 (Va. 1986) ("a
     plaintiff's testimony that defective goods are valueless to him, without more, is insufficient to

1   Second, Ford points to district court rulings in *Philips v. Ford Motor Co.*, No. 14-cv-02989

2   (N.D. Cal.), which is on appeal, and argues that "Dr. Arnold's failure to determine the value of the

3   vehicles received, and offset it against his calculation of the amounts paid, is contrary to controlling

4   law and cannot serve as evidence sufficient to defeat summary judgment." Def. Mem. 21. Ford's

5   reliance on *Philips* is misplaced. On appeal, the *Philips* plaintiffs argue, among other things, that:

6   > The District Court conflated its "gatekeeping role" by going to the
   > weight of Dr. Arnold's economically sound opinion and testimony,

7   > instead of its admissibility as prescribed under Rule 702. Specifically,
   > the district court abused its discretion by ignoring critical portions of

8   > Dr. Arnold's opinion, namely his methodology on how he applied the
   > "expected utility" method to this case, and ultimately used Ford's own,

9   > disputed evidence to refute the $0 value Dr. Arnold gave to the
   > defective EPAS systems that were concealed from consumers.

10  Appellants' Reply Br. 15, *Philips v. Ford Motor Co.*, No. 17-15323 (9th Cir.), ECF No. 44. The

11  *Philips* plaintiffs also point out that "the District Court failed to address, or even acknowledge, that

12  Plaintiffs' statistician put forth a rebuttal report that contradicted Ford's evidence regarding its

13  failure rates. In the end, the district court, using Ford's disputed evidence, abused its discretion and

14  concluded that, '[i]n these circumstances, it is unlikely that 'not a single class member received any

15  benefit from' the EPAS systems.'" *Id.* at 16.

16  In any event, the district court's rationale in excluding Dr. Arnold's opinion in *Philips* is

17  irrelevant to this case. In its Ninth Circuit brief, Ford explained that the two cases differ because this

18  Court "accepted Dr. Arnold's report only in connection with a second report by another expert that

19  faithfully measured class members' expected utility. Such a second report is absent here." Br. of

20  Appellee 46 n.5, *Philips v. Ford Motor Co.*, No. 17-15323 (9th Cir.), ECF No. 37. Here, Plaintiffs

21  have hired an expert who presents a methodology for measuring economic impact by calculating the

22  "expected future value," at the time of purchase, of the MFT system to class members. Edwards

23  Decl., Ex. 56 (Arnold Rpt.) ¶¶ 3-4, 29-32, 35-39. Dr. Arnold then explains that class members who

24  purchased the MFT system did not receive what they intended to purchase—*i.e.*, a defect-free system

25  that enhances driving safety and functionality, *id.* ¶¶ 29, 31-32—and that, "[i]f Ford had informed

26  

27  ────────────────────

28  establish that the goods have no value; however, expert testimony that a mobile home was valueless
    is sufficient evidence to support such a finding").

Class members at the time of sale that MyFord Touch was susceptible to widespread failures and system crashes and that such defects could not be fixed (at all or until some later date), Class members would not have paid the price they did pay for the [MFT] system." *Id.* ¶ 32. Dr. Arnold concludes by opining that the entire amount actually paid by class members for the MFT system—the expected future value absent knowledge of the fundamental defects in the MFT system—should be included in the economic loss model. *Id.* ¶¶ 35-39. Not only does his proposed model target the economic consequences, for consumers, of Ford's failure to disclose known defects in the MFT system, but it is also based on common proof and the reliable application of economic theory. In sum, Dr. Arnold provides a workable damages model.

### b.      Mr. Boedeker validly assesses warranty damages.

Ford misrepresents Mr. Boedeker's report when it argues that his "damages model results in very specific value differences tied directly to certain material non-disclosures—the very fraud theory that this Court refused to certify for classwide adjudication." Def. Mem. 22. In fact, he reports four different results, including the following:

> *Result 2:* The disclosure of defects of the MFT system at the point of purchase decreased the willingness-to-pay for the MFT system for the sample of Ford buyers who purchased vehicles without the MFT system as well as for the sample of buyers who purchased Ford vehicles with the MFT system.

> *Result 3:* The disclosure of statements made by Ford "Officials" about the extent of the defect and the lack of a solution to the problem causing the defect, further decreased the willingness-to-pay for the MFT system among the sample of Ford buyers who had purchased a Ford vehicle with the MFT system.

Ex. 22 (Boedeker Rpt.) at 24. Under Result 2, in which survey respondents were not told about Ford's nondisclosures, he "estimated that the willingness-to-pay for the now known to be defective MFT system drops by $729." *Id.* at 27. Because Result 2 does *not* rest on the disclosure of statements by Ford, Ford's argument cannot justify exclusion of his report. And as to Result 3,[22] a defendant's knowledge of its wrongful conduct can affect damages. For example, the Song-Beverly Act allows

---

[22] Under Result 3, the "the willingness-to-pay dropped from $1,861 to $951, which represents a drop of $910." Ex. 22 (Boedeker Rpt.) at 28.

for a penalty of two times the amount of actual damages if "the buyer establishes that the failure to comply was willful." Cal. Civ. Code § 1794(c).

Ford next wrongly contends that Boedeker "ignores both evidence of class members' extensive and ongoing use of their vehicles and the value of future MFT software updates." Def. Mem. 22. In fact, he does not ignore class members' use of their cars, because he values only the MFT system, not vehicles as a whole. He also does not ignore the value of future MFT software updates. Instead, Plaintiffs have presented substantial evidence that the updates did not fix the MFT system. Indeed, this Court has already found that:

> While Ford argues Plaintiffs' damages theories must be struck because they fail to account for the fix, Plaintiffs' commonality arguments is predicated on the premise that Ford has been unable to fix the MFT in any material way. Plaintiffs have presented evidence that Ford did not meaningfully fix the MFT, at least with regard to the problems of which Plaintiffs complain. *See* Pls.' Exs. 48, 51, 52; Mot. at 15; Reply at 6.[23]

### c.   Boedeker's model does not have flaws that justify summary judgment.

There is no basis for Ford's claim that "it is conceptually inappropriate and inherently unreliable to use responses to hypothetical survey questions to estimate willingness to pay when actual pricing data for used vehicle sales is available that would show whether the supposed 'defects' actually caused any diminished value in the real world." Def. Mem. 22-23 (citation omitted). In fact, a district court recently rejected that very argument. In *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988 (S.D. Fla. 2016), the plaintiffs alleged that a defect in Ford Explorers allowed exhaust to enter the passenger compartment during normal use. The court denied Ford's motion to exclude testimony of plaintiffs' expert about a "conjoint analysis survey he developed and analyzed, which purports to demonstrate that the Explorers' value was diminished by 46.7%." *Id.* at 995. In particular, the court stated, "Ford emphasizes that there is an active secondary market for Explorers, which it contends shows successful sales of used 2011-2015 Explorers with no indication of decreased value.

---

[23] Class Cert. Order at 31. The exhibits cited, "Pls.' Exs. 48, 51, 52," are attached to the Berman Declaration, filed concurrently herewith, as Exhibits 23, 24, and 25, respectively.

1   Ford may present this evidence to the jury in attempt to refute Plaintiff's damages evidence; **it is not**

2   **grounds to exclude [plaintiffs' expert's] opinion**." *Id.* at 996 (emphasis added).[24]

3        Ford not only fails to inform the Court of *Sanchez-Knutson* but also misstates the holding of

4   *In re Ford Motor Co., Spark Plug & 3-Valve Engine Products Liability Litigation*, 2014 WL

5   3778592 (N.D. Ohio July 30, 2014). In *Spark Plug*, Ford presented evidence of "no abnormal or

6   excessive depreciation compared to 'non-defective' vehicles." *Id.* at *43. The court explained that

7   the plaintiffs "fail to cite to the record" for *any* contrary evidence. *Id.* at *44. So the court did **not**

8   hold that evidence of pricing data makes conjoint analysis "inherently unreliable," as Ford argues,

9   but rather found that the plaintiffs provided no evidence at all of depreciation in value.

10       And there is no merit to Ford's misrepresentation that "Boedeker's choice-based conjoint

11  study admittedly does not consider effects of the supply curve on the hypothetical prices central to

12  his damages analysis." Def. Mem. 23. In fact, Mr. Boedeker most certainly *did* consider the supply

13  side. He explained that "in the consumers' actual point-of-purchase situations where vehicles with a

14  defective MFT were sold without disclosing the defect, the same vehicles were sold at the same price

15  as in the hypothetical world 'were the defects were disclosed at the point of purchase. Therefore,

16  only the changes in the demand curve are relevant for the damages assessment." Ex. 22 (Boedeker

17  Rpt.) at 8. Determining that the supply of MFT vehicles sold by Ford was fixed is a far cry from

18  ignoring the supply side. And Ford makes no attempt to show that his determination that the supply

19  was fixed must be rejected as a matter of law.[25]

20       Next, Ford misrepresents Boedeker's testimony when it asserts that he "made [the market

21  simulation] up out of whole cloth." Def. Mem. 24 (citing Boedeker Dep. at 243:19-23). At that point

22  in his deposition, Boedeker said that he "wouldn't know" if the market simulation approach has

23  "been endorsed in any peer-reviewed economics papers." Ex. 26 (Boedeker Dep. Vol. 1) at 243:19-

24  _____

25      [24] The case subsequently settled. *See Sanchez-Knutson v. Ford Motor Co.*, 2017 U.S. Dist.
    LEXIS 96560 (S.D. Fla. June 21, 2017).

26      [25] The cases cited by Ford are inapposite, because the experts did not consider the supply side *at
    all*. *See In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015)

27  ("Harris's model looks only 'to the demand side of the market equation[.]'") (quoting *Saavedra v.
    Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014)); *Saavedra*, 2014 WL 7338930,

28  at *4 ("Plaintiffs' theory of injury ... focuses only on the demand side of the equation, rather than on
    the intersection of supply and demand.").

1    23. But the law is clear that peer-review is not a prerequisite for admissibility of expert methodolo-

2    gies. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235-36 (9th Cir. 2017) ("The district

3    court also wrongly conflated the standards for publication in a peer-reviewed journal with the stand-

4    ards for admitting expert testimony in a courtroom…. We have previously held expert opinions to be

5    reliable that were not subject to peer review through publication."). And Boedeker explains in his

6    merits report that market simulations have been used by others in performing conjoint analyses.[26]

7    Finally, in attacking Boedeker's market simulation, Ford misleadingly states that "the 'impli-

8    cit equilibrium price' which underlies his damages estimates is the amount that only about 30 percent

9    of class members would have been willing to pay for MFT." Def. Mem. 24 (citations omitted). In

10   fact, Boedeker explained at length in his deposition that in his market simulation, he first identified

11   31.2% of survey respondents as a base group that had the highest price sensitivity and then "rais[ed]

12   the price until the market share of the individuals who are not in the base case group … intersects

13   with the market share of the base case group and the interpretation of that is now the price of the

14   added feature …." Ex. 27 (Boedeker Dep. Vol. 2) at 469:25-470:5. So Ford's characterization of his

15   testimony is simply wrong.

16   **G.      Summary judgment should be denied as to Plaintiffs' uncertified individual claims.**

17   Ford's arguments for summary judgment on Plaintiffs' uncertified claims amount to simply

18   rehashing arguments that this Court previously rejected and creating factual disputes.[27] Ford previ-

19   ously argued that MFT defects were immaterial to Plaintiff Rodriguez because he bought a second

20   MFT vehicle for his sister only six months after he purchased his first vehicle. *In re MyFord Touch*,

21   2016 WL 7734558, at *11. This Court rejected that argument: "[b]ecause purchasing an MFT vehicle

22   for someone else does not necessarily demonstrate immateriality any more than continuing to use an

23   MFT vehicle (which many class members do), Plaintiff Rodriguez is not so atypical as Ford con-

24   tends." *Id.* Ford presents nothing new that would warrant a different result now.

---

26   [26] *See* Ex. 22 (Boedeker Rpt.) at 19 ("R. Segal used results from conjoint analysis to perform a
     market simulation to forecast the market for electric vehicles in California…. [Lebeau, et al.] use the
27   results from the CBC study to perform market simulations to predict the shift in consumer prefer-
     ences towards battery electric and plug-in hybrid electric vehicles.") (footnote omitted).
     [27] Plaintiffs do not oppose Ford's Motion for Summary Judgment as it relates to the CLRA claim
28   of CDD. *See* Def. Mem. 24-25.

1    Ford also reiterates its argument that Plaintiffs Miller-Jones and Ervin were aware of prob-

2    lems with the MFT system before purchasing their vehicles and, therefore, could not have reasonably

3    relied on Ford's failure to disclose material facts related to it. *See* Def. Mem. 24.[28] But as before,

4    Ford has no evidence that any plaintiff was aware of (or that Ford ever disclosed) the material fact

5    that the underlying MFT architecture was flawed and unfixed. And Ford misstates the testimony of

6    these plaintiffs. While Ervin acknowledged seeing some negative comments about the MFT system,

7    he testified that he did not "see any sort of negative publication about MyFord Touch before [he]

8    purchased" his vehicle. *See* Ex. 12 (Ervin Dep.) at 75:22-25, 110:1-10. He stated that the overall

9    "gist" of the information he read about his C-Max provided a "positive indication," and while he saw

10   reports that there was "some imperfection" with the MFT, his impression was that overall "it's a

11   good system." *Id.* at 101:24-102:3, 102:5, 102:25-103:2, 103:10-16, 116:21-117:15.

12   Miller-Jones also acknowledged seeing negative reviews about MFT but testified that there

13   had since "been upgrades to the system, so I was – I wasn't terribly worried." Ex. 13 (Miller-Jones

14   Dep.) at 102:4-15. *See also id.* at 102:19-20 ("Why should I worry? And Ford will fix it if it's got a

15   problem."); *id.* at 124:3-13 (stating that Miller-Jones largely "dismissed" negative reviews because

16   the system had been upgraded, he did not see follow-up articles, and "I had some faith in Ford …. I

17   trusted them to fix whatever would -- would have been wrong"); *id.* at 326:3-8, 329:13-21. He also

18   testified that he never visited any of the various online forums with consumer complaints about the

19   MFT system before purchasing his car. *Id.* at 42:25-43:4. He confirmed that he had experienced so

20   many problems with the MFT system that "if I had a choice to buy the car again today, I wouldn't."

21   *Id.* at 81:14-15. So genuine issues of material fact remain to be decided as to these Plaintiffs.

22   ### III.    CONCLUSION

23   With the exception of the CDD's CLRA claim, *see* nn.1, 27, *supra*, Ford's summary

24   judgment motion should be denied in its entirety.

25

26   [28] Contrary to Ford's contention, "justifiable reliance is a context-specific and fact-intensive inquiry" that normally is a question for the trier of fact. *Copart, Inc. v. Sparta Consulting, Inc.*, 2017
27   WL 4269921, at *13 (E.D. Cal. Sept. 26, 2017); *Jackson v. Fischer*, 2017 WL 1019830, at *7 (N.D. Cal. Mar. 16, 2017) ("questions of scienter and reasonable reliance raise further triable issues …
28   which are not appropriate for resolution on summary judgment").

1    Dated: November 17, 2017                    Respectfully Submitted,

2                                                By: */s/ Steve W. Berman*
                                                 Steve W. Berman (*pro hac vice*)
3                                                Craig R. Spiegel (122000)
                                                 Tyler Weaver (*pro hac vice*)
4                                                Catherine Y.N. Gannon (*pro hac vice*)
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
5                                                1918 Eighth Avenue, Suite 3300
                                                 Seattle, WA 98101
6                                                Telephone: (206) 623-7292
                                                 E-mail: steve@hbsslaw.com
7                                                E-mail: craigs@hbsslaw.com
                                                 E-mail: tyler@hbsslaw.com
8                                                E-mail: catherineg@hbsslaw.com

9                                                Adam J. Levitt (*pro hac vice*)
                                                 John E. Tangren (*pro hac vice*)
10                                               DICELLO LEVITT & CASEY LLC
                                                 Ten North Dearborn Street, Eleventh Floor
11                                               Chicago, IL 60602
                                                 Telephone: (312) 214-7900
12                                               E-mail: alevitt@dlcfirm.com
                                                 E-mail: jtangren@dlcfirm.com
13
                                                 Roland Tellis (186269)
14                                               Mark Pifko (228412)
                                                 BARON & BUDD, P.C.
15                                               15910 Ventura Boulevard, Suite 1600
                                                 Encino, CA 91436
16                                               Telephone: (818) 839-2320
                                                 E-mail: rtellis@baronbudd.com
17                                               E-mail: mpifko@baronbudd.com

18                                               Nicholas E. Chimicles (*pro hac vice*)
                                                 Benjamin F. Johns (*pro hac vice*)
19                                               CHIMICLES & TIKELLIS LLP
                                                 One Haverford Centre
20                                               361 West Lancaster Avenue
                                                 Haverford, Pennsylvania 19041
21                                               Telephone: (610) 642-8500
                                                 E-mail: nick@chimicles.com
22                                               E-mail: benjohns@chimicles.com

23                                               *Class Counsel*

24

25

26

27

28