# EXHIBIT 56

# THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE )
)
MYFORD TOUCH CONSUMER ) Case No. 13-cv-3072-EMC
LITIGATION. )
)
)
)
_____ )

**Damages Expert Report of
Jonathan I. Arnold, Ph.D.**

**August 1, 2016**

# THE TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1
    A.   QUALIFICATIONS AND ASSIGNMENT .................................................. 1
    B.   BACKGROUND OF THE LITIGATION ................................................... 3
    C.   SUMMARY OF CONCLUSIONS ........................................................... 5

II.   THE MYFORD TOUCH SYSTEM ...........................................................6

III.   FROM AN ECONOMICS PERSPECTIVE, ALL MEMBERS
    OF THE PROPOSED CLASS WERE INJURED BY FORD'S
    CONCEALMENT OF THE DEFECTIVE MYFORD TOUCH
    SYSTEM ..................................................................................................7
    A.   OVERVIEW ........................................................................................ 7
    B.   ANALYSIS OF PURCHASING DECISIONS FROM AN ECONOMICS PERSPECTIVE ........................... 8
    C.   ALL CLASS MEMBERS WHO PURCHASED DEFECTIVE MYFORD TOUCH SYSTEMS WERE
      HARMED BY FORD'S CONCEALMENT OF THE DEFECTS ............................... 11

IV.   APPROACHES TO QUANTIFYING DAMAGES ON A
    CLASS-WIDE BASIS ..........................................................................14
    A.   FORD CHARGED ███████ FOR MYFORD TOUCH ............................. 15
    B.   CLASS MEMBERS PAID ███████ FOR MYFORD TOUCH ...................... 19
    C.   DOCUMENTARY RESOURCES PROVIDE THE FOUNDATION FOR, AND SERVE AS THE BASIS OF,
      MY ANALYSES AND CONCLUSIONS .................................................... 23
    D.   I INTENTIONALLY EXCLUDED FROM MY COMPUTATION AN OFFSET OR REDUCTION FOR ANY
      PURPORTED RESIDUAL VALUE OF MYFORD TOUCH EQUIPMENT ................ 24
    E.   COMPUTATION OF AGGREGATE DAMAGES ....................................... 25

V.   CONCLUSIONS ...................................................................................25

## I. Introduction

### A. Qualifications and Assignment

1.    My name is Jonathan I. Arnold.   I am employed by Chicago Economics Corp., and I am a Senior Advisor to Compass Lexecon.  I specialize in the application of economics to legal and regulatory disputes.   Prior to my current position, I served as Chief Economist at the New York State Office of the Attorney General (the "OAG").   In this role, I served as senior policymaker on economics questions for the Attorney General -- covering Economic Justice, Criminal Justice, and Social Justice -- as well as (i) overseeing economic analyses of key matters, (ii) retaining and supervising outside expert witnesses, and (iii) integrating economic analysis with legal analysis at the OAG.   I have taught economics at a number of schools, including The University of Chicago (in both the Booth School of Business and the Department of Economics).

2.    I earned my Ph.D. and M.B.A. from The University of Chicago's Booth School of Business and my B.A. from The University of Chicago.   In addition, I am a Certified Public Accountant.  I have offered expert testimony in the form of live testimony in numerous court and arbitration proceedings, depositions, expert reports, and affidavits on a variety of economics, intellectual property, finance, and accounting topics.   In my work, I regularly analyze questions relating to the calculation of damages, as well as serving as an economics expert on questions of class certification.   My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report as Appendix 1 and contains information relating to my previous employment, affiliations, testimony, and publications.

3.    I previously submitted two expert reports in this matter on behalf of Plaintiffs -- on January 7, 2016 (the "Opening Expert Report") and on May 2,

2016 (the "Responsive Expert Report") in connection with class certification.[1]  In addition, I gave a deposition on February 10, 2016. In my Opening Expert Report, I offered opinions on the economic harm suffered by Plaintiffs and Class members in this litigation.  Specifically, I quantified: (1) the revenue received by Ford from the sale of Class vehicles equipped with MyFord Touch and (2) the economic loss suffered by Class members at the time of their purchase of a Class vehicle equipped with an infotainment system that was defective and did not work as advertised, among other topics.  In my Responsive Expert Report, I responded to certain opinions expressed by the Defendant's economic expert, Dr. Hal Singer, in his March 15 Report.[2]

4.      Counsel for Plaintiffs asked me to prepare this report on damages. This report, to the extent appropriate, restates a number of points expressed in the Opening Expert Report and Responsive Expert Report.  Thus, this report is intended to be read without the need to read or refer to the content of my prior reports in this matter.

5.      Compass Lexecon charges my customary hourly rate of $900 for my services in this matter.  In my analysis I was assisted by staff at Compass Lexecon, who are also billed at their usual and customary rates.  Neither my compensation nor that of Compass Lexecon depends upon the opinions that I offer or the outcome of this case.

6.      This report contains my findings and opinions as of August 1, 2016. My analysis is ongoing, however, and my opinions may change if additional information relevant to the issues I have examined comes to my attention.  I may undertake additional analyses, e.g., in response to expert reports submitted on

---

[1]  Expert Report of Jonathan I. Arnold, Ph.D., January 7, 2016 and Responsive Expert Report of Jonathan I. Arnold, Ph.D., May 2, 2016.

[2]  Expert Report of Hal J. Singer, Ph.D., March 15, 2016 ("Singer Report").

Ford's behalf. If my opinions change materially, I will revise my opinions accordingly. A list of the materials upon which I have relied in reaching my conclusions is attached to this report as Appendix 2.

## B. Background of the Litigation

7. At issue in this case is the so-called "infotainment" system known as MyFord Touch and MyLincoln Touch (collectively, "MyFord Touch") that Ford announced in January 2010.[3] The infotainment system was available in certain Ford and Lincoln vehicles beginning with model year 2011. The system was designed to serve as a hub for various communication, entertainment and safety features and is described by Plaintiffs as follows:

> MyFord Touch consists of two or three LCD screens (the primary screen being a touchscreen) that are powered by an operating system known as Ford SYNC. The screens are the gateway between the user and the vehicle's safety, navigation, communications, entertainment and climate control features. Among other operations, MyFord Touch allows the vehicle owner to operate the audio systems in the vehicle; use the GPS navigation technology; control the climate systems in the vehicle, including defrosters; operate the rearview, or back up, camera; operate the adaptive cruise control; and operate a Bluetooth-enabled mobile telephone or other device, with the touch of a fingertip. In addition, MyFord Touch dials 9-1-1 when it detects that the vehicle has been involved in an accident and reports the vehicle's

---

[3] Third Amended Class Action Complaint, September 30, 2015 (the "Complaint"), ¶ 200. It is my understanding that Ford Motor Company ("Ford") manufactures, or has manufactured, vehicles under the Ford and Lincoln brands. The Lincoln Motor Company (also known simply as "Lincoln") is a division of Ford that continues to sell luxury vehicles under the Lincoln brand, primarily in North America. For purposes of this report, I understand that the MyFord Touch and MyLincoln Touch systems are essentially identical and are alleged to suffer from the same defects. Thus, for purposes of this Report, they will collectively be referred to as "MyFord Touch."

location so that emergency services providers can respond immediately, even when the occupants of the vehicle cannot call for help.[4]

8.      Plaintiffs allege that owners and lessees of Ford and Lincoln vehicles experienced numerous failures of the MyFord Touch system,[5] which I assume will be proved at trial.  In particular, Plaintiffs allege that these failures were a result of various software bugs and manifested in consistent and uniform symptoms that included, among other things, the system (i) freezing up; (ii) crashing; (iii) blacking-out; (iv) failing to respond to touch and/or voice commands; (v) failing to connect to the owner's mobile phone or other peripheral device; (vi) failing to display the rearview camera properly; and (vii) providing incorrect navigation directions and/or location of the vehicle.[6]  The Plaintiffs further allege that, when the system froze or crashed, the features associated with MyFord Touch failed to operate, including the navigation technology, the radio, and important safety features such as the rearview camera or defroster.[7]

9.      I understand that Ford attempted to address the defects in the MyFord Touch system on multiple occasions, over several years, by issuing various software updates.[8]  However, Plaintiffs allege that none of the updates were successful in resolving the software bugs plaguing the MyFord Touch system in the Class vehicles.[9]

10.     I understand from counsel that the putative Class consists of all persons or entities who purchased or leased a Ford or a Lincoln vehicle from

---

[4]  Complaint, ¶3.

[5]  Complaint, ¶7.

[6]  Complaint, ¶7, ¶13.

[7]  Complaint, ¶7.

[8]  Complaint, ¶12.

[9]  Complaint, ¶15.

Ford Motor Company or through a Ford Motor Company dealership before August 9, 2013 which was equipped with a MyFord Touch or MyLincoln Touch in-car communication and entertainment system (the "Class" or the "Class vehicles").

### C. Summary of Conclusions

11.     Based on my analysis to date:

- I conclude that, assuming liability in this matter, all members of the proposed Class were injured by Ford's conduct. The economic harm stems from software defects in the MyFord Touch system that Ford did not disclose to consumers who purchased Ford vehicles equipped with MyFord Touch.

- I identify and implement certain methodologies that may be used to quantify class-wide aggregated damages or economic losses in a formulaic fashion – although one is likely to understate the economic harm experienced by the proposed Class members.



- My analysis does not account for any additional punitive or treble damages to which Plaintiffs and Class members may be entitled should they prevail on their claims.

12.    The remainder of this report is organized as follows:

- **Section II** describes selected aspects of the MyFord Touch system relevant to my analysis.

- **Section III** discusses the economic theory of harm to Class members and shows that, assuming liability, all proposed Class members were injured by Ford's conduct.

- **Section IV** discusses alternative methodologies that may be used to formulaically quantify damages or economic harm on a class-wide basis.

- **Section V** contains my conclusions.

## II.    The MyFord Touch System

13.    I understand that the MyFord Touch system consists of two or three LCD screens that provide the gateway between the user and the various technological features that comprise the MyFord Touch system.[10]

14.    I further understand that MyFord Touch "is powered by 'Ford SYNC,' an operating system that is based on Microsoft's Windows Embedded Automotive operating system.  SYNC operates a number of features that form part of the MyFord Touch system."[11]   SYNC is an in-vehicle communications and entertainment system that was first installed in Ford vehicles for model-year 2008 and is the platform on which MyFord Touch operates.   The SYNC technology allows a user to operate Bluetooth-enabled mobile phones or other

---

[10]  Complaint, ¶¶ 3, 208.  Moreover, that "[t]he primary centerpiece of MyFord Touch is an eight-inch LCD touchscreen that is located in the center stack." Complaint, ¶209.

[11]  Complaint, ¶213.

digital devices such as music players, using voice commands, the vehicle's steering wheel, and radio controls or the MyFord Touch system (where installed).[12] SYNC Services is a subscription service available to owners or lessees of vehicles with SYNC with MyFord Touch technology, which allows for access to services such as 411 business information, weather, turn-by-turn navigation, and other information through the system.[13] Navigation services are also an add-on that can be accessed through the MyFord Touch system.

15.    In vehicles that have the MyFord Touch system, defects in the system also affected the purchaser's ability to access SYNC, SYNC Services and the Navigation feature.[14]

## III.    From an Economics Perspective, All Members of the Proposed Class Were Injured By Ford's Concealment of the Defective MyFord Touch System

### A.    Overview

16.    For the purposes of this Report, I assume that liability exists and will be proved.  Specifically, I assume that it will be established that the MyFord Touch system was defective in the Class vehicles.  I further assume that Ford knew the MyFord Touch system suffered from significant defects, including system crashes and that Ford did not disclose such knowledge to Class members when they purchased the Class vehicles.

17.    Given these assumptions, I demonstrate that all Class members suffered economic injury because, when they purchased the Class vehicles equipped with MyFord Touch system, they paid for a Class vehicle that did not

---

[12] http://www.autotrends.org/2008/04/21/is-ford-sync-the-voice-recognition-benchmark/.

[13] https://owner.ford.com/how-tos/sync-technology/myford-touch/sync-services/sync-services-overview.html. See also Deposition of Dennis Curlew, December 15, 2015 ("Curlew Dep." hereafter), pp. 74-75.

[14] See e.g. Complaint, ¶7, 25, 29, 32, 38, 39, 52, 54, 61, 68.

contain a known defect in the MyFord Touch system. If Ford had made disclosures concerning the defects in the MyFord Touch system, Class members would have found such information material and would not have chosen to pay what they did for the MyFord Touch system. This is true irrespective of whether any particular Class member's system exhibited symptoms of the defect. The damage suffered by Class members is derived from Ford's failure to disclose the defects of the MyFord Touch system.

### B.    Analysis of Purchasing Decisions from an Economics Perspective

18.    From an economics perspective, a consumer's decision to purchase a product is based on the enjoyment, or value, the consumer expects to receive in the future from his or her consumption or use of that product.[15] In cases involving uncertainty or risk, consumers evaluate the so-called "expected" enjoyment (or utility) by applying probabilities to all potential outcomes that they may realize in the future. This expected utility framework was first introduced in 1944 by the mathematician John von Neumann and the economist Oskar Morgenstern and has since become the standard economic approach to handling choice under uncertainty.[16]

19.    Applying the expected utility framework, if the true probability of the MyFord Touch product's malfunction had been disclosed by Ford and known by consumers, the consumers would have discounted the future value they expected to receive from the MyFord Touch system by this probability. Consider a simple illustrative example. Suppose a consumer's enjoyment or value of a given product, when measured in monetary terms, is $100. Suppose

---

[15] Economists also call this value "utility".

[16] Jeffrey M. Perloff, Microeconomics, 2nd Ed., 2001, Chapter 17. Also, Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, 5th Ed., 2001, Chapter 5 and David A. Besanko and Ronald R. Braeutigam, Microeconomics: An Integrated Approach, 2002, Chapter 15.

also that there is 60 percent chance of this product being defective and 40 percent chance of this product properly functioning. In other words, for every 100 consumers who purchased the product, it is expected that 60 will experience a malfunctioning product and 40 will experience a properly functioning product. Thus, the expected value of this product to each individual consumer is only 40 percent of the $100 value the customer would receive if it functioned properly, i.e. $40.

20.    However, since Ford allegedly concealed the defects and the resulting substantial probability of MyFord Touch malfunction, the consumers were expecting a higher value when making their purchasing decisions. In terms of the example discussed above, this is illustrated by the fact that consumers were expecting a value of nearly $100 if the product is advertised to function well all (or nearly all) the time, but what they received in expected terms at the time of sale was only $40.

21.    Continuing with the illustrative example, a separate implication of this consumer decision-making framework is that when the purchasing decision is made, every consumer considers the same expected value of $100 and in reality faces the same substantial 60 percent likelihood of a product malfunction. The fact that, ex-post, some consumers will end up with a defective product (and $0 value) while other consumers will enjoy a well-functioning product (and $100 value) is irrelevant because, at the time of purchase, all consumers face the same likelihood of product malfunction.

22.    The discussion so far has not touched upon one additional, important aspect of the decision the consumers are facing – there is an explicit element of risk built into this potential purchase. Although the expected value expressed in dollar terms may be $40 (assuming, of course, that consumers are aware of the defect), there is a risk that a particular consumer will end up with one of the malfunctioning products and will actually receive $0 enjoyment.

Therefore, consumers' attitudes toward risk play an important role in such purchasing decisions.

23.    Economic theory indicates that a risk averse customer would prefer to obtain $40 with certainty instead of assuming a risk that may yield $100 with 40 percent chance and $0 with 60 percent chance. In other words, a risk averse consumer with perfect knowledge of the defect would not pay $40 to purchase a product that provides $40 on average. Instead this risk averse consumer would prefer to avoid the associated risk. The higher the degree of risk aversion of a given consumer, the lower the price at which the consumer would prefer to purchase the product and take on the associated risk.  Economic literature suggests that most consumers are risk averse.[17]  Indeed, the major models of

---

[17]  For example, a number of leading Microeconomics textbooks indicate that

> Risk aversion is the most common attitude toward risk. To see that most people are risk averse most of the time, note that most people not only buy life insurance, health insurance, and car insurance, but also seek occupations with relatively stable wages.

Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, 5th Ed., 2001, p. 157

> Whether people choose a risky option over a nonrisky one depends on their attitudes toward risk and the expected payoffs of the various options. Most people are risk averse and will choose a riskier option only if its expected value is substantially higher than that of a less-risky option.

Jeffrey M. Perloff, Microeconomics, 2nd Ed., 2001, p. 600.

> Although an individual could conceivably be risk neutral or risk loving, economists believe that for big, important decisions, such as whether to purchase insurance coverage for an automobile or how much of one's wealth to invest in the stock market, most individuals tend to act as if they were risk averse.

David A. Besanko and Ronald R. Braeutigam, Microeconomics: An Integrated Approach, 2002, p. 641.

consumer behavior presume risk aversion on the part of consumers. Thus, when the fact of a defect is not disclosed, consumers suffer economic harm both because (i) the expected value (probability weighted value) from the product is lower than they bargained for and (ii) they, in effect, take on risk that they did not bargain for.

24. In this case, the risk of malfunction that a consumer faces is related to more than simply the failure to receive the value the consumer places on the product, as discussed above. Indeed, a malfunctioning MyFord Touch unit may actually confer negative value to the customer in the form of reduced safety.

### C. All Class Members Who Purchased Defective MyFord Touch Systems Were Harmed by Ford's Concealment of the Defects

25. At the time of launch, Ford promoted the MyFord Touch system as a significant technological advance that enhanced the safety and convenience of Ford vehicles. For example, in connection with the launch of MyFord Touch, Ford's CEO at the time, Alan Mulally, in specifically referring to MyFord Touch, stated "this is a reason to buy Ford … It's just smart design. We think it's a value proposition."[18]

26. Additionally, when MyFord Touch was announced, Ford represented:

> "MyFord Touch combined with new SYNC functionality, creates an experience that will cause people to fall in love with their vehicles again," said Derrick Kuzak, Ford group vice president, Global Product Development. "It's not just a technology; it's an experience – one we hope will have people across the globe looking forward to spending time behind the wheel of their vehicle."[19]

---

[18] Complaint ¶201.

[19] Complaint ¶6.

27.     Ford also actively advertised the MyFord Touch system's safety features as a reason to buy Ford and to pay the premium charged for the MyFord Touch systems.  For example, on Ford's website for the MFT system, Ford stated that,

> "SYNC helps you keep your eyes on the road and stay connected to your world." The website features a video entitled, "SYNC Saved My Life," in which the narrator, reading a letter purportedly sent to Ford by a consumer, says the following: "SYNC saved my life"; "if SYNC had not dialed 911, I certainly would have perished at the bottom of that river"; "SYNC is there when nobody else is"; and "it gave me my life … that's the ultimate technology."   The video displays the words, "SYNC.  Can call for help, even if you can't."[20]

28.     Finally, Ford distributed promotional material which contained the following statement concerning MyFord Touch:

> [T]ogether these [MyFord Touch] elements create an interactive, rich interface that makes the vehicle functions, settings and information easily accessible to the driver through voice, steering wheel controls or with a simple tap on the touchscreen.[21]

29.     Because Ford held itself out as offering a well-designed and fabricated MyFord Touch system, consumers who considered purchasing MyFord Touch-equipped vehicles expected that Ford was honest in its representations about the design and functionality, *i.e.* they expected that MyFord Touch had no significant defects. This expectation meant that future value did not have to face heavy discounting for known defects. As a result, for

---

[20] Complaint ¶216.

[21] Complaint ¶224.

consumers who decided to purchase MyFord Touch, the expected future value was at least as high as the price charged by Ford for the MyFord Touch system.[22]

30.     Notwithstanding the above, Plaintiffs allege that the MyFord Touch system was defective, that Ford knew the system had a substantial probability of malfunction, and that Ford concealed such defects from Class members. Therefore, the actual expected value to a consumer of the MyFord Touch system ended up being lower than the value he or she expected from the MyFord Touch system when making the purchasing decision. Put another way, at the time of sale, the consumer did not receive what he or she paid for.

31.     As explained above, both Class members who actually experienced a malfunctioning product ex-post and those who did not were harmed by Ford's failure to disclose the defect. From an economics perspective, the expected (*i.e.* defect probability-discounted) value at the time of purchase is the relevant measure. Because all Class members faced the same odds of experiencing a malfunction, and because Ford concealed the defects from all Class members, all Class members were harmed.[23]

---

[22] The supposition that consumers expect a new vehicle to be free of known (to manufacturer) defects is supported by the fact that most new cars have complete bumper-to-bumper manufacturer warranties. Under such warranties, any defects that manifest themselves are expected to be completely repaired at no cost to the consumer. MyFord Touch was covered under warranty during the period at issue in this case. See Deposition of Michelle Moody, August 19, 2015 ("Moody Dep." hereafter), pp. 214-215. See also, http://wheels.blogs.nytimes.com/2012/11/28/ford-extends-warranties-on-myford-touch-system/?_r=1). Of course, there exist some additional costs associated with driving to the dealership to have the vehicle repaired under warranty.

[23] To be clear, all Class members who purchase MyFord Touch equipped vehicles with the same software version face the same odds to experience a malfunction. The likelihood to experience a malfunction may be different between different MyFord Touch software versions. For the purposes of this report, I assume that
(continued)

32.     Irrespective of whether the risk of malfunction manifested itself in any Class members' MyFord Touch system, all Class members were exposed to a risk for which they did not bargain.  All Class members paid for reliability that they did not receive.  If Ford had informed Class members at the time of sale that MyFord Touch was susceptible to widespread failures and system crashes and that such defects could not be fixed (at all or until some later date), Class members would not have paid the price they did pay for the MyFord Touch system.

33.     In my approach to quantifying the remedy based on the foregoing understanding, a Class member's "willingness-to-pay," or subjective valuation of the accused component on a consumer-by-consumer basis, is irrelevant.  What is relevant is, simply, that Class members purchased vehicles that Ford marketed as possessing capabilities that they did not possess and, assuming that that equipment was defective (and any other legal predicates to recovery), Class members seek one of the remedies described below – each of which I have quantified and each of which can be determined by common proof.

## IV.     Approaches to Quantifying Damages on a Class-Wide Basis

34.     I quantify damages or economic harm two ways in this matter.  First, I quantify the per-vehicle revenue that Ford received from the sale of MyFord Touch systems in the Class vehicles.  Second, I quantify the price that Class members paid at retail for MyFord Touch systems in the Class vehicles.[24]

---

(continued)

all software versions installed on Class vehicles will be found defective, i.e. associated with substantial probability of malfunction.

[24] My analysis and quantifications are, naturally, limited to the data available to me.  In this matter, the relevant data reside within Ford.  Ford did not produce documents that quantified all of the costs associated with the manufacture of the MyFord Touch system, the revenue received by Ford on the sale of the MyFord Touch system as a stand-alone option, or the MSRP of the MyFord Touch system

(continued)

The per-vehicle estimates can be applied to the total number of Class vehicles sold to quantify class-wide damages.  I leave the question of which methodology produces the better measure of economic loss to the Court or the finders of fact.  Irrespective of which one is chosen, these quantifications reflect an amount of money associated with the purchase of MyFord Touch equipment in Class vehicles in the face of Ford's alleged concealment of material defects in the system, as described in more detail above.

### A.  Ford Charged ███████ for MyFord Touch

35.    The first method of computing damages or economic loss to Class members is based on the price Ford charges its dealers.  Ford calls this the "Wholesale Delivered" price, or "WSD."  This method underestimates damages because consumers typically, and on average, pay a markup over dealer cost for vehicles and options such as the MyFord Touch system.

36.    Ford tracks prices and costs on a component part basis. Specifically, the discovery produced in this litigation contains multiple documentary sources quantifying prices and costs associated with the MyFord Touch system and some of the individual components of this system. Table 1 below summarizes the data obtained from one such document – an April 30, 2014 presentation to management titled "Go Further: Connectivity."[25] The table summarizes both WSD (price paid to Ford by dealers) and material costs for

---

(continued)

as a stand-alone option.  Instead, Ford produced documents concerning the revenue, MSRP and dealer mark-up for certain components of the MyFord Touch system.  In this regard, for purposes of my Report, I have confined my analysis to available financial data concerning four components of the defective MyFord Touch system installed in Class vehicles: (i) the MyFord Touch LCD Screen, (ii) the SYNC operating system, (iii) the SYNC Services feature, and (iv) the Navigation feature.

[25]  WLN2-02275652-88; see also Curlew Dep., p. 100.

components of the MyFord Touch system. The document describes the additive design of the MyFord Touch system, meaning that the MyFord Touch system is comprised of the LCD screen, the SYNC operating system and additional components. MyFord Touch with the Navigation feature is, in turn, a MyFord Touch system with additional components.

37.     Put differently, each listed system contains all the features of the previous system, plus additional components.[26]   The prices listed in this document reflect revenues Ford expected to receive before incentives and price realignments.[27]   This document reflects that my approach of estimating the revenue received by Ford from the sale of its MyFord Touch system to dealers is, in fact, the *same* approach that Ford itself used to estimate the revenue it received from the sale of its MyFord Touch system to dealers. The WSD values reported in Table 1 provide illustrative per-vehicle estimates of damages for different versions of MyFord Touch – with and without the Navigation feature.[28]



---

[26] The WSD values for component parts of the MyFord Touch system is also reflected in an internal Ford database known as the "Equipment Master List". See WLN5 053666-WLN5 053666 and WLN5 053667-WLN5 053667. Also see Curlew Dep., pp. 88-89.

[27] Curlew Dep., pp. 102-103.

[28] Curlew Dep., pp. 102-103.

38.     Since the WSD values reported in Table 1 are approximate values reported to management, I also rely on model and trim specific prices listed in the so-called "Trim Spiders," which are internal Ford documents that Ford produced in this litigation. Examples of a "Trim Spider" are attached to this report as Appendix 3.   These "Trim Spider" documents report the manufacturer suggested retail prices (MSRPs) of individual components included in the MyFord Touch system, including the MyFord Touch eight inch screen, the SYNC operating system, the SYNC Services feature, and the Navigation feature.[29]   A typical "Trim Spider" would list the MSRP for each trim and each standard and optional component for a given model and model year. The "Trim Spider" documents also typically contain dealer margin percentages applicable to both standard and optional equipment.[30] By way of example, Table 2 below shows the MSRPs reported for the 2012 model year Ford Edge.  In addition, I have applied the dealer margin percentages from the same 2012 Ford Edge Trim Spider to the MSRPs to obtain the corresponding WSDs.  Exhibit A shows analogous available data for other vehicles equipped with MyFord Touch. Table 3 shows the average WSD values across models with available Trim Spider data.

---

[29]  Curlew Dep, p. 33.

[30]  The dealer margin is the difference between MSRP and previously discussed WSD prices. For example, for a component with MSRP of $100 and dealer margin of 12%, the implied WSD is $88. The dealer margin values may differ for equipment that is standard on a given model and trim compared to the equipment that is optional on the same model and trim. See Curlew Dep, p. 24.



39.     Exhibit A contains the WSD for the following components of the MyFord Touch system in the Class vehicles: (i) The Basic SYNC operating system, (ii) the SYNC Services feature, (iii) the MyFord Touch 8" LCD Screen, and (iv) the Navigation feature, by vehicle and by model year, where legible data were available in Ford's production.[31]  For each vehicle that is at issue in the Class, the relevant elements of damages would be combined to compute the total economic loss.  For example, some, but not all, of the Class vehicles will have the Navigation feature.

**B.     Class Members Paid ███████ for MyFord Touch**

40.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[31] Some of Ford's discovery documents were produced in paper form and were essentially illegible.

[32] Curlew Dep., pp. 151-152:



Q  Does Ford have any data on what consumers actually pay?

A  ████████████████████████████████

(continued)

███████████████████████████████████████████

███████████████████████████████████████ [33] [34]

41.     The estimate of an average discount off MSRP for new Ford vehicles of six-to-seven percent based on Ford testimony is further supported by other sources. In particular, I requested information on average discounts off MSRP from one of the well-known sources of automotive information – Edmunds.[35] Edmunds provided me with the average transaction prices and average MSRPs, by year, for all new Ford vehicles. The data on average transaction prices and MSRPs provided by Edmunds, along with the average discount from MSRP implied by these numbers, are summarized in Table 4. Table 4 shows that, according to Edmunds, consumers were getting discounts of between 6 percent and 7 percent off of MSRP on average in 2012-2014 for new Ford vehicles. In short, these summary statistics confirm exactly the Ford executive's deposition testimony.

---

(continued)



[34] Thus, the Wholesale Delivered price ("WSD") represents the best available estimate of the amount dealers pay Ford for vehicles. This is because the additional items on the invoice are (more or less) credited back to the dealer through other mechanisms. Consumers generally pay less than MSRP, and more than WSD, when purchasing a vehicle.

[35] See http://www.edmunds.com/about/.

**Table 4**

**Ford Average Transaction Price & MSRP**

| Year | Average Transaction Price | Average Transaction MSRP | % off MSRP |
|------|---------------------------|--------------------------|------------|
| 2012 | $32,503 | $34,839 | 6.7% |
| 2013 | $33,451 | $35,810 | 6.6% |
| 2014 | $34,001 | $36,446 | 6.7% |
| 2015 | $35,194 | $37,909 | 7.2% |
| 2016* | $35,901 | $38,685 | 7.2% |

Source: Edmunds.com.
Notes: *2016 data for Jan-May; excludes Lincoln transactions.

42.     The estimates of typical discounts off MSRP for Ford vehicles provided by Ford and Edmunds are similar to the average industry-wide discounts reported by other industry sources. For example, in its November 2013 report, TrueCar, another source of automotive information, stated that "[t]he overall industry discount is 7.2%."[36]

43.     ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

---

[36] TrueTrends, November 2013, available at http://blog.truecar.com/wp-content/uploads/2013/11/TrueTrends November 2013.pdf, pp. 1, 9  The report also describes "Top Discounts", i.e. highest discounts instead of average discounts.     For     information     about     TrueCar,     see https://www.truecar.com/about us.html.



44.     As reflected above, I used Ford's documents, as well as Ford's corporate representative's deposition testimony as the basis for my quantification of the revenue Ford received from the sale of accused MyFord Touch systems to dealers and of the monies spent by Class members on the sale of accused MyFord Touch systems.  The difference between these approaches derives from the fact that dealers stand between Ford and Class members and dealers earn a margin for their services.  Consequently, the amount that Class members paid for vehicles exceeds the amount that Ford earned on those vehicles.  Thus, the amount Ford received from the sale of accused MyFord Touch systems underestimates the economic injury to Class members, because Class members typically, and on average, paid a mark-up over the revenue Ford received from its dealers for vehicles and options such as the MyFord Touch system.[37]

---

[37] Recall that MyFord Touch is sometimes an option and sometimes part of the base vehicle.  In either case, Class Members typically, and on average, pay more for the MyFord Touch system than Ford receives.

### C. Documentary Resources Provide the Foundation For, and Serve as the Basis of, My Analyses and Conclusions

45.     During discovery, Ford did not produce data reflecting the amount each Class member actually paid for MyFord Touch equipment (which I understand is based on Ford's representation that it does not possess these data).[38]  This data limitation derives from the very structure of the auto industry – after all, Class members interact with Ford's dealers and Ford claims it has no visibility into the amount of money its dealers charged for each Class Vehicle. Thus, I estimate the amount paid by Class members using Ford's own documents and testimony.[39]  For this reason, my computations are reliable and factually supported.

46.     Also relevant to my analysis is the fact that the MSRPs for Ford vehicles are built up from WSD prices for component parts.  The WSD prices for MyFord Touch equipment are documented in the discovery record.[40]  The markup on WSD prices, to arrive at MSRP, is also documented in Ford's document production in this matter.[41]  Thus, Ford's documents describe a clear connection from (i) the cost of MyFord Touch equipment in various configurations to (ii) the WSD price to (iii) Ford's MSRP.  These documentary resources provide the foundation for a logical, principled measure of the amount consumers paid for MyFord Touch equipment and serve as the basis of my analyses and conclusions.

---

[38] I note, again, that the amount Ford earned from the sale of MyFord Touch equipment is known with specificity.

[39] Curlew Dep., pp. 151-152.

[40] See Exhibit A.  In addition, I refer to plural "prices" because the price varies across models and configurations (for example, MyFord Touch with Navigation costs more that MyFord Touch without Navigation.)

[41] See Exhibit A.

47. For purposes of my report, I have computed Ford's revenue (as well as the amount that consumers paid to dealers when acquiring the vehicles) to quantify two measures of the remedy focused solely on the MyFord Touch system. This approach reflects, to a reasonable degree of certainty, (i) the amount of money Class members paid for the accused MyFord Touch systems; and (ii) the amount of money Ford received from the sale of accused MyFord Touch systems. In this regard, the notion that no consumer paid a "price" for the MyFord Touch system, or it is impossible to measure any such price, because the MyFord Touch system was never offered as a standalone option at a standalone price is economic sophistry. If one were to accept such a theory, then no bundled component could ever be the subject of a deceptive trade practice litigation. This erroneous logic would lead to the equally erroneous conclusion that a defect or misrepresentation relating to bundled components of a vehicle must result in damages computed based on the price of the entire vehicle.

**D. I Intentionally Excluded From My Computation an Offset or Reduction for Any Purported Residual Value of MyFord Touch Equipment**

48. I intentionally chose to exclude from my analysis any consideration of, and allowance for, potential residual value of MyFord Touch equipment. I understand that Plaintiffs' claim that the injury from the misrepresentation and/or sale of the defective MyFord Touch system occurs at the time of purchase by Class members and that, therefore, damages should be computed as of that time. For these reasons, any remedy need not look forward in time and consider *ex post* factors. If, for the sake of argument, the law requires consideration of *ex post* factors (for example, software fixes), I can easily incorporate such a consideration on a classwide basis. For example, I could compute the economic life of the vehicles at issue and determine what portion of the economic life was used during the presence of the defect.

### E.    Computation of Aggregate Damages

49.    As summarized above, I quantify two remedies that Plaintiffs seek: (i) return of the revenue Ford received from the sale of the allegedly defective MyFord Touch equipment and (ii) return of the monies spent by class members to acquire the allegedly defective MyFord Touch equipment. In order to calculate aggregate Class damages, the per-vehicle damages estimates have to be multiplied by the total number of Class vehicles equipped with MyFord Touch. I am informed by counsel that if the proposed Class is certified, the exact list of vehicles equipped with MyFord Touch will be produced.

## V.    Conclusions

50.    Based on my analysis of economic issues in this case, I conclude:

- Assuming liability in this matter, all members of the proposed Class were injured by Ford's conduct.

- Based on data produced by Ford, I compute the average revenue received by Ford from the sale or lease of a MyFord Touch system in a Class vehicle

- Based on data produced by Ford, I compute the average economic loss suffered by Class members at the time they purchased or leased a Class vehicle

August 1, 2016                                    Jonathan I. Arnold, Ph.D.





# APPENDIX 1

CURRICULUM VITAE

# Jonathan I. Arnold, Ph.D.

**OFFICE ADDRESS:**

854 W. Oakdale Avenue
Chicago, IL 60657
direct 312.352.4200

jonathan.arnold@chicagoecon.com

**EDUCATION:**

Ph.D.    Business Economics, Graduate School of Business, The University of Chicago

M.B.A.  Finance and Accounting, The University of Chicago Graduate School of Business

B.A.      Economics, The University of Chicago

**PROFESSIONAL EXPERIENCE:**

2013 –  Chicago Economics Corp.

2013 –  *Senior Advisor*, Compass Lexecon

2012 – 2013    *Chief Economist*, Office of the Attorney General, New York State

2006 – 2012    *Managing Principal*, Analysis Group, Inc.

1995 – 2006    *Principal*, Chicago Partners

1987 – 1995    *Vice President*, Lexecon

**TESTIMONY – SINCE 2010:**

- Expert Report in *Philips v. Ford*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 5:14-cv-02989-LHK. (July 2016)

- Responsive Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072. (May 2016)

- Supplemental Declaration Lena K. Thodos and David Miller, et al v. Nicor, Inc. Northern Illinois Gas Company, U.S. Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556.  (April 2016)

- Deposition in Energy Labs, Inc., U.S. District  Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (March 2016)

- Expert Report in Energy Labs, Inc., U.S. District  Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (February 2016)

- Deposition in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072. (February 2016)

- Deposition in Richard S. Stack, M.D. v. Abbott Laboratories, Inc., U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148.  (January 2016)

- Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072. (January 2016)

- Deposition in Lena K. Thodos and David Miller, et al v. Nicor, Inc. Northern Illinois Gas Company, U.S. Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556.  (December 2015)

- Expert Report in Richard S. Stack, M.D. v. Abbott Laboratories, Inc., U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148.  (December 2015)

- Declaration in Russell Dover v. British Airways, U.S. District Court, Eastern District of New York, Case No. 1:12-CV-05567.  (November 2015)

- Declaration in Lena K. Thodos and David Miller, et al v. Nicor, Inc. Northern Illinois Gas Company,  U.S. Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556.  (October 2015)

- Deposition in Jo Ann Howard and Associates v. J. Douglas Cassity, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (October 2015)

- Supplemental Expert Report in Russell Dover v. British Airways, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567.  (September 2015)

- Deposition in Russell Dover v. British Airways, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567.  (August 2015)

- Rebuttal Expert Report in Russell Dover v. British Airways, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567.  (June 2015)

- Expert Report in Russell Dover v. British Airways, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567.  (May 2015)

- Expert Report in Thomas & Betts International v. Burny, U.S. District Court, Western District of Tennessee, Case No. 2:14-cv-2296-JPM-tmp. (April 2015)

- Testimony in Jo Ann Howard and Associates v. J. Douglas Cassity, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (March 2015)

- Deposition in Jo Ann Howard and Associates v. J. Douglas Cassity, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (February 2015)

- Deposition in Jo Ann Howard and Associates v. J. Douglas Cassity, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Expert Report in Jo Ann Howard and Associates v. J. Douglas Cassity, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Reply Declaration in Cryolife, Inc. v. C.R. Bard, Inc., U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (January 2015)

- Declaration in Cryolife, Inc. v. C.R. Bard, Inc., U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (September 2014)

- Expert Report in Illinois Pension Litigation, Circuit Court for the Seventh Judicial Circuit, Sangamon County Illinois, Case No. 2014-MR1. (August 2014)

- Deposition in Jo Ann Howard and Associates v. J. Douglas Cassity, et al., U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (August 2014)

- Expert Report in Jo Ann Howard and Associates v. J. Douglas Cassity, et al., U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (July 2014)

- Testimony in SolidFX, LLC v. Jeppesen Sanderson, Inc., U.S. District Court, District of Colorado, Case No. 11-CV-1468. (April 2014)

- Supplemental Expert Report in SolidFX, LLC v. Jeppesen Sanderson, Inc., U.S. District Court, District of Colorado, Case No. 11-CV-1468. (April 2014)

- Deposition in Noble Systems Corporation v. TRG Holdings LLC, JAMS, Case No. 1440003731. (April 2014)

- Expert Report in Noble Systems Corporation v. TRG Holdings LLC, JAMS, Case No. 1440003731. (March 2014)

- Affidavit in Lena K Thodos and David Miller, et al v. Nicor, Inc. Northern Illinois Gas Company, U.S. Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (February 2014)

- Testimony in C. Geoffrey Hampson, Christopher Hampson, and Hampson Equities, Ltd., v. Live Current Media, Inc. and David Jeffs, JAMS, Case No. 1260002566. (October 2013)

- Deposition in C. Geoffrey Hampson, Christopher Hampson, and Hampson Equities, Ltd., v. Live Current Media, Inc. and David Jeffs, JAMS, Case No. 1260002566. (October 2013)

- Expert Report in C. Geoffrey Hampson, Christopher Hampson, and Hampson Equities, Ltd., v. Live Current Media, Inc. and David Jeffs, JAMS, Case No. 1260002566. (September 2013)

- Testimony in AM General, LLC v. BAE Systems, Inc., et al., St. Joseph Superior Court, State of Indiana County of St. Joseph, Case No. 71D07-0907-PL-00195. (October 2012)

- Deposition in SolidFX, LLC v. Jeppesen Sanderson, Inc., U.S. District Court, District of Colorado, Case No. 11-CV-1468. (February 2012)

- Deposition in AM General, LLC v. BAE Systems, Inc., et al., St. Joseph Superior Court, State of Indiana County of St. Joseph, Case No. 71D07-0907-PL-00195. (May 2012)

- Supplemental Expert Report in AM General, LLC v. BAE Systems, Inc., et al., St. Joseph Superior Court, State of Indiana County of St. Joseph, Case No. 71D07-0907-PL-00195. (April 2012)

- Rebuttal Expert Report in AM General, LLC v. BAE Systems, Inc., et al., St. Joseph Superior Court, State of Indiana County of St. Joseph, Case No. 71D07-0907-PL-00195. (April 2012)

- Expert Report in AM General, LLC v. BAE Systems, Inc., et al., St. Joseph Superior Court, State of Indiana County of St. Joseph, Case No. 71D07-0907-PL-00195. (March 2012)

- Expert Report in SolidFX, LLC v. Jeppesen Sanderson, Inc., U.S. District Court, District of Colorado, Case No. 11-CV-1468. (February 2012)

- Deposition in Edgenet, Inc. v. Home Depot U.S.A., Inc., and James Musial, State of Wisconsin, Circuit Court, Waukesha County, Case No. 10-CV-10910. (December 2011)

- Expert Report in Edgenet, Inc. v. Home Depot U.S.A., Inc., and James Musial, State of Wisconsin, Circuit Court, Waukesha County, Case No. 10-CV-10910. (October 2011)

- Testimony in BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp., American Arbitration Association, Case No. 50-148-T-00737-10. (September 2011)

- Deposition in BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp., American Arbitration Association, Case No. 50-148-T-00737-10. (July 2011)

- Second Supplemental Expert Report in BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp., American Arbitration Association, Case No. 50-148-T-00737-10. (July 2011)

- Supplemental Expert Report in BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp., American Arbitration Association, Case No. 50-148-T-00737-10. (July 2011)

- Expert Report in MBDA UK Limited v. Raytheon Company, American Arbitration Association, Case No. 50-180-T-00462-04. (June 2011)

- Expert Report in BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp., American Arbitration Association, Case No. 50-148-T-00737-10. (June 2011)

- Testimony in Agility Defense & Government Services, Inc. v. DynCorp International, LLC, American Arbitration Association, Case No. 13-132-00990-10. (April 2011)

- Deposition in Agility Defense & Government Services, Inc. v. DynCorp International, LLC, American Arbitration Association, Case No. 13-132-00990-10. (March 2011)

- Testimony in Citadel Investment Group, L.L.C. v. Matthew B. Hinerfeld, American Arbitration Association, Case No. 51 116972 09. (February 2011)

- Deposition in Citadel Investment Group, L.L.C. v. Matthew B. Hinerfeld, American Arbitration Association, Case No. 51 116972 09. (February 2011)

- Expert Report in Citadel Investment Group, L.L.C. v. Matthew B. Hinerfeld, American Arbitration Association, Case No. 51 116972 09. (February 2011)

- Expert Report in Agility Defense & Government Services, Inc. v. DynCorp International, LLC, American Arbitration Association, Case No. 13-132-00990-10. (December 2010)

- Arbitration Testimony in ADA-ES, Inc., et al. v. Norit Americas, Inc., American Arbitration Association, Case No. 13-132- Y 00718 09. (October 2010)

- Deposition in ADA-ES, Inc., et al. v. Norit Americas, Inc., American Arbitration Association, Case No. 30 192 Y 00718 09. (July 2010)

- Expert Report in ADA-ES, Inc., et al. v. Norit Americas, Inc., American Arbitration Association, Case No. 30 192 Y 00718 09. (July 2010)

- Deposition in Citadel Investment Group, L.L.C. et al. v. Mikhail Malyshev and Jace Kohlmeier and Mikhail Malyshev and Jace Kohlmeier v. Citadel Investment Group, L.L.C. and CIG GP, L.L.C., American Arbitration Association, Case No. AAA 51 166 00969 09 and Case No. AAA 51 166 00970 09. (June 2010)

- Expert Report in Citadel Investment Group, L.L.C. et al. v. Mikhail Malyshev and Jace Kohlmeier and Mikhail Malyshev and Jace Kohlmeier v. Citadel Investment Group, L.L.C. and CIG GP, L.L.C., American Arbitration Association, Case No. AAA 51 166 00969 09 and Case No. AAA 51 166 00970 09. (June 2010)

- Expert Report in Citadel Investment Group, L.L.C. et al. v. Mikhail Malyshev and Jace Kohlmeier and Mikhail Malyshev and Jace Kohlmeier v. Citadel Investment Group, L.L.C. and CIG GP, L.L.C., American Arbitration Association, Case No. AAA 51 166 00969 09 and Case No. AAA 51 166 00970 09. (June 2010)

- Deposition in Marc S. Kirschner v. Thomas H. Lee Partners L.P., et al. , U.S. District Court, Southern District of New York, Case No. 07 CIV 7074. (June 2010)

- Expert Report in Marc S. Kirschner v. Thomas H. Lee Partners L.P., et al., U.S. District Court, Southern District of New York, Case No. 07 CIV 7074. (April 2010)


**TEACHING EXPERIENCE:**

- **Columbia University and Duke University**
  *Guest Lecturer (2002 – 2004)*

- **The University of Chicago, Department of Economics and Graduate School of Business**
  *Lecturer (1998 – 1999)*

  Taught microeconomics (topics included price theory, industrial organization, capital theory, principles of labor economics, and durable goods economics)

- **Loyola University Chicago School of Law**
  *Lecturer of Law (1997 – 1998)*

  Taught antitrust economics

## PROFESSIONAL AFFILIATIONS:

American Economic Association

## OTHER:

Certified Public Accountant

# APPENDIX 2

# Materials Relied Upon

**Court Documents:**

MyFord Touch Consumer Litigation, Third Amended Class Action Complaint, September 30, 2015


**Expert Reports:**

Expert Report of Jonathan I. Arnold, Ph.D., January 7, 2016

Expert Report of Hal J. Singer, Ph.D., March 15, 2016

Responsive Expert Report of Jonathan I. Arnold, Ph.D., May 2, 2016


**Depositions:**

Deposition and Exhibits of Dennis Curlew, December 15, 2015

Deposition and Exhibits of Michelle Moody, August 19, 2015

Deposition and Exhibits of Jonathan I. Arnold, February 10, 2016


**Bates Numbered Documents:**

WLN2-01191629-WLN2-01191629          WLN2-02388417

WLN2-01191630-WLN2-01191630          WLN2-02388450

WLN2-01191632-WLN2-01191632          WLN2-02388492

WLN2-01191635-WLN2-01191635          WLN2-02388554

WLN2-01191643-WLN2-01191643          WLN2-02388683

WLN2-01191687-WLN2-01191737          WLN2-02388730

WLN2-02275652-88                     WLN2-02388972-WLN2-02388973

WLN2-02388247                        WLN5 053666-WLN5 053666

WLN2-02388320                        WLN5 053667-WLN5 053667

**Academic Literature**

David A. Besanko and Ronal R. Braeutigam, Microeconomics: An Integrated Approach, 2002

Jeffrey M. Perloff, Microeconomics, 2nd Ed., 2001

Robert S. Pindyck and Daniel Rubinfeld, Microeconomics, 5th d., 2001


**Public Sources:**

http://www.autotrends.org/2008/04/21/is-ford-sync-the-voice-recognition-benchmark/

https://owner.ford.com/how-tos/sync-technology/myford-touch/sync-services/sync-services-overview.html

http://wheels.blogs.nytimes.com/2012/11/28/ford-extends-warranties-on-myford-touch-system/?_r=1

http://www.edmunds.com/about/

http://blog.truecar.com/wp-content/uploads/2013/11/TrueTrends_November_2013.pdf

https://www.truecar.com/about_us.html

# APPENDIX 3







