# EXHIBIT 60

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

IN RE:                                    )    Case No. 13-cv-3072-EMC
MYFORD TOUCH CONSUMER                     )
LITIGATION.                               )    CLASS ACTION
                                          )
                                          )
                                          )    **EXPERT MERITS REPORT OF**
                                          )
                                          )    **HAL J. SINGER, PH.D.**
                                          )
                                          )

Contains Confidential Information Subject to Protective Order

Introduction and Assignment ................................................................................................ 4

Qualifications ........................................................................................................................ 5

I.     Background ............................................................................................................... 6

II.    Reliable Information on the Price Paid and Value Received Is Necessary for Proof of Classwide Injury and for Estimating Aggregate Damages .............................................. 10
    A.    Proof of Classwide Injury Requires Evidence That All Or Almost All Class Members Overpaid for the MFT ...................................................................... 12
        1.    Whether or Not a Particular Class Member Overpaid for the MFT Depends on the Price That the Class Member Paid for the MFT ............ 12
        2.    Whether or Not a Particular Class Member Overpaid for the MFT Also Depends on the Value Received by the Class Member ........................... 13
    B.    Estimating Aggregate Damages to Class Members Requires a Reliable Estimate of the Average Extent To Which Class Members Overpaid for the MFT ........... 13
        1.    The Extent To Which Class Members Overpaid for the MFT Depends On The Price Paid for the MFT .................................................................. 14
        2.    The Extent To Which Class Members Overpaid for the MFT Also Depends On The Value Received ............................................................. 14

III.    The Evidence on Price Paid and Value Received Do Not Support Classwide Injury and Aggregate Damages ..................................................................................................... 15
    A.    Because No Class Member Paid a Standalone Price for the MFT, and Because Class Members Negotiated Vehicle Prices Individually, the Evidence on Price Paid Cannot Support Classwide Injury or Damages ............................................. 16
    B.    Contemporaneous Ford Documents Indicate A High Value Received For Large Proportions of Class Members, and Plaintiffs' Experts' Own Data Refutes Common Injury Because It Indicates That The Challenged Conduct Had *No Negative Effect* On Value Received .......................................................... 22
    C.    Improvements to the Base Software Through Updates and the Release of Version 3.6 Imply An Increased Value Received ............................................................ 25
    D.    There Is No Evidence That the Alleged Defects Represent Anything Beyond a Baseline Rate of Technical Difficulties That Would Be Expected for a Non-Defective Product ......................................................................................... 26
    E.    Secondary Market Data Refute Classwide Injury, And Indicate Instead That the Challenged Conduct Had No Negative Classwide Effect On Value Received .... 28

IV.    There are Many Categories of Class Members that Were Not Injured Under Plaintiffs' Theory of Harm, and Data From Named Plaintiffs Illustrate the Inability to Infer Injury Within Those Categories ......................................................................................... 29
    A.    Under Plaintiffs' Theory of Harm, Class Members That Paid a Price at or Below the Value Received Were Uninjured ...................................................... 30
    B.    Class Members Who Received Upgrades To the Base Software Sufficient To Raise Value Received Above the Price Paid Were Uninjured Under Plaintiffs' Theory of Harm ............................................................................................ 33

Contains Confidential Information Subject to Protective Order

C.   Class Members Who Purchased Their Vehicles on the Secondary Market and Received a Discount Sufficient To Reflect Disclosure of the Alleged Defects Were Not Injured Under the Plaintiffs' Theory of Harm ..................................... 34

E.   Class Members Who Leased Their Vehicles, and Whose Payments for the MFT Totaled Less Than The Value Received, Were Not Injured Under Plaintiffs' Theory of Harm ................................................................................................ 35

V.   The Most Reliable Estimate of Aggregate Damages from the Available Classwide Evidence Under Plaintiffs' Theory of Harm Is Zero ....................................... 36

Conclusions ................................................................................................ 38

Appendix 1: Curriculum Vitae ................................................................... 40

Appendix 2: Regression Analysis of Secondary Market Prices ................... 59

Appendix 3: Materials Relied Upon .......................................................... 65

## INTRODUCTION AND ASSIGNMENT

1.     I have been asked by counsel for the Ford Motor Company ("Ford") to offer an economic opinion on classwide injury (also referred to as common impact)[1] and aggregate damages to the putative classes (hereinafter, "Class") in the instant case. I reserve the right to supplement this report and to expand or modify any opinions based on review of material as it becomes available through ongoing discovery and through any additional work.[2]

2.     There is substantial record evidence inconsistent with classwide injury and damages, and no evidence consistent with classwide injury and damages.[3] I therefore conclude that there is no evidence of classwide injury. To the extent that any individual Class Members[4] did suffer economic harm consistent with Plaintiffs' allegations, such proof could only be established through an individual analysis of evidence of injury and damages particular to those Class Members. I also conclude that the most reliable estimate of aggregate damages that can be gleaned from the available classwide evidence and methods is $0.

---

1.     Throughout this report, I use the term "injury" or "impact" to refer to actual or imminent economic harm to Plaintiffs (if any) allegedly caused by Ford. I use the term "damages" to refer to the appropriate amount of money, if any, needed to compensate Plaintiffs for any economic harm allegedly caused by Ford from the challenged conduct in this case.

2.     I understand that the Court has not yet ruled on Plaintiffs' Motion for Class Certification, and I reserve the right to modify or supplement this report to account for the scope of the Court's order, as it may bear on subjects covered in my report. I have been asked to assume that all of the proposed classes will be certified. Should I be called upon to testify at trial, I may create exhibits based upon materials referenced in this report.

3.     Because this report is being filed simultaneously with Plaintiffs' merits expert report filings, the record evidence that I have reviewed does not include the evidence to be submitted by Plaintiffs (and their experts) at the merits expert phase. My opinions in this report include some conclusions regarding Plaintiffs' failure to propose or implement methods capable of proving impact or estimating damages. These conclusions are, by necessity, based on my review of Plaintiffs' filings prior to the merits expert phase, and I may update them after reviewing Plaintiffs' merits expert filings.

4.     Plaintiffs have moved to certify twelve separate statewide classes. When I use the terms "Classwide" or "Class Members," I refer to members any of those putative classes collectively.  My conclusions also hold equally for any of the twelve separate putative classes.

3.      Although it is not possible to determine whether any particular Class Member was injured using classwide evidence and the classwide evidence is contrary to classwide injury, it is still possible to identify categories of certainly uninjured Class Members. I provide a (non-exhaustive) review of several such categories, and I show that the available evidence indicates that large proportions of Class Members were not injured. In addition, I use the available information for certain Named Plaintiffs—which is significantly more extensive than the information available for all other Class Members—to illustrate the inability to infer injury under particular circumstances.

### QUALIFICATIONS

4.      I am a Principal at Economists Incorporated, a Senior Fellow at George Washington University's Institute for Public Policy, and an Adjunct Professor at Georgetown University's McDonough School of Business (where I teach Advanced Pricing to MBA candidates).

5.      Prior to joining Economists Incorporated, I was a Managing Partner at Navigant Economics, and before that, I was Chief Executive Officer of Empiris, a litigation and regulatory consulting firm (which was acquired by Navigant in 2010).

6.      I am the co-author of the e-book *The Need for Speed* (Brookings Press 2013), and the book *Broadband in Europe* (Springer Press 2005). My articles, several of which pertain to the role of an economist in proving classwide impact, have appeared in dozens of legal and economic journals.

7.      I have testified before Congress on the interplay between antitrust and sector-specific regulation. My scholarship and testimony has been widely cited by courts and regulatory agencies. In agency reports and orders, my writings have been cited by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice.

Contains Confidential Information Subject to Protective Order

8.      I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

9.      My curriculum vitae is provided in Appendix 1. I have no stake in the outcome of this case. I am being compensated for my work in this case at the rate of $675 per hour.

10.     The materials that I relied upon in forming my opinions are summarized in Appendix 3.

## I.  BACKGROUND

11.     Plaintiffs allege that the owners and lessees of Ford and Lincoln vehicles were exposed to a risk of experiencing various failures (the "Alleged Defects") of the MyFord Touch and MyLincoln Touch information and entertainment systems (collectively, "MFT"). The MFT was available on certain Ford and Lincoln vehicles either as standard equipment (for some vehicles) or as part of an option package (for certain other vehicles) beginning in the 2011 model year.[5] According to Plaintiffs, the MFT was "intended to allow drivers and passengers to control entertainment, navigation, rear-view camera, cell phone communication, climate control, and other systems via a touch-screen panel placed in the dashboard."[6]

12.     The Alleged Defects have been defined by Plaintiffs as a laundry list of various alleged technical failures, such as touchscreens that would freeze or go blank, MFT-generated error messages that could not be cleared, inability to pair the MFT with mobile devices, problems with the functionality of the voice recognition and navigation features, and general

---

5.  Third Amended Class Action Complaint (September 30, 2015) [hereafter "Complaint"], ¶¶ 2-7.
6.  Plaintiffs' Motion For Class Certification (January 28, 2016) [hereafter "Class Cert Motion"], at 4.

Contains Confidential Information Subject to Protective Order

system sluggishness in responding to commands.[7] Plaintiffs assert that Ford deliberately concealed from Class Members the Alleged Defects in approximately 560,000 vehicles sold in twelve states (the "Class Vehicles") between August 2010 and August 2013 (the "Class Period").[8] Plaintiffs claim that the Alleged Defects arise from bugs in the computer code ("Base Software") that underlies the architecture of the MFT system.[9]

13. Plaintiffs allege that Ford concealed a total of seven common facts ("Common Facts") from Class Members:

1. Ford's initial development of MFT was allegedly contracted out to inexperienced programmers who were not able to handle the complexity of the project;

2. Ford's development of MFT allegedly did not follow industry standards, including MISRA, for development of automotive software;

3. In the initial release of the MFT software, measures designed to ensure the quality of a product prior to release to the public (such as testing, application readiness, and sound software integration and architecture) were allegedly abandoned or lessened in favor of meeting a schedule for including MFT in vehicles as previously planned;

4. Ford's initial release of MFT, version 1.08, was allegedly deeply flawed and materially defective in a way that materially affected consumers;

---

7. *Id.* at 5.

8. *Id.* at 1-3. Plaintiffs allege that "MFT was fundamentally defective on the day Ford first released it, as Ford knew." *Id.* at 4.

9. *Id.* at 4 ("The system operates with two processors, one of which is known as the 'CCPU.' This case, and this brief, center primarily on the CCPU and its software, which is the Base Software."). The MFT system is sometimes referred to by Plaintiffs and Ford as "SYNC Gen2." *Id.* at 3. Prior versions of the SYNC software ran on Ford vehicles before the MFT was introduced; SYNC Gen2 incorporated various technical enhancements that allowed for the MFT's touchscreen interface. Accordingly, the MFT is sometimes referred to by Ford as "SYNC with MyFord Touch." *Id.* at 19. In late 2014, Ford rolled out SYNC 3, which "allows Ford to create an infotainment system with a simpler layout, larger fonts, and a touchscreen that moves with a swipe up, down or across, with pinch-to-zoom like modern tablets." *See* Alisa Priddle and Chris Woodyard, "Ford dumps Microsoft for Blackberry for Sync 3," *USA Today* (December 11, 2014), *available at* http://www.usatoday.com/story/money/cars/2014/12/11/ford-sync-3/20234131/.

Contains Confidential Information Subject to Protective Order

5. Ford allegedly knew prior to its release of version 1.08 that the software was deeply flawed and materially defective in a way that materially affected consumers;

6. Ford continued to put MFT in vehicles, and expand the number and models of vehicles for which MFT was available, even though Ford allegedly knew that the software and its design were deeply flawed and materially defective in a way that materially affected consumers, and that (at least through version 3.5 and the Fall of 2013) Ford could not adequately repair the material defects in MFT, and that its periodic updates remained materially defective; and,

7. The defects in, and design of, MFT allegedly caused MFT to be a driver distraction and a safety hazard.[10]

14. Plaintiffs do not claim that the Alleged Defects manifested themselves in all (or any particular fraction of) Class Vehicles, or that any of the Alleged Defects occurred all (or any particular fraction) of the time in any Class Vehicle. Plaintiffs do not claim that the frequency of the Alleged Defects exceeded any specified baseline rate of technical difficulties that a rational consumer might expect to encounter when purchasing any widely available computer technology[11] (such as a laptop computer running the Microsoft Windows Vista operating

---

10. Plaintiffs' Supplemental Responses to Defendant's Interrogatories(Jan. 13, 2016). I have not been asked to opine on whether Ford did in fact conceal the Common Facts or the Alleged Defects from Class Members at the point of purchase, and my conclusions do not depend on these facts.

11. In his deposition, Dr. Arnold testified that he understood Plaintiffs claims to include the allegation that Alleged Defects exhibited "a much more significant rate of errors" than the "occasional production error that is the sort of thing that people are willing to just accept as sort of a baseline rate of problems." Deposition of Jonathan Arnold (February 10, 2016) [hereafter "Arnold Dep."], 61:7-62:7. However, neither Plaintiffs nor their experts have made any attempt to quantify the "rate of errors" for the Alleged Defects, or to demonstrate that this rate exceeds a normal, baseline error rate for computer technology.

system),[12] let alone an in-vehicle technology. I shall refer to Plaintiffs' allegations against Ford collectively as the "Challenged Conduct."

15.    I understand that Plaintiffs' formal claims against Ford include:

- Breach of implied warranty ("Implied Warranty Claims");
- Violation of Ford's express warranty ("Express Warranty Claims");
- Fraudulent concealment and violations of state consumer-fraud statutes ("Fraudulent Concealment Claims");
- Negligence or strict liability by Ford ("Tort Claims")[13]

16.    In their class reports, both of Plaintiffs' economic experts, Dr. Arnold and Mr. Boedeker, focused their analysis solely on Plaintiffs' Fraudulent Concealment Claims; both admitted to not having considered how injury or damages would be analyzed with respect to

---

12.    *See, e.g.,* Jessica Mintz, "Six months on, Vista users still griping," NBC News (July 13, 2007), available at http://www.nbcnews.com/id/19747743/page/2/#.V56cQbgrKUk

13.    Class Cert Motion at 39-47. I understand that, to prove the Implied Warranty Claims, Plaintiffs intend to demonstrate "that the Class Vehicles were not of merchantable quality at the time they left Ford's possession," and that the MFT was not "fit for the ordinary purposes for which such goods are used." *Id.* at 40.  I understand that Plaintiffs' Express Warranty Claims are based on Ford's Limited Warranty, and that Plaintiffs intend to offer proof that Ford violated the Limited Warranty. *Id.* at 42. I further understand that, according to Plaintiffs' Express Warranty Claims, Ford is not entitled to a "reasonable time" to repair or replace the Alleged Defects. I understand that Ford's Limited Warranty requires that Class Members "present their vehicles for reparative work" so that any purported defects can be remedied under the terms of the Limited Warranty. *Id.* at 45. I understand that Plaintiffs allege that Plaintiffs have allegedly satisfied this "presentment requirement."  *Id.* at 42. I further understand that, to prove the Fraudulent Concealment Claims, Plaintiffs intend to offer evidence that "Ford intentionally concealed a material fact that it had a duty to disclose to Plaintiffs and the other Class Members, resulting in damages." *Id.* at 45. To prove the Tort Claims for Class Members that purchased Class Vehicles in Ohio, I understand that Plaintiffs intend to offer evidence that Ford failed to comply with its "duty of care to Ohio Class Members in designing MFT."  *Id.* at 46. Finally, to prove the Tort Claims for Class Members that purchased Class Vehicles in Colorado, I understand that Plaintiffs intend to offer evidence that "(1) the product is in a defective condition unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the consumer without substantial change in the condition in which it was sold; (3) the defect caused the plaintiff's injuries; (4) the defendant sold the product and is engaged in the business of selling products; and (5) the plaintiff sustained damages." *Id.* at 46.

Plaintiffs' remaining claims.[14] Accordingly, here I focus on Plaintiffs' Fraudulent Concealment claims. Should Plaintiffs present a theory of injury or damages on classwide basis for Plaintiffs' remaining claims, I will offer an opinion on those theories in the future.

## II. RELIABLE INFORMATION ON THE PRICE PAID AND VALUE RECEIVED IS NECESSARY FOR PROOF OF CLASSWIDE INJURY AND FOR ESTIMATING AGGREGATE DAMAGES

17.    Plaintiffs allege that injury and damages flow from Class Members having overpaid for the MFT at the point of purchase as a result of the Challenged Conduct.[15] Class Members were allegedly "exposed to a risk for which they did not bargain."[16] Thus, Class Members allegedly paid a "price premium"[17] for the MFT, owing to non-disclosure of the risk of experiencing the Alleged Defects.[18] Plaintiffs therefore allege that Class Members paid a price for the MFT, in exchange for a product with a certain value to them (the "Value Received"), and that that Class Members' expectations regarding the Value Received were significantly inflated by Ford's failure to disclose the Common Facts. As a consequence, Class Members allegedly would have been willing to pay significantly less for the MFT if Ford had disclosed the Common Facts to them at the point of sale (in the "But-For World").

---

14.    Arnold Dep. 97:2–103:20. *See also* Deposition of Stefan Boedeker (February 23, 2016) [hereafter "Boedeker Dep."], 84:1–87:5.

15.    Class Cert Motion at 17.

16.    Expert Report of Jonathan I. Arnold, Ph.D. (January 7, 2016) [hereafter "Arnold Class Report"], ¶27.

17.    Class Cert Motion at 1, 3, 16 17, 48.

18.    *See, e.g.,* Arnold Class Report ¶15 ("I assume that it will be established that the MyFord Touch system was defective in the Class vehicles. I further assume that Ford knew the MyFord Touch system suffered from significant defects, including system crashes; that Ford did not disclose such knowledge to Class Members when they purchased the Class vehicles; and that, if Ford had made such disclosures, Class Members would have found such information material and would not have paid what they paid for the MyFord Touch system.") See also Revised Expert Report of Stefan Boedeker (January 7, 2016) [hereafter "Boedeker Class Report"] ¶¶27-28 (defining "economic loss" as "equal to the difference between the price this marginal consumer would have paid for the known-to-be-defective product and the non-defective product").

18.     Under Plaintiffs' theory of harm, a Class Member was injured if—as a result of the Challenged Conduct—the price that the Class Member paid for the MFT exceeds the Value Received by that Class Member.[19] Accordingly, to prove injury under Plaintiffs' theory of harm, one must obtain reliable information on the prices paid by Class Members for the MFT and the Value Received by Class Members.

19.     Proof of classwide injury requires evidence, grounded in reliable economic methods, that all or almost all Class Members overpaid for the MFT as a result of the Challenged Conduct. Assuming classwide injury can be proven, a reliable aggregate damages estimate would require a reliable estimate the overpayment, which would be multiplied by the number of units implicated by the Challenged Conduct. Aggregate damages could equal Class Members' total expenditures on the MFT only under the extreme assumption that *all* Class Members, without exception, would have paid $0 for the MFT if the Common Facts had been disclosed at the point of sale. Because Plaintiffs do not allege this, any economically meaningful

---

19.     The Value Received can be defined either as the price that a Class Member would have paid in the But-For World, or as a Class Member's willingness-to-pay ("WTP") for the MFT in the But-For World. Let $P_{Actual}$ represent the price that a Class Member actually paid for the MFT, let $P_{But\_For}$ represent the price that a Class Member would have paid in the But-For World, and let $WTP_{But\_For}$ denote the Class Member's WTP in the But-For World. Under the first definition, a Class Member overpaid (and was injured) only if $P_{Actual} > P_{But\_For}$. Under the second definition, a Class Member overpaid (and was injured) only if $P_{Actual} > WTP_{But\_For}$.

My conclusions here generalize to either definition. In economics, the price paid and WTP are closely related: For a standalone product, the demand curve for a given product is constructed by aggregating individual consumers' willingness-to-pay for the product, resulting in an equilibrium price. Accordingly, factors that increase the WTP for a product (such as high customer satisfaction) also tend to increase the price of the product. The relationship is more complicated for products such as the MFT, which is not sold as a standalone product, and which does not have a uniform equilibrium price due to individualized negotiations. *See* Part III.A, *infra*. Nevertheless, it remains the case that factors that an increase an individual customer's WTP for the MFT will also tend to increase the price paid by that consumer for the MFT.

Contains Confidential Information Subject to Protective Order

estimate of aggregate damages (assuming classwide injury could be established) would have to reflect something less than total expenditures on MFT, and must reliably quantify the extent of alleged overpayment for the MFT that occurred as a result of the Challenged Conduct.

**A.      Proof of Classwide Injury Requires Evidence That All Or Almost All Class Members Overpaid for the MFT**

20.      Because Classwide injury requires evidence that all or almost all Class Members overpaid for the MFT as a result of the Challenged Conduct, Classwide injury cannot be inferred in the absence of information of the amount paid by individual Class Members for the MFT, as opposed to the average amount paid by Class Members. Similarly, any proof of Classwide injury also requires information on the Value Received by particular Class Members, as opposed to an estimate of the average Value Received across all Class Members.

**1.      Whether or Not a Particular Class Member Overpaid for the MFT Depends on the Price That the Class Member Paid for the MFT**

21.      Proof that a particular Class Member overpaid for the MFT is not possible in the absence of any information on the amount that particular Class Member actually paid for the MFT. For example, if a Class Member received a discount on her vehicle that reduced the price of the MFT to $0, that Class Member could not, by definition, have overpaid for the MFT. MFT. More generally, any Class Member that paid a price for MFT below the Value Received (or exactly the same as the Value Received) was uninjured under Plaintiffs' theory of harm. The MFT was not sold as a standalone product; no customer paid an explicit "price" for the MFT by itself.[20] Throughout this report, when I refer to the price of the MFT, or the amount that a Class Member paid for the MFT, this language refers to the portion of the vehicle price attributable to the MFT, assuming that this could be estimated using reliable economic methods.

───────────────

20.      *See* Part III.A, *infra*.

22. Proof of Classwide injury would be less complicated if Class Members paid uniform prices for the MFT or even for the Class Vehicles. However, this is not the case. As explained below, vehicle purchase prices are the outcome of highly individualized negotiations, as well as Ford's own calibration of its prices to varying market conditions and differences among different models and model-years of Class Vehicles. This means that there is wide variation in the amount that Class Members paid for their vehicles generally and in any amount that could be attributed to the MFT in particular.[21]

### 2. Whether or Not a Particular Class Member Overpaid for the MFT Also Depends on the Value Received by the Class Member

23. Even if every Class Member had paid exactly the same price for the MFT, proof of injury cannot proceed without information of the Value Received by particular Class Members. For example, suppose that all Class Members paid $500 for the MFT, and that disclosure of the Common Facts would have reduced Class Members' expectations of the Value Received by $1 for some Class Members, but that the expectation of Value Received would remain at least $500 for all other Class Members, even after disclosure to them of the Common Facts. Under this scenario, Classwide injury cannot be shown. More generally, Class Members with a higher Value Received are less likely to have been injured under Plaintiffs' theory of harm. As explained below, there is substantial record evidence indicating that Value Received was high for many Class Members.

### B. Estimating Aggregate Damages to Class Members Requires a Reliable Estimate of the Average Extent To Which Class Members Overpaid for the MFT

24. Even if it were possible to demonstrate that all or almost all Class Members overpaid in some amount for the MFT as a result of the Challenged Conduct, determining

---

21. *See* Part III.A, *infra*.

aggregate damages to Class Members would require a reliable estimate of the average overpayment. Any such estimate would require information on both the price paid for the MFT and the Value Received.

**1.    The Extent To Which Class Members Overpaid for the MFT Depends On The Price Paid for the MFT**

25.    Data on the price that Class Members actually paid for the MFT is obviously critical for accurately estimating aggregate damages: It is mathematically impossible for damages to exceed the total amount that Class Members paid for the MFT. The maximum a Class Member who paid $300 for the MFT could have been overcharged is exactly $300. The analysis of aggregate damages would be more straightforward if data were available indicating the amount that Class Members paid for the MFT on average. However, this is not the case here because no Class Member paid a standalone price for the MFT.[22]

**2.    The Extent To Which Class Members Overpaid for the MFT Also Depends On The Value Received**

26.    Because Plaintiffs do not allege that *all* Class Members, without exception, would have paid nothing for the MFT in the But-For World, any economically meaningful estimate of aggregate damages must reflect something less than the full price of the MFT, and must reliably quantify the extent to which disclosure of the Common Factors would have resulted in a diminution in Class Members' expectations of Value Received at the point of sale. This means that aggregate damages cannot be estimated without information about the Value Received.

---

22.    As explained below, in his class report, Dr. Arnold claimed (incorrectly) that the price can be reliably quantified using Ford's estimated value of the components that make up the MFT, despite the fact that this does not represent a standalone price for the MFT, was invisible to Class Members at the point of purchase, and was used only internally by Ford as a starting point for making pricing decisions. *See* Part III.A, *infra*.

Contains Confidential Information Subject to Protective Order

27.    Estimating aggregate damages would be more straightforward if there were evidence that disclosure of the Common Facts would have resulted in a widespread and substantial reduction in Class Members' expectations of Value Received. However, as explained below, record evidence is not consistent with this hypothesis. For example, most Class Members were satisfied with the MFT, while a substantial majority would be likely to recommend the MFT to others.[23]

### III. THE EVIDENCE ON PRICE PAID AND VALUE RECEIVED DO NOT SUPPORT CLASSWIDE INJURY AND AGGREGATE DAMAGES

28.    Class Members did not pay uniform prices for their vehicles, and instead paid individualized prices resulting from individualized negotiations. In addition, no Class Member paid a standalone price for the MFT: Class Members either received the MFT as standard equipment, or as part of a broader bundle of features included in an options package. As explained below, the combined effect of these two factors is to make it impossible to reliably quantify the price that a particular Class Member paid for the MFT. In addition, record evidence shows that prices will tend to vary widely from one Class Member to the next, because (1) customers purchasing vehicles at dealerships routinely negotiate discounts significantly in excess of the dollar value of the MFT (even by Plaintiffs' estimates of this value, as indicated in their experts' class reports); and (2) many Class Members faced clear incentives to negotiate discounted prices for their vehicles to reflect their lack of interest in the MFT. Finally, the available evidence of Value Received indicates that many Class Members' Value Received was high, and thus was not substantially suppressed by the Challenged Conduct. Accordingly, it is

---

23.    *See* Part III.B, *infra*.

Contains Confidential Information Subject to Protective Order

not possible to apply a classwide method to infer whether any particular Class Member overpaid for the MFT.

**A.     Because No Class Member Paid a Standalone Price for the MFT, and Because Class Members Negotiated Vehicle Prices Individually, the Evidence on Price Paid Cannot Support Classwide Injury or Damages**

29.     In some markets, consumers pay uniform prices for the same product (*e.g.*, an Apple iPhone). But that is decidedly not the case in the real world of retail vehicle price negotiations, which are highly individualized and routinely result in different customers paying Ford dealers (not Ford) widely varying prices for the same vehicle. As the name suggests, the MSRP is only the *suggested* retail price that a dealer might obtain for the vehicle.

30.     Even if data indicating exactly how much each Class Member paid dealers for their vehicles were available, it would still be impossible to reliably infer how much, if anything, any particular Class Member paid for the MFT. This is the result of both individualized pricing of vehicles and the fact that the MFT was not sold as a standalone product; no customer paid an explicit "price" for the MFT by itself. In some cases, the MFT was bundled with other features (such as leather seats or premium audio in option packages). In others, the MFT was standard equipment—bundled with all other standard components of the vehicle. Because of individualized pricing, customers who assign less value to the MFT (or any other option with which a vehicle is equipped) can and will tend to negotiate discounts for the vehicle that reflect their preferences. Because of feature bundling, it is impossible to determine using classwide evidence how large of a discount for MFT (or any other bundled feature) was negotiated by any particular Class Member, because it is not possible to disentangle the MFT

from other bundle components.[24] The problem is even more acute for the large number of vehicles purchased by Class Members, including all Lincolns, that included the MFT as a standard feature.[25] Class Members purchasing such vehicles may have purchased them due to features entirely unrelated to the MFT, and hence placed little value on the MFT.

31. The evidence shows (as many car buyers know from experience) that customers at dealerships routinely negotiate discounts significantly in excess of the dollar value of the MFT, according to Plaintiffs' experts' own estimates.[26] In the real world of retail vehicle price negotiations, car buyers can and do employ a variety of strategies and negotiating tactics to obtain their desired vehicle at the lowest possible price. For example, car buyers may use information from the Internet to gain better insight into dealer profit margins, or to identify points in time when a particular vehicle is in high supply, prompting dealers to accept discounts in order to move inventory (*e.g.*, end-of-month sales quotas and incentives).[27] As in virtually

---

24. Arnold Dep. 205:16-22 ("I think I would agree with the proposition that when one is buying in a bundle it's not possible to know with specificity how much people are valuing each element of the bundle. All one knows is in aggregate the price of the bundle is sufficiently attractive to induce somebody to take the bundle.")

25. WLN4 117245; WLN5 48668 - WLN5 48743; WLN5 48744 - WLN5 48835; WLN5 48836 - WLN5 48928; WLN5 48929 - WLN5 49022.

26. According to Mr. Boedeker's estimates during the class certification phase, the value of a "defect-free" MFT to Ford and Lincoln owners falls between $939 and $1,390. Boedeker Class Report ¶¶72-73; ¶89. According to Dr. Arnold's estimates, Class Members paid between $625 and $1,364 for the MFT. Arnold Class Report ¶¶30-34.

27. *See*, *e.g*., http://www.car-buying-strategies.com/car-buying.html (advising car buyers that "Dealer prices are full of hidden profits that are often times not passed on to the customer," and suggesting various strategies for obtaining a lower price); *see also* http://www.negotiationdynamics.com/Newcar.asp (laying out various steps that car buyer can take when "Planning the Negotiation for Your New Car."); http://www.autoblog.com/2009/11/25/end-of-month-car-buying/ (noting that "the sales staff at most car dealerships generally operate on a quota system, where they receive an incremental bonus (otherwise known as a spiff) each time they hit their next sales 'mark' for that month. So, if a car dealer is coming up on the end of the month and he's a few cars short of that next

any market, car buyers differ in their sensitivity to price. In the retail vehicle market, this means that different individuals may pay widely varying prices for the same vehicle. Stated in economic terms, some individuals are more willing than others to incur the "search costs" associated with finding the best possible deal (*e.g.*, by visiting multiple dealerships), leading to dispersion in the retail prices paid by customers.[28]

32.    To illustrate the degree of variation in the real world of vehicle retail pricing, consider the Lincoln MKX. I compiled retail-pricing data from TrueCar (an automotive pricing and information website that publishes data on actual retail transactions). The data show that, although the 2016 AWD select model has an MSRP of $45,220, there is wide variation in retail prices paid by customers. The data in Figure 1 confirm what many car buyers know from experience: Retail purchase prices can easily differ by multiple thousands of dollars, even for the same model-year sold with the same options, sold within the same geographic area within the same timeframe: When a single Los Angeles ZIP code was entered into the TrueCar website, the TrueCar database recorded 101 retail transactions in which buyers paid more than $45,045, and 174 retail transactions in which buyers paid less than $42,961. At the two extremes, there are 12 transactions above $45,565, and 12 transactions below $41,659.

---

spiff, he or she usually has an incentive to get the sales manager to knock down the price of a car in order to hit that quota.")

28.   *See, e.g.,* Girish Punj & Richard Staelin, *A Model of Consumer Information Search Behavior for New Automobiles*, 9(4) JOURNAL OF CONSUMER RESEARCH 366–80 (1983).

Contains Confidential Information Subject to Protective Order

FIGURE 1: RETAIL PRICE DISTRIBUTION OF 2016 AWD LINCOLN MKX
LOS ANGELES CA 90095 (OCT. 2015 – MAR. 2016)



*Source*: www.truecar.com

*Notes:* These data reflect retail sales prices for the 2016 Lincoln MKX AWD Select vehicles with the following options selected: Equipment Group 101a (including Compass Display, 8" LCD touch screen), Cargo Accessories Package (including rear bumper anti-scratch pad/load protector, cargo area protector), 3.7L V6 TI-VCT engine, 6-speed Selectshift automatic transmission, all-weather floor mats, 3.65 axle ratio, standard ingot silver metallic paint, and premium leather-trimmed heated bucket seats in ebony.

33.　Record evidence indicates that there were many Class Members who faced clear

incentives to negotiate discounted prices for their vehicles to reflect a lack of interest in the

MFT. Contemporaneous Ford documents indicate that the MFT was unimportant to many Class

Members: A large number of Class Members viewed MFT as "not important but nice to have,"

or "not at all important," while only a minority viewed it as "critically important."[29] This is also confirmed by testimony from Named Plaintiffs, some of whom were unaware of the MFT at time of purchase; others purchased a vehicle with MFT despite not intending to use the system.[30] There is simply no basis for assuming that some Class Members receiving discounts worth thousands of dollars paid exactly the same amount for the MFT as did other Class Members—or indeed any amount greater than $0.

34.     Furthermore, according to Plaintiffs' own allegations, "[t]he problems plaguing MyFord Touch are well known and have directly impacted Ford's reputation,"[31] owing to negative publicity in high-profile media outlets such as *Consumer Reports*, the *New York Times*, and J.D. Power.[32] To the extent that Class Members were exposed to this or other negative publicity, their estimates of the Value Received would have tended to decline, giving them clear incentives to negotiate discounts for their vehicles. In light of such publicity, it is also unclear to what extent the Common Facts were or could have been concealed from these Class Members; to the extent that Class Members were substantially aware of the Alleged Defects, they may not have been injured.

35.     With respect to calculating aggregate damages, there are no data or methods offered by Plaintiffs' experts to quantify the amount that Class Members paid for the MFT on average. In his class reports, Dr. Arnold claimed (incorrectly) that the price can be reliably

---

29.     *See, e.g*., WLN2-001198309 (SYNC/MyFord Touch Satisfaction & Usage Study, Wave 6, December 2014). Study conducted by Ford's Cross Vehicle Marketing Team; one of the primary objectives of the study was to measure satisfaction among MFT owners. More than 1,100 MFT owners were surveyed. *See* WLN2-001198301-02.

30.     Deposition of Russell Rizzo (November 15, 2014), 44:7-9; Deposition of Thomas Mitchell (May 28, 2015), 65:5-11, 71:9-13, 195:9-14.

31.     Complaint ¶264.

32.     Complaint ¶9; ¶264.

quantified using ████████████████████████████████████

████████████████████████████████ █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ █████████████████

███████████████████████████████████████████████████

██████████████████████████████████

36.     Dr. Arnold also proposed (incorrectly) that the price paid by Class Members could be calculated using what Dr. Arnold calls "Ford's estimate of the typical price consumers

---

33.  Arnold Class Report ¶30.
34.  Class Members could, of course, see the MSRP for their vehicles at the point of purchase, as well as the MSRP for bundles of features. But they were not shown a standalone MSRP for the MFT because the MFT was not available as a standalone option. Nor were they shown any "contribution" to MSRP of the ████

████████████████████████████████████████████████████████

pay for its vehicles," [redacted] Dr. Arnold's calculations are not specific to the MFT; no MSRP exists for the MFT as a standalone option. Therefore, his calculations cannot reliably estimate the amount that Class Members paid for the MFT on average.[35]

**B. Contemporaneous Ford Documents Indicate A High Value Received For Large Proportions of Class Members, and Plaintiffs' Experts' Own Data Refutes Common Injury Because It Indicates That The Challenged Conduct Had *No Negative Effect* On Value Received**

37. If the Base Software of MFT was "deeply flawed and materially defective in a way that materially affected consumers," as alleged in the Common Facts, then one would expect to observe widespread customer dissatisfaction with the MFT throughout the Class Period, indicating that the Value Received was substantially suppressed for all or almost all Class Members. However, this is not the case: To the contrary, survey evidence from contemporaneous Ford documents indicates that a majority of Class Members were satisfied with the MFT, while a substantial majority would be likely to recommend the MFT to others.[36]

---

35. Arnold Class Report ¶30. [redacted]

36. *See*, *e.g.*, WLN1-3690287, slides 27 and 31 (SYNC/MyFord Touch Satisfaction & Usage Study, December 2012, updated 2/6/2013, showing 51% mostly satisfied in 2012 Wave 4; showing 71% would probably or definitely recommend in 2012 Wave 4); WLN2-00343974, slides 4-7 (2013 mid-year MyTouch Quality Improvement Plan, showing high overall satisfaction with Ford, as well as high satisfaction with MFT-equipped vehicles in mid-2013; ranking Ford first in customer satisfaction with "Level of Technology & Innovation" in mid-2013); WLN2-01261581, slide 11 (Navigation Usage and Satisfaction Survey, 2012, showing Ford and Lincoln ranked "significantly above the study average for satisfaction" based on J.D. Power & Associates data); *see also* WLN2-01319727, slide 3 (SYNC with MyFord Touch

This evidence is flatly inconsistent with Classwide injury because it indicates that the majority of Class Members perceived the Value Received to be quite high (for example, high enough even to recommend to a friend), after having owned their vehicles long enough to form an opinion as to their overall satisfaction with the MFT. These contemporaneous documents corroborate other evidence that Value Received was high for many Class Members, including the existence of a variety of upgrades to the Base Software intended to improve functionality, as well as my own econometric analysis of secondary market prices.[37]

38.     Ford's contemporaneous documents are also consistent with my analysis of Mr. Boedeker's own survey data gathered during the class certification phase, which shows that respondents with real-life exposure to the MFT (and thus to the Alleged Defects, if they exist) are actually willing to pay *more* for the MFT than those without such exposure. If the allegations in the Common Facts were accurate, then the 60 percent[38] of Mr. Boedeker's survey respondents with actual, first-hand exposure to the Alleged Defects should assign a diminished value to the MFT, relative to the 40 percent of respondents who lacked such exposure. Yet according to Mr. Boedeker's own survey data, those with first-hand experience with the MFT

---

Quality Improvement Communications Plan, June 2011, showing 73% mostly satisfied with MFT).

37.    *See* Parts III.C-III.E, *infra*.

38.    Although Mr. Boedeker's survey included just over 2,000 respondents, about 1,200 respondents indicated that they were Ford/Lincoln owners. *See* Deposition of Stefan Boedeker (February 23, 2016) [hereafter "Boedeker Dep"], 168:1-5; *see also* Boedeker Dep, Exhibit 4, slide 2 ("1,138 respondents were Ford owners / lessees."). Mr. Boedeker restricts his analysis to these Ford/Lincoln owners. *See* Boedeker Class Report ¶72; ¶79; ¶83. Approximately 60 percent of these 1,200 respondents indicated that they were owners of Ford/Lincoln vehicles already equipped with MFT. (Questions 10B and 11B of Mr. Boedeker's survey ask respondents to indicate whether or not they owned a Ford/Lincoln equipped with MFT. By examining Mr. Boedeker's raw survey data, I determined that, of the approximately 1,200 Ford/Lincoln owners in Mr. Boedeker's survey, 721 (or about 60 percent) indicated that they owned a vehicle equipped with MFT based on their responses to these questions.)

Contains Confidential Information Subject to Protective Order

actually place a *higher* value on the MFT than those without.[39] This evidence is flatly inconsistent with Classwide injury.

39.     Plaintiffs' expert's own survey data also indicate significant proportions of Class Members did not consider the Alleged Defects—as characterized by Plaintiffs' expert[40]—to be serious enough to delay purchase of their vehicle, or even to demand a discounted price for their vehicle (indicating that exposure to the Alleged Defects did not cause any diminution to the expectation of Value Received—the actual Value Received met or exceeded the expectation of

_____

39.   I re-calculated Mr. Boedeker's purported estimates of the value that consumers place on the MFT without the Alleged Defects, restricting the sample to the 60 percent of survey respondents who indicated that they owned a vehicle equipped with MFT. According to Mr. Boedeker's own model, these consumers value the MFT at approximately $1,300. This substantially exceeds Mr. Boedeker's comparable estimates of $939 and $839.

40.   The information that Mr. Boedeker provided to respondents about the nature of the Alleged Defects (or "glitches") is complex, imprecise, and unclear, leaving it to respondents to "fill in the blanks." Respondents were asked to "[i]magine that your salesperson tells you that the MyFord Touch system has a glitch," and then given a list of "examples of some glitches that people may experience," including

•System lockup / "screen freezes" / "screen has to reboot"
•Touchscreen turn blacks or blanks out while driving
•Sluggish performance (takes too long to complete tasks)
•Non-responsiveness to peripheral devices (e.g., iPhones, Androids, iPods, USB keys)
•Non-responsiveness to touch commands
•Non-responsiveness to voice commands
•Sluggish navigation performance (freezing or takes too long)
•Lack of Bluetooth audio playback
•Non-responsiveness to steering wheel commands
•Rearview camera freezing or not turning on
•Audio volume rising to max volume without prompting
•Climate controls become inoperable

It is left to the respondent to interpret language indicating that these are examples of "some glitches that people may experience." How often will the screen freeze, and for how long? What exactly is meant by "sluggish" navigation performance? And how does any of this compare to the baseline level of "glitches" that a reasonable user might expect, relative to a non-defective system? Such questions are left to the respondent to fill in with her own imagination. *See* Boedeker Class Report ¶81; Boedeker Survey (Q12). (Mr. Boedeker's survey questions produced with the work papers underlying the Boedeker Class Report).

Value Received). For example, approximately half of the survey respondents indicated that they would still purchase their vehicle, even after being informed of the Alleged Defects, so long as a fix was provided for free within one year.[41]

**C. Improvements to the Base Software Through Updates and the Release of Version 3.6 Imply An Increased Value Received**

40.     Over the Class Period, a variety of updates to the Base Software became available to different Class Members at different points in time. In addition, Ford released Version 3.6 of the MFT Base Software in August 2013.[42] Version 3.6 was made available at no charge to all Class Members for installation on their Class Vehicles, and it is not included in the putative classes. Improvements to the Base Software imply a high Value Received for Class Members that received the updates, particularly those that purchased MFT-equipped vehicles later in the Class Period. This further confounds any attempt to demonstrate Classwide injury.

41.     A Class Member who purchased an MFT-equipped vehicle in (say) July 2013 (with an allegedly-defective software version) would have had to wait only one month before updating to version 3.6; under Plaintiffs' theory of harm, a Class Member who purchased her vehicle in (say) 2011 would have had to wait for years to obtain that same update. In between these two extremes, there exists a spectrum of Class Members who purchased Class Vehicles at intermediate points during the Class Period, and whose expected impairment will vary accordingly based on the quality of the software version available to them at purchase. As a result, even if Plaintiffs could present evidence that a large proportion of early purchasers were

---

41.    Boedeker Dep. 187:2-16.

42.    I understand that approximately 29 percent of the Class Vehicles now have software version 3.6 installed. Upgraded versions of MFT software, which steadily improved the system until it became Best in Class with version 3.6 (WLN5 039357, slide 26), were made available at no cost to all Class Members; dealers were directed to perform the upgrade "at no charge to the vehicle owner." (WLN4 000333).

injured, this would not imply that a large proportion of late purchasers were also injured (because the Value Received for late purchasers may be substantially higher). Similarly, even if Plaintiffs had a reliable estimate of the degree of damages suffered by early purchasers, this estimate would not be reliable for later purchasers, and instead would overstate the damages for them. More generally, to the extent free interim updates to the Base Software improved the functionality of the MFT, it becomes more difficult for Plaintiffs to show that earlier purchasers who received these upgrades were injured.

**D.    There Is No Evidence That the Alleged Defects Represent Anything Beyond a Baseline Rate of Technical Difficulties That Would Be Expected for a Non-Defective Product**

42.    I have seen no evidence (nor have Plaintiffs alleged) that the frequency of the Alleged Defects exceeded any specified baseline rate of technical difficulties that a rational consumer might expect to encounter when purchasing any widely available computer technology. Plaintiffs have proceeded under the unrealistic assumption that any level of imperfection in performance or dissatisfaction among any group of Class Members provides a basis for concluding that Class Members suffered economic harm. This is incorrect. Any attempt to reliably quantify the effect of the Challenged Conduct on Value Received would need to account for the fact that rational consumers would expect some level of imperfection in the performance of virtually any product, particularly a new and sophisticated computer product.[43]

---

43.    *See, e.g.,* Howard Beales, Richard Craswell, and Steven C. Salop, *The Efficient Regulation of Consumer Information*, 24(3) JOURNAL OF LAW AND ECONOMICS 491-539, 517 (1981), (explaining the significance of consumers' *a priori* expectations regarding product performance). *See also* Expert Report of Chris Wood (August 1, 2016), at 6 ("Scientific research has found that people's expectations affect their satisfaction with new technologies. In order to be the first to acquire innovative technologies, early adopters tend to be more willing

43.     Even under Plaintiffs' *ex ante* framework, which ignores individual Class Members' actual experiences with the MFT after their purchases,[44] a showing of Classwide injury and damages requires evidence of what reasonable expectations at the point of sale would have been regarding the potential for defects, and the extent to which the Challenged Conduct increased the frequency of defects beyond those reasonable expectations. Determining the *ex ante* value of an MFT-equipped vehicle in the But-For World thus depends on the overall frequency of defects actually experienced, which is necessary to inform what Class Members' expectations would have been in the but-for world. The *ex ante* value of an MFT-equipped vehicle also depends on the availability of free interim updates that improve the functionality of the Base Software, as well as the release of Version 3.6.[45]

44.     These expectations would then need to be compared with some measure of reasonable expectations of performance in the absence of disclosure of the Common Facts. Yet Plaintiffs have not identified any evidence regarding Class Members' expectations with respect to the MFT's performance at the point of sale, nor have Plaintiffs presented evidence that these expectations diverged from what would have been expected had the Common Facts been disclosed at the point of purchase.

45.     Plaintiffs' *ex ante* approach treats Class Members as injured even if they did not suffer injury in fact. For example, under Plaintiffs' *ex ante* framework, a Class Member would be entitled to damages even if her MFT functioned perfectly after the point of purchase, and

---

than later adopters to accept risks associated with immature technologies, which commonly exhibit some shortcomings.")

44.   In their class reports, Plaintiffs' experts limited their analysis to a specific form of injury and damages; they focus exclusively on the point of purchase. Arnold Dep. 46:24-47:24; Arnold Class Report ¶¶15-19; *see also* Boedeker Class Report ¶24; ¶27; ¶¶88-93.

45.   *See* Part III.C, *supra*.

never once exhibited any of the Alleged Defects.[46] Proving classwide injury would become even more complicated if the Court were to reject Plaintiffs' *ex ante* framework. In that case, the Value Received will tend to vary even more from one Class Member to the next, depending on their actual, individualized experiences of the Alleged Defects.

**E.    Secondary Market Data Refute Classwide Injury, And Indicate Instead That the Challenged Conduct Had No Negative Classwide Effect On Value Received**

46.    If Plaintiffs' allegations about overpayment resulting from the Challenged Conduct are correct, the value of MFT-equipped vehicles in used car (secondary) markets should have been reduced, relative to comparable vehicles not equipped with the MFT. In addition, if the Challenged Conduct caused classwide injury, this price effect should manifest itself in all or almost all Class Vehicles. To test this hypothesis, I analyzed used vehicle prices from a range of Ford and Lincoln model-years and trim lines.

47.    As explained in the Appendix, the results indicate that there was no classwide effect of diminished secondary market values. Instead, about half of the MFT-equipped vehicles depreciated at a faster rate than a set of comparable vehicles without the MFT, while the other half depreciated at a *slower* rate than the comparables. Moreover, the MFT-equipped vehicles

---

46.    Arnold Dep. 46:24-47:24 ("Q.    Suppose hypothetically that a Class member has owned a vehicle with MyFord Touch for three years. Uses all of MyFord Touch's features regularly and has never experienced a malfunction with any aspect of MyFord Touch. Does your analysis nevertheless assume that that person's MyFord Touch did not work as advertised? MR. TELLIS:  Object to form, incomplete hypothetical. THE WITNESS:  In my -- under my approach that would be included in the Class.  And I would be happy to explain why.  BY MR. ANDERSON: Q.    Please do. A. That vehicle and the owner of the vehicle would be in the Class because that person had a product promoted to them, the MyFord Touch system, perhaps with navigation, perhaps without, that Ford concealed at the time of purchase had numerous, either dozens of hundreds or thousands, of software bugs as I read the complaint and assuming that is true, that person did not get the benefit of the bargain to which he entered with Ford and dealer when purchasing the vehicle. For that reason, among others, he did not get what he was paying for.").

that depreciated at a *slower* rate than a set of comparable vehicles without the MFT account for *more than half* of the unit sales of the MFT-equipped vehicles under analysis. These results are confirmed by a variety of robustness checks to the econometric analysis. These findings clearly refute classwide injury: If the Challenged Conduct had no effect on resale value, one would expect roughly half of MFT-equipped vehicles to depreciate more rapidly than comparable vehicles without the MFT due to sheer chance, just as the data indicate.

## IV. THERE ARE MANY CATEGORIES OF CLASS MEMBERS THAT WERE NOT INJURED UNDER PLAINTIFFS' THEORY OF HARM, AND DATA FROM NAMED PLAINTIFFS ILLUSTRATE THE INABILITY TO INFER INJURY WITHIN THOSE CATEGORIES

48.      As noted above, there is extensive record evidence indicating that the Value Received was high for large proportions of Class Members.[47] In addition, the evidence in the record, and the facts of this case, make it impossible to reliably infer the amount, if anything, any particular Class Member paid for the MFT.[48] Therefore, in the absence of individualized inquiries, it is not possible to determine which (if any) Class Members overpaid for the MFT as a result of the Challenged Conduct, and which did not. Nevertheless, it is still possible to identify categories of Class Members who could not have been injured. In this section, I provide a (non-exhaustive) review of several such categories. Although it is not possible to identify all non-injured class members without individualized inquiry, the available evidence indicates that, at the very least, large proportions of Class Members were not injured.

49.      In addition, I use the available information for certain Named Plaintiffs—which is significantly more extensive than the information available for all other Class Members—to illustrate the inability to infer injury within the categories outlined below. I have not attempted

---

47.   *See* Parts III.B-III.E, *supra*.
48.   *See* Part III.A, *supra*.

Contains Confidential Information Subject to Protective Order

to perform an exhaustive inquiry on whether or not each Named Plaintiff was injured. Instead, I have analyzed certain Named Plaintiffs to illustrate the absence of a reliable economic method that could be applied to all Class Members to infer whether or not each was injured.

A.  **Under Plaintiffs' Theory of Harm, Class Members That Paid a Price at or Below the Value Received Were Uninjured**

50.  Any Class Member who negotiated a price of zero for the MFT is not injured, because the Class Member cannot have overpaid for the MFT, even if the Value Received was $0 (in which case the price paid and Value Received would be equal). Under the more realistic assumption that the Value Received is greater than zero, any Class Member that paid a price below the Value Received was uninjured under Plaintiffs' theory of harm. The lower the price paid, and the higher the Value Received, the more likely it is that a Class Member is uninjured under this theory.

51.  Figure 2 below depicts a simplified example. As shown below, all of the Class Members depicted in the shaded area to the left of the vertical line are not injured under the Plaintiffs' theory of harm; the higher is the Value Received, the greater is the proportion of non-injured Class Members. Given the evidence that Value Received was high for large proportions of Class Members,[49] along with the fact that large discounts—in excess of Plaintiffs' own estimates of the price of the MFT—are routine in the industry,[50] record evidence is simply not consistent with classwide injury, and instead indicates that large proportions of Class Members would likely fall in the shaded areas of Figure 2.

---

49.  *See* Parts III.B – III.D, *supra*.
50.  *See* Part III.A, *supra*.

FIGURE 2: ILLUSTRATION OF NON-INJURED CLASS MEMBERS



52.     The inability to establish injury can be illustrated using Named Plaintiffs as examples. Record evidence indicates that seven of the 20 Named Plaintiffs received substantial discounts from the MSRP of their vehicles, ranging from approximately $750 to more than $3,000. In addition to these discounts, 13 Named Plaintiffs received rebates ranging from $500 to $3,000. Plaintiffs have proposed no method that could be applied to all of these Class Members to infer the amount that each paid for the MFT. For example, Plaintiff Thomas

Contains Confidential Information Subject to Protective Order

Mitchell purchased a Lincoln MKX for just over $47,000; the vehicle's MSRP was $50,435. Given that Plaintiff Mitchell paid more than $3,000 less than the MSRP, what (if anything) did he pay for the MFT, which was one of many systems and components on his vehicle that were standard equipment? Plaintiffs have presented no economically meaningful classwide evidence that would provide reliable answers these types of questions, underscoring the lack of evidence of common injury.

53. In addition, Plaintiffs have proposed no method that could be applied to all of these Class Members to infer the Value Received for each of them. Although Named Plaintiffs have testified to various types of impairment that they experienced through their individual experiences with the MFT, Plaintiffs have proposed no reliable economic method to demonstrate that all of them experienced any diminished value because of more than a baseline rate of technical difficulties that a reasonable consumer would expect at the point of purchase for a product. In addition, Plaintiffs have proposed no reliable economic method to assign a dollar value to the effect that impairment beyond reasonable expectations (if any) would have on Value Received. For example, Plaintiff Mitchell testified that he experienced system lockup, failure of navigation and rearview camera, and non-recognition of voice commands. To what extent did the frequency and severity of this impairment go beyond what a reasonable consumer would have expected? And if it did, what was the effect on Plaintiff Mitchell's Value Received? Again, Plaintiffs have presented no economically meaningful classwide evidence that would provide reliable answers these types of questions, reinforcing the lack of evidence of common injury.

54. In summary, Plaintiffs have proposed no method that could be applied to all of these Named Plaintiffs that would allow them to infer whether each of them paid a price in

excess of Value Received—despite the fact that significantly more information is available for these Named Plaintiffs than would be for a typical Class Member.

**B.** **Class Members Who Received Upgrades To the Base Software Sufficient To Raise Value Received Above the Price Paid Were Uninjured Under Plaintiffs' Theory of Harm**

55. As explained above, the periodic free updates to the Base Software, along with the release of Version 3.6 have been made available to (and accepted by) large proportions of Class Members.[51] Improvements to the Base Software imply an increase in Value Received for Class Members that received the updates to earlier vehicles and a higher Value Received for Class Members that purchased MFT-equipped vehicles later in the Class Period. These Class Members would have been exposed to the Alleged Defects for a relatively brief window, if at all, making it less likely that the price paid exceeded the Value Received. Any Class Member that received upgrades to the Base Software sufficient to raise Value Received above the price paid by that particular Class Member was uninjured.

56. The fact that upgrades to the Base Software present an obstacle to any attempted classwide showing of injury can be illustrated using Named Plaintiffs. For example, at least thirteen of the 20 Named Plaintiffs have already upgraded for free to Version 3.6. Different Named Plaintiffs received the upgrade at different points in time, and also purchased their vehicles at different points in time. Four of these Named Plaintiffs purchased their vehicle in 2013, which means that they received the ability to install a free upgrade to a version not included in the class within less than one year after purchase. Plaintiffs have proposed no

---

51. I understand that approximately 29 percent of the Class Vehicles now have Version 3.6 installed. Upgraded versions of MFT, which steadily improved system until it became essentially Best in Class with version 3.6 (WLN5 039357, slide 26), were made available at no cost to all Class Members; dealers were directed to perform the upgrade "at no charge to the vehicle owner." (WLN4 000333).

method that could be applied to all of these Class Members to infer the effect of these upgrades to the Value Received. For example, Named Plaintiff Henry Miller-Jones purchased his vehicle in April of 2013, received a rebate of $1,500, and upgraded to Version 3.6 approximately four months later, in August of 2013. To what extent was Plaintiff Miller-Jones's Value Received diminished, given that he obtained an upgrade to a version not alleged to be defective within a short time span? Was the diminution sufficiently large to push Value Received below the price he paid—and if so, by how much? Again, Plaintiffs have presented no economically meaningful classwide evidence that would allow for an inference of injury under these circumstances.

**C.      Class Members Who Purchased Their Vehicles on the Secondary Market and Received a Discount Sufficient To Reflect Disclosure of the Alleged Defects Were Not Injured Under the Plaintiffs' Theory of Harm**

57.      If Plaintiffs' allegations are correct, then Class Members who purchased their vehicles on the secondary market would have faced clear incentives to demand offsetting discounts on MFT-equipped vehicles.[52] Any Class Member who received a sufficiently large discount on a secondary market purchase, such that the price paid for the MFT was below the Value Received, was not injured under Plaintiffs' theory of harm. Given the size of the used car market, it can reasonably be inferred that a large number of Class Members would have purchased their vehicles on the secondary market.[53]

---

52.      For purposes of my analysis in this section, I assume hypothetically that secondary market prices were affected by the Challenged Conduct, as Plaintiffs' allegations imply. (As explained in Part III.E, *supra*, my own analysis of secondary market data shows that the Challenged Conduct had no negative classwide effect on secondary market prices, which is inconsistent with Plaintiffs' allegations).

53.      For example, more than 30 million used vehicles were sold in the United States during each of the years from 2010 through 2013. *See, e.g.*, Edmunds.com 2015 Used Vehicle Market Report, Executive Summary.

Contains Confidential Information Subject to Protective Order

58.   The complications introduced by secondary market purchases can be illustrated using Named Plaintiffs who dealt in the secondary market. Named Plaintiff Richard Watson purchased his Lincoln MKX on the secondary market for $34,258.80 in September of 2012, and later sold his vehicle on the secondary market for $17,000 in December of 2015. To what extent did Plaintiff Watson receive a discount on the MFT when he purchased his vehicle? And was this discount sufficient to push the price paid below the Value Received? Did the individuals who purchased other used vehicles  also receive such a discount? What about similar individuals who made such purchases during the Class Period (and are therefore Class Members)? Plaintiffs marshalled no classwide evidence capable of providing economically meaningful answers to these questions.

**E.   Class Members Who Leased Their Vehicles, and Whose Payments for the MFT Totaled Less Than The Value Received, Were Not Injured Under Plaintiffs' Theory of Harm**

59.   An automobile lease is essentially an extended rental contract with an option to purchase at the end of the rental term. Lessees typically make a down payment (generally significantly less than 20 percent of the vehicle's total price), along with monthly payments over the course of the lease.[54] For Class Members who leased their vehicles, determining the price paid and Value Received introduces additional complications. The price paid will depend on the down payment, the total amount that a lessee paid over the course of the contract, the residual value at the end of the contract, and on whether or not the lessee elected to purchase her vehicle at the end of the lease. The Value Received will vary with the total amount of time that the lessee had possession of the vehicle, because this determines exposure to the Alleged

---

54.   Lessees typically agree to mileage caps, and to keep the interior and exterior of the vehicle in good condition. *See, e.g.,* "How to Lease a Car and Get the Best Deal," *Wall Street Journal*, available at http://guides.wsj.com/personal-finance/buying-a-car/how-to-lease-a-car/.

Defects. Plaintiffs have proposed no method that would account for these factors, all of which will vary from one individual Class Member to the next.

60.    Five of the 20 Named Plaintiffs leased their vehicles, and the lease terms vary from one individual to the next. Four of these five Named Plaintiffs relinquished their vehicles after varying periods of time. For example, Named Plaintiff Jeffrey Miller leased a 2013 Fusion Titanium in February 2013, received a rebate of $2,000, and relinquished the vehicle in September of 2015. The total price of the vehicle was $37,335.53, and Plaintiff Miller's lease payments were $386.89 per month. What portion of these payments should be interpreted as the price that Plaintiff Miller paid for the MFT, and what portion of the MFT's price remained in the residual value of the vehicle after Plaintiff Miller relinquished his vehicle? To what extent did the rebate he received decrease the price of the MFT? What was Plaintiff Miller's Value Received over the approximately 30-month period during which the vehicle was in his possession, and was this greater than or less than the price paid? Again, Plaintiffs have proposed no method for sorting this out.

## V.    THE MOST RELIABLE ESTIMATE OF AGGREGATE DAMAGES FROM THE AVAILABLE CLASSWIDE EVIDENCE UNDER PLAINTIFFS' THEORY OF HARM IS ZERO

61.    Aggregate damages of all Class Members are equal to the product of (1) the quantity of MFT-equipped vehicles sold to Class Members during the Class Period; and (2) a reliable estimate of the overpayment resulting from the Challenged Conduct. In their class reports, Plaintiffs' experts proposed two methods for estimating the average overpayment, neither of which is reliable. . (Importantly, neither of these methods speaks to common impact, as they produce average effects, and Plaintiffs' experts have done nothing to link average effects to the price paid and/or Value Received of all Class Members.) Dr. Arnold's class report proposes an aggregate damages calculation that assumes that, if liability is proven, every Class

Member would be entitled to a full refund for the MFT.[55] In other words, Dr. Arnold's prior calculations embed the economically indefensible assumption that Value Received is $0 for all Class Members. For the reasons given above, record evidence clearly does not support the assumption that all Class Members, without exception, would have paid $0 for the MFT if the Common Facts had been disclosed at the point of sale, nor to Plaintiffs allege this to be the case.[56] Accordingly, the average overpayment calculation endorsed by Dr. Arnold in his class report cannot be used to reliably calculate aggregate damages.

62.     Mr. Boedeker claims in his class report that a Choice-Based Conjoint ("CBC") analysis undertaken by him, which yields purported average "economic loss" estimates of $729 and $839, can be used to reliably estimate damages.[57] But certain crucial steps that Mr. Boedeker undertakes to obtain these estimates violate elementary economic logic, and have no basis in any standard or generally accepted economic method. Mr. Boedeker's "economic loss" estimates are based entirely on Mr. Boedeker's estimates of the value of a *defect-free* MFT. They are not based on any attempt to measure the amount by which the expectation of Value Received would decline if the Alleged Defects (or the Common Facts) had been disclosed at the point of purchase.[58] Instead, Mr. Boedeker computes the difference between estimates of the value that two different groups of customers placed on a defect-free MFT.[59] Accordingly, the

---

55.     Assuming liability is proven, Dr. Arnold opines that the quantum of economic damages can be estimated from the "typical prices" or "average prices" that he claims were charged for the MFT . *See* Arnold Class Report ¶¶35-36; Tables 2 – 3; *see also* Arnold Dep. 106:22-108:2.

56.     *See* Parts III.B-III.E, *supra*.

57.     Boedeker Class Report ¶¶83-84; ¶86; ¶¶91-92.

58.     Boedeker Dep. 259:1-16.

59.     Mr. Boedeker calculates his $729 "economic loss" estimates by taking the *difference* between two estimates of the value of a *defect-free* MFT. Mr. Boedeker first categorizes

average overpayment calculation endorsed by Mr. Boedeker in his class report cannot be used to reliably calculate aggregate damages of Class Members.

63.     As noted above, my analysis of Mr. Boedeker's own survey data shows that respondents with exposure to the Alleged Defects are willing to pay *more* for the MFT than those without such exposure.[60] This indicates that the Challenged Conduct had no negative effect on Value Received. The only other piece of classwide evidence that could inform aggregate damages is my analysis of secondary market prices, which shows that some models equipped with MFT depreciated at a faster pace than comparable vehicles without MFT, while others depreciated at a slower pace. This again implies that classwide injury is absent. Accordingly, the most reliable estimate of the average extent of overpayment that can be gleaned from classwide evidence is $0, and the most reliable estimate of aggregate damages that can be inferred from the available classwide evidence is also $0.

## CONCLUSIONS

64.     For the reasons given above, I conclude that there is no evidence of Classwide injury. To the extent that any individual Class Members did suffer economic harm consistent

---

respondents based on their answers to question 13 of the Boedeker Survey, which asked respondents how they would react once told that MFT had "glitches." Mr. Boedeker first identified respondents who answered Q13 by indicating that they would still have purchased the vehicle with MFT, despite learning about the Alleged Defects. Next, he identified all other respondents—that is, all those who responded to Q13 by indicating that they would not have purchased the vehicle with MFT, after learning about the "glitches." Mr. Boedeker then computed two separate estimates of the value of a *defect-free* MFT —one for each of these two groups of respondents. Finally, he subtracted the estimate from the first to arrive at his "economic loss" estimates. Boedeker Dep. 254:1 -255:15 . Boedeker calculates his $839 "economic loss" estimate using a nearly identical process. The only distinction is that Mr. Boedeker groups respondents using question 17 of the Boedeker Survey, which asked respondents how they would react once told that MFT had "safety problems arising from glitches." Boedeker Dep. 260:18 – 261:17.

60.     *See* Part III.B, *supra*.

Contains Confidential Information Subject to Protective Order

with Plaintiffs' allegations, injury and damages for these Class Members would need to be analyzed on an individualized basis. I also conclude that many categories of Class Members, representing large proportions of Class Members, were not injured. Finally, the most reliable estimate of aggregate damages that can be gleaned from the available classwide evidence and methods is $0.

◆   ◆   ◆

Hal J. Singer

August 1, 2016

## APPENDIX 1: CURRICULUM VITAE

**Office Address**

> Economists Incorporated
> 2121 K Street, NW
> Suite 1100
> Washington, DC 20037
> Phone: (202) 747-3520
> singer.h@ei.com

**Education**

> Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
> B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor
> Scholar (full academic scholarship). Senior Scholar Prize in Economics, 1994.

**Current Position**

> ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-present.
>
> GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington,
> D.C.: Senior Fellow, 2016-present.
>
> GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF
> BUSINESS, Washington, D.C.: Adjunct Professor, 2010, 2014.

**Employment History**

> NAVIGANT ECONOMICS, Washington, D.C.: Managing
> Director, 2010-2013.
>
> EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and
> President, 2008-2010.
>
> CRITERION ECONOMICS, L.L.C., Washington, D.C.:
> President, 2004-2008. Senior Vice President, 1999-2004.
>
> LECG, INC., Washington, D.C.: Senior Economist, 1998-99.

Contains Confidential Information Subject to Protective Order

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-98.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-98.

**Authored Books and Book Chapters**

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co-authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

Contains Confidential Information Subject to Protective Order

**Journal Articles**

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?,* 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions,* 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks,* 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry,* 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?,* The ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports,* 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

Contains Confidential Information Subject to Protective Order

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co-authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co-authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

## Expert Testimony Since 2010

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.).

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n).

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.).

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board).

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission).

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Ca.).

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fl.).

Contains Confidential Information Subject to Protective Order

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Ca.).

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission).

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation).

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. NY).

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada).

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fl.).

Michelle Downs and Laurie Jarrett v. Insight Communications Company, L.P., Civil Action No. 3:09-Cv-93-S (W.D. Ky.).

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce).

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.).

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Ca.).

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fl.).

Contains Confidential Information Subject to Protective Order

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee).

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.).

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission).

In Re Florida Cement and Concrete Antitrust Litigation, Master Docket No. 09-23493-Civ-Altonaga/Brown (S.D.Fl.).

Karen Ann Ishee Parsons et al. v. Bright House Networks, Case No. CV-09-B-0267-S (N.D. Al.).

In Re Cox Enterprises, Inc. Set-Top: Cable Television Box Antitrust Litigation, Case No. 5:09-ML-02048-C (W.D.Ok.).

Review of the Regulatory Framework Relating to Vertical Integration, Broadcasting Notice of Consultation CRTC 2010-783 (Canadian Radio-television Telecommunications Commission).

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc.,. Case No. 2:06-cv-02768-MSG (E.D. Pa.).

United States, et al. v Amgen, Inc., International Nephrology Network, et al., Civ. Action No. 06-10972-WGY (D. Mass.).

Carl Blessing et al. v. SIRIUS-XM Radio, Inc., Case No. 09-cv-10035 (HB) (S.D. N.Y.).

DISH Network L.L.C., v. Comcast Corporation, Comcast SportsNet California, Inc., Case No. 16 472 E 00211 10 (American Arbitration Association).

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses or

Transfer Control of Licensees, MB Docket No. 10-56 (Federal Communications Commission).

T-Mobile West Corporation v. Michael M. Crow, et al., Case No: 2:08-cv-1337 PHX-NVW (D. Az.).

Metlife Insurance Company of Connecticut and General American Life Insurance Company v. Thomas Petracek, Minnesota Estate Service, Inc., Michael J. Antonello, and Michael J. Antonenllo & Associates, Ltd., No. 08-CV-06095 DSD-FLN (D. Minn).

Tennis Channel, Inc. v. Comcast Cable Communications, LLC, File No. CSR-8258 (Federal Communications Commission).

MEMdata, LLC, v. Intermountain Healthcare, Inc., and IHC Health Services, Inc., Civil No. 2:08-cv-190 (C.D. Utah).

Caroline Behrend, et al. v. Comcast Corporation, Civil Action No. 03-6604 (E.D. Pa.).

In the Matter of Distribution of the 2000-03 Copyright Royalty Funds, Dkt. No. 2008-2 CRB CD 2000-03 (Copyright Royalty Judges).

Cindy Johnson et al. v. Arizona Hospital and Health Care Association et al., Case No. 07-01292 (SRB) (D. Az.).

## White Papers

Good Intentions Gone Wrong: The Yet☐To☐Be☐Recognized Costs of the Department Of Labor's Proposed Fiduciary Rule (prepared for Capital Group), co-authored with Robert Litan (July 2015).

Bringing Sanity Back to the Spectrum Debate: A Response to CCA's White Paper (prepared for Mobile Future), co-authored with Allan Ingraham (June 26, 2015).

Unlocking Patents: Costs of Failure, Benefits of Success (prepared for Patent Utility) (Feb. 4, 2015).

The Consumer Benefits of Efficient Mobile Number Portability Administration (prepared for Neustar) (Mar. 8, 2013).

Economic Analysis of the Implications of Implementing EPA's Tier 3 Rules (prepared for Emissions Control Technology Association), co-authored with George Schink (June 14, 2012).

Are Google's Search Results Unfair or Deceptive Under Section 5 of the FTC Act? (prepared for Google), co- authored with Robert Litan (May 1, 2012).

Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines (prepared for Novartis), co-authored with Kevin Caves (July 13, 2011).

Are U.S. Wireless Markets Effectively Competitive? A Critique of the FCC's 14th and 15th Annual Wireless Competition Reports (prepared for AT&T), co-authored with Gerald R. Faulhaber, Robert W. Hahn (July 11, 2011).

Do Group Purchasing Organizations Achieve the Best Prices for Member Hospitals? An Empirical Analysis of Aftermarket Transactions (prepared for Medical Device Manufacturers Association), co-authored with Robert Litan (Oct. 6, 2010).

The Economic Impact of Broadband Investment (prepared for Broadband for America), co-authored with Robert Crandall (Feb. 23, 2010).

Why the iPhone Won't Last Forever and What the Government Should Do to Promote Its Successor (prepared for Mobile Future), co-authored with Robert Hahn (Sept. 21, 2009).

The Economic Impact of Eliminating Preemption of State Consumer Protection Laws (prepared for the American Bankers' Association), co-authored with Joseph R. Mason (Aug. 21, 2009).

Economic Effects of Tax Incentives for Broadband Infrastructure Deployment (prepared for the Fiber to the Home Council), co-authored with Jeffrey Eisenach and Jeffrey West (Dec. 23, 2008).

The Effect of Brokered Deposits and Asset Growth on the Likelihood of Failure (prepared for Morgan Stanley, Citigroup, and UBS), co-authored with Joseph Mason and Jeffrey West (Dec. 17, 2008).

Estimating the Benefits and Costs of M2Z's Proposal: Reply to Wilkie's *Spectrum Auctions Are Not a Panacea* (prepared for

CTIA), co-authored with Robert W. Hahn, Allan T. Ingraham and J. Gregory Sidak (July 23, 2008).

Irrational Expectations: Can a Regulator Credibly Commit to Removing an Unbundling Obligation? AEI-Brookings Related Publication No. 07-28, co-authored with Jeffrey Eisenach (Dec. 30, 2007)

Is Greater Price Transparency Needed in The Medical Device Industry? (prepared for Advanced Medical Technology Association), co-authored with Robert W. Hahn (Nov. 30, 2007).

Should the FCC Depart from More than a Decade of Market-Oriented Spectrum Policy? Reply to Skrzypacz and Wilson (prepared for CTIA), co-authored with Gerald Faulhaber and Robert W. Hahn (Jun. 18, 2007).

Improving Public Safety Communications: An Analysis of Alternative Approaches (prepared for the Consumer Electronics Association and the High Tech DTV Coalition), co-authored with Peter Cramton, Thomas S. Dombrowsky, Jr., Jeffrey A. Eisenach, and Allan Ingraham (Feb. 6, 2007).

The Budgetary Impact of Eliminating the GPOs' Safe Harbor Exemption from the Anti-Kickback Statute of the Social Security Act (prepared for the Medical Device Manufacturers Association) (Dec. 20, 2005).

Reply to "The Life Settlements Market: An Actuarial Perspective on Consumer Economic Value" (prepared for Coventry First), co-authored with Eric Stallard (Nov. 15, 2005).

The Competitive Effects of Telephone Entry into Video Markets (prepared for the Internet Innovation Alliance), co-authored with Robert W. Crandall and J. Gregory Sidak (Nov. 9, 2005).

How Do Consumers and the Auto Industry Respond to Changes in Exhaust Emission and Fuel Economy Standards? A Critique of Burke, Abeles, and Chen (prepared for General Motors Corp.), co-authored with Robert W. Crandall and Allan T. Ingraham (Sept. 21, 2004).

Inter-City Competition for Retail Trade in North Texas: Can a TIF Generate Incremental Tax Receipts for the City of Dallas? (prepared for Harvest Partners), co-authored with Thomas G. Thibodeau and Allan T. Ingraham (July 16, 2004).

Contains Confidential Information Subject to Protective Order

An Accurate Scorecard of the Telecommunications Act of 1996: Rejoinder to the Phoenix Center Study No. 7 (prepared for BellSouth), co-authored with Robert Crandall (Jan. 6, 2004).

Competition in Broadband Provision and Implications for Regulatory Policy (prepared for the Alcatel, British Telecom, Deutsche Telekom, Ericsson, France Telecom, Siemens, Telefónica de España, and Telecom Italia), co- authored with Dan Maldoom, Richard Marsden, and Gregory Sidak (Oct. 15, 2003).

The Effect of Ubiquitous Broadband Adoption on Investment, Jobs, and the U.S. Economy (prepared for Verizon), co-authored with Robert W. Crandall (Sept. 17, 2003).

The Deleterious Effect of Extending the Unbundling Regime on Telecommunications Investment (prepared for BellSouth), co-authored with Robert W. Crandall (July 10, 2003).

Letter Concerning Spectrum Auction 35 to the Honorable Michael K. Powell, Chairman, Federal Communications Commission, from Peter C. Cramton, Robert W. Crandall, Robert W. Hahn, Robert G. Harris, Jerry A. Hausman, Thomas W. Hazlett, Douglas G. Lichtman, Paul W. MacAvoy, Paul R. Milgrom, Richard Schmalensee, J. Gregory Sidak, Hal J. Singer, Vernon L. Smith, William Taylor, and David J. Teece (Aug. 16, 2002).

## Speaking Engagements

*DOL Rule Analysis and FSR's SIMPLE PTE Explained,* FINANCIAL SERVICES ROUNDTABLE, Washington, D.C., Aug. 6, 2015.

*New Principles for a Progressive Broadband Policy,* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Mar. 13, 2014.

*The Open Internet: Where Do We Go From Here?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Jan. 29, 2014.

*Does Platform Competition Render Common Carriage Irrelevant in an IP world?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C. Nov. 20, 2013.

Contains Confidential Information Subject to Protective Order

*The 41st Research Conference on Communication, Information and Internet Policy*, TELECOMMUNICATIONS POLICY RESEARCH CONFERENCE, George Mason University School of Law, Arlington, VA, September 27, 2013.

*The Broadband Technology Explosion: Rethinking Communications Policy for a Mobile Broadband World*, Pepperdine School of Public Policy, Menlo Park, CA. June 20, 2013.

*Net Neutrality: Government Overreach or the Key to Innovation?*, NORTHWESTERN JOURNAL OF TECHNOLOGY AND INTELLECTUAL PROPERTY EIGHTH ANNUAL SYMPOSIUM, Chicago, IL., Mar. 8, 2013.

*Internet Everywhere: Broadband as a Catalyst for the Digital Economy*, The Brookings Institution, Washington, D.C., Nov. 27, 2012.

*Can Broadband Power an Economic Recovery?*, Advanced Communications Law & Policy Institute at New York Law School, Washington, D.C., July 10, 2012.

*Using Regression in Antitrust Cases*, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL, Philadelphia, PA., April 12, 2012.

*Mergers: The Road to Duopoly or Path to Competitive Panacea?* NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Los Angeles, CA., July 20, 2011.

*State of the Mobile Net*, CONGRESSIONAL INTERNET CAUCUS, Washington, D.C., May 27, 2011.

*Waves of Innovation: Spectrum Allocation in the Age of the Mobile Internet*, INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, Washington D.C., May 17, 2011.

*With or Without Merit, Class Certification Requires Commonality*, ABA SECTION OF ANTITRUST LAW 59TH ANNUAL SPRING MEETING, Washington, D.C., Mar. 30, 2011.

Contains Confidential Information Subject to Protective Order

*4th Annual Future of Private Antitrust Enforcement Conference*, AMERICAN ANTITRUST INSTITUTE, Washington, D.C., Dec. 7, 2010.

*Jobs and Technology*, NEW DEMOCRATIC LEADERSHIP COUNCIL, Washington, D.C., Sept. 22, 2010.

*Regulation and Broadband*, ADVANCED COMMUNICATIONS LAW & POLICY INSTITUTE, NEW YORK LAW SCHOOL, New York, N.Y., July 14, 2010.

*13th Annual Symposium on Antitrust*, GEORGE MASON LAW REVIEW, Washington, D.C., Feb. 4, 2010.

*Broadband Infrastructure and Net Neutrality*, ADVISORY COMMITTEE TO THE CONGRESSIONAL INTERNET CAUCUS' STATE OF THE NET, Washington, D.C., Jan. 22, 2010.

*The Consequences of Net Neutrality Regulations*, AMERICAN CONSUMER INSTITUTE CENTER FOR CITIZEN RESEARCH, Washington, D.C., Nov. 19, 2009.

*Wireless Innovation Luncheon*, MOBILE FUTURE, Washington, D.C., Nov. 3, 2009.

*Second Life Settlements & Longevity Summit*, INSURANCE-LINKED SECURITIES & LIFE SETTLEMENTS, New York, N.Y., Sept. 30, 2009.

*Perspectives on Investment and a National Broadband Plan*, AMERICAN CONSUMER INSTITUTE, Washington, D.C., Sept. 4, 2009.

*Markets and Regulation: How Do We Best Serve Customers?*, Wireless U. Communications Policy Seminar, UNIVERSITY OF FLORIDA PUBLIC UTILITY RESEARCH CENTER, Tampa, FL., Nov. 13, 2008.

*The Price Of Medical Technology: Are We Getting What We Pay For?* HEALTH AFFAIRS BRIEFING, Washington, D.C., Nov. 10, 2008.

*Standard Setting and Patent Pools*, LAW SEMINARS INTERNATIONAL, Arlington, VA., Oct. 3, 2008.

Contains Confidential Information Subject to Protective Order

*The Changing Structure of the Telecommunications Industry and the New Role of Regulation*, INTERNATIONAL TELECOMMUNICATIONS SOCIETY BIENNIAL CONFERENCE, Montreal, Canada, June 26, 2008.

*The Debate Over Network Management: An Economic Perspective*, AMERICAN ENTERPRISE INSTITUTE CENTER FOR REGULATORY AND MARKET STUDIES, Washington, D.C., Apr. 2, 2008.

*Merger Policy in High-Tech Industries*, GEORGE MASON UNIVERSITY SCHOOL OF LAW, Washington, D.C., Feb. 1, 2008.

*Telecommunications Symposium*, U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION, Washington, D.C., Nov. 29, 2007.

*Wireless Practice Luncheon*, FEDERAL COMMUNICATIONS BAR ASSOCIATION, Washington, D.C., Nov. 29, 2007.

*Association for Computing Machinery's Net Neutrality Symposium*, GEORGE WASHINGTON UNIVERSITY, Washington, D.C., Nov. 12, 2007.

*Regulators' AdvanceComm Summit*, NEW YORK LAW SCHOOL, New York, N.Y., Oct. 14, 2007.

*Annual Conference*, CAPACITY USA 2007, New York, N.Y., Jun. 26, 2007.

*William Pitt Debating Union*, UNIVERSITY OF PITTSBURGH, SCHOOL OF ARTS & SCIENCES, Pittsburgh, PA., Feb. 23, 2007.

*Annual Conference*, WIRELESS COMMUNICATIONS ASSOCIATION INTERNATIONAL, Washington, D.C., June 27, 2006.

*Annual Conference*, MEDICAL DEVICE MANUFACTURERS ASSOCIATION, Washington, D.C., June 14, 2006.

*Annual Conference*, ASSOCIATION FOR ADVANCED LIFE UNDERWRITING, Washington, D.C., May 1, 2006.

Contains Confidential Information Subject to Protective Order

*Entrepreneur Lecture Series*, LAFAYETTE COLLEGE, Easton, PA., Nov. 14, 2005.

**Editorials and Magazine Articles**

*Obama's Big Ideas for Small Saves: 'Robo' Financial Advice,* WALL STREET JOURNAL, July 21, 2015, co-authored with Robert Litan.

*How the FCC Will Wreck the Internet,* WALL STREET JOURNAL, May 28, 2015

*The FCC's Incentive Auction: Getting Spectrum Right,* PROGRESSIVE POLICY INSTITUTE PAPER, Nov. 2013.

*Clash of the Titans: How the Largest Commercial Websites Got That Way*, MILKEN INSTITUTE REVIEW, Second Quarter 2013, co-authored with Robert Hahn.

*Wireless Competition: An Update*, GEORGETOWN CENTER FOR BUSINESS AND PUBLIC POLICY ECONOMIC POLICY VIGNETTES, May 3, 2012, co-authored with Robert Hahn.

*Book Review of Tim Wu's The Master Switch*, MILKEN INSTITUTE REVIEW, January 2012.

*The AT&T/T-Mobile Deal: Should We Fear Wireless Consolidation?* FORBES, June 3, 2011.

*In FCC's Report on Wireless Competition, an Agenda?,* HARVARD BUSINESS REVIEW, Apr. 15, 2011, co-authored with Gerald Faulhaber.

*Will the Proposed Banking Settlement Have Unintended Consequences?* HARVARD BUSINESS REVIEW, Mar. 29, 2010, co-authored with Joseph R. Mason.

*Should Regulators Block AT&T's Acquisition of T-Mobile?*, HARVARD BUSINESS REVIEW, Mar. 22, 2010.

*The Black Hole in America's Retirement Savings*, FORBES, Dec. 21, 2010, co-authored with Robert Litan.

*Broken Compensation Structures and Health Care Costs*, HARVARD BUSINESS REVIEW, Oct. 6, 2010, co-authored with

Robert Litan.

*Why Net Neutrality Is Bad for Business*, HARVARD BUSINESS REVIEW, Aug. 13, 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should (or Shouldn't) Do to Promote Its Successor*, MILKEN INSTITUTE REVIEW (First Quarter 2010), co-authored with Robert W. Hahn.

*Streamlining Consumer Financial Protection*, THE HILL, Oct. 13, 2009, co-authored with Joseph R. Mason.

*Foxes in the Henhouse: FCC Regulation through Merger Review*, MILKEN INSTITUTE REVIEW (First Quarter 2008), co-authored with J. Gregory Sidak.

*Don't Drink the CAFE Kool-Aid*, WALL STREET JOURNAL, Sept. 6, 2007, at A17, co-authored with Robert W. Crandall.

*The Knee-Jerk Reaction: Misunderstanding the XM/Sirius Merger*, WASHINGTON TIMES, Aug. 24, 2007, at A19, co-authored with J. Gregory Sidak.

*Net Neutrality: A Radical Form of Non-Discrimination*, REGULATION, Summer 2007.

*Telecom Time Warp*, WALL STREET JOURNAL, July 11, 2007, at A15, co-authored with Robert W. Crandall.

*Earmarked Airwaves*, WASHINGTON POST, June 27, 2007, at A19, co-authored with Robert W. Hahn.

*Not Neutrality*, NATIONAL POST, Mar. 29, 2007, at FP19.

*Should ATM Fees Be Regulated?*, NATIONAL POST, Mar. 8, 2007, at FP17, co-authored with Robert W. Crandall.

*Life Support for ISPs*, REGULATION, Fall 2005, co-authored with Robert W. Crandall.

*No Two-Tier Telecommunications*, NATIONAL POST, Mar. 7, 2003, at FP15, co-authored with Robert W. Crandall.

Contains Confidential Information Subject to Protective Order

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

Contains Confidential Information Subject to Protective Order

65.      I constructed a data set of secondary market prices, and used the data set to implement regression models designed to test whether the observed pricing patterns in secondary markets are consistent with classwide injury. Secondary market prices were compiled from the National Automobile Dealers Association ("N.A.D.A.")—which collects and analyzes more than one million wholesale and retail automotive transactions each month— published in the N.A.D.A. Used Car Guide.[61] N.A.D.A. was founded in 1917, and the Used Car Guide has been in publication since 1933.[62] This longevity indicates that the pricing information that N.A.D.A publishes is considered useful and reliable by participants in secondary vehicle markets (and has been for some time).

66.      Construction of the data set required selection of a set of MFT-equipped models and trim lines (the treatment group) for which comparable vehicles without the MFT (the control group) could be identified. Although comparable vehicles were not identified for every MFT-equipped vehicle, the data set contains ample data points for a reliable econometric analysis. Specifically, the data set spans a total of 48 distinct Ford and Lincoln model years and five distinct regions[63] of the United States, for a total of more than 8,300 unique data points.[64]

67.      Comparable vehicles were identified as follows: For Ford models, which offer the MFT on some trim packages but not others, I defined a comparable vehicle as either (1) a vehicle of the same model year at a trim level that did not offer the MFT; or (2) the same vehicle in the model year before the MFT was introduced.[65] For example, the 2011 Ford Edge

---

61.  *See, e.g.,*
http://www.nada.com/b2b/Portals/0/assets/pdf/NADA_Regions%20Datasheet_2013.pdf ("Since 1933, NADA Used Car Guide has earned its reputation as the leading provider of market-reflective vehicle valuation products, services and information to businesses throughout the U.S. and worldwide. NADA collects and analyzes more than one million combined wholesale and retail automotive-related transactions per month. Its guidebooks, auction data, analysis and data solutions offer automotive, financial, insurance and government professionals the timely information and reliable solutions they need to make better business decisions.").

62.  *Id. See also* https://www.nada.org/about/.

63.  N.A.D.A. compiles secondary market pricing data from ten different regions in the United States. *See*
http://www.nada.com/b2b/Portals/0/assets/pdf/NADA_Regions%20Datasheet_2013.pdf.      The regions used in my analysis were selected based on the geographic Classes named in the Class Cert Motion at 1-4, with priority given to the regions encompassing with the highest number of Class Vehicles, as stated in the Declaration in Support of the Class Cert Motion. *See Declaration Of Steve W. Berman In Support Of Plaintiffs' Motion For Class Certification* (May 26, 2016), ¶3 (listing the number of vehicles sold by state). In particular, data were compiled from the California Region, the Central Region, the Eastern Region, the Southeastern Region, and the Southwestern Region.

64.  The approximately 8,300 data points can be computed by multiplying the number of regions (5) by the number of model-years analyzed (48) by the average number of months that each model-year was observed in the data (approximately 34.6 months).

65.  *See* Exhibit A to *Ford Motor Company's Amended Responses To Plaintiffs' First*

Contains Confidential Information Subject to Protective Order

Limited came equipped with the MFT as a standard feature, but the 2011 Ford Edge SE was not offered with MFT. Accordingly, the 2011 Ford Edge SE was used as a comparable to the 2011 Ford Edge Limited.[66] Similarly, the 2010 Ford Edge Limited was not equipped with the MFT (which had not been rolled out), so it is used as a comparable to the 2011 Ford Edge Limited. My regression analysis includes MFT-equipped Ford models for which both types of comparable were available, and which appeared consistently in N.A.D.A.'s secondary market database.[67]

68.     When constructing the data set, I compiled the longest possible time series for each trim line by focusing on the model-year in which the MFT was first introduced. For example, I compiled data on the 2011 Ford Edge Limited rather than the 2012 Ford Edge Limited or the 2013 Ford Edge Limited. In addition to providing more data points, this procedure avoids the problem of identifying prior-year comparables for vehicles such as the 2012 Ford Edge. (Obviously the 2011 Ford Edge could not be used, because that model year was equipped with the MFT). In addition, my analysis did not consider model years in which the MFT was introduced after 2013, given that relatively few secondary market transactions were recorded for these vehicles. This procedure is conservative, because vehicles sold in the earliest model years, when less negative publicity had accumulated, would have suffered the steepest decline in secondary market value if Plaintiffs theory were correct.

69.     For Lincoln models, which offered the MFT only as a standard option, I defined a comparable vehicle as the same vehicle in the model year before the MFT was introduced. My regression analysis includes all MFT-equipped Lincoln models for which this type of

---

*Interrogatories* (Oct. 13, 2015), setting forth which models and trim packages of vehicles in a given model year either: 1) were equipped with a MyFord Touch or MyLincoln Touch system as a standard feature; or 2) were offered with a MyFord Touch system as optional equipment; or 3) were not equipped with a MyFord Touch system, either as a standard feature or as optional equipment.

66.  In contrast, trim packages such as the 2011 Ford Edge SEL offered the MFT as an option, so the SEL was excluded from the analysis.

67.  These include the 2011 Ford Edge Limited, 2011 Ford Edge Sport, 2011 Ford Explorer Limited, 2013 Ford F-150 King Ranch 2013, Ford F-150 Lariat, 2013 Ford F-150 Platinum, 2013 Ford F-250 King Ranch, 2013 Ford F-250 Lariat, 2013 Ford F-350 King Ranch, 2013 Ford F-350 Lariat, 2013 Ford F-450 King Ranch, 2013 Ford F-450 Lariat 2013, Ford Flex Limited 2013, Ford Flex SEL 2013, Ford Taurus Limited 2013, Ford Taurus SHO. The 2013 Ford Raptor was excluded from the analysis because the N.A.D.A data produced an anomaly in which the vehicle appeared to appreciate over time. According to N.A.D.A., this effect results when vehicles sold on the secondary market include options of substantial value not included in N.A.D.A.'s typically equipped MSRP. In addition, for some relatively uncommon trim lines, the secondary market was not liquid enough to produce a consistent time series of monthly transactions. For example, the Ford Focus was omitted because the only trim lines that include the MFT as a standard feature are the Titanium and Electric, which do not appear consistently in the secondary market data.

comparable was available, and which appeared consistently in N.A.D.A.'s secondary market data base.[68]

70. For each of these Ford and Lincoln trim lines, I compiled data from N.A.D.A. on the typically equipped MSRP in the first model-year in which the MFT was offered on the vehicle. I then compiled monthly data from N.A.D.A. on the secondary market value of each MFT-equipped vehicle and its comparables. Finally, I computed the ratio of the secondary market price to the typically equipped MSRP. The monthly rate at which this ratio declines over time provides measure of depreciation.

71. Using these data, I implemented a variety of "interaction-term" regressions that provide trim line-specific estimates of the depreciation rates for the 20 MFT-equipped Ford and Lincoln vehicles in the database. It is important to note that the analysis turns on the *difference* between (1) the observed depreciation rate of MFT-equipped vehicles, and (2) the observed depreciation rate of comparable vehicles. Accordingly, although there are external factors that may influence used car depreciation rates *generally* (such as macroeconomic variables), these exogenous factors do not bias the analysis.[69]

72. Tables 1 - 2 (shown in the Appendix) present the results of this analysis, and confirm that classwide injury is consistently absent. The first column of Table 1 displays the baseline specification. In this specification, a single regression was estimated that pools data across all Ford non-MFT-equipped comparables to obtain an average depreciation rate for these comparables, which was then compared to the depreciation rate for each of the MFT-equipped Ford vehicles. The numbers in column (1) indicate the extent to which the depreciation rate for each of the 20 MFT-equipped vehicles deviates from the average depreciation rate for all comparable vehicles not equipped with the MFT. A negative number indicates that the MFT-equipped vehicle depreciated faster than the comparable vehicles; a positive number indicates that the MFT-equipped vehicle depreciated at a slower rate than the comparable vehicles. The results are statistically distinguishable from zero if indicated by a "Y." If the results are statistically insignificant (as indicated by a "N"), then there is no evidence that the MFT-equipped vehicle depreciated at a different rate than the comparable vehicles.

73. The results from the baseline specification are statistically significant for each of the 20 MFT-equipped vehicles analyzed. The results indicate that half of the 20 MFT-equipped vehicles depreciated at a slower rate than the comparable vehicles, while the other half depreciated at a faster rate. These results are not consistent with classwide injury or damages: Even if the Alleged Defects had no effect on used vehicle prices, roughly half of MFT-equipped vehicles would be expected to depreciate more rapidly than comparable vehicles without the MFT due to random chance. Moreover, the MFT-equipped vehicles with significantly faster

---

68. These include the 2011 Lincoln MKX, 2013 Lincoln MKS, 2013 Lincoln MKT, and 2013 Lincoln MKZ. Note that the MFT was introduced in 2011 in the Lincoln MKX, but not until 2013 in the MKS, MKT, and MKZ. Note also that the Lincoln MKC and Lincoln Navigator were excluded from the analysis as the MFT was introduced into these models only in 2015.

69. Such factors would be subsumed into the random error term, which is present in all regression models.

depreciation rates than comparable vehicles represent only about 30 percent of the unit sales of the MFT-equipped vehicles under analysis.

74.     Table 1 includes various robustness analyses, which demonstrate that the same conclusion holds when I perform sensitivity tests on alternative regression specifications. The second column of Table 1 estimates separate regressions for each of the 20 MFT-equipped vehicles.[70] These regressions measure the extent to which the depreciation rate for each MFT-equipped model-year deviates from the depreciation rate of either (1) a comparable vehicle from the same model-year in a different trim line; or (2) a comparable vehicle from the same trim line in a different model-year. (For example, the regression for the 2011 Ford Edge Limited includes only the 2011 Ford Edge SE and the 2010 Ford Edge Limited). The results in column (2) indicate that only nine of the 20 MFT-equipped vehicles analyzed depreciated at a faster rate than the comparable vehicles. Of the remaining MFT-equipped vehicles, eight depreciated at a significantly slower rate than the comparable vehicles, and three depreciated at a statistically indistinguishable rate from the comparable vehicles. The MFT-equipped vehicles with significantly faster depreciation rates than comparable vehicles represent only about 23 percent of the unit sales of the MFT-equipped vehicles under analysis.

75.     The remaining columns of Table 1 also estimate separate regressions for each of the 20 MFT-equipped vehicles. Column (3) restricts the analysis to prior-year comparables only; column (4) does the opposite, and restricts the analysis to same-year comparables.[71] Finally, Table 2 replicates the analyses of columns (2) – (4) in Table 1, but limits the analysis to time periods with data available for both the MFT-equipped vehicle and its comparable(s).[72]

---

70.     The baseline specification, which involves a single, pooled regression, requires that only 32 regression coefficients be estimated. If separate regressions are estimated for each MFT-equipped vehicle, over 140 regression coefficients must be estimated. This means that the baseline specification is more parsimonious than the other specifications, which estimate separate regressions for each of the 20 MFT-equipped vehicles under analysis. Economists recognize that parsimony is a key consideration when constructing a regression model. *See, e.g.,* Jean-Marie Dufour, *Model Selection*, THE NEW PALGRAVE DICTIONARY OF ECONOMICS, (2nd ed. 2008). "[M]odel selection can depend on a wide array of elements, such as the objectives of the model, (economic) theory, the data themselves, and various conventions. Features which are often viewed as desirable include: (a) simplicity or *parsimony*…" (emphasis in original). Nevertheless, it is useful to perform separate regressions to confirm the robustness of my analysis, because it demonstrates that my conclusions are not sensitive to the way in which the model is specified.

71.     There is a clear statistical disadvantage to discarding these data points; information on the depreciation rates for some comparables is necessarily lost in the process. Nevertheless, the exercise is useful as a sensitivity analysis, because it demonstrates that my conclusions are not sensitive to the type of comparable used.

72.     Again, there is a clear statistical disadvantage to discarding these data; information on depreciation rates over certain time periods is necessarily excluded. Again, the exercise is useful as a sensitivity analysis, because it demonstrates that my conclusions are not driven by data from non-overlapping time periods.

| Model-Year | (1) Baseline Specification | | (2) Separate Regressions by Model-Year (All Comparables) | | (3) Separate Regressions by Model-Year (Prior-Year Comparables Only) | | (4) Separate Regressions by Model-Year (Same-Year Comparables Only) | | Unit Sales |
|---|---|---|---|---|---|---|---|---|---|
| | Deviation from Comparable | Statistically Significant | Deviation from Comparable | Statistically Significant | Deviation from Comparable | Statistically Significant | Deviation from Comparable | Statistically Significant | |
| 2011 Edge Limited | -0.110 | Y | -0.050 | Y | -0.056 | Y | -0.042 | Y | 54,062 |
| 2011 Edge Sport | 0.070 | Y | 0.062 | Y | -0.026 | Y | 0.136 | Y | 5,733 |
| 2011 Explorer Limited | 0.099 | Y | 0.040 | Y | 0.182 | Y | -0.098 | Y | 33,461 |
| 2013 F-150 King Ranch | 0.024 | Y | 0.033 | Y | -0.009 | N | 0.076 | Y | 132,749 |
| 2013 F-150 Lariat | 0.235 | Y | 0.139 | Y | -0.009 | N | 0.288 | Y | 132,749 |
| 2013 F-150 Platinum | 0.064 | Y | 0.032 | Y | -0.050 | Y | 0.116 | Y | 132,749 |
| 2013 F-250 King Ranch | -0.097 | Y | -0.047 | Y | -0.021 | Y | -0.072 | Y | 26,953 |
| 2013 F-250 Lariat | 0.055 | Y | 0.010 | N | -0.060 | Y | 0.080 | Y | 26,953 |
| 2013 F-350 King Ranch | -0.062 | Y | -0.043 | Y | -0.002 | N | -0.083 | Y | 12,747 |
| 2013 F-350 Lariat | 0.072 | Y | 0.000 | N | -0.051 | Y | 0.051 | Y | 12,747 |
| 2013 F-450 King Ranch | 0.246 | Y | -0.027 | Y | 0.142 | Y | -0.136 | Y | 1,022 |
| 2013 F-450 Lariat | 0.367 | Y | 0.033 | Y | 0.105 | Y | -0.015 | N | 1,022 |
| 2013 Flex Limited | -0.180 | Y | -0.057 | Y | -0.137 | Y | 0.026 | Y | 11,519 |
| 2013 Flex SEL | -0.144 | Y | 0.027 | Y | -0.007 | N | 0.061 | Y | 15,774 |
| 2013 Taurus Limited | -0.661 | Y | -0.242 | Y | -0.161 | Y | -0.334 | Y | 32,348 |
| 2013 Taurus SHO | -0.318 | Y | -0.077 | Y | -0.141 | Y | -0.011 | N | 7,163 |
| 2011 Lincoln MKX | 0.136 | Y | -0.006 | N | -0.006 | N | | | 27,146 |
| 2013 Lincoln MKS | -0.294 | Y | -0.036 | Y | -0.036 | Y | | | 13,150 |
| 2013 Lincoln MKT | -0.246 | Y | -0.210 | Y | -0.210 | Y | | | 6,551 |
| 2013 Lincoln MKZ | -0.031 | Y | 0.255 | Y | 0.255 | Y | | | 36,197 |
| | | | | | | | | | |
| **Number of MFT-equipped vehicles with significantly faster depreciation than comparables:** | 10 | | 9 | | 11 | | 6 | | |
| **Number of MFT-equipped vehicles without significantly faster depreciation than comparables:** | 10 | | 11 | | 9 | | 10 | | |
| **Share of MFT-equipped unit sales with significantly faster depreciation than comparables:** | **29.9%** | | **22.9%** | | **45.6%** | | **25.1%** | | |

**Notes:** Statistically Significant = "Y" if effect significant at the 10% level; "N" otherwise. The Lincoln models do not have same-year, different-trim line comparables. Baseline specification is a single, pooled including all prior-year and same-year comparables. Unit sales data derived from WLN5-048653. In some cases, the unit sales data are less granular than those in Table 1, in which case the sales are distributed equally across trim lines. For example, the sales data do not distinguish between the 2013 F-150 King Ranch, 2013 F-150 Lariat, and the 2013 F-150 Platinum. Accordingly, the unit sales are divided equally among them.

Contains Confidential Information Subject to Protective Order

APPENDIX TABLE 2: ADDITIONAL SENSITIVITY ANALYSIS OF USED VEHICLE PRICING REGRESSIONS
ANALYSIS LIMITED TO TIME PERIODS WITH DATA AVAILABLE FOR BOTH THE MFT-EQUIPPED VEHICLE AND ITS COMPARABLE(S)

| Model-Year | (1) Separate Regressions by Model-Year (All Comparables) | | (2) Separate Regressions by Model-Year (Prior-Year Comparables Only) | | (3) Separate Regressions by Model-Year (Same-Year Comparables Only) | | |
|---|---|---|---|---|---|---|---|
| | Deviation from Comparable | Statistically Significant | Deviation from Comparable | Statistically Significant | Deviation from Comparable | Statistically Significant | Unit Sales |
| 2011 Edge Limited | -0.050 | Y | -0.061 | Y | -0.041 | Y | 54,062 |
| 2011 Edge Sport | 0.062 | Y | -0.026 | Y | 0.136 | Y | 5,733 |
| 2011 Explorer Limited | 0.041 | Y | 0.180 | Y | -0.097 | Y | 33,461 |
| 2013 F-150 King Ranch | 0.033 | Y | -0.009 | N | 0.076 | Y | 132,749 |
| 2013 F-150 Lariat | 0.139 | Y | -0.009 | N | 0.288 | Y | 132,749 |
| 2013 F-150 Platinum | 0.033 | Y | -0.049 | Y | 0.117 | Y | 132,749 |
| 2013 F-250 King Ranch | -0.047 | Y | -0.021 | Y | -0.072 | Y | 26,953 |
| 2013 F-250 Lariat | 0.010 | N | -0.060 | Y | 0.080 | Y | 26,953 |
| 2013 F-350 King Ranch | -0.043 | Y | -0.002 | N | -0.083 | Y | 12,747 |
| 2013 F-350 Lariat | 0.000 | N | -0.051 | Y | 0.051 | Y | 12,747 |
| 2013 F-450 King Ranch | 0.006 | N | 0.134 | Y | -0.136 | Y | 1,022 |
| 2013 F-450 Lariat | 0.044 | Y | 0.097 | Y | -0.015 | N | 1,022 |
| 2013 Flex Limited | -0.060 | Y | -0.141 | Y | 0.020 | Y | 11,519 |
| 2013 Flex SEL | 0.022 | Y | -0.011 | N | 0.055 | Y | 15,774 |
| 2013 Taurus Limited | -0.233 | Y | -0.160 | Y | -0.325 | Y | 32,348 |
| 2013 Taurus SHO | -0.079 | Y | -0.143 | Y | -0.014 | Y | 7,163 |
| 2011 Lincoln MKX | -0.006 | N | -0.006 | N | | | 27,146 |
| 2013 Lincoln MKS | -0.040 | Y | -0.040 | Y | | | 13,150 |
| 2013 Lincoln MKT | -0.208 | Y | -0.208 | Y | | | 6,551 |
| 2013 Lincoln MKZ | 0.256 | Y | 0.256 | Y | | | 36,197 |
| | | | | | | | |
| **Number of MFT-equipped vehicles with significantly faster depreciation than comparables:** | 8 | | 11 | | 7 | | |
| **Number of MFT-equipped vehicles without significantly faster depreciation than comparables:** | 12 | | 9 | | 9 | | |
| **Share of MFT-equipped unit sales with significantly faster depreciation than comparables:** | **22.8%** | | **45.6%** | | **26.2%** | | |

**Notes:** Statistically Significant = "Y" if effect significant at the 10% level; "N" otherwise. The Lincoln models do not have same-year, different-trim line comparables. Baseline specification is a single, pooled including all prior-year and same-year comparables. Unit sales data derived from WLN5-048653. In some cases, the unit sales data are less granular than those in Table 1, in which case the sales are distributed equally across trim lines. For example, the sales data do not distinguish between the 2013 F-150 King Ranch, 2013 F-150 Lariat, and the 2013 F-150 Platinum. Accordingly, the sales are divided equally among them.

Contains Confidential Information Subject to Protective Order

## DEPOSITIONS

Deposition of Jonathan Arnold (February 10, 2016)

Deposition of Stefan Boedeker (February 23, 2016)

Deposition of Center for Defensive Driving Chris Knox (November 11, 2014)

Deposition of Jason R. Connell (March 11, 2015)

Deposition of William Carey Creed III (November 19, 2014)

Deposition of Dennis Curlew (December 15, 2015)

Deposition of Joseph D'Aguanno (May 27, 2015)

Deposition of Michael A. Ervin (May 15, 2015)

Deposition of Daniel Fink (March 13, 2015)

Deposition of Leif Kirchoff (August 6, 2015)

Deposition of Joshua Matlin (May 2, 2015)

Deposition of Jeffrey Miller (January 17, 2015)

Deposition of Henry Miller-Jones (November 7, 2014)

Deposition of Jerome Miskell (July 22, 2015)

Deposition of Thomas Mitchell (May 28, 2015)

Deposition of Nuala Purcell (January 16, 2015)

Deposition of Russell Rizzo (November 15, 2014)

Deposition of Jose Randy Rodriguez (April 9, 2015)

Deposition of Grif Rosser (November 13, 2014)

Deposition of James L. Sheerin, Jr. (May 13, 2015)

Deposition of Darcy Thomas-Maskrey (February 20, 2015)

Deposition of Richard Decker Watson, Jr. (December 18, 2014)

Deposition of Jennifer Whalen (December 11, 2014)

## LITERATURE

Howard Beales, Richard Craswell, and Steven C. Salop, *The Efficient Regulation of Consumer Information*, 24(3) Journal of Law and Economics 491-539 (1981)

Jean-Marie Dufour, *Model Selection*, The New Palgrave Dictionary of Economics, (2nd ed. 2008)

Girish Punj and Richard Staelin, *A Model of Consumer Information Search Behavior for New Automobiles* 9(4) Journal of Consumer Research 366 – 80 (1983)

## TRIAL MATERIALS/BATES DOCUMENTS

WLN1-3690287, slides 27 and 31

WLN2-00343974, slides 4-7

WLN2-01198301-02

WLN2-01198309

WLN2-01261581, slide 11

WLN2-01319727, slide 3

WLN4-000333

WLN4-117245

WLN5-039357, slide 26

WLN5-048653

WLN5-48668 – WLN5-48743

WLN5-48744 – WLN5-48835

WLN5-48836 – WLN5-48928

WLN5 48929 - WLN5 49022

Third Amended Class Action Complaint (September 30, 2015)

Ford Motor Company's Amended Responses To Plaintiffs' First Interrogatories (Oct. 13, 2015)

Plaintiffs' Supplemental Responses to Defendant's Interrogatories (Jan. 13, 2016)

Plaintiffs' Responses to Defendant's Requests for Production of Documents (various dates)

Plaintiff's Motion for Class Certification (January 28, 2016)

Expert Report of Jonathan I. Arnold, Ph.D (January 7, 2016)

Revised Expert Report of Stefan Boedeker (January 7, 2016)

Boedeker Workpapers

Declaration Of Steve W. Berman In Support Of Plaintiffs' Motion For Class Certification (May 26, 2016)

**PUBLICLY AVAILABLE MATERIALS**

Jessica Mintz, "Six months on, Vista users still griping," NBC News (July 13, 2007) available at http://www.nbcnews.com/id/19747743/page/2/#.V56cQbgrKUk

Alisa Priddle and Chris Woodyard, "Ford dumps Microsoft for Blackberry for Sync 3," *USA Today* (December 11, 2014) available at http://www.usatoday.com/story/money/cars/2014/12/11/ford-sync-3/20234131/

Edmunds.com 2015 Used Vehicle Market Report, Executive Summary

"How to Lease a Car and Get the Best Deal," *Wall Street Journal*, available at http://guides.wsj.com/personal-finance/buying-a-car/how-to-lease-a-car/

http://www.autoblog.com/2009/11/25/end-of-month-car-buying/

http://www.car-buying-strategies.com/car-buying.html

https://www.nada.org/about/

http://www.nada.com/b2b/Portals/0/assets/pdf/NADA_Regions%20Datasheet_2013.pdf

http://www.negotiationdynamics.com/Newcar.asp

www.truecar.com

Contains Confidential Information Subject to Protective Order