# EXHIBIT 61

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


**IN RE MFT CONSUMER LITIGATION**


Case No. 13-cv-03072-EMC


**Merits Rebuttal Report Of**

**STEFAN BOEDEKER**


September 8, 2016

# CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    SUMMARY OF OPINIONS ..............................................................................2

III.    DETAILED SUPPORT FOR OPINIONS ...........................................................3

    A.    Opinion 1: In the Singer Merits Report, Dr. Singer states that a sound methodology is needed to assess classwide damages. As Dr. Singer conceded in his prior deposition testimony, Conjoint Analysis is such a methodology. .............3

    B.    Opinion 2: In the Singer Merits Report, Dr. Singer develops conditions to assess if classwide damages exist. I applied these same conditions in my empirical study, which resulted in positive classwide damages. ........................................................6

        1.    Dr. Singer's conditions for classwide injury .................................................6

        2.    The prices $P_{Actual}$ and $P_{But\_For}$ in the Singer Conditions are unknown in the actual world but can be estimated reliably. ...................................................7

        3.    I apply generally accepted methods to estimate unknown prices of features or attributes in composite products. ...........................................................7

        4.    When applying consumers' willingness-to-pay as an estimate for the unknown prices in the two Singer Conditions for injury, the two conditions collapse into one condition. ........................................................9

        5.    I applied the collapsed Singer Conditions for injury in my methodology to calculate classwide damages. ...................................................................10

    C.    Opinion 3: Dr. Singer incorrectly concludes that individual negotiations between Ford dealers and Ford purchasers inevitably lead to classwide damages of zero dollars. ........................................................................................................10

        1.    Dr. Singer asserts that Class Members negotiated vehicle prices individually and that it is impossible to determine how much each Class Member paid for the MFT, which leads him to the false conclusion that evidence on price paid cannot support classwide injury or damage. .........10

        2.    Dr. Singer fails to recognize how Ford sets prices for its vehicle models with the MFT system, which renders negotiations between dealers and consumers irrelevant for the computation of classwide damages. .............11

        3.    While Dr. Singer speculates that some Class Members negotiated a price of zero for the MFT, he contradicts himself by stating that the value discount could not be disentangled .........................................................12

        4.    Prices paid by Class Members are on average tied to the MSRP .............13

D.      Opinion 4: Dr. Singer fails to recognize that my damage analysis captures damages for both fraudulent concealment and breach of warranty. ......................13

E.      Opinion 5: Dr. Singer incorrectly concludes that Class Members who purchased a vehicle with an MFT System cannot possibly have a higher willingness-to-pay for the MFT System than consumers who did not purchase a vehicle with the MFT System..............................................................................................................................14

F.      Opinion 6: Only the use of flawed assumptions enables Dr. Singer to conclude that large numbers of Class Members are allegedly unharmed. ............................16

G.      Opinion 7: Dr. Singer's regression approach yields further evidence of classwide damages..............................................................................................................................18

H.      Opinion 8: In a failed attempt to prove that classwide damages are zero, Dr. Singer misrepresents contemporaneous documents that indicate consumers' satisfaction with the MFT System, without their being aware that Ford knew the Base Software of the MFT System was fundamentally flawed at the architectural level and was not fixed by Ford's updates............................................................20

I.      Opinion 9: Dr. Singer's example of consumers' willingness to accept computer technology defects is not proof that classwide damages do not exist in this case. 23

J.      Opinion 10: Dr. Singer misrepresents TrueCar Data and incorrectly uses these data to support his view that classwide damages do not exist in this case. ...........23

        1.      The data used by Dr. Singer cannot be replicated because of a change in TrueCar's report format shortly after Dr. Singer issued his report............23

        2.      Dr. Singer incorrectly claims that a single Los Angeles ZIP Code had a large number of sales transactions with widely varying prices in the TrueCar dataset when in fact all Los Angeles ZIP Codes show the same information................................................................................................................24

K.      Opinion 11: Based on an incorrect calculation of individual and overall willingness-to-pay for the participants in my November 2015 empirical study, Dr. Singer erroneously concludes that classwide damages do not exist in this case. ..26

IV.    CONCLUSION..............................................................................................................................28

## I.      Introduction

1.      I, Stefan Boedeker, a Managing Director at the Berkeley Research Group, LLC ("BRG"), was retained by counsel for Plaintiffs in *In Re MyFord Touch Consumer Litigation*, Case No. 13-cv-3072-EMC (N.D. Cal.), to develop an economic loss model for the purpose of quantifying the damages suffered by the proposed classes due to having purchased a vehicle with an infotainment system that Plaintiffs contend was defective.

2.      Previously, I submitted an expert report regarding class certification on January 12, 2016; I was deposed on February 23, 2016; on April 29, 2016, I submitted a rebuttal expert report regarding class certification in response to the expert report regarding class certification submitted by Hal J. Singer, Ph.D., dated March 15, 2016; and on August 1, 2016, I submitted an expert report addressing merits issues in this case.  My updated Curriculum Vitae is attached to this report as Exhibit A.

3.      I submit this rebuttal report in response to the Expert Merits Report of Hal J. Singer, Ph.D., dated August 1, 2016 ("Singer Merits Report").[1] In forming my opinions for this report, I have considered all materials cited in the text and in the footnotes to this report and the results of the surveys conducted by Amplitude Research.[2] My hourly billing rate for professional services related to this case is $650 and the billing rates of BRG staff supporting me on this engagement range from $150 to $490. BRG's payment in this matter is not contingent upon the outcome of this litigation.

---

[1]      Besides the two merits report filed on 8/1/2016, the following reports have been filed by Dr. Singer and me in this case and will be referred to as follows:
   a.  Boedeker Class Certification Report, 1/12/2016 – "Boedeker Class Certification Report";
   b.  Singer Rebuttal to Class Certification Report, 3/15/2016 – "Singer Class Certification Rebuttal Report";
   c.  Boedeker Rebuttal Report, 4/29/2016 – "Boedeker Class Certification Rebuttal Report".

[2]      Similarly, in forming the opinions expressed in my Merits Report dating August 1, 2016, I considered all materials cited in the text and footnotes of the Merits Report, as well as the results of the surveys conducted by Amplitude Research and the backup material for the Merits Report that was provided to Ford's attorneys shortly after the Merits Report was served on Ford's attorneys.

## II.     Summary of Opinions

Opinion 1:    In the Singer Merits Report, Dr. Singer states that a sound methodology is needed to assess classwide damages. As Dr. Singer conceded in his prior deposition testimony, Conjoint Analysis is such a methodology.

Opinion 2:    In the Singer Merits Report, Dr. Singer develops conditions to assess if classwide damages exist. I applied these same conditions in my empirical study, which resulted in positive classwide damages.

Opinion 3:    Dr. Singer incorrectly concludes that individual negotiations between Ford dealers and Ford purchasers inevitably lead to classwide damages of zero dollars.

Opinion 4:    Dr. Singer fails to recognize that my damage analysis captures damages for both fraudulent concealment and breach of warranty.

Opinion 5:    Dr. Singer incorrectly concludes that Class Members who purchased a vehicle with an MFT System cannot possibly have a higher willingness-to-pay for the MFT System than consumers who did not purchase a vehicle with the MFT System.

Opinion 6:    Only the use of flawed assumptions enables Dr. Singer to conclude that large numbers of Class Members are unharmed.

Opinion 7:    Dr. Singer's regression approach yields further evidence of classwide damages.

Opinion 8:    In a failed attempt to prove that classwide damages are zero, Dr. Singer misrepresents contemporaneous documents that indicate consumers' satisfaction with the MFT System, without their being aware that Ford knew the Base Software of the MFT System was fundamentally flawed at the architectural level and was not fixed by Ford's updates.

Opinion 9:    Dr. Singer's example of consumers' willingness to accept computer technology defects is not proof that classwide damages do not exist in this case.

Opinion 10:   Dr. Singer misrepresents TrueCar Data and incorrectly uses these data to support his view that classwide damages do not exist in this case.

Opinion 11:   Based on an incorrect calculation of individual and overall willingness-to-pay for the participants in my November 2015 empirical study, Dr. Singer erroneously concludes that classwide damages do not exist in this case.

## III.    Detailed support for opinions

### A.    Opinion 1: In the Singer Merits Report, Dr. Singer states that a sound methodology is needed to assess classwide damages. As Dr. Singer conceded in his prior deposition testimony, Conjoint Analysis is such a methodology.

4.    During his deposition, Dr. Singer expressed partial or full agreement with the Conjoint Analysis methodology that I utilized to compute classwide damages, by assessing consumers' willingness-to-pay for a feature in a composite product:

a.    Dr. Singer acknowledges that Conjoint Analysis is an appropriate methodology when stating "That could get us to a starting point.[3] . . . [I]f done properly, you could get the average willingness to pay of all class members.[4] . . . I'm skeptical that it can be done.[5] . . . [T]his is just a real tough one."[6]

b.    The statement that "this is a real tough one" (*i.e.*, applying conjoint analysis in this case) has to be put into perspective by Dr. Singer's admission that he has not

---

[3]    Singer Deposition, at 87:7-8.

[4]    *Id*. at 87:9-11.

[5]    *Id*. at 88:3-4.

[6]    *Id*. at 88:21-22.

conducted any conjoint analysis like the one applied in my report.[7,8]   His only somehow related experience is in the field of "contingent valuation" methodology, which he puts in the "same family" as conjoint analysis.[9]

c.   Dr. Singer fully agrees with the approach of a Conjoint Study, which is a method of not asking respondents directly but rather giving them a multitude of choices. The willingness-to-pay ("WTP") would then be estimated utilizing Logit Modeling because asking direct questions would give unreliable results.[10]

d.   Dr. Singer also agrees with the fact that the correct question to be addressed in this case to compute classwide damages is the determination of the consumer's willingness to pay for what Dr. Singer calls a "crippled feature."[11]

e.   Dr. Singer further agrees that consumers display a willingness to pay for a feature that is not sold separately but is standard in a vehicle:[12]

> Q.   So, you agree that even though there isn't a price listed out for MyFord Touch, when people buy a vehicle equipped with it, they are paying something for it?

---

[7]   *Id*. at 174:21-22.

[8]   In my first report in this matter, I introduced Choice Based Conjoint ("CBC") Analysis as the appropriate tool to estimate the willingness-to-pay for features of a composite good. For a detailed discussion see Vithala Rao's book, Applied Conjoint Analysis, Chapter 4, Pages 127-183, Springer Verlag, 2014.

[9]   Singer Deposition, at 173:2-174:21.

[10]   *Id*. at 176:22-177:6 ("And here Mr. Boedeker and I are in agreement.  Right?  When asked during his deposition why you can't just tell them that, and then rerun the numbers and get a diminished willingness to pay, he says that at that point, and I'm paraphrasing, but I've got the block quote, he says something to the effect that he wouldn't get reasonable responses.  And basically I agree with him.").

[11]   *Id*. at 177:11-20 ("The, what we are trying to get at here is the, now, the willingness to pay of a crippled feature.  And I think I am with Mr. Boedeker in this sense.  That, we can't go back and say now do these choices again but this time under the knowledge that the feature is crippled.  We are not going to get, we are not going to get the, we are not going to be able to draw the proper inferences.  We are actually in agreement on that.").

[12]   *Id*. at 95:9-16.

A.      It is hard to say.  Are they paying something for it?  It is certainly contributing to their willingness to pay when it is included, I will give you that.

f.      Dr. Singer agrees that conjoint analysis is an appropriate tool to derive at the willingness to pay for a particular component in a bundle:[13]

Q.      And perhaps an aggregate, they might even do a conjoint analysis of consumers' willingness to pay for various channels and come up with their pricing strategy in part based on that.  Would you agree with that?

A.      It is conceivable that they could perform a conjoint to get at a particular component of the bundle. . . .

But, I grant you the conjoint could be a valuable tool for a business that is deciding whether to add on an option, and as to how much they should charge for it.

5.      In summary, Dr. Singer agrees with all the components of the damages model that I utilized to compute classwide damages in my merits report for a "crippled product"[14]:

The, what we are trying to get at here is the, now, the willingness to pay for a crippled feature. And I think I am with Mr. Boedeker in this sense.

6.      In this case, the "crippled product" at question is Ford/Lincoln MFT, yet Dr. Singer concludes that classwide damages are zero.

---

[13]     *Id*. at 112:11-18, 113:2-5.

[14]     *Id*. at 177:11-14.

**B.** **Opinion 2: In the Singer Merits Report, Dr. Singer develops conditions to assess if classwide damages exist. I applied these same conditions in my empirical study, which resulted in positive classwide damages.**

**1.** **Dr. Singer's conditions for classwide injury.**

7.    Dr. Singer states, "Under Plaintiffs' theory of harm, a Class Member was injured if—as a result of the Challenged Conduct—the price that the Class Member paid for the MFT exceeds the Value Received by that Class Member. Accordingly, to prove injury under Plaintiffs' theory of harm, one must obtain reliable information on the prices paid by Class Members for the MFT and the Value Received by Class Members."[15] Footnote 19 to that quotation in the Singer Merits Report states:

> The Value Received can be defined either as the price that a Class Member would have paid in the But-For World, or as a Class Member's willingness-to-pay ("WTP") for the MFT in the But-For World. Let $P_{Actual}$ represent the price that a Class Member actually paid for the MFT, let $P_{But\_For}$ represent the price that a Class Member would have paid in the But-For World, and let $WTP_{But\text{-}For}$ demote the Class Member's WTP in the But-For World. Under the first definition, a Class Member overpaid (and was injured) if and only if $P_{Actual} > P_{But\_For}$. Under the second definition, a Class Member overpaid (and was injured) if and only if $P_{Actual} > WTP_{But\text{-}For}$.[16]

8.    In the following discussion I will refer to

a.    $P_{Actual} > P_{But\_For}$ and

b.    $P_{Actual} > WTP_{But\text{-}For}$

as the Singer Conditions for Injury or short the "Singer Conditions".

---

[15]    Singer Merits Report, ¶18, p 11 (FN 19 to this quotation quoted immediately hereafter).

[16]    *Id.*, FN 19, p 11.

**2.    The prices $P_{Actual}$ and $P_{But\_For}$ in the Singer Conditions are unknown in the actual world but can be estimated reliably.**

9.    From his statements in the Singer Merits Report cited above, it is clear that Dr. Singer agrees with the facts that

a.    the MFT is part of a composite product (i.e., an automobile),

b.    the MFT is bundled with other features as an add-on or it is a standard feature for certain vehicles, and

c.    there is no standalone price for the MFT. Consequentially, there is no separate actual price for the MFT available.

10.    In other words, $P_{Actual}$, as Dr. Singer calls it, is unknown because the car buyer paid a price for the vehicle as a whole and not a price for the MFT alone, the engine alone, the steering wheel alone etc. Therefore, $P_{Actual}$ has to be estimated. Following what is known in Economics as Lancaster's Utility Theory[17] or "hedonic demand theory," the total price of a composite good, like a vehicle, can be decomposed into implicit prices or values of its individual characteristics, parts, and features.[18] The value of each of the characteristics that comprise the vehicle can be estimated. The overall equilibrium price for the entire vehicle is equal to the weighted sum of the values of the individual characteristics.

**3.    I apply generally accepted methods to estimate unknown prices of features or attributes in composite products.**

11.    Generally, there are two distinct classes of approaches to estimate the values of the individual characteristics for a composite product:

a.    Revealed preference based, and

---

[17]    Lancaster, Kelvin J.:  A New Approach to Consumer Theory, Journal of Political Economy, Vol. 74, No. 2 (Apr., 1966), pp. 132-157.

[18]    Rosen, Sherwin: Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition. Journal of Political Economy, Vol 82, No 1, (Jan-Feb., 1974), pp. 34-55.

b.      Stated preference based.

12.     In the revealed preference based approaches, the value of individual characteristics is determined by observing actual choices of individual consumers and using the information to infer the relation between overall price of the vehicle and the value of its constituent components. This will most often be accomplished by using hedonic regression models, where the actual transaction price is regressed on the levels and features of the product in question. The regression coefficients are then interpreted as the weights that the constituent components contribute to the overall price or as the implicit price of the feature, reflecting the value that consumers place on a particular feature and the incremental costs manufacturers incurred in adding the particular feature.

13.     The proper use of hedonic regression models requires that the composite good being valued can be decomposed to its constituent parts and that the market values those constituent parts. This may pose an issue if the composite good is comprised of more features than there are observations available for analysis or if a particular feature is present in every single observation.

14.     In the stated preference based approaches, the value of an individual characteristic is determined by asking individuals how much worth a particular product is to them. This is done, for example, by investigating how much consumers would be willing to pay for a particular feature in an automobile. Conjoint analysis and Contingent Valuation are two of the stated preferences based approaches and derives this information by asking for a respondent's preference over multiple sets of choices, which produces rich data sets with a large number of data points from which to estimate the value of the feature of interest. Conjoint analysis and Contingent Valuation are typically conducted in a survey setting.

15.     In his deposition, Dr. Singer stated that he had used hedonic pricing regression in the past.[19] Dr. Singer also stated that he had applied contingent valuation to assess the value of particular features.[20] In his view expressed at deposition, the surveys that underlie conjoint

---

[19]    Singer Deposition, pp 90-91.

[20]    *Id*. at 174.

analysis and contingent valuation are the same and the differences in the applied methodologies are very subtle:

> The survey is the same. The survey is the same, but the difference is the back end analysis on the survey. And the differences are fairly subtle. It is whether you are estimating a logit model or a logit with random coefficients.[21]

**4. When applying consumers' willingness-to-pay as an estimate for the unknown prices in the two Singer Conditions for injury, the two conditions collapse into one condition.**

16. In his deposition, Dr. Singer accepted the use of Conjoint Analysis to derive prices and values for features within a composite product when those prices do not exist in the actual world.[22] Therefore, $WTP_{But\text{-}For}$ and $WTP_{Actual}$ can be used as estimates for the unknown $P_{Actual}$ and $P_{But\_For}$. In other words, Dr. Singer agrees that the unknown prices for the MFT in the actual world (MFT is defective but the defect was not disclosed to the consumer at the point of sale)[23] and in the But-For World (MFT is defective and the defect is disclosed at the point of purchase) can be estimated by the part-worth or willingness-to-pay derived from a Conjoint Analysis. When substituting these estimates into the Singer Conditions, the two Singer Conditions for Injury collapse into one:

$$WTP_{Actual} > WTP_{But\text{-}For}.$$

---

[21] *Id.*.

[22] *Id.* at 87, Line 6: "I think Boedeker has an interesting idea on conjoint. The execution was botched. That could get us to a starting point, which is the average willingness to pay across all class members. I think if done properly, you could get to the average willingness to pay of all class members, with certain complications. You still would have to make certain assumptions."

[23] Singer Merits Report, ¶17, p 10.

5.      **I applied the collapsed Singer Conditions for injury in my methodology to calculate classwide damages.**

17.    In my Merits Report, I conducted an empirical study to quantify economic losses to the class members resulting from the purchase of a vehicle with a defect under different sets of information available to the consumer. I utilized the Hierarchical Bayesian Estimation (HBE) technique, which takes into account that the price-setting mechanism for a product incorporates individual consumers' willingness-to-pay by estimating the equilibrium price rather than just simply averaging the individual willingness-to-pay values.[24] The estimate of the implicit equilibrium price, which is the price set by the profit-maximizing producer at which the market transaction takes place, yields a quantification of the perceived value of the feature of interest to the consumer.

18.    Contrary to Dr. Singer's assertion, I do not compute the difference between estimates of the value of the defect-free MFT for two different groups.[25] Instead, for the same set of respondents, I conducted two separate conjoint studies that allowed me to determine each respondent's willingness-to-pay for the MFT in the actual world, where respondents had been promised a defect free product, and in the but-for-world, where respondents had been correctly informed at the point of sale that the MFT was defective.

C.      **Opinion 3: Dr. Singer incorrectly concludes that individual negotiations between Ford dealers and Ford purchasers inevitably lead to classwide damages of zero dollars.**

1.      **Dr. Singer asserts that Class Members negotiated vehicle prices individually and that it is impossible to determine how much each Class**

---

[24]    See ¶68 on Page 27 in this Rebuttal Report for a more detailed discussion of Dr. Singer's flawed use of simple averages in his attempt to calculate WTP.

[25]    Singer Merits Report, FN 59, pp 37-38, also Singer Deposition, pp 178-179.

**Member paid for the MFT, which leads him to the false conclusion that evidence on price paid cannot support classwide injury or damage.**

19.     Purchase negotiations take place between dealers and Class Members – however, Dr. Singer fails to recognize the fact that the manufacturer was compensated by the dealers for a vehicle as manufactured (i.e., if vehicles include MFT then regardless of negotiations between dealer and buyer the money that goes back to Ford includes an amount paid for MFT).[26] Therefore, the amount the consumer pays for a vehicle includes the implicit price for all features in the vehicle regardless of what the dealer and a class member may have negotiated.

20.     Exactly for the reason that no tabulation of the prices paid by each Class Member for the MFT exists, I designed an empirical study to determine how much the Class Members were willing to pay for the MFT in the actual and in the But-For-World. I applied conjoint analysis to individual study participants' responses to determine an equilibrium WTP for all features covered in the conjoint analysis, including the defective and non-defective MFT.

        2.      **Dr. Singer fails to recognize how Ford sets prices for its vehicle models with the MFT system, which renders negotiations between dealers and consumers irrelevant for the computation of classwide damages.**

21.     Ford sets a price to the dealer that reflects the cost of each feature and the expected average willingness-to-pay for each component. Economic theory tells us that if a feature is more expensive to produce (marginal cost) than the average marginal increase in price paid by

---

[26]     Vyas, Anant et al, Comparison of Indirect Cost Multipliers for Vehicle Manufacturing, 2000, ¶1. "In the process of manufacturing and selling vehicles, a manufacturer incurs certain costs. Among these costs are those incurred directly as a part of manufacturing operations and those incurred indirectly in the processes of manufacturing and selling. The indirect costs may be production-related such as R&D and engineering; business-related, such as corporate staff salaries and pensions; or retail-sales-related, such as dealer support and marketing. These indirect costs are recovered by allocating them to each vehicle… [T]hese indirect costs can be approximated as multipliers (or factors) applied to the direct cost of manufacturing."

the dealer to manufacturer then Ford will not include the feature in the vehicle. The marginal increase in price paid by the dealer depends on the consumer's willingness-to-pay for this particular feature.

22.    The dealers decide which vehicle specification to order from the manufacturer and to display on their lots. The dealers will only order a certain feature if the expected marginal resale price increase attributable to this feature is greater than the marginal purchase price increase. There might be situations when the dealers ex-post accept a lower marginal resale price for a feature in order to move the vehicle faster but this can be expected to be an exception. In the long-run and on average, the marginal resale price of each feature needs to be greater than the marginal purchase price of the feature. Otherwise, the dealers would constantly incur losses and would not be able to stay in business.

> **3.    While Dr. Singer speculates that some Class Members negotiated a price of zero for the MFT, he contradicts himself by stating that the value discount could not be disentangled**

23.    Dr. Singer alleges that some Class Member negotiated a price of zero for the MFT:

> For example, if a Class Member received a discount on her vehicle that reduced the price of the MFT to $0, that Class Member could not, by definition have overpaid for the MFT.[27]

24.    At the same time Dr. Singer alleges that it is impossible to disentangle the MFT from other bundle components.

> Because of feature bundling it is impossible to determine using classwide evidence how large of a discount for MFT (or any other bundled feature) was negotiated by any particular Class Member, because it is not possible to disentangle the MFT from other bundle components.[28]

---

[27]    Singer Merits Report, ¶21, p 12.

[28]    Singer Merits Report, ¶30, pp 16-17.

25.   These two statements clearly contradict each other. As stated above, conjoint analysis and hedonic pricing analysis allow disentangling the different features and allow estimating an implicit price for a feature. In his deposition, even Dr. Singer has acknowledged that these methodologies can be applied to disentangle prices of bundled products.

### 4.   Prices paid by Class Members are on average tied to the MSRP

26.   Even if individual Class Members paid different prices to the dealer, these prices fell within a certain range relative to the MSRP.

27.   Dr. Singer fails to recognize that in the case when Ford equipped a vehicle with the MFT system then this vehicle's price includes an implicit price for the MFT system. The conjoint analysis utilizing the HBE approach allows estimating this implicit price of the MFT for all Class Members.

### D.   Opinion 4: Dr. Singer fails to recognize that my damage analysis captures damages for both fraudulent concealment and breach of warranty.

28.   Dr. Singer states, "In their class reports, both of Plaintiffs' economic experts, Dr. Arnold and Mr. Boedeker, focused their analysis solely on Plaintiffs' Fraudulent Concealment Claims; both admitted to not having considered how injury or damages would be analyzed with respect to Plaintiffs' remaining claims. Accordingly, here I focus on Plaintiffs' Fraudulent Concealment claims."[29]

29.   In fact, based on legal principles provided to me by Plaintiffs' counsel, my damages model applies equally well to claims for breach of warranty as to claims for fraudulent concealment (including violation of consumer protection laws). According to the Uniform Commercial Code, which Plaintiffs' counsel informed me governs the damage claims for breach of warranty brought by the Class Members, the damage for breach of warranty "is the difference at the time and place of acceptance between the value of the goods accepted

---

[29]   Singer Merits Report, ¶16, pp 9-10.

and the value they would have had if they had been as warranted."[30]  And I understand that a similar standard applies to Plaintiffs' claims for fraudulent concealment (including violation of consumer protection laws).  *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (damages are "based on what a purchaser would have paid at the time of purchase had the purchaser received all the information" and "need not account for benefits received after purchase").

30.     Under those standards, I understand that the focus of the law is not on the seller but on the value received by the purchaser at the time of purchase. Plaintiffs claim that Class Members purchased a product that did not work as advertised or warranted.

**E.     Opinion 5: Dr. Singer incorrectly concludes that Class Members who purchased a vehicle with an MFT System cannot possibly have a higher willingness-to-pay for the MFT System than consumers who did not purchase a vehicle with the MFT System.**

31.     Dr. Singer makes the argument that the survey I commissioned shows that Class Members who purchased MFT are likely to have a higher Willingness-To-Pay for the MFT than consumers who did not purchase MFT:

> If the allegations in the Common Facts were accurate, then the 60 percent of Mr. Boedeker's survey respondents with actual, first-hand exposure to the Alleged Defects should assign a diminished value to the MFT, relative to the 40 percent of respondents who lacked such exposure. Yet according to Mr. Boedeker's own survey data, those with first-hand experience with the MFT actually place a higher value on the MFT than those without. This evidence is flatly inconsistent with Classwide injury.[31]

32.     Besides the obvious fact that individuals who did not purchase a Ford vehicle with the MFT system are not Class Members, it should not be surprising that Class Member who

---

[30]     Uniform Commercial Code, § 2-714. Buyer's Damages for Breach in Regard to Accepted Goods

[31]     Singer Merits Report, ¶38, pp 23-24.

purchased a vehicle with the MFT system have a higher WTP for the non-defective product than consumers who purchased a vehicle without the MFT system. In general, when a consumer's WTP is below the implicit price then that consumer will not purchase. Only consumers whose WTP is equal to or higher than the implicit price will purchase the product.

33. Applied to the purchasers of vehicles with the MFT system this means that if the WTP of these consumers were lower than the implicit price of the MFT, these consumers would not have bought a vehicle with this feature. In fact, this observation demonstrates the strength of the conjoint survey approach: For MFT owners on the one hand, the expected utility of the feature MFT was likely above the expected implicit price and therefore these respondents purchased the vehicle with that feature in the actual world. They also reacted to the hypothetical conjoint questions by expressing their relatively high WTP for the feature MFT. Respondents who did not purchase a vehicle with MFT, on the other hand, ceteris paribus are likely to have a WTP that is below the implicit price of the feature. These respondents reacted to the conjoint question by expressing their relatively low WTP for the feature MFT.

34. Dr. Singer fails to understand that it is no contradiction of the stated theory of harm if the WTP for the defective product of respondents who owned a vehicle with MFT was higher than that of respondents who did not own a MFT. Instead of comparing respondents who owned a vehicle with MFT and respondents who did not, the correct analysis to establish economic losses to the Class Members has to take into account the demand curves of purchasers of vehicles with the defective MFT (i.e., the Class Members) for the defective and non-defective feature in order to determine by how much the equilibrium price would have changed between the actual and the but-for-world.

35. Only in those instances where the implicit equilibrium price did not change after the disclosure of defects at the point of purchase would there be no damages. However, the results from the empirical study presented in my merits report show a downward shifted demand curve for the defective product in the but-for world and therefore a lower implicit

equilibrium price, due to the additional information disclosed at the point of purchase in the but-for-world.

F.      **Opinion 6: Only the use of flawed assumptions enables Dr. Singer to conclude that large numbers of Class Members are allegedly unharmed.**

36.     In Figure 2 of his report, Dr Singer seems to assume that there is a range of prices paid by Class Members for the defective feature. He assumes that the prices paid by class members are normally distributed. Therefore, in Dr. Singer's model, more Class Members paid a price in the center of the chart than on the tails. Dr. Singer then arbitrarily draws a line that is supposed to show a uniform "Value Received", assuming that all Class Members have the same "Value Received". In his view, all class members for which the price paid is smaller than the "Value Received", have not been insured (depicted with the grey, shaded area), while all Class Members to the right of the horizontal line have been insured.

**Figure 1      Dr. Singer's Illustration of Non-Injured Class Members[32]**



37.     The distribution depicted in the figure appears to be without any theoretic foundation. There is no explanation how one would determine the "Value Received" and why all Class Member in this graphical illustration have the same "Value Received". It is not clear

---

[32]     Singer Merits Report, Figure 2, p 31.

whether "Value Received" is a legal term or supposed to express the utility derived from the feature.

38.    In Footnote 19 on Page 11 of his Merits Report, Dr. Singer points out that the "Value Received can be defined either as the price that a Class Member would have paid in the But-For-World, or as a Class Member's willingness-to-pay ('WTP') for the MFT in the But-For World". To this extent, I agree with Dr. Singer's description provided in Footnote 19 on Page 11 of Dr. Singer's Merits Report.

39.    As discussed above, I have been informed by Plaintiffs' Counsel that the damage for breach of warranty "is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."[33] And I understand that a similar standard applies to Plaintiffs' claims for fraudulent concealment (including violation of consumer protection laws). *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (damages are "based on what a purchaser would have paid at the time of purchase had the purchaser received all the information" and "need not account for benefits received after purchase").. Dr. Singer appears to argue that the value of the defect product should be the price of the defect product and hence the damage could be measured two ways: Either as the difference between the actual price and the price paid in the But-For-World or as the difference between the price paid and the WTP in the But-For-World.[34]

    1.    *Damage=WTP_{Actual} − WTP_{But-For}* or

    2.    *Damage=P_{Actual} - WTP_{But-For}.*

40.    To be consistent, the same value concept has to be applied to the actual world and the But-For-World consistently; otherwise, the damage would not be computed correctly. In my view, either the damage is the difference between the willingness-to-pay in the actual world and the but-for-world, or the damage is the difference between the price paid in the real

---

[33]    Uniform Commercial Code, § 2-714. Buyer's Damages for Breach in Regard to Accepted Goods.

[34]    Singer Merits Report, FN 19, p 11.

world and the price paid in the but-for-world. I believe that a damage based on the price paid in the real world and in the but-for-world is more conservative as the Willingness-To-Pay exceeds the price for many consumers.

41.     In my approach to determine economic losses, I apply the same value concept to the Actual World as to the But-For-World. Given that MFT is not individually offered, I use conjoint analysis to assess the WTP of each respondent for the defective and non-defective product. I compile two demand curves, one for the defective and on for the non-defective product. I then calibrate for the share of consumers who purchased the product and derive the implicit price of the feature in the actual and in the but-for-world. The difference between the implicit price of the defective product and the implicit price of the non-defective product is the derived damages estimate.

G.      **Opinion 7: Dr. Singer's regression approach yields further evidence of classwide damages.**

42.     In my Class Certification Rebuttal Report, I pointed out that Dr. Singer's regression model was fundamentally flawed in several aspects, the main one being the fact that Dr. Singer combines all non-MFT models and then compares individual MFT models with the combined pool of all non-MFT models.[35]

43.     In Appendix 2 of his Merits Report, Dr. Singer builds upon his original regression analysis and presents a series of models he collectively refers to as "robustness analyses" or "sensitivity tests". The goal being of his additional modelling is to demonstrate that his original "parsimonious" model is robust enough. In Statistics, a model is called robust when its predictive coefficients show little variation when compared to estimates produced by other similar models.

44.     However, it is my opinion that these additional regression models are not more than failed attempts to justify Dr. Singer's initial use of an overly generalized baseline model that is

---

[35]     Boedeker Class Certification Rebuttal Report, ¶63a-e, pp 20-21.

flawed in numerous ways, including its use of a comparable group.[36]  Further, in his presentation and discussion of these sensitivity tests, Dr. Singer asserts that his baseline model is robust despite the fact that the results of his new analysis show the opposite.

45.  For example, in column (3) of Appendix Table 1, Dr. Singer has listed the depreciation rates for MFT-equipped vehicles relative to same model prior year vehicles.  I would agree that this particular segment of comparable vehicles is best suited for control group inclusion.  However, the results from Dr. Singer's regressions in column (3) are significantly different from those produced by his baseline model: the ratio of MFT-equipped models that depreciates faster than their non-MFT comparables increases from 10-10 to 11-4, and the percentage of units sold of MFT-equipped models with faster depreciation rates increases 1.5 times from 29.9% to 45.6%.  Conveniently, Dr. Singer's only discussion of these regressions in column (3) is limited to a brief mention in a footnote where he attempts to undermine their significance by describing use these findings as a "statistical disadvantage".

46.  Further examination of the results in column (3) indicate that 16 out of 20 MFT-models depreciated faster than of non-MFT vehicles at varying significance levels. The correct way to test if all class vehicles do show a faster depreciation is to combine the MFT models into one group and the non-MFT model into another group and then to utilize regression analysis to test for the significance of the difference in depreciation rates, if any. Such a model is parsimonious as Dr. Singer requires and it does not compare apples with oranges (i.e., specific MFT models with a combined group of all non-MFT models).

---

[36]    Boedeker Class Certification Rebuttal Report, ¶63b, bullets i & ii, pp 20-21.

**H.      Opinion 8: In a failed attempt to prove that classwide damages are zero, Dr. Singer misrepresents contemporaneous documents that indicate consumers' satisfaction with the MFT System, without their being aware that Ford knew the Base Software of the MFT System was fundamentally flawed at the architectural level and was not fixed by Ford's updates.**

47.      Dr. Singer claims that contemporaneous Ford documents and surveys indicate that Class Members were satisfied with MFT or would even be likely to recommend MFT to others:

> [S]urvey evidence from contemporaneous Ford documents indicates that a majority of Class Members were satisfied with the MFT, while a substantial majority would be likely to recommend the MFT to others.[37]

48.      A closer look at the surveys cited by Dr. Singer reveals that the cited surveys do not address the issue at stake in this lawsuit, and that he "cherry-picked" a limited number of survey results to "prove" his point while ignoring the fact that Ford failed to disclose that it knew the Base Software of the MFT System was fundamentally flawed at the architectural level and was not fixed by Ford's updates.

49.      The surveys Dr. Singer cites are all surveys conducted by Ford that asked respondents about their satisfaction with certain features of their new vehicles. None of the surveys address the issue at stake in this lawsuit:  whether Class Members would have paid the price that Ford charged for MFT-equipped vehicles if they had known the truth about MFT's defects.  As I explained in my Merits Report, in order to assess classwide damages, "we need to focus on the marginal consumer in the market for the non-defective product and compare the price she had paid to the price she would have paid for the known-to-be-defective product at the point of purchase."[38]  But Ford's "customer satisfaction" surveys do not reveal what consumers would have paid for MFT if they had known the full truth about MFT's flaws at the point of purchase.

---

[37]      Singer Merits Report, FN 36, p 22.

[38]      Boedeker Merits Report, p 11.

50. Even Dr. Singer acknowledges in his deposition testimony that Ford never disclosed the defects of the MFT system to the Class Members, and in particular not at the point of purchase.[39] Nevertheless, Dr. Singer does not admit this fact in his Merits Report. Instead, Dr. Singer cites information derived from surveys that are not relevant to this case, because the survey participants were not aware of the truth about MFT's defects.

51. In addition, Dr. Singer cherry-picks examples from those surveys and misrepresents the survey results.[40] It is my opinion that Dr. Singer has selectively presented summary figures that are in no way representative of the survey findings as a whole: Dr. Singer reports 71% of survey respondents would probably or definitely recommend in 2011[41] but he fails to mention that the results of the 2011 Wave 3 show how deeply dissatisfied MFT owners were with the system and that 57% of respondents owning MFT equipped vehicles were mostly dissatisfied or somewhat dissatisfied.

52. Dr. Singer also claims that "[c]ontemporaneous Ford documents indicate that the MFT system was unimportant to many Class Members: A large number of Class Members viewed MFT as 'not important but nice to have,' or 'not at all important,' while only a minority viewed it as 'critically important.'"[42] Dr. Singer's claim is based on the 2014 SYNC/MyFord Touch Satisfaction & Usage Study.[43] None of the respondents in this survey actually are Class Members, as the respondents were owners of new 2014/25 model year vehicles equipped with SYNC & MFT purchased in 2014. Given the quality issues related to MFT identified by Ford, it is not surprising that by 2014 consumers had to some degree turned away from MFT.

53. Further, Dr. Singer references WLN2-01261581, "slide 11 (Navigation Usage and Satisfaction Survey, 2012, showing Ford and Lincoln ranked "significantly above the study average for satisfaction" based on J.D. Power & Associates data)". A close look at this

---

[39] Singer Deposition Lines 2-13, p 79 and Lines 4-9, p 80.

[40] WLN1-3690287, p 4. and p 23.

[41] Singer Merits Report, FN 36, p 22.

[42] Singer Merits Report, p 19-20.

[43] WLN2-01198299.

document reveals that J.D. Power & Associates was only reviewing the navigation feature and not other features that form part of MFT. The survey focused on owners of 2012 model year vehicles equipped with a factory-installed navigation system, purchased by June 30, 2012.[44] The study also does not explore, how much the respective owners had paid for their factory pre-installed navigation system and whether the system worked as advertised or not.

54.     In addition, Dr. Singer references WLN2-01319727, "slide 3 (SYNC with MyFord Touch Quality Improvement Communication Plan, June 2011, showing 73% mostly satisfied with MFT".[45] It appears that Ford's communication specialists did not believe in the link between the positive survey results quoted by Dr. Singer and the company's bottom line. Slide 1, which is marked as "Secret", summarizes the situation in the summer of 2011 as challenging in part due to declines in customer perception of the SYNC brand:

> Now, MyFord Touch is being challenged by media and consumers due to complexity of use, lack of training, screens 'going black' and additional functional issues [...] Though initially launched to positive reviews in 2007, the SYNC brand is at risk due to complexity and functional issues in relation to Customer concerns about MyFord Touch functionality.[46]

55.     Dr. Singer ignores the fact that Ford North America (NA) fell to the near bottom of the brand ranking in its own 2011 Q1 GQRS survey and Ford's management anticipated that the J.D. Power IQS (Initial Quality Study) survey would show a corresponding drop.[47]

---

[44]     WLN2-01261581, Slide 5.

[45]     Singer Merits Report, FN 36, p. 22-23.

[46]     WLN2-01319727, Slide 1.

[47]     WLN2-01319727, Slide 1.

## I.     Opinion 9: Dr. Singer's example of consumers' willingness to accept computer technology defects is not proof that classwide damages do not exist in this case.

56.     Dr. Singer states that he has not seen any evidence that the Alleged Defects exceeded any specified "baseline rate of technical difficulties" in computer technology:

> I have seen no evidence (nor have Plaintiffs alleged) that the frequency of the Alleged Defects exceeded any specified baseline rate of technical difficulties that a rational consumer might expect to encounter when purchasing any widely available computer technology.[48]

57.     Dr. Singer implies the existence of a "baseline rate of technical difficulties" that rational consumers might expect to encounter. However, he does not provide any economic, econometric, statistical or other methodology to assess or quantify a "baseline rate of technical difficulties" acceptable to rational consumers. It is my opinion that Dr. Singer fails to include a calculation, quantification or other derivation of consumer expectation related to a "baseline rate of technical difficulties" in his Merit Report. Therefore, the above statement is nothing but mere speculation and cannot be relied on.

## J.     Opinion 10: Dr. Singer misrepresents TrueCar Data and incorrectly uses these data to support his view that classwide damages do not exist in this case.

### 1.     The data used by Dr. Singer cannot be replicated because of a change in TrueCar's report format shortly after Dr. Singer issued his report.

58.     Figure 1 in the Singer Merits Report is entitled "Retail Price Distribution of 2016 AWD Lincoln MKX Los Angeles CA 90095 (Oct. 2015 – Mar. 2016)."[49]  There are numerous unaddressed questions about the data in Figure 1.  It is unclear what time range is covered by the data. Support documentation to Dr. Singer's Class Certification Rebuttal Report indicate that the chart's data were last updated on March 10, 2016.  My attempt to replicate

---

[48]     Singer Merits Report, ¶42, p 26.

[49]     Singer Merit Report, p 19. I will refer to the data from www.truecar.com as TrueCarData.

the data was unsuccessful because apparently the data provider www.truecar.com changed the format of its data reports shortly after Dr. Singer submitted his report.

> **2.** **Dr. Singer incorrectly claims that a single Los Angeles ZIP Code had a large number of sales transactions with widely varying prices in the TrueCar dataset when in fact all Los Angeles ZIP Codes show the same information.**

59.    Dr. Singer falsely claims that the TrueCarData depicted in Figure 1 are the results of individual sales transactions and the prices paid in those transactions. Instead, Figure 1 summarizes the data in bins of a pre-defined length that the user cannot modify.  Figure 1 is based on 519 transactions divided into 17 price ranges with no reference to individual transactions and the prices paid in those transactions. For example, the largest bar in Figure 1 shows 58 transactions that fall into the $260 wide range between $45,045 and $45,305 but the TrueCarData do not show any individual prices.

60.    Dr. Singer states that when typing in a single Los Angeles ZIP Code, TrueCar reports a certain number of sales transactions and prices.  His Figure 1 is purportedly based on actual sales price data over a continuous six-months period in the Los Angeles ZIP Code 90095. The ZIP Code 90095 represents the UCLA campus. A quick on-line search on the official Ford and Lincoln websites shows that there is no Ford or Lincoln dealership in ZIP Code 90095. According to the Ford and Lincoln websites, there are no dealers located in Zip Code 90095.  The search query also confirmed the locations of the five closest dealers to be in:

    a.    ZIP Code 90404 (Santa Monica, 4.14 miles to 90095),

    b.    ZIP Code 90045 (Los Angeles, 7.31 miles to 90095)

    c.    ZIP Code 91601 (North Hollywood, 7.88 miles to 90095),

    d.    ZIP Code 91343 (North Hills, 10.57 miles to 90095), and

    e.    ZIP Code 91364 (Woodland Hills, 11.32 miles to 90095).

61.     I entered the ZIP Code information for those five dealer locations into the TrueCarData website and obtained exactly the same results as for the UCLA ZIP Code 90095. In total, Ford/Lincoln has approximately 30 associated dealerships in Los Angeles County.  The geographic area of Los Angeles County, the most populous county in the United States, spans 4,083 square miles with a population of over 10 million residents. When entering a ZIP code for a very poor community like 90221 (Compton) or for a very affluent community like 90210 (Beverly Hills) or a ZIP Code like 93539 (Lancaster), a city in the Northeastern part of Los Angeles County approximately 65 miles away from ZIP code 90095, the results will always be the same.

62.     For this large geographically dispersed area, the TrueCar price curve data are identical across all metrics, including Average Price Paid and MSRP, with the exception of what TrueCar advertises as "TRUECar Estimate".  It is my understanding that this metric is supposed to represent a "locked-in" sticker price that prospective buyers can then present to qualifying dealers to be honored during the sales transaction.  Aside from the fact that the "TRUECar Estimate" is  a black box with no clear definition or explanation how this price has been derived, the retail sales price analysis based on TrueCarData presented by Dr. Singer does not support his claims of highly variable, individualized automobile pricing.

63.     Further, the six-month period arbitrarily selected by Dr. Singer fails to consider the factors of seasonality in the auto sales industry as well as varying overhead structures across different dealerships that may mask otherwise much less variable prices paid by consumers. Consequentially, it is highly probable that the sales price data Dr. Singer utilizes represents a non-representative, skewed sample with little value for use in this case.

64.     In addition, it is not clear from which sources TrueCar obtains its sales price data; some if not all of the sales price data might come from dealers participating in TrueCar's program. TrueCar reports having more than 11,000 TrueCar Certified Dealers as of 2015[50], while the National Automobile Dealers Association claims representing nearly 16,500 new-car

---

[50]     TrueCar Annual Report 2015, p 4.

and –truck dealers, with 32,500 franchises, both domestic and international.[51] This would also serve as additional confirmation that Dr. Singer's sales price data represents a non-representative, skewed sample.

65.    As stated previously, Dr. Singer's claims that the data in Figure 1 detail six months of vehicle sales price data. However, when performing my own vehicle inquiries, TrueCar's price graphs only indicated a rolling 28-day window of retail sales price data – a new way of reporting data, which was introduced in March 2016 within a few days of Dr. Singer's last inquiry into the TrueCarData to obtain the data for Figure 1.

66.    In summary, Dr. Singer's use of TrueCarData is misrepresentative, unreplicable, and does not support his assertion that classwide damages are zero.

**K.    Opinion 11: Based on an incorrect calculation of individual and overall willingness-to-pay for the participants in my November 2015 empirical study, Dr. Singer erroneously concludes that classwide damages do not exist in this case.**

67.    In the supporting materials to his Merits Report[52], Dr. Singer falsely assumes that the utilities derived from the Hierarchical Bayesian Estimation methodology applied to the results from the conjoint study are independent measures, and then continues to perform calculations not considering all attributes (and corresponding utilities) that form the chosen product. He falsely assumes utilities derived from a Mixed Logit model exhibit a linear relationship, as shown in his simple algebraic calculations. Therefore, Dr. Singer incorrectly computes the utility of the different price points in the empirical study when performing his own willingness-to-pay calculations leading to meaningless figures for individual consumer's willingness to pay.

---

[51]    https://www.nada.org/about/.

[52]    Backup material to Singer Merits Report: a) spreadsheet "Simulation Results_Q13 Q17_MFTOwner.xlsx", tab "summary of results"_MFTOwner, b) STATA program "All Models_MFTOwner.do".

68.   In order to derive an overall willingness-to-pay of $1,300[53], Dr. Singer takes the simple average across study participants in the first study. This is incorrect for three reasons:

a.   The first study had four groups of participants, only of which is the group of Class Members:

1.   Ford/Lincoln buyers who bought MFT vehicles,

2.   Ford buyers who purchased non-MFT models,

3.   Other brand buyers who purchased vehicles with similar product, and

4.   Other brand buyers who purchased vehicles without similar product.

b.   The willingness-to-pay for individual study participants is based on a flawed calculation of the utility for price – Dr. Singer's calculations are based on a demand curve for price that is upward sloped – i.e., the more expensive a feature, the higher the consumer's utility.

69.   Even if Dr. Singer had correctly computed individual willingness-to-pay values, the overall willingness-to-pay is not the simple average because the utilities in the willingness-to-pay calculation are derived from a non-linear estimation methodology. As derived in Kenneth Train's book, *Discrete Choice Methods with Simulations*,[54] the consumer's willingness-to-pay can be estimated by converting the price differences between attribute levels derived from the Conjoint Analysis to a monetary scale by taking the negative ratio of the attribute's coefficient to the price coefficient.

---

[53]   Singer Merits Report, FN 39, p 24.

[54]   Train, Kenneth E., "Discrete Choice Methods with Simulations", Cambridge University Press; 2nd edition, 2009.

## IV.    Conclusion

70.    Dr. Singer argues that classwide damages are equal to zero even though the MFT system was "crippled"[55]. However, a detailed analysis of his merits report leads to the following opinions:

Opinion 1:    In the Singer Merits Report, Dr. Singer states that a sound methodology is needed to assess classwide damages. As Dr. Singer conceded in his prior deposition testimony, Conjoint Analysis is such a methodology.

Opinion 2:    In the Singer Merits Report, Dr. Singer develops conditions to assess if classwide damages exist. I applied these same conditions in my empirical study, which resulted in positive classwide damages.

Opinion 3:    Dr. Singer incorrectly concludes that individual negotiations between Ford dealers and Ford purchasers inevitably lead to classwide damages of zero dollars.

Opinion 4:    Dr. Singer fails to recognize that my damage analysis captures damages for both fraudulent concealment and breach of warranty.

Opinion 5:    Dr. Singer incorrectly concludes that Class Members who purchased a vehicle with an MFT System cannot possibly have a higher willingness-to-pay for the MFT System than consumers who did not purchase a vehicle with the MFT System.

Opinion 6:    Only the use of flawed assumptions enables Dr. Singer to conclude that large numbers of Class Members are unharmed.

Opinion 7:    Dr. Singer's regression approach yields further evidence of classwide damages.

---

[55]    Singer Deposition, p 177, Line 13-17.

Opinion 8:    In a failed attempt to prove that classwide damages are zero, Dr. Singer misrepresents contemporaneous documents that indicate consumers' satisfaction with the MFT System, without their being aware that Ford knew the Base Software of the MFT System was fundamentally flawed at the architectural level and was not fixed by Ford's updates.

Opinion 9:    Dr. Singer's example of consumers' willingness to accept computer technology defects is not proof that classwide damages do not exist in this case.

Opinion 10:   Dr. Singer misrepresents TrueCar Data and incorrectly uses these data to support his view that classwide damages do not exist in this case.

Opinion 11:   Based on an incorrect calculation of individual and overall willingness-to-pay for the participants in my November 2015 empirical study, Dr. Singer errouneously concludes that classwide damages do not exist in this case.

71.    In summary, I conclude that Dr. Singer's opinion that classwide damages are equal to zero is incorrect. It appears that Dr. Singer started with the conclusion that classwide damages are equal to zero rather than using accepted economic, econometric, and statistical methodologies and all evidence available to him to test whether classwide damages exist and then to quantify them empirically if they were found to exist.  In fact, there is compelling evidence in Dr. Singer's own analyses that classwide damages do exist and can be reliably estimated.

Respectfully submitted on September 8, 2016.

_____

Stefan Boedeker