# EXHIBIT 62

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

IN RE:                              )        Case No. 13-cv-3072-EMC
MYFORD TOUCH CONSUMER                )
LITIGATION.                          )        CLASS ACTION
                                     )
                                     )
                                     )        **EXPERT MERITS REPLY**
                                     )        **REPORT OF**
                                     )
                                     )        **HAL J. SINGER, PH.D**
                                     )
                                     )

Introduction and Assignment ................................................................................. 4

Qualifications ......................................................................................................... 4

Background ............................................................................................................. 5

I.    Mr. Boedeker's Economic Loss Model Does Not Support Any Classwide Damages Estimate Above $0 ........................................................................................... 7

    A.    Mr. Boedeker's Economic Loss Estimates Are Rendered Unreliable By Numerous Flaws ............................................................................... 9

    B.    Mr. Boedeker's Economic Loss Estimates Are Unstable and Self-Contradictory 12

    C.    Mr. Boedeker's Economic Loss Estimates Do Not Follow Generally Accepted Economic Methods and Contradict Elementary Economic Logic ...................... 18

        1.    Mr. Boedeker's Economic Loss Estimates of $729 and $839 from the Phase 1 Survey Do Not Follow Generally Accepted Economic Methods and Contradict Elementary Economic Logic, and Mr. Boedeker's Characterization of These Estimates Is Demonstrably False .................... 19

        2.    Mr. Boedeker's Economic Loss Estimates of $910 and $1,290 from the Phase 2 Survey Contradict Elementary Economic Logic, And Correcting A Single Flaw Reduces Damages To Zero ............................................... 22

        3.    Mr. Boedeker's Economic Loss Estimates of $910 and $1,290 from the Phase 2 Survey Are Additionally Flawed Because They Do Not Follow Generally Accepted Methods, and His Characterization of The Economic Literature Purportedly Supporting These Estimates Is Demonstrably False ............................................................................ 26

    D.    The Design and Structure of Mr. Boedeker's Disclosure Statements Predispose Respondents To Provide The Desired Result ............................................. 29

        1.    The Disclosure Statements Present a Skewed Picture of Relevant Information About the MFT ............................................................. 29

        2.    Mr. Boedeker Fails To Construct A Valid Control Group Against Which To Compare The Effects Of Disclosure .............................................. 32

    E.    Mr. Boedeker's Phase 1 and Phase 2 Data Continue to Confirm That The Challenged Conduct Had *No Negative Effect* On Value Received ...................... 34

II.    Mr. Boedeker's Economic Loss Model Refutes Classwide Injury .................................. 36

III.    Dr. Arnold Fails To Prove Classwide Injury ............................................................ 39

    A.    Dr. Arnold Fails to Establish That All Class Members Expected a Higher Value Than They Actually Received at the Point of Purchase .................................. 39

    B.    Dr. Arnold Fails To Establish That All Class Members Would Have Paid Less for the MFT Under Disclosure ............................................................ 42

IV.    Dr. Arnold's Analysis Does Not Support Any Damages Estimate Above $0 .................. 48

Conclusions ........................................................................................................... 51

Appendix 1: Materials Relied Upon ...................................................................... 52

Appendix 2: Curriculum Vitae..................................................................................... 55

Appendix 3: Retail Pricing Data for 2016 Lincoln MKX (Front-Wheel Drive) .......................... 74

Appendix 4: Distribution of Individual WTP from Mr. Boedeker's Economic Loss Model ....... 87

PRIVILEGED AND CONFIDENTIAL

## INTRODUCTION AND ASSIGNMENT

1.     I have been asked by counsel for the Ford Motor Company to respond to merits reports submitted by Plaintiffs' economic experts, Mr. Stefan Boedeker[1] and Dr. Jonathan Arnold.[2] Both Mr. Boedeker and Dr. Arnold opine on classwide injury and damages.[3] As explained below, neither of Plaintiffs' economic experts succeeds in proving classwide injury, or in offering a credible estimate of aggregate damages to the putative classes ("Class"). I therefore continue to conclude that there is no evidence of classwide injury, and that the most reliable estimate of aggregate damages under Plaintiffs' theory of harm that can be gleaned from the available classwide evidence and methods is $0.[4]

## QUALIFICATIONS

2.     I am a Principal at Economists Incorporated, a Senior Fellow at George Washington University's Institute for Public Policy, and an Adjunct Professor at Georgetown University's McDonough School of Business (where I teach Advanced Pricing to MBA candidates).

3.     My background and qualifications are described in detail in my Merits Report.[5] I have no stake in the outcome of this case. I am being compensated for my work in this case at

---

1.    Merits Report of Stefan Boedeker (August 1, 2016) [hereinafter "Boedeker Merits Report"].

2.    Damages Expert Report of Jonathan I. Arnold, Ph.D. (August 1, 2016) [hereinafter "Arnold Merits Report"].

3.    Throughout this report, I use the term "injury" or "impact" to refer to actual or imminent economic harm to Plaintiffs (if any) allegedly caused by Ford. I use the term "damages" to refer to the appropriate amount of money, if any, needed to compensate Plaintiffs for economic harm allegedly caused by Ford.

4.    Expert Merits Report of Hal J. Singer (August 1, 2016) [hereinafter "Singer Merits Report"].

5.    Singer Merits Report ¶¶4-10.

the rate of $675 per hour. The materials that I considered in forming my opinions are summarized in Appendix 1. My curriculum vitae is provided in Appendix 2.

<div align="center">BACKGROUND</div>

4.     Plaintiffs allege that the owners and lessees of Ford and Lincoln vehicles were exposed to a risk of experiencing various failures (the "Alleged Defects") of the MyFord Touch and MyLincoln Touch information and entertainment systems (collectively, "MFT"). The MFT was available on certain Ford and Lincoln vehicles either as standard equipment (for some vehicles) or as part of an option package (for certain other vehicles) beginning in the 2011 model year. The MFT was never sold as a separate, stand-alone option at a separate, stand-alone price.

5.     The Alleged Defects have been defined by Plaintiffs as a laundry list of various alleged technical failures.[6] Plaintiffs claim that the Alleged Defects arise from flaws in the computer code ("Base Software") that underlies the architecture of the MFT system.[7] Plaintiffs assert that Ford deliberately concealed from Class Members the Alleged Defects in approximately 560,000 vehicles sold in twelve states (the "Class Vehicles") between August 2010 and August 2013 (the "Class Period").[8] Plaintiffs allege that Ford concealed a total of seven common facts ("Common Alleged Facts") from Class Members.[9] I shall refer to Plaintiffs' allegations against Ford collectively as the "Challenged Conduct."

---

6.     Plaintiffs' Motion For Class Certification (January 28, 2016) [hereinafter "Class Cert Motion"], at 5.

7.     *Id.* at 4.

8.     *Id.* at 1-3. Plaintiffs allege that "MFT was fundamentally defective on the day Ford first released it, as Ford knew." *Id.* at 4.

9.     Singer Merits Report ¶13; *see also* Plaintiffs' Supplemental Responses to Defendant's Interrogatories (Jan. 13, 2016). I have not been asked to opine on whether Ford did in fact

6. Plaintiffs allege that injury and damages flow from Class Members having overpaid for the MFT at the point of purchase as a result of the Challenged Conduct.[10] Class Members allegedly paid a "price premium"[11] for the MFT, owing to non-disclosure of the Alleged Defects at the point of purchase. According to Plaintiffs' theory of harm, Class Members paid a price for the MFT, in exchange for a product with a certain value (the "Value Received"), and Class Members' expectations regarding the Value Received were significantly inflated by Ford's non-disclosure.[12] As a consequence, Class Members allegedly would have been willing to pay significantly less for the MFT if Ford had disclosed the Common Alleged Facts to them at the point of sale (in the "But-For World"). Under Plaintiffs' theory of harm, a Class Member was injured if—as a result of the Challenged Conduct—the price that the Class Member paid for the MFT exceeds the Value Received by that Class Member.[13] My Merits Report provides additional background on this matter.[14]

---

conceal the Common Alleged Facts or the Alleged Defects from Class Members at the point of purchase, and my conclusions do not depend on these facts.

10. Class Cert Motion at 17.

11. *Id.* at 1, 3, 16 17, 48.

12. Arnold Merits Report ¶32 ("If Ford had informed Class members at the time of sale that MyFord Touch was susceptible to widespread failures and system crashes…Class members would not have paid the price they did pay for the MyFord Touch system"); *see also* Boedeker Merits Report ¶32 (quantifying "economic loss" as "equal to the difference between the price this marginal consumer would have paid for the known-to-be-defective product and the non-defective product.")

13. Singer Merits Report ¶¶17-19. As explained in my Merits Report, the Value Received can be defined either as the price that a Class Member would have paid in the But-For World, or as a Class Member's WTP for the MFT in the But-For World. Let $P_{Actual}$ represent the price that a Class Member actually paid for the MFT, let $P_{But\_For}$ represent the price that a Class Member would have paid in the But-For World, and let $WTP_{But\_For}$ denote the Class Member's WTP in the But-For World. Under the first definition, a Class Member overpaid (and was injured) only if $P_{Actual} > P_{But\_For}$. Under the second definition, a Class Member overpaid (and was injured) only if $P_{Actual} > WTP_{But\_For}$.

## I. MR. BOEDEKER'S ECONOMIC LOSS MODEL DOES NOT SUPPORT ANY CLASSWIDE DAMAGES ESTIMATE ABOVE $0

7.      Proof of classwide injury requires evidence, grounded in reliable economic methods, that all or almost all Class Members overpaid for the MFT as a result of the Challenged Conduct. Assuming classwide injury could be proven, a reliable classwide damages estimate would require a reliable estimate of the amount of the overpayment by Class Members on a per-unit basis, multiplied by the number of units implicated by the Challenged Conduct.[15]

8.      Mr. Boedeker focuses primarily on damages; he "was retained by counsel for Plaintiffs to develop an economic loss model to quantify the damages suffered by the class due to having driven a vehicle with an infotainment system that was defective and did not work as advertised."[16] Mr. Boedeker claims that "[t]he lower bound of classwide damages can be calculated by multiplying the number of vehicles sold during the class period with $727,"[17] while "[t]he upper bound of classwide damages can be calculated by multiplying the number of vehicles sold during the class period with $1,290."[18] Mr. Boedeker also opines on classwide

---

My conclusions here generalize to either definition. In economics, the price paid and WTP are closely related: For a standalone product, the demand curve for a given product is constructed by aggregating individual consumers' willingness-to-pay for the product, resulting in an equilibrium price. Accordingly, factors that increase the WTP for a product (such as high customer satisfaction) also tend to increase the price of the product (although most consumers pay less than their maximum WTP). The relationship is more complicated for products such as the MFT, which is not sold as a standalone product, and which does not have a uniform equilibrium price due to individualized negotiations. *See* Singer Merits Report, Part III.A. Nevertheless, it remains the case that factors that an influence an individual customer's WTP for the MFT also tend to influence the price paid by that consumer for the MFT.

14.     *Id.* ¶¶11-19.
15.     *Id.* ¶¶17-19.
16.     Boedeker Merits Report ¶6.
17.     *Id.* ¶91.
18.     *Id.*

PRIVILEGED AND CONFIDENTIAL

injury, claiming that "*every* Ford vehicle with a defective MFT system that was sold/leased caused an economic loss."[19]

9.      Mr. Boedeker's economic loss estimates rely on a survey-based technique known as Choice-Based Conjoint ("CBC") analysis. CBC analysis is a "stated preference" approach, which "involve[s] asking individuals how much they value a particular product."[20] The methodology attempts to elicit respondents' willingness-to-pay ("WTP") for a product, or a particular feature of a product, based on their answers to questions involving hypothetical "choice sets."[21]

10.     Mr. Boedeker's CBC analysis uses surveys administered in November 2015 and July 2016.[22] His merits analysis is based on what his respondents indicated they would hypothetically pay for the MFT, both before and after reviewing a mock disclosure statement. Mr. Boedeker's analysis is not based on any information on the actual price paid or the Value Received by any Class Member at the point of purchase. It instead relies on self-reported, hypothetical transactions based on responses elicited years after respondents' actual purchases of MFT-equipped vehicles. As explained below, Mr. Boedeker's CBC-derived economic loss estimates are rendered unreliable by numerous methodological flaws. These include flaws in his implementation of the CBC method itself, as well as additional calculations performed by Mr. Boedeker that are not based in any generally accepted economic method, and that contradict elementary economic logic.[23]

---

19.     *Id.* ¶84 (emphasis added).
20.     *Id.* ¶¶37-38.
21.     *Id.* ¶¶40-41; ¶47.
22.     *Id.* ¶¶54-56; ¶68; ¶70.
23.     *See* Part I.A, *infra*.

11.     Mr. Boedeker's data and methods generate unstable, widely varying, and self-contradictory economic loss estimates, confirming that his model of economic loss is fundamentally unreliable. When I correct a single error in his economic logic, his economic loss model cannot support any damages estimate above $0. In addition, Mr. Boedeker's own survey data consistently reveal that actual, first-hand exposure to the MFT system that supposedly contained the Alleged Defects *increases* the value that consumers place on the MFT system, relative to consumers who did not purchase or lease an MFT-equipped vehicle. This again yields an economic loss estimate of $0.

12.     My analysis of Mr. Boedeker's economic loss model shows that his model refutes classwide injury as well.[24] For example, even after reading a skewed mock disclosure statement purporting to characterize the Alleged Defects, approximately 30 percent of Mr. Boedeker's respondents were, according to his own data, still willing to pay *more* than $1,861 for the MFT—that is, *more* than the value that (according to Mr. Boedeker) Class Members placed on the MFT without *any* disclosure.[25] Even when the mock disclosure implicates safety concerns, approximately 25 percent of respondents still fall into this category.

A.     **Mr. Boedeker's Economic Loss Estimates Are Rendered Unreliable By Numerous Flaws**

13.     Economists recognize that the CBC methodology is capable of generating reliable results only under limited conditions.[26] A fundamental problem is the fact that surveys

---

24.     *See* Part II, *infra.*
25.     Boedeker Merits Report ¶71.
26.     Expert Report of Hal J. Singer (March 15, 2016) [hereinafter "Singer Class Report"], Part III.C

are inherently hypothetical—they have "no consumption consequences for the participants"[27]—and may therefore fail to provide a realistic representation of the actions that consumers would (or would not) actually take if they were making real purchases with their own money.[28] Accordingly, "the extent to which [hypothetical CBC] studies are able to uncover 'true' consumer preference structures is questionable."[29] It is therefore unsurprising that economists have "long warned about the perils of inferring preferences in such hypothetical conditions, because participants are not incentive aligned to report their true preferences."[30] Even Sawtooth Software, which sells the software that Mr. Boedeker uses to implement his CBC analysis (and thus presumably has every incentive to emphasize the power of CBC), has emphasized that "[t]here are some widely-recognized shortcomings of conjoint methods."[31]

14.    As Nobel Laureate Daniel McFadden has emphasized, "[i]n conjoint surveys, it is important to align the respondent's incentives with incentives they would face in the actual

---

27.    Min Ding, Rajdeep Grewal & John Liechty, *Incentive-Aligned Conjoint Analysis*, XLII JOURNAL OF MARKETING RESEARCH 67-82, at 67 (2005). *See also* Daniel McFadden, *A Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275–297, at 289 (1986) [hereinafter "McFadden Choice Theory"] (explaining that "[a] number of problems may invalidate market forecasts constructed from conjoint data.")

28.    Ding et. al. (2005), *supra* (stressing the need for "realistic settings using incentive structures that require participants to 'live with' their decisions.").

29.    *Id.*

30.    Min Ding, *An Incentive-Aligned Mechanism for Conjoint Analysis*, XLIV JOURNAL OF MARKETING RESEARCH 214-223, at 214 (May 2007), citing Colin Camerer & Robin Hogarth, *The Effects of Financial Incentives in Experiments: A Review and Capital-Labor-Production Framework*, 19 (1–3) JOURNAL OF RISK AND UNCERTAINTY 7–42 (1999); Peter Diamond & Jerry Hausman, *Contingent Valuation: Is Some Number Better Than No Number?* 8 (4) JOURNAL OF ECONOMIC PERSPECTIVES 45–64 (1994); John List, *Do Explicit Warnings Eliminate the Hypothetical Bias in Elicitation Procedures? Evidence from Field Auctions for Sportscards,* 91(5) AMERICAN ECONOMIC REVIEW 1498–1507 (2001).

31.    Bryan K. Orme, Mark I. Alpert & Ethan Christensen, "Assessing the Validity of Conjoint Analysis -Continued," *Sawtooth Software Research Paper Series* (1997).

market to ensure they accurately reveal their preferences."[32] In testimony before the Copyright Royalty Board, Professor McFadden structured his own conjoint survey to give his respondents clear incentives to be accurate in their statements about willingness to pay for different options.[33] In contrast, Mr. Boedeker's respondents were given no incentive whatsoever to weigh costs and benefits in a similar manner as they would if they were faced with an actual purchase decision.

15.     Professor McFadden has also emphasized the need for CBC studies to be "clear, complete, and realistic"[34] in the choices that are presented to respondents. Yet Mr. Boedeker's mock disclosure presents a skewed and misleading picture of relevant information about the MFT, and the study does not follow any accepted methodology in framing disclosure statements to elicit reliable responses. Instead, the design and structure of Mr. Boedeker's mock disclosure statements predispose respondents to provide the desired result by (1) providing an incomplete and inaccurate characterization of record evidence; and (2) failing to construct anything resembling a proper control group against which to compare the effects of disclosure.[35] (A proper control group is necessary to identify the incremental effect of disclosure at the point of purchase).[36]

---

32.     *Before The Copyright Royalty Board, Library Of Congress, In The Matter Of Determination Of Rates And Terms For Digital Performance In Sound Recordings And Ephemeral Recordings (Web IV)* (Docket No. 14-CRB-0001-WR), Testimony of Daniel L. McFadden (October 6, 2014), ¶36.

33.     *Id.* ¶¶36-39 (explaining that respondents were given gift cards, the value of which fluctuated depending on the answers provided).

34.     *Id.* at 4.

35.     *See* Part I.D.1, *infra*.

36.     In addition, all of Mr. Boedeker's calculations are based on responses elicited years after respondents' actual purchase decisions related to MFT-equipped vehicles. Mr. Boedeker's estimates therefore assume without evidence that a survey conducted in 2015 and 2016 can

16. Finally, Mr. Boedeker layers onto his CBC analysis additional calculations that lack any basis in generally accepted economic principles and contradict elementary economic logic. The first of these additional calculations are Mr. Boedeker's purported "market simulations," based on which Mr. Boedeker opines that a "reliable estimate"[37] of the marginal Class Members' WTP for the MFT exceeds $1,800. Yet his own market simulations indicate that 69 percent of his Phase 2 respondents (all of whom actually did purchase MFT-equipped vehicles) would *not* have purchased the MFT at this price. In fact, Mr. Boedeker's "market simulations" cannot support any economic loss estimate above $0, which invalidates his estimates of $910 and $1,290, both of which rely on his "market simulations."[38]

17. Mr. Boedeker's remaining economic loss estimates ($729 and $839) are also derived using calculations that lack any basis in generally accepted economic principles and contradict elementary economic logic.[39] The data used to calculate these estimates was elicited from respondents that had not yet received *any mention* of the Alleged Defects.[40]

**B.    Mr. Boedeker's Economic Loss Estimates Are Unstable and Self-Contradictory**

18. Mr. Boedeker's data and methods generate unstable, widely varying, and self-contradictory economic loss estimates, indicating that his model of economic loss is

---

reliably estimate Class Members' WTP as far back in time as 2010. Although this might be a valid assumption for some products, Mr. Boedeker provides no basis for assuming that consumer expectations regarding the functionality of software driven vehicle information and entertainment systems would have remained substantially unchanged over the past several years, despite significant technological advances that present a different context for evaluating systems such as the MFT. *See, e.g.,* "Infotainment System Reviews," *Digital Trends*, (2015) available at http://www.digitaltrends.com/infotainment-system-reviews/;

37. Boedeker Merits Report ¶72.

38. As explained below, these "market simulations" contradict elementary economic logic, and have no basis in generally accepted economic methods. *See* Parts I.C.2-3, *infra*.

39. *See* Part I.C.1. *infra*.

40. *Id.*

fundamentally unreliable and economically unsound. In particular, the data and methods utilized in Mr. Boedeker's Class Report yield substantially lower economic loss estimates than those in with his Merits Report. The discrepancy is driven by arbitrarily discarding hundreds of respondents from his analysis (all Ford and Lincoln owners who did *not* purchase MFT-equipped vehicles), and by focusing exclusively on a nonsensical "market simulation" method for estimating WTP.[41] The results from Mr. Boedeker's Class and Merits Reports diverge so much that they contradict each other, as described below.

19.     In his Merits Report, Mr. Boedeker continues to rely on survey data he utilized in his Class Report, supplemented by additional data that were gathered in a separate survey after his Class Report was submitted. Mr. Boedeker refers to the survey data utilized in his Class Report, which were collected in November 2015, as having been collected in "Phase 1." Mr. Boedeker refers to new survey data collected in July 2016 as having been collected in "Phase 2."[42] Mr. Boedeker calculates his purported economic loss estimates from four different findings ("Results") in his Merits Report, which utilize data from both Phase 1 and Phase 2.[43] Based on Results 1 through 4, Mr. Boedeker claims that the economic loss per vehicle falls between $729 and $1,290.[44]

20.     In the first result ("Result 1"), Mr. Boedeker claims that selected survey respondents from Phase 1 (those that purchased MFT-equipped vehicles) exhibited a WTP of $1,836 for the MFT, while respondents from Phase 2 (all of whom purchased MFT-equipped

---

41.   *See* Parts I.C.2-3.
42.   Boedeker Merits Report ¶¶54-56; ¶68; ¶70.
43.   *Id.* Part VII.
44.   *Id.* ¶91. Mr. Boedeker claims that his economic loss estimates are based on the WTP of the "marginal consumer." *Id.* ¶¶31-33.

vehicles) had a WTP of $1,861.[45] Mr. Boedeker claims, without performing any disclosed statistical test, that the difference between these two estimates is "statistically indistinguishable."[46] (He presumably meant to say the difference is not "economically significant.") Mr. Boedeker also claims that $1,850 "represents a reliable estimate of the willingness-to-pay of individuals who purchased/leased a vehicle with the MFT system without any information about the defect at the point of purchase,"[47] although he does not explain why.[48]

21.     According to the second result ("Result 2"), as well as a subpart of the fourth result ("Result 4"), Mr. Boedeker estimates the economic loss per vehicle (based on a purported decrease in WTP for the marginal customer) at either $729 and $839 per vehicle, depending on whether the Alleged Defects are disclosed as causing "distractions that affect the safe operation of the vehicle."[49] Although the $729 figure is reported as Result 2 and the $839 figure reported in Result 4, the two estimates are calculated using identical (and fatally flawed)[50] methods. The

---

45.  *Id.* ¶69; ¶71. Mr. Boedeker's CBC model includes four different attributes. The attributes are (i) seating options, (ii) rear camera, (iii) GPS, and (iv) SYNC w/ MFT. His WTP and economic loss estimates apply to (iv) only. *See* Boedeker Merits Report ¶59

46.  *Id.* ¶72.

47.  *Id.*.

48.  Mr. Boedeker does not explain how his estimate of $1,850 was calculated, or what tests (if any) he performed to determine the reliability of this figure.  Mr. Boedeker also does not explain why his analysis is valid for Class Members that leased their vehicles, or those that purchased their vehicles on the secondary market.  As I explained in my Merits Report, analyzing injury for these Class Members introduces many additional complications. Singer Merits Report ¶¶57-60.

49.  Boedeker Merits Report ¶79.

50.  As explained below, despite Mr. Boedeker's attempts to mischaracterize his Phase 1 economic loss estimates of $729 and $839, they are calculated entirely from data collected from survey participants *before* those survey participants received any mention of the Alleged Defects. Specifically, they are calculated by taking the *difference* between two estimates of the value of a *defect-free* MFT. There is no economic logic to this calculation. *See* Part I.C.1, *infra*.

PRIVILEGED AND CONFIDENTIAL

$729 and $839 figures are the only economic loss estimates in Mr. Boedeker's Merits Report that utilize data from Ford and Lincoln owners and lessees who did not own an MFT-equipped vehicle, as well as those that owned or leased an MFT-equipped vehicle. Mr. Boedeker ignored such respondents in his Phase 2 data collection. As a consequence, his remaining economic loss estimates (reported in Results 3 and 4, and based only on Phase 2 respondents) are derived entirely from respondents who reported that they had leased or owned MFT-equipped Fords and Lincolns.

22.     To calculate the third result ("Result 3"), a randomly selected sample of Phase 2 participants was read disclosure statements describing the Alleged Defects, in addition to what Mr. Boedeker describes as "a set of quotations from statements made by Ford Officials expressing their opinions about the nature and extent of the defects."[51] Mr. Boedeker claims that the WTP for this group of study participants is $951, and thus he claims that the resulting economic loss per vehicle (based on a purported decrease in WTP for the marginal customer) is $910.[52]

23.     Result 4 is actually two additional results, both of which purport to incorporate concerns that the Alleged Defects implicate safety issues. The first part of Result 4 consists of an economic loss estimate of $839, as noted above. For the second part of Result 4, the same group of respondents used in Result 3 was read an additional disclosure statement that "pointed out to them that the defect causes distractions that affect the safe operation of the vehicle."[53]

---

51.   *Id.* ¶75.
52.   Equal to $1,861 (the purported WTP "without any information") less $951 (the purported WTP for respondents after reviewing Mr. Boedeker's disclosure statement). *Id.* ¶77.
53.   Boedeker Merits Report ¶81. Mr. Boedeker's Merits Report does not disclose the fact that his economic loss estimates of $910 and $1,290 in Results 3 and 4 are calculated from

After this additional disclosure, Mr. Boedeker claims that the WTP for this group of study participants is $571, and claims that the resulting economic loss per vehicle (based on a purported decrease in WTP for the marginal customer) is $1,290.[54]

TABLE 1: ESTIMATES FROM MR. BOEDEKER'S MERITS AND CLASS REPORTS

| Boedeker Result | Source | WTP for MFT w/o Disclosure | Economic Loss | Economic Loss (w/ Safety) | Ignore Non-MFT Owners?** | Data Source |
|---|---|---|---|---|---|---|
| Result 1 | Merits | $1,836 - $1,861* | n/a | n/a | Y | Phases 1 & 2 |
| Results 3 & 4 | Merits | n/a | $910 | $1,290 | Y | Phase 2 |
| Results 2 & 4 | Class & Merits | n/a | $729 | $839 | N | Phase 1 |
| N/A | Class | $1,390 | n/a | n/a | N | Phase 1 |
| N/A | Class | $939 | n/a | n/a | N | Phase 1 |

* As noted above, Mr. Boedeker also claims that $1,850 is a reliable estimate of WTP for the MFT, although he does not explain why.
**Y = Sample limited to owners and lessees of MFT-equipped vehicles; N = Sample includes all respondents that leased or owned Fords and Lincolns.

24.    Table 1 summarizes key estimates from Mr. Boedeker's Merits Report, as well as the economic loss estimates reported in his Class Report (which, like his Merits Report, used Phase 1 data). As seen above, Mr. Boedeker claims in his Merits Report that the economic loss per vehicle falls between $729 and $910 (if disclosure of the Alleged Defects does not implicate

_____

exactly the same set of respondents. In fact, the work papers that he submitted indicate the opposite. *See* "Empirical Study Phase 2 Survey.docx," at 7. Nevertheless, a review of Mr. Boedeker's calculations confirms that precisely the same group of respondents was used to calculate Mr. Boedeker's economic loss estimates of $910 and $1,290. This means that these respondents were read two different disclosure statements (one that mentioned potential safety issues, and one that did not), and were asked to complete two separate conjoint modules. Mr. Boedeker has confirmed this is true in correspondence via Plaintiffs' counsel. By exposing the same group of respondents to two disclosures, Mr. Boedeker may have further biased his results: The act of disclosure itself (as opposed to its content) can that drive economic loss estimates, exposing respondents to two disclosures can magnify this effect. *See* Part I.D.2, *infra*.

54.  Equal to $1,861 (the purported WTP "without any information") less $571 (the purported WTP for respondents after reviewing Mr. Boedeker's disclosure statement, with added information relating to safety risks). *See* Boedeker Merits Report ¶83.

purported safety concerns) or between $839 and $1,290 (if purported safety concerns are implicated).[55] In comparison, Mr. Boedeker claimed in his Class Report that economic losses were substantially lower, ranging from $729 (without safety issues) to $839 (with safety issues).[56]

25.    Mr. Boedeker's economic loss estimates suffer from many obvious discrepancies:

- Mr. Boedeker claimed in his Class Report that the $729 - $839 estimates "represent reliable statistical estimates of the economic loss to the purchaser of a Ford vehicle with the defective system."[57] Mr. Boedeker does not provide any justification in his Merits Report for augmenting the purportedly "reliable estimates"[58] in his Class Report with substantially higher values in his Merits Report.

- The economic loss estimates in Mr. Boedeker's Merits Report assume that (in the absence of disclosure) the MFT is worth more than $1,800 to customers, despite the fact that Mr. Boedeker's Class Report estimated that the value was as low as $939 and did not exceed $1,390, using other data from the same Phase 1 survey that he now uses to calculate an estimate of $1,836. The increase is driven by the fact that Mr. Boedeker discards from his Merits analysis, without justification, owners of Fords and Lincolns that did not purchase the MFT. Had he included them, his WTP estimates would have been lower, as the results of his Class Report demonstrate.

- By suppressing his two prior estimates of the MFT's value to customers ($939 and $1,390), and focusing exclusively on his new (conveniently higher) estimates ($1,836 - $1,861), Mr. Boedeker obtains larger damages estimates than he could otherwise. He provides no plausible justification for suppressing his prior estimates. Indeed, they were calculated using Phase 1 data, which he continues to utilize (albeit selectively) in his Merits Report.

- Mr. Boedeker's Class Report used two different methods to generate a range of WTP for the MFT ($939 - $1,390). The latter (and larger) value was calculated using purported "market simulations;" the former was not. His Merits Report

---

55.   Boedeker Merits Report ¶91.
56.   Boedeker Class Report ¶92.
57.   *Id.*
58.   *Id.*

uses only the latter (market simulation) method. This again yields higher WTP and thus greater scope for damages.

- Mr. Boedeker's new "economic loss" estimate of $1,290 exceeds one of his prior estimates of the *total* value of the MFT ($939). Clearly a Class Member that valued the MFT at only $939 cannot have suffered an economic loss of $1,290.

- Mr. Boedeker's new "economic loss" estimate of $910 *without* safety disclosures exceeds his prior "economic loss" estimate *with* safety "disclosures" ($839), which violates basic economic logic: If both of these estimates were accurate, it would mean that Class Members suffer *less* harm when concealment of the Alleged Defects implicates potential safety hazards, and *more* harm when this is not the case.

- Mr. Boedeker's latest economic loss estimates ($910 and $1,290) are inflated by the fact that he ignores Ford and Lincoln owners and lessees who did not purchase an MFT-equipped vehicle. Mr. Boedeker collected data from such respondents in Phase 1 and used the data in the economic loss calculations in his Class Report; he provides no plausible justification for failing to collect or analyze such data in his Phase 2 survey.

- Mr. Boedeker claims that his decision to ignore non-MFT owners makes his analysis conservative,[59] even though plainly the opposite is true. This is evident from the fact that his new economic loss estimates are significantly higher (not lower) than those in his Class Report, which did not ignore non-MFT owners: Because owners of MFT-equipped vehicles place a higher value on the MFT than those that did not own an MFT, there is more potential for damages when Mr. Boedeker excludes the latter from his analysis.[60]

## C.    Mr. Boedeker's Economic Loss Estimates Do Not Follow Generally Accepted Economic Methods and Contradict Elementary Economic Logic

26.     Despite Mr. Boedeker's attempts to mischaracterize his Phase 1 economic loss estimates of $729 and $839 (reported in Results 2 and 4), they are calculated entirely from data collected from survey participants *before* those survey participants received *any mention* of the Alleged Defects.    Mr. Boedeker calculates these economic loss estimates by taking the

---

59.    Boedeker Merits Report ¶73.
60.    See Part I.E, *infra*. As explained below, the correct inference to draw from the fact that MFT owners exhibit a higher WTP for the MFT than other Ford and Lincoln owners is that economic loss is $0. *Id.*

*difference* between two estimates of the value of a *defect-free* MFT. There is no economic logic

to this calculation. As such, they cannot be used to calculate the effect of disclosure at the point

of purchase. As explained below, Mr. Boedeker's attempt to do so is not based on any generally

accepted economic method and contradicts elementary economic logic: One cannot hope to

measure the effects of disclosure at the point of purchase on respondents' WTP if there is no

disclosure at the point of purchase to any respondent.[61]

27.     Mr. Boedeker's Phase 2 economic loss estimates of $910 and $1,290 rely on

purported "market simulations," which have no basis in generally accepted economic methods,

and contradict elementary economic logic, as explained below.[62] Despite Mr. Boedeker's

attempts to mischaracterize the economic literature, none of the published articles that he

references provides any basis for his calculations.[63] When I perform just one correction to his

calculations—by simulating the price at which *all* Class Members would purchase the MFT,

instead of just 30 percent of them, as Mr. Boedeker's economically nonsensical calculations

did—his economic loss model cannot support any damages estimate above $0.[64]

**1.      Mr. Boedeker's Economic Loss Estimates of $729 and $839 from the Phase 1 Survey Do Not Follow Generally Accepted Economic Methods and Contradict Elementary Economic Logic, and Mr. Boedeker's Characterization of These Estimates Is Demonstrably False**

28.     According to Result 2 of Mr. Boedeker's Merits Report, "[t]he disclosure of

defects of the MFT system at the point of purchase decreased the willingness-to-pay for the

MFT system;"[65] Mr. Boedeker claims that he "estimated that the willingness-to-pay for the now

---

61.  *See* Part I.C.1, *infra*.
62.  *See* Part I.C.2, *infra*.
63.  *Id.*
64.  *See* Part I.C.3, *infra*.
65.  Boedeker Merits Report Part VII.B.

known to be defective MFT system drops by $729."[66] This is a demonstrably false characterization of the calculation that Mr. Boedeker actually used to arrive at his $729 estimate.

29.    Mr. Boedeker's economic loss estimate of $729 is not based on any measure of respondents' "willingness-to-pay for the now known to be defective MFT system."[67] As explained in my Class Report, the $729 figure is based entirely on Mr. Boedeker's estimates of the value of a *defect-free* MFT.[68] To be clear: None of the respondents whose data were used to calculate Result 2 received *any mention* of the Alleged Defects when completing the conjoint module, which Mr. Boedeker used to calculate WTP at the point of purchase. To the contrary, all references to the Alleged Defects were deliberately withheld from respondents until *after* the conjoint module, as Mr. Boedeker explained in his Class Report,[69] and as can be seen plainly in his survey document.[70] Yet Mr. Boedeker claims that information his respondents *had not even seen* reflects "additional information at the point of purchase" that reduced WTP.[71] This is demonstrably false. Mr. Boedeker calculates his $729 "economic loss" estimate by taking the *difference* between two estimates of the value of a *defect-free* MFT. Mr. Boedeker first categorizes respondents based on their answers to question 13 of the Boedeker Survey, which asked respondents how they would react once told that MFT had "glitches." Mr. Boedeker first

---

66.    *Id.* The Boedeker Merits Report sometimes reports this estimate as $727, rather than $729. I understand that this is a typographical error, and that the former should be replaced with the latter throughout his report.  Mr. Boedeker has confirmed this is true in correspondence via Plaintiffs' counsel.
67.    Boedeker Merits Report ¶74.
68.    Singer Merits Report ¶62; Singer Class Report ¶¶95-100.
69.    Boedeker Class Report ¶53.
70.    Boedeker Phase 1 Survey (work papers produced by Mr. Boedeker). The Alleged Defects ("glitches") are not mentioned until Q13, after the conjoint module.
71.    Boedeker Merits Report ¶74.

identified respondents who answered Q13 by indicating that they would still have purchased the vehicle with MFT, despite learning about the Alleged Defects. Next, he identified all other respondents—that is, all those who responded to Q13 by indicating that they would not have purchased the vehicle with MFT, after learning about the "glitches." Mr. Boedeker then computed two separate estimates of the value of a *defect-free* MFT —one for each of these two groups of respondents. Finally, he subtracted the estimate from the first to arrive at his "economic loss" estimates.[72]

30.     As I have also explained previously (in my Class Report and my Merits Report), the calculations employed by Mr. Boedeker in Result 2 are not grounded in generally accepted economic principles or methodologies, Plaintiffs' theory of harm, or even basic economic logic.[73] One cannot hope to measure the effects of disclosure at the point of purchase if there is no disclosure at the point of purchase to any respondent. Unsurprisingly, Mr. Boedeker does not reference any economic authority to justify his illogical calculations in Result 2.

31.     Finally, precisely the same deficiencies also apply to Mr. Boedeker's $839 economic loss estimate in Result 4. The $729 and $839 figures utilize identical methods, except that the latter claims to account for potential safety hazards arising from the Alleged Defects.[74]

---

72.     Deposition of Stefan Boedeker (February 23, 2016) [hereinafter "Boedeker Class Dep."], 254:1 -255:15. Mr. Boedeker calculates his $839 "economic loss" estimate using a nearly identical process. The only distinction is that Mr. Boedeker groups respondents using question 17 of the Boedeker Survey, which asked respondents how they would react once told that MFT had "safety problems arising from glitches." Boedeker Class Dep. 260:18 – 261:17.

73.     Singer Merits Report ¶62; Singer Class Report ¶¶95-100.

74.     Boedeker Merits Report ¶79.

PRIVILEGED AND CONFIDENTIAL

**2. Mr. Boedeker's Economic Loss Estimates of $910 and $1,290 from the Phase 2 Survey Contradict Elementary Economic Logic, And Correcting A Single Flaw Reduces Damages To Zero**

32.     As explained above, Mr. Boedeker's economic loss estimate of $910 is calculated as the difference between $1,861 (the purported WTP without disclosure) and $951 (the purported WTP for respondents after reviewing Mr. Boedeker's disclosure statement). Similarly, Mr. Boedeker's economic loss estimate of $1,290 is calculated as the difference between $1,861 and $571 (the purported WTP for respondents after reviewing Mr. Boedeker's disclosure statement, with added information relating to safety risks). Mr. Boedeker calculates each of the WTP estimates that feed into these calculations ($1,861, $951, and $571) using purported "market simulations."[75] According to Mr. Boedeker, these simulations yield a reliable estimate of the marginal Class Members' WTP for the MFT—also referred to by Mr. Boedeker as the "implicit price"[76] of the MFT.

33.     Mr. Boedeker's market simulations provide estimates of the proportion of respondents that would purchase a package that includes the MFT at a given price. As the price of the package rises, the proportion of respondents that would purchase the package declines. However, Mr. Boedeker's "implicit price" calculations contradict elementary economic logic. In particular, each of Mr. Boedeker's implicit prices is calculated as the price at which *only a fraction* of his survey respondents would choose to purchase an MFT-equipped vehicle. As a

---

75. *Id.* ¶¶67-71; ¶¶76-77; ¶¶82-83.
76. *Id.* ¶69.

result, each of Mr. Boedeker's market simulations dramatically overstate Class Members' WTP for the MFT.[77]

34.     To illustrate, consider Mr. Boedeker's claim that Class Members' WTP for the MFT in the absence of disclosure is between $1,836 and $1,861 (depending on whether Phase 1 or Phase 2 data are utilized).[78] At this price, only about 31 percent of respondents would have purchased an MFT-equipped vehicle, according to Mr. Boedeker's own simulations.[79] The remaining 69 percent of respondents would *not* have purchased an MFT-equipped vehicle, because the price was too high. Therefore, according to Mr. Boedeker's simulations, the vast majority of his respondents have a WTP *below* $1,836 (and $1,861). But all of the respondents used to calculate these WTP *did* purchase an MFT-equipped vehicle. Accordingly, Mr. Boedeker's simulations overstate WTP for the MFT. For Mr. Boedeker's market simulations to have any internal logic at all, Mr. Boedeker would need to determine the price at which 100 percent of his respondents would have purchased the MFT in the absence of disclosure.

35.     It is straightforward to show that correcting this single, fundamental flaw causes damages to fall to zero. In Figure 1, I use Mr. Boedeker's simulations from Result 1 to calculate the percentage of respondents that would have purchased the MFT at each of the price points

---

77.     As noted above, Mr. Boedeker never attempted to calculate the price that Class Members actually paid for the MFT. Mr. Boedeker ignores the (substantially lower lower) price that Dr. Arnold opines is attributable to the MFT.

78.     *See* Table 1, *supra*.

79.     According to Mr. Boedeker's simulations, about 31 percent of respondents would have chosen the "base case" option (a package with standard seats, no GPS, no rearview camera, and no MFT), at a price of $0. Mr. Boedeker's simulations first add the MFT to this base case package for free, which increases the proportion of respondents that would accept the package. Next, Mr. Boedeker increases the price of the package incrementally until approximately 31 percent would have purchased it. The price at which this occurs is $1,836 - $1,861, depending on whether Phase 1 or Phase 2 respondents are used. Boedeker Merits Report ¶70.

PRIVILEGED AND CONFIDENTIAL

allowed for in Mr. Boedeker's model. As seen below, at an "implicit price" of approximately $1,850, only about 30 percent of his respondents would purchase an MFT-equipped vehicle. Therefore, the WTP of the "marginal customer"[80] is, according to Mr. Boedeker's model, not even close to $1,850. If this were the case, then all respondents should have been willing to purchase the MFT at this price.

36.     At an implicit price of $1,500, only 38 percent would purchase an MFT-equipped vehicle per Mr. Boedeker's model. Even when the implicit price drops to just $250, only a bit over half (56 percent) of respondents would purchase an MFT-equipped vehicle. Even when the price drops to $0, the percentage rises—but only to 62.8 percent.[81] Therefore, Mr. Boedeker's own simulations cannot support any "implicit price" for the MFT above $0, nor can they be used to calculate any (nonzero) decline in WTP as a result of the Challenged Conduct. As a consequence, Mr. Boedeker's data and methods cannot support any damages estimate above $0.

37.     This result is consistent with the conclusions of my Merits Report: Because the MFT was just one component bundled into the Class Vehicles, the fact that all Class Members purchased an MFT-equipped vehicle does not imply that all Class Members have a high WTP for the MFT.[82] To the contrary, record evidence indicates that the MFT was relatively unimportant to many Class Members—some of whom were unaware of the MFT at time of

---

80.  *Id.* ¶¶31-33.
81.  The data in Figure 1 assume the same "base case" as Mr. Boedeker's simulations, which models demand for a package with standard seats, no GPS, and no rearview camera. However, the same conclusions hold if I modify Mr. Boedeker's simulations to model demand for a package with the most attractive options available (leather & heated seats + GPS + rearview camera). Even in this scenario, less than 100 percent of respondents would purchase an MFT-equipped vehicle for an implicit price of $0.
82.  Singer Merits Report ¶28; Part III.A; Singer Class Report ¶59.

purchase, or purchased an MFT-equipped vehicle despite not intending to use the system.[83] These Class Members would have faced clear incentives to negotiate discounted prices for their vehicles to reflect a lack of interest in the MFT.[84] Under these conditions, it is entirely possible that the "implicit price" of the MFT would have to fall to $0 before 100 percent of Class Members would agree to purchase it.

FIGURE 1:  SHARE OF RESPONDENTS CHOOSING TO PURCHASE AN MFT-EQUIPPED VEHICLE ACCORDING TO MR. BOEDEKER'S MARKET SIMULATIONS



---

83.   Singer Merits Report ¶33;

84.   *Id.* ¶34.

**3.** **Mr. Boedeker's Economic Loss Estimates of $910 and $1,290 from the Phase 2 Survey Are Additionally Flawed Because They Do Not Follow Generally Accepted Methods, and His Characterization of The Economic Literature Purportedly Supporting These Estimates Is Demonstrably False**

38.     In an apparent attempt to provide a basis for his nonsensical market simulations, Mr. Boedeker has claimed that they are supported by various studies that purportedly implement the same technique.[85] As explained below, any resemblance between Mr. Boedeker's market simulations and published, peer-reviewed studies in professional journals is purely superficial. In reality, Mr. Boedeker's market simulations have no basis in the studies he cites to support them; they do not follow any generally accepted economic method, and they contradict elementary economic logic.

39.     Most of the articles that Mr. Boedeker references to defend his use of market simulations and their methodology do not even calculate an implicit price, and therefore they provide no basis for Mr. Boedeker's market simulations. The only exception employs a sophisticated simulation methodology completely unlike Mr. Boedeker's simplistic approach, which solves for prices consistent with basic economic principles.

40.     The first journal article that Mr. Boedeker references, by Ahn et al., is a conjoint study of consumer demand for alternative fuel vehicles.[86] Unlike Mr. Boedeker, the authors explicitly account for competition from a variety of competitive alternatives, including gasoline, diesel, compressed natural gas, liquefied petroleum gas, and hybrid vehicles.[87] The market simulation in the Ahn study allows consumers to choose among these vehicle types. Each

---

85.     Boedeker Merits Report ¶53; Boedeker Class Reply ¶14.
86.     Jiwoon Ahn, Gicheol Jeong, & Yeonbae Kim, *A forecast of household ownership and use of alternative fuel vehicles: A multiple discrete-continuous choice approach*, 30 ENERGY ECONOMICS 2091 – 2104 (2007).
87.     *Id.* at 2094.

vehicle has an associated fuel cost and maintenance cost, gleaned from external data. For purposes of the simulation, it is assumed that all the vehicles have the same purchase price.[88] Therefore, the Ahn study did not calculate an "implicit price" for any vehicle, or for any component of any vehicle. The Ahn study provides no support for Mr. Boedeker's market simulations or the "implicit prices" that he calculates.

41.     The second article that Mr. Boedeker references, by Robin Segal, used the results of a conjoint study to forecast the market for electric vehicles in California.[89] Like the Ahn study and unlike Mr. Boedeker's work, the study does not ignore competitive alternatives, but instead explicitly accounts for competition among three fuel types (gasoline, natural gas, and electricity).[90] The Segal study implements two market simulations, each of which assumes a hypothetical price for a gasoline vehicle, an electric vehicle, and a compressed natural gas vehicle, and then estimates the resulting market share for each type of vehicle.[91] The Segal study does not calculate an "implicit price" for any vehicle, or for any component of any vehicle. Accordingly, the Segal study provides no support for Mr. Boedeker's market simulations or the "implicit prices" that he calculates.

42.     The third article that Mr. Boedeker references, by Lebeau et al., applies a choice-based conjoint experiment to estimate the market potential for battery electric and plug-in

---

88.     Ahn et al, *supra*, at 2100 – 2102.
89.     Robin Segal, *Forecasting the market for electric vehicles in California using conjoint analysis* 16(3) ENERGY JOURNAL 89 – 111 (1995).
90.     *Id.* at Table 2.
91.     *Id.* at 103 – 104.

hybrid electric vehicles.[92] Once again, unlike Mr. Boedeker, the study explicitly accounts for competition, this time among eight different vehicle types.[93] Similar to the prior studies, the Lebeau study assumes a purchase cost for each type of vehicle, and estimates the resulting market share for each type of vehicle.[94] The study does not calculate an "implicit price" for any vehicle, nor for any component of any vehicle. Accordingly, the study provides no support for Mr. Boedeker's market simulations or the "implicit prices" that he calculates.

43.     In his Class Reply (but not in his Merits Report), Mr. Boedeker referenced one study, by Jedidi et al., that uses an "optimization algorithm" to "obtain the optimal prices of a product line."[95] Any resemblance between the optimization algorithm employed by Jedidi and Mr. Boedeker's market simulations is purely superficial. Jedidi develops a sophisticated simulation methodology completely unlike Mr. Boedeker's simplistic approach.[96] Jedidi develops a simulation model consistent with elementary economic principles, which solve for the optimal prices that firms could charge when choosing to sell products separately, in bundles,

---

92.   Kenneth Lebeau, Joeri Van Mierlo, Philippe Lebeau, Olivier Mairesse, & Cathy Macharis, *The market potential for plug-in hybrid and battery electric vehicles in Flanders: A choice-based conjoint analysis*, 17 TRANSPORTATION RESEARCH PART D 17 592–597 (2012).

93.   Demand is modeled for city petroleum cars (City P), medium class petroleum cars (Medium P), premium class petroleum cars (Premium P), city diesel cars (City D), medium class diesel cars (Medium D), premium class diesel cars (Premium D), battery electric vehicles (BEV) and plug-in hybrid electric vehicles (PHEV). *Id.* at 594.

94.   *Id.* at 594– 596.

95.   Rebuttal Expert Report of Stefan Boedeker (April 29, 2016) [hereinafter, "Boedeker Class Reply], ¶14, referencing Kamel Jedidi, Sharan Jagpal & Puneet Manchanda, *Measuring Heterogeneous Reservation Prices for Product Bundles* 22(1) MARKETING SCIENCE (2003) 107-130.

96.   *See* Jedidi et al. at 123-124 (describing multi-step iterative algorithm  to solve for optimal product line prices).

or both.[97] In contrast, Mr. Boedeker's simulations nonsensically have solved for the price at which less than one third of his respondents would have purchased the MFT—despite the fact that 100 percent of them actually had purchased MFT-equipped vehicles outside the context of the study.[98]

## D. The Design and Structure of Mr. Boedeker's Disclosure Statements Predispose Respondents To Provide The Desired Result

44.    The design and structure of Mr. Boedeker's disclosures appear engineered such that survey respondents will view the MFT as suffering from far more than what a reasonable consumer would expect from a baseline rate of technical defects in newly-released computerized products—despite Plaintiffs' failure to establish what consumers' expectations were on a classwide basis or to show that any frequency of issues with the MFT exceeded that rate by a material amount.[99] As explained below, Mr. Boedeker accomplishes this by (1) mischaracterizing plaintiffs' allegations and incomplete record evidence; and (2) failing to construct anything resembling a proper control group against which to compare the effects of disclosure.

### 1. The Disclosure Statements Present a Skewed Picture of Relevant Information About the MFT

45.    Mr. Boedeker's survey respondents were read disclosure statements that appear to be engineered to guarantee the desired result—namely, depressing the respondents' WTP:

> The software that runs MyFordTouch in the car you are purchasing or leasing was developed by an *inexperienced software company* which did not follow

---

97.    *Id.* The authors "develop and test a flexible algorithm that allows the practitioner to use the model estimates to choose the optimal product-line pricing policy." *Id.* at 108.
98.    *See* Part I.C.2, *infra.*
99.    Singer Merits Report Part III.D.

accepted standards for developing that software…The software that runs MyFordTouch is *brittle, fundamentally unstable, and complex.*

Ford is aware of these defects….However, Ford has not fixed these known defects in the software before selling or leasing you a car with MyFordTouch, and does not know if it can or will ever fix all of the defects.

The defects in MyFordTouch *will have a negative impact on you as a consumer when you use it*…Ford is selling you MyFordTouch for a premium even though Ford does not know if it will fix all of the defects in the software in the future.[100]

46.    Mr. Boedeker's mock disclosure statements appear crafted to obtain the desired result. As seen above, survey respondents were told that they were *guaranteed* to experience defects that "*will* have a negative impact on you as a consumer when you use it."[101] I am not aware of any effort by Plaintiffs to establish that the Alleged Defects had a perceived "negative impact" on *all* Class Members. (For example, Dr. Arnold assumes only that the Challenged Conduct created a "substantial probability of MyFord Touch malfunction," not a guaranteed malfunction).[102] This is significant because, if this (or any other aspect of Mr. Boedeker's mock disclosure statement) is found to be untrue, Mr. Boedeker's damages estimates collapse. Mr. Boedeker's Phase 2 data cannot tell him how his respondents would have reacted to a revised disclosure statement.

47.    The mock disclosure statements create additional bias by including only negative information about the MFT (and only including it in the mock disclosure statement, while providing purchasers no information in the initial questioning about public criticisms of the MFT). This negative-information-only disclosure is inconsistent with record evidence from

---

100.  Reliance materials to Boedeker Merits Report (emphasis added).
101.  *Id.* (emphasis added).
102.  Arnold Merits Report ¶¶18-24; ¶31.

contemporaneous Ford documents indicating that a majority of Class Members was satisfied with the MFT, while a substantial majority would be likely to recommend the MFT to others.[103] Indeed, Plaintiffs' own human factors expert found that 14 of his 24 subjects in a driving study were either satisfied or very satisfied with the MFT, while five were neutral, and only five were unsatisfied or very unsatisfied (notwithstanding the criticisms of this study by Drs. Rauschenberger and Wood).[104] Again, Mr. Boedeker's analysis collapses if there is any material flaw in the information given to (or withheld from) either the control group (to whom Mr. Boedeker provided no information, even though purchasers regularly research public information prior to purchase and lease decisions) or the disclosure group (to who, Mr. Boedeker provided incomplete information that omits favorable evidence on the likely functionality of the MFT).

48.     The mock disclosure statements create further bias by selectively disclosing only alleged problems with the MFT. Respondents were not informed that information and entertainment systems released by Ford's competitors reportedly suffered from a variety of defects, as noted below. The performance of competing systems provides an obvious benchmark for assessing the expected future performance of the MFT at the point of purchase. Reviews of competing systems published *after* the Class Period frequently mention defects similar to those alleged by Plaintiffs for the MFT. This indicates that problems similar in kind to

---

103. Singer Merits Report Part III.B.
104. Craig Rosenberg, Ph.D., "Human Factors Evaluation of MyFord Touch," (August 1, 2016) Exhibit 24, Q10; Exhibit 26 (showing response data).

the Alleged Defects are both common and persistent in the industry.[105] Reviewer complaints regarding competing systems include:

- "Touchscreen is slow to react" (Cadillac Cue)
-  "Very slow start-up time" (Volkswagen RNS)
- "Buggy, stuttered operation" (Apple CarPlay)
- "Unresponsive and balky...touchscreen" (Toyota Entune)
- "[T]ouch screen works only when the vehicle is stopped…voice-recognition system often misunderstands commands." (Mazda Connect)
-  "[S]uffers from a slew of stability issues." (Infiniti InTouch)
-  "[T]ouchscreen requires a great deal of pressure to produce an accurate input. The icons are also small and cluttered, making it difficult—and potentially dangerous—to operate while the vehicle is in motion." (AcuraLink)
- "Due to its limited surface area and slow-witted nature, accurate inputs with the touchpad are difficult to come by—regardless of your skill level." (Lexus Enform)
-  "simple requests like displaying current track info, returning to the home screen, or scanning for radio stations have become a multi-step process." (BMW iDrive)

## 2. Mr. Boedeker Fails To Construct A Valid Control Group Against Which To Compare The Effects Of Disclosure

49.     Mr. Boedeker's economic loss estimates of $910 and $1,290 are derived by comparing (1) respondents that received Mr. Boedeker's misleading disclosure statements with (2) respondents that received no disclosure whatsoever. The latter can be thought of as the "control group" in Mr. Boedeker's analysis. Even setting aside the fatal flaws in Mr. Boedeker's disclosure statement discussed above, the very fact that certain respondents are receiving a disclosure about the MFT sends a clear signal that the Alleged Defects MFT are substantially

---

105. *See, e.g.,* Jodi Lai, "The best and worst infotainment systems in the industry," *Driving* (April 14, 2014), available at http://driving.ca/chrysler/auto-news/news/the-best-and-worst-infotainment-systems-in-the-industry; Consumer Reports, Brand-by-Brand Guide to Car Infotainment Systems," (June 2, 2016), available at http://www.consumerreports.org/cars/infotainment-system-brand-by-brand-guide/; "Infotainment System Reviews," *Digital Trends*, (2015) available at http://www.digitaltrends.com/infotainment-system-reviews/; Zach Vlasuk, "Luxury Car Infotainment Buyer's Guide," *Kelly Blue Book* (November 3, 2015), available at http://www.kbb.com/car-news/all-the-latest/luxury-car-infotainment-systems-compared/2000012622/

-33-

worse than what a reasonable consumer would expect from the baseline rate of defects. Studies of consumer decision-making have found that "individuals tend to overestimate risks that are brought to their attention."[106] This means that Mr. Boedeker failed to construct a valid control group against which to compare the effects of disclosure. At a minimum, Mr. Boedeker's control group should have been constructed to ensure that it is the *content* of the disclosure, as opposed to the act of disclosure itself, that drives any economic loss estimates. Mr. Boedeker does not appear to have recognized this problem when he designed his study.

50.     In addition, because all respondents purchased MFT-equipped vehicles, the mock disclosure statements could have also have misled respondents into believing that they were being asked about an MFT system that was more deeply flawed than the system with which they were familiar. Stated differently, the control group (which received no disclosure) would have based their answers on (often years of) actual knowledge and experience with the MFT. In contrast, the mock disclosure statement could be interpreted as signaling the existence of *new* defects, *beyond* any problems respondents had actually experienced. This would exacerbate the artificial divergence between the control group and respondents exposed to the mock disclosure. Again, Mr. Boedeker does not appear to have recognized this problem when he designed his study.

---

106. *See* Mark A. Geistfeld, *Product Liability*, in MICHAEL FAURE, TORT LAW AND ECONOMICS: ENCYCLOPEDIA OF LAW AND ECONOMICS 292 (Edward Elgar 2nd ed. 2009). *See also* DANIEL KAHNEMAN, PAUL SLOVIC & AMOS TVERSKY, JUDGMENT AND UNCERTAINTY: HEURISTICS AND BIASES (Cambridge University Press 1982). *See also* Expert Rebuttal Report of Chris Wood (September 8, 2016), at 3-4.

**E.  Mr. Boedeker's Phase 1 and Phase 2 Data Continue to Confirm That The Challenged Conduct Had *No Negative Effect* On Value Received**

51.     As I have explained previously, my analysis of Mr. Boedeker's Phase 1 data shows that respondents with real-life exposure to the MFT (and thus to the risk of experiencing the Alleged Defects, if they exist) are actually willing to pay *more* for the MFT than those without such exposure.[107] If the Base Software of MFT really was "deeply flawed and materially defective in a way that materially affected consumers,"[108] as Plaintiffs have alleged, then the survey respondents described in Mr. Boedeker's Merits Report—all of whom purchased an MFT-equipped vehicle—should assign a diminished value to the MFT relative to respondents who never had such exposure. Yet according to Mr. Boedeker's own survey data, those with first-hand experience with the MFT actually place a *higher* value on the MFT than those without.[109]

52.     This explains why Mr. Boedeker estimated a lower WTP for the MFT in his Class Report ($939 - $1,390) than in his Merits Report ($1,836), despite the fact that both of these estimates were calculated using Phase 1 data. The Class Report is calculated from the full Phase 1 sample, in which approximately 40 percent of respondents did not purchase an MFT-equipped vehicle.[110] The Merits Report excludes all such respondents who did not own or lease an MFT-equipped vehicle—and the excluded respondents had a lower WTP for the MFT.

53.     Mr. Boedeker's Phase 2 data (comprised entirely of respondents who purchased an MFT-equipped vehicle) provide further confirmation that owners of MFT-equipped vehicles

---

107.  Singer Merits Report ¶38; Singer Class Report ¶¶116-119.
108.  Plaintiffs' Supplemental Responses to Defendant's Interrogatories (Jan. 13, 2016).
109.  Singer Merits Report ¶38; Singer Class Report ¶¶116-119.
110.  In Phase 1, Mr. Boedeker surveyed approximately 1,200 Ford and Lincoln owners. Approximately 60 percent of these respondents purchased MFT-equipped vehicles, while 40 percent did not. Singer Class Report ¶117.

place a higher value on the MFT: Mr. Boedeker's WTP estimate from Phase 2 ($1,861) is also higher than the WTP estimates in his Class Report ($939 - $1,390). Accordingly, Mr. Boedeker's own data consistently indicates that the Challenged Conduct did not negatively impact the Value Received by Class Members. To the contrary, people who have owned or leased MFT-equipped vehicles, and have experienced the system firsthand, value the MFT more highly than those without experience with the MFT.

54.    Mr. Boedeker claims that restricting his analysis to purchasers of MFT-equipped-vehicles makes his analysis conservative by causing him to underestimate economic loss.[111] Specifically, he claims that, to the extent that responses are "tainted" by negative experiences with the MFT, this would result in a lower WTP without disclosure, and hence less potential for damages via a reduced WTP after reviewing the mock disclosure.[112] This is demonstrably false. Mr. Boedeker's claim would be accurate only if respondents who did not purchase MFT-equipped vehicles exhibited a higher WTP than purchasers of MFT-equipped-vehicles. In fact, precisely the opposite is true, as explained above. Therefore, by restricting his sample to respondents that purchased an MFT-equipped vehicle (and had higher WTP for the MFT), Mr. Boedeker inflates his damages estimates and purports to show economic loss where there is none. This is evident from the substantial increase in estimated damages in Mr. Boedeker's Merits Report ($729 - $1,290 per vehicle), compared with his Class Report ($729 - $839 per vehicle).

---

111.  Boedeker Merits Report ¶73.
112.  Boedeker Merits Report ¶73.

## II. MR. BOEDEKER'S ECONOMIC LOSS MODEL REFUTES CLASSWIDE INJURY

55.    Although Mr. Boedeker focuses primarily on damages, he also opines on classwide injury, claiming that "every Ford vehicle with a defective MFT system that was sold/leased caused an economic loss."[113] As explained below, far from supporting an inference of classwide injury, Mr. Boedeker's own economic loss model actually refutes it.

56.    As I have explained previously, because the MFT is not sold on a stand-alone basis, and because vehicle prices are negotiated individually, the fact that all Class Members purchased MFT-equipped vehicles does not imply that all Class Members' had a uniform WTP for the MFT or that they paid a uniform price for the MFT.[114] My Merits Report reviewed record evidence indicating that WTP and prices for the MFT vary widely from one Class Member to the next, as well as evidence that discounts worth thousands of dollars are routine in retail automobile purchases. For this reason, classwide data and methods do not allow one to infer whether a particular Class Member paid *any* amount over $0 for the MFT. This means that it is not possible to apply a classwide method to establish that all or virtually all Class Members overpaid for the MFT (even assuming that *any* did).[115]

57.    The results of Mr. Boedeker's economic loss model confirm that this is indeed the case.[116] Figure 2 below displays the distribution of individual WTP estimates for the Phase 1 respondents that Mr. Boedeker used to calculate Result 1—which, according to Mr. Boedeker, indicates that his Phase 1 respondents are willing to pay $1,836 for the MFT. As seen below,

---

113. Boedeker Merits Repot ¶84.
114. Singer Merits Report ¶28; Part III.A; Singer Class Report ¶59.
115. Singer Merits Report ¶28; Part III.A; Singer Class Report ¶59.
116. For purposes of this section, I assume hypothetically that Mr. Boedeker's economic loss model generates reliable estimates, which allows me to explore the logical implications of this assumption. As explained above, Mr. Boedeker's economic loss model does not actually generate reliable estimates.

this is not the case: Approximately one half of Mr. Boedeker's Phase 1 respondents have a WTP below $1,836. More generally, the variation in WTP from one respondent to the next is extreme: More than 25 percent of Mr. Boedeker's Phase 1 respondents have a WTP below $729 (the "low end" of his economic loss estimates), and more than 38 percent have a WTP below $1,290 (the "high end" of his economic loss estimates).

FIGURE 2: DISTRIBUTION OF INDIVIDUAL WTP ESTIMATES FOR RESULT 1 OF MR. BOEDEKER'S ECONOMIC LOSS MODEL (PHASE 1 RESPONDENTS)



Note: Excludes the top and bottom one percent of the distribution for display purposes. The WTP for the bottom 1 percent of respondents ranges from -$8,229 to -$2,206. The WTP for the top 1 percent ranges from $26,108 to $52,919.

58. Many of the WTP estimates from Mr. Boedeker's model are economically implausible, which further highlights the unreliability of his economic loss model. For example, the WTP for the bottom 1 percent of respondents ranges from *negative* $8,229 to *negative*

$2,206. The WTP for the top 1 percent ranges from $26,108 to $52,919. (Figure 2 excludes the top and bottom 1 percent for display purposes).

59.     Large proportions of Class Members cannot be shown to have suffered the injury that Mr. Boedeker claims. For example, the 26 percent of respondents with a WTP of $715 or less cannot be shown to have suffered injury of $729; the 38 percent of respondents with a WTP of $1,250 or less cannot be shown to have suffered injury of $1,290. The 6.4 percent of respondents with *negative* WTP cannot be shown to have suffered any injury at all, even if every other flaw with Mr. Boedeker's analysis are ignored and the results are accepted at face value.

60.     More generally, Mr. Boedeker's economic loss model illustrates why it is not possible to infer classwide injury here: The large proportion of Class Members with a relatively low WTP would have faced clear incentives to negotiate discounts to reflect their relative lack of interest in the MFT. Again, this means that it is not possible to apply a classwide method to establish that all (or almost all) Class Members overpaid for the MFT.

61.     In the Appendix, I perform a similar analysis for Result 1 (Phase 2), which confirms the same patterns shown above. I also perform comparable analyses for Results 3 and 4. My analysis shows that, even after reviewing Mr. Boedeker's skewed mock disclosure statements, more than 30 percent of Mr. Boedeker's respondents had a WTP *above* $1,861— that is, *above* what Mr. Boedeker claims Class Members were willing to pay for the MFT without *any* disclosure. Even when the mock disclosure implicates safety concerns, the same result holds for 25 percent of respondents. Mr. Boedeker's economic loss model therefore refutes classwide injury, even when safety concerns are implicated.

### III. Dr. Arnold Fails To Prove Classwide Injury

62.     Dr. Arnold opines that all Class Members suffered economic injury as a result of the Challenged Conduct and that this economic harm "stems from software defects in the MyFord Touch system that Ford did not disclose [at the point of purchase]."[117] Specifically, Dr. Arnold claims that (1) as a result of the Challenged Conduct, all Class Members expected a higher value than they actually received at the point of purchase;[118] and (2) had Ford disclosed the Alleged Defects at the point of purchase, all Class Members "would not have paid the price they did pay for the MyFord Touch system."[119] As explained below, Dr. Arnold fails to demonstrate that classwide injury occurred because he fails to establish either point (1) or point (2).

### A.     Dr. Arnold Fails to Establish That All Class Members Expected a Higher Value Than They Actually Received at the Point of Purchase

63.     In attempting to establish that all Class Members received a lower value than they expected at the point of purchase as result of the Challenged Conduct, Dr. Arnold invokes an expectations-based framework; he does not consider post-purchase events. All injury in his model flows from a hypothetical risk of experiencing the Alleged Defects; whether or not a particular Class Member actually experienced any defect is irrelevant to Dr. Arnold.[120] Dr. Arnold offers a hypothetical example in which a consumer purchases a product worth $100 if it functions properly, but worth $0 if it is defective. If a consumer believes that the product is guaranteed to function properly (almost) 100 percent of the time, then she should be willing pay up to (almost) $100 for the product. However, if there is a 60 percent chance that the product is

---

117.  Arnold Merits Report ¶11; *see also* Part III.
118.  *Id.* ¶20.
119.  *Id.* ¶32.
120.  *Id.* ¶31.

defective, then the expected future value of the product is only $40 (equal to $100 x [1 – 0.6]).[121] Even if the product turns out not to be defective, the consumer is still exposed to increased risk at the point of purchase. Based on this hypothetical example, Dr. Arnold claims that *all* Class Members "suffer economic harm both because (i) the expected value (probability weighted value) from the product is lower than they bargained for and (ii) they, in effect, take on risk that they did not bargain for."[122] As explained below, these claims are based purely on assumptions; Dr. Arnold presents no evidence and performs no analysis to justify maintaining these assumptions for all (or virtually all) Class Members. To the contrary, record evidence refutes Dr. Arnold's assumptions.

64.     The fundamental flaw in Dr. Arnold's reasoning is that he has no evidence, and no basis in economics, for baldly assuming that his purely hypothetical example actually applies to any significant proportion of Class Members—let alone all (or virtually all) of them. In particular, Dr. Arnold has no basis for assuming that his simple hypothetical accurately characterizes Class Members' expectations at the point of purchase. Dr. Arnold has done no evaluation and has no evidence whatsoever on individual Class Members' expectations at the point of purchase.

65.     Record evidence invalidates Dr. Arnold's assumption that all or virtually all Class Members uniformly expected to receive significantly more value than they actually received. Plaintiffs themselves allege that "[t]he problems plaguing MyFord Touch are well known and have directly impacted Ford's reputation,"[123] owing to negative publicity in high-

---

121. *Id.* ¶¶18-20.
122. *Id.* ¶23.
123. Third Amended Class Action Complaint (September 30, 2015), ¶264.

profile media outlets such as *Consumer Reports*, the *New York Times*, and J.D. Power.[124] Dr. Arnold has done no evaluation regarding what portion of Class Members were exposed to such publicity. Dr. Arnold has no basis for assuming that all Class Members exposed to negative publicity prior to purchasing their vehicles nonetheless uniformly expected a higher value than they actually received at the point of purchase. Yet without this assumption, he has no basis to infer that all Class Members were injured.

66. Relatedly, the logic of Dr. Arnold's hypothetical also implies that Class Members, on average, should register significant disappointment with their actual experiences with the MFT, relative to their expectations at the point of purchase.[125] His assumption is contradicted by record evidence. As I have noted previously, contemporaneous Ford documents indicate that the majority of Class Members reported substantial satisfaction with the system (sufficient to recommend it to a friend), after having owned their vehicles long enough to form an opinion as to their overall satisfaction with the MFT.[126] These documents corroborate my own econometric analysis of secondary market vehicle prices, which shows that the Challenged Conduct (if it occurred at all) had no classwide effect on resale value—a fact inconsistent with the assumption underlying Dr. Arnold's opinion.[127] Finally, as noted above, Mr. Boedeker's own survey data consistently find that individuals with actual, firsthand experience with the MFT are willing to pay more for the MFT than the reported WTP of other Ford and Lincoln

---

124. *Id.* ¶9; ¶264.
125. Even under Plaintiffs' *ex ante* framework, which ignores *individual* Class Members' actual experiences with the MFT after their purchases, the value of an MFT-equipped vehicle at the point of purchase still depends on Class Members' *overall* experiences with the system, which is necessary to inform what Class Members' expectations would have been had Ford disclosed the Alleged Defects. Singer Merits Report ¶43.
126. Singer Merits Report ¶¶37-38.
127. Singer Merits Report ¶¶46-47.

owners who do not actually have ownership or lease experience with the system, which further refutes Dr. Arnold's assumption that the actual owners were injured.[128]

**B.    Dr. Arnold Fails To Establish That All Class Members Would Have Paid Less for the MFT Under Disclosure**

67.    Dr. Arnold also assumes that, if Ford had disclosed the Alleged Defects at the point of purchase, all or virtually all Class Members "would not have paid the price they did pay for the MyFord Touch system."[129] As before, Dr. Arnold has no evidence, and no basis in economics, for claiming that this assumption is valid for all or virtually all Class Members. Dr. Arnold's assumption is not even valid in his own hypothetical example.

68.    To see this, recall that Dr. Arnold's hypothetical involved a consumer purchasing a product that is worth at most $100 to her if it functions properly and $0 if defective. In his artificial example, without disclosure, the consumer believes that that the probability of a defective product is low (close to zero); in reality, the product is defective 60 percent of the time.[130] Therefore, in the absence of disclosure, the consumer would be willing to spend up to (almost) $100 for the product; if the defect were disclosed, the consumer would have been willing to spend at most $40.

69.    Under Dr. Arnold's hypothetical, $100 represents the "consumer's enjoyment or value of a given product."[131] It is the *maximum* amount she would be willing to pay—not necessarily the amount that she *actually* pays. In general, the price paid in the absence of disclosure will be significantly less than $100: As a matter of economics, a consumer that pays

---

128.    *See* Part I.E, *supra*.
129.    Singer Merits Report ¶¶32.
130.    Arnold Merits Report ¶¶18-20.
131.    Arnold Merits Report ¶19 ("Suppose a consumer's enjoyment or value of a given product, when measured in monetary terms, is $100.").

a price exactly equal to her maximum willingness-to-pay does not derive any benefit from the transaction. The benefit (or "consumer surplus") accrues only when the price is below her maximum WTP.[132] The gap between her maximum WTP and the actual price paid depends on the particular circumstances of the individual consumer (especially when prices are negotiated individually, as in the retail automobile market).

70.     Because of this, one cannot reasonably assume, let alone conclude with any reasonable degree of certainty, that Dr. Arnold's hypothetical consumer would have paid less under disclosure than she paid without any disclosure. For example, suppose that Customer A and Customer B are both willing to pay up to $100, but that Customer B is a more aggressive negotiator. If Consumer A negotiated modestly and paid $75 at the point of purchase, she clearly overpaid if the product is really worth only $40. Customer A would therefore have insisted on a lower price if the potential for defects had been disclosed to her.

71.     In contrast, suppose that Customer B paid only $25 without disclosure. In this case, even after the true likelihood of defects has been disclosed, the expected future value of the product ($40) is still $15 above the price paid. Dr. Arnold has no basis for assuming individuals resembling Customer B "would not have paid the price they did pay for the MyFord Touch system."[133] After receiving the disclosure, Customer B may or may not have attempted to negotiate a price below $25. If she made no such attempt, she would simply purchase the system at a price of $25—exactly the same amount that she paid in the absence of any

---

132. For a typical standalone product, nearly all consumers will pay something less than their WTP. The difference between the WTP and the price actually paid is referred to in economics as "consumer surplus." *See, e.g.,* MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 110-18 (Irwin McGraw-Hill 3rd ed. 1998).

133. Arnold Merits Report ¶32.

disclosure. Class Member B would be uninjured under Plaintiffs' theory of harm, because she did not overpay for the MFT.

72.     Even if Class Member B did attempt to negotiate a price below $25, there is no guarantee that the dealer would have agreed to it. If the dealer did not agree, Class Member B would still have chosen to purchase the system at a price of $25, and she still would be uninjured under Plaintiffs' theory of harm, because she did not overpay for the MFT. Dr. Arnold's proof of classwide injury therefore rests on the unrealistic assumption that all or virtually all Class Members resemble Customer A—or, to the extent that any Class Members do resemble Customer B, all or virtually all of them would have successfully negotiated a lower price than they paid in the actual world. In summary, Dr. Arnold's proof cannot tolerate the existence of Class Members that paid substantially less than their maximum willingness-to-pay for the MFT, because there is no guarantee that these customers would pay any less in a but-for world with disclosure, relative to what they paid in the actual world.

73.     Dr. Arnold's embedded assumptions are refuted by elementary economic principles, according to which consumers frequently pay a price substantially below their maximum WTP.[134] His assumptions are also refuted by record evidence, which shows that prices for the MFT vary widely from one Class Member to the next, and that it is not possible to infer whether any particular Class Members paid any amount above $0 for the MFT.[135] Despite this, Dr. Arnold claims to quantify "the price that Class members paid at retail for MyFord Touch systems in the Class vehicles."[136] As I have previously explained, these calculations are

---

134.  Katz & Rosen, *supra*.
135.  Singer Merits Report ¶28; Part III.A; Singer Class Report ¶59.
136.  Arnold Merits Report ¶34.

PRIVILEGED AND CONFIDENTIAL

not economically meaningful.[137] Class Members did not pay uniform prices for the MFT, just as they did not pay uniform prices for their vehicles. The "prices" that Dr. Arnold calculates are, from Class Members' perspective, an accounting fiction; Class Members were not even cognizant of Dr. Arnold's "prices" at the time that they purchased their vehicles. Class Members could not have compared the expected future value of the MFT system to a price that was invisible to them.[138]

74. As noted above, Dr. Arnold's proof of classwide injury requires that all Class Members paid close to their maximum WTP for the MFT. But in the real world of retail vehicle price negotiations, car buyers employ a variety of strategies and negotiating tactics to obtain their desired vehicle at the lowest possible price. For example, car buyers may use information from the Internet to gain better insight into dealer profit margins, or to identify points in time when a particular vehicle is in high supply or low demand, prompting dealers to accept discounts to move inventory (e.g., end-of-month sales quotas and incentives).[139] In economic

---

137. Singer Merits Report ¶¶28-30; Singer Class Report ¶¶54-56.

138. Dr. Arnold claims that it is "economic sophistry" to point out that his calculations lack any economic content, and that "[i]f one were to accept such a theory, then no bundled component could ever be the subject of a deceptive trade practice litigation." Arnold Merits Report ¶47. This is incorrect. What makes it impossible to reliably quantify the amount paid by Class Members for the MFT is the unusual combination of (1) bundling; (2) individualized retail negotiations; and (3) wide variation in retail prices paid, with Class Members routinely receiving discounts larger than Dr. Arnold's and Mr. Boedeker's own estimates of the value of the MFT.

139. *See*, *e.g.*, http://www.car-buying-strategies.com/car-buying.html (advising car buyers that "Dealer prices are full of hidden profits that are often times not passed on to the customer," and suggesting various strategies for obtaining a lower price); *see also* http://www.negotiationdynamics.com/Newcar.asp (laying out various steps that car buyer can take when "Planning the Negotiation for Your New Car."); *see also* http://www.autoblog.com/2009/11/25/end-of-month-car-buying/ (noting that "the sales staff at most car dealerships generally operate on a quota system, where they receive an incremental bonus (otherwise known as a spiff) each time they hit their next sales 'mark' for that month.

terms, some individuals are more willing than others to incur the "search costs" associated with finding the best possible deal, leading to dispersion in the retail prices paid by customers.[140]

75.    To illustrate the degree of variation in the real world of vehicle retail pricing, consider the Lincoln Front-Wheel Drive MKX. I compiled retail-pricing data from TrueCar (an automotive pricing and information website that publishes data on actual retail transactions). As shown in the Appendix, although this model has an MSRP of $39,435, there is wide variation in retail prices paid by customers. For example, transaction prices in the Phoenix area ranged from $35,325 to $38,125. In the Denver area, transaction prices ranged from $35,428 to $39,004. Nationwide, transaction prices ranged from $34,696 to $39,668. These data confirm what many car buyers know from experience: Retail purchase prices can easily differ by multiple thousands of dollars, even for the same model-year sold with the same options, sold within the same geographic area within the same timeframe.

76.    Dr. Arnold's calculations ignore all variation in retail pricing. Rather, he assumes that the prices paid by Class Members for the MFT can be estimated reliably by assuming that Class Members paid 93 percent of MSRP of the MFT.[141] Dr. Arnold's calculations are not specific to the MFT; no Class Member paid a separate MSRP for the MFT, as it was not available as a standalone option.[142] Instead, he relies on rough averages *for entire vehicles* derived from (1) calculations from dealer profit margins; and (2) average industry-wide

---

So, if a car dealer is coming up on the end of the month and he's a few cars short of that next spiff, he or she usually has an incentive to get the sales manager to knock down the price of a car in order to hit that quota.")

140.  *See, e.g.,* Girish Punj & Richard Staelin, *A Model of Consumer Information Search Behavior for New Automobiles* 9(4) JOURNAL OF CONSUMER RESEARCH 366 – 80 (1983).

141.  Arnold Merits Report ¶40.

142.  Singer Merits Report ¶¶35-36; Singer Class Report ¶¶51-56

discounts reported by sources such as Edmunds and TrueCar.[143] These calculations cannot reliably estimate the amount that Class Members paid for the MFT.

77. 

Again, these calculations cannot reliably estimate the amount that Class Members paid for the MFT.

78. Even if Dr. Arnold's estimates of the prices paid by Class Members were accurate, when combined with Mr. Boedeker's economic loss estimates, they would imply either that classwide injury is absent, or that damages are vastly overstated by both Mr.

---

143. Boedeker Merits Report ¶¶40-44.
144. Arnold Merits Report ¶38.
145. Singer Merits Report ¶¶35-36; Singer Class Report ¶¶51-56. *See also* 30(b)(6) Deposition of Dennis Curlew (December 15, 2015) [hereinafter "Curlew Dep."] at 41:10-42:23 ("Q But what shouldn't vary is the WSD amount for the component? A The equipment value. MR. EDWARDS: Objection. You can answer. THE WITNESS: Okay. The equipment value doesn't vary. The actual price that we charge could vary. The equipment master list isn't my start point for all the pricers. We will start with that, and then we will do our analysis and our competitive positioning to determine what our end prices are. So we'll have -- we will realign that, positive or negative. Potentially we could realign that price that we were using. But it's done on a vehicle line basis. It is not done necessarily on a component basis. But we build up the components, and then we decide what the right prices are on the vehicle line. *Because we're selling vehicles. We're not selling necessarily a, you know, component within that vehicle. We are selling the total vehicle. And we do the same thing with option packages*.") (emphasis added).

Boedeker and Dr. Arnold. In particular, note that Mr. Boedeker claims that Class Members' post-disclosure WTP is between $571 and $951 (depending on whether safety concerns are implicated). These estimates reflect WTP for the MFT system by itself, without navigation or rearview camera.[146] Yet Dr. Arnold estimates that Class Members paid approximately ████████ ████████████████████ Therefore, if safety concerns are not implicated, then the combined results of Mr. Boedeker and Dr. Arnold imply that Class Members paid ████████ ████████████████████████████ This means that injury cannot be inferred for these Class Members, as explained above. Even if safety concerns are implicated, the combined results imply that Class Members paid only ████████████ ████████████████████ which means that the both experts vastly overstate damages.

## IV. DR. ARNOLD'S ANALYSIS DOES NOT SUPPORT ANY DAMAGES ESTIMATE ABOVE $0

79.     Dr. Arnold purports to quantify damages from purported economic harm to Class Members using methods devoid of economics. As explained below, Dr. Arnold's estimates provide no economically meaningful basis for quantifying damages. Therefore, Dr. Arnold's damages analysis does not support any classwide damages estimate above $0.

80.     Dr. Arnold performs two sets of calculations. First, he claims to "quantify the per-vehicle revenue that Ford received from the sale of MyFord Touch systems in the Class

---

146. As noted above, Mr. Boedeker's CBC model includes four different attributes. The attributes are (i) seating options, (ii) rear camera, (iii) GPS, and (iv) SYNC w/ MFT. His WTP and economic loss estimates apply to (iv) only. *See* Boedeker Merits Report ¶59.

147. Arnold Merits Report, Table 5. Although Dr. Arnold does not estimate the amount paid for the MFT without navigation or rearview camera, this would presumably be even lower than the range that he calculates ($601-$635).

vehicles."[148] Second, he claims to "quantify the price that Class members paid at retail for MyFord Touch systems in the Class vehicles." [149] Dr. Arnold "compute[s] the average revenue received by Ford for the sale or lease of a MyFordTouch system in a Class Vehicle ███████ ████████████████████████████████████████████████████████████"[150] In addition, assuming that the MFT has zero value at the point of purchase, he "compute[s] the average economic loss suffered by Class members at the time they purchased or leased a Class Vehicle at ██████████████████████████████████████████████████████[151]

81.     Dr. Arnold's damages calculations assume that all Class Members are entitled a full refund; the calculations embed the untenable assumption that not a single Class Member would have paid more than $0 for the MFT if the Alleged Defects had been disclosed at the point of purchase.[152] As a matter of economics, Dr. Arnold's proposed damages calculations necessarily assume that the MFT would be uniformly worthless to all Class Members if the Alleged Defects had been disclosed at the point of purchase.

82.     Dr. Arnold does not have any evidence, or any basis in economics, to support this extreme and unrealistic assumption. His assumption is contradicted by extensive record evidence already reviewed above, including contemporaneous Ford documents indicating that the majority of Class Members perceived the Value Received to be substantial (after acquiring real world experience using MFT), my own econometric analysis of secondary market prices, and my analysis of Mr. Boedeker's survey data. In addition, Dr. Arnold's approach to damages

---

148. *Id.* ¶34.
149. *Id.* ¶34.
150. *Id.* ¶50.
151. *Id.* ¶50.
152. *Id.* ¶48.

also directly contradicts Mr. Boedeker's; according to Mr. Boedeker's estimates, Class Members' post-disclosure WTP for the MFT is between $571 and $951.[153]

83.    Dr. Arnold claims that his extreme and unrealistic assumption is justified because "injury from the misrepresentation and/or sale of the defective MyFord Touch system occurs at the time of purchase."[154] This is a non sequitur. The fact that the injury occurs at the point of purchase does *not* allow one to conclude that the severity of the injury somehow rendered the MFT worthless to all Class Members. This can be seen in Dr. Arnold's own hypothetical example: In that example, disclosure of the defects does not reduce the value of the product to at the point of purchase to $0. Instead, value at the point of purchase is reduced from (approximately) $100 to $40.[155] Thus, if Dr. Arnold's own damages methodology were applied to his own hypothetical, damages would be estimated at (approximately) $100, which vastly overstates the economic harm implied by his own example.

84.    Dr. Arnold claims that he could "easily" modify his damages calculations to allow for the possibility that Class Members received some value greater than $0 at the point of purchase,[156] yet he performs no such calculation in his Merits Report. He speculates that he could do so by "comput[ing] the economic life of the vehicles at issue and determin[ing] what

---

153.  Mr. Boedeker has also testified to this effect. Boedeker Class Dep. 40:2-16 ("Q. Okay. Would you, therefore, disagree with somebody who said that damages in this case must be an either/or proposition, either 100 percent of the price paid for the MyFord Touch or zero percent of the price paid for the MyFord Touch? A. Would I agree or disagree either way? Q. It's either way. A. Either way. I mean, that statement in itself would probably have to be backed up by something. But again, in my experience, working in statistics, econometrics, and dealing with these issues, there is some derived utility. So therefore, that either/or is probably something that I would not agree with.")

154. *Id.* ¶48.

155. *Id.* ¶¶18-20.

156. *Id.* ¶48.

portion of the economic life was used during the presence of the defect."[157] Such a calculation would depend on individualized factors, such as the point in time at which each Class Member upgraded to a given software version, and the mileage of each Class Vehicle when the upgrade was performed. Dr. Arnold provides no hint as to how he would accurately perform this calculation using classwide data and methods. Even if he could, the calculation would not answer the relevant economic question: It would not allow Dr. Arnold to quantify the extent to which Class Members would have paid a reduced price, had the Alleged Defects had been disclosed at the point of purchase.

## CONCLUSIONS

85.     For the reasons given above, I continue to conclude that there is no evidence of classwide injury, and that the most reliable estimate of aggregate damages under Plaintiffs' theory of harm that can be gleaned from the available classwide evidence and methods is $0.

◆     ◆     ◆

Hal J. Singer

September 8, 2016

---

157. *Id.*

## APPENDIX 1: MATERIALS RELIED UPON

**DEPOSITIONS**

Deposition of Jonathan Arnold (February 10, 2016)

Deposition of Stefan Boedeker (February 23, 2016)

Deposition of Dennis Curlew (December 15, 2015)

**LITERATURE**

Jiwoon Ahn, Gicheol Jeong, & Yeonbae Kim, *A forecast of household ownership and use of alternative fuel vehicles: A multiple discrete-continuous choice approach*, 30 ENERGY ECONOMICS 2091 – 2104 (2007)

Colin Camerer and Robin Hogarth, *The Effects of Financial Incentives in Experiments: A Review and Capital-Labor-Production Framework*, 19 (1–3) JOURNAL OF RISK AND UNCERTAINTY 7–42 (1999)

Kevin Caves & Hal Singer, *Econometric Tests for Analyzing Common Impact*, in THE LAW AND ECONOMICS OF CLASS ACTIONS: 26 RESEARCH IN LAW AND ECONOMICS 135-160 (James Langenfeld, ed., Emerald Publishing 2014)

Peter Diamond and Jerry Hausman, *Contingent Valuation: Is Some Number Better Than No Number?* 8 (4) JOURNAL OF ECONOMIC PERSPECTIVES 45–64 (1994)

Min Ding, Rajdeep Grewal, and John Liechty, *Incentive-Aligned Conjoint Analysis*, XLII JOURNAL OF MARKETING RESEARCH 67-82 (Feb 2005)

Min Ding, *An Incentive-Aligned Mechanism for Conjoint Analysis*, XLIV JOURNAL OF MARKETING RESEARCH 214-223 (May 2007)

Mark A. Geistfeld, *Product Liability*, in MICHAEL FAURE, TORT LAW AND ECONOMICS: ENCYCLOPEDIA OF LAW AND ECONOMICS (Edward Elgar 2nd ed.) 292 (2009)

Kamel Jedidi, Sharan Jagpal, & Puneet Manchanda, *Measuring Heterogeneous Reservation Prices for Product Bundles* 22(1) MARKETING SCIENCE (2003) 107-130

DANIEL KAHNEMAN, PAUL SLOVIC & AMOS TVERSKY, JUDGMENT AND UNCERTAINTY: HEURISTICS AND BIASES (Cambridge University Press 1982)

MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 110-18 (Irwin McGraw-Hill 3rd ed. 1998)

PRIVILEGED AND CONFIDENTIAL

Kenneth Lebeau, Joeri Van Mierlo, Philippe Lebeau, Olivier Mairesse, & Cathy Macharis, *The market potential for plug-in hybrid and battery electric vehicles in Flanders: A choice-based conjoint analysis*, 17 TRANSPORTATION RESEARCH PART D 17 592–597 (2012)

John List, *Do Explicit Warnings Eliminate the Hypothetical Bias in Elicitation Procedures? Evidence from Field Auctions for Sportscards,* 91(5) AMERICAN ECONOMIC REVIEW 1498–1507 (2001)

Daniel McFadden, *A Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275–297

Bryan K. Orme, Mark I. Alpert, and Ethan Christensen, "Assessing the Validity of Conjoint Analysis -Continued," *Sawtooth Software Research Paper Series* (1997)

Girish Punj and Richard Staelin, *A Model of Consumer Information Search Behavior for New Automobiles* 9(4) JOURNAL OF CONSUMER RESEARCH 366 – 80 (1983)

Robin Segal, *Forecasting the market for electric vehicles in California using conjoint analysis* 16(3) ENERGY JOURNAL 89 – 111 (1995)

**TRIAL MATERIALS/BATES DOCUMENTS**

Third Amended Class Action Complaint (September 30, 2015)

Plaintiffs' Supplemental Responses to Defendant's Interrogatories (January 13, 2016)

Plaintiffs' Motion For Class Certification (January 28, 2016)

Damages Expert Report of Jonathan I. Arnold, Ph.D (August 1, 2016)

Revised Expert Report of Stefan Boedeker (January 7, 2016)

Rebuttal Expert Report of Stefan Boedeker (April 29, 2016)

Merits Report of Stefan Boedeker (August 1, 2016)

Boedeker Workpapers

Boedeker Empirical Study Phase 1 Survey

Boedeker Empirical Study Phase 2 Survey

Craig Rosenberg, Ph.D., "Human Factors Evaluation of MyFord Touch," (August 1, 2016)

Expert Report of Hal J. Singer, Ph.D (March 15, 2016)

Expert Merits Report of Hal J. Singer, Ph.D (August 1, 2016)

Expert Rebuttal Report of Chris Wood (September 8, 2016).

PUBLICLY AVAILABLE MATERIALS

Jodi Lai, "The best and worst infotainment systems in the industry," *Driving* (April 14, 2014), available at http://driving.ca/chrysler/auto-news/news/the-best-and-worst-infotainment-systems-in-the-industry

Jamie Lendino, "Ford Sync (With MyFord Touch)," *PC Magazine* (May 14, 2012), available at http://www.pcmag.com/article2/0,2817,2404249,00.asp

Zach Vlasuk, "Luxury Car Infotainment Buyer's Guide," *Kelly Blue Book* (November 3, 2015), available at http://www.kbb.com/car-news/all-the-latest/luxury-car-infotainment-systems-compared/2000012622/

*Before The Copyright Royalty Board, Library Of Congress, In The Matter Of Determination Of Rates And Terms For Digital Performance In Sound Recordings And Ephemeral Recordings (Web IV)* (Docket No. 14-CRB-0001-WR), Testimony of Daniel L. McFadden (October 6, 2014)

Consumer Reports, "Brand-by-Brand Guide to Car Infotainment Systems," (June 2, 2016), available at http://www.consumerreports.org/cars/infotainment-system-brand-by-brand-guide/

"Infotainment System Reviews," *Digital Trends*, available at http://www.digitaltrends.com/infotainment-system-reviews/

http://www.autoblog.com/2009/11/25/end-of-month-car-buying/

http://www.car-buying-strategies.com/car-buying.html

http://www.negotiationdynamics.com/Newcar.asp

https://www.truecar.com/

## APPENDIX 2: CURRICULUM VITAE

**Office Address**

  Economists Incorporated
  2121 K Street, NW
  Suite 1100
  Washington, DC 20037
  Phone:  (202) 747-3520
  singer.h@ei.com

**Education**

  Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
  B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor
  Scholar (full academic scholarship). Senior Scholar Prize in Economics, 1994.

**Current Position**

  ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-present.

  GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington,
  D.C.: Senior Fellow, 2016-present.

  GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF
  BUSINESS, Washington, D.C.: Adjunct Professor, 2010, 2014.

**Employment History**

  NAVIGANT ECONOMICS, Washington, D.C.: Managing
  Director, 2010-2013.

  EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and
  President, 2008-2010.

  CRITERION ECONOMICS, L.L.C., Washington, D.C.:
  President, 2004-2008. Senior Vice President, 1999-2004.

  LECG, INC., Washington, D.C.: Senior Economist, 1998-99.

  U.S. SECURITIES AND EXCHANGE COMMISSION,
  OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.:  Staff
  Economist, 1997-98.

PRIVILEGED AND CONFIDENTIAL

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS
DEPARTMENT, Baltimore: Teaching Assistant, 1996-98.

## Authored Books and Book Chapters

THE NEED FOR SPEED: A NEW FRAMEWORK FOR
TELECOMMUNICATIONS POLICY FOR THE 21ST
CENTURY, co-authored with Robert Litan (Brookings Press
2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with
Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE
FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE
(Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press
2012).

*Valuing Life Settlements as a Real Option*, co-authored with
Joseph R.  Mason, in LONGEVITY TRADING AND LIFE
SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision
in the U.S.-Mexico Arbitration on Telecommunications Services*,
co- authored with J. Gregory Sidak, in HANDBOOK OF
TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward
Elgar
2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE
THE INFORMATION SOCIETY, co-authored with Dan
Maldoom, Richard Marsden and J. Gregory Sidak
(Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated
ISPs (and Should We Care)?*, co-authored with Robert W.
Crandall, in ACCESS PRICING: THEORY, PRACTICE AND
EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter
eds., Elsevier Press 2005).

## Journal Articles

*On the Utility of Surrogates for Rule of Reason Cases*,
COMPETITION POLICY INTERNATIONAL (2015), co-
authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, The ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer

PRIVILEGED AND CONFIDENTIAL

2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC*

*Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co-authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co-authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

## Expert Testimony Since 2010

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.).

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n).

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.).

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board).

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission).

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Ca.).

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fl.).

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Ca.).

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission).

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation).

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. NY).

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada).

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fl.).

Michelle Downs and Laurie Jarrett v. Insight Communications Company, L.P., Civil Action No. 3:09-Cv-93-S (W.D. Ky.).

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce).

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.).

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Ca.).

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fl.).

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee).

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.).

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission).

In Re Florida Cement and Concrete Antitrust Litigation, Master Docket No. 09-23493-Civ-Altonaga/Brown (S.D.Fl.).

Karen Ann Ishee Parsons et al. v. Bright House Networks, Case No. CV-09-B-0267-S (N.D. Al.).

In Re Cox Enterprises, Inc. Set-Top: Cable Television Box Antitrust Litigation, Case No. 5:09-ML-02048-C (W.D.Ok.).

Review of the Regulatory Framework Relating to Vertical Integration, Broadcasting Notice of Consultation CRTC 2010-783 (Canadian Radio-television Telecommunications Commission).

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc.,. Case No. 2:06-cv-02768-MSG (E.D. Pa.).

United States, et al. v Amgen, Inc., International Nephrology Network, et al., Civ. Action No. 06-10972-WGY (D. Mass.).

Carl Blessing et al. v. SIRIUS-XM Radio, Inc., Case No. 09-cv-10035 (HB) (S.D. N.Y.).

DISH Network L.L.C., v. Comcast Corporation, Comcast SportsNet California, Inc., Case No. 16 472 E 00211 10 (American Arbitration Association).

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses or Transfer Control of Licensees, MB Docket No. 10-56 (Federal Communications Commission).

T-Mobile West Corporation v. Michael M. Crow, et al., Case No: 2:08-cv-1337 PHX-NVW (D. Az.).

Metlife Insurance Company of Connecticut and General American Life Insurance Company v. Thomas Petracek, Minnesota Estate Service, Inc., Michael J. Antonello, and Michael J. Antonenllo & Associates, Ltd., No. 08-CV-06095 DSD-FLN (D. Minn).

Tennis Channel, Inc. v. Comcast Cable Communications, LLC, File No. CSR-8258 (Federal Communications Commission).

MEMdata, LLC, v. Intermountain Healthcare, Inc., and IHC Health Services, Inc., Civil No. 2:08-cv-190 (C.D. Utah).

Caroline Behrend, et al. v. Comcast Corporation, Civil Action No. 03-6604 (E.D. Pa.).

In the Matter of Distribution of the 2000-03 Copyright Royalty Funds, Dkt. No. 2008-2 CRB CD 2000-03 (Copyright Royalty Judges).

Cindy Johnson et al. v. Arizona Hospital and Health Care Association et al., Case No. 07-01292 (SRB) (D. Az.).

**White Papers**

Good Intentions Gone Wrong: The Yet-To-Be-Recognized Costs of the Department Of Labor's Proposed Fiduciary Rule (prepared for Capital Group), co-authored with Robert Litan (July 2015).

Bringing Sanity Back to the Spectrum Debate: A Response to CCA's White Paper (prepared for Mobile Future), co-authored with Allan Ingraham (June 26, 2015).

Unlocking Patents: Costs of Failure, Benefits of Success (prepared for Patent Utility) (Feb. 4, 2015).

The Consumer Benefits of Efficient Mobile Number Portability Administration (prepared for Neustar) (Mar. 8, 2013).

Economic Analysis of the Implications of Implementing EPA's Tier 3 Rules (prepared for Emissions Control Technology Association), co-authored with George Schink (June 14, 2012).

Are Google's Search Results Unfair or Deceptive Under Section 5 of the FTC Act? (prepared for Google), co- authored with Robert Litan (May 1, 2012).

Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines (prepared for Novartis), co-authored with Kevin Caves (July 13, 2011).

Are U.S. Wireless Markets Effectively Competitive? A Critique of the FCC's 14th and 15th Annual Wireless Competition Reports (prepared for AT&T), co-authored with Gerald R. Faulhaber, Robert W. Hahn (July 11, 2011).

Do Group Purchasing Organizations Achieve the Best Prices for Member Hospitals? An Empirical Analysis of Aftermarket Transactions (prepared for Medical Device Manufacturers Association), co-authored with Robert Litan (Oct. 6, 2010).

The Economic Impact of Broadband Investment (prepared for Broadband for America), co-authored with Robert Crandall (Feb. 23, 2010).

Why the iPhone Won't Last Forever and What the Government Should Do to Promote Its Successor (prepared for Mobile Future), co-authored with Robert Hahn (Sept. 21, 2009).

The Economic Impact of Eliminating Preemption of State Consumer Protection Laws (prepared for the American Bankers' Association), co-authored with Joseph R. Mason (Aug. 21, 2009).

Economic Effects of Tax Incentives for Broadband Infrastructure Deployment (prepared for the Fiber to the Home Council), co-authored with Jeffrey Eisenach and Jeffrey West (Dec. 23, 2008).

The Effect of Brokered Deposits and Asset Growth on the Likelihood of Failure (prepared for Morgan Stanley, Citigroup, and UBS), co-authored with Joseph Mason and Jeffrey West (Dec. 17, 2008).

Estimating the Benefits and Costs of M2Z's Proposal: Reply to Wilkie's *Spectrum Auctions Are Not a Panacea* (prepared for CTIA), co-authored with Robert W. Hahn, Allan T. Ingraham and J. Gregory Sidak (July 23, 2008).

Irrational Expectations: Can a Regulator Credibly Commit to Removing an Unbundling Obligation? AEI-Brookings Related Publication No. 07-28, co-authored with Jeffrey Eisenach (Dec. 30, 2007)

Is Greater Price Transparency Needed in The Medical Device Industry? (prepared for Advanced Medical Technology Association), co-authored with Robert W. Hahn (Nov. 30, 2007).

Should the FCC Depart from More than a Decade of Market-Oriented Spectrum Policy? Reply to Skrzypacz and Wilson (prepared for CTIA), co-authored with Gerald Faulhaber and Robert W. Hahn (Jun. 18, 2007).

Improving Public Safety Communications: An Analysis of Alternative Approaches (prepared for the Consumer Electronics Association and the High Tech DTV Coalition), co-authored with Peter Cramton, Thomas S. Dombrowsky, Jr., Jeffrey A. Eisenach, and Allan Ingraham (Feb. 6, 2007).

The Budgetary Impact of Eliminating the GPOs' Safe Harbor Exemption from the Anti-Kickback Statute of the Social Security Act (prepared for the Medical Device Manufacturers Association) (Dec. 20, 2005).

Reply to "The Life Settlements Market: An Actuarial Perspective on Consumer Economic Value" (prepared for Coventry First), co-authored with Eric Stallard (Nov. 15, 2005).

The Competitive Effects of Telephone Entry into Video Markets (prepared for the Internet Innovation Alliance), co-authored with Robert W. Crandall and J. Gregory Sidak (Nov. 9, 2005).

How Do Consumers and the Auto Industry Respond to Changes in Exhaust Emission and Fuel Economy Standards? A Critique of Burke, Abeles, and Chen (prepared for General Motors Corp.), co-authored with Robert W. Crandall and Allan T. Ingraham (Sept. 21, 2004).

Inter-City Competition for Retail Trade in North Texas: Can a TIF Generate Incremental Tax Receipts for the City of Dallas? (prepared for Harvest Partners), co-authored with Thomas G. Thibodeau and Allan T. Ingraham (July 16, 2004).

An Accurate Scorecard of the Telecommunications Act of 1996: Rejoinder to the Phoenix Center Study No. 7 (prepared for BellSouth), co-authored with Robert Crandall (Jan. 6, 2004).

Competition in Broadband Provision and Implications for Regulatory Policy (prepared for the Alcatel, British Telecom, Deutsche Telekom, Ericsson, France Telecom, Siemens, Telefónica de España, and Telecom Italia), co- authored with Dan Maldoom, Richard Marsden, and Gregory Sidak (Oct. 15, 2003).

The Effect of Ubiquitous Broadband Adoption on Investment, Jobs, and the U.S. Economy (prepared for Verizon), co-authored with Robert W. Crandall (Sept. 17, 2003).

The Deleterious Effect of Extending the Unbundling Regime on Telecommunications Investment (prepared for BellSouth), co-authored with Robert W. Crandall (July 10, 2003).

Letter Concerning Spectrum Auction 35 to the Honorable Michael K. Powell, Chairman, Federal Communications Commission, from Peter C. Cramton, Robert W. Crandall, Robert W. Hahn, Robert G. Harris, Jerry A. Hausman, Thomas W. Hazlett, Douglas G. Lichtman, Paul W. MacAvoy, Paul R. Milgrom, Richard Schmalensee, J. Gregory Sidak, Hal J. Singer, Vernon L. Smith, William Taylor, and David J. Teece (Aug. 16, 2002).

## Speaking Engagements

*DOL Rule Analysis and FSR's SIMPLE PTE Explained,* FINANCIAL SERVICES ROUNDTABLE, Washington, D.C., Aug. 6, 2015.

*New Principles for a Progressive Broadband Policy,* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Mar. 13, 2014.

*The Open Internet: Where Do We Go From Here?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Jan. 29, 2014.

*Does Platform Competition Render Common Carriage Irrelevant in an IP world?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C. Nov. 20, 2013.

*The 41st Research Conference on Communication, Information and Internet Policy*, TELECOMMUNICATIONS POLICY

RESEARCH CONFERENCE, George Mason University School of Law, Arlington, VA, September 27, 2013.

*The Broadband Technology Explosion: Rethinking Communications Policy for a Mobile Broadband World*, Pepperdine School of Public Policy, Menlo Park, CA. June 20, 2013.

*Net Neutrality: Government Overreach or the Key to Innovation?*, NORTHWESTERN JOURNAL OF TECHNOLOGY AND INTELLECTUAL PROPERTY EIGHTH ANNUAL SYMPOSIUM, Chicago, IL., Mar. 8, 2013.

*Internet Everywhere: Broadband as a Catalyst for the Digital Economy*, The Brookings Institution, Washington, D.C., Nov. 27, 2012.

*Can Broadband Power an Economic Recovery?*, Advanced Communications Law & Policy Institute at New York Law School, Washington, D.C., July 10, 2012.

*Using Regression in Antitrust Cases*, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL, Philadelphia, PA., April 12, 2012.

*Mergers: The Road to Duopoly or Path to Competitive Panacea?* NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Los Angeles, CA., July 20, 2011.

*State of the Mobile Net*, CONGRESSIONAL INTERNET CAUCUS, Washington, D.C., May 27, 2011.

*Waves of Innovation: Spectrum Allocation in the Age of the Mobile Internet*, INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, Washington D.C., May 17, 2011.

*With or Without Merit, Class Certification Requires Commonality*, ABA SECTION OF ANTITRUST LAW 59TH ANNUAL SPRING MEETING, Washington, D.C., Mar. 30, 2011.

*4th Annual Future of Private Antitrust Enforcement Conference*, AMERICAN ANTITRUST INSTITUTE, Washington, D.C., Dec. 7, 2010.

*Jobs and Technology*, NEW DEMOCRATIC LEADERSHIP COUNCIL, Washington, D.C., Sept. 22, 2010.

*Regulation and Broadband*, ADVANCED COMMUNICATIONS LAW & POLICY INSTITUTE, NEW YORK LAW SCHOOL, New York, N.Y., July 14, 2010.

*13th Annual Symposium on Antitrust*, GEORGE MASON LAW REVIEW, Washington, D.C., Feb. 4, 2010.

*Broadband Infrastructure and Net Neutrality*, ADVISORY COMMITTEE TO THE CONGRESSIONAL INTERNET CAUCUS' STATE OF THE NET, Washington, D.C., Jan. 22, 2010.

*The Consequences of Net Neutrality Regulations*, AMERICAN CONSUMER INSTITUTE CENTER FOR CITIZEN RESEARCH, Washington, D.C., Nov. 19, 2009.

*Wireless Innovation Luncheon*, MOBILE FUTURE, Washington, D.C., Nov. 3, 2009.

*Second Life Settlements & Longevity Summit*, INSURANCE-LINKED SECURITIES & LIFE SETTLEMENTS, New York, N.Y., Sept. 30, 2009.

*Perspectives on Investment and a National Broadband Plan*, AMERICAN CONSUMER INSTITUTE, Washington, D.C., Sept. 4, 2009.

*Markets and Regulation: How Do We Best Serve Customers?*, Wireless U. Communications Policy Seminar, UNIVERSITY OF FLORIDA PUBLIC UTILITY RESEARCH CENTER, Tampa, FL., Nov. 13, 2008.

*The Price Of Medical Technology: Are We Getting What We Pay For?* HEALTH AFFAIRS BRIEFING, Washington, D.C., Nov. 10, 2008.

*Standard Setting and Patent Pools*, LAW SEMINARS INTERNATIONAL, Arlington, VA., Oct. 3, 2008.

*The Changing Structure of the Telecommunications Industry and the New Role of Regulation*, INTERNATIONAL TELECOMMUNICATIONS SOCIETY BIENNIAL CONFERENCE, Montreal, Canada, June 26, 2008.

*The Debate Over Network Management: An Economic Perspective*, AMERICAN ENTERPRISE INSTITUTE CENTER FOR REGULATORY AND MARKET STUDIES, Washington, D.C., Apr. 2, 2008.

*Merger Policy in High-Tech Industries*, GEORGE MASON UNIVERSITY SCHOOL OF LAW, Washington, D.C., Feb. 1, 2008.

*Telecommunications Symposium*, U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION, Washington, D.C., Nov. 29, 2007.

*Wireless Practice Luncheon*, FEDERAL COMMUNICATIONS BAR ASSOCIATION, Washington, D.C., Nov. 29, 2007.

*Association for Computing Machinery's Net Neutrality Symposium*, GEORGE WASHINGTON UNIVERSITY, Washington, D.C., Nov. 12, 2007.

*Regulators' AdvanceComm Summit*, NEW YORK LAW SCHOOL, New York, N.Y., Oct. 14, 2007.

*Annual Conference*, CAPACITY USA 2007, New York, N.Y., Jun. 26, 2007.

*William Pitt Debating Union*, UNIVERSITY OF PITTSBURGH, SCHOOL OF ARTS & SCIENCES, Pittsburgh, PA., Feb. 23, 2007.

*Annual Conference*, WIRELESS COMMUNICATIONS ASSOCIATION INTERNATIONAL, Washington, D.C., June 27, 2006.

*Annual Conference*, MEDICAL DEVICE MANUFACTURERS ASSOCIATION, Washington, D.C., June 14, 2006.

*Annual Conference*, ASSOCIATION FOR ADVANCED LIFE UNDERWRITING, Washington, D.C., May 1, 2006.

*Entrepreneur Lecture Series*, LAFAYETTE COLLEGE, Easton, PA., Nov. 14, 2005.

**Editorials and Magazine Articles**

*Obama's Big Ideas for Small Saves: 'Robo' Financial Advice,* WALL STREET JOURNAL, July 21, 2015, co-authored with Robert Litan.

*How the FCC Will Wreck the Internet,* WALL STREET JOURNAL, May 28, 2015

*The FCC's Incentive Auction: Getting Spectrum Right,* PROGRESSIVE POLICY INSTITUTE PAPER, Nov. 2013.

*Clash of the Titans: How the Largest Commercial Websites Got That Way,* MILKEN INSTITUTE REVIEW, Second Quarter 2013, co-authored with Robert Hahn.

*Wireless Competition: An Update,* GEORGETOWN CENTER FOR BUSINESS AND PUBLIC POLICY ECONOMIC POLICY VIGNETTES, May 3, 2012, co-authored with Robert Hahn.

*Book Review of Tim Wu's The Master Switch,* MILKEN INSTITUTE REVIEW, January 2012.

*The AT&T/T-Mobile Deal: Should We Fear Wireless Consolidation?* FORBES, June 3, 2011.

*In FCC's Report on Wireless Competition, an Agenda?,* HARVARD BUSINESS REVIEW, Apr. 15, 2011, co-authored with Gerald Faulhaber.

*Will the Proposed Banking Settlement Have Unintended Consequences?* HARVARD BUSINESS REVIEW, Mar. 29, 2010, co- authored with Joseph R. Mason.

*Should Regulators Block AT&T's Acquisition of T-Mobile?,* HARVARD BUSINESS REVIEW, Mar. 22, 2010.

*The Black Hole in America's Retirement Savings,* FORBES, Dec. 21, 2010, co-authored with Robert Litan.

*Broken Compensation Structures and Health Care Costs,* HARVARD BUSINESS REVIEW, Oct. 6, 2010, co-authored with
Robert Litan.

*Why Net Neutrality Is Bad for Business,* HARVARD BUSINESS REVIEW, Aug. 13, 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should (or Shouldn't) Do to Promote Its Successor*, MILKEN INSTITUTE REVIEW (First Quarter 2010), co-authored with Robert W. Hahn.

*Streamlining Consumer Financial Protection*, THE HILL, Oct. 13, 2009, co-authored with Joseph R. Mason.

*Foxes in the Henhouse: FCC Regulation through Merger Review*, MILKEN INSTITUTE REVIEW (First Quarter 2008), co-authored with J. Gregory Sidak.

*Don't Drink the CAFE Kool-Aid*, WALL STREET JOURNAL, Sept. 6, 2007, at A17, co-authored with Robert W. Crandall.

*The Knee-Jerk Reaction: Misunderstanding the XM/Sirius Merger*, WASHINGTON TIMES, Aug. 24, 2007, at A19, co-authored with J. Gregory Sidak.

*Net Neutrality: A Radical Form of Non-Discrimination*, REGULATION, Summer 2007.

*Telecom Time Warp*, WALL STREET JOURNAL, July 11, 2007, at A15, co-authored with Robert W. Crandall.

*Earmarked Airwaves*, WASHINGTON POST, June 27, 2007, at A19, co-authored with Robert W. Hahn.

*Not Neutrality*, NATIONAL POST, Mar. 29, 2007, at FP19.

*Should ATM Fees Be Regulated?*, NATIONAL POST, Mar. 8, 2007, at FP17, co-authored with Robert W. Crandall.

*Life Support for ISPs*, REGULATION, Fall 2005, co-authored with Robert W. Crandall.

*No Two-Tier Telecommunications*, NATIONAL POST, Mar. 7, 2003, at FP15, co-authored with Robert W. Crandall.

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

## APPENDIX 3: RETAIL PRICING DATA FOR 2016 LINCOLN MKX (FRONT-WHEEL DRIVE)

### Data Selection: Zip Code by Class State

| Class State | City | Zip Code |
|---|---|---|
| Arizona | Phoenix | 85004 |
| California | Los Angeles | 90012 |
| Colorado | Denver | 80202 |
| Iowa | Des Moines | 50316 |
| Massachusetts | Boston | 02203 |
| New Jersey | Newark | 07102 |
| New York | Buffalo | 14202 |
| North Carolina | Charlotte | 28280 |
| Ohio | Columbus | 43215 |
| Texas | Houston | 77002 |
| Virginia | Virginia Beach | 23451 |
| Washington | Seattle | 98164 |

### Vehicle Details

| Category | Selection(s) |
|---|---|
| **Model** | 2016 Lincoln MKX |
| **Drivetrain** | Front Wheel Drive |
| **Model** | Premiere |
| **MPG** | 17/26 |
| **Engine** | Regular Unleaded V-6 3.7 L |
| **Exterior Color** | Ingot Silver Metallic |
| **Interior Color** | Ebony |
| **Options** | Cargo Accessories Package (inc: Rear Bumper Anti-Scratch Pad/Load Protector, Cargo Area Protector) |
| | All Weather Floor Mats |

## 2016 Lincoln MKX Pricing and Sales Data at National Level

| Price Range | Number of Buyers | MSRP:<br>$39,435 |
|:---:|:---:|:---:|
| $34,696 - $34,988 | 3 | |
| $34,988 - $35,281 | 4 | |
| $35,281 - $35,573 | 8 | |
| $35,573 - $35,866 | 4 | |
| $35,866 - $36,158 | 10 | |
| $36,158 - $36,451 | 7 | |
| $36,451 - $36,743 | 11 | |
| $36,743 - $37,036 | 12 | |
| $37,036 - $37,328 | 13 | |
| $37,328 - $37,620 | 19 | |
| $37,620 - $37,913 | 9 | |
| $37,913 - $38,205 | 3 | |
| $38,205 - $38,498 | 4 | |
| $38,498 - $38,790 | 12 | |
| $38,790 - $39,083 | 1 | |
| $39,083 - $39,375 | 2 | |
| $39,375 - $39,668 | 3 | |

**Notes:** Based on 125 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,182. Data collected 8/30/2016, 2:58pm.

**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=98164

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Phoenix, Arizona (Zip Code: 85004)**

| | | MSRP: |
| --- | --- | --- |
| **Price Range** | **Number of Buyers** | $39,435 |
| $35,325 - $35,516 | 1 | |
| $35,516 - $35,708 | 1 | |
| $36,090 - $36,282 | 5 | |
| $36,282 - $36,473 | 10 | |
| $36,473 - $36,664 | 8 | |
| $36,664 - $36,855 | 7 | |
| $36,855 - $37,047 | 12 | |
| $37,047 - $37,238 | 6 | |
| $37,238 - $37,429 | 2 | |
| $37,429 - $37,621 | 2 | |
| $37,621 - $37,812 | 4 | |
| $37,812 - $38,003 | 2 | |
| $38,003 - $38,195 | 1 | |

**Notes:** Based on 61 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,951. Data collected 8/30/2016, 09:53am.

**Source:** https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=85004

**2016 Lincoln MKX Pricing and Sales Data for Los Angeles, California (Zip Code: 90012)**

| Price Range | Number of Buyers | MSRP:<br>$39,435 |
|---|---|---|
| $34,962 - $35,153 | 3 | |
| $35,536 - $35,727 | 1 | |
| $36,109 - $36,300 | 3 | |
| $36,300 - $36,491 | 1 | |
| $36,682 - $36,873 | 2 | |
| $36,873 - $37,064 | 6 | |
| $37,064 - $37,255 | 2 | |
| $37,255 - $37,466 | 1 | |
| $37,828 - $38,019 | 1 | |

**Notes:** Based on 20 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,586. Data collected 8/30/2016, 10:13am.

**Source:** https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=90012

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Denver, Colorado (Zip Code: 80202)**

|  |  | **MSRP:**<br>$39,435 |
|---|---|---|
| **Price Range** | **Number of Buyers** |  |
| $35,428 - $35,667 | 2 |  |
| $35,667 - $35,905 | 1 |  |
| $35,905 - $36,144 | 1 |  |
| $36,144 - $36,382 | 3 |  |
| $36,382 - $36,620 | 4 |  |
| $36,620 - $36,859 | 2 |  |
| $36,859 - $37,097 | 1 |  |
| $37,097 - $37,335 | 3 |  |
| $37,812 - $38,051 | 2 |  |
| $38,051 - $38,289 | 1 |  |
| $38,289 - $38,527 | 13 |  |
| $38,527 - $38,766 | 1 |  |
| $38,766 - $39,004 | 1 |  |

**Notes:** Based on 35 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,674. Data collected 8/30/2016, 10:51am.
**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=80202

**2016 Lincoln MKX Pricing and Sales Data for Des Moines, Iowa (Zip Code: 50316)**

| | | MSRP: |
| | | $39,435 |
| Price Range | Number of Buyers | |
| --- | --- | --- |
| $35,736 - $35,875 | 2 | |
| $36,155 - $36,294 | 1 | |
| $36,294 - $36,434 | 1 | |
| $36,434 - $36,574 | 3 | |
| $36,574 - $36,713 | 1 | |
| $36,713 - $36,853 | 1 | |
| $36,853 - $36,993 | 1 | |
| $36,993 - $37,133 | 1 | |
| $37,133 - $37,272 | 3 | |
| $37,552 - $37,691 | 1 | |
| $37,691 - $37,831 | 1 | |

**Notes:** Based on 16 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,923. Data collected 8/30/2016, 11:27am.
**Source:** https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=50316

**2016 Lincoln MKX Pricing and Sales Data for Boston, Massachusetts (Zip Code: 02203)**

| Price Range | Number of Buyers | MSRP: $39,435 |
|---|---|---|
| $34,945 - $35,231 | 1 | |
| $35,231 - $35,518 | 5 | |
| $35,518 - $35,805 | 1 | |
| $35,805 - $36,091 | 1 | |
| $36,091 - $36,378 | 6 | |
| $36,378 - $36,664 | 6 | |
| $36,664 - $36,951 | 5 | |
| $36,951 - $37,237 | 4 | |
| $37,237 - $37,524 | 13 | |
| $37,524 - $37,811 | 5 | |
| $37,811 - $38,097 | 2 | |
| $38,097 - $38,384 | 3 | |
| $38,384 - $38,670 | 2 | |
| $38,957 - $39,243 | 1 | |
| $39,243 - $39,530 | 2 | |
| $39,530 - $39,817 | 2 | |

**Notes:** Based on 59 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,381. Data collected 8/30/2016, 11:54am.

**Source:** https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=02203

**2016 Lincoln MKX Pricing and Sales Data for Newark, New Jersey (Zip Code: 07102)**

|  |  | **MSRP:** |
| --- | --- | --- |
| **Price Range** | **Number of Buyers** | $39,435 |
| $34,579 - $34,841 | 7 | |
| $34,841 - $35,104 | 2 | |
| $35,104 - $35,367 | 4 | |
| $35,367 - $35,629 | 10 | |
| $35,629 - $35,892 | 8 | |
| $35,892 - $36,154 | 11 | |
| $36,154 - $36,417 | 14 | |
| $36.417 - $36,679 | 8 | |
| $36,679 - $36,942 | 10 | |
| $36,942 - $37,204 | 8 | |
| $37,204 - $37,467 | 16 | |
| $37,467 - $37,729 | 2 | |
| $37,729 - $37,992 | 8 | |
| $37,992 - $38,254 | 4 | |
| $38,254 - $38,517 | 2 | |
| $38,517 - $38,779 | 3 | |
| $38,779 - $39,042 | 2 | |

**Notes:** Based on 119 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,810. Data collected 8/30/2016, 12:25pm.

**Source:** https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=07102

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Buffalo, New York (Zip Code: 14202)**

**MSRP:**
$39,435

| Price Range | Number of Buyers |
|---|:---:|
| $34,896 - $35,144 | 2 |
| $35,144 - $35,393 | 2 |
| $35,393 - $35,641 | 6 |
| $35,641 - $35,889 | 5 |
| $35,889 - $36,137 | 5 |
| $36,137 - $36,385 | 10 |
| $36,385 - $36,633 | 1 |
| $36,633 - $36,881 | 7 |
| $36,881 - $37,129 | 4 |
| $37,129 - $37,377 | 9 |
| $37,377 - $37,626 | 1 |
| $37,626 - $37,874 | 5 |
| $37,874 - $38,122 | 5 |
| $38,122 - $38,370 | 2 |
| $38,370 - $38,618 | 3 |
| $38,618 - $38,866 | 1 |

**Notes:** Based on 68  recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,005. Data collected 8/30/2016, 12:25pm.
**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=14202

**2016 Lincoln MKX Pricing and Sales Data for Charlotte, North Carolina (Zip Code: 28280)**

| Price Range | Number of Buyers | MSRP: $39,435 |
|---|---|---|
| $34,710 - $35,022 | 1 | |
| $36,272 - $36,584 | 1 | |
| $36,584 - $36,897 | 3 | |
| $36,897 - $37,209 | 1 | |
| $37,209 - $37,522 | 1 | |
| $37,522 - $37,834 | 1 | |
| $38,459 - $38,771 | 4 | |
| $39,396 - $39,709 | 1 | |

**Notes:** Based on 13  recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,053. Data collected 8/30/2016, 2:22pm.
**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=28280

**2016 Lincoln MKX Pricing and Sales Data for Columbus, Ohio (Zip Code: 43215)**

| Price Range | Number of Buyers | MSRP: $39,435 |
|---|---|---|
| $36,812 - $36,996 | 2 | |
| $36,996 - $37,180 | 2 | |
| $37,180 - $37,364 | 1 | |
| $37,364 - $37,548 | 1 | |
| $37,548 - $37,732 | 1 | |
| $37,732 - $37,916 | 1 | |
| $38,651 - $38,835 | 3 | |

**Notes:** Based on 11  recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,456. Data collected 8/30/2016, 2:30pm.
**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=43215

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Houston, Texas (Zip Code: 77002)**

|  |  | **MSRP:** |
|---|---|---|
| **Price Range** | **Number of Buyers** | $39,435 |
| $33,788 - $34,163 | 2 | |
| $34,163 - $34,539 | 1 | |
| $34,539 - $34,915 | 1 | |
| $35,666 - $36,042 | 2 | |
| $36,042 - $36,417 | 2 | |
| $36,417 - $36,793 | 2 | |
| $36,793 - $37,169 | 3 | |
| $37,169 - $37,544 | 4 | |
| $37,544 - $37,920 | 3 | |
| $37,920 - $38,296 | 2 | |
| $38,296 - $38,671 | 1 | |
| $38,671 - $39,047 | 1 | |

**Notes:** Based on 24 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,981. Data collected 8/30/2016, 2:50pm.

**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=77002

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Virginia Beach, Virginia (Zip Code: 23451)**

|                        |                   | **MSRP:** |
| :---                   | :---:             | :---: |
| **Price Range**        | **Number of Buyers** | $39,435 |
| $34,710 - $35,022      | 1                 | |
| $36,272 - $36,584      | 1                 | |
| $36,584 - $36,897      | 3                 | |
| $36,897 - $37,209      | 1                 | |
| $37,209 - $37,522      | 1                 | |
| $37,522 - $37,834      | 1                 | |
| $38,459 - $38,771      | 4                 | |
| $39,396 - $39,709      | 1                 | |

**Notes:** Based on 13 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $37,053. Data collected 8/30/2016, 2:58pm.

**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=23451

PRIVILEGED AND CONFIDENTIAL

**2016 Lincoln MKX Pricing and Sales Data for Seattle, Washington (Zip Code: 98164)**

|  |  | **MSRP:** |
|  |  | $39,435 |
| **Price Range** | **Number of Buyers** |  |
| $34,189 - $34,511 | 1 |  |
| $35,156 - $35,478 | 2 |  |
| $35,478 - $35,801 | 1 |  |
| $35,801 - $36,123 | 1 |  |
| $36,445 - $36,768 | 1 |  |
| $36,768 - $37,090 | 2 |  |
| $37,412 - $37,734 | 3 |  |
| $37,734 - $38,057 | 1 |  |
| $38,057 - $38,379 | 1 |  |
| $38,701 - $39,024 | 1 |  |

**Notes:** Based on 14 recent sales transactions (last 28 days), the Average Paid for the selected 2016 Lincoln MKX is $36,284. Data collected 8/30/2016, 2:58pm.

**Source**: https://www.truecar.com/prices-new/lincoln/mkx-pricing/2016/92BC39BD/?trimOptionIds=4-C-U,24-C-U,8-C-U,13-C-U,2-C-U,16-C-U,0-C-U,14-C-U,27-C-U&exteriorColorId=1309363&interiorColorId=1309364&incentiveIds=4000175348&trimId=294239&zipcode=98164

86.     Figure A1 below displays the distribution of individual WTP estimates for the Phase 2 respondents that Mr. Boedeker used to calculate Result 1—which, according to Mr. Boedeker, indicates that his Phase 2 respondents are willing to pay $1,861 for the MFT. As seen below, this is not the case: Approximately 48 percent of these respondents have a WTP *below* $1,861. As before, the variation in WTP from one respondent to the next is extreme: More than 25 percent of respondents have a WTP below $729, and more than 39 percent of them have a WTP below $1,290.

87.     As before, many of the WTP estimates from Mr. Boedeker's model are implausible as a matter of elementary economic logic. For example, the WTP for the bottom 1 percent of respondents ranges from -$30,024 to -$2,158. The WTP for the top 1 percent ranges from $41,374 to $146,225. (Figure A1 excludes the top and bottom 1 percent for display purposes).

88.     As before, large proportions of Class Members cannot be shown to have suffered the injury that Mr. Boedeker claims. For example, the 25 percent of respondents that with a WTP of $715 or less cannot be shown to have suffered injury of $729; the 38 percent of respondents with a WTP of $1,250 or less cannot be shown to have suffered injury of $1,290. The 4 percent of respondents with a *negative* WTP clearly cannot be shown to have suffered any injury at all. More generally, Mr. Boedeker's economic loss model illustrates why it is not possible to infer classwide injury here: The large proportion of Class Members with a relatively low WTP would have faced clear incentives to negotiate discounts to reflect their relative lack of interest in the MFT. Again, this means that it is not possible to apply a classwide method to establish that all Class Members overpaid for the MFT.

FIGURE A1: DISTRIBUTION OF INDIVIDUAL WTP ESTIMATES FOR RESULT 1
OF MR. BOEDEKER'S ECONOMIC LOSS MODEL (PHASE 2 RESPONDENTS)



Note: Excludes the top and bottom one percent of the distribution for display purposes. The WTP for the bottom 1 percent of respondents ranges from -$30,024 to -$2,158. The WTP for the top 1 percent ranges from $41,374 to $146,225.

89.     Figure A2 displays analogous calculations for Result 3 of Mr. Boedeker's economic loss model. According to Result 3, disclosure of the Alleged Defects causes WTP to drop to $951. As seen below, this is not the case: Even after reading Mr. Boedeker's skewed disclosure statement, 46 percent of Mr. Boedeker's Phase 2 respondents have a WTP *above* $951. Moreover, 32 percent of respondents have a WTP *above* $1,861—that is, *above* what Mr. Boedeker claims Class Members were willing to pay for the MFT without *any* disclosure. Accordingly, Mr. Boedeker's economic loss model refutes classwide injury.

PRIVILEGED AND CONFIDENTIAL

OF MR. BOEDEKER'S ECONOMIC LOSS MODEL



Note: Excludes the top and bottom one percent of the distribution for display purposes.

90.     Figure A3 displays analogous calculations for Result 4 of Mr. Boedeker's economic loss model. According to Result 4, disclosure of the Alleged Defects (with safety concerns) causes WTP to drop to $571. As seen below, this is not the case: Even after reading Mr. Boedeker's skewed disclosure statement (including safety concerns), 45 percent of Mr. Boedeker's Phase 2 respondents have a WTP *above* $571. Moreover, 25 percent of respondents have a WTP *above* $1,861—that is, *above* what Mr. Boedeker claims Class Members were willing to pay for the MFT without *any* disclosure. Mr. Boedeker's economic loss model therefore refutes classwide injury, even when safety concerns are implicated.

PRIVILEGED AND CONFIDENTIAL

FIGURE A3: DISTRIBUTION OF INDIVIDUAL WTP ESTIMATES FOR RESULT 4
OF MR. BOEDEKER'S ECONOMIC LOSS MODEL



Note: Excludes the top and bottom one percent of the distribution for display purposes.

91.     Below, I report detail from the individualized WTP estimates from Results 1, 3, and 4 of Mr. Boedeker's economic loss model. (The underlying data is being produced to Plaintiffs, which can be sorted into any "estimate bin" chosen; the "estimate bins" listed below are simply for illustrative purposes).

## Distribution of WTP, Result 1 (Phase 1)

| WTP Estimate Bin | Frequency | Share | Cumulative Share |
|:---:|:---:|:---:|:---:|
| Less than $562 | 157 | 21.8% | 21.8% |
| $562 - $639 | 13 | 1.8% | 23.6% |
| $639 - $715 | 14 | 1.9% | 25.5% |
| $715 - $792 | 6 | 0.8% | 26.4% |
| $792 - $868 | 15 | 2.1% | 28.4% |
| $868 - $944 | 13 | 1.8% | 30.2% |
| $944 - $1,021 | 19 | 2.6% | 32.9% |
| $1,021 - $1,097 | 15 | 2.1% | 35.0% |
| $1,097 - $1,174 | 10 | 1.4% | 36.3% |
| $1,174 - $1,250 | 10 | 1.4% | 37.7% |
| $1,250 - $1,327 | 13 | 1.8% | 39.5% |
| $1,327 - $1,403 | 11 | 1.5% | 41.1% |
| $1,403 - $1,480 | 10 | 1.4% | 42.4% |
| $1,480 - $1,556 | 10 | 1.4% | 43.8% |
| $1,556 - $1,632 | 10 | 1.4% | 45.2% |
| $1,632 - $1,709 | 10 | 1.4% | 46.6% |
| $1,709 - $1,785 | 12 | 1.7% | 48.3% |
| $1,785 - $1,862 | 8 | 1.1% | 49.4% |
| Greater than $1,862 | 365 | 50.6% | 100.0% |

## Distribution of WTP, Result 1 (Phase 2)

| WTP Estimate Bin | Frequency | Share | Cumulative Share |
|:---:|:---:|:---:|:---:|
| Less than $380 | 115 | 15.3% | 15.3% |
| $380 - $601 | 51 | 6.8% | 22.0% |
| $601 - $821 | 44 | 5.8% | 27.9% |
| $821 - $1,041 | 46 | 6.1% | 34.0% |
| $1,041 - $1,261 | 33 | 4.4% | 38.4% |
| $1,261 - $1,482 | 34 | 4.5% | 42.9% |
| $1,482 - $1,702 | 24 | 3.2% | 46.1% |
| $1,702 - $1,922 | 21 | 2.8% | 48.9% |
| Greater than $1,922 | 385 | 51.1% | 100.0% |

PRIVILEGED AND CONFIDENTIAL

## Distribution of WTP, Result 3

| WTP Estimate Bin | Frequency | Share | Cumulative Share |
| --- | --- | --- | --- |
| Less than $389 | 289 | 39.1% | 39.1% |
| $389 - $674 | 67 | 9.1% | 48.2% |
| $674 - $958 | 44 | 6.0% | 54.1% |
| $958 - $1,243 | 48 | 6.5% | 60.6% |
| $1,243 - $1,527 | 30 | 4.1% | 64.7% |
| $1,527 - $1,812 | 27 | 3.7% | 68.3% |
| $1,812 - $2,096 | 26 | 3.5% | 71.9% |
| Greater than $2,096 | 208 | 28.1% | 100.0% |

## Distribution of WTP, Result 4

| WTP Estimate Bin | Frequency | Share | Cumulative Share |
| --- | --- | --- | --- |
| Less than $315 | 348 | 47.1% | 47.1% |
| $315 - $560 | 53 | 7.2% | 54.3% |
| $560 - $805 | 48 | 6.5% | 60.8% |
| $805 - $1,050 | 40 | 5.4% | 66.2% |
| $1,050 - $1,295 | 21 | 2.8% | 69.0% |
| $1,295 - $1,540 | 22 | 3.0% | 72.0% |
| $1,540 - $1,785 | 21 | 2.8% | 74.8% |
| $1,785 - $2,030 | 20 | 2.7% | 77.5% |
| Greater than $2,030 | 166 | 22.5% | 100.0% |

PRIVILEGED AND CONFIDENTIAL