1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No.  13-cv-03072-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 341 |

     The crux of this case is that Ford's infotainment system known as MyFord Touch was allegedly defective.  Plaintiffs seek to recover damages on behalf of the certified classes in the form of the diminution in value caused to their vehicles by the defect.  Ford now moves for summary judgment on the classwide express and implied warranty claims as well as a number of individual fraud and consumer protection claims.  For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Ford's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

     The following claims have been certified for class treatment: Breach of Implied Warranty on behalf of California, Massachusetts, New Jersey, North Carolina, Ohio, and Virginia classes; Breach of Express Warranty on behalf of California and Washington classes; violation of the Massachusetts Consumer Protection Act on behalf of the Massachusetts class; negligence under Ohio law; and strict product liability under Colorado law.  *See* Docket No. 279 at 41-43.[1]  The classes are defined to include "all persons or entities who purchased or leased a Ford or a Lincoln

---

[1]  The Court initially certified similar claims under California's Consumer Legal Remedies Act and the consumer protection statutes of Ohio, Texas, and Virginia, but decertified them upon reconsideration because Plaintiffs could not demonstrate a method to prove actual reliance on a classwide basis.  *See* Docket No. 301 at 8-9.

vehicle in [the applicable state] from Ford Motor Company or through a Ford Motor Company dealership before August 9, 2013, which vehicle was equipped with a MyFord Touch or MyLincoln Touch in-car communication and entertainment system." *Id.* at 1.

Plaintiffs' various claims alleging fraud and fraudulent omission were not certified by the Court, nor were express warranty claims under the laws of Iowa, Massachusetts, New Jersey, New York, North Carolina, Ohio, and Virginia. *Id.* at 36-39, 43. However, several of the non-class claims remain in the case on an individual basis.

The following chart summarizes the class claims certified by state.

| State | Claims Certified |
|---|---|
| California | Breach of Implied Warranty<br>Breach of Express Warranty<br>Song-Beverly Act<br>Unfair Competition Law |
| Colorado | Strict Product Liability |
| Massachusetts | Breach of Implied Warranty<br>Massachusetts Consumer Protection Act |
| New Jersey | Breach of Implied Warranty |
| North Carolina | Breach of Implied Warranty |
| Ohio | Breach of Implied Warranty<br>Negligence |
| Virginia | Breach of Implied Warranty |
| Washington | Breach of Express Warranty |

A.    Summary of Factual Allegations

Plaintiffs and Class Members purchased vehicles from Ford that were equipped by MyFord Touch ("MFT"), an "infoatainment" system. The gravamen of Plaintiffs' allegations is that the MFT system suffered from an underlying, systemic defect in its base software that caused numerous problems, many of which are described in more detail below. In general, these involved failure of navigation systems, failure of Bluetooth connectivity and hands-free systems, failure of the climate control system, frequent freezes and lock-ups, the failure of the back-up camera including images that froze in place, and so on. *See* TAC ¶ 7. When malfunctions occurred, certain vehicle features allegedly became inoperable because MFT was the only way to utilize them. Further, Plaintiffs allege that the malfunctions distract drivers and therefore cause

2

1    unreasonable safety risks.

2           MFT is powered by an operating system known as Ford SYNC, which is also the name

3    given to Ford's first generation MFT system.  Vehicles with MFT cost more than those without it,

4    though the precise cost is disputed.  Plaintiffs allege that Ford has not yet fixed the problem with

5    MFT, though Ford claims that one of its post-Class Period software updates in 2013 made MFT

6    "first in class," and that other software updates issued during the Class Period improved MFT's

7    functionality.  Ford's vehicles were covered by a limited express warranty, whose relevant

8    portions are quoted in the analysis below.

9    B.     Summary of Expert Reports

10          Although not all of the expert reports are material to the instant motion, the Court

11   summarizes each expert's proffered testimony below.

12          1.     Plaintiffs' Expert Dr. Arnold

13          Dr. Arnold is an economist with advanced degrees in business and who has taught

14   economics; he works at Compass Lexecon applying economic models to project damages

15   calculations.  Ford does not challenge Dr. Arnold's expertise, but contends his models in this case

16   are not tied to implied and express warranty damages and provide no reliable justification for his

17   assumption that the value of a defective MFT to consumers was $0.

18          Dr. Arnold used data produced by Ford to calculate the revenue Ford received for sales of

19   the MFT system with and without a navigation feature.  *See* Edwards Decl., Ex. 56.  He calculates

20   that consumers paid $625 for MFT without navigation and $1,364 for MFT with navigation.  Dr.

21   Arnold then treats the full cost paid as equivalent to the economic loss suffered by each plaintiff

22   due to the defect; in other words, Dr. Arnold's damages calculation assumes that the MFT system

23   was valueless.  Plaintiffs argue that this assumption is supported by other evidence they intend to

24   introduce at trial showing that none of the subsequent software upgrades released by Ford resolved

25   the defects at issue, and thus failed to restore any value to the MFT system.  Dr. Arnold's

26   determination that the MFT system had zero value is premised on the notion that risk averse

27   consumers would not purchase the MFT with known and severe defects, especially as many affect

28   safety, thus rendering its value zero.  However, that the value to some consumers is zero does not

necessarily imply that the MFT had no market value generally. Dr. Arnold did not attempt to determine the percentage of consumers or Class Members who were in fact risk averse and for whom the MFT system therefore had zero value versus those who might attribute value to it. At best, he states that "most" consumers are risk averse, but he does not state that "all" are. Plaintiffs argue that the basis for his assumption is economic literature he relies upon; thus, the credibility of his assumption is a question of fact for the jury, which may discredit his testimony and make downward adjustments to his damages estimate. The parties disagree about whether Dr. Arnold's predicate assumptions are so unreliable or unsound as to require exclusion of his opinion entirely, or whether they may be presented to the jury to consider alongside other foundational evidence and the jury may be allowed to determine what weight, if any, to give to Dr. Arnold's opinion.

2. Plaintiffs' Expert Mr. Boedeker

Mr. Boedeker is an economist with advanced degrees in statistics and economics, and 25 years of experience applying economic, statistical, and financial models. Ford does not challenge Mr. Boedeker's qualifications but rather whether his damages model is tied to implied and express warranty damages, and whether his methodology is reliable.

Mr. Boedeker used a survey method called choice-based conjoint analysis to infer how consumers valued the MFT system in four scenarios where they were exposed to varying levels of information about the MFT defect, its safety implications, and Ford's knowledge of and failure to disclose information about the defect. *See* Edwards Decl., Ex. 57. The analysis shows that the more information consumers were provided about the defect, the less valuable the MFT system became to them. Thus, while consumers originally valued MFT at $1,850, that value dropped by $729 when they were told to "[i]magine that your salesperson tells you at the point of purchase that the MFT system has a glitch but that a fix for the glitches will be provided for free in the future when ready," *id.* ¶ 74; by $910 when they were presented with statements showing Ford's knowledge of the defect and its severity; and by $839-$1,290 when they learned that the defect also caused distractions raising safety concerns.

Ford argues that Mr. Boedeker's model is not suitable for calculating express or implied warranty damages because it does not estimate the cost of repair, it fails to account for the value of

4

subsequent software upgrades, and because the survey questions introduce an element of fraud into respondents' valuations, an element irrelevant to breach of warranty claims. Ford also argues that Mr. Boedeker's methodology is unreliable because his calculation of the change in MFT's value focuses only on the demand side of the equation without considering the supply-side, because he does not account for used car sales data, and because certain aspects of his methodology have not been peer reviewed in economic literature.

### 3. Plaintiffs' Expert Dr. Rosenberg

Dr. Rosenberg provided a human factors analysis of the MyFord Touch system. *See* Berman Decl., Ex. 19. He analyzes MFT for its usability, safety, and stability. He performed driving studies that focused on measuring subjective and objective measures of driver distraction resulting from interactions with MFT. He concluded that there are issues with the design and implementation of MFT including requiring undue time and attention, excessive task demand, overly complicated mental models, and causing mistrust of the system, resulting in distraction to drivers and hence a safety hazard. He also observes that because of the frustrations with the MFT systems, drivers may fall back on performing tasks with other devices like smartphones that are not designed with the driving task in mind, therefore increasing the safety risks involved. Dr. Rosenberg evaluated up to version 3.7 of the MFT system, including software upgrades issued after the end of the class period in August 2013. Ford has not challenged Dr. Rosenberg.

### 4. Other Experts

The parties have retained other experts but they are not at issue on this motion, although there are some references to their testimony or positions. Ford's additional experts include Dr. Taylor (safety issues and analysis of accident data), Dr. Rauschenberger (usability/safety issues), and Dr. Singer (economic analysis regarding damages). Plaintiffs have also retained a technical expert, Dr. Smith, but the scope of his testimony and opinion is unclear because the report was not submitted. These experts are not subject to challenges at this time.

## II.   LEGAL STANDARD

A party may move for summary judgment by arguing that the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case,

5

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). When a party so moves, it must identify the elements of the claims upon which the nonmoving party has failed to produce sufficient evidence. *Carmen v. S.F. Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The nonmoving party then has the burden to present evidence demonstrating the existence of a genuine dispute of material fact, which exists only when there is sufficient evidence to permit a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 252 (1986). At the summary judgment stage, evidence is viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in his or her favor. *Id.* at 255.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party, however, may not rely on bare assertions. *Anderson*, 477 U.S. at 248. Rather, it must bring relevant evidence to the district court's attention in a clear manner, as the court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029(9th Cir. 2001); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (the court is not obligated to "scour the record in search of a genuine issue of triable fact").

## III. **DISCUSSION**

A.    Implied Warranty of Merchantability

To state a claim for breach of the implied warranty of merchantability, a consumer must demonstrate that a good sold by a merchant with respect to such goods is "fit for the ordinary purposes for which such goods are used." U.C.C. § 2-314(2). Additional requirements which may apply on a state-by-state basis and which are relevant to Ford's motion are discussed below. Here, Ford argues that Plaintiffs (1) cannot present evidence the vehicles were unmerchantable, (2) cannot present evidence showing the defect manifested within one year; (3) may not as a matter of law bring a claim under the Song-Beverly Act for used car purchasers; (4) and are precluded from bringing claims to the extent that they used their vehicles for business or commercial purposes because of Ford's disclaimer of implied warranty.

1.     Unmerchantability

Ford argues that it is entitled to summary judgment because Plaintiffs do not present (a) evidence that the transportation function of their vehicle was impaired; (b) evidence that the vehicles were so unsafe as to be unmerchantable in light of their continued use of the vehicles; or (c) evidence that MFT-equipped vehicles were involved in accidents at a greater rate than comparable vehicles.

a.     Legal Standard

Before reviewing the evidence, it is necessary to set forth the standard for unmerchantability.  "The implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a minimum level of quality." *T&M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F.Supp.3d 855, 878 (N.D. Cal. 2015) (quotation omitted).  To state a claim, "a plaintiff must allege a fundamental defect that renders the product unfit for its ordinary purpose." *Id.* (quotation omitted).

The law is clear that to be fit for its ordinary purpose, a vehicle must be "in safe condition and substantially free of defects." *Isip v. Mercedes-Benz USA, LLC*, 155 Cal.App.4th 19, 27 (2007).[2]  Moreover, it must provide "reliable" transportation. *Brand v. Hyundai Motor Am.*, 226 Cal.App.4th 1538, 1547 (2014) (quotation omitted).  Thus, three factors related to vehicle merchantability are safety, reliability, and substantial freedom from defects.

Contrary to Ford's suggestion, proof of a safety condition is not required to demonstrate unmerchantability; it is merely one way to demonstrate unmerchantability.  *See Brand*, 226

---

[2]  A number of cases cited by Ford do not involve vehicles and therefore are not illuminating with respect to when a vehicle is unfit for its ordinary purpose. *See*, *e.g.*, *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *8 (N.D. Cal. Jun. 5, 2009) (plaintiff alleging defect caused mold to grow in bed failed to demonstrate unmerchantability where mold was not discovered for several years and no harm was alleged); *Haglund v. Philip Morris, Inc.*, 847 N.E.2d 315, 323 (Mass. 2006) (in cigarette case, stating that "[w]hen the consumer's knowing use of a product in a dangerous and defective condition is unreasonable, the consumer's own conduct has become the proximate cause of his injuries, and he can recover nothing from the seller"); *Tietsworth v. Sears Roebuck & Co.*, 720 F.Supp.2d 1123, 1142 (N.D. Cal. 2010) (purchaser continued to use washing machine to clean clothes for full duration of implied warranty period despite occasional error messages, but machine did not fail until after warranty period).

Cal.App.4th at 1538, n.2 (holding that "vehicle safety is [not] the sole or dispositive criterion in implied warranty cases, which may turn on other facts"). The *Brand* court further explained that *Isip*, which concerns a defect related to a potential safety hazard, "provides just one example of a breach of the implied warranty of merchantability, and does not purport to establish the only manner in which a seller violates the warranty." *Id.* 1547. Reliability, operability, and substantial freedom from defects related thereto are independent grounds for demonstrating unmerchantability.

Moreover, courts reject the notion that a vehicle is fit for its ordinary purpose "merely because [it] provides transportation from point A to point B[.]" *Isip*, 155 Cal.App.4th at 27. A car's ability to provide transportation is a defense only in "the context of . . . cases in which *no damage ha[s] been suffered*" otherwise. *Id.* at 25 (emphasis added). Ford cites a number of cases where courts looked to continued use of the vehicle to conclude that it was not unmerchantable, but those cases involved defects where a vehicle's operability was not impaired until a particular part malfunctioned and required replacement.[3] They did not involve situations where a defect's symptoms were persistent and could not be addressed through repair or replacement of an isolated component.[4] Because no aspect of the vehicle's operability in such cases was impaired before the

---

[3] *See Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013) (affirming dismissal where plaintiff alleged fuel tank required more frequent refills because plaintiffs "failed to allege that their Prius was unfit for its intended purpose, as the alleged defect did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage"); *Suddreth v. Mercedes-Benz, LLC*, 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011) (defect that caused balance shaft to require premature but post-warranty replacement did not breach warranty of merchantability because "Plaintiffs all *admit* that they were able to drive their vehicles for several years *without issue*" (emphasis added)); *see also Sheris v. Nissan N. Am., Inc.*, 2008 U.S. Dist. LEXIS 43664, at *15-16 (D. N.J. Jun. 2, 2008) (premature break pad wear did not support claim for implied merchantability in light of "the undisputed facts" that plaintiff could drive vehicle for 2 years and over 20,000 miles before break pad required replacement and had "failed to allege factually what made his [vehicle] unmerchantable or unsafe for driving"); *but see Keegan v. Am. Honda Motor Co.*, 838 F.Supp.2d 929, 945-46 (C.D. Cal. 2012) (on motion to dismiss, plaintiff alleging that rear suspension defect caused premature tire wear adequately pleaded claim for breach of implied merchantability warranty).

[4] Ford also cites *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*, 959 F.Supp.2d 1244, 1254 (C.D. Cal. 2013), *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 F. App'x 765 (9th Cir. 2016), to support its argument that continued usage is relevant, but that case does not discuss unmerchantability at all. Rather, summary judgment for the defendant was affirmed because of the plaintiff's failure to present evidence of a defect in the first place—there was no evidence that the purported brake defect resulted in extended and therefore unsafe stopping

8

defective part failed, it could not be unmerchantable.  In contrast, courts have recognized that vehicles may be unmerchantable even if they can be used to provide basic transportation when a defect presents symptoms in a persistent manner that can be said to impair safety, reliability, or operability over an extended period of time.[5]

In sum, the law does not require Plaintiffs to introduce proof that the vehicles were not in fact used to demonstrate unmerchantability.  They can also demonstrate unmerchantability by introducing evidence that their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit.

### a. Application to Evidence

Plaintiffs have introduced sufficient proof from which a reasonable jury could conclude that the MFT defect caused, *inter alia*, persistent distractions; failed intermittently and unexpectedly while performing key functions such as navigation assistance or rear-view cameras; and impaired operability by undermining use of the rear-view cameras, climate control systems, and navigation systems, often requiring drivers to pull-over to reboot the systems.[6]  Plaintiffs have

---

distances.  Because there was no defect, there was no occasion to consider whether the vehicle was fit for its ordinary purpose.

[5] *See, e.g.*, *Isip*, 155 Cal.App.4th at 27 (unmerchantability demonstrated where vehicle "smells, lunches, clanks, and emits smoke *over an extended period of time*" (emphasis added)); *Borkman v. BMW of N. Am., LLC*, 2017 WL 4082420 , at *9, *9 n.10 (C.D. Cal. Aug. 28, 2017) (plaintiff alleged defect causes "loss of power during operation, engine overheating, and, potentially, engine failure" in addition to "check engine alerts . . . and a strong burning smell in the cabin of her vehicle"); *see also Burdt v. Whirlpool Corp.*, 2015 U.S. Dist. LEXIS 102761, at *17 (N.D. Cal. Aug. 5, 2015) (distinguishing allegedly defective oven-rack which tipped over on only a single occasion from vehicle defects which "consistently impair [the drivers'] entire use [of the vehicle] over an extended period of time"); *Brand*, 226 Cal.App.4th at 1547-48 (holding that "a reasonable jury could conclude that a vehicle sunroof that opens and closes *on its own* creates a substantial safety hazard" due to, inter alia, sudden distractions and "the element of surprise" (emphasis in original)).

[6] *See, e.g.*, Watson Dep. (Berman Decl., Ex. 1) at 68:21-69:21 (volume may suddenly spike, back-up camera may fail while reversing, and navigation system may suddenly instruct driver to exit freeway at highway speeds); Thomas-Maskrey Dep. (Berman Decl., Ex. 2) at 15:12-16:17, 17:8-19:16 (built-in navigation system times out frequently without providing directions, screen blacks out intermittently, and rear-view cameras and sensors do not function); Connell Dep. (Berman Decl., Ex. 3) at 18:17-19:13 (rearview camera non-functional, navigation system lockup, among other problems); Creed Dep. (Berman Decl., Ex. 4) at 11:15-25, 102:8-104:21 (sound system

introduced evidence that these defects are prevalent in the class vehicles. *Id.* Irrespective of whether these issues also pose safety concerns, they are adequate to support a claim for unmerchantability because a jury could conclude that the symptoms were so persistent and prevalent that they impaired the reliability or operability of the vehicles class-wide.

Ford argues that Plaintiffs cannot demonstrate that the MFT defect created safety issues so serious as to render the vehicles unmerchantable because they have not shown that the MFT-defect causes more accidents than other vehicles nor presented evidence of an accident caused by MFT. Plaintiffs are not required to introduce proof of an accident caused by the defect to demonstrate the vehicle was unmerchantable. *See, e.g., Brand*, 226 Cal.App.4th at 1547 (focusing on whether sun-roof defect could create a "dangerous distraction," not whether accident actually occurs); *Borkman*, 2017 WL 4082420, at *9 (defect could create "hazardous *conditions*, including loss of power during operation, engine overheating, and *potentially*, engine failure" (emphasis added)). Rather, it is sufficient to show that the defect creates "hazardous conditions," *Borkman*, 2017 WL 4082420, at *9, or "dangerous distraction[s]," *Brand*, 226 Cal.App.4th at 1547.

Many of the safety issues alleged with respect to MFT are not as graphic as in other cases. *See, e.g., Isip*, 155 Cal.App.4th at 27 (smoke, smells, engine failure); *Borkman*, 2017 WL 4082420, at *9 (burning smells in cabin, engine overheating). Moreover, Plaintiffs do not suggest

---

would not shut off, navigation system locked up or did not provide directions, sound system unexpectedly turned on, climate control system blew cold air uncontrollably); Fink Dep. (Berman Decl., Ex. 5) at 11:22-12:4, 12:11-15:6 (navigation system instructs him to make illegal U-turns, may freeze for ten-twenty minutes during journey, may arrive at incorrect destination, climate control system does not function at times, entire MFT system may crash during travel); Matlin Dep. (Berman Decl., Ex. 6) at 21:1-11, 108:19-25, 112:19-114:13, 124:10-125:16 (backup camera did not always work, radio station presets often did not function, MFT system froze several times per month, at least once a week); Sheerin Dep. (Ex. 7) at 8:8-9:11 (failures include system crashes, backup camera completely fails, backup camera image may freeze while vehicle is in motion, MFT may spontaneously reboot in the middle of navigation); Whalen Dep. (Ex. 8) at 38:18-40:13, 69:1-70:8, 89:5-20 (climate control interface does not function, voice commands do not work, navigation unreliable, back-up camera froze, MFT system froze a lot, he is distracted and feels unsafe when MFT stops working); Kirchoff Dep. (Ex. 9) at 10:15-11:3 (backup camera did not function properly, navigation screen did not update properly or updated slowly, MFT system crashes or provides frequent distracting text message alerts); Miskell Dep. (Ex. 10) at 9:13-10:7, 56:3-22 (MFT system froze, sometimes rebooting three times a day).

that the MFT defects impair the mechanical functionality of the vehicles.[7]  Nevertheless, a reasonable juror could conclude, for instance, that a rear-view camera whose image spontaneously freezes without warning while a car is moving in reverse, and thus misleads a driver about what is or is not behind the vehicle, may present a hazardous or dangerous condition.  *See supra*, n. 6.

Additionally, Plaintiffs have testified that problems like their navigation systems failing in the middle of a trip or providing insufficient time before instructing the driver to exit or turn, the non-responsiveness of the climate control system, and their inability to properly operate the Bluetooth or hands-free features of MFT cause unexpected distractions while they are driving.  *See supra*, n. 6.  This is bolstered by Plaintiffs' expert on user interfaces, Dr. Rosenberg, who claims that various design issues and usability problems with MFT result in greater distractions than necessary to drivers.  These are further examples of evidence that a jury could rely on to determine the defect caused a safety issue implicating merchantability.

Although many of the distraction-based evidence implicates safety issues that are less tangible than defect cases involving engine fires or shutdowns, Ford has not identified case-law which precludes, as a matter of law, a claim for unmerchantability.  Moreover, Plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that the extent of the distractions, in addition to other problems associated with the defect, rendered the vehicles so unsafe as to be unmerchantable.  Though Ford cites evidence like customer satisfaction surveys supporting the notion that many customers provided positive feedback about MFT, *see* Edwards Decl., Ex. 40 at 31-32 (in 2012, most consumers report being "mostly satisfied" with most MFT features), Ex. 41 at 27 & 31 (in 2012, most would "probably" or "definitely" recommend MFT), Ex. 42 at 32, 35 and 43 (similar results in 2013), and an expert analysis purporting to show that crash and injury rates of MFT-equipped vehicles were lower than those of vehicles without MFT, *see* Edwards Decl., Ex. 44 at ¶¶ 29-30, 33-34, that evidence is for the trier of fact to consider and weigh against Plaintiffs' competing evidence.  *See* Docket No. 97 (Order re: Motion to Dismiss) at

---

[7]  *See* Edwards Decl., Ex. 4 (Smith Depo.) at 367:13-369:21 (Plaintiffs' technical expert conceding that MFT is not known to affect steering, throttle control, braking, vehicle stability control, or mirrors).

48 ("[I]t is a question of fact for the jury as to whether the problems with MFT posed enough of a safety risk that the cars at issue could not be said to provide safe, reliable transportation.").

Accordingly, the Court **DENIES** Ford's motion for summary judgment on the basis that Plaintiffs cannot prove the vehicles were unmerchantable.

### 2.  Manifestation Within One Year Under Song-Beverly

Ford argues that the California Plaintiffs have not demonstrated that their vehicles' MFT system "caused an accident or otherwise caused his or her vehicle to be inoperable" during the one-year statute of limitations for an implied warranty claim under the Song-Beverly Act.  Mot. at 8.

Under the Song-Beverly Act, a plaintiff must show their vehicle was unmerchantable within one year of purchase.  *See* Cal. Civ. Code § 1791.1(c).  However, this requirement does not mean "that the purchaser [must] discover and report to the seller a *latent* defect within that time period."  *Daniel v. Ford*, 806 F.3d 1217, 1222-23 (9th Cir. 2015) (quoting *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1309 (2009)) (emphasis in reproduction).  Rather, there is a "distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect; the fact that the alleged defect resulted in destructive [harm to the product] two years after the sale . . . does not necessarily mean that the defect did not exist at the time of sale," the critical question under the Act.  *Mexia*, 174 Cal.App.4th at 1308.  In other words, the defect itself renders a vehicle unmerchantable at the time of sale, even if the consequences of the defect do not manifest until a later time.

The evidence shows the defect did manifest persistently from the time of purchase onwards; indeed, Plaintiffs allege that the defect was inherent to the MFT software system, which was included in all vehicles as of purchase.[8]  Plaintiffs need not show that an accident occurred or that the vehicle became absolutely inoperable within one year.  Rather, as discussed above,

---

[8]  *See, e.g.*, Maskrey Dep. (Berman Decl., Ex. 2) at 18:8-19:9 (testifying he encountered problems with navigation system "[r]ight away" after purchase"); Connell Dep. (Berman Decl., Ex. 3) at 254:16-24 (discussing service sought for MFT-related issues in January 2011, just a few months after purchasing vehicle); Matlin Dep. (Berman Decl., Ex. 6) at 21:1-4 (testifying he "had a really bad experience with MyFord Touch throughout my entire lease"); Whalen Dep. (Berman Decl., Ex. 8) at 69-70, 89 (discussing MFT problems within months of purchase).

Plaintiffs need only to demonstrate that a persistent defect affecting safety, reliability, or operability either manifested within one year or arose due to a latent defect; they have done so here. Accordingly, the Court **DENIES** Ford's motion for summary judgment on this basis.

### 3. Song-Beverly and Used Car Purchasers

Ford argues that used car purchasers do not have a claim under the Song-Beverly Act because the statute extends only to "consumer goods," which are defined as referring to "any *new* product or part." Cal. Civ. Code § 1791(a) (emphasis added).

In opposition, Plaintiffs argue that the statute permits used car purchasers to sue for the breach of implied warranty of merchantability because it also provides that, "[n]otwithstanding the provisions . . . defining consumer goods to mean 'new' goods, the obligation of a distributor or retail seller of used consumer goods in a sale in which an express warranty is given shall be the same as that imposed on manufacturers under this chapter." Cal. Civ. Code § 1795.5. Such an express warranty was given here, so § 1795.5 would apply to used vehicles where its conditions are met. The provision, however, does not create additional obligations on a *manufacturer* vis-à-vis used car purchasers; rather, it simply states that the *retailer* or *distributor* is also subject to whatever obligations already apply to the manufacturer. *See Johnson v. Nissan N. Am., Inc.*, --- F.3d ---, Case No. 17-cv-00517-WHO, 2017 WL 4570712, at *6-7 (N.D. Cal. Aug. 29, 2017) (holding that used car purchaser may only pursue implied warranty claims against a "distributor" or "retailer" under § 1795.5(c)).[9]

Plaintiffs assert that Ford is liable as a "distributor" or "retailer" of used vehicles, but they

---

[9] Plaintiffs also cite cases that state that privity of contract between a consumer and manufacturer is not required to state a claim for breach of the implied warranty of merchantability under the Song-Beverly Act, but they are inapposite because the question here is what constitutes a "consumer good" under the Act, not whether privity is required. *See In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 982-83 (N.D. Cal. May 30, 2014) ("For the implied warranty claim under the Song-Beverly Act, there is no privity requirement."); *Sater v. Chrysler Grp. LLC*, 2015 WL 736273, at *8 (C.D. Cal. Feb. 20, 2015) ("The SBA does not require privity to assert an implied warranty claim (either for merchantability or fitness)."). Additionally, *Mui Ho v. Toyota Motor Corp.*, 931 F.Supp.2d 987, 993 (N.D. Cal. 2013), is inapposite because it does not consider whether used vehicles are "consumer goods" for purposes of the statute; rather, it dismissed the implied warranty claim for failure to plead that the vehicle was purchased during the implied warranty period. *See Johnson*, 2017 WL 4570712, at *7 (explaining that *Mui Ho* "did not recognize a claim against the manufacturer for used goods because it did not reach the question").

do not cite evidence to support that representation (nor is evidence cited of an agency relationship between the dealers and Ford). *Cf. Herrera v. Volkswagen Grp. of Am., Inc.*, 2016 WL 10000085, at *5 (C.D. Cal. Sep. 9, 2016) (dismissing implied warranty of merchantability claims for used car purchasers on the basis that plaintiffs had not alleged defendant was a distributor or retailer). At the hearing, Plaintiffs conceded that they have no evidence of an agency relationship between Ford and its authorized dealerships with respect to used car sales.

Because Plaintiffs have no evidence sufficient to create a genuine, triable issue of material fact with respect to whether Ford was a retailer or distributor of used vehicles, the Court **GRANTS** summary judgment in Ford's favor on the California Class's implied warranty claims under the Song-Beverly Act with respect to class members who purchased used vehicles.[10]

4.      Vehicles Used for Business Purposes

Ford argues that its express warranty disclaims the implied warranty of merchantability for vehicles used for business purposes, and summary judgment should therefore be granted in its favor against each of the six certified implied warranty classes (California, Massachusetts, New Jersey, North Carolina, Ohio, and Virginia).

In opposition, Plaintiffs argue that the disclaimer is not sufficiently conspicuous and therefore invalid, citing the California Commercial Code.[11] The Code permits disclaimers of the implied warranty of merchantability so long as they are "conspicuous," defined as "so written, displayed, or presented that a reasonable person against whom it is to operate ought to have noticed it." Cal. Com. Code § 1201(10); *see also* Cal. Com. Code § 2316(2). The statute further provides:

> Whether a term is "conspicuous" or not is a decision for the court.
> Conspicuous terms include both of the following:

---

[10]  The Court need not address persons who purchased used vehicles from an entity other than a Ford authorized dealership because they are not included in the class definition.

[11]  The parties do not appear to dispute that the same conspicuousness requirement applies in each of the certified states. *See* Ford's Mot. at 9, n.9; *see also* Cal. Com. Code § 2316(2); Mass. Gen. Laws ch. 106, § 2-316; N.J. Stat. Ann. § 12A 2-316; N.C. Gen. Stat. § 25-2-316(2); Ohio Rev. Code § 1302.29(B); Va. Code Ann. § 8.2-316(2). Thus, the same analysis with respect to California applies to all six classes.

(A) A heading in capitals equal to or greater in size than the surrounding text, <u>or</u> in contrasting type, font, or color to the surrounding text of the same or lesser size.

(B) Language in the body of a record or display in larger type than the surrounding text, <u>or</u> in contrasting type, font, or color to the surrounding text of the same size, <u>or</u> set off from the surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.* (emphasis added). The conspicuousness requirement serves to "protect the buyer from the situation where the salesman's 'pitch,' advertising brochures, or large print in the contract, giveth, and the disclaimer clause—in fine print—taketh away." *Dorman v. Int'l Harvester Co.*, 46 Cal.App.3d 11, 18 (Cal. Ct. App. 1975). The court must "review the conspicuousness of the disclaimer in the context of the entire contract, and in light of the sophistication of the parties." *Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F.Supp.2d 842, 860 (N.D. Cal. 2000) (citation omitted). The court's analysis "is not simply a matter of measuring the type size or looking at the placement of the disclaimer within the contract," but rather, "[a] reviewing court must ascertain that a reasonable person in the buyer's position would not have been surprised to find the warranty disclaimer in the contract." *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108 (9th Cir. 1989).

The relevant portions of Ford's disclaimer appear on pages 5, 6, and 7 of the 2013 Limited Warranty, near the middle of a 3-page section titled, in all-caps and bold text, "Limitations and Disclaimers." It is re-produced below with a highlight of the sentence that disclaims the implied warranty for vehicles used for business purposes.

15

**3. The New Vehicle Limited Warranty for your 2013-model vehicle**

**LIMITATIONS AND DISCLAIMERS**
All of the warranties in this booklet are subject to the following limitations and disclaimers.

The warranties in this booklet are the only express warranties applicable to your vehicle. Ford does not assume or authorize anyone to assume for it any other obligation or liability in connection with your vehicle or these warranties. No person, including Ford employees or dealers, may modify or waive any part of these warranties.

Ford and its dealers reserve the right to make changes or additions to vehicles built or sold by them at any time without incurring any obligation to make the same or similar changes or additions to vehicles previously built or sold.

Ford and its dealers also reserve the right to provide post-warranty repairs, conduct recalls, or extend the warranty coverage period for certain vehicles or vehicle populations, at the sole discretion of Ford. The fact that Ford has provided such measures to a particular vehicle or vehicle population in no way obligates Ford to provide similar accommodations to other owners of similar vehicles.

As a condition of these warranties, you are responsible for properly using, maintaining, and caring for your vehicle as outlined in your Owner's Manual. Ford recommends that you maintain copies of all maintenance records and receipts for review by Ford.

Ford and your dealer are not responsible for any time or income that you lose, any inconvenience you might be caused, the loss of your transportation or use of your vehicle, the cost of rental vehicles, fuel, telephone, travel, meals, or lodging, the loss of personal or commercial property, the loss of revenue, or for any other incidental or consequential damages you may have.

Punitive, exemplary, or multiple damages may not be recovered unless applicable law prohibits their disclaimer.

You may not bring any warranty-related claim as a class representative, a private attorney general, a member of a class of claimants or in any other representative capacity.

Ford shall not be liable for any damages caused by delay in delivery or furnishing of any products and/or services.

You may have some implied warranties. For example, you may have an implied warranty of merchantability (that the car or light truck is reasonably fit for the general purpose for which it was sold) or an implied warranty of fitness for a particular purpose (that the car or light truck is suitable for your special purposes), if a special purpose was specifically disclosed to Ford itself not merely to the dealer before your purchase, and Ford itself not just the dealer told you the vehicle would be suitable for that purpose.

These implied warranties are limited, to the extent allowed by law, to the time period covered by the written warranties, or to the applicable time period provided by state law, whichever period is shorter.

These implied warranties do not apply at all if you use your vehicle for business or commercial purposes. In addition, the implied warranty of fitness for a particular purpose does not apply if your vehicle is used for racing, even if the vehicle is equipped for racing.

The warranties contained in this booklet and all questions regarding their enforceability and interpretation are governed by the laws of the state in which you purchased your Ford vehicle. Some states do not allow Ford to limit how long an implied warranty lasts or to exclude or limit incidental or consequential damages, so the limitation and exclusions described above may not apply to you.

**NOTE: This information about the limitation of implied warranties and the exclusion of incidental and consequential damages under the NEW VEHICLE LIMITED WARRANTY also applies to the EMISSIONS WARRANTIES described on pages 17-31.**

Ford participates in the BBB AUTO LINE warranty dispute resolution program. You may contact BBB AUTO LINE by calling 800-955-5100.

You are required to submit your warranty dispute to the BBB AUTO LINE before exercising rights or seeking remedies under the Federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. To the extent permitted by the applicable state "Lemon Law", you are also required to submit your warranty dispute to the BBB AUTO LINE before exercising any rights or seeking remedies under the "Lemon Law". If you choose to seek remedies that are not created by the Magnuson-Moss Warranty Act or the applicable state "Lemon Law," you are not required to first use BBB AUTO LINE to resolve your dispute – although the program is still available to you.

For more information regarding the BBB AUTO LINE program, see page 34 of this booklet.

*See* Edwards Decl., Ex. 47 at 5-7 (Docket No. 343-4).

Ford relies primarily on two cases to show that its disclaimer is conspicuous, but they are different in important respects because, in those cases, the heading clearly indicated that it involved a disclaimer of warranty, and the portions disclaiming the implied warranty of merchantability were distinguishable from the surrounding text. *See Hammond Enters. Inc. v. ZPS Am. LLC*, 2013 WL 5814505, at *3-4 (N.D. Cal. Oct. 29, 2013) (disclaimer sufficiently conspicuous even though entire term sheet was in small typeface because paragraph 13 contained a bold-face, all-capitals heading stating "Warranty: Disclaimer of Implied Warranties," followed by a subheading in all capitals explaining that all implied warranties were disclaimed); *In re Google Phone Litig.*, 2012 WL 3155571, at *8 (N.D. Cal. Aug. 2, 2012) (disclaimer sufficient where boldfaced heading larger than surrounding text read "Warranties; Disclaimer of Warranties," and text of disclaimer was in all-caps while surrounding text was not, and stated that "GOOGLE EXPRESSLY DISCLAIMS ALL WARRANTIES . . . WHETHER EXPRESS OR IMPLIED . . . INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY").[12]

---

[12] Ford also cites a number of other cases under the laws of other states in a footnote. *See* Mot. at 9, n.9. Two cases cited by Ford actually found that the disclaimer was *not* conspicuous in circumstances similar to this case. *See Wayne Mem'l Hosp., Inc. v. Elec. Data Sys. Corp.*, 1990 WL 606686, at *5 (E.D.N.C. Apr. 10, 1990) (holding that a disclaimer "in the same type, color, and size as the rest of the Agreement" was not conspicuous, even though it was in a separately numbered paragraph with line spaces and an underlined heading titled "No Other Representation or Warranty," but enforcing it because the commercial customer had actual knowledge of the disclaimer); *Hoffman v. Daimler Trucks N. Am., LLC*, 940 F. Supp. 2d 347, 355 (W.D. Va. 2013) (disclaimer not conspicuous when located in the middle of back-page in all-caps because heading

16

In contrast, here, the heading only states "Limitations and Disclaimers," and the disclaimer of the implied warranty of merchantability does not appear until the middle of 3 pages that mostly discuss the terms of the express warranty. The sentence including the disclaimer of implied warranty does not appear until the bottom of the second page and is not distinguished from the surrounding text. To be conspicuous, the disclaimer of implied warranty should have been in a larger font size, in all caps, in bold, or set-off in some way from the surrounding text (much like the "NOTE:" that appears on page 3 of this section).

Thus, these circumstances are more similar to *Sierra Diesel*, where the Ninth Circuit held that a disclaimer was not conspicuous even though the front of a software agreement stated in large capital bold letters that "THE TERMS AND CONDITIONS, INCLUDING THE WARRANTY AND LIMITATION OF LIABILITY, ON THE REVERSE SIDE ARE PART OF THE AGREEMENT," but the back-side contained 14 separately numbered and titled sections and the ninth section containing the disclaimer was titled "WARRANTY," in all caps but not bolded. *Sierra Diesel*, 890 F.2d at 114. On those facts, the Ninth Circuit held that a reasonable person would not have noticed the warranty disclaimers on the back of the contract.

Ford has not cited any case approving a disclaimer similar to the one in its limited warranty, and the warranty does not appear to meet the requirements for conspicuousness. Accordingly, the Court **DENIES** Ford's motion for summary judgment with respect to class

---

was in the same font type and size as for other paragraphs and two other paragraphs were also in capital letters and text was not set off from other paragraphs in any distinctive way).

The others are distinguishable for the same reason as *Hoffman* and *In re Google Phone Litig*. *See Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 376 (D. Mass. 1991) (disclaimer conspicuous where stated in all caps, unlike surrounding text, that "THIS WARRANTY IS GIVEN EXPRESSLY AND IN PLACE OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE . . ."); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, 2015 WL 4591236, at *28 (D.N.J. July 29, 2015) (disclaimer stated in all-caps, unlike surrounding text, that "THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY . . ."); *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prod. Inc.*, 2007 WL 894833, at *26–27 (S.D. Ohio Mar. 22, 2007) (disclaimer conspicuous where immediately below signature line it stated in all caps that "THIS AGREEMENT IS SUBJECT TO ALL TERMS AND CONDITIONS ON THE REVERSE SIDE INCLUDING THOSE WHICH **LIMIT WARRANTIES**," and on the reverse side stated in all capital letters "THERE ARE NO . . . WARRANTIES, EXPRESS OR IMPLIED . . . INCLUDING OF MERCHANTABILITY . . . .").

17

members who used their vehicles for business or commercial purposes.[13]

B.   Tort Claims

The Court has also certified a class tort claim under Colorado strict product liability law and under Ohio negligence law.  Ford argues that (1) the economic loss doctrine bars Plaintiffs' strict product liability claim under Colorado law; (2) Plaintiffs cannot demonstrate that the vehicles created an unreasonable safety risk under Colorado law; and (3) Plaintiffs cannot show that Ford breached its duty to design a safe vehicle under Ohio negligence law.  The Court addresses each argument below.

1.   Colorado Law and Economic Loss Doctrine

Ford argues that the economic loss doctrine bars the Colorado Plaintiffs' strict liability claim, an argument this Court previously rejected in connection with Ford's earlier motion to dismiss.  *See In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 962-63 (N.D. Cal. 2014).  The parties' disagreement arises from an apparent conflict between two decisions of the Colorado Supreme Court.  In 1975, the Colorado Supreme Court held that in non-commercial, non-business transactions, a consumer may bring a claim under strict products liability in tort to recover damages, even when the defect harms only the product's own economic value.  *See Hiigel v. General Motors Corp.*, 54 P.2d 983, 989 (Colo. 1975).  Twenty-five years later, in 2000, the Colorado Supreme Court re-visited the question in *Town of Alma v. AZCO Constr. Inc.*, 10 P.3d 1256, 1264 (Colo. 2000), engaging in a thorough discussion about the economic loss doctrine and its role in maintaining a boundary between tort and contract law.  After a lengthy analysis of the

---

[13] Some case-law suggests that, insofar as sophisticated business entities are concerned, a disclaimer may be enforceable even if it is inconspicuous.  *See, e.g.*, *Wayne*, 1990 WL 606686, at *6 (holding that "if the plaintiffs have actual knowledge of the disclaimer, they are experienced businessmen, and have legal as well as technical consultants, then the purpose of the conspicuousness requirement is met" even if the disclaimer was not conspicuous).  Here, the class includes both private individuals and business entities.  However, Ford has not specifically argued for summary judgment with respect to business entity class members, and the parties have not briefed or addressed that issue.  In any case, Ford here interprets its disclaimer quite broadly to apply even to private individuals who use a car for "business or commercial purposes," including, in Ford's view, claiming mileage for tax purposes.  Given that Ford's broad interpretation would apply equally to both ordinary consumers with incidental business-related uses and sophisticated business entities, the Court finds the conspicuousness requirement has not been satisfied and denies summary judgment.

18

history of the economic loss rule nationwide, the court concluded, "[w]e hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* Though *Town of Alma* did not expressly overrule *Hiigel*, it cited the case in its historiography of the economic loss rule. *Id.* at 1260.

This Court previously interpreted *Town of Alma* narrowly, stating that it "did not overrule *Hiigel*," that it "addressed the issue of whether the [economic loss] rule barred the plaintiff's claim for negligence, not strict liability," and emphasized that it applies when no "independent duty" arises under tort law. *See In re MyFord Touch*, 46 F.Supp.3d at 963, 963 n.8. Since then, however, the Colorado Supreme Court has described *Town of Alma* as "adopting the economic loss rule, which provides that a party who suffers only economic harm may recover damages for that harm based only upon a contractual claim and not on a tort theory, such as negligence *or strict liability*, in order to 'maintain the boundary between tort law and contract law.'" *Forest City Stapleton Inc. v. Rogers*, 393 P.3d 487, 491 (Colo. 2017) (emphasis added). This description appears in a parenthetical describing *Town of Alma* and is not central to *Forest City*'s holding that implied warranty claims may be brought only if privity of contract is shown, except in the consumer goods context. Arguably, it is dicta. However, coming from Colorado's highest court, the language—contradicting this Court's earlier interpretation that *Town of Alma* was limited to negligence claims—is a sufficient reason to re-consider the issue despite Plaintiffs' objections under the law of the case. *See Hurst v. Prudential Securities, Inc.*, 923 F.Supp. 150, 153 (N.D. Cal. 1995) (court has discretion to reopen a previously resolved question when, inter alia, "an intervening charge in the law has occurred" or "other changed circumstances exist").

With the benefit of the Colorado Supreme Court's clarification in *Forest City*, the Court concludes that *Town of Alma* is not limited to negligence claims. Rather, in *Town of Alma*, the Supreme Court adopted the economic loss rule in relation to *all* tort claims. *See Town of Alma*, 10 P.3d at 1264 ("We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert *a tort claim* for such a breach absent an independent duty of care under tort law."). Notwithstanding the fact that *Town of Alma* does not expressly overrule

19

*Hiigel*, it extends the economic loss rule to tort claims in strict liability, as the Colorado Supreme Court later stated in *Forest City*.

Plaintiffs urge the Court not to read *Forest City*'s parenthetical reference to have overturned "decades" of law under *Hiigel*, but it is *Town of Alma*—not the parenthetical remark in *Forest City*—that appears to have changed the law. *Hiigel* did not stand without ambiguity for decades. In *Town of Alma*, the Colorado Supreme Court began by discussing the origins of the economic loss rule, including its adoption by the California Supreme Court in 1965. *See Town of Alma*, 10 P.3d at 1259-61. The court then explained that, in *Hiigel*, "[a]lthough not reaching as far as the [California Supreme Court], we endorsed the principles underlying the economic loss rule when we declined to extend . . . [the] strict liability doctrine to allow it to be used as a vehicle to recover commercial or business losses." *Id.* at 1261. Consumers could still pursue strict product liability claims premised solely on economic loss. The court then discussed the gradual adoption of the broader economic loss rule by courts around the country and by Colorado's appellate courts. *Id.* at 1261-62. After that overview and a discussion of the rationale underlying the economic loss rule, *id.* at 1262-63, the court stated unequivocally, "we now expressly adopt the economic loss rule" and "[w]e hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264. As this Court noted in its earlier ruling, *see* 46 F.Supp.3d at 963, *Town of Alma* had to be construed narrowly to save *Hiigel*.[14] That interpretation is no longer viable after *Forest City*.

Thus, the economic loss rule applies to strict product liability claims in Colorado. Plaintiffs' claim may only proceed if premised on breach of an "independent duty of care under

---

[14] Plaintiffs cite two cases to argue that *Hiigel* is good law, but they are distinguishable because they both involved a product defect which *also* caused damage to *other* property, and therefore could have proceeded even if the economic loss rule applied. *See U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.,* 358 F.Supp.2d 1021, 1025-27 (D. Colo. 2005) (holding that loss of aircraft in crash due to defective engine was "more than damage to the warrantied 'product' or products [itself]"); *Loughridge v. Goodyear Tire and Rubber Co.*, 192 F.Supp.2d 1175, 1184 (D. Colo. 2002) (though holding that strict products liability law imposes an independent duty from contract law and relying on *Hiigel*, holding that even if that were not the case, "Plaintiffs alleged physical harm to property other than the product itself").

20

tort law." *Town of Alma*, 10 P.3d at 1264.  The Tenth Circuit has recently explained:

> Under Colorado law, for a duty to be 'independent' of a contract, and thus actionable in tort notwithstanding the economic-loss rule, two conditions must be met.  First, the duty must arise from a source other than the relevant contract.  Second, the duty *must not be a duty also imposed by the contract*.  That is, even if the duty would be imposed in the absence of a contract, it is not independent of a contract that memorializes it.

*Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009) (citations, quotations, and alterations omitted) (emphasis added).  Thus, it is not sufficient simply that strict products liability creates a duty independent of the contract if the contract memorializes or imposes the same duty.  *See*, *e.g.*, *In re Porsche Cars N. Am., Inc.*, 880 F.Supp.2d 801, 837 (S.D. Ohio 2012) (interpreting *Town of Alma* as setting forth a standard inconsistent with *Hiigel* and holding that "[w]hen a product sustains damage that would have been covered under its warranty, but the damage occurs outside of the warranty period, the damages could have been addressed in contract and are exactly the kind of damages that the economic loss rule developed to address").

Here, to the extent that Plaintiffs allege the defective design gave rise to an unreasonable safety hazard (rather than non-safety defective performance), there is some ambiguity whether such claims arise from an independent tort duty and therefore are not precluded by the economic loss rule.  *See Scott v. Honeywell Int'l Inc.*, 2015 U.S. Dist. LEXIS 42194, at *34-36 (D. Colo. Mar. 30, 2015) (holding that plaintiffs' strict liability claims had to be dismissed under Colorado's economic loss rule because, inter alia, plaintiff failed to allege his defective "humidifiers created any unreasonable risk of injury").  Most courts still apply the economic loss rule in such circumstances, however, and that appears to be the direction Colorado has taken after *Town of Alma* and *Forest City*.[15]  In any case, even if strict liability gives rise to an independent duty

---

[15] *See also* Restatement (Third) of Torts: Prod. Liab. § 21 (1998) ("A somewhat more difficult question is presented when the defect in the product renders it unreasonably dangerous, but the product does not cause harm to persons or property. In these situations the danger either (1) never eventuates in harm because the product defect is discovered before it causes harm, or (2) eventuates in harm to the product itself but not in harm to persons or other property. A plausible argument can be made that products that are dangerous, rather than merely ineffectual, should be governed by the rules governing products liability law. However, a majority of courts have concluded that the remedies provided under the Uniform Commercial Code—repair and

protecting against safety hazards in design, given the terms of Ford's express warranty, that duty also arises under Ford's broader express warranty protections against *any* design defects.  Under *Haynes*, Ford's express warranty effectively memorializes the strict liability duty and therefore the economic loss rule precludes the claim for breach of that duty.  The Court **GRANTS** Ford's motion for summary judgment on the Colorado strict product liability claim.[16]

            2.    <u>Ohio Negligence Claims</u>

        Plaintiffs bring a class claim for negligence based on Ohio law.  TAC ¶ 640 (alleging Ford breached its "duty to design and manufacture [vehicles that] worked reasonably well and presented no significant risks to the safe operation of the vehicles").  Under Ohio law, "to establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom."  *Strother v. Hutchinson*, 423 N.E.2d 467, 469-70 (Ohio 1981).  Moreover, manufacturers have a duty "to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable."  *Jones v. White Motor Corp.*, 401 N.E.2d 223, 229 (Ohio Ct. App. 1978) (quotation omitted).  No cases have been cited to support the notion that Ford had a duty to design vehicles that "worked reasonably well," TAC ¶ 640, so it appears this claim may proceed only to the extent Plaintiffs present evidence of a breach of duty to design a vehicle that is reasonably safe.

        Ford argues Plaintiffs have failed to present evidence of an unreasonable safety risk, especially in light of the fact that Ohio Plaintiff Miskell never collided his vehicle despite driving it extensively and continuously for several years.  Thus, according to Ford, Plaintiffs' sole "harm" is allegedly the potential risk of future accidents, which is not actionable in and of itself.  *See Hoffer v. Cooper Wiring Devices, Inc.*, 2007 WL 1725317 (N.D. Ohio June 13, 2007).  Plaintiffs respond that they are not seeking damages caused by car accidents—present or future—but rather

---

replacement costs and, in appropriate circumstances, consequential economic loss—are sufficient. Thus, the rules of this Restatement do not apply in such situations.").

[16]  Because the Court grants summary judgment on these grounds, it need not reach Ford's alternative argument that Plaintiffs have not introduced evidence of an unreasonable risk of harm under Colorado law.

1   only for the decreased value of their vehicles consistent with the Court's certification order.[17]  As

2   *Hoffer*—the case cited by Ford—itself recognizes, plaintiffs may recover for economic loss

3   "connected to alleged damage to or decreased value of a defective product."  2007 WL 1725317 at

4   *8.

5          Thus, the Ohio Plaintiffs' negligence claim appears to rise or fall with whether Plaintiffs

6   have shown that Ford breached its duty to design a reasonably safe product, and whether they can

7   show a loss of value of the vehicles proximately caused by that breach of duty.  As explained

8   earlier, Plaintiffs have presented sufficient evidence for a jury to conclude that the defect presents

9   an unreasonable safety risk.  Further, as discussed below, they present evidence that the MFT lost

10  value due to the various problems associated with it.

11         However, in their briefing Plaintiffs have not squarely addressed *causation*, *i.e.*, whether

12  the lost value can be attributed to the breach of the duty to design a *safe* product rather than a *good*

13  product.  If the economic harm was simply the result of MFT not living up to consumer

14  expectations (rather than the result of its safety defects), then their economic loss would not be

15  proximately caused by breach of the duty underpinning their negligence claim.  Nevertheless,

16  though Plaintiffs do not cite to it in this portion of their briefing, as explained in the section below

17  regarding the experts, it appears that one of Mr. Boedeker's studies predicts the loss of economic

18  value when the defect is linked to safety concerns (see Result 4 in Mr. Boedeker's study, *infra*).

19  This model may constitute a basis for calculating proximate damages with respect to the Ohio

20  negligence claims, for the reasons explained below.

21         The Court thus **DENIES** Ford's motion for summary judgment on the Ohio negligence

22  claim.

23  C.     Express Warranty Claims and Repair Attempts

24         Ford argues that the California and Washington class claims for breach of express warranty

25  based on failure of its essential purpose must fail because Plaintiffs cannot demonstrate that class

---

27  [17]  *See* Docket No. 279 at 27 ("Where Plaintiffs seek actual or economic damages, these claims
28  will be certified to the extent Plaintiffs seek to recover lost value" but not "to the extent they seek
    incidental or consequential damages").

members attempted at least two repair attempts. "A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992). A repair or replace remedy "fails of its essential purpose when a warrantor fails to successfully repair defects within a reasonable time." *Oddo v. Arcoaire Air Conditioning and Heating*, Case No. 15-cv-01985-CAS(Ex), 2017 WL 372975, at *12 (Jan. 24, 2017). "[B]efore the exclusive repair and replace remedy is considered to have failed of its essential purpose, the seller *must be given an opportunity* to repair and replace the product." *In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 970 (N.D. Cal. 2014) (quotation and citation omitted, emphasis in original). Ford makes a similar argument with respect to Plaintiffs Kirchoff and Mitchell's individual breach of express warranty claims. The Court addresses each separately.

1.  Class Claims

In its class certification order, the Court explained that "[t]o recover for breach of express warranty, a plaintiff must have brought his or her vehicle in for repair twice, and Ford must have been unable to repair it." *See* Docket No. 279 at 42. The Court reasoned that such information should be reflected in Ford's records, and,

> [i]f Ford has no record that a particular consumer took his or [her] vehicle in for repair twice, then the fact finder can presume that the consumer did not do so. A consumer may rebut that presumption by producing proof that he or she took the vehicle in for two repairs, from his or her own records. As the consumer has the burden of proof, if he/she is not able to produce such proof, then he or she will not recover. The inquiry will turn on records and is relatively simple. It does not defeat predominance.

*Id.*

Ford's expert, Dr. Taylor, analyzed Ford's business records with respect to Subject Vehicles in twelve states (before the Court certified only two states) and concluded that 77.1% of proposed class members did not obtain any MFT repairs, and 17.3% obtained only one. *See* Edwards Decl., Ex. 44 at 31, Fig. 14. Thus, 94.4% of the then-proposed class members did not meet the two-repair threshold, and only 1.5% obtained three or more MFT warranty repairs. *Id.* Neither party has introduced evidence focusing on repair attempts by class members in the

24

certified states, California and Washington.

Plaintiffs raise two main arguments in rebuttal.

*First*, Plaintiffs argue that Ford's "repair and replace remedy" under the warranty does not apply to design defects, so they were not required to attempt repairs to demonstrate a breach.[18] Ford's warranty states that "if" a vehicle "was taken to a Ford dealership for a warranted repair during the warranty period," then Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use . . . *due to a manufacturing defect* in factory-supplied materials or factory workmanship." *See* Edwards Decl., Ex. 47 at 8-9 (emphasis added). The next paragraph, however, states that "[d]efects may be unintentionally introduced . . . during the *design* and manufacturing processes," and "[f]or this reason, Ford provides the [warranty] in order to remedy *any such defects* that result in vehicle part malfunction or failure during the warranty period." *Id.* at 9 (emphasis added). As Plaintiffs note, the Ninth Circuit has construed this warranty provision to cover both design and manufacturing defects, reasoning that the ambiguity created by the second clause requires construction of the first clause against the drafter, Ford. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Contrary to Plaintiffs' argument, however, that necessarily means that the requirement to present the vehicle for repair *also* applies to design defects. Thus, class members must comply with the repair requirement to allege a breach.

*Second*, Plaintiffs point back to the Court's order on class certification to state that Ford has records which could show the required repairs were attempted. This argument makes little sense. Plaintiffs conflate their burden at class certification (demonstrating the existence of a common issue not predominated by individualized inquiries) with their burden at summary judgment (demonstrating that evidence exists to permit a jury to conclude that class members exhausted their repair attempts). Plaintiffs have not presented any evidence that permits a class-wide inference that repair attempts were exhausted such that Ford was given an opportunity to resolve the breach with respect to each class member.

---

[18] The Court did not reach this question at class certification because "[t]he parties did not brief whether the warranty applies to design defects." Docket No. 279 at 42, n.26.

25

United States District Court
For the Northern District of California

Nevertheless, classwide summary judgment in Ford's favor is not appropriate here. Dr. Taylor's analysis, as Ford concedes, does not address whether the California and Washington class members had the same rates of repair attempts as the twelve states analyzed by Dr. Taylor in the aggregate. Moreover, even Dr. Taylor's analysis confirms that at least 5% of consumers in the twelve states analyzed *did* attempt at least two repairs. There is no basis to enter judgment against those class members. Further, Ford's lack of records with respect to the remaining class members is not dispositive; rather, under the burden-shifting framework established by the Court's class certification order, they are still entitled to demonstrate on an individual basis whether they pursued repairs. The Court therefore **DENIES** Ford's motion for summary judgment (on a classwide basis) on this basis.[19]

### 2. Plaintiff Kirchoff (Washington)

Ford argues it is entitled to summary judgment against Plaintiff Kirchoff because he sought only one repair for the MFT system and then three repairs for an issue with his rearview camera, which was "solved." Ford's summary mischaracterizes the record.

Kirchoff presented his vehicle for service on July 3, 2013 regarding a Bluetooth connectivity issue in connection with incoming and outgoing calls, for which he was advised to pull the fuse to reset SYNC. He followed these steps a few times when the problem arose and he said the problem stopped recurring after a summer 2013 software update. *See* Edwards Decl., Ex. 36 at 162:16-164:23. In November 2014, Kirchoff began experiencing problems with his backup camera, so he presented it to a dealer three times between November and December 2014. *See* Edwards Decl., Ex. 36 at 186:24-192:24. The measures that the dealer attempted (including cleaning connectors and replacing the camera) solved a "problem concerning wavy lines on the screen or picture, a fuzzy, a staticy picture." *Id.* at 191:18-23. However, the issue of 'the MyFord

---

[19] Though summary judgment is inappropriate, the question arises whether common issues still predominate over individualized inquiries with respect to the express warranty claims. The Court certified these classes on the presumption that Ford's records would provide a starting point for demonstrating the attempted repairs, but it now appears that those records can substantiate the claims of only a very small percentage of the potential class, with the overwhelming majority of class members being required to demonstrate their exhaustion attempt through some sort of individualized proceeding. However, that question has not been brought before the Court.

1    Touch indicating it can't connect with a camera went back to the incident that was the frequency

2    prior to when it started to get much worse." *Id*. In other words, the November 2014 repairs

3    mitigated the issues that had suddenly become exacerbated, but did not eliminate all the issues

4    Kirchoff had been experiencing in connection with the MFT system. *See id.* at 192:16-18

5    (testifying that "[c]ertain aspects of those problems still exist and are part of the total body of

6    issues which have prompted me to get involved in this").

7          Ford argues that these multiple repair attempts are insufficient because they related to

8    "separate" issues, and that Plaintiffs, in place of "lumping" service requests, have to instead show

9    that they sought two repair attempts with respect to each discrete issue to show a breach of

10   warranty. In connection with Ford's first motion to dismiss, the Court observed that "all of the

11   problems here relate to the MFT system specifically" and held:

12             Plaintiffs have alleged there is an underlying defect within the MFT
               system (software and/or hardware). Even if that underlying defect
13             manifests itself in different ways within the MFT system, that does
               not necessarily detract from the allegation that there is still an
14             underlying systemic defect. That assertion is supported by factual
               allegations in the complaint, in particular, the allegations related to
15             Ford's issuance of the TSBs and software updates. In other words,
               if Ford was trying to fix the problems with MFT by issuing TSBs
16             and software updates that implemented systemic types of fixes, that
               lends support to Plaintiffs' theory that the varying problems were
17             manifestations of an underlying systemic problem and hence
               'grouping' is permissible, at least for pleading purposes.
18

19   *In re MyFord Touch Litig.*, 46 F.Supp.3d 936, 972 (N.D. Cal. 2014). Thus, to the extent a repair

20   request arises out of that systemic, underlying defect, then it appears that grouping of service

21   requests for purposes of fulfilling the terms of the express warranty—even with respect to distinct

22   symptoms—is permissible.

23         Ford does not argue that Plaintiffs lack evidence of an underlying systemic defect in MFT.

24   For the purposes of this motion, then, the existence of such a defect is not disputed. Grouping of

25   Plaintiff Kirchoff's repair requests is therefore proper. The Court **DENIES** Ford's motion

26   because Kirchoff unsuccessfully sought warranty service related to MFT on at least two occasions.

27         3.     <u>Plaintiff Mitchell (Iowa)</u>

28         Ford also argues that Plaintiff Mitchell failed to attempt at least two repairs. In November

2010, Mitchell presented his car for service due to a problem with his USB connector, but it turned out that the issue was with his cable and not MFT. *Id.* at 104-110. Replacing the cable fixed the problem, but Mitchell testified that "[t]here was still other issues[.]" *Id.* at 110:7-8. Ford does not appear to have closed out the issue by asking Mitchell what those "other issues" were. In any case, the repair request related to a dysfunctional USB cable, not the MFT defect, so it does not count for purposes of this breach of express warranty claim.

In September 2011, Mitchell presented his vehicle for service again due to issues with the backup camera image freezing. *See* Edwards Decl., Ex. 51 at 128-129. Ford installed a software update. Mitchell could not recall whether it ever happened again, but noted that it "hasn't happened for some time, so it very well could have been this [software] update that cleared that up." *Id.* at 129:24-25. He could not remember any specific additional issues he raised in September 2011, but he testified that he "repeatedly complained about [MFT]." *Id.* at 130:11-13. Ford did not close out the issue to determine what or when those repeated complaints were. Thus, Ford has not established that no question of material fact exists as to how many times Mitchell requested a repair and whether it addressed the issues with the MFT system. Ford's motion is **DENIED**.

D.    UCL Class Claims

The parties dispute what claims under California's Unfair Competition Law have been certified for class treatment. Ford contends that none have been certified because Plaintiffs sought only certification of fraud claims under the UCL, which the Court declined to certify. *See* Docket No. 279 at 48 (stating "The Court will not certify the class as to Plaintiffs' claims for violation of California's Unfair Competition Law to the extent they are predicated upon fraud[.]"); *see also* Docket No. 202 (Mot. for Class Certification) at 25, 29-30 (describing the UCL claim as a "California consumer fraud claim" and arguing only that the elements of fraudulent conduct satisfy commonality). Plaintiffs respond that the Notice of Motion was broader, in that it stated broadly that the "California Class seeks certification of claims for: . . . (b) violation of the Unfair Competition Law," Docket No. 202 at 1. They contend the Court therefore understood that Plaintiffs may bring class claims under the unfair and unlawful prongs of the UCL as well, which

28

1    Plaintiffs pled in their complaint.  *See* TAC ¶¶ 300-304.

2         Though there is some ambiguity in Plaintiffs' briefing of the motion for class certification,

3    both parties ignore that the Court's class certification order explicitly states that "[t]he Court will

4    certify the class as to claims for violation of . . . California's Unfair Competition Law to the extent

5    they are predicated on bases other than fraud."  Docket No. 279 at 47-48.  If fraud were the only

6    basis on which Plaintiffs sought class certification for the California Class under the UCL, then

7    there would have been no need for this sentence.  Moreover, the TAC is clear that Plaintiffs have

8    at least also pled a claim under the UCL's "unlawful" prong.  *See* TAC ¶ 301(ii) (Ford marketed

9    the vehicles as possessing functional and defect-free in-car communications and entertainment

10   units); *id.* ¶ 301(iii) (Ford refused or otherwise failed to repair and/or replace defective MFT

11   systems); *id.* ¶¶ 301(iv) (Ford violated the Magnuson-Moss Warranty Act).  The breach of

12   warranty claims have therefore been pled under the UCL and, in light of the Court's order, are

13   certified for class treatment.

14        Thus, whether Ford should be granted summary judgment on the class UCL claim depends

15   on the outcome of Plaintiffs' express and implied warranty claims.  Because the Court denied

16   Ford's motion to grant summary judgment on the breach of warranty claims, the Court will also

17   **DENY** Ford's motion with respect to the UCL.

18   E.   Plaintiff Creed's MCPA § 9 Claim

19        Ford argues that Plaintiff Creed's claim under the Massachusetts Consumer Protection Act

20   (MCPA), Mass. Gen. Laws ch. 93A, § 9, fails because he did not use his vehicle for purely

21   business purposes and the pre-litigation demand letter he sent failed to meet the statutory

22   requirements.  Neither of Ford's arguments is persuasive, as explained below.

23        1.   Purely Business Purposes

24        Under Massachusetts law, "[u]nfair methods of competition and unfair or deceptive acts or

25   practices in the conduct of any trade or commerce are . . . declared unlawful."  Mass. Gen. Laws

26   ch. 93A, § 2(a).  A person "who engages in the conduct of any trade or commerce and who suffers

27   any loss of money or property" due to violations of § 2 "by another person who engages in any

28   trade or commerce" may bring a cause of action under § 11 of the MCPA.  *See id.* § 11.  In

29

contrast, any other person must bring a cause of action under § 9 of the MCPA. *See id.* § 9. Thus, the MCPA "distinguishes between 'consumer' and 'business' claims, the former actionable under § 9, the latter actionable under § 11." *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 821 (2004). "The dividing line between a consumer claim and a business claim . . . is not always clear." *Id.* The question "[w]hether a particular plaintiff is acting in a business context . . . is a question of fact" reserved for the trier of fact. *Frullo*, 61 Mass.App.Ct. at 822; *see also Brown v. Gerstein*, 460 N.E.2d 1043, 1052 (Mass. App. Ct. 1984).

Here, Plaintiff Creed brings a claim under § 9, but Ford argues that he may not do so because he did not use his vehicle for "purely" personal reasons. *See Frullo*, 61 Mass.App.Ct. at 821 (explaining that "the choice [between Section 9 and Section 11 claims] appears to turn on whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons (such as the purchase of an item for personal use)"). In using the phrase "purely personal reasons," however, the Appeals Court of Massachusetts went beyond Massachusetts Supreme Court precedent stating that Section 9 merely "require[s] the plaintiff to prove that she purchased goods or services *primarily* for personal, family, or household purposes." *Linthicum v. Archambault*, 398 N.E.2d 482, 487 (Mass. 1979) (emphasis added), *abrogated on other grounds by Knapp Shoes, Inc. v. Sylvania Sohe Mfg. Corp.*, 418 Mass. 737 (1994); *see also Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 701 (1975) (for a section 9 remedy, "the included transaction must have been undertaken *primarily* for personal, family, or household purposes" (emphasis added)). The *Frullo* court did not explain the departure, discuss the potential conflict, or cite any case-law as direct support for its "purely personal reasons" standard. In determining state law, this Court is obligated to determine what the highest state court has held or would hold. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (federal courts must "follow a state supreme court's interpretation of its own statute in the absence of extraordinary circumstances," and when the highest court has not ruled on an issue, "the task of the federal courts is to predict how the state high court would resolve it"), *modified at* 810 F.2d 1517 (9th Cir. 1987). Where there appears to be a conflict, this Court must follow the Massachusetts Supreme Court.

Moreover, the *Frullo* court's statement was equivocal. *See* 61 Mass. App. Ct. at 821 ("the choice *appears* to turn on whether . . . [the transaction was undertaken] for purely personal reasons" (emphasis added)). The use of the term "appears" is significant because this sentence follows a string citation of cases presumably forming the backdrop for the court's observation. However, none of those cases set forth or follow a "purely personal reasons" standard; to the contrary, two in fact use the "primarily personal reasons" standard.[20]

In light of the *Frullo* court's equivocal statement, the lack of support in the case-law for a "purely personal reasons" standard,[21] and the unexplained deviation from Massachusetts Supreme

---

[20] *See Lantner v. Carson*, 374 Mass. 606, 609 (1978) (stating that Section 9 "provides a private right of action to any person who purchases . . . property . . . primarily for personal, family or household purposes"); *Linthicum, supra*, 398 N.E.2d at 487 (same); *Begelfer v. Najarian*, 381 Mass. 177 (holding that defendant private individuals participating in a real estate transaction were not "engaged in the conduct of any trade or commerce" and therefore could not be liable, and stating that one relevant factor is "whether the transaction is motivated by business or personal reasons" but not stating how that analysis is conducted); *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 22-27 (1997) (following *Begelfer* to conclude defendant university was acting in a business context and therefore could be liable under the MCPA); *Lynn v. Nashawaty*, 12 Mass.App.Ct. 310, 312-314 (1981) (following *Begelfer* to conclude trial court's conclusion that defendant was acting in business context was not clearly erroneous); *Brown v. Gerstein*, 17 Mass.App.Ct. 558, 569-571 (1984) (holding that "[t]he evidence warranted a finding that the plaintiffs as lessors of commercial property and perhaps as commercial clients of [defendant]) were acting in a business context" and thus could bring § 11 claim).

[21] Ford cited one federal district court applying the *Frullo* standard, but the case did not discuss this unexplained deviation and potential conflict with the state supreme court's precedent. *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016) (plaintiff health funds suing pharmaceutical companies for reverse settlement "cannot bring a claim under § 9 as they cannot show that they undertook the relevant transactions 'for purely personal reasons (such as the purchase of an item for personal use)'" (quotation omitted)). Moreover, the *Asacol* court did not need to address that question because the plaintiffs were plainly engaging in business activity and could not have shown they transacted "primarily" for personal reasons. In any case, at least one federal court has permitted the question whether the plaintiff was acting in a business context to go to a jury where the evidence could have supported either conclusion, thus implicitly rejecting a "purely personal reasons" standard. *See South Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F.Supp.3d 197, 217 (D. Mass. 2016) (denying summary judgment because reasonable fact finder could find *either* that plaintiff non-profit church was not acting in a business context when it contracted repair work but rather "in furtherance of its core mission to provide religious services," *or* that the work "was undertaken in order to increase revenue"). The other two cases cited by Ford are not illuminating because they do not analyze the applicable standard and involve obvious business transactions. *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) (property owner who rented the property and lived elsewhere was engaged in "trade or commerce" and therefore could bring claim under section 9); *Kay Constr. Co. v. Control Point Assocs.*, 15 Mass. L. Rptr. 203 (Mass. Super. Ct. 2002) (holding that a plaintiff business entity was "barred from bringing a consumer protection claim against an insurance company under § 9, when the claim asserted is based on conduct covered in § 11").

1    Court precedent, the Court concludes it must follow the Massachusetts Supreme Court's clear

2    examination of the "primarily personal reasons" standard.

3        Ford's motion for summary judgment fails.  Ford's argument is premised exclusively on

4    Plaintiff Creed's testimony about how he subsequently used the vehicle.  Creed testified that he

5    used his vehicle for both "personal" and "business" reasons, and by "business," he meant his use

6    of the car during work hours to attend meetings, visit clients, and travel between job sites.  *See*

7    Edwards Decl., Ex. 34 at 48:2-9, 52:16-54:3; Reply, Ex. A at 24:22.  He estimated that 30-40% of

8    his total mileage was for business purposes, as he "meticulously" tracked his mileage in a log in

9    the car for tax purposes.  *Id.*  Moreover, Ford did not present any evidence that spoke directly to

10   Creed's motivations at the time he purchased the vehicle.  Though his subsequent use may be

11   probative of his original motivations, none of it precludes a reasonable jury finding that he

12   purchased the vehicle either for "purely" or "primarily" (or indeed on this record—"purely")

13   personal reasons.

14       Accordingly, the Court **DENIES** Ford's motion for summary judgment on this basis.

15       2.    Sufficiency of Demand Letter

16       Massachusetts law requires a demand letter to be sent at least thirty days prior to filing suit

17   which "identif[ies] the claimant and reasonably describ[es] the unfair or deceptive act or practice

18   relied upon and the injury suffered."  Mass. Gen. Laws ch. 93A, § 9(3).  The purpose of the

19   written demand requirement is "(1) to encourage negotiation and settlement by notifying

20   prospective defendants of claims arising from allegedly unlawful conduct and (2) to operate as a

21   control on the amount of damages which the complainant can ultimately recover."  *Spring v.*

22   *Geriatric Auth. of Holyoke*, 475 N.E.2d 727, 736 (Mass. 1985) (quotation omitted).  The injury

23   suffered and relief demanded must "provide[] the prospective defendant with an opportunity to

24   review the facts and the law involved to see if the requested relief should be granted or denied and

25   enables him to make a reasonable tender of settlement."  *Id.* (quotation omitted).  This is a context-

26   specific inquiry.  "[A] demand letter need not contain a dollar amount of damages, so long as it

27   describes the injuries in 'sufficient detail to permit [the defendant] reasonably to ascertain its

28   exposure."  *Richards v. Arteva Specialties S.A.R.L.*, 66 Mass.App.Ct. 726, 734 (2006) (quotation

32

and citation omitted, alteration in original). Moreover, "in judging the sufficiency of . . . a precertification demand letter [in the class action context], we look solely to the description of the individual claimant's own injury[.]" *Id.* at 733.

Ford argues that Plaintiff Creed's pre-suit demand letter was insufficient because it "did not describe any concrete injury he allegedly suffered," "says nothing about the number of times his MFT system required repair, what repairs he requested or received, the amount of any out-of-pocket repair expenses incurred, or any other injury." Mot. at 17. Creed's 4-page demand letter, made on behalf of himself and those similarly situated, states that Ford failed to disclose that the MFT systems were defective, enumerates a number of specific problems with the MFT systems, states that "Ford has benefited from collecting funds from its customers who have paid for the Sync System option, as well as, potentially unnecessary vehicle service procedures," and demands (1) a voluntary recall, repair, and replacement of the subject vehicles; (2) notice of the defect to the class; (3) "actual damages representing, with interest, the ascertainable loss of moneys and/or property and/or value suffered or to be suffered as a result of Ford's omissions"; (4) treble damages; (5) "damages suffered or to be suffered as a result of Ford's breach of contract, and restitution for the unjust enrichment conferred upon Ford;" (6) attorneys' fees; and (7) additional relief as appropriate. *See* Edwards Decl., Ex. 53.

While no specific dollar amount is stated, the type of injury asserted is clear, as the letter claims the defective vehicles require repair (*i.e.*, a voluntary recall, repair, or replacement), damages related to the loss of vehicle value, and restitution. Moreover, the letter states that Creed "purchased a 2011 model year Ford Explorer equipped with the SYNC and MyFord Touch infotainment system." *Id.* at 1. This information is sufficient for Ford to ascertain its exposure at least vis-à-vis Plaintiff Creed, as the potential value of his individual claim would be derived principally from the cost of repairing or replacing his 2011 Ford Explorer. *See Richards*, 66 Mass.App.Ct. at 735 (holding that demand letter sent by prospective named plaintiff in antitrust class action was sufficient where it stated that the injury was "higher out-of-pocket costs to purchase [the] products" and therefore provided "sufficient detail to permit the defendants reasonably (even if only roughly) to ascertain their exposure, at least to [plaintiff] as an individual

33

and occasional purchaser of [the products in question]").  That was enough for Ford to determine a ballpark figure of what was at stake and to make a settlement offer to Creed, satisfying the purposes of the requirement for a prelitigation demand letter under Massachusetts law.

Thus, the Court **DENIES** Ford's motion for summary judgment on Plaintiff Creed's MCPA § 9 claim.[22]

F.    Expert Opinions re: Classwide Damages

Ford challenges the expert opinions of Dr. Arnold and Mr. Boedeker under both *Daubert* and *Comcast*.  Under *Daubert*, Ford argues that Dr. Arnold presents no evidentiary basis for his assumption that MFT had no value and therefore consumers' damages were the full cost they paid for the system.  Ford also argues that Mr. Boedeker's prediction of the diminution in value due to the defect is unreliable because Mr. Boedeker predicts only changes in the demand curve without considering any changes in the supply curve.  Under *Comcast*, Ford argues that Mr. Boedeker's model is based on a fraud theory of liability rather than liability for breach of implied and express warranty, and therefore incapable of estimating classwide damages on the certified claims.

Before analyzing each expert, the Court clarifies the appropriate measure of damages for each of the express and implied warranty claims.

1.    Measure of Damages

a.    Express Warranty Damages

Generally speaking, consumers suing for breach of an express warranty are limited to the remedies provided therein.  *See* Cal. Com. Code § 2719(1)(a); Wash. R.C. § 62A.2-719.  Here, Ford's warranty states that any remedy for a breach may not "exceed the cost of correcting manufacturing defects."  Edwards Decl., Ex. 47 at 12.  Though Plaintiffs argue this limitation of remedies does not extend to design defects, the Ninth Circuit has construed the scope of Ford's

---

[22]  Ford cites two other cases but they are not analogous.  *See Hiller v. Daimler Chrysler Corp.*, 2007 WL 2367629, at *1 (Mass.Super.Ct. July 25, 2007) (plaintiffs' demand letter was "vague and devoid of any description of an injury" and "fail[ed] to inform Defendant that their c. 93A claim was based on a breach of implied and expressed warranties"); *Moynihan v. LifeCare Centers of Am., Inc.*, 60 Mass.App.Ct. 1102 (2003) (in negligence claim against nursing home, plaintiff's letter "contained neither a reasonable description of the plaintiff's injuries nor a damage figure of an amount which would enable the defendant to assess the plaintiff's claim," but the contents of the letter are not described so a comparison is not possible).

express warranty to cover both design and manufacturing defects. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224-25 (9th Cir. 2015). It appears that the limitation clause should be similarly construed, as discussed above. If the appropriate measure of damages is the cost of correcting the MFT defects, then Ford is correct that Plaintiffs have not proffered any expert opinion or other evidence that estimates the cost of repair.

Plaintiffs correctly point out, however, that both California and Washington law provide that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." Cal. Com. Code § 2719(2); Wash. Rev. Code § 62A.2-719(2). A limited remedy of repair fails of its essential purpose when the seller is unable to repair the product. *See, e.g.*, *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978); *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 547 (9th Cir. 1985). In those circumstances, the purchaser "is entitled to recover the difference between the value of what he should have received and the value of what he got." *S.M. Wilson*, 587 F.2d at 1375. *See also* Cal. Com. Code § 2714(2); Wash. Rev. Code § 62A.2-714(2).

Thus, there are two issues: whether Plaintiffs can demonstrate that the express warranty failed of its essential purpose (*i.e.*, that Ford failed to repair the defects despite the opportunity to do so) and, if so, whether Plaintiffs' damages models are admissible evidence of the difference in value between the vehicles as warranted and as accepted.

As discussed above, the question whether the limited warranty failed its essential purpose because Ford failed to repair the defects despite a sufficient opportunity cannot be resolved on summary judgment. If a jury ultimately concludes that the warranty failed its essential purpose because all Class Members attempted unsuccessful repairs, then damages will be measured by the diminution in value between the vehicles as warranted and the vehicles as sold. The Court will rely on this measure in assessing the adequacy of Plaintiffs' damages models. As explained below, this is the same measure of damages as Plaintiffs' implied warranty claims.[23]

---

[23] Plaintiffs concede that if they cannot prove the warranty failed of its essential purpose, then they have offered no evidence estimating the cost of repair.

        b.        Implied Warranty Damages

The parties agree that the U.C.C. provides for the measure of damages for the breach of implied warranty in all of the certified states. *See* U.C.C. § 2-714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."). Thus, this standard is identical to damages for breach of express warranty, if Plaintiffs were to prove that Ford's warranty failed its essential purpose.

        c.        Summary

The Court's analysis of the expert models will proceed from the assumption that damages for both the implied and express warranty claims will be measured presumptively by the diminution in value of the vehicles as warranted versus as sold. Indeed, this is the same measure of damages certified by the Court for class treatment. *See* Docket No. 279 at 27. In connection with class certification, the Court approved Dr. Arnold and Mr. Boedeker's damages models because, at that stage of proceedings, they appeared to "allow the fact finder to calculate the diminution in value of Plaintiffs' vehicles." *Id.* However, the Court also held that "Plaintiffs are incorrect in arguing their damages cannot be reduced by post-purchase mitigation;" rather, the Court's holding was "without prejudice to Ford's ability to present evidence of mitigation later in this litigation (to reduce its liability)[.]" *Id.* at 31.

        2.        Ford's *Daubert* Challenges

The Court first analyzes Ford's *Daubert* challenges to Plaintiffs' experts. Under *Daubert*, in assessing the admissibility of expert testimony under Federal Rule of Evidence 702,[24] the Court must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

---

[24] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

applied to the facts in issue." *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (*Daubert* standards apply to all expert testimony, not only scientific experts). The Supreme Court has identified a non-exhaustive list of factors that may bear on the inquiry:

- whether the theory or technique can be or has been tested
- whether the theory or technique has been subjected to peer review and publication
- the known or potential rate of error with a scientific technique
- acceptance of the technique by a relevant scientific community

*Id.* at 593-94; *see also United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). None of these factors is dispositive and, ultimately, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one" which is focused "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. Under Rule 702 and *Daubert*, "[t]he duty falls squarely upon the district court to act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quotation and citation omitted). Moreover, "[t]he trial judge also has broad latitude in determining the appropriate form of the inquiry." *Id.* at 463.

In this role, the "judge is a gatekeeper, not a fact finder," and the "gate [should] not be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010). The purpose of the gatekeeping role is to ensure that expert testimony is "properly grounded, well-reasoned and not speculative," but it is not meant to substitute for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden and proof [which] are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702, Adv. Comm. Notes (2000) (quotation omitted). Thus, "[a]fter an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

Because the Court acts merely as a gatekeeper and not a factfinder, an expert whose

methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute, unless those factual assumptions are "indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 93 F.3d 1320, 1331 (5th Cir. 1996); *see also* Fed. R. Evid. 702, Adv. Comm. Notes (2000) (explaining that "[w]hen facts are in dispute, experts sometimes reach different conclusions" and a trial court is not "authorize[d] . . . to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other"). Indeed, Rule 702 is "broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." Fed. R. Evid. 702, Adv. Comm. Notes (2000). It traditionally falls upon cross-examination to negate the facts or factual assumptions underlying an expert's opinion.

        a.    <u>Mr. Boedeker and *Daubert*</u>

Ford argues Mr. Boedeker's methodology is unreliable under *Daubert* because he (i) fails to consider used car prices in assessing whether the defect caused a diminution in value; (ii) fails to consider the supply side of the equation in his market analysis; and (iii) uses a method that has not been peer reviewed. Ford does not otherwise challenge Mr. Boedeker's qualifications.

        i.    <u>Mr. Boedeker's Method Is Not Unreliable Because It Relies On Survey Evidence Rather Than Used Car Sales Data</u>

Mr. Boedeker uses a choice-based conjoint analysis to measure how consumers valued the MFT system in four scenarios where they were provided varying levels of information about MFT; each scenario and the resulting value calculation is summarized in the table below. *See* Edwards Decl., Ex. 57 at·¶¶ 67-83.

| Scenario | Consumers Aware Of… | Projected Value of MFT |
|---|---|---|
| Result 1 | MFT's general features, but no defect | $1,850 (¶¶ 67-73) |
| Result 2 | MFT suffers from a "glitch" that will be fixed free of charge in the future | Drops by $729 (¶ 74) |
| Result 3 | Specific statements by Ford officials regarding extent of MFT defect and that it could not be fixed | Drops by $910 (¶ 75-77) |
| Result 4 | MFT defect may cause distractions affecting safety | Drops by $839 without Result 3 Ford statements (¶79) |
| | | Drops by $1,290 if Result 3 statements also disclosed (¶ 83) |

As the table demonstrates, Mr. Boedeker found that the more information consumers were provided about the defect, the greater the drop in MFT's value to consumers. Where survey respondents simply learned MFT suffered from a glitch that would be fixed within a year, the value dropped by $729 (Result 2). Where respondents also learned of statements by Ford officials concerning their knowledge of the problem and its severity (*i.e.*, the lack of a solution), the value dropped by $910 (Result 3). Under Result 4, Mr. Boedeker performed two tests. Under one, he concluded that where respondents were informed that the MFT defect could cause distractions affecting safety, the value dropped by $839. Under the other, where they learned about *both* the Ford officials' statements (the same as in Result 3) *and* the safety problem, the value dropped by $1,290.

Ford argues that it is "conceptually inappropriate and inherently unreliable to use responses to hypothetical survey questions to estimate willingness to pay when actual pricing data for used vehicle sales is available." Mot. at 22-23. In other words, Ford contends that Mr. Boedeker should have analyzed used car sales data rather than consumers' opinions. As support, Ford relies only on *In re Ford Motor Co., Spark Plug & 3-Valve Engine Prod Liab. Litig.*, 2014 WL 3778592, at *43 (N.D. Ohio July 30, 2014). However, that case does not hold that an expert may only rely on used vehicle sales data to estimate a vehicle's diminution in value. Rather, in that case, Ford's experts opined based on used car sales data that the defect at issue had not caused

39

any diminution of value.  *Id.* at *43.  The plaintiffs in *Spark Plug* did not introduce *any* expert testimony or other evidence to support their diminution of value theory.  *Id.*  In light of that failure, summary judgment was granted in Ford's favor.  In contrast, here Plaintiffs have presented evidence to rebut Ford's own contentions about the vehicles' value.  *Spark Plug* does not purport to establish adopt or apply a per se rule that used car sales data is the only legitimate measure of a diminution in value, nor does it support exclusion of Mr. Boedeker's analysis.

Under *Daubert*, Mr. Boedeker's method need only be "reliable" and Ford has not explained why a choice-based conjoint analysis is inherently unreliable because it relies on survey evidence rather than used car sales data.  To the contrary, one court has specifically rejected Ford's argument.  *See Sanchez-Knutson v. Ford Motor Co.*, 181 F.Supp.3d 988, 996 (S.D. Fla. 2016) (admitting choice-based conjoint analysis and holding that Ford's evidence of "an active secondary market . . . which [Ford] contends shows successful sales of used [vehicles] with no indication of decreased value" may be presented to the jury as refutation evidence but "is not grounds to exclude [plaintiffs' expert's] opinion").  Moreover, a similar choice-based conjoint analysis survived a *Daubert* challenge in one of the cases cited by Ford.  *See In re NJOY, Inc. Consumer Litig.*, 120 F.Supp.3d 1050, 1073-75(C.D. Cal. 2015) (holding that expert's choice-based conjoint analysis measuring consumer willingness-to-pay satisfied reliability requirements of *Daubert*).

Though Ford criticizes Mr. Boedeker's decision not to analyze used car sales data, that objection goes to the weight of his opinion, not its admissibility.  His value analysis is sufficiently reliable to survive *Daubert*.  The Court declines to exclude Mr. Boedeker's analysis on the basis he uses a survey rather than used car sales data.

ii.     Mr. Boedeker's Focus On The Demand Side Of The Equation Does Not Render His Method Unreliable

Ford also argues that Mr. Boedeker focused only on consumers' subjective valuations to determine how the defect affects demand, but failed to consider the effects of the supply curve on hypothetical prices.  According to Ford, Mr. Boedeker's failure to consider the supply curve means he cannot offer a well-founded opinion about market price, which requires looking at the

40

intersection of supply and demand curves and the resulting equilibrium market price under traditional economic theory.

In response, Plaintiffs claim that Mr. Boedeker—unlike experts in cases cited by Ford—did not ignore the supply curve, but rather assumed that it was constant. Mr. Boedeker's report states:

> Defendant's act to not disclose the defect at the point of purchase has created a new situation with respect to supply and demand – if the purchasers of the vehicle would have been informed about the defect at the point of purchase, their purchase decision would have been different and, as a result, the demand curve shifts.
>
> However, the supply curve remains the same with either set of information: in the consumers' actual point-of-purchase situations where vehicles with a defective MFT were sold without disclosing the defect, the same vehicles were sold at the same price as in the hypothetical world where the defects were disclosed at the point of purchase. Therefore, only the changes in the demand curve are relevant for the damages assessment.

Edwards Decl., Ex. 57 ¶¶ 22-23.

Although it is correct that Mr. Boedeker assumes that the supply curve is constant (*i.e.*, its shape is fixed), that does not in itself respond fully to Defendant's challenge; Mr. Boedeker does not expressly look to the new equilibrium price point as defined by the intersection of a sloping supply curve with the adjusted demand curve. This is illustrated by Figure 7 in Mr. Boedeker's report, reproduced below:



The hypothetical equilibrium price point (intersection between supply and demand) would be where the two gray lines intersect at the left; the equilibrium price point would be approximately

$35. Instead, Mr. Boedeker calculates a diminution in value by looking at the absolute difference between the original demand curve (in red) and the hypothetical demand curve (in gray) assuming the amount of product supplied remained constant. At the same quantity, the price under the new demand curve would be approximately $20.

Thus, he measures the difference in value by assuming that the supply—the quantity—was fixed. In terms of economic theory, the portion of the supply curve that concerns Mr. Boedeker's analysis is effectively vertical—supply is fixed regardless of price in this region of the graph. Though Mr. Boedeker adamantly denies that his analysis is consistent with assuming a vertical supply curve, *see* Edwards Decl., Ex. 59 at 322:6-24, that is the effect.

Despite Mr. Boedeker's apparent inconsistency in characterizing his own analysis, the substance of this analysis is clear. The Court cannot conclude at this stage that Mr. Boedeker's assumption that the supply would have been the same regardless of the change of price within the range of his survey is "indisputably wrong." *Guillory*, 93 F.3d at 1331. Mr. Boedeker explained that, "[f]or my calculations, the supply is fixed because it's – it's the same vehicles that include the MyFord Touch System, it's just that the level of information available to the consumer, who is at the point of purchase, differs." Edwards Decl., Ex. 59 at 315:20-24; *see also id.* at 316:9-317:2. The assumption that Ford would have sold the same number of vehicles notwithstanding a drop in value ranging from $729-$1,290 is not so far-fetched as to be indisputably wrong. The projected reduction in value is not so significant as to suggest that Ford would have preferred not to sell any vehicles at that price; indeed, the projected drop in value appears to be within a range of negotiable price discounts not uncommon at a car dealership—at least Ford has not on this motion demonstrated to the contrary. The jury is entitled to weigh the credibility of Mr. Boedeker's assumption, and Ford will have the opportunity to cross-examine him.[25]

---

[25] Ford has identified two district court decisions that may fairly be read to hold that an expert's failure to consider the supply side of the equation when predicting diminution in value may render his or her testimony unsuitable for calculating damages. *See Saavedra v. Eli Lilly & Co.*, 2014 U.S. Dist. LEXIS 179088 (C.D. Cal. Dec. 18, 2014); *See In re NJOY, Inc. Consumer Litig.*, 120 F.Supp.3d 1050 (C.D. Cal. 2015). But because Mr. Boedeker does consider the supply curve, those cases are distinguishable. Moreover, those courts cited other weighty reasons rendering the expert's methodology unsuitable for the cases before them. *See Saavedra*, 2014 U.S. Dist. LEXIS 170988 at *16-17 (choice-based conjoint analysis to determine a "refund ratio" based on relative

42

Finally, the Court notes there are policy reasons to afford Plaintiffs a reasonable opportunity to posit damages based on a more flexible approach to economic theory. Under a traditional economic model, determining the equilibrium price point would require looking at the intersection of a supply and demand curve. In this case, modifying the supply curve could mean that a projection will assume that fewer vehicles were sold than were in fact sold, thereby failing to account for the fixed number of defective vehicles that *were* sold. Assuming that fewer consumers were injured in the hypothetical world than were injured in the real world runs the risk of undercompensating the real-world injured consumers. Although the Court understands why, as a matter of economic theory, projecting an equilibrium market price requires consideration of both supply and demand curves, here the fact that a fixed number of vehicles were in fact sold (and thus a fixed number of consumers were potentially harmed) merits assuming that the size of the class is the same in both the hypothetical and real worlds and assessing damages on that basis. Doing otherwise might allow a defendant to profit in the real world by its wrongdoing (if proven) based on the notion that fewer people were harmed in the hypothetical world. That would not serve the remedial purpose of the damages remedy, making real-world consumers whole again. *See*, *e.g.*, *Plasti-Line Mfg. Co. v. Combined Communications Corp.*, 741 F.Supp. 141, 144 (E.D. Tenn. 1989) ("The purpose of damages is to put the injured party . . . in as good a position as it would have been in if the breach of warranty had not occurred. It is to give [the plaintiff] the benefit of its bargain—not more and not less.").

A defendant should not be permitted to profit on the basis that calculating damages may be theoretically challenging. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (noting that damages "[c]alculations need not be exact" so long as they "attempt" to "measure only those damages attributable to [plaintiffs'] theory"); *cf. Living Designs, Inc. v. E.I. Dupont de Nemours*

value of misrepresentation to consumers could not simply be applied to consumers' out-of-pocket costs to calculate damages because those costs were not "tether[ed]" to "fair market value" but rather "an arbitrary amount [such as a prescription co-payment] that is unrelated to the amount of harm incurred by individual class members"); *In re NJOY*, 120 F.Supp.3d at 1121-22 (choice-based conjoint analysis could determine "the relative value a class of consumers ascribed to the safety message [regarding electronic cigarettes]," but [did] not permit the court to turn the 'relative valuation . . . into an absolute valuation to be awarded as damages"). Here, Mr. Boedeker rendered opinions based on actual dollar amounts.

1   *and Co.*, 431 F.3d 353, 367 (9th Cir. 2005) (explaining that "[w]here the fact of damage is

2   established," the court will "not insist upon a higher degree of certainty as to the amount of

3   damages than the nature of the case admits, particularly where the uncertainty was caused by the

4   defendant's own wrongful acts"); *Hunt Foods, Inc. v. Phillips*, 248 F.2d 23, 33 (9th Cir. 1957)

5   ("[W]here it clearly appears that a party has suffered damage, a liberal rule should be applied in

6   allowing a court or jury to determine the amount; and that, given proof of damage, uncertainty as

7   to the exact amount is no reason for denying all recovery.  The fact that the amount of damage

8   may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment

9   does not bar recovery."); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 513

10  (9th Cir. 1985) ("Although uncertainty as to the amount of damages will not preclude recovery,

11  uncertainty as to the fact of damages may.").

12      For these reasons, the Court concludes Mr. Boedeker's treatment of supply in his analysis

13  is sufficiently reliable to satisfy *Daubert*.

                    iii.    Market Simulation Method

15      Ford also argues that the "market simulation method" which Mr. Boedeker uses has no

16  accepted basis in economics.  Mr. Boedeker's market simulations "begin[] by defining a 'base

17  case' vehicle with no features added and no additional cost."  Edwards Decl., Ex. 57 at ¶ 68.

18  Respondents are then asked whether they would take the "base case" vehicle or not; Mr. Boedeker

19  determined that 29.5% of consumers would have chosen the "base case" option while 70.5%

20  would not.  *Id.*  In the next step, Mr. Boedeker adds the MFT system at no additional cost.  *Id.*

21  Then, Mr. Boedeker increases the price of the MFT system incrementally.  *Id.* ¶ 69.  The price

22  increases correspond with a gradual decrease in the number of consumers who opt for the MFT-

23  equipped vehicle.  *Id.*  Eventually, "the proportion of consumers accepting the option declines

24  until the proportion of consumers choosing the MFT system will fall below the 'base case' defined

25  earlier."  *Id.*  Under the market simulation method, "[t]he cost at the intersection of the line

26  depicting the percentage of consumers who initially chose the 'base case' and the downward

27  sloping line of increased cost for additional attributes is the implicit price estimate for the attribute

28  [*i.e.*, MFT]."  *Id.*  Mr. Boedeker then repeats the process again and averages the results from both

                                    44

phases to conclude that consumers' willingness-to-pay for the MFT system, absent a defect, is $1,850. *Id.* ¶¶ 70-73. As Mr. Boedeker explained in his deposition, the purpose of this method to increment the price of MFT until he identifies the price point at which the market share of people willing to pay falls below the market share of those in the base case group. That point is "interpret[ed]" as "the price of the added feature." Berman Decl., Ex. 27 at 469:25-470:10.

Ford claims that Mr. Boedeker cannot point to any examples of other economists using such a simulation or academic studies supporting it, and that he therefore invented it "out of whole cloth."[26] However, as the Supreme Court has explained, though peer review is a "pertinent consideration," "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility," "does not necessarily correlate with reliability," and "well-grounded but innovative theories will not have been published." *Daubert*, 509 U.S. at 593. Thus, "[t]he fact of publication (or lack thereof) in a peer reviewed journal . . . will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id.* at 594. *See also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235-36 (9th Cir. 2017) (district court abused its discretion by excluding expert opinion because it had not been published in peer reviewed journal and therefore "conflated the standards for publication . . . with the standards for admitting expert testimony in a courtroom").

Here, Mr. Boedeker's report itself cites at least two other studies in which a market simulation was used. *See* Edwards Decl., Ex. 57 at 19 (describing two studies that used similar market simulations). Ford replies that those studies were forward-looking while Mr. Boedeker's is backward-looking and that therefore "[r]etrospective simulation is invalid when the actual valuation has been established in the real world [through used car data]". However, the *method* is the same when making projections about past and future scenarios. Ford's attempt to distinguish Mr. Boedeker's study is an implicit concession that Mr. Boedeker's methodology is not *inherently* unreliable. Ford's argument is essentially that *better* evidence exists to determine historic market

---

[26] *See* Edwards Decl., Ex. 63 at 243:19-23 ("Q: All right. Now, has the market simulation process that you followed to estimate the willingness to pay for MyFord Touch been endorsed in any peer-reviewed economics papers? A. I wouldn't know.").

value, but that is an argument going to the weight of Mr. Boedeker's analysis, not its admissibility under *Daubert*.  It is within the province of the jury to decide whether Mr. Boedeker's estimates of past market value are more or less credible than estimates based on subsequent used car sales.

Finally, Mr. Boedeker cites examples in which his method has been used by industry and marketing experts to assess the relevant value of products and product features, which Ford has not challenged.  *See* Edwards Decl., Ex. 57 at ¶¶ 52-53.  That the method is used in the industry for the same purpose here (*i.e.*, predicting market value based on consumer preferences) further bolsters its reliability for admissibility purposes.  Thus, the Court declines to exclude Mr. Boedeker's testimony on this basis. [27]

In sum, Ford has not demonstrated that exclusion of Mr. Boedeker's testimony is warranted under *Daubert*.  All of Ford's objections go to the soundness of certain underlying factual assumptions or to the weight of Mr. Boedeker's analysis, questions that are properly for the jury to consider.

b.    Dr. Arnold and *Daubert*

Ford also argues that Dr. Arnold improperly values the MyFord Touch system as having zero value to Class Members by assuming their damages are the full amount they paid for the MFT.  In his study, Dr. Arnold offers two methods of calculating class-wide damages.  First, he calculates the average revenue received by Ford from the sale or lease of a MyFord Touch system. *See* Edwards Decl., Ex. 56, ¶¶ 34, 35-39.  Second, he calculates the "economic loss" each class member suffered at the time of purchase, which he treats as equivalent to the price they paid for MFT, estimated to be $625 without the navigation feature and $1,364 with it.  *Id.* ¶¶ 34, 40-44.

Ford does not dispute the method Dr. Arnold uses to estimate Ford's revenue from MFT or the amount consumers paid for it, but it disputes whether Dr. Arnold presents a valid basis to

---

[27] Ford cites *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) as support, but it is inapposite because it simply reiterates the *Daubert* standard and affirms the district court's exclusion of an expert opinion because the expert "offered precious little in the way of a reliable foundation or basis for his opinion" that, in a kidnapping and rape case, "the recovery of inculpatory hair or seminal fluid 'would be expected.'"  *Id.* at 1264-65.  The district court did not abuse its discretion in finding "the absence of a sufficiently verifiable, quantitative basis for [the expert's] opinion."  *Id.* at 1265.  In contrast, Mr. Boedeker's opinion is founded upon the surveys he conducted.

assume that the entire amount paid by consumers was lost.

Dr. Arnold's assumption that the MFT systems had zero value is based on his reliance on the risk averseness of consumers. He explains that "a risk averse customer would prefer to obtain $40 with certainty instead of assuming a risk that may yield $100 with 40 percent chance and $0 with 60 percent chance." Edwards Decl., Ex. 56 ¶ 23. "In other words, a risk averse consumer with perfect knowledge of the defect would not pay $40 to purchase a product that provides $40 on average. Instead, this risk averse consumer would prefer to avoid the associated risk." *Id.* Dr. Arnold posits that even if the "average" value of a defective product is still greater than zero, it in fact holds zero value to a risk averse consumer who prefers not to take the chance. *Id.* Following this general proposition, Dr. Arnold asserts that "most" consumers are risk averse, and therefore would not have purchased a defective product at all had they been aware of a defect. Edwards Decl., Ex. 56 at ¶¶ 23-24. He does not maintain, however, that "all" consumers or that "all" class members are risk averse, nor does he attempt to determine what proportion of the class are risk averse and therefore would pay nothing for the MFT system. Yet, in order to conclude the class damages are based on the full value paid for the MFT, Dr. Arnold implicitly assumes that all class members were risk averse consumers.

This is a tenuous thread, as Plaintiffs acknowledged at the hearing. Nevertheless, Plaintiffs are willing to hinge their case on proving to the jury that the MFT was so defective as to confer no value to *any* class member. Ford disputes that fact and will be entitled to present evidence of MFT value. The resolution of this factual predicate upon which Dr. Arnold's opinion is based is for the jury to determine. *See* Fed. R. Evid. 702, Adv. Comm. Notes (2000) (explaining that "[w]hen facts are in dispute, experts sometimes reach different conclusions" and a trial court is not "authorize[d] . . . to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other").[28] So long as that assumption regarding the universality of

---

[28] Ford's reliance on *Philips v. Ford Motor Co.* is inapposite for the same reasons stated by Judge Koh in her decision. *See* Case No. 14-cv-02989-LHK, 2016 U.S. Dist. LEXIS 177672, at *73 (N.D. Cal. Dec. 22, 2016) (contrasting Dr. Arnold's report in that case because it appears "in conjunction with a second report by another expert that faithfully measure[s] class members' expected utility" and because the defect in this case "is visible to consumers and about which consumers are likely to have preferences," in contrast to those in *Phillips* involving an obscure

risk averseness is not "indisputably wrong," *Daubert* does not bar Dr. Arnold's testimony.  In

view of the evidence regarding the pervasiveness and seriousness of the defect of the MFT system,

the Court is unable at this juncture to conclude that Dr. Arnold's assumption is indisputably

wrong.  The Court therefore declines to exclude Dr. Arnold's testimony at this time.

> 3.     Ford's Challenges Under *Comcast*

Ford also challenges whether Plaintiffs' damages models are adequately tailored to

measure the diminution of value caused by the defect, as required for breach of warranty claims.

Under *Comcast*, "[a] model purporting to serve as evidence of damages in [a] class action must

measure only those damages attributable to that theory [of liability certified for class treatment]."

*Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  "If the model does not even attempt to do

that, it cannot possibly establish that damages are susceptible of measurement across the entire

class for purposes of Rule 23(b)(3)."  *Id.*  "Calculations need not be exact, but at the class-

certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent

with its liability case . . . ."  *Id.* (quotation and citations omitted).  *See also Culley v. Lincare Inc.*,

2017 U.S. Dist. LEXIS 121834 (E.D. Cal. Aug. 2, 2017) (granting summary judgment and

decertifying class where plaintiffs' damages model was "wholly unconnected to . . . any specific

loss resulting from Defendants' allegedly unfair and deceptive treatment of meal breaks").

> a.     Mr. Boedeker's Calculation Of Breach Of Warranty Damages

Ford claims that Mr. Boedeker's analysis "results in very specific value differences tied

directly to certain material non-disclosures—the very fraud theory that this Court refused to certify

for classwide adjudication."  Mot. at 22.  According to Ford, this creates a mismatch between Mr.

Boedeker's damages model and the liability theory, in violation of *Comcast*.

Plaintiffs argue that, for purposes of their warranty claims, they may rely on both Result 2

and Result 3.  As explained above, under Result 2, Mr. Boedeker informed respondents that MFT

suffered from a glitch that would be resolved in the future.  Under Result 3, Mr. Boedeker exposed

respondents to particular statements by Ford officials in which they acknowledged the extent of

component of which "consumers are probably not aware").

the defect, including that it could not be resolved.

Result 2 appears to be appropriately tailored to a breach of warranty theory of damages. Though it is true that Result 2 measures how consumers value MFT when they are aware of a defect, that does not mean that Result 2 is premised on a fraud theory of liability. The survey respondents were not made aware of *Ford's* state of mind, the key to a fraud theory. The respondents were not told, *e.g.*, that Ford already knew about the defect. Rather, Result 2 measures the difference in how consumers value MFT with and without the defect, a subjective valuation from which Mr. Boedeker then extrapolates MFT's drop in value caused by the defect. That corresponds with the measure of damages under breach of warranty, as explained above. Accordingly, there is no "mismatch" under *Comcast* between the method used to calculate damages under Result 2 and Plaintiffs' theory of warranty liability.

Plaintiffs also argue that Result 3, in which survey respondents were provided with statements by Ford officials revealing the extent of the MFT defect,[29] also provides an appropriate measure of damages because the Song-Beverly Act allows for a penalty of two times the amount of actual damages if "the buyer establishes that the failure to comply was willful." Cal. Civ. Code § 1794(c). That argument not only fails to address the laws of other states, but is also a non-sequitur. The fact that Plaintiffs may double actual damages if they prove willfulness at trial does not mean that the method used in Result 3 to estimate actual damages is tailored to Plaintiffs' liability theory. The question is whether Result 3 provides an appropriate model to measure breach of warranty damages. To the extent it measures the effect on consumer valuation of information about the severity of the defect, it does. However, it appears that Result 3 injects information about Ford's state of mind and implicitly about Ford's culpability. Ford argues that Result 3's projection of damages is tainted because it makes it impossible to separate how respondents valued Ford's knowledge of fraud (and its culpability) in comparison to consumers' valuation based solely on the defect's severity.

---

[29] The actual statements shared with survey respondents have not been submitted to the Court. Mr. Boedeker's report states they are listed in "Appendix A" to the report, but Appendix A was not filed.

However, the effect of this potential defect in the survey design, if any, is not clear. The Court cannot say the analysis is inherently unreliable. Exclusion under *Daubert* and *Comcast* is not required particularly since the alleged defect of Mr. Boedeker's analysis will be made plain to the jury which can then choose what weight to give to his testimony.

In sum, *Comcast* does not bar Mr. Boedeker's testimony.

      b.    <u>Mr. Boedeker and Dr. Arnold's Failure To Consider Post-Purchase Facts</u>

Ford also faults Mr. Boedeker for "fail[ing] even to consider the available direct evidence of the actual performance or value of the class vehicles," and failing to "offer[] any opinion as for the value of the software updates Ford offered to MFT," which Ford's expert Dr. Singer opined were valuable. Mot. at 22.[30] It is true that Mr. Boedeker did not consider any services or repairs related to MFT, any software updates to MFT, any actual use of MFT by class members, or whether customers received any value from such use. Edwards Decl., Ex. 59 at 293:3-294:7; 343:14-345:15. According to Ford, this means that Mr. Boedeker's damages analysis "fails to provide a reliable measure of the actual value of the class vehicles." *Id.* However, Plaintiffs' burden is to offer a measure of the difference in value "at the time and place of acceptance," U.C.C. § 2-714(2), which, by definition, does not require looking at subsequent use. Thus, Mr. Boedeker's model adequately focuses on the difference in value, anchored in differences in willingness-to-pay, *at the point of purchase*. His opinion goes no further than addressing this point.

As to whether Ford's subsequent software upgrades improved the value of MFT, that goes to the question whether damages based on diminished value at time of purchase were mitigated, a matter which is Ford's burden to produce. *See* Docket No. 279 at 31 (permitting Ford "to present evidence of mitigation later in this litigation (to reduce its liability)").[31] There appears to be

---

[30] Ford also criticized Mr. Boedeker for failing to take into account the effect wear and tear has on vehicle value under *Isip*, but that is irrelevant because Mr. Boedeker estimates MFT-value, not overall vehicle value.

[31] Where the plaintiff presents evidence of value at the time of delivery, it is the defendant's burden to rebut that evidence. *See Louis DeGidio Oil & Gas Burner Sales and Serv., Inc. v. Ace Engineering Co., Inc.*, 302 Minn. 19 (1974) (affirming jury award for full value of defective burners even though "the continued use of most of the equipment was certainly some evidence it

conflicting evidence on whether Ford's subsequent software updates completely resolved the

defect. Ford's expert, Dr. Singer, opines that improvements to the software through subsequent

upgrades would have conferred additional value, but he does not evaluate whether the software

upgrades were in fact improvements.[32] Ford itself has not submitted evidence to demonstrate that

the software upgrades in fact resolved the defects at issue. Further, Plaintiffs dispute that the MFT

updates resolved the defects or restored any value.[33] This is a matter for trial, which, if resolved in

Ford's favor, will likely impact the jury's assessment of damages notwithstanding Mr. Boedeker's

analysis.[34]

   Ford also challenges Dr. Arnold's analysis of damages because he does not account for

---

had value" because such evidence was "not conclusive on the factfinders" and the defendant "offered no evidence whatever of the value of the equipment at the time of its delivery to rebut the testimony of plaintiff's witnesses"). The circumstances of this case are somewhat distinguishable because post-purchase software updates would not alter the value of the vehicles at time of delivery. However, they may constitute "special circumstances" under U.C.C. § 2-714 permitting a different measure of damages, and thus may offset the class members' original loss if Ford can demonstrate the software updates conferred value.

[32] *See* Edwards Decl., Ex. 60 at ¶40 (stating that "[i]mprovements to the Base Software imply a high Value Received for Class Members that received the updates, particularly those that purchased MFT-equipped vehicles later in the Class Period," but no explanation whether the upgrades were in fact "improvements"); ¶ 55 (same).

[33] That the issue is disputed distinguishes this case from *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 487-89 (S.D. Cal. 2013), where a consumer who purchased software that did not contain an advertised feature brought a class action complaint on behalf of defrauded consumers. After receiving evidence that the software manufacturer released a free software update adding the feature, which the plaintiff acknowledged resolved his concerns, the court decertified the class.

[34] Because no such evidence was provided by Ford in connection with its motion, Plaintiffs were not obligated to submit rebuttal evidence on this motion. However, the Court notes that Plaintiffs' attempt to do so fell far short. Plaintiffs merely cited back to the Court's class certification order and re-attached exhibits cited by the Court in the class certification order as Exhibits 23, 24, and 25 to the Berman Declaration. Plaintiffs' brief made no attempt to explain the contents of the exhibits, and counsel was unable to explain their import at the hearing. In any case, the exhibits do not appear to demonstrate that *no* software upgrade ever resolved the defect. Exhibit 23 is an October 2011 e-mail; regardless of its contents, it is unclear how an e-mail sent very early in the class period can demonstrate that no software upgrade resolved the defect. Exhibit 24 is a July 23, 2012 slideshow titled "Electrical AQM Quality Review," but it is unclear how it indicates that no subsequent update successfully repaired the MFT defect. Similarly, Exhibit 25 is a January 28, 2013 slideshow titled "Electrical AQM Quality Review – Glidepaths & Warranty Spend." The charts apparently deal with information about improvements in connection various MFT features, but no explanation was provided to the Court how it demonstrates that the MFT defect was never repaired. Nevertheless, there is at least some evidence in the record of MFT problems arising after the August 2013 software update. *See, e.g.*, Kirchoff Dep. (Edwards Decl., Ex. 36) at 186-192 (defect problems arose in November-December 2014).

post-purchase software fixes. Like Mr. Boedeker, Dr. Arnold confined his analysis to valuation at the time of purchase. In his report, Dr. Arnold states:

> I intentionally chose to exclude from my analysis any consideration of, and allowance for, potential residual value of MyFord Touch equipment. I understand that Plaintiffs' claim that the injury from the misrepresentation and/or sale of the defective MyFord Touch system occurs at the time of purchase by Class members and that, therefore, damages should be computed as of that time. For these reasons, any remedy need not look forward in time and consider *ex post* factors. If, for the sake of argument, the law requires consideration of *ex post* factors (for example, software fixes), I can easily incorporate such a consideration on a classwide basis. For example, I could compute the economic life of the vehicles at issue and determine what portion of the economic life was used during the presence of the defect.

*Id.* ¶ 48.

As discussed above in connection with Mr. Boedeker, however, it is Ford's burden to rebut Plaintiffs' damages calculations by showing that its subsequent software updates added value and thereby mitigated their damages.

Finally, Ford claims Dr. Arnold must consider "the value of the entire vehicle, not just the purportedly defective system." Ford cites *T&M Solar and Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F.Supp.3d 855 (N.D. Cal. 2015) for that proposition, but *T&M Solar* is not a vehicle defect case and does not discuss how damages must be measured for breach of implied warranty in such cases. Similarly, Ford cites to this Court's previous dismissal order, but the cited portion merely states that one may not "[i]dentify a particular component of a car . . . and use that to define the ordinary purpose of the car," but it says nothing about how damages are calculated. *See* Docket No. 97 at 48, n.14. In any case, since MFT was a component of the vehicles, a loss in value for the MFT is a loss of value for the vehicle as well.

For the same reasons stated above, Dr. Arnold's decision not to consider subsequent value added does not mean that his model fails to estimate implied and express warranty damages at the time of purchase under *Comcast*.

In sum, because Ford has not established that Dr. Arnold and Mr. Boedeker's damages fail to pass muster under *Daubert* or *Comcast*, the Court **DENIES** Ford's motion for summary judgment based on a failure of proof with respect to classwide damages.

52

G.     Individual Fraud Claims and Evidence of Reliance

An essential element for a claim of fraud by omission is demonstrating actual reliance on the fraudulent omission.  *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Ford argues that individual Plaintiffs Rodriguez, Miller-Jones, and Ervin cannot prove justifiable reliance on Ford's omissions because they either subsequently purchased a second MFT-equipped vehicle despite their experience with the first vehicle, or were aware, prior to purchase, of criticisms of MFT.  Ford cites cases for the general proposition that a plaintiff cannot prove reasonable or justifiable reliance if the plaintiff was actually aware of the omitted information or based on notice would have uncovered it through the exercise of reasonable diligence.[35]  However, justifiable reliance is a fact-specific question that is usually appropriate for jury resolution.[36]  As explained below, viewing the evidence in Plaintiffs' favor, a reasonable jury could conclude that Plaintiffs' reliance was justified.

1.     Plaintiff Rodriguez's Texas DTPA claim

Ford argues that Plaintiff Rodriguez cannot prove reliance in support of his individual claim under the Texas Deceptive Trade Practices Act because six months after purchasing an MFT-equipped Ford Focus, he purchased an MFT-equipped Ford Explorer for his sister.  This appears to be a challenge under the first component of reliance, *i.e.*, materiality.  *Daniel*, 806 F.3d

---

[35]  *See Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F.Supp. 182, 185-86 (E.D. Va. 1990) (plaintiff who hired title search company and had actual knowledge that title belonged to two entities could not have justifiably relied on defendant's representation that only one entity had title); *Rich v. Olah*, 274 S.W.3d 878, 887-88 (Tex.App.Ct. 2008) (purchasers who were advised of warranty inspections of home after foundation repairs and were aware of cracks in the walls, kitchen tile, and of sticking doors prior to purchase could not have justifiably relied on failure to disclose need for remedial work on foundation); *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 205 (Tex. 1957) (noting that a plaintiff alleging fraud must exercise reasonable diligence when it is put on notice of facts that arouse its suspicions, such as obtaining information through public records or other inquiries).

[36]  *See Copart, Inc. v. Sparta Consulting, Inc.*, 2017 WL 4269921, at *13 (E.D. Cal. Sep. 26, 2017) (noting that "justifiable reliance is a context-specific and fact-intensive inquiry"); *Jackson v. Fischer*, 2017 WL 1019830, at *7 (N.D. Cal. Mar. 16, 2017) (concluding that "under the facts of this case, the questions of scienter and reasonable reliance raise further triable issues—in particular, issues related to state of mind, intent, and credibility—which are not appropriate for resolution on summary judgment"); *Dias v. Nationwide Life Ins. Co.*, 700 F.Supp.2d 1204, 1218 (E.D. Cal. 2010) ("Justifiable reliance is normally a question of fact for a jury" except in "rare cases.").

at 1225.  In other words, the fact that Rodriguez purchased a second MFT-equipped vehicle might suggest that the MFT defect could not have made a difference to his own earlier purchase and was thus immaterial.

However, Plaintiff Rodriguez's testimony does not establish that he was aware of the defect and its severity by the time he paid for his sister's vehicle.  He states that when his sister purchased her vehicle, he "still had held out hope that [Ford] would fix the system around that time."  Edwards Decl., Ex. 64 at 146:8-9.  This testimony does not establish that Plaintiff Rodriguez was fully aware of the omitted information at the time of the second purchase (*i.e.*, the severity of the defect or the fact that it could not be solved), such that the only reasonable inference is that the defect was immaterial to him.  At most it would be probative, but not dispositive, of what was material to his *own* vehicle purchase six months earlier.  Furthermore, Plaintiff Rodriguez testified that he played virtually no role in his sister's purchase decision other than paying the bill.  Edwards Decl., Ex. 64 at 62:11-14, 62:20-23.  Because he deferred to his sister's decision, her purchase decision does not necessarily speak to what he himself considered to be material.

Because Ford has not established that no reasonable jury could conclude that Rodriguez justifiably relied on Ford's omission at the time of his own vehicle purchase, the Court **DENIES** Ford's motion for summary judgment.

> 2.    Virginia Plaintiff Miller-Jones and Texas Plaintiff Ervin

Ford also argues that Plaintiffs Miller-Jones and Ervin could not have reasonably relied on the omitted information because they were already aware of certain criticism of MFT before their vehicle purchases.  In effect, Ford argues that the omitted information was thus immaterial to them.  However, each Plaintiff's testimony does not support that argument.

Plaintiff Miller-Jones testified that he had not visited websites with consumer complaints before he purchased the vehicle.  *See* Berman Decl., Ex. 13 42:25-4.  To the extent he had read articles in which the MyFord Touch system "got heavily criticized in the New York Times and Consumer Reports," he said that "the articles . . . had been written originally, I think around 2010 and '11, 12 even, maybe even early 12 before that, and there had been upgrades to the system, so I

54

1   was – I wasn't terribly worried." *Id.* at 102:6-15.  He "dismissed" that coverage because "the[]

2   [articles] were a year or so old . . . and I had assumed and knew at least to some degree that they

3   [Ford] had upgraded [MFT] at least once, and there were no follow-up articles that I could find

4   that basically said anything more than what they had said before." *Id.* at 124:3-9.  He thought that

5   "Ford will fix it if it's got a problem." *Id.* 102:19-20; 124:12-13 ("I trusted them to fix whatever

6   would – would have been wrong.").  He reiterated, "I have faith in Ford, they – they're going to

7   fix this, and I will buy it.  That's really why I went – I ultimately bought it, because everything

8   that had been criticized before that looked like it could have been fixed in the period between the

9   time the criticism was written and the time I bought – was ready to buy the car." *Id.* at 329:13-21.

10  He reiterated that, "if I had a choice to buy the car again today, I wouldn't." *Id.* at 81:14-15.

11          Plaintiff Miller-Jones never testified that he was aware of the full scope of the problem

12  (*i.e.*, that MFT had not or could not have been fixed).  Ford has not introduced any evidence that

13  Plaintiff Miller-Jones had reason to suspect that the version of MFT he purchased suffered from

14  the same problems for which earlier versions had been criticized.  Nor has Ford introduced any

15  evidence establishing that Plaintiff Miller-Jones could have learned about the severity of the defect

16  or its un-fixability through the exercise of reasonable diligence.  Indeed, Ford does not explain

17  how an ordinary consumer could have learned that information when, if it existed, it was likely in

18  Ford's exclusive possession.  Viewing the evidence most favorably to Miller-Jones, then, a

19  reasonable jury could conclude that he justifiably relied on Ford's omission because he was not

20  and could not have become aware of the extent and irreparability of the MFT defect prior to

21  purchase.

22          Similarly, Plaintiff Ervin was exposed to some criticism of the MFT system prior to

23  purchasing his vehicle, but was not aware of the extent of the defect.  Specifically, he stated that

24  an article he read explained that "[o]verall, the vehicle was great" and "[e]ven MyFord Touch was

25  very useful" but that "as there are with anything, there's always an imperfection that they find,"

26  such as "saying it's a little bit slow to respond, which it was, and that it's not necessarily perfect,

27  but nothing is."  Edwards Decl., Ex. 65 at 102:20-103:4.  The "gist of these articles was that it was

28  a positive indication" for the vehicle. *Id.* at 102:1-5.  Ervin also testified he did not read anything

55

"negative" or "critical" of MyFord Touch before he went to the dealership for the first time. Berman Decl., Ex. 12 at 75:4-10, 75:22-25. Indeed, he agreed that "specifically about the MyFord Touch system, the theme was, some imperfection, but overall, it's a good system." *Id.* at 103:10-16. As with Miller-Jones, this testimony does not establish that Ervin was aware of the extent of the defect or that it could not be repaired at the time that he purchased his vehicle; nor does Ford explain how Ervin could have learned that information through the exercise of reasonable diligence.

Accordingly, the Court **DENIES** Ford's motion for summary judgment on Plaintiff Ervin and Miller-Jones's individual, non-certified fraud claims.

### 3. Plaintiff Center for Defensive Driving

Plaintiffs concede that Ford's motion for summary judgment with respect to Plaintiff Center for Defense Driving's uncertified claim under California's Consumer Legal Remedies Act should be granted because CDD is a non-profit corporation that purchased its vehicle for work, and therefore does not constitute a "consumer" under California law. *See* Cal. Civ. Code §§ 1761(d) (defining "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes"), 1780(a) (limiting cause of action to "[a]ny consumer"); *see also* Edwards Decl., Ex. 33 (CDD Depo.) at 12:4-5, 20:14 (acknowledging that CDD is a non-profit corporation that purchased an MFT-equipped vehicle for non-personal use). The Court **GRANTS** Ford's motion for summary judgment on this claim.

## IV.   CONCLUSION

To summarize, the Court **GRANTS** Ford's motion as follows:

- On the California Class's implied warranty of merchantability claims under the Song-Beverly Act, **GRANT** with respect to used car purchasers because Plaintiffs have not presented evidence to support an inference that Ford acted as a distributor or retailer, such as through an agency relationship with its authorized dealers.

- On the Colorado Class's strict product liability claim, **GRANT** because the claim is precluded by the economic loss rule.

- For Plaintiff Center for Defensive Driving's California Consumer Legal Remedies

Act claim, **GRANT** because CDD is not a "consumer" within the meaning of the statute.

The Court **DENIES** Ford's motion as follows:

- **Implied Warranty**:  With respect to new vehicles, Plaintiffs have introduced sufficient evidence for a reasonable jury to conclude that the vehicles were unmerchantable and that the defects manifested within one year.  Ford's disclaimer for vehicles used for business purposes is not conspicuous and therefore unenforceable with respect to vehicle use for business or commercial purposes.

- **Express Warranty**:  Ford has not established that classwide summary judgment for failure to exhaust two repair attempts is appropriate where its own evidence indicates that at least some class members satisfied that requirement.  Plaintiffs Kirchoff and Mitchell have demonstrated that a genuine issue of material fact exists as to whether they exhausted two repair attempts in connection with the MFT defect.

- **Ohio Negligence Class Claim**:  With respect to the Ohio Class's negligence claim, Plaintiffs have introduced sufficient evidence for a jury to conclude that Ford breached its duty to design a reasonably safe product, thereby causing economic harm to class members.

- **California UCL Class Claim:**  With respect to the California Class's UCL claim, the Court certified the non-fraud breach of warranty theories for class treatment, so the UCL claim may proceed consistent with the Court's holdings regarding implied and express warranty.

- **Plaintiff Creed:**  Plaintiff Creed may pursue a claim under the Massachusetts Consumer Protection Act because a jury could conclude he purchased his vehicle for primarily personal reasons and his demand letter was sufficient.

- **Expert Damages Models**:  Mr. Boedeker and Dr. Arnold's damages models are adequate under *Daubert* and *Comcast* to project classwide damages for breach of implied and express warranty.

57

- **Individual Fraud Claims:** Plaintiffs Rodriguez, Ervin, and Mitchell-Jones have presented sufficient evidence for a jury to conclude that they justifiably relied on Ford's omissions concerning the MFT defect when they purchased their vehicle.

This order disposes of Docket No. 341.

**IT IS SO ORDERED**.

Dated:  February 14, 2018

_____
EDWARD M. CHEN
United States District Judge