STEVE W. BERMAN (*pro hac vice*)
CRAIG SPIEGEL (122000)
CATHERINE Y.N. GANNON (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com
tyler@hbsslaw.com
craigs@hbsslaw.com

ROLAND TELLIS (186269)
MARK PIFKO (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600 Encino,
California 91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

*Class Counsel*

ADAM J. LEVITT (*pro hac vice*)
JOHN E. TANGREN (*pro hac vice*)
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com

NICHOLAS E. CHIMICLES (*pro hac vice*)
BENJAMIN F. JOHNS (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
nick@chimicles.com
benjohns@chimicles.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION. | Case No. 3:13-cv-03072-EMC<br><br>**PLAINTIFFS' TRIAL PLAN** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    THERE IS SUBSTANTIAL OVERLAP IN THE EVIDENCE IN SUPPORT OF
       ALL CLAIMS ........................................................................................................... 2

       A.     Certified implied warranty claims ............................................................... 2

              1.     Evidence establishing that the MFT is inherently defective. ........... 3

                     a.     Plaintiffs will show that the initial development was rushed
                            and contracted out to inexperienced contractors. .................. 3

                     b.     Plaintiffs will show that the initial release of the MFT
                            software was rushed and suffered from serious deficiencies
                            relating to application readiness, software integration and
                            architecture ("brittle software architecture"). ...................... 4

                     c.     Plaintiffs will show the connection between brittle software
                            architecture and user-interfacing manifestations. .................. 4

              2.     Plaintiffs will show that the MFT Defects persistently caused the
                     MFT system to fail unexpectedly while performing the following
                     key functions: voice recognition; phone pairing and use; climate
                     control; radio; media pairing and use; navigation; rear-view camera;
                     and GPS location identification. ..................................................... 4

       B.     Evidence establishing that MFT Defects significantly impaired the safety,
              reliability and operability of the class vehicles. ......................................... 5

       C.     Evidence establishing that Ford's repairs were never successful ................ 7

              1.     Plaintiffs will show that Ford never attempted to repair the Base
                     Software. ........................................................................................ 7

              2.     Plaintiffs will show that the same MFT Defects were present in the
                     MFT Base Software for every software upgrade and any repairs
                     made by Ford were superficial and temporary in nature. ................ 7

              3.     Plaintiffs will show that, in spite of numerous software updates, all
                     class members continued to experience the same issues that
                     significantly impaired the safety, reliability or operability of their
                     vehicles over an extended period. ................................................... 8

III.   EXPRESS WARRANTY CLAIMS ......................................................................... 8

       A.     Certified express warranty claims .............................................................. 8

       B.     Evidence establishing the existence of the MFT Defects and their
              manifestation during the warranty period .................................................... 9

C.   Evidence establishing that the MFT Defects harmed Plaintiffs by significantly impairing the safety, reliability and operability of their class vehicles and suffering economic loss ................................................................. 9

D.   Evidence establishing Ford's continued inability to repair the MFT Defects or replace the MFT constituted a failure of essential purpose ...................... 9

E.   Plaintiffs will also present common evidence relating to the Limited Warranty's terms and conditions to demonstrate that Ford was under a duty to repair ................................................................................................................ 9

F.   Plaintiffs will also present evidence on repair attempts. ............................... 9

IV.   OHIO NEGLIGENCE CLAIM .................................................................................. 10

A.   Certified Ohio Negligence Claim .................................................................. 10

V.   MASSACHUSETTS FRAUD CLAIM ...................................................................... 10

A.   Certified Massachusetts Consumer Protection Act § 9 Claim ..................... 10

VI.   FRAUDULENT CONCEALMENT CLAIMS ........................................................... 11

A.   Plaintiffs will show that Ford had a duty to disclose the MFT Defects ...................... 11

B.   Plaintiffs will show that the MFT is inherently defective and that the MFT Defects impaired the safety, reliability and operability of the class vehicles. ........... 11

C.   Plaintiffs will show that Ford's repairs to the MFT were never successful. ............... 12

D.   Plaintiffs will show that Ford intentionally concealed material facts confirming (1) the existence of the MFT defects  (2) how these defects impaired the ordinary purpose of class vehicles; and (3) Ford's willingness and ability to repair the MFT Defects. ................................................................. 12

VII.   STATUTORY FRAUD CLAIMS ............................................................................... 12

A.   A large portion of Plaintiffs' burden in establishing the statutory fraud claims has already been discharged with evidence used for the warranty claims ............................................................................................................... 12

B.   Individual Statutory Fraud Claims ................................................................ 12

C.   Variances on the consumer protection acts across the different state subclasses ...................................................................................................... 14

D.   Evidence Pertaining to Ford's State of Mind ............................................... 17

1.   Ford knew (or should have known) that the initial design of the MFT Base Software was deeply flawed from the onset, yet chose to do nothing to address the concerns of their key MFT engineers. ......................... 17

2.   Ford knew (or should have known) before any of the first MFT-equipped vehicles were being delivered to consumers that the MFT

Defects were pervasive, sustained and serious. This same evidence is relevant to all claims. ...................................................................17

3. Ford knew (or should have known) that the heart of the MFT Defects was located in the Base Software and that key engineers were advocating a fundamental rearchitecture as the only way to properly resolve the MFT Defects. This same evidence is relevant to all claims. ..............................................................................................18

4. Ford chose not to complete a fundamental rearchitecture because it was too expensive and time-consuming and instead opted for superficial, quick fixes. ....................................................................18

5. As a result Ford knew (or should have known) that its subsequent software versions could never address the Base Software and were thereby incapable of adequately addressing consumers concerns. ................18

6. Ford knew (or should have known) that the only relief, or a "full fix" for consumers, would be to purchase a new vehicle with SYNC Gen 3 ............................................................................................................19

VIII. THE WITNESSES HAVE OVERLAPPING KNOWLEDGE AS TO ALL CLAIMS ..........................................................................................................19

A. Experts .............................................................................................19

B. Plaintiffs/Class Representatives .....................................................20

C. Ford Employees—Fed. R. Civ. P. 30(b)(6) witnesses ................21

D. Ford Employees – Fact witnesses...................................................22

IX. ANY PREJUDICE TO FORD CAN BE APPROPRIATELY MITIGATED BY PROPER JURY INSTRUCTIONS ...................................................................23

X. CONCLUSION ..............................................................................................25

## I.    INTRODUCTION

Plaintiffs submit this Trial Plan, as requested by this Court at the February 6, 2018 status conference. The plan provides a roadmap to aid the Court in assessing how a single trial can be conducted in an efficient and manageable manner without any undue prejudice to Ford.

The claims to be presented at trial in this lawsuit can be roughly categorized into the following groups:[1] (1) classwide implied warranty claims; (2) classwide express warranty claims; (3) classwide California UCL claim; (4) classwide Ohio negligence claim; (5) classwide statutory fraud claim under Mass. Gen. Laws ch. 93A; (6) individual fraudulent concealment claims; and (7) individual statutory fraud and consumer protection claims.

To prove each of these claims, Plaintiffs will present core evidence that: (1) MFT is inherently defective; (2) MFT Defects were so prevalent and persistent that they significantly impaired the safety, reliability, and operability of the class vehicles; (3) MFT has been inherently defective since the first software version; and (4) MFT Defects are so pervasive and integrated into the underlying software architecture that Ford's repair attempts (that never addressed the software architecture) were simply never successful. These four common elements represent the heart of what Plaintiffs must prove to succeed on their implied warranty claims. But, at the same time, these four common elements must also be established for each and every claim still at issue in this litigation; therefore, there is an extensive amount of evidentiary overlap between all claims, making a single trial both manageable and efficient.[2]  Please see Appendix C, identifying selected pieces of evidence, and indicating why each piece of evidence is relevant to all claims.

Plaintiffs' trial plan also demonstrates that the amount of evidence presented by Plaintiffs specifically relating to Ford's state-of-mind is, by comparison, relatively small.[3] Plaintiffs anticipate

---

[1] A full list of remaining certified claims can be found at Appendix A.  A full list of the remaining individual claims can be found at Appendix B.

[2] *See, e.g.*, *Ellsworth v. Tuttle*, 148 F. App'x 653 (10th Cir. 2005) (court finding same common core of facts supporting warranty and fraud claims).

[3] Ford's contention that the evidence underpinning the remaining fraud claims are distinct as they pertain to actions "before the sales of the class vehicles" while evidence underpinning the warranty claims will focus on "post-sale" evidence is simply untrue. Fact finders will need to assess the initial *ad hoc* design process and preliminary quality observations to determine the extent to which the

PLAINTIFFS' TRIAL PLAN – 1
010388-11 1016647 V1

Case No. 3:13-cv-03072-EMC

that the same Ford witnesses will testify as to that issue and as to the four common elements noted above. Thus, Plaintiffs' plan does not cause any undue prejudice to Ford that would provide a basis to bifurcate trial. And, even if Ford could point to undue prejudice, Ford bears the burden of demonstrating that such prejudice outweighs the convenience, expedition, and economy of resources of the other parties and the Court. This is a high burden and it is the very reason why bifurcation is the exception and not the rule.[4] *Bookhamer v. Sunbeam Prods.*, 2013 U.S. Dist. LEXIS 1575, at *1 (N.D. Cal. Jan. 3, 2013) (Chen, J.). Moreover, even if it could point to undue prejudice, and Ford could demonstrate that this prejudice outweighs all other factors, Ford also must demonstrate why the prejudice here is so distinct that it cannot be mitigated with appropriate jury instructions. *See, e.g.*, *Lam Research Corp. v. Schunk Semiconductor*, 65 F. Supp. 3d 863, 867 (N.D. Cal. 2014) (Chen, J.). *See* Section IX, *infra*.

## II. THERE IS SUBSTANTIAL OVERLAP IN THE EVIDENCE IN SUPPORT OF ALL CLAIMS

### A. Certified implied warranty claims

To demonstrate unmerchantability, a plaintiff must show "a fundamental defect that renders the product unfit for its ordinary purpose." MSJ Order at 6.[5] Proof of a safety condition "is not required to demonstrate unmerchantability; it is merely one way to demonstrate unmerchantability." *Id*. at 7. In addition, "reliability, operability, and substantial freedom from defects [...] are independent grounds for demonstrating unmerchantability." *Id*. at 8. And Plaintiffs can "demonstrate unmerchantability by introducing evidence that their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit." *Id*. at 9.

---

MFT was initially defective as to render the class vehicles unmerchantable and whether Ford could sufficiently repair the MFT by focusing on bugs that were found outside of the Base Software.

[4] It is clear that the crux of Ford's effort to seek bifurcation is to isolate the evidence pertaining to warranty claims from the evidence pertaining to fraud claims. Given that almost all of Plaintiffs' individual claims are fraud-related, Ford's efforts to separate the individual claims from the class is just another attempt to isolate the fraud-based evidence and the same analysis applies.

[5] For ease of review, Plaintiffs have omitted all internal citations in their quotations referencing the February 14, 2018 Order granting in part and denying in part Defendant's motion for summary judgment (ECF No. 383) ("MSJ Order").

To accomplish this task, Plaintiffs will begin by showing that the MFT Base Software is common across all class vehicles. Plaintiffs will then demonstrate that there are severe defects in the software architecture underpinning the MFT Base Software ("MFT Defects"), and that these MFT Defects persistently caused the MFT system to fail unexpectedly while the system was performing the following key functions: voice recognition; phone pairing and use; climate control; radio; media pairing and use; navigation; rear-view camera; and GPS location identification. Plaintiffs will also show that the MFT Defects manifested soon after class members took delivery of their vehicles and were so prevalent and persistent that they significantly impaired the safety, reliability and operability of the class vehicles so as to render them unfit.

Plaintiffs will also establish that the MFT Defects were present in Ford's initial release of the product. Plaintiffs will show that, despite repeated attempts to repair the MFT, Ford never addressed the flawed architectural underpinning that was the main source of MFT Defect manifestations. Instead, any improvements made by Defendant were at a superficial level or temporary in nature. As such, the same MFT Defects were present in the MFT Base Software for every software upgrade and the system remained deeply flawed even after Ford's attempts to fix it. Plaintiffs will show that, in spite of numerous software updates, class members continued to experience the same issues that significantly impaired the safety, reliability or operability of their vehicles during the class period and beyond.

Plaintiffs detail the evidence underpinning the warranty claims below.

**1.      Evidence establishing that the MFT is inherently defective.**

Plaintiffs will demonstrate that the Base Software installed in each MFT-equipped vehicle is inherently defective in that it contains *ad hoc*, overly complex, and brittle software architecture that is fundamentally incapable of reliably performing basic MFT tasks.

**a.      Plaintiffs will show that the initial development was rushed and contracted out to inexperienced contractors.**

Plaintiffs will also show through testimony of Ford employees and Ford-produced documentation that Ford hired BSquare, a software company that was not capable of proper project management and communication, thereby resulting in excessive delays and poor product design

choices. Plaintiffs will also show that BSquare released the Base Software to Ford before finalizing it and that any testing done was inadequate. Plaintiffs will also establish the existence of software development processes specifically designed to promote best practices and create a bug-reducing coding standard known as MISRA ("Motor Industry Software Reliability Association"). And then Plaintiffs will also demonstrate that Ford and BSquare did not follow MISRA standards for the MFT.

*See*, for example, Exs. 1-7, 53.  *See also* testimony of Mike Westra (Ford SYNC engineer) (Ex. 8 at 134:14-135:7,  271:24-272:19, 273:7-16, 274:15-275:10, 367:5-368:1) who testified as to the activities of BSquare during the initial development process.

**b. Plaintiffs will show that the initial release of the MFT software was rushed and suffered from serious deficiencies relating to application readiness, software integration and architecture ("brittle software architecture").**

Plaintiffs will produce documents describing the root cause of the MFT problem along the following lines: "A project of this magnitude was started late and was further effected (sic) by late feature definitions, late specification development, late HMI development, Sync platform development challenges and completion. Severe resource shortage on the Sync team. All of this resulted in compressed software development and validation." *See*, for example, Ex. 6.

**c. Plaintiffs will show the connection between brittle software architecture and user-interfacing manifestations.**

Plaintiffs will establish through Daniel Smith's testimony that the software architecture is flawed, and that those flaws are consistent across the versions at issue. Mr. Smith will also testify that while the developers made superficial changes to the Base Software during the Class Period, those changes did not alter the underlying architecture. Mr. Smith will also explain that how some common defects (such as a failure of MFT's "watchdog" or a system crash following a memory leak) manifested themselves so that the same defect might appear to be a phone problem in one instance, or a voice recognition error in another, depending on the task the MFT was performing when the defect appeared.

*See*, for example, Ex. 9 ¶¶ 105–108.

**2. Plaintiffs will show that the MFT Defects persistently caused the MFT system to fail unexpectedly while performing the following key functions: voice**

**recognition; phone pairing and use; climate control; radio; media pairing and use; navigation; rear-view camera; and GPS location identification.**

Plaintiffs will establish through Daniel Smith's testimony that the software architecture is flawed, and that those flaws are consistent across the versions at issue. Mr. Smith will also testify that while the developers made superficial changes to the Base Software during the Class Period, those changes did not alter the underlying architecture. Mr. Smith will also explain how some common defects (such as a failure of MFT's "watchdog" or a system crash following a memory leak) manifested themselves so that the same defect might appear to be a phone problem in one instance, or a voice recognition error in another, depending on the task the MFT was performing when the defect appeared.

*See*, for example, Ex. 10 ¶ 207.

Plaintiffs will also establish the above by presenting testimony from Ford's own engineers that the majority of the problems related to the MFTs were in the following categories: voice recognition, phone pairing and use, media, navigation, and stability.

*See*, for example, Ex. 11 at 52:23-53:15; Ex. 12 at 137:18-138:6.

**B.    Evidence establishing that MFT Defects significantly impaired the safety, reliability and operability of the class vehicles.**

*Reliability*

Plaintiffs will testify to unexpected and sudden failures involving the MFT system. Plaintiffs will also demonstrate through Ford's own documents instances of employees refusing to use the MFT system anymore and characterizing the MFT units as "unsaleable."

*See*, for example, Exs. 13–15; Ex. 16 at 51:16–24; Ex. 17 at 12:7–13:9.

*Operability*

Plaintiffs will identify through their testimony, the special precautions they undertook to mitigate against the MFT Defects. These included: not using the system while driving; instructing family members not to use the system; using their smartphones; pulling over to the shoulder and shutting the car off; and terminating their leases early.

*See*, for example, Ex. 17 at 40:22-41:6; Ex. 18 at 68:11-12, 69:12-14; Ex. 19 at 16:18-21; Ex. 20 at 183:8-14.

*Safety*

2      Plaintiffs will establish through Daniel Smith's testimony that , the MFT is a safety-critical

3    system. Mr. Smith will also testify to several non-distraction-related defects that he believes present

4    a considerable safety hazard such as "obvious and avoidable defects in the rear-view camera" which

5    can cause it to freeze or display inaccurate footage.

6                *See*, for example, Ex. 9 ¶¶ 21–25, 40–64, 98–104

7      Plaintiffs will also present Dr. Craig Rosenberg, a human factors expert, who will testify to

8    his on-road driving study evaluating the practical or "real world" functionality of the MFT in light of

9    the MFT's software bugs and system latency. He will testify that his testing shows that the MFT was

10    distracting to drivers, and that MFT's distractions presented a significant safety hazard. For instance,

11    Dr. Rosenberg will testify to his results showing that drivers who experienced MFT defects while

12    driving took their eyes off the road at rates that far exceeded the safety thresholds established by

13    NHTSA. He will explain that the MFT's problems lead to undue time and attention, excessive task

14    demand, overly complicated mental models, and mistrust of the system, which result in driver

15    distraction from the task of driving and cause a significant safety issue. He will also testify that

16    distractions posed by the MFT increase the risk of a crash with the associated risk of injury or death.

17                *See*, for example, Ex. 21 at 199, 260-263.

18      Dr. Rosenberg will also testify that there is reason to believe that distraction may be under-

19    reported as a cause of accidents. But in spite of these challenges, Dr. Rosenberg will testify that

20    numerous statistics still show the danger of distracted driving, including: (1) in 2010, 17% of all

21    police-reported crashes (fatal, injury-only and property-damage-only) involved driver distraction,

22    with these crashes leading to thousands of fatalities and over 400,000 injured people each year, on

23    average.

24                *See*, for example, Ex. 21 at 199.

25      Plaintiffs will also present sworn testimony from Plaintiffs with direct experience driving

26    MFT-equipped vehicles. These Plaintiffs will provide testimony that mirrors Dr. Rosenberg's expert

27    findings on the relationship between undue distraction and safety.

28

*See*, for example, Ex. 22 at 206:6-9; Ex. 23 at 209:8-13; Ex. 24 at 127:20-128:116; Ex. 17 at 40:22-41:6.

### C. Evidence establishing that Ford's repairs were never successful

#### 1. Plaintiffs will show that Ford never attempted to repair the Base Software.

Plaintiffs will present Ford documents showing that the Base Software installed in each MFT-equipped vehicle was 100% common. Plaintiffs will also present Daniel Smith, who will testify to his opinion that, fundamentally, the Base Software remained unchanged across all the versions. Plaintiffs will also present Ford-produced documents consistently documenting that no changes were being made to the software architecture, and as a result engineers were critically constrained and foreclosed from bringing about substantive change. In one example, engineers from Microsoft explain the consequences stemming from the 2011 decision not to re-architect the MFT: "we are building on top of an unstable system with a staggering bug debt" and that "carrying such a high bug debt means that functionality changes in areas such as phone, navigation or speech can cause system instability and even worse regression."

*See*, for example, Exs. 31-35.

#### 2. Plaintiffs will show that the same MFT Defects were present in the MFT Base Software for every software upgrade and any repairs made by Ford were superficial and temporary in nature.

Plaintiffs will present Ford-produced documents observing that the first suite of updates were a "*disaster*" and "*crap*."

*See*, for example, Ex. 36.

Plaintiffs will present Ford-produced documents that admit in June 2011: "The reality is that the systems we are still building and selling ARE flawed.... This creates a steadily growing body of vehicles in the field with SYNC Gen 2 systems that will fail and require repair."

*See* Ex. 37.

Plaintiffs will present email evidence where Ford engineers proceeded to describe the March 2012 software version as a "polished turd" and "lipstick on a pig." In a post-mortem for the March 2012 software version, Ford concluded that it was "still 4x worse than SYNC Gen 1 and

uncompetitive." In addition, the top ten failure modes reported by users of version 3.0 included the same problems Ford has always had with the software.

*See* Exs. 13, 38-39.

Plaintiffs will present additional email evidence from Ford engineers that suggests the August 2012 release was even worse than the previous software release.

*See* Ex. 40.

Plaintiffs will also produce evidence from Ford's internal planning documents suggesting that software version 3.5 punted "approx[imately] 2500 bugs, 71% of all bugs punted will have medium-to-high impact on a customer."

*See* Ex. 41.

**3. Plaintiffs will show that, in spite of numerous software updates, all class members continued to experience the same issues that significantly impaired the safety, reliability or operability of their vehicles over an extended period.**

Plaintiffs will present testimony that they continued to experience the same issues that significantly impaired the safety, reliability or operability of their vehicles over an extended period. Plaintiffs will also present Ford-produced documents recognizing that the majority of the TGW's related to MFT were consistently problems with voice recognition, phone pairing and use, media, navigation, and stability. Plaintiffs will also present evidence from top-level Ford executives stating that "a full fix" will not transpire until "we get to SYNC Gen 3" and that the MFT was "the biggest quality fiasco in the recent history of Ford."

*See*, for example, Ex. 18 at 68:21-69, Exs. 15, 42-44.

### III. EXPRESS WARRANTY CLAIMS

#### A. Certified express warranty claims

This Court previously held that "[a] repair or replace remedy 'fails of its essential purpose when a warrantor fails to successfully repair defects within a reasonable time.'" MSJ Order at 24. As such, Plaintiffs will rely on much of the same common evidence demonstrated for the implied warranty claims to establish the following elements of the express warranty claims: (1) the manifestation and existence of the MFT Defects during the warranty period; (2) that the MFT Defects harmed Plaintiffs by significantly impairing the safety, reliability and operability of their

class vehicles and suffering economic loss; and (3) Ford's continued inability to repair the MFT

Defects or replace the MFT constituted a failure of essential purpose. Plaintiffs will also present

common evidence relating to the Limited Warranty's terms and conditions to demonstrate that Ford

was under a duty to repair or replace the design defects inherent in the MFT within a reasonable

amount of time. Plaintiffs will also present evidence on repair attempts.

> **B.      Evidence establishing the existence of the MFT Defects and their manifestation during the warranty period**

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to

demonstrate that the MFT Defects existed at delivery and manifested shortly after delivery. *See*

Section II.A.1–II.B, *supra*.

> **C.      Evidence establishing that the MFT Defects harmed Plaintiffs by significantly impairing the safety, reliability and operability of their class vehicles and suffering economic loss**

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to

demonstrate that the MFT Defects significantly impaired the safety, reliability and operability of

class vehicles. *See* Section II.A.1–II.B, *supra*. Plaintiffs will rely on their damages experts to

measure economic loss. *See* Section VI, *infra*.

> **D.      Evidence establishing Ford's continued inability to repair the MFT Defects or replace the MFT constituted a failure of essential purpose**

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to

demonstrate that the MFT Defects were never adequately addressed or repaired. *See*, Section II. C.

> **E.      Plaintiffs will also present common evidence relating to the Limited Warranty's terms and conditions to demonstrate that Ford was under a duty to repair.**

Plaintiffs will present evidence from Ford's Limited Warranty regarding its duty to repair or

replace the design defects inherent in the MFT within a reasonable amount of time.

> *See* Ex. 45.

> **F.      Plaintiffs will also present evidence on repair attempts.**

Plaintiffs will present testimony from Plaintiffs pertaining to their individual repair attempts.

Plaintiffs will also rebut Dr. Taylor's superficial and highly-flawed analysis of MFT repairs in part

by demonstrating  that Dr. Taylor excluded hundreds of thousands of MFT repairs from his analysis.

# IV. OHIO NEGLIGENCE CLAIM

## A. Certified Ohio Negligence Claim

To prevail on this claim, Plaintiffs need to show that "Ford breached its duty to design a reasonably safe product, and […] show a loss of value of the vehicles proximately caused by that breach of duty." MSJ Order at 23. Plaintiffs will rely on much of the same common evidence demonstrated for the implied warranty claims (as it relates to safety) to show that Ford did not design a reasonably safe product and therefore breached its duty. Additionally, Plaintiffs will rely on common evidence to establish that Ford had a duty to design a reasonably safe product. Plaintiffs will also present expert evidence from Stefan Boedeker to demonstrate that the MFT lost economic value because of the increased safety concerns.

# V. MASSACHUSETTS FRAUD CLAIM

## A. Certified Massachusetts Consumer Protection Act § 9 Claim

Chapter 93A of Massachusetts General Law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2 ("MCPA"). To succeed on a MPCA claim, Plaintiffs must show that the Defendant (1) engaged in trade or commerce; (2) committed an unfair or deceptive practice; and (3) caused economic injury to the plaintiffs. *See Hanrahran v. Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 153 (D. Mass. 2014). Courts have recognized a distinction between an unfair practice and a deceptive practice. *Id.* at 154 (citing *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000)). "[C]onduct is 'deceptive' when 'it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently than they otherwise would have acted.'" *Id.* (quoting *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 488 (Mass. 2004)). On the other hand in determining whether conduct is "unfair" for purposes of Chapter 93A, courts consider several factors: "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Id.* (citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009)).

To establish the first element, Plaintiffs will demonstrate through common evidence that Ford was engaged in trade or commerce and that Ford's conduct took place in the business context. To establish the second element as it pertains to deceptive practices, Plaintiffs will rely on the same common evidence demonstrated for the warranty claims to show that a reasonable person would have acted differently[6] had they: (1) known of the existence of the MFT Defects; (2) known that the MFT Defects harmed Plaintiffs by significantly impairing the safety, reliability and operability of their class vehicles; (3) known that the MFT Defects existed since MFT's inception and would manifest shortly after delivery of the class vehicle; and (4) known of Ford's continued inability to repair the MFT Defects. Items 1-4 will be proven using the same evidence used in the implied warranty claim. *See* Section II.A.1–II.C, *supra*, and App'x C. Plaintiffs will rely on similar evidence to demonstrate that Ford's conduct was unfair. To establish the third element Plaintiffs will rely on the same economic loss models used for the warranty claims. As such, the vast majority of the evidence for the MCPA claim as it pertains to deceptive practices overlaps with the implied and express warranty claims.

## VI. FRAUDULENT CONCEALMENT CLAIMS

### A. Plaintiffs will show that Ford had a duty to disclose the MFT Defects

Plaintiffs will show that Ford knew about the safety concerns associated with the MFT Defects, triggering a duty to disclose. *See* Section VI.D, *infra*. Plaintiffs will also show that Ford had exclusive knowledge of material facts not reasonably known to the plaintiff. *See id*. Again the core implied warranty evidence will be used to prove knowledge and duty.

### B. Plaintiffs will show that the MFT is inherently defective and that the MFT Defects impaired the safety, reliability and operability of the class vehicles.

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to demonstrate that the MFT Defects existed at delivery and manifested shortly after delivery. *See* Section II.A–C, *supra*, and App'x C.

---

[6] The reasonable person would have either not paid as much for a MFT-equipped vehicle or would not have purchased an MFT-equipped vehicle at all.

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to demonstrate that the MFT Defects significantly impaired the safety, reliability and operability of class vehicles. *See* Section II.B–C, *supra*, and App'x C.

  **C.**  **Plaintiffs will show that Ford's repairs to the MFT were never successful.**

Plaintiffs will rely on the same evidence used to establish the implied warranty claims to demonstrate that the MFT Defects were never adequately addressed or repaired. *See* Section II.C, *supra*.

  **D.**  **Plaintiffs will show that Ford intentionally concealed material facts confirming (1) the existence of the MFT defects  (2) how these defects impaired the ordinary purpose of class vehicles; and (3) Ford's willingness and ability to repair the MFT Defects.**

Plaintiffs will show that Ford *knew* before selling even one unit that the MFT Base Software was deeply flawed in a way that materially affected consumers. Plaintiffs will also demonstrate that Ford *intentionally chose* never to address the MFT Defects located in the Base Software and therefore *knew* before the release of each software update that any fixes were superficial and temporary.  This proof will rely on the same evidence used for the implied warranty claim.  *See* App'x C at 6–7.

## VII. STATUTORY FRAUD CLAIMS

  **A.**  **A large portion of Plaintiffs' burden in establishing the statutory fraud claims has already been discharged with evidence used for the warranty claims.**

As discussed above, the vast majority of Plaintiffs' evidence will go towards establishing that the MFT Defects existed at time of delivery and significantly impaired the safety, reliability and operability of class vehicles. Plaintiffs will also show that Ford's efforts to address and repair the MFT Defects were unsuccessful. These four common elements are required for both fraud and non-fraud claims.

  **B.**  **Individual Statutory Fraud Claims**

Plaintiffs assert individual claims under each state's unfair and deceptive fraud statutes. *See* App'x B.  While there are some small variations between the statutes, as explained below, all of the statutory fraud-based claims involve common or identical elements and burdens of proof. For

example, omission-based fraud claims under the CLRA require proof that the omission was either contrary to a representation actually made by the defendant or was a material omission of fact the defendant was otherwise obligated to disclose. As such, Plaintiffs' remaining statutory fraud claims can be established through similar circumstances involving deception, deceptive acts or practices, fraud, misrepresentation, or concealment, suppression or omission of any material fact, among other things.

Given the above analysis, Plaintiffs must demonstrate that Ford concealed material information from Plaintiffs. To that end, Plaintiffs must once again demonstrate these four common elements in order to prevail on their fraud claims: (1) the MFT is inherently defective; (2) the MFT Defects were so prevalent and persistent that they significantly impaired the safety, reliability, and operability of the class vehicles; (3) the MFT has been inherently defective since its inception; and (4) the MFT Defects are so pervasive and integrated into the underlying software architecture that Ford's repair attempts (that never addressed the software architecture) were simply never successful. These elements will be established with the same common evidence used for the warranty claims.

Only then will Plaintiffs show that Ford knew (or should have known):[7] (1) that the initial design of the MFT Base Software was deeply flawed, yet chose to do nothing to supervise or ameliorate the situation; (2) before any of the first MFT-equipped vehicles were being delivered to consumers, Ford knew that the MFT Defects were pervasive, sustained and serious, and that the Company had no plan for consumers seeking relief; (3) that the root cause of the MFT Defects was located in the Base Software and that key Ford SYNC engineers were advocating a fundamental rearchitecture as the only way to properly resolve the MFT Defects; (4) that Ford chose not to complete a fundamental rearchitecture because it was too expensive and time-consuming and instead opted for superficial, quick fixes; (5) that its subsequent software versions could never address the Base Software and were therefore incapable of adequately addressing consumers concerns; and (6) that the only relief, or a "full fix" for consumers, would be to purchase a new vehicle with SYNC

---

[7] *Elias v. Hewlett-Packard Co.*, 2014 U.S. Dist. LEXIS 16836, at *26 (N.D. Cal. Feb. 5, 2014) ("Plaintiff need only plead sufficient facts to raise a plausible inference that HP knew, or by the exercise of reasonable care should have known, [of the defect]").

Gen 3. But, all of the above "knowledge evidence" is also relevant to establishing the warranty claims. If Ford executives are discussing a fix as "lipstick on a pig" that same evidence is relevant to whether the product was merchantable.

### C.	Variances on the consumer protection acts across the different state subclasses

Plaintiffs assert claims under each state's unfair and deceptive fraud statutes, including the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq*.; California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.; Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.; and False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.; the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq*.; Massachusetts General Laws, Chapter 93A; the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq*.; New York General Business Law §§ 349-350; the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq*.; the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, *et seq*.; the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq*.; the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*.; and the Washington Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86.010, *et seq*.

All of the statutory fraud-based claims involve common or identical elements and burdens of proof, with some small variations. For example, omission-based fraud claims under the CLRA require proof that the omission was either contrary to a representation actually made by the defendant or was a material omission of fact the defendant was otherwise obligated to disclose. *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012). Similarly, with respect to claims under California's UCL, omissions can serve as the basis for a claim under the fraudulent prong if "members of the public are likely to be deceived" by the fraudulent omission. *In re Carrier IQ, Inc. Cons. Priv. Litig.*, 78 F. Supp. 3d 1051, 1112 (N.D. Cal. 2015); *Ehret v. Uber Techs., Inc.*, 2015 WL 7759464, at *8 (N.D. Cal. Dec. 2, 2015). A violation of the UCL fraud prong is also a violation of the False Advertising Law. *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 485 (S.D. Cal. 2013). Plaintiffs' remaining statutory fraud claims can be established through similar

circumstances involving deception, deceptive acts or practices, fraud, misrepresentation, or

concealment, suppression or omission of any material fact, among other things.[8]

Given the above analysis, Plaintiffs must demonstrate, as a minimum issue common to all

statutory fraud claims, that Ford concealed the following material information from Plaintiffs: (1) the

MFT is inherently defective; (2) the MFT Defects were so prevalent and persistent that they

significantly impaired the safety, reliability, and operability of the class vehicles; (3) the MFT has

---

[8] <u>Arizona</u>: Ariz. Rev. Stat. §44-1522(A); (prohibiting unfair or deceptive trade practices, including misrepresenting or omitting material facts about the characteristics of goods).

<u>Colorado</u>: Colo. Rev. Stat. § 6-1-105(1); *Rhino Linings USA, Inc. v. Rocky Mt. Rhino Lining, Inc.*, 62 P.3d 142, 146-48 (Colo. 2003) (a representation or omission is unfair or deceptive if it induces a party to act or refrain from acting, or has the capacity or tendency to do so even if it did not).

<u>Massachusetts</u>: Mass. Gen. Laws ch. 93A, § 2 (prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce"); *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 79 (Mass. 1975) (Massachusetts statute "goes far beyond the scope of the common law action for fraud and deceit").

<u>New Jersey</u>: N.J. Stat. Ann. § 56:8-2 (prohibiting "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact").

<u>New York</u>: N.Y. Gen. Bus. Law § 349 (prohibiting "deceptive acts or practices in the conduct of any business, trade or commerce"); N.Y. Gen. Bus. Law § 350 (prohibiting "false advertising"); *Spagnola v. Chubb Corp.*, 574 F.3d 64, 75 (2d Cir. 2009) (Sections 349-350 concern misleading misrepresentations or omissions in consumer-oriented conduct, that results in an injury to the plaintiff).

<u>North Carolina</u>: N.C. Gen. Stat. § 75-1.1(a) (prohibiting unfair and deceptive acts or practices in or affecting commerce); *LFM Real Estate Ventures, LLC v. SunTrust Bank*, 2012 WL 6114242, at *10 (W.D.N.C. 2012) (an act or practice is unfair or deceptive if it has "the tendency or capacity to mislead" or creates "the likelihood of deception").

<u>Ohio</u>: Ohio Rev. Code § 1345.02(A) (prohibiting "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction"); *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 996-1002 (S.D. Ohio 2014) (defendant's conduct must have the "likelihood of inducing a state of mind in the consumer that is not in accord with the facts").

<u>Texas</u>: Tex. Bus. & Com. Code § 17.46(a) (prohibiting "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce"); *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978) (prohibited acts or omissions may be proven by demonstrating "an act or series of acts which has the capacity or tendency to deceive an average or ordinary person").

<u>Virginia</u>: Va. Code Ann. § 59.1-200(A) (prohibiting fraudulent and deceptive acts or practices in connection with consumer transactions).

<u>Washington</u>: Wash. Rev. Code § 19.86.020 (prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce"); *Grays Harbor Adventist Christian School v. Carrier Corp.*, 242 F.R.D. 568, 573 (W.D. Wash. 2007) (analyzing material omissions as an unfair or deceptive act and stating that "[a] presumption of reliance is appropriate in fraud cases such as this one, where [p]laintiffs have *primarily* alleged omissions") (emphasis in original).

been inherently defective since its inception; and (4) the MFT Defects are so pervasive and integrated into the underlying software architecture that Ford's repair attempts (that never addressed the software architecture) were simply never successful. As discussed above, these elements will be established with the same common evidence used for the warranty claims.

Only then will Plaintiffs present evidence pertaining to Ford's state of mind to establish that: (1) Ford knew the MFT Base Software was deeply flawed, yet chose to do nothing to supervise or ameliorate the situation; (2) Ford knew before the first MFT-equipped vehicles were being delivered to consumers that the MFT Defects were pervasive, sustained and serious, and that the Company had no plan for consumers seeking relief; (3) the root cause of the MFT Defects was located in the Base Software and that key engineers were advocating a fundamental rearchitecture as the only way to properly resolve the MFT Defects; (4) Ford chose not to complete a fundamental rearchitecture because it was too expensive and time-consuming and instead opted for superficial, quick fixes; (5) Ford therefore knew that its subsequent software versions could never address the Base Software and were therefore incapable of adequately address consumers concerns; (6) Ford knew that the only relief, or a "full fix" for consumers would be to purchase a new vehicle with SYNC Gen 3. But this same knowledge evidence is relevant to the warranty claims: If Ford executives were making statements about software flaws, that "knowledge" evidence is relevant to the issue of whether the vehicles were reliable and merchantable.

Plaintiffs are mindful that there may be some differences between the statutory fraud claims. These differences, however, do not upend the presentation of evidence. As appropriate, additional showings can be provided to address any state specific issues, after presentation of the core evidence establishing Plaintiffs' claims occurs. For example, Ford argued that some states apply different burdens of proof, require notice of an alleged breach of warranty, or require that proposed class members be consumers who were not business customers. (*See* ECF No. 225 at 39–40.) Ford also argued that some states have different legal standards for reliance and causation in relation to their statutory fraud causes of action. (*See* ECF No. 225 at 15–20; ECF No. 290 at 1–3.) Under the circumstances, even assuming *arguendo* that Ford were correct, Ford does not show that Plaintiffs' statutory fraud claims require proof of different issues that would support the bifurcation exception.

**D.** **Evidence Pertaining to Ford's State of Mind**

Plaintiffs will show that Ford knew (or should have known) and intentionally concealed from consumers the following material information regarding the MFT. Plaintiffs assert this same evidene is relevant to the issues of merchantability.

**1.** **Ford knew (or should have known) that the initial design of the MFT Base Software was deeply flawed from the onset, yet chose to do nothing to address the concerns of their key MFT engineers.**

Plaintiffs will demonstrate that early on in the development of the project, Ford engineers warned Ford managers and executives that BSquare—the contractor used to develop MFT Base Software—was inexperienced, incompetent and not meeting basic coding or project management standards. In spite of warnings and pleas of MFT engineers, no action was taken by Ford to remedy or supervise BSquare. Plaintiffs will also demonstrate that Ford executives pressured BSquare to release unfinalized, immature code, so that Ford could maintain profit margins.

*See*, for example, Ex. 8 at 134:14-135:7, 273:7-16, 367:5-368:1; Exs. 1, 4, 46.

**2.** **Ford knew (or should have known) before any of the first MFT-equipped vehicles were being delivered to consumers that the MFT Defects were pervasive, sustained and serious. This same evidence is relevant to all claims.**

Plaintiffs will show that, once the MFT Base Software was first installed into vehicles, but before it was delivered to consumers, Ford engineers thought the product "sucks eggs" and was "worst in show." Ex. 47. Ford engineers bemoaned "those poor customers" who would be paying a significant premium to become unwitting beta testers. Ex. 48.

Plaintiffs will also show that Ford managers and highest executives were also "well aware" of the MFT shortcomings, as they had tested the MFT-equipped vehicles and found a litany of defects involving stability (problems with the system rebooting or slowdowns due to memory leaks, phone, voice recognition, navigation and performance). Ex. 49.

Drivers who took delivery of these MFT-equipped vehicles immediately reported huge numbers of problems. The number of TGWs or "Things Gone Wrong" per vehicle was an unprecedented 1,304 TGWs per 1,000 vehicles: more than one TGW for every car sold. Ex. 29. Ford's uppermost senior management also knew from direct personal experience that MFT was defective.

**3. Ford knew (or should have known) that the heart of the MFT Defects was located in the Base Software and that key engineers were advocating a fundamental rearchitecture as the only way to properly resolve the MFT Defects. This same evidence is relevant to all claims.**

Plaintiffs will show that Ford knew about the existence of "larger architectural issues . . . required long-term fixes." Ford further knew that fundamental problems such as eliminating repeated spontaneous reboots of the software would "require major architectural change," and it knew that its revisions were not resolving "major concerns."

*See*, for example, Exs. 50-52.

**4. Ford chose not to complete a fundamental rearchitecture because it was too expensive and time-consuming and instead opted for superficial, quick fixes.**

Plaintiffs will also demonstrate that from 2010 through 2011, Ford made numerous attempts at quick, superficial fixes to the MFT, which it knew did not actually address the MFT Defects located within the Base Software. Ex. 52.

Plaintiffs will also show that in 2011 Ford hired Microsoft, hoping that Microsoft could improve MFT's software. However, Microsoft soon came to the conclusion that a fundamental re-architecture of the Base Software was the only way to address the MFT Defects in any substantive way. Ford and Microsoft decided that "due to Ford's time constraints and the aggressive timelines needed for Gen 2" they would not rearchitect the MFT. Instead, they would build on top of an unstable system with a staggering level of bugs. Ex. 33.

**5. As a result Ford knew (or should have known) that its subsequent software versions could never address the Base Software and were thereby incapable of adequately addressing consumers concerns.**

Plaintiffs will show that Ford continued on its path of "chaotic high risk launches" issuing software updates that failed to fix the fundamental flaws in the software at the same time Ford increased the risk of worsening the software. As one Ford engineer said, there was not even a process for resolving global problems in the software, leading to "hacky one-off fixes" that often led to larger problems. Plaintiffs will show that the result of this disjointed process was that throughout its 2010 and 2011 software revisions, Ford never solved any of the fundamental flaws in the MFT Software. At the end of March 2011, Ford knew that the basic problems with the code were largely unchanged.

Ford also knew that the Microsoft-led software versions did little to provide adequate, sustained relief.

*See*, for example, Ex. 53.

**6.    Ford knew (or should have known) that the only relief, or a "full fix" for consumers, would be to purchase a new vehicle with SYNC Gen 3**

Plaintiffs will show Ford emails from Mark Fields stating: "[It's] going to take a while to get this fixed, and not fully until we get to Sync Gen 3." *See* Ex. 44.

## VIII.    THE WITNESSES HAVE OVERLAPPING KNOWLEDGE AS TO ALL CLAIMS

It is Plaintiffs' position that each of the trial witnesses played a key role regarding the MFT system, and/or in establishing Ford's liability/damages, and their testimony is required to establish elements pertaining to both warranty and fraud claims. In the event of bifurcation, many of these 33 individuals would need to testify at two or three trials.

### A.    Experts

1.    Jonathan Arnold

Witness will testify to his damages model for all claims.

2.    Stefan Boedeker

Witness will testify to his damages model for all claims.

3.    Craig Rosenberg

As referenced above, this witness will testify to the topic of driver distraction, the role of driver distraction and accidents, and the results of his field study regarding distraction and the use of MFT. His testimony will be used to establish elements pertaining to both warranty and fraud claims.

4.    Dan Smith

As explained above, this witness will testify to the quality of the Base Software, and its role in creating the MFT defects and subsequent manifestations. Witness will also testify to software development best practices and how the Base Software changed between software versions. His testimony will be used to establish elements pertaining to all claims.

**B.      Plaintiffs/Class Representatives**

Plaintiffs will testify to (1) Fords' representations and omissions regarding the MFT; (2) the MFT Defects and their manifestations; (3) Plaintiffs' repair efforts; and (4) safety concerns. They will also testify regarding the extent to which, if any, Ford's software versions modified their experiences with the MFT. As explained above, Plaintiffs' testimony will be used to establish elements pertaining to both warranty and fraud claims.

1.      Jennifer Whalen

2.      Center for Defensive Driving

3.      Richard Decker Watson

4.      Darcy Thomas-Maskrey

5.      James Laurence Sheerin

6.      William Creed

7.      Joshua Matlin

8.      Russ Rizzo

9.      Daniel Fink

10.     Jerome Miskell

11.     Jose Randy Rodriguez

12.     Michael Ervin

13.     Henry Miller-Jones

14.     Leif Kirchoff

15.     Jason Connell

16.     Joe D'Aguanno

17.     Thomas Mitchell

18.     Jeffrey Miller

19.     Nuala Purcell

### C. Ford Employees—Fed. R. Civ. P. 30(b)(6) witnesses

#### 1. Kenneth Williams

Kenneth Williams was, during the relevant time period, the SYNC Gen2 Lead Systems Engineer. This witness will testify as Ford' corporate representative on the following three topics: (1) the third parties with which Ford worked on the MFT system, (2) the Ford and/or third-party personnel responsible for analyzing trends pertaining to MFT issues, and (3) the post-production research and development of the MFT system. As such his testimony is relevant in establishing the required elements for the warranty and fraud claims.

#### 2. Gary Jablonski

Mr. Jablonski was, during the relevant time period, Ford's Manager of Infotainment Systems. This witness will testify about MFT problems and that Ford rushed to launch MFT. His testimony is thus relevant in establishing the required elements for the warranty claims in that he has knowledge of the defective nature of the MFT and the failed attempts to repair the system and has knowledge as to what Ford knew regarding the defective nature of the MFT and when.

#### 3. John Schneider

John Schneider was, during the relevant time period, the Global Chief Engineer of upper-body electronics. He was responsible for designing systems functions for SYNC and other connectivity products. Mr. Schneider's testimony will go to whether the MFT is defective and Ford's knowledge that MFT was experiencing significant consumer-interfacing manifestations. As such, his testimony is relevant in establishing the required elements for the warranty and the fraud claims.

#### 4. Michelle Moody

Michelle Moody has been involved in marketing Ford vehicles and the MFT system since 2010. She was actively involved in marketing MFT/SYNC to consumers, as well as interpreting customer feedback regarding the systems. Her testimony is thus relevant in establish the required elements for the warranty claims and the fraud claims.

### D. Ford Employees – Fact witnesses

#### 1. Michael Westra

Mr. Westra was, during the relative time period, one of the key engineers associated with the initial design of the MFT and an important intermediary between Ford and BSquare. Mr. Westra will testify to MFT problems, and their root case, and that Ford rushed to launch MFT. As identified above, his testimony is thus relevant in establishing the required elements for both the warranty and the fraud claims.

#### 2. Graydon Reitz

Mr. Reitz was, during the relevant time period, Director of Americas Quality and has knowledge regarding MFT's widespread defectiveness by October 2010 and Ford's inability to repair the MFT. He also has knowledge regarding Ford's communcations strategy regarding the MFT and subsequent updates. His testimony is thus relevant in establishing the required elements for both the warranty and the fraud claims.

#### 3. Jeff Ostrowski

Mr. Ostrowski was, during the relevant time period, a supervising software engineer. He has considerable knowledge relating to the MFT's problems and was actively involved in facilitating the Microsoft series of software versions. His testimony is thus relevant in establishing the required elements for both the warranty in that the MFT was defective and that the software versions failed to address the Base Software and the fraud claims that Ford knew it was punting an extremely large amount of material software bugs from software version to software version.

#### 4. Jeremiah Bragg

Jeremiah Bragg was, during the relevant time period, the "Sync Gen 2 Software Lead" for Ford. His role included interfacing with a software supplier in determining and managing different software releases. He can testify to the design of MFT and subsequent consumer complaints/issues with MFT. As identified above, his testimony is relevant in establishing the required elements for the warranty claims and the fraud claims.

#### 5. Hanna Parrish

Mr. Hanna was heavily involved in the human machine interface design aspects of Ford's SYNC 3. His testimony is thus relevant in establishing the required elements for the warranty claims in that he has knowledge of the defective nature of the MFT and the fraud claims in that he has knowledge as to what Ford knew regarding the defective nature of the MFT and when.

6. Florian Frischmuth

Mr. Frischmuth was, during the relevant time period, the Global Manger, Telematics & Infotainment Quality at Ford Motor Company. He was routinely a participant in emails regarding MFT problems and played a key role in the different software updates. He also testified regarding the GPS location errors within the 911 Assist MFT feature. As identified above, his testimony is thus relevant in establishing the required elements for the warranty claims in that he has knowledge of the defective nature of the MFT and the failed attempts to repair the system and has knowledge as to what Ford knew regarding the defective nature of the MFT and when.

## IX. ANY PREJUDICE TO FORD CAN BE APPROPRIATELY MITIGATED BY PROPER JURY INSTRUCTIONS

Ford's bifurcation argument implicitly asserts that a jury will inevitably fail to follow appropriate jury instructions. Ford's argument is without merit and lacks legal support. The Ninth Circuit and the state of California both routinely rely on jury instructions limiting the use of evidence. See Model Civ. Jury Instr. 9th Cir. 1.11 (2017); Cal. Jury. Instruc. Civ. 2.05; Judicial Council of California Civil Jury Instruction 206. Using these types of instructions, a court can clearly and effectively instruct the jury that certain types of evidence should be used for the limited purpose of establishing elements of certain claims, but not others. This Court has already indicated that it "presumes that the jury will follow the instructions given by the Court." *Bookhamer* at *4. And Ford has failed to even attempt to explain why such a presumption is impossible here.

Further, many courts have relied upon the use of jury instructions to mitigate different evidentiary showings for different claims or parties. In *Wooten v. BNSF Railway Co.*, 2017 WL 4678197 (D. Mont. Oct. 17, 2017), BNSF argued that the plaintiff's FELA (Federal Employers Liability Act) and FRSA (Federal Railway Safety Act) claims should be bifurcated in order to

prevent undue prejudice. The *Wooten* court noted that the FELA claim required proof that the plaintiff was injured as a result of BNSF's negligence while the FRSA claim required proof that BNSF retaliated against him for reporting the injury. BNSF argued that the retaliatory conduct was not relevant to the question of whether it acted negligently, and feared it would be prejudiced if evidence of its alleged FRSA violation was allowed during the trial of the FELA claims. The *Wooten* court disagreed with BNSF's argument and held that "any possibility of prejudice can be reduced or eliminated by the use of limiting instructions to the jury, explaining how and for what purposes certain evidence may be considered." *Id.* at *2. The *Wooten* court also pointed out that "[a]ppropriate limiting instructions will adequately ensure that the jury understands that a finding of liability under the FELA does not mean that BNSF is also liable under the FRSA." *Id.* (citing *Powell v. Union Pacific R. Co.*, 2013 WL 497636, at *4 (E.D. Cal. Feb. 7, 2013) ("[b]esides their bald assertions of prejudice, defendants have not explained why jury instructions would be insufficient to ensure that the jury understands that a finding of liability for Union Pacific under FELA does not necessitate a finding that Union Pacific wrongfully terminated plaintiff")).

In *Zaldana v. KB Home*, 2010 WL 4313777 (N.D. Cal. Oct. 26, 2010), the plaintiff alleged that KB Home collected kickbacks from the Countrywide Defendants and from the First American Defendants. The defendants admitted that they were properly joined because the claims against each of them arose from the same transaction, occurrence, or series of transactions or occurrences. But, the defendants sought to sever trials against them, arguing that neither the First American nor Countrywide Defendants were alleged to have participated in the other's alleged arrangements with KB Home. While the court was mindful that the liability of each defendant must be assessed individually, it held that they failed to support their conclusory assertion that no jury instruction would suffice to assure such individual evaluation. *Id.* at *2 (citing *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1493, 1495 (11th Cir. 1985) (recognizing the use of cautionary instruction in eliminating risks of prejudice and confusion in consolidated trial; affirming consolidation of forty-four individual asbestos cases); *S.E.C. v. Leslie*, 2010 WL 2991038, at *4 (N.D. Cal. July 29, 2010) (noting that "[c]areful jury instructions should be effective to ensure that the jury can separate out the two sets of allegations and the alleged conduct that is relevant to each."))

## X.    CONCLUSION

Plaintiffs submit that the core proof is common to all claims and it would be inappropriate to bifurcate. Indeed bifurcation would serve to extend what will already be a lengthy trial.

DATED: February 20, 2018

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Steve W. Berman
    Steve W. Berman (*pro hac vice*)
Craig R. Spiegel (122000)
Catherine Y.N. Gannon (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
E-mail: steve@hbsslaw.com
E-mail: craigs@hbsslaw.com
E-mail: catherineg@hbsslaw.com

Adam J. Levitt (*pro hac vice*)
John E. Tangren (*pro hac vice*)
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, IL 60602
Telephone: (312) 214-7900
E-mail: alevitt@dlcfirm.com
E-mail: jtangren@dlcfirm.com

Roland Tellis (186269)
Mark Pifko (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2320
E-mail: rtellis@baronbudd.com
E-mail: mpifko@baronbudd.com

Nicholas E. Chimicles (*pro hac vice*)
Benjamin F. Johns (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
E-mail: nick@chimicles.com
E-mail: benjohns@chimicles.com

*Class Counsel*