UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. 13-cv-03072-EMC<br><br>**ORDER TO SHOW CAUSE WHY PRELIMINARY APPROVAL OF SETTLEMENT SHOULD NOT BE DENIED**<br><br>Docket No. 437 |

In addition to the issues raised by the Court in its prior order and at the June 12, 2018 specially-set hearing, Docket Nos. 442 and 448, the Court orders Class Counsel to show cause why preliminary approval should not be denied.

Among various concerns, the proposed settlement has three features which merit heightened scrutiny and judicial skepticism. First, the monetary portion is fashioned as a "claims-made" settlement (and therefore the equivalent of a common fund with a reversion to the defendant) and as such disfavored.[1] Second, the putative value of the equitable relief (software version 3.10) is highly questionable as it was not tested or verified by Class Counsel. Third, the settlement includes a "clear-sailing" provision which guarantees that Ford will not oppose Class Counsel's fee request up to $22 million, an amount which dwarfs the actual value of the likely relief to the class. These factors are "indicia of collusion between class counsel and the defendant," 4 Newberg § 13:9, and demand the courts be "particularly vigilant." *In re Bluetooth*

---

[1] A claims-made settlement "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them." 4 Newberg on Class Actions § 13:7 (5th ed. 2018). Unlike the more typical "common fund" settlement, under a claims-made settlement, "A claims-made settlement is, therefore, the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Id.*

*Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *see also Tait v. BSH Home Appliances Corp.*, 2015 WL 4537463, at *6 (C.D. Cal. Jul. 27, 2015) (treating these features as "red flags" heightening the court's "special obligation to assure itself that the settlement is fair, reasonable, and adequate" (quotations, citation, and alterations omitted)).

A.  True Value of the Settlement

    1.  Non-Monetary Relief

At this point, the Court is not inclined to attribute any value to the "free" "upgrade" to MFT v. 3.10. Class Counsel conceded that it had not engaged in any real scrutiny of MFT v. 3.10. Counsel has not reviewed or vetted the software at all to determine whether it functioned materially better than MFT v. 3.5 and below (the allegedly defective versions in this litigation), or even v. 3.6, which just months ago Class Counsel argued had no value because it failed to repair the MFT defects. Indeed, counsel was willing to hinge its entire case on proving that v. 3.6 had no value.

Further, Ford's counsel indicated that MFT v. 3.10 can already be downloaded and self-installed for free by Class Members. Thus, the only "value" that Class Members would derive would not be from the software itself, but from the approximately $80-100 in labor costs that would be waived if class members asked a Ford dealership to install the software upgrade for them.

    2.  Monetary Relief

At the June 12, 2018 hearing, Class Counsel presented information estimating the number of class members eligible for each category of monetary relief provided by the settlement. This information should have been included in the motion for preliminary approval. At least in theory, the magnitude of the theoretical potential relief arguably would reflect a reasonable compromise in light of the significant litigation risks involved in continued prosecution of the case. Plaintiffs' damages experts had estimated damages of $625-$1,364 per class member, at best, and the proposed Settlement will provide 61% of class members between $100-500 in cash reimbursements, and the remaining 39% potentially with $35 or more. Considering only these cash reimbursements and assuming a 100% claims rate, Class Counsel estimated that the potential

1 value of the settlement fund is $55,800,000.

2 The problem is this estimate is illusory. *Cf. Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (denying preliminary approval of claims-made settlement in part because "[i]n reality, the bulk of the economic relief hypothetically available under the Settlement is merely illusory due to its strict eligibility conditions, while much of what is attainable will go unpaid as a result of the claims-made process"). Class Counsel conceded that claims rates are often in the range of 1 to 10%, trending towards the lower end. *See* 4 Newberg § 12:17 (recognizing that claims rates are often very low when relief is small and process burdensome); *Allen v. Bedolla*, 787 F.3d 1218, 1221 (9th Cir. 2015) (approximately 7% claims rate); *Tait*, 2015 WL 4537463 at *6 (less than 3% claims rate); *Yeagley v. Wells Fargo & Co.*, Case No. 05-03403 CRB, 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008) (less than 1% claims rate); *LaGorden v. Support.com, Inc.*, No. C 12-0609 JSC, 2013 WL 1283325, at *6 (N.D. Cal. Mar. 26, 2013) (0.17% claims rate); *In re Apple iPhone 4 Prods. Liab. Litig.*, No. 5:10-md-2188 RMW, 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012) (0.16% to 0.28% claims rate); *see also* Mayer Brown LLP, *Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions*, at 2 (reporting that out of six consumer and products liability cases for which claims data could be located, five delivered funds to only 0.000006%, 0.33%, 1.5%, 9.66%, and 12%), available at http://cdn.ca9.uscourts.gov/datastore/library/2014/06/13/Laguna_ClassActions.pdf. Absent convincing evidence that the claims rate in *this* case will substantially exceed the normal trend (unlikely given the onerous claims process), the amount of money that is likely to be distributed under this claims-made settlement is no more than $558,000 to $5,558,000. *Cf.* 4 Newberg § 13:7 ("Claims-made settlements are disfavored because . . . they tend to promise far more than they deliver. . . . This troubles courts, even more so if the settlement also includes a 'clear sailing' agreement.").

This settlement is particularly troubling because a claims-made distribution does not appear necessary in this case for the most part. A claims-made process may be justified when it is the best or only option available. *See*, *e.g.*, *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fl. 2014) (approving claims-made process where defendant "presented evidence

that they cannot, on a systemwide basis, determine" key information identifying class members or the type of relief for which they would be eligible). For example, in many consumer class actions involving retail products, the defendant manufacturer may have no idea who purchased and was purportedly harmed by their products (*e.g.*, Coca-Cola would not know who purchased an allegedly mislabeled soda at Safeway).

That is not the case here. Ford concedes that the identity of and number of repairs sought by 61% of Class Members are reflected in its centralized warranty database. Indeed, that is how claims will be verified. Ford and Class Counsel are experienced and know full well the suppressive impact of imposing a claims process; they know the actual payment is not likely to come close to $55,800,000. One might reasonably infer that the purpose of the claims process is to reduce the defendant's real world exposure rather than to tailor the settlement to serve some other legitimate end. Whatever the motivation, the $55,800,000 is wholly illusory.

B.   Proportionality of Attorneys' Fees to Settlement Value

Compounding the problem is the fact that while the amount to be recovered by the Class is likely to be lower than $5 million, Counsel's anticipated request for $22 million in fees is grossly disproportionate. This disproportionality raises serious questions about the fairness and adequacy of the settlement. *Allen*, 787 F.3d at 1224 (quotation and citation omitted). In *Allen*, the Ninth Circuit pointed out that the disproportionality was present where the Class's recovery "examined in terms of 'economic reality,'" *i.e.*, in terms of claims actually made not potential claims, rendered the attorneys' fee award three times larger than the class recovery. *Id. Cf. In re Bluetooth*, 654 F.3d at 944, 947 (holding that district court was required to analyze the "disproportionate distribution between fees and relief" both with respect to the fairness of the settlement and the reasonableness of attorney fees).

These signs not only require heightened scrutiny of the fairness of the settlement, but also impose "a special obligation [on the district court] to assure itself that the fees awarded in the agreement [are] not unreasonably high." *Allen*, 787 F.3d at 1224 (quotation, citation, and alteration omitted). The district court must consider the value of the relief provided by the settlement and make "express findings . . . on what it considered to be a reasonable lodestar

1 amount" in light of that valuation. *Id.* at 1225. And, as noted above, that evaluation should
2 consider the "economic reality" of the actual claims recovered, not merely the potential recovery.
3 *Id.* at 1224.

4 Contrary to *Allen*'s directive, at the hearing, Class Counsel incorrectly stated that the Court may only look to the *potential* value of the settlement in evaluating its fairness and adequacy irrespective of how many claims are *actually* made and recovered, citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997). *Williams* concerned calculation of attorneys' fees award, not fairness and adequacy. And even with respect to fees, *Williams* merely held that, where the defendant had contractually agreed to pay attorneys' fees based on the potential size of the common fund, the district court abused its discretion in awarding fees based only on the actual recovery. *See Reyes v. Bakery and Confectionery Union and Indus. Int'l Pension Fund*, 281 F.Supp.3d 833, 861 (N.D. Cal. 2017) (rejecting argument that *Williams* required the court to assess attorneys' fees based on potential value of common fund rather than actual claims recovered); *Yeagley v. Wells Fargo & Co.*, Case No. 05-03403 CRB, 2008 WL 171083, at *7-8 (N.D. Cal. Jan. 18, 2008) ("*Williams* does not require this Court to adopt the fiction that the settlement is worth $114 million. . . . *Williams* is based on the defendants' agreement to pay fees based on the larger amount."), *reversed on other grounds*, 365 Fed.Appx. 886 (9th Cir. 2010). *Williams* did not otherwise discuss the reasonableness of the fees requested, nor did it rule on the problem of disproportionality between actual benefits obtained for the class and fee award discussed in *Allen*.

Class Counsel is **ORDERED** to address these concerns in the supplemental brief it must file by Friday, June 22, 2018.

**IT IS SO ORDERED**.

Dated: June 14, 2018

_____
EDWARD M. CHEN
United States District Judge

5