Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

```
IN RE                              )
                                   )
MYFORD TOUCH CONSUMER LITIGATION   ) No. C 13-3072 EMC
                                   )
                                   )  San Francisco, dollars
                                   )  Monday
                                   )  June 11, 2018
_____    )  2:30 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:            HAGENS BERMAN SOBOL SHAPIRO, LLP
                          1918 Eighth Avenue
                          Suite 3300
                          Seattle, Washington 98101
                   BY:  **STEVE W. BERMAN**
                        **CATHERINE Y.N. GANNON, ESQ.**


                          BARON & BUDD, P.C.
                          15910 Ventura Boulevard
                          Suite 1600
                          Encino, California 91436
                   BY:  **ROLAND TELLIS, ESQ.**


                          CHIMICLES & TIKELLIS, LLP
                          361 W. Lancaster Avenue
                          Haverford, Pennsylvania 19041
                   BY:  **NICHOLAS E. CHIMICLES, ESQ.**
                        **BENJAMIN F. JOHNS, ESQ.**
                         - appeared via telephone

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

```
 1  APPEARANCES:   (CONTINUED)

 2  For Plaintiff:          DICELLO LEVITT & CASEY, LLP
                            Ten North Dearborn Street
 3                          11th Floor
                            Chicago, Illinois 60602
 4                     BY:  ADAM J. LEVITT, ESQ.
                            JOHN TANGREN, ESQ.
 5                          - appeared via telephone

 6

 7  For Defendant:          O'MELVENY & MYERS, LLP
                            Two Embarcadero Center
 8                          28th Floor
                            San Francisco, California 94111
 9                     BY:  RANDALL W. EDWARDS, ESQ.
                            CLAY MARQUEZ, ESQ.
10                          SARAH H. TRELA, ESQ.

11                             -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Monday - June 11, 2018**</u>                    <u>**2:32 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling case C13-072, Whalen versus Ford |
| 5 | Motor. |
| 6 |    Counsel, please come to the podium and state your name for |
| 7 | the record. |
| 8 | **MR. BERMAN:**  Good afternoon, your Honor.  Steve |
| 9 | Berman on behalf of the class. |
| 10 | **THE COURT:**  All right.  Good afternoon, Mr. Berman. |
| 11 | **MR. TELLIS:**  Roland Tellis, Baron and Budd, on behalf |
| 12 | of the class. |
| 13 | **MS. GANNON:**  Catherine Gannon on behalf of the class. |
| 14 | **THE COURT:**  Good afternoon. |
| 15 | **MR. EDWARDS:**  Good afternoon, your Honor.  Randall |
| 16 | Edwards on behalf of Ford Motor Company.  With me are my |
| 17 | colleagues Clay Marquez and Sarah Trela. |
| 18 | **THE CLERK:**  We have counsel on the phone. |
| 19 |    Counsel on the phone, please state your names for the |
| 20 | record. |
| 21 | **MR. LEVITT:**  Good afternoon, your Honor.  Adam Levitt |
| 22 | and John Tangren on plaintiffs' behalf. |
| 23 | **THE COURT:**  Okay.  Thank you. |
| 24 | **MR. CHIMICLES:**  And good afternoon, your Honor.  Nick |
| 25 | Chimicles and Benjamin Johns on behalf of the plaintiffs in the |

1   class.

2           **THE COURT:**  All right.  Thank you, counsel.

3       So I wanted to meet early rather than waiting for the full

4   hearing on this motion because I had some foundational

5   questions to ask and I thought we should get to it sooner

6   rather than later.

7       First of all, I'm sort of lost as to the fix part of this.

8   I have -- there is nothing that's been submitted to me that

9   tells me anything about Version 3.10, I guess it is, of the

10  software.

11      You know, theories always been advanced in this case, and

12  I understand it's disputed, that there was something

13  fundamentally defective about the architecture of the MyFord

14  Touch.  It was unfixable, et cetera, et cetera, et cetera.  And

15  now I'm told that a major part of the settlement is a free

16  upgrade to Version 3.10 or later.  And I have -- there has been

17  nothing presented to the Court in the papers that I could see

18  that tells me anything about this Version 3.10.

19      Does it apply to all of the class vehicles equally?  Does

20  it work?  How do I know, given all the representations about

21  the pervasiveness and the fundamental problem with the

22  architecture that this is of any benefit to the class?  Is this

23  something that's available anyway?  I mean, is this something

24  that's being implemented now?  Do people have to pay for it,

25  even though they are outside the warranty period?

1    So what is this?  It's a major part of the settlement,

2    evidently.  So I can't possibly approve unless I know more

3    details with this.

4        So maybe someone can explain to me what is 3.10 and why --

5    particularly from the plaintiffs' perspective, why does this

6    fix what was represented all along in this case to be a

7    fundamental flaw in the architecture?

8        **MR. BERMAN:**  Before I address 3.10, your Honor, we

9    think the major aspect of the case is the cash.  And one of the

10   questions you asked is what's the value of the settlement.  And

11   I think that perhaps in our papers we did not explain the cash

12   value as well as we should have, so I'd like to take a moment

13   do that.

14       First, as you're aware, one of Ford's primary arguments,

15   and you noted in your footnote one, was that it appears there

16   are over 70 percent of the class never got a repair, according

17   to Ford's records.  That's not the way we looked at it.  We

18   looked at it if you went in and got a software upgrade to try

19   to fix MyFord Touch that that was a repair.  And there were

20   hundreds of thousands of such instances and under the

21   settlement a software update is considered to be a repair.

22       So we've expanded the pool of people who are eligible for

23   monetary relief in a very significant fashion.  And I can

24   illustrate that -- I could tell you that that means that

25   33 percent of all class members had one repair, 16 percent --

```
 1            THE COURT:  Do you know this from Ford records?

 2            MR. BERMAN:  What's that, your Honor?

 3            THE COURT:  You know this from Ford records?

 4            MR. BERMAN:  Yes.

 5            THE COURT:  33 percent had a repair within the

 6    meaning of the settlement agreement?

 7            MR. BERMAN:  Yes.

 8            THE COURT:  And that took the form of possibly just

 9    an upgrade?

10            MR. BERMAN:  Yes.

11            THE COURT:  Where --

12            MR. BERMAN:  I have a chart that might be useful for

13    your Honor.

14        (Whereupon document was tendered to the Court.)

15            THE COURT:  Because it defines -- the settlement

16    agreement defines MFT software repair to be service performed

17    by an Authorized Ford Dealer in an effort to repair MFT

18    software undertaken in response to a customer's complaint about

19    a malfunction or problem.

20        So it doesn't expressly say that someone just got the

21    upgrade because they brought it in for servicing and didn't

22    complain, does it?  Am I missing something?

23        Oh, installation of an updated -- Paragraph 2 -- software

24    through customer satisfaction program 10B, et cetera.  I'm not

25    sure what that means issues.
```

1          **MS. GANNON:**  If I can clarify for, your Honor.

2     So Ford's records are -- from my understanding, they used

3     codes to organize the repairs.  And so there is a list of codes

4     there that list out when a customer came to complain about a

5     problem.  And those, I think, they start with A.

6          And then there was a second edition of codes, which

7     primarily represents the software updates campaigns.  And those

8     are the 12M01 codes you see there.

9          And so it's -- when we go through those records, we would

10    look for those codes and that's what we would count as an MFT

11    software repair.

12         **THE COURT:**  And that could have happened even without

13    somebody complaining?  These, like, 10B20 and 11A01?  How does

14    that come about?

15         It says through Customer Satisfaction Programs.  That

16    means somebody complained and then got an upgrade, or how does

17    that work?

18         **MS. GANNON:**  Usually through the 12M01.  That's

19    usually when they got the letter saying that there's a free

20    upgrade available and to either download it or go visit a

21    dealership to get the repair done.

22         I'm sure Mr. Edwards would be able to clarify more, but I

23    don't think we can tell from that code if it was pursuant to a

24    complaint.  But the definition includes the software updates

25    pursuant to those codes as an MFT software repair.

1          **MR. EDWARDS:**  Your Honor, if I may?

2          **THE COURT:**  Yes.

3          **MR. EDWARDS:**  Just to just elaborate a little bit.

4     So with respect to the Owner Notification Programs or

5     sometimes referred to as the Field Service Actions, every time

6     that Ford did a software update that was rolling out to new

7     vehicles -- so let's say for the 2012 model year, 2013 model

8     year, whatever -- it also made those software updates available

9     to all owners of older vehicles that had already been sold as

10    part of these Customer Satisfaction Programs for free.  And it

11    would send a letter saying:  You can download it or you can

12    come into a dealer and have the dealer install it in your

13    vehicle if you like.

14    So I would assume all of the following scenarios were

15    captured by that.  One would be somebody who got a letter and

16    thought software upgrades were -- sounded like a nice thing,

17    but otherwise had been reasonably satisfied with the

18    performance.

19    I'm sure there were people who thought, boy, a software

20    upgrade would be really great because I haven't been fully

21    satisfied.

22    There might have been people who had to go to a dealer for

23    another reason and if -- if, let's say, the air conditioning

24    was not working in their vehicle, maybe under warranty, maybe

25    not, goes into the dealer for the air conditioning repair and

1    the dealer would see, well, there is an open Owner Customer

2    Satisfaction Program.  We'll just install the software because

3    that's something Ford said that they will pay for all customers

4    to have.  So there could be all kinds of scenarios.

5         Ford's warranty analysis that Dr. Taylor presented, and I

6    believe certainly our argument and I believe it to be the

7    accurate one with respect to the breach of express warranty

8    claim, is there would absolutely be people who received an

9    Owner Notification Software Update who would not have been able

10   to prove a breach of express warranty claim because they didn't

11   present the vehicle for a particular repair.

12        Now, plaintiffs may have disputed that, but we briefed

13   that on summary judgment and in the Jury Instructions.  So by

14   design the definition of MFT software repair in the Settlement

15   Agreement, Ford yielded to capture not only warranty repairs,

16   as Dr. Taylor had identified them, but also these Owner

17   Notification Programs and, also, actually post warranty repairs

18   or repairs that had been undertaken at non-Ford dealers if --

19   you know, to the extent that there were any that class members

20   wanted to submit claims on.

21        So the definition of MFT software repair in the settlement

22   is broader in three or four different respects compared to the

23   breach of express warranty claim.

24             THE COURT:  So it would include somebody who went in

25   for an air conditioner repair.  Didn't necessarily say anything

1    about a problem, but nonetheless got the upgraded software.

2    That would count as an MFT software repair under the

3    settlement?

4                    **MR. EDWARDS:**  Yes.

5                    **THE COURT:**  All right.  And do you agree that -- I

6    guess it's been represented by Mr. Berman, 33 percent of the

7    class got a repair through one of the -- at least the records

8    show either a service performed in response to a complaint or a

9    letter.  You know, somehow got the -- got a, quote, MFT

10   software repair.

11                   **MR. EDWARDS:**  So we don't know the exact number,

12   particularly because of the post warranty where Ford doesn't

13   have any records at all in the out-of-pocket.

14        But the numbers that Mr. Berman was identifying, I believe

15   I have -- I don't have my chart in front of me now, but they

16   sound very close.

17        We shared the information in the course of -- well,

18   Dr. Taylor and his report and then in the course of the

19   settlement negotiations.  We shared all the information that we

20   had relevant to both warranty repairs and then summary

21   information on the owner notification repairs.  So that fits

22   with what Mr. Berman just said.

23        We could easily supplement with the precise figures, you

24   know, at a level of detail even --

25                   **THE COURT:**  So the assumption is that whatever that

1  number is, 33 percent roughly, would be entitled to the 100 or

2  300 or -- depending on how many on the monetary side, they

3  would be entitled to that to be entered into that matrix of 100

4  or 300 or $500, or the discount coupons.

5          MR. BERMAN:  It's 33 percent would be entitled to the

6  $100.

7          THE COURT:  The $100.  Oh, the one time.

8          MR. BERMAN:  Right, one time.

9      16 percent would be entitled to 300, and 12 percent would

10  be entitled to 500.

11          THE COURT:  All right.  So that's a lot different

12  than my footnote one.

13          MR. BERMAN:  Yes.

14          MR. EDWARDS:  Yes, your Honor, because the footnote

15  one, I think you're extracting from Dr. Taylor's express

16  warranty analysis, which did not include the -- the updates

17  that were made available on this, for example.

18          THE COURT:  All right.  Then that raises -- okay.

19  What's the value -- so you do the math.  What is that?  There

20  is like 300,000 in the class?

21          MR. BERMAN:  I've got a calculation chart for you,

22  your Honor.

23      (Whereupon document was tendered to the Court.)

24          MR. BERMAN:  So you asked us to try to calculate the

25  value.  So on the top corner we took the number of -- if you

```
 1   assume that there are 360,000 class vehicles and then you

 2   multiply the percentages for each of the repair categories, you

 3   can come to various dollar figures that we have there for the

 4   value of the repairs.

 5           THE COURT:  So the repairs in the upper right-hand

 6   corner total, if 100 percent claimed, 21,500,000?

 7           MR. BERMAN:  No.  They total 50,900,000.  Twenty-one

 8   is just for repair three.

 9           THE COURT:  Oh, I see.

10           MR. BERMAN:  Seventeen-four is for repair two.  And

11   12 million for repair one.

12       And if you look down in the summary chart, it's

13   50,900,000.

14           THE COURT:  What is the first line?  It says

15   "Software Upgrade Value Benefit 34 million."

16           MR. BERMAN:  So we took the total number of potential

17   class members out there who could be available to take 3.10.

18   And that's 342,000.  And the labor cost is about a hundred

19   dollars that they would have been charged.

20           THE COURT:  That's the quote, injunctive part of --

21   the value of the injunctive part of the case.

22           MR. BERMAN:  Yes, that's correct.

23           THE COURT:  All right.

24           MR. BERMAN:  Then we come up with thirty-four two.

25   And then there is the people who would qualify for the $35.
```

1   Those are the people we call the silent sufferers, who didn't

2   do anything, but may have had a couple instances where they had

3   freezing or some other manifestation of the issue.  These are

4   people who we think would have a very difficult time proving an

5   implied warranty because the frequency of their issue did not

6   render the car inoperable under your holding in the implied

7   warranty standard.  So the value of that is 2.4 million.

8        So then left off of this were people who made post

9   warranty repairs on their own, who are going to get

10  out-of-pocket reimbursement.  We don't know who they are or how

11  to identify them.  So that value is not included here, but

12  it's -- there's value there.

13            THE COURT:  The 2.45 million is calculated by taking

14  the 39 percent of the class times $35?

15            MR. BERMAN:  It's 50 percent of that class.  We made

16  an assumption, just to be conservative.

17            THE COURT:  Where does it say that?

18            MR. BERMAN:  It doesn't.  But it's 50 percent,

19  correct?

20            MS. GANNON:  It's 50 percent.

21            THE COURT:  That assumes a 50 percent claims rate.

22            MR. BERMAN:  That's right.

23            THE COURT:  But $35 times 39 percent of the class of

24  342,000 people.

25            MR. BERMAN:  That's right.

```
1        And so the other value that's not known here is there are
2   used car people out here who can also make a claim.  We don't
3   have a precise number on how many used car purchasers are going
4   to qualify, but there will be claims made by used car
5   purchasers.
6            THE COURT:  All right.  So this raises the other side
7   of the question I have; and that is, since you have this data,
8   why do we need to make it a claims based settlement?
9            MR. BERMAN:  Well --
10           THE COURT:  At least for the part where you have the
11  records.
12           MR. BERMAN:  Okay.  So let me answer that two-fold.
13  Okay?
14       Number one, when we were trying to -- first of all, we
15  wanted to mail checks.  We demanded that.  We think it can be
16  done.  Ford wouldn't agree.  And so we had to decide what do we
17  do?  Do we continue to trial over that issue or do we make some
18  real money available to consumers?
19       And we think we're making real money available to
20  consumers because as we were sitting in the negotiation room,
21  we looked at how this would affect our class representatives,
22  making this kind of money available to them.
23       And I would hand up another chart which shows -- I'll give
24  you two copies this time.  I'm getting trained.
25
```

1          (Whereupon document was tendered to the Court.)

2          **MR. BERMAN:**  So we were thinking, what does this mean

3    to our class reps?  Well, they are going to have the

4    opportunity, if they make the claim, to make some real money

5    here.  Most of them will be entitled to 500.  The average of

6    the class representatives is something like 385.

7          **THE COURT:**  Of the class representatives.  What about

8    of the class?

9          **MR. BERMAN:**  This is available to everyone.

10         **THE COURT:**  I know, but this may not be -- I don't

11   know how representative of the class they are with respect to

12   that distribution.

13         **MR. BERMAN:**  So, well --

14         **THE COURT:**  Based on the percentages you can figure

15   that out.

16         **MR. BERMAN:**  Well, we know that 12 percent of the

17   class would fit in the 500 category.  We know that 33 percent

18   would fit in the 100 category.  And we know that 16 percent.

19   So we know how typical they are.

20         But we thought, should we walk away from this opportunity

21   or should we insist on mailing checks?

22         Now, the other thing that the Court might not recall, and

23   maybe you do, is that we weren't asking for a lump sum at

24   trial.  We were asking for a per vehicle amount and then we

25   were going to have to go through a process, some kind of claims

1    process, in order to actually get money in people's pockets.

2    And I suspect that there would have been some litigation.  In

3    fact, I know there would have been litigation over the claims

4    process because Ford made that clear to us.

5         So those were the calculations that were going through our

6    head.  Now, the reason -- and you raised a question, why are

7    you linking repair efforts to your settlement?  Because that's

8    not a requirement of an express warranty case.  But we think

9    that the repair efforts are a good proxy under the implied

10   warranty of merchantability.  Because what we're talking about,

11   is the car operable?  Is it fit?  And if you're not complaining

12   about it, and this would have been a big point that Ford made,

13   that so many people never made a complaint according to Ford,

14   how can you prove that you would have breached the implied

15   warranty of merchantability?

16        So the way the settlement works is those people who

17   complained, right, thought there was a problem and brought it

18   in for software upgrade or they brought it in for repair, they

19   are going to get compensation and the compensation is tailored

20   to what appears to be their degree of dissatisfaction.  And

21   that's not unheard of in settlements like this.

22        In fact, I know that your Honor -- hopefully I'll find

23   this opinion.  You have a car settlement that is linked to the

24   number of repairs.  So that's how we -- that's how we got to

25   the --

1          **THE COURT:**  Well, I think right now from what I'm

2    hearing the biggest question I have is a claims made

3    requirement, because you've experienced this as much as anyone.

4    You know, we all know that a claims made basis reduces the --

5    the take rates typically, especially when you're not talking

6    four or five figures, is often one percent, ten percent,

7    five percent, 12 percent.  It's a small percentage.  So this

8    looks nice until you actually apply the percentage.  And

9    especially when you have the records.

10         I can understand claims made for those who went outside

11   and want to claim category two were people who, you know, leave

12   the door open for those who -- somehow they think that Ford

13   doesn't have the complete records.  But for the most part to

14   get these numbers, you know who they are, you know whether it

15   was one time, two times, three times.  I have trouble

16   understanding.

17         I understand it's all negotiation and at the end of the

18   day, you know, you've got to figure out, you know, what you can

19   live with and what you can live with.  But I have to look at

20   what's an adequate basis.  And if I look at something that's

21   claims made, it's going to be a lot less value.  There is no

22   common fund here.  There is no guaranteed fund on those claims.

23   Unlike many cases, where there is a *cy pres* and a

24   redistribution.

25         I have to -- to assess the reasonableness, I have to come

```
 1    to some kind of estimate as to what the likely actual
 2    distribution is.  And the number is going to look -- I'm afraid
 3    is going to look a lot different than 87 million.  It may be
 4    well below 10 million.  It may be very low millions.  Maybe a
 5    low seven figure.  I don't know.  Especially in the $35 figure.
 6    I mean, most people -- you know, the notice problem is a
 7    problem.  You could either get it by physical mail, which I
 8    know you've done the best notice you can, physical mail or
 9    email.
10        So much of the stuff these days, you know, unless you can
11    demonstrate to me a likely recovery here, a response rate
12    that's high, it looks like to me that the real value of the
13    settlement on the money part of this is going to be a low, you
14    know, seven figure number.
15            MR. BERMAN:  It could be 10- to $15 million.  And so
16    the issue is --
17            THE COURT:  If even that much, frankly.
18            MR. BERMAN:  That's right.  The issue is, as class
19    counsel, if I'm making that available to people who had a
20    problem, is that a fair and reasonable settlement or should I
21    have gone to trial over the fact they won't mail checks?
22    That's really what it boils down to.
23            THE COURT:  Well, your comments then.
24            MR. EDWARDS:  Thank you, your Honor.
25        I guess there's both philosophical and technical issues.
```

 1    Philosophically, one of the most significant disputes in the

 2    case is Ford's belief that most class members were satisfied,

 3    not just with their vehicle but with their system.

 4        And even people who came in and had a software update --

 5    using the air conditioner example, maybe a software update they

 6    didn't ask for.  Maybe they came in because they wanted a

 7    software update.  Maybe they came in because they had

 8    experienced some issues with it, but thought that the system

 9    overall was sufficiently good, that they were happy with it;

10    that there were a large number of satisfied customers.  We

11    believe we have strong evidence of that.  I know it's disputed.

12        But in the case where there is a fundamental dispute about

13    whether the system worked well and whether the system was

14    unmerchantable in plaintiff's view, one logical solution to

15    that problem is to allow class members to participate in

16    evaluating whether they were unhappy and wanted 100, 300, $500.

17        There are going to be, we suspect, class members who don't

18    feel that they need to make a claim because they were happy

19    with their vehicles.  And there will be other class members,

20    surely, who will make claims.

21            THE COURT:  If this is for a perfect market and

22    perfect information, I would agree with you.  The intensity of

23    their interests and whether they were actually dissatisfied,

24    there could be a correlation.

25        We all know in this world when you go to a notice

1    procedure, the amount of leakage is extraordinarily high.

2    That's my concern.   If you force people to opt in or out, you

3    know which way they're electing, that's fine.   But when 90-X

4    percent of the people never vote because they don't even look

5    at it, even if they felt that there was a problem, that's my

6    concern.

7              **MR. EDWARDS:**   I understand the concern about the

8    imperfect market.   I think -- so philosophically Ford is

9    opposed to assuming that everybody wants a check and everybody

10   is entitled to a check.   And Ford just fundamentally felt that

11   that was not a fair outcome of the claim, to assume that; that

12   there -- you know, it's the best notice practicable.   It's

13   direct mail to everyone.   And it's email, in addition, to those

14   for whom we have emails.

15             Certainly, Mr. Berman is exactly right.   There would have

16   been a claims process had plaintiffs prevailed in the first

17   phase of the trial and people then needed to identify

18   themselves.   There would have been a more elaborate claims

19   proceeds than this one.

20             So it's -- and -- and so I feel like philosophically

21   that's where Ford is coming from.   So that's point number one.

22             Point number two, technically, so the language in the --

23   Dr. Taylor's report and a lot of the other information provided

24   is we know what the repairs were on the class vehicles.   There

25   are used purchasers for some of those class vehicles.   Ford's

1   warranty records do not identify necessarily and with any

2   accuracy exactly who brought the vehicle in.

3        And so if we -- the question is:  Who do we mail the check

4   to?  It's not a given if nobody identifies themselves saying:

5   I own the vehicle.  I had two repairs.  I had three repairs,

6   whatever the number is.

7            **THE COURT:**  If they were brought to a Ford Authorized

8   Dealer for some repair, air conditioning or upgrade, usually

9   the first thing you do is you confirm who brings it in.

10           **MR. EDWARDS:**  It's a contact for whoever brought it

11  in.  It may not be the owner of the vehicle.  It doesn't have

12  to be the owner of the vehicle.

13       In many cases surely there is some signal, but it's not a

14  one-to-one relationship.  And you have repairs that could be

15  from an original purchaser, from a used purchaser at a Ford

16  dealer, who would be a class member, or a used purchaser who

17  bought it not at a Ford dealer, who wouldn't necessarily be a

18  class member.

19       So there's not -- the warranty records allow us to

20  understand what the number of repairs on the class vehicles

21  are, but they don't provide the information Ford feels is

22  sufficiently accurate to just mail checks.  So there is a

23  philosophical issue and there's a technical issue.

24       And we were careful when we -- I went back and looked at

25  it to make sure I could say this.  We were careful when we

 1   talked about the -- in the decertification and the

 2   certification opposition.  When we talk about the warranty

 3   repair records and everything else, we're talking about the

 4   vehicles.  And that's, in fact, I think what Mr. Berman's chart

 5   reflects as well because that's what Ford knows.  It's a VIN.

 6   We know it came in for repair.

 7        So those are some of the concerns with the claims, why

 8   it's important from Ford's perspective to have a claims

 9   process.  I don't want to lose sight of the philosophical point

10   because that's the large one, but there is also that technical

11   issue.

12        THE COURT:  Let me ask you, the philosophical

13   approach, one response to the philosophical approach, the

14   problem, which is -- this is highly contested.  This case,

15   there is no admission at all about it.  You know, perhaps the

16   more intellectual analysis approach is to say get the claims

17   made.  Let's just do it.  But instead of 100, 300, it should be

18   a lower amount.  I mean, we should look at the total amount

19   that's going -- you know, take into account -- you're talking

20   about all the risk factors.  Really, that's all it boils down

21   to.

22        And you're saying, oh, perhaps it's not even worth the

23   $100 or the $300 or the $500.  Given the risk factors, if we

24   know we're going to pay it out, it should be a lot less than

25   that.  At least you know the amount.  Or have a common fund

1    from which we know the class, at least in the aggregate, is

2    getting "X."

3        It just seems like -- you know, at this point Ford gets

4    the benefit of the leakage problem, which is not necessarily

5    tied to the philosophical problem.  Unless you're calibrating

6    that, you're doing an advanced calculation and you figure on a

7    percentage basis we're going to even it out.  I don't know if

8    that's your approach, but that doesn't seem to me -- it still

9    doesn't take into account, number one, that the problem that's

10   inherent in noticed procedure, especially when there are small

11   amounts involved, and at the end of the day when I evaluate the

12   total value of the settlement, which is one factor I've got to

13   look at, both the fees and for approval, I've got to take into

14   account some expected response rate.

15           MR. EDWARDS:  So let me just try to address that with

16   one more comment, your Honor.

17           THE COURT:  Yeah.

18           MR. EDWARDS:  I can't say what Ford would or would

19   not agree to on the floor here.

20       If the question is if Ford were paying $100 and the

21   question is:  Does Ford care whether $100 goes to five people

22   at $20 dollars or 20 people at $5 each?  That's an interesting

23   question.

24       But I will say this.  I think philosophically, one, it's

25   important for Ford to say, as a class member would have had to

 1    do to prove their claim, at least you have to raise your hand

 2    and say you didn't like something about the vehicle performance

 3    because Ford's belief is most people were very happy and Ford

 4    believes the evidence showed that.

 5         But the second issue is if there were a pot of $100 and

 6    the question is 5 people at 20 or 20 people at 5, I think there

 7    is an argument to be made that the people who are unhappy

 8    have -- there is a reason to think that the people who are

 9    unhappy might be the ones that are more entitled to the benefit

10    than to just distribute to everyone equally.

11         Now, if the question is if this were a different

12    negotiation and a different global resolution and Ford knew

13    that the exact dollar expenditure was the same and does it care

14    whether it's twice as many or half as many people, I guess I

15    can't answer that on the spot.  But I do think that there are

16    some philosophical reasons that I know were very important to

17    Ford in the negotiation process about ensuring that class

18    members who were satisfied with their vehicles were not getting

19    checks necessarily, including those that might have had a

20    software update, and others who were -- we yielded on the fact

21    that there were a lot of things the Owner Notification Program,

22    for example, we don't think shows unhappiness at all.  We

23    yielded on that.  It was important to plaintiffs.  We thought

24    that added significant value to the settlement.

25              THE COURT:  Well, the other half of this equation is

1    that those that don't have the warranty repair, or at least the

2    MFT repair under the definition that you've used, I mean, they

3    are eligible, but they, again, have to fill out a physical

4    claim form and declare under penalty of perjury that they are

5    unhappy.  They had two unsatisfactory incidents and, again, if

6    we knew that 100 percent of the people could see this and

7    respond, go one way or another, I could see it.

8         But, again, when you've got a $35 potential claim, my

9    prediction is you're going to get about a two percent response

10   to that.

11        And so if there was a floor, for instance, if that were

12   not claims made, if we knew that those who didn't fall into the

13   other category, you know, that they would be compensated for

14   something, you know, it might be a little different and you

15   could say those who really feel intensely about it could

16   exercise their right to claim and prove more.  But the way this

17   is structured is everything is claims based.

18        And my suspicion is that -- especially I have also

19   questions about what do you have to show to get that.  Because

20   the way this thing reads -- it's not clear because I haven't

21   seen the claim form, but if you have to sort of demonstrate

22   that you did take it in to Ford, here is the dates that I took

23   it in, et cetera, et cetera.  You have to show that -- you

24   know, proof of ownership, the dates that the repair was made,

25   the identity of the Ford dealer or other automotive repair

1    service, proof of ownership or lease.  And these are, by

2    definition, cars that were bought pre 20- -- what, August 2013

3    is the cut-off date?

4        So this is something that would have happened now six

5    years ago.  Nobody is going to have the dates.

6            MR. BERMAN:  But I think you're -- we haven't fully

7    explained the ease of the claims process.  It's a lot easier

8    than I think the Court appreciates.  I have a chart to

9    illustrate that as well.

10       (Whereupon document was tendered to the Court.)

11           MR. BERMAN:  Because Ford is going to populate a lot

12   of information for these class members.

13           THE COURT:  I looked for a claims form.  Was there

14   one submitted?  I didn't actually see a claims form.

15           MR. BERMAN:  I don't believe there was.

16           THE COURT:  I don't think there was.

17           MR. BERMAN:  So you go to the Ford website.  You put

18   in your VIN number.  The settlement -- the website will then

19   populate the repairs that are shown on the car.  So you're --

20   MyFord software repair service will auto populate.  And then

21   you just answer some questions.  I don't think that that's very

22   burdensome.

23           THE COURT:  What do you have to answer?  I guess

24   that's the question.  You don't have to recall service dates?

25   They're already in there?

1          **MR. BERMAN:**  Yes, that's correct.  Unless you're one

2     of the people who doesn't have service records and are going to

3     claim that you had two unsatisfactory incidents.  It's all

4     going to be -- that's all you've got to do is click, and the

5     only thing that you have to upload is that you -- really is

6     that you own the vehicle.

7          And, you know, car ownership records, I think, are among

8     the most saved records, next to records about the purchase of

9     your house.  So I don't think it's too onerous to say that here

10    is a document showing I own the car, either by way of insurance

11    or registration or whatever other information would show

12    current ownership.

13         So I don't think we explained this well.  We wanted to

14    make it consumer friendly and I think it's -- it's consumer

15    friendly.

16         **THE COURT:**  What about the people that fall into that

17    last category, the non-MFT software repair people?  What's

18    their claim form going to look like?

19         **MR. BERMAN:**  Well, they can go on the website, as I

20    understand it, and click a screen that will walk them through

21    that they don't have a repair.  But if they have these two

22    kinds of incidents, they click on the types of incidents and

23    then they continue in the claims process.

24         **THE COURT:**  They have to physically then print out

25    and sign the way it is now.  You don't allow electronic.

 1          **MR. BERMAN:**  Well, that's a point that you raise, and

 2   I think that is a good one, and I think the settlement should

 3   change.

 4          **MR. EDWARDS:**  May I comment on some of this, your

 5   Honor?

 6       So, first, the website hasn't been built yet.  So I don't

 7   disagree with most of what Mr. Berman said in terms of the

 8   intent.

 9       The -- one of the things Ford committed to do in the

10   settlement was to provide the repair records that it has.  And

11   by repair records I speak in the -- as defined in the

12   settlement, including the Owner Notification Program records.

13       Whether it can auto population or whether they have to be

14   made available for the class member to see and do something

15   with, we're working with J&D, the settlement administrator, who

16   was also the notice administrator earlier, to try to see how we

17   make that work.  Fundamentally Ford has agreed to make what

18   records it has available.

19          **THE COURT:**  There is a big difference between auto

20   populate and saying:  Here is the records.  Now you've got to

21   now go ahead and find --

22          **MR. EDWARDS:**  I understand, your Honor.  We don't

23   want to promise and then have the administrator say there is a

24   problem with doing that.

25          **THE COURT:**  When will the administrator know whether

1  this chart is actually doable?

2          **MR. EDWARDS:**  I can get the answer to that question.

3  I don't know as I stand here.

4      I know we have been in touch with the administrator to try

5  to make the records the most easily available to the class

6  members.

7          **MR. BERMAN:**  We've done this before.  So I would be

8  surprised if we can't auto populate.  This is not the first

9  time in an automobile settlement we've auto populated.

10         **MR. EDWARDS:**  To be clear, we aren't resisting that

11  notion, your Honor.  We just -- as we explained to plaintiffs,

12  we want to make sure, before we define something in writing,

13  that will be done.  We just need to make sure the administrator

14  that's going to be doing it can actually do that.

15      With respect to the physical signature, I mean, I guess

16  two points, your Honor.  One, I don't -- I don't want to start

17  renegotiating the Settlement Agreement.  Here on the stand I

18  heard Mr. Berman offer to do that, but I don't think that's

19  appropriate to do.

20      But the physical signature requirement comes from our

21  understanding of the concerns about the federal E-Sign Act and

22  whether an electronic signature would be enforceable.

23      We do think that part of the claims process is -- and Ford

24  has done this in other agreements for sure -- to have people

25  submit a claim under penalty of perjury.  And they certainly

```
 1   would have to do that if there were a claim -- if plaintiffs
 2   were successful in phase one of the trial and we went to a
 3   second phase.
 4        So the concern that -- I'll own it.  My personal concern
 5   is that an electronic signature with none of the prerequisites
 6   of the E-Sign Act may not cut it.  And so that's a concern that
 7   we thought was a legitimate reason; that if somebody wants to
 8   get $100 or $300 or $500 or even $35 --
 9             THE COURT:  It's $35.
10             MR. EDWARDS:  So even for the 35 -- I'll make the
11   point with respect to the $35 one, your Honor.  That asking
12   them to upload a signed document is not too much to ask.
13             THE COURT:  You can say that, but, again, the fact
14   that we're imposing a claims requirement in the first place.
15   Two, we're requiring a physical signature.  You can't do it
16   electronically.  Three, you have to print it out, send it in.
17        I don't know about you.  I don't know how often you lick
18   stamps and envelopes these days, but it feels like a chore.
19   I'll tell you, every time I have to pay a bill.  Ooh.  Rather
20   than clicking and doing online banking.  Maybe it shouldn't be
21   that way, but given the demands of the modern world, we just
22   know there is going to be a fall off.
23        I understand your concern about people not saying they had
24   two unhappy experiences and freeze-ups or something when, in
25   fact, they didn't and clicking that and -- you know, and not
```

1  having a signature might prevent, well, some kind of

2  enforcement.  I'm not sure what kind of enforcement that would

3  be.  I don't know how you would end up proving that or

4  disproving that in any event.

5      But the net effect is going to be it just further

6  suppresses the response rate.  And that's why, you know, if

7  that's the way it's going to be, if you're going to insist on a

8  claims made basis and various requirements that people have to

9  meet, I have to make some assessment as to how this estimated

10  monetary recovery of 53,350,000, how much of that is really

11  going to be claimed against -- now you said, Mr. Berman, about

12  300 million and that's -- you know, I calculate anywhere from

13  232 to 506 million, depending on which expert, you know, you

14  take.  But that's a rough.

15      But, you know, at some point if we think there is going to

16  be a take rate of three percent, four percent, five percent,

17  six percent, it comes out to about a one percent recovery.

18      I mean, that's the way I would do it.  That's the way I

19  would have to analyze it analytically.  Then you have to take

20  into account the risk.  The risk of decertification.  The risk

21  that the 3.6 was effective.  The risk that your expert -- and I

22  understand well all the risks; that the expert testimony did

23  not take into account the mitigation factor, use -- utility

24  factor and maybe that was a very high risk.  Is it 99 percent?

25  I don't know.

1          MR. BERMAN:  I think under the case law that you

2   assess the value of the settlement based on the amount of money

3   that we've made available, not on the claims rate.

4      And there is a Ninth Circuit case I give -- I cite to you

5   on that.  It's *Williams v MGM* 129 F.3d 1026.  It's a 1997 case.

6   And then that was filed in 2011.  But *Lopez versus Youngblood*,

7   2011 Westlaw 1048 --

8          THE COURT:  Are you talking about for purpose of

9   attorney's fees calculation?

10         MR. BERMAN:  Well, also in terms of the value, you

11  know.  If you're trying to decide how much have we recovered

12  compared to what the --

13         THE COURT:  For purposes of determining adequacy and

14  fairness?

15         MR. BERMAN:  Right.  For purposes of determining what

16  we could have got if we go to trial.

17         THE COURT:  There is no difference between a claims

18  made basis and non-claims made basis?

19         MR. BERMAN:  I think what -- as I understand the

20  Ninth Circuit case, is when you're trying to decide if we went

21  to trial we would have gotten maybe $282 million.  We've made

22  available to the class $87 million.  Roughly 30 percent of

23  damages, not one percent.

24         THE COURT:  Well, I'll look at those cases.  My

25  recollection is that there is some law about when you apply the

1   25 percent benchmark to a common fund situation, whether you

2   look at the total amount made available or the amount actually

3   claimed.  I understand that -- what the law is, at least in

4   this circuit, which is unlike other circuits.

5       Of course, I will say, jumping ahead to attorney's fees,

6   that doesn't mean I don't take into account results obtained in

7   assessing what kind of multiplier, positive or negative, to the

8   loadstar analysis under the *Bluetooth* case.  I think that's

9   clear.

10      In any event, before we get there, I find it hard to

11  believe that for purposes of determining the fairness and

12  adequacy, I cannot take into account the fact that this is a

13  claims made basis versus a non-claims made or common fund

14  that's non-reversionary.

15          **MR. BERMAN:**  I think you can.

16          **THE COURT:**  I've got to look at that.

17          **MR. BERMAN:**  I think you can take it into account,

18  but that's not the only way to measure the value of the

19  settlement.

20          **THE COURT:**  Well, I have real concerns about a claims

21  made basis where documents are available, information is

22  available, records are available.

23      I understand there are a lot of consumer cases where there

24  is simply no records.  You have no choice but to do a claims

25  made basis.

 1        And the concerns that Mr. Edwards comes up with, I

 2   understand those, but that's going to be true in almost every

 3   case where it's contested liability.  Every case where there is

 4   going to be some shift in ownership.  Every case where there is

 5   going to be some imperfections along the way.

 6        And the idea is as long as you have one imperfection or

 7   one philosophical objection on the merits that you could never

 8   have anything other than a claims made basis, is a proposition

 9   I'm not prepared to accept.

10        **MR. EDWARDS:**  Well, your Honor, just to address that

11   point.  I think it was addressed to me.

12        I mean, I don't say that one could never have a different

13   settlement, but in terms of what Ford was willing to do here.

14        In light of the specific evidence that we've put in

15   several times, and we certainly would be putting in at trial,

16   where there was significant survey results showing the vast

17   majority of people were expressing satisfaction with their

18   MyFord Touch system, not just their vehicle.

19        And other evidence -- I understand it's contested, but

20   this is a situation, unlike a lot of cases where there was

21   significant defense evidence that would be presented, to show

22   that class members -- you can have a debate about how many.  I

23   believe very strongly a very large percentage of class members

24   did not feel aggrieved, did not suffer any problem.

25        **THE COURT:**  We never got to trial or we hadn't gotten

 1   to trial.  What was that survey evidence?  Did you summarize

 2   that someplace?

 3            MR. EDWARDS:  Sure.  In the summary judgment, but

 4   also in the opposition to class certification are the two main

 5   places.

 6            THE COURT:  Remind me what the statistics were.

 7            MR. EDWARDS:  Contemporaneously.  So Karen Roland was

 8   a declarant in opposition to class certification.  So she

 9   submitted a declaration, and I can provide the ECF number to

10   you --

11            THE COURT:  I can find it.

12            MR. EDWARDS:  -- if, your Honor, would like.

13        But essentially so Ford contemporaneously -- not with this

14   case, but contemporaneously with the sale of the vehicles hired

15   a company called Morpace to do surveys of customers related to

16   those vehicles, asking lots of questions about the MyFord Touch

17   system in particular.

18        Among those questions there is a question that says:  How

19   satisfied are you?  Rating on a scale from one to ten.  So

20   there were results.  And I -- it's now, unfortunately, been

21   along enough that I don't remember whether it was twice a year

22   or something on about that sequence where there were results

23   that were reported back in those surveys about what people were

24   saying, on a scale from one to ten, how satisfied they were

25   with their vehicles.

1      There is a --

2           **THE COURT:**  MFT in particular?

3           **MR. EDWARDS:**  With the MyFord Touch system in

4  particular.  And it was actually framed, Ford had an older

5  system that was similar in some ways, different some ways

6  called Sync.  So there's separate questions for Sync and Sync

7  with the MyFord Touch system.

8      There was another questions in that same survey:  How

9  likely are you to recommend the MyFord Touch system to a

10 friend?

11     Now, in a merchantability case, as this one, as your Honor

12 recognized in the Motion to Dismiss order and going forward,

13 the is whether the whole vehicle is rendered unmerchantable.

14     So Ford believes there is a very significant secondary

15 argument that the vehicle was not unmerchantable.  If someone

16 drove it for potentially 50-, 100-, 150,000 miles, even if they

17 were slightly dissatisfied with the performance of one

18 component, that's a whole legal issue that we briefed, your

19 Honor.  But just specifically with the evidence on the MyFord

20 Touch system Ford believed it had strong evidence.  Now,

21 plaintiffs were going to dispute what inferences one could draw

22 from that evidence.

23     But my point here, your Honor, is that this is not the

24 same as every other case where someone could say

25 philosophically some people may have been happy with the

1    system.  It's the entire crux of our case, or at least a huge

2    crux of our case, was going to be that there was substantial

3    evidence on that point.

4        And so Ford, in negotiating the settlement, was not

5    willing to yield on the point and assume that everybody was

6    dissatisfied contrary to what it believed the evidence showed

7    and what its own understanding of its customers was showing.

8        So that's why the claims made process in this case was

9    particularly good, because we have a different view than

10   plaintiffs about how upset the population of the class as a

11   whole was.  If plaintiffs are right, more people will claim

12   benefits.  If Ford is right, fewer people will claim benefits.

13       **THE COURT:**  Well, I understand that -- that basic

14   theory, but you still haven't addressed the general leakage

15   problem that you get, where people are not even aware of what

16   they are voting on.  If they all voted, that's fine.  Then you

17   could see the greater number of people are satisfied.  They're

18   not going to claim anything, presumably, or go through the

19   effort to do so.  Those who are very dissatisfied, you know

20   would do so.

21       But it's -- I guess it's the imperfect market that I'm

22   concerned about.

23       **MR. EDWARDS:**  Your Honor, all I can say on that is

24   that with respect to the notice, I mean, it is the best notice

25   practicable.  It's direct email.  It's email where we have the

1    emails.  It's --

2           THE COURT:  Do we have any data as to how many people

3    actually review when they get a class -- there must be studies

4    out there that show when people get physical mail announcing,

5    you know, a class settlement, how many people actually look at

6    it?

7        I mean, all we know is response rates.  There are studies

8    of that and they show very low, usually single digit-ish kind

9    of, especially these amounts.  But out of how many of those --

10   is that because only 20 percent of the people actually look at

11   it and half of them respond, or is it because 90 percent look

12   at it and only ten percent choose to respond?

13       Are there studies that demonstrate or have -- give us any

14   idea empirically what -- how good notice is in actually

15   reaching people?

16          MR. BERMAN:  There are such studies.  I can't give

17   you a cite right now.

18       But one of the things that we were both going to do was to

19   ask for time to put in a written submission to all your

20   questions.

21          THE COURT:  Well, I would like that, because that

22   remains my concern.  If this was not a claims made basis and

23   this is money going out to people, frankly, I'd have no

24   problem, given that, you know, it's a fair percentage.

25       I don't know about the value of the upgrade.  We haven't

```
 1   talked about that yet.  But given the risks -- and these are
 2   substantial risks.  This is a high risk case.  I recognize
 3   that.
 4        But when you go to claims made basis, and my perception is
 5   that it doesn't reach a lot of people, even with the best
 6   practicable notice with mail and email, because people throw
 7   away emails, delete, delete, delete.
 8        Another problem I had, I don't know if you raised it in
 9   this case or not, maybe you did, about the spam filter problem.
10   Do we have some -- I can't remember which case it was that we
11   had raised a question:  How often does it get caught up in spam
12   when you send out notice from the administrator about a
13   settlement?  Some people never even see it.
14        Maybe that was another case.  We talked about that and
15   tried to get some data.  You know, I don't know if there are
16   studies on that either, but that's another concern.
17        So, I mean, the two best ways we know how have problems in
18   actually reaching people.
19        Well, let me ask you about the upgrade.  Tell me about the
20   three points.  What do you know about this?  When you say there
21   is value -- first of all, is this something that's available
22   now to people?  How do you get it?  If it weren't for this
23   settlement, how does one with a 2013 vehicle get a 3.10
24   upgrade?
25             MR. EDWARDS:  So there are two typical ways to get
```

 1   the software during the class period and after, which is you

 2   could download yourself, you can go to a dealer and have the

 3   dealer install it.

 4        The principal benefit here is that you can go to the

 5   dealer and have the dealer install it even if you're outside of

 6   the warranty period, which -- if you're outside the warranty

 7   period otherwise, if you went to a dealer and you wanted the

 8   dealer to install it, you would be subject to whatever the

 9   dealer decides to do about charging you for that.

10        **THE COURT:**  All right.

11        **MR. EDWARDS:**  So --

12        **THE COURT:**  So normally you get charged if you're

13   outside the warranty period?  Some labor charge to install it?

14        **MR. EDWARDS:**  If you go to the dealer, Ford would

15   expect -- again, if you're outside the warranty, dealers don't

16   necessarily report back what their post-warranty repair

17   practices are to Ford, because it's not Ford's business line,

18   but Ford has some understanding of what they are.

19        So Ford would expect, and communicated to plaintiffs, that

20   it -- you know, there would be some labor time associated with

21   doing that.  You know, we would think about an hour.  So at

22   that I think we had indicated 80 to $100 was kind of a rough

23   cut of what that might cost if somebody had gone to a dealer

24   and done it on their own.

25        **THE COURT:**  Otherwise, you could download it from the

1  website without charge?

2           MR. EDWARDS:  I have to confirm whether 3.10 has

3  actually been made available on the website, but during the

4  class period and for the years after the class period,

5  typically the latest version of the software was downloadable.

6      You know, this is now a generation of technology that's

7  passed.  So I would be happy to confirm that in writing, but

8  that was the practice during the class period.

9           THE COURT:  And how do you download -- if you want to

10 avoid going to the dealer, just physically how do you do that?

11          MR. EDWARDS:  I think you download it to a USB drive

12 and then you could put the USB drive in your vehicle.  Then you

13 have to run the update and you would have to run that --

14          THE COURT:  So it's not done by wifi or some --

15          MR. EDWARDS:  Not on this generation of technology,

16 your Honor.

17          THE COURT:  Okay.  Does this version 3.10 work on all

18 of the class vehicles?

19          MR. EDWARDS:  That's my understanding, yes.

20          THE COURT:  And what has been done from the

21 plaintiff's side to evaluate the effectiveness of this?  I

22 guess you don't want to admit anything that might prejudice

23 trial, I understand, but I also want to know, you know, how do

24 we know -- what luck have you had with this to know this is a

25 decent fix, quote/unquote?

1          **MR. BERMAN:**  What we haven't done is what we did

2     originally, was to look at the source code.  So we don't have

3     anyone who could say whether the architecture is better or

4     worse, but we do know -- we've seen documents that Ford was

5     going to put into evidence at trial that shows, according to

6     Ford, increasing satisfaction with 3.6.

7          And so we have no reason to believe that as they

8     progressively changed to 3.7, 3.8, 3.9 and 3.10, that that

9     wouldn't be some kind of improvement.

10         You know, we asked and tried to negotiate the latest, you

11    know, software package they have and it can't even be

12    physically put in the vehicles any more.  What they are running

13    now doesn't fit with what's in these vehicles.  So this is the

14    best fix out there, whether it's flawed or not.

15         **THE COURT:**  But how do we know it does anything?

16    Have you done any kind of testing on it?  At least taken some

17    sample vehicles to see how --

18         **MR. BERMAN:**  What we have seen is we've seen the

19    documents in the litigation, and we would be happy to show you

20    what we've seen, to show increasing satisfaction with 3.6.

21         **THE COURT:**  Well, do you know anything about 3.10?

22    It's supposed to be an improvement over 3.6 or what it does?

23         **MR. BERMAN:**  Only what was described to us during the

24    negotiations.

25         **THE COURT:**  Have you had your expert look at those

```
 1   explanations?

 2            MR. BERMAN:  We have not.

 3            THE COURT:  Well, I mean, that raises some concern.

 4   Because you don't know what you're buying necessarily.  What if

 5   it actually makes it worse for some reason?  How well has this

 6   been tested?

 7            MR. BERMAN:  There is not a lot of complaints out on

 8   the internet, as we have been preparing for trial, about the

 9   newer versions.  So, obviously, Ford has been making progress.

10   And we have no reason to believe that this isn't better than

11   what many class members have.

12            THE COURT:  Well, so how do you value this benefit of

13   $34,200,000?

14            MR. BERMAN:  Well, we took the $100 labor cost and we

15   multiply it by the percentage of people who would be eligible,

16   which is 342,000.

17            THE COURT:  Well that assumes everybody --

18            MR. BERMAN:  And then we assume 50 percent of those

19   people claimed in.

20            THE COURT:  But you're not valuing the actual

21   benefit.  You're valuing the saved labor costs that have to be

22   paid --

23            MR. BERMAN:  That's right.  That's right.

24            THE COURT:  -- but we don't know what benefit this is

25   to the class members actually in terms of improved forms.
```

1           **MR. BERMAN:**  We have not tried to measure that.

2           **THE COURT:**  Has Ford produced any kind of sampling

3    data to show, first of all, if there is customer satisfaction

4    data with respect to 3.10.  You have it with 3.6.  Is there

5    anything?

6           **MR. EDWARDS:**  So, no.  I mean, it takes -- it's

7    lagging data.

8           **THE COURT:**  3.10 has been out for -- it's a couple

9    years?

10          **MR. EDWARDS:**  No.  I -- let me just look back.

11       (Brief pause.)

12          **MR. EDWARDS:**  I can confirm the date.  It's not been

13   out for long at all.  So 3.6 came in and out 2013 and 3.8 came

14   out in the fall of either 2015 or 2016.  My memory is failing

15   me at this moment.  So 3.10 is more recent than that.  I can

16   identify the exact date in the written submission that

17   Mr. Berman identified.

18       Just to elaborate a little bit.  So Ford submitted in

19   connection, I believe with the class certification opposition

20   and summary judgment, as well the declaration from Ken

21   Williams, who walked through the changes of each version of the

22   software starting with 1.08, which was the initial release

23   version, and walking through not every change, but the major

24   changes version to version to version all the way up through

25   3.6.

1   Then, in addition, there have been further changes, but

2   typically they fall into two categories.  One is the -- any

3   bugs that are identified that have generated customer problems

4   and complaints, you know, are prioritized according to the

5   number of complaints and addressed.

6   And then there are new phones, new capabilities that

7   didn't even exist at the time.  So Siri is an easy example with

8   3.10.  There is Siri compatibility that wasn't rolled out for

9   class members during the class period because Siri wasn't

10  available, but it would be valuable to at least those class

11  members that had Apple products they now wanted to sync.

12  So those are the two general classifications of the types

13  of changes.  But the data that we submitted in the opposition

14  to class cert, and more particularly on summary judgment,

15  really discuss the differences between 3.6 and some of the

16  prior versions.

17  The other point that I think is worth noting here is that

18  Dr. Taylor identified the percentage of class vehicles that

19  have -- according to Ford's records, have the various versions.

20  Ford will get notification from a dealer when the dealer

21  performs an update.  It asks people to provide a notification

22  when they self update, although it's obviously up to the people

23  whether they do that or not.  But a very significant portion of

24  the class has not updated to version 3.6.  Either they are in

25  the original version that they had or something else.

 1       Now, there may be different reasons for that, but all of

 2  those individuals, some of whom purchased their vehicles

 3  sometime ago, would now be able to go to a dealer and get the

 4  latest software version, which, among other things, would

 5  provide compatibility with more modern phones and other

 6  technology.

 7       **THE COURT:**  When somebody -- let me ask you, going

 8  back to an earlier point.  When they upgrade by downloading, I

 9  assume that gets into Ford's database.  You know, that owner

10  so-and-so got the download?

11       **MR. EDWARDS:**  As I understood it, and I was a little

12  surprised when I learned this, my understanding is for them to

13  actually -- Ford to actually have a record of that, the

14  individual needs to notify them at the end, yes, I've completed

15  the download.  Because they didn't assume that when you

16  download it, that you necessarily installed it in your vehicle.

17  You may have had some trouble.  And they were keeping track of

18  individuals who reported back:  Yes, I downloaded it and I put

19  it -- and I put it in my vehicle.

20       **THE COURT:**  That's not done in one transaction?  When

21  you download, that doesn't necessarily record it into the

22  database?  You have to get back online and look at that?

23       **MR. EDWARDS:**  As I understand it, when you have

24  successfully downloaded to your vehicle, you're asking -- when

25  you download it, you're asked:  Once you've successfully

1  downloaded to your vehicle, please tell us.

2          THE COURT:  So that number that you gave, the

3  30-whatever-it-was that you had in your table here, 33 percent,

4  16 percent, 12 percent, that's not just people -- that doesn't

5  include people who may have downloaded it because there may not

6  be a record of them then?

7          MR. EDWARDS:  The 33 percent, your Honor, I think had

8  to do with --

9          MR. BERMAN:  Those would be people who they have a

10  record of.

11          THE COURT:  Who actually came in or responded yes?

12          DEFENSE COUNSEL:  Right.

13          THE COURT:  Because there may be people who

14  downloaded it, but didn't report it.  So they wouldn't be in

15  that 33 percent.

16          MR. BERMAN:  That's correct.

17          THE COURT:  They would end up in the -- the

18  unsatisfactory performance category possibly.

19          MR. BERMAN:  Well, they have to have two or more

20  incidents to be unsatisfied.

21          THE COURT:  Yeah, right.  But, I mean, they wouldn't

22  get in that one repair -- if they never report it -- they got

23  the download, but never reported it.

24          MR. BERMAN:  That's correct.

25          MR. EDWARDS:  If they never went to a dealer and

1  never paid out-of-pocket expenses, then they would be in that

2  category, your Honor.

3              THE COURT:  Well, if they downloaded it from the

4  data, from the website and then reported it, like they were

5  supposed to, they would -- there would be a record of that you

6  said?

7              MR. EDWARDS:  Ford has an understanding of what the

8  current software version is in the vehicles if a dealer reports

9  it or if an individual reports back into the database.

10             THE COURT:  So there may be some people who did go to

11  the trouble of downloading it on a USB device, but they

12  wouldn't be on that 33 or 16 or 12 percent?

13             MR. BERMAN:  That's correct.

14             THE COURT:  All right.  So to get back to the 3.10,

15  you know, my concern is it doesn't sound like, frankly, there

16  has been much vetting of that to determine, one, whether that's

17  on a code basis, whether that's effective or an experiential

18  basis what the experience has been, whether -- we just have no

19  idea.

20             MR. BERMAN:  Anecdotally, we've looked on the web.

21  We haven't found the kind of complaints that we found for the

22  earlier versions.  And on a code basis it took us a year and

23  two-and-a-half million dollars to analyze the earlier code.  So

24  that's not, I think, something that's feasible.

25             THE COURT:  Well, all right.  Even if you don't go

1   the source code basis, why hasn't there been at least an

2   exchange?  Have your expert talk to their people about what

3   this purportedly does or at least look at the records to see if

4   there has been a further decline in their repair rates,

5   response rates, satisfaction, something.

6           **MR. BERMAN:**  We would be glad to do that.

7           **THE COURT:**  Because this is a major part -- you say

8   it's not a major part, but it is a substantial part of the

9   settlement, it seems like there should be some substantiation

10  this is something that actually does something.

11      Well, my main concerns, frankly, are the ones that I've

12  articulated.  That is, at the end of the day the claims made

13  basis impacts, I think, the overall value of the settlement,

14  plus questions about the 3.10.

15      And I understand your view, your philosophical and

16  practical questions, but I have still major concerns about the

17  imperfect market and notice problems and what that does to the

18  overall value of the settlement, vis-a-vis the potential

19  verdict value of this case undiscounted.

20      I understand there are reasons to discount this,

21  everything from risk of decertification to the expert -- holes

22  in the expert evidence, to now the survey evidence and 3.6

23  being a fix and everything else.

24      I just think there is a big distance between this

25  $87,550,000 estimated recovery and the actual realistic

1    recovery in this case.  And I'm concerned that.  Very concerned

2    about that.

3        We have a hearing on the 26th; is that right?

4            **THE CLERK:**  Yes, at 1:30.

5            **THE COURT:**  So if between now and then, knowing what

6    my concerns are, you want to try to address that one by looking

7    -- giving me more information about 3.10, whatever information

8    you can give about its effectiveness.

9        But, two, this question about notice and how effective

10   notice is and, you know, what it's likely to actually -- how

11   effective it's going to be and what it's likely to yield in

12   terms of actual recovery.  You should submit that and I'll take

13   a look at it, but those are -- my concerns remain.

14       And, of course, you are free to have further discussions

15   amongst yourselves about responding to any concerns that could

16   obviate some of this.

17       But I'd say the notice problem is -- the claims process is

18   number one on the top of the list in terms of affecting the

19   overall value of the settlement at the end of the day.  I'll

20   leave that to you.

21       But in the meantime, at the very least, I'll give you a

22   chance to submit some more information, whether it's studies

23   you have or any information that will enlighten the Court about

24   how effective mail and email notice is likely to be and what

25   you think the actual response rate is likely to yield in this

```
 1   case, certainly you're welcome to do that.
 2              MR. BERMAN:  Do you want to set a date for us to --
 3              THE COURT:  Yeah.  Well, we're back here on the 26th?
 4   Is that right, Betty?
 5              THE CLERK:  28th, your Honor.
 6              THE COURT:  The 28th?
 7              THE CLERK:  Yes.
 8              THE COURT:  Today is the 11th.  Can you get something
 9   to us by next Thursday, the 21st, or the 22nd, Friday?  So we
10   have a few days to look at it?
11              MR. BERMAN:  The answer is yes.
12              THE COURT:  All right.
13       All right.  Now, I also mentioned if this does not get
14   approved, if I don't approve, we do need to think about another
15   trial date.  And I want to -- I don't know if we need to set
16   one technically or start thinking about a date, but we were --
17   what were we, three months away or four months away from trial
18   when we called the time out?
19              MR. EDWARDS:  Sorry to say, your Honor, a little
20   closer than that.
21              THE COURT:  Well, lucky for you.  If I wanted to just
22   move everything back commensurately you know, we would be
23   talking about November or something.  And I -- I've got now
24   things stacked up.
25       So I would want to get the trial sooner rather than later,
```

1    but realistically it's looking like either late January or

2    early February is likely.

3            **MR. BERMAN:**  Should we set a date then?

4            **THE COURT:**  Why don't you pencil in a date now?  I

5    have to move some things around.

6            **THE CLERK:**  How about February 4th?

7            **THE COURT:**  Yeah, February 4th.  I will have to

8    displace some other things and make this a priority, if we

9    can't get this resolved.

10        All right?

11           **MR. EDWARDS:**  Thank you, your Honor.

12           **THE COURT:**  All right.  So we'll see you in two

13   weeks.

14           **MR. BERMAN:**  Your Honor, can I ask one question?

15           **THE COURT:**  Yeah.

16           **MR. BERMAN:**  In terms of submitting further papers to

17   you and explaining some of our choices we made, I would like to

18   submit something, maybe two pages, in camera, if that's okay.

19   Because there are things I'd like to say, but I don't want to

20   say in front of Mr. Edwards.

21           **THE COURT:**  Do you have any objection to that?  He's

22   going to argue his case -- he's probably not going to argue his

23   case.  He's going to argue your case.

24           **MR. EDWARDS:**  If it's all right, your Honor, could I

25   perhaps email the clerk tomorrow morning with an answer to

```
 1   that?  I don't want to reject it out of hand, but I have some
 2   concerns that I want to think through.
 3             THE COURT:  Okay.  Maybe you can talk about whether
 4   the general subject -- something to give Mr. Edwards a little
 5   comfort about, without briefing the subject, of course, the
 6   actual content.  Maybe you can talk about that.
 7        I'm willing to look at that so long there is no objection.
 8             MR. BERMAN:  Okay.  Thank you, your Honor.
 9             THE COURT:  Great.
10             MR. EDWARDS:  Is that acceptable that I email the
11   clerk?
12             THE COURT:  That's fine.  Just let Betty know.
13        All right.  Thank you.
14        (Proceedings adjourned.)
15
16
17
18
19
20
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, June 21, 2018