UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION<br><br>. | Case No. 13-cv-03072-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT FORD'S MOTION FOR PARTIAL DECERTIFICATION OF CLASSES**<br><br>Docket No. 393 |

Ford moves for partial class decertification on three grounds. First, it argues that the California and Washington express warranty claims should be decertified because common issues no longer predominate due to the lack of records substantiating that each class member presented their vehicle to Ford for repair on at least two occasions. Second, Ford argues that the Massachusetts Consumer Protection Act (MCPA) claim should be decertified because Ford's knowledge about the MyFord Touch (MFT) defect varied over time with each software update, and thus there is no common answer to whether Ford knew about the defect before sales for all class members. Third, Ford seeks decertification of all classes to the extent they include persons who purchased used cars from Ford dealerships, as Plaintiffs have conceded that the dealerships were not Ford's agent with respect to used vehicle sales.

For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Ford's motion.

## I.     LEGAL STANDARD

The parties disagree who bears the burden of proof on a motion to decertify a class. Although in *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), the Ninth Circuit stated that "[t]he party seeking to maintain class certification bears the burden of

demonstrating that the Rule 23 requirements are satisfied, even on a motion to decertify," *id.* (citing *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011)), the question of burden does not appear to have been squarely before the Court. After both *Marlo* and *Lambert*, district courts have continued to impose the burden on a defendant to show that decertification is warranted because "decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary." *In re Apple iPod Antitrust Litig.*, 2014 WL 6783763, at *5 (N.D. Cal. Nov. 25, 2014) (quoting 3 Newberg on Class Actions § 7:34 (5th ed. 2013)).[1] The Eighth Circuit appears to be the only court of appeals to directly confront the question, and it refrained from adopting a categorical rule. *See Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817 (8th Cir. 2016) (holding that district court did not abuse discretion in placing burden on defendant where motion was brought years after class certification). The Court need not resolve this issue because the allocation of the burden does not affect the outcome of this motion.

## II. DISCUSSION

The Court analyzes each of Ford's arguments below.

A. Express Warranty in California and Washington

As explained in the Court's recent order on summary judgment, Plaintiffs' express warranty claims rest on demonstrating that Ford's limited warranty failed its essential purpose. *See In re MyFord Touch Consumer Litig.*, 291 F.Supp.3d 936, 957 (N.D. Cal. 2018). At class certification, the Court held "[t]o recover for breach of express warranty, a plaintiff must have

---

[1] *See also In re Optical Disk Drive Antitrust Litig.*, Case No. 10-md-02143-RS, 2017 WL 6448192, at *1 (N.D. Cal. Dec. 18, 2017) ("[T]o prevail on its decertification motion, defendant[] face[s] a heavy burden because doubts regarding the propriety of class certification should be resolved in favor of certification." (quotation and citation omitted)); *Angeles v. US Airways, Inc.*, Case No. 12-05860 CRB, 2017 WL 587658, at *3 (N.D. Cal. Feb. 13, 2017) ("The party seeking decertification bears the burden of demonstrating that the elements of Rule 23 have not been established."); *Ramirez v. Trans Union, LLC*, Case No. 12-cv-00632-JSC, 2016 WL 6070490, at *2 (N.D. Cal. Oct. 17, 2016) (explaining that "[p]arties should be able to rely on a certification order and in the normal course of events it will not be altered except for good cause," so the burden is on the party seeking decertification (quotation and citation omitted)); *Holman v. Experian Info. Solutions, Inc.*, Case No. C-11-0180-CW, 2013 WL 4873496, at *6 (N.D. Cal. Sep. 12, 2013); *Chavez v. Lumber Liquidators, Inc.*, Case No. CV-09-4812 SC, 2012 WL 6115611 at *3 (N.D. Cal. Dec. 10, 2012); *Moeller v. Taco Bell Corp.*, Case No. 02-5849 PJH, 2012 WL 3070863, at * (N.D. Cal. Jul. 26, 2012).

2

brought his or her vehicle in for repair twice, and Ford must have been unable to repair it." Docket No. 279 at 42. The Court contemplated that Ford's records would reflect that information, but that individual class members would have the opportunity to produce other proof if the records were insufficient. *See* Docket No. 279 at 42. Because "[t]he inquiry will turn on records and is relatively simple," the Court determined that predominance under Rule 23(b)(3) was not defeated. *Id.*

Now, according to Ford's expert Dr. Taylor, company records establish that 91.9% of Class Members in California and Washington had fewer than two MFT-related repairs and only 2.4% had more than two. Docket No. 391. Plaintiffs claim Dr. Taylor undercounts by excluding class members who (1) presented their vehicle for a software update in response to Ford's "Owner Notification Program" (ONP) informing them of new releases; (2) attempted to present their vehicle for warranty repair but were turned away by a dealership; or, (3) independently downloaded software updates from Ford's website. As for those for whom a Ford record of repair exists, entitlement will be easy to determine. As to the other three categories of consumers posited by Plaintiffs, unilaterally downloading software updates (number (3)) is not a repair request. The possibility of (1) and (2) could present more factually complicated claims to adjudicate but there is no showing that there is a substantial volume of consumers in those two categories. Specifically with regard to group (1), there is no showing regarding what proportion of those persons who responded to an ONP notification did so as part of an attempt to request a repair.

Even assuming that presentment could be an individualized fact-based issue for a small number of class members,[2] that does not defeat predominance. Adjudication of those claims is not likely to be more difficult than, *e.g.*, the adjudication of individualized affirmative defenses, which

---

[2] Plaintiffs also allude to the possibility that seeking a repair would have been "futile," but they have not cited any case-law recognizing a futility exception to compliance with the terms of a limited warranty. *Cf. Asp v. Toshiba America Consumer Prods., LLC*, 616 F.Supp.2d 721, 730 (S.D. Ohio 2008) (rejecting plaintiff's attempt to excuse presentment requirement based on futility without a showing that the seller was given an opportunity to attempt a repair); *Ex parte Miller*, 693 So. 2d 1372, 1379 (Ala. 1997) ("While [Plaintiff] would be required to submit the machine for repair in order to comply with the limited warranty, and must prove that it would have been futile to do so again after the last failure, he was not required, as a condition to recovering for breach of the express warranty, to submit the machine for repair after it would have been futile to do so.").

3

typically does not defeat predominance. *See Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."). The Court has various tools at its disposal to manage resolution of those issues to the extent they arise. *See Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1156 (9th Cir. 2016) (explaining that the "district court has discretion to shape the proceedings" to accommodate individual issues "such as the use of individual claim forms or the appointment of a special master, which plainly would allow Defendants to raise any defenses they may have to individual claims").[3]

Moreover, the same common issues remain in the case, including (a) whether class vehicles suffered from a common defect in MFT's base architecture; (b) whether any of Ford's 11 software updates (falling in 4 main groups) during the class period successfully resolved that common defect; and (c) damages per vehicle, or the presumptive difference in how much class members would have paid for the defective vehicle. *See* Docket No. 385 at 8-9. These common issues are central to all class members' claims and continue to predominate.[4]

In light of the net benefits that resolution of common issues will have over the potential individualized issues and the various tools at the Court's disposal to address the individual questions, the Court **DENIES** Ford's motion to decertify the express warranty classes, and concludes that Rule 23(b)(3)'s predominance requirement is still satisfied.

---

[3] The Court notes that, if the California Class prevails on its implied warranty claim, that may obviate the need for a claims process on the express warranty claim; the relief on both claims (at least as certified by the Court) appears to be identical. The Washington Class has not been certified for implied warranty.

[4] Ford cites *Cruz v. Dollar Tree Stores, Inc.*, but that case is distinguishable because the individualized issues there precluded the resolution of *any* common issues. *See* 2011 WL 2682967, at *3-4 (N.D. Cal. Jul. 8, 2011) (in overtime exemption case dependent on how individual class members actually spent their time, decertifying after determining that defendant's records on how time was spent were unreliable and thus individual testimony would be required, and no other reliable common proof existed). The inquiry here is not as burdensome as those in cases cited by Ford where predominance was not found. *See Schaffer v. Litton Loan Serv., LP*, 2009 WL 9436302, at *9 (C.D. Cal. Jan. 20, 2009) (partially decertifying class with respect to *actual* damages because it would require hundreds of thousands of mini-trials "in stark contrast to an administrative procedure that would merely require borrowers to present evidence that [defendant] imposed a late charge").

4

B. MCPA Claim and Variations in Ford's Knowledge Over Time

To prevail under the Massachusetts Consumer Protection Act (MCPA), Plaintiffs must prove an "unfair or deceptive" act. Mass. Gen. Laws ch. 93A. For Ford's omission to be "deceptive," Plaintiffs must prove that Ford knew about the defect at the time of each sale. *See Underwood v. Risman*, 605 N.E.2d 832, 835 (Mass. 1993) ("There is no liability for failing to disclose what a person does not know."). Ford argues that decertification is warranted because of variations in Ford's knowledge over time, and because variation in the amount of information available to consumers over time undermines any showing of reasonable reliance on those deceptions. The Court addresses each issue below.

1. Variation in Ford's Knowledge

Ford argues that there were variations in its knowledge over time, as it may have believed that some MFT updates released during the class period would be successful and were therefore not deceptive. Although there were only 11 software updates during the Class Period, the relevant question will not be Ford's knowledge at the time of each software release, but rather Ford's knowledge at the time of each individual vehicle sale. *See Underwood*, 605 N.E.2d at 835. Technically, Ford's knowledge at each discrete point in time is a common question that can be resolved class-wide in one stroke; the question does not turn on issues peculiar to individual class members but rather on evidence about Ford. However, the fact that there are a virtually infinite number of points in time raises serious manageability issues that call for the MCPA claim to be decertified.

Ford engaged in extensive pre-release testing in advance of each upcoming software release, creating the potential that, by the time of release, it could have developed a good faith belief that the defect had been resolved. *See* Williams Decl. ¶¶ 8-14. Furthermore, Ford engaged in ongoing post-release tracking of MFT performance, including analysis of customer contacts, dealership contacts, warranty claims, and other sources of information and metrics related to the rate of problems with MFT with regard to each software release. *Id.* ¶¶ 33-38. The state of information known to Ford was therefore in flux at all times throughout the Class Period. Thus, it is possible, for example, that Ford had a good faith belief with respect to a new software release,

5

1   but that within, *e.g.*, a few weeks of the release, Ford had received sufficient customer and dealer

2   feedback to develop scienter of a problem. In that hypothetical, Ford would have no scienter

3   immediately after the release, but developed scienter once reports of problems began to trickle in.

4       This evolving state of knowledge occurs not only with respect to each software upgrade,

5   but also the time in between. These were the same concerns that motivated the Court to decertify

6   similar fraud claims under the laws of other states. *See* Docket No. 301 at 5-6 (concluding that

7   because "Ford's culpability for any omissions could vary throughout the class period," "the

8   viability of consumers' fraud claims could vary over time [too]"). Although the MCPA claims

9   have been reserved for Phase 2 of trial and therefore will not be tried alongside the other class

10  claims, the question of knowledge is sufficiently complex such that predominance and

11  manageability as a class even in Phase 2 are no longer satisfied.

    2.    Variation in Information Available to Class Members

    Under Section 93A, a plaintiff must also prove "that the defendant's unfair or deceptive act caused an adverse consequence or loss." *Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass. 486, 496 (2012). "The plaintiffs need not show proof of actual reliance on a misrepresentation in order to recover damages," but rather must show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 630-631 n.12 (2008) (where manufacturer misrepresented vehicles as compliant with federal safety requirements, plaintiffs' ignorance of those requirements did not preclude claim because plaintiffs could not have purchased the vehicles but for the misrepresentation as they could not have been marketed otherwise). In the context of misleading advertising, this requirement may be satisfied when an omission "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product." *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 396-398 (2004).

    Ford argues that the information available to class members may have varied over time, an issue going to injury causation. Plaintiffs correctly state that the MCPA relies on an objective person standard rather than a subjective standard; variations in information therefore do not raise

6

individualized issues within the meaning of Rule 23(b)(3). However, Ford's argument is still relevant even under a reasonable person standard. Ford's omission is only deceptive "when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall*, 442 Mass. at 396. Thus, Ford could argue or introduce evidence that at any particular point in time during the class period, information about MFT's problems were so widespread and well-known that a reasonable consumer could not have been enticed by its omissions. In opposition, Plaintiffs will argue that Ford *never* disclosed the full extent of the defect. The problem, as above, is that the nature of the available public information may vary over time and with regard to each software release. It may not be a simple matter of finding a single cut-off date at which point a reasonable consumer would no longer be deceived by the omission. The issue may turn on evolving events including the release of software updates, public reports, and commentaries in response, etc. Thus, this issue also poses manageability and predominance problems.

Plaintiffs attempted to argue that they need not show reasonable reliance because Ford's omissions would have affected the market price of MFT, and therefore would have caused damages regardless of any consumer's state of mind. Plaintiffs' alternative theory is akin to the "fraud on the market" theory in securities fraud cases, which is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business" and "[m]isleading statements [or omissions] will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (citation and quotation omitted). This theory runs into the same problem, though: the price of MFT would supposedly be linked to "the available material information," *id.*, and here, that fluctuated over time, as explained above.

Because both Ford's knowledge and the knowledge of a reasonable consumer may have fluctuated over time, predominance and manageability of Rule 23 are not satisfied. Ford's motion to decertify the MCPA claim is **GRANTED**.

C.  Used Car Purchases

Plaintiffs previously "conceded that they have no evidence of an agency relationship between Ford and its authorized dealerships with respect to used car sales." *See* Docket No. 383 at 14. Due to that concession, the Court granted Ford's request for summary judgment on the California Class's implied warranty claims under the Song-Beverly Act with respect to class members who purchased used vehicles. *Id.* Now, Ford argues that, in light of Plaintiffs' concession regarding the absence of an agency relationship, decertification of all class claims belonging to used purchasers is warranted because of intra-class conflicts between new and used car purchasers.

In particular, Ford posits that the used car purchasers will have to present evidence that prices were "still inflated" when they bought their cars, which will necessarily place them in conflict with new car purchasers, who will want to show that *they* suffered the harm of inflated prices. This argument presumes that damages per vehicle must be allocated between new and used purchasers of the same vehicle, *and* that used purchasers bought their vehicles from other class members (the original owners). That is not the case here. The price "inflation" alleged in this case is a function of the diminished value to consumers caused by the undisclosed defect. If the defect was undisclosed to both new and used car purchasers, then both groups presumably paid "inflated" prices to Ford or its dealers, and both groups of drivers have an equal interest in so proving. Furthermore, all class members, by definition, purchased their vehicles from Ford or Ford dealerships; they did not purchase vehicles from one another. There is no conflict of interest between new and used purchasers.

Ford also argues that permitting both new and used car purchasers to recover damages will result in an impermissible double recovery. That would only be true if the original purchaser of a vehicle resold directly to a subsequent purchaser, and then both the original and subsequent purchaser sought to recover from Ford for the same amount of damages claimed—presumably, in that scenario, the original purchaser would have "passed on" his or her damages to the subsequent purchaser, and thus would have nothing left to recover. *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730 (1977) (explaining risk of "multiple liability" in antitrust cases where "following an

8

automatic recovery of the full overcharge by the direct purchaser, the direct purchaser could sue to recover the same amount"). That risk does not arise here, however, because the classes only include persons who purchased directly from Ford or its dealerships, not from a new car purchaser.[5]

Ford also argues that the damages model presented by Plaintiffs' expert, Mr. Boedeker, does not distinguish between used and new car purchasers. The Court assumes familiarity with Mr. Boedeker's damages model, which is described in detail in the Court's summary judgment order. *See* 291 F.Supp.3d at 943-944, 965-73. In particular, Ford claims that Mr. Boedeker's "assumption that the MFT had the same implicit equilibrium price for both new and used purchasers of the same vehicles is incompatible with a theory that both groups could have been harmed, let alone in the same undifferentiated amount." Mot. at 13. Mr. Boedeker's theory of damages is based on the difference in how consumers valued a defective and non-defective MFT. He did not analyze whether consumers would value the defect differently in a new versus used vehicle. That goes to the weight and admissibility of his opinion. That is a merits issue that does not materially impact class certification.

Plaintiffs' concession that they lack any evidence of an agency relationship between Ford dealerships and Ford with respect to used vehicle sales raises a question as to whether Ford can be held liable under the various legal theories asserted here in accordance with the laws of each jurisdiction. Again, that is a merits issue which does not materially alter class certification.

Ford's motion to decertify the classes to exclude used car purchasers is **DENIED**.

///
///
///
///

---

[5] The dealer's purchase breaks the causal chain with respect to the "passing on" of damages. There is no information in the record about how much the dealers paid to original purchasers. Thus, there is no basis to infer that the original purchaser, for example, "passed on" the damages to the dealership or other intermediaries, who then "passed on" the damages to the used car purchasers.

9

### III.     CONCLUSION

As explained above, Ford's motion to decertify the classes is **GRANTED** with respect to the MCPA claim, but **DENIED** with respect to the express warranty claim and used car purchasers.

This order disposes of Docket No. 393.

**IT IS SO ORDERED**.

Dated: August 1, 2018

_____
EDWARD M. CHEN
United States District Judge