STEVE W. BERMAN (*pro hac vice*)
CATHERINE Y.N. GANNON (*pro hac vice*)
CRAIG SPIEGEL (122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com
craigs@hbsslaw.com

ROLAND TELLIS (186269)
MARK PIFKO (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

ADAM J. LEVITT (*pro hac vice*)
JOHN E. TANGREN (*pro hac vice*)
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com

NICHOLAS E. CHIMICLES (*pro hac vice*)
BENJAMIN F. JOHNS (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
nick@chimicles.com
benjohns@chimicles.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE<br><br>MYFORD TOUCH CONSUMER LITIGATION | Case No. 3:13-cv-03072-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION AND INCORPORATED MEMORANDUM OF LAW FOR PRELIMINARY APPROVAL OF THE NEW CLASS ACTION SETTLEMENT**<br><br>Date: January 31, 2019<br>Time: 1:30 p.m.<br>Judge: Hon. Edward M. Chen<br>Location: Courtroom 5, 17th floor |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................2

II.    STATEMENT OF ISSUES TO BE DECIDED ..................................................3

III.   BACKGROUND ....................................................................................................3

IV.    MAXIMUM VALUE OF CLAIMS....................................................................6

V.     SUMMARY OF SETTLEMENT TERMS ..........................................................6

    A.     The Settlement Classes ...............................................................................6

    B.     The Settlement Consideration.....................................................................6

        1.     Monetary Compensation..................................................................6

            a.     Monetary Compensation through the Claims Process ..........................7

                (1)     Compensation for MFT Software Repairs .................................7

                (2)     Reimbursement of Post-Warranty Repair Costs ......................7

                (3)     Compensation for Unsatisfactory MFT Performance ..............8

            b.     Monetary Compensation Through the Unilateral Payments Process ....8

        2.     Equitable Relief ..............................................................................8

            a.     Access to the Latest MFT Software Update .........................................8

        3.     Anticipated Class Recovery ............................................................9

    C.     Claims Administration ...............................................................................11

            a.     Monetary Compensation through Claims Submission Process...........11

            b.     Monetary Compensation through the Unilateral Payments Process ....12

            c.     Equitable Relief ..................................................................................12

    D.     Guaranteed Minimum Payment to Class Members .................................12

    E.     Notice and Administration Costs ..............................................................13

    F.     Notice to Attorneys General .....................................................................14

    G.     Release of Claims .....................................................................................14

    H.     Service Awards and Attorneys' Fees and Expenses .................................14

VI.    ALLOCATION PLAN ........................................................................................15

VII.    SETTLEMENT ADMINISTRATOR.................................................................................16

VIII.   ARGUMENT .................................................................................................................16

 A.    The Settlement meets the standards for preliminary approval. ................................16

  1.    The Settlement is the product of thorough, arm's-length, negotiation. ............16

  2.    Any previous deficiencies have been adequately addressed by the Parties........17

  3.    The New Settlement Agreement does not improperly grant preferential treatment. ..........................................................................................................19

  4.    The New Settlement Agreement falls within the range of possible approval. ..20

 B.    The Settlement Classes Satisfy Rule 23........................................................................22

  1.    Rule 23(a)(1): Numerosity ..............................................................................22

  2.    Rule 23(a)(2): Commonality ...........................................................................23

  3.    Rule 23(a)(3): Typicality .................................................................................23

  4.    Rule 23(a)(4): Adequacy .................................................................................23

  5.    Rule 23(b)(3): Common Questions of Fact or Law Predominate ...................23

 C.    The Court Should Reaffirm its Previous Appointments ............................................24

 D.    The Proposed Class Notice and Plan for Dissemination Meets the Strictures of Rule 23 ...............................................................................................................................24

IX.    CONCLUSION ..............................................................................................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Animation Workers Antitrust Litig.*,
   No. 14-cv-04062-LHK, 2016 WL 6663005 (N.D. Cal. Nov. 11, 2016) ...................................20

*Burden v. SelectQuote Ins. Servs.*,
   2013 WL 1190634 (N.D. Cal. Mar. 21, 2013) ...................................................................16, 22

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 3648478 (N.D. Cal. July 7, 2016) ...........................................................................20

*Fleury v. Richemont N. Am., Inc.*,
   No. C-05-4525 EMC, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008) .....................19

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1988) ......................................................................................... 16, 23

*Harris v. Vector Mktg. Corp.*,
   No. C-08-5198 EMC, 2012 U.S. Dist. LEXIS 13797 (N.D. Cal. Feb. 6, 2012) ......................... 19

*McLeod v. Bank of Am.*,
   No. 16-cv-03294-EMC, 2018 WL 5982863 (N.D. Cal. Nov. 14, 2018)....................................16

*Vargas v. Ford Motor Co.*,
   No. 2:12-cv-08388-AB-FFM (C.D. Cal. Oct. 18, 2017), ECF No. 193.................................7, 8, 9

*Vasquez v. Coast Valley Roofing, Inc.*,
   670 F. Supp. 2d 1114 (E.D. Cal. 2009) ................................................................................... 20

*Viceral v. Mistras Grp., Inc.*,
   Case No. 15-cv-02198-EMC, 2017 U.S. Dist. LEXIS 23220 (N.D. Cal. Feb. 17,
   2017)......................................................................................................................................... 19

**Other Authorities**

Fed. R. Civ. P. 23 .............................................................................................................. 22, 23, 24

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 31, 2019, at 1:30 p.m. or as soon thereafter as the matter may be heard by the Honorable Judge Edward M. Chen of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for entry of an order in the form prescribed in the proposed Preliminary Approval Order and setting the following schedule:

| Event | Proposed Deadline |
|---|---|
| Class Action Fairness Act Notice to Attorneys General | December 31, 2018 |
| Notice campaign to begin, including website, email notice, and mailing short form notice | 30 days from preliminary approval order |
| Notice campaign to be substantially complete | 60 days from preliminary approval order |
| Last day for motion for attorneys' fees, costs, expenses, and service awards | 75 days from preliminary approval order |
| Last day for objections and requests for exclusion from the class | 110 days from preliminary approval order |
| Last day for motion in support of final approval of settlement/ responses to objections | 14 days after objection deadline |
| Fairness Hearing | 14 days from motion for final approval, unless otherwise ordered by the Court. |
| Claims Deadline <br><br> Start of Claims period | 6 months after Effective Date of Settlement[1] <br><br> Promptly after the Effective Date of Settlement |

This Motion is based on this Notice of Motion and Unopposed Motion for Preliminary Approval of Settlement with Ford Motor Company, the following memorandum of points and authorities, the declaration of Steve W. Berman filed herewith, the pleadings and the papers on file in this action, and such other matters as the Court may consider.

---

[1] Claims for reimbursement of Post-Warranty Repair costs must be submitted by 6 months after the Effective Date of Settlement or within one month of obtaining the MFT Software Repair for which they seek reimbursement (whichever is later).

# I.     INTRODUCTION

There is no denying that the Parties have vigorously litigated every aspect of this complex, multi-state matter for the past five-and-a-half years. Plaintiffs originally brought this class action in 2013, alleging that the MyFord Touch was so inherently defective that it persistently impaired the safety, reliability, and operability of the Class Vehicles over an extended period of time. Plaintiffs also allege that Ford knew that the MFT was inherently defective throughout the class period, refused to disclose this information, and failed to provide an adequate fix for consumers.

As the Court will recall, Plaintiffs previously moved for preliminary approval of a previous settlement agreement, but later withdrew that motion after receiving feedback from this Court. Accordingly, the Parties spent weeks in extensive negotiations under the direct supervision of Magistrate Judge Sallie Kim—ultimately culminating in the Parties agreeing to Magistrate Judge Kim's Mediator's Proposal. As a product of these negotiations, the Parties have agreed to a settlement with an estimated actual recovery of over $17,400,000. Ford has committed to sending at least 360,000 monetary payments and making a guaranteed minimum payment of $17 million. Plaintiffs have also ensured that at least one owner or lessee of each Class Vehicle will receive a monetary payment. So now, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs respectfully seek preliminary approval[2] of a New Settlement Agreement that they believe addresses this Court's comments and concerns.[3]

In terms of concrete benefits to Class Members, the New Settlement Agreement restructures the previous settlement to provide Class Members with the best of both worlds. The vast majority of Class Members will have a choice to either fill out a simplified claim form with prepopulated information to recover between $45-400, or opt for a unilateral payment of $20-55 that Ford will send them without the need to file a claim. The New Settlement Agreement balances very high recoveries for Class Members who fill out claim forms (Claims Submission Process) with a mechanism to guarantee concrete monetary payments to hundreds of thousands of Class Members (Unilateral Payments Process).

---

[2] *See* Section VIII.A.2., *infra*, and Decl. Steve W. Berman in Supp. Pls.' Unopposed Mot. Prelim. Approval of New Class Action Settlement ("Berman Decl.").

[3] *See* Berman Decl. Ex. I.

Regarding Notice and Claims Submission, the Parties propose the same robust, comprehensive program that was previously approved by this Court during the 2017 Litigation Class Notice campaign. The Parties will work together towards a claims process that is fair and as streamlined as reasonably possible, and Class Counsel will be involved in its design and testing. The New Settlement Agreement still provides as a supplement benefit, a no-cost, dealer-installed upgrade to software version 3.10. And like before, the full costs of administration and notice will be paid by Ford.

Plaintiffs believe that, with the changes identified herein, this Court will find the New Settlement Agreement to be a fair, reasonable and adequate compromise between the Parties, worthy of preliminary approval and presentation to the seven certified state classes.

## II.   STATEMENT OF ISSUES TO BE DECIDED

Should the Court preliminarily approve the New Settlement Agreement, the product of arm's-length negotiations under the direct supervision of a Magistrate Judge, which provides valuable monetary and equitable compensation to a well-defined set of Settlement Classes, following implementation of a comprehensive Notice program?

## III.   BACKGROUND

On July 2, 2013, Jennifer Whalen filed an action entitled *Jennifer Whalen v. Ford Motor Company* in this Court, alleging breach of express warranty, violations of the California Unfair Competition Law and Consumers Legal Remedies Act, and unjust enrichment. She also sought certification of a class of current and former owners and lessees of certain Ford vehicles. ECF No. 1.

On November 12, 2013, Plaintiffs filed the First Amended Class Action Complaint on behalf of 24 plaintiffs from 15 states. ECF No. 47. The Parties engaged in extensive motion practice, which resulted in: the narrowing of the claims asserted by Plaintiffs; dismissal of certain plaintiffs; the addition of claims; and Ford's Answer to the First Amended Complaint on July 18, 2014. ECF Nos. 56, 69, 72, 97, 106. Plaintiffs filed under seal their Second Amended Class Action Complaint on May 8, 2015. ECF No. 145. Once again the Parties engaged in motion practice, which resulted in a further narrowing of the Plaintiffs' claims. ECF Nos. 157, 165, 172, 175. Plaintiffs then filed their Third Amended Class Action Complaint against Ford on October 13, 2015, asserting claims on behalf of 19 Plaintiffs from 14 states; Ford provided its Answer on October 30, 2015. ECF Nos. 183, 184.

1    The Parties also conducted significant discovery, including: Fed. R. Civ. P. 26(a) initial

2    disclosures; production by Ford of more than 8.3 million pages of documents (all of which were

3    reviewed and analyzed by Class Counsel); several months of review by Plaintiffs' experts of source code

4    for the MFT software; responses to at least nine sets of written discovery requests; depositions of

5    fourteen Ford fact witnesses and five Ford experts; depositions of twenty Plaintiffs and four Plaintiffs'

6    experts; and inspections of over a dozen Plaintiffs' vehicles. *See* Berman Decl. ¶ 4.

7    Plaintiffs filed for class certification on January 28, 2016, and the Parties briefed their respective

8    positions. ECF Nos. 202, 225, 250. On September 14, 2016, following a hearing, the Court partially

9    granted and partially denied Plaintiffs' motion to certify this action as a class action, certifying classes on

10   behalf of MFT-equipped vehicle owners and lessees in nine states.[4] ECF No. 279 at 47-49. On

11   December 6, 2016, Plaintiffs filed an interlocutory appeal under Fed. R. of Civ. P. 23(f), and the Parties

12   briefed their respective positions. Berman Decl. ¶ 6. The Ninth Circuit denied Plaintiffs' Petition. *Id.*

13   Ford moved for summary judgment on October 6, 2017, with respect to all certified claims, as

14   well as certain non-certified fraud-based claims, and the Parties briefed their respective positions. ECF

15   Nos. 341, 355, 364. After a hearing, the Court partially granted and partially denied Ford's motion for

16   summary judgment on February 14, 2018, leaving most of the classes and claims intact. ECF No. 383.

17   On October 13, 2017, this Court approved the protocol proposed by Plaintiffs for disseminating

18   notice to the certified classes ("2017 Class Action Litigation Notice"). ECF No. 348.  JND Legal

19   Administration Group ("JND") was appointed as the Notice Administrator. Berman Decl. Ex. B ("JND

20   Decl.") ¶ 9.  The notice period concluded on February 5, 2018. *Id.* JND stated that it received 429 opt-

21   outs. *Id.* ¶ 10.

22   On March 1, 2018, Ford filed a motion to decertify the certified express warranty claims, the

23   certified Massachusetts Consumer Protection Act claim, and the claims of those Class Members who

24   purchased their vehicles used from an Authorized Ford Dealer and Plaintiffs responded. ECF No. 393.

25   Plaintiffs responded and Ford filed a reply soon thereafter. ECF Nos. 409, 415. The Court granted in

26   part and denied in part Ford's decertification motion, decertifying the Massachusetts Consumer

27

28   [4] The Court later decertified the statutory consumer fraud claims for the California, Ohio, Texas, and
     Virginia classes on November 22, 2016. ECF No. 301.

Protection Act claim (ECF No. 465) and denying Ford's motion in all other respects. Ford moved for leave to file a motion for reconsideration on this order as it relates to the express warranty claims, which Plaintiffs opposed. ECF Nos. 473, 482, 484.  Ford's motion for leave was denied. ECF No.491.

On March 7, 2018, the Court ordered that the trial be bifurcated, separating trial of the certified express warranty, implied warranty, and Ohio negligence claims from trial of the certified Massachusetts Consumer Protection Act claim and all remaining individual claims, and set the first phase of the jury trial to commence on May 11, 2018. ECF No. 403.

The Parties reached a provisional settlement on March 29, 2018. Berman Decl. ¶ 10.  Plaintiffs moved for preliminary approval of the provisional settlement on June 1, 2018. ECF No. 437. This Court held a hearing on June 11, 2018, and issued three orders regarding the provisional settlement. ECF Nos. 442, 448, 449. In these three orders, the Court raised questions and concerns regarding different aspects of the settlement agreement. In response to the Court's directive, the Parties met and conferred on June 19, 2018, to discuss the Court's questions and concerns.  Berman Decl. ¶ 11. Plaintiffs then filed a Notice of Withdrawal of Class Action Settlement Agreement. ECF No. 452. This Court entered a Third Amended Case Management and Pretrial Order for Jury Trial, setting a trial date of March 4, 2019. ECF No. 472.

On August 24, 2018, the Court referred this Litigation to Magistrate Judge Sallie Kim for a Settlement Conference. ECF No. 479. Magistrate Judge Kim presided over an in-person Settlement Conference between the Parties on October 16, 2018. Berman Decl. ¶ 12. While that conference did not result in a settlement of the action, Magistrate Judge Kim continued to assist the Parties in arm's-length negotiations during October and November concerning a proposed classwide settlement. After several mediated rounds of intense, arm's-length negotiations, the Parties reached an impasse, and on November 19, 2018, Magistrate Judge Kim made a Mediator's Proposal. *Id.* The Parties accepted the Mediator's Proposal on November 20, 2018, and Ford management provided formal signoff in December 2018. *Id.*  The Parties signed the New Settlement Agreement, incorporating the terms set out in the Mediator's Proposal, on December 21, 2018. *Id.* ¶ 13 & Ex. A ("NSA").

1

## IV.   MAXIMUM VALUE OF CLAIMS

Plaintiffs assert 42 claims—including eleven certified claims.[5] The damages theories in this Litigation center on recovery of the decreased value of Plaintiffs' vehicles (*i.e.*, benefit-of-the-bargain damages). Plaintiffs have presented findings by their damages expert, Mr. Stefan Boedeker, showing that classwide benefit-of-the-bargain damages can be determined using choice-based conjoint analysis. This analysis shows that consumers would have paid $729 less if they knew about the MFT Defects and $839 less if they knew the MFT Defects raised safety issues. Plaintiffs estimate that the value of all claims is $300 million.[6]

## V.   SUMMARY OF SETTLEMENT TERMS

### A.   The Settlement Classes

The proposed Settlement Classes are identical to the seven state classes already certified by this Court[7] and listed in the NSA § I.X.

### B.   The Settlement Consideration

Ford will pay all valid claims submitted, and the NSA contains no cap on the total amount of money Ford will pay in response to Class Members' valid claims. *Id.* ¶ 17.

#### 1.   Monetary Compensation

Under the NSA, monetary compensation will be allocated through a two-stage process. The first stage will consist of a six-month period where Class Members will be encouraged to submit claims forms.[8] NSA § II.D. The Parties have agreed to work together to provide a claims process that is fair and as streamlined as reasonably possible. Berman Decl. ¶ 14. The second stage will consist of Ford sending unilateral payments to those original owners and lessees of Class Vehicles as to which no claim was submitted, but for whom Ford has records of ownership. NSA § II.B.2. All compensation will be

---

[5] See Berman Decl. Ex. D for an itemized list of damages sought under each claim. There are no differences between the claims to be released and the claims in the Third Amended Complaint.

[6] Mr. Boedeker estimates $302 million ($839 x 360,000 Class Vehicles). Plaintiffs also rely on Dr. Arnold, who relied on Ford's own pricing data and testimony to compute the economic loss at the time of purchase. He estimated that figure to be $291.5 million (($625 x 270,000 non-navigation equipped Class Vehicles) plus ($1,364 x 90,000 navigation equipped Class Vehicles)).

[7] ECF No. 279 at 47-49.

[8] Class members seeking reimbursement of post-warranty repairs may be able to submit claims beyond this 6-month period depending on when the settlement becomes effective.

distributed in the form of a Visa check card. *See* Ford's Memo in Supp. Pls.' Unopposed Mot. Prelim. Approval of Class Settlements & Approval of Proposed Class Notice ("Ford's Brief"). These cards are accepted anywhere Visa is accepted, and Ford asserts that Class Members will not incur fees for use. *Id.* Recently another court approved Ford's use of Visa check cards. *See* Order Granting Final Approval, *Vargas v. Ford Motor Co.*, No. 2:12-cv-08388-AB-FFM (C.D. Cal. Oct. 18, 2017), ECF No. 193.

### a.   Monetary Compensation through the Claims Process

#### (1)   Compensation for MFT Software Repairs

Class Members who, within six months of the Effective Date of Settlement, submit a claim that they sought one or more MFT Software Warranty Repairs to their Class Vehicle during their ownership or lease, and before the date of the Preliminary Approval Order, will receive a payment as follows:[9]

| Number of MFT Software Repairs | Payment Amount |
| --- | --- |
| 1 | $100 |
| 2 | $250 |
| 3 or more | $400 |

An MFT Software Repair generally includes: (1) services performed by an Authorized Ford Dealer during the warranty of a Class Vehicle in an effort to repair MFT software undertaken in response to a customer's complaint about an MFT malfunction or software problem; (2) installation of an updated version of MFT software by an Authorized Ford Dealer; (3) any actions undertaken by an automobile repair service provider other than an Authorized Ford Dealer in an effort to repair MFT software undertaken in response to a customer's complaint about an MFT software malfunction or problem, if those actions were paid for by the Member of the Settlement Classes. NSA § I.N.

#### (2)   Reimbursement of Post-Warranty Repair Costs

Class Members who, within six months after the Effective Date of Settlement or within one month of obtaining the MFT Software Repair for which they seek reimbursement, submit a claim demonstrating that they paid for an MFT Software Repair (either by an Authorized Ford Dealer or another automobile repair service provider) within one year after the expiration of the MFT Extended

---

[9] NSA § II.B.1.

Warranty will receive reimbursement of the full amount they paid for all such repairs.  NSA § II.B.2.

(3)  **Compensation for Unsatisfactory MFT Performance**

Class Members who, within six months after the Effective Date of Settlement, submit a claim stating that they experienced two or more instances of Unsatisfactory MFT Performance before the date of the Preliminary Approval Order, will receive a payment of $45. NSA § II.B.3. Class Members do not require proof of a MFT Software Repair to qualify for this category of monetary compensation. *Id.* "Unsatisfactory MFT Performance" means an owner or lessee who experienced any of the following types of malfunctions of the MFT software in their Class Vehicle during their period of ownership or lease: (1) freezing up; (2) crashing; (3) blacking-out; (4) failing to respond to touch and/or voice commands; or (5) backup camera failure (failing to display the rearview camera or freezing). NSA § I.B.

b.  **Monetary Compensation Through the Unilateral Payments Process**

*Compensation for MFT Software Repairs*: After the deadline for the Claims Submission Process has expired, all original owners and lessees of Class Vehicles that Ford's records indicate received an MFT Software Warranty Repair, but as to which Class Vehicle a claim was not submitted through the Claims Submission Process, will receive a unilateral payment of $55. NSA § I.B.2.

*Compensation for Unsatisfactory MFT Performance:* After the deadline for the Claims Submission Process has expired, all original owners and lessees of Class Vehicles that Ford's records indicate did not receive a MFT Software Repair, and as to which Class Vehicle a claim was not submitted through the Claims Submission Process, will receive a unilateral payment of $20. *Id.*

2.  **Equitable Relief**

a.  **Access to the Latest MFT Software Update**

Ford will make the most current compatible update of the MFT software (version 3.10 or later) available for free to all Class Members for six months. NSA § II.A. While this software upgrade remains free on the Ford website for self-download installation, Plaintiffs believe there is a significant number of Class Members who would prefer to have a Ford technician install the software update. *Id.* Ford estimates that the out-of-pocket cost for a Ford technician to complete the installation is between $80 and $100. *See* Ford's Brief. Ford has exchanged with Plaintiffs information that Ford believes demonstrates that version 3.10 is the best and most reliable software version for SYNC Gen 2 vehicles.

*Id.* Although Plaintiffs firmly believe that the MFT is inherently defective, Plaintiffs do see some value to Class Members availing themselves of a no-cost, dealer-installed, upgrade to the most reliable MFT software version. Berman Decl. ¶ 14.

### 3.    Anticipated Class Recovery

*Compensation on a Class Member Basis:* There are at least 360,000 Class Vehicles[10] in the Settlement Classes: 39% had no MFT Software Repair;[11] 33% had one MFT Software Repair; 16% had two MFT Software Repairs; and, 12% had at least three MFT Software Repairs. *See* Berman Decl. Ex. E.

To test whether the NSA provided sufficient monetary compensation to Class Members, Plaintiffs reviewed Ford's records showing the number of MFT Software Repairs for the Class Representatives and calculated their estimated recoveries. *See id.* at Ex. F.  Berman Decl. ¶ 15. After making these calculations Plaintiffs found that, under the Claims Submission Process, more than half of the Class Representatives would receive the maximum $400 payout. These $400 recoveries represent around 50% of Mr. Boedeker's damages estimates—a considerable result for a class action settlement. *Id.*

Plaintiffs then reviewed monetary compensation for the Settlement Classes. Under the NSA at least one owner or lessee of all 360,000+ Class Vehicles will be receiving one of the following monetary payments:

|  | No MFT Software Repair | 1 MFT Software Repair | 2 MFT Software Repairs | 3 MFT Software Repairs |
|---|---|---|---|---|
| Claims Submission Process | $45 (if unsatisfied with performance) | $100 | $250 | $400 |
| Unilateral Payments Process | $20 | $55 | $55 | $55 |

Plaintiffs also provide Exhibits E and G to show how the monetary relief is proportioned across Class Members. Exhibit E shows the distribution under a 100% Claims Submission Process and details

---

[10] Ford's records indicate that there are at least 360,000 Class Vehicles, each of which has an original owner or lessee. Berman Decl. ¶ 14.

[11] The definition of MFT Software Repairs in the NSA includes the following repairs: (1) services performed by an Authorized Ford Dealer undertaken in response to a customer's MFT complaint; (2) installation of an updated version of MFT software by an Authorized Ford Dealer; and (3) out-of-pocket services performed by an automobile repair service provider other than an Authorized Ford Dealer in response to a customer's MFT complaint. Previously Ford used the term "Warranty Repairs" in this litigation to exclusively relate to the actions undertaken in (1), but not (2) and (3). The inclusion of (2) and (3) under the definition of "MFT Software Repairs" dramatically expands the number of Class Members eligible for significant monetary compensation.

the following: (1) 39% of Class Members would receive $45; (2) 33% would receive $100; (3) 16% would receive $250; and (4) 12% would receive $400. Based on Exhibit E, 60% of Class Members likely would be eligible for a payment of $100+ or more.

Exhibit G shows the distribution under a 100% Unilateral Payments Process and details the following: 39% of original owner Class Members would receive $20, and 61% of original owners and lessees would receive $55 automatically.

*Total Value of Settlement:* Plaintiffs recognize that the estimated actual recovery will likely not be 100% claims-based or 100% unilateral payments, but instead a mixture of both. As such, Exhibit H summarizes the estimated actual recovery of the New Settlement Agreement, assuming: (1) a 7% claims rate for monetary compensation[12]; and, (2) 20% of Class Members will avail themselves of the 3.10 software upgrade.[13] With regards to monetary compensation through the Claims Submission Process, Plaintiffs calculate the estimated actual recovery for those 7% of Class Members who file claims to be approximately $3,500,000. *See* Berman Decl. Ex. H. With regards to monetary compensation through the Unilateral Payments Process, Plaintiffs calculate the estimated actual recovery of the remaining original owner Class Members who did not file valid claims, but for which Ford has adequate records, to be $13,908,150. *Id.* Therefore Plaintiffs estimate that the estimated total actual recovery of the NSA, assuming a 7% claims rate, is at least $17,408,150. *Id.*

Plaintiffs note that the $17,408,150 estimated total actual recovery of the NSA is a very conservative estimate, performed to emphasize the concrete benefits to the Settlement Classes. But all factors seem to suggest that the real recovery will be higher. For instance, purchasers of used vehicles and those seeking MFT Post-Warranty Reimbursement have been excluded from the above estimate, even though they could materially impact the value of the monetary relief. And if the Court attributes value to the free, dealer-installed, 3.10 software update provided by Ford (for which Ford currently charges $80-100), the total actual recovery is around $24.4 million. *Id.* And finally, a 7% claims rate is

---

[12] Plaintiffs relied on a 7% claims rate as it is within the estimated 5-10% claims rate for this Litigation. *See* JND Decl. ¶ 27.

[13] For the purposes of this Motion, Plaintiffs estimate approximately 20% of Class Members will avail themselves of this benefit. Plaintiffs arrived at this estimate by reviewing Ford upgrade data indicating that 29% of Class Vehicles received a 3.6 upgrade, and assuming a lower figure due to the fact that the 3.10 software upgrade only being made available for a limited time. Berman Decl. ¶ 14.

1  also a conservative assumption. It is not unreasonable to assume that with streamlined claims submission

2  and notice processes the claims rate could increase to 10% or 15%. In those scenarios, the estimated

3  total actual recovery is approximately between $19,868,000 (10% claims rate) and $21,542,000 (15%

4  claims rate). *See* Berman Decl. ¶¶ 14–15.

5  **C.**     **Claims Administration**

6          **a.**     **Monetary Compensation through Claims Submission Process**

7          Class Members will be encouraged to make a claim during the Claims Submission Process for

8  one of the three categories of monetary compensation. The Parties have also agreed to work together to

9  provide a claims process that is fair and as simple as reasonably possible, and Ford has committed to

10  involving Class Counsel in the design, testing and approval. Berman Decl. ¶ 16.  While the precise

11  contours of the process have yet to be developed, the parties expect that for each of the these categories,

12  for each of the these categories, Class Members will be invited to visit the settlement website and use the

13  on-line claims process to create a claim form that is prepopulated with their name, contact information

14  and VIN, where such information is available ("Registration Information"). JND Decl. ¶ 19.

15          1.     Unsatisfactory MFT Performance: After confirming the Registration Information, Class

16  Members would then be presented with the option to select the types(s) of malfunctions they

17  experienced, and then electronically sign the claim form. Notably, original owner and lessee Class

18  Members are not required to append or upload any additional documents to avail themselves of this

19  benefit. Berman Decl. ¶ 18. Used purchasers would need to submit documents to prove class

20  membership.

21          2.     Compensation of MFT Software Repairs: After confirming the Registration Information,

22  Class Members would then be presented with the MFT Software Repairs that are contained in Ford's

23  warranty records for his or her vehicle. After selecting the repairs for which they can attest they

24  completed, the original owner or lessee Class Member would then be invited to append a single

25  document showing proof of ownership for the time of the repairs, such as a copy of vehicle registration,

26  service invoice, or insurance card. The last step would be an electronic signature. JND Decl. ¶ 20.

27          3.     Reimbursement of Post-Warranty Repair Costs: Because Ford's warranty records do not

28  contain information about post-warranty repairs, after reviewing the Registration Information, Class

1    Members would be required to manually input the repair before submitting the claim electronically.  In

2    addition to the documentation noted above, this Class Member must submit documents showing

3    information about the post-warranty repair, and proof of payment for that repair. *Id.* ¶ 22.

### b.    Monetary Compensation through the Unilateral Payments Process

After the deadline for submitting claims for compensation for MFT Software Repairs has

expired, Ford will make a unilateral payment of $55 to be sent to all original owners and lessees of a

Class Vehicle that received one or more MFT Software Warranty Repairs as identified in Ford's MFT

Service and Software Records, but as to which Class Vehicle no claim for monetary compensation was

submitted. Ford will also make a unilateral payment of $20 to original owners and lessees of Class a

Class Vehicle that did not receive an MFT Software Warranty Repair as identified in Ford's MFT Service

and Software Records, and as to which Class Vehicle no claim was submitted through the Claims

Submission Process. NSA § II.B.2.

### c.    Equitable Relief

Class Members will be able to receive the no-cost, dealer-installed MFT Software Update by

downloading a certificate from the settlement website (or requesting a certificate via U.S. Mail) entitling

them to have an Authorized Ford Dealer install the software update in their vehicle. NSA § II.A.

### D.    Guaranteed Minimum Payment to Class Members

After the deadline for submitting claims for MFT Software Repairs and Unsatisfactory MFT

Performance has expired, the collective amount to be paid in response to all valid claims submitted to

date (including claims for Post-Warranty Repair Costs) will be determined.  That amount will be added

to the collective amounts to be paid for Unilateral Payments for MFT Software Repairs and Unilateral

Payment to original owners and lessees who do not submit claims. If the sum of the amounts paid

through the Claims Submission Process ("Total Payment Amount") is less than $17 million, the

difference between the sum of those amounts and $17 million will unilaterally be distributed on a *pro rata*

basis among all Class Members who submitted valid claims during the Claims Submission Process. No

amount of the $17 million guaranteed minimum payment will revert back to Ford. NSA § II.B.3.

**E.    Notice and Administration Costs**

Ford will bear all costs and expenses related to the administration of this New Settlement, in addition to the Settlement Consideration. NSA § II.E. Notice will be distributed to Class Members using the same notice administrator and communication methods that were previously approved by this Court in the 2017 Litigation Class Notice campaign. *Id.* § I.C. After preliminary approval of the Settlement, the Settlement Administrator will confirm the name and last known address of each potential member of the Settlement Classes from the information collected in the 2017 Litigation Class Notice campaign and update any new addresses via the National Change of Address database. *Id.* § III.C. Thereafter, the Settlement Administrator shall mail, or otherwise disseminate, in accordance with the Preliminary Approval Order, a copy of the Short Form Class Notice to each Member of a Settlement Classes so identified.  *Id.* The Settlement Administrator shall use its best efforts to complete the mailing of the Short Form Class Notice to potential Class Members within 60 days after the preliminary approval, including conducting a reasonable search for more current contact information for unreturnable notices. *Id.*

The Settlement Administrator will also establish a notice settlement website soon after an entry of an order granting preliminary approval. This website will contain the Notice of the Settlement and relevant case documentation will be available.  JND Decl. ¶ 14.d.  Additionally, the Settlement Administrator will establish a toll-free telephone line where Class Members may call to obtain information about the Settlement. *Id.* ¶ 13.f.  JND has reviewed the newest Northern District Procedural Guidance for Class Action Settlements and believes that the notice plan articulated above meets these guidelines for notice and that the Parties have taken steps, such as including third-party data from DMV records to significantly increase the effectiveness of the notice process.  *Id.* ¶ 17.

Promptly after the Effective Date of Settlement, Ford will direct the Settlement Administrator to open a "Ford Claim Center" to receive and appropriately respond to all claims submitted by Members of the Settlement Classes. NSA § II.C. The Ford Claim Center will include: (1) personnel assigned to manage the settlement implementation process; (2) a toll-free telephone number that Class Members may call to obtain information about their claims; (3) a mailing address to which Class Members can

1    send claims for reimbursement; (4) updates to the previously-established notice website containing

2    information about the NSA, so that it now includes downloadable and electronic claim forms. *Id.*

3        JND has also been working with the Parties on establishing a Claims Submission Process. Based

4    on preliminary discussions of the Claims Submission Process, which may change subject to technical or

5    legal constraints, JND estimates a 5-10% claims rate in this litigation. JND Decl. ¶ 27.

6        The Parties recognize that under the proposed schedule, claims will not be submitted until after

7    the Court grants final approval of the NSA and hears Plaintiffs' motion for attorneys fees, costs and

8    service awards. NSA § II.C. For reasons explained in Ford's Brief, Ford requires that the claims process

9    begin after final approval. *See* Ford's Brief. Plaintiffs also submit that the NSA provides sufficient

10   information for the Court to assess the fairness of the settlement as it contains significant concrete

11   benefits[14] that will be realized by the Settlement Classes and are not dependent on any specific claims

12   rate. *See* Berman Decl. Ex. H.

13   **F.       Notice to Attorneys General**

14       Ford will provide and pay all of the costs of notice to the attorneys general of the relevant

15   states according to the requirements of 28 U.S.C. § 1715. NSA § III.B.

16   **G.       Release of Claims**

17       If the NSA becomes final, the Plaintiffs and Class Members shall release, as to Ford and any of

18   its related entities as defined by the New Settlement Agreement, any and all state and federal claims,

19   either known or unknown, arising from or relating to alleged malfunctions of the MFT in the Class

20   Vehicles, up to the date of Settlement, as more fully described in the NSA. NSA § III.I. Excluded are

21   individual claims seeking damages for an alleged personal injury caused by a MFT malfunction. NSA §

22   I.T.

23   **H.       Service Awards and Attorneys' Fees and Expenses**

24       As for Plaintiffs' attorneys' fees, costs, and expenses, Plaintiffs request these by separate motion.

25   Berman Decl. ¶ 26. Plaintiffs note that $16,000,000 was the amount recommended for attorneys' fees in

26   Magistrate Judge Kim's Mediator's Proposal (*id.* ¶ 12) and Ford agrees not to oppose any attorneys' fee

27

28       ———————————
        [14] Some of these benefits include unilateral payments and a $17 million guaranteed minimum fund.

and litigation expenses application up to that amount.  NSA § II.E. Plaintiffs' motion will be filed 35 days prior to the end of the objection and opt-out period and well in advance of the Fairness Hearing. Berman Decl. ¶ 26 Plaintiffs will also make a request for service awards for the Named Plaintiffs in the amount of $9,000 each. Ford will pay the attorneys' fees and service awards separately from and in addition to the other consideration agreed in the Settlement. NSA § II.E.

Plaintiffs have included information regarding their past distributions in Exhibit J. Plaintiffs' counsel have spent more than 67,500 hours and have accrued  $31.7 million in attorneys' fees litigating this case. Berman Decl. ¶ 27. In addition, Plaintiffs' counsel have also accrued more than $4,700,000 in expert fees and over $2,395,405 in other costs. *Id.* So based on current estimates, Plaintiffs have spent over $38.5 million in fees and costs in the five years that this Litigation has been active. *Id.*  Plaintiffs request $16,000,000 in attorneys fees and costs. This represents a fractional multiplier of 0.28. Berman Decl. ¶ 27.

## VI.    ALLOCATION PLAN

Soon after the Effective Date of Settlement, the Settlement Administrator will make available electronic and print claim forms and begin accepting and processing valid claims.[15] NSA § II.A. Class Members will have six months during the Claims Submission Process to file a claim for monetary compensation for either MFT Software Repairs or Unsatisfactory MFT Performance. NSA § II.B.1. After the deadline for the Claims Submission Process has expired, Ford will make unilateral payments to all original owners and lessees of Class Vehicles. NSA § II.B.2. For those Class Vehicles for which no valid claim has been filed, $55 will be sent to those original owner/lessee Class Members who owned a Class Vehicle with a Ford-identified record of an MFT Software Repair. Likewise, $20 will go to those whose Class Vehicle has no Ford-identified record of an MFT Software Repair will receive $20. *Id.* If the Total Payment Amount of all valid claims is less than $17 million, Ford will cause the difference between the Total Payment Amount and $17 million to be distributed on a *pro rata* basis to all Class Members who submitted valid claims of any type within the six months Claims Submission Process. NSA § II.B.3.

---

[15] Around this time Ford will also make available software upgrade 3.10 for the next six months at no charge to Class Members.

1   VII.   **SETTLEMENT ADMINISTRATOR**

2          Ford will pay all administration costs apart from any benefits going to the class. NSA § II.C. The

3   Parties propose JND as the Settlement Administrator for this Litigation. JND has been previously vetted

4   and proved highly capable of administering the 2017 Class Action Litigation Notice. *See* Ford's Brief.

5   Exhibit C lists the history of engagements between Class Counsel and JND over the past two years.

6   **VIII.   ARGUMENT**

7   **A.   The Settlement meets the standards for preliminary approval.**

8          At the preliminary approval stage, the Court asks whether "'[1] the proposed settlement appears

9   to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3]

10  does not improperly grant preferential treatment to class representatives or segments of the class, and [4]

11  falls within the range of possible approval . . . .'" *See, e.g.*, *Burden v. SelectQuote Ins. Servs.,* 2013 WL

12  1190634, at *3 (N.D. Cal. Mar. 21, 2013) (citations omitted).  In doing so, the Court "make[s] a

13  preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms […] ."

14  MANUAL FOR COMPLEX LITIG. (FOURTH) § 21.632. Because the Settlement Classes in this Litigation

15  have already been certified, the NSA need not be held to the "higher standard of fairness" required of

16  pre-certification settlements. *McLeod v. Bank of Am.*, No. 16-cv-03294-EMC, 2018 WL 5982863 at *4 n.1,

17  (N.D. Cal. Nov. 14, 2018). Plaintiffs submit that the NSA passes this initial evaluation.

18         **1.   The Settlement is the product of thorough, arm's-length, negotiation.**

19         In contemplating preliminary approval, one of the Court's duties is to ensure that "the agreement

20  is not the product of fraud or overreaching by, or collusion between, the negotiating Parties . . . ."

21  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1988) (internal quotations and citations omitted).

22         There are many factors here that demonstrate that the NSA was reached through intense, arm's

23  length, negotiations. First, the Parties negotiated the terms and conditions of the NSA under the direct

24  supervision of Magistrate Judge Sallie Kim. Berman Decl. ¶ 12. And as set forth above, the NSA was

25  achieved only after extensive written and oral discovery including: production by Ford of more than 8.3

26  million pages of documents (all of which were reviewed and analyzed by Class Counsel); months of

27  review by Plaintiffs' experts of source code for the MFT software; responses to at least nine sets of

28  written discovery requests; depositions of fourteen Ford fact witnesses and five Ford experts;

1    depositions of twenty Named Plaintiffs and four Plaintiffs' experts; and inspections of at least a dozen of

2    the Named Plaintiffs' vehicles. *See* Section III, *supra*. The Parties also litigated two motions to dismiss; a

3    motion for class certification; three motions for reconsideration; at least four *Daubert* challenges; a Fed.

4    R. Civ. P. 23(f) Petition; a motion for summary judgment; and a motion for decertification. Berman

5    Decl. ¶¶ 3, 6. Additionally, Parties had undertaken a considerable amount of trial preparation before

6    settling, including the exchange of a Trial Plan, Trial Plan Response, proposed exhibit lists and

7    objections, jury instructions, deposition designations, almost a dozen motions *in limine* and relevant

8    oppositions, witness lists and other required pretrial materials. *Id.* ¶ 10. The Litigation settled within

9    days of the deadline to file the Joint Pretrial Conference Statement and pretrial materials. *Id.*

10           **2.      Any previous deficiencies have been adequately addressed by the Parties.**

11           The Parties have agreed to fundamental changes in the structure of the NSA that addresses the

12   three main deficiencies identified by this Court in the Order to Show Cause as to Why the Preliminary

13   Settlement Should Not Be Denied (ECF No. 449): (1) the monetary portion was exclusively claims-

14   made; (2) the estimated value of equitable relief was highly questionable given Plaintiffs' theory of the

15   case and the limited verification of Plaintiffs' counsel that the software upgrade provided meaningful

16   relief; and, (3) Class Counsel's fee requests dwarfed the actual value of the likely relief to the class.

17           *Claims-Made Settlement:* The Parties have agreed to two tectonic changes Plaintiffs believe will

18   address this Court's concerns that an exclusively claims-made settlement renders actual monetary

19   recovery illusory. *Id.* at 3. First, Ford has now agreed to send unilateral payments to all original owners

20   and lessees of vehicles in this Litigation for which a claim was not filed. *See* Ford's Brief. Second, Ford

21   has agreed to pay at least $17 million to Class Members in the form of a guaranteed minimum payment.

22   NSA § II.B.3. These two additional changes overlaid onto the previous structure allows for the best of

23   both worlds: (1) a maximum amount of compensation for Class Members who choose to fill out claims

24   forms (for instance, as many as 43,000 Class Members will be eligible for $400 (half of their total

25   damages)); and (2) a backstop that guarantees that at least one owner or lessee of all 360,000 Class

26   Vehicles will receive monetary compensation, regardless of whether or not they submit a claim form.

27   There is also no upward cap on the payment of valid claims. NSA § II. With these changes, the NSA

28   guarantees significant benefits to all Class Members.

*Software Upgrade 3.10:* The Court previously expressed skepticism as to the value of a software upgrade, given Plaintiffs' theory that the underlying architecture remains inherently defective. ECF No. 449 at 2.  As explained in Section V.B.2., *supra*—while Plaintiffs firmly believe that the MFT remains inherently defective—Plaintiffs do see some value to Class Members being able to avail themselves of a no-cost, dealer-installed, upgrade to the most reliable MFT software version available. Without this term in the Settlement Agreement, Class Members would have to pay $80-100 out-of-pocket. Berman Decl. ¶ 14.

*Proportionality of Attorneys' Fees to Settlement Value:* The Court had estimated the total value of the previous settlement agreement to be approximately $5 million and stated that in light of this recovery, Counsel's request for $22 million in fees was grossly disproportionate. ECF No. 449 at 4. Under the New Settlement Agreement, the Court can be assured that Class Members will receive at least $17 million in the form of monetary compensation, and likely much more. NSA § II.B.3.

The maximum attorney fees, costs, and expenses request has also been reduced to $16 million. Berman Decl. ¶ 27.  To date, Plaintiffs have incurred more than $38,000,000 in fees and expenses in the five-and-a-half years that this Litigation has been active. *Id.* Class Counsel have logged more than 67,500 hours litigating this case. *Id.* Due to the highly-complex nature of the MFT system, and the inherent challenge of reliably measuring the impact of defective technology on distracted driving, more than $4,700,000 of the total $38,000,000 in fees and expenses incurred in this Litigation was spent on expert services. *Id.* Thus, Plaintiffs' fees and expenses were incurred in reviewing the extremely voluminous amounts of discovery, retaining experts to analyze sophisticated and highly-sensitive pieces of software evidence, taking or defending of 50 fact and expert depositions, and, as discussed above, vigorously litigating a multitude of legal and technical issues. *See* Section III, *supra.* Plaintiffs therefore respectfully submit that their fee request, which represents a fractional multiplier of 0.28, is fair in light of the years-long extensive effort spent by counsel on this matter, their experience, and the present results achieved for the Class Members. Berman Decl. ¶ 27. Plaintiffs also believe armed with the information herein, this Court is better equipped to evaluate the proportionality of Attorneys' Fees.

Finally, Plaintiffs note that the Court's Order re Proposed Settlement, entered on June 7, 2018. included a series of questions related to various aspects of the previous settlement agreement. ECF

No. 442. The June 12, 2018 Civil Minutes also ordered that the Parties present the Court with specific information relating to the effectiveness of the notices, the anticipated response rate, and the claims process. ECF No. 448. Plaintiffs now present Exhibit I, which is a response to the Court's stated concerns included within the Order re Proposed Settlement and the Civil Minutes.

### 3. The New Settlement Agreement does not improperly grant preferential treatment.

As explained above, all Class Members, including the Class Representatives, are treated equally under the NSA. Each Class Member is invited to submit a claim form and their proportion of the estimated recovery is calculated using a uniform and objective method.[16] Likewise, all original owners and lessees are treated equally with regard to the distribution of unilateral payments.[17] NSA § II.B.2.

Plaintiffs plan on requesting up $9,000 each in Service Awards for Class Representatives.[18] NSA § II.F. Such awards are supported by precedent[19] and will compensate these Named Plaintiffs for the significant time and effort they have devoted to this matter. The Named Plaintiffs here have assisted counsel with the preparation of complaints in this matter; consulted with counsel as requested, and on their own initiative, throughout the pendency of this case; monitored the proceedings on their own behalf and on behalf of the putative class; worked with counsel to prepare, review, and submit declarations in support of their claims and those of the proposed Settlement Classes; answered interrogatories and responded to requests for production, including by gathering and producing documents, in consultation with counsel; and prepared for and sat for full-day depositions. Berman Decl. ¶ 22. Plaintiffs also presented their Class Vehicles in response to all of Ford's Requests for Inspection. *Id.* ¶ 23. Additionally, Plaintiffs provided advance notice to their counsel when they intended to

---

[16] The parties used the time/energy that the class member spent addressing MFT defects as a proxy to suggest that the MFT defects were persistently impeding the reliability, operability, or safety of their specific Class Vehicle (the essence of an implied warranty claim). *See* Berman Decl. Ex. I at 4.

[17] The parties must limit the distribution of unilateral payments to original owners, because this is the subclass of individuals for which Ford has ownership information.

[18] NSA § II.F.

[19] *See Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-02198-EMC, 2017 U.S. Dist. LEXIS 23220 (N.D. Cal. Feb. 17, 2017) (awarding a plaintiff an incentive award of $7,500); *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 U.S. Dist. LEXIS 13797 (N.D. Cal. Feb. 6, 2012) (awarding a plaintiff an incentive award of $12,500); *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008) (finding that "a $5,000 incentive award [for each plaintiff] is modest").

1    relinquish their vehicles, in the event that Ford wanted to conduct any secondary inspections. *Id.* Named

2    Plaintiffs also confirmed that they were planning on attending the trial in San Francisco that was

3    scheduled to take place in May 2018 and then in March 2019. *Id.* And Plaintiffs have consulted with Class

4    Counsel regarding the terms of the Settlement and have expressed their support for it. *Id.* ¶ 24.

5        Plaintiffs should be compensated then for their hard work done pursuant to this Litigation and

6    for achieving these results on behalf of the Class. *See In re Animation Workers Antitrust Litig.*, No. 14-cv-

7    04062-LHK, 2016 WL 6663005, at *9 (N.D. Cal. Nov. 11, 2016)(approving a service award of $10,000

8    when Plaintiffs spent "a significant amount of time … respond[ing] to written discovery and produc[ing]

9    documents relating to their claims; . . . [being] deposed by defense counsel all day regarding their claims

10   in this case; … review[ing] the SAC and other substantive pleadings; and … review[ing] the

11   settlements.").

12       **4.    The New Settlement Agreement falls within the range of possible approval.**

13        "To evaluate the 'range of possible approval' criterion, which focuses on 'substantive fairness

14   and adequacy,' 'courts primarily consider plaintiffs' expected recovery balanced against the value of the

15   settlement offer.'" *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1125 (E.D. Cal. 2009)

16   (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).  But it is "'well-settled

17   law that a proposed settlement may be acceptable even though it amounts to only a fraction of the

18   potential recovery that might be available to the class members at trial.'" *In re: Cathode Ray Tube (CRT)*

19   *Antitrust Litig.*, 2016 WL 3648478, at *6 (N.D. Cal. July 7, 2016) (citing *Linney v. Cellular Alaska P'ship*,

20   151 F.3d 1234, 1242 (9th Cir. 1998)).

21       Here, the maximum value of Plaintiff's claims is approximately $300 million. *See* Section IV,

22   *supra.* The total estimated actual recovery to Class Members under the NSA is $17,408,150. Berman

23   Decl. ¶ 16, Ex. H. Class Members will have a choice to fill out a simplified claim form with prepopulated

24   information to recover anywhere from $45-400, or they can opt for Ford to send them a unilateral

25   payment between $20-55. *See* Section V.B.1, *supra.* Regardless, Ford is required to make over 360,000

26   payments that will total at least $17 million. *See* Ford's Brief. Plaintiffs believe the NSA balances very

27   high potential recoveries (Claims Submission Process) with a mechanism to provide almost unilateral

28

payments to the vast majority of Class Members (Unilateral Payments Process). Plaintiffs therefore submit that the NSA is substantively adequate and fair, representing a reasonable compromise.

It is the Plaintiffs' view that the NSA is a reasonable compromise in light of the risks relating both to liability and damages if this Litigation went to trial. This Court's decision not to certify Plaintiffs' fraud claims made this Litigation much more challenging, as implied warranty claims are harder to prove. Berman Decl. ¶ 19. In this regard, to prevail on their implied warranty claims, Plaintiffs would be required to establish that the Class Vehicles were "unmerchantable" because of a persistent defect which impairs the vehicle's safety, reliability, or operability over an extended period of time. Plaintiffs remain confident that they could prove liability, as they had presented hundreds of pages of compelling evidence in their class certification briefing demonstrating the defective nature of the MFT.[20] ECF Nos. 202, 203. However, Plaintiffs also acknowledged during the Litigation that their theory of the case for the Phase I trial hinged on demonstrating that all MFT versions up to and including 3.6 were so defective as to create liability for express warranty, implied warranty, and negligence. ECF No. 403. Given Ford's vigorous contention that software version 3.6 constituted an adequate fix for the MFT system, and that repairs relating to the MFT trailed off over time, Plaintiffs had to consider the risk that a jury could find that software version 3.6 alleviated the MFT defects so that they no longer persistently impaired the safety, reliability, or operability of the Class Vehicles over time. *See* Berman Decl. Ex. I at 6.

And despite surviving multiple *Daubert* attacks, Plaintiffs' damages models posed some material challenges had Plaintiffs presented them at trial. Expert damages evidence proffered by Mr. Boedeker and Dr. Jonathan Arnold found that due to the presence of the MFT Defects, Plaintiffs overpaid for their Class Vehicles by several hundred dollars. ECF No. 279 at 6. Plaintiffs sought to recover these funds based on the underlying benefit-of-the-bargain theory that, had they known the MFT system was inherently defective and that Ford would fail to provide an adequate fix, they would have either not purchased the Class Vehicle or paid less for it. *Id.* at 7. This Court also found that both Dr. Taylor and Mr. Boedeker's damages models were sufficiently sound and could be adequately applied to the seven

---

[20] Plaintiffs' evidence not only included expert opinion on the quality of the source code and the impact of the MFT on distracted driving, but also referenced a mountain of statements from throughout the class period where Ford engineers, employees and executives vividly and consistently expressed their dissatisfaction with the quality of the MFT system. *See* ECF Nos. 202, 203.

state classes. *Id.* at 27. But Plaintiffs also acknowledged the possibility that Ford could potentially convince a jury that the experts' calculations did not properly account for any residual utility of the MFT system, after the MFT defects were taken into account. As such, success for Class Members was not assured, even if Plaintiffs prevailed in demonstrating liability.

And finally, in spite of the creation of a highly-detailed Trial Plan addressing this issue,[21] there continued to be a risk that due to the inherent complexity of trying class claims for express warranty, implied warranty, and negligence under the laws of seven states, in addition to 21 individual Plaintiffs' claims under the laws of twelve states, (even in a bifurcated format) the Court could have, at a future date, chose to further divide different portions of the litigation or decertify different classes (or portions of the classes) due to manageability or superiority concerns. *See* ECF No. 403 (bifurcating trial). Plaintiffs were also mindful of Ford's *motions in limine* that could have reduced the amount of evidence available to Plaintiffs, while introducing highly prejudicial evidence of dubious probative value. Berman Decl. ¶ 19.

So while Plaintiffs had what they believed to be strong affirmative theories and rebuttals to Ford's defenses, there was significant risk, nonetheless, in proceeding further with the Litigation. Ultimately, after taking into account the risk, expense, complexity, and likely duration of further litigation,[22] Plaintiffs and their experienced counsel, were able to achieve a Settlement that allows for substantial monetary relief and flexibility to the Class Members. Berman Decl. ¶¶ 19, 30.  Thus, the Settlement falls within the range of possible approval.

**B.      The Settlement Classes Satisfy Rule 23**

This Court has already found that seven state classes, identical to the proposed Settlement Classes here, satisfied Rule 23(a) and Rule 23(b)(3). ECF No. 249 at 47–49.  Plaintiffs review this evidence briefly.

**1.      Rule 23(a)(1): Numerosity**

The first requirement for maintaining a class action is that its members are so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). Here, the class consists of hundreds of thousands of Class Members across seven states. ECF No. 279 at 14. Numerosity is established.

---

[21] Berman Decl. ¶ 7.
[22] *See, e.g., Burden*, 2013 WL 1190634, at*3.

**2.      Rule 23(a)(2): Commonality**

The second requirement of Rule 23 is the existence of common questions of law or fact. Fed. R. Civ. P. 23(a)(2). This Court has already found that Plaintiffs have raised common questions that generate common answers apt to drive the resolution of the litigation and that "[p]laintiffs have made a sufficient showing that in the main the defects were common for purposes of Rule 23." ECF No. 279 at 14–15, 31. The commonality element is therefore met.

**3.      Rule 23(a)(3): Typicality**

"Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. This Court has already found that, here, because "[a]t base, all Plaintiffs claim that they paid money expecting MFT to work, and that it did not work." ECF No. 279 at 16. This Court also found that: "[n]amed Plaintiffs thus 'have the same or similar injury' as other members of the class: they paid money for a substantially defective product." *Id.* at 17.  Thus, typicality is established.

**4.      Rule 23(a)(4): Adequacy**

The final requirement of Rule 23(a) is that the representative plaintiffs will fairly and adequately represent the interests of the class. This requires only that a class member does not have interests that are antagonistic to or in conflict with the interests of the class. *Hanlon*, 150 F.3d at 1020. Here, this Court had found no conflict with new and used purchasers, and that the class representatives were adequate. ECF No. 279 at 20-21.

**5.      Rule 23(b)(3): Common Questions of Fact or Law Predominate**

Once the prerequisites of Fed. R. Civ. P. 23(a) are satisfied, the Court must determine if one of the subparts of Rule 23(b) is also satisfied.  Here, Rule 23(b)(3) is satisfied because questions common to Class Members predominate over questions affecting only individual Class Members, and the class action device provides the best method for the fair and efficient resolution of the claims at issue.

This Court has already conducted an extensive predominance analysis at class certification, and finding that common questions of fact or law predominate when granting certification for the claims identified in the certified seven state classes. ECF No. 279 at 47-49. For example, this Court found that the majority of the state-based implied warranty claims could be certified as "Plaintiffs have produced

1    enough evidence regarding Ford's base software for the Court to infer at this stage that each MFT

2    version has materially similar defects. If each MFT version is similarly flawed, it follows that each would

3    breach (or not) the IWM in materially the same way." *Id.* at 41. Similarly, after conducting a rigorous

4    analysis into each of Plaintiffs' damages models, this Court found that "[t]he methodologies set forth in

5    Plaintiffs' expert declarations are sufficiently sound and capable of practicable application to the class

6    without unreasonable difficulty." *Id.* at 27. As such, issues common to the Classes predominate.

7    Referencing Plaintiffs' arguments that individual recovery in this Litigation was "likely to be so small as

8    to make individual actions not worth bringing", this Court concluded that, here, "a class action is

9    therefore a superior option." *Id.* at 46. Plaintiffs thus meet the Rule 23(b)(3) requirements.

10   **C.      The Court Should Reaffirm Its Previous Appointments.**

11   Under Rule 23, the appointment of class counsel, to "fairly and adequately represent the interests

12   of the class" is required. Fed. R. Civ. P. 23(g)(1)(A), (B). In making this determination, the Court must

13   consider counsels': (1) work in identifying or investigating potential claims; (2) experience in handling

14   class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of

15   the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

16   Here, Class Counsel has spent an extraordinary amount of time litigating claims on behalf of Plaintiffs

17   and hundreds of thousands of Class Members. Berman Decl. ¶ 27. As such, Hagens Berman Sobol

18   Shapiro LLP; Baron & Budd, P.C.; DiCello Levitt & Casey LLC.; and Chimicles & Tikellis LLP should

19   continue as Class Counsel. Likewise, the Court should re-affirm its appointment of the Plaintiffs as Class

20   Representatives.

21   **D.      The Proposed Class Notice and Plan for Dissemination Meets the Strictures of Rule 23.**

22   Fed. R. Civ. P. 23(e)(1) requires this Court to "direct notice in a reasonable manner to all class

23   members who would be bound by the proposal." Also, for a Rule 23(b)(3) class, this Court to is required

24   to "direct to class members the best notice that is practicable under the circumstances, including

25   individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P.

26   23(c)(2)(B).

27   The Parties intend to follow the same parameters and use the same Notice Administrator

28   previously approved by this Court during the 2017 Litigation Class Notice. ECF No. 348. The proposed

notice forms provide all information required by Rule 23(c)(2)(B) to the Settlement Classes, in language that is plain and easy to understand. JND Decl ¶ 16. The Parties have also followed, as closely as possible, the language for settlements recommended by this District's newest Procedural Guidance for Class Action Settlements. Berman Decl. ¶ 31; JND Decl. ¶ 17. With this Motion, the Parties provide proposed short form notice, long form notice, and e-mail notice. *See* NSA Exs. 1–3.

The direct notice component will include email and mail notice to potential class members, using the contact information collected during the 2017 Litigation Class Notice campaign and updated to reflect any interim changes. JND Decl. ¶¶ 8, 11. The Notice Administrator will also establish a website, containing information about the settlement as well as copies of relevant case documentation and a toll-free telephone number will be created. *Id.* ¶¶ 14.d, 14.f. It is the opinion of JND that this plan will provide the best notice possible given the circumstances. *Id.* ¶ 15. These notice provisions meet the requirements of Rule 23, allowing the Classes a full and fair opportunity to review and respond.

## IX.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully ask that the Court grant preliminary approval of the Parties' New Settlement Agreement and grant the other relief requested in this Motion.

Dated: December 21, 2018

Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
     Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
Craig R. Spiegel (122000)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: catherineg@hbsslaw.com
E-mail: craigs@hbsslaw.com

1        Adam J. Levitt (*pro hac vice*)
         John E. Tangren (*pro hac vice*)

Adam J. Levitt (*pro hac vice*)
John E. Tangren (*pro hac vice*)
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, IL 60602
Telephone: (312) 214-7900
E-mail: alevitt@dlcfirm.com
E-mail: jtangren@dlcfirm.com

Roland Tellis (186269)
Mark Pifko (228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2320
Facsimile: (818) 986-9698
E-mail: rtellis@baronbudd.com
E-mail: mpifko@baronbudd.com

Nicholas E. Chimicles (*pro hac vice*)
Benjamin F. Johns (*pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail: nick@chimicles.com
E-mail: benjohns@chimicles.com

*Class Counsel*