UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE | Case No. 13-cv-03072-EMC |
| MYFORD TOUCH CONSUMER LITIGATION | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Docket No. 515 |

Plaintiffs filed this class action suit against Defendant Ford Motor Company ("Ford") in 2013, alleging that Ford's vehicles were equipped with an MyFordTouch "infotainment system" ("MFT") that was so defective that it compromised the safety, reliability, and operability of the vehicles. After more than five years of litigation, including extensive motions practice and discovery, the parties engaged in settlement negotiations overseen by Magistrate Judge Kim and ultimately agreed to her Mediator's Proposal. Currently pending before the Court is Plaintiffs' motion for preliminary approval of the resulting Settlement Agreement. Docket No. 515 ("Mot.").

For the reasons discussed below, the Court finds that the proposed Settlement Agreement is fair, adequate, and reasonable, and accordingly **GRANTS** the motion for preliminary approval.

## I. BACKGROUND

A. Procedural Background

Named Plaintiff Jennifer Whalen filed her original complaint against Ford in July 2013, followed by a First Amended Class Action Complaint in November 2013 and a Second Amended Class Action Complaint in May 2015. Docket Nos. 1, 47, 154. Along the way, Plaintiffs' claims were narrowed as a result of two motions to dismiss. Docket Nos. 97, 175. The Third Amended Class Action Complaint was filed in October 2015, asserting claims on behalf of 19 Plaintiffs

from 14 states. Docket No. 183. Plaintiffs moved for class certification in January 2016. Docket No 196-5. The Court granted in part and denied in part the motion, certifying classes for nine states. Docket No. 279. Plaintiffs sought to interlocutorily appeal the class certification order, but the Ninth Circuit denied their petition.

In October 2017, Ford moved for summary judgment on all of Plaintiffs' certified class claims, as well as certain non-certified claims on behalf of individual Plaintiffs. Docket No. 341. The Court granted the motion as to two certified claims and one non-certified claim, allowing the remaining claims to proceed. Docket No. 383. In August 2018, the Court granted Ford's motion to decertify Plaintiffs' Massachusetts Consumer Protection Act claim. Docket No. 465. This left eleven certified claims for seven classes (California, Massachusetts, New Jersey, North Carolina, Ohio, Virginia, and Washington).

The parties reached a provisional settlement agreement in March 2018. However, over the course of several orders and a hearing, the Court raised a number of concerns about the provisional agreement. *See* Docket Nos. 442, 448, 449. Of these concerns, three in particular stood out. First, the monetary portion of the settlement was a "claims-made" fund that was functionally equivalent to a common fund with a reversion to Ford. Docket No. 449 at 1. Second, the supposed value of the equitable portion of the settlement—a free upgrade to version 3.10 of the MFT software—was highly questionable as that version of the software had not been tested or verified by Class Counsel. *Id.* Third, the settlement included a "clear-sailing" provision which guaranteed that Ford would not oppose Class Counsel's fee request up to $22 million, an amount which dwarfed the actual value of the likely relief to the class. *Id.* The parties met and conferred to discuss the Court's concerns, and Plaintiffs ultimately opted to withdraw from the provisional agreement. Docket No. 452.

The Court then referred the parties to Magistrate Judge Kim for settlement negotiations. Docket No. 479. Judge Kim presided over a settlement conference on October 16, 2018, which did not result in a settlement agreement. However, the parties continued to exchange proposals via Judge Kim through October and November before reaching an impasse, whereupon Judge Kim made a Mediator's Proposal on November 19, 2018. Both parties accepted the Mediator's

Proposal the next day.  The parties then moved the Court to grant preliminary approval of the

resulting Settlement Agreement.  Docket No. 498.  At a hearing on January 24, 2019, the Court

conveyed several concerns it had regarding the Settlement Agreement, and ordered the parties to

discuss possible solutions to those concerns.  Docket No. 509.  The parties filed the instant

renewed motion for preliminary approval addressing the Court's concerns.

B.      Terms of Proposed Settlement Agreement

The key terms of the Settlement Agreement are summarized below.

1.      Settlement Classes and Released Claims

The proposed settlement classes are the same as the seven remaining certified classes.  *See*

Docket No. 516-1 (New Settlement Agreement or "NSA") § I.X.  In return for the consideration

described below, Class Members will release

> all claims, demands, causes of action, and suits pleaded against Ford
> in the Litigation, and all other claims, demands, actions, causes of
> action of any nature whatsoever, including, but not limited to, any
> claim for violations of federal, state, or other law (whether in
> contract, torts, or otherwise, including statutory and injunctive relief,
> common law, property, warranty, Lemon Law, and equitable
> claims), and also including Unknown Claims, that relate to
> malfunctions of the MFT in Ford and Lincoln vehicles sold or leased
> prior to August 9, 2013 and which are asserted or brought against
> any of the Released Parties.

NSA § I.W.  The release does not extend to "individual claims seeking damages for an alleged

personal injury caused by a malfunction of the MFT."  *Id.*

2.      Monetary Consideration

Class Members can receive monetary compensation[1] in one of two ways under the

Settlement Agreement.

a.      Claims Process

First, they can submit a claim through the Claims Process under three possible categories:

i.      MFT Software Warranty Repairs

Class Members who sought one or more MFT Software Warranty Repairs to their Class

---

[1] The monetary compensation will be distributed in the form of Visa check cards.

Vehicle and submits a claim within 180 days after preliminary approval will receive a payment as follows:

| Number of MFT Software Repairs | Payment Amount |
| --- | --- |
| 1 | $100 |
| 2 | $250 |
| 3 or more | $400 |

NSA § II.B.1. An "MFT Software Repair" includes: (1) an Authorized Ford Dealer's attempt to repair MFT software during the warranty of a Class Vehicle; (2) an Authorized Ford Dealer's installation of an updated version of MFT software; and (3) a non-Ford repair provider's attempt to repair MFT software, if a Class Member paid for the repair. NSA § I.N.

ii.  Post-Warranty Repairs

Class Members who paid for an MFT Software Repair within one year after the expiration of their MFT Extended Warranty and submit a claim within 180 days of preliminary approval will receive reimbursement for the full amount they paid for the repair. NSA § II.B.1.b.

iii.  Unsatisfactory MFT Performance

Class Members who submit a claim within 180 days of preliminary approval stating that they experienced two or more instances of Unsatisfactory MFT Performance will receive a payment of $45. NSA § II.B.2. "Unsatisfactory MFT Performance" means any of the following types of MFT software malfunction experienced by a Class Member in their Class Vehicle: (1) freezing up; (2) crashing; (3) blacking-out; (4) failing to respond to touch and/or voice commands; or (5) backup camera failure. NSA § I.B. Class Members do not need to submit any proof of a repair attempt to qualify for this category of compensation. NSA § II.B.3.

b.  Unilateral Payments Process (Without Submission of Claim)

Second, Class Members who do not submit a claim can nonetheless receive compensation through the Unilateral Payments Process. After the claims process is complete, all original owners and lessees of Class Vehicles that Ford's records indicate received an MFT Software Repair

4

during the warranty period, but as to which no claim was submitted, will receive a payment of $55. NSA § II.B.2. And all original owners and lessees of Class Vehicles that Ford's records indicate did *not* receive an MFT Software Repair will receive a payment of $20. *Id.* Class Members who purchased their Class Vehicles used will not receive unilateral payments, since Ford does not have records pertaining to them.

      c.   Total Value of Monetary Consideration

   As explained in more detail below, the parties estimate that, assuming a 7% claims rate, the total value of the monetary consideration (*i.e.*, the sum of payments Class Members will receive from the Claims Process and the Unilateral Payment Process) under the Settlement Agreement will be approximately $17.4 million. If the claims rate turns out to be lower, leading to an actual payout of less than $17 million, the difference between the actual payout and $17 million will then be unilaterally distributed *pro rata* to all Class Members who submitted valid claims. NSA § II.B.3. In other words, the Settlement Agreement provides a guaranteed minimum monetary payout of $17 million. There is no upper cap on the total monetary consideration Ford will pay to Class Members. If the claims rate is higher than 7%, Ford will be required to pay out for all valid claims, even if their total exceeds $17 million. If, for example, the claims rate turns out to be 15%, the total recovery will be approximately $20.2 million. Docket No. 516 (Berman Decl.) ¶ 15; Docket No. 506.

     3.   Non-Monetary Consideration

   Class Members will be able to obtain the most current version of the MFT software (version 3.10 or later) for free. NSA § II.A. This software upgrade is already available to the public for free on the Ford website, but typically consumers must download and install the software themselves. However, Class Members will be able to have a Ford technician complete the installation for free within six months of the Effective Date of Settlement by downloading a certificate from the settlement website. *Id.* Ford estimates that the out-of-pocket cost for such an installation is between $80 and $100.

     4.   Claims Process

   The parties represent that "the precise contours of the [claims] process have yet to be

developed." Mot. at 11.  However, they represent that Class Members will be able to submit their claims online, via a claim form on the settlement website.  *Id.*  The claim form will be prepopulated with certain information (such as the Class Members' names, contact information, and Vehicle Identification Numbers) to make the claims process easier.  *Id.*

Class Members who submit claims for MFT Software Warranty Repairs will be able to select the qualifying repairs they completed from a list prepopulated from Ford's warranty records. Mot. at 12.  These claims require one document showing proof of ownership at the time of the repair.  *Id.*

Class Members who submit claims for Post-Warranty Repairs will need to manually input the repair information because Ford does not maintain records for post-warranty repairs.  *Id.* These claims require proof of ownership at the time of the repair, documents showing information about the repair, and proof of payment for the repair.  *Id.*

Class Members who submit claims for Unsatisfactory MFT Performance will be able to select the type of qualifying malfunction they experienced from a list, and electronically sign the claim form under penalty of perjury.  *Id.*  Original owners and lessees will not be required to submit any supporting documents, but purchasers of used Class Vehicles will need to submit documents showing class membership.  *Id.*

The claims process will begin 45 days after the Court grants preliminary approval of the Settlement Agreement, and close 180 days after preliminary approval (*i.e.*, 135 days after claims processing opens).  NSA § II.C; Mot. at 1.

5.    Notice, Objections, and Opt-Out

The parties propose to appoint JND Class Action Administration, which conducted the notice campaign to Class Members in this case in 2017, as the Settlement Administrator.  NSA § I.Y.  The Settlement Administrator will provide notice of the settlement to Class Members using the same methods that the Court approved for the 2017 Class Notice campaign.  Namely, the Settlement Administrator will use the name and address of each Class member collected during the 2017 campaign and update new addresses using the National Change of Address database. NSA § III.C.  It will then use U.S. mail to send copies of the Short Form Class Notice to Class

Members and use email to send the Email Notice to all Class Members whose email addresses are known.  *Id.*; *see* Docket No. 525-1 (Short Form Class Notice); Docket No. 525-3 (Email Notice).  The Long Form Class Notice will also be posted on the settlement website.  NSA § III.C; *see* Docket No. 525-5 (Long Form Class Notice).  If any Short Form Class Notice is returned as undeliverable, the Settlement Administrator will perform a reasonable search for a more current name and/or address and resend the notice.  NSA § III.C.  No further mailings will be attempted for any Short Form Class Notice returned as undeliverable for a second time.  *Id.*

Any Class Member who intends to object to the Settlement Agreement must file such objection with the Court by 180 days from preliminary approval.  NSA § III.D.1.  Any Class Member who wishes to opt out of the Settlement Agreement (who has not already opted out) can submit a request for exclusion via first-class U.S. mail to the Settlement Administrator by the same date.  NSA § III.D.2.  In response to the Court's suggest, *see* Docket No. 523 at 1, the parties agreed at the March 21, 2019 hearing to also permit Class Members to submit exclusion requests online.

### 6.     Attorneys' Fees and Service Awards

Class Counsel intends to file their motion for attorneys' fees and costs, seeking a total of $16 million, 35 days prior to the end of the objection and opt-out period.  Mot. at 14–15.  Ford has agreed not to oppose any fee request up to that amount, and will pay the amount awarded separately from and in addition to the settlement consideration to Class Members.  NSA § II.E.

Class Counsel also intends to file an application for a $9,000 service award for each of the nineteen Named Plaintiffs.  NSA § II.F.

## II.     DISCUSSION

### A.     Legal Standard

Per Rule 23, a class action may only be settled with court approval.  Fed. R. Civ. P. 23(e).  Before a court renders approval, it must determine that the settlement is "fundamentally fair, adequate, and reasonable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (citing Fed. R. Civ. P. 23(e)(2)).

Amendments to Rule 23 took effect on December 1, 2018.  These amendments provide

new guidance on the "fair, adequate, and reasonable" standard at the preliminary approval stage. Prior to the amendments, "[t]he standard for reviewing class action settlements at the final approval stage [wa]s well-settled," but the standard applied to preliminary approval was less clear. *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035–36 (N.D. Cal. 2016). Courts in the Ninth Circuit generally interpreted Rule 23 to require a determination of whether the proposed settlement "falls within the range of possible approval" and "has no obvious deficiencies." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079–80 (N.D. Cal. 2007). The new Rule 23 clarifies that preliminary approval should only be granted where the parties have "show[n] that the court *will likely be able to . . .* approve the proposal under [the final approval factors in] Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added). Review at the preliminary approval stage thus is increasingly robust.

Accordingly, for the purposes of this motion the Court will consider the factors informing final approval, namely, whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

   (i) the costs, risks, and delay of trial and appeal;

   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[2]

---

[2] Because the classes in this case have already been certified, the Settlement Agreement need not be held to the "higher standard of fairness" required of pre-certification settlements. *See Hanlon*,

B.     The Court's Previous Concerns

Before discussing the Rule 23(e)(2) factors, the Court first addresses the specific concerns it voiced about the March 2018 provisional settlement agreement.  *See* Docket Nos. 442, 448, 449. The Court agrees with the parties that those concerns have been resolved by the present Settlement Agreement.

1.     Claims-Made Settlement

The Court's first concern was that the "claims-made" structure of the provision settlement only required Ford to pay Class Members who file claims.  Docket No. 449 at 1.  The parties had estimated that, assuming 100% of Class Members submitted claims, the total value of the provisional settlement would be over $55 million.  *Id.* at 3.  But Class Counsel conceded that in reality, claims rates tend to range from 1–10%, which meant that the amount that Ford would have distributed to Class Members under the provisional settlement would likely to have been in the $550,000–$5.5 million range.  *See id.*

Two aspects of this Settlement Agreement—the guaranteed minimum total payment of $17 million and the Unilateral Payment Process that compensates Class Members who do not submit any claims—cure this deficiency.  The guaranteed minimum payment provision mitigates the most problematic feature of a claims-made settlement—the reversion of unclaimed funds to the defendant.  *See* 4 Newberg on Class Actions § 13:7 (5th ed. 2018).  The Unilateral Payment process ensures that all Class Members (apart from those who purchased used Class Vehicles) as a group will receive a guaranteed measure of recovery.

Although the use of a claims process deserves scrutiny,[3] as a practical matter, a claims process is necessary here because Ford's warranty database does not contain enough information to allow it to unilaterally determine which Class Members sought warranty repairs, paid out-of-pocket for post-warranty repairs, or experienced unsatisfactory MFT performance.  Ford's

---

150 F.3d at 1026.

[3] This district's Procedural Guidance for Class Action Settlements requires a party proposing a claims process for the distribution of settlement funds to justify the process by estimating the expected claim rate.  *See* Proc. Guidance for Class Action Sett. ¶ 1.

United States District Court
Northern District of California

database tracks warranty repairs by vehicle, and records the original owner of each vehicle, but not the identity of the vehicle owner at the time of repair. Docket No. 517 ("Ford Br.") at 13–14. Ford also lacks information about non-warranty repairs. *Id.* at 14. Thus, unless Class Members corroborate proof of ownership and provide other relevant information, Ford would not be able to compensate the correct vehicle owners.

The parties have designed the claims process will be designed minimize the burdens on Class Members to submit a claim. The claims form will prepopulate with information to the extent it is available in Ford's database, and the forms can be completed and submitted online. *Id.* at 15–16. Class Members who submit claims for in-warranty MFT Software Repairs will only need to include one document showing proof of ownership at the time of the repair, and claims for Unsatisfactory MFT Performance will require no supporting documentation at all (unless the vehicle was purchased used, in which case the owner will need to submit documents showing class membership). *Id.* at 16. Furthermore, every eligible class member who does not submit a claim will receive compensation.

2. <u>Software Upgrade to MFT Version 3.10</u>

The Court's second concern was about the supposed value of the free upgrade to version 3.10 of the MFT software. Docket No. 449 at 2. "Class Counsel conceded that it had not engaged in any real scrutiny of MFT v. 3.10 . . . . to determine whether it functioned materially better" than the earlier MFT versions that Plaintiffs had consistently argued were inherently defective. *Id.* Moreover, the software upgrade was already available for free on the Ford website, so the only "value" that Class Members would derive would be from the approximately $80–100 in labor costs that would be waived if they asked a Ford dealership to install the software upgrade for them. *Id.*

Class Counsel explained at the January 24, 2019 hearing that vetting version 3.10 would entail reviewing the source code and therefore incur significant additional time and expense. However, Class Counsel did "review . . . information provided by Ford regarding software version 3.10" and "belie[ves] that software version 3.10 is the most reliable MFT software version." Berman Decl. ¶ 14. At least some Class Members have told Class Counsel that they "would find

value in a no-cost, dealer-installed MFT software version upgrade." *Id.* ¶ 14. Ford has also submitted an updated expert analysis based on the latest available government data that shows no statistically significant difference in accident rates between model year 2014 vehicles equipped with MFT software and otherwise identical models without MFT software.[4] *See* Docket No. 518-1 (expert report of Dr. Paul Taylor). This tends to support Ford's assertion that, even if Plaintiffs maintain the MFT software is flawed, version 3.10 is sufficiently reliable that its use mitigates significant safety concerns. These considerations, in addition to the potentially substantial cost Ford would absorb in reimbursing dealers for performing installations, indicate that the free upgrades to version 3.10 do add some value to the settlement, even if that value is not substantial.[5]

### 3. Attorneys' Fees

Third, the Court expressed concern that the provisional settlement included a "clear-sailing" provision which guaranteed that Ford would not oppose Class Counsel's request for fees and costs up to $22 million. Docket No. 449 at 4. The Court was troubled by the disproportionate size of the fee request relative to the likely total recovery for the Class under the pure claims-made model of the provisional settlement. *Id.* The current Settlement Agreement retains the clear sailing provision. *See* NSA § II.E. However, relative to the provisional agreement, the total recovery for the class has increased to a guaranteed minimum of $17 million and the requested fees and costs have decreased to $16 million, the amount recommended in Judge Kim's Mediator's Proposal. Berman Decl. ¶ 12. Class Counsel represents that it has accrued approximately $7,095,405 in total costs ($2,395,405 in litigation expenses plus $4,700,000 in expert fees). *Id.* ¶ 27. Subtracting these costs from the $16 million request, Class Counsel is effectively seeking $8,904,595 in fees. *Id.*

"[C]ourts have an independent obligation to ensure that [an attorneys' fee] award, like the

---

[4] Ford transitioned to version 3.10 of the MFT software in August 2013, so model year 2014 vehicles were generally equipped with this version. Docket No. 518-1 at 2.

[5] Class Members will not be able to receive their free version 3.10 installations from dealers until after final approval of the Settlement Agreement is granted, but the parties have agreed to disseminate a second round of notice upon final approval to alert Class Members that the free upgrades are available.

settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). In particular, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* at 948 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)). Generally, courts have discretion to choose between using the lodestar method and the percentage-of-recovery method to analyze the reasonableness of attorneys' fees, depending on the circumstances. *See Bluetooth Headset*, 654 F.3d at 941. Some courts have suggested that the lodestar method is more appropriate where, as here, counsel "do[es] not request a percentage of recovery from the common fund, but instead seek attorneys' fees and expenses separate from the Class Members' recovery." *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 688 (N.D. Cal. 2016). Whatever method is employed, the other method is typically used as a cross-reference. *See Bluetooth Headset*, 654 F.3d at 944.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id.* at 941. "Though the lodestar figure is presumptively reasonable, the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 941–42 (citations and internal quotation marks omitted). Class Counsel will be required to provide more fulsome documentation of its hours and rates when it moves for fees, but for the purposes of the instant motion it represents that it has accrued over 67,500 hours and $31.7 million in fees in this litigation. Berman Decl. ¶ 27. Accordingly, the $8,904,595 fee request represents a negative multiplier of 0.28 on the lodestar total. Even if the multiplier were calculated on the basis of the total amount requested for fees *and* costs, the result would be a negative multiplier of 0.50.

The Ninth Circuit has observed that lodestar multipliers ranging from one to four are

frequently awarded in complex class action cases, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002), and "courts view self-reduced fees" representing a negative multiplier on the lodestar "favorably," *Schuchardt*, 314 F.R.D. at 690. Assuming Class Counsel's billed hours and rates are reasonable,[6] the negative multiplier it has applied to its fee request suggests the request is reasonable. Further, while a clear sailing provision can be a warning sign of possible collusion between the parties, that concern is mitigated by two considerations here. First, the Settlement Agreement and fee agreement were reached under the auspices of an experienced mediator. *See Bluetooth Headset*, 654 F.3d at 948 (holding that the participation of a mediator is "a factor weighing in favor of a finding of non-collusiveness"). Second, the $17 million "settlement fund is not subject to reversion to the Defendant; all of it will be distributed to class members," *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1007 (N.D. Cal. 2015), reducing "the likelihood that class counsel will have bargained away something of value to the class," *Bluetooth Headset*, 654 F.3d at 948.

Using the percentage-of-recovery method as a cross-check, a fee (net of costs) of $8,904,595 represents 27% of the estimated $33 million that Ford will pay out in total (*i.e.*, $17 million settlement fund + $16 million fees and costs), a percentage close to the 25% benchmark in the Ninth Circuit. *See Bluetooth Headset*, 654 F.3d at 942.

On balance, given the size of Class Counsel's lodestar, accrued over five-plus years of litigation, the request for $8,904,595 in fees and $7,095,405 in costs is not unreasonable on its face.

C.     Preliminary Approval Factors

The Court now turns to the Rule 23(e)(2) factors.

1.     Adequate Representation of the Class

The first factor asks whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "[T]he adequacy of representation

---

[6] The Court will scrutinize Class Counsel's billing records once Plaintiffs separately move for fees and costs. *See* Berman Decl. ¶ 26 ("Plaintiffs' motion for fees, costs, and expenses will be filed 35 days prior to the end of the objection and opt-out period and well in advance of the Fairness Hearing."). It should be noted that 67,500 hours is a sizable number, even for a lengthy case.

requirement . . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

In granting class certification, the Court has already found that Named Plaintiffs have no conflicts of interest and can adequately represent Class Members. *See* Docket No. 279 at 20–21. That remains the case. Moreover, Named Plaintiffs and Class Counsel have vigorously prosecuted this action for more than five years, through motion practice, extensive initial discovery, class certification, and formal mediation.

This factor therefore weighs in favor of approval.

### 2. Arms-Length Negotiation

The second factor asks whether "the [settlement] proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).

Here, the parties reached settlement under the supervision of Judge Kim; indeed, the Settlement Agreement is based on Judge Kim's Mediator's Proposal. Berman Decl. ¶ 12. Thus, the settlement proposal is the product of arm's-length bargaining. Further, the parties have conducted extensive discovery, and Class Counsel has reviewed more than 8.3 million pages of Ford's documents, analyzed MFT source code, and deposed fourteen Ford fact witnesses and five Ford experts. Berman Decl. ¶ 4. This gave Class Counsel adequate information to gauge the value of the class claims and assess the adequacy of the settlement terms. *See Hanlon*, 150 F.3d at 1027 (affirming approval of settlement after finding "no evidence to suggest that the settlement was negotiated in haste or in the absence of information illuminating the value of plaintiffs' claims").

Accordingly, the Settlement Agreement "appears to be the product of serious, informed, non-collusive negotiations." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079–80. This factor weighs in favor of approval.

### 3. Relief Provided for the Class

The third factor requires the Court to consider whether "the relief provided for the class is

14

adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).

          a.      <u>Costs, Risks, and Delay of Trial and Appeal</u>

In accordance with Rule 23(e)(2)'s instruction to evaluate "the costs, risks, and delay of trial and appeal," courts assess "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial." *Hanlon*, 150 F.3d at 1026. This inquiry focuses on "substantive fairness and adequacy," and evaluates "plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

Plaintiffs acknowledge that there are three notable weaknesses in their case. First, their implied warranty claims are difficult to prove. Mot. at 21. To succeed on their implied warranty claims, Plaintiffs must establish that "their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit" for their ordinary purpose. Docket No. 383 at 9. The theory of liability underpinning all their certified claims (implied warranty, express warranty, and negligence) is that all versions of the MFT software up to and including version 3.6 are inherently defective. Mot. at 21. But Ford represents that it has evidence of a significant drop-off in warranty repairs and software updates, and survey data indicating improvements in MFT performance, after MFT version 3.5 was introduced. Berman Decl., Exh. I at 6. Ford also has evidence that "every Plaintiff had driven their Class Vehicles for tens of thousands of miles without a major accident." *Id.* Moreover, Ford has filed a motion in limine to exclude any statements from Ford engineers, executives, or employees regarding the pre-release quality of most versions of the MFT software. Plaintiffs concede that if this motion is successful, they would "lose a large amount of the best evidence to demonstrate that the software versions were defective." *Id.* Thus, there is a substantial risk that a jury could find that versions 3.5 and 3.6 had mitigated the alleged MFT defects to a sufficient degree that they longer

persistently impaired the safety, reliability, or operability of the Class Vehicles. *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010) (finding that approval of a class settlement is appropriate when "there are significant barriers plaintiffs must overcome in making their case").

Second, Plaintiffs recognize potential challenges to their damages model, premised on the benefit-of-the-bargain theory that, had they known the MFT system was inherently defective, they would either have paid less for their vehicles or not purchased them at all. Mot. at 21. Their experts, Dr. Boedeker and Dr. Arnold, conducted analyses to calculate Plaintiffs' damages under such a theory. However, the Court had observed at the class certification stage that

> Dr. Arnold's calculations assume that all the money paid by class members for their MFT systems is a loss; in other words, the MFT system had no value whatsoever at the time of purchase. This assumption is contradicted by Ford's evidence that Plaintiffs still use the MFT's navigation, Bluetooth, and backup camera features, suggesting that MFT, for all its alleged faults, had some utility and residual value.

Docket No. 279 at 7–8. The Court further pointed out that "Dr. Arnold's assumption seems inconsistent with the evidence presented by Dr. Boedeker" that suggested "consumers were still willing to pay at least $551 for a defective MFT system." *Id.* at 8. In light of these issues, it is possible that Ford could "convince a jury that the experts' calculations did not properly account for any residual utility of the MFT system, after the MFT defects were taken into account." Mot. at 22. In other words, Plaintiffs may not succeed in their theory of damages even if they are able to establish liability.

Third, Plaintiffs point to the risk arising from "the inherent complexity of trying class claims for express warranty, implied warranty, and negligence under the laws of seven states, in addition to 21 individual Plaintiffs' claims under the laws of twelve states," even if the trial would be bifurcated. Mot. at 22. "Complex litigation is inherently uncertain." *Mego Fin. Corp.*, 213 F.3d at 463. The uncertainty in this case is particularly pronounced given the significant hurdles Plaintiffs face to prevailing on their claims at trial, which justify a reduction in the percentage of their settlement recovery. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

On the other side of the scale, the risk to Plaintiffs of maintaining class action status

16

throughout the trial does not appear to be substantial. The Court has already certified the seven

state classes, and resolved a decertification motion and a motion for summary judgment as to

certain certified claims. The Ninth Circuit has also rejected a Rule 23(f) appeal of the class

certification order. Ford notes, however, that the damages phase of a trial could still present

individualized issues of proof that complicate a classwide verdict. This factor therefore does not

lean strongly in either direction.

To assess whether the value of the settlement is adequate in light of the above risks, the

Court compares the settlement amount to the parties' estimates of the maximum amount of

damages recoverable in a successful litigation. *Mego Fin. Corp.*, 213 F.3d at 459. Plaintiffs

estimate that the maximum value of their claims is approximately $300 million. Thus, the

guaranteed minimum recovery of $17 million under the Settlement Agreement represents 5.7% of

the maximum possible recovery.[7] This percentage does not account for the value of the free

dealer-installed upgrades to version 3.10 of MFT that will be available for Class Members under

the Settlement Agreement. It also does not include the reimbursements Ford will provide to Class

Members who paid out-of-pocket for post-warranty MFT repairs (although Ford's counsel

conceded at the January 24, 2019 hearing that Ford does not expect to receive many post-warranty

reimbursement claims).

"[T]he very essence of a settlement is compromise." *Officers for Justice v. Civil Serv.

Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

Accordingly, "[t]he fact that a proposed settlement may only amount to a fraction of the potential

recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and

should be disapproved." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir.

1998) (citation omitted). The expected recovery rate here of approximately 6% is on the lower

end of settlements approved in this district. However, as discussed above, there are several

deficiencies in Plaintiffs' case that could jeopardize their recovery at trial. In such circumstances,

---

[7] If the claims rate turns out to be higher than the assumed 7%, the value of the settlement would
be greater. For example, if the claims rate is 15%, the recovery under the Settlement Agreement
would be 6.7% of the maximum recovery at trial.

courts have approved settlements below the 10% threshold that reflect the plaintiffs' judgment that "a deeply discounted recovery is better than the substantial likelihood of recovering nothing." *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016 WL 5907869, at *8 (N.D. Cal. Oct. 11, 2016). *See, e.g.*, *id.* at *7 (approving settlement representing 8.1% of the full verdict value in recognition of the "daunting" risks plaintiffs faced in proving their case); *In re Uber FCRA Litig.*, No. 14-CV-05200-EMC, 2017 WL 2806698, at *7 (N.D. Cal. June 29, 2017) (approving a settlement worth less than 7.5% of the possible verdict where the class faced "substantial risks and obstacles" to prevailing at trial, as well as "the inevitable expense of litigating a large, complex case through trial"); *Balderas v. Massage Envy Franchising, LLC*, No. 12-CV-06327 NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (approving a settlement representing 5% of the maximum recovery in light of "the strengths of plaintiff's case and the risks and expense of continued litigation").

Given the substantial obstacles Plaintiffs must surmount if litigation continues, and the benefits Class Members will derive from the free upgrades to MFT version 3.10 on top of the monetary relief, the Court concludes that the settlement amount is reasonable.

b. <u>Method of Distributing Relief to the Class</u>

As discussed in Part II.B.1, *supra*, the Court determines that the composite method of distributing relief to the Class, consisting of a claims-made portion and a unilateral payment portion, is appropriate and effective. The current Settlement Agreement also eliminates a concern that was present under the provisional settlement that the claims process would not begin until after final approval of the settlement is granted. *See* Docket No. 442 at 3. Now, Class Members will be able to submit claims starting from 45 days after preliminary approval, and the claims process will close 135 days later, before the fairness hearing. *See* Mot. at 1; NSA §§ II.B, II.C. The Court will therefore have the claims rate data before it when ruling on final approval.

The Court further approves the method and content of the proposed Notices of Settlement. Notice will be sent via U.S. mail (the Short Form Class Notice), email (the Email Notice), and posted on the settlement website (the Long Form Class Notice). NSA § III.C. If any Short Form Class Notice is returned as undeliverable, the Settlement Administrator will perform a "reasonable

18

search" for a more current name and/or address and resend the notice. *Id.* This method of notice satisfies due process. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 254 (N.D. Cal. 2015) (approving system of mailing settlement notices to last-known addresses and using skip traces to re-send undeliverable mail as "reasonably calculated to provide notice to class members"). Before the March 21, 2019 hearing, the Court suggested some changes to the content of the Notices to bring them into compliance with the requirements of Rule 23(c)(2)(B) and this district's Procedural Guidance for Class Action Settlements. *See* Docket No. 523. The parties have incorporated these suggestions into the final version of the Notices. *See* Docket No. 525.

Accordingly, this factor weighs in favor of approval.

### c. Attorneys' Fees

As discussed in Part II.B.3, *supra*, the Court concludes that Class Counsel's request for $8,904,595 in fees and $7,095,405 in costs is not unreasonable on its face.

### 4. Equitable Treatment of Class Members

The Settlement Agreement does not improperly grant preferential treatment to certain segments of the class. Under the claims process, Class Members who sought more repairs receive a greater recovery because the number of repair attempts serves as a proxy for the seriousness of their MFT defects. Establishing a persistent defect is a requirement of a breach of warranty claim. *See* Docket No. 383 at 9 (holding that Plaintiffs can establish a breach of implied warranty "by introducing evidence that their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit" for their ordinary purpose). Similarly, the minimum threshold of two instances of unsatisfactory MFT performance is a proxy for the persistency of MFT defects. Under the Unilateral Payment Process, only original owners and lessees will receive compensation because Ford does not have ownership information for Class Vehicles that were purchased used.

Plaintiffs also intend to apply for $9,000 service awards for each Named Plaintiff. NSA § II.F. "[T]he Ninth Circuit has recognized that service awards to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *9 (N.D. Cal. Apr. 29, 2011) (citing

United States District Court
Northern District of California

1   *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003)). However, the service award must be

2   "reasonable," and the Court "must evaluate their awards individually, using 'relevant factors

3   includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to

4   which the class has benefitted from those actions, ... the amount of time and effort the plaintiff

5   expended in pursuing the litigation ... and reasonabl[e] fear[s of] workplace retaliation.'" *Staton*,

6   327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)) (alterations in

7   original). A "very large differential in the amount of damage awards between the named and

8   unnamed class members" must be justified by the record. *Id.* at 978. A $9,000 service award is

9   on the high end. *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *7

10  (N.D. Cal. Feb. 6, 2012) ("[I]ncentive payments of $10,000 or $25,000 are quite high and . . . as a

11  general matter, $5,000 is a reasonable amount.").

12          The Named Plaintiffs represent that they have devoted significant time and effort to this

13  case, including preparing declarations, sitting for full-day depositions, and presenting their Class

14  Vehicles in response to Ford's requests for inspection. Berman Decl. ¶¶ 22–23. The request,

15  therefore, is not unreasonable on its face. *Compare, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016

16  (9th Cir. 1998) (upholding $25,000 incentive payment in case with a $13 million settlement where

17  class representative spent "hundreds" of hours with class counsel) *with, e.g.*, *Knight v. Red Door

18  Salons, Inc.*, No. 08–01520, 2009 WL 248367, at *7 (N.D. Cal. Feb.2, 2009) (awarding $5,000 to

19  named plaintiffs who spent 40–50 hours each to help recover $500,000).

20  D.      <u>Procedural Guidance for Class Action Settlements</u>

21          Finally, the Court notes that the proposed Settlement sufficiently conforms to the standards

22  articulated in this district's updated Procedural Guidance for Class Action Settlements. For

23  example, the parties have provided the necessary information about the Settlement for the Court to

24  determine that its terms are sufficiently fair, reasonable, and adequate. *See* Proc. Guidance for

25  Class Action Sett. ¶ 1. The parties have justified their choice of JND as Settlement Administrator.

26  *See id.* ¶ 2; Mot. at 16; Berman Decl., Exh. C. And the Court finds that the language of the class

27  notices is appropriate and that the means of notice is the "best notice . . . practicable under the

28  circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also* Proc. Guidance for Class Action Sett. ¶¶ 3–

1    5, 9.

2                          **III.    CONCLUSION**

3           For the foregoing reasons, the Settlement Agreement is fair, adequate, and reasonable.

4    Accordingly, the Court **GRANTS** the motion for preliminary approval.  It is further **ORDERED**

5    that:

6           (1)     The Settlement Classes are defined as follows:

7                          "California Settlement Class" means all persons or entities who
                           purchased or leased a Ford or a Lincoln vehicle in California from
8                          Ford Motor Company or through a Ford Motor Company Dealership
                           before August 9, 2013, which vehicle was equipped with a MyFord
9                          Touch or MyLincoln Touch in-vehicle information and
                           entertainment system.
10
                           "Massachusetts Settlement Class" means all persons or entities who
11                         purchased or leased a Ford or a Lincoln vehicle in Massachusetts
                           from Ford Motor Company or through a Ford Motor Company
12                         Dealership before August 9, 2013, which vehicle was equipped with
                           a MyFord Touch or MyLincoln Touch in-vehicle information and
13                         entertainment system.

14                         "New Jersey Settlement Class" means all persons or entities who
                           purchased or leased a Ford or a Lincoln vehicle in New Jersey from
15                         Ford Motor Company or through a Ford Motor Company Dealership
                           before August 9, 2013, which vehicle was equipped with a MyFord
16                         Touch or MyLincoln Touch in-vehicle information and
                           entertainment system.
17
                           "North Carolina Settlement Class" means all persons or entities who
18                         purchased or leased a Ford or a Lincoln vehicle in North Carolina
                           from Ford Motor Company or through a Ford Motor Company
19                         Dealership before August 9, 2013, which vehicle was equipped with
                           a MyFord Touch or MyLincoln Touch in-vehicle information and
20                         entertainment system.

21                         "Ohio Settlement Class" means all persons or entities who
                           purchased or leased a Ford or a Lincoln vehicle in Ohio from Ford
22                         Motor Company or through a Ford Motor Company Dealership
                           before August 9, 2013, which vehicle was equipped with a MyFord
23                         Touch or MyLincoln Touch in-vehicle information and
                           entertainment system.
24
                           "Virginia Settlement Class" means all persons or entities who
25                         purchased or leased a Ford or a Lincoln vehicle in Virginia from
                           Ford Motor Company or through a Ford Motor Company Dealership
26                         before August 9, 2013, which vehicle was equipped with a MyFord
                           Touch or MyLincoln Touch in-vehicle information and
27                         entertainment system.

28                         "Washington Settlement Class" means all persons or entities who

purchased or leased a Ford or a Lincoln vehicle in Washington from Ford Motor Company or through a Ford Motor Company Dealership before August 9, 2013, which vehicle was equipped with a MyFord Touch or MyLincoln Touch in-vehicle information and entertainment system.

(2)     Excluded from all of the Settlement Classes are: (a) all federal court judges who have presided over this case and any members of their immediate families; (b) all entities and natural persons that elect to exclude themselves from the Settlement Classes; (c) all entities and natural persons that have litigated claims involving MFT against Ford to final judgment; (d) all entities and natural persons who, via a settlement or otherwise, delivered to Ford releases of their claims involving MFT; (e) Ford's employees, officers, directors, agents, and representatives, and their family members; and (f) all entities and natural persons who submitted a valid request for exclusion following the Notice of Pendency of Class Action and did not revoke his, her, or its exclusion and re-enter the Settlement Classes.

(3)     Named Plaintiffs Jennifer Whalen, Center for Defensive Driving, Jason Connell, William Creed, Daniel Fink, Leif Kirchoff, Joshua Matlin, Henry Miller-Jones, Jerome Miskell, Darcy Thomas-Maskrey, and Richard Decker Watson (the "Named Plaintiffs"), all of whom were representatives of the certified litigation classes, are appointed to serve as representatives of the Settlement Classes.

(4)     The appointment of Steve W. Berman Esq., Craig Spiegel Esq., Catherine Y.N. Gannon Esq., Roland Tellis Esq., Mark Pifko Esq., Adam J. Levitt Esq., John E. Tangren Esq., Nicholas E. Chimicles Esq., Benjamin F. Johns Esq., and the law firms Hagens Berman Sobol Shapiro LLP, Baron & Budd, P.C., DiCello Levitt & Casey LLC, and Chimicles Schwartz Kriner & Donaldson-Smith LLP, to serve as Class Counsel is confirmed.

(5)     Ford is authorized and directed to establish an administrative mechanism for receiving requests from Settlement Class Members to exclude themselves from the Settlement Classes, as set forth in the Settlement Agreement.

(6)     In conjunction with moving for final approval, Class Counsel may apply to the Court

1  for an award of attorneys' fees and expense reimbursement covering all legal services

2  provided to the Named Plaintiffs and Settlement Class Members in connection with the

3  Litigation and settlement of the Litigation (the "Fee and Expense Application").  The

4  Fee and Expense Application shall be filed by August 16, 2019.

5  (7)  Also in conjunction with moving for final approval, Class Counsel may submit by

6  August 16, 2019, an application for any service award for each of the 19 Plaintiffs, to

7  be paid by Ford separately from the fee and expense award.

8  (8)  Pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure and 28 U.S.C.

9  § 1715(d), a hearing (the "Fairness Hearing") shall be held on November 21, 2019, at

10  1:30 p.m. before the undersigned at United States Federal Building and Courthouse,

11  450 Golden Gate Avenue, San Francisco, CA 94102, for the purpose of finally

12  determining whether the proposed Settlement Agreement is fair, reasonable, and

13  adequate and should be approved by the Court via entry of the Final Judgment and

14  Order attached to the Settlement Agreement and, if so, what amount of reasonable

15  attorneys' fees and reasonable reimbursement of costs and expenses should be awarded

16  to Class Counsel, and whether the service awards shall be awarded.

17  (9)  On or before June 10, 2019, Ford shall cause to be delivered by United States Postal

18  Service first-class mailing, postage prepaid, copies of the Short Form Class Notice

19  containing the language in Exhibit 1 to the Settlement Agreement to be mailed to the

20  current address of each original and subsequent purchaser or lessee of a Class Vehicle

21  for whom Ford can reasonably obtain an address.  On or before June 10, 2019, Ford

22  shall cause to be transmitted via electronic mail, copies of the Email Notice containing

23  the language in Exhibit 2 to the Settlement Agreement to the Settlement Class

24  Members for whom an e-mail address was previously obtained from Ford's records.

25  On or before May 10, 2019, Ford shall cause to be posted on a settlement website that

26  it shall establish and maintain the Long Form Class Notice containing the language in

27  Exhibit 3 to the Settlement Agreement.  The Court finds that such individual notice is

28  the best notice practicable under the facts and circumstances of this case.

(10) If it has not done so already, Ford shall provide to the Attorney General of the United States and the attorneys general of the states and territories in which Settlement Class Members reside the information specified in 28 U.S.C. § 1715 by the deadline established in that statute.

(11) Ford shall provide a declaration from it or the Settlement Administrator attesting to its compliance with its notice obligations not less than seven days prior to the Fairness Hearing. The declaration shall include:

- the total number of Settlement Class Members;
- a sample copy of the Class Notice;
- the process by which Ford obtained a mailing list for the Short Form Class Notice;
- the number of Short Form Class Notices mailed and the range of dates within which such Notices were mailed; and
- the number of Short Form Class Notices returned to Ford by the United States Postal Service.

(12) Each potential Settlement Class Member who wishes to be excluded from the Settlement Classes must submit via United States Postal Service first-class mailing a Request for Exclusion to the address specified in the Class Notice, which address shall be a site under Ford's control. Such Requests for Exclusion must be received at that address on or before September 20, 2019.  To be effective, the Request for Exclusion must:

- Include the Settlement Class Member's full name, address, and telephone number;
- Identify the model, model year, and vehicle identification number of the Settlement Class Member's Class Vehicle(s);
- Explicitly and unambiguously state his, her, or its desire to be excluded from the Settlement Classes in *In re MyFord Touch Consumer Litigation*; and
- Be individually and personally signed by the Member of the Settlement Classes

24

1      (if the Member of the Settlement Classes is represented by counsel, it must also

2      be signed by such counsel).

3  (13)  Any Settlement Class Member who fails to submit a timely and complete Request for

4      Exclusion to the required address, or communicates his, her or its intentions regarding

5      membership in the Settlement Classes in an ambiguous manner, shall be subject to and

6      bound by all proceedings, orders, and judgments of this Court pertaining to the

7      Settlement Class pursuant to the Settlement Agreement unless determined otherwise by

8      the Court. Any communications from Settlement Class Members (whether styled as an

9      exclusion request, an objection, or a comment) as to which it is not readily apparent

10     whether the Settlement Class Member meant to request an exclusion from the Class

11     will be evaluated jointly by counsel for the Parties, who will make a good-faith

12     evaluation if possible.  Any uncertainties about whether a Settlement Class Member

13     requested to exclude himself, herself, or itself from the Settlement Classes will be

14     resolved by the Court.

15  (14)  The Notice Administrator shall tabulate Requests for Exclusion from prospective

16     Settlement Class Members and shall report the names and addresses of such persons to

17     the Court and to Class Counsel no less than seven days before the Fairness Hearing.

18  (15)  Any Settlement Class Member who intends to object to the fairness of the Settlement

19     Agreement (including Class Counsel's Fee and Expense Application) must, by

20     September 20, 2019, file any such objection with the Court. Any objection to the

21     Settlement Agreement must be individually and personally signed by the Settlement

22     Class Member (if the Settlement Class Member is represented by counsel, the objection

23     additionally must be signed by such counsel), and must include:

24        &bull;  The case name and number (*In Re MyFord Touch Consumer Litigation*, Case

25           Number 13-cv-3072-EMC);

26        &bull;  The objecting Member of the Settlement Classes's full name, address, and

27           telephone number;

28        &bull;  The model, model year, and VIN of the objecting Member of the Settlement

Classes's Class Vehicle, along with Proof of Membership in a Settlement Class;

- A written statement of all grounds for the objection, accompanied by any legal support for the objection;

- Copies of any papers, briefs, or other documents upon which the objection is based;

- A list of all cases in which the Member of the Settlement Classes and/or his or her counsel filed or in any way participated—financially or otherwise—objecting to a class settlement during the preceding five years;

- The name, address, email address, and telephone number of every attorney representing the objector; and

- A statement indicating whether the objector and/or his or her counsel intends to appear at the Fairness Hearing and, if so, a list of all persons, if any, who will be called to testify in support of the objection.

(16) The parties to this Litigation and to the Settlement Agreement shall file any memoranda or other materials in support of final approval of the Settlement Agreement, including in response to any timely and properly filed objection to the Settlement Agreement, no later than November 7, 2019, fourteen days prior to the Fairness Hearing. Such materials shall be served on Class Counsel, counsel for Ford, and on any member of the Settlement Classes (or their counsel, if represented by counsel) to whose objection to the Settlement Agreement the memoranda or other materials respond.

(17) Following the Fairness Hearing, and based upon the entire record in this matter, the Court will decide whether the Settlement Agreement should be finally approved and, if so, what amount of reasonable fees and expenses should be awarded to Class Counsel, and whether a service award of no more than $9,000 service award for each of the 19 Plaintiffs, will be awarded. If the Court determines the Settlement is reasonable, fair, and adequate, the Court will issue a Final Order and Judgment memorializing its decision. The Court will also issue an Order awarding reasonable fees and expenses to

Class Counsel in an amount determined by the Court but in any event of no more than $16,000,000.

(18)    Pending final determination of the joint application for approval of this Settlement Agreement, all proceedings in this Litigation other than settlement approval proceedings shall be stayed and all Members of the Settlement Classes who do not validly request exclusion from the Settlement Classes shall be enjoined from commencing or prosecuting any action, suit, proceeding, claim, or cause of action in any court or before any tribunal based on based on alleged malfunctions of the MFT in Ford and Lincoln vehicles.

This order disposes of Docket No. 515.

**IT IS SO ORDERED**.

Dated: March 28, 2019

_____
EDWARD M. CHEN
United States District Judge